1 | **PHILLIP A. TREVIÑO** [SBN 121119]
137 N. Larchmont Blvd., #801
2 | Los Angeles, California 90004
Telephone: (213) 949-8000
3 |
Attorney for Petitioner
4 | **ERNEST DYKES**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

ERNEST DYKES,           )   **Case No. 11-CV-04454-SI**
                 )
      Petitioner,  )
                 )   PETITION FOR WRIT OF HABEAS
        v.         )   CORPUS UNDER 28 U.S.C. 2254
                 )
MICHAEL MARTEL, Acting Warden, )
                 )
      Respondent.  )
_____)   **DEATH PENALTY CASE**

# TABLE OF CONTENTS

I.    INITIAL ALLEGATIONS.. . . . . . . . . . . . . . . . . .    2

II.   JURISDICTION. . . . . . . . . . . . . . . . . . . . . .   13

III.  FACTUAL SUMMARY.. . . . . . . . . . . . . . . . . . . .   13

IV.   AEDPA.. . . . . . . . . . . . . . . . . . . . . . . . .   17

V.    INCORPORATION OF EXHIBITS;
      REQUEST FOR JUDICIAL NOTICE.. . . . . . . . . . . . . .   25

VI.   GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS. . . . . .   26

VII.  PROCEDURAL HISTORY OF THE CASE. . . . . . . . . . . . .   29

VIII. STATEMENT OF FACTS OF THE OFFENSES. . . . . . . . . . .   32

IX.   PETITIONER'S CLAIMS IN FEDERAL HABEAS.. . . . . . . . .   55

      Claim 1
            PETITIONER'S DEATH SENTENCE IS INVALID BECAUSE CALIFORNIA'S DEATH
            PENALTY SCHEME IS FUNDAMENTALLY FLAWED IN NUMEROUS RESPECTS; BOTH ON
            ITS FACE AND AS APPLIED TO PETITIONER.. . . . . . . . . . . . . . .   55

            Synopsis. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   55

            CALIFORNIA'S DEATH PENALTY STATUTE OF OVER-INCLUSIVE AS DEMONSTRATED
                  BY SECTION 190.2 AND AS APPLIED TO PETITIONER.. . . . . . .   57

            CALIFORNIA'S DEFINITION AND APPLICATION OF AGGRAVATING AND MITIGATING
                  FACTORS IN SECTION 190.3 FURTHER INVALIDATE ITS DEATH PENALTY
                  STATUTE ON ITS FACE AND AS APPLIED TO PETITIONER
                  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   61

            AS APPRENDI AND RING CONFIRM, THE FAILURE TO REQUIRE THE NECESSARY
                  PENALTY PHASE DETERMINATIONS TO BE MADE BEYOND A REASONABLE DOUBT
                  IS  OFFENSIVE TO THE FEDERAL CONSTITUTION.. . . . . . . . .   67

            CALIFORNIA LAW VIOLATES THE FEDERAL CONSTITUTION BY FAILING TO REQUIRE
                  THAT THE JURY MAKE WRITTEN FINDINGS REGARDING THE AGGRAVATING
                  FACTORS THE JURY BELIEVES JUSTIFY A DEATH SENTENCE; CALIFORNIA'S
                  STATUTORY FRAMEWORK DOES NOT OTHERWISE SQUARE WITH FEDERAL
                  LAW.. . . . . . . . . . . . . . . . . . . . . . . . . . . .   79

            THE DEATH PENALTY IS DISPROPORTIONATE TO PETITIONER'S CULPABILITY AND
                  THEREFORE VIOLATES THE EIGHTH AMENDMENT.. . . . . . . . . .   84

            LACK OF INTER-CASE PROPORTIONALITY REVIEW.. . . . . . . . . . . .   86

**TABLE OF CONTENTS**
**(continued)**

CALIFORNIA GIVES PROSECUTORS VIRTUALLY UNBRIDLED DISCRETION TO DECIDE IN WHICH SPECIAL CIRCUMSTANCE MURDER CASES THE DEATH PENALTY WILL BE SOUGHT, AND THIS VIOLATES THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS. . . . . . . . . . . . . . . . . . . . . . . . 93

AS APPLIED TO PETITIONER, EACH AND ALL OF THE ABOVE DEFECTS HAVE CONTRIBUTED TO A DEATH SENTENCE IN VIOLATION OF FEDERAL CONSTITUTIONAL LAW. . . . . . . . . . . . . . . . . . . . 94

IMPOSITION OF THE DEATH PENALTY IN CALIFORNIA TODAY IS A VIOLATION OF THE FEDERAL CONSTITUTION'S PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENT. . . . . . . . . . . . . . . . . . . . . . . 95

**Claim 2**

TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE IN MITIGATION AT PETITIONER'S PENALTY PHASE TRIAL. . . . 99

Synopsis. . . . . . . . . . . . . . . . . . . . . . . . . 100

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . 101

THE LIMITED EXTENT OF TRIAL COUNSEL'S INVESTIGATION.. . . . . . 105
        Investigation of Petitioner's Juvenile Arson. . . . . . . 105
        Investigator Services.. . . . . . . . . . . . . . . . 105
        Trial Counsel's Investigative Efforts.. . . . . . . . . . 106
        Mental Health and Social History Investigation. . . . . . 107

EVIDENCE OF REDEEMING QUALITIES IN PETITIONER THAT COULD HAVE BEEN PRESENTED TO THE SENTENCING JURY. . . . . . . . . . . . . 112

MITIGATING EVIDENCE OF PETITIONER'S IMMEDIATE AND CONTEMPORANEOUS REMORSE THAT COULD HAVE BEEN PRESENTED TO THE SENTENCING JURY . . . . . . . . . . . . . . . . . . . . . . . . . 118

MENTAL HEALTH MITIGATION EVIDENCE.. . . . . . . . . . . . . 133

**Claim 3**

THE JURY COMMITTED MISCONDUCT IN TWO WAYS: (A) IT PUT PETITIONER IN JEOPARDY FOR A CRIME OF WHICH HE HAD ALREADY BEEN ACQUITTED, AND (B) IT CONSIDERED EXTRINSIC EVIDENCE, ALL IN VIOLATION OF FEDERAL AND STATE LAW.. . . . . . . . . . . . . . . . . . . . . . . . . . 138

Synopsis. . . . . . . . . . . . . . . . . . . . . . . . . 141

**TABLE OF CONTENTS**
(continued)

PERMITTING THE JURY TO RECONSIDER THE ISSUE OF PREMEDITATION VIOLATED PETITIONER'S RIGHTS BECAUSE PETITIONER WAS ACQUITTED OF PREMEDITATED MURDER.. . . . . . . . . . . . . . . . . . 145

THE JURORS WERE TAINTED BY EXTRANEOUS INFLUENCES AND THEIR EXPOSURE TO THESE EXTRANEOUS MATTERS VIOLATED FEDERAL CONSTITUTIONAL CONCERNS . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

Synopsis. . . . . . . . . . . . . . . . . . . . 151

CONTENT OF THE JUROR STATEMENTS.. . . . . . . . . . . . 153

THE TRIAL COURT ERRED IN REFUSING TO CONSIDER THE JUROR STATEMENTS. . . . . . . . . . . . . . . . . . . 155

**Claim 4**
CALIFORNIA'S DEATH PENALTY IS CONSTITUTIONALLY OFFENSIVE IN HOW IT DIRECTS A SENTENCING JURY TO EVALUATE AND WEIGH EVIDENCE IN MITIGATION AND AGGRAVATION.. . . . . . . . . . . . . . . . . . 159

THE JURY WAS MISLED REGARDING HOW IT SHOULD WEIGH THE AGGRAVATING AND MITIGATING FACTORS IN THIS MATTER.. . . . . . . . . . . . 160

CALJIC NO. 8.88, AS GIVEN HEREIN, VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.. . . . . . . . . . . . . . . . . 170

**Claim 5**
CALIFORNIA'S DEATH PENALTY SCHEME VIOLATES THE FEDERAL CONSTITUTION IN HOW AND WHAT IT ALLOWS JURIES TO USE AS EVIDENCE IN AGGRAVATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 179

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT, BEFORE CONSIDERING A FACTOR IN AGGRAVATION, IT MUST UNANIMOUSLY FIND BOTH THAT THE DEFENDANT COMMITTED THE ACT IN AGGRAVATION AND THE ACT CONSTITUTED AN IMPLIED THREAT OF FORCE OR VIOLENCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . 180

Background. . . . . . . . . . . . . . . . . . . 180

CALIFORNIA LAW VIOLATES THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION BY FAILING TO REQUIRE UNANIMOUS JURY AGREEMENT ON AGGRAVATING FACTORS.. . . . . . . . . . 183

THE ADMISSION OF EVIDENCE THAT PETITIONER WAS ARRESTED FOR POSSESSION OF A LOADED AND CONCEALED WEAPON VIOLATED THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.. . . . . . . . . . . . 187

**TABLE OF CONTENTS**
**(continued)**

**Claim 6**
        THE JURY SPECULATED REGARDING MATTERS ABOUT WHICH EVIDENCE HAD NOT BEEN
        PRESENTED BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT IT NOT TO DO SO.
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 193

**Claim 7**
        THE METHOD OF EXECUTION EMPLOYED IN CALIFORNIA VIOLATES THE FOURTEENTH
        AMENDMENT  GUARANTEE  OF  PROCEDURAL  DUE  PROCESS  AND  THE  EIGHTH
        AMENDMENT'S PROHIBITION UPON CRUEL AND UNUSUAL PUNISHMENT
        . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 199

        THE  DEPARTMENT  OF  CORRECTIONS'  FAILURE  TO  ADOPT  THE  REGULATIONS
                MANDATED BY PENAL CODE § 3604 VIOLATES PETITIONER'S RIGHT TO
                PROCEDURAL DUE PROCESS... . . . . . . . . . . . . . . . 200

        CALIFORNIA'S LETHAL INJECTION PROCEDURE VIOLATES THE EIGHT AMENDMENT
                PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS.. . . . 206

**Claim 8**
        THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS WHICH OCCURRED DURING THE
        TRIAL COMPELS REVERSAL EVEN IF NO SINGLE ISSUE, STANDING ALONE, WOULD
        DO SO.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

**X.      PRAYER FOR RELIEF..** . . . . . . . . . . . . . . . . . . . 212

**VERIFICATION.** . . . . . . . . . . . . . . . . . . . . . . . . . . . 213

**TABLE OF AUTHORITIES**

**United States Supreme Court cases**

Addington v. Texas, 441 U.S. 418 (1979). . . . . . . . . . . . . 70

Almendarez-Torres v. United States, 523 U.S. 224 (1998). . . . . 70

Apprendi v. New Jersey, 530 U.S. 466 (2000). . . 68, 70, 71, 72, 73

Ashe v. Swenson, 397 U.S. 436 (1970). . . . . . . . . . . 146, 148

Atkins v. Virginia, 536 U.S. 304 (2002). . . . . . . . . 16, 55, 90

Barclay v. Florida, 463 U.S. 939 (1976). . . . . . . . . . . . . 86

Beck v. Alabama, 447 U.S. 625 (1980). . . . . . . 74, 93, 158, 169

Board of Regents v. Roth, 408 U.S. 564 (1972). . . . . . . . . . 151

Boumediene v. Bush, 553 U.S. 723 (2008). . . . . . . . . . . 22, 24

Boyde v. California, 494 U.S. 370 (1990). . . . . . . . . . . . 101

Boyde v. California, 494 U.S. 370 (1990). . . . . . . . . . . . 173

Brady v. Maryland, 373 U.S. 83 (1963). . . . . . . . . . . . . . 23

Brecht v. Abrahamson, 507 U.S. 619 (1993). . . . . . . . . . . . 27

Bullington v. Missouri, 451 U.S. 430 (1981). . . . . . . 70, 74, 146

Caldwell v. Mississippi, 472 U.S. 320 (1985). . . . . . . . . . 158

California v. Brown, 479 U.S. 538 (1987). . . . . . . . . . . . . 79

Case v. Nebraska, 381 U.S. 336 (1965). . . . . . . . . . . . . . 24

Coker v. Georgia, 433 U.S. 584 (1977). . . . . . . . . . . . 88, 97

Coleman v. Thompson, 501 U.S. 722 (1991). . . . . . . . . . . . 28

Cone v. Bell, 556 U.S. 449 (2009). . . . . . . . . . . . . . . . 21

Cullen v. Pinholster, 131 S. Ct. 1388 (2011). . . . . . . 20, 21, 22

Dent v. West Virginia, 129 U.S. 114 (1889). . . . . . . . . . . 151

Eddings v. Oklahoma, 455 U.S. 104 (1982). . . . . . . . . . 78, 93

**TABLE OF AUTHORITIES**
**(continued)**

Enmund v. Florida, 458 U.S. 782 (1982). . . . . . . . . 59, 88, 97

Estelle v. Gamble, 429 U.S. 97 (1976).. . . . . . . . . . . . 96

Evitts v. Lucey, 469 U.S. 387 (1985). . . . . . . . . . . . . 29

Ewing v. California, 538 U.S. 11 (2003).. . . . . . . . . . . 98

Ford v. Wainwright, 477 U.S. 399 (1986).24, 74, 83, 90, 92, 158, 169

Fry v. Pliler, 551 U.S. 112 (2007). . . . . . . . . . . . . . 27

Furman v. Georgia, 408 U.S. 238 (1972). 56, 59, 81, 87, 88, 90, 91, 95

Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . 16, 55, 56

Goldberg v. Kelly, 397 U.S. 254 (1970). . . . . . . . . . . . 151

Goss v. Lopez, 419 U.S. 565 (1975). . . . . . . . . . . . . . 151

Gregg v. Georgia, 428 U.S. 153 (1976).. . . . . . . . 79, 88, 91, 92

Griffin v. United States, 502 U.S. 46 (1991). . . . . . . . . 77

Harmelin v. Michigan, 501 U.S. 957 (1991).. . . . . . . 81, 84, 92

Harrington v. Richter, 131 S. Ct. 770 (2011). . . . . . . . 18, 21

Harris v. Nelson, 394 U.S. 286 (1969) . . . . . . . . . . . . 22

Hicks v. Oklahoma, 447 U.S. 343 (1980). . . . 79, 83, 164, 173, 175

House v. Bell, 547 U.S. 518 (2006). . . . . . . . . . . . . . 28

In re Winship, 397 U.S. 358 (1970). . . . . . . . . . . . 75, 77

Jefferson v. Upton, 560 U.S. _, 130 S. Ct. 2217 (2010). . . . . 24

Johnson v. Mississippi, 486 U.S. 578 (1988).. . . . . . . . . 149

Johnson v. Zerbst, 304 U.S. 458 (1938). . . . . . . . . . . . 24

Kansas v. Marsh, 548 U.S. 163 (2006). . . . . . . . . . . . . 57

Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).. . . . . . . . . . 23

**TABLE OF AUTHORITIES**
(continued)

Kelly v. South Carolina, 534 U.S. 246 (2001). . . . . . . . . . 158

Knowles v. Mirzayance, 556 U.S. 111 (2009). . . . . . . . . . .  22

Lindh v. Murphy, 521 U.S. 320 (1997). . . . . . . . . . . . .  17

Lockett v. Ohio, 438 U.S. 586 (1978). . . . . . . . . . . . . 172

Lockyer v. Andrade, 538 U.S. 63 (2003). . . . . . . . . . . .  18

Martinez v. Ryan, 132 S. Ct. 1309 (2012). . . . . . . . . . .  28

Mattox v. United States, 146 U.S. 140 (1892). . . . . . . . . 152

McFarland v. Scott, 512 U.S. 849 (1994).. . . . . . . . . . .  22

McKoy v. North Carolina, 494 U.S. 433 (1990). . . . . . . . .  75

Meachum v. Fano, 427 U.S. 215 (1976). . . . . . . . . . . . . 151

Miller-El v. Cockrell, 537 U.S. 322 (2003). . . . . . . . . .  20

Miller-El v. Dretke, 545 U.S. 231 (2005). . . . . . . . . . .  20

Mills v. Maryland, 486 U.S. 367 (1988). . . . . . . . . . . .  78

Monge v. California, 524 U.S. 721 (1998). . . . . . . . . 69, 74

Morrissey v. Brewer, 408 U.S. 471 (1982). . . . . . . . . . . 150

Murray's Lessee v. Hoboken Land and Improvement Co., 59 U.S. (18
     How) 272 (1855). . . . . . . . . . . . . . . . . . . . .  78

Panetti v. Quarterman, 551 U.S. 930 (2007). . . . . . . . . .  21

Parker v. Dugger, 498 U.S. 308 (1991).. . . . . . . . . . 92, 164

Parker v. Duke, 498 U. S. 308 (1991). . . . . . . . . . . . .  84

Penry v. Lynaugh, 492 U.S. 302 (1989).. . . . . . . . . . 101, 165

Perry v. Sindermann, 408 U.S. 593 (1972). . . . . . . . . . . 151

Proffitt v. Florida, 428 U.S. 242 (1976). . . . . . . . 78, 86, 88

Pulley v. Harris, 465 U.S. 37 (1984). . . . . . . . 58, 86, 87, 90

**TABLE OF AUTHORITIES**
(continued)

Ramdass v. Angelone, 530 U.S. 156 (2000). . . . . . . . . . . . 18

Remmer v. United States, 347 U.S. 227 (1954). . . . . . . . . . 152

Ring v. Arizona, 536 U.S. 584 (2002). . . . . . 68, 71, 72, 74, 166

Rompilla v. Beard, 545 U.S. 374 (2005). . . . . . . . . . . . . 21

Santosky v. Kramer, 455 U.S. 745 (1982).. . . . . . . . . . . . 70

Schiro v. Farley, 510 U.S. 222 (1994).. . . . . . . . . . . . 146

Sealfon v. United States, 332 U.S. 575 (1948).. . . . . . . . . 148

Shafer v. South Carolina, 532 U.S. 36 (2001). . . . . . . . . . 158

Simmons v. South Carolina, 512 U.S. 154 (1994). . . . . . . . . 176

Smith v. Bennett, 365 U.S. 708 (1961).. . . . . . . . . . . . . 24

Strickland v. Washington, 466 U.S. 668 (1984).. . . . . . . . . 29

Stringer v. Black, 503 U.S. 222 (1992). . . . . . . . . . . . . 174

Sullivan v. Louisiana, 508 U.S. 275 (1993). . . . . . . . . 74, 173

Taylor v. Kentucky, 436 U.S. 478 (1978).. . . . . . . . . . . . 28

Thompson v. Oklahoma, 487 U.S. 815 (1988).. . . . . . . . . . . 88

Townsend v. Sain, 372 U.S. 293 (1963).. . . . . . . . . . . 22, 80

Trop v. Dulles, 356 U.S. 86 (1958). . . . . . . . . . . . . . . 96

Tuilaepa v. California, 512 U.S. 967 (1994).. . . . . . 62, 84, 163

Walton v. Arizona, 497 U.S. 639 (1990). . . . . . . . . . . 74, 166

Wiggins v. Smith, 539 U.S. 510 (2003).. . . . . . . . . . . . . 19

Woodson v. North Carolina, 428 U.S. 280 (1976). . . . . . . 24, 94

Ylst v. Nunnemaker, 501 U.S. 797 (1991).. . . . . . . . . . . . 20

Young v. Ragen, 337 U.S. 235 (1949).. . . . . . . . . . . . . . 24

Zant v. Stephens, 462 U.S. 862 (1983).. . . . . . 56, 94, 164, 166

1

**TABLE OF AUTHORITIES**
**(continued)**

2

3

4    **United States Courts of Appeal cases**

5    Benn v. Lambert, 283 F.3d 1040 (9th Cir. 2002). . . . . . . . .  19

6    Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003). . . . . . . .  28

7    Bittaker v. Woodford, 331 F.3d 715 (9th Cir. 2003)(en banc).. .  27

8    Brown v. Smith, 551 F.3d 424 (6th Cir. 2008). . . . . . . . . .  23

9    Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003). . . . . . . . 116

10   Caro v. Calderon, 165 F.3d 1223 (9th Cir. 1999).. . . . . . . . 101

11   Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995). . . . .  101, 107

12   Delap v. Dugger, 890 F.2d 285 (11th Cir. 1989). . . . . . . . . 147

13   Duhaime v. Ducharme, 200 F.3d 597 (9th Cir. 2000).. . . . . . .  18

14   Dyer v. Calderon, 151 F.3d 970 (9th Cir.) (en banc), cert. denied.

15       525 U.S. 1033 (1998).. . . . . . . . . . . . . . . . 155, 157

16   Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).. . . .  21

17   Hard v. Burlington N. Railroad, 812 F.2d 482 (9th Cir. 1987). . 157

18   Hoffman v. Arave, 236 F.3d 523 (9th Cir. 2001). . . . . . . . .  23

19   James v. Ryan, 679 F.3d 780 (9th Cir. 2012).. . . . . . . . . .  20

20   Killian v. Poole, 282 F.3d 1204 (9th Cir. 2002).. . . . . .  22, 23

21   Lambert v. Blodgett, 393 F.3d 943 (9th Cir. 2004).. . .  18, 22, 23

22   Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992).. . . . . . . . . 101

23   Mayes v. Gibson, 210 F.3d 1284 (10th Cir.), cert. denied, 531 U.S.

24       1020 (2000). . . . . . . . . . . . . . . . . . . . . . . 101

25   Monroe v. Angelone, 323 F.3d 286 (4th Cir. 2003) . . . . . . .  23

26   Myers v. Ylst, 897 F.2d 417 (9th Cir. 1992).. . . . . .  76, 81, 92

27   Phillips v. Woodford, 267 F.3d 966 (9th Cir. 2001). . . . . . .  28

28

**TABLE OF AUTHORITIES**
**(continued)**

Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004). . . . . . . . . . 19

United States v. Bailin, 977 F.2d 270 (7th Cir. 1992).. . . . . . 146

United States v. Henley, 238 F.3d 1111 (9th Cir. 2001). . . . . 157

United States v. Smith, 26 F.3d 739 (7th Cir. 1993).. . . . . . 158

Wade v. Terhune, 202 F.3d 1190 (9th Cir. 2000). . . . . . . . . 152

Wallace v. Stewart, 184 F.3d 1112 (9th Cir. 1999).. . 101, 107, 108

Williams v. Calderon, 52 F.3d 1465 (9th Cir. 1995). . . . . . . 68

Williams v. Taylor, 529 U.S. 362 (2000).. . . . . . . . . . . . 19

Wilson v. Sirmons, 536 F.3d 1064 (10th Cir. 2008).. . . . . . . 23

**United States Constitutional provisions**

U.S. Const. amend. V . . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. VI.. . . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. VIII.. . . . . . . . . . . . . . . . . . passim

U.S. Const. amend. XIV. . . . . . . . . . . . . . . . . . . passim

**United States Rules and Statutes**

28 U.S.C. 2254. . . . . . . . . . . . 1, 2, 13, 17, 19, 20, 21, 23

Antiterrorism and Effective Death Penalty Act.. . . 17, 19, 23, 24

Rule 201 Fed. Rules of Evidence . . . . . . . . . . . . . . . . 25

Rule 606(b)(2) Fed. Rules of Evidence.. . . . . . . . . . . . 157

**TABLE OF AUTHORITIES**
**(continued)**

**California cases**

Conservatorship of Roulet, 23 Cal.3d 219 (1979). . . . . . . . . .   75

In re Hitchings, 6 Cal.4th 97 (1993). . . . . . . . . . . .  155, 156

In re Sturm, 11 Cal.3d 258 (1974). . . . . . . . . . . . . . .   80

People v. Adcox, 47 Cal.3d 207 (1988). . . . . . . . . . . . .   93

People v. Adcox, Cal. Supreme Ct. No. S004558. . . . . . . . . .   64

People v. Allison, Cal. Supreme Ct. No. S004649. . . . . . . .  63, 66

People v. Anderson, Cal. Supreme Ct. No. S004385. . . . . .  64, 67

People v. Ashmus, Cal. Supreme Ct. No. S004723. . . . . . . .   67

People v. Avalos, 37 Cal.3d 216 (1984). . . . . . . . . . . . .  175

People v. Avena, Cal. Supreme Ct. No. S004422. . . . . . . . .   66

People v. Bacigalupo, 6 Cal.4th 857 (1993). . . . . . . . . . .   57

People v. Bean, Cal. Supreme Ct. No. S004387. . . . . . . .  65, 66

People v. Belmontes, Cal. Supreme Ct. S004467. . . . . . . .  63, 66

People v. Benson, Cal. Supreme Ct. No. S004763. . . . . . .  63, 66

People v. Bittaker, 48 Cal.3d 1046 (1990). . . . . . . . . . .   62

People v. Bonin, Cal. Supreme Ct. No. S004565. . . . . . . . .   65

People v. Brown, 40 Cal.3d 512 (1985). . . . . . . . . . . . .  172

People v. Brown, Cal. Supreme Ct. No. S004451. . . . . . . .  63, 66

People v. Burnick, 14 Cal.3d 306 (1975). . . . . . . . . . . .   75

People v. Cain, Cal. Supreme Ct. No.  5006544. . . . . . . .  66, 67

People v. Carpenter, Cal. Supreme Ct. No. S004654. . . .  64, 65, 67

People v. Carrera, Cal. Supreme Ct. No. S004569. . . . . . .  63, 64

People v. Clair, Cal. Supreme Ct. No. S004789. . . . . . . . .   66

**TABLE OF AUTHORITIES**
**(continued)**

People v. Coddington, Cal. Supreme Ct. S008840 . . . . . . .  63, 66

People v. Comtois, Cal. Supreme Ct. No. S017116. . . . . . . . .  67

People v. Cooper, 53 Cal.3d 771 (1991). . . . . . . . . . . . . 174

People v. Davenport, 41 Cal.3d 247 (1985). . . . . . . . . . . . 164

People v. Davis, Cal. Supreme Ct. No. S014636. . . . . . . . . .  64

People v. Deere, Cal. Supreme Ct. No. S004722. . . . . . . . . .  65

People v. Dillon, 34 Cal.3d 441 (1984). . . . . . . . . . . . .  59

People v. Dunkle, Cal. Supreme Ct. No. S014200. . . . . . . . .  64

People v. Dykes, 46 Cal. 4th 731 (2009). . . . . . . . . . . . .  32

People v. Edwards, Cal. Supreme Ct. No. S004755. . . . . . .  63, 66

People v. Fauber, Cal. Supreme Ct. No. S005868. . . . . . .  64, 66

People v. Fierro, 1 Cal.4th 173 (1991). . . . . . . . . . .  89, 92

People v. Freeman, Cal. Supreme Ct. No. S004787. . . . .  63, 64, 67

People v. Frierson, Cal. Supreme Ct. No. S004761. . . . . . . .  63

People v. Ghent, Cal. Supreme Ct. No. S004309. . . . . . . .  63, 66

People v. Gonzalez, 51 Cal.3d 1179 (1990). . . . . . . . . . . .  22

People v. Grant, 45 Cal.3d 829 (1988). . . . . . . . . . . . . 174

People v. Hamilton, 48 Cal.3d 1142 (1989). . . . . . . . . . . 164

People v. Hamilton, Cal. Supreme Ct. No. S004363. . . . . . . .  64

People v. Hardy, 2 Cal.4th 86, cert. den., 113 S.Ct. 498 (1992).  62

People v. Hawkins, Cal. Supreme Ct. No. S014199. . . . . . . . .  63

People v. Hayes, 52 Cal.3d 577 (1990). . . . . . . . . . . . . 174

People v. Hernandez, 47 Cal.3d 315 (1988). . . . . . . . . . . 175

People v. Hillhouse, 27 Cal. 4th 469 (2002). . . . . . . . . . .  59

**TABLE OF AUTHORITIES**
**(continued)**

People v. Hines, 15 Cal.4th 997 (1997). . . . . . . . . . . . .  83

People v. Howard, Cal. Supreme Ct. No. S004452. . . . . . .  63, 66

People v. Jackson, Cal. Supreme Ct. No. S010723.. . . . . . . .  66

People v. Jennings, 53 Cal.3d 334 (1991). . . . . . .  63, 150, 151

People v. Jones, 17 Cal.4th 279 (1998). . . . . . . . . . . .  152

People v. Kaurish, 52 Cal.3d 648 (1990).. . . . . . . . . . . .  64

People v. Kimble, Cal. Supreme Ct. No. S004364. . . . . . . . .  65

People v. Kipp, Cal. Supreme Ct. No.  5009169.. . . . . . .  65, 66

People v. Livaditis, Cal. Supreme Ct. No. S004767.. . . . . . .  64

People v. Lucas, Cal. Supreme Ct. No. S004788.. . . . . . .  63, 64

People v. Lucero, Cal. Supreme Ct. No. S012568. . . . . . . . .  66

People v. Marshall, 50 Cal.3d 907 (1990). . . . . . . . . . . .  89

People v. Martin, 42 Cal.3d 437 (1986). . . . . . . . . . . . .  80

People v. Mayberry, 15 Cal.3d 143 (1975). . . . . . . . . . .  175

People v. McElheny, 137 Cal.App.3d 396 (1982).. . . . . . . . .  175

People v. McLain, Cal. Supreme Ct. No. S004370. . . . . . .  63, 66

People v. McPeters, Cal. Supreme Ct. No. S004712. . . . . . . .  64

People v. Melton, Cal. Supreme Ct. No. S004518. . . . . . . . .  65

People v. Miranda, Cal. Supreme Ct. No. S004464.. . . . . . . .  63

People v. Morales, 48 Cal.3d 527 (1989).. . . . . . . . . . . .  59

People v. Morales, Cal. Supreme Ct. No. S004552.. . . . . .  63, 64

People v. Nicolaus, 54 Cal.3d 551 (1991), cert. denied, 112 S.Ct.

    3040 (1992). . . . . . . . . . . . . . . . . . . . . . . .  62

People v. Osband, Cal. Supreme Ct. No. S005233. . . . . . . . .  63

**TABLE OF AUTHORITIES**
**(continued)**

People v. Padilla, Cal. Supreme Ct. No. S014496. . . . . . . . . .  64

People v. Phillips, 41 Cal.3d 29 (1985). . . . . . . . . . . . .  65

People v. Reilly, Cal. Supreme Ct. No.  5004607. . . . . . . . .  66

People v. Reynolds, 205 Cal.App.3d 775 (1988). . . . . . . . . . 175

People v. Robertson, 33 Cal.3d 21 (1982). . . . . . . . . . . . 150

People v. Romero, 8 Cal. 4th 728 (1994). . . . . . . . . . . 21, 22

People v. Samayoa, Cal. Supreme Ct. No. S006284. . . . . . . . .  65

People v. Sanders, 51 Cal.3d 471 (1990). . . . . . . . . . . . 166

People v. Scott, Cal. Supreme Ct. No. S010334. . . . . . . . . .  66

People v. Sheldon, 48 Cal.3d 935 (1989). . . . . . . . . . . . 150

People v. Stewart, Cal. Supreme Ct. No. S020803. . . . . . . . .  63

People v. Superior Court (Engert), 31 Cal.3d 797 (1982). . . . .  57

People v. Vacca, 38 Cal.App.4th 804 (1995). . . . . . . . . . . 165

People v. Viscotti, Cal. Supreme Ct. No. S004597. . . . . . . .  63

People v. Von Villas, 11 Cal.App.4th 175 (1992), cert. den. 510

   U.S. 838 (1993). . . . . . . . . . . . . . . . . . . . . . . 156

People v. Walker, 47 Cal.3d 605 (1988), cert. den., 494 U.S. 1038

   (1990). . . . . . . . . . . . . . . . . . . . . . . . . . .  62

People v. Webb, Cal. Supreme Ct. No. S006938. . . . . . . . . .  64

People v. Williams, Cal. Supreme Ct. No. S004365. . . . . . . .  64

People v. Zapien, Cal. Supreme Ct. No. S004762. . . . . . . 63, 64

**TABLE OF AUTHORITIES**
**(continued)**

**California Constitutional provisions**

Cal. Constitution, Art. I § 7.. . . . . . . . . . . . . . . . .  7, 8

Cal. Constitution, Art. I § 15. . . . . . . . . . 8, 9, 10, 11, 164

Cal. Constitution, Art. I § 16. . . . . . . . . . . . . . . . . . 7

Cal. Constitution, Art. I § 17. . . . . . . . . . . . . . 7, 8, 9, 10

**California Rules and Statutes**

Cal. Rules of Court 420(b). . . . . . . . . . . . . . . . . . . . 78

CALJIC No. 8.67.. . . . . . . . . . . . . . . . . . . . . . . . 143

CALJIC No. 8.85.. . . . . . . . . . . . 6, 162, 166, 167, 169, 210

CALJIC No. 8.88.. . . . . . . 6, 170, 171, 172, 173, 174, 194, 210

CALJIC No. 17.15. . . . . . . . . . . . . . . . . . . . . . . . 75

Evid. Code § 520. . . . . . . . . . . . . . . . . . . . . . . . 78

Evid. Code § 1150.. . . . . . . . . . . . . . . . . 152, 156, 157

Evid. Code § 1200.. . . . . . . . . . . . . . . . . . . . . . . 156

Penal Code § 187. . . . . . . . . . . . . . . . . . . . . 2, 3, 30

Penal Code § 189. . . . . . . . . . . . . . . . . . . . . . . . 59

Penal Code § 190.2. . . . . . . . . . . . . . . . . . . . . passim

Penal Code § 190.3. . . . . . . . . . . . . . . . . . . . . passim

Penal Code § 190.7. . . . . . . . . . . . . . . . . . . . . . . 71

Penal Code § 211. . . . . . . . . . . . . . . . . . . . . 3, 4, 30

Penal Code § 664. . . . . . . . . . . . . . . . . . . . . . 30, 143

Penal Code § 1170(c). . . . . . . . . . . . . . . . . . . . 81, 91

Penal Code § 1181(7). . . . . . . . . . . . . . . . . . . . 82, 83

**TABLE OF AUTHORITIES**
**(continued)**

Penal Code § 1203.06. . . . . . . . . . . . . . . . . . . 2, 3, 4, 30

Penal Code § 1203.075.. . . . . . . . . . . . . . . . . . . . 30

Penal Code § 1203.09(a).. . . . . . . . . . . . . . . . . 3, 4, 30

Penal Code § 1260.. . . . . . . . . . . . . . . . . . . . 82, 83

Penal Code § 12022.5. . . . . . . . . . . . . . . . . . 2, 3, 4, 30

Penal Code § 12022.7. . . . . . . . . . . . . . . . . . . . . 30

**Miscellaneous additional authorities**

18 Charles A. Wright, et al., (1981) Federal Practice &

    Procedure § 4418.. . . . . . . . . . . . . . . . . . . . 146

Article VI, Section 2 of the International Covenant on Civil and

    Political Rights.. . . . . . . . . . . . . . . . . . . . 90

Bowers, Research on the Death Penalty: Research Note (1993) 27 Law

    & Society Rev. 157, 170. . . . . . . . . . . . . . . . . 176

Ga. Stat. Ann. § 27-2537(c).. . . . . . . . . . . . . . . . 88

J. Acker and C. Lanier, Matters of Life or Death: The Sentencing

    Provisions in Capital Punishment Statutes (1995) 31

    Crim.L.Bull. 19. . . . . . . . . . . . . . . . . . . . . 75

Kozinski and Gallagher (1995) Death, The Ultimate Run-On Sentence,

    46 Case W. Res.L.Rev. 1. . . . . . . . . . . . . . . . . 90

Local Rule 3-5 of the U.S.D.C. for N.D. of California.. . . . . 13

Shatz and Rivkind, The California Death Penalty Scheme: Requiem for

    Furman?, 72 N.Y.U. L.Rev. 1283, 1324-26 (1997).. . . . . . 60

State v. Wood, 648 P.2d 71 (Utah 1982). . . . . . . . . . . 69, 75

**PHILLIP A. TREVIÑO** [SBN 121119]
137 N. Larchmont Blvd., #801
Los Angeles, California 90004
Telephone: (213) 949-8000

Attorney for Petitioner
**ERNEST DYKES**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ERNEST DYKES,** | ) **Case No. 11-CV-04454-SI** |
| Petitioner, | ) |
| v. | ) PETITION FOR WRIT OF HABEAS |
| | ) CORPUS UNDER 28 U.S.C. 2254 |
| **MICHAEL MARTEL, Acting Warden,** | ) |
| Respondent. | ) |
| _____ | ) **DEATH PENALTY CASE** |

Petitioner ERNEST DYKES, under sentence of death pronounced by the Alameda County Superior Court, hereby petitions this Honorable Court to issue a writ of habeas corpus under 28 U.S.C. § 2254.

Petitioner seeks such relief based upon the claims and allegations set forth herein, to be further demonstrated and bolstered by discovery and an evidentiary hearing at such time as this Honorable Court may permit.

Respectfully submitted,

Dated: December 21, 2012         s/Phillip A. Treviño

**PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. § 2254 WHICH
SEEKS RELIEF FROM A SENTENCE OF DEATH**

**I.
INITIAL ALLEGATIONS**

1.        Petitioner is detained in custody at San Quentin State
Prison, Tamal, California.

2.        He was convicted and sentenced by the Alameda County
Superior Court, the Hon. Jeffrey W. Horner, presiding.  Superior
Court Docket number 118376.

3.        Petitioner entered pleas of not guilty to the charges
filed against him, and the matter proceeded to trial by jury.

4.        Petitioner was convicted of the following offenses with
the indicated sentence pronounced on each count as noted.

   A.   Petitioner was found guilty of PC § 187,[1] the first

   degree murder of Lance Clark (count one).  The jury also

   found true the enhancement under PC § 1203.06, and

   § 12022.5, that Petitioner used a firearm during the

---

[1]      All statutory references herein are to California codes
unless otherwise made clear from context or citation format.  E.g.,
"PC" refers to the California Penal Code; "EC" refers to the
California Evidence Code, and so forth.  "RT" refers to the reporter's
transcript for the trial court proceedings; "CT" refers to the clerk's
transcript for the trial court proceedings; "Tr. Exh." refers to
exhibits admitted before the trial court.  "Cal. Hab. Ex." refers to
exhibits submitted to the California Supreme Court in support of
Petitioner's habeas proceeding heard by that court.  "Exhibit" refers
to the additional exhibits Petitioner submits directly to this Court
contemporaneous with the instant petition. Counsel for Respondent has
advised that, consistent with this Court's local rules, Respondent
will submit to this Court the entirety of the lower court records.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -2-                    **Dykes v. Martel**
                                          Case No. C-11-04454-SI

1    commission of said offense.  As to this offense, the

2    jury also found true the death penalty qualifying special

3    circumstance contained in PC § 190.2(A)(17)(i), namely

4    that Petitioner killed Lance Clark while Petitioner was

5    engaged in the commission, attempted commission, and the

6    flight thereafter of a felony, to wit: robbery, a

7    violation of PC § 211.  Petitioner was subsequently

8    sentenced to death plus four (4) years for this offense.

9

10    B.   As to count two Petitioner was found guilty of the

11    attempted murder of Bernice Clark in violation of PC

12    § 187, but notably the jury specifically found that said

13    attempted murder was not willful, deliberate and

14    premeditated.  (RT 3740)   The jury found that during the

15    commission of said offense Petitioner used a firearm in

16    violation of PC § 1203.06 and § 12022.5, and that he

17    inflicted great bodily injury during the commission of

18    said offense.   The jury also found true the aged victim

19    clause set forth in PC § 1203.09(a), in that Bernice

20    Clark was 60 years of age or older at the time of the

21    offense and Petitioner had reason to so know.  Petitioner

22    was subsequently sentenced to a term of sixteen (16)

23    years in state prison, to run concurrent with the term

24    imposed on count one.

25

26    C.   As to count three, the jury found Petitioner guilty

27

28    *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*                Page -3-                **Dykes v. Martel**
                                                   Case No. C-11-04454-SI

of robbery in violation of PC § 211, and that during said

robbery Petitioner used a firearm in violation of PC

§ 1203.06 and § 12022.5.  The jury also found true the

aged victim clause under PC § 1203.09(a) as to the

robbery, in that Bernice Clark was 60 years of age or

older at the time of the offense and Petitioner had

reason to so know.  Petitioner was sentenced to a term of

ten (10) years in state prison on this count, said term

to run concurrent with the sentences for counts one and

two.

5.      Petitioner testified during the pretrial phase, guilt

phase trial, but not in the penalty phase trial.

6.      Petitioner appealed his conviction and sentence to the

California Supreme Court.  His direct appeal was docketed in that

court as S050851.  In that direct appeal, which was denied, he

raised the following grounds:

    1.   THE PROSECUTOR ENGAGED IN EGREGIOUS MISCONDUCT
    THROUGHOUT BOTH THE GUILT AND PENALTY PHASES,
    RENDERING THE TRIAL FUNDAMENTALLY UNFAIR, IN
    VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO
    THE UNITED STATES CONSTITUTION AND CORRESPONDING
    PROVISIONS OF THE CALIFORNIA CONSTITUTION.

    2.   THE TRIAL COURT COMMITTED PLAIN ERROR IN
    PERMITTING THE PROSECUTOR TO BOLSTER THE TESTIMONY OF
    WITNESS ALPHONSO ODOM WITH PRIOR CONSISTENT
    STATEMENTS.

    3.   THE TRIAL COURT ERRED IN RULING THAT MR. DYKES'
    POST ARREST CONFESSIONS WERE NOT OBTAINED THROUGH

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -4-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

VIOLATIONS OF <u>MIRANDA V. ARIZONA</u>.

4.   THE TRIAL COURT ERRED IN CONCLUDING THAT MR. DYKES' CONFESSIONS WERE VOLUNTARY.

5.   THE TRIAL COURT ERRED IN RULING THAT MR. DYKES VOLUNTARILY MADE SPONTANEOUS STATEMENTS DURING THE RIDE TO THE POLICE STATION.

6.   THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS WHICH OCCURRED DURING THE GUILT PHASE COMPELS REVERSAL EVEN IF NO SINGLE ERROR, STANDING ALONE, WOULD DO SO.

7.   THE ADMISSION OF VICTIM IMPACT EVIDENCE DEPRIVED MR. DYKES OF DUE PROCESS AND RESULTED IN AN ARBITRARY AND CAPRICIOUS CAPITAL SENTENCING PROCEEDING IN VIOLATION OF THE UNITED STATES AND CALIFORNIA CONSTITUTIONS. THE ADMISSION OF THE VICTIM IMPACT EVIDENCE ALSO VIOLATED CAL. PEN. CODE SECTION 190.3, SUBDIVISION (A).

8.   THE ADMISSION OF EVIDENCE THAT MR. DYKES WAS ARRESTED FOR POSSESSION OF A LOADED AND CONCEALED WEAPON, VIOLATED THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 190.3(b).

9.   THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO STRIKE THE IRRELEVANT AND PREJUDICIAL TESTIMONY OF OAKLAND POLICE OFFICER RAND MONDA.

10.  THE TRIAL COURT ERRED BY REFUSING TO GIVE A DEFENSE INSTRUCTION DIRECTING THE JURY NOT TO SPECULATE OR CONJECTURE REGARDING MATTERS ABOUT WHICH EVIDENCE HAD NOT BEEN PRESENTED.

11.  THE TRIAL COURT'S SUPPLEMENTAL INSTRUCTION, REGARDING FACTOR (K) AND LACK OF REMORSE VIOLATED APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTIONS BY ELEVATING LACK OF REMORSE TO A NON-STATUTORY FACTOR IN AGGRAVATION.

12.  THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT, BEFORE CONSIDERING A FACTOR IN AGGRAVATION, IT MUST UNANIMOUSLY FIND BOTH THAT THE DEFENDANT COMMITTED THE ACT IN AGGRAVATION AND THE ACT CONSTITUTED AN IMPLIED THREAT OF FORCE OR VIOLENCE.

13.  THE TRIAL COURT VIOLATED THE UNITED STATES CONSTITUTION AND CALIFORNIA LAW IN PERMITTING THE

JURY TO RECONSIDER PREMEDITATION AND DELIBERATION
DURING THE PENALTY PHASE AFTER THE JURY ACQUITTED MR.
DYKES OF SHOOTING THE VICTIM WITH PREMEDITATION.

14.  THE JURY PANEL WAS TAINTED BY EXTRANEOUS
INFLUENCES AND THEIR EXPOSURE TO THESE EXTRANEOUS
MATTERS WAS PRESUMPTIVELY PREJUDICIAL.

15.  CALIFORNIA'S DEATH PENALTY STATUTE, AS
INTERPRETED BY THIS COURT AND APPLIED AT APPELLANT'S
TRIAL, VIOLATES THE UNITED STATES CONSTITUTION.

16.  APPELLANT'S DEATH SENTENCE IS INVALID BECAUSE
SECTION 190.2 IS IMPERMISSIBLY BROAD.

17.  APPELLANT'S DEATH PENALTY IS INVALID BECAUSE
§ 190.3(a) AS APPLIED ALLOWS ARBITRARY AND CAPRICIOUS
IMPOSITION OF DEATH, IN VIOLATION OF THE FIFTH,
SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED
STATES CONSTITUTION.

18.  CALIFORNIA'S DEATH PENALTY STATUTE LACKS
NECESSARY SAFEGUARDS TO AVOID ARBITRARY AND
CAPRICIOUS SENTENCING, AND THEREFORE VIOLATES THE
EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION.

19.  EVEN IF THE ABSENCE OF THE PREVIOUSLY ADDRESSED
PROCEDURAL SAFEGUARDS DID NOT RENDER CALIFORNIA'S
DEATH PENALTY SCHEME CONSTITUTIONALLY INADEQUATE TO
ENSURE RELIABILITY AND GUARD AGAINST ARBITRARY
CAPITAL SENTENCING, THE DENIAL OF THOSE SAFEGUARDS TO
CAPITAL DEFENDANTS VIOLATES THE CONSTITUTIONAL
GUARANTEE OF EQUAL PROTECTION OF THE LAWS.

20.  NUMEROUS DEFECTS IN CALJIC[2] NO. 8.85 MISLED THE JURY
WITH RESPECT TO THE WEIGHING OF AGGRAVATING AND
MITIGATING FACTORS, AND THE DEATH JUDGMENT MUST BE
REVERSED.

21.  CALJIC NO. 8.88, AS GIVEN HEREIN, VIOLATED
APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTIONS.

22.  THE FAILURE TO INSTRUCT THE JURY ON THE
PRESUMPTION OF LIFE VIOLATED THE FIFTH, EIGHTH, AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES

───────────────

      [2]   "CALJIC" refers to the standard California Jury Instructions
for Criminal Cases.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -6-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

CONSTITUTION.

23.  THE DEATH PENALTY IS DISPROPORTIONATE TO APPELLANT'S INDIVIDUAL CULPABILITY AND ITS IMPOSITION WOULD THEREFORE VIOLATE THE EIGHTH AMENDMENT AND ARTICLE I, SECTION 17 OF THE CALIFORNIA CONSTITUTION.

24.  THE FAILURE OF CALIFORNIA'S DEATH PENALTY STATUTES TO PROVIDE FOR INTER-CASE PROPORTIONALITY REVIEW VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS.

25.  THE CALIFORNIA STATUTORY SCHEME GIVES PROSECUTORS THE UNBRIDLED DISCRETION TO DECIDE IN WHICH SPECIAL CIRCUMSTANCE MURDER CASES THE DEATH PENALTY WILL BE SOUGHT, AND THEREFORE VIOLATES THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

26.  THE METHOD OF EXECUTION EMPLOYED IN CALIFORNIA VIOLATES THE FOURTEENTH AMENDMENT GUARANTEE OF PROCEDURAL DUE PROCESS AND THE EIGHTH AMENDMENT'S PROHIBITION UPON CRUEL AND UNUSUAL PUNISHMENTS.

27.  CALIFORNIA'S USE OF THE DEATH PENALTY AS A REGULAR FORM OF PUNISHMENT FALLS SHORT OF INTERNATIONAL NORMS OF HUMANITY AND DECENCY, AND VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS.

28.  THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS WHICH OCCURRED DURING THE PENALTY PHASE COMPELS REVERSAL EVEN IF NO SINGLE ISSUE, STANDING ALONE, WOULD DO SO.

7.    Petitioner also sought, and was denied, a writ of habeas corpus from the California Supreme Court.  Docket S126085.  In that proceeding, he sought relief based on the following claims:

1.    PETITIONER'S CONVICTION AND DEATH SENTENCE WERE OBTAINED IN VIOLATION OF HIS RIGHT TO JURY AND DUE PROCESS OF LAW UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 7 AND 16 OF THE CALIFORNIA CONSTITUTION AS WELL AS CALIFORNIA STATE LAW. THESE VIOLATIONS OCCURRED WHEN A UNIFORMED OFFICER, PRESUMABLY AT THE BEHEST OF THE PROSECUTION, TALKED TO JURORS ON THE STREET ABOUT A KILLER WHO HAD BEEN SENTENCED TO LIFE GETTING OUT AND KILLING AGAIN.

2.    PETITIONER'S CONVICTION AND DEATH SENTENCE WERE OBTAINED IN VIOLATION OF HIS RIGHT TO JURY AND DUE PROCESS OF LAW UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -7-                    **Dykes v. Martel**
                                                              Case No. C-11-04454-SI

TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 7 AND 16 OF THE CALIFORNIA CONSTITUTION AS WELL AS CALIFORNIA STATE LAW. THESE VIOLATIONS OCCURRED WHEN JURORS LG AND MD FAILED TO DISCLOSE THAT A UNIFORMED OFFICER SPOKE TO THEM ABOUT THE CASE.

3.    PETITIONER'S DEATH SENTENCE WAS OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION AND ARTICLE I, SECTIONS 7 AND 15 OF THE CALIFORNIA CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN PETITIONER'S TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE IN MITIGATION AT PETITIONER'S PENALTY PHASE TRIAL.

4.    PETITIONER'S DEATH SENTENCE WAS OBTAINED IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS 7, 15 AND 17 OF THE CALIFORNIA CONSTITUTION. THESE VIOLATIONS OCCURRED AT THE PENALTY PHASE WHEN THE PROSECUTOR ARGUED 1) THAT PETITIONER CAME FROM AN UNTROUBLED FAMILY EVEN THOUGH HE KNEW THAT THIS WAS NOT TO BE TRUE AND 2) THAT PETITIONER'S GIRLFRIEND COULD NOT HAVE TESTIFIED THAT PETITIONER SHOWED REMORSE WHEN HE KNEW THAT WAS NOT TRUE 3) THAT PETITIONER WAS NOT REMORSEFUL WHEN HE KNEW THAT THIS WAS NOT TRUE AND 4) THAT THERE WAS NOTHING REDEEMING TO BE SAID ABOUT PETITIONER WHEN HE KNEW THAT WAS NOT TRUE.

5.    PETITIONER'S CONVICTION AND DEATH SENTENCE WERE OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN PETITIONER'S TRIAL COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S FALSE ARGUMENTS THAT PETITIONER CAME FROM A GOOD FAMILY, THAT PETITIONER'S GIRLFRIEND COULD NOT HAVE TESTIFIED THAT HE WAS REMORSEFUL, THAT PETITIONER WAS NOT REMORSEFUL AND THAT THERE WAS NOTHING REDEEMING ABOUT PETITIONER.

6.    IN LIGHT OF HIS MENTAL LIMITATIONS, PETITIONER'S DEATH SENTENCE IS CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 17 OF THE CALIFORNIA CONSTITUTION.

7.    PETITIONER'S CONVICTION AND DEATH SENTENCE WERE OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

AND ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN PETITIONER'S
TRIAL COUNSEL FAILED TO MOVE TO STRIKE THE VENIRE AS NOT
REPRESENTING A FAIR CROSS-SECTION OF THE COMMUNITY.

8.   PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
OBTAINED IN  VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW
AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND ARTICLE ONE, SECTIONS 7, 15, AND 17 OF
THE CALIFORNIA CONSTITUTION. THESE VIOLATIONS OCCURRED
WHEN PETITIONER'S TRIAL COUNSEL FAILED TO PICK A JURY
THAT WAS NOT BIASED IN FAVOR OF IMPOSING A DEATH
SENTENCE.

9.   PETITIONER'S DEATH SENTENCE WAS RENDERED IN VIOLATION
OF THE FIFTH, SIXTH, EIGHT AND FOURTEENTH AMENDMENTS OF
THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTIONS
7, 15, 17 AND 17 OF THE CALIFORNIA CONSTITUTION WHEN THE
JURY DELIBERATED ABOUT 1) THE FACT THAT PETITIONER DID
NOT TAKE THE STAND AT THE PENALTY PHASE AND 2) THE FACT
THAT PETITIONER DID NOT APOLOGIZE FOR WHAT HE DID DURING
HIS TESTIMONY AT THE GUILT PHASE.

10.  PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
RENDERED IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION AND
ANALOGOUS PROVISIONS OF THE CALIFORNIA CONSTITUTION.
JUROR MD COMMITTED MISCONDUCT BY FAILING TO DISCLOSE HER
EMPLOYER'S ONGOING THREATS TO FIRE HER IF SHE DID NOT
RETURN TO WORK.

11.  PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
RENDERED IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS OF THE UNITED STATES CONSTITUTION AND ARTICLE
ONE, SECTIONS 7, 15 AND 17 OF THE CALIFORNIA
CONSTITUTION. JURORS GS AND RM COMMITTED MISCONDUCT BY
FAILING TO DISCLOSE TO THE COURT THAT THEY KNEW EACH
OTHER THROUGH LIVERMORE CUB SCOUTS.

12.  PETITIONER'S DEATH SENTENCE WAS RENDERED IN
VIOLATION OF THE  SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE,
SECTIONS 7, 15 AND 17 OF THE CALIFORNIA CONSTITUTION.
JUROR RM COMMITTED MISCONDUCT BY VOTING FOR DEATH SO THAT
PETITIONER WOULD NOT GET RAPED IN PRISON EVERY DAY.

13.  PETITIONER'S DEATH SENTENCE WAS RENDERED IN
VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE,
SECTIONS 7, 15 AND 17 OF THE CALIFORNIA CONSTITUTION.
THE JURORS COMMITTED MISCONDUCT DURING PENALTY PHASE

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -9-                    **Dykes v. Martel**
Case No. C-11-04454-SI

DELIBERATIONS BY ASSUMING THAT PETITIONER HAD A LENGTHIER
CRIMINAL HISTORY THAN THAT SHOWN BY THE EVIDENCE.

14.   PETITIONER'S DEATH SENTENCE WAS RENDERED IN
VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE,
SECTIONS 7, 15 AND 17 OF THE CALIFORNIA CONSTITUTION.
THESE VIOLATIONS OCCURRED WHEN THE JURORS DISCUSSED HOW
MURDERERS WHO GET SENTENCED TO LIFE WITHOUT PAROLE
REGULARLY GET OUT OF PRISON.

15.   PETITIONER'S DEATH SENTENCE WAS RENDERED IN
VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE,
SECTIONS 7, 15 AND 17 OF THE CALIFORNIA CONSTITUTION.
THESE VIOLATIONS OCCURRED WHEN THE JURORS ABUSED A HOLD-
OUT TO THE POINT WHERE DELIBERATIONS BROKE DOWN AND HE
CHANGED HIS VOTE.

16.   PETITIONER'S DEATH SENTENCE WAS RENDERED IN
VIOLATION OF THE SIXTH, EIGHT AND FOURTEENTH AMENDMENTS
OF THE UNITED STATES CONSTITUTION AND ARTICLE ONE,
SECTIONS, 7, 15 AND 17 OF THE CALIFORNIA CONSTITUTION
BECAUSE THE JURY COMMITTED MISCONDUCT BY NOT STARTING ITS
PENALTY PHASE DELIBERATIONS FROM THE BEGINNING WHEN
JURORS RD AND MD WERE REPLACED.

17.   PETITIONER'S DEATH SENTENCE WAS OBTAINED IN
VIOLATION OF HIS  RIGHT TO DUE PROCESS OF LAW AND
EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED DURING PENALTY
PHASE ARGUMENT WHEN PETITIONER'S COUNSEL ARGUED THAT
LANCE CLARK'S DEATH WAS, RELATIVELY SPEAKING, NOT A
SERIOUS CRIME.

18.   PETITIONER'S DEATH SENTENCE WAS OBTAINED IN
VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW AND
EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN PETITIONER'S
COUNSEL FAILED TO OBJECT TO THE PROSECUTOR'S QUESTIONING
OFFICER MONDA ABOUT WHAT PETITIONER WAS WEARING WHEN HE
WAS STOPPED IN THE INCIDENT THAT LED TO THE ARREST FOR
GUN POSSESSION.

19.   PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW
AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*
**Dykes v. Martel**
Case No. C-11-04454-SI

AND ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN PETITIONER'S
TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT AVAILABLE
EVIDENCE THAT WOULD HAVE IMPEACHED THE CREDIBILITY OF THE
OAKLAND POLICE DEPARTMENT OFFICERS WHO TESTIFIED AT THE
MOTION TO SUPPRESS PETITIONER'S CONFESSION AS HAVING BEEN
OBTAINED IN VIOLATION OF HIS MIRANDA RIGHTS.

20.  PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
OBTAINED IN  VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW
AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN PETITIONER'S
TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT AVAILABLE
EVIDENCE THAT WOULD HAVE IMPEACHED THE CREDIBILITY OF THE
OAKLAND POLICE DEPARTMENT OFFICERS WHO TESTIFIED AT
TRIAL.

21.  PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW
AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND HIS ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN THE
PROSECUTION FAILED TO DISCLOSE TO THE DEFENSE INFORMATION
IN THE TESTIFYING OFFICERS' CONFIDENTIAL PERSONNEL FILES
THAT WOULD HAVE IMPEACHED THEIR CREDIBILITY AT THE
SUPPRESSION HEARING AND AT TRIAL.

22.  PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
OBTAINED IN VIOLATION OF THE SIXTH, EIGHTH AND FOURTEENTH
AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE
ONE, SECTIONS 7, 15 AND 17 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN THE TRIAL
COURT FAILED TO ADMONISH THE JURY TO AVOID NEWS REPORTS
ABOUT OTHER CRIMES THAT WOULD CAUSE THEM TO BECOME BIASED
AGAINST PETITIONER.

23.  PETITIONER'S DEATH SENTENCE VIOLATES THE SIXTH,
EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES
CONSTITUTION AND ARTICLE ONE, SECTIONS 7, 15 AND 17 OF
THE CALIFORNIA CONSTITUTION BECAUSE THE JURY COMMITTED
MISCONDUCT BY SENTENCING HIM TO DEATH IN THE BELIEF THAT
HIS SENTENCE WOULD HAVE A DETERRENT EFFECT ON OTHERS.

24.  BECAUSE PUBLIC SUPPORT FOR THE DEATH PENALTY AND THE
IMPOSITION OF THE DEATH PENALTY HAS BEEN SHOWN TO
FLUCTUATE BASED ON PUBLIC PERCEPTION OF THE CRIME RATE,
SOCIAL INSTABILITY AND OTHER FACTORS, IMPOSITION OF THE
DEATH PENALTY DENIES A DEFENDANT DUE PROCESS AND EQUAL
PROTECTION OF THE LAW UNDER THE FEDERAL AND STATE

CONSTITUTIONS AND VIOLATES HIS RIGHT TO BE FREE FROM
CRUEL AND UNUSUAL PUNISHMENTS.

25.   PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS OF LAW
AND EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND
FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE ONE, SECTIONS 7 AND 15 OF THE CALIFORNIA
CONSTITUTION. THESE VIOLATIONS OCCURRED WHEN PETITIONER'S
TRIAL COUNSEL FAILED TO OBJECT TO THE PROSECUTION'S
REPEATED BOLSTERING OF WITNESS ODOM'S TESTIMONY WITH
PRIOR CONSISTENT STATEMENTS FROM THE PRELIMINARY HEARING.

26.   PETITIONER'S CONVICTION AND DEATH SENTENCE WERE
OBTAINED IN VIOLATION OF HIS RIGHT TO DUE PROCESS AND
EQUAL PROTECTION OF THE LAW UNDER THE FOURTEENTH
AMENDMENT TO THE UNITED STATES CONSTITUTION, HIS RIGHT
UNDER THE EIGHTH AMENDMENT NOT TO BE SENTENCED TO DEATH
IN AN ARBITRARY AND CAPRICIOUS MANNER, AND HIS ANALOGOUS
RIGHTS UNDER ARTICLE I, SECTIONS 1, 7, 9, 12-17, 24, 27
AND 28 OF THE CALIFORNIA CONSTITUTION.  THE PROSECUTOR
ELECTED TO SEEK THE DEATH PENALTY IN PETITIONER'S CASE
BASED ON IMPERMISSIBLE CONSIDERATIONS, INCLUDING
PETITIONER'S RACE, HIS GENDER, HIS ECONOMIC STATUS, THE
RACE OF THE VICTIM AND THE FACT THAT THE VICTIM WAS A
CHILD.

27.   EXECUTION BY LETHAL INJECTION IS CRUEL AND UNUSUAL
PUNISHMENT IN VIOLATION OF THE EIGHTH AMENDMENT TO THE
U.S. CONSTITUTION AND ARTICLE ONE, SECTION 17 OF THE
CALIFORNIA CONSTITUTION.

28.   THE PROSECUTOR OBSTRUCTED PETITIONER'S RIGHT TO
INVESTIGATE JURY MISCONDUCT AND SEEK HABEAS CORPUS RELIEF
IN STATE AND FEDERAL COURT BY LYING TO THEM ABOUT
PETITIONER'S CRIMINAL RECORD AFTER THEY RENDERED THE
DEATH VERDICT.

29.   THE CUMULATIVE EFFECT OF TRIAL COUNSEL'S DEFICIENT
PERFORMANCE, THE TRIAL COURT'S ERROR, THE PROSECUTOR'S
MISCONDUCT AND THE JURY'S MISCONDUCT RENDERED
PETITIONER'S TRIAL FUNDAMENTALLY UNFAIR IN VIOLATION OF
THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT TO THE
U.S. CONSTITUTION AND ARTICLE ONE, SECTIONS 7, 15, 17 AND
17 OF THE CALIFORNIA CONSTITUTION.

8.      Petitioner also sought a writ of certiorari from the U.S.

Supreme Court.  Therein he presented the following issue for

consideration:

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -12-                    **Dykes v. Martel**
Case No. C-11-04454-SI

1          Did California, by allowing the jury to reconsider

2        during the penalty phase, an issue on which the jury

3        previously acquitted the petitioner, violate the

4        prohibition of collateral estoppel embodied in the Fifth

5        Amendment?

6    The Supreme Court denied the requested writ.

7

8    9.    Petitioner has no other proceedings pending in any court,

9    federal or state.

10    **II.**
**JURISDICTION**

11

12    10.    Pursuant to Local Rule 3-5, Petitioner notes that he

13    invokes the jurisdiction of this Honorable Court under 28 U.S.C.

14    § 2254.

15

16    11.    Petitioner was tried before and sentenced to death in

17    Alameda County Superior Court.  As such, jurisdiction is proper in

18    this District.

19    **III.**
**FACTUAL SUMMARY**

20

21    12.    On July 26, 1993, Petitioner robbed and shot Bernice

22    Clark, the owner of the East Oakland apartment building in which

23    Petitioner, his mother (Mary Brown), and his sister (Sara Dykes),

24    were tenants.  (RT 2698-99, 2701)  A single bullet passed through

25    Mrs. Clark's body and then struck her grandson, Lance Clark,

26    killing him.  Mrs. Clark survived the robbery and shooting.

27

28    *Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -13-                    **Dykes v. Martel**
Case No. C-11-04454-SI

13.        While Petitioner intended to rob Mrs. Clark, at trial the jury found he did not premeditate her killing.  Importantly, Petitioner did not even know that Lance Clark was present in the car at the time of the robbery.  It was undisputed at trial that Petitioner did not intend to shoot Lance;[3] the prosecution's theory for premeditation turned entirely on the state of mind Petitioner had when he shot Mrs. Clark.  Indeed, when the jury concluded that Petitioner was not guilty of premeditated and deliberate attempted murder of Mrs. Clark, the jury itself put to rest any question whether the murder of Lance was in any way premeditated. The alternative legal theory the prosecution used, and which the jury must have adopted, was that Petitioner was guilty of murdering Lance on a felony-murder theory. Petitioner acknowledges this was a permissible theory for him to be convicted of Lance's murder.

14.        Petitioner was immediately remorseful for his actions: he turned himself into the police after learning the authorities wanted him, and Petitioner promptly and tearfully confessed, twice. Despite his self-surrender, the immediate expression of remorse for committing the crime, and Petitioner's minimal criminal history (a juvenile adjudication for arson and a misdemeanor narcotics possession), the prosecution sought and the jury sentenced Petitioner to death.

_____

[3]      For clarity, Bernice Clark, the surviving victim, is referred to herein as Mrs. Clark, while the decedent is frequently referred to as Lance. This convention is used respectfully and to minimize repetition of the shared surname and thereby reduce the potential for any confusion.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -14-                    **Dykes v. Martel**
Case No. C-11-04454-SI

15.        Dispassionately evaluating this record, it seems clear the death sentence in this case resulted from a variety of errors: pervasive prosecutorial misconduct; the erroneous introduction of unduly passionate, lengthy and heart-wrenching victim impact testimony; and the jury's being permitted to reopen the question of premeditation during the penalty phase, despite its own prior verdict acquitting Petitioner of premeditated attempted murder.

16.        Petitioner alleges the death sentence in this case was imposed by a jury inflamed by unduly prejudicial evidence during the penalty phase, a jury which also engaged in misconduct and - in violation of the court's instructions - freely speculated regarding Petitioner's criminal history and the likelihood that he would never be executed, but rather could be released from prison if sentenced to life without possibility of parole.

17.        Most especially, the judgment in this case illustrates how and why California's death penalty scheme offends the federal constitution in its vagueness as well as over-inclusion of all types of homicides, and how California's jury instructions, applied in this matter, fail to guide a sentencing jury in the manner that the Supreme Court has directed must occur.   This case is, plainly put, not a death penalty case. However, it is a death penalty case precisely and only due to the errors in the state court proceedings

1  that are identified herein.[4]

2

3  18.        While the death of Lance Clark is indisputably a tragedy,

4  this case is not properly one of those cases for which the death

5  penalty is justifiable at law.  The Supreme Court has clearly

6  stated that the death penalty is constitutional only so long as it

7  is applied in a clearly delineated manner designed to impose it

8  only on the "worst of the worst."

9

10 19.        Capital punishment must be limited to those offenders who

11 commit "a narrow category of the most serious crimes" and whose

12 extreme culpability makes them "the most deserving of execution."

13 Atkins v. Virginia, 536 U.S. 304, 319 (2002). This principle is

14 implemented throughout the capital sentencing process. States must

15 give narrow and precise definition to the aggravating factors that

16 can result in a capital sentence. Godfrey v. Georgia, 446 U.S. 420,

17 428-429 (1980) (plurality opinion). Roper v. Simmons, 543 U.S. 551,

18 568 (2005).  That Petitioner's case could reach this point

19 illustrates just how dysfunctional the California death penalty is

20 at this time. Its application generally, and in particular as to

21 Petitioner, represents a violation of the Eighth Amendment

22 jurisprudence as pronounced by the Supreme Court for decades.   In

23 many other cases these same constitutional violations may elude

24

25        [4]     Petitioner respectfully notes that he will, at such time as

26 permitted by this Honorable Court and under the Rules Governing Habeas
   Corpus Proceedings, move for discovery and an evidentiary hearing to

27 substantiate these claims.

28 *Petition for a writ of habeas corpus*          **Dykes v. Martel**
   *under 28 U.S.C. 2254*          Page -16-          Case No. C-11-04454-SI

focus because the crimes at issue therein are more shocking and
offensive to morality and human sensibilities. Lest there be any
misunderstanding, Petitioner openly acknowledges that his actions,
resulting in Lance Clark's death, were a tragedy and he equally
openly accepts that he is deserving of just and lawful punishment.
Petitioner urges this Honorable Court to assess this matter and
determine whether, however, his case is one of the worst of the
worst, such as to justify the ultimate penalty?

20.      For the foregoing reasons, and for the additional reasons
set forth below, Petitioner respectfully asks that at the
conclusion of these proceedings this Court should grant the writ
sought herein, vacating Petitioner's judgment of conviction and
death sentence.

## IV.
## AEDPA

**A.          AEDPA Standards**

21.      The Antiterrorism and Effective Death Penalty Act of 1996
("AEDPA") applies to this petition because it is being filed after
April 16, 1996. Lindh v. Murphy, 521 U.S. 320 (1997). AEDPA,
however, does not foreclose relief for the violation of
Petitioner's constitutional rights.  Under AEDPA, this Court may
grant habeas relief if it determines that Petitioner suffered a
violation of his federal constitutional rights and that Petitioner
has satisfied 28 U.S.C. § 2254(d). See 28 U.S.C.  § 2254(a), (d).
Section 2254(d) is satisfied if the Court finds that the state

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -17-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

court's adjudication of Petitioner's claims was either (1) contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court, or (2) based on an unreasonable determination of the facts in light of the record that was before the state court. Id. § 2254(d). Petitioner is not required to satisfy both § 2254(d)(1) and § 2254(d)(2). See id.; Harrington v. Richter, 131 S. Ct. 770, 787 (2011). Section 2254(d) only applies to state court decisions addressing the substantive grounds of a claim. Lambert v. Blodgett, 393 F.3d 943, 966 (9th Cir. 2004).

22.    Clearly established federal law refers to "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71-72 (2003). Although the source of clearly established federal law must be the Supreme Court, circuit court decisions remain persuasive authority in determining what law is clearly established. Duhaime v. Ducharme, 200 F.3d 597, 600 (9th Cir. 2000).

23.    A state court acts contrary to clearly established federal law if it applies a legal rule that contradicts a prior Supreme Court holding or if it reaches a different result from a Supreme Court case presenting indistinguishable facts. Ramdass v. Angelone, 530 U.S. 156, 165-66 (2000). Similarly, "[t]he addition, deletion, or alteration of a factor in a test established by the

Supreme Court also constitutes a failure to apply controlling

Supreme Court law under the 'contrary to' clause of AEDPA." Benn v.

Lambert, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002) (citing Williams

v. Taylor, 529 U.S. 362, 405-06 (2000)).

24.    A state court decision involves an unreasonable

application of clearly established federal law if it identifies the

correct legal principle but applies it in an unreasonable manner to

the particular facts before it. Williams, 529 U.S. at 407.  A state

court decision is also an "unreasonable application" if it

unreasonably extends a legal principle to a new context or

unreasonably refuses to extend a legal principle to a context where

it should apply. Id. at 397, 407.

25.    Section 2254(d)(2) allows petitioners to challenge the

state court's factual findings based upon the evidence before the

state court. Wiggins v. Smith, 539 U.S. 510, 528 (2003). A section

2254(d)(2) challenge can be premised on any one of numerous

theories, including that: (1) the state's factual finding is

unsupported by sufficient evidence or is based on a misstatement of

the evidence; (2) the state court fact-finding process is

defective; (3) no factual finding was made by the state court at

all; and (4) the state court makes factual findings under the wrong

legal standard. Taylor v. Maddox, 366 F.3d 992, 1000-01 (9th Cir.

2004).

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -19-                    **Dykes v. Martel**
                                                                    Case No. C-11-04454-SI

26.        Federal court review of a state court decision under
§ 2254(d) is limited to the record that was before the state court
that adjudicated the claim on the merits. See 28 U.S.C.
§ 2254(d)(2); Cullen v. Pinholster, 131 S. Ct. 1388, 1398 (2011).
The state court record "includes both the allegations of [the]
habeas corpus petition . . . and . . . any matter of record
pertaining to the case." Pinholster, 131 S. Ct. at 1402 n.12
(internal quotation marks omitted). The relevant state court
decision is the last reasoned decision regarding a claim. See Ylst
v. Nunnemaker, 501 U.S. 797, 803-04 (1991); James v. Ryan, 679 F.3d
780 (9th Cir. 2012).

27.        The Supreme Court has stated that "in the context of
federal habeas" "[d]eference does not imply abandonment or
abdication of judicial review." Miller-El v. Cockrell, 537 U.S.
322, 340 (2003). To that end, while the standard as articulated in
§ 2254 is demanding, it is not insatiable; "[d]eference does not by
definition preclude relief." Miller-El v. Dretke, 545 U.S. 231, 240
(2005) (internal quotation marks omitted). Section 2254(d) does not
preclude relief for the claims stated herein because:

    (1) the state court's denial of the claims was contrary to or
an unreasonable application of clearly established federal law;

    (2) the state court's denial of the claims was based on
an unreasonable factual determination; and/or

    (3) § 2254(d) does not apply to the claims because they were
not adjudicated on the merits in state court. When § 2254(d) does

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -20-                    **Dykes v. Martel**
                                                            Case No. C-11-04454-SI

1  not apply or is satisfied, the federal habeas court reviews the

2  claim de novo. See Cone v. Bell, 556 U.S. 449, 472 (2009); Panetti

3  v. Quarterman, 551 U.S. 930, 953-54 (2007); Rompilla v. Beard, 545

4  U.S. 374, 390 (2005); Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.

5  2008) (en banc).

6

7  **B.      Suspension Of The Writ**

8  28.      The denial of federal habeas relief without adequate

9  federal and/or state court process and fact-development procedures

10 is an unconstitutional suspension of the writ of habeas corpus.

11

12 29.      In Harrington v. Richter, 131 S. Ct. 770, 784 (2011), the

13 Supreme Court held that a state court summary denial is presumed to

14 be an adjudication on the merits and "the habeas petitioner's

15 burden [under § 2254(d)] still must be met by showing there was no

16 reasonable basis for the state court to deny relief." In

17 Pinholster, 131 S. Ct. at 1398, the Supreme Court held that "review

18 under § 2254(d)(1) is limited to the record that was before the

19 state court that adjudicated the claim on the merits."  These two

20 cases working together impede Petitioner's ability to receive

21 federal factual development where he was denied state factual

22 development.

23

24 30.      In California, a state court summary denial means the

25 state court determined the petition did not state a prima facie

26 case for relief. People v. Romero, 8 Cal. 4th 728, 737 (1994); see

27

28 *Petition for a writ of habeas corpus*        *Dykes v. Martel*
   *under 28 U.S.C. 2254*          Page -21-        Case No. C-11-04454-SI

1   <u>Pinholster</u>, 131 S. Ct. at 1403 n.12.  Most of Petitioner's claims

2   were summarily denied, so he was never given the opportunity for

3   factual development of those claims. <u>See</u> <u>Romero</u>, 8 Cal. 4th at 739-

4   40.[5] Because many habeas claims require factual development to be

5   colorable, <u>McFarland v. Scott</u>, 512 U.S. 849, 855 (1994), full and

6   fair factual development at the state court level necessarily is a

7   predicate to the application of § 2254(d) in federal court.[6]   <u>See</u>

8   <u>Boumediene v. Bush</u>, 553 U.S. 723, 790 (2008) (holding that federal

9   habeas proceedings may be constitutionally circumscribed only to

10  the extent that some court is available to consider the relevant

11  evidence supporting a claim); <u>Harris v. Nelson</u>, 394 U.S. 286, 300

12  (1969) (holding that "it is the duty of the court to provide the

13  necessary facilities and procedures for an adequate inquiry" into

14  colorable claims); <u>Townsend v. Sain</u>, 372 U.S. 293, 313 (1963)

15  (describing the content of a full and fair state court adjudication

16  with emphasis on factual development), <u>overruled on other grounds</u>

17

18      [5]   Under California law, a habeas petitioner is not allowed
    discovery unless a court so orders.  <u>People v. Gonzalez</u>, 51 Cal.3d
19  1179 (1990).

20      [6]   The U.S. Supreme Court has not yet addressed this issue. <u>See</u>
    <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 121 n.2 (2009) (declining to
21  decide whether review under § 2254(d) embraces an analysis of whether
    the factual record was sufficiently developed in state court);
22  <u>Pinholster</u>, 131 S. Ct. at 1402 n.11 (accepting without analysis
    petitioner's argument that § 2254(d) applied to his claims). The Ninth
23  Circuit itself appears to have taken inconsistent positions on the
    matter. <u>Compare</u> <u>Killian v. Poole</u>, 282 F.3d 1204, 1207-08 (9th Cir.
24  2002) (holding that normal AEDPA deference is not owed to factual
    determinations made by state courts that denied an evidentiary hearing
25  on the matter), <u>with</u> <u>Blodgett</u>, 393 F.3d at 966 ("We decline to hold
    that AEDPA's reference to 'adjudicated on the merits' authorizes us
26  to review the form or sufficiency of the proceedings conducted by the
    state court."). It therefore remains an open question for this Court
27  to resolve.

28  ***Petition for a writ of habeas corpus***                              **Dykes v. Martel**
    ***under 28 U.S.C. 2254***              Page -22-              Case No. C-11-04454-SI

by <u>Keeney v. Tamayo-Reyes</u>, 504 U.S. 1 (1992); <u>Brown v. Smith</u>, 551 F.3d 424, 429-30 (6th Cir. 2008) (holding that when "substantial evidence" comes to light that was not considered by the state court, "there is no relevant state court adjudication" for purposes of § 2254(d)); <u>Wilson v. Sirmons</u>, 536 F.3d 1064, 1082-83 (10th Cir. 2008) ("When a state court has not examined the non-record evidence, it has reached no conclusion 'on the merits.'" (citing <u>Hoffman v. Arave</u>, 236 F.3d 523, 536 (9th Cir. 2001))); <u>Killian</u>, 282 F.3d at 1207-1208 ("Having refused Killian an evidentiary hearing on the matter, the state cannot argue now that the normal AEDPA deference is owed the factual determinations of the California courts."); <u>see also</u> <u>Monroe v. Angelone</u>, 323 F.3d 286, 297 (4th Cir. 2003) (holding that § 2254(d) does not apply when a <u>Brady</u> claim is premised on evidence surfacing for the first time in federal proceedings). <u>But see</u> <u>Blodgett</u>, 393 F.3d at 966 ("We decline to hold that AEDPA's reference to 'adjudicated on the merits' authorizes us to review the form or sufficiency of the proceedings conducted by the state court.").

31.     The federal court requirement that Petitioner satisfy § 2254(d) based on the record before the state court – which is necessarily limited because he was not entitled to fact-development procedures – violates Petitioner's constitutional rights. In the absence of a full and fair opportunity to litigate habeas claims in state court, the application of AEDPA to those claims violates Petitioner's right to due process and results in a suspension of

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -23-                    **Dykes v. Martel**
Case No. C-11-04454-SI

the writ by leaving Petitioner with no effective remedy for federal

constitutional violations occurring at his criminal trial. See

Boumediene, 553 U.S. at 790; Jefferson v. Upton, 130 S. Ct. 2217,

2223 (2010); Ford v. Wainwright, 477 U.S. 399, 424 (1986)

("[F]undamental fairness is the hallmark of the procedural

protections afforded by the Due Process Clause."); Case v.

Nebraska, 381 U.S. 336, 344 (1965) (Clark, J., concurring)

(explaining that the exhaustion doctrine "presupposes that some

adequate state remedy exists"); Young v. Ragen, 337 U.S. 235, 238-

39 (1949); Johnson v. Zerbst, 304 U.S. 458, 467 (1938) ("To deprive

a citizen of his only effective remedy would not only be contrary

to the 'rudimentary demands of justice' but destructive of a

constitutional guaranty specifically designed to prevent

injustice.").

32.    Equally, it violates the equal protection guarantee as it

applies to indigent petitioners, Smith v. Bennett, 365 U.S. 708,

714 (1961), and undermines the reliability of capital sentencing

under the Eighth Amendment, Woodson v. North Carolina, 428 U.S.

280, 305 (1976).

33.    Accordingly, AEDPA deference should not apply to those

claims for which Petitioner was denied factual development in state

court and he should be afforded the opportunity to factually

develop those claims in this Court.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -24-                    **Dykes v. Martel**
Case No. C-11-04454-SI

**V.**
**INCORPORATION OF EXHIBITS;**
**REQUEST FOR JUDICIAL NOTICE**

34.      While Petitioner has endeavored to specifically state all facts and law supporting each claim herein, additional supporting facts and law may have been stated in separate claims. For this reason, Petitioner incorporates by reference each and every paragraph of this petition into each and every claim presented as if fully set forth therein.

35.      Petitioner additionally incorporates all exhibits filed concurrently with this petition and all exhibits which may be subsequently filed in this action.[7]

36.      Petitioner requests that under Rule 201 of the Federal Rules of Evidence this Court take judicial notice of the certified record on appeal and all pleadings, briefs, orders and exhibits filed with the California Supreme Court in connection with Petitioner's appeal and in connection with Petitioner's state habeas petition.  Petitioner also requests that this Court take judicial notice of the record of other proceedings before the state courts before and during the time of Petitioner's trial.

_____

[7]      As noted in n. 1 above, counsel for Respondent has advised the undersigned counsel that, consistent with the local habeas rules of this Court, Respondent will lodge the entire record of the prior judicial proceedings.  Accordingly Petitioner is not presenting the entire record of said proceedings.  Should Respondent fail to do so, or if this Court should otherwise request, Petitioner will present such records to this Court.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -25-                    **Dykes v. Martel**
                                                                    Case No. C-11-04454-SI

1

**VI.**
**GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS**

2

3    37.        In the interest of brevity and to avoid repetition,

4    Petitioner makes the following allegations for each of the

5    enumerated claims below and incorporates these allegations into

6    each claim.

7

8    38.        The declarations and other exhibits submitted with this

9    petition and the allegations set forth in this petition are hereby

10   incorporated by reference into each claim in this petition.

11

12   39.        After Petitioner has been provided discovery, the use of

13   this Honorable Court's subpoena power, and the opportunity to fully

14   investigate his claims, Petitioner will and hereby does request an

15   opportunity to supplement or amend this petition.

16

17   40.        If the State disputes any of the facts alleged below,

18   Petitioner requests that this Court issue an order directing that

19   an evidentiary hearing be held so that the factual disputes may be

20   resolved.  After Petitioner has been afforded discovery and the

21   full disclosure of material evidence by the prosecution, the use of

22   this Court's subpoena power, and the opportunity to investigate

23   fully, he requests an opportunity to supplement or amend this

24   petition.

25

26   41.        Petitioner does not waive any applicable rights or

27

28   *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
     *under 28 U.S.C. 2254*                 Page -26-                     Case No. C-11-04454-SI

privileges by the filing of this petition and the exhibits; in particular, Petitioner does not waive either the attorney-client privilege or the work-product doctrine protection.  Petitioner requests that any waiver of a privilege occur only after a hearing with sufficient notice and the right to be heard on the issue. Petitioner also requests "use immunity" for each and every disclosure he has made and may make in support of this petition. See Bittaker v. Woodford, 331 F.3d 715 (9th Cir. 2003)(en banc).

42.      The violation of Petitioner's constitutional rights constitutes structural error and warrants the granting of this Petition without any determination of whether the error was harmless. Even assuming that the harmless error doctrine applies, however, relief is nevertheless required because the error "had substantial and injurious effect or influence" in determining Petitioner's convictions and sentences. Brecht v. Abrahamson, 507 U.S. 619, 627, 631, 638 (1993); Fry v. Pliler, 551 U.S. 112, 121 (2007). Relief is also required because the errors so infected the integrity of the proceedings as to warrant habeas relief even if they did not substantially influence the jury's verdict. Brecht, 507 U.S. at 638 n.9.

43.      The constitutional violations set forth in each individual claim alone justify relief.  In the alternative, if this Honorable were to conclude such is not justified when the claims are considered individually, Petitioner alleges and avers this

1    Court should conclude that relief is justified when the claims are

2    considered in the aggregate. <u>Taylor v. Kentucky</u>, 436 U.S. 478, 487

3    n.15 (1978); <u>Phillips v. Woodford</u>, 267 F.3d 966, 985 (9th Cir.

4    2001).

5

6    44.      If Respondent contends that any claim should not be

7    considered on the merits because the California Supreme Court found

8    the claim to be procedurally barred under state law, Petitioner

9    contends that the bar does not preclude federal merits review

10   because it is not an adequate and independent state ground. <u>See</u>

11   <u>Coleman v. Thompson</u>, 501 U.S. 722, 729-30 (1991); <u>Bennett v.</u>

12   <u>Mueller</u>, 322 F.3d 573, 580 (9th Cir. 2003). If this Court finds any

13   claim to be procedurally defaulted, federal review on the merits of

14   the claim is nevertheless required because given an opportunity

15   Petitioner can and will establish: (1) cause and prejudice for the

16   default; and (2) that the failure to consider the claim will result

17   in a fundamental miscarriage of justice. <u>Coleman</u>, 501 U.S. at 750,

18   753-754; <u>House v. Bell</u>, 547 U.S. 518, 522 (2006).

19

20   45.      To the extent that any claim, or part thereof, is deemed

21   to be unexhausted, untimely, or procedurally or otherwise barred,

22   it is a result of the ineffective assistance of prior counsel

23   (trial and/or appellate and state habeas counsel) and/or inadequate

24   state court funding for post-conviction proceedings. Prior counsel

25   (trial and/or appellate and state habeas counsel) was ineffective

26   in not raising the claim earlier. See <u>Martinez v.</u>

27

28   *Petition for a writ of habeas corpus*          **Dykes v. Martel**
     *under 28 U.S.C. 2254*          Page -28-          Case No. C-11-04454-SI

1  Ryan, 132 S. Ct. 1309, 1315, 1320 (2012); Evitts v. Lucey, 469 U.S.

2  387, 396-97 (1985); Strickland v. Washington, 466 U.S. 668 (1984).

3  Accordingly, Petitioner urges this Honorable Court to adjudicate

4  any such claim(s) on the merits.

5

6  46.     Petitioner is presently aware of the facts set out below,

7  establishing the right to relief. To the extent that the facts set

8  forth below could not reasonably have been uncovered by trial

9  and/or appellate and state habeas counsel, those facts constitute

10  newly discovered evidence which casts fundamental doubt on the

11  accuracy and reliability of the proceedings and undermines the

12  prosecution's case against Petitioner such that his rights to due

13  process and a fair trial have been violated, and collateral relief

14  is appropriate.

15                          **VII.**
                **PROCEDURAL HISTORY OF THE CASE**

16

17  47.     On September 9, 1993, the Alameda County district

18  attorney filed a complaint against Ernest Edward Dykes

19  ("Petitioner") charging him with murder with a special circumstance

20  and use of firearm and great bodily injury clauses, and

21  premeditated attempted murder.  (CT 1)  The latter offense also

22  contained enhancement allegations for the infliction of great

23  bodily injury, the use of a firearm and an aged victim.  (CT 2)

24  Petitioner had counsel appointed to represent him.[8]

25  _____

26      [8]    On August 24, 1993, Attorney Spencer Strellis was appointed
    to represent Petitioner. (CT 10)  William Daley was later appointed

27                                                          (continued...)

28  *Petition for a writ of habeas corpus*                    **Dykes v. Martel**
    *under 28 U.S.C. 2254*          Page -29-            Case No. C-11-04454-SI

1  48.      The trial court held a preliminary hearing on November

2  19, 1993.  (CT 97)  At the conclusion of the hearing, the court

3  held Petitioner to answer for the crimes charged.  (CT 208-10)

4

5  49.      On December 2, 1993, the prosecution filed a multi-count

6  information against Petitioner, alleging several crimes arising out

7  of the incident.  (CT 213-16) In particular, Count 1 alleged that

8  on July 26, 1993, Petitioner committed the murder of Lance Clark in

9  violation of Penal Code[9] section 187.  (CT 213)[10]

10

11  50.      Petitioner pled not guilty, and after pretrial

12  proceedings not germane here, jury selection began on May 16, 1995.

13  ─────────────────────

14      [8](...continued)
   as second counsel.  As Mr. Strellis was in name and de facto lead

15  counsel, references herein to counsel are generally to him alone.

16      [9]    Unless otherwise noted, all statutory references are to
   California statutes. For example,  Penal Code references are to the

17  California Penal Code, and Evidence Code references are the California
   Evidence Code, and so forth.

18

19      [10]    The information further alleged the special circumstance
   that the murder was committed while Petitioner was engaged in the

20  commission, attempted commission, and the flight thereafter of a
   robbery, in violation of PC § 190.2(a)(17)(i).  (CT 213-14)  Count 1

21  also alleged that Petitioner personally used a firearm in violation
   of sections 1203.06 and 12022.5.  (CT 214)

22      Count 2 alleged that on the same day, Petitioner attempted to
   murder Bernice Clark, in violation of PC §§ 664 and 187.  (CT 214-15)

23  Count 2 further alleged that the attempted murder was committed with
   premeditation and deliberation, and that Petitioner personally used

24  a firearm, within the meaning of §§ 1203.06 and 12022.5.  Id.  Count
   2 also alleged that Petitioner inflicted great bodily injury on Mrs.

25  Clark, in violation of §§ 1203.075, and 12022.7, and that she was an
   aged victim, within the meaning of § 1203.09(a).

26      Finally, count 3 alleged that on the same day, Petitioner robbed
   Bernice Clark, in violation of PC § 211.  Count 3 also alleged an

27  enhancement for personal use of a firearm, the infliction of great
   bodily injury, and for an aged victim.  (CT 215-16)

1   Opening statements commenced on July 10, 1993.  On August 2, 1993,

2   the jury found Petitioner guilty of the first-degree murder of

3   Lance Clark, and the robbery and attempted murder of Bernice Clark.

4   (RT 3739-41)  The jury concluded that the special circumstance,

5   robbery-murder, was true.  Id.  The jury also found the charged

6   enhancements for use of a firearm, infliction of great bodily

7   injury and an aged victim to be true.  Id. Notably, the jury

8   concluded that the attempted murder of Bernice Clark was not

9   committed with premeditation and deliberation.  (RT 3739)

10

11  51.      The penalty phase of the trial began on August 8, 1993,

12  and ended the next day on August 9, 1995.  The jury began

13  deliberating on August 10, 1993.  (RT 3972)  On August 23, 1995,

14  the court excused two jurors, replacing them with alternates. The

15  jury resumed deliberations.  (RT 4026-35, 4039-41) The next day, on

16  August 24, 1995, the jury fixed the penalty at death.  (CT 550,

17  518; RT 4043)

18

19  52.      Post-trial, the defense moved for a new trial based on

20  prosecutorial and juror misconduct.  (CT 649-53; 691-727)   On

21  December 22, 1995, the trial court denied those motions, as well as

22  a motion to modify the judgment. That same day the trial court

23  sentenced Petitioner to death. (CT 767-68, 771-94; RT 4091)

24

25  53.      Petitioner appealed the judgment and sentence to the

26  California Supreme Court. He also sought a writ of habeas corpus

27

28  *Petition for a writ of habeas corpus*            **Dykes v. Martel**
    *under 28 U.S.C. 2254*          Page -31-        Case No. C-11-04454-SI

1   from the California Supreme Court.  That court denied all requested

2   relief. <u>People v. Dykes</u>, 46 Cal. 4th 731 (2009); Order in re Dykes,

3   8/31/2011.

4                                **VIII.**
                   **STATEMENT OF FACTS OF THE OFFENSES**

5

6   A.        Background

7   54.        Bernice Clark owned a six-unit apartment building at 9706

8   Cherry Street in East Oakland. As a matter of routine, she visited

9   the building a few times per month, usually on the first of the

10  month to collect rent and at other times to assist with building

11  maintenance.  (RT 2695, 2697)  Frequently Mrs. Clark brought her

12  adult son or granddaughter with her.  (RT 2978)  On occasion Mrs.

13  Clark brought her eight-year old grandson, Lance Clark, along.  (RT

14  2696)

15

16  55.        Mrs. Clark frequently lent her tenants small amounts of

17  money and cashed personal checks for them.  (RT 2700) Doing so, she

18  would subtract any amounts owed for rent from the check and then

19  provide the remainder to the tenant.  (RT 2700-01)  Several months

20  before the shooting, Mrs. Clark cashed a check for Petitioner.

21  (<u>Id</u>.; RT 3336-37)  Tenants understood she regularly carried

22  significant amounts of cash with her.  One tenant, LaCondra

23  Douglas, warned Mrs. Clark about carrying around so much money at

24  the apartments.  (RT 2977-78)[11]

25  _____

26        [11]    LaCondra Douglas testified that the tenants of the building,
    located in an impoverished area, were known joked about robbing Mrs.
27                                                            (continued...)

28  *Petition for a writ of habeas corpus*                       **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -32-          Case No. C-11-04454-SI

56.        In November, 1992, Petitioner's girlfriend, Bianca

Rodriguez, gave him $50.00 to buy a gun for his birthday.  (RT

3422, 3424)  At some point, he showed her a gun that he had

purchased.  (RT 3425) Petitioner  bought the gun, because he felt

he needed to have one for self-protection in his neighborhood.  (RT

3303)  When he purchased the gun, he did not initially buy any

bullets for it.  (RT 3304)


57.        A couple of months before the events at issue here, Ms.

Douglas sold Petitioner some bullets for a .45 caliber gun.  (RT

2956)[12]


B.        The Events of July 26, 1993

58.        On July 26, 1993, Mrs. Clark visited the apartment

building to bring some plastic bags to her maintenance man, Leo

Pena.  She brought Lance Clark with her.  (RT 2697)  She arrived at

around 2:30 p.m., and parked in the parking lot at the rear of the

building.  Id.  She turned her car around so it was facing the

building before she got out of the car.  (RT 2698, 2845) Thus, her

---

[11](...continued)
Clark.  (RT 2961-62)  A couple of months before the shooting,
Petitioner had been visiting with other tenants when they discussed
the possibility of robbing Mrs. Clark.  (RT 2961)  Douglas testified
that Petitioner stated he would like to "get that lady's money."
(Id.; RT 2963, 2967)

[12]        Petitioner testified that she gave him the bullets, he
denied paying her for them. (RT 3305) He test-fired a number of them
after he received them. Petitioner also denied he was the one who
stated he would like to get "that lady's money" although he admitted
to being present when the statement was made by another. (RT 3334)

*Petition for a writ of habeas corpus*                                         **Dykes v. Martel**
*under 28 U.S.C. 2254*                    Page -33-                    Case No. C-11-04454-SI

car was facing apartment #6.  Petitioner's mother rented apartment

#6, an upstairs unit with a window overlooking the parking lot.

(RT 2698-99)[13]

59.      After arriving, Mrs. Clark and Lance got out of the car

and she spoke to Mr. Pena. (RT 2701)  After she talked with Pena,

she and Lance got back into the car.  Edward Tyson, the tenant in

apartment #1, came up to her and asked to borrow $20.00.  (RT 2703)

Tyson had previously called her to see if she was coming over to

the building and to ask if could have a $20.00 loan; she had agreed

to lend him the money.  (RT 2703, 2738-39)[14]  She sat in the

driver's seat of her car, with the door open and Tyson stood by the

door.  (RT 2707-08) As was her practice, she gave him a business

card to sign and date with his name and the amount of money, and

then gave him $20.00.  (RT 2703, 2841-42)

60.      Approximately three to five minutes before hearing the

gunshots, Odom saw Petitioner at the front of the building by the

---

[13]    The apartment building is two stories and contains six
apartments, units 1-3 on the ground floor and 4-6 on the second floor.
(RT 2692-93) Apartments 1 and 4 are in the front of the building by
Cherry Street, and apartments 3 and 6 are in the rear near to the
parking lot.  Id.  The apartment building has two staircases, one in
the front that leads to the upstairs walkway which goes by the front
of the apartments, and a second staircase in the back by apartment 6.
(RT 2693-94)  The front staircase ends at the front door of apartment
6.  (RT 2750-51)

[14]    Mrs. Clark testified at trial that she had a few hundred
dollars in cash in her bankbook which was located underneath the seat
of her car.  (RT 2703) She also had some money in her purse.  (RT
2704-05)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -34-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

mailboxes.  Odom was standing on his balcony in front of his
apartment at the time.  Petitioner was wearing a gray hooded
sweatshirt and green or blue acid-washed jeans.

61.        As Tyson and Mrs. Clark were talking, Petitioner -
wearing a gray or white hooded sweatshirt and with a woman's nylon
stocking over his face - came up to the car and may have said "This
is a robbery," or words to that effect.  (RT 2708, 2844-45)  When
Tyson first saw Petitioner, he was standing right in front of him.
Id.  Initially, Petitioner pointed the gun at Tyson's forehead from
about four feet away.  (RT 2846)  Tyson thought that the demand for
money was directed at him and responded by taking a couple of steps
back and stating that he didn't have any money.  (RT 2847-48)
Petitioner turned his attention to Mrs. Clark, pointed the gun at
her, and demanded her money.  (RT 2848)  Tyson heard Mrs. Clark say
to the robber that he looked like one of her tenants, and also
heard her say the name "Ernest."  (RT 2849-51)  After Tyson heard
this, he backed away from the man and then ran for a gap in the
back fence. (RT 2850-51, 2853)

62.        At trial the testimony regarding what happened next was
conflicting. It is clear the gun was fired, but the number of
gunshots and the timing of the shots conflicted.   Two bullets were
recovered from Mrs. Clark's vehicle.   However, Mrs. Clark
testified that Petitioner fired the gun only once - immediately
upon approaching her - without even saying anything and before she

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -35-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

had the opportunity to hand him the money.  (RT 2709)  She recalled
the gun went off after the man put the gun behind her neck.  (RT
2741)

63.        Witness Odom heard two shots, and heard the sound of
glass breaking after the second shot.  (RT 2787)

64.        Petitioner testified that the gun fired twice, but he had
pulled the trigger three times.  He first pulled the trigger to
fire a warning shot into the back window of the automobile.  (RT
3310) But the gun only clicked, and so he pulled the trigger again,
firing the warning shot.  Id.  He fired the second shot
accidentally; it was this shot that struck Mrs. Clark and killed
Lance.  (RT 3312-13)

65.        At some point, either in response to Petitioner's demand
or the gunshot, Mrs. Clark held up her wallet and told Petitioner
to take the money and leave the credit cards, which he did.  (RT
2710, 2745-47)  They struggled over the wallet, which she did not
wish to relinquish because of the credit cards and identification.
(RT 2710, 3312)  Mrs. Clark recalled that after she had been shot,
she said to the robber that he looked like the tenant in Apartment
#6.  (RT 2745)  She was able to see Petitioner through the nylon
mask.  (RT 2711)[15]

---

[15]    At trial, the prosecution contended there were two shots:
the first shot shattered the car's back window, and then Petitioner
(continued...)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -36-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

66.        Meanwhile, Tyson was still fleeing.  (RT 2854-57)   After
he went through the fence, he looked back in the direction of the
parking lot, and then ran around the curb to another apartment
complex, out of the line of sight of the car.  (RT 2856-60)   He
waited about 30 seconds to one minute, and returned to the car.
(RT 2680)  As he lifted his head back up, he glimpsed someone
running from the direction where the gunman had been.  Id.   Odom saw
Petitioner go over the fence.  (RT 2763)

67.        At this point, Tyson returned to the parking lot.  (RT
2861)  When he reached Mrs. Clark's car, the driver's side door was
closed.  Id. Mrs. Clark seemed to be trying to start the car.  Id.
Tyson tried to open the driver's door but it was locked.  (RT 2862)
He ran to the passenger side door, which was unlocked, and then he
saw that Lance had been shot.  Id.

68.        Tyson, his girlfriend, and Odom attempted to assist Mrs.
Clark and Lance.  It was apparent that the child had been badly
injured. (RT 2864) He stopped breathing before the ambulance
arrived. (RT 2865)

69.        Within three to five minutes, the police arrived and the

---

[15](...continued)
allegedly fired the second shot, allegedly intending to kill Mrs.
Clark once he realized she could identify him. (RT 3451-52)     To
advance this view, the prosecution rejected both Mrs. Clark's and Mr.
Tyson's versions of the events. (RT 3454-55) By its verdict, the jury
rejected the prosecution's theory.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -37-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

1  ambulance arrived thereafter. (RT 2866)  Emergency medical
2  personnel could not revive Lance and he was pronounced dead.  Mrs.
3  Clark was shot in the back of her neck, but she recovered from her
4  injuries.  (RT 2715)

5

6  70.      About ten (10) to fifteen (15) minutes after the
7  shooting, Petitioner returned to the scene and made a statement to
8  Oakland Police Department ("OPD") Officer Ceasar Basa who was
9  canvassing the area.  (RT 2893) Petitioner told Basa that at about
10 4:35 p.m., he saw Mrs. Clark standing near her car, talking with
11 Tyson.  (RT 2898) Petitioner related he had walked past them
12 through the rear yard, toward Birch Street.  _Id_.  He then heard
13 gunshots, and claimed to have seen an unknown Black male running
14 away.  (RT 2898)  Petitioner said he could not identify the man if
15 he were to see him again. _Id_. Petitioner signed a written statement
16 affirming the truth of his statement.  _Id_.  Basa testified that
17 during the interview Petitioner did not seem upset or excited, nor
18 did he appear to be under the influence of alcohol or drugs.  (RT
19 2897-98)

20

21 71.      Odom was watching while Petitioner talked with the
22 police.  (RT 2815) By that time, Petitioner had changed his
23 clothes and was no longer wearing the gray sweatshirt and long
24 pants.  _Id_.  At the preliminary hearing, Odom testified he heard
25 Petitioner state to Officer Basa:  "that's messed up.  The dude ran
26 right by me," or words to that effect. (RT 2818)  Later that

27

28 *Petition for a writ of habeas corpus*                        **Dykes v. Martel**
   *under 28 U.S.C. 2254*          Page -38-          Case No. C-11-04454-SI

evening, Odom spoke with Petitioner and told him he knew that he had committed the robbery and shooting. (RT 2775) Petitioner confessed he had, telling Odom that "he didn't mean for it to go down like that." Id. Petitioner also allegedly told Odom that he got about $100 during the robbery, and that he took the money to his girlfriend's house. (RT 2776)

C.        Petitioner's Arrest and Confession

72.        At approximately 8:45 a.m. on August 7, 1993, Petitioner telephoned the Oakland Police Department and spoke to Saundra Marie Fears, a civilian employee. (RT 2983) Fears testified that Petitioner stated "Hello, my name is Ernest Dykes and I want to know if I shot somebody." (Id.; RT 2992) She asked him who he was supposed to have shot and he mentioned the name Bernice Clark. (RT 2986) She recalled the name, placed Petitioner on hold and found the report. (RT 2986-87) She kept him on the line for 15-20 minutes during which time Petitioner told her where he was, asked to have the dispatcher send police for him, and an officer was sent to the location. (RT 2989-91, 2992-93) During the conversation, Petitioner indicated he was responsible for the robbery and murder. (RT 2991, 2993, 2995) However, he also stated "I didn't do it." (RT 2984-85)

73.        At some point during the conversation, he told the dispatcher the police were almost there and he stayed on the telephone with her until they arrived. (RT 2995) When the police

1  arrived, she told Petitioner to go outside holding nothing in his
2  hands and with his hands up.  Id.  OPD Officers Grier and Fritz
3  arrested Petitioner. (RT 3004)

4

5  74.       Fritz put Petitioner in his patrol car.  (RT 3005)  Fritz
6  advised Petitioner that he was under arrest for suspicion of murder
7  and that Petitioner was not to ask about the case.  (RT 3009)
8  Police officers Fritz and Keller transported him to the police
9  station.  At some point, Petitioner began to talk, making a number
10  of disjointed statements during the ride.  (RT 3009-10)  Petitioner
11  was talking quickly and rambling.  (RT 3015)  He said:

12         This can't be happening to me, I wake up like this,
13      my father called me and told me, then I called the
14      station, I wouldn't do this to Ms. Parker [sic], I seen
15      people come and go, the paper said I borrowed money from
16      her, that was the other tenants.  I don't know how they
17      can identify me.  Shit, this is not right.
18  Id.  Petitioner appeared to be thinking out loud and was repeating
19  himself, over and over.  (RT 3016)

20

21  75.       Homicide detectives John Madarang and Robert Chenault
22  interviewed Petitioner at the station. Petitioner initially denied
23  involvement in the shooting, then he began confessing.  (RT
24  3162-64, 3166, 3170-73)

25

26  76.       Petitioner became increasingly emotional as the interview

27

28  *Petition for a writ of habeas corpus*
   *under 28 U.S.C. 2254*          Page -40-          **Dykes v. Martel**
                                                Case No. C-11-04454-SI

progressed, becoming more and more upset.  He decided to tell the detectives "what really happened."  (RT 3170)  He can be heard audibly sobbing during the two audio recordings introduced at trial of his confessions.  (Tr. Exh. 5, 7)

77.     Before the detectives began recording, Petitioner told them about the state of his life that led up to his needing money. (RT 3171) Petitioner also told them that he had thrown the gun that he used in the robbery into the water at the Alameda estuary.  (RT 3172, 3209)  He described the gun as an old army issue Colt.45, a 1917 revolver.  Id. He told the detectives that he had bought the gun for $90 from his former manager at Togo's.  (RT 3172-73)  He also admitted firing a shot while committing the robbery.  (RT 3172)

78.     In his first recorded statement, Petitioner admitted that he saw Mrs. Clark on July 26, 1993, between 4:00 and 5:00 p.m.  (CT 16798)  She was in the back parking lot with Ed, the tenant who lived in apartment #1. Id.  Petitioner did not see Mrs. Clark's grandson, Lance.  (CT 16799) Petitioner decided to get some money from Mrs. Clark at gunpoint.  Id.  He knew that she had collected rent in the past, and she had previously cashed his income tax refund check for him.  Id.  He was wearing a white sweater with a hood, and blue jeans, and had covered his face with a nylon in the hope Mrs. Clark would not be able to identify him.  (CT 16800)  He carried the .45 revolver which contained two bullets.  Id.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -41-                    **Dykes v. Martel**
Case No. C-11-04454-SI

79.        The gun was in his waistband as Petitioner ran toward the car. (CT 16801) Mrs. Clark was in the driver's seat. He went up to the car and told her to give him the money. Id. Then, because he felt he needed to scare her, he fired a warning shot into the back window of the car, after initially pulling the trigger and having the gun dry-fire. (CT 16801, 16807-08)  He reached for her wallet, and she said take the money, but a struggle over the wallet ensued. Id. He was pulling on the money and trying to run.  (CT 16807) He did not intend for the gun to go off and did not point the gun at her head. (CT 16801, 16807) Petitioner denied intending to kill Mrs. Clark or Lance. (CT 16807)  Mrs. Clark made a noise after the gun fired. (CT 16802)

80.        After the gun went off, Petitioner had the money in his hand. He got approximately $140 from the robbery. Id.  After the robbery, he left the parking lot through the back fence and went to a vacant house to change his clothes. Id. He took off his clothes and threw them in a garbage bin. Id. He was wearing shorts and a t-shirt underneath. (CT 16803)  By changing his clothes, he hoped that "they wouldn't know if it was me or not." Id. After that, he went to a store and got a beer. (CT 16802-03)  Then, he returned to the apartment complex.

81.        When he returned to the apartments, the police were there, and he recalled talking to an officer. (CT 16803-04)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -42-                    **Dykes v. Martel**
                                                                        Case No. C-11-04454-SI

82.       Petitioner explained that he needed the money to go to school and take classes in carpentry and masonry.  (CT 16804)  It cost $12/unit to take classes.  Id.

83.       Petitioner said he got the gun from Ron Marengo, a manager at his former place of employment.  Id.  A woman who lived in his apartment complex, Connie, had given him the bullets about a month prior.  (CT 16805)  She gave him between 12-18 bullets.

84.       Petitioner recalled that before the shooting he had drunk five (5) 16 oz. beers and was affected by them.  Id.  He began drinking around 2:30 p.m. that afternoon.  (CT 16805-06)  He stated that he thought about robbing Mrs. Clark about 15-20 minutes before he went down with the gun.  (CT 16806)  Petitioner did not know that the boy was in the front seat until he returned to the apartments after the shooting and the police said a boy had been shot.  (CT 16806)

85.       Petitioner was remorseful, stating: "I didn't mean it to go down like that."  Id.  He spent the money on drinking, trying to forget.  This recorded statement ended at 5:19 p.m.  (CT 16808)

86.       Petitioner's second statement, taken by Deputy District Attorney O'Connor, in the presence of Detective Madarang, commenced at 6:25 p.m. the same evening.  During the second statement, Petitioner added only a few details. Petitioner testified that he

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*            Page -43-            **Dykes v. Martel**
Case No. C-11-04454-SI

did not know how many bullets were in the gun when he pulled it out

to fire the warning shot. (CT 16813)  He stated he fired the

warning shot to scare Mrs. Clark into understanding that he was

serious and wanted the money. (CT 16814) Initially she was not

scared and told him, "don't be stupid." (CT 16815)  When he

grabbed the money, the gun went off and he heard her scream. (CT

16814)  Petitioner had not checked to see if the gun was loaded,

because he believed that Mrs. Clark would be scared if she just saw

the gun. Id. Petitioner also told O'Connor that the gun

malfunctioned frequently: that the trigger would jam, and then

become extremely loose, with a very light trigger pull. (CT

186817-18) At the end of his second statement, Petitioner began

crying uncontrollably and reiterated that he did not "mean it to go

down like that. I'm no killer." (CT 16820)

87.      Both of Petitioner's taped confessions were played and

entered into evidence. (RT 3174; Tr. Exh. 5, 7)

88.      While Chenault claimed that Petitioner denied being under

the influence of alcohol at the time of the crime, Chenualt

admitted that Petitioner told the detectives that he drank four (4)

cans of beer before the robbery. (RT 3205, 3210-11) Chenault also

confirmed that during the interview Petitioner told the detectives

the firing of the second shot was an accident and he did not even

know he had hit the boy. (RT 3209, 3212)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -44-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

D.          Forensic Evidence

89.          Forensic evidence showed that a single bullet went through the back portion of Mrs. Clark's neck and into the left side of Lance's chest.  (RT 2670, 2668) The bullet created a large entrance wound in Lance's body.  (RT 2666, 2668)  The bullet exited Lance's body on the lower right hand side of his back.  (RT 2666) The bullet struck a number of vital organs, including the heart, the aorta, and the liver.  (RT 2667)  The bullet wound caused extensive internal bleeding.  (RT 2688)  The cause of death was the single gunshot.  (RT 2689)   The bullet was recovered from the body of the car; it was found underneath Lance's body.  (RT 2933)

90.          The forensic pathologist, Dr. Hermann, could not determine with certainty the victim's position at the time he was shot, because he did not know the positioning of the gun.  (RT 2675)  Dr. Hermann testified, in response to a hypothetical question, that if the bullet had passed through another person's neck, one would expect it to go straight through the neck without changing its course. (RT 2675)  If the bullet was fired through the window and went through the neck of another, it would not be expected to head downward as it did in Lance's body.  (RT 2675-76) Hermann opined that the victim's body would have to have been tipped over toward the left side of the car so that when the bullet struck him, it headed downward through his body.  Id.

91.          A ballistics expert, Dr. Lansing Lee, testified that the

two bullets recovered from the victim's car, trial exhibits 27 and 28, were ammunition for a .45 caliber semiautomatic pistol and had been fired by the same gun.  (RT 3121-22)  Dr. Lee testified that normally, a revolver could not properly fire bullets designed for a semiautomatic weapon.  (RT 3127)  However, the Colt Company had manufactured one revolver that could fire such ammunition.  (RT 3127-28)  Dr. Lee produced a replica gun, which was a Colt .45 revolver, the 1917 model designed for the United States Army.  (RT 3128-31)

92.     Dr. Lee testified that a revolver like the replica gun could be fired using either a double or single action.  (RT 3133) Firing the gun using a single action mechanism required the person to pull back the hammer.  (RT 3133)  Alternatively, the person using a weapon could simply pull the trigger without pulling back the hammer, but this method required greater force to pull the trigger.  (RT 3134)  Dr. Lee opined that it took approximately 10 pounds of pressure to fire the replica gun using a double action mechanism, with a minimum of eight pounds of pressure.  (RT 3136) He estimated that it would only take about two pounds of pressure to fire the replica gun if the hammer was already cocked.  (RT 3136-37)  His estimates of the pressure required to fire the gun were based solely upon the replica gun.  (RT 3140)  Dr. Lee did not examine the gun that was actually used in the shooting.  (RT 3141)

93.     Deborah Rivers, a crime scene investigator, photographed

the scene and examined Mrs. Clark's vehicle.  (RT 2907-10)  When

she examined the vehicle, she observed the rear passenger side

window was broken out, with glass in the car and outside the car on

the ground.  (RT 2915)  She opined that the bullet entered through

the first wall of the door, went through the base of the window,

and then dented the second wall of the door.  (RT 2917-18)  She

recovered a spent bullet from the interior portion of the right

rear door of the vehicle.  (RT 2916, 2918)  Rivers inserted a

wooden dowel into the bullet hole, in an attempt to draw the

possible trajectory of the bullet.  (RT 2919-21)  She admitted that

her estimate of trajectory could be off by several inches.  (RT

2930-31)  She believed that the window shattered from velocity and

concussion, not because the bullet went through it.  (RT 2931)  She

noted that the fact that the bullet went through the first part of

the door, before creating the dent in the second part of the door,

could have changed its path.  Id.  Rivers prepared a diagram, which

was admitted into evidence, of the location of Mrs. Clark's

vehicle, as well as other vehicles that were present in the parking

lot.  (RT 2922-26)


E.       The Defense Case

94.       Petitioner testified in his own defense and admitted he

was the armed robber.  At the time of the robbery, he was

unemployed and looking for work.  (RT 3294-95) He had left his job

working at Togo's in Hayward about a year prior to the incident.


*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                     Page -47-                     **Dykes v. Martel**
                                                                        Case No. C-11-04454-SI

95.      About a year prior to the incident, he bought a .45 caliber revolver, because he lived in a dangerous neighborhood and wanted it for protection. (RT 3303-04)  When he bought the gun, he did not buy any bullets for it.  (RT 3304)  He got some bullets for the gun approximately two to three months after buying the gun. Id.  He obtained about 12-18 bullets from his neighbor, LaCondra Douglas.  (RT 3304-05) When testing the gun, he had noticed it had problems.  (RT 3304)  Sometimes the trigger locked up and would not pull back at all.  Id.  When he finally got the trigger mechanism to work, the trigger was loose and took very little force to pull. (RT 3304)  By July 26, 1993, he only had a few bullets remaining; the rest had been used to test the gun.  (RT 3305)

96.      On July 26, 1993, Petitioner had traveled to a couple of different locations, looking for work. (RT 3294-97)  First, he went to Internal Personnel, an organization that provides temporary jobs.  Id.  Next, he went to the Togo's in downtown Oakland and looked for a job there. (RT 3296-97)  Petitioner wanted employment and money, hoping he could attend Laney College. (RT 3296)

97.      These activities took several hours and when he was done, he returned to his apartment at Cherry Street.  (RT 3298)  When he returned home, he lounged around and performed some household chores.  (RT 3299)  While he was doing his chores, he made three trips to the local store for beer.  On each trip he bought two (2) 16 oz. cans of malt liquor.  (RT 3299-3301)  On his third trip, he

gave one of the cans of alcohol to Alphonso Odom. (RT 3300-01)  He
was feeling the effects of the alcohol when he finished the last of
the beer.  (RT 3301)

98.        At that point, he took the vacuum cleaner to his sister's
room and looked out the back window, which looked over the back
parking lot.  (RT 3301-02)  He saw Mrs. Clark talking to Ed Tyson,
but did not see anyone else there. (RT 3302)  He did not see Mrs.
Clark's grandson Lance. Id. It was then that he decided to rob Mrs.
Clark.  (RT 3302, 3306)  He went into his mother's room, got one of
her stockings to cover his face and then got his gun and put it in
his waistband.  (RT 3302-03, 3306)  Petitioner was wearing some
jeans over gym shorts and a sweatshirt.  (RT 3306) Petitioner
walked downstairs and to the back quickly.  (RT 3307)  Mrs. Clark
was halfway in the car, sitting in the car with her legs out and
Mr. Tyson was standing by the back door of the car.  Petitioner did
not see anyone else in the area or in the car.  (RT 3308)  When he
reached the car, he demanded money from Mrs. Clark and told Tyson
not to move. Id.

99.        Initially, Petitioner pointed the gun at Mrs. Clark.
Mrs. Clark told him "don't be stupid, child."  (RT 3308)  Mrs.
Clark seemed to be hesitating, so Petitioner fired a warning shot
into the rear window of the car, to let her know that he was
serious.  (RT 3308)  When he fired the shot, he was right up at the
car and the gun was inside the car pointing in back of the seat

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -49-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

toward the back window. (RT 3309)  When he first tried, the gun

just clicked; then he pulled the trigger again and that's when it

fired a bullet into the back window. (RT 3310)  Mrs. Clark then

held out her wallet and Petitioner reached for it.  (RT 3311)  Mrs.

Clark had the wallet in her lap and was taking money out of it.

(RT 3310) Petitioner was holding part of the wallet. Id.  His right

hand was wrapped around the headrest of Mrs. Clark's car seat,

supporting himself and holding the gun in his right hand. Id.  Both

the gun and his hand were inside the car.  (RT 3311)

100.    As they were struggling, Connie Douglas' boyfriend pulled

his car into the back parking lot and Petitioner was rushing

because he did not want him to see what was going on.  Id.

Petitioner turned around and looked toward Connie's boyfriend over

his left shoulder.  (RT 3311)  Then, the car backed up and

disappeared.  (RT 3312)  Petitioner thought that Connie's boyfriend

had driven away quickly because he had seen what was going on.  (RT

3311)

101.    It was during this period, while Petitioner was trying to

take the money from Mrs. Clark, that the gun went off.  Id.

Petitioner did not know why the gun went off.  He did not

intentionally pull the trigger.  (RT 3312-13)  After the gun went

off, Petitioner dropped the gun.  (RT 3313) As the gun went off, he

heard Mrs. Clark scream. Id.  Petitioner was not aware that Lance

Clark was in the car at all.  Id.  He did not intend to shoot Mrs.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -50-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

Clark and never intended to injure or shoot Lance Clark.  Id.

102.    Petitioner next picked up the gun and ran.  Id.  He ran through a space in the back fence, through some apartments where some adults and children were standing around and stopped on Birch Street.  (RT 3314)  He then ran to a vacant house on Birch Street and stood there for awhile, wondering whether he had really shot her.  Id.  He took his pants and sweatshirt off.  Id.  He then went to another back yard where some people approached him, asking what he was doing back there.  Id. He left, went back to the same store and got another beer.  Id. He then returned to the Cherry Street apartments where he saw the ambulance and the paramedics pulling Lance Clark out of the car.  (RT 3315)  That was the first time Petitioner realized Lance was there.  Id.

103.    Petitioner was paranoid and afraid.  (RT 3316)  At the time of trial, Petitioner did not recall what he had told the police at that time, but admitted that he lied to them because he was afraid.  (RT 3316)  Eventually the police left and he stayed at the apartments, living there for about a week or so.  Id.  Most of the time he got drunk, smoked marijuana and tried to forget.  (RT 3317)  He did not eat and lost weight.  Id.  He testified "I was just doing stuff like I felt this was my last days on earth or something."  (RT 3317)

104.    Eventually, Petitioner talked with his father and his

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                          Page -51-                          **Dykes v. Martel**
Case No. C-11-04454-SI

brother.  Petitioner called the police after learning they were looking for him.  (RT 3317-18)  He spoke with a dispatcher and told her where he was.  (RT 3319)  She sent the police out to arrest him.  _Id_.  He stayed on the telephone until the police arrived and put down the phone when he saw police in riot gear.  (RT 3319) When he came out of his apartment with his hands out, an officer came and handcuffed him.  (RT 3320)  He initially denied responsibility in the interview because he was scared, but eventually confessed to committing the crimes.  _Id_.

105.    In closing argument, defense counsel conceded that Petitioner was guilty of first-degree murder on a felony-murder theory, given that even an accidental killing during the course of a robbery was murder, but argued that the crimes were not premeditated.  (RT 3468, 3474-75)  The defense argued that Petitioner was not guilty of premeditated attempted murder or even of attempted murder, but of the lesser included offense of assault with a deadly weapon.  (RT 3475-77)  Counsel further argued that Petitioner was not guilty of the special circumstance, because the killing was an accident, not carried out to advance the robbery or the escape.  (RT 3478-81)

F.    The Penalty Phase

106.    The prosecution presented victim impact evidence, consisting of the testimony of Bernice Clark, Christine Clark (Lance's sister), and Judy Schaaf (Lance's second grade teacher).

These witnesses described Lance and testified regarding the effect that his death had upon each of them.  The prosecution also presented an edited videotape of the victim and his family at Disneyland. (Tr. Exh. 10)

107.    The prosecution presented evidence regarding a single uncharged circumstance in aggravation, Petitioner's prior possession of a concealed loaded firearm.  OPD Officer Rand Monda testified that he and his partner detained Petitioner on December 16, 1991, in the 10000 block of East 14th Street at 100th Avenue. (RT 3777)  Petitioner removed his gloves and placed them on the hood of the police car.  (RT 3779)  Officer Monda then pat-searched Petitioner for safety, and noticed a gun protruding from one of the ski gloves, which were sitting on the roof of his police car.  Id. Officer Monda asked Petitioner to sit in the back of the police car and Petitioner complied.  (RT 3779) Officer Monda then found the glove contained a loaded .25 caliber firearm.  (RT 3780)  When Petitioner saw the officer had the gun, he yelled things from the back of the squad car.  (RT 3781)  The officer testified that the incident stuck in his mind,  because he didn't even see the gun and "I could have been shot."  (RT 3782)

108.    However, Petitioner did not shoot at the officer or menace him with the gun.  (RT 3783-85)  He had stood at the police car when he was asked to do so and he submitted to the pat search. Id.  He peacefully gave up the gun by taking off his gloves, which

1  contained the gun, and placing them on the roof of the police car.

2  (RT 3784-85)  He removed his gloves without any request from the

3  officer.  In due course, Petitioner was handcuffed and taken to

4  jail, which procedures he did not resist.  (RT 3785)

5

6  G.       Evidence in Mitigation

7  109.      The defense presented an extremely limited case in

8  mitigation, consisting of the testimony of a few members of

9  Petitioner's immediate family.  Petitioner's mother Mary Brown, his

10  sister Sarah Dykes, his brother Israel Wroton, and his aunt

11  Floyzell Jones.  Each testified that they hoped Petitioner would

12  not be executed. (RT 3818-19, 3823-25, 3826-27, 3830-32, 3835-37)

13  They also testified that they visited Petitioner in prison and

14  intended to continue to do so.  (RT 3821, 3825, 3828-29, 3833-34)

15

16  110.      On cross-examination, the prosecution elicited testimony

17  that Mr. Wroton had visited Petitioner three times since he had

18  been incarcerated, Mrs. Brown had visited him almost every weekend,

19  and his aunt had visited him approximately two or three times

20  during the two years since he had been incarcerated.  (RT 3821,

21  3825, 3828, 3833)

22

23  111.      Petitioner's father also testified, mostly regarding his

24  own life, including that he was a war veteran.  (RT 3835-36)  He

25  said he did not want to see his son executed as that would be the

26  last of his family line.  (RT 3837)  The defense did not present

27

28  *Petition for a writ of habeas corpus*              **Dykes v. Martel**
   *under 28 U.S.C. 2254*          Page -54-          Case No. C-11-04454-SI

1    any further evidence in mitigation.

2

3                                    **IX.**
                        **PETITIONER'S CLAIMS IN FEDERAL HABEAS**

4                                **Claim 1[16]**

5    **PETITIONER'S DEATH SENTENCE IS INVALID BECAUSE CALIFORNIA'S DEATH**
     **PENALTY SCHEME IS FUNDAMENTALLY FLAWED IN NUMEROUS RESPECTS; BOTH**
6    **ON ITS FACE AND AS APPLIED TO PETITIONER.**

7    *Synopsis*

8    112.     The U.S. Supreme Court has clearly stated that the death

9    penalty is constitutional provided it is applied in a clearly

10   delineated manner designed to impose it only on the "worst of the

11   worst."

12        Capital punishment must be limited to those offenders who

13        commit "a narrow category of the most serious crimes" and

14        whose extreme culpability makes them "the most deserving

15        of execution." Atkins, supra, at 319, 153 L. Ed. 2d 335,

16        122 S. Ct. 2242. This principle is implemented throughout

17        the capital sentencing process. States must give narrow

18        and precise definition to the aggravating factors that

19        can result in a capital sentence. Godfrey v. Georgia, 446

20        U.S. 420, 428-429 (1980) (plurality opinion).

21   Roper v. Simmons, 543 U.S. 551, 568 (2005).

22

23   113.     The recent re-affirmation of this principle by the Court

24

25        [16]    This claim was exhausted during proceedings before the
26   California Supreme Court.    See direct appeal claims XII, XV, XVI,
     XVII, XVIII, XIX, XXIII, XXIV, XXV, and XXVIII, and state habeas claim
27   24.

28   *Petition for a writ of habeas corpus*                    **Dykes v. Martel**
     *under 28 U.S.C. 2254*          Page -55-          Case No. C-11-04454-SI

1  is in complete accord with the Court's longstanding view,

2  articulated as far back as when it invalidated the death penalty

3  nation-wide in 1972, observing:

4      To avoid the Eighth Amendment's proscription against

5      cruel and unusual punishment, a death penalty law must

6      provide a 'meaningful basis for distinguishing the few

7      cases in which the death penalty is imposed from the many

8      cases in which it is not.'

9  Furman v. Georgia, 408 U.S. 238 (1972)(conc. opn. of White, J.);

10 accord Godfrey v. Georgia, 446 U.S. 420, 427 (1980) (plur. opn.)

11 The capital punishment system our nation had in place at that point

12 no longer satisfied this mandate, and accordingly the Court struck

13 it down in its entirety.

14

15 114.    To meet this constitutional mandate, since then the

16 states have regularly been reminded by the Court they must

17 genuinely narrow, by rational and objective criteria, the class of

18 murderers eligible for the death penalty:

19     Our cases indicate, then, that statutory aggravating

20     circumstances play a constitutionally necessary function

21     at the stage of legislative definition: they circumscribe

22     the class of persons eligible for the death penalty.

23 Zant v. Stephens, 462 U.S. 862, 878 (1983).

24

25 115.    Sadly, it has become increasingly obvious that

26 California's death penalty statute as utilized in this day, and in

27

28 *Petition for a writ of habeas corpus*
   *under 28 U.S.C. 2254*
   **Dykes v. Martel**
   Case No. C-11-04454-SI

1  particular as shown clearly in this specific case, does not

2  meaningfully narrow the pool of murderers eligible for the death

3  penalty.  Nor does it guide the sentencer properly.  Rather, in

4  California it is a combination of random forces and factors that

5  determine who will actually be subjected to the ultimate

6  punishment.  This is constitutionally offensive.

7

8  **CALIFORNIA'S DEATH PENALTY STATUTE OF OVER-INCLUSIVE AS DEMONSTRATED BY SECTION 190.2 AND AS APPLIED TO PETITIONER**

9

10  116.    At the time of the offenses at issue here, the statute

11  contained no less than twenty-nine (29) special circumstances that

12  purported to narrow the large category of first degree murders and

13  murderers to the "worst of the worst" cases.  See e.g. Kansas v.

14  Marsh, 548 U.S. 163, 206 (2006)(those most deserving of the death

15  penalty.[17]  However, reality is that the listed special

16  circumstances found in § 190.2 are currently so numerous and broad

17  that they encompass nearly every first-degree murder.[18]

18

19  117.    This is all directly against the grain of the U.S.

20  ──────────────

21      [17]    This figure does not include the "heinous, atrocious, or
    cruel" special circumstance declared invalid in People v. Superior

22  Court (Engert), 31 Cal.3d 797 (1982).

23      [18]    The required narrowing in California is accomplished in its
    entirety by the "special circumstances" set out in Penal Code § 190.2.

24  The California Supreme Court has explained that "[U]nder our death
    penalty law, . . . the section 190.2 'special circumstances' perform

25  the same constitutionally required 'narrowing' function as the
    'aggravating circumstances' or 'aggravating factors' that some of the

26  other states use in their capital sentencing statutes." People v.

27  Bacigalupo, 6 Cal.4th 857, 868 (1993).

28  *Petition for a writ of habeas corpus*          **Dykes v. Martel**
    *under 28 U.S.C. 2254*          Page -57-          Case No. C-11-04454-SI

1   Supreme Court's orders; nevertheless this result was exactly the

2   drafters' publicly declared desired result in California.  When it

3   enacted the 1978 statute, the public did so embracing the goal of a

4   death penalty statute that was as all-inclusive as possible.

5

6   118.     This statute was enacted into law as a ballot-based

7   initiative, Proposition 7, on November 7, 1978. Proposition 7

8   replaced the death penalty statute that had been implemented in

9   California just one year before in 1977.  Proposition 7 truly

10  narrowed the number of offenders who might be sentenced to death,

11  and thus, in the public's eyes, the 1977 statute was too narrow.[19]

12

13  119.     In the 1978 Voter's Pamphlet, the proponents of

14  Proposition 7 described certain murders not covered by the existing

15  1977 death penalty law, and then stated: "And if you were to be

16  killed on your way home tonight simply because the murderer was

17  high on dope and wanted the thrill, the criminal would not receive

18  the death penalty. Why?  Because the Legislature's weak death

19  penalty law does not apply to every murderer. Proposition 7 would."

20  1978 Voter's Pamphlet at 34, "Arguments in Favor of Proposition 7."

21  (Exhibit 1)

22

23  120.     Proposition 7, now embodied in Section 190.2, was thus

24

25      [19]      Indeed, the Supreme Court itself has contrasted the 1977 law

26  with the 1978 law under which Petitioner was convicted, noting that
    the 1978 law had "greatly expanded" the list of special circumstances.

27  Pulley v. Harris, 465 U.S. 37, 52 n. 14 (1984).

28  *Petition for a writ of habeas corpus*                          **Dykes v. Martel**
    *under 28 U.S.C. 2254*                    Page -58-      Case No. C-11-04454-SI

drafted and successfully enacted to satisfy a public intent that
was directly contrary to what the Supreme Court had ordered: a
narrow circumscription of the class of persons eligible for the
death penalty.  In California, in a particularly disturbing twist
that must surely offend the core of Enmund v. Florida, 458 U.S. 782
(1982), almost all felony-murders are now potentially special
circumstance cases, this even though - as here - felony-murder
cases can clearly include accidental and unforeseeable deaths, as
well as acts committed in a panic, or under the dominion of a
mental breakdown, or acts committed by others.  People v. Dillon,
34 Cal.3d 441 (1984).

121.    Section 190.2's reach has been even further extended to
virtually all intentional murders by the California Supreme Court's
construction of the lying-in-wait special circumstance, which the
Court has construed so broadly as to encompass essentially all
intentional murders. See People v. Hillhouse, 27 Cal. 4th 469,
500-501, 512-515 (2002);  People v. Morales, 48 Cal.3d 527, 557-58,
575 (1989).  These broad categories are joined by so many other
categories of capital murder that the statute either does, or at
least appears to, come very close to achieving its impermissible
goal of making every murderer eligible for death. This simply does
not comport with Furman or any of its related progeny.

122.    A comparison of § 190.2 with Penal Code § 189, which
defines first degree murder under California law, reveals that

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -59-                    **Dykes v. Martel**
Case No. C-11-04454-SI

§ 190.2's sweep is so broad that it is difficult to identify varieties of first degree murder that would not make the perpetrator statutorily death-eligible.[20]

123.     In California there is no winnowing such as that the Supreme Court declared a requisite to a constitutionally acceptable statute.   Petitioner alleges that it is not occurring generally, and it did not occur specifically in his case.   This justifies relief.

124.     The U.S. Supreme Court has made it clear that the narrowing function, as opposed to the selection function, is to be accomplished by the legislature.   The electorate in California and the drafters of the Briggs Initiative threw down a challenge to the courts by seeking to make every murderer eligible for the death penalty. Post-Rose Bird[21] the California Supreme Court has never taken up the challenge the voters presented to it.

---

[20]     One scholarly article has identified seven (7) narrow but theoretically possible categories of first degree murder that would not be capital crimes under § 190.2. Shatz and Rivkind, The California Death Penalty Scheme: Requiem for Furman?, 72 N.Y.U. L.Rev. 1283, 1324-26 (1997).

[21]     As this Honorable Court no doubt well recalls, the late Hon. Rose Bird was California's first female justice and first female Chief Justice. In a historic and singular development, in 1986 she and two other justices, Cruz Reynoso and Joseph Grodin, were removed from office by California voters who perceive the court to be soft on the death penalty under her leadership. Since then, the California Supreme Court has affirmed capital judgments at a rate unequaled in any other state.

**Petition for a writ of habeas corpus**
**under 28 U.S.C. 2254**                Page -60-                **Dykes v. Martel**
                                                        Case No. C-11-04454-SI

125.      This Court should squarely accept that challenge, review the death penalty scheme currently in effect in this state, and, Petitioner believes and urges, once having done so, it will be compelled to strike down the statutory scheme as so all-inclusive as to be in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

**CALIFORNIA'S DEFINITION AND APPLICATION OF AGGRAVATING AND MITIGATING FACTORS IN SECTION 190.3 FURTHER INVALIDATE ITS DEATH PENALTY STATUTE ON ITS FACE AND AS APPLIED TO PETITIONER**

126.      California Penal Code § 190.3(a) violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in that it has been applied in such a wanton and freakish manner that almost all features of every murder have been found to be "aggravating" within the statute's meaning.

127.      Factor (a), listed in § 190.3, directs the jury to consider in aggravation the "circumstances of the crime." Having at all times found that the broad term "circumstances of the crime" met constitutional scrutiny, the California Supreme Court has never applied a limiting construction to this factor. Instead, that court has allowed ever continuing expansions of this factor, approving reliance on the "circumstance of the crime" as an aggravating factor in such disparate instances as where the defendant had a "hatred of

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -61-                    **Dykes v. Martel**
Case No. C-11-04454-SI

1  religion,"[22] or because three weeks after the crime a defendant sought

2  to conceal evidence,[23] or threatened witnesses after his arrest,[24] or

3  disposed of the victim's body in a manner that precluded its

4  recovery.[25]  The ostensible purpose of § 190.3, at least according to

5  its language is to inform the jury of what the jury should consider

6  in assessing the appropriate penalty.  Although factor (a) has

7  survived a facial Eighth Amendment challenge, <u>Tuilaepa v. California</u>,

8  <u>supra</u>, 512 U.S. 967, 987-988 (1994), it has been used in ways so

9  arbitrary and contradictory as to violate both the federal guarantee

10 of due process of law and the Eighth Amendment as applied in this

11 case. Petitioner alleges this statute, as applied generally and in his

12 case in specific, is constitutionally infirm and must be invalidated.

13

14 128.    Prosecutors throughout California have argued that the jury

15 could weigh in aggravation almost every conceivable circumstance of

16 the crime, even those that, from case to case, reflect starkly

17 opposite circumstances.   Thus, prosecutors have stood before the

18 California Supreme Court arguing that "circumstances of the crime" is

19 a permissible aggravating factor to be weighed on death's side of the

20 scale:

21 _____

22      [22]   <u>People v. Nicolaus</u>, 54 Cal.3d 551, 581-82 (1991), <u>cert</u>.
   <u>denied</u>, 112 S.Ct. 3040 (1992).

23      [23]   <u>People v. Walker</u>, 47 Cal.3d 605, 639 n.10 (1988), <u>cert</u>.
24 <u>denied</u>, 494 U.S. 1038 (1990).

25      [24]   <u>People v. Hardy</u>, 2 Cal.4th 86, 204, <u>cert</u>. <u>denied</u>, 113 S.Ct.
   498 (1992).

26      [25]   <u>People v. Bittaker</u>, 48 Cal.3d 1046, 1110 n. 35, <u>cert</u>.
27 <u>denied</u>, 496 U.S. 931 (1990).

28

a.  Both where the defendant struck many blows and inflicted multiple wounds,[26] or because the defendant killed with a single execution-style wound.[27]

b. Both where the defendant killed the victim for some purportedly aggravating motive (money, revenge, witness-elimination, avoiding arrest, sexual gratification)[28] or because the defendant killed the victim without any motive at all.[29]

c. Both where the defendant killed the victim in cold blood[30] or because the defendant killed the victim during a savage frenzy.[31]

d. Both where the defendant engaged in a cover-up to conceal his crime,[32] or because the defendant did not engage

---

[26]  People v. Morales, California Supreme Court (hereafter "No.") S004552; People v. Zapien, No. S004762; People v. Lucas, No. S004788; People v. Carrera, No. S004569.

[27]  People v. Freeman, No. S004787; People v. Frierson, S004761.

[28]  People v. Howard, No. S004452 (money); People v. Allison, S004649 (same); People v. Belmontes, S004467 (eliminate a witness); People v. Coddington, S008840 (sexual gratification); People v. Ghent, No. S004309 (same); People v. Brown, No. S004451 (avoid arrest); and People v. McLain, No. S004370 (revenge).

[29]  People v. Edwards, No. S004755 (no reason); People v. Osband, No. S005233; and People v. Hawkins, No. S014199 (same).

[30]  People v. Viscotti, No. S004597 (cold blood).

[31]  People v. Jennings, 53 Cal.3d 334 (1991)(savage frenzy).

[32]  People v. Stewart, No. S020803 (attempt to influence witnesses); People v. Benson, No. S004763 (lied to police); and People v. Miranda, No. S004464 (defendant did not seek aid for victim).

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -63-                    **Dykes v. Martel**
Case No. C-11-04454-SI

1    in a cover-up and so must have been proud of it.[33]

2       e. Both where the defendant made the victim endure the

3    terror of anticipating a violent death[34] or because the

4    defendant killed instantly without any warning.[35]

5       f. Both where the victim had children,[36] or because the

6    victim had not yet had a chance to have children.[37]

7       g. Both where the victim struggled prior to death,[38] or

8    because the victim did not struggle.[39]

9       h. Both where the defendant had a prior relationship

10   with the victim,[40] or because the victim was a complete

11   stranger to the defendant.[41]

12

---

13   [33]   People v. Adcox, No. S004558 (defendant freely informed
14   others about crime); People v. Williams, No. S004365 (same); and
     People v. Morales, No. S004552 (defendant failed to engage in a cover-
15   up).

16   [34]   People v. Webb, No. S006938; People v. Davis, No. S014636;
     and People v. Hamilton, No. S004363.

17
18   [35]   People v. Freeman, No. S004787 (victim killed instantly);
     and People v. Livaditis, No. S004767 (same).

19   [36]   People v. Zapien, No. S004762 (victim had children).

20   [37]   People v. Carpenter, No. S004654 (victim had not yet had
     children).

21
22   [38]   People v. Dunkle, No. S014200 (victim struggled); People v.
     Webb, No. S006938 (same); and People v. Lucas, No. S004788 (same).

23   [39]   People v. Fauber, No. S005868 (no evidence of struggle); and
     People v. Carrera, No. S004569 (same).

24
25   [40]   People v. Padilla, No. S014496 (prior relationship); People
     v. Waidla, No. S020161 (same); and People v. Kaurish, 52 Cal.3d 648,
     717 (1990).

26
27   [41]   People v. Anderson, No. S004385 (no prior relationship); and
     People v. McPeters, No. S004712 (same).

28   *Petition for a writ of habeas corpus*                    **Dykes v. Martel**
     *under 28 U.S.C. 2254*         Page -64-         Case No. C-11-04454-SI

129.     These examples show that absent any limitation on the "circumstances of the crime" aggravating factor, different prosecutors have urged juries to define and use this aggravating factor on death's side of the scale in completely contradictory circumstances.     A reasoned public, let alone a reasoned jurist, cannot consider this varied usage to narrow the group of individuals qualified for the most severe of all punishments.

130.     Of equal importance and problematic is the use of the "circumstances of the crime" aggravating factor to embrace facts which cover the entire spectrum of facets inevitably present in every homicide:

        a.   The age of the victim.   Prosecutors have argued, and juries were free to find, that factor (a) was an aggravating circumstance because the victim was a child, an adolescent, a young adult, in the prime of life, or elderly.[42]

        b.   The method of killing.   Prosecutors have argued, and juries were free to find, that factor (a) was an aggravating circumstance because the victim was strangled,

---

[42]     People v. Deere, No. S004722 (victims were young, ages 2 and 6); People v. Bonin, No. S004565 (victims were adolescents, ages 14, 15, and 17); People v. Kipp, No. 5009169 (victim was a young adult, age 18); People v. Carpenter, No. S004654 (victim was 20), People v. Phillips, 41 Cal.3d 29, 63 (1985)(26-year-old victim was "in the prime of his life"); People v. Samayoa, No. S006284 (victim was an adult "in her prime"); People v. Kimble, No. S004364 (61-year-old victim was "finally in a position to enjoy the fruits of his life's efforts"); People v. Melton, No. 5004518 (victim was 77); People v. Bean, No. S004387 (victim was "elderly").

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -65-                    **Dykes v. Martel**
Case No. C-11-04454-SI

bludgeoned, shot, stabbed or consumed by fire.[43]

c.   The motive of the killing. Prosecutors have argued, and juries were free to find, that factor (a) was an aggravating circumstance because the defendant killed for money, to eliminate a witness, for sexual gratification, to avoid arrest, for revenge, or for no motive at all.[44]

d.   The time of the killing. Prosecutors have argued, and juries were free to find, that factor (a) was an aggravating circumstance because the victim was killed in the middle of the night, late at night, early in the morning or in the middle of the day.[45]

e.   The location of the killing. Prosecutors have argued, and juries have been free to find, that factor (a) was an aggravating circumstance because the victim was killed in her own home, in a public bar, in a city park or

---

[43]    People v. Clair, No. S004789 (strangulation); People v. Kipp, No. 5004784 (same); People v. Fauber, No. S005868 (use of an ax); People v. Benson, No. S004763 (use of a hammer); People v. Cain, No. 5006544 (use of a club); People v. Jackson, No. S010723 (use of a gun); People v. Reilly, No. 5004607 (stabbing); People v. Scott, No. S010334 (fire).

[44]    People v. Howard, No. S004452 (money); People v. Allison, No. S004649 (same); People v. Belmontes, No. S004467 (eliminate a witness); People v. Coddington, No. S008840 (sexual gratification); People v. Ghent, No. S004309 (same); People v. Brown, No. S004451 (avoid arrest); People v. McLain, No. S004370 (revenge); People v. Edwards, No. S004755 (no motive at all).

[45]    People v. Fauber, No. S005868 (early morning); People v. Bean, No. S004387 (middle of the night); People v. Avena, No. S004422 (late at night); People v. Lucero, No. S012568 (middle of the day).

1    in a remote location.[46]

2

3    131.    The foregoing are representative examples of how the factor

4    (a) aggravating circumstance is actually being applied in practice and

5    make clear that it is being relied upon as an aggravating factor in

6    virtually if not literally every case, by every prosecutor, and

7    without any limitation whatsoever.  As a consequence, from case to

8    case, prosecutors have been permitted to turn entirely opposite facts

9    - or mundane facts that are inevitably present in some variation in

10   every homicide - into aggravating factors which the jury is urged to

11   weigh on death's side of the scale.

12

13   132.    It is because of these deficiencies that Petitioner,

14   convicted of felony-murder where the core crime is a robbery, can be

15   eligible for death, and this even despite the jury's finding that he

16   did not intend to murder Bernice Clark, and despite his virtual lack

17   of a criminal history. Due to these infirmities in the application of

18   the statute Petitioner has been sentenced to death, all in violation

19   of federal constitutional principles.

20

21   **AS APPRENDI AND RING CONFIRM, THE FAILURE TO REQUIRE THE NECESSARY
     PENALTY PHASE DETERMINATIONS TO BE MADE BEYOND A REASONABLE DOUBT IS**
22   **OFFENSIVE TO THE FEDERAL CONSTITUTION**

23   133.    The trial court's failure to define the prosecution's burden

24

25       [46]    People v. Anderson, No. S004385 (victim's home); People v.
     Cain, No. S006544 (same); People v. Freeman, No. S004787 (public bar);
26   People v. Ashmus, No. S004723 (city park); People v. Carpenter, No.
     S004654 (forested area); People v. Comtois, No. S017116 (remote,
27   isolated location).

28   *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
     *under 28 U.S.C. 2254*              Page -67-              Case No. C-11-04454-SI

of proof for aggravating circumstances deprived Petitioner of his constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Although the Ninth Circuit has previously rejected this specific argument for the 1977 statute, Williams v. Calderon, 52 F.3d 1465, 1485 (9th Cir. 1995)(rejecting this claim regarding 1977 law), Petitioner respectfully submits that the argument must be considered as to the 1978 statute and the timing is particularly appropriate in light of the recent decisions in Ring v. Arizona, 536 U.S. 584 (2002), and Apprendi v. New Jersey, 530 U.S. 466 (2000).

134.    Twenty-six (26) states require that factors relied on to impose death in a penalty phase must be proven beyond a reasonable doubt by the prosecution, and three (3) additional states have related provisions.[47]  Only the statutes of California and four other states

---

[47]    See Ala. Code § 13A-5-45(e)(1975); Ark. Code Ann. § 5-4-603 (Michie 1987); Colo. Rev. Stat. Ann. § 16-11-103(d)(West 1992); Del. Code Ann. tit. 11, § 4209(d)(1)(a)(1992); Ga. Code Ann. § 1 7-10-30(c) (Harrison 1990); Idaho Code § 19-2515(g)(1993); Ill. Ann. Stat. ch. 38, para. 9-1(f)(Smith-Hurd 1992); Ind. Code Ann. § 35-50-2-9 (a), (e)(West 1992); Ky. Rev. Stat. Ann. § 532.025(3)(Michie 1992); La. Code Crim. Proc. Ann. art. 905.3 (West 1984); Md. Ann. Code art. 27, § 413(d),(f),(g)(1957); Miss. Code Ann. § 99-19-103 (1993); State v. Stewart (Neb. 1977) 250 N.W.2d 849, 863; State v. Simants (Neb. 1977) 250 N.W.2d 881, 888-890; N.J . Stat. Ann. § 2C:1 1-3c(2)(a); Nev. Rev. Stat. Ann. § 175.554(3) (Michie 1992); N.M. Stat. Ann. § 31-20A-3 (Michie 1990); Ohio Rev. Code § 2929.04 (Page's 1993); Okla. Stat. Ann. tit. 21, § 701.11 (West 1993); 42 Pa. Cons. Stat. Ann. § 971.1(c)(1)(iii)(1982); S.C. Code Ann. §§ 16-3-20(A),(C) (Law. Co-op 1992); S.D. Codified Laws Ann. § 23A-27A-5 (1988); Tenn. Code Ann. § 39-13-204(f)(1991); Tex. Crim. Proc. Code Ann. § 37.071(c)(West 1993); State v. Pierre (Utah 1977) 572 P.2d 1338, 1348; Va. Code Ann. § 19.2-264.4(C)(Michie 1990); Wyo. Stat. § 6-2-102(d)(i)(A),(e)(I) (1992).
    Washington has a related requirement that, before making a death (continued...)

---

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                Page -68-                **Dykes v. Martel**
Case No. C-11-04454-SI

(Florida, Missouri, Montana, and New Hampshire) fail to address burden of proof.  Four states require that the jury must base any death sentence on a finding beyond a reasonable doubt that death is the appropriate punishment.[48]  A fourth state, Utah, has reversed a death judgment because that judgment was based on a standard of proof that was less than proof beyond a reasonable doubt. State v. Wood, 648 P.2d 71, 83-84 (Utah 1982).

135.    California does not require the reasonable doubt standard be used during any part of the penalty phase of a defendant's trial, except as to proof of prior criminality relied upon as an aggravating circumstance.  Even in that context, the required finding need not be unanimous. Accordingly, and under current federal law, California's statute violates the due process clause of the Fourteenth Amendment and the jury trial guarantees of the Sixth Amendment.

136.    There is no greater interest than what is at stake in the penalty phase of a capital case.  Monge v. California, 524 U.S. 721, 732 (1998)("the death penalty is unique in its severity and its

---

[47](...continued)
judgment, the jury must make a finding beyond a reasonable doubt that no mitigating circumstances exist sufficient to warrant leniency. (Wash. Rev. Code Ann. § 10.95.060(4) (West 1990).  And Arizona and Connecticut require that the prosecution prove the existence of penalty phase aggravating factors, but specify no burden. (Ariz. Rev. Stat. Ann. § 13-703(c)(1989); Conn. Gen. Stat. Ann. § 53a-46a(c) (West 1985).

[48]    See Ark. Code Ann. § 5-4-603(a)(3)(Michie 1991); N.J. Stat. Ann. § 2C:11- 3c(3)(a); State v. Goodman (N.C. 1979) 257 S.E.2d 569, 577; Wash. Rev. Code Ann. § 10.95.060 (West 1990).

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -69-                    **Dykes v. Martel**
                                                                        Case No. C-11-04454-SI

1  finality").   In Monge, the Supreme Court expressly applied its

2  rationale, previously set forth in Santosky, infra, to the burden of

3  proof beyond a reasonable doubt[49] applicable to capital sentencing

4  proceedings:  "[I]n a capital sentencing proceeding, as in a criminal

5  trial, 'the interests of the defendant are of such magnitude that .

6  . . they have been protected by standards of proof designed to exclude

7  as nearly as possible the likelihood of an erroneous judgment.

8  Bullington v. Missouri, 451 U.S. 430, 441 (1981)(quoting Addington v.

9  Texas, 441 U.S. 418, 423-424 (1979).

10

11  137.     In Apprendi v. New Jersey, 530 U.S. 466, 489 (2000), the

12  Supreme Court confirmed that any matter used to increase a defendant's

13  punishment beyond the statutory maximum must be alleged in the

14  charging document, presented to the jury, and proved beyond a

15  reasonable doubt.   The only exception to this rule is for prior

16  convictions.[50] Under California's capital sentencing scheme, the jury

17  may not impose a death sentence unless it finds (1) that one or more

18  aggravating factors exist and (2) the aggravating factor or factors

19  outweigh any mitigating factors.  (Pen. Code § 190.3) Accordingly,

20  under Apprendi, both the existence of any aggravating factors relied

21

22      [49]    "When the State brings a criminal action to deny a defendant
23  liberty or life, . . . the interests of the defendant are of such
    magnitude that historically and without any explicit constitutional
24  requirement they have been protected by standards of proof designed
    to exclude as nearly as possible the likelihood of an erroneous
25  judgment." Santosky v. Kramer, 455 U.S. 745, 755 (1982)(internal
    citations omitted).
26

27      [50]    Almendarez-Torres v. United States, 523 U.S. 224 (1998).

28  *Petition for a writ of habeas corpus*                    **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -70-        Case No. C-11-04454-SI

upon to impose a death sentence and the determination that such factors outweigh any mitigating factors must be made beyond a reasonable doubt.

138.    Any doubt that _Apprendi_ applies to capital cases was put to rest by the Supreme Court's recent decision in _Ring v. Arizona_, 536 U.S. 584 (2002), in which the Court concluded that when a finding of a particular fact is necessary to impose a sentence of death, such a finding must be made by a unanimous jury beyond a reasonable doubt. The _Ring_ decision makes clear that the due process principle set forth in _Apprendi_ applies to capital penalty phase jury trials.

139.    Analysis of the _Apprendi_ and _Ring_ decisions demonstrates that the California death penalty sentencing scheme violates due process principles embodied in the Fourteenth Amendment by failing to require capital juries to find aggravating factors beyond a reasonable doubt.  Under California's statutory scheme, a conviction for first degree murder simpliciter carries a maximum sentence of 25 years to life, unless certain additional findings are made, namely that the defendant is guilty of a special circumstance. (Pen. Code § 190.7) If the jury finds the defendant guilty of first degree murder and also finds special circumstances to be true, the offense carries a maximum sentence of life without the possibility of parole. (Pen. Code § 190.2) Death is only authorized if the jury finds the additional factor that there is a factor in aggravation and the circumstances in aggravation outweigh the circumstances in mitigation. In light of

1  <u>Ring</u>, the jury's findings were deficient and the sentence cannot
2  stand.

3

4  140.    California's statute requires that the "trier of fact" find
5  one or more aggravating factors, and that these factors outweigh
6  mitigating factors, before it can decide whether or not to impose
7  death.  Indeed, under the California statutes, neither a judge nor a
8  jury may sentence a defendant to death based solely on the jury's
9  findings at the guilt phase.  Rather, to impose the increased
10 punishment of death, the jury must make additional factual findings
11 at the penalty phase. These findings include at least one aggravating
12 factor plus a finding that the aggravating factor or factors outweigh
13 any mitigating factors.  (Pen. Code § 190.3)

14

15 141.    As <u>Apprendi</u> shows, because these two additional factual
16 matters are required to impose an increased punishment, they
17 constitute the functional equivalent of offense elements which must
18 be proved beyond a reasonable doubt.  <u>Apprendi</u>, at 489.  Thus
19 Petitioner was entitled to a jury instruction that before a death
20 verdict could be returned, the jury was required to find that: (1) any
21 aggravating factors upon which it relied were true beyond a reasonable
22 doubt; and (2) the aggravating factor or factors outweighed the
23 mitigating factors beyond a reasonable doubt.  The failure of
24 California law to require such instructions renders California's death
25 penalty scheme unconstitutional.

26

27

28 *Petition for a writ of habeas corpus*                                    **Dykes v. Martel**
   *under 28 U.S.C. 2254*                    Page -72-                    Case No. C-11-04454-SI

142.        The additional facts supporting the greater punishment of death must be submitted to the jury and must be proved beyond a reasonable doubt. As the Supreme Court observed:

> "The historic link between verdict and judgment and the consistent limitation on judges' discretion to operate within the limits of the legal penalties provided highlight the novelty of a legislative scheme that removes the jury from the determination of a fact that, if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone."

Apprendi, 466 U.S. at 482.

143.        Of course, here, the error is not that a judge made the requisite finding but that the jury was not required to unanimously conclude beyond a reasonable doubt that one or more aggravating factors was present or that death was the appropriate penalty. This is a distinction without a difference. A unanimous jury failed to make the additional finding that there was an aggravating factor or factors and that those aggravating factor(s) outweighed any mitigating factor(s). Pen. Code § 190.3. After the decisions in Apprendi and Ring, these determinations must be made by a unanimous jury applying a standard of proof of beyond a reasonable doubt. Apprendi, at 482-89.

144.        Without a jury instruction allocating the proper burden of

proof as to proof of factors in aggravation and among the aggravating and mitigating factors, Ring bars the imposition of the death penalty. No jury instruction on the burden of proof was given in this case and in fact, the jury was not required to unanimously find that the factors in aggravation were present. The failure to properly instruct on the burden of proof is a structural error "without which [the penalty trial] cannot not serve its function." Sullivan v. Louisiana, 508 U.S. 275, 281 (1993).

145.    The fact the jury was not required to make these findings beyond a reasonable doubt also violates the Sixth Amendment, the Eighth Amendment, and the Fourteenth Amendment.

146.    The United States Supreme Court has held that under the Eighth and Fourteenth Amendments, "in a capital sentencing proceeding, as in a criminal trial, 'the interests of the defendant [are] of such magnitude that . . . they have been protected by standards of proof designed to exclude as nearly as possible the likelihood of an erroneous judgment.'" Monge v. California, 524 U.S. at 733, quoting Bullington, 451 U.S. at 441; see also Walton v. Arizona, 497 U.S. 639 (1990), overruled in part by Ring v. Arizona, supra; Ford v. Wainwright, 477 U.S. 399, 414 (1986); Beck v. Alabama, 447 U.S. 625 (1980).

147.    The practice in other states comports with this conclusion. In at least eight (8) states in which the death penalty is

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -74-                    **Dykes v. Martel**
Case No. C-11-04454-SI

permissible, capital juries are specifically instructed that a death verdict may not be returned unless the jury finds beyond a reasonable doubt that aggravation outweighs mitigation and/or that death is the appropriate penalty.[51]

148.    The reasonable doubt standard is routinely applied in California in proceedings with less serious consequences than a capital penalty trial, such as proceedings to determine eligibility for commitment under the mentally disordered sex offender law, and in juvenile proceedings. See People v. Burnick, 14 Cal.3d 306, 318-320 (1975); Conservatorship of Roulet, 23 Cal.3d 219 (1979); In re Winship, 397 U.S. 358, 364 (1970).

149.    Indeed, in California such comparatively minor matters as sentence enhancement allegations, such as the allegation that the defendant was armed during the commission of an offense, must be proved by the standard of beyond a reasonable doubt.    CALJIC No. 17.15.    The disparity of requiring a higher standard of proof for matters of significantly less consequence while requiring no standard at all for aggravating circumstances which may result in the defendant's death violates eighth amendment interests, as well as

---

[51]    See J. Acker and C. Lanier, Matters of Life or Death: The Sentencing Provisions in Capital Punishment Statutes (1995) 31 Crim.L.Bull. 19, 35-37, and fns. 71-76, and the citations therein regarding the pertinent statutes of Arkansas, Missouri, New Jersey, Ohio, Tennessee, and Washington; see also McKoy v. North Carolina, 494 U.S. 433, 437 (1990), and State v. Wood (Utah 1982) 648 P.2d 71, 83-84, regarding the procedures in North Carolina and Utah, respectively.

equal protection and due process principles.  See generally, Myers v. Ylst, 897 F.2d 417, 421 (9th Cir. 1992)("A state should not be permitted to treat defendants differently . . . . unless it has 'some rational basis, announced with reasonable precision' for doing so").

150.     Here, the trial court instructed the jury to consider the matters set forth in Penal Code section 190.3, subdivisions (a) through (k), "if applicable," as aggravating or mitigating factors. (CT 609-11)  The court directed the jury to "consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed" and to "weigh[] the various circumstances . . . by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances." (CT 629-31; RT 3962-63)  The court also told the jury that to return a death sentence, each juror "must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without the possibility of parole."  Id.

151.     Thus, the court gave the jury the task and responsibility of determining what the aggravating circumstances and the mitigating circumstances were, but did not instruct the jury as to the standard of proof or which party bore it as to aggravating or mitigating circumstance.  Indeed, the jury was told only that the burden of proof beyond a reasonable doubt applied to Petitioner's prior misconduct, implying that the burden did not apply to any other aggravating

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -76-                    **Dykes v. Martel**
Case No. C-11-04454-SI

factor. (CT 612-13; RT 3954-55)   This left the jury without any guidance on these crucial issues.

152.     The failure to give a reasonable doubt instruction applicable to circumstances in aggravation violated due process and equal protection principles, as well as the Eighth Amendment requirement of a reliable penalty determination.   The burden of proving appropriate punishment should be the same as that of proving guilt or special circumstances; namely, the burden of proof beyond a reasonable doubt.  See e.g., In re Winship, supra, 397 U.S. 358.

153.     A burden of proof of at least a preponderance is required as a matter of due process because that has been the minimum burden historically permitted in any sentencing proceeding.   Judges have never had the power to impose sentence without the firm belief that whatever considerations underlie their sentencing decisions have been at least proved to be more likely than not.   They have never had the power that a California capital sentencing jury has been accorded, which is to base "proof" of aggravating circumstances on any considerations they want, without any burden at all on the prosecution, and sentence a person to die based thereon.   The absence of any historical authority for a sentencer to impose sentence based on aggravating circumstances found with proof less than 51% - even 10%, or 1% - demonstrates the unconstitutionality of failing to assign a burden of proof.  See e.g., Griffin v. United States, 502 U.S. 46, 51 (1991)(historical practice given great weight in constitutionality

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -77-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

determination); <u>Murray's Lessee v. Hoboken Land and Improvement Co.</u>, 59 U.S. (18 How)  272, 276-277 (1855)(due process determination informed by historical settled usages).

154.     "Capital punishment [must] be imposed fairly, and with reasonable consistency, or not at all." <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 112 (1982).   It is unacceptable - "wanton" and "freakish," <u>Proffitt v. Florida</u>, 428 U.S. 242, 260 (1976) - the "height of arbitrariness," <u>Mills v. Maryland</u>, 486 U.S. 367, 374 (1988) - that one defendant should live and another die simply because one juror or jury can use different standards of proof for these questions, with no coherent or uniformly applicable standards to guide either.

155.     In non-capital cases, California does require the prosecution to bear the burden of proof to establish the defendant should receive the most severe sentence possible.   It does so, however, only in non-capital cases. Cal. R. Ct. 420(b)(existence of aggravating circumstances necessary for imposition of upper term must be proved by preponderance of evidence).    To provide greater protection to non-capital defendants than to capital defendants violates the due process, equal protection, and cruel and unusual punishment clauses of the Eighth and Fourteenth Amendments.

156.     Finally, California Evidence Code section 520 provides: "The party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue."   There is no statute to the

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -78-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

1   contrary.  In any capital case, any aggravating factor will relate to

2   wrongdoing; those that are not themselves wrongdoing (such as, for

3   example, age when it is counted as a factor in aggravation) are still

4   deemed to aggravate other wrongdoing by a defendant.  Section 520 is

5   a   legitimate   state   expectation   in   adjudication,   and   is   thus

6   constitutionally protected under the Fourteenth Amendment.  Hicks v.

7   Oklahoma, 447 U.S. 343, 346 (1980).

8

9   157.    For all of these reasons, Petitioner's jury should have been

10  instructed that the prosecution had the burden of persuasion, and that

11  the  burden  was  proof  beyond  a  reasonable  doubt,  regarding  the

12  existence of any factor in aggravation, and the appropriateness of the

13  death penalty.   Sentencing Petitioner to death without adhering to

14  this minimal protection violated federal due process.   Petitioner's

15  death sentence violates the federal constitution and the writ should

16  issue.

17  **CALIFORNIA LAW VIOLATES THE FEDERAL CONSTITUTION BY FAILING TO REQUIRE THAT THE JURY MAKE WRITTEN FINDINGS REGARDING THE AGGRAVATING FACTORS**
18  **THE JURY BELIEVES JUSTIFY A DEATH SENTENCE; CALIFORNIA'S STATUTORY FRAMEWORK DOES NOT OTHERWISE SQUARE WITH FEDERAL LAW**

19

20  158.    The failure to require written or other specific findings

21  by the jury regarding aggravating factors deprived Petitioner of his

22  federal  due  process  and  Eighth  Amendment  rights  to  meaningful

23  appellate review.   California v. Brown, 479 U.S. 538, 543 (1987);

24  Gregg v. Georgia, 428 U.S. 153, 195 (1976).  And especially given that

25  California juries have total discretion without any guidance on how

26

27

28  *Petition for a writ of habeas corpus*          *Dykes v. Martel*
    *under 28 U.S.C. 2254*          Page -79-          Case No. C-11-04454-SI

to weigh aggravating and mitigating circumstances,[52] there can be no meaningful appellate review without at least written findings because it will otherwise be impossible to "reconstruct the findings of the state trier of fact." See Townsend v. Sain, 372 U.S. 293, 313-316 (1963).

159.    Such findings are considered by the California Supreme Court to be an element of due process so fundamental that they are even required at parole suitability hearings.  A convicted prisoner who believes that he or she was improperly denied parole must proceed via a petition for writ of habeas corpus, and is required to allege with particularity the circumstances constituting the state's wrongful conduct and show prejudice flowing from that conduct.  In re Sturm, 11 Cal.3d 258 (1974).   The parole board is therefore required to state its reasons for denying parole:  "It is unlikely that an inmate seeking to establish that his application for parole was arbitrarily denied can make necessary allegations with the requisite specificity unless he has some knowledge of the reasons therefor."  11 Cal.3d at 267.

160.    The same reasoning applies to the far graver decision a jury faces in deciding whether to put someone to death. See also, People v. Martin, 42 Cal.3d 437, 449-450 (1986)(statement of reasons essential to meaningful appellate review).

---

[52]    Tuilaepa v. California, 512 U.S. 967, 979-980 (1994).

161.        Consider also that in non-capital cases the sentencer is required by California law to state on the record the reasons for the sentence choice. Penal Code § 1170(c). Under the Fifth, Sixth, Eighth and Fourteenth Amendments, capital defendants are entitled to more rigorous protections than those afforded non-capital defendants. Harmelin v. Michigan, 501 U.S. 957, 994 (1991). Since providing more protection to a non-capital defendant than a capital defendant would violate the equal protection clause of the Fourteenth Amendment, see generally Myers v. Ylst, 897 F.2d at 421, the sentencer in a capital case should be  required to identify for the record in some fashion the aggravating circumstances found. California's failure to impose this violates federal law.

162.        The importance of written findings is recognized elsewhere and throughout this country.  Of the thirty-four (34) post-Furman state capital sentencing systems, twenty-five (25) require some form of such written findings, specifying the aggravating factors upon which the jury has relied in reaching a death judgment. Nineteen (19) of these states require written findings regarding all penalty phase aggravating factors found true, while the remaining six (6) require a written finding as to at least one aggravating factor relied on to impose death.[53]

---

    [53]    See Ala. Code §§ 13A-5-46(f), 47(d) (1982); Ariz. Rev. Stat. Ann. § 13-703(d)(1989); Ark. Code Ann. § 5-4-603(a)(Michie 1987); Conn. Gen. Stat. Ann. § 53a-46a(e)(West 1985); State v. White (Del. 1978) 395 A.2d 1082, 1090; Fla. Stat. Ann. § 921.141(3)(West 1985); Ga. Code Ann. § 17-10-30(c)(Harrison 1990); Idaho Code
(continued...)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -81-                    **Dykes v. Martel**
Case No. C-11-04454-SI

163.     California's failure to require this from capital juries renders the California death penalty scheme constitutionally flawed and the writ should issue.

164.     Under California law in any case where the authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, that court itself may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed.    Pen. Code § 1181(7).

165.     California Penal Code § 1260 similarly provides:

> The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order,

[53](...continued)
§ 19-2515(e)(1987); Ky. Rev. Stat. Ann. § 532.025(3)(Michie 1988); La. Code Crim. Proc. Ann. art. 905.7 (West 1993); Md. Ann. Code art. 27, § 413(i)(1992); Miss. Code Ann. § 99-19-103 (1993); Mont. Code Ann. § 46-18-306 (1993); Neb. Rev. Stat. § 29-2522 (1989); Nev. Rev. Stat. Ann. § 175.554(3)(Michie 1992); N.H. Rev. Stat: Ann. § 630:5(IV)(1992); N.M. Stat. Ann. § 31-20A-3 (Michie 1990); Okla. Stat. Ann. tit. 21, § 701.11 (West 1993); 42 Pa. Cons. Stat. Ann. § 9711 (1982); S.C. Code Ann. § 16-3-20(C)(Law. Co-op. 1992); S.D. Codified Laws Ann. § 23A-27A-5 (1988); Tenn. Code Ann. § 39-13-204(g)(1993); Tex. Crim. Proc. Code Ann. § 37.071(c)(West 1993); Va. Code Ann. § 19.2-264.4(D)(Michie 1990); Wyo. Stat. § 6-2-102(e)(1988).

1          and may, if proper, order a new trial and may, if proper,

2          remand the cause to the trial court for such further

3          proceedings as may be just under the circumstances.

4    Pen. Code § 1260.

5

6    166.      Under the terms of these statutes, any defendant is entitled

7    to have the state courts consider reducing his punishment.  Despite

8    the clear language of these statutes, and over repeated dissents, a

9    majority of the California Supreme Court has consistently refused to

10   acknowledge or exercise its power to modify punishments in capital

11   cases.  See e.g., People v. Hines, 15 Cal.4th 997, 1079-1080 and

12   1081-1084 (1997), and cases cited therein.

13

14   167.      The foregoing statutes establish a procedural entitlement

15   that is protected by the federal due process clause.  Hicks v.

16   Oklahoma, 447 U.S. 343; see also Ford v. Wainwright, 477 U.S. 399, 428

17   (1986)(O'Connor, J., concurring)("Where a statute indicates with

18   language of an unmistakable mandatory character that state conduct

19   injurious to an individual will not occur 'absent specified

20   substantive predicates,' the statute creates an expectation protected

21   by the Due Process Clause.").  The persistent refusal of the

22   California Supreme Court to acknowledge or employ its power under

23   Penal Code § 1181(7), and Penal Code § 1260 accordingly is offensive

24   to the Due Process Clause of the Fourteenth Amendment.

25

26   168.      It should also bears noting that capital defendants possess

27

28   *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
     *under 28 U.S.C. 2254*              Page -83-              Case No. C-11-04454-SI

the right, under the Eighth Amendment and the Due Process Clause, to meaningful appellate review. Parker v. Duke, 498 U. S. 308, 321 (1991)("We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.") Petitioner respectfully submits that the California Supreme Court's persistent refusal to employ its statutory right of review deprives capital defendants of that entitlement, as well as increasing the risk that California's capital charging and sentencing system, already unable to separate defendants deserving of death from those who are not, Tuilaepa v. California, supra, 512 U.S. 967 (Blackmun, J., dissenting), will randomly condemn even more defendants.

**THE DEATH PENALTY IS DISPROPORTIONATE TO PETITIONER'S CULPABILITY AND THEREFORE VIOLATES THE EIGHTH AMENDMENT.**

169.    The death penalty is disproportionate to Petitioner's personal culpability and thus violates the prohibition against cruel and unusual punishment contained in the federal constitution.

170.    The Eighth Amendment forbids punishment that is grossly disproportionate to the crime. Harmelin v. Michigan, 501 U.S. 957, 997-1001 (1991)(Kennedy, J., plurality opn).

171.    The death penalty is a disproportionate punishment here. Petitioner was 19 years old at the time of the crime.  He committed

*Petition for a writ of habeas corpus
under 28 U.S.C. 2254*                     Page -84-                    **Dykes v. Martel**
Case No. C-11-04454-SI

a robbery which had tragic consequences.[54] The jury concluded that the alleged attempted murder of Mrs. Clark was not premeditated. The forensic evidence established that Lance Clark was killed by the same bullet that struck his grandmother. Under the doctrine of transferred intent, if Petitioner had no premeditation, willful or deliberate intention to kill Bernice Clark, he could have none to kill Lance Clark since it was a single bullet, the same bullet, that struck both people. Moreover, it is clear Petitioner never intended to shoot, let alone kill, victim Lance Clark. Petitioner testified at trial that, intoxicated at the time, he did not even realize that Lance Clark was in the vehicle when he went to rob Mrs. Clark.

172.    Petitioner has virtually no prior criminal history. Specifically, he has no prior felony convictions, and had only one prior misdemeanor, admitted as evidence in aggravation, where he was found in possession of a concealed firearm.[55] However, he made no attempt to use the firearm against the officer who stopped him; indeed, when he was stopped by police he relinquished the firearm forthwith. (RT 3779-80) He did not resist arrest or offer any difficulties to the arresting officer. (RT 3783-85) This incident, which ostensibly served as a aggravation in Petitioner's capital sentencing trial, was so innocuous to the court which heard that case

---

[54]    The trial court did not impose the upper term for the robbery itself. At sentencing, the trial court imposed the mid-term for the robbery.

[55]    Petitioner also underwent a juvenile adjudication, in which he was alleged to have started a series of fires.

**Petition for a writ of habeas corpus**
**under 28 U.S.C. 2254**                    Page -85-                    **Dykes v. Martel**
                                                            Case No. C-11-04454-SI

1    as to result in a misdemeanor conviction, for which Petitioner was

2    placed on probation.

3

4    173.    The death sentence imposed in this case is plain and simply

5    disproportionate.  The federal constitution authorizes this Court to

6    conduct proportionality review; the facts of this case justify the

7    Court thereupon to grant the requested writ.

8

9    **LACK OF INTER-CASE PROPORTIONALITY REVIEW**

10   174.    The Eighth Amendment to the United States Constitution

11   forbids punishments that are cruel and unusual.  The jurisprudence

12   that has emerged applying this ban to the imposition of the death

13   penalty has required that death judgments be proportionate, and

14   reliable.  The notions of reliability and proportionality are

15   intertwined.  Part of the requirement of reliability, in law as well

16   as science, is "`that the [aggravating and mitigating] reasons

17   present in one case will reach a similar result to that reached under

18   similar circumstances in another case.'" Barclay v. Florida, 463 U.S.

19   939, 954 (1976)(plurality opinion, alterations in original, quoting

20   Proffitt v. Florida, 428 U.S. 242, 251 (1976) (opinion of Stewart,

21   Powell, and Stevens, JJ.).

22

23   175.    One commonly utilized mechanism for helping to ensure

24   reliability and proportionality in capital sentencing is comparative

25   proportionality review - a procedural safeguard the California Supreme

26   Court has rejected.  In Pulley v. Harris, 465 U.S. 37, 51 (1984), the

27

28   *Petition for a writ of habeas corpus*      **Dykes v. Martel**
     *under 28 U.S.C. 2254*          Page -86-          Case No. C-11-04454-SI

Supreme Court, while declining to hold that comparative proportionality review is an essential component of every constitutional capital sentencing scheme, did observe the possibility that "there could be a capital sentencing scheme so lacking in other checks on arbitrariness that it would not pass constitutional muster without comparative proportionality review."

176.    Petitioner respectfully urges that California's 1978 death penalty statute, as drafted and as construed by the California courts and applied in fact, has become such a sentencing scheme.   The <u>Harris</u> Court, in contrasting the 1978 statute with the 1977 law, noted that the 1978 law had  "greatly expanded" the list of special circumstances.  <u>Harris</u>, 465 U.S. 52 n. 14.

177.    In the absence of such proportionality review, the ever-growing and now even more expansive list fails to meaningfully narrow the pool of death-eligible defendants and leaves more room for arbitrary sentencing than existed in even the death penalty schemes struck down in <u>Furman v. Georgia</u>, <u>supra</u>.   Further, the statute lacks numerous other procedural safeguards commonly utilized in other capital sentencing jurisdictions, and the statute's principal penalty phase sentencing factor (§ 190.3(a) "circumstances of the crime") as seen elsewhere herein has itself proved to be an invitation to arbitrary and capricious sentencing.  A comparative proportionality review was the only mechanism that might have enabled California's scheme to pass constitutional muster, but the California Supreme Court

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                     Page -87-                     **Dykes v. Martel**
Case No. C-11-04454-SI

1   has consistently declined to impose it.

2

3   178.    The death penalty may not be imposed when actual practice

4   demonstrates that the circumstances of a particular crime or a

5   particular criminal rarely lead to execution. Gregg v. Georgia, 428

6   U.S. at 206.  A demonstration of such a societal evolution is not

7   possible without considering the facts of other cases and their

8   outcomes.  The U.S. Supreme Court regularly considers other cases in

9   determining claims that the imposition of the death penalty on a

10  particular person or class of persons may be disproportionate - even

11  cases from outside the United States. See Thompson v. Oklahoma, 487

12  U.S. 815, 821, 830-31 (1988); Enmund v. Florida, 458 U.S. 782, 796 n.

13  22 (1982); Coker v. Georgia, 433 U.S. 584, 596 (1977).

14

15  179.    Almost all of the states that have reinstated capital

16  punishment since Furman require comparative, or "inter-case,"

17  appellate sentence review (thirty-one (31) of the thirty-four (34)).

18  By statute, Georgia requires that the Georgia Supreme Court determine

19  whether ". . . the sentence is disproportionate compared to those

20  sentences imposed in similar cases." Ga. Stat. Ann. § 27-2537(c).  The

21  provision was approved by the United States Supreme Court, holding

22  that it guards ". . . further against a situation comparable to that

23  presented in Furman v. Georgia . . ." Gregg v. Georgia, supra, 428

24  U.S. at 198.  Toward the same end, Florida has judicially ". . .

25  adopted the type of proportionality review mandated by the Georgia

26  statute." Profitt v. Florida, 428 U.S. 242, 259 (1976).  Twenty states

27

(20) have statutes similar to that of Georgia, and seven (7) have judicially instituted similar review.[56]

180.     Section 190.3 neither requires nor forbids either the trial court or the California Supreme Court to undertake a comparison between similar cases regarding the relative proportionality of the sentence imposed. See People v. Fierro, 1 Cal.4th 173, 253 (1991). The prohibition on the consideration of evidence showing that death sentences are not being charged or imposed on similarly situated defendants is a judicially construed rule. See e.g., People v. Marshall, 50 Cal.3d 907, 946-947 (1990).

---

[56]     See Ala. Code § 13A-5-53(b)(3) (1982); Conn. Gen. Stat. Ann. § 53a-46b(b)(3)(West 1993); Del. Code Ann. tit. 11, § 4209(g)(2)(1992); Ga. Code Ann. § 17-10-35(c)(3)(Harrison 1990); Idaho Code § 19-2827 (c)(3)(1987); Ky. Rev. Stat. Ann. § 532.075(3) (Michie 1985); La. Code Crim. Proc. Ann. art. 905.9.1(1) (c)(West 1984); Miss. Code Ann. § 99-19-105(3) (c)(1993); Mont. Code Ann. § 46-18-310(3) (1993); Neb. Rev. Stat. §§ 29-2521.01, 03, 29-2522(3) (1989); Nev. Rev. Stat. Ann. § 177.055(d)(Michie 1992); N.H. Rev. Stat. Ann. § 630:5(XI)(c) (1992); N.M. Stat. Ann. § 31-20A-4(c)(4)(Michie 1990); N.C. Gen. Stat. § 15A-2000(d)(2)(1983); Ohio Rev. Code Ann. § 2929.05(A) (Baldwin 1992); 42 Pa. Cons. Stat. Ann. § 9711 (h)(3)(iii)(1993); S.C. Code Ann. § 16-3-25(C)(3) (Law. Co-op. 1985); S.D. Codified Laws Ann. § 23A-27A-12(3) (1988); Tenn. Code Ann. § 39-13-206(c) (1)(d)(1993); Va. Code Ann. § 17.110.1C(2) (Michie 1988); Wash. Rev. Code Ann. § 10.95.130(2)(b) (West 1990); Wyo. Stat. § 6-2-103(d)(iii) (1988).

     Also see State v. Dixon (Fla. 1973) 283 So.2d 1, 10; Alford v. State (Fla. 1975) 307 So.2d 433, 444; People v. Brownell (Ill. 1980) 404 N.E.2d 181, 197; Brewer v. State (Ind. 1981) 417 N.E.2d 889, 899; State v. Pierre (Utah 1977) 572 P.2d 1338, 1345; State v. Simants (Neb. 1977) 250 N.W.2d 881, 890 (comparison with other capital prosecutions where death has and has not been imposed); State v. Richmond (Ariz. 1976) 560 P.2d 41, 51; Collins v. State (Ark. 1977) 548 S.W.2d 106, 121.

181.      Given the tremendous reach of the special circumstances that make one eligible for death as set out in § 190.2 - a significantly higher percentage of murderers than those eligible for death under the 1977 statute considered in <u>Pulley v. Harris</u> - and the absence of any other procedural safeguards to ensure a reliable and proportionate sentence, the California courts' categorical refusal to engage in inter-case proportionality review now violates the Eighth Amendment and Petitioner is aggrieved as a direct consequence of this violation. Categories of crimes that warrant a particularly close comparison with actual practices in other cases include the imposition of the death penalty for felony-murders such as that at issue here or other non-intentional killings, and single-victim homicides. (See Article VI, Section 2 of the International Covenant on Civil and Political Rights, which limits the death penalty to only "the most serious crimes")[57]   Categories of criminals that warrant such a comparison include persons suffering from insanity or mental retardation. <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986); <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002).

182.      <u>Furman</u> framed the question a viable capital sentencing structure would be required to answer: whether, within a category of crimes or criminals for which the death penalty is not inherently disproportionate, the death penalty has been fairly applied to the individual defendant and his circumstances. In the absence of inter-

_____

[57]    <u>See</u> <u>also</u> Kozinski and Gallagher (1995) <u>Death, The Ultimate Run-On Sentence</u>, 46 Case W. Res.L.Rev. 1, 30.

1  case proportionality, California's 1978 death penalty scheme and

2  system of case review fails to assess let alone answer this question,

3  and as such is infirm. Gregg v. Georgia, supra, 428 U.S. at 192

4  (citing Furman v. Georgia, supra, 408 U.S. at 313 (White, J., conc)).

5  This defect in the statutory scheme violates the Fifth and Fourteenth

6  Amendment due process clauses, the Fourteenth Amendment equal

7  protection clause, and the Eighth Amendment prohibition on cruel and

8  unusual punishments.

9

10  183.    Notably, California previously required inter-case

11  proportionality review for non-capital cases. Former Pen. Code

12  § 1170(f).[58]  However, neither Penal Code § 190.3 nor any other

13

14      [58]    Prior to Petitioner's crime and sentence, Penal Code § 1170,
   subdivision (f) provided as follows: "(f)(1) Within one year after the
15  commencement of the term of imprisonment, the Board of Prison Terms
   shall review the sentence to determine whether the sentence is
16  disparate in comparison with the sentences imposed in similar cases.
   If the Board of Prison Terms determines that the sentence is
17  disparate, the board shall notify the judge, the district attorney,
   the defense attorney, the defendant, and the Judicial Council. The
18  notification shall include a statement of the reasons for finding the
   sentence disparate.    Within 120 days of receipt of this
19  information, the sentencing court shall schedule a hearing and may
   recall the sentence and commitment previously ordered and resentence
20  the defendant in the same manner as if the defendant had not been
   sentenced previously, provided the new sentence is no greater than the
21  initial sentence. In resentencing under this subdivision the court
   shall apply the sentencing rules of the Judicial Council and shall
22  consider the information provided by the Board of Prison Terms. "(2)
   The review under this section shall concern the decision to deny
23  probation and the sentencing decisions enumerated in paragraphs (2),
   (3), and (4) of subdivision (a) of Section 1170.3 and apply the
24  sentencing rules of the Judicial Council and the information regarding
   the sentences in this state of other persons convicted of similar
25  crimes so as to eliminate disparity of sentences and to promote
   uniformity of sentencing. "(g) Prior to sentencing pursuant to this
26  chapter, the court may request information from the Board of Prison
                                                        (continued...)

27

28  *Petition for a writ of habeas corpus*                    **Dykes v. Martel**
   *under 28 U.S.C. 2254*          Page -91-          Case No. C-11-04454-SI

statute required the trial court or the California Supreme Court to undertake a comparison between this and other similar cases regarding the relative proportionality of capital sentence imposed.  See People v. Fierro, 1 Cal.4th 173, 253 (1991).

184.    Since the Fifth, Eighth, and Fourteenth Amendments require that capital defendants be afforded greater proportionality protection than non-capital defendants,[59] and since providing greater protection to a non-capital defendant would violate the equal protection clause of the Fourteenth Amendment,[60] Petitioner alleges the failure of California's death penalty scheme to provide for inter-case proportionality review further violates the federal constitution in that the statutory scheme also violates the Eighth Amendment requirement that a death penalty not be imposed arbitrarily or capriciously.  Gregg v. Georgia, 428 U.S. at 189, and that all mitigating factors and evidence be considered by the sentencer.  See Parker v. Dugger, 498 U.S. 308, 315 (1991).

185.    This means the statutory scheme also violates the Eighth and Fourteenth Amendment's heightened due process and requirement of reliability in capital cases.  Ford v. Wainwright, 477 U.S. 399, 414

---

[58](...continued)
Terms concerning the sentences in this state of other persons convicted of similar crimes under similar circumstances."

[59]    See Harmelin, 501 U.S. at 994.

[60]    See generally, Myers v. Ylst, supra, 897 F.2d at 421.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -92-                    **Dykes v. Martel**
Case No. C-11-04454-SI

1  (1986); <u>Beck v. Alabama</u>, 447 U.S. 625, 637-638 & n. 13 (1980).

2

3  186.      For each and all of these reasons, this Honorable Court

4  should grant the requested writ.

5

6  **CALIFORNIA GIVES PROSECUTORS VIRTUALLY UNBRIDLED DISCRETION TO DECIDE**
   **IN WHICH SPECIAL CIRCUMSTANCE MURDER CASES THE DEATH PENALTY WILL BE**
7  **SOUGHT, AND THIS VIOLATES THE FIFTH, EIGHTH, AND FOURTEENTH**
   **AMENDMENTS.**
8

9  187.      Under California law, the prosecutor alone in a special

10 circumstances case has the discretion to determine whether a penalty

11 trial will be held, meaning the prosecutor alone has the power to put

12 a defendant at risk of a capital sentence.  This defect in the state's

13 statutory scheme introduces arbitrary and capricious elements into the

14 decision-making process and thereby violates the Fifth, Eighth, and

15 Fourteenth Amendments to the United States Constitution.

16

17 188.      As the late Justice Broussard noted in his dissenting

18 opinion in <u>People v. Adcox</u>, 47 Cal.3d 207, 275-276 (1988),

19 California's giving individual prosecutors this discretion creates a

20 substantial risk of county-by-county arbitrariness.   Under the

21 existing statutory scheme, some offenders will be chosen as candidates

22 for the death penalty by a prosecutor in one county while other

23 offenders with similar or even more ominous backgrounds in other

24 counties will not.   This arbitrariness offends the federal

25 constitution.  "Capital punishment [must] be imposed . . . with

26 reasonable consistency, or not at all." <u>Eddings v. Oklahoma</u>, 455 U.S.

27

28 *Petition for a writ of habeas corpus*                                **Dykes v. Martel**
   *under 28 U.S.C. 2254*              Page -93-                Case No. C-11-04454-SI

1  104, 112 (1981).    There is no check or barrier against a misguided

2  prosecutor's considering constitutionally irrelevant and impermissible

3  considerations, including race and economic status. Yet, to seek the

4  death penalty on the basis of "factors that are constitutionally

5  impermissible . . . such as . . . race" violates the Fifth, Eighth,

6  and Fourteenth Amendments.    Zant v. Stephens, 462 U.S. 862, 885

7  (1983).

8

9  189.    Like the "arbitrary and wanton" jury discretion condemned

10  in Woodson v. North Carolina, 428 U.S. 280, 303 (1976), the arbitrary

11  and wanton prosecutorial discretion -- in charging, prosecuting, and

12  deciding whether to submit the case to a penalty phase jury -- allowed

13  by the California scheme is contrary to the principled decision-making

14  mandated by the Fifth, Eighth, and Fourteenth Amendments.    Furman v.

15  Georgia, supra, 408 U.S. 238.  The judgment of death in this case is

16  the product of that unconstitutional system and for that reason may

17  not stand.

18

19  **AS APPLIED TO PETITIONER, EACH AND ALL OF THE ABOVE DEFECTS HAVE**
20  **CONTRIBUTED TO A DEATH SENTENCE IN VIOLATION OF FEDERAL CONSTITUTIONAL**
    **LAW**

21  190.    Petitioner alleges, and with discovery and an evidentiary

22  hearing will establish, that within Alameda County, the facts of his

23  offenses, the nature of his charges and offenses of conviction, and

24  the facts of his personal background including but not limited to his

25  nominal criminal history, are completely outside the norm of those

26  cases for which capital punishment has been sought and/or obtained by

27

28  *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -94-              Case No. C-11-04454-SI

the prosecution since <u>Furman v. Georgia</u>, 408 U.S. 238 (1972).  <u>See</u>
Verification of Phillip A. Treviño, infra, at ¶ 4.

191.      Petitioner f urther alleges, and with   discovery and  an
evidentiary hearing will establish, that within the counties of the
State of Cal ifornia, the  facts of his offenses, the nature of his
charges and offenses of conviction, and the facts of his personal
background including but not limited to his nominal criminal history,
are completely outside the norm of  those cases  for which capital
punishment has been sought and/or obtained by the prosecution since
<u>Furman v. Georgia</u>, 408 U.S. 238 (1972).

192.      Petitioner further alleges, and   with discovery and  an
evidentiary hearing will establish, that in the United States, the
facts of his o ffenses, the  nature of his charges and offenses of
conviction, and the facts of his personal background including but not
limited to his nominal criminal history, are outside the norm of those
cases for which capital punishment has been sought and/or obtained by
the prosecution since <u>Furman v. Georgia</u>, 408 U.S. 238 (1972).

**IMPOSITION OF THE DEATH PENALTY IN CALIFORNIA TODAY IS A VIOLATION OF
THE FEDERAL CONSTITUTION'S PROHIBITION AGAINST CRUEL AND UNUSUAL
PUNISHMENT**

193.      California voters recently demonstrated their support for
the death penalty has dropped significantly from the strong margin it
held when the current statute was enacted in the late 1970's. On
November 6, 2012, Californians were offered a referendum (Proposition

*Petition for a writ of habeas corpus
under 28 U.S.C. 2254*                    Page -95-                    **Dykes v. Martel**
Case No. C-11-04454-SI

34) on whether to abolish the death penalty, with such abolishment to include all individuals as to whom the penalty had been pronounced such as Petitioner. Individuals such as Petitioner as to whom a death sentence had previously been pronounced would have seen the sentence commuted to a sentence of life without possibility of parole.

194.    Although Proposition 34 failed by a margin of four (4) percent,[61] this narrow margin shows this penalty is no longer the strong view of the state.   The narrow margin justifies an allegation, as Petitioner makes herein, that this extreme penalty no longer reflects a contemporary view that comports with the Eighth Amendment.[62]

195.    The Eighth Amendment embodies concepts of dignity, civilized standards, humanity and decency against which courts must evaluate penal measures. Estelle v. Gamble, 429 U.S. 97 (1976). It prohibits punishments that are incompatible with "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101 (1958).  To discern the "evolving standards of decency,"

---

[61]    As of December 3, 2012, with 100% of the precincts reporting, the California Secretary of State reports a final tally on Proposition 34 as 48.% in favor, 52% against.   (5,885,080 versus 6,372,996)   http://vote.sos.ca.gov/returns/ballot-measures/

[62]    Indeed, while both California Governor Jerry Brown and California Attorney General Kamala Harris have affirmed their intentions to enforce the law, they have publicly announced their personal opposition to the penalty. Exhibits 3, 4.  After voting, Governor Brown publicly stated he voted for Proposition 34. Exhibit 4.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -96-                    **Dykes v. Martel**
Case No. C-11-04454-SI

courts look to objective evidence of how society views a punishment today. <u>Coker v. Georgia</u>, 433 U.S. 584, 593-597 (1977); <u>Enmund v. Florida</u>, 458 U.S. 782, 788-796 (1982).

196.    Petitioner alleges that the vote tally from this recent election clearly shows the evolving standards in California are growing away from capital punishment. This in itself reflects how Petitioner's sentence violates the Amendment.

197.    The Eighth Amendment also prohibits capital punishment from being imposed in an arbitrary and capricious manner. The Fifth and Fourteenth Amendment entitle all persons to equal protection of the laws, which includes the right to be treated similarly on similar facts.

198.    Petitioner was tried and sentenced in 1995. According to a Gallup poll taken in September 1994, public support for the death penalty had reached an all-time high of 80 per cent, having steadily increased from around 65 per cent in the early 1970s. (Cal. Hab. Exh. 74, 6 App. 1558)[63]

199.    Petitioner was tried during a period of notable anti-crime

---

[63]    In support of his state habeas, Petitioner submitted eight (8) volumes of exhibits. Said materials are referenced herein as "Cal. Hab. Exh. X, Y App. Z" where "X" refers to the individual exhibit number, "Y" refers to which of the eight volumes contains said exhibit, and "Z" refers to the page number at which the cited reference appears.

sentiment.  For example, Petitioner's trial occurred in the wake of Polly Klaas's murder.  As the U.S. Supreme Court has recognized, "Polly Klaas' murder galvanized support for the three strikes initiative" in California and throughout the country.  <u>Ewing v. California</u>, 538 U.S. 11 (2003).  "Between 1993 and 1995, 24 States and the Federal Government enacted three strikes laws."  <u>Id</u>.

200.    It seems reasonable, and Petitioner alleges, that a defendant who committed the same death eligible offense under the same circumstances in 1995 was statistically more likely to be sentenced to death than a defendant who might commit the same crime today would be. Such variance is at odds with the Supreme Court's jurisprudence regarding what practices comport with the Eighth Amendment.

201.    With discovery and an opportunity to adduce supporting evidence, Petitioner alleges he can establish the same, all in conformance with California's recent election results.[64]

_____

[64]    Under the Antiterrorism and Effective Death Penalty Act, Petitioner must present this initial petition for filing by no later than December 21, 2012.   California voters decided Proposition on November 6, 2012, and 100% of the ballots cast were fully tallied as of December 3, 2012, according to the California Secretary of State. Exhibit 5.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                          Page -98-                          **Dykes v. Martel**
Case No. C-11-04454-SI

## Claim 2[65]

**TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT READILY AVAILABLE EVIDENCE IN MITIGATION AT PETITIONER'S PENALTY PHASE TRIAL.**

202.     There were numerous types of mitigation evidence that reasonable and competent trial counsel would have prepared and presented to Petitioner's penalty phase jury.  Petitioner's personal and family profile is nothing less than the story of how a poor, undereducated and ignored child grows up in a deprived and violent inner-city existence:

    a.   Single parent family with absentee father.

    b.   Repeated shuffling back and forth between the parents.

    c.   Depressed, overworked and mentally ill single mother with
         low self-esteem who was raising five children.

    d.   Low income impoverished environment.

    e.   Life in a series of violent, hopeless neighborhoods, each
         with repeated exposure to crime.

    f.   Lack of parental supervision at home.

    g.   Lack of parental affection.

    h.   Lack of individual attention.

    i.   Lack of appropriate role models at home or in the
         neighborhood.

    j.   Volatile relationship with stepmother.

    k.   Drunken and abusive stepfather.

---

[65]    This claim was presented to and decided by the California Supreme Court during state habeas proceedings.  See Habeas Claims 3, 4, 5, 9, 18, and 29.

1    l.    Low expectations and humiliation by aunts and uncles.

2    m.    Learning    disabilities    and    subnormal    intellectual

3          functioning, of which there appears to be a strong family

4          history.

5    n.    Neuropsychological impairments in functions related to

6          planning, organizing, judgment, cognitive flexibility,

7          fluency and self-monitoring.

8    o.    Lack of parental support for education.

9    p.    Dysfunctional and underfunded schools.

10   q.    Extremely    poor    performance    in    school,    with    frequent

11         suspensions.

12   r.    Attention deficit/hyperactivity disorder

13   s.    Bipolar disorder

14   t.    Alcoholism, of which there was a strong history on both

15         sides of the family, and substance abuse.

16   u.    Family history of various forms of mental illness including

17         schizophrenia.

18   Reasonable and competent trial counsel would have brought forth this

19   evidence for the jury's evaluation during the penalty phase, and once

20   informed fully of Petitioner's background, the jury would not have

21   sentenced him to death.   Trial counsel delivered constitutionally

22   ineffective assistance and the writ should issue.

23

24   **Synopsis**

25   203.    It is clear that under the case law this evidence is

26   admissible and relevant during a capital sentencing proceeding.

27

28   *Petition for a writ of habeas corpus*
     *under 28 U.S.C. 2254*                    Page -100-                    **Dykes v. Martel**
                                                                   Case No. C-11-04454-SI

"[E]vidence about the defendant's background and
character is relevant because of the belief, long held by
this society, that defendants who commit criminal acts that
are attributable to a disadvantaged background, or to
emotional and mental problems, may be less culpable than
defendants who have no such excuse."

California v. Brown, 479 U.S. 538, 545 (1987)(O'Connor, J.,
concurring); Boyde v. California, 494 U.S. 370, 382 (1990); Penry v.
Lynaugh, 492 U.S. 302, 319 (1989).

"The presentation of mitigation evidence affords an
opportunity to humanize and explain--to individualize a
defendant outside the constraints of the normal rules of
evidence."

Mayes v. Gibson, 210 F.3d 1284, 1288 (10th Cir.), cert. denied, 531
U.S. 1020 (2000).

204.     It is ineffective assistance of capital trial counsel to
fail to conduct a proper penalty phase investigation and to make
reasonable strategic decisions in the presentation of penalty phase
mitigation evidence. Wallace v. Stewart, 184 F.3d 1112, 1117 (9th Cir.
1999); Caro v. Calderon, 165 F.3d 1223, 1227 (9th Cir. 1999);
Clabourne v. Lewis, 64 F.3d 1373, 1378 (9th Cir. 1995); Mak v.
Blodgett, 970 F.2d 614, 619 (9th Cir. 1992).

**DISCUSSION**

205.     To consider the significance of trial counsel's failures,

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -101-                    **Dykes v. Martel**
                                                            Case No. C-11-04454-SI

it seems pertinent to start with the prosecutor's own admission of just how weak the aggravation case was against Petitioner.   At a pre-trial hearing, the prosecutor openly conceded that any error in admitting aggravating evidence would not withstand review because "this case doesn't have the bulk of additional aggravation[.]"   (RT 242, emphasis added)

206.     Next: a few stark facts.  The entire penalty phase comprises exactly and only 62 pages of reporter's transcript. (RT 3767-3838) The entire case in aggravation against Petitioner consisted of victim impact testimony and proof Petitioner had been in possession of a handgun during a non-violent police stop.   The prosecution's own acknowledgment about how weak its aggravation case against Petitioner was no generous gesture; it was compelled to make the concession.

207.     Even more stark: the defense case consists of only 22 pages of reporter's transcript. The entire case in mitigation consisted solely of unemotional requests by Petitioner's family that he not be executed.

208.     The record is sparse not because Petitioner had no redeeming qualities, but because trial counsel failed to conduct a proper and competent investigation pretrial.

        -     Trial counsel failed to provide a mental health
        expert   with   critical   information   about   Petitioner's
        family's history of mental illness, subnormal intellectual

function and alcoholism.

- Trial counsel did not follow up on evidence of neuropsychological impairment he did learn existed by requesting a more thorough examination.

- Trial counsel never investigated how any adverse impact from admitting Petitioner's juvenile arson behavior could be blunted, even when it was still a possibility that the arson would be admitted as aggravation. Importantly, counsel also failed to consider how the fact of the fires could be developed as powerful mitigation by explaining it as the product of many of the same dysfunctional and unhealthy influences that Petitioner labored under throughout his life.

209.    The trial court refused to allow the prosecutor to impeach Petitioner at the guilt phase with evidence of his juvenile misconduct. (RT 3290)[66]

210.    The trial court, therefore, saw what trial counsel inexplicably did not: that a rational jury probably would not have used Petitioner's minor adolescent juvenile history to discredit him. Even after this ruling trial counsel made no effort to evaluate this

---

[66]    Doing so, the court held that even if the fires Petitioner set as a juvenile constituted moral turpitude and would otherwise have been admissible as impeachment, "the probative value of juvenile misdemeanor conduct" as impeachment was substantially outweighed by the potential for confusion of the issues. (RT 3290)

evidence as a potentially favorable illustration of just how unguided Petitioner was during his formative years.

- Evidence could have been put on about the crime-ridden neighborhood Petitioner spent his adolescent years in.

- Evidence could have been put on about Petitioner's learning disabilities, lifelong failure at school and broken family.

- Importantly, Petitioner could have taken the stand to apologize openly and express the remorse he felt. This alone would likely have saved his life.  And the record makes clear Petitioner was fully ready and willing to testify when called upon to do so.  Trial counsel simply failed to allow Petitioner to use this opportunity for salvation.

211.    Granted discovery and an evidentiary hearing, Petitioner anticipates illustrating clearly just how these and further details and illustrations of Petitioner's deprived background and personal challenges could have been presented to the jury and why it was ineffective assistance of counsel to fail to do these things.

212.    Had trial counsel properly and competently investigated and presented the evidence readily as mitigation, Petitioner would not have been sentenced to death.  The judgment of death must be reversed.

**THE LIMITED EXTENT OF TRIAL COUNSEL'S INVESTIGATION.**

<u>Investigation of Petitioner's Juvenile Arson</u>

213.      Although trial counsel obtained Petitioner's juvenile court file, counsel had no understanding of the significance of Petitioner's arsonist behavior.  Had he done so, counsel would have understood the fires Petitioner lit at his junior high school could not have been used to bolster the case for a death sentence; that any adverse impact of this evidence coming in at the penalty phase could be mitigated; and that the fact Petitioner set these fires could be turned to his advantage and explained as the product of the same dysfunctional and unhealthy influences that ultimately led to the commission of the robbery/murder.  (Cal. Hab. Exh. 1, 1 App. 2-3)

<u>Investigator Services</u>

214.      Lead counsel Spencer Strellis' billing records contain two entries regarding investigator services:  a 0.3-hour "discussion on phone" on March 9, 1995, and a 2.5 hour meeting on May 14, 1995, meeting "with investigator, co-counsel and doctor."  (Cal. Hab. Exh. 118, 7 App. 1936, 1953)

215.      The pre-trial investigator was Richard Eric Hove.  (Cal. Hab. Exh. 1, 1 App. 3.)  Mr. Hove, however, was not a capital mitigation specialist.  Mr. Hove was a criminal defense attorney in dire straits, unable to practice law, and a friend of Mr. Strellis. At the time of his engagement on Petitioner's case, Mr. Hove had been suspended by the State Bar from practice following a federal criminal

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -105-                    **Dykes v. Martel**
Case No. C-11-04454-SI

1   conviction.   (Cal. Hab. Exh. 110, 7 App. 1832)[67]

2

3   216.      On May 22, 1995, the trial court ruled that the fires that

4   Petitioner had lit at his junior high school would not be admissible

5   at the penalty phase as part of the prosecutor's case in aggravation.

6   (RT 405) Yet, by that point, Mr. Strellis had already decided he would

7   not present a case in mitigation and he did not revisit the issue.

8

9   Trial Counsel's Investigative Efforts

10  217.      Trial counsel did not speak with Poashan Jones, Timothy

11  Love, Warren Johnson, or Beverly Joyce Johnson-Kaufman, Rhonda Dykes

12  or Cynthia Dykes Wise, family members of Petitioner who have provided

13  declarations with the petition.

14

15  218.      Trial counsel's files contain no public records or other

16  _____

17      [67]   In 1993, under Docket 92-CR-234-VRW, Mr. Hove had been
    convicted in this District of two counts of violating 31 U.S.C. §§

18  5322(a) and 5324(3) by illegally structuring currency transactions to
    avoid triggering the filing of a cash transaction report. (Cal. Hab.

19  Exh. 111, 7 App. 1833) On April 6, 1995, the Ninth Circuit filed an
    opinion reversing Hove's conviction.   (Cal. Hab. Exh. 112, 7 App.

20  1854)
        The United States government elected to re-try Mr. Hove.

21  Although Mr. Hove had retained counsel at his first trial, he
    represented himself at the re-trial.  Mr. Hove submitted or responded

22  to numerous filings during June 1995.  Trial commenced on June 26,
    1995 and concluded on June 29, 1995.  On June 30, 1995, Mr. Hove was

23  acquitted.  (Cal. Hab. Exh. 1, 1 App. 3, Cal. Hab. Exh. 111, 7 App.
    1833, 1846-48)

24      Mr. Strellis was aware of Mr. Hove's legal problems at the time,
    including the fact that he would be retried in June 1995 and would be

25  representing himself.  (Cal. Hab. Exh. 1, 1 App. 3)
        Trial counsel hired no other investigators to develop mitigation

26  for the penalty phase, not even to take Mr. Hove's place while he was
    preoccupied in June 1995 with his own legal problems.  Id.

27

1  documents related to numerous member of Petitioner's family.

2

3  219.     Trial counsel did not even contact John Murcko, the lawyer

4  who represented Petitioner in his juvenile court case to discuss his

5  impressions of Petitioner and his family.  Murcko had office space in

6  the same building that Spencer Strellis did.  (Cal. Hab. Exh. 3, 1

7  App. 7-9)

8

9  <u>Mental Health and Social History Investigation</u>

10 220.     Trial counsel did not engage a psychiatrist to evaluate

11 Petitioner.  Instead, trial counsel retained Dr. Ollie Glover, a

12 forensic psychologist to investigate Petitioner's mental health.

13 Counsel provided Dr. Glover only with Petitioner's school records and

14 his juvenile court records.  (Cal. Hab. Exh. 2, 1 App. 6)  Trial

15 counsel did not provide Dr. Glover with any records related to

16 Petitioner's family or any background information about mental health

17 issues in Petitioner's family.  <u>Id</u>.

18

19 221.     In preparing an expert to conduct an examination concerning

20 the penalty phase, counsel must "seek out [evidence of the defendant's

21 background] and bring it to the attention of experts."  <u>Wallace v.</u>

22 <u>Stewart</u>, 184 F.3d 1112, 1118 (9th Cir. 1999).  <u>See also</u>, <u>Clabourne v.</u>

23 <u>Lewis</u>, 64 F.3d 1373, 1385 (9th Cir. 1995)(counsel was ineffective

24 where he failed to provide experts with materials they needed to

25 "develop an accurate profile" of the defendant's mental health).

26 Counsel has "a professional responsibility to investigate and bring

27

28 *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
   *under 28 U.S.C. 2254*          Page -107-          Case No. C-11-04454-SI

to the attention of mental health experts who are examining his client, facts that the experts do not request[.]" <u>Wallace</u>, 184 F.3d at 1116.

222.    Even without trial counsel performing effectively and as reasonable and competent counsel should, Dr. Glover's evaluation of Petitioner brought forth information that could have and should have been used to Petitioner's advantage during the penalty phase. It was not used, and more significantly it was not further developed, only due to trial counsel's failures.

223.    The testing that Dr. Glover did on Petitioner established that Petitioner is in the low normal range of intelligence.  (Cal. Hab. Exh. 5, 1 App. 41-42)

224.    Dr. Glover interviewed Petitioner on two occasions, developing a basic social history for Petitioner in the process.  His notes from his March 17, 1995, and June 2, 1995, interview of Petitioner contain the seeds of strong mitigation that should have been developed and presented:

225.    Petitioner discussed being raised in a single parent family by a mother who was on welfare until he was eleven (11) years old and then worked very hard but never got ahead. While his mother worked, Petitioner was often alone with his younger sister, Sarah.  He would have to look after her.  (Cal. Hab. Exh. 37, 2 App. 551, 570, 574)

226.      Petitioner spoke with Dr. Glover about the criminal history of two of his brothers.  He told Dr. Glover that he kept a firearm because of the neighborhood they lived in and the fact that Cherry Street had been shot up by a rival gang.  (Cal. Hab. Exh. 37, 2 App. 573)

227.      On the subject of school, Petitioner related he not know how he got the limited education he achieved.  He never did school work or homework, not even when staying with his father.  He discussed dropping out of school after tenth grade, his experience in special education programs, and the fact that he always hyperactive in school and acted like the class clown.  He talked about his difficulty reading, comprehending and remembering.  (Cal. Hab. Exh. 37, 2 App. 551, 571)

228.      Dr. Glover noted that Petitioner seemed genuinely remorseful and cried.  Petitioner said, "Lord knows I didn't have any intention of hurting anybody."  After the crime, Petitioner couldn't eat and lost weight.  He felt better if he was drunk or high.  He started reading the Bible with his girlfriend, and he felt she knew something had happened.  (Cal. Hab. Exh. 37, 2 App. 576)

229.      Dr. Glover's interview notes periodically document Petitioner's manic state, manic episodes, and how absentminded he was. He also memorialized Petitioner's paranoid ideations about forces conspiring to keep African-Americans subjugated.  Petitioner told Dr.

Glover that he felt he has always been impulsive.  (Cal. Hab. Exh. 37, 2 App. 552, 573, 574)

230.    Petitioner told Dr. Glover that his mother was married for a while to an alcoholic man.  Petitioner also told Dr. Glover about his own serious drinking problem, which began in junior high school, and how he would pour brandy into a Sprite can and go to school drunk. (Cal. Hab. Exh. 37, 2 App. 555, 576)

231.    Dr. Glover also documented a number of head injuries that Petitioner received, including in the bathroom where he blacked out. (Cal. Hab. Exh. 37, 2 App. 577)

232.    Dr. Glover noted his impressions following the March 17, 1995, interview:  1) bipolar/manic; 2) OBS (Organic Brain Syndrome) 2nd degree to fall as child.  Impacted ability to learn.  Later blacked out in bathtub.  Later hit in head with a bat; 3) chronic alcoholism. (Cal. Hab. Exh. 37, 2 App. 577)

233.    Petitioner told Dr. Glover that he felt he understood more than he could express.  It was hard for him to talk in front of people.  He would get sweats and would stutter a lot.  Smoking marijuana would help calm him down, and he could express himself better.  (Cal. Hab. Exh. 37, 2 App. 552)

234.    Petitioner didn't like being broke and laying around the

house but felt trapped in his situation.  (Cal. Hab. Exh. 37, 2 App. 552, 553)

235.    At one point, Dr. Glover was scheduled to interview Petitioner's mother.  However, this meeting was cancelled by trial counsel and was never rescheduled.  (Cal. Hab. Exh. 2, 1 App. 6A)

236.    Dr. Glover never came to a conclusive diagnosis of Petitioner. However, Dr. Glover's files contain extensive notes on the symptoms of bipolar disorder.  (Cal. Hab. Exh. 37, 2 App. 558-563)

237.    Dr. Glover's working diagnoses, as well as his emphasis on Petitioner's alcoholism, are evidenced by a June 7, 1995, letter that he wrote to Dr. John Ratey, a professor of psychiatry at the Harvard School of Medicine, and the co-author of a book on attention deficit disorder that Dr. Glover had recently read.  In the letter Dr. Glover asks for Dr. Ratey's "professional opinion" on the question of whether "symptoms of ADD could co-exist with Bi-polar/manic symptoms of an episodic nature . . . especially if that person were prone to abuse alcohol." (Cal. Hab. Exh. 37, 2 App. 549-50)  Discussing Petitioner, Dr. Glover wrote, "In my opinion, this lad has all of the hallmarks of ADD which dates back to the 2nd grade.  During the course of the events which led up to the instant offense, I am of the impression that he suffered a manic episode just prior to the commission of the alleged offense.  He was under dire circumstances at home and desperate for money.  That is no excuse for such an offense, but it

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -111-                    **Dykes v. Martel**
Case No. C-11-04454-SI

is part of the set of circumstances surrounding this offense." (Cal. Hab. Exh. 37, 2 App. 550)

238.     It is unclear whether or to what extent Dr. Glover's impressions from his June 2, 1995, interview of Petitioner were communicated to or considered by trial counsel. Dr. Glover's records contain no bill for services rendered in June, which would include the June 2 interview as well as the June 7 letter to Dr. Ratey which appears to be the last thing that Dr. Glover did on the case, or any discussion of these matters with trial counsel. (Cal. Hab. Exh. 37, 2 App. 515-519)  Counsel's bills reflect no conversations with Dr. Glover about the June 2 interview with Petitioner or the letter to Dr. Ratey. (Cal. Hab. Exh. 118, 7 App. 1896-1959)

239.     Dr. Glover did professional and helpful work on Petitioner's case. Trial counsel simply failed to use it or to develop the leads that it revealed. Follow-up to Dr. Glover's interviews of Petitioner that could have, and Petitioner respectfully alleges should have, been conducted was not undertaken by trial counsel.  Reasonable and competent counsel would have pursued this, and the failure to do so was ineffective assistance of counsel.


**EVIDENCE OF REDEEMING QUALITIES IN PETITIONER THAT COULD HAVE BEEN PRESENTED TO THE SENTENCING JURY.**

240.     During closing argument, the prosecution emphasized the complete lack of mitigating evidence put on by the defense,

emphasizing how nobody who testified had anything good to say about
Petitioner.

> [T]he defense is allowed to put on virtually anything to
> try to persuade you to give him life without parole  The
> prosecution's limited as to the areas we're allowed to
> present evidence.  The defense can put on anything.  And
> what you saw yesterday is a bare request from four — or was
> it five -  relatives, with no other information provided.
> They offered no opinion as to his character, they didn't
> tell you about anything good he's ever done, but just the
> bare request, he's my relative, don't execute him.  That's
> it.  That's all that's been offered to you in mitigation.
> And you're going to weigh that against the circumstances of
> the crime, the harm to the victim's family, and his other
> criminal conduct. . . .  [T]he death penalty is the
> appropriate punishment. . . .  And when you weigh what you
> heard yesterday by the defense against the rest of the
> case, it's inconceivable that the scales could turn out any
> other way.

(RT 3888-89)


241.    The prosecutor further argued for a death sentence on the
basis that "there's nothing redeeming in Mr. Dykes to point to."  (RT
3890)    Petitioner's ostensible lack of redeeming qualities appears
to have figured prominently in the jury's decision to impose a death
sentence.  Several jurors afterwards related that because Petitioner

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -113-                    **Dykes v. Martel**
                                                                Case No. C-11-04454-SI

presented no evidence on his behalf, they felt that there was nothing they could do but impose a death sentence.

242.    Juror RA recalled that there was a lack of any positive evidence on behalf of Petitioner that she felt gave her the option of a sentence other than death.  She said that she was very dismayed that the family members made a plea for Mr. Dykes in such a rote fashion. She recalled that the various family members said something perfunctory along the lines of 'I want my brother to live' and yet could not elaborate on why he should be allowed to live, etc.  In sum, it was her view she had not received enough information or very little information that would give her anything to go on, either emotionally or something substantial that would give her sympathy and allow her to consider life imprisonment as opposed to death as a verdict.  (CT 698-99)

243.    Juror RA further recalled the defense team was basically unable to provide any redeeming characteristics for them to consider with regards to Petitioner.  She recalled the jurors were not sure if Petitioner even had any redeeming characteristics but they knew that they had not heard anything substantive with regards to that.  There was such a lack of information of that nature that the jury actually found it "very odd."  (CT 701)

244.    Juror RA further stated that the jurors had wanted to confer with Mr. Strellis after they gave the verdict of death.  They wanted

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -114-                    **Dykes v. Martel**
Case No. C-11-04454-SI

to express their concerns regarding the lack of this type of information that might have given them something to lean on positively toward Petitioner.  (CT 664)

245.    Juror JR felt Petitioner's family members who testified appeared to show no concern for Petitioner himself.  Although the family members said they wanted Petitioner to receive life imprisonment, they did not elaborate as to why he was deserving of life as opposed to death.  In particular, when Petitioner's father testified, he only said that he wanted his son's life spared because of all the hard work that he (the father) had done. (CT 713-14)

246.    Juror SL was affected by the fact that Petitioner's parents had no redeeming qualities to relate about Petitioner and that his father, mother and sister said absolutely nothing of any redeeming nature about him.  (CT 717)  She also "felt that the testimony on the part of other family members speaking in support of [Petitioner] was lacking and that the members said nothing redeeming about [Petitioner] at all."  (CT 719)

247.    Recalling Petitioner's father's testimony that his son should be spared because he was the last of the Dykes men in his line, Juror SL recalls thinking, "Who the hell cares?"  (Cal. Hab. Exh. 20, 1 App. 173)

248.    In turn, juror FC noted: "Mr. Strellis presented his case

very well but just did not have any material to work with.  She felt

sorry for a lawyer who had such a client.  (CT 727)

249.    Trial counsel was on notice from the outset that proof of some redeeming qualities would be expected for the jury to spare Petitioner if the matter reached a penalty phase.  Juror JM had stated during voir dire, "In terms of the death penalty for me to really, to really say that somebody would deserve that I think it would come down for me personally to be an individual that has no redeeming value to society, for instance, cannot be rehabilitated and that sort of thing."  (RT 2476)

> "In all, counsel's gross mishandling of the penalty-
> phase defense left his client's fate to jurors who could
> only wonder why neither the man himself nor any member of
> his family would step up to explain, in personal human
> terms, why his life should be spared notwithstanding the
> reprehensible conduct of which he had been found guilty."

Cargle v. Mullin, 317 F.3d 1196, 1211 (10th Cir. 2003).

250.    Petitioner's apparent lack of redeeming qualities also figured prominently in the trial court's decision not to set aside the death sentence.  The trial court found that the record contained no "sympathetic or other aspects of the defendant's character or record which provide a basis for a sentence less than death."  (RT 4130-31)

251.    Sadly the trial court was correct in this assessment.  The

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -116-                    **Dykes v. Martel**
Case No. C-11-04454-SI

record is completely devoid of any evidence that might have humanized Petitioner in the eyes of a jury who felt that the circumstances of his crime, standing alone, justified a death sentence. This is only true, however, due to trial counsel's ineffective assistance in failing to muster that evidence for the court's and jury's consideration.

252.     This is even more unsettling since trial counsel plainly had ample reason and proof to know redeeming evidence was available for him to put forth on Petitioner's behalf.  Trial counsel's own files contain a folder labeled "Mitigation."  In it were eight hand-written letters on loose-leaf paper from various friends and family members of the Petitioner.  The letters that bear dates reflect that they were written in December, 1993, long before Petitioner's penalty phase trial.

253.     When asked about them by successor counsel, trial counsel Strellis did not even recall the letters existed or that he asked the family to write them. (Cal. Hab. Exh. 1, 1 App. 3-4)

254.     In contrast, Petitioner's sister, Sarah Dykes, clearly recalled that the letters were trial counsel's idea. (Cal. Hab. Exh. 7, 1 App. 94)  Of the letter writers, only Sarah Dykes testified at trial. Yet, with her on the stand, trial counsel did not even elicit from Ms. Dykes any of the heart-felt sentiments expressed in her letter.  He did not have the jury hear how she and Petitioner would

try to watch each other's back when they were left to fend for themselves in the dangerous Cherry Street neighborhood or that Petitioner would try to help Sarah with her with her homework, even though he himself had tremendous, longstanding problems in school, or that while Petitioner always had trouble finding work, when he did work, he helped his mother pay the bills and would buy groceries and other necessities.  (Cal. Hab. Exh. 7, 1 App. 92)

255.      It was ineffective assistance of counsel to fail to call each of the authors of such sympathetic and revealing letters to testify on Petitioner's behalf in the penalty phase.   If those favorable witnesses had testified, Petitioner would not have been sentenced to death.   Further, had trial counsel simply followed up with those individuals or other members of Petitioner's family, he could have presented additional redeeming mitigation.

**MITIGATING EVIDENCE OF PETITIONER'S IMMEDIATE AND CONTEMPORANEOUS REMORSE THAT COULD HAVE BEEN PRESENTED TO THE SENTENCING JURY.**

256.      During closing argument at the penalty phase, the prosecutor argued forcefully that Petitioner had not put on any evidence that he was remorseful about the murder:

> Why didn't the defense put on the girlfriend to say
> that he's showed [sic] remorse to her, confided in her?
> There's been no evidence presented that he ever showed any
> remorse, other than when you listen to the tape, when he's
> finally confronted and he knows he can no longer continue

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -118-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

1    to deny it's him.  Then the sprinklers turn on, then we get

2    some tears.  But as you sit here now, do you really think

3    when Mr. Dykes goes back to his cell at night he cries for

4    Lance and Bernice and what he did to their family?  Or do

5    you think the tears are for him, for the situation he finds

6    himself in?  Ask yourself that before you decide whether or

7    not he deserves your mercy?

8    (RT 3893) This prosecution argument resonated with the jury because

9    of the absence of contrary evidence from Petitioner.[68]

10

11   257.    Juror  RM  stated  that  the  jurors  were  disturbed  that

12   Petitioner "never once said he was sorry for his actions" during his

13   guilt phase testimony. (CT 709-10.)[69]

14

15   258.    Juror JR recalled the jurors were disturbed by the fact that

16   at no time during the trial did Petitioner show any remorse or concern

17   for the consequences of his actions or for injuries and death to the

18   victims.  He and the other jurors were hoping that they would hear

19   something from Petitioner such as an apology or anything that would

20   give them some indication that Petitioner's actions were anything

21   ─────────────────────

22       [68]    This prosecution argument is of questionable ethics, as the
     prosecutor  had  reason  to  know  based  on  his  own  interview  of
23   Petitioner's girlfriend that Petitioner had in fact been deeply
     troubled by these events, was drinking heavily, and reading the Bible
24   prior to self-surrendering in this matter.

25       [69]    That the jurors held Mr. Dykes' silence at the penalty phase
     and his failure to apologize during his guilt phase testimony against
26   him during penalty phase deliberations is the subject of the juror
     misconduct claim, which is claim 9 of the petition.

27

28   **Petition for a writ of habeas corpus**                                **Dykes v. Martel**
     **under 28 U.S.C. 2254**              Page -119-              Case No. C-11-04454-SI

other than intentional acts.  (CT 713)

259.    Juror SL felt that during the sentencing phase, Petitioner should have gotten up and told the family of his victim that he was sorry, but there was no such testimony.  (CT 717)  She felt it was unusual Petitioner did not have anything to say for himself and showed no remorse.  (CT 719)

260.    Juror GS wished Petitioner had been asked about remorse at the penalty phase rather than at the guilt phase, where the court ruled the question irrelevant and Petitioner was not allowed to answer.  (Cal. Hab. Exh. 21, 1 App. 175-176)

261.    Juror FC remembered the jurors all wondered why Petitioner was not put on the stand, if for nothing else than to say he was sorry to the family. It was her understanding the lack of this behavior on the part of Petitioner greatly affected the jurors.  (CT 723)  She recalled that during the final vote on penalty, she asked the jurors generally how many of them may have changed their mind if Petitioner had simply said he was sorry to someone.  Some of the jurors said that they would have been swayed by that and might have tipped their vote to life imprisonment.  (CT 726)

262.    Despite the prosecutor's assertion before the jury to the contrary, the prosecutor had first-hand reason to believe Petitioner was in fact remorseful after committing these crimes.  Ms. Rodriguez's

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -120-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

account of Petitioner's remorseful behavior is memorialized in the prosecutor's notes of an interview he conducted with her prior to calling her as a rebuttal witness.[70]

263.     Ms. Rodriguez was available to trial counsel, and she could have testified that during the time period following the crimes, Petitioner was very quiet around her.  Although Petitioner did not tell her about the crimes, he told her that he had "messed up."  She erroneously assumed this meant he was cheating on her. Thereafter she and Petitioner spent time reading the Bible together.  (Cal. Hab. Exh. 39, 2 App. 479.)

264.     Petitioner's cousin, Poashan Jones, also could have testified about Petitioner's remorseful demeanor.  As his 1993 letter states, "I know that he took someone's life but deep in his heart he didn't mean to do that to anyone because I could see it in his eyes. We grew up together, and we dreamed together.  So I know what type of person Ernest is inside and out.  He hurt a lot of people's hearts and he hurts inside because of that, but doesn't deserve to get the Death Sentence."  (Cal. Hab. Exh. 25, 1 App. 180)

265.     Trial counsel had no reasonable justification for failing to put forth this witness in Petitioner's penalty phase; his failure

---

[70]     The prosecutor argued Petitioner had never acted remorsefully around his girlfriend despite the fact the prosecutor know, from his own interview of Petitioner's girlfriend, this was a false assertion.

to do so was simply ineffective assistance of counsel.

266.      If granted discovery and an evidentiary hearing, Petitioner will be able to show this Court there was simply no reasonable or competent strategy for trial counsel's failures.

267.      As seen earlier, Petitioner's genuine remorse and agitation after the crime are also reflected in trial counsel's interview notes and Dr. Glover's interview notes.   Trial counsel's own notes of an interview with Petitioner dated January 17, 1994, include a heading "post event regret."   Trial counsel noted under this entry:   "drink heavy, act differently, told brother why." (Cal. Hab. Exh. 38, 2 App. 587)

268.      The testimony of the other witnesses alone probably would have resulted in Petitioner's life being spared, but Petitioner should have testified at the penalty phase to say that he was sorry.   He could have done so had trial counsel simply prepared him or even just called him to the stand.[71]

269.      Significantly, Petitioner's remorse is even documented in the probation report filed prior to sentencing.  The probation officer stated:  "The defendant is convincing that he is remorseful about the

---

[71]      The record shows Petitioner testified on numerous occasions throughout the proceedings, starting at the outset during pretrial motion hearings.

1  death of the nine-year-old grandson.  That is clear from our talking

2  to him."  (Cal. Hab. Exh. 36, 2 App. 490)

3

4  270.      Petitioner had an extremely limited education, completing

5  only the eighth grade.  (Cal. Hab. Exh. 54, 5 App. 1345-46.)

6

7  271.      Petitioner's father and mother did not live together, and

8  Mr. Dykes was not regularly present in Petitioner's life.  (Cal. Hab.

9  Exh. 6, 1 App.66; Cal. Hab. Exh. 7, 1 App. 83; Cal. Hab. Exh. 11, 1

10  App. 127)

11

12  272.      Petitioner's father was a distant, unloving man.  He never

13  expressed love to his daughters or took anything close to an active

14  interest in their lives and problems.  He never paid much attention

15  to Petitioner or his sister, Sarah, either.  (Cal. Hab. Exh. 7, 1 App.

16  90; Cal. Hab. Exh. 11, 1 App. 127, 129; Cal. Hab. Exh. 12, 1 App. 132)

17

18  273.      Petitioner    recalls    his    father    as    being    completely

19  emotionally distant.  His father only told him once, while drunk, that

20  he loved him.  (Cal. Hab. Exh. 6, 1 App. 66)  His father never

21  attempted to converse with Petitioner about the problems Petitioner

22  was having or the difficult choices that he that confronted him

23  growing up in one of the worst neighborhoods in Oakland.  Id.

24

25  274.      Petitioner's father had a severe drinking problem. He would

26  start drinking early in the morning and would continue drinking

27

28  *Petition for a writ of habeas corpus*                                    **Dykes v. Martel**
   *under 28 U.S.C. 2254*              Page -123-              Case No. C-11-04454-SI

1    throughout the day and late into the night.  His drinking worsened

2    after his wife died in 1980.  Even when he found out that he had

3    ulcers and intestinal problems and gout from drinking too much, he did

4    not stop.  (Cal. Hab. Exh. 7, 1 App. 93-94; Cal. Hab. Exh. 11, 1 App.

5    126; Cal. Hab. Exh. 12, 1 App. 135)

6

7    275.    Military records reflect incidents of misconduct involving

8    Petitioner's father's abuse of alcohol that resulted in discipline,

9    including being drunk on duty.  (Cal. Hab. Exh. 54, 5 App. 1347, 1352)

10   His wife, Mary Dykes, was an alcoholic as well and died in 1980 of

11   respiratory failure related to her alcohol abuse.

12

13   276.    In 1992, prior to Petitioner's crime, Petitioner's father

14   was convicted of misdemeanor domestic violence, stemming from an

15   incident around the time of his divorce in which he hit Petitioner's

16   stepmother with a gun.  (Cal. Hab. Exh. 52, 5 App. 1278; Cal. Hab.

17   Exh. 11, 1 App. 128)  This resulted in restraining and stay away

18   orders being entered against the father, which Petitioner's stepmother

19   requested be maintained in her response to the father's petition for

20   divorce.  (Cal. Hab. Exh. 53, 5 App. 1314)[72]

21

22   _____

      [72]    Late in life, in 2002, Petitioner's father was convicted of
23   felony elder abuse, stemming from an especially tragic incident in
      which he tried to sexually assault his 102-year-old mother-in-law who
24   lived in his house.  Police reports regarding the incident described
      the man as "extremely intoxicated."  Indeed, Petitioner's father was
25   so intoxicated that the arresting officers did not give him a Miranda
      warning  (Cal. Hab. Exh. 52, 5 App. 1257, 1265)  Probation conditions
26   included no drinking and attending an alcohol rehabilitation program.
      (Cal. Hab. Exh. 52, 5 App. 1298)

27

28   *Petition for a writ of habeas corpus*                                    **Dykes v. Martel**
      *under 28 U.S.C. 2254*              Page -124-                Case No. C-11-04454-SI

277.        Petitioner's father was a disciplinarian when Petitioner was living with him as an adolescent.  He would hit Petitioner with a belt and take away his privileges.  Petitioner was afraid of him and his moods.  When Petitioner would bring people to the home, he would walk on eggshells and try to be very quiet to avoid making his father angry.  (Cal. Hab. Exh. 10, 1 App. 120.)

278.        Root causes of the father's anger and withdrawal are difficult to identify.  Petitioner's aunt Yvonne said that Petitioner's father had issues from his time in the military and they sometimes came out in his anger.  (Cal. Hab. Exh. 9, 1 App. 110)

279.        Petitioner's half-sister, Rhonda, lived with their father for many years but never felt like she knew the person that he was inside at all because he hardly ever spoke and never expressed emotion.  (Cal. Hab. Exh. 11, 1 App. 129)

280.        According to Cynthia, their father would hardly ever talk about his own father, Lawyer Dykes.  She believes he was a minister and had the impression from what little Petitioner's father said about the man that their grandfather had been very, very strict.  Although Lawyer Dykes lived to be a very old man, she never met her grandfather.  (Cal. Hab. Exh. 12, 1 App. 132)  Lawyer Dykes may have become a minister at some point, but records show he was a laborer. (Cal. Hab. Exh. 58, 6 App. 1522)

281.    Petitioner's father's marriage to Lillian Young, Petitioner's stepmother, was not a good marriage.  By all accounts, Petitioner's stepmother was an unloving, materialistic, manipulative, and jealous person who spent the household money faster than it came in and she wanted nothing whatsoever to do with her husband's family, including Petitioner.  (Cal. Hab. Exh. 7, 1 App. 93; Cal. Hab. Exh. 11, 1 App. 127-28; Cal. Hab. Exh. 12, 1 App. 134-35)

282.    During his marriage to Petitioner's stepmother, Petitioner's father repeatedly borrowed money against his house to pay off creditors.  (Cal. Hab. Exh. 40, 3 App. 633-685; Hab. Exh 12, 1 App. 134)  He filed for bankruptcy twice, once in 1987, while he was married to Petitioner's stepmother, and again in 1993, not long after his separation from her. (Cal. Hab. Exh. 55, 5 App. 1388; Cal. Hab. Exh. 56, 5 App. 1450)

283.    According to the juvenile court records, during the period shortly before his arsonist activities, Petitioner had been living with his father and his stepmother.  Not surprisingly, Petitioner's relationship with his stepmother was volatile.  She was openly critical of Petitioner's mother and accused him of trying to break up her marriage to Petitioner's father.  (Cal. Hab. Exh. 29, 1 App. 201, 208)  Petitioner recalls that, to appease his stepmother when she made false accusations against Petitioner, his father beat him.  (Cal. Hab. Exh. 6, 1 App. 66-67)

284.    Petitioner's sister Sarah recalled that their step-mother Lillian could not get along with anybody.  Ernest moved back in with his mother because Lillian wanted him out.  She blamed Ernest whenever money was missing at the house or when something went wrong.  In sum, she was jealous of the children.[73]

285.    Because Petitioner's father's stable work record was emphasized at the penalty phase, the jury was left with the impression that the man  was a far more stable father-figure and provided a more tranquil home than was remotely the case. The evidence to rebut this image was available if trial counsel had bothered to put it before the jury; the failure to do so was unreasonable and incompetent. This was ineffective assistance of counsel.

286.    Petitioner's mother's lot in life was no better.  At the time Petitioner was born, Ms. Brown was on welfare.  (Cal. Hab. Exh. 9, 1 App. 103)  Petitioner's family did not have very much money or material possessions.  He and his siblings would have gone without food if there had not been so many extended family members around to help feed them.  Petitioner would periodically go to their grandmother's house to eat.  (Cal. Hab. Exh. 18, 1 App. 167)

---

[73]    Once after Mr. Dykes had given Petitioner a remote control car for a present, she got mad and asked him, "Why you buying things for those kids?"  Another time when Petitioner was visiting, he was laying on the bed watching TV.  She attacked him, trying to choke him for some small reason.  On another occasion, she accused Sarah of chewing up 17 sticks of gum and tried to throw her out.  (Cal. Hab. Exh. 7, 1 App. 93)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -127-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

287.      When Petitioner lived with his mother, he moved around a lot. He recalled they lived in at least six (6) different apartments in Oakland. Moving so frequently was hard on Petitioner, particularly as in the crime-ridden neighborhoods in which his family lived he always had to prove himself in each new school.

288.      Ms. Brown would often work night shifts, and Petitioner would be home unsupervised when she left. (Cal. Hab. Exh. 17, 1 App. 163)  Sometimes Ms. Brown worked two jobs trying to take care of her family's financial needs. One consequence of her absences from the home was that she did not have control over her children. (Cal. Hab. Exh. 18, 1 App. 166)  When Ms. Brown was not at work, she was usually home sleeping.  (Cal. Hab. Exh. 17, 1 App. 163)

289.      Petitioner's teachers repeatedly entreated her to be sure that he did his homework and that he practiced reading.  (Cal. Hab. Exh. 30, 2 App. 413, 414, 418)  Ms. Brown was either unable or unwilling to help Petitioner in this way.

290.      Ms. Brown had no involvement in the Juvenile Court's attempts to rehabilitate Petitioner through his camp placement, a fact that is repeatedly noted in the court papers. (Cal. Hab. Exh. 29, 1 App. 202, 207, 210)

291.      Ms. Brown's inability or unwillingness to help Petitioner is mirrored in her inability or unwillingness to involve herself in

*Petition for a writ of habeas corpus
under 28 U.S.C. 2254*                    Page -128-                    **Dykes v. Martel**
Case No. C-11-04454-SI

1  Petitioner's half-brother Versie Wroten's juvenile proceedings.  A

2  social study prepared March 1, 1984, notes that "Mary Brown is a hard

3  working woman who appears to have given up on her son.  She decided

4  he had the problem with theft and she was not going to deal with it.

5  She ignored the letters sent by this Deputy as it was 'Versie's

6  problem.'  (Cal. Hab. Exh. 42, 3 App. 777)

7

8  292.    Mental illness also runs in this family.  Petitioner's

9  uncle, Billy Brown, developed mental illness as a young man.  He was

10 in and out of jail when he lived in Oklahoma with Petitioner's

11 maternal grandmother.  From time to time, he would accuse his mother

12 and his siblings of some type of conspiracy against him.  (Cal. Hab.

13 Exh. 17, 1 App. 162)

14

15 293.    Petitioner's uncle, Tony, got Billy his own apartment, but

16 Billy pulled a knife on his landlord.  He was arrested and has been

17 institutionalized in mental hospitals ever since.  (Cal. Hab. Exh. 9,

18 1 App. 107, 109; Cal. Hab. Exh. 17, 1 App. 162)

19

20 294.    Billy has been diagnosed with schizophrenia; Petitioner's

21 aunt, Grace Love, also suffers from mental problems, perhaps also

22 schizophrenia (Cal. Hab. Exh. 9, 1 App. 109)  Her problems were severe

23 around the 1980s but then subsided.  When her husband suffered a

24 stroke, her mental health became worse.  (Cal. Hab. Exh. 17, 1 App.

25 162)  She constantly thought that people were following her and

26 talking behind her back.  She quit her job and eventually refused to

27

28 *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
   *under 28 U.S.C. 2254*              Page -129-              Case No. C-11-04454-SI

1   accept any help from family or friends.  She has since become

2   homeless.  (Cal. Hab. Exh. 17, 1 App. 162)

3

4   295.    Petitioner's cousin, Joyce Johnson, is described as

5   "fragile."  She had trouble with her speech and was slow in school.

6   (Cal. Hab. Exh. 17, 1 App. 163)

7

8   296.    Subnormal intelligence also appears to run in the family.

9   Petitioner's maternal grandfather, Sherman Brown, and several of his

10  relatives, including his mother, are described as borderline retarded.

11  (Cal. Hab. Exh. 9, 1 App. 106)  Petitioner's aunt Yvonne started a

12  board and care facility for mentally disabled men as a result of

13  having taken in two of her disabled relatives.  (Cal. Hab. Exh. 9, 1

14  App. 104-05)

15

16  297.    Petitioner, his sister and his half-brothers have all been

17  described as unusually slow as children.  (Cal. Hab. Exh. 9, 1 App.

18  104; Cal. Hab. Exh. 17, 1 App. 161)   Petitioner's half-brother,

19  Israel, was distractible and had difficulty learning.  (Cal. Hab. Exh.

20  9, 1 App. 104)  Petitioner, his sister, and his half-brother, Versie,

21  are described as being not all there.  (Cal. Hab. Exh. 17, 1 App. 163)

22   Petitioner's Aunt Yvonne, who was the product of an extramarital

23  relationship and was not Sherman Brown's biological child, in contrast

24  is a successful businesswoman.  (Cal. Hab. Exh. 13, 1 App. 139)

25

26  298.    According to family members, Ms. Brown has often been seen

27

28  *Petition for a writ of habeas corpus*                                    **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -130-             Case No. C-11-04454-SI

talking to herself.  She claims to see and hear things that no one else does, and claims the ability to make predictions.  She has been known to be friendly with someone and then the following day ignore them or curse them out for no perceptible reason.  (Cal. Hab. Exh. 9, 1 App. 107)  She has frequently talked about how people are out to get her.

299.    Thus available evidence suggested a mother who was effectively disabled from being an active, engaged, involved and loving presence in Petitioner's life.  Had the jury been made aware of these facts and forces at work in Petitioner's life and upbringing, he would not have been sentenced to death. Reasonable and competent counsel know these types of information are mitigating evidence that can be powerful with a sentencing jury faced with the ominous responsibility for deciding another human being's fate. A jury would have been free to reject them, but it was trial counsel's constitutional duty to put them before the jury precisely so that the jury could do its task properly.  It was ineffective assistance of counsel of counsel to fail to present this evidence during the penalty phase.

300.    Sarah Dykes recalled that of all the places she and her brother lived growing up, the Cherry Street apartment was the most difficult. At Cherry Street, there were six apartments in our building – three on top and three down below. Petitioner's family moved to Cherry Street because the bedrooms were bigger and the rent was

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -131-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

1    cheaper.  Sarah had her own room and Petitioner's mother had her own

2    room.   Petitioner and his older brothers shared a third room.  For

3    Petitioner, this was still a crowded apartment.  (Cal. Hab. Exh. 7,

4    1 App. 85)

5

6    301.     There were drug dealers living in some of the other

7    apartments.   Sarah would always hear fights through the walls.

8    Boyfriends kicked down the doors of their girlfriends' apartments.

9    Strangers would pound on the family's door.  Petitioner's mother told

10   them never to answer the door when she was not home.  They were not

11   allowed to let anyone in the apartment either.  Id.

12

13   302.     The neighborhood around the Cherry Street apartment was not

14   good either.  Sarah was always worried and constantly looking out for

15   trouble.   When the landlord put up a gate outside the building,

16   vandals broke all the locks.  There was no way to make things safe.

17   Vandals regularly broke into the mailboxes to steal food stamps.

18   (Cal. Hab. Exh. 7, 1 App. 86)

19

20   303.     There were many abandoned buildings in the neighborhood from

21   which drug dealers operated.  Prostitutes were on the nearby street

22   corners. People were always getting into fights on this street.  They

23   always found a way to get a fight started, and they would start a

24   fight if they thought you just looked at them strangely.  You had to

25   know how to avoid them or to protect yourself.   People armed

26   themselves with knives, box-cutters and razors.   The police were

27

28   *Petition for a writ of habeas corpus*
     *under 28 U.S.C. 2254*                    Page -132-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

always patrolling the area. Sarah did not see guns very often but she always heard the gunshots. A few streets over – on Birch, Sunnyside and Olive – someone was always getting shot. Id.

304.    Reasonable and competent counsel would have understood that putting such evidence and information about Petitioner's background would have been to Petitioner's advantage.

**MENTAL HEALTH MITIGATION EVIDENCE**

305.    During his state habeas proceedings, Petitioner engaged Dr. Pablo Stewart, a psychiatrist with an expertise on the intersection of mental illness and substance abuse, in connection with these proceedings. Dr. Stewart met with Petitioner twice and reviewed 1) declarations and reports from family members regarding Mr. Dykes' early development and young adulthood; 2) his school records, including educational reports, disciplinary reports and psychological evaluations, 3) his juvenile court records, 4) records of Dr. Oliver Glover, the psychologist retained by trial counsel, 5) medical and psychological records from San Quentin State Prison; and 6) the penalty phase transcript of his trial. Dr. Stewart also had discussions with habeas counsel about the crime and about his observations of Petitioner.

306.    Dr. Stewart opined that Petitioner has long exhibited and continues to exhibit symptoms of bipolar disorder. (Cal. Hab. Exh. 6, 1 App. 74) Dr. Stewart also expects that Petitioner has long

1  exhibited and, to a lesser degree, continues to exhibit, symptoms of

2  attention deficit hyperactivity disorder.  Id.

3

4  307.    Additionally, while much of Petitioner's conspiracy

5  theorizing by itself is not indicative of a mental disorder, his

6  insistence that influential people such as President Bush and John

7  Ashcroft communicate to greater powers through secret code words is

8  considered to be an "idea of reference," which is a psychotic symptom.

9  Id.

10

11  308.    Dr. Stewart noted that Petitioner's half-brother, Dwayne,

12  on his mother's side shared a similar worldview and possibly a similar

13  symptom.  There is also substantial evidence of mental illness on

14  Petitioner's mother's side of the family.  Petitioner's maternal

15  grandfather is described as borderline retarded.  An uncle, Billy

16  Brown, has long been institutionalized for schizophrenia.  An aunt,

17  Grace Love, has long suffered from mental illness.  (Cal. Hab. Exh.

18  6, 1 App. 74-75)

19

20  309.    Dr. Stewart noted that based on family reports, trial

21  counsel's declaration and the declarations of Petitioner's

22  investigators, Petitioner's mother (Mary Brown) exhibits symptoms

23  associated with schizophrenia.  (Cal. Hab. Exh. 6, 1 App. 74-75)

24

25  310.    In Dr. Stewart's view, it would have been critical for a

26  mental health expert like Dr. Glover to have as much information as

27

28  **Petition for a writ of habeas corpus**
    **under 28 U.S.C. 2254**        Page -134-        **Dykes v. Martel**
                                                       Case No. C-11-04454-SI

possible about mental illness in Petitioner's family for Dr. Glover to be able to develop as thorough and accurate a diagnosis as possible.  (Cal. Hab. Exh. 6, 1 App. 75)

311.     According to Dr. Stewart, the prevalence of alcoholism in Petitioner's family made it four to five times more likely that he would become alcoholic as well as develop a substance abuse problem. The odds of this increased substantially given Petitioner's lack of appropriate role modeling or pro-social influences.  In light of these facts, and coupled with Petitioner's longstanding abuse of alcohol and marijuana from an early age, Dr. Stewart opined that Petitioner suffers from a Polysubstance Abuse disorder.  (Cal. Hab. Exh. 6, 1 App. 76)   This would have been true at the time of the offenses at issue here.

312.     Testimony about Petitioner's conditions would have been vital at the penalty phase because, in Dr. Stewart's view, persons suffering from bipolar disorders and schizophrenic spectrum disorders frequently have impulse control problems and tend to misinterpret reality to a greater or lesser degree.  (Cal. Hab. Exh. 6, 1 App. 75)

313.     If trial counsel had been effective and adduced such testimony during the penalty phase trial, this would have challenged the prosecution's portrayal of Petitioner as having carefully planned and orchestrated the robbery over a long period of time.   When

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -135-                    **Dykes v. Martel**
Case No. C-11-04454-SI

Petitioner's mental disorders, poor impulse control and substantial consumption of alcohol are considered, it becomes easy to see that the far more likely scenario is that Petitioner committed an aggressive act on the spur of the moment without giving any consideration to the wisdom of his actions or their possibly grave consequences.    (Cal. Hab. Exh. 6, 1 App. 77) But for trial counsel's ineffective assistance of counsel, the jury would have heard all of this evidence and not returned a death sentence.

314.    Testing was also done during the state habeas proceedings by Dr. Nell Riley, a neuropsychologist. That testing further confirmed the learning disabilities that disabled Petitioner in school, his low average IQ, his extremely poor academic functioning, and significant neuropsychological deficits.

315.    Even the brief testing conducted by Dr. Glover provided trial counsel with clear evidence Petitioner has cognitive dysfunction.    Dr. Glover's test results should have triggered a follow-up and comprehensive assessment by a qualified specialist.

316.    Reasonable and competent trial counsel would have pursued this properly, equipped Dr. Glover (and any other appropriate medical professionals) with the necessary information and allowed Dr. Glover to complete his work.    Reasonable and competent effective counsel also would have secured appropriate and warranted neuropsychological tests to gauge the true nature and extent of Petitioner's impairment.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -136-                    **Dykes v. Martel**
Case No. C-11-04454-SI

317.      Had such evidence been gathered, generated and presented to the sentencing jury, Petitioner would not have been sentenced to death.   It was ineffective assistance of trial counsel to undertake this preparation in this capital matter.

318.      Trial counsel failed to take these reasonable steps, Petitioner's jury was denied what could have been powerful and persuasive mitigation evidence, and as a consequence Petitioner was sentenced to death. Trial counsel delivered ineffective assistance and the writ should issue.

319.      Had trial counsel performed competently here, the prosecutor would not have been able to argue that 1) Petitioner came from a normal, healthy family, 2) that he had no redeeming qualities, and 3) that he was remorseless.

320.      The record reveals that jury did not regard a death sentence as "a foregone conclusion." Id. at 724.  The jury spent approximately two weeks deliberating over the sentence. (CT 541-547, 581)

321.      Reasonable and competent trial counsel would have properly investigated Petitioner's family and history, and in the process located and developed each and all of these areas for presentation during the penalty phase trial.[74] It was failure of constitutional

---

[74]     Respectfully, granted discovery and an evidentiary hearing
(continued...)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -137-                    **Dykes v. Martel**
Case No. C-11-04454-SI

dimension for trial counsel to not do so.   Respectfully, the writ should issue.

**Claim 3**[75]

**THE JURY COMMITTED MISCONDUCT IN TWO WAYS: (A) IT PUT PETITIONER IN JEOPARDY FOR A CRIME OF WHICH HE HAD ALREADY BEEN ACQUITTED, AND (B) IT CONSIDERED EXTRINSIC EVIDENCE, ALL IN VIOLATION OF FEDERAL AND STATE LAW**

322.    The guilt trial verdict forms required the jury to decide whether the shooting of Mrs. Clark amounted to premeditated attempted murder.   The jury's response to this allegation was unequivocal: it entered a finding "that the attempted murder [of Bernice Clark] was not wilful, deliberate and premeditated." (CT 526)

323.    Accordingly, when the jury returned its verdict of first-degree murder as to Lance Clark (CT 529), the only possible reading that reconciled the two components of the jury's verdict is that the jury convicted Petitioner of Lance's murder on a theory of felony-murder.   The jury necessarily had to have acquitted Petitioner of the premeditated murder of Lance at the time it found

_____

[74](...continued)
Petitioner respectfully notes he will be able to demonstrate to this Honorable Court each and all of these points in detail, showing the Court the persuasive showing and presentation that could and should have been made to Petitioner's sentencing jury.

[75]    This claim was presented and denied by the California Supreme Court in direct appeal claims 13, 14, and 28, and in state habeas claims 16, 23, and 29.

1    no premeditation as to the attempted murder of Bernice Clark.   On

2    this fact pattern and with these legal instructions, there was no

3    alternative basis for the verdict.

4

5    324.     The above verdicts were signed by the foreperson of the

6    jury on July 26, 1995, and August 2, 1995. They were read in open

7    court by the clerk, the jury was polled, and these verdicts were

8    affirmed and made a part of the court's records on August 2, 1995.

9    (CT 528-32)    Thereafter the matter proceeded to a penalty trial,

10   with opening statements therein given on August 8, 1995. (CT 533)

11

12   325.     On August 22, 1995, the seventh day of penalty phase

13   deliberations, the sentencing jury asked the court:

14         Even though we agreed that death of Lance Clark was

15      murder of the first degree because it happened during the

16      commission of robbery, (felony murder law), are we now

17      permitted to look at the willful, premeditated and

18      deliberate nature of this killing under factor A?

19   (RT 4015)

20

21   326.     The record does not reflect a contemporaneous discussion

22   regarding the jury's question.[76] The court thereafter instructed the

23   ──────────────────

24         [76]   The record does contain the trial judge's explanation to the
     jury that he was going to excuse the jury for a break before answering
25   the jury's inquiries.   The court stated: "I have not had a chance to
     confer with counsel in terms of how to respond. I have notified them
26   of the general nature of it, but I'd like to confer with them in terms
                                                            (continued...)

27

28   *Petition for a writ of habeas corpus*                    **Dykes v. Martel**
     *under 28 U.S.C. 2254*            Page -139-         Case No. C-11-04454-SI

jury:

> You may consider such factors under factor A of jury
> instruction 8.85 in your consideration of the
> circumstances of the crime of which the defendant was
> convicted in the present proceeding and the existence of
> any special circumstance found to be true.

(CT 635-6; RT 4016) The court did not tell the jury that it was not allowed to revisit a theory as to which Petitioner had already been acquitted. There is no objection from Petitioner's counsel to this instruction on the existing record.

327.     The next day the court substituted two alternate jurors for members of the panel. At this time, Petitioner's counsel requested the court instruct the jury to begin penalty deliberations over.  (RT 4032-33)  At this point Petitioner's counsel noted he did not want the jury to relitigate the guilt phase, since the jury had found non-premeditated murder.  (RT 4034) The prosecutor disagreed, however, arguing the jury could consider premeditation under a lower burden of proof, even if it had a reasonable doubt whether the murder was "willful, deliberate and

_____

[76](...continued)
of responding to you. . . I will discuss it with them, and I anticipate we'll be able to respond to you very shortly [after your lunch break.]" (RT 4012) Prior to answering the jury's inquiries, the court further stated: "I have had an opportunity to discuss [the note] with counsel."  (RT 4014) With discovery and an evidentiary hearing, Petitioner expects to be able to establish the substance of that conference and his contemporaneous opposition to the response given by the court.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -140-                    **Dykes v. Martel**
                                                                 Case No. C-11-04454-SI

premeditated."  (RT 4034-35)

328.    Petitioner's counsel asked the court to instruct the jury not to reconsider deliberations already made during the guilt phase, and the court agreed, but reiterated that the jury would be free to consider the circumstances of the crime under factor (a). (RT 4035-36)  In the court's view, the circumstances of the crime "encompasses all of the circumstances of the crime including examination of questions of whether or not the acts of the defendant were willful, deliberate or premeditated."  (RT 4037)

329.    However, despite this discussion, the court simply instructed the jury to begin its penalty phase deliberations anew, saying nothing about guilt phase deliberations.  (RT 4041) The court's lack of instruction, combined with the prior instruction given to all of the ten (10) jurors who remained and had received the prior instruction in response to the jury's earlier question, left the jury with license to revisit the issue of premeditation and deliberation under the guise of factor (a).  This error requires reversal of the death sentence.

**Synopsis**

330.    At the conclusion of the guilt phase, the jury convicted Petitioner of robbing Bernice Clark and of the first-degree murder of Lance Clark.  (CT 524)  The jury also convicted Petitioner of the attempted murder of Bernice Clark.  (CT 526)  Importantly, the

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -141-                    **Dykes v. Martel**
                                                                  Case No. C-11-04454-SI

1  jury concluded that the attempted murder was not committed with

2  premeditation and deliberation.  _Id_.  The only logically consistent

3  interpretation of the jury's verdicts is that the killing of Lance

4  Clark was a first-degree murder because it was committed during a

5  felony robbery.  Indeed, the jury even makes this explicit in the

6  aforementioned note.  (RT 4015)

7

8  331.    An examination of the guilt phase instructions and

9  verdicts supports this conclusion.  The court instructed the jury

10 that there were two possible verdicts as to counts 1 and 3 and

11 three possible verdicts as to count 2.  (RT 3538; CT 520)  The

12 court also instructed the jury in pertinent part:

13       With respect to the charges contained in Count Two

14       (attempted murder) of the Information, if you are not

15       satisfied beyond a reasonable doubt that the defendant is

16       guilty of the crime charged, you may nevertheless convict

17       [him] of an lesser crime, if you are convinced beyond a

18       reasonable doubt that the defendant is guilty of such

19       lesser crime.

20                         *      *      *

21       The court cannot accept a guilty verdict on a lesser

22       crime unless you have unanimously found the defendant not

23       guilty of the [charged] or [greater] crime.

24 (CT 489-90)

25

26 332.    The court instructed the jury as to premeditated and

27

deliberate murder.  (CT 464-67; CALJIC 8.20)  The jury also was

instructed in regard to murder, as follows:

> When one attempts to kill a certain person, but by
> mistake or inadvertence kills a different person, the
> crime, if any, so committed is the same as though the
> person originally intended to be killed, had been killed.

(CT 474)

333.    In regard to attempted murder, the court instructed the

jury that "every person who attempts to murder another human being

is guilty of a violation of Sections 664 and 187 of the Penal Code.

The court further instructed:

> It is also alleged in [count[s] 2] of the
> information that the crime attempted was willful,
> deliberate, and premeditated murder.  If you find the
> defendant guilty of attempt to commit murder, you must
> determine whether this allegation is true or not true.

(RT 3526; CT 485; CALJIC 8.67)[77]  In contrast, the trial court

instructed the jury that Petitioner did not need to have intent to

kill in order to be guilty of the special circumstance of

robbery-murder.  Of course, under the felony murder rule, intent to

kill also is unnecessary.[78]

_____

[77]    CALJIC 8.67, which concerns premeditated attempted murder,
contains the entirety of CALJIC 8.20, which defines the element of
premeditation for first degree murder.

[78]    Thus the murder and special circumstance verdicts do not
(continued...)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -143-                    **Dykes v. Martel**
                                                                Case No. C-11-04454-SI

334.        During his guilt phase closing argument, the prosecutor
argued that Petitioner premeditated the robbery and the murder of
Lance Clark.  E.g. RT 3443-45, 3446-47, 3461, 3495-96.  The legal
basis for the prosecutor's theory of premeditated murder was that
Petitioner premeditated the shooting of Mrs. Clark and that, under
a theory of transferred intent, this premeditation and deliberation
should be transferred and applied to the killing of Lance Clark.
This was the only available theory, because - as the forensic
evidence established - the bullet that killed Lance Clark was the
same bullet that struck Mrs. Clark.  The evidence clearly showed
and the prosecution conceded that Petitioner made no independent
effort to shoot let alone kill Lance Clark.   There was simply no
independent evidence of premeditation as to the homicide, and as
such any findings as to Lance Clark's death would have to turn on
the jury's findings as to Petitioner's mental state at the time of
the alleged attempted murder of Bernice Clark.

335.        The verdict forms required the jury to decide whether the
shooting of Mrs. Clark amounted to premeditated attempted murder.
The jury's response was unequivocal: it entered a finding the
attempted murder was not premeditated. (CT 531)

336.        Thus when the jury also returned a verdict of

---

[78](...continued)
show intent to kill; the only verdict that shows a finding as to
Petitioner's mental state is the acquittal of attempted premeditated
murder.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -144-                    **Dykes v. Martel**
                                                                        Case No. C-11-04454-SI

first-degree murder as to Lance, the only possible reading of the
verdict is that the jury convicted Petitioner of Lance's murder on
a theory of felony-murder, but - just as it had done with its
findings as to Mrs. Clark - the jury necessarily had to have
acquitted him of the premeditated murder of Lance.

337.    Despite these prior findings, the court erroneously
permitted the jury to reopen the issue of premeditation and
deliberation under the guise of "circumstances of the crime."  The
court's instruction, which allowed the jury to reconsider the
issues of premeditation and deliberation, after an acquittal of
premeditated attempted murder, constitutes federal constitutional
error and the writ should issue.

**PERMITTING THE JURY TO RECONSIDER THE ISSUE OF PREMEDITATION
VIOLATED PETITIONER'S RIGHTS BECAUSE PETITIONER WAS ACQUITTED OF
PREMEDITATED MURDER**

338.    The penalty phase jury's reconsideration of the issue of
premeditation and deliberation, an issue which the guilt phase jury
necessarily resolved in Petitioner's favor, violated constitutional
principles of collateral and direct estoppel, incorporated into the
Double Jeopardy Clause of the Fifth and Fourteenth Amendments to
the United States Constitution.  The trial court's explicit grant
of permission to reconsider premeditation and deliberation also
violated the Eighth Amendment and Penal Code § 190.3, because the
jury already had found the evidence insufficiently reliable to
support a conviction in the guilt phase. These errors require

*Petition for a writ of habeas corpus
under 28 U.S.C. 2254*                Page -145-                **Dykes v. Martel**
Case No. C-11-04454-SI

1   reversal of Petitioner's death sentence.

2

3   339.    It is well-established that principles of estoppel apply

4   to criminal proceedings.  <u>Ashe v. Swenson</u>, 397 U.S. 436 (1970).

5   Estoppel means that "when an issue of ultimate fact has been once

6   determined by a valid and final judgment, that issue cannot again

7   be litigated between the same parties."  <u>Id</u>. at 442.  Collateral

8   estoppel principles apply during the penalty phase of a capital

9   trial.  <u>Bullington v. Missouri</u>, 451 U.S. 430, 444-45 (1981); <u>see</u>

10  <u>Schiro v. Farley</u>, 510 U.S. 222, 230 (1994).

11

12  340.    More narrowly, the principle of direct estoppel applies

13  to issue preclusion "within the confines of a single claim or cause

14  of action."  18 Charles A. Wright, et al., (1981) Federal Practice

15  & Procedure § 4418 at 169.  "Direct estoppel prevents a party from

16  relitigating a fact which was already determined against it in a

17  'decision that finally disposes of a part of a claim on the merits

18  but does not preclude all further action on the remainder of the

19  claim; issues common to both parts of the claim are precluded, even

20  though new issues remain to be decided.'"  <u>Id</u>. at  169-70 (quoted

21  in <u>United States v. Bailin</u>, 977 F.2d 270, 276 (7th Cir. 1992). The

22  principles of direct estoppel prevent the prosecution from

23  relitigating issues that were necessarily decided in the

24  defendant's favor by reason of a partial acquittal on other counts.

25  <u>Bailin</u>, at 276-77.

26

27

28  *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*          Page -146-          **Dykes v. Martel**
                                                       Case No. C-11-04454-SI

341.    In deciding whether estoppel bars relitigation or reconsideration of an issue, three elements must be present: (1) the issue in question was actually raised and litigated in the prior proceeding; (2) the issue was necessarily decided in the defendant's favor; and (3) the issue in the later proceeding is the same as that involved in the prior proceeding. <u>Delap v. Dugger</u>, 890 F.2d 285, 314 (11th Cir. 1989).

342.    Application of these principles here leads to the conclusion that the trial court committed grave error when it allowed the jury to incorporate premeditation into its deliberations during the penalty phase.

343.    The issue of premeditation and deliberation was openly litigated during the guilt phase of the trial.  The prosecution presented evidence that it contended showed that Petitioner committed a deliberate and premeditated murder and a deliberate and premeditated attempted murder.  This evidence was weak, but included testimony from Alphonso Odom, LaCondra Douglas and Edward Tyson. Likely precisely because the prosecution recognized how weak the case was for premeditation, in closing the prosecutor argued in the alternative that Petitioner was guilty of felony-murder.  (RT 3443-45, 3461-62, 3496)

344.    Once the jury concluded that Petitioner did not commit the crime of premeditated attempted murder and the verdicts were

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -147-                    **Dykes v. Martel**
Case No. C-11-04454-SI

announced, the question was resolved and Petitioner could not
properly be put in jeopardy a second time for that crime.

> The rule of collateral estoppel in criminal cases is not
> to be applied with the hypertechnical and archaic
> approach of a 19th century pleading book, but with
> realism and rationality. . . . [T]his approach requires a
> court to 'examine the record of a prior proceeding,
> taking into account the pleadings, evidence, charge, and
> other relevant matter, and conclude whether a rational
> jury could have grounded its verdict upon an issue other
> than that which the defendant seeks to foreclose from
> consideration.'

Ashe v. Swenson, 397 U.S. at 443 (quoting Sealfon v. United States,
332 U.S. 575 (1948)).  The only theory that supported a
first-degree murder conviction as to Lance Clark that could be
based on premeditation and deliberation was via intent transferred
from the attempted murder of Bernice to the actual murder of Lance
Clark. The forensic evidence simply permits no other construction:
it was undisputed that Lance Clark was killed by the same bullet
that first struck his grandmother.  If the shooting of Mrs. Clark
was not deliberate and premeditated, the murder of Lance Clark
could not be either.  The jury's acquittal of premeditated and
deliberate attempted murder must rest on a factual determination
that Petitioner was not guilty of premeditating and deliberating.
There is simply no other conclusion that can be drawn rationally
from the verdicts as announced on this fact pattern.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*          Page -148-          **Dykes v. Martel**
Case No. C-11-04454-SI

345.     Finally, the issue of premeditation involved in the guilt phase is the same issue of premeditation that came into play during the penalty phase.   But, the acquittal of premeditated murder raised an absolute bar to the jury's reconsideration of premeditation in deciding whether to impose the death penalty.

346.     On this procedural and factual record, the trial court should have clearly instructed the jury it was not allowed to reconsider this part of the matter. The trial court's decision to allow the jury to consider premeditation under factor (a) violated the Eighth Amendment to the United States Constitution as well as Penal Code § 190.3.

347.     The Eighth Amendment requires that a death sentence be based only upon evidence that is reliable.   Johnson v. Mississippi, 486 U.S. 578, 585-86 (1988).

348.     The California Legislature, in enacting § 190.3, apparently recognized and wished to avoid the problems of double jeopardy and estoppel in capital proceedings.   Section 190.3 provides in pertinent part:

> However, in no event shall evidence of prior criminal
> activity be admitted for an offense for which the defendant
> was prosecuted and acquitted.   The restriction on the use of
> this evidence is intended to apply only to proceedings
> pursuant to this section and is not intended to affect

1   statutory or decisional law allowing such evidence to be used

2   in any other proceedings.

3   Section 190.3 thus plainly prohibits the prosecution from using, as

4   evidence in aggravation, alleged crimes of which the defendant was

5   acquitted.  See also People v. Jennings, 53 Cal.3d 334, 389-90

6   (1991).  The language of § 190.3 is mandatory.  The apparent

7   purpose of this statute, which applies only to capital cases, is to

8   ensure compliance with the heightened standard of reliability for

9   evidence admitted in aggravation, as required by the Eighth

10  Amendment and corresponding provisions of the state constitution.

11  See People v. Robertson, 33 Cal.3d 21, 53-54 (1982); People v.

12  Sheldon, 48 Cal.3d 935, 950-51 (1989).

13

14  349.     Section 190.3 excludes not only evidence of conduct for

15  which the defendant has been acquitted, but also "evidence

16  surrounding the acquitted offense which involve[s] additional,

17  lesser criminal misconduct."  Sheldon, 48 Cal.3d at 951.

18

19  350.     Thus, § 190.3 itself operates as an independent and

20  explicit bar during a capital penalty phase to consideration of

21  conduct for which the defendant has been acquitted.  Id.[79]  The

22  exclusion of § 190.3 is not limited to crimes tried in a separate

23  trial or proceeding, but will include offenses tried along with the

24

25      [79]    The trial court therefore also violated Petitioner's liberty

26  interest in a state procedural guarantee, a further violation of
    federal law. Morrissey v. Brewer, 408 U.S. 471, 481 (1982).

27

28  *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*          Page -150-          **Dykes v. Martel**
                                                        Case No. C-11-04454-SI

1    capital offense.    Jennings, 53 Cal.3d at 389-90.

2

3    351.    This statute plainly embodies a state created liberty

4    interest of the highest order, and as such Section 190.3 must be

5    applied in a manner that is consistent with due process and which

6    does not arbitrarily abrogate its purpose or intent. To allow

7    otherwise is to violate federal constitutional due process

8    principles. Dent v. West Virginia, 129 U.S. 114, 123 (1889);

9    Goldberg v. Kelly, 397 U.S. 254 (1970); Board of Regents v. Roth,

10   408 U.S. 564 (1972); Perry v. Sindermann, 408 U.S. 593 (1972); Goss

11   v. Lopez, 419 U.S. 565 (1975); and Meachum v. Fano, 427 U.S. 215

12   (1976).

13

14   352.    The requirements of heightened reliability under the

15   Eighth Amendment and the express language of § 190.3 preclude that

16   which the trial court allowed to happen here.    The requested writ

17   should issue.

18

19   **THE JURORS WERE TAINTED BY EXTRANEOUS INFLUENCES AND THEIR EXPOSURE**
     **TO THESE EXTRANEOUS MATTERS VIOLATED FEDERAL CONSTITUTIONAL CONCERNS**

20

21   **Synopsis**

22   353.    After the trial, some of the jurors submitted to interviews.

23   Those interviews disclosed that at least some jurors engaged in

24   serious misconduct. Based on this evidence, Petitioner presented the

25   trial court with a motion for a new trial.  In support of the motion,

26   Petitioner submitted the reports of the investigator who conducted the

27

28   *Petition for a writ of habeas corpus*              **Dykes v. Martel**
     *under 28 U.S.C. 2254*          Page -151-          Case No. C-11-04454-SI

1   juror interviews.[80]

2

3   354.    The court concluded that the juror statements themselves

4   were incompetent to impeach the jury verdict, because they concerned

5   the jurors' reasoning processes. (CT 757-59) The trial court

6   declined to hold an evidentiary hearing on the juror misconduct. (CT

7   756, RT 4103-04) The court further ruled, contrary to what trial

8   counsel told the court he had been led to believe it would do, that

9   the investigator's statements were a further level of inadmissible

10  hearsay. (RT 4105) The court accordingly ruled that the juror

11  statements could not be considered in support of the motion for new

12  trial pursuant to Evidence Code section 1150. Id.

13

14  355.    The trial court's refusal to hold an evidentiary hearing on

15  jury misconduct was error under both state and federal law, as was the

16  subsequent trial court ruling denying the motion for a new trial.

17  People v. Jones, 17 Cal.4th 279, 317 (1998)[81] Granted appropriate

18  discovery and an evidentiary hearing, Petitioner alleges he will

19  _____

20      [80]    Trial counsel had not obtained declarations from the jurors
    directly, but rather attempted to rely on an under oath recital from
21  a defense investigator as to what the jurors had told him. Trial
    counsel represented to the trial court he did this in reliance upon
22  statements the court had made to him to the effect it would consider
    such a presentation. (CT 745-46, CT 750, RT 4093-94) The court denied
23  making any statements to counsel as to what would be admissible. (CT
    750-51, RT 4096)

24
        [81]    Under federal constitutional law, a defendant needs only to
25  present a prima facia case of juror misconduct. Mattox v. United
    States, 146 U.S. 140, 150 (1892); Remmer v. United States, 347 U.S.
26  227, 229 (1954). See also Wade v. Terhune, 202 F.3d 1190, 1197-98 (9th
    Cir. 2000).

27

28  *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -152-            Case No. C-11-04454-SI

1  establish these events did indeed violate his federal constitutional

2  rights.

3

4  **CONTENT OF THE JUROR STATEMENTS.**

5  356.    Petitioner proffered to the California Supreme Court, and

6  here presents this Honorable Court with evidence regarding several

7  jurors' consideration of extrinsic materials during deliberations.

8  This evidence consisted of a defense investigator's report regarding

9  juror interviews.  Some of the juror statements are clearly admissible

10 under both state and federal law, as they simply report what occurred

11 in the jury room or primarily tended to go to matters other than juror

12 reasoning.  As those statements did not reflect on the juror's

13 reasoning processes, but rather, showed that juror misconduct

14 occurred, the trial court should have consider their substance.  A

15 summary of the juror statements follows.

16

17 357.    Juror RA's interview demonstrates that she and other jurors

18 considered extrinsic evidence when deciding this case. RA stated that

19 she had heard that the district attorney's automobile tires had been

20 slashed during the trial.  (CT 662)  The jury speculated whether this

21 incident was connected to the case.[82]  Id.   RA also expressed fear to

22 other jurors and actively urged the jurors to remain anonymous when

23 returning their verdict.  Id. RA was afraid of several young men in

24

25       [82]    The record does not show whether this actually occurred.
26 What matters here, however, is whether the jury believed the premise,
   which was extrinsic to the facts at issue.

27

28 *Petition for a writ of habeas corpus*                                      **Dykes v. Martel**
   *under 28 U.S.C. 2254*              Page -153-                Case No. C-11-04454-SI

the courtroom who, she stated, the jury assumed were friends, relatives, or acquaintances of Petitioner. <u>Id</u>. She stated that "some" jurors saw the young men create a disturbance as they were leaving the courtroom and outside the courthouse by pulling up their shirts, lowering their pants, running through traffic, and shouting profanity. (CT 662) Juror FC also mentioned this misconduct, and described the courthouse spectators in question as "little gangsters." (CT 669) She relayed that the judge observed the misbehavior and instructed jurors not to leave the courthouse unless accompanied by the bailiff. (CT 669-700)

358. RA also recalled a discussion to the effect that a death sentence did not mean Petitioner actually would be executed. (CT 703) This sentiment was echoed by juror SL who told the defense investigator that "to be honest, if we thought he would actually get death, we probably wouldn't put him to death." (CT 681-82) She also "had the impression this was not [Petitioner's] first crime. (CT 717-21)

359. Juror FC's interview constituted further evidence that the jury considered extraneous matters. FC personally injected extraneous prejudicial material into deliberations: she stated that "she and others knew that the defendant had not just started committing crimes and that he undoubtedly had a juvenile history." (CT 666; 722-27) The jury foreman, RM, confirmed that jurors speculated regarding Petitioner's probable additional criminal history. (CT 676, 708-12)

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                Page -154-                **Dykes v. Martel**
Case No. C-11-04454-SI

360.      More significant, FC asserted that she had relayed to other jurors that she had "worked for a lawyer in the Fresno courthouse" and had seen many people get sentenced to life without possibility of parole, but nonetheless be released from prison.  (CT 666, 722-27)

361.      FC's statements regarding her familiarity with criminal law through her work were notable because these statements both showed misconduct during deliberations and possibly, the deliberate concealment of material information on voir dire.  During voir dire, FC did not mention that she had worked for a lawyer.  Her questionnaire indicated that she previously had worked as an assistant court clerk in Fresno.  (CT 15947) She did not mention any prior experiences or discussions affected her view of prisoners receiving life without possibility of parole, other than to express her personal belief that death was a more lenient sentence than life without possibility of parole.  (RT 641) Her statements thus suggest she may have responded dishonestly during voir dire.  Such dishonesty, in turn, would strongly suggest improper jury bias.  In re Hitchings, 6 Cal.4th 97, 118 (1993); Dyer v. Calderon, 151 F.3d 970, 982-83 (9th Cir.) (en banc), cert. denied. 525 U.S. 1033 (1998).

**THE TRIAL COURT ERRED IN REFUSING TO CONSIDER THE JUROR STATEMENTS.**

362.      The trial court initially concluded that the juror statements contained in the defense investigator report were inadmissible as unsworn hearsay.  (RT 4105)  This ruling was error.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -155-                    **Dykes v. Martel**
                                                                      Case No. C-11-04454-SI

363.    Generally, when a party seeks a new trial based on jury misconduct, "the court must undertake a three-step inquiry." People v. Von Villas, 11 Cal.App.4th 175, 255 (1992), cert. den. 510 U.S. 838 (1993).    First, the court must determine whether the affidavits supporting the motion are admissible under Evidence Code § 1150(a). Id.    Second, the court must consider whether the facts establish misconduct.    Id.    Third, if misconduct occurred, the prosecution must be given the opportunity to seek to rebut the presumption of prejudice stemming from the misconduct.    Hitchings, supra, 6 Cal.4th at 118. Such rebuttal can be made by "proof that no prejudice actually resulted."    Id.

364.    Hearsay is defined as an out-of-court statement admitted for the truth of the matter.    Evid. Code § 1200.    While hearsay is generally inadmissible as evidence at trial, there is no rule that bars consideration of hearsay in considering whether a prima facie case is established to justify an evidentiary hearing regarding jury misconduct; indeed, juror affidavits themselves constitute hearsay but are nonetheless admissible.    Thus, the trial court's concern that the defense investigator report may have itself been hearsay should not have precluded consideration of its content in deciding whether an evidentiary hearing on juror misconduct should be held.    Jurors commit misconduct when they consider extrinsic evidence - that is, facts or information that was not admitted into evidence.    A juror's affidavits or testimony are admissible to show the truth or falsity of a juror's voir dire responses, as well as juror bias or misconduct.

Petition for a writ of habeas corpus
under 28 U.S.C. 2254                    Page -156-                    Dykes v. Martel
                                                                Case No. C-11-04454-SI

1  <u>Hard v. Burlington Northern Railroad</u>, 812 F.2d 482, 484 (9th Cir.

2  1987).

3

4  365.    The trial court erred in denying an evidentiary hearing

5  because the juror statements showed misconduct and the consideration

6  of extrinsic evidence.  A verdict rendered by even one biased juror

7  denies a defendant due process and violates the Sixth Amendment right

8  to a fair trial and the Seventh Amendment's guarantee to an impartial

9  jury.  <u>United States v. Henley</u>, 238 F.3d 1111, 1120 (9th Cir. 2001);

10 <u>Dyer v. Calderon</u>, 151 F.3d 970, 973 (9th Cir. 1998).

11

12 366.    Under both federal and state law, jurors are competent to

13 testify regarding certain statements made inside the jury room.  Evid.

14 Code § 1150(a); Rule 606(b)(2) of the Federal Rules of Evidence.

15 Statements that go to the jurors' deliberative and reasoning processes

16 are inadmissible, but a juror may give testimony about whether

17 extraneous prejudicial information was brought before the jury.

18 Therefore, while certain statements contained in the juror interviews

19 submitted by the defense were not admissible under evidence law,

20 others clearly were.  The trial court erred in ruling that the

21 substance of the juror statements to the defense investigator were

22 barred by E.C. § 1150.  At a minimum, the admissible portions of the

23 statements presented a prima facie case of misconduct, sufficient to

24 require an evidentiary hearing.

25

26 367.    Even without the requested hearing, it was clear the jurors

27

28

committed prejudicial misconduct, as they considered evidence other than what the court admitted into evidence. This violated Petitioner's Sixth Amendment right to a fair trial and Fifth Amendment right to due process. <u>United States v. Smith</u>, 26 F.3d 739, 758 (7th Cir. 1993).

368.    This error is particularly offensive in a capital case, which presents a heightened need for reliability. <u>Ford v. Wainwright</u>, 477 U.S. 399, 414 (1986); <u>Beck v. Alabama</u>, 447 U.S. 625, 637-638 & fn. 13 (1980).

369.    At least two jurors' statements indicated a discussion undertaken in violation of <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 333 (1985), in that the jurors commented that Petitioner likely would never be executed. In other words, they speculated that death did not mean death. This was misconduct. A defendant facing the death penalty is entitled to a jury instruction that a sentence to life imprisonment without possibility of parole precludes any chance for parole. <u>Kelly v. South Carolina</u>, 534 U.S. 246 (2001); <u>Shafer v. South Carolina</u>, 532 U.S. 36 (2001).

370.    Finally, the jurors committed misconduct when they considered the activities of some unidentified trial spectators who they unjustifiably associated with Petitioner, as well as when they somehow received and then discussed information that the district attorney's automobile tires had been slashed during the trial. Notably, there is no evidence in the record regarding these

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -158-                    **Dykes v. Martel**
                                                                Case No. C-11-04454-SI

1   unidentified spectators or that the slashed tire event occurred, let

2   alone that any of this was in any way associated with Petitioner if

3   it did occur.

4

5   371.    The jury misconduct committed in this case was serious and

6   the judgment accordingly infirm. Petitioner will and does request both

7   discovery and an evidentiary hearing in support of his claim his death

8   sentence is accordingly a violation of federal constitutional law.

9

10                              **Claim 4**

11  **CALIFORNIA'S DEATH PENALTY IS CONSTITUTIONALLY OFFENSIVE IN HOW IT
    DIRECTS A SENTENCING JURY TO EVALUATE AND WEIGH EVIDENCE IN**
12  **MITIGATION AND AGGRAVATION**

13  372.    When a death penalty prosecution proceeds to a penalty

14  phase trial, California's statutory scheme relies on the jury to

15  weigh the statutorily enumerated aggravating and mitigating factors

16  presented by the evidence,[83] and then to determine which of two

17  penalties to impose: life imprisonment without possibility of

18  parole or death.

19

20  373.    Petitioner alleges that as written and as applied in his

21  case, this statutory scheme has denied him his federal

22  constitutional rights.  Based on these infirmities, the sentence of

23  death is unlawful and this Honorable Court should grant the

24  requested writ of habeas corpus.

25  _____

26      [83]    The jury was instructed on the factors as presented in Penal
    Code § 190.3.

27

28  *Petition for a writ of habeas corpus*                    **Dykes v. Martel**
    *under 28 U.S.C. 2254*           Page -159-           Case No. C-11-04454-SI

1

2  **THE JURY WAS MISLED REGARDING HOW IT SHOULD WEIGH THE AGGRAVATING AND MITIGATING FACTORS IN THIS MATTER**

3

4  374.       The jury in this case was instructed with CALJIC No.

5  8.85, a standard instruction regarding the factors in aggravation

6  and mitigation which may be considered in determining whether a

7  sentence of death or life without the possibility of parole should

8  be imposed.  As given in this case, the instruction read as

9  follows:

10        In determining which penalty is to be imposed on the

11        defendant, you shall consider all of the evidence which

12        has been received during any part of the trial of this

13        case, except as you may be hereafter instructed.  You

14        shall consider, take into account and be guided by the

15        following factors if applicable.  Some of these factors

16        may be inapplicable because they were not shown by the

17        evidence in this case.  The factors you may consider are

18        as follows:

19        (a) The circumstances of the crime of which the

20        defendant was convicted in the present proceeding and the

21        existence of any special circumstances found to be true;

22        (b) The presence or absence of criminal activity by

23        the defendant, other than the crimes for which the

24        defendant has been tried in the present proceedings,

25        which involve the use or attempted use of force or

26        violence or the express or implied threat to use force or

27

28  *Petition for a writ of habeas corpus*    *under 28 U.S.C. 2254*              Page -160-                    **Dykes v. Martel**  Case No. C-11-04454-SI

violence;

(c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings;

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act;

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct;

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person;

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication;

(i) The age of the defendant at the time of the crime;

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor;

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*          Page -161-                    **Dykes v. Martel**
                                                     Case No. C-11-04454-SI

1          (k) Any other circumstance which extenuates the

2     gravity of the crime even though it is not a legal excuse

3     for the crime, and any sympathetic or other aspect of the

4     defendant's character or record that the defendant offers

5     as a basis for a sentence less than death, whether or not

6     related to the offense for which he is on trial.

7          You must disregard any jury instruction given to you

8     in the guilt or innocence phase of this trial which

9     conflicts with this principal (sic).

10         You are to determine from all of the evidence

11    whether any particular factor is present in the case.

12    You are to disregard any factor that is not shown by the

13    evidence.

14  (CALJIC No. 8.85, CT 609-11)

15

16  375.     The foregoing instruction violates the federal

17  constitution in a number of respects.  Whether read as a whole or

18  in its component parts, the instruction is impermissibly vague,

19  overbroad, and misleading regarding the manner in which aggravating

20  and mitigating factors are to be weighed.  The instruction also

21  violates the federal constitution has applied to Petitioner because

22  it includes inapplicable factors and fails to designate which

23  factors are aggravating and which are mitigating.  Therefore, in

24  this case CALJIC 8.85 violates the Eighth and Fourteenth

25  Amendments.

26

27

28  *Petition for a writ of habeas corpus*                                      **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -162-              Case No. C-11-04454-SI

376.       Factor (b) permitted the jury to consider in aggravation "[t]he presence or absence of criminal activity by the defendant, other than the crimes for which the defendant has been tried in the present proceedings, which involve the use or attempted use of force or violence or the express or implied threat to use force or violence."

377.       This instruction failed to provide the jury with proper guidance regarding the use of unadjudicated criminal conduct and violated Petitioner's rights to due process and equal protection. In addition, while this instruction was upheld against an Eighth Amendment vagueness challenge in <u>Tuilaepa v. California</u>, 512 U.S. 967, 977 (1994), the instruction as applied in this case violated the Eighth Amendment because it permitted the jury to consider unreliable evidence of Petitioner's possession of a loaded firearm, an act which did not involve any violence.

378.       To the extent <u>Tuilaepa</u> has any application here, Petitioner respectfully submits that on these facts the holding warrants reconsideration.

379.       The admission of evidence of previously unadjudicated criminal conduct as an aggravating factor justifying a capital sentence violated Petitioner's rights to due process and a reliable determination of penalty under the Eighth Amendment.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -163-                    **Dykes v. Martel**
Case No. C-11-04454-SI

380.        California does not allow the use of unadjudicated offenses in non-capital sentencing.  For the same state to nevertheless allow use of the same unreliable evidence in a capital proceeding violates Petitioner's equal protection rights under the federal constitution, and it violates Petitioner's federal right to due process of law because the state applies its law in an irrational and unfair manner.  Hicks v. Oklahoma, 447 U.S. 343 (1980), U.S. Const. Amend. XIV; Cal. Const., art. I, §§ 7, 15).

381.        The use of factors (d) and (h) on this record specifically violated Petitioner's rights under the federal constitution. The jury was instructed that in determining the appropriate penalty they could consider factor (d), "[w]hether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance" and factor (h), "[w]hether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication."

382.        As a matter of both state and Eighth Amendment law, factors (d) and (h) may only be used by the jury to mitigate Petitioner's sentence.  People v. Davenport, 41 Cal.3d 247, 288-289 (1985); People v. Hamilton, 48 Cal.3d 1142, 1184 (1989); see generally, Parker v. Dugger, 498 U.S. 308, 314-316 (1991)(intoxication is mitigating circumstance); Zant v. Stephens,

1  <u>supra</u>, 462 U.S. at 885 (some circumstances can only serve as

2  mitigating).

3

4  383.    There are several different ways in which the given

5  instructions could have been misunderstood on this record, thereby

6  depriving Petitioner of his federal constitutional protections.

7

8  384.    First, a claim that a defendant killed due to some kind

9  of mental illness or emotional disturbance will trigger negative

10  responses in some people and accordingly be seen as an aggravating

11  factor for those individuals.  While it is true that many jurors

12  could properly view evidence of mental disturbance or mental defect

13  as mitigating, others may view such evidence as aggravating.  As

14  the Supreme Court recognized in <u>Penry v. Lynaugh</u>, 492 U.S. 302

15  (1989), evidence of a defendant's mental problems-- in that case

16  mental retardation and a history of abuse-- can serve as "a

17  two-edged sword: it may diminish his blameworthiness for his crime

18  even as it indicates that there is a probability that he will be

19  dangerous in the future."  <u>Id</u>. at 324.

20

21  385.    Similarly, it is foreseeable that some jurors might

22  conclude that a defendant who was voluntarily under the influence

23  of drugs or alcohol at the time of his crime was more, rather than

24  less, deserving of death.  This interpretation is acknowledged

25  within California state law.  <u>People v. Vacca</u>, 38 Cal.App.4th 804,

26  808 (1995)(trial court properly considered as aggravating

27

28  *Petition for a writ of habeas corpus*
   *under 28 U.S.C. 2254*                    Page -165-          **Dykes v. Martel**
                                                         Case No. C-11-04454-SI

sentencing factor that defendant committed his offense while under the influence of alcohol and drugs).  Other jurors, however, could consider this to be a mitigating factor.   This again demonstrates that the jury was not adequately guided; state law makes clear these factors could only be considered mitigating.

386.    Significantly, the California Supreme Court has held that the "presence or absence" formulation normally used with respect to CALJIC No. 8.85 factors (b) and (c) connotes that the presence of those factors is aggravating while their absence is mitigating. See e.g., People v. Sanders, 51 Cal.3d 471, 528 fn. 27 (1990).  It follows that the "whether or not" formulation used in factors (d) and (h) gives rise to a converse - but otherwise identical - connotation.  Thus, the failure to instruct the jurors that factors (d) and (h) could only be used as mitigation made it reasonably likely that one or more jurors, in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments, would "attach . . . the 'aggravating' label . . . to conduct that actually should [have] militate[d] in favor of a lesser penalty." Zant v. Stephens, 462 U.S. 862, 865 (1983).

387.    In capital cases "it is essential that jurors be properly instructed regarding all facets of the sentencing process." Walton v. Arizona, 497 U.S. 639, 653 (1990), overruled by Ring v. Arizona, 536 U.S. 584 (2002).  In this case, due to these errors, this did not occur.  Accordingly, the judgment must be vacated.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -166-                    **Dykes v. Martel**
Case No. C-11-04454-SI

388.    The failure to delete inapplicable factors from CALJIC No. 8.85 further violated Petitioner's federal constitutional rights.  Although some factors listed in CALJIC No. 8.85 were potentially applicable to the facts of this case, many clearly were not.  The inapplicable factors included: factor (c) ("the presence or absence of any prior felony conviction"), factor (e) ("Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act"); factor (f) ("Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct"); factor (g) ("Whether or not the defendant acted under extreme duress or under the substantial domination of another person"); factor (j) ("Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor").  In addition, the prosecutor argued that factor (h) ("Whether . . . the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication"), was also inapplicable as phrased.  In spite of their inapplicability, the trial court did not delete these factors from the instruction.  Their inclusion in the list introduced confusion, capriciousness, and unreliability into the capital decision-making process in violation of Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -167-                    **Dykes v. Martel**
Case No. C-11-04454-SI

1   389.      The "whether or not" formulation of the inapplicable

2   factors cited above suggested that the jury could consider them

3   either for or against Petitioner. Instructing the jury on such

4   irrelevant matters diluted the jury's focus, distracted its

5   attention from the difficult task at hand, and introduced confusion

6   into the process.  Irrelevant instructions also created a grave

7   risk that the death penalty was imposed on the basis of

8   inapplicable factors.  These two dangers are heightened by the

9   court's failure to explain which factors were aggravating and which

10  were mitigating.

11

12  390.      The failure to delete unsupported factors for which there

13  was no supporting evidence denigrated the nominal mitigation

14  evidence actually presented.  The jury was effectively invited to

15  engage in a quantitative analysis and sentence Petitioner to death

16  because there was evidence in mitigation for "only" one or two

17  factors, whereas the instruction suggested there could have, and

18  likely in the jury's eyes should have, been more to justify a life

19  sentence.

20

21  391.      The inclusion of inapplicable factors deprived Petitioner

22  of his right to an accurate and individualized sentencing

23  proceeding based solely on permissible factors relating to him and

24  the crime.

25

26  392.      This error also artificially inflated the weight of the

27

28  *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*                    Page -168-                    **Dykes v. Martel**
                                                              Case No. C-11-04454-SI

1  aggravating factors and violated the Fifth, Sixth, Eighth and

2  Fourteenth Amendment requirements of heightened reliability in the

3  penalty determination.  Ford v. Wainwright, 477 U.S. 399, 411, 414

4  (1986); Beck v. Alabama, 447 U.S. 625, 637 (1980).

5

6  393.    The court's failure to designate aggravating and

7  mitigating factors deprived Petitioner of federal constitutional

8  rights.   CALJIC No. 8.85 presents the jury with a list of factors

9  but does not indicate which factors are aggravating and which are

10  mitigating.

11

12  394.    The failure to instruct Petitioner's jury clearly as to

13  which factors could be mitigating only as well as to eliminate

14  those clearly not presented for consideration all deprived

15  Petitioner of federal constitutional rights to due process, an

16  impartial jury, equal protection, and a reliable determination of

17  penalty in violation of the Fifth, Sixth, Eighth, and Fourteenth

18  Amendment.

19

20  395.    These errors are exacerbated here by the prosecutor's

21  arguments, the jury's misconduct, and trial counsel's ineffective

22  assistance as presented herein and as will be further developed

23  through these proceedings.

24

25  396.    Petitioner was entitled to a reliable penalty

26  determination. These errors denied him this. The writ should issue.

27

28  *Petition for a writ of habeas corpus*
   *under 28 U.S.C. 2254*              Page -169-          **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

**CALJIC NO. 8.88, AS GIVEN HEREIN, VIOLATED PETITIONER'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.**

397.    Petitioner's jury was instructed with CALJIC No. 8.88. In pertinent part, this instruction read as follows:

> It is now your duty to determine which of the two penalties, death or confinement in the state prison for life without parole, shall be imposed on the defendant.

> After having heard all the evidence, and after having heard and considered the arguments of counsel, you shall consider, take into account, and be guided by the applicable factors of aggravating and mitigating circumstances upon which you have been instructed.

> An aggravating factor is any fact, condition, or event attending the commission of a crime which increases its guilt or enormity, or adds to its injurious consequences which is above and beyond the elements of the crime itself.

> A mitigating circumstance is any fact, condition or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

> The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the

1      arbitrary assignment of weights to any of them.  You are
2      free to assign whatever moral or sympathetic value you
3      deem appropriate to each and all of the various factors
4      you are permitted to consider.

5          In weighing the various circumstances you determine
6      under the relevant evidence which penalty is justified
7      and appropriate by considering the totality of the
8      mitigating circumstances with the totality of the
9      aggravating circumstances.

10         To return a judgment of death, each of you must be
11     persuaded that the aggravating circumstances are so
12     substantial in comparison with the mitigating
13     circumstances that it warrants death instead of life
14     without possibility of parole.

15  (CALJIC No. 8.88; CT 629-30; RT 3962-63)

16

17  398.    This instruction violated Petitioner's rights under the

18  Fifth, Sixth, Eighth and Fourteenth Amendments to the federal

19  constitution.  The instruction was defective in a number of

20  respects.  First, the instruction was vague and imprecise, failed

21  to accurately describe the weighing process the jury must apply in

22  capital cases, and deprived Petitioner of the individualized

23  consideration the Eighth Amendment requires.  Second, the

24  instruction contradicted the requirements of PC § 190.3 by

25  indicating that a death judgment could be returned if the

26  aggravating circumstances were merely "substantial" when compared

27

28  *Petition for a writ of habeas corpus*          **Dykes v. Martel**
    *under 28 U.S.C. 2254*          Page -171-          Case No. C-11-04454-SI

to mitigating circumstances, thus permitting the jury to impose death even if it found mitigating circumstances outweighed aggravating circumstances.  The instruction was therefore improperly weighted toward death.  Third, the instruction effectively informed the jury that a single mitigating factor was not sufficient to prevent imposition of the death penalty.[84]  The instruction's definition of mitigating circumstances was further defective in that it failed to inform the jury of the full scope of evidence which may be considered in mitigation.  See Lockett v. Ohio, 438 U.S. 586 (1978).  The instruction also misled the jury by failing to provide the jury with a definition of the legal term "life without the possibility of parole."

399.    CALJIC No. 8.88 also improperly modified the prosecution's burden of proof under California law.  Penal Code § 190.3 states that after considering aggravating and mitigating factors, the jury "shall impose" a sentence of confinement in state prison for a term of life without the possibility of parole if "the mitigating circumstances outweigh the aggravating circumstances." PC § 190.3.[85]   The United States Supreme Court has held that this mandatory language is consistent with the individualized

---

[84]    This component alone violates Lockett v. Ohio, 438 U.S. 586 (1978).

[85]    It bears note the California Supreme Court has recognized that the statute's provision that if aggravating circumstances outweigh mitigation circumstances, the jury "shall impose" a sentence of death is impermissible. People v. Brown, 40 Cal.3d 512, 544 n. 17 (1985).

Petition for a writ of habeas corpus
under 28 U.S.C. 2254                    Page -172-                    Dykes v. Martel
                                                          Case No. C-11-04454-SI

1    consideration of the defendant's circumstances required under the

2    Eighth Amendment.  Boyde v. California, 494 U.S. 370, 377 (1990).

3

4    400.    However, this mandatory language is not included in

5    CALJIC No. 8.88.  Instead, the instruction informs the jury merely

6    that the death penalty may be imposed if aggravating circumstances

7    are "so substantial" in comparison to mitigating circumstances that

8    the death penalty is warranted.  The word "substantial" means only

9    "of or having substance."  Webster's New World Dictionary (3d

10   College ed. 1989) 1336.  Although the word carries with it the

11   connotations "considerable," "ample," and "large," id., it neither

12   means nor suggests "outweigh."  The instruction therefore fails to

13   conform to the requirements of Penal Code § 190.3.  The instruction

14   by its terms would plainly permit, if not outright direct, the

15   imposition of a death sentence whenever aggravating circumstances

16   were merely "of substance" or "considerable," even if the jury felt

17   they were outweighed by mitigating circumstances.  By failing to

18   conform to the specific mandate of Penal Code § 190.3, the

19   instruction violates the Fourteenth Amendment.  Hicks v. Oklahoma,

20   447 U.S. 343, 346-347 (1980).

21

22   401.    In addition, the instruction improperly reduced the

23   prosecution's burden of proof below that required by the applicable

24   statute.  An instructional error which incorrectly describes the

25   burden of proof, and thus "vitiates all the jury's findings," can

26   never be shown to be harmless.  Sullivan v. Louisiana, 508 U.S.

27

28   *Petition for a writ of habeas corpus*
     *under 28 U.S.C. 2254*                    Page -173-                    **Dykes v. Martel**
                                                                          Case No. C-11-04454-SI

1  275, 281 (1993)(emphasis in original).

2

3  402.    The instruction incorrectly described the weighing

4  process applicable to aggravating and mitigating evidence under

5  California law.

6

7  403.    The instruction incorrectly explained the weighing

8  process required by California law in a number of other respects.

9  For example, the instruction was defective because it improperly

10 suggested that a quantitative comparison of the "totality" of

11 mitigating factors was required. Yet, the California Supreme Court

12 has indicated that one mitigating factor, standing alone, may be

13 sufficient to outweigh all other factors. People v. Grant, 45

14 Cal.3d 829, 857, n. 5 (1988); People v. Hayes, 52 Cal.3d 577, 642

15 (1990); People v. Cooper, 53 Cal.3d 771, 845 (1991).  The language

16 of CALJIC No. 8.88 not only failed to communicate this important

17 concept to the jury but also suggested that the jury was required

18 to consider the "totality" of the mitigating circumstances and

19 balance them against the "totality" of the aggravating

20 circumstances.  This was prejudicial because, in the absence of

21 qualitative consideration, this quantitative formula could weigh

22 the scales in favor of a judgment of death, thereby depriving

23 Petitioner of the individualized consideration guaranteed him by

24 the Eighth Amendment to the United States Constitution.  Stringer

25 v. Black, 503 U.S. 222, 231-232 (1992).

26

27

28

404.        Under California law, a trial court has a sua sponte duty to correctly instruct the jury on the general principles of law governing the case before it.  <u>People v. Hernandez</u>, 47 Cal.3d 315, 353 (1988); <u>People v. Avalos</u>, 37 Cal.3d 216, 229 (1984).   The trial court's failure to comply with so basic a premise, guaranteed by state, is cognizable here as a deprivation of a liberty interest. <u>Hicks v. Oklahoma</u>, 447 U.S. 343 (1980).

405.        The instruction also is defective and death-oriented because it fails to adequately describe or define the penalty of life without the possibility of parole.  This technical term is commonly misunderstood by lay persons and jurors, such that the trial court was obliged to define it.[86]  The trial court had a sua sponte duty to define terms which have a "technical meaning peculiar to the law."  <u>People v. McElheny</u>, 137 Cal.App.3d 396 (1982). Its failure to do so denied Petitioner his federal constitutional right to have the jury decide every material issue presented by the evidence.  <u>People v. Reynolds</u>, 205 Cal.App.3d 775, 779 (1988), <u>citing</u> <u>People v. Mayberry</u>, 15 Cal.3d 143, 157 (1975). The error also deprived Petitioner his rights to a reliable determination of penalty under the Eighth Amendment and his right to due process of law under the Fourteenth Amendment.

---

[86]    In fact, here, the record shows the jury actually misunderstood the term and a discussion ensued during jury deliberations that Petitioner could receive a sentence of life without the possibility of parole and yet be released from prison.  (CT 722-27) <u>See</u> <u>also</u> Claim 3.

406.        Current academic research shows that many jurors, perhaps as many as half, do not understand that the sentencing alternative of life without parole actually means no possibility of parole. See, e.g., Bowers, Research on the Death Penalty: Research Note (1993) 27 Law & Society Rev. 157, 170; see also, Simmons v. South Carolina, 512 U.S. 154, 169-170 and n. 9 (1994).  Media accounts and pervasive mistrust of the criminal justice system have resulted in a widespread believe that a sentence of  "life without parole" does not really mean the defendant will spend the rest of his life in prison. Id. Indeed, the United States Supreme Court reversed a South Carolina death sentence on the grounds that the trial court refused to give a parole ineligibility instruction requested by the defense. Shafer v. South Carolina, 532 U.S. 36 (2001).  The court stated that where "[d]isplacement of 'the longstanding practice of parole availability' remains a relatively recent development, . . . 'common sense tells us that many jurors might not know whether a life sentence carries with it the possibility of parole.'" Id.

407.        Here the danger that Petitioner's jury would share this common misunderstanding ripened into reality.  As addressed in Claim 3 at least some jurors believed that even with a sentence of life without possibility of parole, there was a significant chance that Petitioner would be released from prison.  They believed that if he were sentenced to death, there was a lesser chance that he would eventually be released.  This shows that the lack of a jury instruction defining clearly that life without possibility of

parole meant exactly that was harmful to Petitioner.

408.    The instruction given was further defective in its description of mitigation.  As noted above, the instruction stated that "[a] mitigating circumstance is any fact, condition or event which as such does not constitute a justification or excuse for the crime in question, but may be considered as an extenuating circumstance in determining the appropriateness of the death penalty."  This definition of mitigation failed to inform the jury of the full scope of evidence that may be considered in determining the appropriate sentence and was reasonably likely to be understood as a limitation on mitigating evidence.

409.    The definition of mitigation given in this case, with its focus limited to "the crime in question," was substantially likely to have been understood as limiting the jury's consideration solely to the circumstances of the crime, in violation of the federal constitution.  Lockett v. Ohio, 438 U.S. 586 (1978).  Numerous authorities have noted the importance of mitigation evidence which is wholly unrelated to the crime. See e.g., Williams v. Taylor, 529 U.S. 362, 398 (2000)(defendant's childhood "filled with abuse and privation, or reality that he was 'borderline mentally retarded'" may influence jury's determination of moral culpability); Lambright v. Stewart, 241 F.3d 1201, 1208 (9th Cir. 2001)("Evidence of mental disabilities or a tragic childhood can affect a sentencing determination even in the most savage case.").

410.      The trial court's failure to provide the jury with
adequate instructions on this critical concept undermined the
reliability of the ensuing death judgment, failed to properly
channel the jury's decision-making process, and effectively
eliminated from consideration relevant mitigating evidence.  (U.S.
Const., Amends. V, VI, VIII, and XIV.

411.      It is fundamental that a "risk that the death penalty
will be imposed in spite of factors which may call for a less
severe penalty . . . is unacceptable and incompatible with the
commands of the Eighth and Fourteenth Amendments." Lockett v.
Ohio, 438 U.S. 586, 605 (1978).  The numerous errors in this
instruction improperly impaired, all to Petitioner's disadvantage,
the jury's freedom to assess whether life without the possibility
of parole or death was the proper verdict to reach in this case. On
these facts and record, especially given the closeness of the
penalty determination, these errors render infirm the judgment of
death. Chapman v. California, 386 U.S. 18, 24 (1967).

412.      Accordingly, for each and all of these reasons,
individually and in unison, the writ should issue.

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -178-                    **Dykes v. Martel**
                                                          Case No. C-11-04454-SI

1

**Claim 5**[87]

2 **CALIFORNIA'S DEATH PENALTY SCHEME VIOLATES THE FEDERAL CONSTITUTION IN HOW AND WHAT IT ALLOWS JURIES TO USE AS EVIDENCE IN AGGRAVATION.**

3

4 413.    Petitioner herein alleges that his sentence of death is a

5 violation of the Eighth Amendment in that it is the result of a

6 defective definition of what constitutes evidence in aggravation

7 for purposes of guiding a capital sentencing jury in California,

8 compounded by erroneous rulings by the trial court regarding such

9 evidence. The result of these flaws is a capital sentence that

10 violates federal constitutional law.

11

12 414.    This claim has two principal components, each of which

13 assesses a particular defect, each having to do with evidence

14 presented to or considered by the jury in aggravation, and

15 individually and in unison they render the sentence defective as a

16 matter of federal constitutional law:

17      (A)  The trial court's refusal to instruct the sentencing
       jury that under California law that it had to find
18      unanimously that an aggravating act had been committed,
       and said act had to reflect an actual or implied threat
19      of force and violence. (infra)

20      (B)  The trial court's decision to permit the prosecution
       to introduce evidence of simple possession of a firearm
21      as a qualifying act in aggravation under California Penal
       Code § 190.3(b). (infra)

22

23 415.    Individually as well as in unison, these defects in the

24

25 ───────────────────

      [87]    This claim was presented to and adjudicated by the
26 California Supreme Court in direct appeal issues 16, 17, 18, 20, and
   21.

27

28 *Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*          Page -179-          **Dykes v. Martel**
                                                    Case No. C-11-04454-SI

proceedings render Petitioner's death sentence a violation of federal law and the writ should be granted.

**THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT, BEFORE CONSIDERING A FACTOR IN AGGRAVATION, IT MUST UNANIMOUSLY FIND BOTH THAT THE DEFENDANT COMMITTED THE ACT IN AGGRAVATION AND THE ACT CONSTITUTED AN IMPLIED THREAT OF FORCE OR VIOLENCE.**

Background

416.    At the jury instruction conference during the penalty phase, Petitioner's counsel asked the court for several modifications to CALJIC 8.87. (RT 3855-57) The court rejected the defense requests, holding that there is no requirement a capital sentencing jury unanimously agree that the act in aggravation was committed. (RT 3856-58) The court then instructed the jury with CALJIC No. 8.87.

417.    Initially, Petitioner's counsel did not request that to consider an incident in aggravation, the jury had to unanimously agree both that it occurred and that it constituted an implied threat of force or violence.

418.    However, after deliberations had commenced, the jury made the following inquiry:

> We the jury . . . request:
>
>     1. Did both attorneys stipulate to the fact that
>     the defendant was one, convicted of the act of carrying a
>     concealed firearm upon the person and, two, carrying a

1    loaded firearm on the person while in a public place

2    which involved the implied use of force or violence?

3  (RT 4014) The jury underlined the term "implied use of force or

4  violence." Id.

5

6  419.    The record shows that the trial court responded:

7        First with respect to your first question, during

8        the course of this trial neither attorney formally

9        stipulated that the defendant was convicted of the act of

10       carrying a concealed firearm upon the person or that the

11       defendant was convicted of carrying a loaded firearm on a

12       person while in public place.  The alleged conduct of the

13       defendant's carrying a concealed firearm upon the person

14       and carrying a loaded firearm on the person while in

15       public place was a subject of testimony received at the

16       penalty phase of these proceedings from Officer Rand

17       Monda of the Oakland Police Department, and in addition

18       was the subject of testimony by the defendant Ernest

19       Dykes on cross-examination by Mr. Carmine during the

20       guilt phase of these proceedings.

21       The weight and significance to be attached to such

22       testimony are exclusively matters for your determination.

23       By your underlining the phrase in your note which reads,

24       and I'm quoting, which involved the implied use of force

25       or violence, end quote, I assume that you wish the court

26       to respond in some fashion to this particular phrase as

27

28  *Petition for a writ of habeas corpus*     *Dykes v. Martel*
    *under 28 U.S.C. 2254*        Page -181-        Case No. C-11-04454-SI

1      it is used in the instructions.  As I have just indicated

2      there was no formal stipulation entered into by the

3      attorneys on the subject although the alleged conduct

4      itself was the subject of the testimony to which I have

5      just referred.

6          Whether the conduct involved the implied use of

7      force or violence is also exclusively a matter for your

8      determination.

9  (RT 4015-16)

10

11  420.    Petitioner's counsel thereupon requested the court to

12  clarify for the jury that it must find beyond a reasonable doubt

13  the alleged act of possession of the concealed, loaded weapon was

14  an act involving the implied use of force or violence.  (RT

15  4020-21) Petitioner's counsel further objected to the instruction

16  as given since it did not require the jury to find beyond a

17  reasonable doubt both that the incident occurred and that the

18  incident involved the implied use of force or violence.  (RT

19  4020-21)  He also argued that the prior instruction regarding the

20  gun possession should have required the jury to find the possession

21  beyond a reasonable doubt.  Id.

22

23  421.    The court refused to give Petitioner's requested jury

24  instruction.  Nor did the court instruct the jury any such finding

25  must be unanimous.  Thus the jury was not reminded that its

26  findings on aggravating circumstances must be made beyond a

27

28  *Petition for a writ of habeas corpus*          **Dykes v. Martel**
   *under 28 U.S.C. 2254*          Page -182-          Case No. C-11-04454-SI

1  reasonable doubt.  (RT 4020)  Nor was the jury instructed that it

2  had to be unanimous in its finding.  (RT 3855)

3

4  422.     Indeed, the court further failed to require even that a

5  simple majority of jurors agree on any particular aggravating

6  factor, let alone agree whether any particular combination of

7  aggravating factors might warrant the sentence of death.  (See RT

8  3856-58) As a consequence, this record is deficient regarding how

9  the jury operated and whether its judgment was structured in

10 compliance with federal constitutional tenets.

11

12 423.     This is deficient for the same reason addressed by the

13 plurality opinion in Schad v. Arizona, 501 U.S. 624, 632-633

14 (1991)(plur. opn. of Souter, J.). With nothing to guide its

15 decision, there is nothing to suggest the jury imposed a death

16 sentence based on any form of agreement regarding the reasons for

17 the sentence. Petitioner requested this clarification be given to

18 his jury when it demonstrated it was foundering on the point; the

19 trial court's refusal to do so warrants relief from this Court.

20

21 **CALIFORNIA LAW VIOLATES THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
   TO THE UNITED STATES CONSTITUTION BY FAILING TO REQUIRE UNANIMOUS
22 JURY AGREEMENT ON AGGRAVATING FACTORS**

23 424.     Petitioner understands the California Supreme Court "has

24 held that unanimity with respect to aggravating factors is not

25 required by statute or as a constitutional procedural safeguard."

26 People v. Taylor, 52 Cal.3d 719, 749 (1990); accord People v.

27

28 *Petition for a writ of habeas corpus*          *Dykes v. Martel*
   *under 28 U.S.C. 2254*          Page -183-          Case No. C-11-04454-SI

1  <u>Bolin</u>, 18 Cal.4th 297, 335-336 (1998). It was consistent with this

2  construction of California's capital sentencing scheme that the

3  trial court refused to provide an instruction requiring jury

4  agreement or unanimity on any particular aggravating factor. The

5  instructions did not even require that a majority of jurors agree

6  on any particular aggravating factor nor that any particular

7  combination of aggravating factors warranted the sentence of death.

8  Petitioner respectfully notes this is a deficient scheme, failing

9  to guide the sentencer adequately in its task, and indeed allowing

10  a sentence to rest on inconsistent findings within the jury.

11

12  425.    For each and all of these reasons, the sentence of death

13  violates the Sixth, Eighth and Fourteenth Amendments. <u>See</u> <u>e.g.</u>,

14  <u>Murray's Lessee v. Hoboken Land and Improvement Co.</u>, 59 U.S. (18

15  How) 272 (1855); <u>Griffin v. United States</u>, 502 U.S. 46, 51 (1991).

16

17  426.    California's judicial interpretation of its capital

18  sentencing structure as not requiring unanimity of the jury on

19  whether a given aggravating factor has been proven beyond

20  reasonable doubt places the state in a distinct minority of the

21  states.  Of the twenty-two (22) states that vest responsibility for

22  death penalty sentencing on the jury, fourteen (14) require

23  unanimity within the jury as to proof of specific factors in

24  aggravation.[88]

25  ────────────

26        [88]    See Ark. Code Ann. § 5-4-603(a) (Michie 1993); Colo. Rev.
                                                              (continued...)

27

28  *Petition for a writ of habeas corpus*                           **Dykes v. Martel**
    *under 28 U.S.C. 2254*            Page -184-                  Case No. C-11-04454-SI

427.    California's lack of a unanimity requirement violates the Due Process Clause of the Fourteenth Amendment and the jury trial guarantees of the Sixth Amendment, which mandate that all of the findings prerequisite to a sentence of death must be made beyond a reasonable doubt by a unanimous jury.  Ring v. Arizona, 536 U.S. 584 (2002); Apprendi v. New Jersey, 530 U.S. 466 (2000).

428.    In Apprendi, the Supreme Court held that a state may not impose a sentence greater than that authorized by the jury's verdict of guilt, unless the facts supporting an increased sentence (other than a prior conviction) are submitted to the jury and proved beyond a reasonable doubt.  Id. at 489.  Under California's capital sentencing scheme, a death sentence may not be imposed absent findings (1) that one or more aggravating factors exist and (2) the aggravating factor or factors outweigh any mitigating factors.  (Penal Code § 190.3)  In Ring v. Arizona, the Supreme Court made clear that the principles of Apprendi apply to findings necessary to impose a death sentence.  Accordingly, under Ring and Apprendi, it should be clear the existence of any aggravating

---

[88](...continued)
Stat. Ann. § 16-11-103(2) (West 1992); Ill. Ann. Stat. ch. 38, para. 9-1(g) (Smith-Hurd 1992); La. Code Crim. Proc. Ann. art. 905.6 (West 1993); Md. Ann. Code art. 27, § 413(i) (1993); Miss. Code Ann. § 99-19-103 (1992); N.H. Rev. Stat. Ann. § 630:5(IV) (1992); N.M. Stat. Ann. § 31-20A-3 (Michie 1990); Okla. Stat. Ann. tit. 21, § 701.11 (West 1993); 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iv) (1982); S.C. Code Ann. § 16-3-20(C) (Law. Co-op. 1992); Tenn. Code Ann. § 39-13-204(g) (1993); Tex. Crim. Proc. Code Ann. § 37.071 (West 1993). In addition, New Jersey requires unanimity by case law. State v. Bey II (N.J. 1988) 548 A.2d 887, 112 N.J. 123, 159.

*Petition for a writ of habeas corpus under 28 U.S.C. 2254*                Page -185-                **Dykes v. Martel** Case No. C-11-04454-SI

factors relied upon to impose a death sentence must be found beyond a reasonable doubt by a unanimous jury.

429.    The failure to require unanimity before evidence could be weighed as aggravating violated the Sixth, Eighth and Fourteenth Amendments.

430.    The Supreme Court has pointed out that the penalty phase of a capital case "has the 'hallmarks' of a trial" on guilt or innocence." Monge v. California, supra, 524 U.S. at 726; Strickland v. Washington, 466 U.S. 668, 686-687 (1984); Bullington v. Missouri, 451 U.S. 430, 439 (1981). While the unadjudicated offenses are not the only offenses for which the defendant is being tried, that trial-within-a-trial often plays a dispositive role in determining whether death, the "penalty . . . unique 'in both its severity and its finality,'" is imposed. Monge v. California, at 732 (quoting Gardner v. Florida, supra, 430 U.S. at 357).

431.    The error is reversible per se, because it permitted the jury to return a death judgment without making the findings required by law. See Sullivan v. Louisiana, supra, 508 U.S. at 278-281; United States v. Gaudin, 515 U.S. 506, 522-523 (1995)(aff'g 28 F.3d at pp. 951-952).

432.    In any event, given the difficulty of the penalty determination in this case, Respondent cannot show there is no beyond a reasonable doubt that the failure to instruct on the need

1  for unanimity regarding aggravating circumstances did not

2  contribute to the verdict of death.  Chapman v. California, supra,

3  386 U.S. at 24; Fahy v. Connecticut, 375 U.S. 85, 86-87 (1963);

4  Satterwhite v. Texas, 486 U.S. 253, 258-259 (1988); Hitchcock v.

5  Dugger, 481 U.S. 393, 399 (1977) It cannot even be found that the

6  error had "no effect" on the penalty verdict.  Caldwell v.

7  Mississippi, 472 U.S. 320, 341 (1985)  As a result, the penalty

8  verdict must be set aside.

9

10 **THE ADMISSION OF EVIDENCE THAT PETITIONER WAS ARRESTED FOR
   POSSESSION OF A LOADED AND CONCEALED WEAPON VIOLATED THE EIGHTH**

11 **AMENDMENT TO THE UNITED STATES CONSTITUTION**

12 433.    Before trial, the district attorney notified the defense

13 he intended to present as evidence in aggravation that Petitioner

14 had previously possessed a concealed and loaded firearm in a public

15 place.  (CT 231)  The defense objected because the incident

16 involved neither the use or threatened use of force or violence,

17 nor the implied or threatened use of force or violence.  (RT

18 219-21) The court nonetheless ruled that the evidence was

19 admissible, stating that "someone who carries a loaded and

20 concealed handgun is carrying a classical instrument of violence

21 that is normally used only for criminal purposes." (RT 224) To so

22 rule, the court concluded that the incident qualified under PC

23 § 190.3(b) as involving an implied use or threat of force or

24 violence. (RT 224-25)

25

26 434.    The California Supreme Court held in People v. Michaels,

27

28 *Petition for a writ of habeas corpus
   under 28 U.S.C. 2254*          Page -187-          **Dykes v. Martel**
                                                     Case No. C-11-04454-SI

28 Cal.4th 486 (2002), that all incidents of illegal weapons possession were admissible as acts involving an implied threat of violence under § 190.3(b). California law, embodied in the <u>Michaels</u> decision and as seen in this case, now extends the scope of § 190.3(b) beyond that which is permitted under the Due Process Clause of the Fourteenth Amendment.  The California Supreme Court's expansion of the scope of evidence admissible under § 190.3(b) also aggravates the already significant risk of the arbitrary and capricious imposition of the death penalty, in violation of the Eighth Amendment.

435.    Petitioner alleges this all violates his federal constitutional rights. Petitioner respectfully asks this Court to assess the tension between federal law and California law as stated in <u>Michaels</u> and as applied here. Upon doing so, and in consideration of the facts at issue herein, Petitioner respectfully submits this Court will be drawn to the conclusion it is appropriate to issue the writ.

436.    In a capital case, the prosecution is entitled to introduce evidence regarding prior incidents involving the defendant's actual use of force or violence, or his threats to use force and violence, as well as incidents which involve an implied threat of violence.  (Pen. Code § 190.3(b)) State law makes clear evidence of threats alone are not admissible.  <u>See</u> <u>People v. Boyd</u>, 38 Cal.3d 762, 774-776 (1985).   While in certain circumstances the

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -188-                    **Dykes v. Martel**
Case No. C-11-04454-SI

possession of weapons has been seen to permissibly constitute an incident involving an implied use or threat of violence or force, under Eighth Amendment jurisprudence this has not been true for all instances of illegal weapons possession.  Rather, whether illegal weapon possession constitutes an implied threat of force or violence turned on the individual circumstances of the case.  The admission of weapons possession had been admitted under § 190.2(b) when the weapons were possessed in jail or prison, e.g., People v. Hughes, 27 Cal.4th 287 (2002); People v.  Quartermain, 16 Cal.4th 600, 631-32 (1997); People v. Williams, 16 Cal.4th 153, 238 (1997); People v. Ramos, 15 Cal.4th 1133 (1997); People v. Hines, 15 Cal.4th 997, 1057 (1997); and People v. Ramirez, 50 Cal.3d 1158, 1186-87 (1990).  It had also been held admissible when the evidence permitted "an inference that the defendant possessed a dangerous weapon with the purpose of using it to avoid apprehension and successfully escape the scene of a crime." People v. Smithey, 20 Cal.4th 936, 993 (1999).  See also People v. Clair, supra, 2 Cal.4th at 676-77 (defendant came to crime scene equipped with screwdriver and took up knife while committing burglary, but cast it away at last minute); People v. Jackson, 13 Cal.4th 1164, 1235-36 (1996) (defendant armed himself after escaping from custody); People v. Grant, 45 Cal.3d 829, 851 (1988)(evidence that while in jail the defendant possessed a prison-made weapon and made provocative threats to deputy admissible under § 190.2(b)); cf. People v. Belmontes, 45 Cal.3d 744, 809 (1988)(defendant's prior act of motioning to a handgun at his side and stating to a friend

**Petition for a writ of habeas corpus**
**under 28 U.S.C. 2254**          Page -189-          **Dykes v. Martel**
Case No. C-11-04454-SI

1  that it was all the protection that he needed was inadmissible).

2

3  437.    This was all true until the California Supreme Court

4  issued its decision in People v. Michaels, 28 Cal.4th 486 (2002).

5  There that court extended its reasoning to the mere possession of a

6  loaded or concealed weapon.  The decision is in tension with

7  federal law as it violates the due process clause of the Fourteenth

8  Amendment and the prohibition against the arbitrary and capricious

9  imposition of the death penalty under the Eighth Amendment.

10

11 438.    It bears observation that in this Nation generally an

12 individual may lawfully possess a firearm.  U.S. Const. Amend. II.

13 Petitioner's possession of the firearm during the incident in

14 question was unlawful simply because he was carrying a loaded and

15 concealed weapon.[89]  He did not threaten or menace anyone with the

16 weapon, and he was not prohibited from possessing a firearm.  Given

17 the vitality of the Second Amendment, and the United States

18 Solicitor General's position that the Second Amendment protects an

19 individual's right to bear arms, it is doubtful that federal law

20 can be reconciled with the premise that the mere carrying of a

21 firearm constitutes an implied threat of force or violence.  See

22 Haney v. United States, No. 01-8272, Brief in Opposition of the

23

_____

24      [89]    Demonstrating the randomness of California's death penalty
25 scheme, if Petitioner had possessed a carry permit for the gun there
   would have been no violation of law for his exact same conduct.  The
26 point is even more acute when looked at from a national perspective
   which, at best is uneven.

27

28 **Petition for a writ of habeas corpus**          **Dykes v. Martel**
   **under 28 U.S.C. 2254**          Page -190-          Case No. C-11-04454-SI

1  United States.  The fact that in California such carrying is

2  unlawful and constitutes a misdemeanor, does not, as a matter of

3  federal law, transform the conduct from one of innate

4  self-protection into a threat against others.

5

6  439.     The court erred in admitting the incident of gun

7  possession as aggravation evidence in this case.  The incident

8  merely involved Petitioner's possession of a loaded and concealed

9  handgun. When stopped by police officer, Petitioner immediately

10 relinquished the weapon by placing it on top of the police car,

11 albeit in his glove.  Petitioner never motioned to the weapon, did

12 not confront the police officer, did not reach for the weapon, and

13 indeed did not threaten the officer in any way.  While possession

14 of a loaded and concealed handgun is illegal, this conduct, by

15 itself, does not constitute an implied threat of force, at least in

16 the context of the other facts surrounding Petitioner's arrest and

17 particularly not for use in a capital context as evidence in

18 aggravation.

19

20 440.     The prosecutor relied heavily on Petitioner's prior

21 arrest involving this conduct to argue that he was a dangerous

22 individual for whom lenient treatment had failed.  (RT 3887)  In

23 particular, the prosecutor argued that even after he had been

24 arrested for possession of a gun, Petitioner went out and got

25 another one with deadly results.  The prosecutor used Petitioner's

26 prior offense to argue that he was "well down the road of criminal

27

28 *Petition for a writ of habeas corpus*
   *under 28 U.S.C. 2254*                Page -191-                **Dykes v. Martel**
                                                         Case No. C-11-04454-SI

age." (RT 3887) Yet there was no other evidence before the jury of Petitioner engaging in other prior criminal conduct. The admission of this evidence was powerful and prejudicial.

441.    Additionally, there is evidence that the jury directly relied on the prior offense in deciding to sentence Petitioner to death. One juror cited directly to Petitioner's prior arrest for possessing the gun as reason enough to impose the death penalty. (CT 676-77) Other jurors admitted that they believed that Petitioner had a more extensive criminal history than was presented at trial and based their penalty decision on this belief. See e.g., CT 666, 708-12, 721.

442.    Even the trial judge cited this incident as a reason not to modify and reduce the sentence. (CT 778-80) The evidence regarding the possession of the handgun served to inflame the emotions of the jury resulting in the belief that Petitioner was a threat to society.

443.    The admission of this evidence was particularly harmful to Petitioner because the case in aggravation against him was not overwhelming. Petitioner had no other prior adult criminal history and if this incident had not been admitted, the prosecutor would not have been able to make the strident argument that Petitioner was a man on whom leniency had been tried and failed. Moreover, the circumstances of the offense were not so unusually heinous that

1    the death penalty was a foregone conclusion.  This was after all a

2    homicide that occurred in the context of a robbery gone wrong, and

3    where the jury did not even find Petitioner to have acted with

4    premeditation.  It was undisputed that Petitioner did not intend to

5    kill Lance Clark, and the jury concluded that he did not

6    premeditate the attempted murder of Mrs. Clark. Even the length of

7    jury deliberations regarding the penalty supports the premise that

8    the introduction of this evidence was not harmless.  <u>People v.</u>

9    <u>Cardenas</u>, 31 Cal.3d 897, 907 (1982)(12 hours); <u>People v. Rucker</u>, 26

10   Cal.3d 368, 391 (1980)(9 hours); <u>People v. Woodard</u>, 23 Cal.3d 329,

11   341 (1979)(6 hours).

12

13   444.    Given the nature and circumstances of the offense and the

14   lack of  other evidence in aggravation, the erroneous admission of

15   the gun incident was serious error and justifies issuance of the

16   writ.

17

18                            **Claim 6**[90]

19   **THE JURY SPECULATED REGARDING MATTERS ABOUT WHICH EVIDENCE HAD NOT**
     **BEEN PRESENTED BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT IT NOT**

20   **TO DO SO.**

21   445.    Prior to submitting the penalty phase case to the jury,

22   defense counsel requested modifications to instructions, to wit:

23          I do have a request, on page 2, the third paragraph

24

25   _____

26        [90]   This claim was presented to and decided by the California
     Supreme Court in direct appeal claims 10, 14, and 28, as well as

27   habeas claims 1, 2, 9, 13, 14 and 29.

28   *Petition for a writ of habeas corpus*
     *under 28 U.S.C. 2254*                    Page -193-              **Dykes v. Martel**
                                                            Case No. C-11-04454-SI

1    reads, "you must neither be influenced by bias nor

2    prejudice against the defendant, nor swayed by public

3    opinion or public feelings.  Both the defendant" - "the

4    people and the defendant have a right to expect that you

5    will consider all of the evidence, follow the law,

6    exercise your discretion conscientiously, and reach a

7    just verdict."

8        I would like to add a sentences [sic] to that,

9    probably between public feeling and both, that you are to

10    reach your verdict based upon the evidence, and should

11    not either speculate, you know, not be subject to either

12    speculation or conjecture, 'cause clearly it's the law in

13    the state of California that they can't speculate or

14    conject, but are only supposed to use the evidence as

15    it's been presented to them.  That was - conjecture, for

16    some reason, got left out of this instruction when they

17    went over to capital.  And I believe that to be a fair

18    statement of the law.

19    (RT 3863-64)

20

21    446.    The court expressed concern that such an instruction

22    might conflict with part of No. 8.88 which permits the jury to

23    assign "whatever moral or sympathetic value you deem appropriate to

24    each and all of the various factors." Petitioner's counsel

25    disagreed, persisting in the request.  (RT 3865)  He explained:

26        "All I'm telling them is that they have to operate on

27

28    *Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                Page -194-                **Dykes v. Martel**
                                        Case No. C-11-04454-SI

1          evidence, they can't operate on mere conjecture or

2          guessnot or whatnot, they have to deal with evidence.

3              Then the next section tells them how to consider the

4          evidence, they may assign to it whatever moral or

5          sympathetic value they want to."

6    (RT 3866)

7

8    447.     The court rejected Petitioner's request and gave the

9    instructions as worded.  (RT 3867)

10

11   448.     After the court addressed some other matters, defense

12   counsel renewed his request, asking the court to give a special

13   instruction telling the jury they are not allowed to decide the

14   case by "either speculation or conjecture.  I feel very strongly

15   that this is a principle which is, in fact, embodied in the

16   California law."  (RT 3870)  The court denied the request.  Id.

17   The trial court erred under both federal and state law.

18   Petitioner's subsequent death sentence is a violation of federal

19   constitutional and this Court should grant the writ of habeas

20   corpus requested herein.

21

22   449.     It is a fundamental principle of law that jury decisions

23   are to be based on the evidence presented to it, not on speculation

24   or conjecture regarding matters outside the record.  This is

25   particularly true in capital cases.  Although juries are permitted

26   to consider almost any matter in mitigation, and are free to assign

27

28   *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
     *under 28 U.S.C. 2254*              Page -195-              Case No. C-11-04454-SI

whatever moral weight to a particular matter they see fit, juries are precluded from exploring matters outside the evidence presented to it.[91]

450.    The Supreme Court has outlined procedures designed to preclude sentencers from being given "unbridled discretion in determining the fates of those charged with capital offenses." California v. Brown, supra, 479 U.S. at 541. Thus, a jury instruction directing jurors not to speculate or to make the penalty determination based on speculation or conjecture is a correct statement of the law.  Such an instruction is appropriate because it reminds the jury that it is not to speculate regarding matters such as whether the defendant has a more extensive criminal record than was presented at trial, or any other matters regarding the defendant's character as to which evidence was not presented.

451.    In this case we now know the jury speculated that Petitioner had an additional and more extensive criminal record than was presented in evidence, as well as that a sentence of life without possibility of parole did not really mean Petitioner would

_____

[91]    For example, in California juries are routinely instructed not to conduct experiments relating to evidence and are forbidden from visiting crime scenes on their own.  CALJIC 1.03.  Jurors are precluded from consulting with outside experts, People v. Honeycutt, 20 Cal.3d 150, 157-58 (1977), and may not consult outside source materials such as dictionaries to learn the definition of particular legal terms.  People v. Karis, 46 Cal.3d 612, 642 (1988).  See generally In re Malone, 12 Cal.4th 935, 963-64 (1996)(presumption of prejudice when juror commits misconduct by going outside the evidence presented).

1  stay in prison.  Even at the time of trial we also had reason to

2  know the jury was being invited by the prosecution to speculate as

3  to Petitioner's upbringing and the nature and character of his

4  family and support systems. This all renders the ensuing death

5  sentence a violation of Eighth Amendment principles.

6

7  452.    The trial court's decision was not even consistent with

8  prior California Supreme Court decisions. In People v. Mickey, 54

9  Cal.3d 612, 695, (1991), cert. denied, 506 U.S. 819 (1992), the

10 state court upheld an instruction similar to the one requested

11 here.  There, the trial court had instructed: "You may consider

12 pity, sympathy or mercy in deciding the appropriate punishment;

13 however, you should not be governed by mere  conjecture,  prejudice

14 or public opinion." Accord People v. Gonzalez, 51 Cal.3d 1179,

15 1225 (1990), cert. denied, 502 U.S. 835 (1991) The instruction

16 requested here did not even call for the jury to consider pity or

17 sympathy, rather it merely asked the jury not to speculate

18 regarding matters outside the record.  Thus, the instruction was an

19 accurate statement of state law and should have been given by the

20 trial court.

21

22 453.    The error was significant as this record discloses jurors

23 did in fact speculate about matters outside the record.  Post

24 verdict interviews with jurors confirm that several jurors opined

25 their suspicion that Petitioner had a lengthy juvenile criminal

26 history.   For example, juror FC admitted in post-verdict

27

28 *Petition for a writ of habeas corpus*                                    **Dykes v. Martel**
   *under 28 U.S.C. 2254*              Page -197-              Case No. C-11-04454-SI

interviews that she believed and told other jurors that Petitioner
likely had a lengthy juvenile record, and that he had not just
started committing crimes. (CT 666-67, 722-27)  While during voir
dire, juror FC denied working for a lawyer with any criminal
practice; during deliberations, she informed jurors that while
working for a Fresno lawyer, she had seen many people be sentenced
to life without possibility of parole and then be released.
(CT 722-27)  She did not want to see Petitioner get out of prison.
The foreman of the jury, RM, confirmed in a post-trial interview
that the jury speculated about Petitioner's probable additional
criminal history.  (CT 708-12)  He personally stated that he did
not believe the jurors had gotten the full story regarding
Petitioner's past criminal history.  (CT 676)  Similarly, juror
Sandra Lucas "had the impression this was not [Petitioner's] first
crime. (CT 681-82, 717-21)

454.    The speculation engaged in by these jurors, and the
speculation very likely engaged in by other jurors, undoubtedly was
evaluated in their decision to sentence Petitioner to death.

455.    The record presented to the state court established the
jury in fact speculated.  The trial court's refusal to provide the
requested instruction was prejudicial and the writ should issue.

1

**Claim 7**[92]

2
3
**THE METHOD OF EXECUTION EMPLOYED IN CALIFORNIA VIOLATES THE FOURTEENTH AMENDMENT GUARANTEE OF PROCEDURAL DUE PROCESS AND THE EIGHTH AMENDMENT'S PROHIBITION UPON CRUEL AND UNUSUAL PUNISHMENT.**

4

5   456.    In 1992, California added as an alternative means of

6   execution "intravenous injection of a substance or substances in a

7   lethal quantity sufficient to cause death by standards established

8   under the direction of the Department of Corrections." Penal Code

9   § 3604(a).  The 1992 legislation allowed the inmate to select

10  either lethal gas or lethal injection, and provided that if the

11  inmate made no selection, execution would be by lethal gas.

12  Previously, the only method of execution was lethal gas.

13

14  457.    California's execution procedures violate the federal

15  constitution in two respects.  First, the state has failed to

16  comply with the statutory requirement that standards for lethal

17  injection be established by the Department of Corrections.  Pen.

18  Code § 3604(a).  Second, Petitioner submits that both of the

19  statutory methods of execution constitute cruel and unusual

20  punishment in violation of Petitioner's rights under the Eighth

21  Amendment.

22

23  **THE DEPARTMENT OF CORRECTIONS' FAILURE TO ADOPT THE REGULATIONS**
24  **MANDATED BY PENAL CODE § 3604 VIOLATES PETITIONER'S RIGHT TO**

25      [92]    This claim was presented to the California Supreme Court in
26  direct appeal claim 26, and habeas claim 27.  That court found the
    issue premature and denied it without prejudice.
27

28  *Petition for a writ of habeas corpus*                          **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -199-              Case No. C-11-04454-SI

1    **PROCEDURAL DUE PROCESS.**

2

3    458.      The Fourteenth Amendment guarantees that no person will

4    be deprived of life, liberty, or property without due process of

5    law.  U.S. Const., Amend. XIV.  To establish a violation of the

6    right to procedural due process, the complaining party must show:

7    (1) a constitutionally protected interest in life, liberty or

8    property; (2) governmental deprivation of that interest; and (3)

9    the constitutional inadequacy of procedures accompanying the

10   deprivation.  <u>Bank of Jackson County v. Cherry</u>, 980 F.2d 1362, 1366

11   (11th Cir. 1993).  An inmate facing execution has a

12   constitutionally protected interest in life that is not

13   extinguished by his judgment and sentence.  <u>Ohio Adult Parole</u>

14   <u>Authority v. Woodward</u>, 523 U.S. 272, 281, 288 (1998)

15

16   459.      The state of California intends to deprive Petitioner of

17   life and must accordingly do so in accordance with procedures which

18   accord with the requirements of due process.  As the following

19   discussion demonstrates, the procedures adopted by the state were

20   and are constitutionally inadequate.

21

22   460.      When a statute requires a regulatory agency to adopt

23   standards to guide the performance of specified actions, the

24   agency's failure to adopt such standards or to comply with the

25   procedures required for adoption of standards prior to taking those

26   actions violates the guarantee of procedural due process.  <u>See</u> <u>e.g.</u>

27

28   *Petition for a writ of habeas corpus*                              **Dykes v. Martel**
     *under 28 U.S.C. 2254*              Page -200-              Case No. C-11-04454-SI

1  <u>Marshall v. Union Oil</u>, 616 F.2d 1113, 1116 (9th Cir. 1980).  In

2  California, all regulations and other standards of general

3  application employed by a governmental agency must be adopted

4  pursuant to the procedures set forth in the state Administrative

5  Procedures Act (hereinafter, "the Act."  Gov't Code § 11342(g).

6  The Act mandates that rigorous procedures be observed prior to the

7  adoption of regulations, including public notice and hearings,

8  legal review, and a public comment period, followed by filing of

9  the regulation with the Secretary of State.  <u>See</u> <u>e.g</u>. Gov't Code

10 § 11346.4 et seq.  Rules adopted without complying with the Act are

11 invalid and may not be enforced.  Gov't Code § 11340.5.

12

13 461.    To Petitioner's knowledge, the Department of Corrections

14 has not complied with the mandate of section 3604(a) to establish

15 standards for the administration of lethal injections or with the

16 provisions of the Administrative Procedures Act.  The only

17 regulation in the California Code of Regulations which even

18 mentions the words "lethal injection" is 15 C.C.R. § 3349.  This

19 section merely sets forth the procedures and departmental forms

20 required for a Death Row inmate's request for either lethal

21 injection or lethal gas and therefore does not comply with the

22 requirements of § 3604(a).  The only other information dealing with

23 the subject which is available from the Department of Corrections

24 is a brief document, dated March, 1996, which merely provides a

25 vague description of the Department's lethal injection procedures.

26 The document, apparently a press release, neither states the source

27

28 *Petition for a writ of habeas corpus*
   *under 28 U.S.C. 2254*                    Page -201-                    **Dykes v. Martel**
                                                                    Case No. C-11-04454-SI

of the information it contains nor refers to any official regulations or rules.  In pertinent part, this document states as follows:

> "The inmate is connected to a cardiac monitor which is connected to a printer outside the execution chamber. An IV is started in two usable veins and a flow of normal saline solution is administered at a slow rate. [One line is held in reserve in case of a blockage or malfunction in the other.] The door is closed. The warden issues the execution order.

462.    In advance of the execution, syringes containing the following are prepared:

> - 5.0 grams of sodium pentothal in 20-25 cc of diluent
> - 50 cc of pancuronium bromide
> - 50 cc of potassium chloride

Each chemical is lethal in the amounts administered.

463.    At the warden's signal, sodium pentothal is administered, then the line is flushed with sterile normal saline solution. This is followed by pancuronium bromide, a saline flush, and finally, potassium chloride. As required by the California Penal Code, a physician is present to declare when death occurs."
http://www.cdc.state.ca.us/issues/capital/capital4.htm; See Appendix 124, In re Carpenter, Petition for Habeas Corpus, S083246.

464.       This document does not comply with the provisions of the Administrative Procedures Act.  No notice appears to have been given to the public prior to its adoption, nor is Petitioner aware that any hearing or public comment period preceded its adoption either.  The document does not appear to have been published or filed with the Secretary of State, nor does it appear to have been vetted by the Office of Administrative Law.  In addition, the document itself does not even purport to be a regulation.  By its own terms, it does not prescribe the procedures that must be used during an execution, but rather appears to describe for the press or public in general terms the procedures the department uses.

465.       The foregoing document also fails to establish coherent standards for administering lethal injections. The document is extremely vague and general in its description.  For example, it is not clear from the document how far "in advance of the execution" the drugs are prepared.  No physical restraints are described.  It is not clear how many people are present, who these people are, what qualifications they must have, or what training they must have undergone.

466.       Most significantly, the document does not define a set of procedures that will ensure that a condemned prisoner will be free from unnecessary suffering.  The document's failure to prescribe even a minimal level of training for the personnel involved in administering the lethal injection raises a substantial and

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -203-                    **Dykes v. Martel**
                                                                Case No. C-11-04454-SI

1    unnecessary risk that the subject will undergo extreme pain and

2    suffering before and during his execution.  If inadequately trained

3    personnel improperly insert the catheter, the chemicals may be

4    inserted into Petitioner's muscle or other tissue rather than

5    directly into his bloodstream, causing extreme pain in the form of

6    a severe burning sensation.  Furthermore, a failure to inject the

7    chemicals directly into the bloodstream will cause the chemicals to

8    be absorbed far more slowly, and the intended effects will not

9    occur. Improper insertion of the catheter could also result in its

10   failing out of the vein, resulting in a failure to inject the

11   intended dose. There also is the risk that the catheter will

12   rupture or leak as pressure builds up during the administration of

13   the chemicals unless the catheter has adequate strength and all the

14   joints and connections are adequately reinforced.

15

16   467.    The document does not mandate that a physician or other

17   trained medical expert be present to render treatment or assistance

18   to a prisoner in the event of an emergency; instead, the document

19   mandates only that a physician be present to declare death.  In

20   fact, medical doctors are prohibited from participating in

21   executions pursuant to the ethical principles set forth in the

22   Hippocratic Oath.  The American Nurses Association also forbids

23   members from participating in executions.  This increases the

24   chances of improper administration which could result in pain, an

25   air embolism, the clotting of the catheter which would prevent

26   injection, and heart failure.  Furthermore, the document sets out

27

28   *Petition for a writ of habeas corpus*
     *under 28 U.S.C. 2254*                    Page -204-                **Dykes v. Martel**
                                                                Case No. C-11-04454-SI

1  specific dosages of three drugs to be administered to all subjects,

2  but different dosages affect different people in different ways,

3  depending upon individual body weight, metabolism, and other

4  medical conditions.  Accordingly, there is a risk that the listed

5  dosages may be inadequate for the purposes for which they were

6  selected, may result in unanticipated or inappropriate effects in a

7  particular individual for medical or other reasons, and may inflict

8  unnecessarily extreme pain and suffering.

9

10  468.    The document also does not outline the proper guidelines

11  for the storage or the handling of the chemicals involved.

12  Improperly stored and/or handled chemicals may cause unnecessary

13  suffering.  Sodium pentothal wears off quickly; and if not enough

14  is given, it may paralyze the muscles of the prisoner and render

15  him incapable of breathing while still conscious, causing panic and

16  an excruciatingly arduous death.

17

18  469.    Plainly the procedures outlined in the document discussed

19  above were not properly adopted as required by the statute and the

20  Administrative Procedures Act.  They are constitutionally

21  inadequate under the Fourteenth Amendment as a violation of

22  Petitioner's right to procedural due process and also may not be

23  enforced under state law. Gov't Code § 11340.5.

24

25              *      *      *      *      *

26

27

28  *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*               Page -205-              **Dykes v. Martel**
                                                                Case No. C-11-04454-SI

**CALIFORNIA'S LETHAL INJECTION PROCEDURE VIOLATES THE EIGHT AMENDMENT PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS.**

470.    California's lethal injection also procedures violate the Eighth Amendment ban on cruel and unusual punishments.  The Eighth Amendment proscribes punishment that would inflict torture or a lingering death or involve the wanton infliction of pain.  In re Kemmler, 136 U.S. 436, 447 (1890); Gregg v. Georgia, 428 U.S. 153, 173 (1976); Hudson v. McMillian, 503 U.S. 1 (1992).  The Amendment embodies concepts of dignity, civilized standards, humanity and decency against which courts must evaluate penal measures. Estelle v. Gamble, 429 U.S. 97 (1976). It prohibits punishments that are incompatible with "evolving standards of decency that mark the progress of a maturing society." Trop v. Dulles, 356 U.S. 86, 101 (1958).  To discern the "evolving standards of decency," courts look to objective evidence of how society views a punishment today. Coker v. Georgia, 433 U.S. 584, 593-597 (1977); Enmund v. Florida, 458 U.S. 782, 788-796 (1982).  In essence, "no court would approve any method of implementation of the death sentence found to involve cruelty in light of presently available alternatives." Furman v. Georgia, supra, 408 U.S. 430.

471.    Death by lethal gas has been ruled cruel and unusual punishment.  Fierro v. Gomez, 865 F.Supp.1387 (N.D. Cal. 1994), aff'd, 77 F.3d 301, 309, vacated & remanded, 519 U.S. 918 (1996). On October 15, 1996, the judgment of the Ninth Circuit was vacated in light of amendments to § 3604. Gomez v. Fierro, 519 U.S. 918

1   (1996).  In 1996, section 3604 was again amended, to provide that
2   in default of an election by the inmate, the execution would be by
3   lethal injection. However, lethal injection also results in
4   precisely the kind of painful, agonizing, and lingering death which
5   the Eighth Amendment prohibits.  It should also be declared
6   unconstitutional and the writ should issue.

7

8   472.      The risk of prolonged administration of the lethal
9   injection is increased by California's lack of comprehensive
10  standards in defining the procedures. In McKenzie v. Day, 57 F.3d
11  1461, 1469 (9th Cir 1995), the Ninth Circuit held that execution by
12  lethal injection under the procedures which had been defined in
13  Montana was constitutional. The Court of Appeals explained that
14  those procedures passed constitutional muster because they were
15  "reasonably calculated to ensure a swift, painless death." Id.
16  Such a statement cannot be made about the procedures in California.
17  A swift, painless death cannot be ensured without standards in
18  place to ensure that the lethal chemicals will be administered to
19  Petitioner in a competent, professional manner by someone
20  adequately trained to do so.

21

22  473.      Similarly, in LaGrand v. Lewis, 883 F.Supp. 469 (D.Ariz.
23  1995), aff'd (9th Cir. 1998) 133 F.3d 1253, the district court
24  upheld the written Internal Management Procedures prescribing
25  standards for the administration of lethal injection because "they
26  clearly indicate that executions are to be conducted under the

27

28  *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*          Page -207-          **Dykes v. Martel**
    Case No. C-11-04454-SI

1   direction of the ASPC-Florence Facility Health Administrator,

2   knowledgeable personnel are to be used, and the presence of a

3   physician is required."  Such procedures are not found in the

4   California Code of Regulations or in the document released by the

5   California Department of Corrections.

6

7   474.     California's use of lethal injection in the

8   administration of the death penalty fails to protect condemned

9   prisoners from unnecessary pain and suffering, violating the Eighth

10  Amendment of the Constitution.  Accordingly, Petitioner's death

11  judgment must be vacated and must not be carried out.

12

13                          **Claim 8[93]**

14  **THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS WHICH OCCURRED DURING
    THE TRIAL COMPELS REVERSAL EVEN IF NO SINGLE ISSUE, STANDING ALONE,**

15  **WOULD DO SO.**

16  475.     The cumulative impact of the numerous penalty phase

17  errors requires reversal of the death penalty even if no single

18  error does so independently.  Taylor v. Kentucky, 436 U.S. 478,

19  487, and fn. 15 (1978); Mak v. Blodgett, 970 F.2d 614, 622 (9th

20  Cir. 1992).  In addition, a number of guilt-phase errors also had a

21  considerable impact on the penalty phase and the impact of these

22  errors must also be assessed in evaluating the prejudice resulting

23  from the penalty phase errors.  In re Marquez, 1 Cal.4th 584, 605,

24

25        [93]    This claim relies upon and hereby incorporates the entirety
26  of the claims presented during both the direct appeal and the state
    habeas proceedings.

27

28  *Petition for a writ of habeas corpus*                           **Dykes v. Martel**
    *under 28 U.S.C. 2254*              Page -208-         Case No. C-11-04454-SI

1  609 (1992).

2

3  476.      Petitioner's death sentence resulted from several serious

4  penalty phase errors as explained herein. As detailed in the state

5  court proceedings below, in addition the prosecutor misbehaved

6  flagrantly and continuously, openly seeking to inflame the passions

7  and prejudices of the jury.  The misconduct occurred throughout

8  both phases of the trial, but was particularly serious during

9  closing argument during the guilt and penalty phases.  The

10  prosecutor's misconduct was compounded by the admission of

11  overwhelmingly prejudicial victim impact evidence.

12

13  477.      The prejudice to Petitioner was heightened by serious

14  errors in the penalty phase instructions.  The trial court

15  permitted the jury to reconsider the question of premeditation

16  after the jury acquitted Petitioner of premeditated attempted

17  murder during the guilt phase of the trial.  The court did not

18  require the jury to find factors in aggravation, other than prior

19  criminal conduct, beyond a reasonable doubt, and did not require

20  jury unanimity as to factors in aggravation.  The court gave

21  prejudicial instructions on the question of remorse or its absence,

22  and also refused to instruct the jury not to speculate regarding

23  matters not in evidence.  The result of this last error was

24  manifestly prejudicial, because the record amply shows that jurors

25  engaged in prejudicial speculation on the questions whether

26  Petitioner had a more serious criminal history than was presented

27

28  *Petition for a writ of habeas corpus*                                      **Dykes v. Martel**
    *under 28 U.S.C. 2254*                    Page -209-                     Case No. C-11-04454-SI

1  to him, whether he would actually be executed, and whether, if

2  sentenced to life without possibility of parole, he would

3  nonetheless be released from custody.  Of course, the jury's

4  misconduct during penalty phase deliberations is a separate reason

5  to reverse the death sentence.

6

7  478.     Furthermore, Petitioner' death sentence is

8  disproportionate to his individual culpability.  Petitioner

9  committed a foolish and dangerous robbery, with disastrous

10  consequences.  However, he did not intend to kill the child victim,

11  and he did not premeditate either the killing or the shooting of

12  the adult victim.  He has a minimal criminal history and was

13  remorseful for what he did.

14

15  479.     These errors were compounded by the numerous

16  instructional defects, primarily in CALJIC Nos. 8.85 and 8.88 which

17  misled the jury with regard to the weighing of aggravating and

18  mitigating factors.  These errors and the numerous systemic

19  deficiencies in California's death penalty process violate not only

20  the state and federal constitutions, but also the provisions of

21  numerous treaties and customary international law.  The cumulative

22  effect of these errors rendered the judgment here highly suspect

23  and unreliable.

24

25  480.     The foregoing errors and others detailed herein

26  demonstrate that the penalty was imposed here in violation of a

27

28  *Petition for a writ of habeas corpus*
   *under 28 U.S.C. 2254*          Page -210-          **Dykes v. Martel**
                                                      Case No. C-11-04454-SI

1   number of Petitioner's constitutional rights under the Fifth,

2   Sixth, Eighth, and Fourteenth Amendments.  Individually and in

3   their cumulative impact, it is both reasonably possible, <u>Chapman v.</u>

4   <u>California</u>, 386 U.S. 18, 24 (1968), and reasonably probable, <u>People</u>

5   <u>v. Watson</u>, 56 Cal.2d 818, 836 (1956), that these errors adversely

6   influenced the penalty determination of at least one if not more

7   jurors.  Certainly it cannot be said that the errors had "no

8   effect" on the penalty verdict.  <u>Caldwell v. Mississippi</u>, 472 U.S.

9   320, 341 (1985).  Thus, this Court lawfully is called upon to

10  vacate the judgment of death.

11

12

13

14

15

16                    *        *        *        *        *

17

18

19

20

21

22

23

24

25

26

27

28  *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*                    Page -211-                    **Dykes v. Martel**
                                                                  Case No. C-11-04454-SI

**X.**
**PRAYER FOR RELIEF**

FOR AND ALL OF THE REASONS AND AUTHORITIES CITED HEREIN, Petitioner respectfully asks that this Honorable Court:

1)    Continue to stay any attempt by Respondent to execute the sentence of death pronounced by the state court while this petition remains pending before the federal courts, including during any appellate proceedings that may become pertinent;

2)    Grant Petitioner leave to conduct discovery and to present evidence thereafter at an evidentiary hearing in order to demonstrate the truth and gravity of the allegations set forth herein; and,

3)    Upon due and complete consideration of the matters raised herein, grant Petitioner relief from the unlawful sentence and judgment at issue herein, as well as such further relief as this Court may find warranted in these proceedings.

                                    Respectfully submitted,


Dated: December 21, 2012          s/Phillip A. Treviño
                                  Attorney at Law
                                  Counsel to Petitioner

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    Page -212-                    **Dykes v. Martel**
                                                                       Case No. C-11-04454-SI

1

2

3

# VERIFICATION

I, Phillip A. Treviño, do hereby declare as follows:

4

5   1.   I am an attorney at law, duly admitted to practice before this

6   Honorable Court.  I am under appointment by this Court to represent

7   Petitioner in the instant proceedings.

8

9   2.   I have read and am familiar with the contents of this petition

10  for a writ of habeas corpus.  To the best of my knowledge and based

11  upon my reading and review of what I believe to be true and correct

12  copies of the proceedings heard in this matter, the matters alleged

13  herein are true and correct.

14

15  3.   I am executing the instant verification on Petitioner's

16  behalf.  I am authorized to do so by Petitioner.  Petitioner is

17  incarcerated in a different county than my own.   The facts and

18  events at issue herein are more within my knowledge than that of

19  Petitioner.

20

21  4.   In support of Claim 1, I represent to this Honorable Court

22  that I have spoken with a senior member of the Alameda County

23  Public Defender's Office regarding this matter.  She has practiced

24  in that office continuously since 1985.  She was in the office at

25  the time this matter was charged and prosecuted as a capital

26  matter.  I described the operative facts of the offenses at issue

27

28  *Petition for a writ of habeas corpus*
    *under 28 U.S.C. 2254*                    Page -213-                    **Dykes v. Martel**
                                                                    Case No. C-11-04454-SI

herein as well as the jury's determinations during the guilt phase, the prosecution's evidence in aggravation, and Petitioner's criminal history.  She has represented to me that as a member of her Office she has a ready and ongoing familiarity with the capital charging practices of the Alameda County District Attorney.  She expressed surprise upon learning this matter was charged and pursued as a capital matter since, in her extensive experience in Alameda County, this fact pattern and offender profile would not ordinarily be a capital matter in that county in her professional judgment.

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Executed this day under the laws of the State of California at Los Angeles.

Date:   December 20, 2012          s/Phillip A. Treviño

*Petition for a writ of habeas corpus*
*under 28 U.S.C. 2254*                    -Page i-                    **Dykes v. Martel**
                                                           Case No. C-11-04454-SI

1

2

# **TABLE OF CONTENTS**

I.

    INITIAL ALLEGATIONS.. . . . . . . . . . . . . . . . . . . Page -2-

II.

    JURISDICTION. . . . . . . . . . . . . . . . . . . . . . Page -13-

III.

    FACTUAL SUMMARY.. . . . . . . . . . . . . . . . . . . . Page -13-

IV.

    AEDPA.. . . . . . . . . . . . . . . . . . . . . . . . Page -17-

V.

    INCORPORATION OF EXHIBITS;

    REQUEST FOR JUDICIAL NOTICE.. . . . . . . . . . . . . . Page -25-

VI.

    GENERAL ALLEGATIONS APPLICABLE TO ALL CLAIMS. . . . . . . Page -26-

VII.

    PROCEDURAL HISTORY OF THE CASE. . . . . . . . . . . . . Page -29-

VIII.

    STATEMENT OF FACTS OF THE OFFENSES. . . . . . . . . . . Page -32-

1

2

3    IX.

4    PETITIONER'S CLAIMS IN FEDERAL HABEAS.. . . . . . . . . . . .    Page -55-

5    Claim 1

6

7        PETITIONER'S DEATH SENTENCE IS INVALID BECAUSE CALIFORNIA'S DEATH

8        PENALTY SCHEME IS FUNDAMENTALLY FLAWED IN NUMEROUS RESPECTS; BOTH ON

9        ITS FACE AND AS APPLIED TO PETITIONER.. . . . . . . . .    Page -55-

10       Synopsis. . . . . . . . . . . . . . . . . . . . .    Page -55-

11       **CALIFORNIA'S DEATH PENALTY STATUTE OF OVER-INCLUSIVE AS DEMONSTRATED**

12           **BY SECTION 190.2 AND AS APPLIED TO PETITIONER.. . . .**    Page -57-

13       CALIFORNIA'S DEFINITION AND APPLICATION OF AGGRAVATING AND

14           MITIGATING FACTORS IN SECTION 190.3 FURTHER INVALIDATE ITS

15           DEATH PENALTY STATUTE ON ITS FACE AND AS APPLIED TO PETITIONER

16           . . . . . . . . . . . . . . . . . . . . .    Page -61-

17       AS <u>APPRENDI</u> AND <u>RING</u> CONFIRM, THE FAILURE TO REQUIRE THE NECESSARY

18           PENALTY PHASE DETERMINATIONS TO BE MADE BEYOND A REASONABLE

19           DOUBT IS  OFFENSIVE TO THE FEDERAL CONSTITUTION.. . .    Page -67-

20       CALIFORNIA LAW VIOLATES THE FEDERAL CONSTITUTION BY FAILING TO

21           REQUIRE THAT THE JURY MAKE WRITTEN FINDINGS REGARDING THE

22           AGGRAVATING FACTORS THE JURY BELIEVES JUSTIFY A DEATH

23           SENTENCE; CALIFORNIA'S STATUTORY FRAMEWORK DOES NOT OTHERWISE

24           SQUARE WITH FEDERAL LAW.. . . . . . . . . . . . .    Page -79-

25       THE DEATH PENALTY IS DISPROPORTIONATE TO PETITIONER'S CULPABILITY

26           AND THEREFORE VIOLATES THE EIGHTH AMENDMENT.. . . .    Page -84-

27

28

LACK OF INTER-CASE PROPORTIONALITY REVIEW.. . . . . . . . Page -86-

CALIFORNIA GIVES PROSECUTORS VIRTUALLY UNBRIDLED DISCRETION TO

      DECIDE IN WHICH SPECIAL CIRCUMSTANCE MURDER CASES THE DEATH

      PENALTY WILL BE SOUGHT, AND THIS VIOLATES THE FIFTH, EIGHTH,

      AND FOURTEENTH AMENDMENTS.. . . . . . . . . . . . Page -93-

AS APPLIED TO PETITIONER, EACH AND ALL OF THE ABOVE DEFECTS HAVE

      CONTRIBUTED TO A DEATH SENTENCE IN VIOLATION OF FEDERAL

      CONSTITUTIONAL LAW. . . . . . . . . . . . . . . . . Page -94-

IMPOSITION OF THE DEATH PENALTY IN CALIFORNIA TODAY IS A VIOLATION

      OF THE FEDERAL CONSTITUTION'S PROHIBITION AGAINST CRUEL AND

      UNUSUAL PUNISHMENT. . . . . . . . . . . . . . . . Page -95-

Claim 2


TRIAL COUNSEL FAILED TO INVESTIGATE AND PRESENT READILY AVAILABLE

EVIDENCE IN MITIGATION AT PETITIONER'S PENALTY PHASE TRIAL

. . . . . . . . . . . . . . . . . . . . . . . . . Page -99-

Synopsis. . . . . . . . . . . . . . . . . . . . . . Page -100-

DISCUSSION. . . . . . . . . . . . . . . . . . . . . Page -101-

THE LIMITED EXTENT OF TRIAL COUNSEL'S INVESTIGATION.. . . Page -105-

      Investigation of Petitioner's Juvenile Arson. . . . Page -105-

      Investigator Services.. . . . . . . . . . . . . . Page -105-

      Trial Counsel's Investigative Efforts.. . . . . . . Page -106-

      Mental Health and Social History Investigation. . . Page -107-

EVIDENCE OF REDEEMING QUALITIES IN PETITIONER THAT COULD HAVE BEEN

      PRESENTED TO THE SENTENCING JURY. . . . . . . . . . Page -112-

MITIGATING EVIDENCE OF PETITIONER'S IMMEDIATE AND CONTEMPORANEOUS

REMORSE THAT COULD HAVE BEEN PRESENTED TO THE SENTENCING JURY
. . . . . . . . . . . . . . . . . . . . . . . . . . Page -118-

MENTAL HEALTH MITIGATION EVIDENCE.. . . . . . . . . . . Page -133-

Claim 3

**THE JURY COMMITTED MISCONDUCT IN TWO WAYS: (A) IT PUT PETITIONER IN
JEOPARDY FOR A CRIME OF WHICH HE HAD ALREADY BEEN ACQUITTED, AND (B)
IT CONSIDERED EXTRINSIC EVIDENCE, ALL IN VIOLATION OF FEDERAL AND
STATE LAW.**. . . . . . . . . . . . . . . . . . . . . Page -138-

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . Page -141-

PERMITTING THE JURY TO RECONSIDER THE ISSUE OF PREMEDITATION
VIOLATED PETITIONER'S RIGHTS BECAUSE PETITIONER WAS ACQUITTED
OF PREMEDITATED MURDER. . . . . . . . . . . . . . . Page -145-

THE JURORS WERE TAINTED BY EXTRANEOUS INFLUENCES AND THEIR EXPOSURE
TO THESE EXTRANEOUS MATTERS VIOLATED FEDERAL CONSTITUTIONAL
CONCERNS. . . . . . . . . . . . . . . . . . . . . . Page -151-

**Synopsis.** . . . . . . . . . . . . . . . . . . . . Page -151-

CONTENT OF THE JUROR STATEMENTS.. . . . . . . . . . Page -153-

THE TRIAL COURT ERRED IN REFUSING TO CONSIDER THE JUROR
STATEMENTS. . . . . . . . . . . . . . . . . . . . Page -155-

Claim 4

**CALIFORNIA'S DEATH PENALTY IS CONSTITUTIONALLY OFFENSIVE IN HOW IT
DIRECTS A SENTENCING JURY TO EVALUATE AND WEIGH EVIDENCE IN
MITIGATION AND AGGRAVATION.** . . . . . . . . . . . . Page -159-

THE JURY WAS MISLED REGARDING HOW IT SHOULD WEIGH THE AGGRAVATING
AND MITIGATING FACTORS IN THIS MATTER.. . . . . . . Page -160-

CALJIC NO. 8.88, AS GIVEN HEREIN, VIOLATED PETITIONER'S RIGHTS UNDER

THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION... . . . . . . . . . . . . Page -170-

Claim 5

**CALIFORNIA'S DEATH PENALTY SCHEME VIOLATES THE FEDERAL CONSTITUTION**

**IN HOW AND WHAT IT ALLOWS JURIES TO USE AS EVIDENCE IN AGGRAVATION**

. . . . . . . . . . . . . . . . . . . . . . . . . . Page -179-

THE TRIAL COURT ERRED IN REFUSING TO INSTRUCT THE JURY THAT, BEFORE
        CONSIDERING A FACTOR IN AGGRAVATION, IT MUST UNANIMOUSLY FIND
        BOTH THAT THE DEFENDANT COMMITTED THE ACT IN AGGRAVATION AND
        THE ACT CONSTITUTED AN IMPLIED THREAT OF FORCE OR VIOLENCE.
        . . . . . . . . . . . . . . . . . . . . . . . . . . Page -180-
        Background. . . . . . . . . . . . . . . . . . . . Page -180-
CALIFORNIA LAW VIOLATES THE SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS
        TO THE UNITED STATES CONSTITUTION BY FAILING TO REQUIRE
        UNANIMOUS JURY AGREEMENT ON AGGRAVATING FACTORS.. . Page -183-
THE ADMISSION OF EVIDENCE THAT PETITIONER WAS ARRESTED FOR
        POSSESSION OF A LOADED AND CONCEALED WEAPON VIOLATED THE
        EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION
        . . . . . . . . . . . . . . . . . . . . . . . . . . Page -187-

Claim 6

THE JURY SPECULATED REGARDING MATTERS ABOUT WHICH EVIDENCE HAD NOT
BEEN PRESENTED BECAUSE THE TRIAL COURT REFUSED TO INSTRUCT IT NOT TO
DO SO. . . . . . . . . . . . . . . . . . . . . . . . Page -193-

Claim 7

**THE METHOD OF EXECUTION EMPLOYED IN CALIFORNIA VIOLATES THE**

**FOURTEENTH AMENDMENT GUARANTEE OF PROCEDURAL DUE PROCESS AND THE**

**EIGHTH AMENDMENT'S PROHIBITION UPON CRUEL AND UNUSUAL PUNISHMENT**

. . . . . . . . . . . . . . . . . . . . . . . . . . . Page -199-

THE DEPARTMENT OF CORRECTIONS' FAILURE TO ADOPT THE REGULATIONS

    MANDATED BY PENAL CODE § 3604 VIOLATES PETITIONER'S RIGHT TO

    PROCEDURAL DUE PROCESS... . . . . . . . . . . . . . Page -200-

CALIFORNIA'S LETHAL INJECTION PROCEDURE VIOLATES THE EIGHT AMENDMENT

    PROHIBITION AGAINST CRUEL AND UNUSUAL PUNISHMENTS.. Page -206-

Claim 8

THE CUMULATIVE EFFECT OF THE NUMEROUS ERRORS WHICH OCCURRED DURING

THE TRIAL COMPELS REVERSAL EVEN IF NO SINGLE ISSUE, STANDING ALONE,

WOULD DO SO.. . . . . . . . . . . . . . . . . . . . Page -208-

    *    *    *    *    *

X.

PRAYER FOR RELIEF.. . . . . . . . . . . . . . . . . . . . Page -212-

VERIFICATION. . . . . . . . . . . . . . . . . . . . . . . Page -213-

TABLE OF AUTHORITIES

**United States Supreme Court cases**

*CA Const. Sec. 7 . . . . . . . . . . .    Page -8-, Page -10-, Page -11-

*Roper v. Simmons,. . . . . . . . . . . . . . . .    Page -16-, Page -55-

Addington v. Texas, 441 U.S. 418 (1979).. . . . . . . . . . . . .    70

Almendarez-Torres v. United States, 523 U.S. 224 (1998).. . . . .    70

Apprendi v. New Jersey, 530 U.S. 466 (2000).. .    68, 70, 71, 72, 73

Ashe v. Swenson, 397 U.S. 436 (1970). . . . . . . . . . .    146, 148

Atkins v. Virginia, 536 U.S. 304 (2002).. . . . . . . .    16, 55, 90

Barclay v. Florida, 463 U.S. 939 (1976).. . . . . . . . . . . . .    86

Beck v. Alabama, 447 U.S. 625 (1980). . . . . . .    74, 93, 158, 169

Board of Regents v. Roth, 408 U.S. 564 (1972).. . . . . . . . . .    151

Boumediene v. Bush, 553 U.S. 723 (2008).. . . . . . . . . .    22, 24

Boyde v. California, 494 U.S. 370 (1990). . . . . . . . . . . . .    101

Boyde v. California, 494 U.S. 370 (1990). . . . . . . . . . . . .    173

Brady v. Maryland, 373 U.S. 83 (1963).. . . . . . . . . . . . . .    23

Brecht v. Abrahamson, 507 U.S. 619 (1993).. . . . . . . . . . . .    27

Bullington v. Missouri, 451 U.S. 430 (1981).. . . . . . .    70, 74, 146

Caldwell v. Mississippi, 472 U.S. 320 (1985). . . . . . . . . . .    158

California v. Brown, 479 U.S. 538 (1987). . . . . . . . . . . . .    79

Case v. Nebraska, 381 U.S. 336 (1965).. . . . . . . . . . . . . .    24

Coker v. Georgia, 433 U.S. 584 (1977).. . . . . . . . . . .    88, 97

Coleman v. Thompson, 501 U.S. 722 (1991). . . . . . . . . . . . .    28

Cone v. Bell, 556 U.S. 449 (2009).. . . . . . . . . . . . . . . .    21

Cullen v. Pinholster, 131 S. Ct. 1388 (2011). . . . . .    20, 21, 22

1  Dent v. West Virginia, 129 U.S. 114 (1889). . . . . . . . . . . 151

2  Eddings v. Oklahoma, 455 U.S. 104 (1982). . . . . . . . . . 78, 93

3  Enmund v. Florida, 458 U.S. 782 (1982). . . . . . . . 59, 88, 97

4  Estelle v. Gamble, 429 U.S. 97 (1976).. . . . . . . . . . . . . 96

5  Evitts v. Lucey, 469 U.S. 387 (1985). . . . . . . . . . . . . . 29

6  Ewing v. California, 538 U.S. 11 (2003).. . . . . . . . . . . . 98

7  Ford v. Wainwright, 477 U.S. 399 (1986).. 24, 74, 83, 90, 92, 158,

8                                                                    169

9  Fry v. Pliler, 551 U.S. 112 (2007). . . . . . . . . . . . . . . 27

10 Furman v. Georgia, 408 U.S. 238 (1972). 56, 59, 81, 87, 88, 90, 91,

11                                                                   95

12 Godfrey v. Georgia, 446 U.S. 420 (1980) . . . . . . . . 16, 55, 56

13 Goldberg v. Kelly, 397 U.S. 254 (1970). . . . . . . . . . . . 151

14 Goss v. Lopez, 419 U.S. 565 (1975). . . . . . . . . . . . . . 151

15 Gregg v. Georgia, 428 U.S. 153 (1976).. . . . . . . 79, 88, 91, 92

16 Griffin v. United States, 502 U.S. 46 (1991). . . . . . . . . . 77

17 Harmelin v. Michigan, 501 U.S. 957 (1991).. . . . . . . 81, 84, 92

18 Harrington v. Richter, 131 S. Ct. 770 (2011). . . . . . . . 18, 21

19 Harris v. Nelson, 394 U.S. 286 (1969) . . . . . . . . . . . . . 22

20 Hicks v. Oklahoma, 447 U.S. 343 (1980). . . . 79, 83, 164, 173, 175

21 House v. Bell, 547 U.S. 518 (2006). . . . . . . . . . . . . . . 28

22 In re Winship, 397 U.S. 358 (1970). . . . . . . . . . . . . 75, 77

23 Jefferson v. Upton, 560 U.S. _, 130 S. Ct. 2217 (2010). . . . . 24

24 Johnson v. Mississippi, 486 U.S. 578 (1988).. . . . . . . . . . 149

25 Johnson v. Zerbst, 304 U.S. 458 (1938). . . . . . . . . . . . . 24

26 Kansas v. Marsh, 548 U.S. 163 (2006). . . . . . . . . . . . . . 57

27

28

Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992) . . . . . . . . . . . . 23

Kelly v. South Carolina, 534 U.S. 246 (2001) . . . . . . . . . . 158

Knowles v. Mirzayance, 556 U.S. 111 (2009) . . . . . . . . . . . 22

Lindh v. Murphy, 521 U.S. 320 (1997) . . . . . . . . . . . . . . 17

Lockett v. Ohio, 438 U.S. 586 (1978) . . . . . . . . . . . . . . 172

Lockyer v. Andrade, 538 U.S. 63 (2003) . . . . . . . . . . . . . 18

Martinez v. Ryan, 132 S. Ct. 1309 (2012) . . . . . . . . . . . . 28

Mattox v. United States, 146 U.S. 140 (1892) . . . . . . . . . . 152

McFarland v. Scott, 512 U.S. 849 (1994) . . . . . . . . . . . . 22

McKoy v. North Carolina, 494 U.S. 433 (1990) . . . . . . . . . . 75

Meachum v. Fano, 427 U.S. 215 (1976) . . . . . . . . . . . . . . 151

Miller-El v. Cockrell, 537 U.S. 322 (2003) . . . . . . . . . . . 20

Miller-El v. Dretke, 545 U.S. 231 (2005) . . . . . . . . . . . . 20

Mills v. Maryland, 486 U.S. 367 (1988) . . . . . . . . . . . . . 78

Monge v. California, 524 U.S. 721 (1998) . . . . . . . . . . 69, 74

Morrissey v. Brewer, 408 U.S. 471 (1982) . . . . . . . . . . . . 150

Murray's Lessee v. Hoboken Land and Improvement Co., 59 U.S. (18
        How) 272 (1855) . . . . . . . . . . . . . . . . . . . . . 78

Panetti v. Quarterman, 551 U.S. 930 (2007) . . . . . . . . . . . 21

Parker v. Dugger, 498 U.S. 308 (1991) . . . . . . . . . . . . . 92

Parker v. Dugger, 498 U.S. 308 (1991) . . . . . . . . . . . . . 164

Parker v. Duke, 498 U. S. 308 (1991) . . . . . . . . . . . . . . 84

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . 101

Penry v. Lynaugh, 492 U.S. 302 (1989) . . . . . . . . . . . . . 165

Perry v. Sindermann, 408 U.S. 593 (1972) . . . . . . . . . . . . 151

Proffitt v. Florida, 428 U.S. 242 (1976) . . . . . . . . 78, 86, 88

Pulley v. Harris, 465 U.S. 37 (1984). . . . . . . . 58, 86, 87, 90

Ramdass v. Angelone, 530 U.S. 156 (2000). . . . . . . . . . . . 18

Remmer v. United States, 347 U.S. 227 (1954). . . . . . . . . . 152

Ring v. Arizona, 536 U.S. 584 (2002). . . . . . 68, 71, 72, 74, 166

Rompilla v. Beard, 545 U.S. 374 (2005). . . . . . . . . . . . . 21

Santosky v. Kramer, 455 U.S. 745 (1982).. . . . . . . . . . . . 70

Schiro v. Farley, 510 U.S. 222 (1994).. . . . . . . . . . . . . 146

Sealfon v. United States, 332 U.S. 575 (1948).. . . . . . . . . 148

Shafer v. South Carolina, 532 U.S. 36 (2001). . . . . . . . . . 158

Simmons v. South Carolina, 512 U.S. 154 (1994). . . . . . . . . 176

Smith v. Bennett, 365 U.S. 708 (1961).. . . . . . . . . . . . . 24

Strickland v. Washington, 466 U.S. 668 (1984).. . . . . . . . . 29

Stringer v. Black, 503 U.S. 222 (1992). . . . . . . . . . . . . 174

Sullivan v. Louisiana, 508 U.S. 275 (1993). . . . . . . . . 74, 173

Taylor v. Kentucky, 436 U.S. 478 (1978).. . . . . . . . . . . . 28

Thompson v. Oklahoma, 487 U.S. 815 (1988).. . . . . . . . . . . 88

Townsend v. Sain, 372 U.S. 293 (1963).. . . . . . . . . . . 22, 80

Trop v. Dulles, 356 U.S. 86 (1958). . . . . . . . . . . . . . . 96

Tuilaepa v. California, 512 U.S. 967 (1994).. . . . . . . . 62, 84

Tuilaepa v. California, 512 U.S. 967 (1994).. . . . . . . . . . 163

Walton v. Arizona, 497 U.S. 639 (1990). . . . . . . . . . . . . 166

Walton v. Arizona, 497 U.S. 639 (1990). . . . . . . . . . . . . 74

Wiggins v. Smith, 539 U.S. 510 (2003).. . . . . . . . . . . . . 19

Woodson v. North Carolina, 428 U.S. 280 (1976). . . . . . . 24, 94

Ylst v. Nunnemaker, 501 U.S. 797 (1991).. . . . . . . . . . . . 20

Young v. Ragen, 337 U.S. 235 (1949).. . . . . . . . . . . . . . 24

1  Zant v. Stephens, 462 U.S. 862 (1983).. . . . . . . . . . . . . 94

2  Zant v. Stephens, 462 U.S. 862 (1983).. . . . . . . . 56, 164, 166

3

4  **United States Courts of Appeal cases**

5

6  Benn v. Lambert, 283 F.3d 1040 (9th Cir. 2002). . . . . . . . . 19

7  Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003). . . . . . . . 28

8  Bittaker v. Woodford, 331 F.3d 715 (9th Cir. 2003)(en banc).. . 27

9  Brown v. Smith, 551 F.3d 424 (6th Cir. 2008). . . . . . . . . . 23

10 Cargle v. Mullin, 317 F.3d 1196 (10th Cir. 2003). . . . . . . . 116

11 Caro v. Calderon, 165 F.3d 1223 (9th Cir. 1999).. . . . . . . . 101

12 Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995). . . . . . . . 107

13 Clabourne v. Lewis, 64 F.3d 1373 (9th Cir. 1995). . . . . . . . 101

14 Delap v. Dugger, 890 F.2d 285 (11th Cir. 1989). . . . . . . . . 147

15 Duhaime v. Ducharme, 200 F.3d 597 (9th Cir. 2000).. . . . . . . 18

16 Dyer v. Calderon, 151 F.3d 970 (9th Cir.) (en banc), cert. denied.

17     525 U.S. 1033 (1998).. . . . . . . . . . . . . . . . 155, 157

18 Frantz v. Hazey, 533 F.3d 724 (9th Cir. 2008) (en banc).. . . . 21

19 Hard v. Burlington Northern Railroad, 812 F.2d 482 (9th Cir. 1987)

20     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

21 Hoffman v. Arave, 236 F.3d 523 (9th Cir. 2001). . . . . . . . . 23

22 James v. Ryan, 679 F.3d 780 (9th Cir. 2012).. . . . . . . . . . 20

23 Killian v. Poole, 282 F.3d 1204 (9th Cir. 2002).. . . . . . 22, 23

24 Lambert v. Blodgett, 393 F.3d 943 (9th Cir. 2004).. . . . . . . 18

25 Lambert v. Blodgett, 393 F.3d 943 (9th Cir. 2004).. . . . . 22, 23

26 Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992).. . . . . . . . . 101

27

28

Mayes v. Gibson, 210 F.3d 1284 (10th Cir.), cert. denied, 531 U.S. 1020 (2000). . . . . . . . . . . . . . . . . . . . . . . 101

Monroe v. Angelone, 323 F.3d 286 (4th Cir. 2003) . . . . . . . 23

Myers v. Ylst, 897 F.2d 417 (9th Cir. 1992). . . . . . . 76, 81, 92

Phillips v. Woodford, 267 F.3d 966 (9th Cir. 2001). . . . . . . 28

Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004). . . . . . . . . 19

United States v. Bailin, 977 F.2d 270 (7th Cir. 1992). . . . . . 146

United States v. Henley, 238 F.3d 1111 (9th Cir. 2001). . . . . 157

United States v. Smith, 26 F.3d 739 (7th Cir. 1993). . . . . . . 158

Wade v. Terhune, 202 F.3d 1190 (9th Cir. 2000). . . . . . . . . 152

Wallace v. Stewart, 184 F.3d 1112 (9th Cir. 1999). . . . . 107, 108

Wallace v. Stewart, 184 F.3d 1112 (9th Cir. 1999). . . . . . . . 101

Williams v. Calderon, 52 F.3d 1465 (9th Cir. 1995). . . . . . . 68

Williams v. Taylor, 529 U.S. 362 (2000). . . . . . . . . . . . 19

Wilson v. Sirmons, 536 F.3d 1064 (10th Cir. 2008). . . . . . . . 23

**United States Constitutional provisions**

U.S. Const. amend. V . . 4, 6, 9, 68, 92, 157, 158, 166, 167, 169, 170, 171, 183, 184, 185, 186, 211

U.S. Const. amend. VI. . . . . . . . . . . . . . 5, 6, 7, 10, 11, 68

U.S. Const. amend. VIII. . 5, 6, 7, 8, 62, 68, 78, 79, 84, 90, 92, 149, 150, 151, 162, 163, 164, 166, 167, 169, 170, 171, 173

U.S. Const. amend. XIV. . 4, 6, 7, 8, 10, 11, 61, 68, 78, 83, 92, 162, 166, 167, 169, 170, 171, 173, 175, 178, 183, 184, 185,

186,  188,  190

**United States Rules and Statutes**

28 U.S.C. 2254. . . . . . . . . . . .    1, 2, 13, 17, 19, 20, 21, 23

Antiterrorism and Effective Death Penalty Act of 1996 . 17, 19, 23,
24

Rule 201 Fed. Rules of Evidence . . . . . . . . . . . . . . . .    25

Rule 606(b)(2) Fed. Rules of Evidence.. . . . . . . . . . . . .    157

**California cases**

Conservatorship of Roulet, 23 Cal.3d 219 (1979).. . . . . . . .    75

In re Hitchings, 6 Cal.4th 97 (1993). . . . . . . . . .    155, 156

In re Sturm, 11 Cal.3d 258 (1974).. . . . . . . . . . . . . . .    80

People v. Adcox, 47 Cal.3d 207 (1988).. . . . . . . . . . . . .    93

People v. Adcox, California Supreme Court docket No. S004558. .    64

People v. Allison, California Supreme Court docket No. S004649.    66

People v. Allison, California Supreme Court docket No. S004649.    63

People v. Anderson, California Supreme Court docket No. S004385
    .. . . . . . . . . . . . . . . . . . . . . . . .    64, 67

People v. Ashmus, California Supreme Court docket No. S004723..    67

People v. Avalos, 37 Cal.3d 216 (1984). . . . . . . . . . . . .    175

People v. Avena, California Supreme Court docket No. S004422. .    66

People v. Bacigalupo, 6 Cal.4th 857 (1993). . . . . . . . . . . 57

People v. Bean, California Supreme Court docket No. S004387.. . 65,
66

People v. Belmontes, California Supreme Court S004467.. . . . 63, 66

People v. Benson, California Supreme Court docket No. S004763.. 63

People v. Benson, California Supreme Court docket No. S004763.. 66

People v. Bittaker, 48 Cal.3d 1046, cert. denied, 496 U.S. 931
(1990).. . . . . . . . . . . . . . . . . . . . . . . . 62

People v. Bonin, California Supreme Court docket No. S004565. . 65

People v. Brown, 40 Cal.3d 512 (1985).. . . . . . . . . . . . 172

People v. Brown, California Supreme Court docket No. S004451. . 63,
66

People v. Burnick, 14 Cal.3d 306 (1975).. . . . . . . . . . . 75

People v. Cain, California Supreme Court docket No. 5006544.. . 66,
67

People v. Carpenter, California Supreme Court docket No. S004654
. . . . . . . . . . . . . . . . . . . . . . . . 64, 65, 67

People v. Carrera, California Supreme Court docket No. S004569. 63,
64

People v. Clair, California Supreme Court docket No. S004789. . 66

People v. Coddington, California Supreme Court S008840 .. . . 63, 66

People v. Comtois, California Supreme Court docket No. S017116. 67

People v. Cooper, 53 Cal.3d 771 (1991). . . . . . . . . . . . 174

People v. Davenport, 41 Cal.3d 247 (1985).. . . . . . . . . . 164

People v. Davis, California Supreme Court docket No. S014636. . 64

People v. Deere, California Supreme Court docket No. S004722. . 65

1  People v. Dillon, 34 Cal.3d 441 (1984). . . . . . . . . . . . . . 59

2  People v. Dunkle, California Supreme Court docket No. S014200.. 64

3  People v. Dykes, 46 Cal. 4th 731 (2009).. . . . . . . . . . . . 32

4  People v. Edwards, California Supreme Court docket No. S004755. 63,

5                                                                 66

6  People v. Fauber, California Supreme Court docket No. S005868.. 64,

7                                                                 66

8  People v. Fierro, 1 Cal.4th 173 (1991). . . . . . . . . . 89, 92

9  People v. Freeman, California Supreme Court docket No. S004787. 63,

10                                                             64, 67

11  People v. Frierson, California Supreme Court docket No. S004761

12  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

13  People v. Ghent, California Supreme Court docket No. S004309. . 63

14  People v. Ghent, California Supreme Court docket No. S004309. . 66

15  People v. Gonzalez, 51 Cal.3d 1179 (1990).. . . . . . . . . . . 22

16  People v. Grant, 45 Cal.3d 829 (1988).. . . . . . . . . . . . 174

17  People v. Hamilton, 48 Cal.3d 1142 (1989).. . . . . . . . . . 164

18  People v. Hamilton, California Supreme Court docket No. S004363

19  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

20  People v. Hardy, 2 Cal.4th 86, cert. denied, 113 S.Ct. 498 (1992)

21  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

22  People v. Hawkins, California Supreme Court docket No. S014199. 63

23  People v. Hayes, 52 Cal.3d 577 (1990).. . . . . . . . . . . . 174

24  People v. Hernandez, 47 Cal.3d 315 (1988).. . . . . . . . . . 175

25  People v. Hillhouse, 27 Cal. 4th 469 (2002).. . . . . . . . . . 59

26  People v. Hines, 15 Cal.4th 997 (1997). . . . . . . . . . . . . 83

27

28

People v. Howard, California Supreme Court docket No. S004452.. 63, 66

People v. Jackson, California Supreme Court docket No. S010723. 66

People v. Jennings, 53 Cal.3d 334 (1991). . . . . . . . . . . . 63

People v. Jennings, 53 Cal.3d 334 (1991). . . . . . . . 150, 151

People v. Jones, 17 Cal.4th 279 (1998). . . . . . . . . . . . . 152

People v. Kaurish, 52 Cal.3d 648 (1990).. . . . . . . . . . . . 64

People v. Kimble, California Supreme Court docket No. S004364.. 65

People v. Kipp, California Supreme Court docket No. 5009169.. . 65, 66

People v. Livaditis, California Supreme Court docket No. S004767 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

People v. Lucas, California Supreme Court docket No. S004788. . 63, 64

People v. Lucero, California Supreme Court docket No. S012568.. 66

People v. Marshall, 50 Cal.3d 907 (1990). . . . . . . . . . . . 89

People v. Martin, 42 Cal.3d 437 (1986). . . . . . . . . . . . . 80

People v. Mayberry, 15 Cal.3d 143 (1975). . . . . . . . . . . . 175

People v. McElheny, 137 Cal.App.3d 396 (1982).. . . . . . . . . 175

People v. McLain, California Supreme Court docket No. S004370.. 63

People v. McLain, California Supreme Court docket No. S004370.. 66

People v. McPeters, California Supreme Court docket No. S004712 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

People v. Melton, California Supreme Court docket No. 5004518.. 65

People v. Miranda, California Supreme Court docket No. S004464. 63

People v. Morales, 48 Cal.3d 527 (1989).. . . . . . . . . . . . 59

People v. Morales, California Supreme Court docket No. S004552.    64

People v. Morales, California Supreme Court Docket S004552. . .    63

People v. Nicolaus, 54 Cal.3d 551 (1991), cert. denied, 112 S.Ct.

    3040 (1992). . . . . . . . . . . . . . . . . . . . . . . .    62

People v. Osband, California Supreme Court docket No. S005233..    63

People v. Padilla, California Supreme Court docket No. S014496.    64

People v. Phillips, 41 Cal.3d 29 (1985).. . . . . . . . . . .    65

People v. Reilly, California Supreme Court docket No. 5004607..    66

People v. Reynolds, 205 Cal.App.3d 775 (1988).. . . . . . . .    175

People v. Robertson, 33 Cal.3d 21 (1982). . . . . . . . . . .    150

People v. Romero, 8 Cal. 4th 728 (1994).. . . . . . . . . .    21, 22

People v. Samayoa, California Supreme Court docket No. S006284.    65

People v. Sanders, 51 Cal.3d 471 (1990).. . . . . . . . . . .    166

People v. Scott, California Supreme Court docket No. S010334. .    66

People v. Sheldon, 48 Cal.3d 935 (1989).. . . . . . . . . . .    150

People v. Stewart, California Supreme Court docket No. S020803.    63

People v. Superior Court (Engert), 31 Cal.3d 797 (1982).. . . .    57

People v. Vacca, 38 Cal.App.4th 804 (1995). . . . . . . . . .    165

People v. Viscotti, California Supreme Court docket No. S004597

    . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    63

People v. Von Villas, 11 Cal.App.4th 175 (1992), cert. den. 510

    U.S. 838 (1993). . . . . . . . . . . . . . . . . . . . .    156

People v. Walker, 47 Cal.3d 605 (1988), cert. denied, 494 U.S. 1038

    (1990).. . . . . . . . . . . . . . . . . . . . . . . . .    62

People v. Webb, California Supreme Court docket No. S006938.. .    64

People v. Williams, California Supreme Court docket No. S004365

. . . . . . . . . . . . . . . . . . . . . . . . . . 64

People v. Zapien, California Supreme Court docket No. S004762.. 63, 64

**California Constitutional provisions**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Cal. Constitution, Art. I § 15. . . . . . . . . 8, 9, 10, 11, 164

Cal. Constitution, Art. I § 16. . . . . . . . . . . . . . . 7

Cal. Constitution, Art. I § 17. . . . . . . . . . . 7, 8, 9, 10

Cal. Constitution, Art. I § 7. . . . . . . . . . . . . . . 7

Cal. Constitution, Art. I § 7. . . . . . . . . . . . . . . 8

Cal. Constitution, Art. I § 7. . . . . . . . . . . . . . . xx

**California Rules and Statutes**

Cal. Rules of Court 420(b). . . . . . . . . . . . . . . . 78

CALJIC No. 17.15. . . . . . . . . . . . . . . . . . . . 75

CALJIC No. 8.67.. . . . . . . . . . . . . . . . . . . . 143

CALJIC No. 8.85.. . . . . . . . . . . 6, 162, 166, 167, 169, 210

CALJIC NO. 8.88. . . . . . . 6, 170, 171, 172, 173, 174, 194, 210

Evid. Code § 1150.. . . . . . . . . . . . . . . . 152, 156, 157

Evid. Code § 1200.. . . . . . . . . . . . . . . . . . . . 156

1  Evidence Code § 520.. . . . . . . . . . . . . . . . . . . . . 78

2  Penal Code § 1170(c). . . . . . . . . . . . . . . . . . 81, 91

3  Penal Code § 1181(7). . . . . . . . . . . . . . . . . . 82, 83

4  Penal Code § 12022.5. . . . . . . . . . . . . . . 2, 3, 4, 30

5  Penal Code § 12022.7. . . . . . . . . . . . . . . . . . . . 30

6  Penal Code § 1203.06. . . . . . . . . . . . . . . 2, 3, 4, 30

7  Penal Code § 1203.075.. . . . . . . . . . . . . . . . . . . 30

8  Penal Code § 1203.09(a).. . . . . . . . . . . . . . . 3, 4, 30

9  Penal Code § 1260.. . . . . . . . . . . . . . . . . . . 82, 83

10  Penal Code § 187. . . . . . . . . . . . . . . . . . . 2, 3, 30

11  Penal Code § 189. . . . . . . . . . . . . . . . . . . . . . 59

12  Penal Code § 190.2. . . . . . . . . . 3, 6, 30, 57, 59, 71, 90, 189

13  Penal Code § 190.3. . . . 5, 6, 61, 62, 72, 76, 87, 89, 91, 145, 149,

14                           150, 151, 159, 171, 172, 173

15  Penal Code § 190.7. . . . . . . . . . . . . . . . . . . . . 71

16  Penal Code § 211. . . . . . . . . . . . . . . . . . . 3, 4, 30

17  Penal Code § 664. . . . . . . . . . . . . . . . . . . . 30, 143

18

19

20  **Miscellaneous additional authorities**

21

22  18 Charles A. Wright, et al., (1981) Federal Practice & Procedure

23      § 4418.. . . . . . . . . . . . . . . . . . . . . . . . . 146

24  Article VI, Section 2 of the International Covenant on Civil and

25      Political Rights.. . . . . . . . . . . . . . . . . . . . 90

26  Bowers, Research on the Death Penalty: Research Note (1993) 27 Law

27

28

1  & Society Rev. 157, 170. . . . . . . . . . . . . . . . . . 176

2  Ga. Stat. Ann. § 27-2537(c).. . . . . . . . . . . . . . . . 88

3  J. Acker and C. Lanier, Matters of Life or Death: The Sentencing

4      Provisions in Capital Punishment Statutes (1995) 31

5      Crim.L.Bull. 19. . . . . . . . . . . . . . . . . . . . . 75

6  Kozinski and Gallagher (1995) Death, The Ultimate Run-On Sentence,

7      46 Case W. Res.L.Rev. 1. . . . . . . . . . . . . . . . . 90

8  Local Rule 3-5 of the U.S. District Court for the Northern District

9      of California. . . . . . . . . . . . . . . . . . . . . . 13

10 Shatz and Rivkind, The California Death Penalty Scheme: Requiem for

11     Furman?, 72 N.Y.U. L.Rev. 1283, 1324-26 (1997).. . . . . . 60

12 State v. Wood, 648 P.2d 71 (Utah 1982). . . . . . . . . . . 69, 75

13 Webster's New World Dictionary (3d College ed. 1989) 1336.. . . 173

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28