# PROPOSITION 34 DEATH PENALTY. INITIATIVE STATUTE.

**OFFICIAL TITLE AND SUMMARY**      **PREPARED BY THE ATTORNEY GENERAL**

## DEATH PENALTY. INITIATIVE STATUTE.

- Repeals death penalty as maximum punishment for persons found guilty of murder and replaces it with life imprisonment without possibility of parole.
- Applies retroactively to persons already sentenced to death.
- States that persons found guilty of murder must work while in prison as prescribed by the Department of Corrections and Rehabilitation, with their wages subject to deductions to be applied to any victim restitution fines or orders against them.
- Directs $100 million to law enforcement agencies for investigations of homicide and rape cases.

**Summary of Legislative Analyst's Estimate of Net State and Local Government Fiscal Impact:**

- State and county savings related to murder trials, death penalty appeals, and corrections of about $100 million annually in the first few years, growing to about $130 million annually thereafter. This estimate could be higher or lower by tens of millions of dollars, largely depending on how the measure is implemented and the rate at which offenders would otherwise be sentenced to death and executed in the future.
- One-time state costs totaling $100 million for grants to local law enforcement agencies to be paid over the next four years.

## ANALYSIS BY THE LEGISLATIVE ANALYST

### BACKGROUND

***Murder and the Death Penalty.*** First degree murder is generally defined as the unlawful killing of a human being that (1) is deliberate and premeditated or (2) takes place at the same time as certain other crimes, such as kidnapping. It is punishable by a life sentence in state prison with the possibility of being released by the state parole board after a minimum of 25 years. However, current state law makes first degree murder punishable by death or life imprisonment without the possibility of parole when specified "special circumstances" of the crime have been charged and proven in court. Existing state law identifies a number of special circumstances that can be charged, such as in cases when the murder was carried out for financial gain, was especially cruel, or was committed while the defendant was engaged in other specified criminal activities. A jury generally determines which penalty is to be applied when special circumstances have been charged and proven.

***Implementation of the Death Penalty in California.*** Murder trials where the death penalty is sought are divided into two phases. The first phase involves determining whether the defendant is guilty of murder and any charged special circumstances, while the second phase involves determining whether the death penalty should be imposed. Under existing state law, death penalty verdicts are automatically appealed to the California Supreme Court. In these "direct appeals," the defendants' attorneys argue that violations of state law or federal constitutional law took place during the trial, such as evidence improperly being included or excluded from the trial. If the California Supreme Court confirms the conviction and death sentence, the defendant can ask the U.S. Supreme Court to review the decision. In addition to direct appeals, death penalty cases ordinarily involve extensive legal challenges in both state and federal courts. These challenges involve factors of the case different from those considered in direct appeals (such as the claim that the defendant's counsel was ineffective) and are commonly referred to as "habeas corpus" petitions. Finally, inmates who have received a sentence of death may also request that the Governor reduce their sentence. Currently, the proceedings that follow a death sentence can take a couple of decades to complete in California.

Both the state and county governments incur costs related to murder trials, including costs for the courts and prosecution, as well as for the defense of persons charged with murder who cannot afford legal

# PROP 34 DEATH PENALTY. INITIATIVE STATUTE.

**ANALYSIS BY THE LEGISLATIVE ANALYST** *CONTINUED*

representation. In addition, the state incurs costs for attorneys employed by the state Department of Justice that seek to uphold death sentences in the appeals process. Various state agencies (including the Office of the State Public Defender and the Habeas Corpus Resource Center) are tasked with providing representation to individuals who have received a sentence of death but cannot afford legal representation.

Since the current death penalty law was enacted in California in 1978, around 900 individuals have received a death sentence. Of these, 14 have been executed, 83 have died prior to being executed, and about 75 have had their sentences reduced by the courts. As of July 2012, California had 725 offenders in state prison who were sentenced to death. Most of these offenders are at various stages of the direct appeal or habeas corpus review process. Condemned male inmates generally are housed at San Quentin State Prison (on death row), while condemned female inmates are housed at the Central California Women's Facility in Chowchilla. The state currently has various security regulations and procedures that result in increased security costs for these inmates. For example, inmates under a death sentence generally are handcuffed and escorted at all times by one or two officers while outside of their cells. In addition, these offenders are currently required to be placed in separate cells, whereas most other inmates share cells.

## PROPOSAL

This measure repeals the state's current death penalty statute. In addition, it generally requires murderers to work while in prison and provides new state funding for local law enforcement on a limited-term basis.

*Elimination of Death Sentences.* Under this measure no offender could be sentenced to death by the state. The measure also specifies that offenders currently under a sentence of death would not be executed and instead would be resentenced to a prison term of life without the possibility of parole. This measure also allows the California Supreme Court to transfer all of its existing death penalty direct appeals and habeas corpus petitions to the state's Courts of Appeal or superior courts. These courts would resolve issues remaining even after changing these sentences to life without the possibility of parole.

*Inmate Work Requirement.* Current state law generally requires that inmates—including murderers—work while they are in prison. California regulations allow for some exceptions to these work requirements, such as for inmates who pose too great a security risk to participate in work programs. In addition, inmates may be required by the courts to make payments to victims of crime. This measure specifies that every person found guilty of murder must work while in state prison and have their pay deducted for any debts they owe to victims of crime, subject to state regulations. Because the measure does not change state regulations, existing prison practices related to inmate work requirements would not necessarily be changed.

*Establishment of Fund for Local Law Enforcement.* The measure establishes a new special fund, called the SAFE California Fund, to support grants to police departments, sheriffs' departments, and district attorneys' offices for the purpose of increasing the rate at which homicide and rapes are solved. For example, the measure specifies that the money could be used to increase staffing in homicide and sex offense investigation or prosecution units. Under the measure, a total of $100 million would be transferred from the state General Fund to the SAFE California Fund over four years—$10 million in 2012–13 and $30 million in each year from 2013–14 through 2015–16. Monies in the SAFE California Fund would be distributed to local law enforcement agencies based on a formula determined by the state Attorney General.

## FISCAL EFFECTS

The measure would have a number of fiscal effects on the state and local governments. The major fiscal effects of the measure are discussed below.

### Murder Trials

*Court Proceedings.* This measure would reduce state and county costs associated with some murder cases that would otherwise have been eligible for the death penalty under current law. These cases would likely be less expensive if the death penalty was no longer an option for two primary reasons. First, the duration of some trials would be shortened. This is because there would no longer be a separate phase to determine

34

**PROP 34** DEATH PENALTY. INITIATIVE STATUTE.

ANALYSIS BY THE LEGISLATIVE ANALYST                                                                                          CONTINUED

whether the death penalty is imposed. Other aspects of murder trials could also be shortened. For example, jury selection time for some trials could be reduced as it would no longer be necessary to remove potential jurors who are unwilling to impose the death penalty. Second, the elimination of the death penalty would reduce the costs incurred by counties for prosecutors and public defenders for some murder cases. This is because these agencies generally use more attorneys in cases where a death sentence is sought and incur greater expenses related to investigations and other preparations for the penalty phase in such cases.

*County Jails.* County jail costs could also be reduced because of the measure's effect on murder trials. Persons held for trial on murder charges, particularly cases that could result in a death sentence, ordinarily remain in county jail until the completion of their trial and sentencing. As some murder cases are shortened due to the elimination of the death penalty, the persons being charged with murder would spend less time in county jail before being sent to state prison. Such an outcome would reduce county jail costs and increase state prison costs.

*Savings.* The state and counties could achieve several tens of millions of dollars in savings annually on a statewide basis from reduced costs related to murder trials. The actual amount of savings would depend on various factors, including the number of death penalty trials that would otherwise occur in the absence of the measure. It is also possible that the state and counties would redirect some of their court-related resources to other court activities. Similarly, the county jail savings would be offset to the extent that jail beds no longer needed for defendants in death penalty trials were used for other offenders, such as those who are now being released early because of a lack of jail space in some counties.

The above savings could be partially offset to the extent that the elimination of the death penalty reduced the incentive for offenders to plead guilty in exchange for a lesser sentence in some murder cases. If the death penalty is prohibited and additional cases go to trial instead of being resolved through plea agreements, additional state and county costs for support of courts, prosecution, and defense counsel, as well as county jails, could result. The extent to which this would occur is unknown.

### Appellate Litigation

Over time, the measure would reduce state expenditures by the California Supreme Court and the state agencies participating in the death penalty appeal process. These state savings would reach about $50 million annually. However, these savings likely would be partially offset in the short run because some state expenditures for appeals would probably continue until the courts resolved all pending appeals for inmates who previously received death sentences. In the long run, there would be relatively minor state and local costs—possibly totaling about $1 million annually—for hearing appeals from additional offenders receiving sentences of life without the possibility of parole.

### State Corrections

The elimination of the death penalty would affect state prison costs in different ways. On the one hand, its elimination would result in somewhat higher prison population and higher costs as formerly condemned inmates are sentenced to life without the possibility of parole. Given the length of time that inmates currently spend on death row, these costs would likely not be major. On the other hand, these added costs likely would be more than offset by the savings generated by not having to house hundreds of inmates on death row. As previously discussed, it is generally more expensive to house an inmate under a death sentence than an inmate subject to life without the possibility of parole, due to higher and more expensive security measures to house and supervise inmates sentenced to death.

The net effect of these fiscal impacts would likely be a net reduction in state costs for the operation of the state's prison system, potentially in the low tens of millions of dollars annually. These savings, however, could be higher or lower for various reasons. For example, if the rate of executions that were to occur in the future in the absence of the measure increased, the future cost of housing inmates who have been sentenced to death would be reduced. Therefore, there would be lower correctional savings resulting from this measure's provisions eliminating the death penalty. Alternatively, if the number of individuals sentenced to death in the future in the absence of the measure were to increase, the cost to house these individuals in

| PROP | |
|---|---|
| **34** | **DEATH PENALTY. INITIATIVE STATUTE.** |

**ANALYSIS BY THE LEGISLATIVE ANALYST** **CONTINUED**

prison would also increase. Under this scenario, eliminating the death penalty would result in higher correctional savings than we have estimated.

### General Fund Transfers to the SAFE California Fund

The measure requires that a total of $100 million be transferred from the state General Fund to the SAFE California Fund from 2012–13 through 2015–16. As a result, less General Fund resources would be available to support various other state programs in those years, but more funding would be available for local government agencies that receive these grants. To the extent that funding provided from the SAFE California Fund to local agencies results in additional arrests and convictions, the measure could increase state and county costs for trial court, jail, and prison operations.

### Other Fiscal Effects

*Prison Construction.* The measure could also affect future prison construction costs by allowing the state to avoid future facility costs associated with housing an increasing number of death row inmates. However, the extent of any such savings would depend on the future growth in the condemned inmate population, how the state chooses to house condemned inmates in the future, and the future growth in the general prison population.

*Effect on Murder Rate.* To the extent that the prohibition on the use of the death penalty has an effect on the incidence of murder in California, the measure could affect state and local government criminal justice expenditures. The resulting fiscal impact, if any, is unknown.

### Summary

In total, the measure would result in net savings to state and local governments related to murder trials, appellate litigation, and state corrections. These savings would likely be about $100 million annually in the first few years, growing to about $130 million annually thereafter. The actual amount of these annual savings could be higher or lower by tens of millions of dollars, depending on various factors including how the measure is implemented and the rate of death sentences and executions that would take place in the future if this measure were not approved by voters. In addition, the measure would require the state to provide a total of $100 million in grants to local law enforcement agencies over the next four years.

**34**