1   Kamala D. Harris
    Attorney General of California
2   Dane R. Gillette
    Chief Assistant Attorney General
3   Gerald A. Engler
    Senior Assistant Attorney General
4   Alice B. Lustre
    Deputy Attorney General
5   Eric D. Share
    Supervising Deputy Attorney General
6   State Bar No. 151230
     455 Golden Gate Avenue, Suite 11000
7    San Francisco, CA 94102-7004
     Telephone: (415) 703-1375
8    Fax: (415) 703-1234
     E-mail: Eric.Share@doj.ca.gov
9   *Attorneys for Respondent*

10                    IN THE UNITED STATES DISTRICT COURT

11              FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                          SAN FRANCISCO DIVISION

13

14

15  **ERNEST EDWARD DYKES,**                    **CAPITAL CASE**

                                  Petitioner,   11-CV-04454-SI
16
                                                **ANSWER TO PETITION FOR WRIT OF**
17        v.                                     **HABEAS CORPUS**

18  **KEVIN CHAPPELL, Warden of San**
    **Quentin State Prison,**
19
                                  Respondent.
20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    CUSTODY .................................................................................. 1

II.    PROCEDURAL HISTORY ..................................................... 1

III.    VERIFICATION ...................................................................... 2

IV.    EXHAUSTION OF STATE REMEDIES ............................... 2

V.    TIMELINESS ............................................................................ 3

VI.    RULE 5 STATEMENT ............................................................. 3

VII.    INCORPORATION BY REFERENCE ................................... 7

VIII.    STANDARD OF REVIEW ...................................................... 7

IX.    PETITIONER'S BURDEN OF ESTABLISHING ENTITLEMENT TO RELIEF ..................................................................................... 9

X.    NEW RULES .......................................................................... 10

XI.    FACTUAL FINDINGS BY THE STATE COURT ............... 10

XII.    GENERAL DENIAL ............................................................. 14

XIII.    CLAIMS FOR RELIEF ........................................................ 15

     A.    Claim 1: Petitioner's Death Sentence is Not Invalid; California's Death Penalty Scheme Is Not "Fundamentally Flawed" ........................ 15

         1.    California's Death Penalty Statute Sufficiently Narrows the Class of Eligible Offenders .......................................... 15

         2.    Penal Code Section 190.3, Factor (a), Does Not Allow for an Arbitrary and Capricious Imposition of the Death Penalty ...... 18

         3.    The Failure to Require Proof Beyond a Reasonable Doubt for Aggravating Factors Does Not Render California's Death Penalty Scheme Unconstitutional .................................... 20

         4.    That Written Findings Regarding Aggravating Factors Are Not Required Does Not Render California's Death Penalty Scheme Unconstitutional; Petitioner's Argument Regarding the California Supreme Court's Power to Modify a Death Sentence Does Not Present a Claim on Which Federal Habeas Relief Can Be Granted ........................................ 24

             a.    Unanimous written findings regarding aggravating factors are not required by the United States Constitution .............................................................. 25

             b.    Petitioner's assertions regarding the California Supreme Court's power to modify a death sentence do not present a claim on which habeas relief can be granted .................................................................... 26

         5.    Petitioner's Sentence Is Not Disproportionate to His Personal Culpability and Does Not Violate the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment ......................................................... 28

i

**TABLE OF CONTENTS**
(continued)

Page

6.  The Absence of Intercase Proportionality Review Does Not Render the California Death Penalty Statute Unconstitutional ........................................................................... 34

7.  Prosecutorial Charging Discretion Does Not Render California's Death Penalty Statute Unconstitutional .................. 35

8.  Petitioner's Contention that His Sentence Is "Outside the Norm" Does Not Present A Claim on which Habeas Relief Can Be Granted ...................................................................... 37

9.  Alleged Fluctuating Support for the Death Penalty in California Does Not Render Its Imposition a Violation of the Eighth Amendment ................................................................ 40

B.  Claim 2:  Petitioner Fails to Establish that His Trial Counsel Rendered Ineffective Assistance ................................................ 42

    1.  Introduction:  Petitioner's Allegation that the Prosecutor Conceded the Case for the Death Penalty Was Weak Is Misleading and Incorrect ...................................................... 42

    2.  Legal Standard for Assessing a Claim of Ineffective Assistance of Counsel ............................................................ 43

    3.  Trial Counsel's Strategy ........................................................ 44

        a.  Exclusion of evidence of petitioner's acts of arson as a juvenile .................................................................... 44

        b.  Seeking sympathy and mercy for petitioner and his family ........................................................................ 47

    4.  Defense Investigative Efforts ................................................ 49

        a.  Defense investigator ........................................................ 49

        b.  Trial counsel's investigative efforts ............................... 51

    5.  Mental Health and Social History Investigation ...................... 53

    6.  Alleged Evidence of "Redeeming Qualities" ............................ 57

    7.  Contrary to Petitioner's Assertions, there Was No Evidence that He Displayed Timely and Genuine Remorse ..................... 59

    8.  Counsel Was Not Incompetent for Failing to Introduce Additional Information About Petitioner's Family Life and Social History ........................................................................ 65

    9.  It Was a Reasonable Tactical Choice for Counsel Not to Present Evidence About the Neighborhoods in which Petitioner Had Resided ......................................................... 69

    10. Trial Counsel Was Not Ineffective for Choosing Not to Emphasize Petitioner's Alleged Mental Illness .......................... 70

    11. Ultimately, Petitioner Has Failed to Establish Ineffective Assistance of Counsel ............................................................ 73

ii

**TABLE OF CONTENTS**
(continued)

Page

C.  Claim 3:  Petitioner's Claims of Jury Misconduct Are Without
Merit ............................................................................................ 76

1.  Petitioner's Claim that the Jury or the Trial Court
Committed Misconduct By Violating Principles of Double
Jeopardy or Collateral Estoppel is Procedurally Defaulted
and, in Any Event, the State Court's Alternative Denial on
the Merits Does Not Violate AEDPA ........................................ 76

a.  Procedural background ................................................... 77

b.  Review of this claim is barred by procedural default ....... 82

c.  The state court's alternative finding that the claim
lacks merit is not contrary to or an unreasonable
application of Supreme Court precedent .......................... 83

2.  The California Supreme Court's Finding that the Trial Court
Did Not Err in Denying Petitioner's Motion for New Trial
Based on Alleged Jury Misconduct Does Not Violate 28
U.S. C. § 2254(d) ..................................................................... 85

a.  Procedural background ................................................... 86

b.  The claims of misconduct not included in the motion
for new trial are procedurally defaulted .......................... 88

c.  For the claims that were properly preserved, the
California Supreme Court's denial on the merits was
not contrary to or an unreasonable application of
Supreme Court precedent. ............................................... 89

D.  Claim 4:  Petitioner's Challenges to the Standard California Jury
Instructions Regarding the Death Penalty Are Without Merit ................ 96

1.  The Jury Was Not Misled Regarding How it Should Weigh
Aggravating and Mitigating Factors ........................................... 96

2.  California's Standard Jury Instruction on the Weighing of
Aggravating and Mitigating Circumstances Is Not
Unconstitutional ...................................................................... 102

E.  Claim 5:  California's Death Penalty Scheme Is Not
Unconstitutional "in How and What it Allows Juries to Use as
Evidence in Aggravation" .................................................................. 108

1.  The Absence of a Unanimity Requirement as to
Aggravating Factors Does Not Render California's Death
Penalty Scheme Unconstitutional ............................................. 108

a.  Background .................................................................. 109

b.  The California Supreme Court's rejection of
petitioner's claim ........................................................ 111

c.  The California Supreme Court's resolution of
petitioner's challenge to the jury instructions is not
contrary to or an unreasonable application of
Supreme Court law ...................................................... 112

iii

**TABLE OF CONTENTS**
(continued)

Page

2. Evidence that Petitioner Possessed a Loaded and Concealed Firearm Was Admissible Under California Law in the Penalty Phase, and Admission of the Evidence Did Not Violate Petitioner's Constitutional Rights ................................. 114

F. Claim 6:  The Trial Court Did Not Commit Federal Constitutional Error in Refusing to Modify a Standard Jury Instruction on the Duties of the Jurors ............................................................................. 119

G. Claim 7:  Petitioner's Challenges to California's Method of Execution Do Not Provide a Basis for Federal Habeas Relief .............. 123

H. Claim 8:  Petitioner's Overbroad Claim of Cumulative Error Fails ....... 126

CONCLUSION ........................................................................................................... 129

1

## TABLE OF AUTHORITIES

2

__Page__

3      CASES

4      *Agostini v. Felton*
          521 U.S. 203 (1997)..................................................................................................... 99
5

6      *Apprendi v. New Jersey*
          530 U.S. 466 (2000).............................................................................................. passim
7

       *Arave v. Creech*
8         507 U.S. 463 (1993)..................................................................................................... 17

9      *Ashe v. Swenson*
          397 U.S. 436 (1970)............................................................................................... 78, 85
10

11     *Atkins v. Virginia*
          536 U.S. 304 (2002)..................................................................................................... 52
12

13     *Baze v. Rees*
          553 U.S. 35 (2008)..................................................................................................... 124

14     *Beck v. Alabama*
          447 U.S. 625 (1980)................................................................................................... 102
15

16     *Bell v. Cone*
          535 U.S. 685 (2002)................................................................................................ 9, 75
17

18     *Blakely v. Washington*
          542 U.S. 296 (2004).......................................................................................... 23, 114
19

20     *Blystone v. Pennsylvania*
          494 U.S. 299 (1990)..................................................................................................... 16
21

       *Boyde v. Brown*
22        404 F. 3d 1159 (9th Cir. 2005) .................................................................................. 118

23     *Bradshaw v. Richey*
          546 U.S. 74 (2005)..................................................................................................... 117
24

25     *Brecht v. Abrahamson*
          507 U.S. 619 (1993)....................................................................................................... 8

26     *Brown v. Ornoski*
          503 F. 3d 1006 (9th Cir. 2007) .................................................................................. 126
27

28     *Bullington v. Missouri*
          451 U.S. 430 (1981)................................................................................................... 114

v

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Burger v. Kemp*
    483 U.S. 776 (1987)...........................................................................................75

*Calderon v. Coleman*
    525 U.S. 141 (1998).........................................................................................122

*Caldwell v. Mississippi*
    472 U.S. 320 (1985)...........................................................................................94

*California v. Brown*
    479 U.S. 538 (1987).........................................................................................123

*Carey v. Musladin*
    549 U.S. 70 (2006).............................................................................................26

*Chaidez v. United States*
    __ U.S. __, 133 S. Ct. 1103 (2013)...............................................................39, 40

*Coleman v. Thompson*
    501 U.S. 722 (1991)...........................................................................................82

*CSX Transp., Inc. v. Hensley*
    556 U.S. 838 (2009).........................................................................................122

*Cullen v. Pinholster*
    563 U.S. __, 131 S. Ct. 1388 (2011)..........................................................passim

*Cunningham v. California*
    549 U.S. 270 (2007)..............................................................21, 23, 112, 114

*Dykes v. California*
    558 U.S. 1127 (2010)...........................................................................................2

*Eddings v. Oklahoma*
    455 U.S. 104 (1982)...........................................................................................36

*Estelle v. McGuire*
    502 U.S. 62 (1991).....................................................................................passim

*Fairbanks v. Ayers*
    650 F. 3d 1243 (9th Cir. 2011) .......................................................................83, 89

*Featherstone v. Estelle*
    948 F. 2d 1497 (9th Cir. 1991) .............................................................................89

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Ford v. Wainwright*
    477 U.S. 399 (1986)..................................................................................... 102

*Fry v. Pliler*
    551 U.S. 112 (2007)......................................................................................... 8

*Furman v. Georgia*
    408 U.S. 238 (1972)................................................................................... 17, 39

*Godfrey v. Georgia*
    446 U.S. 420 (1980)....................................................................................... 17

*Gray v. Lucas*
    677 F. 2d 1086 (1982)................................................................................... 17

*Gregg v. Georgia*
    428 U.S. 153 (1976)................................................................17, 25, 36, 37

*Hamilton v. Vasquez*
    17 F. 3d 1149 (9th Cir. 1994).................................................................... 118

*Harrington v. Richter*
    562 U.S. __, 131 S. Ct. 770 (2011)....................................................7, 8, 9, 44

*Harris v. Pulley*
    692 F. 2d 1189 (9th Cir. 1982)........................................................23, 24, 25, 26

*Harris v. Reed*
    489 U.S. 255 (1988)....................................................................................... 82

*Hicks v. Feiock*
    485 U.S. 624 (1988)..................................................................................... 117

*Hicks v. Oklahoma*
    447 U.S. 343 (1980)............................................................................... 80, 105

*In re Andrews*
    28 Cal. 4th 1234 (2002) ............................................................................... 75

*In re Clark*
    5 Cal. 4th 750 (1993)............................................................................50, 66, 70

*In re Gallego*
    18 Cal. 4th 825 (1998) ............................................................................ 51, 65

vii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*In re Lynch*
   8 Cal. 3d 410 (1972) .................................................................. 28

*In re Waltreus*
   62 Cal. 2d 218 (1965) ................................................................ 86

*Jammal v. Van de Kamp*
   926 F. 2d 918 (9th Cir. 1991) ................................................... 118

*Jones v. Thieret*
   846 F. 2d 457 (7th Cir. 1988) ................................................... 117

*Jurek v. Texas*
   428 U.S. 262 (1976) .................................................................. 36

*Karis v. Calderon*
   283 F. 3d 1117 (9th Cir. 2002) ............................................ 16, 17

*Kelly v. South Carolina*
   534 U.S. 246 (2011) .................................................................. 94

*Knowles v. Mirzayance*
   556 U.S. 111 (2009) ............................................................ passim

*Lewis v. Jeffers*
   497 U.S. 764 (1990) ................................................................ 122

*Lockett v. Ohio*
   438 U.S. 586 (1978) ......................................................... 106, 107

*Lowenfield v. Phelps*
   484 U.S. 231 (1988) ............................................................ 16, 29

*Lucky v. Calderon*
   86 F. 3d 923 (9th Cir. 1996) ...................................................... 2

*Mayfield v. Woodford*
   270 F. 3d 915 (9th Cir. 2001) ................................................... 16

*McCleskey v. Kemp*
   481 U.S. 279 (1987) ............................................................ 16, 17

*Mendez v. Small*
   298 F. 3d 1154 (9th Cir. 2002) ................................................ 117

### TABLE OF AUTHORITIES
#### (continued)

Page

*Middleton v. McNeil*
541 U.S. 433 (2004)........................................................................... 121

*Monge v. California*
524 U.S. 721 (1998)........................................................................... 114

*Morrissey v. Brewer*
408 U.S. 471 (1982)............................................................................. 80

*Pace v. DiGuglielmo*
544 U.S. 408 (2005)............................................................................... 7

*Parker v. Dugger*
498 U.S. 308 (1991)........................................................................... 100

*Paulino v. Castro*
371 F. 3d 1083 (9th Cir. 2004) ...................................................... 83, 89

*Penry v. Lynaugh*
492 U.S. 302 (1989)............................................................................. 10

*People v. Anderson*
43 Cal. 3d 1104 (1987)........................................................................ 17

*People v. Arias*
13 Cal. 4th 92 (1996) ........................................................................ 105

*People v. Bacigalupo*
1 Cal. 4th 103 (1991) .................................................................... 23, 66

*People v. Bean*
46 Cal. 3d 919 (1988) ........................................................................ 29

*People v. Cain*
10 Cal. 4th 1 (1995) ........................................................................... 99

*People v. Carpenter*
15 Cal. 4th 312 (1997) ....................................................................... 23

*People v. Cornwell*
37 Cal. 4th 50 (2004) ....................................................................... 125

*People v. Cox*
53 Cal. 3d 618 (1991) ............................................................. 58, 60, 92

ix

# TABLE OF AUTHORITIES
### (continued)

**Page**

*People v. Crittenden*
  9 Cal. 4th 83 (1994) .................................................................19, 35, 36

*People v. Cromer*
  24 Cal. 4th 889 (2001) ...................................................................... 25

*People v. Cruz*
  44 Cal. 4th 636 (2008) ................................................................. 21, 35

*People v. Demetrulias*
  39 Cal. 4th 1 (2006) ................................................................... passim

*People v. Dickey*
  35 Cal. 4th 884 (2005) .................................................................... 113

*People v. Duvall*
  9 Cal. 4th 464 (1995) .................................................................. 50, 65

*People v. Dykes*
  46 Cal. 4th 731 (2009) ................................................................ passim

*People v. Earp*
  20 Cal. 4th 826 (1999) ...................................................................... 36

*People v. Fairbank*
  16 Cal. 4th 1223 (1997) .................................................................. 112

*People v. Farnam*
  28 Cal. 4th 107 (2002) ...........................................................46, 50, 70

*People v. Frierson*
  25 Cal. 3d 142 (1979) ................................................................. 24, 25

*People v. Gutierrez*
  28 Cal. 4th 1083 (2002) .................................................................. 106

*People v. Hayes*
  21 Cal. 4th 1211 (1999) ...........................................................58, 60, 92

*People v. Hume*
  196 Cal. App. 4th 990 (2011) ............................................................ 99

*People v. Jackson*
  28 Cal. 3d 264 (1980) ................................................................. 25, 59

x

### TABLE OF AUTHORITIES
**(continued)**

**Page**

*People v. Jenkins*
   22 Cal. 4th 900 (2000) ....................................................................... 18, 20

*People v. Johnson*
   6 Cal. 4th 1 (1993) .................................................................................. 106

*People v. Keenan*
   46 Cal. 3d 478 (1988) ............................................................................... 36

*People v. Lewis*
   26 Cal. 4th 334 (2001) .............................................................................. 95

*People v. Lucero*
   23 Cal. 4th 692 (2000) ...................................................................... 21, 100

*People v. McPeters*
   2 Cal. 4th 1148 (1992) ............................................................................. 105

*People v. Mickey*
   54 Cal. 3d 612 (1991) .............................................................................. 122

*People v. Musselwhite*
   17 Cal. 4th 1216 (1998) ........................................................................... 100

*People v. Page*
   44 Cal. 4th 1 (2008) .........................................................................100, 106

*People v. Prieto*
   30 Cal. 4th 226 (2003) .......................................................................107, 113

*People v. Prince*
   40 Cal. 4th 1179 (2007) ............................................................................ 35

*People v. Reyes*
   195 Cal. App. 3d 957 (1987) ..................................................................... 54

*People v. Riel*
   22 Cal. 4th 1153 (2000) ............................................................................ 95

*People v. Rodrigues*
   8 Cal. 4th 1060 (1994) ......................................................................... 42, 43

*People v. Salcido*
   44 Cal. 4th 93 (2008) .................................................................23, 114, 127

# TABLE OF AUTHORITIES
### (continued)

**Page**

*People v. Smith*
  35 Cal. 4th 334 (2005) ........................................................................... 104

*People v. Snow*
  30 Cal. 4th 43 (2003) ...................................................................... 22, 113

*People v. Steele*
  27 Cal. 4th 1230 (2002) ........................................................................... 58

*People v. Welch*
  20 Cal. 4th 701 (1999) ................................................................... 108, 121

*People v. Williams*
  45 Cal. 3d 1268 (1988) ................................................................ 58, 60, 92

*People v. Zamudio*
  43 Cal. 4th 327 (2008) ......................................................................... 107

*Pinholster v. Ayers*
  590 U.S. 651 (9th Cir. 2009) ................................................ 49, 51, 52, 56, 69

*Price v. North Carolina*
  512 U.S. 1249 (1994) ............................................................................. 95

*Proffitt v. Florida*
  428 U.S. 242 (1976) .............................................................................. 25

*Pulley v. Harris*
  465 U.S. 37 (1984) .......................................................................... passim

*Rich v. Calderon*
  187 F. 3d 1064 (9th Cir. 1999) ................................................................. 89

*Richardson v. Marsh*
  481 U.S. 200 (1987) ............................................................................ 122

*Ring v. Arizona*
  536 U.S. 584 (2002) ......................................................................... passim

*Roe v. Flores-Ortega*
  528 U.S. 470 (2000) .............................................................................. 75

*Romano v. Oklahoma*
  512 U.S. 1 (1994) .......................................................................... 80, 118

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Rupe v. Wood*
    93 F. 3d 1434 (9th Cir. 1996) ...................................................................... 118

*Schad v. Arizona*
    501 U.S. 624 (1991) .................................................................................... 112

*Schiro v. Farley*
    510 U.S. 222 (1994) ...................................................................................... 84

*Schriro v. Landrigan*
    550 U.S. 465 (2007) ........................................................................................ 7

*Shafer v. South Carolina*
    532 U.S. 36 (2001) ............................................................................... 94, 108

*Smith v. Spisak*
    558 U.S. 139 (2010) .................................................................................... 122

*Solem v. Helm*
    463 U.S. 277 (1983) ...................................................................................... 28

*Spaziano v. Florida*
    468 U.S. 447 (1984) ...................................................................................... 16

*Stewart v. LaGrand*
    526 U.S. 115 (1999) .................................................................................... 126

*Strickland v. Washington*
    466 U.S. 668 (1984) ............................................................................. passim

*Sully v. Ayers*
    725 F. 3d 1057 (9th Cir. 2013) ...................................................................... 53

*Tanner v. United States*
    483 U.S. 107 (1987) .......................................................................... 57, 90, 93

*Teague v. Lane*
    489 U.S. 288 (1989) .......................................................................... 10, 39, 40

*Tison v. Arizona*
    481 U.S. 137 (1987) ...................................................................................... 29

*Townsend v. Knowles*
    562 F. 3d 1200 (9th Cir. 2009) .................................................................... 122

1

## TABLE OF AUTHORITIES
### (continued)

2
**Page**

3

*Tuilaepa v. California*
    512 U.S. 967 (1994)................................................................................ passim

4

*Turner v. Calderon*
    281 F. 3d 851 (9th Cir. 2002) ....................................................................... 28

5

6

*United States v. Bagnariol*
    665 F. 2d 877 (9th Cir. 1981) ....................................................................... 92

7

8

*United States v. Hernandez-Escarsega*
    886 F. 2d 1560 (9th Cir. 1989) ..................................................................... 92

9

*United States v. Hove*
    (93-10219) ................................................................................................... 50

10

11

*United States v. Shryock*
    342 F. 3d 948 (9th Cir. 2003) ....................................................................... 90

12

13

*Vasquez v. Hillary*
    474 U.S. 254 (1986)...................................................................................... 2

14

*Waddington v. Sarausad*
    555 U.S. 179 (2009).................................................................................. 122

15

16

*Wainwright v. Sykes*
    433 U.S. 72 (1977)..........................................................................82, 83, 89

17

18

*Walker v. Martin*
    __ U.S. __, 131 S. Ct. 1120 (2011)........................................................7, 82, 83

19

*Wells v. Maass*
    28 F. 3d 1005 (9th Cir. 1994) ....................................................................... 82

20

21

*Wiggins v. Smith*
    539 U.S. 510 (2003)..................................................................................... 51

22

23

*Williams v. Calderon*
    52 F. 3d 1465 (1995).................................................................................... 24

24

*Williams v. Taylor*
    529 U.S. 362 (2000)...................................................................................... 9

25

26

*Woodford v. Visciotti*
    537 U.S. 19 (2002)..................................................................................... 7, 9

27

28

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Woodson v. North Carolina*
  428 U.S. 280 (1976)............................................................... 37

*Yarbough v. Alvarado*
  541 U.S. 652 (2004)............................................................... 44

*Ylst v. Nunnemaker*
  501 U.S. 797 (1991)........................................................... 83, 89

*Zant v. Stephens*
  462 U.S. 862 (1983)....................................................... 37, 100

STATUTES

Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA")................................. passim

California Evidence Code
  § 353.......................................................................... 83, 88
  § 1150........................................................................ 58, 65
  § 1150(a).......................................................................... 91
  § 1200(b).......................................................................... 65

California Penal Code
  § 187(a)............................................................................ 1
  §§ 189, 664(a)...................................................................... 1
  § 190.2........................................................................... 15
  § 190.2(a)(17)(A).............................................................. 1, 15
  § 190.3....................................................................... passim
  § 190.4........................................................................... 28
  § 190.4(e)..................................................................... 25, 26
  § 211.............................................................................. 1
  §§ 664, 189........................................................................ 1
  § 1170 (f)........................................................................ 35
  § 1181........................................................................ 26, 27
  § 1260............................................................................ 27
  § 12022.5.......................................................................... 1
  § 12022.7(c)....................................................................... 1

1

**TABLE OF AUTHORITIES**
(continued)

2

**Page**

3

United States Code, Title 28
    § 2254 ............................................................................................... 2, 8
    § 2254(b)(1) ........................................................................................ 37
    § 2254(d) ..................................................................................... passim
    § 2254(d)(1) .............................................................................7, 14, 41
    § 2254(d)(2) ........................................................................................ 15
    § 2254(e)(1) ........................................................................................ 10
    § 2254(e)(2)(B) .................................................................................. 39

8

**CONSTITUTIONAL PROVISIONS**

9

United States Constitution
    Second Amendment ........................................................................ 116
    Eighth Amendment ................................................................... passim
    Fourteenth Amendment ..............................................25, 26, 35, 124

12

**COURT RULES**

13

Federal Rules of Evidence
    Rule 606(b) ..............................................................................57, 65, 90
    Rule 606(b)(1) .........................................................................58, 60, 91
    Rule 802 .............................................................................................. 65

16

**OTHER AUTHORITIES**

17

CALJIC
    No. 1.03 ............................................................................................ 120
    No. 8.83 .............................................................................................. 95
    No. 8.84 ............................................................................................ 107
    No. 8.84.1 ..................................................................................119, 120
    No. 8.85 ...................................................................................... passim
    No. 8.87 ....................................................................................109, 110
    No. 8.88 ...................................................................................... passim

22

23

24

25

26

27

28

1    Respondent, Kevin Chappell, Warden of San Quentin State Prison, provides this Answer to

2    the Petition for Writ of Habeas Corpus ("Petition" or "Pet.").

3    **I.    CUSTODY**

4        Petitioner, Ernest Edward Dykes ("petitioner") is lawfully in the custody of Kevin

5    Chappell, Warden, pursuant to a valid judgment in *People v. Dykes*, 46 Cal. 4th 731 (2009)

6    (*Dykes*).  He was convicted by a jury in Alameda County on August 2, 1995, of the first degree

7    murder of Lance Clark (Cal. Penal Code § 187(a).)[1]  The jury also convicted petitioner of

8    attempted murder (Penal Code §§ 664, 189) and one count of robbery (Penal Code § 211), both

9    involving Lance Clark's grandmother, Bernice Clark.  In connection with each count, the jury

10   found true an allegation that petitioner personally used a firearm.  (Penal Code § 12022.5.)  With

11   respect to the charge of attempted murder, the jury found not true an allegation that the attempted

12   murder had been willful, deliberate, and premeditated.  (Penal Code §§ 189, 664(a).)  In

13   connection with the attempted murder and robbery counts, the jury found true the allegations that

14   the victim suffered great bodily injury and that she was a victim age 70 years or older.  (Penal

15   Code § 12022.7(c).)  The jury found true a robbery-murder special-circumstance allegation (Penal

16   Code § 190.2(a)(17)(A).)  *Dykes*, 46 Cal. 4th at 742; AG022067;[2] *see also* AG000585 (minute

17   order); AG000586-AG000589 (verdict forms).

18       On August 24, 1995, following the penalty-phase trial, the jury determined that the

19   punishment should be death.  *Dykes*, 46 Cal. 4th at 742; AG022068; *see also* AG000607 (verdict

20   form); AG000637 (minute order).  On December 22, 1995, the trial court imposed a sentence of

21   death and imposed sentence on the noncapital offenses.  *Dykes*, 46 Cal.4th at 742; AG022068; *see*

22   *also* AG000792-AG000793 (minute order) AG000868-AG000875 (commitment order).

23   **II.    PROCEDURAL HISTORY**

24       Following petitioner's automatic appeal, the California Supreme Court affirmed his

25   conviction and sentence in its entirety on June 15, 2009.  *Dykes*, 46 Cal. 4th at 742; AG022067-

26

27   [1] Further statutory references to the Penal Code are to the California Penal Code.
     [2] For this Court's convenience, when citing to the California Supreme Court's opinion in
28   this case, we give the official cite and the cite to the opinion in the lodged exhibits.

1

1    AG022180.  Petitioner filed a petition for writ of certiorari in the United States Supreme Court on

2    November 9, 2009.  AG022199-AG022219.  The Court denied the petition on January 11, 2010.

3    *Dykes v. California*, 558 U.S. 1127 (2010); AG022369.

4        Petitioner filed a state petition for writ of habeas corpus on July 6, 2004.  AG022370-

5    AG022790.  The California Supreme Court denied the petition on August 31, 2011.  AG025232.

6        On December 21, 2012, petitioner filed a petition for writ of habeas corpus in this Court.

7    **III.   VERIFICATION**

8        Rule 2 of the Rules Governing 28 U.S.C. § 2254 cases in the United States District Court

9    sets forth the form and requirement of a habeas corpus petition.  Rule 2(c) requires that the

10   petition "be signed and sworn by petitioner."  The petition here includes a verification by counsel

11   stating:  "To the best of my knowledge and based on my reading and what I believe to be true and

12   correct copies of the proceedings heard in this matter, the matters are alleged herein are true and

13   correct."  Pet. at 213-214.  There is no burden on petitioner to provide proof of authorization

14   beyond his attorney's verification.  *Lucky v. Calderon*, 86 F. 3d 923, 925 (9th Cir. 1996).

15   **IV.   EXHAUSTION OF STATE REMEDIES**

16       Petitioner has presented most of his present claims to the California Supreme Court either

17   in his briefing on direct appeal or in his state habeas petition.  In a few instances, identified in this

18   answer *post*, respondent believes that the claims were not fully and fairly presented to the

19   California Supreme Court.  As also explained in this answer, however, in these instances

20   respondent has waived exhaustion because the claims are not ones on which relief can be granted.

21   The state high court has denied all of the claims petitioner presented to it on the merits.  Some

22   have also been denied on procedural grounds.

23       Throughout his petition, however, petitioner asserts the intent to rely on additional facts to

24   be established after additional investigation, discovery, use of this Court's subpoena powers, and

25   an evidentiary hearing.  The presentation of new facts in an attempt to prove petitioner's

26   entitlement to relief could constitute a new unexhausted claim.  *See Vasquez v. Hillary*, 474 U.S.

27   254, 260 (1986) (the addition of new facts do not render a claim unexhausted so long as they do

28   not fundamentally alter the claim).  Even if the new facts were insufficient to render the claim

2

1    unexhausted, however, this Court must review the claim based only upon the evidence presented

2    in the state court.  *See Cullen v. Pinholster*, 563 U.S. __, 131 S. Ct. 1388, 1398-99 (2011).

3    **V.    TIMELINESS**

4          Petitioner filed the instant petition on December 21, 2012.  The filing is within the 28

5    U.S.C. § 2254(d) statute of limitations as extended by this Court's grant of equitable tolling in its

6    order of August 28, 2012.[3]

7    **VI.    RULE 5 STATEMENT**

8          Concurrently with the filing of this answer, respondent will lodge with this Court what it

9    believes is the complete record of petitioner's state trial, direct appeal, and state habeas

10   proceedings (as of that date).  The specific exhibits lodged are:

11   STATE TRIAL RECORD
     Alameda County Superior Court #102880
12   A.  Clerk's Transcripts on Appeal
     Master Index                              [AG000001-AG000047]
13   Volume 1                                  [AG000049-AG000284]
14   Volume 2                                  [AG000286-AG000478]
     Volume 3                                  [AG000479-AG000746]
15   Volume 4                                  [AG000747-AG000944]
     Volume 5                                  [AG000945-AG001224]
16   Volume 6                                  [AG001225-AG001504]
17   Volume 7                                  [AG001505-AG001783]
     Volume 8                                  [AG001784-AG002063]
18   Volume 9                                  [AG002064-AG002342]
     Volume 10                                 [AG002343-AG002622]
19   Volume 11                                 [AG002623-AG002900]
20   Volume 12                                 [AG002901-AG003180]
     Volume 13                                 [AG003181-AG003460]
21   Volume 14                                 [AG003461-AG003740]
     Volume 15                                 [AG003741-AG004019]
22   Volume 16                                 [AG004020-AG004300]
     Volume 17                                 [AG004301-AG004578]
23   Volume 18                                 [AG004579-AG004858]
24   Volume 19                                 [AG004859-AG005141]
     Volume 20                                 [AG005142-AG005421]
25   Volume 21                                 [AG005422-AG005700]
     Volume 22                                 [AG005701-AG005978]
26   Volume 23                                 [AG005979-AG006262]

27   _____
          [3] Respondent opposed petitioner's motion for equitable tolling.  Without equitable tolling,
28   the petition was filed outside the statute of limitations.

3

Volume 24                                              [AG006263-AG006539]
Volume 25                                              [AG006540-AG006819]
Volume 26                                              [AG006820-AG007099]
Volume 27                                              [AG007100-AG007379]
Volume 28                                              [AG007380-AG007660]
Volume 29                                              [AG007661-AG007940]
Volume 30                                              [AG007941-AG008220]
Volume 31                                              [AG008221-AG008498]
Volume 32                                              [AG008499-AG008777]
Volume 33                                              [AG008778-AG009053]
Volume 34                                              [AG009054-AG009327]
Volume 35                                              [AG009328-AG009604]
Volume 36                                              [AG009605-AG009878]
Volume 37                                              [AG009879-AG010152]
Volume 38                                              [AG010153-AG010426]
Volume 39                                              [AG010427-AG010701]
Volume 40                                              [AG010702-AG010979]
Volume 41                                              [AG010980-AG011257]
Volume 42                                              [AG011258-AG011536]
Volume 43                                              [AG011537-AG011815]
Volume 44                                              [AG011816-AG012096]
Volume 45                                              [AG012097-AG012337]
Volume 46                                              [AG012338-AG012616]
Volume 47                                              [AG012617-AG012893]
Volume 48                                              [AG012894-AG013170]
Volume 49                                              [AG013171-AG013452]
Volume 50                                              [AG013453-AG013732]
Volume 51                                              [AG013733-AG013933]
Volume 52                                              [AG013934-AG014214]
Volume 53                                              [AG014215-AG014495]
Volume 54                                              [AG014496-AG014776]
Volume 55                                              [AG014777-AG015056]
Volume 56                                              [AG015057-AG015337]
Volume 57                                              [AG015338-AG015615]
Volume 58                                              [AG015616-AG015894]
Volume 59                                              [AG015895-AG016055]
Volume 60                                              [AG016056-AG016368]
Volume 61                                              [AG016369-AG016705]
Volume 62 SEALED TRANSCRIPT
Volume 63                                              [AG016706-AG016857]
Volume 64                                              [AG016858-AG016907]
Volume 65                                              [AG016908-AG017054]

B.  Reporter's Transcripts on Appeal
Master Index                                           [AG017055-AG017067]
Pre-Trial Transcripts
Pages 00001-00003          August 10, 1993             [AG017068-AG017072]
Pages 00001-00002          August 24, 1993             [AG017073-AG017076]

4

| | | | |
|---|---|---|---|
| Pages 00001-00002 | September 2, 1993 | | [AG017077-AG017080] |
| Pages 00001-00002 | September 8, 1993 | | [AG017081-AG017085] |
| Pages 00001-00002 | October 4, 1993 | | [AG017086-AG017089] |
| Pages 00001-00002 | October 21, 1993 | | [AG017090-AG017093] |
| Pages 00001-00007 | Dec 3, 9, 23, 1993 | | [AG017094-AG017100] |
| Pages 00001-00004 | October 19, 1994 | | [AG017101-AG017105] |
| Pages 00001-00002 | February 8, 1995 | | [AG017105-AG017109] |
| Pages 00001-00004 | February 28, 1995 | | [AG017110-AG017115] |
| Pages 00001-00004 | February 28, 1995 | | [AG017116-AG017121] |

Trial Transcripts

| | | | |
|---|---|---|---|
| Volume 1 | Pages 00001-00163 | VARIOUS | [AG017122-AG017287] |
| Volume 2 | Pages 00164-00236 | May 10, 1995 | [AG017288-AG017363] |
| Volume 3 | Pages 00237-00322 | May 11, 15, 1995 | [AG017364-AG017450] |
| Volume 4 | Pages 00323-00559 | VARIOUS | [AG017451-AG017687] |
| Volume 5 | Pages 00576-00770 | June 1, 1995 | [AG017688-AG017885] |
| Volume 6 | Pages 00771-00915 | June 5, 1995 | [AG017886-AG018032] |
| Volume 7 | Pages 00916-01044 | June 6, 1995 | [AG018033-AG018164] |
| Volume 8 | Pages 01045-01197 | June 7, 1995 | [AG018165-AG018321] |
| Volume 9 | Pages 01198-01352 | June 8, 1995 | [AG018322-AG018479] |
| Volume 10 | Pages 01353-01540 | June 12, 1995 | [AG018450-AG018671] |
| Volume 11 | Pages 01541-01687 | June 13, 1995 | [AG018672-AG018818] |
| Volume 12 | Pages 01688-01854 | June 14, 1995 | [AG018819-AG018980] |
| Volume 13 | Pages 01855-02054 | June 15, 1995 | [AG018981-AG019182] |
| Volume 14 | Pages 02055-02215 | June 19, 1995 | [AG019183-AG019345] |
| Volume 15 | Pages 02216-02332 | June 20 & 21, 1995 | [AG019346-AG019464] |
| Volume 16 | Pages 02334-02448 | June 22, 1995 | [AG019465-AG019582] |
| Volume 17 | Pages 02449-02580 | June 26, 1995 | [AG019583-AG019717] |
| Volume 18 | Pages 02581-02603 | June 29, 1995 | [AG019718-AG019741] |
| Volume 19 | Pages 02604-02798 | July 10, 1995 | [AG019742-AG019938] |
| Volume 20 | Pages 02799-02940 | July 11, 1995 | [AG019939-AG020132] |
| Volume 21 | Pages 02941-03036 | July 12, 1995 | [AG020131-AG020181] |
| Volume 22 | Pages 03037-03110 | July 13, 1995 | [AG020182-AG020256] |
| Volume 23 | Pages 03111-03252 | July 17, 1995 | [AG020257-AG020402] |
| Volume 24 | Pages 03253-03418 | July 18, 1995 | [AG020403-AG020571] |
| Volume 25 | Pages 03419-03499 | July 19, 1995 | [AG020572-AG020654] |
| Volume 26 | Pages 03500-03592 | July 20-21, & 24, 1995 | [AG020655-AG020749] |
| Volume 27 | Pages 03593-03748 | VARIOUS | [AG020750-AG020906] |
| Volume 28 | Pages 03749-03872 | August 8, 1995 | [AG020907-AG021032] |
| Volume 29 | Pages 03873-04056 | VARIOUS | [AG021033-AG021217] |
| Volume 30 | Pages 04057-04090 | Nov. 3, 1995 | [AG021218-AG021252] |
| Volume 31 | Pages 04091-04158 | Dec. 22, 1995 | [AG021253-AG021323] |

Record Correction

| | | |
|---|---|---|
| Pages 00001-00046 | January 6, 2006 | [AG021324-AG021372] |
| Pages 00047-00062 | January 6, 2006 | [AG021373-AG021390] |

5

DIRECT REVIEW RECORD
California Supreme Court #S050851
Appellant's Opening Brief filed August 19, 2002    [AG021391-AG021679]
Respondent's Brief filed May 16, 2003    [AG021680-AG021953]
Appellant's Reply Brief filed January 7, 2004    [AG021954-AG022066]
Opinion filed June 15, 2009    [AG022067-AG022182]
Petition for Rehearing filed June 29, 2009    [AG022183-AG022196]
Order Denying Petition filed August 12, 2009    [AG022197-AG022198]

FEDERAL CERTIORARI
Supreme Court of the United States #09-7563
Petition for Certiorari filed November 9, 2009    [AG022199-AG022337]
Brief in Opposition to Petition filed Dec. 7, 2009    [AG022338-AG022368]
Order Denying Petition filed January 11, 2010    [AG022369]

STATE HABEAS CORPUS RECORD
California Supreme Court #S126085
Petition for Writ of Habeas Corpus filed July 6, 2004    [AG022370-AG022790]
Exhibits in Support Volumes 1 filed July 6, 2004    [AG022791-AG023131]
Exhibits in Support Volumes 2 filed July 6, 2004    [AG023132-AG023437]
Exhibits in Support Volumes 3 filed July 6, 2004    [AG023438-AG023757]
Exhibits in Support Volumes 4 filed July 6, 2004    [AG023758-AG024057]
Exhibits in Support Volumes 5 filed July 6, 2004    [AG024058-AG024407]
Exhibits in Support Volumes 6 filed July 6, 2004    [AG024408-AG024763]
Exhibits in Support Volumes 7 filed July 6, 2004    [AG027464-AG024933]
Informal Response filed March 29, 2005    [AG024934-AG025125]
Informal Reply In Support of Pet. filed May 12, 2006    [AG025126-AG025199]
Exhibits in Support Volume 8 filed May 12, 2006    [AG025200-AG025231]
Order Denying Petition filed August 31, 2011    [AG025232]

California First District Court of Appeal #A112760
Petition for Writ of Mandate filed January 26, 2006    [AG025233-AG025266]
Exhibits in Support of Writ of Mandate filed Jan. 26, 2006    [AG025267-AG025408]
Order Denying the Petition filed February 2, 2006    [AG025409]

California Supreme Court #S141081
Petition for Review filed February 14, 2006    [AG025410-AG025485]
Answer to Petition filed March 23, 2006    [AG025486-AG025516]
Reply to Answer to Petition filed March 29, 2006    [AG025517-AG025536]
Order Denying Petition filed April 19, 2006    [AG025537]

California First District Court of Appeal #A113539
Petition for Writ of Mandate filed April 17, 2006    [AG025538-AG025555]
Order Denying Writ of Mandate filed May 4, 2006    [AG025556]

6

1  **VII.   INCORPORATION BY REFERENCE**

2        Respondent incorporates by reference into this answer the exhibits comprising the state

3  record lodged with this Court.

4  **VIII.  STANDARD OF REVIEW**

5        This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996

6  ("AEDPA"), which imposes a "highly deferential" standard for evaluating state court rulings and

7  "demands that state court decisions be given the benefit of the doubt."  *Woodford v. Visciotti*, 537

8  U.S. 19, 24 (2002) (per curium).  As the United States Supreme Court has articulated, AEDPA

9  represents Congress's judgment that the primary forum for the resolution of state prisoners'

10  constitutional claims should be the state court system.  *Harrington v. Richter*, 562 U.S. __, 131 S.

11  Ct. 770, 787 (2011); *see also Pinholster*, 131 S. Ct. at 1398-99; *Pace v. DiGuglielmo*, 544 U.S.

12  408, 427 (2005).  The AEDPA was designed to vindicate the States' interests in the finality of

13  state court judgments.  *Richter*, 131 S. Ct. at 787, citing *Calderon v. Thompson*, 523 U.S. 538,

14  555-56 (1998).

15        Under AEDPA, the federal court has no authority to grant habeas relief unless the state

16  court's ruling was either (1) "contrary to, or involved an unreasonable application of," clearly

17  established Supreme Court precedent, or (2) based on an unreasonable determination of the facts

18  in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d)(1);

19  *Richter*, 131 S. Ct. at 784.  If no exception is shown, relitigation is barred.  Absent an exception

20  under 28 U.S.C. § 2254(d), "analysis is at an end" and "a writ of habeas corpus 'shall not be

21  granted.'"  *Pinholster*, 131 S. Ct. at 1141 n.20.

22        "The question under AEDPA is not whether a federal court believes the state court's

23  determination was incorrect but whether that determination was unreasonable—a substantially

24  higher threshold."  *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

25        If this [AEDPA] standard is difficult to meet, that is because it was meant to be.  As
       amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal
26     court relitigation of claims already rejected in state proceedings.  It preserves
       authority to issue the writ in cases where there is no possibility fairminded jurists
27     could disagree that the state court's decision conflicts with this Court's precedents.  It
       goes no farther.  Section 2254(d) reflects the view that habeas corpus is a 'guard
28     against extreme malfunctions in the state criminal justice systems,' not a substitute

7

1

2

3

> for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

4

*Richter*, 131 S. Ct. at 786-87 (citations omitted).

5

6

7

8

9

10

11

12

13

Moreover, this highly deferential analysis applies regardless of whether the state court decision consists of a summary denial or a reasoned statement of the court's holding.  *Richter*, 131 S. Ct. at 784 ("Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief.  This is so whether or not the state court reveals which of the elements in a multipart claim it found insufficient, for 28 U.S.C. § 2254(d) applies when a 'claim,' not a component of one, has been adjudicated."); *Pinholster*, 131 S. Ct. at 1404, 1406 (implementing AEDPA standard to summary denial by positing the reasons the state court could have rejected the claim, and then finding that implicit holding reasonable).

14

15

16

17

18

19

20

Even were the state court's ruling contrary to or an unreasonable application of Supreme Court precedent, or based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings, that error justifies overturning the conviction only if the error had "substantial and injurious effect or influence in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).  The *Brecht* standard applies to all 28 U.S.C. § 2254 cases, regardless of the type of harmless error review conducted by the state courts.  *Fry v. Pliler*, 551 U.S. 112 (2007).

21

22

23

24

25

26

27

28

Finally, many of petitioner's claims are based on assertions of ineffective assistance of counsel, the review of which is "doubly deferential."  In order to establish that counsel was ineffective, petitioner bears the burden of showing that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and that there is a reasonable probability the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687-688 (1984).  Under AEDPA, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland*'s standard . . . . A state court

8

1  must be granted a deference and latitude that are not in operation when the case involves review

2  under the *Strickland* standard itself." *Richter*, 131 S. Ct. at 785. Thus, federal habeas review of a

3  state court's denial of an ineffective assistance claim is "doubly deferential." *Knowles v.*

4  *Mirzayance*, 556 U.S. 111, 123 (2009).

5  **IX.    PETITIONER'S BURDEN OF ESTABLISHING ENTITLEMENT TO RELIEF**

6         Recent United States Supreme Court cases have clarified that under 28 U.S.C. § 2254(d),

7  petitioner bears the burden of establishing entitlement to relief. *Visciotti*, 537 U.S. at 25; *Richter*,

8  131 S. Ct. at 784; *Pinholster*, 131 S. Ct. at 1398.

9         To satisfy his burden, petitioner must identify the decision of the United States Supreme

10 Court that would demonstrate his entitlement to prevail but which the state court failed to heed.

11 This requires that a petitioner do more than cite to a Supreme Court decision that establishes

12 some broad constitutional principle or states a standard of review applicable to a broad category

13 of claims. Rather, petitioner must identify the Supreme Court's decision which, in his view, both

14 defines by its holding a set of circumstances under which relief cannot be denied and is so legally

15 and factually similar to his own circumstances that any failure to grant relief in his case is

16 objectively unreasonable. *See Williams v. Taylor*, 529 U.S. 362, 405-12 (2000); *Bell v. Cone*, 535

17 U.S. 685, 694 (2002). "[I]t is the habeas applicant's burden to show that the state court applied

18 [the Supreme Court's holding] to the facts of his case in an objectively unreasonable manner,"

19 which "is different from an *incorrect* application of federal law." *Visciotti*, 537 U.S. at 25.

20        Additionally, the 28 U.S.C. § 2254(d) analysis must be made solely in light of the evidence

21 that was before the state court that adjudicated the claim on the merits, without regard to any new

22 or additional evidence submitted as a part of the federal proceedings. *Pinholster*, 131 S. Ct. at

23 1398-99.

24        Here, petitioner's claims were rejected on the merits (and some also on procedural grounds)

25 by the California Supreme Court. Petitioner fails to demonstrate that the California Supreme

26 Court's ruling as to any of his claims was contrary to, or an unreasonable application of, existing

27 Supreme Court precedent, or based on an unreasonable application of the evidence before the

28 state court. Indeed, in most cases, petitioner does not even address the California Supreme

9

Court's opinion. Instead, he repeats, often verbatim, the claims made by his state court appellate counsel in the opening brief on direct appeal—without changing the claim to specifically address the California Supreme Court's denial of the claim. Thus, he has failed to make out valid claims for relief.

Although petitioner expresses the hope to establish a basis for his claims after he has obtained additional evidence, in light of recent Supreme Court decisions, in particular *Pinholster*, this is insufficient. The burden to establish entitlement to relief is on petitioner, and any claims decided on the merits by the state courts must be viewed solely in light of the state court record. Accordingly, petitioner must demonstrate from the outset that 28 U.S.C. § 2254(d) has been met. Absent an exception under 28 U.S.C. § 2254(d), the "analysis is at an end" and "a writ of habeas corpus 'shall not be granted.'" *Pinholster*, 131 S. Ct. at 1411 n.20.

## X.    NEW RULES

Since the California Supreme Court's rejection of petitioner's claims was not contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent, or an unreasonable determination of the facts in light of the evidence presented in the state court proceeding, relief on any claim in the petition here would require the creation of a new rule of criminal procedure. Relief predicated on retroactive application of a new rule of criminal procedure is foreclosed on collateral review except under limited circumstances not applicable here. *See Penry v. Lynaugh*, 492 U.S. 302, 314 (1989); *Teague v. Lane*, 489 U.S. 288, 299-301 (1989).

## XI.    FACTUAL FINDINGS BY THE STATE COURT

The facts underlying petitioner's convictions and death sentence, along with citations to the trial court record, are set forth in Respondent's Brief in the direct appeal to the California Supreme Court (AG021715-AG021740) and in the opinion of the California Supreme Court affirming the judgment (*Dykes*, 46 Cal. 4th at 742-47; AG022068-AG022075). The state court's factual findings are presumptively correct. 28 U.S.C. § 2254(e)(1). We set forth in full the state supreme court's summary of the facts.

A.  Guilt Phase Evidence

Bernice Clark owned an apartment building in Oakland.  During a period of unemployment, defendant, who was 20 years of age, resided for several months with his mother in one of the apartments in Bernice's building.  The apartment defendant shared with his mother overlooked the rear parking lot of the building.

Tenants, including defendant, were aware that Bernice carried ample cash with her on her frequent visits to the apartment building.  On her visits, Bernice cashed checks for tenants and lent them money; she had cashed a check for defendant.  Indeed, another tenant, LaCondra Douglas, had warned Bernice not to carry cash with her.  Douglas testified that defendant had expressed an intent to rob Bernice prior to the commission of the charged crimes.  Tenants testified that they had observed Lance Clark, the murder victim, who was Bernice's young grandson, accompanying Bernice on her rounds on multiple occasions.

In November 1992, defendant acquired a .45-caliber revolver.  Bianca Rodriguez, then his girlfriend, testified that at his request she gave him the money with which to purchase the weapon.  Douglas testified that about two months prior to the commission of the charged crimes, she sold defendant approximately 20 bullets for his handgun.

On the afternoon of July 26, 1993, Bernice, who was then 70 years of age, and her grandson Lance, then nine years of age, drove to the rear parking lot of the apartment building, where she consulted with her handyman.  Bernice testified that she was approached by one of her tenants, Edward Tyson, who asked to borrow $ 20.  She agreed, and while he was signing a receipt, a man approached wearing a stocking mask.  The man placed a dark object against her head.  She recognized the man as defendant and told him that he looked like one of her tenants.  She heard a shot, then defendant said something about money or a holdup, and she recalled a struggle over her wallet.  She heard only one shot, but her recollection of the crime was confused, and she was unable to hear well after the weapon discharged.

Tyson testified that on the afternoon of July 26, 1993, Bernice agreed to lend him $ 20.  He heard her drive to the rear parking lot and approached her as she sat in the driver's seat with the door open.  Tyson observed Lance seated in the passenger seat of the vehicle.  As Tyson signed a receipt, a man approached wearing a light-colored hooded sweatshirt.  He had a woman's nylon stocking over his head.  The man demanded money of Tyson, but Tyson backed away and denied he had any.  Tyson witnessed the man point his weapon at Bernice and demand money.  Tyson heard Bernice inform the man that he resembled one of her tenants named Ernest.  Tyson fled, and as he passed a gap in the fence he heard a firearm "dry fire."  He subsequently heard two shots in quick succession, the first followed by a sound of breaking glass.  After an interval he heard a third shot.  He heard the robber continue to demand money after the first shot.

Alphonso Odom, who had been staying for several months with a resident of the apartment building located next to the one owned by Bernice, testified that he was acquainted with defendant and with Bernice.  Odom observed defendant in front of the apartment building a few minutes prior to the shooting.  Defendant was wearing a gray hooded sweatshirt and green or blue acid-washed jeans.  Odom observed Bernice drive with her grandson to the rear of the apartment building.  Shortly thereafter, Odom heard two shots and witnessed the second shot being fired as he stood on his apartment balcony.  He observed defendant standing by Bernice's vehicle holding a firearm and wearing a gray sweatshirt and green or blue acid-

11

washed jeans. He heard the sound of breaking glass after the second shot, and observed defendant flee over the back fence.

Odom ran from his apartment to the scene of the shooting, joining Tyson, who had returned after initially fleeing. They observed Lance slumped over in the automobile. Bernice's neck was bleeding. Lance had been shot and soon stopped breathing. Emergency medical personnel were unable to revive him.

Tyson remained at the scene, while Odom returned to his apartment. Tyson gave a statement to the police, picked defendant's photograph from a photo lineup, and reported that the robber's voice sounded like defendant's. Odom, on the other hand, did not contact the police concerning his knowledge of the crime until after he was arrested on unrelated charges a few days subsequent to the commission of the charged offenses. He hoped for leniency in return for information he was able to provide. His testimony was impeached with prior felony convictions.

Defendant changed his attire and returned to the scene of the shooting. There he spoke with a police officer, stating that he had observed Tyson speaking with Bernice as she sat in her vehicle and that as he crossed the parking lot he heard shots. An unidentified, armed Black male wearing jeans and a white hooded sweatshirt ran past him and fled over the back fence. The officer testified that defendant appeared composed and was not intoxicated. Odom overheard some of this discussion, reporting that defendant told the officer, "that's messed up. The dude ran right by me."

In the afternoon or evening of July 26, 1993, Odom lent his bicycle to defendant. When defendant returned with some beer, defendant said to Odom, "that was f'd up, you know, what happened." Odom agreed and said he knew defendant was responsible for the shooting. Odom testified that defendant admitted he was the culprit and said, "man, I didn't mean it to go down like that."

Lance was killed by a single gunshot that passed through his body from his left chest, exiting on the lower right side of his back. There was a large entry wound, indicating the same bullet had passed through Bernice's neck before it struck Lance. The forensic pathologist, Dr. Paul Hermann, was unable to determine with certainty Lance's position when he was shot, but the pathologist believed Lance had been leaning to the left. Bernice received an injury to her neck but survived.

An examination of Bernice's automobile produced a bullet lodged inside the rear door on the passenger side. The impact of the bullet had shattered the door's window. Another bullet later was discovered in the front passenger floor area.

Dr. Lansing Lee, a firearms expert, testified that the bullets discovered in Bernice's vehicle were for a .45-caliber semiautomatic pistol. Although the ammunition was manufactured for a semiautomatic weapon, it also could be fired by a certain vintage Colt .45-caliber revolver. Such a weapon could be fired by single action if the shooter pulled back the hammer using two pounds of pressure. The weapon also could be fired without pulling back the hammer, but would require at least eight pounds of pressure to fire.

Sergeant Madarang of the Oakland Police Department was interviewing Tyson at the police station on the day of the crime when he received a telephone call from someone who would identify herself only as Connie, stating that she had sold defendant some bullets a few days preceding the crime, and that defendant had told her he planned to rob Bernice. In her own testimony, LaCondra Douglas would admit

12

only that she had placed an anonymous call to the police on that date, denying she had reported that defendant had purchased ammunition from her.

On August 7, 1993, defendant telephoned the Oakland Police Department, stating he "want[ed] to know if I shot somebody." He mentioned Bernice and provided his location, but denied responsibility for the crime. He was arrested and transported to the police department for interrogation. Arresting officers directed him not to speak while he was being transported, but he did so in a rambling manner, wondering how he could be identified and stating he would not commit anything like the charged crimes. Once defendant arrived at the police station, he was advised of his constitutional rights and interrogated by Officers Chenault and Madarang. During two hours of questioning, he denied responsibility for the crime. He reported that he had heard the shots because he had been walking through the parking lot on his way to purchase beer, and repeated his story of having witnessed an unidentified Black male flee from the scene. Ultimately the officers confronted him with evidence in their possession, including statements of eyewitnesses. Defendant became distressed and admitted involvement in the shooting. The unrecorded statement reflected the circumstance that he was aware prior to the shooting that Lance was in the vehicle.

Defendant subsequently made two tape-recorded statements. These were played for the jury. In the first statement, he explained that his family expected more of him than he was able to deliver and that he needed money to attend Laney Community College. He observed Bernice from the rear of his apartment and decided to rob her. He approached the vehicle and demanded money. She did not respond quickly, so he unsuccessfully attempted to fire a warning shot, and on the second attempt fired a shot to the rear of the vehicle, intending to destroy the rear window. Bernice said "don't be silly, child" and told him to take the money from her wallet but leave the cards. He had one hand on the wallet and the other hand, which was holding his firearm, on the headrest of the driver's seat. During the struggle over the wallet, the weapon fired accidentally. He claimed he had not observed Lance in the vehicle. He departed from the scene, changed his clothes, and returned to the apartment building to see what was happening. He subsequently threw the murder weapon, a .45-caliber Colt service revolver manufactured in 1917, into the Oakland Estuary. He stated he had drunk four cans of Olde English 800 malt liquor prior to committing the crime and one afterwards, but in his statement he informed the police he was not under the influence of alcohol when he committed the crime. Defendant sobbed during the recorded statements and reiterated "I didn't mean for it to go down like that. I'm no killer." He informed the officers he had spent two weeks following his commission of the crime drinking alcohol and using marijuana, feeling that his world was coming to an end. After his father notified him he had been mentioned in the newspaper as a suspect in the crime, he telephoned the police department.

Defendant testified in his own behalf at trial, giving substantially the same narrative he had given in his taped statements. He testified he had spent the afternoon preceding the crime applying for employment, and then returned home and performed household chores. When he observed Bernice drive into the rear parking lot of the building, he formed the intent to rob her. He retrieved his loaded firearm, and then took some stockings from his mother's room to wear as a mask. Donning jeans over his shorts and pulling the hood of his sweatshirt over his head to disguise himself from Bernice, he proceeded to the parking lot and confronted Bernice without ever observing Lance in her vehicle. He demanded her money. She said, "Don't be stupid, child." When she hesitated, he attempted to fire his weapon, but failed. A second attempt resulted in a warning shot aimed at the rear of the vehicle. Bernice tried to remove the cash from her wallet, but defendant grabbed the wallet.

13

In his trial testimony, defendant claimed for the first time that after he fired the warning shot, LaCondra Douglas's boyfriend drove into the parking lot and defendant became flustered and rushed, leading to the accidental firing of the weapon during his struggle with Bernice over her wallet. He denied intending to shoot Bernice or injure her. He seized the cash from the wallet and fled through a gap in the rear fence, wondering whether he really had shot Bernice. He changed his clothing, found a hiding place for his firearm, purchased some beer, and shortly thereafter returned to the parking lot to find out what had transpired. He lied to the police, trying to offer a description of the shooter that "somewhat" matched his own appearance, in case he had been observed during the shooting. He subsequently disposed of his weapon and spent the ensuing days in a state of intoxication, "trying to forget." He testified that he "was just doing stuff like [he] felt this was [his] last days on earth or something." After discussion with his father, he telephoned the police department to determine whether there was a warrant for his arrest. During the initial stage of his interrogation, he had denied responsibility for the crimes because he was frightened.

In the course of his testimony, defendant denied that his girlfriend had given him the money to buy the firearm and claimed that LaCondra Douglas had provided him with the ammunition free of charge, months prior to the crime. He testified he had test-fired the weapon and found its firing unpredictable. Defendant testified he had observed Lance accompanying Bernice on only one occasion. Defendant denied he had stated prior to committing the crime that he intended to rob Bernice, claiming he merely had been present when other tenants discussed robbing her. He acknowledged he was on probation for illegal possession of a firearm at the time he committed the crime and knew he should not be armed, but he claimed he needed a weapon to protect himself from the drug dealers who trafficked in his neighborhood.

B.  Penalty Phase Evidence

Penalty phase evidence introduced by the prosecution included testimony from Bernice, Lance's sister Kristie, and Lance's elementary school teacher. They described how they had learned of Lance's death and described the impact of his death upon them. Bernice recounted the difficult course of her recovery from her physical injuries.

Oakland Police Officer Rand Monda described the circumstances of defendant's prior illegal possession of a loaded, concealed firearm.

Defendant's mother, father, sister, brother, and aunt testified on his behalf, describing their love for him and their hope that he would be granted a sentence of life imprisonment.

*Dykes*, 46 Cal. 4th at 742-47; AG022068-AG022075.

## XII.  GENERAL DENIAL

Petitioner was not denied rights under the Constitution or laws of the United States and is not entitled to discharge from his present confinement. The state court adjudication of petitioner's claims was not contrary to, nor involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court (28 U.S.C. § 2254(d)(1)), and was not based on an unreasonable determination of the facts in light of the

14

1  evidence presented in the state court proceedings (28 U.S.C. § 2254(d)(2)).  Respondent denies

2  each and every factual allegation or procedural allegation in the Petition purporting to afford a

3  basis for relief that has not been expressly admitted or denied in the answer.

4  **XIII.  CLAIMS FOR RELIEF**

5      Petitioner specifically designates eight claims for relief.  Most of the claims, however,

6  contain one or more subclaims that are not designated by a letter or a number.  For ease of

7  reference, respondent has separated the subclaims under lettered subheadings.

8      **A.    Claim 1:  Petitioner's Death Sentence Is Not Invalid; California's Death
             Penalty Scheme Is Not "Fundamentally Flawed"**

9

10          **1.    California's Death Penalty Statute Sufficiently Narrows the Class of
                     Eligible Offenders**

11      Asserting that California's listed "special circumstances" in Penal Code section 190.2[4] are

12  "numerous and broad," petitioner asserts that they "encompass nearly every first degree murder."

13  Pet. at 57.  Thus, he claims, California's death penalty statute does not meaningfully narrow the

14  pool of murderers eligible for the death penalty.  Pet. at 60.  More specifically, he maintains that

15  nearly all felony-murder cases are special-circumstance murders.  Pet. at 59.  Thus, he concludes,

16  the statutory scheme violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

17  State Constitution.  Pet. at 61.[5]  Relying on its own precedent, the California Supreme Court

18  rejected this claim on direct review.  *Dykes*, 46 Cal. 4th at 813; AGO22169.  The state high

19  court's decision was neither contrary to nor an unreasonable application of clearly established

20  Supreme Court precedent.

21

22

23

24      [4] Penal Code section 190.2 provides that the penalty for a defendant who is found guilty of
    murder in the first degree is death or imprisonment in the state prison for life without the
    possibility of parole if one or more specified "special circumstances" are found to be true.  As

25  relevant here, Penal Code section 190.2(a)(17)(A) designates murder committed while engaged in
    specified felonies, including robbery, a special circumstance.

26      [5] Petitioner raised this claim on direct review in the California Supreme Court.  *See*
    Appellant's Opening Brief in *People v. Dykes* (S050851) ("AOB") Claim XVI at AG021574-

27  AG021577; *see also* Respondent's Brief in *People v. Dykes* ("RB") Claim XVI at AG021907-
    AG021909.

28

In *McCleskey v. Kemp*, 481 U.S. 279 (1987), the Supreme Court summarized the constitutional prerequisites which a state must satisfy before a sentence of death can lawfully be imposed:

> In sum, our decisions since *Furman* [*v. Georgia*, 408 U.S. 238 (1972)] have identified a constitutionally permissible range of discretion in imposing the death penalty.  First, there is a required threshold below which the death penalty cannot be imposed.  In this context, the State must establish rational criteria that narrow the decisionmaker's judgment as to whether the circumstances of a particular defendant's case meet the threshold.  Moreover, a societal consensus that the penalty is disproportionate to a particular offense prevents a State from imposing the death penalty for that offense.  Second, States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the penalty.  In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider any relevant information by the defendant.

*Id*. at 305-06.  If these limits are satisfied, "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Blystone v. Pennsylvania*, 494 U.S. 299, 309 (1990).  Although it is incumbent upon a state to narrow the class of death-eligible defendants, there is no exclusive "right way for a State to set up its capital sentencing scheme." *Spaziano v. Florida*, 468 U.S. 447, 464 (1984).  The narrowing function described in *McCleskey* may be undertaken at either the guilt or the penalty phase of a capital case. *Lowenfield v. Phelps*, 484 U.S. 231, 244-45 (1988).  As long as a State's capital sentencing scheme "narrows the class of death-eligible murderers," and then during sentence selection permits the exercise of discretion without limiting the consideration of mitigating evidence, the United States Supreme Court has stated that the Eighth Amendment "requires no more." *Id*. at 246.

In California, the narrowing function occurs at the guilt/special circumstances phase of a capital trial.  Before the defendant can become death-eligible, he must be convicted of first degree murder and at least one special circumstance must be found true beyond a reasonable doubt.  The latter requirement, the United States Supreme Court has held, adequately "limits the death sentence to a small subclass of capital-eligible cases." *Pulley v. Harris*, 465 U.S. 37, 53 (1984); *Mayfield v. Woodford*, 270 F. 3d 915, 924 (9th Cir. 2001) ("A reasonable jurist could not debate . . . that the 1978 California statute, which narrows the class of death-eligible defendants at both the guilt and penalty phases, was constitutional"); *Karis v. Calderon*, 283 F. 3d 1117, 1141 n.11

16

1   (9th Cir. 2002) (rejecting claim that California's death penalty statute does not adequately narrow

2   the class of persons eligible for the death penalty). [6]

3        The Georgia statutes under evaluation in *Furman* gave juries "untrammeled discretion to

4   impose or withhold the death penalty." *Gregg v. Georgia*, 428 U.S. 153, 195 n.47 (1976).

5   California's death penalty statute, by contrast, grants juries guided and limited discretion, i.e., it

6   "contains carefully defined standards that . . . narrow discretion to impose the death sentence,"

7   but leaves juries with virtually unlimited discretion "to decline to impose the death sentence."

8   *McCleskey v. Kemp*, 481 U.S. at 304.

9        Moreover, the California Supreme Court has specifically rejected a claim that the felony-

10  murder special circumstance renders California's statutory scheme unconstitutionally vague.  In

11  *People v. Anderson*, 43 Cal. 3d 1104, 1147 (1987), the court held, "[w]hether or not we approve

12  of the wisdom of the statutory classification, it appears to be generally accepted that by making

13  the felony murderer but not the simple murderer death-eligible, a death penalty law furnishes the

14  'meaningful basis [required by the Eighth Amendment] for distinguishing the few cases in which

15  [the death penalty] is imposed from the many cases in which it is not.' (*Furman v. Georgia*

16  (1972) 408 U.S. 238, 313 (conc. opn. of White, J.); accord, *Godfrey v. Georgia* (1980) 446 U.S.

17  420, 427 (plur. opn.).)  [Footnote omitted.]  It also appears to be generally accepted that a death

18  penalty law that makes the felony murderer but not the simple murderer death-eligible does not

19  violate the equal protection clause.  (See *Gray v. Lucas*, [677 F. 2d 1086, 1104 (1982)].)"

20       Thus, petitioner fails to show that the California Supreme Court's rejection of his claim that

21  California's statute is unconstitutionally broad was contrary to or an unreasonable application of

22  clearly established and controlling United States Supreme Court precedent.  Indeed, the

23  California Supreme Court's decision is clearly consistent with high court and Ninth Circuit

24  precedent.  Consequently, petitioner has failed to make the legal or factual showing necessary to

25  satisfy 28 U.S.C. § 2254(d) and his claim should be denied.

26       [6] In *Karis*, the Ninth Circuit stated:  "California has identified a subclass of defendants
    deserving of death and by doing so, it has 'narrowed in a meaningful way the category of
27  defendants upon whom capital punishment may be imposed.'  *Arave v. Creech*, 507 U.S. 463, 476
    . . . (1993)."  *Karis*, 283 F. 3d at 1141 n.11.

28

### 2. Penal Code Section 190.3, Factor (a), Does Not Allow for an Arbitrary and Capricious Imposition of the Death Penalty

Penal Code section 190.3, factor (a), provides in relevant part: "In determining the penalty, the trier of fact shall take into account any of the following factors if relevant: [¶] (a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1." Petitioner contends that Penal Code section "190.3(a) violates the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution in that it has been applied in such a wanton and freakish manner that almost all features of every murder have been found to be 'aggravating' within the statute's meaning." Pet. at 61.[7]  Relying on its own precedent, which is based on a United States Supreme Court case, the California Supreme Court rejected this claim on direct review. *Dykes*, 46 Cal. 4th at 813; AGO22169.  Its decision was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

Citing a panoply of death penalty cases, petitioner maintains that Penal Code section 190.3, factor (a), is unconstitutionally broad because "it is being relied upon as an aggravating factor in virtually if not literally every case, by every prosecutor, and without any limitation whatsoever." Pet. at 67.  As petitioner acknowledges (pet. at 62), however, the United States Supreme Court has upheld the validity of California Penal Code section 190.3, factor (a). *Tuilaepa v. California*, 512 U.S. 967, 980 (1994).  Nonetheless, petitioner asserts that Penal Code section 190.3, factor (a), "has been used in ways so arbitrary and contradictory as to violate the federal guarantee of due process of law and the Eighth Amendment as applied in this case." Pet. at 62.  Based on *Tuilaepa* and California Supreme court precedent applying that decision, petitioner's argument fails.

In *People v. Jenkins*, 22 Cal. 4th 900 (2000), the California Supreme Court, relying on *Tuilaepa*, rejected arguments substantively identical to the ones petitioner makes.  The court held:

---

[7] Petitioner raised this claim on direct review in the California Supreme Court.  AOB Claim XVII at AG021578-AG021584; *see also* RB at AG021910-AG021913.

Defendant's contention corresponds in substance to a contention found in Justice Blackmun's dissent in *Tuilaepa v. California* (1994) 512 U.S. 967 . . . . (*Id.* at pp. 986-988 (dis. opn. of Blackmun, J.).) It is evident that this contention was not persuasive to a majority of the United States Supreme Court when it determined that section 190.3, factor (a), is not violative of the Eighth Amendment on the basis of vagueness or other grounds. Instead, the court's majority opinion stated that "our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty," and that "this California factor instructs the jury to consider a relevant subject matter and does so in understandable terms." (*Tuilaepa v. California*, *supra*, 512 U.S. at p. 976 . . . .) The court observed that "[t]he circumstances of the crime are a traditional subject for consideration by the sentencer, and a instruction to consider the circumstances is neither vague nor otherwise improper under our Eighth Amendment jurisprudence." (*Ibid.*)

Defendant contends it cannot be appropriate under the Eighth Amendment or as a matter of due process to permit the jury to consider in aggravation, for example, that a murder was committed in a calculated manner, while a jury in another case may be urged to consider in aggravation that the murder was committed in a frenzy of violence. It is not inappropriate, however, that a particular circumstance of a capital crime may be considered aggravating in one case, while a contrasting circumstance may be considered aggravating in another case. The sentencer is to consider the defendant's individual culpability; there is no constitutional requirement that the sentencer compare the defendant's culpability with the culpability of other defendants. (See *People v. Crittenden*, [9 Cal. 4th 83, 156-157 (1994)].) The focus is upon the individual case, and the jury's discretion is broad: "In providing for individualized sentencing, it must be recognized that the States may adopt capital sentencing processes that rely upon the jury, in its sound judgment, to exercise wide discretion." (*Tuilaepa v. California*, *supra*, 512 U.S. at p. 974.)

Thus, for example, in *Tuilaepa* the high court rejected the defendant's claim—substantially identical to defendant's claim in the present case—that section 190.3, factor (i), permitting consideration of the defendant's age, is vague, although, the defendant claimed, prosecutors typically argue in favor of the death penalty based on this factor, no matter whether the defendant is old or young. "It is neither surprising nor remarkable that the relevance of the defendant's age can pose a dilemma for the sentencer. But difficulty in application is not equivalent to vagueness. Both the prosecution and the defense may present valid arguments as to the significance of the defendant's age in a particular case. Competing arguments by adversary parties bring perspective to a problem . . . ." (*Tuilaepa v. California*, *supra*, 512 U.S. at p. 977.)

Defendant contends that the high court's discussion in the *Tuilaepa* case does not dispose of his claim, because there the high court examined the California statute on its face, while he asks that we examine its alleged infirmities as applied. As noted, he draws our attention to various cases in which apparently inconsistent claims were made by the prosecution with respect to the relevance of certain circumstances of the charged crimes. He also refers us to various cases in which, he alleges, prosecutors made broad use of section 190.3, factor (a) to argue to the jury that facts inevitably present in every homicide constitute circumstances in aggravation. He contends that these cases demonstrate that section 190.3, factor (a), permits arbitrary and capricious imposition of the death penalty in violation of the guarantee of due process of law. He offers no relevant authority in support of his claim.

Defendant's contention is inconsistent with the rationale of the high court's decision in *Tuilaepa*. Defendant's claim essentially is that section 190.3, factor (a) is so vague

19

and open-ended that it has resulted in prosecutors making inconsistent or overinclusive arguments with respect to the significance of circumstances of the charged crime. This result is not improper in view of the circumstance that factor (a) provides adequate guidance to the jury in selecting the appropriate penalty. It is not so vague as to risk "wholly arbitrary and capricious action'" (*Tuilaepa v. California*, *supra*, 512 U.S. at p. 973; the jury is engaged in an individualized sentencing process (*id*. at p. 972), and the jury appropriately has very broad discretion in determining whether the death penalty should be imposed. (*Id*. at pp. 978-980.) A jury should consider the circumstances of the crime in determining penalty (*id*. at p. 976), but this is an individualized, not a comparative function. The jury may conclude that the circumstance that a murder was committed with cold premeditation is aggravating in a particular case, while in another case another jury may determine that the circumstance that a murder was committed in a murderous frenzy is an aggravating factor. The ability of prosecutors in a broad range of cases to rely upon apparently contrary circumstances of crimes in various cases does not establish that a jury in a particular case acted arbitrarily and capriciously. As with the factor of the defendant's age, the adversary process permits the defense, as well as the prosecution, to urge the significance of the facts of the charged crime. Defendant fails to persuade us that these circumstances deprive him of due process of law.

*People v. Jenkins*, 22 Cal. 4th at 1052-53, footnote omitted.

In sum, both the United States Supreme Court and the California Supreme Court have rejected petitioner's challenge to California Penal Code section 190.3, factor (a). Consequently, petitioner has failed to make the legal or factual showing necessary to satisfy § 2254(d), and his claim must be denied.

### 3. The Failure to Require Proof Beyond a Reasonable Doubt for Aggravating Factors Does Not Render California's Death Penalty Scheme Unconstitutional

Citing the United States Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Ring v. Arizona*, 536 U.S. 584 (2002), petitioner contends that California's capital sentencing scheme violates the federal Constitution because it does not require that, before rendering a verdict of death, jurors must unanimously find beyond a reasonable doubt the presence of one or more specific aggravating factors, that those specific factors outweigh the mitigating factors, or that death is the appropriate verdict. Pet. at 67-79.[8] The California Supreme Court rejected this claim, stating:

"[N]othing in the federal Constitution requires the penalty phase jury to (1) make written findings of the factors it finds in aggravation and mitigation [citations]; (2) agree unanimously that a particular aggravating circumstances exists [citations]; (3)

---

[8] Petitioner raised this claim on direct review in the California Supreme Court. AOB Claim XVIII at AG021584-AG021596; *see also* RB at AG021914-AG021918.

20

find all aggravating factors prove beyond a reasonable doubt or by a preponderance of the evidence [citations]; (4) find that aggravation outweighs mitigation beyond a reasonable doubt [citations]; or (5) conclude beyond a reasonable doubt that death is the appropriate penalty. [Citations.]" (*People v. Williams*, [43 Cal. 4th 584, 648-49 (2008)].)  The application of these principles to penalty determinations does not violate equal protection principles established by the 14th Amendment to the United States Constitution. (*People v. Cruz*, [44 Cal. 4th 636, 681 (2008)] ["capital defendants are not similarly situated to noncapital defendants, [so] the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants"]; *People v. Valencia* (2008) 43 Cal. 4th 268, 311).

*Dykes*, 46 Cal. 4th at 813-14; AG022169-AG022170; *see also People v. Demetrulias*, 39 Cal. 4th 1, 41-43 (2006); *People v. Lucero*, 23 Cal. 4th 692, 741 (2000) (federal Constitution does not require jurors to find aggravating factors true beyond a reasonable doubt or that aggravating factors outweigh mitigating factors beyond a reasonable doubt).

In rejecting the claim regarding a burden of proof, the California Supreme Court has found that neither *Apprendi* nor *Ring* compelled a different conclusion.

"[E]xcept for prior violent crimes evidence and prior felony convictions under section 190.3, factors (b) and (c), the court need not instruct regarding a burden of proof . . . ." (*People v. Cruz*, *supra*, 44 Cal. 4th at p. 681.)  Because "'[u]nlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification'" (*People v. Manriquez* (2005) 37 Cal. 4th 547, 589), it is sufficient that the jury was instructed that "'[t]o return a judgment of death, each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without possibility of parole'" (*ibid.*).  Moreover, "[t]he United States Supreme Court decisions rendered in *Ring v. Arizona*[, *supra*,] 536 U.S. 584 and *Apprendi v. New Jersey*[, *supra*,] 530 U.S. 466 do not compel a different conclusion." (*People v. Manriquez*, supra, 37 Cal. 4th at p. 589; see also *People v. Williams*, *supra*, 43 Cal. 4th at p. 649 [the high court's decision in *Cunningham v. California*, [549 U.S. 270 (2007)], does not compel a different result].)  Under the principles recited above and contrary to defendant's claim, Evidence Code section 520, establishing that a party "claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue," does not apply to the normative decision on penalty that is performed by the trier of fact at the penalty phase of a capital trial.

*Dykes*, 46 Cal. 4th at 814; AG022170-AG022171; *see also id.* at 799 (California Supreme Court has rejected claims that *Apprendi*, *Ring*, or *Cunningham*, "requires juries to enter unanimous findings concerning aggravating factors").

The California Supreme Court's conclusion on the issue of a burden of proof is neither contrary to nor an unreasonable application of United State Supreme Court precedent.  In *Apprendi*, the Court held, "[o]ther than the fact of a prior conviction, any fact that increases the

21

penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. In *Ring*, the Court explained that under *Apprendi*, where the jury's verdict alone does not make the defendant eligible for the maximum punishment of death, additional findings necessary to make the defendant eligible must be found by a jury beyond a reasonable doubt. *Ring*, 536 U.S. at 597-609. As the California Supreme Court explained in *Demetrulias*, however, neither *Apprendi* nor *Ring* are applicable to the California death penalty scheme:

> "'[U]nder the California death penalty scheme, once the defendant has been convicted of first degree murder and one or more special circumstances has been found true beyond a reasonable doubt, death is no more than the prescribed statutory maximum for the offense; the only alternative is life imprisonment without possibility of parole. ([Pen. Code] § 190.2, subd. (a).) Hence, facts which bear upon, but do not necessarily determine, which of these two alternative penalties is appropriate do not come within the holding of *Apprendi*.' [Citation.] The high court's recent decision in *Ring v. Arizona, supra*, 536 U.S. 584 does not change this analysis. Under the Arizona capital sentencing scheme invalidated in *Ring*, a defendant convicted of first degree murder could be sentenced to death if, and only if, the trial court first found at least one of the enumerated aggravating factors true. (*Id.* at p. 603.) Under California's scheme, in contrast, each juror must believe the circumstances in aggravation substantially outweigh those in mitigation, but the jury as a whole need not find any one aggravating factor to exist. The final step in California capital sentencing is a free weighing of all the factors relating to the defendant's culpability, comparable to a sentencing court's traditionally discretionary decision to, for example, impose one prison sentence rather than another. Nothing in *Apprendi* or *Ring* suggests the sentencer in such a system constitutionally must find any aggravating factor true beyond a reasonable doubt." (*People v. Snow*, [30 Cal. 4th 43, 126 n 32 (2003)].)

*People v. Demetrulias*, 39 Cal. 4th at 41.

In rejecting the claim that the California death penalty scheme violates the federal Constitution because it does not require jurors to agree unanimously on the existence of particular factors in aggravation, the California Supreme Court further explained:

> While all the jurors must agree death is the appropriate penalty, the guided discretion through which jurors reach their penalty decision must permit each juror individually to assess such potentially aggravating factors as the circumstances of the capital crime ([Pen. Code] § 190.3, factor (a)), prior felony convictions (*id.*, factor (c)), and other violent criminal activity (*id.*, factor (b)), and decide for him- or herself "what weight that activity should be given in deciding the penalty." (*People v. Ghent* (1987) 43 Cal. 3d 739, 774.) The series of normative judgments involved in deciding whether a particular circumstance is indeed aggravating and, if so, what weight it should be given, cannot be fitted into a scheme of unanimous jury factfinding. Defendant's contention is premised on a "misunderstand[ing] [of] the penalty determination process." (*People v. Miranda* (1987) 44 Cal. 3d 57, 99.)

22

1 *People v. Demetrulias*, 39 Cal. 4th at 41-42.

2   The California Supreme Court has also concluded that the high court's decisions in *Blakely*

3 *v. Washington*, 542 U.S. 296 (2004) and *Cunningham v. California*, 549 U.S. 270 (2007), merely

4 extend the *Apprendi* and *Blakely* analyses to California's determinate sentencing law and have

5 "no apparent application to California's capital sentencing scheme." *See People v. Salcido*, 44

6 Cal. 4th 93, 167 (2008).

7   Petitioner further argues that the absence of a requirement of proof beyond a reasonable

8 doubt in the capital sentencing procedure is inconsistent with the requirement that other

9 "comparatively minor matters," such as sentence enhancement allegations, must be proved

10 beyond a reasonable doubt. Pet. at 75-76. Petitioner's argument again misapprehends the nature

11 of the capital sentencing decision. California law already requires the jury to be convinced

12 beyond a reasonable doubt of the only factual determinations—those related to the defendant's

13 criminality—that are implicated by the listed penalty-phase factors. As the California Supreme

14 Court has explained in *People v. Carpenter*, 15 Cal. 4th 312 (1997), "'[t]he sentencing function is

15 inherently moral and normative, not factual, the sentencer's power and discretion under

16 [California's death penalty law] is to decide the appropriate penalty for the particular offense

17 under all the relevant circumstances.' [Citation.] Because of this, instructions associated with the

18 usual fact-finding process—such as burden of proof—are not necessary. [Citations.]" *Id.* at 417-

19 18; see also *People v. Bacigalupo*, 1 Cal. 4th 103, 145-46 (1991) (rejecting claim that death

20 penalty law violates equal protection because "less protected" interests are required to be found

21 by proof beyond a reasonable doubt finding that those fact-finding proceedings are not analogous

22 to the jury's "moral and normative" sentencing function in a death penalty case).

23   In *Harris v. Pulley*, 692 F. 2d 1189 (9th Cir. 1982) (en banc, per curium) overruled on other

24 grounds in *Pulley v. Harris*, 465 U.S. 37 (1984), the Ninth Circuit rejected a claim that

25 California's death penalty scheme was unconstitutional because it failed to specify a burden of

26 proof in determining whether aggravating factors outweigh mitigating ones and that death is the

27 appropriate penalty. The court held:

28

1

2     Although the statute does not specify the burden of proof at this stage, it does require use of the beyond-a-reasonable-doubt standard in the stage where the truth of any special circumstance is determined. Unless a jury is convinced beyond a reasonable

3     doubt of the truth of at least one special circumstance charged, it cannot even consider whether to impose the death penalty. Cal. Penal Code § 190.4(a). The statute then requires a jury to consider and take into account all mitigating and

4     aggravating factors in determining whether to impose the death penalty. *Id*. § 190.3. And while the statute does not specify the burden of proof, a plurality of the

5     California Supreme Court has read the statute as requiring the jury to weigh these factors before imposing the penalty. See *People v. Frierson*, [25 Cal. 3d 142, 180

6     (1979)]. These procedures guarantee that the jury's discretion will be guided and its consideration deliberate.

7

8     The United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed. In

9     *Proffitt v. Florida*, the Court upheld a statute that did not require this standard when the jury rendered an advisory verdict on whether the death penalty should be imposed. See *Proffitt v. Florida*, 428 U.S. [242,] 257-58 [(1976)](plurality opinion).

10    Although the jury's verdict in this statute is mandatory, we do not think that this difference makes this statute distinguishable from the one in *Proffitt*. Moreover, we

11    are not aware of any instance where the state must carry such a burden of proof when attempting to convince a sentencing authority of the appropriate criminal sentence. If

12    the Supreme Court had intended for the burden in death-penalty cases to vary from the standard burden in all other criminal sentencing, it would have said so in one of

13    the many modern cases dealing with the death penalty.

14    *Harris v. Pulley*, 692 F. 2d at 1194-95; *see also Williams v. Calderon*, 52 F. 3d 1465, 1485 (1995)

15    ("the failure of the statute to require a specific finding that death is beyond a reasonable doubt the

16    appropriate penalty does not render it unconstitutional").

17    Petitioner has presented no persuasive arguments to establish that the California Supreme

18    Court's denial of his claim regarding the burden of proof was contrary to or an unreasonable

19    application of United States Supreme Court authority. Accordingly, his claim must be denied.

20                    **4.    That Written Findings Regarding Aggravating Factors Are Not
                            Required Does Not Render California's Death Penalty Scheme**

21                    **Unconstitutional; Petitioner's Argument Regarding the California
                            Supreme Court's Power to Modify a Death Sentence Does Not**

22                    **Present a Claim on Which Federal Habeas Relief Can Be Granted**

23    Appellant's next subclaim incorporates two unrelated arguments. First, petitioner contends

24    that California's failure to require written findings regarding aggravating factors violates due

25    process and the Eighth Amendments. Pet. at 79-82. Second, petitioner asserts that "[t]he

26    persistent refusal" of the California Supreme Court to "acknowledge or employ its power" under

27    state law to modify death judgments by imposing a lesser punishment "is offensive to the Due

28

                                              24

1  Process Clause of the Fourteenth Amendment." Pet. at 82-84. Neither of these arguments

2  provides a basis for federal habeas relief.

3          a.      **Unanimous written findings regarding aggravating factors are**
                   **not required by the United States Constitution**
4

5          Appellant maintains that "[t]he failure to require written or other specific findings by the

6  jury regarding aggravating factors deprived [him] of his federal due process and Eighth

7  Amendment rights to meaningful review." Pet. at 79.[9] The California Supreme Court rejected

8  this claim, stating that nothing in the federal Constitution requires the penalty phase jury to make

9  written findings of the factors it finds in aggravation and mitigation. *Dykes*, 46 Cal. 4th at 813;

10 AG022169.

11         The California Supreme Court's rejection of petitioner's claim is consistent with its own

12 precedent which has repeatedly held that the requirement that the judge make written findings

13 upholding or overturning the jury's verdict is sufficient to satisfy the procedures validated in

14 *Gregg v. Georgia*, 428 U.S. 153 (1976) and *Proffitt v. Florida*, 428 U.S. 242 (1976). *See People*

15 *v. Jackson*, 28 Cal. 3d 264, 316-17 (1980), overruled on other grounds in *People v. Cromer*, 24

16 Cal. 4th 889, 901 (2001); *People v. Frierson*, 25 Cal. 3d 142, 178-80 (1979) (plurality opn). The

17 claim petitioner makes has also been rejected by the Ninth Circuit in *Harris v. Pulley*, 692 F. 2d

18 at 1195-96 reversed on other grounds in *Pulley v. Harris*, 465 U.S. 37 (1984). As the Ninth

19 Circuit held:

20         We agree with the California Supreme Court's conclusion because the California
           statute is very similar to the statute upheld in *Proffitt v. Florida*, 428 U.S. 242, 250,
21         49 L. Ed. 2d 913, 96 S. Ct. 2960 (1976). There the judge, not the jury, set forth
           written findings stating the reasons why the death sentence was appropriate under the
22         Florida statute. Under that statute, the jury's verdict was only advisory. *Id.* at 249.
           Although the jury's verdict here is mandatory, the judge "shall review the evidence,
23         consider, take into account, and be guided by the aggravating and mitigating
           circumstances referred to in Section 190.3, and shall make an independent
24         determination as to whether the weight of the evidence supports the jury's findings
           and verdicts. He shall state on the record the reason for his findings." Cal. Penal
25         Code § 190.4(e). Because the judge must determine independently whether the death
           penalty is appropriate and, in so doing, weigh the evidence of aggravating and
26         mitigating circumstances, the appellate court is provided with a sufficient record upon

27     _____
           [9] Petitioner raised this claim on direct review in the California Supreme Court. AOB
28 Claim XVIII at AG0-21599-AG021601; RB at AG021917-AG021918.

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

review.  On the basis of the judge's written conclusions, the appellate court can
determine whether the evidence supported the jury's finding of aggravated
circumstances.  If the judge and the appellate court conclude that the jury verdict is
supported by the evidence, the danger that the jury acted under the influence of undue
passion or prejudice is negligible.  See *Gregg v. Georgia*, 428 U.S. at 195 (plurality
opinion).  While it might be preferable to have the sentencer provide a written
statement concerning the basis for the decision to impose the death penalty, we
cannot say that the California statute is unconstitutional because it requires only the
judge to provide such a statement.  The judge's statement provides an adequate basis
for appellate review.

*Harris v. Pulley*, 692 F. 2d at 1195-96.

Petitioner cites no United States Supreme Court authority to the contrary.  The absence of

such authority precludes relief under AEDPA.  *Cullen v. Pinholster*, 131 S. Ct. at 1411, n.20;

*Carey v. Musladin*, 549 U.S. 70, 77 (2006).

**b.    Petitioner's assertions regarding the California Supreme
Court's power to modify a death sentence do not present a
claim on which habeas relief can be granted**

Citing only California statutes, petitioner contends that state courts may modify a judgment

by imposing a lesser punishment, but that "the persistent refusal of the California Supreme Court

to acknowledge or employ its power [to modify a sentence] accordingly is offensive to the Due

Process Clause of the Fourteenth Amendment."  Pet. at 83.[10]  Petitioner's claim does not raise an

issue of federal constitutional law upon which the writ can be granted.

At the time of petitioner's trial, Penal Code section 190.4(e) provided that in every case in

which a jury had rendered a death verdict, the trial court had to determine whether to modify that

judgment by imposing a lesser punishment.  The judge also had to state on the record its findings

regarding its determination.[11]  Similarly, pursuant to Penal Code section 1181, subpart 7, the trial

---

[10] Petitioner raised this claim in the California Supreme Court in his direct appeal.  AOB
Claim XXIII at AG0201635-AG0201637.

[11] Penal Code section 190.4(e) provides in relevant part:

In every case in which the trier of fact has returned a verdict or finding imposing the
death penalty, the defendant shall be deemed to have made an application for
modification of such verdict or finding pursuant to Subdivision 7 of Section 11.  In
ruling on the application, the judge shall review the evidence, consider, take into
account, and be guided by the aggravating and mitigating circumstances referred to in
Section 190.3, and shall make a determination as to whether the jury's findings and
verdicts that the aggravating circumstances outweigh the mitigating circumstances are

(continued…)

26

court in a capital case must consider whether to modify the death judgment by imposing the lesser

punishment without granting or ordering a new trial, and this power extends to any court to which

the case may be appealed.[12]  Finally, Penal Code section 1260 provides:

> The court may reverse, affirm, or modify a judgment or order appealed from, or reduce the degree of the offense or attempted offense or the punishment imposed, and may set aside, affirm, or modify any or all of the proceedings subsequent to, or dependent upon, such judgment or order, and may, if proper, order a new trial and may, if proper, remand the cause to the trial court for such further proceedings as may be just under the circumstances.

The trial court in petitioner's case denied the automatic motion to modify the judgment on

December 2, 1995.  CT 735-36, 771-94; AG000792-AG000793, AG000828-AG000851.  The

California Supreme Court rejected petitioner's challenge to the denial of the motion.  The court

found:

> Defendant contends we should rely upon section 1181, subdivision 7 and section 1260, provisions that govern motions for new trial and the authority of appellate courts to modify judgments, as a basis for exercising our own authority to reduce the capital sentence.  Prior decisions establish that these provisions do not confer authority on this court to "substitute its judgment as to the choice of penalty for that of the trier of fact, and . . . the court may not reduce a capital defendant's sentence from death to life imprisonment simply because it disagrees with the jury's penalty determination."  (*People v. Hines*, [15 Cal. 4th 997, 1080 (1997)]; see also *People v. Steele*, [27 Cal. 4th 1230, 1268-69 (2002)].)  Accordingly, we reject defendant's claim that the statutory provisions constitute a "procedural entitlement that is protected by the due process clause."  Our conclusion does not impair defendant's right to meaningful appellate review within the meaning of the Eighth Amendment or the due process clause of the United States Constitution; defendant's rights in this regard are confined to and satisfied by our having considered, and rejected, his assertion that his sentence of death is disproportionate to this individual culpability.

*Dykes*, 46 Cal. 4th at 819; AG022178.

_____

(...continued)

contrary to law or the evidence presented.  The judge shall state on the record the reasons for his findings . . . .

[12] California Penal Code section 1181, subpart 7, provides:

When a verdict has been rendered or a finding made against the defendant, the court may, upon his application, grant a new trial, in the following cases only:

7. When the verdict or finding is contrary to law or evidence, but in any case wherein authority is vested by statute in the trial court or jury to recommend or determine as a part of its verdict or finding the punishment to be imposed, the court may modify such verdict or finding by imposing the lesser punishment without granting or ordering a new trial, and this power shall extend to any court to which the case may be appealed[.]

27

1    Petitioner now repeats the claim regarding the state courts' exercise of their statutory power

2  under California law in this federal habeas petition.  He does not specifically address the

3  California Supreme Court's reasoning in denying his claim.  More importantly, he does not cite

4  controlling United States Supreme Court precedent to establish that the California Supreme

5  Court's denial of his claim on the merits was either an unreasonable interpretation of the facts or

6  an unreasonable application of United States Supreme Court law.  Thus, his claim of state-law

7  error fails to state a valid federal constitutional claim.  *See Pulley v. Harris*, 465 U.S. at 41-42

8  ("federal court may not issue the writ on the basis of a perceived error of state law"); *Turner v.*

9  *Calderon*, 281 F. 3d 851, 871 (9th Cir. 2002) (violation of Penal Code, § 190.4 is, "at most," a

10  violation of state law and, therefore, not cognizable on federal habeas).  Accordingly, petitioner

11  fails to state a claim upon which relief can be granted under U.S.C. § 2254(d).

### 5.    Petitioner's Sentence Is Not Disproportionate to His Personal Culpability and Does Not Violate the Eighth Amendment's Prohibition Against Cruel and Unusual Punishment

14    Petitioner contends that the "death penalty is disproportionate to [his] personal culpability

15  and thus violates the prohibition against cruel and unusual punishment contained in the federal

16  constitution."  Pet. at 84.[13]  Both the trial court and the California Supreme Court rejected this

17  claim.  *Dykes*, 46 Cal. 4th at 818-19; AG022176-AG022178.[14]  The rejection of the claim was

18  neither contrary to, nor an unreasonable application of, Supreme Court law.

19    Under California law, imposition of the death penalty is subject to "intracase" review to

20  determine whether the penalty is "so disproportionate to the crime for which it is inflicted that it

21  shocks the conscience and offends fundamental notions of human dignity," thereby violating the

22  constitutional prohibition against cruel and/or unusual punishment.  *In re Lynch*, 8 Cal. 3d 410,

23  424 (1972), footnote omitted.  In requiring a proportionality review, California law is consistent

24  with United State Supreme Court law.  *Solem v. Helm*, 463 U.S. 277, 286-92 (1983).  In

---

[13] Petitioner raised this claim on direct review in the California Supreme Court.  AOB Claim XXIII at AG0-21632-AG021635; RB AG021931-AG021940.

[14] Petitioner raised the claim again in a petition for rehearing in the California Supreme Court.  AG022191-AG022194.  On August 12, 2009, the California Supreme Court denied the petition.  AG022197.

1    petitioner's case, the California Supreme Court stated that petitioner's claim required it to

2    consider:

3        "'the nature of the offense and/or the offender, with particular regard to the degree of
         danger both present to society.'" (*People v. Dillon*, [34 Cal. 3d 441, 479 (1983)].)

4        We inquire "whether the punishment is grossly disproportionate to the defendant's
         individual culpability. . . ." (*Ibid.*)  "'[W]e examine the circumstances of the offense,

5        including its motive, the extent of defendant's involvement, the manner in which the
         crime was committed, the consequences of defendant's acts, and defendant's personal

6        characteristics including age, prior criminality, and mental capabilities.'" (*People v.
         Tafoya*, [42 Cal. 4th 147, 198 (2007)].)"

7

8    *Dykes*, 46 Cal. 4th at 818; AG022176.

9        First, there can be no contention that imposition of the death penalty in a felony-murder

10   case violates the Eighth Amendment.  The United States Supreme Court has rejected similar

11   arguments and has made it clear that the death penalty for felony murder is permissible if the

12   defendant is the actual killer.  *Lowenfield v. Phelps*, 484 U.S. 231 (1988); *Tison v. Arizona*, 481

13   U.S. 137 (1987); *accord People v. Bean*, 46 Cal. 3d 919, 958 (1988).

14       In this case, the trial court undertook a considered and detailed review of the evidence and

15   determined that the jury's sentence of death was fair, justified, and proportionate.  RT 4117-4133;

16   *see* AG021280-AG021296.  The trial court's conclusions, particularly because they were

17   validated by the California Supreme Court, provide the outline for our argument here.

18       The trial court found that "the circumstances surrounding the first degree murder of Lance

19   Clark were cruel, vicious and brutal."  RT 4120; AG021382.  The trial court rejected petitioner's

20   claim, repeated here, that he committed an "impulsive" act that led to terrible consequences. (*See*

21   pet. at 85 ("a robbery which had tragic consequences").)

22       His plan to rob Mrs. Clark of money, he knew that she carried with her on her regular
         visits to her apartment complex in which he was a tenant, had been formed by the

23       defendant weeks or months before.  There was credible evidence presented to the jury
         during the trial that established that the subject of the robbery of Mrs. Clark and the

24       specific ways in which such robbery could be carried out were discussed on
         numerous occasions by the defendant and other tenants in the apartment complex.

25

26       The evidence clearly establishes that long before the defendant committed the
         robbery he procured the 45 caliber revolver he would use to commit the robbery and
         that he persuaded his girlfriend against her better judgment to buy that weapon for

27       him with her money. The evidence established that the defendant purchased
         ammunition for the weapon from a second person, the evidence further establishes

28       that he worked on the weapon taking it apart, reassembling it, loading it and test

29

1

firing it in an effort to make sure it would work properly when it was used. He then loaded it for a final time.

2

3

The evidence clearly establishes that on the day the crimes were committed, July 26th, 1993, from the vantage point of his second floor apartment window the defendant saw Bernice Clark drive into the parking lot at the rear of the apartment complex, he knew she would have money, a substantial amount of money on her person. Bernice Clark had her grandson, Lance Clark, present with her as she parked the car. He was seated, Lance Clark was seated in the right front passenger seat of the automobile.

4

5

6

7

RT 4120-4121; AG021283-AG021284.

8

As he did in the California Supreme Court, petitioner asserts that the jury concluded that his

9

attempted murder was not "premeditated," hence allegedly lessening his culpability. Pet. at 85.

10

The California Supreme Court correctly rejected this argument.

11

Defendant has requested that we conclude he did not act with premeditation, relying upon the jury's verdict on the attempted murder charge. If we consider the jury's verdict on the latter charge in connection with the capital offense, it also causes us to conclude that defendant actually *did* form the intent to kill before he discharged his weapon, because intent to kill is an element of the offense of attempted murder. Thus, defendant's claim that the murder constituted an entirely accidental killing is not persuasive—particularly when we consider evidence suggesting he shot Bernice Clark because she had recognized him. There was ample evidence that defendant planned the robbery and armed himself with a loaded weapon for the purpose of confronting an elderly woman . . . .

12

13

14

15

16

17

*Dykes*, 46 Cal. 4th at 818-19; AG022177.

18

As he did in the state courts, petitioner claims that he had not realized that Lance Clark was

19

in the vehicle when he went to rob Mrs. Clark. Pet. at p. 85. The trial court found that the

20

evidence belied this claim.

21

The defendant in his tape recorded statements to the police . . . and in his own testimony at the trial denies that he [k]new Lance Clark was present in the car. From my independent review of all of the evidence presented to the jury during this trial I do not believe this.

22

23

24

On every other occasion to which reference was made in the trial of occasions where Bernice Clark visited the apartment complex she was accompanied by her grandson. Her grandson would play with children of various tenants, in fact was known by everyone in the complex. On this day these crimes occurred the defendant observed Mrs. Clark drive her car into the parking lot in the rear of the apartment complex, he could see her clearly through the window of her vehicle as the car faced his second floor apartment window. This observation and this recognition of her caused him to don additional items of clothes, obtain his previously loaded weapon and leave his apartment to put into action the robbery he had planned. In my judgment and from an independent review of the photographs . . . admitted into evidence . . . , if the

25

26

27

28

30

defendant could clearly see, recognize and identify Mrs. Clark from this vantage point he must also have seen her grandson sitting right next to her in the front seat of the same car just as clearly visible through the same windshield.

And surely even if the defendant somehow saw Mrs. Clark but missed seeing her grandson from the apartment window he could not possibly have missed seeing him as the defendant went into the parking lot, approached the car from the front of the driver's side and commenced the robbery.

Certainly every other person who witnessed the crimes that day clearly saw the victim, Lance Clark, in the car. It was virtually their first observation.

RT 4121-4123; AG021284-AG021285; *see also Dykes*, 46 Cal. 4th at 819; AG022177.

The court's finding on this issue was not based solely on the physical evidence. It also noted that petitioner had admitted to the police that he had seen the young boy.

Sergeant Chenault of the Oakland Police Department testified at the trial . . . that the defendant, Ernest Dykes, admitted to him off tape that he did in fact see the little boy in the car and knew he was there at the time of the robbery and the shooting. The sergeant's recollection of the defendant's statement was recorded in the sergeant's notes to which he referred in his testimony. This testimony remained unshaken despite vigorous cross-examination. From my independent review of this testimony . . . and from my observations of Sergeant Chenault as he testified and his demeanor while he so testified, I believe that Sergeant Chenault was telling us the truth and that his recollection was in fact accurate . . . .

Thus I believe that when he denied making these observations or having this knowledge of the little boy's presence in the car at the time of the robbery and the shooting, the defendant lied to this jury in an attempt perhaps to reduce his legal culpability and certainly in an attempt to reduce his moral culpability for the events which would follow.

RT 4123-4124; *see* AG021286-AG021287.

Following the crime, petitioner did not turn himself in to the police and claim that the shooting of Mrs. Clark and/or Lance was an impulsive mistake. Rather, as the trial court detailed, he misled the police and attempted to conceal his responsibility for the crimes.

Having shot the victims and having completed the robbery the defendant left the scene. He apparently went to an adjacent apartment complex where he removed his clothing and his stocking mask, revealing a second set of clothing underneath. He also apparently discarded the murder weapon which he later stated he threw into the bay. A short time later he returned to the scene and spoke to police officers. There he would calmly and dispassionately and convincingly tell the police a false story about having seen the robber run right by him. He described this mythical robber to the police officers. At the time he told this false story to the police in such a calm and convincing fashion he had the money he had taken from Mrs. Clark in his pants pockets.

RT 4125; AG021288.

1    As he did in the state courts, petitioner portrays himself as deeply remorseful for his crimes

2   and claims he expressed this remorse immediately following the shootings.  The trial court

3   accurately highlights the evidence that belies this contention.

> From an independent and a careful examination of the testimony which reflects this
> false and fabricated story so convincingly told the police there at the scene, there is
> not the slightest shred of remorse expressed by this defendant.  There is as evidence
> substantiates later deceit, there is fabrication, there is willful falsehood, but there is no
> remorse.
>
> In fact in an examination of all of the evidence presented to the jury in this trial I find
> absolutely no genuine expression of remorse by this defendant for the little boy, his
> life [that] he took, to be sure.  The defendant weeps copiously on the tape record[ed]
> statement to the police homicide detectives.  I heard this tape when the jury heard it, I
> have listened to it many times before and since.  There are tears, but they are not tears
> for Lance Clark. Ernest Dykes cries, when he finally cries after telling us all the false
> stories and all the deceptions, Ernest Dykes cries only for himself and for the
> predicament he finds himself in.
>
> No where in my judgment from an independent review of the evidence presented to
> the jury in the course of this trial, nowhere is a single tear shed by this defendant for a
> nine year old boy who is lost forever.

14   RT 4125-4126; AG021388-AG021289.

15    The trial court next described the circumstances of the crimes (see Penal Code, § 190.3,

16   factor (a)) and the devastating impact of the crimes on the survivors.  The description further

17   belies the claim that petitioner's sentence is disproportionate to his culpability.

> I have also independently reviewed the evidence presented to the jury of the
> devastating impact the murder of Lance Clark has had on the people who loved him.
> There were literally no words to convey the enormity of the loss of this little boy [to]
> his family to those who cared so much for him, to those who knew him.  Nine years
> of age, he[] never had the chance to grow up to become an adult, to fall in love, to
> have a family of his own.
>
> His life ended with hopes and dreams unfulfilled or as yet undreamed.  The utter
> sadness of that senseless and purposeless[] loss and the loss of the whole future of
> that life will never leave Bernice Clark or [Kristie] Clark or Judy [Schaaf].  As the
> testimony in this case, testimony presented to this jury reflects[,] Lance Clark's little
> brother Justin cries for his older brother, he wants to play with him again, and what
> can Bernice Clark tell him about that[?]  Justin doesn't want to be with his
> Grandmother because he doesn't want to be hurt like Lance was, what can Bernice
> Clark tell him about that?  All of these things come back to Bernice Clark especially
> at night.  I expect that they will continue to come back to her unbidden for a very long
> time to come.
>
> [Kristie] Clark will always remember having to make the funeral arrangements for
> her little brother and having to pick out a small casket on a special order to fit Lance,
> that is her last memory of her little brother.  Now in a very real sense these are the

32

circumstances of the crime of whi[ch] the defendant has been convicted in the present proceedings and the existence of the special circumstance found to be true.

RT 4126-4128; AG021389-AG021291.

The trial court's independent review of the other factors under Penal Code section 190.3 strengthens the conclusion that petitioner's punishment was proportionate to his crimes. It was proved beyond a reasonable doubt that petitioner had committed a prior crime which involved the implied threat to use force or violence when he possessed a loaded and concealed weapon in 1991 (Penal Code, § 190.3, factor (b)). RT 4128; AG021291. His crimes were not committed while he was under the influence of extreme mental or emotional disturbance (Penal Code, § 190.3, factor (d)). RT 4129; AG021292. Obviously, petitioner's victims were not participants in his homicidal conduct, nor did they consent to his acts (Penal Code, § 190.3, factor (e)). RT 4129; AG021292. His offenses were not committed under circumstances which he reasonably believed to be a moral justification or extenuation of his conduct (Penal Code, § 190.3, factor (f)). RT 4129; AG021292. Petitioner did not act under extreme duress or under substantial domination of another person (Penal Code, § 190.3, factor (g)). RT 4129; AG021293. Petitioner alone was responsible for these crimes (Penal Code, § 190.3, factor (j)). RT 4130; AG021293.

Petitioner, as he did in the state courts, claims he was intoxicated as the result of alcohol use when he committed the crimes. Pet. at 85. The trial court found, however, that at the time of the offenses, petitioner's capacity to appreciate the criminality of his conduct and conform his conduct to the requirements of the law were not impaired as the result of mental disease or defects, or the effects of intoxication (Penal Code, § 190.3, factor (h)). RT 4129-4130; AG021292-AG021293. The California Supreme Court agreed, stating: "The claim that defendant may have been intoxicated at the time of the capital offense does not diminish the degree of danger defendant evidently presents to society, nor does it diminish his culpability in robbing and shooting an elderly woman who was known to lend money to her tenants." *Dykes*, 46 Cal. 4th at 819; AG022178.

The state courts also rejected petitioner's claim that his age should be considered as a mitigating factor (Penal Code, § 190.3, factor (i)). RT 4130; AG021293. First, the California

33

1    Supreme Court noted that petitioner was wrong in stating he was 19 years old at the time of the

2    crime.  Petitioner was born on December 23, 1972, and the crimes occurred in July 1993.

3    Therefore, petitioner was 20 years old.  *Dykes*, 46 Cal. 4th at 818, n.25; AG022176.  In his federal

4    petition, which largely repeats verbatim the claims raised on direct appeal, petitioner again asserts

5    that he was 19 years old at the time of the crime.  Pet. at 84.  Yet, he fails to explain, let alone

6    address, why the California Supreme Court's calculation of his age is incorrect.  The California

7    Supreme Court "acknowlede[d] that defendant's youth stands in his favor."  *Dykes*, 46 Cal. 4th at

8    818; AG022177.  However, it found that his prior record, "although denominated a misdemeanor,

9    suggests a disregard for safe and appropriate use of firearms that, even under defendant's account,

10   is evident in the present crime, as well."  *Dykes*, 46 Cal. 4th at 818; AG022177.  In other words,

11   petitioner, who previously had been arrested for a crime involving the use of a gun, was certainly

12   old enough to appreciate the danger of robbing—with a gun—an elderly woman, who was

13   accompanied by a nine-year-old boy.

14        Finally, as the trial court found, there are no circumstances "which extenuate the gravity of

15   the crimes nor are there present any sympathetic or other aspects of the defendant's character or

16   record which provide a basis for a sentence less than death . . ." (Penal Code, § 190.3, factor (k)).

17   RT 4130-4131; AG021293-AG021294; see also *Dykes*, 46 Cal. 4th at 819 ("none of defendant's

18   claims on appeal counter the nature and tragic result of he crime itself"); AG022178.  In sum, the

19   trial court accurately concluded from its "independent determination that imposing the death

20   penalty upon the defendant is appropriate in light of the relevant evidence and the applicable

21   law."  RT 4131; AG021294.

22        Consequently, petitioner has failed to show that the state courts' careful evaluation of the

23   proportionality of his punishment to his crimes is contrary to or an unreasonable application of

24   Supreme Court law.

25        **6.    The Absence of Intercase Proportionality Review Does Not Render
          the California Death Penalty Statute Unconstitutional**

26

27        Petitioner contends that the failure of California to engage in intercase proportionality

28   review in capital cases violates the Eighth and Fourteenth Amendments to the United States

34

1   Constitution.  Pet. at 86-93.[15]  The California Supreme Court rejected this claim, stating:  "The

2   absence of intercase proportionality review does not violate the federal or state Constitutions.

3   (*People v. Crittenden* (1994) 9 Cal. 4th 83, 156-157 [rejecting claims based upon due process and

4   equal protection guarantees, the prohibition on cruel or unusual punishment, and [Penal Code] §

5   1170 (f)]; see also *People v. Cruz*, [44 Cal. 4th 636, 681 (2008)].)"  *Dykes*, 46 Cal. 4th at 813;

6   AG022169.

7         The United States Supreme Court has held that intercase proportionality review is not

8   constitutionally required under the Eighth Amendment, made applicable to the states through the

9   Fourteenth Amendment.  *Pulley v. Harris*, 465 U.S. at 50-51.  As explained by the Court in

10  *Pulley*, that some sentencing schemes which provide proportionality review are constitutional

11  does not mean that such review is indispensable.  *Id*. at 44-51.

12        Given the Court's holding in *Pulley*, petitioner cannot establish that the California Supreme

13  Court's rejection of his claim is contrary to or an unreasonable application of Supreme Court law.

14              **7.    Prosecutorial Charging Discretion Does Not Render California's
                        Death Penalty Statute Unconstitutional**
15

16        Petitioner contends that allowing prosecutors the discretion to determine whether the death

17  penalty will be sought in a particular murder case "introduces arbitrary and capricious elements

18  into the decision-making process and thereby violates the Fifth, Eighth, and Fourteenth

19  Amendments to the United States Constitution."  Pet. at 93.[16]  The California Supreme Court

20  rejected this claim.  *Dykes*, 46 Cal. 4th at 820; AG022179 ("Contrary to defendant's claim, the

21  California death penalty provisions do not violate the Fifth, Eighth, and Fourteenth Amendments

22  to the United States Constitution by virtue of the assertedly 'unbridled' charging discretion these

23  provisions vest in prosecutors.  (*People v. Prince*, [40 Cal. 4th 1179, 1298 (2007)]; *People v.*

24

25  _____

26        [15] Petitioner raised this claim on direct review in the California Supreme Court.  AOB
    Claim XXIII, subpart A at AG021637-AG021641, and Claim XXIV at AG021641-AG021644;
27  *see also* AG021931-AG021939 and AG021941-AG021942.
          [16] Petitioner raised this claim on direct review in the California Supreme Court.  AOB
28  Claim XXV at AG021644; *see also* RB at AG021943.

1    *Crittenden*, [9 Cal. 4th 83, 152 (1994)])"). The California Supreme Court's rejection of this claim

2    was neither contrary to, nor an unreasonable application of, Supreme Court law.

3         As the California Supreme Court has explained:

4         prosecutorial discretion to select those eligible cases in which the death penalty will
          actually be sought does not in and of itself evidence an arbitrary and capricious

5         capital punishment system or offend principles of equal protection, due process, or
          cruel and/or unusual punishment. (*Jurek v. Texas* (1976) 428 U.S. 262, 274 [plur.

6         opn.], 279 [conc. opn. of White, J.]; *Proffitt v. Florida* (1976) 428 U.S. 242, 254
          [plur. opn.], 261 [conc. opn. of White, J.]; *Gregg v. Georgia* (1976) 428 U.S. 153,

7         199-200 [plur. opn.], 225-226 [conc. opn. of White, J.] . . . .

8    *People v. Keenan*, 46 Cal. 3d 478, 505 (1988), footnote omitted; see also *People v. Earp*, 20 Cal.

9    4th 826, 905 (1999) ("There is no constitutional proscription against delegating to each district

10   attorney the power to effectively decide in which cases to seek the death penalty"); *People v.*

11   *Crittenden*, 9 Cal. 4th 83, 152 (1994).

12        The California Supreme Court's conclusion is consistent with United States Supreme Court

13   precedent. As the high Court held in *Gregg v. Georgia*, 428 U.S. 153:

14        First, the petitioner focuses on the opportunities for discretionary action that are
          inherent in the processing of any murder case under Georgia law. He notes that the

15        state prosecutor has unfettered authority to select those persons whom he wishes to
          prosecute for a capital offense and to plea bargain with them. Further, at the trial the

16        jury may choose to convict a defendant of a lesser included offense rather than find
          him guilty of a crime punishable by death, even if the evidence would support a

17        capital verdict. And finally, a defendant who is convicted and sentenced to die may
          have his sentence commuted by the Governor of the State and the Georgia Board of

18        Pardons and Paroles.

19        The existence of these discretionary stages is not determinative of the issue before us.
          At each of these stages an actor in the criminal justice system makes a decision which

20        may remove a defendant from consideration as a candidate for the death penalty.
          *Furman* [*Furman v. Georgia*, 408 U.S. 238 (1972)], in contrast dealt with the

21        decision to impose the death sentence on a specific individual who had been
          convicted of a capital offense. Nothing in any or our cases suggests that the decision

22        to afford an individual defendant mercy violates the Constitution. *Furman* held only
          that, in order to minimize the risk that the death penalty would be imposed on a

23        capriciously selected group of offenders, the decision to impose it had to be guided by
          standards so that the sentencing authority would focus on the particularized

24        circumstances of the crime and the defendant.

25   *Id*. at 199, footnote omitted; see also *Jurek v. Texas*, 428 U.S. 262, 274 (1976).

26        Petitioner neither cites nor addresses *Gregg*. Rather, he cites several United States

27   Supreme Court cases that are inapposite. Pet. at 93-94, citing *Eddings v. Oklahoma*, 455 U.S.

28   104, 110 (1982) (the Constitution requires that the sentencer not be precluded from considering,

                                        36

as a mitigating factor, any aspect of the defendant's character or record and any of the

circumstances of the offense that the defendant proffers as a basis for a sentence less than death);

*Woodson v. North Carolina*, 428 U.S. 280 303 (1976) (plurality opinion holding that mandatory

death sentencing was not a permissible response to the problem of arbitrary jury discretion); *Zant*

*v. Stephens*, 462 U.S. 862, 885 (1983) (due process requires reversal of a jury decision to impose

the death penalty where the decision is based on constitutionally invalid aggravating

circumstances).  Citation to these cases without adequate explanation of how they alter the *Gregg*

analysis is unavailing to establish that the California Supreme Court failed to apply appropriate

United States Supreme Court precedent.  Thus, petitioner's claim fails under section 2254(d).

### 8.    Petitioner's Contention that His Sentence Is "Outside the Norm" Does Not Present A Claim on which Habeas Relief Can Be Granted

In this subclaim, petitioner essentially maintains that his case is "completely outside the

norm" for cases in which capital punishment has been sought and obtained.  Petitioner phrases his

claim as follows:

> [W]ithin Alameda County, the facts of his offenses, the nature of his charges and offenses of conviction, and the facts of his personal background including but not limited to his nominal criminal history, are completely outside the norm of those cases for which capital punishment has been sought and/or obtained by the prosecution since *Furman v. Georgia*, 408 U.S. 238 (1972).

Pet. at 94-95.  Petitioner repeats this same claim, asserting that his case is also outside the norm

for cases in which capital punishment has been obtained in California (pet. at 95) and in the

United States (pet. at 95).

Petitioner did not raise these claims in either the Alameda County Superior Court or the

California Supreme Court.  Therefore, the claims are unexhausted.  Under 28 U.S.C. §

2254(b)(1), "[a]n application for writ of habeas corpus on behalf of a person in custody pursuant

to the judgment of a State court shall not be granted unless it appears that (A) the applicant has

exhausted the remedies available in the courts of the State."  Respondent, however, is not

asserting the exhaustion bar because, under any state of facts, petitioner's claims cannot form the

basis for habeas relief.  At their core, petitioner's claims are based on a request for intercase

1    proportionality review.  Such review, however, is not constitutionally required.  *Pulley v. Harris*,

2    465 U.S. at 44-45.

3         Petitioner implicitly recognizes that his claim was not presented in the state courts.

4    Therefore, he maintains, instead, that "with discovery and an evidentiary hearing" in this Court,

5    he could establish the factual basis for his claims.  In support of this request, he relies on the

6    "Verification" of his attorney, who relates a hearsay conversation on an unspecified date with an

7    unnamed member of the Alameda County Public Defender's Office who had no personal

8    knowledge of petitioner's case.  Thus, counsel declares to this Court:

9         In support of Claim 1, I represent to this Honorable Court that I have spoken with a
         senior member of the Alameda County Public Defender's Office regarding this
10        matter.  She has practiced in that office continuously since 1985.  She was in the
         office at the time this matter was charged and prosecuted as a capital matter.  I
11        described the operative facts of the offenses at issue herein as well as the jury's
         determinations during the guilt phase, the prosecution's evidence in aggravation, and
12        Petitioner's criminal history.  She has represented to me that as a member of her
         Office she has a ready and ongoing familiarity with the capital charging practices of
13        the Alameda County District Attorney.  She expressed surprise upon learning this
         matter was charged and pursued as a capital matter since, in her extensive experience
14        in Alameda County, this fact pattern and offender profile would not ordinarily be a
         capital matter in that county in her professional judgment.
15

16   Pet. at 213 – i, ¶ 4, Verification of Philip A. Treviño.[17]  Even were Mr. Treviño's verification

17   relevant, which it will be shown *ante* it is not, it is riddled with deficiencies.  First, it is

18   unverifiable hearsay.  As stated, no date is given for the conversation.  The "senior member" of

19   the public defender's office is not identified, making it impossible to substantiate the

20   representations allegedly made.  Moreover, as is clear from the verification itself, the individual

21   had no participation in, or personal familiarity with, petitioner's case.  Her opinion is based on

22   nothing more than the information Mr. Treviño chose to provide to her.  The extent and

23   completeness of Mr. Treviño's description is unknown.  Furthermore, there is no reason to

24   assume that the public defender can give reliable information on the charging decisions of the

25   Alameda County District Attorney.  Last, but not least, the opinion of a member of the Alameda

26   County Public Defender's Office cannot support a claim that petitioner's case is outside the norm

27   _____

         [17] The first page of Mr. Treviño's verification is page 213 of the Petition, and the second
28   page is designated as page i.

38

1    of cases for which capital punishment has been sought in the entire State of California or in the

2    United States.

3        Not only does counsel's verification not support a request for an evidentiary hearing in this

4    Court, such a hearing would be immaterial.  In any such hearing petitioner could not establish

5    facts entitling him to relief.  Pursuant to 28 U.S.C. § 2254(e)(2)(B), if the petitioner "has failed to

6    develop the factual basis of a claim in State court proceedings, [this] court shall not hold an

7    evidentiary hearing on the claim unless the applicant shows that . . . the facts underlying the claim

8    would be sufficient to establish by clear and convincing evidence that but for constitutional error,

9    no reasonable fact finder would have found applicant guilty of the underlying offense."  Here,

10   even were petitioner able to introduce evidence about every other case in Alameda County, the

11   State of California, and the United States in which capital punishment has been sought and

12   obtained, he could not establish constitutional error.

13       Petitioner could not establish a claim for relief because his claims reduce to a request that

14   this Court engage in intercase proportionality review, a practice determined by the United States

15   Supreme Court to lack a constitutional foundation.  *Puley v. Harris*, 465 U.S. at 51 ("Assuming

16   that there could be a capital sentencing system so lacking in other checks on arbitrariness that it

17   would not pass constitutional muster without comparative proportionality review, the 1977

18   California statute is not of that sort"); *id*. at 53 (California's capital sentencing scheme "[o]n it's

19   face, . . . without any requirement or practice of comparative proportionality review, cannot be

20   successfully challenged under *Furman* and our subsequent cases").

21       Given the Supreme Court's clear rejection of intercase proportionality review in *Pulley*,

22   petitioner's claim here amounts to a request for a new constitutional rule of criminal procedure.

23   Imposing such a new rule on collateral review would violate *Teague v. Lane*, 489 U.S. 288

24   (1989).  In *Teague*, the Supreme Court made the retroactivity of its criminal procedure decisions

25   turn on whether they are novel.  When that Court announces a "new rule," a defendant whose

26   conviction is final may not benefit from the decision in a habeas corpus proceeding.  Only when

27   the Court applies a settled rule may a defendant avail himself of the decision on collateral review.

28   *Chaidez v. United States*, __ U.S. __, __ [133 S. Ct. 1103, 1107] (2013).  "'[A] case announces a

                                         39

1    new rule,' *Teague* explained, 'when it breaks new ground or imposes a new obligation' on the

2    government.  489 U.S. at 301.  'To put it differently,' [the Court] continued, 'a case announces a

3    new rule if the result was not dictated by precedent existing at the time the defendant's conviction

4    became final.'  *Ibid.*"  *Chaidez v. United States*, 133 S. Ct. at 1107.

5           Any rule requiring a state in a capital proceeding to compare a defendant's case to all other

6    cases in the country, in light of *Pulley*, would undoubtedly be a new watershed rule of criminal

7    procedure.  Thus, even were it adopted by the Supreme Court, it could not apply to petitioner's

8    case.

9           Thus, petitioner is not entitled to an evidentiary hearing in this Court on his unexhausted

10   claims for countywide, statewide, and nationwide intercase proportionality review.

11           **9.    Alleged Fluctuating Support for the Death Penalty in California Does**
            **Not Render Its Imposition a Violation of the Eighth Amendment**
12

13          Petitioner maintains that imposition of the death penalty "in California today" is a violation

14   of the federal Constitution's prohibition against cruel and unusual punishment.  Pet. at 95.  The

15   basis of the claim is that alleged declining support for capital punishment in California "clearly

16   shows that evolving standards in California are growing away from capital punishment.  This in

17   itself reflects how Petitioner's sentence violates the Eighth Amendment."  Pet. at 97-98.[18]

18   Petitioner further surmises that "[i]t seems reasonable and Petitioner alleges, that a defendant who

19   committed the same death eligible offense under the same circumstances in 1995 was statistically

20   more likely to be sentenced to death than a defendant who might commit the same crime today

21   would be."  Pet. at 200.[19]  In essence, petitioner contends that because public attitudes towards

22   capital punishment can fluctuate over time, his sentence constitutes cruel and unusual

23   punishment.  He cites no United States Supreme Court authority that instructs a state court to

24

25          [18] Except to the extent that this claim relies on new information submitted with this federal
     petition, see *post*, this claim was presented in petitioner's State Petition for Writ of Habeas
26   Corpus.  State Pet. at Claim XXIV at AG022759-AG022766; *see also* Respondent's Informal
     Response to State Petition ("IR") at AG025110-AG025112.  The California Supreme Court
27   denied the state petition for writ of habeas corpus on August 31, 2011.  AG025232.
            [19] Neither in the state courts nor in this Court has petitioner offered any statistics to
28   substantiate his allegedly "reasonable assumption."

                                          40

1   survey alleged shifts in public support for capital punishment in evaluating whether a particular

2   sentence was fair and impartial.  Therefore, he cannot show that the California Supreme Court's

3   rejection of his claim is contrary to or an unreasonable application of Supreme Court authority.

4        In this Court, petitioner purports to supplement the claim raised in the state court by relying

5   on information about a November 2012 California initiative (Proposition 34) that, if adopted,

6   would have abolished capital punishment in the state.  Although acknowledging that the initiative

7   was rejected by the voters of California, petitioner maintains that the "narrow margin shows this

8   penalty is no longer the strong view of the state."  Pet. at 96.  He extrapolates on this claim,

9   asserting that the "narrow margin justifies an allegation, as Petitioner makes herein, that this

10  extreme penalty no longer reflects a contemporary view that comports with the Eighth

11  Amendment."  Pet. at 96.

12       In referring to a 2012 voter initiative, not only does petitioner rely on events occurring long

13  after his trial and sentence, he further attempts to include new exhibits that were not presented in

14  the state court.  Petition exhibits 3, 4, and 5, referenced at petition page 96, footnote 62, and

15  petition page 98, footnote 64, are two newspaper articles about statements made by Governor

16  Edmund G. Brown Jr. and Attorney General Kamala D. Harris about capital punishment and a

17  summary of the results of the vote tallies for Proposition 34.  Inclusion of these new exhibits in

18  the federal petition is improper and they cannot be considered by this Court.  As the United States

19  Supreme Court held in *Cullen v. Pinholster*, 131 S. Ct. 1388, "review under § 2254(d)(1) is

20  limited to the record that was before the state court that adjudicated the claim on the merits.

21  Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that 'resulted in' a

22  decision that was contrary to, or 'involved' an unreasonable application of, established law.  This

23  backward-looking language requires an examination of the state-court decision at the time it was

24  made.  It follows that the record under review is limited to the record in existence at the same

25  time—i.e., the record before the state court."  *Id.* at 1398.

26       In any event, petitioner's purported new evidence is irrelevant to his claim.  That California

27  voters in 2012 rejected an attempt to abolish capital punishment hardly supports his assertion that

28  his sentence violates the Eighth Amendment now, let alone in 1995 when it was imposed.  Again,

1    petitioner cites no United States Supreme Court case that holds that a lawful and valid conviction

2    and sentence must be reevaluated in light of allegedly fluctuating poll numbers or a failed voter

3    initiative.  Thus, the claim here must be rejected.

4        **B.    Claim 2:  Petitioner Fails to Establish that His Trial Counsel Rendered
            Ineffective Assistance**

5

6            **1.    Introduction:  Petitioner's Allegation that the Prosecutor Conceded
                the Case for the Death Penalty Was Weak Is Misleading and
                Incorrect**

7

8            In a multi-pronged argument, petitioner contends his trial counsel failed to investigate and

9    present readily available evidence in mitigation at the penalty-phase trial.  Pet. at 99-138.

10   Petitioner raised this claim in his state petition for habeas corpus.  State Pet. Claims III & IV at

11   AG022435-AG022641; *see also* IR at AG024970-AG025024.  The California Supreme Court

12   denied petitioner's state petition for writ of habeas corpus.  AG025232.  Respondent will address

13   the many subparts of petitioner's claims *post*.  Preliminarily, however, we address a theme that is

14   repeated throughout petitioner's argument, i.e., that the prosecutor conceded in the trial court that

15   the case for the death penalty for petitioner was weak.  For example, in the introduction to Claim

16   2, petitioner asserts:

17           To consider the significance of trial counsel's failures, it seems pertinent to start with
             the prosecutor's own admission of just how weak the aggravation case was against
18           Petitioner.  At a pretrial hearing, the prosecutor openly conceded that any error in
             admitting aggravating evidence would not withstand review because "*this case
19           doesn't have the bulk of additional aggravation*[.]" (RT 242, emphasis added)

20   Pet. at 101-02, emphasis in original; see also pet. at 102 (asserting that the prosecutor stated the

21   case in aggravation was weak).  Petitioner misrepresents the prosecutor's comment.

22           Contrary to petitioner's assertions, the prosecutor did not "admit" that the case for the death

23   penalty was weak.  Petitioner's mischaracterization of the prosecutor's comments is achieved

24   only by omitting words from the prosecutor's statement and taking the statement out of context.

25   When the comments are viewed in context, it is apparent that the court and the parties were

26   discussing whether petitioner's juvenile arson record would be admitted as evidence in

27   aggravation in the penalty phase.  The discussion included the parties views on the California

28   Supreme Court's opinion in *People v. Rodrigues*, 8 Cal. 4th 1060, 1102-06 (1994).  RT 237-242

                                              42

1  at AG017365-AG017370.  Referring specifically to *Rodrigues*, the prosecutor acknowledged

2  "this case doesn't have the bulk of additional aggravation *that that case does* . . . ."  RT 242,

3  emphasis added, at AGO17370.  Plainly, the prosecutor in no way made a broad concession that

4  the aggravation case here was weak.  Rather, he simply acknowledged that one other case then

5  under discussion had more extensive aggravation evidence.  Petitioner's attempt to read more into

6  the comment, and thus mischaracterize the state's view of its own case, must be rejected from the

7  outset.

8         Having demonstrated that the theme of petitioner's argument is erroneous, we proceed to

9  discuss his individual claims that he received ineffective assistance of counsel.

10                **2.    Legal Standard for Assessing a Claim of Ineffective Assistance of
                      Counsel**

11

12        On federal habeas, review of the state court's rejection of a claim of ineffective assistance

13  of counsel is "doubly deferential."  In order to establish that counsel was ineffective, petitioner

14  bears the burden of showing both that counsel's performance fell below an objective standard of

15  reasonableness under prevailing professional norms, and that there is a reasonable probability the

16  result of the proceeding would have been different.  *Strickland*, 466 U.S. at 687-88.  In evaluating

17  a defendant's showing of incompetence, courts accord great deference to the tactical decisions of

18  trial counsel.  "A fair assessment of attorney performance requires that every effort be made to

19  eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's

20  challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id.* at

21  689.  Moreover, in assessing prejudice, a reasonable probability that the outcome would have

22  been different is a "probability sufficient to undermine confidence in the outcome."  *Id.* at 693-

23  94.

24        In assessing a claim of counsel's incompetence, a court must consider "'the constitutionally

25  protected independence of counsel and . . . the wide latitude counsel must have in making tactical

26  decisions.'  *Strickland*, 466 U.S. at 689.  Beyond the general requirement of reasonableness,

27  'specific guidelines are not appropriate.'  *Id.* at 688.  'No particular set of detailed rules for

28  counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense

43

1   counsel or the range of legitimate decisions . . . .' *Id.* at 688-689. *Strickland* itself rejected the

2   notion that the same investigation will be required in every case. *Id.* at 691 ('[C]ounsel has a duty

3   to make reasonable investigations or to make a reasonable decision that makes particular

4   investigations unnecessary'). It is '[r]are' that constitutionally competent representation will

5   require 'any one technique or approach. [*Harrington v.*] *Richter*, 562 U.S. at ___, 131 S. Ct. 770,

6   178 L. Ed. 2d 624, 643." *Cullen v. Pinholster*, 131 S. Ct. at 1406-07. As the United States

7   Supreme Court has instructed:

8       strategic choices made after thorough investigation of law and facts relevant to
        plausible options are virtually unchallengeable; and strategic choices made after less
9       than complete investigation are reasonable precisely to the extent that reasonable
        professional judgments support the limitations on investigation. In other words,
10      counsel has a duty to make reasonable investigations or make a reasonable decision
        that makes particular investigations unnecessary. In any ineffectiveness case, a
11      particular decision not to investigate must be directly assessed for reasonableness in
        all the circumstances, applying a heavy measure of deference to counsel's judgments.

12

13  *Strickland*, 466 U.S. at pp. 690-91.

14          Under AEDPA, "[t]he pivotal question is whether the state court's application of the

15  *Strickland* standard was unreasonable. This is different from asking whether defense counsel's

16  performance fell below *Strickland*'s standard. . . . A state court must be granted a deference and

17  latitude that are not in operation when the case involves review under the *Strickland* standard

18  itself." *Harrington v. Richter*, 131 S. Ct. at 785. Thus, federal habeas review of a state court's

19  denial of an ineffective assistance claim is "doubly deferential." *Knowles v. Mirzayance*, 556

20  U.S. at 123. "And, because the *Strickland* standard is a general standard, a state court has even

21  more latitude to reasonably determine that a defendant has not satisfied that standard. *See*

22  *Yarbough v. Alvarado*, 541 U.S. 652, 664 (2004) ('[E]valuating whether a rule application was

23  unreasonable requires considering the rule's specificity. The more general the rule, the more

24  leeway courts have in reaching outcomes in case-by-case determinations')." *Ibid.*

25          **3.      Trial Counsel's Strategy**

26                  **a.      Exclusion of evidence of petitioner's acts of arson as a juvenile**

27          As background to this claim, it is essential to understand the concerns that motivated trial

28  counsel in the presentation of the penalty-phase mitigation case and the strategy that counsel

                                                    44

chose.  First, counsel was motivated to preserve a crucial pretrial ruling he had won that excluded evidence that, as a minor, petitioner had engaged in acts of arson.  Second, counsel chose to ask the jury for mercy for petitioner and his family.  Neither strategy displayed incompetence.

In pretrial motions, petitioner's counsel won a significant victory in convincing the trial court to bar evidence in the penalty phase that petitioner had set several fires at his junior high school when he was 14 years old.  RT 237-244 at AG017365-AG017372.  Habeas counsel deems trial counsel ineffective for not choosing instead to introduce the arson evidence and attempt to use it to his advantage.  Pet. at 105.  Habeas counsel's disagreement with trial counsel's tactical decision to prevent the jury from knowing that petitioner was a juvenile arsonist is not a valid basis for finding trial counsel ineffective.

One of petitioner's trial attorneys, Spencer Strellis, stated in a declaration submitted with petitioner's state petition for habeas corpus that he "succeeded in convincing the trial judge to deny the prosecutor's request to introduce evidence of Mr. Dyke's juvenile firesetting as aggravation at the penalty phase." Exh. to State Pet. for Habeas Corpus ("Exh. to State Pet.") 1 at AG022802.  Based on this significant victory, Mr. Strellis made a tactical decision to limit his penalty-phase presentation "out of concern that calling any expert or lay witness to testify about Mr. Dykes' life or background would open the door to" introduction of the arson evidence.  Exh. 1 to State Pet. at AG022802.

Habeas counsel questions and criticizes trial counsel's strategy and contends the arson evidence could have been turned to petitioner's advantage.  This conclusion is by no means self-evident or indisputable.  Trial counsel had reason, based on his experience, to conclude that a jury might react negatively to learning of petitioner's juvenile record.  Trial counsel's argument to the trial court for exclusion of the evidence was based on the claim that "the fires Mr. Dykes had set only caused property damage and were not intended to harm anyone."  Exh. 1 to State Pet. at AG022802.  Trial counsel also feared that the introduction of the evidence would have been highly damaging to petitioner.  As he stated:

> [¶]  Notwithstanding what I argued in court, it was my personally held belief at the time that most firesetters are mentally ill and would be difficult to present in a sympathetic light to the jury.

1
2

[¶]  I came by this belief while working for the Alameda County Public Defender between the years 1959 and 1963.  During this period, I worked the Highland Hospital run representing arsonists in commitment proceedings.

3
4
5
6

[¶]  I engaged Dr. Oliver Glover, a psychologist, to evaluate Mr. Dykes with an eye towards developing possible mental health based defenses at the guilt phase as well as providing mitigation for a penalty phase trial.  I did not, however, consult with or engage any experts on juvenile firesetting behavior to evaluate Mr. Dykes, to verify whether or not my long-held beliefs about firesetters generally accepted in the field, or to explore whether Mr. Dykes' juvenile firesetting behavior could be put into a context that could make it usable as mitigating evidence.

7    Exh. 1 to State Pet. at AG022802-AG022803.

8        Trial counsel's tactical decision, based on his years of experience, was not unreasonable

9    and does not establish incompetence.  *See Strickland*, 466 U.S. at 689 (in evaluating a defendant's

10   showing of incompetence, courts accord great deference to the tactical decisions of trial counsel;

11   a fair assessment of attorney performance requires that every effort be made to eliminate the

12   distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct,

13   and to evaluate the conduct from counsel's perspective at the time); *see also People v. Farnam*,

14   28 Cal. 4th 107, 148 (2002) ("Tactical errors are generally not deemed reversible, and counsel's

15   decisionmaking must be evaluated in the context of the available facts").  Even had counsel

16   presented expert evidence to try to explain petitioner's acts of arson, it by no means follows that

17   the evidence would have engendered sympathy for petitioner.  The jury may have responded

18   negatively if they learned that petitioner's antisocial behavior was evident from a young age.

19       In fact, in response to any such hypothetical evidence aimed at "explaining" petitioner's

20   arson, the prosecutor could have been expected to present its own expert to testify that a 14-year-

21   old boy who committed multiple acts of arson at his school may well have been displaying early

22   signs of antisocial behavior that would lead him, some years later, to commit more serious acts of

23   violence without care for the consequences.

24       The trial court's comments in excluding the arson evidence well explain the potential

25   serious ramifications to petitioner had the evidence been admitted.  They validate trial counsel's

26   decision to seek exclusion of the evidence and severely undermine petitioner's conclusion here

27   that it would have been better had the evidence been admitted.

28

46

I voiced my concerns yesterday and I still am concerned. Arson is a peculiar and insidious crime because to use perhaps an analogy that may not be totally appropriate[,] unlike many other crimes where the limits and the ramifications of the defendant's actions are neither readily foreseeable or at least somewhat reasonably predicted, arson is something where you literally let a Jeannie [*sic*] out of a bottle and what the Jeannie does and how far the damage the Jeannie can cause[,] to stretch the analogy perhaps too far[,] is impossible to see.

Setting a fire in an unoccupied classroom can set forces in motion which can cause a configuration that can sweep a whole city, getting it down to more perhaps practical terms the idea that to set a fire in a, what is supposed to be an unoccupied school class room makes a presumption that no person is entitled to make. Who's to say there isn't going to be a youngster in the very next room.., making up an assignment, sitting for a test, picking up property that they left behind, whatever. Who's to say a custodian wasn't working in the hallway cleaning up the school. Who's to say that a teacher wouldn't be in the next classroom sketching a project for the following Monday.

In other words, to simply assume that an act of arson set, deliberat[ely] setting an incendiary fire in a room you believe to be empty is in fact going to be true and is no danger to human life is something we have been too tragically reminded is wrong too often. Even then there is danger that Mr. Carmine [the prosecutor] mentioned yesterday that any conflict of information that's pretty spotty at least one of these fires that is actually engulf the building [sic], a fire department is called, and we again would have had to be tragically reminded in our common every day life that many fire fighters die fighting fires. I'm concerned that this is a crime that, you know, leaves forces that can cause death and serious injury that can go far beyond what the defendant or any person could reasonably expect to have been the limits of the fire. And that's something that is unique to arson, it's unique to arson as opposed to any other crime.

RT 242-243 at AG017370-AG017371.

Part of petitioner's defense was to try to convince the jury that, although he chose to commit robbery, he did not intend the fatal consequences of his acts. Given this defense, the trial court's comments highlight the wisdom of trial counsel's tactical choice of preventing the jury from learning of petitioner's acts of arson which, as the trial court so accurately explained, had potentially dire unforeseen consequences. Petitioner's second guessing of this strategy does not provide a basis for finding trial counsel incompetent.

### b.    Seeking sympathy and mercy for petitioner and his family

An overarching goal in trial counsel's strategy in the penalty-phase case was to seek the jury's sympathy for petitioner and his family and thereby attempt to avoid the death penalty. Thus, as detailed in the Statement of Facts, the defense presented mitigating evidence in the form of testimony from petitioner's relatives, i.e., petitioner's mother, Mary Brown, his father, Ernest

47

1    Dykes, Sr., petitioner's sister, Sara Dykes, petitioner's brother, Israel Wroten, and petitioner's

2    Aunt, Floyzell Jones.  Each relative testified as to their relationship with petitioner and their

3    desire not to see him receive the death penalty.

4        In the penalty-phase closing arguments, defense counsel relied on the testimony from

5    petitioner's family to urge the jury to sentence petitioner to life in prison and spare petitioner's

6    family from additional anguish.  In effect, counsel asked for mercy for the family.

7
        An execution would impose a similar loss [as that suffered by the Clark family] on
        the Aunt you heard testify, Floyzell Jones.  It would impose a similar loss upon Mary
8       Brown, Ernest Dykes' Mother.  It would impose a similar loss on Ernest Dykes, Sr.,
        the man you saw testify, served some 20 years in the navy and served some 20 years
9       for the County of Alameda.  The execution of Ernest Dykes will not resolve the loss
        to the Clarks.  It will create an equivalent loss to he family of Ernest Dykes.  [¶]  The
10      old saying two wrongs don't make a right is still true.  We would solve nothing.

11   RT 3914-3915 at AG021075-AG021076.  Counsel amplified on this theme later in argument:

12      The Dykes, Mr. Dykes and Mrs. Brown are decent, hardworking people.  They work.
        They're decent.  Their son turned out, obviously to be a great disappointment.  We're
13      not dealing with the bad seed here.  We're dealing with a youngster who made a
        terrible, terrible choice, and as a result of that terrible, terrible choice is going to die
14      in the state prison of the State of California.

15      But I am not going to apologize for bringing the family to ask that you spare their
        relative.  I would be derelict in my duty if I did not.
16
        How do I show the other side of Ernest's character?  How do I show that this is a
17      person that people liked, relayed in a positive way?  You bring people in to say that
        we love him, we would like him to live.
18
        There are no wonderful antidotes [sic], he did not invent a cure for polio.  He is not
19      Mother [sic] Curry.  He is an ordinary man, who has lived an ordinary life.  How do
        you validate an ordinary life?  By bringing people who know him, to say, for our
20      sake, do not kill our son.

21      Mr. Dykes, Sr. fought in the Second World War, was on the Franklin, which I think,
        if you know your naval history was a big deal 'cause they tried to sink it.  It was a
22      ship that couldn't be sunk.  He came away with medals.  He served his country for 20
        honorable years, and then he served the county for another 20.  He's a decent man.
23      He asks you that, when he dies, there still be a member of his line still alive.

24      Is that an unreasonable request?  Is that a chick [sic] that we owe him for his service
        to the country?  I don't know.  I really don't know.  But it sure as hell is not an
25      unreasonable request, that I won't put him up there and say, nor will I apologize for
        having done it.
26

27   RT 3932-3933 at AG021093-AG021094.

28

A strategy of seeking sympathy for a defendant's family—especially where the defendant himself is not particularly sympathetic— is a reasonable tactical choice, and does not amount to ineffective assistance of counsel.  The strategy was explained by Judge Kozinski in his dissent in *Pinholster v. Ayers*, 590 U.S. 651 (9th Cir. 2009).[20]  Judge Kozinski stated:

> The current infatuation with "humanizing" the defendant as the be-all and end-all of mitigation disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers conclude that the jury simply won't buy it.  Not all defendants are susceptible to such a rehabilitation, and not all juries are susceptible to such a plea.  Counsel, who are in the courtroom and can observe the jurors and their reaction to various witnesses (including the defendant), may have good reason for pursuing other avenues of mitigation, such as sympathy for the defendant's family.

*Pinholster v. Ayers*, 590 U.S. at 692 (Kozinski, J., dissenting); *see also Cullen v. Pinholster*, 131 S. Ct. at 1405 ("Given these impediments, it would have been a reasonable penalty-phase strategy to focus on evoking sympathy for Pinholster's mother"); *id*. at 1404 ("the 'family sympathy' mitigation defense was known to the defense bar in California at the time and had been used by other attorneys"); *id*. at 1408 [dissent presents no evidence that approach of trying to elicit sympathy for defendant's family as a mitigation strategy "would have been inconsistent with the standard of profession competence in capital cases that prevailed in Los Angeles in 1984").

Given the facts of this crime, involving the senseless attempted robbery of a elderly woman, resulting in the tragic death of her young grandson, and petitioner's attempts to elude the police and impede their investigation of the crimes, counsel could reasonably conclude that a better strategy than trying to humanize petitioner would be to seek sympathy for his family.

### 4.    Defense Investigative Efforts

#### a.    Defense investigator

In challenging the investigatory efforts of the defense, petitioner specifically targets the services provided by defense investigator Richard Hove.  Pet. at 105-07.  Although petitioner assails many aspects of Mr. Hove's work, he ultimately fails to show with particularity how or why his challenge casts fundamental doubt on the accuracy of the penalty proceedings.  As the California Supreme Court has stated, it is not sufficient that additional defense investigation

---

[20] The Circuit Court's majority decision in *Pinholster* ultimately was reversed by the United States Supreme Court in *Cullen v. Pinholster* 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011)

1    might have weakened the prosecution case or presented a more difficult question for the jury.  *See*

2    *In re Clark*, 5 Cal. 4th 750, 766 (1993).  Moreover, defense counsel's decision not to present

3    more of the evidence of petitioner's background, as explained *ante*, was a tactical decision that

4    must be accorded great deference.  *See People v. Farnam*, 28 Cal. 4th at 148 ("Tactical errors are

5    generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context

6    of the available facts").

7        Petitioner begins by noting that lead trial counsel Spencer Strellis's billing records contain

8    only two entries, for a total of 2.8 hours, regarding investigator services.  Pet. at 105.  Petitioner

9    fails, however, to state with specificity how additional billing by lead counsel would have

10   affected the penalty-phase outcome or why the billing records establish ineffective assistance.

11   *See People v. Duvall*, 9 Cal. 4th 464, 474 (1995) (petitioner must set forth fully and with

12   particularity the facts supporting each claim, along with reasonably available documentary

13   evidence supporting the claim, including affidavits and declarations).  Moreover petitioner does

14   not consider that all the time lead counsel spent talking to or meeting with the investigator might

15   not be reflected in his billing records.  Also, petitioner does not include the billing records of co-

16   defense counsel, William Daly, that also might reflect time spent between attorney and

17   investigator.  As petitioner acknowledges, Mr. Hove's own billing records show that he spent

18   31.5 hours on petitioner's case, including 5.75 hours meeting with counsel.  Exh. 39 to State Pet.

19   at AG023448-AG023449.

20       Next, petitioner asserts that Mr. Hove was not a "capital mitigation specialist," but instead

21   was a defense attorney who at the time of his investigation had been suspended by the state bar

22   for a criminal conviction.  Pet. at 105.[21]  Petitioner fails to explain who would qualify as a

23   "capital mitigation specialist"—and whether that term is commonly defined in the legal

24   community, why a mitigation specialist was required, or why a defense attorney could not qualify

25   as mitigation specialist.  Indeed, an investigator who is also a defense attorney could be expected

26   _____

27   [21] Mr. Hove's conviction was later reversed by the Ninth Circuit Court of Appeals.  *See* Ninth Circuit docket sheet for *United States v. Hove* (93-10219).  On retrial, Mr. Hove was acquitted.  *See* United States District Court for the Northern District of California docket sheet for *United States v. Hove* (92-CR-234-ALL); see also pet. at 106 n.67.

28

50

1    to bring unique and advantageous skills to his assignment.  Furthermore, petitioner fails to

2    establish that Mr. Hove's own criminal case directly and appreciably affected his work on

3    petitioner's case.

4                        **b.    Trial counsel's investigative efforts**

5          Petitioner also challenges trial counsel's investigative efforts.  He states that trial counsel

6    did not speak to specified members of petitioner's family—first cousins and two half-sisters—

7    who then provided declarations in support of petitioner's state petition for writ of habeas corpus.

8    Exhs. 10-12, 15, 16, 18 to State Pet. at AG022922-AG022948, AG022961-AG022975,

9    AG022984-AG022987.[22]  Petitioner does not, however, specify any specific information in these

10   declarations that would have had a substantial and material effect on the penalty proceedings.  *See*

11   *In re Gallego*, 18 Cal. 4th 825, 837 n.12 (1998) (petitioner does not allege claim with specificity

12   merely by generally incorporating by reference all of the facts set forth in accompanying

13   exhibits).

14         Trial counsel cannot be deemed to have rendered ineffective assistance of counsel simply

15   because he did not interview some of petitioner's more distant relatives.  *See Wiggins v. Smith*,

16   539 U.S. 510, 533 (2003) (explaining, in a case that involved counsel's responsibility to present

17   mitigating evidence at sentencing, that "*Strickland* does not require counsel to investigate every

18   conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the

19   defendant . . . [or even] to present mitigating evidence at sentencing in every case"); *Knowles v.*

20   *Mirzayance*, 556 U.S. at 127.  "The Supreme Court, [the Ninth Circuit] and the California

21   Supreme Court have all held that competent counsel need not, and often will not, exhaust every

22   avenue of investigation.  *Strickland* itself held that counsel need not conduct an exhaustive

23   investigation of a defendant's background.  Instead, counsel only has 'a duty to make reasonable

24   investigation or to make a reasonable decision that makes particular investigation unnecessary.'

25   [*Strickland*,] 466 U.S. at 691" *Pinholster v. Ayers*, 590 F. 3d at 693 (Kozinski, J., dissenting).

26   "Counsel is also not required to have a tactical reason—above and beyond a reasonable appraisal

27   _____

      [22] In his state petition for writ of habeas corpus, petitioner faulted the defense investigator,
not trial counsel, for failing to talk to these witnesses.  AG022460.

28

51

1    of a claim's dismal prospects for success—for recommending that a weak claim be dropped

2    altogether." *Knowles*, 556 U.S. at 127.

3        Moreover, it is not at all certain that submitting the testimony of a multitude of petitioner's

4    relatives would have inured to petitioner's benefit.  Defense counsel's files contained several

5    letters from petitioner's relatives and friends, written before trial (probably around December

6    1993), and these letters frequently state that petitioner was a good person from a loving and

7    giving family.  *See* Exhs. 22-28 to State Pet. at AG023000-AG023013.  These letters suggest that

8    habeas counsel's assumption in this federal petition that trial counsel could have established

9    unequivocally that petitioner was the product of a miserable upbringing by uncaring parents is not

10   certain.  In fact, the equivocal nature of the information from petitioner's family may have been a

11   factor contributing to defense counsel's tactical decision not to rely on alleged evidence of

12   petitioner's upbringing and/or family history.

13       Furthermore, "there are no free-throws in criminal trials."  *Pinholster v. Ayers*, 590 F. 3d at

14   707 (Kozinski, J., dissenting).  If the defense had presented family members to testify about

15   petitioner's alleged positive characteristics and peaceable tendencies, the prosecutor would have

16   been able to cross-examine those witnesses—and possibly present additional witnesses of its

17   own—to testify about petitioner's misdeeds—including, most likely, his acts of arson.  Thus,

18   there is no guarantee that pursuing this line of mitigation would have been successful or

19   advisable.

20       Furthermore, to the extent habeas counsel believes it would have been to petitioner's

21   benefit to present extensive history of his family's alleged mental illnesses, substance abuse

22   problems, and criminal history, such a strategy could easily have backfired.  *See Cullen v.*

23   *Pinholster*, 131 S. Ct. at 1410 ("To the extent the state habeas record includes new factual

24   allegations or evidence, much of it is of questionable mitigating value. . . .  The new evidence

25   relating to Pinholster's family—their more serious substance abuse, mental illness, and criminal

26   problems . . . —is also by no means clearly mitigating, as the jury might have concluded that

27   Pinholster was simply beyond rehabilitation"); *Atkins v. Virginia*, 536 U.S. 304, 321 (2002)

28   (recognizing that mitigating evidence can be a "two-edged sword" that juries might find to show

52

1    future dangerousness).  Forgoing a defense based on an all-encompassing exploration of problems

2    within petitioner's family cannot be deemed an unreasonable strategy.  In any event, given the

3    questionable mitigating value of the proposed evidence, petitioner has failed to show that the

4    California Supreme Court was unreasonable in concluding that the alleged deficient performance

5    did not prejudice petitioner.  *See Sully v. Ayers*, 725 F. 3d 1057, 1069 (9th Cir. 2013).

6    ### 5.    Mental Health and Social History Investigation

7        Petitioner addresses what he terms the "mental health and social history investigation"

8    conducted for trial.  Pet. at 107.  Most of the information in this section comes from the notes of

9    Dr. Ollie Glover, a forensic psychologist trial counsel retained to investigate petitioner's mental

10   health.  Because most of this information comes directly from Dr. Glover's notes, it must be

11   assumed that  the information was known to petitioner's defense team at trial and the decision not

12   to use it in the mitigation case was a tactical decision that must be accorded deference.

13       Petitioner asserts that trial counsel did not engage a psychiatrist to evaluate petitioner.  Pet.

14   at 107.  He fails to explain what benefit there would have been from hiring a psychiatrist in

15   addition to the forensic psychologist, or why the failure to do so demonstrates incompetence.

16   Petitioner acknowledges that Dr. Glover was provided with petitioner's school and juvenile court

17   records, but states that he was not provided with records related to petitioner's family.  Pet. at

18   107.  Later in the petition, however, petitioner recites details regarding his family members and

19   his upbringing, including his own use of alcohol, that were reflected in Dr. Glover's notes.  Pet. at

20   108-112.  Thus, petitioner fails to identify with specificity the family records that were not

21   provided that would have had a material effect on Dr. Glover's analysis.

22       Petitioner states that Dr. Glover's notes of his interviews with petitioner establish that

23   "Petitioner is in the low normal range of intelligence."  Pet. at 108.  Petitioner does not cite,

24   however, any documents to establish this assertion.  Instead, he cites to the declaration of Nell

25   Riley, petitioner's state habeas expert in neuropsychology.  Exh. 5 to State Pet. at AG022829.

26   Dr. Riley declares that from 1983 through 1995, petitioner was given various IQ tests and had

27   scores on the verbal, performance, and full scale portions ranging from 70 to 89.  Exh. 5 to State

28   Pet. at AG022831-AG022832.  Dr. Riley does not attach any test or document in which petitioner

1    was diagnosed as being mentally retarded.  Indeed, as noted, the petition itself concedes that

2    petitioner is in the "low normal range of intelligence."  Pet. at 108.

3        In several paragraphs of his petition, petitioner recites details regarding his family members

4    and his upbringing, including his own use of alcohol, that were reflected in Dr. Glover's notes.

5    Pet. at 108-112.  Petitioner does not explain how any of this information, which was known by

6    the defense psychologist, would have made a difference in the penalty phase.  Abuse of alcohol is

7    not necessarily a mitigating factor and might be seen by the jury instead as a sign of petitioner's

8    irresponsibility.  *See People v. Reyes*, 195 Cal. App. 3d 957 (1987) (addressing alcohol abuse in

9    the context of non-capital sentencing and stating: "There may be . . . circumstances where the

10   defendant's alcohol or drug addiction might be considered in mitigation.  But, where that

11   addiction has simply provided the defendant with a continuing incentive or excuse to commit

12   crimes, we see no reason why that addiction should be considered as a circumstance in

13   mitigation"].)

14       Petitioner states that Dr. Glover noted that petitioner seemed "genuinely remorseful and

15   cried."  Pet. at 109.  As proof of remorse, petitioner claims he could not eat, lost weight, read the

16   Bible, and felt better if he was drunk or high.  Pet. at 109.  Where petitioner sees evidence of

17   remorse, however, a jury could see evidence of fear of being apprehended.  This is especially true

18   given petitioner's attempt to mislead and deceive the police immediately after his crimes.  Even

19   after petitioner contacted the police some days after the crime, he initially denied responsibility

20   and continued to lie.  He finally admitted responsibility only when confronted by the police with

21   evidence of his guilt.  These circumstances were powerful confirmation that petitioner was not

22   remorseful.  A jury could certainly conclude that if petitioner indeed had been truly remorseful, a

23   better way for him to demonstrate that remorse would have been to admit his crimes long before

24   he did rather than turn to alcohol and drugs.

25       Dr. Glover's notes indicate petitioner might have had manic episodes, was impulsive and

26   distractible, and had "paranoid ideations about forces conspiring to keep African-Americans

27   subjugated."  Pet. at 109-110.  Petitioner provides no further evidence to substantiate the

28   information in Dr. Glover's notes which were merely the doctor's impressions upon interviewing

54

petitioner.  That this information was known to the defense team, but was not used in the

mitigation case, suggests it was not material or relevant.  Trial counsel could reasonably have

concluded that petitioner's alleged conspiracy beliefs would not lessen in the jurors' eyes his

moral culpability for robbing and shooting his elderly landlady.  Similarly, that petitioner was

"impulsive" also was not likely to provide mitigation, especially where there was evidence of

planning (i.e., purchasing a gun and bullets, discussing Bernice Clark's habits when at the

apartment building, donning a disguise, concocting ways to mislead the police, etc.).

Dr. Glover's notes, according to petitioner, "documented" a number of head injuries that

petitioner suffered.  Pet. at p. 110.  In fact, there is no documentation for any of these injuries and

petitioner has failed to show how they would have been relevant.

Dr. Glover, according to petitioner, noted his "impressions" after interviewing petitioner

including: "1) bipolar/manic; 2) OBS (Organic Brain Syndrome) 2nd degree to fall as a child

[sic]. Impacted ability to learn. Later blacked out in bathtub. Later hit in head with a bat; 3)

chronic alcoholism."  Pet. at 110.  Petitioner provides nothing to substantiate Dr. Glover's first

"impressions."  That Dr. Glover had these impressions, but that they were not presented in the

mitigation case, suggests they were not substantiated or found to be mitigating.

Petitioner told Dr. Glover he did not like being broke and lying around the house, but felt

trapped in his situation.  Pet. at 110-11.  A jury, of course, could not be expected to feel sympathy

for someone who did not like being broke and lying around the house and, hence, instead of

getting a job, going to school, or otherwise bettering his situation, chose to rob an elderly woman

who was known to be helpful to her tenants.  Indeed, petitioner's idleness and lack of initiative,

and consequent decision to resort to criminal conduct against a compassionate and vulnerable

victim, would likely be seen by a jury as an aggravating circumstance.

Petitioner states that Dr. Glover did not interview petitioner's mother.  An interview with

the mother allegedly had been scheduled, but canceled.  Pet. at 111.  Petitioner provides no

specific information that could have been developed in such an interview that would have had a

material impact on the penalty phase.

1    Petitioner's habeas investigator states that Dr. Glover did not come to a conclusive

2    diagnosis of petitioner, but discussed with trial counsel several possible diagnoses.  Pet. at 111.

3    That possible diagnoses were discussed, but not presented, suggests they could not be

4    substantiated or counsel made a tactical decision not to present them.

5    Finally, petitioner states it is "unclear" whether Dr. Glover's impressions from his

6    interviews with petitioner were communicated to or considered by trial counsel.  Pet. at 112.

7    There is no reason to assume that trial counsel did not communicate with, and consider the views

8    of, the psychologist he hired to assist in petitioner's case.  Moreover, given the doubly deferential

9    standard applied on federal habeas, such an assumption cannot support a claim for relief.

10    Implicit in habeas counsel's arguments regarding possible mental health mitigating

11    evidence—as well as his other arguments about possible avenues of mitigation that trial counsel

12    might have introduced—is the assumption that trial counsel had nothing to lose by introducing

13    the evidence in the penalty phase.  The United States Supreme Court, however, "has never

14    established anything akin to [a] . . . 'nothing to lose' standard for evaluating *Strickland* claims."

15    *Knowles v. Mirzyance*, 556 U.S. at 122 (the Circuit Court used an improper standard when it

16    blamed counsel for abandoning an insanity defense because there was "nothing to lose" by

17    pursuing it).  Habeas counsel cannot merely reference a broad list of possible avenues of

18    mitigation that were not presented at trial and then deem trial counsel incompetent for having

19    chosen a different strategy.  As the United States Supreme Court has stated, it "has never required

20    defense counsel to pursue every claim or defense, regardless of its merit, viability, or realistic

21    chance for success."  *Id*. at 123.

22    Moreover, had petitioner put on evidence about his alleged mental health issues, it would

23    have opened the door to additional evidence that he was a remorseless killer.  See *Pinholster v.

24    Ayers*, 590 F. 3d at 707 (Kozinski, J., dissenting).  In addition, it potentially would have opened

25    the door to evidence regarding petitioner's prior acts of arson, again portraying him as someone

26    prone to criminal conduct without care or regard for its consequences.  Thus, petitioner's counsel

27    "faced a serious risk that a mitigation case could turn out to be aggravating."  *Id.*

28

56

### 6.    Alleged Evidence of "Redeeming Qualities"

Petitioner contends his trial counsel neglected to introduce readily available evidence of petitioner's redeeming qualities and, had this evidence been introduced, petitioner would not have been sentenced to death.  Pet. at 112-118.  As petitioner concedes, trial counsel was aware of the evidence on which petitioner now relies.  *See* Pet. at 117 (referencing letters from petitioner's friends and family that were in trial counsel's files.)  Petitioner's counsel, as discussed *ante*, made a tactical decision not to introduce extensive evidence of petitioner's character in order to protect the important pretrial ruling he had won excluding evidence of petitioner's arson record.  Petitioner's counsel largely concentrated their closing arguments on trying to convince the jury that petitioner's crimes did not rise to the level of requiring the ultimate punishment.  *See* RT 3898, 3904, 3906, 3921, 3933 at AG021059, AG021065-AG021067, AG021082, AG021094.  Petitioner's second-guessing of this strategy does not provide a basis for habeas relief.  Defense counsel's decision not to present more of petitioner's life history was a reasonable tactical decision and must be accorded great deference in this proceeding.

Petitioner begins this section by quoting alleged statements from jurors commenting negatively on the defense's mitigation case.  *See* Pet. at 113-16.  These comments are taken from reports prepared in 1995 by Clarick Brown, a defense investigator, which were attached to a defense motion for a new trial.  CT 698-727 at AG000755-AG00784.  The trial court ruled that the defense investigator's reports were not admissible to impeach the jury's verdict.  RT 4103-4105 at AG021266-AG021268.  This conclusion was correct and is equally applicable here.

The reports, consisting of the investigator's descriptions of what jurors allegedly told him in telephone conversations, consist entirely of inadmissible hearsay.  Under both federal and California law, a jury's verdict cannot be impeached with hearsay declarations.  *See* Fed. Rules of Evid., Rule 606(b) ("During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment.  The court may not receive a juror's affidavit or evidence of a juror's statement on these matters"); *Tanner v. United States*, 483 U.S. 107, 117 (1987) ("By the

57

1    beginning of this century, if not earlier, the near-universal and firmly established common-law

2    rule in the United States flatly prohibited the admission of juror testimony to impeach a jury

3    verdict"); *People v. Williams*, 45 Cal. 3d 1268, 1318-19 (1988) (jury verdict may not be

4    impeached by hearsay affidavits prepared by defense investigator purporting to relate

5    conversations with jurors); *People v. Hayes*, 21 Cal. 4th 1211, 1256 (1999); *People v. Cox*, 53

6    Cal. 3d 618,697 (1991), overruled on other grounds in *People v. Doolin*, 45 Cal. 4th 390, 421,

7    n.22 (2009).

8         Even were petitioner to have submitted competent evidence of the jurors' statements, they

9    would still be irrelevant to impeach the jury's penalty-phase verdict.  California Evidence Code

10   section 1150 provides that evidence of jurors' mental processes cannot be used to challenge the

11   jury's verdict.  Cal. Evid. Code, § 1150 ("No evidence is admissible to show the effect of such

12   statement, conduct, condition, or event upon a juror either in influencing him to assent to or

13   dissent from the verdict or concerning the mental processes by which it was determined"); *People

14   v. Steele*, 27 Cal. 4th 1230, 1260-64 (2002).)  The Federal Rules of Evidence contain a similar

15   prohibition.  *See* Fed. Rules of Evid., Rule 606(b)(1) ("During the inquiry into the validity of a

16   verdict or indictment, a juror may not testify about any statement made or incident that occurred

17   during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or

18   any juror's mental processes concerning the verdict . . . .  The court may not receive a juror's

19   affidavit or evidence of a juror's statement on these matters").  Thus, the affidavit from a defense

20   investigator purporting to rely the postverdict thoughts of jurors are immaterial in this proceeding.

21        Petitioner next refers to letters that were written by his family members and others in late

22   1993 extolling his positive qualifies.  Pet. at 117.  Although Mr. Strellis in post-conviction

23   proceedings declared that he did not recall the letters (Exh. 1 to State Pet. at AG022803-

24   AG022804), the letters were taken from his files (Pet. at 117).  It is not unreasonable to conclude

25   that Mr. Strellis might not have remembered the letters at the time he wrote his declaration—over

26   10 years after the letters were written.  That is not evidence, however, that he was unaware of

27   them at the time they were written or at the time of trial.

28

More importantly, petitioner fails to establish that introduction of either the letters or testimony from relatives and friends to the same effect would have altered the penalty-phase verdict. As counsel recognized at the time of trial, any effort to establish petitioner's good character would have been countered by the prosecution's ability to tell the jury about petitioner's juvenile arson record. Petitioner's contention that the good character evidence would have outweighed the additional evidence of his criminal record is speculation that is insufficient to challenge counsel's tactical decision or the jury's verdict. *See People v. Jackson*, 28 Cal. 3d 264, 294 (1980) [allegations of representation so inadequate as to amount to constitutional defect must be supported by more than speculative argument].)

Moreover, the jury still would have had to evaluate evidence of petitioner's alleged good character in light of the evidence of his inexcusable and heinous crimes. The jury would have had to consider whether a truly good person, as petitioner asserts he should have been portrayed, would have robbed an elderly woman who had a reputation for assisting her tenants, and shot a defenseless child, motivated by nothing more than a desire for a little quick cash. It is not unreasonable to expect that the jury's answer to that question would still have been that petitioner deserved the punishment he received.[23]

### 7. Contrary to Petitioner's Assertions, there Was No Evidence that He Displayed Timely and Genuine Remorse

Petitioner claims his counsel provided ineffective assistance by ignoring evidence of petitioner's remorse that, if presented, could have swayed the jury during the penalty phase. Pet. 118-123. This claim is unpersuasive. As discussed in part *ante*, contrary to petitioner's assertions, there is no evidence in the record of his honest and sincere remorse. Indeed, as the

---

[23] Much of the evidence in the letters petitioner alleges should have been introduced would have contradicted evidence of his alleged low intelligence level and unfortunate upbringing that petitioner *also* claims should have been introduced. For example, some of the letter writers describe petitioner as intelligent and bright and commend his mother as a good woman who raised petitioner in a loving home. *See, e.g.*, Exh. 22 to State Pet. at AG02300 (petitioner is "intelligent"); Exh. 25 to State Pet. at AG02306 (describing petitioner as bright); Exh. 26 to State Pet. at AG02308 (stating that petitioner's house "was filled with nothing but love and joy"); Exh. 28 to State Pet. at AG023012 (describing petitioner's mother as "a good mother").)

59

1  trial court observed, the evidence was clear that petitioner did not express remorse, but only regret

2  that he had been caught.  Trial counsel cannot be deemed incompetent for failing to present

3  evidence that was either nonexistent or insincere—or easily contradicted by other evidence.

4      Again in this claim, petitioner relies extensively on his defense investigator's reports of

5  posttrial conversations with jurors in which they allegedly said they wished petitioner had

6  expressed remorse.  Pet. at 119-120.  The reports, containing the investigator's descriptions of

7  what jurors allegedly told him consist entirely of inadmissible hearsay and cannot be relied upon

8  in this proceeding.  *People v. Williams*, 45 Cal. 3d at 1318-19 (jury verdict may not be impeached

9  by hearsay affidavits prepared by defense investigator purporting to relate conversations with

10  jurors]; *People v. Hayes*, 21 Cal. 4th at 1256; *People v. Cox*, 53 C. 3d at 697; Fed. Rules of Evid,

11  Rule 606(b)(1) (during inquiry into the validity of a verdict, a juror may not testify about any

12  statement made or incident that occurred during deliberations; the effect of anything on that

13  juror's or another juror's vote; or any juror's mental processes concerning the verdict; court may

14  not receive a juror's affidavit or evidence of a juror's statement on these matters).

15      Next, petitioner questions the ethics of the prosecutor in arguing that the potential

16  mitigating factor of remorse was absent.  He claims the prosecutor "had reason to know," based

17  on an interview with petitioner's girlfriend, that "Petitioner had in fact been deeply troubled by

18  these events, was drinking heavily, and reading the Bible prior to self-surrendering in this

19  matter."  Pet. at 119 n.68, 120-121 & n.70.  First, petitioner fails to cite to the record for this

20  assertion.  Second, the prosecutor's supposed knowledge based on an alleged conversation with

21  petitioner's girlfriend would not have been admissible evidence on which trial counsel could have

22  relied in challenging the prosecutor's observations that petitioner lacked remorse.  The

23  information was unverified hearsay.  Even if memorialized in the prosecutor's notes, as petitioner

24  asserts (without citing the record), the information would still have been inadmissible hearsay.

25  Finally, even were the information from the girlfriend accurate, it hardly establishes remorse.

26  Notably absent is any effort by petitioner to confess his crimes, ask forgiveness, make amends, or

27  turn himself in to the police in a timely manner.

28

60

1      Reframing this argument as one of ineffective assistance of counsel as opposed to

2 prosecutorial misconduct, petitioner asserts that his girlfriend could have testified that during the

3 time period following the crimes, he "was very quiet around her.  Although Petitioner did not tell

4 her about the crimes, he told her that he had 'messed up.'  She erroneously assumed this meant he

5 was cheating on her.  Thereafter she and petitioner spent time reading the Bible together."  Pet. at

6 121.  This evidence, even had it been admitted, hardly establishes remorse.  Nowhere in the

7 purported evidence is a statement of regret, a desire to confess, or a desire to make any attempt to

8 begin to rectify the terrible pain petitioner had caused to the Clark family.

9      Carrying on this theme, petitioner's points to his trial counsel's notes from an interview

10 with petitioner in which trial counsel listed under a heading, "post event regret":  "drink heavy,

11 act differently, told brother why."  Pet. at 122.  Throughout the petition, petitioner claims that

12 since his youth he drank heavily.  That he continued to do so after killing a young boy and

13 severely injuring an elderly woman who also was his landlord is hardly evidence of remorse.

14 "Acting differently" is also not evidence of remorse; one would expect someone who had just

15 committed murder, and feared arrest, to act differently.  Finally, whatever petitioner supposedly

16 told his brother is irrelevant because petitioner did not immediately confess to authorities.  No

17 competent counsel would have based an argument for remorse on this insubstantial evidence.

18      Indeed, trial counsel could not have presented evidence of remorse because the only

19 *credible* evidence was that petitioner *did not* feel remorse.  He felt regret only for his own

20 predicament and that he had been caught, and fear for his future.  Thus, for example, petitioner's

21 actions right after the crime did not evidence remorse.  Rather than immediately turn himself in to

22 the police, he changed his clothes, returned to the scene of the crime, and concocted a story for

23 the police in an effort to deceive and misdirect them, and hence lessen the chances they would be

24 able to link him to the crimes.

25      Even when petitioner again contacted the police some time after the crime, he initially

26 continued to deny responsibility for the crimes.  Thus, on August 7, 1993, petitioner  called the

27 Oakland Police Department, stating he "want[ed] to know if I shot somebody."  He mentioned

28 Bernice and provided his location, but denied responsibility for the crime.  He was arrested and

61

1    transported to the police department for interrogation.  In the car, petitioner spoke in a rambling

2    manner, wondering how he could be identified and stating he would not commit anything like the

3    charged crimes.  At the police station, during two hours of questioning, petitioner denied

4    responsibility for the crimes.  He again concocted a false story meant to mislead the police.  He

5    claimed that he had heard the shots because he had been walking through the parking lot on his

6    way to purchase beer, and repeated his story of having witnessed an unidentified Black male flee

7    from the scene.  Ultimately the officers confronted him with evidence in their possession,

8    including statements of eyewitnesses.  Petitioner became distressed and finally admitted

9    involvement in the shooting.  The unrecorded statement reflected the circumstance that he was

10   aware prior to the shooting that Lance was in the vehicle.

11        Trial counsel would have had an impossible task in trying to convince a jury that the

12   evidence described *ante* of petitioner's repeated denials, efforts to mislead the police, and general

13   deceitful conduct were the actions of a man who was genuinely  remorseful for his actions.

14        The trial court, in rejecting petitioner's motion for a new trial, accurately summarized the

15   evidence that petitioner indeed neither demonstrated nor felt remorse.  Describing petitioner's

16   actions after the crime, the court stated:

17        Having shot the victims and having completed the robbery the defendant left the
18        scene. He apparently went to an adjacent apartment complex where he removed his
         clothing and his stocking mask, revealing a second set of clothing underneath.  He
19        also apparently discarded the murder weapon which he later stated he threw into the
         bay. A short time later he returned to the scene and spoke to police officers.  There he
20        would calmly and dispassionately and convincingly tell the police a false story about
         having seen the robber run right by him.  He described this mythical robber to the
21        police officers.  At the time he told this false story to the police in such a calm and
         convincing fashion he had the money he had taken from Mrs. Clark in his pants
22        pockets.

23        From an independent and a careful examination of the testimony which reflects this
         false and fabricated story so convincingly told [to] the police at the scene, *there is not*
24        *the slightest shred of remorse expressed by this defendant.*  There is as evidence
         substantiates later deceit, there is fabrication*, there is willful falsehood, but there is no*
25        *remorse.*

26        In fact in an examination of all of the evidence presented to the jury in this *trial I find*
         *absolutely no genuine expression of remorse by this defendant for the little boy*, his
27        life he took, to be sure.  The defendant weeps copiously on the tape[-recorded]
         statement to the police homicide detectives.  I heard this tape when the jury heard it, I
28        have listened to it many times before and since.  There are tears, but they are not tears
         for Lance Clark. Ernest Dykes cries, when he finally cries after telling us all the false

stories and all the deceptions, *Ernest Dykes cries only for himself and for the predicament he finds himself in.*

Nowhere in my judgment from an independent review of the evidence presented to the jury in the course of this trial, nowhere is a single tear shed by this defendant for a nine year old boy who is lost forever.

Now make no mistake . . . . I am fully aware of the case law in this state which clearly states that absence of remorse is not a factor in aggravation and can not be considered to be such by either the trier of fact, the jury, by a reviewing court in a motion under Penal Code section 190.4. I fully understand and abide by that law. But I am also aware of the principle of law that allows the trier of fact and the reviewing courts to examine the evidence to determine if remorse, normally a factor in mitigation, if it is present, is in fact present in this case before the court.

I have carefully viewed the evidence presented to the jury in this trial carefully and independently to determine if any where in that evidence there is any convincing and credible indication that the potentially mitigating factor of genuine remorse is present. In my judgment it is not present in this case.

RT 4124-26 at AG021287-AG021289, emphasis added.

Trying to compensate for this demonstrable lack of remorse, petitioner points to a letter his cousin Poashan Jones wrote in 1993 stating that she knew petitioner did not mean to kill Lance because she "could see it in his eyes." Pet. at 264. However, petitioner's actions— many of which Jones may have been unaware— spoke far louder than any look in his eyes to his cousin. Had counsel chosen to present Jones as a witness, she surely would have been confronted with all the evidence in this case that established a lack of remorse. Thus, counsel can hardly be faulted for choosing not to call this witness to testify about the look in petitioner's eyes.

Habeas counsel asserts that "the testimony of other witnesses alone probably would have resulted in Petitioner's life being spared, but Petitioner should have testified at the penalty phase to say that he was sorry. He could have done so had trial counsel simply prepared him or even just called him to the stand." Pet. at 122. First, petitioner provides no support for his assertion that he was prepared, or wanted, to testify. Second, habeas counsel assumes petitioner could have simply got on the stand, said he was sorry, and thus persuade the jury he was genuinely remorseful. Had petitioner testified, however, the prosecutor surely would have confronted him with all his posttrial *actions* which would have firmly established that any late words of remorse were insincere and too late to be considered genuine. Moreover, trial counsel would not have been able to limit petitioner's testimony to a short apology. Having petitioner testify would have

63

1    opened the door to other damaging areas of cross-examination, including details about his

2    planning for the crime and, potentially, the arson acts that had previously been excluded.

3         Finally, habeas counsel asserts that petitioner's "remorse at the time of trial was

4    documented in, of all places, the probation report . . . ." Pet. at 122-123. He cites the probation

5    officer's statement: "The defendant is convincing that he is remorseful about the death of the

6    nine-year old grandson. That is clear from talking to him." Pet. at 122-123. The probation

7    officer's conclusion is unpersuasive. First, as shown, petitioner's actions spoke louder than his

8    words. More importantly, the probation officer's understanding of petitioner's actions was

9    incomplete. The probation officer admitted that he did not have "the benefit of information

10   revealed during the trial." Exh. 36 to State Pet. at AG023336. Indeed, the probation officer did

11   not even fully understand the circumstances of petitioner's crimes; he was under the impression

12   that petitioner had killed both Lance and Mrs. Clark. Hence, after concluding that petitioner was

13   remorseful for Lance's death, the probation officer stated: "Strangely, he stated he did not intend

14   to shoot the grandmother but did not appear to be particularly remorseful about her death. He

15   may have been remorseful about her, too, but his statement centered around remorse for the

16   grandson." Exh. 36 to State Pet. at AG023336. Given the probation officer's incomplete and

17   inaccurate understanding of petitioner's crimes, his conclusion about petitioner's remorse is far

18   less compelling than petitioner now asserts. Given how easily the information could have been

19   discredited, trial counsel was not incompetent for failing to rely on it.

20        In sum, there was no credible and convincing evidence from which trial counsel could have

21   argued that petitioner was remorseful. In fact, much of the evidence petitioner relies on here is

22   unpersuasive and insincere. Had counsel tried to introduce it in the penalty phase, it would have

23   been easily discredited and reflected even more poorly on petitioner. Thus, petitioner has failed

24   to show either that his counsel committed errors at trial or that, absent the errors, the result of the

25   proceeding would have been different.

26

27

28

64

### 8.    Counsel Was Not Incompetent for Failing to Introduce Additional Information About Petitioner's Family Life and Social History

Although contained in the subheading concerning alleged remorse, the next allegations in the petition regard evidence of petitioner's family life and social history that he contends should have been used to greater effect in the penalty phase of his trial.  Thus, petitioner contends that trial counsel should have presented evidence about his family members and his family life that would have contradicted the positive impression jurors may have had about those subjects.  Pet. at 123-133.  Petitioner asserts that had the jurors been aware of problems in his family life and the difficulties suffered by his family members, they would not have sentenced him to death. His claim is based on speculation and conjecture.  He fails to establish that counsel's decision not to present extensive evidence regarding petitioner's background was due to incompetence.

Relying principally on declarations from his relatives, petitioner details incidents in the lives of several members of his family: his father, Ernest Edward Dykes, Sr.; his mother, Mary Dykes; his stepmother, Lillian Young; his stepfather, Thomas E. Meadows; his half-brothers, Versie Wroten, Israel Wroten, and Dwayne Johnson; and his cousin, John Blocker.  Much of this information concerns various family members' use of alcohol, abusive behavior, mental illness, and/or criminal records.  Moreover, most of the factual allegations petitioner believes are most pertinent are contained in declarations by family members discussing *other* family members. This hearsay evidence is not competent to impeach the verdict.  For this reason alone, petitioner's claim that his trial counsel failed to investigate and present petitioner's life history should be rejected.  See Fed. Rules of Evid., rule 802 (general prohibition against hearsay evidence); Fed. Rules of Evid., Rule 606(b); Cal. Evid. Code, § 1200(b) (hearsay evidence is generally inadmissible); Cal. Evid. Code, § 1150; *In re Gallego*, 18 Cal. 4th at 837, fn. 12 (petitioner does not allege claim with specificity "merely by generally 'incorporating by reference' all of the facts set forth in the exhibits"); *People v. Duvall*, 9 Cal. 4th at 474 (petitioner must set forth fully and with particularity the facts supporting each claim along with reasonably available documentary evidence supporting the claim, including relevant affidavits and declarations).

1   Petitioner's claim should also be rejected because he fails to identify with specificity the

2   information about his life history that was not investigated or known by the defense.  In the

3   mitigation case, the defense presented the testimony of petitioner's father, mother, sister Sarah

4   Dykes, half-brother Israel Wroten, and aunt Floyzell Jones. Hence, the defense was not unaware

5   of petitioner's family and had the opportunity to learn about his family life.

6   Petitioner also fails to identify with specificity the additional information that he believes

7   should have been presented as mitigating evidence or that would have cast "fundamental doubt on

8   the accuracy and reliability of the proceedings," and thus it was incompetence of counsel not to

9   present it.  *See In re Clark*, 5 Cal. 4th 750, 766 (1993) ("It is not sufficient that the evidence

10  might have weakened the prosecution case or presented a more difficult question for the judge or

11  jury".)  It is insufficient in this proceeding for petitioner to simply describe the life histories of

12  numerous individuals without specifying the information he believes was crucial and admissible.

13  It obviously would have been impractical for trial counsel to present the life histories of all of

14  petitioner's relatives.  Moreover, much of that information, particularly evidence about more

15  distant relatives, would not have been relevant or admissible.  Also not relevant is habeas

16  counsel's personal diagnoses of alleged mental illness afflicting petitioner's relatives (*see* Pet. at

17  129-31); habeas counsel is not qualified to make such diagnoses.

18  The record is clear that trial counsel's decision not to present extensive evidence about

19  petitioner's or his family's background was a tactical choice.  First, as trial counsel declared in

20  the state habeas proceedings, he chose not to call expert or lay witnesses to testify about

21  petitioner's life or background in order not to open the door to previously excluded evidence of

22  petitioner's juvenile arson record.  Exh. 1 to State Pet. at AG022802.  Second, it was not the

23  defense team's strategy to try to spare petitioner's life by arguing that petitioner had a troubled

24  life and was surrounded by troubled relatives.  *See In re Marquez*, 1 Cal. 4th at 601-02, 609

25  (evidence of "good" character can be more compelling than the "abuse excuse".)  Rather, it was

26  their strategy to try to convince the jury that petitioner's crimes did not merit the death penalty.

27  RT 3898, 3904-3906, 3921, 3933 at AG021059, AG021065-AG021067, AG021082, AG021094 .

28  The defense team also emphasized that life without the possibility of parole was a harsh and

66

1   appropriate sentence. RT 3901, 3919, 3924-3925, 3934 at AG021062, AG021080, AG021085-

2   AG021086, AG021095.  The defense team also stressed petitioner's minimal criminal record (RT

3   3903, 3926 at AG021064, AG021087), his age (RT 3904 at AG021065), and their claim that

4   these crimes were not well planned (RT 3907, 3922 at AG021068, AG021083).  Counsel also

5   urged the jury to resolve any lingering doubt about petitioner's intent in the crimes by sparing his

6   life. RT 3908-3909 at AG021069-AG021070.  Finally, petitioner's counsel made a direct appeal

7   for mercy.  RT 3915-3917, 3933, 3935 at AG021076-AG021078, AG021094, AG021096.

8          Trial counsel concluded that portraying petitioner as a troubled man raised by a troubled

9   family would not be successful in sparing his life.  Rather, they portrayed him as an ordinary man

10  from an ordinary family—a family that would miss him were he to die.  Trial counsel was honest

11  and straightforward with the jury about this strategy.  Mr. Strellis, acknowledging the testimony

12  of the victim's family, told the jury:

13          I'm almost offended by the theory that if I don't have a lot of relatives to get up and
            say how sorry they are that I was murdered, that my life is somehow more validated if
14          I did.  Or conversely, if we have a defendant who is an orphan and doesn't have a
            family, and if nobody gets up and says don't kill my son, then somehow their life is
15          less validated.

16          Ernest Dykes is an impulsive young man, but he is a very ordinary young man.  He's
            not the reincarnation of Satan, nor is he the reincarnation of the Archangel.  He's a
17          very ordinary man, who comes from an ordinary, a loving family.  And he did an
            incredibly, impulsive, stupid, wrong act.  And for that, he has forfeited his liberty, he
18          will spend the rest of his life in prison.

19  RT 3923-3924 at AG021084-AG021085.  Later, in discussing factor (k) of Penal Code section

20  190.3, Mr. Strellis again discussed petitioner's family.  He strove not to demonize petitioner's

21  family in an effort to convince the jury to spare petitioner's life partially for his family's sake.

22          And then we get to k. And now I'm being damned because I put the family on the
            stand to ask them to plea for their son, brother's life.  And to make it worse, I'm
23          being damned if I didn't.  And if I got up to say he had a lousy life, that's bad too.
            Good parents can have disappointments in the way their children turn out.
24
            What is very interesting is, this is a case where we have a classical [sic] example of it.
25          We know Lance's grandmother, and she seems like a decent woman.  I certainly
            believed her to be a decent woman, a hardworking woman, a moral, uptight woman.
26          Right?  Her son [Lance's father] is a drag addict, who's in and out of prison, in an out
            of Santa Rita, who had to be let out of jail so that he could let his daughter make the
27          arrangements for [Lance's] funeral.

28

                                                    67

The Dykes, Mr. Dykes and Mrs. Brown are decent, hardworking people.  They work.  They're decent.  Their son turned out, obviously, to be a great disappointment.  We're not dealing with the bad seed here.  We're dealing with a youngster who made a terrible, terrible choice, and as a result of that terrible, terrible choice is going to die in the state prison of the State of California.

But I am not going to apologize for bringing the family to ask that you spare their relative.  I would be derelict in my duty if I did not.  How do I show the other side of Ernest's character?  How do I show that this is a person that people liked, relayed [sic] in a positive way?  You bring people in to say that we love him, we would like him to live.

There are no wonderful antidotes, he did not invent a cure for polio.  He is not Mother Curry.  He is an ordinary man, who has lived an ordinary life.  How do you validate an ordinary life?  By bringing people who know him, to say, for our sake, do not kill our son.

RT 3931-3932 at AG021092-AG021093.  Given this approach, trial counsel reasonably could have concluded that it would have been counterproductive to discuss potentially negative characteristics of petitioner's relatives or of his own life.  An appeal to the jury to spare petitioner's life for his family might be more likely to persuade the jury if the jurors had a positive image of petitioner's family rather than a negative one.  That this strategy ultimately was not successful does not mean that counsel was constitutionally deficient for choosing it.

Furthermore, although the family history evidence that petitioner focuses on in this argument is mostly negative, the record he presents is more ambiguous.  The relatives' posttrial declarations portray petitioner's troubled upbringing.  However, the letters that relatives and friends wrote in 1993, prior to trial, often portray petitioner as intelligent, kind, a good man, and a son raised by a loving mother.  The letters state that petitioner's relatives cared about him and he cared about them.  Exhs. 22-28 to State Pet. at AG023000-AG023012  The information in these letters may have been another reason counsel did not believe it would have been advantageous to focus his mitigation case on petitioner's upbringing.

Finally, even had petitioner faced challenges growing up, that would not necessarily influence the jury in its penalty-phase determination.  "There is absolutely nothing in this record that suggests [petitioner's] experience growing up differed from that of millions of other young men from broken homes with parents who have a hard time making ends meet.  Hyperbolic language cannot force from the record something it doesn't contain.  And what it doesn't contain

68

is anything that could conceivably have swayed a jury to go easy on [petitioner] because of his childhood." *See Pinholster v. Ayers*, 590 F. 3d at 714 (Kozinski, J., dissenting).  The vast majority of those from troubled childhoods do not resort to preying on especially vulnerable members of society, the elderly, and committing senseless acts of violence.  Thus, such evidence in no way was certain to cause the jury to feel sympathy for petitioner.

9. **It Was a Reasonable Tactical Choice for Counsel Not to Present Evidence About the Neighborhoods in which Petitioner Had Resided**

Petitioner next contends his trial counsel should have introduced evidence in mitigation about the violent and economically depressed nature of the neighborhoods where he had lived. Pet. at 131-133.  Petitioner fails to explain with specificity how such evidence would have worked to his advantage.  Instead, he offers the general and conclusory statement:  "Reasonable and competent counsel would have understood that putting such evidence and information about Petitioner's background would have been to Petitioner's advantage."  Pet. at 133.  Petitioner's contention is unpersuasive.  Additional evidence about the neighborhoods in which petitioner had resided would not have cast fundamental doubt on the accuracy and reliability of the penalty-phase verdict, and counsel was not incompetent for failing to produce this evidence.

Trial counsel was not unaware of evidence about the neighborhoods in which petitioner had resided.  Indeed, in the guilt-phase of the trial, he asked petitioner about his neighborhood in an attempt to explain petitioner's possession of a gun.  When he asked petitioner why he had bought a gun, petitioner said:  "At the time where I live at I felt, you know, you always in need to have one, you know, because at the time there was a lot of dope dealers on the street, they was having altercations with the next block up the street, I don't know what it was, but I just felt I didn't want to be caught in it and be made a statistic at the time. I just don't really know why I purchased it." RT 3303-3304 at AG020456-AG020457.  On cross-examination, petitioner expanded on his explanation.  The prosecutor asked:  "And I believe you testified here that the reason you bought this gun is because you were being hassled by drug dealers or something along those lines?"  RT 3325 at AG020478.  Petitioner responded:  "That wasn't right, sir.  I was, I live in the area which was drug wars goes on and I didn't want to be made a statistic, you know, in the middle of that,

69

1   so at the time I just carried it around for when I go to the store and as far as when I [g]o to the

2   store and back."  RT 3325-3326 at AG020478-AG020479.  In his closing argument in the penalty

3   phase, petitioner's counsel, William Daley, referred to petitioner's testimony about his

4   neighborhood: "You heard him describe his neighborhood. There were gang wars going on the

5   streets."  RT 3903 at AG021064.

6       Given this testimony and argument, it must be concluded that trial counsel's decision not to

7   present *additional* evidence about petitioner's neighborhood was a tactical choice that must be

8   accorded great deference.  *See People v. Farnam*, 28 Cal. 4th at 148 (tactical errors are generally

9   not deemed reversible.)

10      Moreover, the anecdotal evidence from petitioner's relatives and friends about petitioner's

11  neighborhood would not have cast fundamental doubt on the accuracy and reliability of the

12  penalty-phase verdict.  *In re Clark*, 5 Cal. 4th at 766 ("It is not sufficient that the evidence might

13  have weakened the prosecution case or presented a more difficult question for the judge or jury").

14  Petitioner implies that evidence of neighborhood violence would have engendered sympathy for

15  him.  This is nothing more than speculation.  Jurors would be more likely to wonder why, if

16  petitioner was so upset about neighborhood violence, he chose to address his anger by *adding* to

17  the violence.  This would be especially true because petitioner did not direct his violence against

18  those responsible for his neighborhood's poor conditions.  Instead, he targeted his elderly

19  landlady who, by all accounts, was a good woman.

20      In sum, trial counsel could have reasonably concluded that additional evidence about the

21  neighborhoods in which petitioner had resided would have done nothing to mitigate petitioner's

22  crime in the eyes of the jurors.  Certainly no prejudice can be shown by its omission.

23      **10.    Trial Counsel Was Not Ineffective for Choosing Not to Emphasize
            Petitioner's Alleged Mental Illness**

24

25      In a section that often overlaps with prior arguments in this claim, petitioner faults his trial

26  counsel for not presenting evidence of his alleged mental impairments during the penalty phase.

27  Pet. at 133-138.  The record is clear that trial counsel considered presenting evidence of mental

28

1    impairment, but made a tactical choice not to do so.  That habeas counsel now disagrees with trial

2    counsel's tactical choice does not establish trial counsel's ineffective representation.

3        In this proceeding, habeas counsel references declarations from Dr. Pablo Stewart, a

4    psychiatrist, and Dr. Nell Riley, a neuropsychologist, that were made as part of the state habeas

5    corpus proceedings.  Both doctors examined records relevant to petitioner and interviewed him

6    following the verdicts.  Both provided their analyses of petitioner and diagnosis possible mental

7    impairments.  Exhs. 5 & 6 to State Pet. at AG022829-AG022888.  Based on these declarations,

8    habeas counsel contends trial counsel should have presented evidence designed to show that

9    petitioner suffered from mental impairments, as did various members of his family.

10        The record is clear, however, that trial counsel was not unaware of the option of presenting

11    evidence of possible mental impairments.  He made a tactical decision not to do so.  Counsel

12    engaged Dr. Oliver Glover, a psychologist, to evaluate petitioner "with an eye towards

13    developing possible mental health based defenses at the guilt phase as well as providing

14    mitigation for a penalty phase trial."  Exh. 1 to State Pet. at AG022802.  He provided Dr. Glover

15    with information about petitioner, and Dr. Glover met with petitioner and administered various

16    psychological tests and obtained information in an attempt to develop petitioner's "social

17    history."  Exh. 2 to State Pet. at AG022807-AG022808.

18        Dr. Glover met with petitioner's attorneys to discuss the case and interpret the test results

19    for them.  He told trial counsel that his "preliminary impression was that Mr. Dykes was suffering

20    from either bipolar disorder, attention deficit hyperactivity disorder and alcoholism."  He

21    recommended further testing to determine the extent of petitioner's impairments.  State Exh. 2 at

22    AG022808.

23        Trial counsel decided, however, not to rely on a mental impairment defense during the

24    penalty phase.  Mr. Strellis explained his decision in a declaration in state court:

25        I limited my penalty phase presentation in this manner out of concern that calling any
         expert or lay witness to testify about Mr. Dykes' life or background would open the
26        door to the fact that during an approximately one week period when he was 14 years
         old, Mr. Dykes had lit several fires at his junior high school that had caused property
27        damage.

28

71

1   Exh. 1 to State Pet. at AG022808.  As previously noted, Strellis had won an important pretrial

2   ruling excluding evidence of petitioner's arson activity.

3        Thus, instead of portraying petitioner as mentally impaired, it was trial counsel's strategy to

4   try to convince the jury that petitioner's crimes did not merit the death penalty.  RT 3898 at

5   AG021059 ("This is not a death penalty case"); *see also* 3904-3906, 3911-3913, 3921, 3933 at

6   AG021065-AG021067, AG021072-AG021074, AG021082, AG021093.  The defense also

7   emphasized that life without the possibility of parole was a harsh sentence that would ensure that

8   petitioner died in prison.  This, they contended, was the punishment that most fit the crimes.  RT

9   3901, 3919, 3924-3925, 3934 at AG021062, AG021080, AG021085-AG021086, AG021094.

10  The defense team also stressed what they termed petitioner's minimal criminal record (RT 3903,

11  3926, 3928-3929 at AG021064, AG021087, AG021089-AG021903926), his age (RT 3904, 3931

12  at AG021065, AG021092), and their assertion that these crimes were not well planned (RT 3907,

13  3922 at AG021068).  Trial counsel also urged the jury to resolve any lingering doubt about

14  petitioner's intent in the crimes by sparing his life.  RT 3908-3909 at AG021069-AG021070.

15  Defense counsel asked for "mercy" (RT 3902, 3915-3917, 3933, 3935 at AG021063, AG021076-

16  AG021078, AG021094, AG021096 ) and urged the jury that no good could come from executing

17  petitioner (RT 3911, 3914 at AG021072, AG021075).

18       Finally, as discussed *ante*, trial counsel urged the jury to sentence petitioner to life in prison

19  to spare additional pain to petitioner's family.  In effect, he asked for mercy for them too.

20       An execution would impose a similar loss [as that suffered by the Clark family] on
         the Aunt you heard testify, Floyzell Jones.  It would impose a similar loss upon Mary
21       Brown, Ernest Dykes' Mother.  It would impose a similar loss on Ernest Dykes, Sr.,
         the man you saw testify, served some 20 years in the navy and served some 20 years
22       for the County of Alameda.  The execution of Ernest Dykes will not resolve the loss
         to the Clarks.  It will create an equivalent loss to he family of Ernest Dykes.  [¶]  The
23       old saying two wrongs don't make a right is still true.  We would solve nothing.

24  RT 3914-3915 at AG021075-AG021076.  Counsel amplified on this theme later in argument

25  describing petitioner's parents as decent and hardworking with a son who made a terrible mistake

26  and, at the least, would never be released from prison.  Counsel explained that he would have

27  been "derelict" had he not had petitioner's family ask the jury to spare petitioner's life.  He

28

72

1    explained that he was attempting to show petitioner's "other side" by having family members

2    testify that they loved him and wanted him to live. As counsel told the jury:

3
> There are no wonderful antidotes [sic], he did not invent a cure for polio. He is not
4
> Mother [sic] Curry. He is an ordinary man, who has lived an ordinary life. How do
> you validate an ordinary life? By bringing people who know him, to say, for our
5
> sake, do not kill our son.

6
> Mr. Dykes, Sr. fought in the Second World War, was on the Franklin, which I think,
> if you know your naval history was a big deal 'cause they tried to sink it. It was a
7
> ship that couldn't be sunk. He came away with medals. He served his country for 20
> honorable years, and then he served the county for another 20. He's a decent man.
8
> He asks you that, when he dies, there still be a member of his line still alive.

9
> Is that an unreasonable request? Is that a chick [sic] that we owe him for his service
> to the country? I don't know. I really know. [¶] But it sure as hell is not an
10
> unreasonable request, that I won't put him up there and say, nor will I apologize for
> having done it.

11   RT 3932-3933 at AG021093-AG021094.

12         In sum, once again, petitioner has failed to show that the state supreme court's decision

13   rejecting his claim of constitutionally deficient performance by trial counsel was an unreasonable

14   application of the facts to controlling law, or was contrary to Supreme Court law.

15         **11.    Ultimately, Petitioner Has Failed to Establish Ineffective Assistance
                    of Counsel**
16

17         None of petitioner's claims of ineffective assistance of counsel, singularly or together, have

18   merit. Petitioner's argument underestimates both the prosecution's case in aggravation and trial

19   counsel's case in mitigation. The prosecution's case in aggravation was forthright and limited, it

20   was also highly persuasive. The jury understood that petitioner, without justification, preyed on

21   the most vulnerable members of our society. For no other reason than his desire for money, he

22   chose to target his elderly landlady—a person who had never harmed him and who had, in fact,

23   previously helped him and other tenants. Despite Mrs. Clark's generosity, petitioner and others

24   had talked about robbing her on previous occasions. Petitioner was the one, however, who

25   carried out this stated intention. Petitioner planned the robbery by obtaining his gun and donning

26   a disguise. He demanded Mrs. Clark's money and, when she did not act quickly enough for him

27   and indicated she knew who he was, he shot her. That Mrs. Clark's young and defenseless

28   grandson was seated by her side was no deterrent to petitioner in his attempt to fulfill his plan.

1    Petitioner showed no remorse after the crime.  Instead of turning himself into the police and

2    solving this senseless murder, he changed clothes, returned to the crime scene, and made up a

3    story designed to misdirect and thwart the police investigation.  It was only when petitioner

4    realized that he would not be able to hide forever that he turned himself in.  Even then, he did not

5    confess initially, but first tried to again misdirect the police.

6    This was not petitioner's first experience with the criminal justice system.  He previously

7    had been arrested for possession of a concealed and loaded gun.  This prior experience did

8    nothing to deter petitioner's determination to possess a deadly weapon.

9    The impact of Lance's death on his family cannot be underestimated and was obvious to the

10   jury.  Lance came from a difficult family background and his grandmother tried to provide him

11   and his siblings with a better family life.  Lance's sister Kristie Clark testified about the extreme

12   sense of loss and sadness the family suffered from Lance's murder.

13   In sum, although the prosecution's penalty phase case was forthright and limited, it would

14   be a fundamental mistake to dismiss it as "weak."  See Pet. at 102.

15   By contrast, petitioner denigrates and minimizes defense counsel's efforts to convince the

16   jury to spare his life.  Trial counsel consciously chose a strategy of trying to convince the jury that

17   petitioner's crimes did not warrant the death penalty.  Rather than portray petitioner as the

18   product of an uncaring family, counsel chose to present testimony from petitioner's relatives that

19   they loved him and did not want to see him put to death.  An appeal to the jury's sympathy for the

20   defendant's family, even if not ultimately a successful strategy in this case, is not a

21   constitutionally deficient strategy.  Counsel consulted with a mental health expert, but ultimately

22   chose to forgo a mental health defense for fear of opening the door to potentially devastating

23   testimony about petitioner's prior acts of arson.

24   In assessing the California Supreme Court's decision on this claim, it is instructive to

25   review the facts of the seminal case on ineffective assistance of counsel—*Strickland v. Arizona*.

26   In *Strickland*, 466 U.S. 668, defense counsel's entire penalty phase investigation consisted of

27   talking to defendant about his background and speaking on the phone to defendant's wife and

28   mother.  Counsel ultimately presented no mitigating evidence, making a tactical decision to rely

74

1    on the plea colloquy to support the lack of evidence of a criminal record and defendant's

2    acceptance of responsibility for the crime.  By adopting this strategy, counsel avoided potentially

3    damaging cross-examination and the introduction of the defendant's rap sheet which would have

4    undermined his mitigation argument.  Habeas counsel subsequently presented evidence from a

5    number of character witnesses, as well as mental health experts who would have testified that

6    defendant was under considerable emotional stress at the time of the crime.  The Supreme Court

7    noted that counsel's duties at a capital sentencing proceeding "need not be distinguished from an

8    ordinary trial," and established the standards of performance and prejudice applicable to any

9    criminal case.  *Id*. at 686-87.  Applying those standards, the Court concluded, "On these facts

10   there can be little question, even without application of the presumption of adequate performance,

11   that trial counsel's defense, though unsuccessful, was the result of reasonable professional

12   judgment."  *Id*. at 699; *accord*, *Burger v. Kemp*, 483 U.S. 776 (1987) (upholding capital judgment

13   where trial counsel conducted limited penalty phase investigation and presented no mitigating

14   evidence, and habeas counsel discovered evidence showing that the defendant had "an

15   exceptionally unhappy and unstable childhood" and stunted mental and emotional development);

16   *Bell v. Cone*, 535 U.S. 685 (2002) (upholding capital judgment where trial counsel made a

17   strategic choice to present no mitigating evidence and to waive closing argument at the penalty

18   phase); *see In re Andrews*, 28 Cal. 4th 1234, 1253-62 (2002) (discussing *Strickland*, *Burger*, and

19   *Bell*.)  At the very least, these cases illustrate that there is no one right way to provide effective

20   assistance (*Strickland*, 466 U.S. at p. 689), and that counsel's performance cannot be judged

21   based on "mechanical rules" (*Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000)).

22        Thus, although trial counsel's strategy ultimately did not result in the jury choosing life in

23   prison for petitioner, that does not mean trial counsel was constitutionally incompetent.

24   Petitioner's counsel "confronted a challenging penalty phase with an unsympathetic client, which

25   limited their feasible mitigation strategies."  See *Cullen v. Pinholster*, 131 S. Ct. at 1405.  Habeas

26   counsel, as stated repeatedly in the petition, disagrees with trial counsel's strategy.  Such

27   disagreement and second-guessing, however, is an insufficient basis on which to find trial counsel

28   incompetent and grant habeas relief.

1    Given the evidence of trial counsel's strategic planning, and the lack of evidence of

2    prejudice, the California Supreme Court's holding cannot be said to be contrary to or

3    unreasonable under §2254(d), particularly in light of AEDPA's doubly deferential standard of

4    review.

5    **C.    Claim 3:  Petitioner's Claims of Jury Misconduct Are Without Merit**

6    Petitioner asserts that the jury committed misconduct in two ways: (1) it put him in

7    jeopardy for a crime of which he had already been acquitted, and (2) it considered extrinsic

8    evidence.  Pet. at 138.  We address petitioner's two claims in order.

9        **1.    Petitioner's Claim that the Jury or the Trial Court Committed
         Misconduct By Violating Principles of Double Jeopardy or Collateral
10        Estoppel is Procedurally Defaulted and, in Any Event, the State
         Court's Alternative Denial on the Merits Does Not Violate AEDPA.**

11

12    Although the first part of petitioner's claim is asserted as one of alleged jury misconduct,

13    the substance of the claim also faults the trial court for its actions.  In essence, petitioner takes

14    issue with the trial court's response to a jury question regarding what the jury could consider in

15    the penalty-phase deliberations.  Pet. at 138-151.  Petitioner argues that the trial court responded

16    to a jury question in a manner that improperly allowed the jury to reconsider whether petitioner's

17    crimes were premeditated and deliberate, even though the jury had found not true an allegation in

18    the guilt phase that the attempted murder of Bernice Clark was willful, deliberate, and

19    premeditated.  Thus, he concludes, "the penalty phase jury's reconsideration of the issue of

20    premedition and deliberation, an issue which the guilt phase jury necessarily resolved in

21    petitioner's favor, violated constitutional principles of collateral and direct estoppel, incorporated

22    into the Double Jeopardy Clause of the Fifth and Fourteenth Amendments to the United States

23    Constitution.  The trial court's explicit grant of permission to reconsider premeditation and

24    deliberation also violated the Eighth Amendment and Penal Code § 190.3, because the jury

25    already had found the evidence insufficiently reliable to support a conviction in the guilt phase."

26    Pet. at 145.  Petitioner's argument is based on a misreading of the precise language of the jury's

27    question and of the court's answer.  There was nothing in the question nor the court's response

28

1    that allowed the jury to consider impermissible factors in its penalty-phase determination.

2    Petitioner's double-jeopardy/collateral estoppel claim is, thus, without merit.[24]

3                    **a.    Procedural background**

4          During penalty-phase deliberations, the jury posed the following question to the court:

5    "Even though we agreed that the death of Lance Clark was murder of the first degree because it

6    happened during the commission of a robbery [felony murder law], are we now permitted to look

7    at the willful, premeditated and deliberate nature of this killing under Factor A?" CT 557 at

8    AG000615, brackets in original; *see also* RT 4015 at AG021176. The reference to "Factor A" in

9    the jury's question was to Penal Code section 190.3, which states in relevant part: "In

10   determining the penalty, the trier of fact shall take into account any of the following factors if

11   relevant: (a) The circumstances of the crime of which the defendant was convicted in the present

12   proceeding and the existence of any special circumstances found to be true pursuant to Section

13   190.1."

14         The court, after stating that it had discussed the question with counsel (RT 4014 at

15   AG021175), provided the jury with the following response: "You may consider such factors

16   under Factor A of jury [CALJIC] instruction 8.85 in your consideration of the circumstances of

17   the crime of which the defendant was convicted in the present proceeding and the existence of

18   any special circumstance found to be true." RT 4016 at AG021177; *see also* CT 636 at

19   AG000692. "Defense counsel did not object to the court's response to the jury's question or

20   request that the jury be reminded of its 'not true' finding in connection with the allegation that the

21   attempted murder of Bernice was willful, deliberate, and premeditated. Indeed, the court stated

22   on the record that the court and counsel discussed the jury's question and agreed upon the

23   wording of the court's response." *Dykes*, 46 Cal. 4th at 800; AG022150.

24         As he does here, in the state court petitioner claimed that the trial court's response "failed to

25   take into account the danger that the jury would reconsider its prior verdict." *Dykes*, 46 Cal. 4th

26   ───────────────
     [24] The substance of this portion of petitioner's claim was raised in his direct appeal in the
27   California Supreme Court. AOB Claim XIII at AG021545-AG021557; *see also* RB at
     AG021880-AG021888. The California Supreme Court rejected the claim. *Dykes*, 46 Cal. 4th at
     800-06; AG022149-AG022158.
28

                                        77

at 800; AG022151.  In rejecting the claim, the California Supreme Court first explained the

contours of the argument.

> He claims the jury's verdict on the charge of attempted murder of Bernice Clark—a
> verdict convicting defendant of the attempted murder but acquitting him of having
> committed a willful, deliberate, and premeditated attempted murder—established that
> the jury acquitted defendant of having committed a willful, deliberate, premeditated
> murder of Lance Clark, and that the jury should have been so informed to avoid
> violating double jeopardy principles that defendant invokes for the first time on
> appeal.  Defendant claims that the unusual facts of the case established an implied
> acquittal, thereby requiring deviation from the general rule that, if the trial is based
> upon an accusatory pleading charging two or more crimes, "[a]n acquittal of one or
> more counts shall not be deemed an acquittal of any other count" ([Penal Code,] §
> 954), and also from the general rule that "'[t]he murder of two persons, even by the
> same act, constitutes two offenses, for each of which a separate prosecution will lie,
> and . . . a conviction or acquittal in one case does not bar a prosecution in the other.'"
> [Citation.]"  (*People v. Carpenter* (1999) 21 Cal. 4th 1016, 1039, fn. 4 [90 Cal. Rptr.
> 2d 607, 988 P. 2d 531].)  He points to the circumstance that a single shot
> accomplished both the attempted murder and the murder, claiming that the jury's
> verdict on the attempted murder charge therefore essentially constituted a special
> verdict or finding with respect to the mental state involved in the murder.  He claims
> this asserted special verdict should have barred "reconsideration" of willfulness,
> deliberation, and premeditation as circumstances of the crime under section 190.3,
> factor (a).  He asserts the court's response constituted an error under [Penal Code,]
> section 190.3, factor (a), which refers only to consideration of circumstances of the
> crimes of which a defendant was convicted and that the error violated the federal
> double jeopardy clause.  He also urges that the asserted error constituted a violation
> of the Eighth Amendment to the United States Constitution, because it undermined
> the reliability of the proceeding.

*Dykes*, 46 Cal. 4th at 801-02, footnote omitted; AG022151-AG022152.[25]  The California

Supreme Court held that even if it were to accept the "debatable general premise of [petitioner's ]

collateral estoppel argument, his claim contains analytical flaws."  *Id*. at 802 at AG022152.

> For example, the "not true" finding constituted a finding that the prosecutor had failed
> to prove that the attempted murder of Bernice Clark was willful, deliberate, and
> premeditated, but the verdict did not establish that the jury agreed none of those
> mental states had been established.  The verdicts certainly did not reflect a finding
> that the attempted murder of Bernice was not willful.  A killing is willful if intent to
> kill is proved (*People v. Moon* (2005) 37 Cal. 4th 1, 29 [32 Cal. Rptr. 3d 894, 117 P.

---

[25] In a footnote, the California Supreme Court noted that petitioner referred to parallel
provisions of the California Constitution, but did not present separate argument and analysis
based upon California law.  Therefore, the court stated, "we do not address his claim under
California constitutional law."  *Dykes*, 46 Cal. 4th at 801 n.17 at AG022152; see also *Ashe v.
Swenson*, 397 U.S. 436 (1970) ("'Collateral estoppel' is an awkward phrase, but it stands for an
extremely important principle in our adversary system of justice.  It means simply that when an
issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot
again be litigated between the same parties in any future lawsuit"; collateral estoppel applies in
both civil and criminal cases).

78

3d 591]), and the attempted-murder verdict established the jury found intent to kill (*People v. Smith* (2005) 37 Cal. 4th 733, 739 [37 Cal. Rptr. 3d 163, 124 P. 3d 730]). The element of willfulness was the focus of the parties' closing arguments and was impervious to any possible attack based upon collateral estoppel principles.

*Dykes*, 46 Cal. 4th at 801-02 at AG022152.

In any event, the California Supreme Court held, petitioner's claim was forfeited "because [petitioner] did not object or request clarification at trial; he instead agreed with the [trial] court's formulation." *Dykes*, 46 Cal. 4th at 802 at AG022152. As the court further explained:

The [trial] court is under a general obligation to "clear up any instructional confusion expressed by the jury," but "[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information." [Citations, including Penal Code, § 1138.]

When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal. [Citations.]

*Dykes*, 46 Cal. 4th at 802 at AG022152-AG022153. The California Supreme Court determined that it was "appropriate" to apply the forfeiture rule in this case. *Id.*

Guilt phase instructions permitted the jury to convict defendant of the first degree murder of Lance Clark on a felony-murder theory, which does not require proof of malice (*People v. Dillon* (1983) 34 Cal. 3d 441, 474-475; see also *People v. Patterson* (1989) 49 Cal. 3d 615, 626), or alternatively on the theory that the murder was committed with malice aforethought ([Penal Code,] §§ 188, 189). The jury evidently was concerned because it had based the first degree murder verdict on a felony-murder theory, but was uncertain whether at the penalty phase it was permissible to consider such mental elements as to which it had been instructed with respect to the other theory of first degree murder. The court's answer to the jury's question was correct in that a jury that has convicted a defendant of first degree murder on the basis of a felony-murder theory may consider, as part of its evaluation of the defendant's culpability and its moral and normative decision concerning the appropriate penalty, the defendant's state of mind with respect to the murder—that is, whether the defendant also intended to kill or acted with malice aforethought. It was this information that the court's response conveyed, and we conclude the jury would have understood the court's response in this manner. If defendant wished to limit or clarify the information conveyed by the court, defense counsel should have requested limitation or clarification.

Id. at 802-03 at AG022153-AG022154, footnote omitted. In a footnote, the California Supreme court further explained that a defendant's culpable mental state may be considered a circumstance of the crime under Penal Code section 190.3, factor (a). *Id.* at 803 n.18 at AG022154. "Even

79

1    when the verdict is based upon a felony-murder theory, it is appropriate to consider any apparent

2    premeditation on the part of the defendant as an aggravating circumstance of the crime." *Id.*[26]

3        Here, as he did in state court, petitioner contends that although his counsel did not object or

4    request clarification at the time the trial court responded to the jury's question, his attorney

5    subsequently brought the matter to that court's attention.  Pet. at 140-141.  As the California

6    Supreme Court explained, the following description of what occurred "did not concern the

7    response by the [trial] court that [petitioner] now attacks . . . ."  *Dykes*, 46 Cal. 4th at 803;

8    AG022154.  "Rather, the discussion occurred after the court had proposed a response, secured

9    defense counsel's agreement to the suggested wording, and delivered the agreed-upon

10   explanation to the jury.  Additionally, the discussion noted below occurred after the jury had

11   resumed its deliberations, and after two of its members were excused."  *Id.*

12       The sequence of events, as described by the California Supreme Court, was as follows.

13   After two deliberating jurors were excused and alternate jurors were seated, the court and counsel

14   discussed the principle that the newly constituted jury should begin deliberations anew.  *Dykes*,

15       [26] In his federal petition, petitioner asserts that the court's response to the jury's question
16   violated Penal Code section 190.3.  Even were this correct—which it is not—habeas relief does
     not lie for a violation of state law.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("We have
17   stated many times that 'federal habeas corpus relief does not lie for errors of state law.'
     [Citations.]  Today, we reemphasize that it is not the province of a federal habeas court to
18   reexamine state-court determinations on state-law questions.  In conducting habeas review, a
     federal court is limited to deciding whether a conviction violated the Constitution, laws, or
     treaties of the United States.  [Citations]".)
19       In apparent recognition of this principle and bar to his claim, petitioner asserts that in
20   violating section 190.3, "[t]he trial court therefore also violated petitioner's liberty interest in a
     state procedural guarantee, a further violation of federal law.  *Morrissey v. Brewer*, 408 U.S. 471,
21   481 (1982)."  Pet. at 150, n.79; *see also* Pet. at 151.  This claim was not raised in the state court
     and thus is unexhausted.  Nevertheless, it too fails to state a claim on which habeas relief can be
     granted.
22       Petitioner cannot circumvent the rule enunciated in *Estelle* simply by asserting a violation
     of a "liberty interest."  A state violates a criminal defendant's due process right to fundamental
23   fairness if it arbitrarily deprives the defendant of a state law entitlement.  *See Hicks v. Oklahoma*,
     447 U.S. 343, 346 (1980).  Penal Code section 190.3 is a constitutionally valid recitation of the
24   permissible factors a jury can consider in assessing penalty in a capital case.  The jury's question
     in this case concerned section 190.3 and the court's response was a proper application of that state
25   law evidentiary rule.  The United States Supreme Court has made clear that "[t]he Eighth
     Amendment does not establish a federal code of evidence to supersede state evidentiary rules in
26   capital sentencing proceedings."  *Romano v. Oklahoma*, 512 U.S. 1, 11-12 (1994).  Thus, even
     were the claim exhausted, petitioner has not established that the trial court's response to the jury's
27   question violated a "liberty interest."

28

1    46 Cal. 4th at 803; AG022154-AG022155.  The court, however, was concerned that the jury not

2    be misled into thinking that it had to begin the guilt-phase deliberations anew.  The court,

3    therefore, proposed that the jury be instructed to commence the penalty-phase deliberations anew.

4    *Id*.; AG022155  Defense counsel commented:  "And for the record, . . . I am specifically

5    requesting this because at the time of the guilt phase they found a nonpremeditated murder and I

6    don't . . . want to revisit that.  They have made a finding and I believe we have a right to have that

7    finding be an appropriate finding.'"  *Id*.  As the California Supreme Court concluded, "This

8    comment clearly suggests that defense counsel did not believe the court's response to the jury's

9    question suggested to the jury that it should reconsider its prior verdict."  *Id*.

10       The prosecutor responded that it could not be determined that the jury acquitted petitioner

11   of the premeditated murder of Lance Clark and, in any event,

12
     "they're free under the law to consider the circumstances of the offense as they see
13   fit, . . . based on all the evidence . . . .  But the fact that they had a reasonable doubt as
     to whether or not the murder was willful, deliberate and premeditated would not
14   prevent them from considering either the theory of willful, deliberate and
     premeditated or *certain parts of it* and you never know if they had a reasonable *doubt*
15   *as to one part* . . . .  [¶]  In any event, the burden of proof of the circumstances of the
     events is not beyond a reasonable doubt and therefore a jury could have conceivably
16   been convinced to some extent that it was actually deliberate and premeditated *or*
     *some part thereof* and yet not be convinced beyond a reasonable doubt of that, but
17   would be free to revisit those views as it bears on the circumstances of the offense
     because there is a different burden of proof, and by their finding that the attempted
18   murder was not the finding, not the true premeditation clause, does not prevent them
     from considering any part of the state of mind that that instruction defines."  (Italics
19   added.)

20   *Dykes*, 46 Cal. 4th at 804; AG022155-AG022156.  The California Supreme Court found the

21   prosecutor's response significant "because defense counsel stated he agreed with it."  *Dykes*, 46

22   Cal. 4th at 803; AG022155.

23       The trial court agreed that the newly constituted jury was not to begin guilt-phase

24   deliberations anew, but added:  "'[t]he law is clear they should consider the circumstances of the

25   crime as one of the factors under [Penal Code, § 190.3, factor (a)] as one of the things they may

26   consider in determining appropriate penalty.  [¶]  So certainly they are free and I have told them

27   previously in response to earlier notes that is precisely what they may do . . . .'"  *Dykes*, 46 Cal.

28   4th at 804; AG022156.  Defense counsel responded:  "'*I'm not arguing with his* [the prosecutor's]

81

1   *statement as to what they can consider*, I believe the instruction [concerning recommencing

2   deliberation] as amended more accurately tells them what they're supposed to be doing and with

3   this jury I may not live long enough from them to go back and relitigate both parts of the case.'

4   (Italics added.)"  *Id*.  Accordingly, the trial court instructed the jury to begin its deliberations

5   "'from the beginning,'" but explained:  "'You must therefore set aside and disregard all past

6   deliberations at the penalty phase of the trial and begin deliberating anew.  This means that each

7   remaining original juror must set aside and disregard the earlier deliberations at the penalty phase

8   of the trial as if they [had] not taken place.'"  *Id*.

9                          **b.     Review of this claim is barred by procedural default**

10          The California Supreme Court held, "trial counsel did not preserve the issue that defendant

11   now seeks to raise."  *Dykes*, 46 Cal. 4th at 804; AG022156.  Because trial counsel failed to

12   preserve the claim of instructional error in the state courts, federal habeas relief is prohibited.

13          In *Coleman v. Thompson*, 501 U.S. 722 (1991), the Supreme Court reiterated the general

14   principle that a district court should not review an alleged violation of federal law if the state

15   court's decision rested on an independent and adequate state ground.

16          In all cases in which a state prisoner has defaulted his federal claims in state court
        pursuant to an independent and adequate state procedural rule, federal habeas review
17      of the claims is barred unless the prisoner can demonstrate cause for the default and
        actual prejudice as a result of the alleged violation of federal law, or demonstrate that
18      failure to consider the claims will result in a fundamental miscarriage of justice.

19   *Id*. at 729; *see also Walker v. Martin*,__ U.S. __, __, 131 S. Ct. 1120, 1127 (2011).  In other

20   words, a default in state court under an independent and adequate state procedural rule operates as

21   a bar to the review of the merits of the constitutional claim in federal court.  *Wainwright v. Sykes*,

22   433 U.S. 72 (1977); *Wells v. Maass*, 28 F. 3d 1005, 1008 (9th Cir. 1994).  A state procedural bar

23   is independent of federal law when the state-law basis for it is not interwoven with federal law.

24   *Harris v. Reed*, 489 U.S. 255, 265 (1988).  The fact that the state court may have also ruled on the

25   merits of the claim in the alternative is inconsequential.  *Id*. at 264 n.10.

26          Regarding the "adequacy" prong of the rule, "a state rule must be 'firmly established and

27   regularly followed.'  '[A] discretionary state procedural rule,' . . . 'can serve as an adequate

28   ground to bar federal habeas review.'  A 'rule can be "firmly established" and "regularly

                                                        82

1    followed,'" . . . 'even if the appropriate exercise of discretion may permit consideration of a

2    federal claim in some cases but not others.'"  *Walker v. Martin*, 131 S. Ct. at 1127-28, citations

3    and footnote omitted.

4         California's contemporaneous objection requirement is well established and regularly

5    followed.  Cal. Evid. Code, § 353.  The Supreme Court as recognized that this state rule

6    constitutes a valid procedural default.  *Ylst v. Nunnemaker*, 501 U.S. 797, 799, 806 (1991) (failure

7    to object to confession on *Miranda* grounds); *Wainwright v. Sykes*, 433 U.S. at 87 (failure to

8    object to confession).  Likewise, the Ninth Circuit has repeatedly held that this rule precludes

9    federal habeas review.  *Paulino v. Castro*, 371 F. 3d 1083, 1093 (9th Cir. 2004) (failure to object

10   to jury instruction); *see also Fairbanks v. Ayers*, 650 F. 3d 1243, 1256 (9th Cir. 2011)

11   ("California consistently applies its contemporaneous objection rule when a party fails to object

12   to the admission of evidence").  Thus, petitioner cannot obtain habeas relief on his claim that the

13   trial court erred in responding to the jury's question and that the jury committed misconduct.

14              c.    **The state court's alternative finding that the claim lacks merit
                       is not contrary to or an unreasonable application of Supreme
15                     Court precedent**

16        Although finding the claim forfeited, the California Supreme Court also concluded that "it

17   is not reasonably likely the jury would understand the court's response as an invitation to

18   reconsider its verdict  [citations], especially in light of the apparent purpose of the jury's

19   question—to determine generally whether it could consider defendant's mental state with

20   reference to the murder of Lance Clark despite the circumstances that the murder verdict rested

21   upon the felony-murder theory."  *Dykes*, 46 Cal. 4th at 804-05; AG022156-AG022157.  The state

22   supreme court examined the arguments of counsel and found that they supported its conclusion.

23   "The focus of the closing arguments was upon intent to kill rather than premeditation; the

24   prosecutor's closing argument did not suggest that the jury reconsider its prior guilt phase

25   verdicts; and defense counsel reminded the jury that it had determined the attempted murder was

26   not premeditated—a reminder that was not rebutted."  *Id.* at 805; AG022157.  The court further

27   explained regarding the closing arguments:

28

83

1

2

> Thus, in his closing argument at the penalty phase of the trial, the prosecutor did not ask the jury to reconsider its prior finding that the allegation that the attempted murder of Bernice Clark occurred with premeditation, deliberation, and willfulness was not true. Rather, he informed the jury that he anticipated the defense would renew its claim that the shooting was accidental or at least did not involve intent to kill. He reminded the jury it had found intent to kill when it convicted defendant of the attempted murder of Bernice. The prosecutor argued that the robbery was planned and that when defendant prepared for the robbery, he contemplated the possibility he might employ deadly force against a weak and elderly victim. The prosecutor stressed that intent to kill could be inferred from this preparation and from the circumstance that defendant realized Bernice had recognized him.

3

4

5

6

7

> For its part, the defense's closing argument reminded the jury of its apparent conclusion that the attempted murder of Bernice Clark involved intent to kill but was not premeditated, and it focused on asking the jury to recognize some lingering doubt concerning the question whether the shooting involved an intent to kill or was entirely accidental. Defense counsel urged that even if defendant formed the intent to kill, the death penalty was not warranted. The prosecutor did not offer argument in rebuttal to this point.

8

9

10

11    *Dykes*, 46 Cal. 4th at 805; AG022157. In short, "the jury did not pose a question specifically

12    directed at reconsideration of prior guilt phase verdicts or findings, nor was the court's response

13    directed to that possibility." *Dykes*, 46 Cal. 4th at 805; AG022157-AG022158. The California

14    Supreme Court noted that "defense counsel's evident understanding that the trial court's response

15    had not invited the jury to reconsider its prior guilt phase verdicts." *Id*.; AG022158.

16

> Furthermore, the court instructed and reinstructed the jury (in the terms of the statute) that it should consider the circumstances of the crimes of which defendant was convicted, thereby rendering it unlikely the jury would consider an allegation that it had found not to be true. Finally, after the alternate jurors had been seated, the court reminded the reconstituted jury to recommence deliberation solely on the potential penalty phase verdict—thereby informing the former alternates who had not participated in the guilt verdicts and findings that their task did not include reconsidering those matters. Under these circumstances, it is not reasonably likely the jury, including the newly seated alternates, would have reexamined the guilt phase verdicts.

17

18

19

20

21

22    *Dykes*, 46 Cal. 4th at 805-06, footnote omitted; AG022158.

23    Furthermore, even had the jury considered the findings it made in the guilt-phase in

24    assessing punishment, there would have been no violation of principles of collateral estoppel or

25    double jeopardy. Collateral estoppel prevents reconsideration of exact issues that have been

26    previously determined in a defendant's favor. But collateral estoppel principles do not fit the

27    situation of the consideration of sentencing factors in the second phase of a single prosecution.

28    *See, e.g., Schiro v. Farley*, 510 U.S. 222, 230 (1994) (sentencing phase of a single prosecution is

1    not a successive prosecution for purposes of the Double Jeopardy Clause).  As the Supreme Court

2    has instructed, "*the rule of collateral estoppel in criminal cases is not to be applied with the*

3    *hypertechnical and archaic approach of a 19th century pleading book, but with realism an*

4    *rationality*.  Where a previous judgment of acquittal was based upon a general verdict, as is

5    usually the case, the approach requires a court to 'examine the record of a prior proceeding,

6    taking into account the pleadings, evidence, charge, and other relevant matter, and conclude

7    whether a rational jury could have grounded its verdict upon an issue other than that which the

8    defendant seeks to foreclose from consideration.'  The inquiry 'must be set in a practical frame

9    and viewed with an eye to all the circumstances of the proceedings.' [Citation.]"  *Ashe v.*

10   *Swenson*, 397 US 436, 444 (1970), footnote omitted, italics added.  As the California Supreme

11   Court correctly explained, there was nothing in the jury's guilt-phase verdicts that would have

12   prevented the jury from considering the circumstances of the crimes when assessing the

13   appropriate penalty.

14          In sum, petitioner fails to establish that the California Supreme Court misapplied

15   controlling United States Supreme Court authority in concluding that the jury did not commit

16   misconduct during the penalty phase deliberations, nor did the trial court commit misconduct in

17   responding to the jury's inquiry.  Thus, federal habeas relief is unwarranted.

18                     **2.    The California Supreme Court's Finding that the Trial Court Did
                               Not Err in Denying Petitioner's Motion for New Trial Based on**
19                     **Alleged Jury Misconduct Does Not Violate 28 U.S. C. § 2254(d)**

20          Based on a post-trial defense investigator's report allegedly recounting statements by jurors,

21   petitioner contends that jurors engaged in misconduct in the penalty phase of his trial.  The trial

22   court was presented with these claims by way of a motion for new trial.  The court found no basis

23   to hold an evidentiary hearing on petitioner's claims.  In this federal petition, petitioner claims

24   that "the trial court's refusal to hold an evidentiary hearing on jury misconduct was error under

25   both state and federal law, as was the subsequent trial court ruling denying the motion for new

26   trial." Pet. at 152.  Petitioner asserts that, "[g]ranted appropriate discovery and an evidentiary

27   hearing . . . he will establish these events did indeed violate his federal constitutional rights." Pet.

28   at 152-53.

1    Petitioner raised his claim of jury misconduct and the alleged improper denial of his motion

2  for new trial in his direct appeal in the California Supreme Court.  He contended that the error

3  violated his rights under the Fifth, Sixth, and Seventh Amendments to the federal Constitution.

4  *Dykes*, 46 Cal. 4th at 806; AG022158; *see also* AOB claim XIV at AG021558-AG021572 and

5  RB at AG021889-AG021905.  Variations of the claim were also raised in petitioner's state

6  petition for writ of habeas corpus.  State Pet. claims XIII & XIV at AG022696-AG022700.  The

7  California Supreme Court denied the claim on direct review.  *Dykes*, 46 Cal. 4th at 806-13;

8  AG022158-AG022168.  It also denied the claims on habeas corpus.  AG025232.  In addition, the

9  state supreme court found that claim XIV of petitioner's state petition was procedurally barred

10  because it was raised and rejected on appeal.  AG025232, citing *In re Waltreus*, 62 Cal. 2d 218,

11  225 (1965) (habeas corpus cannot serve as a second appeal).

12                    **a.    Procedural background**

13    In November 2005, following the jury's verdict in the guilt phase of the trial, petitioner

14  submitted a motion for new trial.  At the same time, defense counsel gave the court several

15  reports prepared by a defense investigator concerning postverdict conversations with several

16  jurors.  *Dykes*, 46 Cal. 4th at 806; AG022159.  Those reports were presented without a written

17  motion or points and authorities in support of a motion for new trial based on any claim of juror

18  misconduct.  Several weeks later, defense counsel submitted a more detailed motion for new trial

19  alleging three claims of juror misconduct:  "'First . . . did the jury discuss the opinion that death

20  did not mean death, despite the court['s] instructions.  Second did the jury discuss the

21  defendant['s] lack of remorse as a factor in aggravation.  Third, did the jury discuss that "life does

22  not mean life."'"  *Dykes*, 46 Cal. 4th at 806; AG022159.  "Attached to the report were unsworn

23  reports, prepared for defense counsel by the defense investigator, concerning interviews with

24  several jurors.  The motion was based exclusively on the three enumerated claims and concluded

25  with a request for an evidentiary hearing."  *Id.*  The prosecutor objected that the unsworn hearsay

26  reports prepared by the investigator were not a competent basis upon which to grant a motion for

27  new trial.  *Id.*

28

During a hearing on the motion in December 2005, the trial court concluded that the defense investigator's reports were not admissible to impeach the verdict. "It added that, even if the investigator's hearsay reports were considered, defendant's allegations lacked merit. Finally, he court determined that the motion did not provide a sufficient basis for conducting an evidentiary hearing." *Dykes*, 46 Cal. 4th at 807; AG022160.

As background, we briefly summarize the alleged statements of the jurors as relayed in the defense investigator's report. Pet. at 153.[27] Juror RA[28] recalled a discussion during deliberations that a death sentence did not mean that petitioner would actually be executed. That sentiment was echoed by Juror SL. Pet. at 154; see also *Dykes*, 46 Cal. 4th at 807; AG022160-AG022161. Juror RA also stated, however, that she did not think the comments about whether the death penalty would be implemented "'influenced anyone's opinion nor their decision to vote for the death penalty.'" *Id.*

Juror FC stated that she told the other jurors that she had worked for a lawyer in Fresno, California, and had seen many people get sentenced to life in prison without the possibility of parole who were nonetheless released from prison. Pet. at 155; *see Dykes*, 46 Cal. 4th at 808; AG022161-AG022162. Juror FC, however, told other jurors who wondered whether the death sentence would be carried out "that the speculation was not appropriate and that 'they should consider the death penalty as something that for all their knowledge they might give a verdict out and he might be executed the next week.'" *Id.*

As he did in the state supreme court, in this federal petition petitioner relies on other comments by jurors as the basis for additional claims of juror misconduct that were not part of the motion for new trial in the trial court. According to the defense investigator, Juror RA and other jurors heard that the district attorney's car tires had been slashed during trial and they speculated

---

[27] In describing the jurors alleged statements, respondent does not accept petitioner's assertion that the statements were competent evidence in the state courts or are competent evidence in this Court. All the following descriptions of the statements attributed to jurors are only "alleged" statements because the only "evidence" of them is a report by a defense investigator—not actual declarations from the jurors. To avoid repetition, respondent will not characterize each statement as an "alleged" statement, but it is our contention that they are

[28] As they were in the state court, jurors are referred to only by their initials to protect their identities.

87

1    whether the incident was related to the case.  Pet. at 153.  RA also expressed fear about juror

2    anonymity.  Pet. at 153.  RA was afraid of several men in the courtroom that the juror assumed

3    were associated with petitioner.  Pet. at 153-154.  Juror FC also observed suspicious behavior by

4    some courtroom observers.  Pet. at 154.    Juror FC also said that she and others knew that

5    petitioner had not just started committing crimes and undoubtedly had a juvenile criminal history.

6    Pet. at 154.  Juror SL, also expressed the view that this was not petitioner's first crime.  Pet. at

7    154.  The jury foreman, Juror RM said jurors speculated regarding petitioner's probable

8    additional criminal history.  Pet. at 154.  Petitioner contends Juror FC also committed misconduct

9    by not revealing her previous work for an attorney during jury voir dire.  Pet. at 155.

> **b.    The claims of misconduct not included in the motion for new trial are procedurally defaulted**

12    We first address the additional allegations of juror misconduct that were not part of the

13    motion for new trial in the state trial court.  On direct appeal in the California Supreme Court, the

14    court found that the claims that were not first raised in the trial court were forfeited.  As that court

15    explained:

> In his appellate briefs, defendant refers to a number of other alleged instances of juror misconduct that he claims were disclosed by the investigator's reports and should have been the basis for a hearing or a new trial.  The People respond that defendant did not raise these concerns in the trial court in connection with his motion for new trial or his request for an evidentiary hearing, and therefore the additional claims of misconduct should be forfeited on appeal.  We agree that failure to raise the issue of juror misconduct and seek relief from the court on that basis results in a forfeiture of the issue on appeal. (See *People v. Stanley*, [39 Cal. 4th 913, 950 (2006)] [failure to object to juror misconduct and request mistrial]; *People v. Holloway* (2004) 33 Cal. 4th 96, 124.)  The circumstance that defendant raised some juror misconduct claims in his motion for new trial does not serve to preserve other bases for his claim on appeal. (*People v. Masotti* (2008) 163 Cal. App. 4th 504, 508.)

23    *Dykes*, 46 Cal. 4th at 808 n.22; AG022162-AG022163.

24    The California Supreme Court's finding that these claims of juror misconduct were

25    forfeited by the failure to raise them in the motion for new trial prevents their use as an alleged

26    basis for federal habeas relief.  As explained *ante*, California's contemporaneous objection

27    requirement is well established and regularly applied.  Cal. Evidence Code, § 353.  Both the

28    Supreme Court and the Ninth Circuit have recognized that this state rule constitutes a valid

88

1   procedural default.  *Ylst v. Nunnemaker*, 501 U.S. at 806 (failure to object to confession on

2   Miranda grounds); *Wainwright v. Sykes*, 433 U.S. at 87 (failure to object to confession); *Rich v.*

3   *Calderon*, 187 F. 3d 1064, 1070 (9th Cir. 1999) (failure to object to prosecutorial misconduct

4   during closing argument); *Featherstone v. Estelle*, 948 F. 2d 1497, 1506 (9th Cir. 1991) (same);

5   *Paulino v. Castro*, 371 F. 3d 1083, 1093 (9th Cir. 2004) (failure to object to jury instruction); see

6   also *Fairbanks v. Ayers*, 650 F. 3d at 1256 ("California consistently applies its contemporaneous

7   objection rule when a party fails to object to the admission of evidence").  Thus, petitioner cannot

8   attain habeas relief on the claims that were not raised in his state court motion for new trial.

9               **c.    For the claims that were properly preserved, the California**
                      **Supreme Court's denial on the merits was not contrary to or an**
10                    **unreasonable application of Supreme Court precedent.**

11         As for the claims petitioner did preserve for review in the California Supreme Court, they

12  too fail to provide a basis for federal habeas relief.   In California, a trial court is vested with

13  broad discretion to act upon a motion for new trial.  *See Dykes*, 46 Cal. 4th at 809; AG022163,

14  and cases cited therein.  When the motion is based upon alleged juror misconduct, the state

15  supreme court should accept the trial court's factual findings and credibility determinations if

16  they are supported by substantial evidence, but exercises its independent judgment to determine

17  whether any misconduct was prejudicial.  *Id.*, and cases cited therein.

18         A juror's receipt or discussion of evidence not submitted at trial constitutes misconduct.

19  *Dykes*, 46 Cal. 4th at 809, and cases cited therein; AG022163.  "Juror misconduct raises a

20  rebuttable presumption of prejudice; a trial court presented with *competent* evidence of juror

21  misconduct must consider whether the evidence suggests a substantial likelihood that one or more

22  jurors were biased by the misconduct."  *Id.*, italics added.  The trial court has discretion to

23  determine whether to conduct an evidentiary hearing to resolve factual disputes raised by claims

24  of juror misconduct.  *Id.*  "Defendant is not, however, entitled to an evidentiary hearing as a

25  matter of right.  Such a hearing should be held only when the court concludes an evidentiary

26  hearing is 'necessary to resolve material, disputed issues of fact.'  [Citation.]  'The hearing . . .

27  should be held only when the defense has come forward with evidence demonstrating a strong

28  possibility that prejudicial misconduct has occurred.  Even upon such a showing, an evidentiary

89

1    hearing will generally be unnecessary unless the parties' evidence presents a material conflict that

2    can only be resolved at such a hearing.' [Citations.]" *Id.* at 809-10 at AG022163-AG022164.

3        As a preliminary matter, we note that, as he did in the state supreme court, petitioner

4    contends the California standard requiring a "strong possibility" of prejudicial misconduct before

5    holding an evidentiary hearing is inconsistent with federal constitutional law which, he says,

6    requires a defendant to show only a prima facie case of misconduct. Pet. at 152, n.81. The

7    California Supreme Court rejected this claim as unsupported by argument or persuasive authority.

8    *Dykes*, Cal. 4th at 810 n.23; AG022163-AG022164. The California Supreme Court in part relied

9    on a case from the United States Court of Appeal for the Second Circuit which held:

> "'[C]ourts are, and should be hesitant to haul jurors in after they have reached a
> verdict in order to probe for potential instances of bias, misconduct or extraneous
> influences.' [Citation.] 'This is to avoid harassment of jurors, inhibition of
> deliberations in the jury room, a deluge of post-verdict applications mostly without
> merit, . . . an increase in opportunities for jury tampering . . . [and] to prevent jury
> verdicts from being made more uncertain.' [Citations.] As we explained . . . , a trial
> court is required to hold a posttrial juror interrogation *only when reasonable grounds
> for investigation exist. [Citation.] Reasonable grounds are present when there is
> 'clear,' 'strong' and 'incontrovertible' evidence.*" (*U.S. v. Rosario* (2d Cir. 1997)
> 111 F. 3d 293, 298-299, italics added; see *U.S. v. Angulo* (9th Cir. 1993) 4 F. 3d 843,
> 847 ["in determining whether a hearing [under *Remmer v. United States* (1954) 347
> U.S. 227 [98 L. Ed. 654, 74 S. Ct. 450]] must be held, the court must consider the
> content of the allegations, the seriousness of the alleged misconduct or bias, and the
> credibility of the source"].)

18    *Dykes*, 46 Cal. 4th at 810 n.23; AG022163-AG022164. The California Supreme Court also relied

19    on Ninth Circuit cases holding that the trial court has broad discretion in determining whether and

20    when to hold an evidentiary hearing on allegations of jury misconduct. *Id.*, citing *United States v.*

21    *Hendrix*, 549 F. 2d 1225, 1227-1228 (9th Cir. 1977), fn. omitted; *United States v. Shryock*, 342 F.

22    3d 948, 973 (9th Cir. 2003).

23        Petitioner's bare assertion in a footnote notwithstanding, the California court's explanation

24    of when a trial court must hold an evidentiary hearing on a claim of jury misconduct is consistent

25    with federal constitutional precedent. Moreover, petitioner provides no citation to Supreme Court

26    authority that would require a hearing to develop inadmissible evidence. *Cf Tanner v. United*

27    *States*, 483 U.S. 107 (1987) (defendant not entitled to additional evidentiary hearing to present

28    evidence that would be inadmissible under Rule 606(b))

90

1      Next, petitioner takes issue with the state trial court's conclusion that the juror statements in

2  the defense investigator's report were inadmissible as unsworn hearsay and its denial of an

3  evidentiary hearing.  Pet. at 155, 157; *see also* RT 4103-05 at AG021266-AG021268 (trial court's

4  finding that the investigator's reports were inadmissible).[29]   As he frames the issue, under federal

5  and state law, jurors are competent to testify regarding certain statements made in the jury room.

6  He states that "[a] juror may give testimony about whether extraneous prejudicial information

7  was brought before the jury."  Pet. at 157.  He further states that even without a hearing on the

8  issue in the state courts, it is clear that the jury committed misconduct by considering evidence

9  other than that admitted at trial.  Pet. at 158.

10     Pursuant to California Evidence Code section 1150(a), evidence is not admissible to show

11  the effect of a statement or event upon a deliberating juror's mental processes.  That section

12  provides:

13         Upon inquiry as to the validity of a verdict, any otherwise admissible evidence may
           be received as to statements made, or conduct, conditions, or events occurring, either
14         within or without the jury room, of such a character as is likely to have influenced the
           verdict improperly.  No evidence is admissible to show the effect of such statement,
15         conduct, conditions, or event upon a juror either in influencing him to assent or to
           dissent from the verdict or concerning the mental processes by which it was
16         determined.

17  The Federal Rules of Evidence contain a similar prohibition.  *See* Fed. Rules of Evid., Rule

18  606(b)(1) ("During the inquiry into the validity of a verdict or indictment, a juror may not testify

19  about any statement made or incident that occurred during the jury's deliberations; the effect of

20  anything on that juror's or another juror's vote; or any juror's mental processes concerning the

21  verdict . . . .  The court may not receive a juror's affidavit or evidence of a juror's statement on

22  these matters").

23     The California Supreme Court concluded that the unsworn statements allegedly made by

24  jurors to a defense investigator were incompetent evidence under state and federal law.

25         Presumably, a trial court would have discretion to view an unsworn report by a
           defense investigator as lacking in sufficient credibility.  A report that falls short of
26         asserting that the juror said he or she had conveyed information to other jurors based

27  _____

        [29] The trial court further concluded that even were the reports capable of consideration, the
28  claim of juror misconduct would fail.  RT 4106-4113 at AG021269-AG021276.

91

upon his or her work experience may be considered lacking in seriousness. Federal court decisions recognize the breadth of the trial court's discretion in such matters. "The decision to investigate jury misconduct allegations rests within the sound discretion of the [trial] court." (*U.S. v. Rosario*, [111 F. 3d 293, 299 (1997)] [also referring to the court's "very broad discretion"]; see *U.S. v. Shryock*, [342 F. 3d 948, 973 (2003)].) In a case in which defense counsel presented "unverified conjecture" prior to the verdict that a juror might be biased because of a relationship with government witnesses, "[i]n the absence of a showing which, on its face, would disqualify [the] juror . . ., the court act[s] properly in taking into account . . . the failure of counsel to provide an affidavit . . ." detailing evidence of misconduct. (*U.S. v. Bradshaw* (10th Cir. 1986) 787 F. 2d 1385, 1390.)

*Dykes*, 46 Cal. 4th at 810 n.23; AG022163-AG022165. Thus, as the state supreme court concluded: "The evidence proffered by the defense in the present case was not such that the court's failure to conduct an evidentiary hearing constituted error under either the state or federal standards." *Id.*

Under California law, a court does not abuse its discretion in declining to hold an evidentiary hearing on allegations of jury misconduct when the allegations consist only of hearsay. *See People v. Hayes*, 21 Cal. 4th 1211, 1256 (1999) ("Normally, hearsay is not sufficient to trigger the court's duty to make further inquiries into a claim of juror misconduct"); *People v. Cox*, 53 Cal. 3d at 697 (the defense presented the unsworn statement of a juror and an affidavit by an investigator recounting the juror's statement to him, but the evidence was not competent); *People v. Williams*, 45 Cal. 3d at 1318 ("The sole evidence of the alleged misconduct was the declaration of a defense investigator that purports to relate a conversation with [a] juror. It is settled, however, that 'a jury verdict may not be impeached by hearsay affidavits'").

Citing Federal Rules of Evidence, Rule 606(b), the Ninth Circuit has similarly held that an evidentiary hearing is not justified when the allegations of juror misconduct related to the internal, mental processes by which the verdict was reached. *See United States v. Hernandez-Escarsega*, 886 F. 2d 1560, 1579 (9th Cir. 1989); *accord United States v. Bagnariol*, 665 F. 2d 877, 884-85 (9th Cir. 1981) (jurors "may not be questioned about the deliberative process . . . nor can such information be considered by the trial or appellate courts").

Here, there is no persuasive basis for deviating from the general rule governing unsworn hearsay as a basis for a motion for new trial or for a request to hold an evidentiary hearing on an allegation of juror misconduct.

92

The trial court afforded defense counsel approximately one month to amend or supplement his original motion for new trial to include the juror misconduct claim. [The California Supreme Court accepted] as true the trial court's assertion that it did not suggest to defense counsel in off-the-record conversations that counsel was not obliged to support the motion for new trial with affidavits or declarations from jurors. Defendant does not point to any discussion on the record in which the court made such a suggestion. The prosecution's written opposition to the motion—filed almost two weeks prior to the hearing on the motion—relied in part upon the failure of defense counsel to submit juror affidavits, citing governing decisions by this court, yet defense counsel did not respond by submitting such affidavits prior to or at the hearing. Defense counsel evidently had full access to the jurors, and there is no indication that the defense could not have obtained juror affidavits. [The California Supreme Court noted], too, that the defense motion was not even supported by a declaration from the investigator, but merely by his unsworn reports to defense counsel. Defense counsel did not seek to call the investigator to testify. In addition, defense counsel did not request a continuance for the purpose of securing juror affidavits.

*Dykes*, 46 Cal. 4th at 811; AG022166-AG022167. *Cf Tanner*, 483 U.S. 107 (evidentiary hearing granted for testimony of non-jurors regarding observations, but second hearing to develop inadmissible juror testimony properly denied).

The California Supreme Court rightly rejected petitioner's claim in that court that the investigator's reports did not constitute hearsay because they were not offered for the truth, i.e., it was immaterial whether the jurors' statements to the investigator were true. Rather, the statements constituted objective evidence that improper matters had been discussed during deliberations. The state supreme court was not persuaded. As it concluded, "[t]he investigator's report itself interposed a level of hearsay [citation], and the investigator's assertions concerning juror statements were probative only if the investigator's assertions—that the jurors had made the comments—were true." *Dykes*, 46 Cal. 4th at 811; AG022167.

The state supreme court also rejected petitioner's assertion that the seriousness of the allegations of juror misconduct compelled an evidentiary hearing.

The purported statements by jurors concerning the effect on them of the possibility of defendant's release from prison and the probability of an execution constituted indications of juror mental processes that are made inadmissible by Evidence Code section 1150, subdivision (a). (See *People v. Steele* (2002) 27 Cal. 4th 1230, 1261 [statements of jurors "regarding their understanding of the meaning of a life sentence and what they would have done had they believed differently come squarely within the prohibition against impeaching a verdict with evidence of the juror's mental processes"].) To the extent the comments reflected speculation concerning punishment, in *People v. Steele, supra*, 27 Cal. 4th 1230, and other decisions, we have accepted similar discussions as an inevitable feature of the jury system. (See *id.* at pp. 1264-1265; see also *People v. Schmeck* (2005) 37 Cal. 4th 240, 307 [no

93

misconduct in jury's discussion of a television talk show program concerning a prisoner who was released although he had been sentenced to life in prison without the possibility of parole, or in juror' speculation concerning the defendant's possible release]; *People v. Riel, supra,* 22 Cal. 4th at p. 1219 [no misconduct when a juror who had been employed at the county jail expressed the opinion that the court would reduce a death sentence to life imprisonment]; *People v. Pride,* [*supra,* 3 Cal. 4th 195, 267-268 (1992) [jurors discussed a recent escape from Vacaville prison, and a juror known to have served as an employee at that prison suggested that a life prisoner has a far greater opportunity to escape than a prisoner condemned to death] . . . ").

*Dykes,* 46 Cal. 4th at 811-12; AG022167-AG022168.

Petitioner asserts that the jurors committed misconduct by speculating that "death did not mean death." Pet. at 158. The cases he cites for the proposition that this amounted to federal constitutional error in his case, however, do not support his claim. In *Caldwell v. Mississippi,* 472 U.S. 320 (1985), the prosecutor in closing argument sought to minimize the jury's sense of responsibility for its verdict in the penalty phase by suggesting that the jury was not the final decision maker, i.e., its verdict was reviewable by the courts. The Supreme Court held this violated the defendant's constitutional rights. The Court held: "the uncorrected suggestion that the responsibility for any ultimate determination of death will rest with others presents an intolerable danger that the jury will in fact choose to minimize the importance of its role. Indeed, one can easily imagine that in a case in which the jury is divided on the proper sentence, the presence of appellate review could effectively be used as an argument for why those jurors who are reluctant to invoke the death sentence should nevertheless give in." *Id.* at 333. Here, even were the reports of the defense investigator considered, there was no suggestion to the jury that its decision was not final or that they should take the decision less seriously because others would review it.

Petitioner relies on *Kelly v. South Carolina,* 534 U.S. 246 (2011) and *Shafer v. South Carolina,* 532 U.S. 36 (2001) for the proposition that a defendant facing the death penalty is entitled to a jury instruction that a sentence of life imprisonment without possibility of parole precludes any chance of parole. Pet. at 158. Those cases, however, tethered the requirement for such an instruction to evidence and argument placing the defendant's future dangerousness at issue, a factor not present in this case. *Kelly,* 534 U.S. at 252-54; *Shafer,* 532 U.S. at 51. Thus these cases do not support petitioner's claim that the jury committed misconduct in his case. His

94

1     jury was properly instructed with the California jury instruction that "[i]t is the law of this state

2     that the penalty for a defendant found guilty of murder of the first degree shall be death or

3     confinement in the state prison for *life without the possibility of parole* in any case in which the

4     special circumstance alleged in this case has been specifically found true."  CALJIC No. 8.83,

5     italics added; RT 3943 at AG021104.  "Jurors are presumed to be intelligent, capable of

6     understanding instructions and applying them to the facts of the case."  *People v. Lewis*, 26 Cal.

7     4th 334, 390 (2001); *see also Price v. North Carolina*, 512 U.S. 1249, 1250 (1994) ("Jurors are

8     presumed to follow their instructions").

9        As to the specific claim that Juror F.C. committed misconduct by telling the jury that she

10    had knowledge about the release of prisoners based on her work with a lawyer in the Fresno

11    County courts, the California Supreme Court noted that the investigator's reports "did not state

12    that Juror F.C. said she had *conveyed* outside information *to other jurors* in the form of her

13    asserted 'experience' in the Fresno County courts. [Citation.]  The circumstance that the juror

14    herself may have considered this asserted experience goes in large part to her internal thought

15    processes and, in any event, does not constitute misconduct."  *Dykes*, 46 Cal. 4th at 812;

16    AG022168; *see also People v. Riel*, 22 Cal. 4th 1153, 1219 (2000) (jurors bring to their

17    deliberations knowledge and beliefs about general matters of law and fact that find their source in

18    everyday life experience).

19        Thus, the California Supreme Court held:  "Under all the circumstances, the trial court did

20    not abuse its discretion in concluding that the investigator's unsworn reports did not constitute a

21    basis for holding an evidentiary hearing.  For the same reasons, the court did not err in denying

22    the motion for a new trial.  No error under state law or federal constitutional law occurred."

23    *Dykes*, 46 Cal. 4th at 812-13; AG022168.  Petitioner has failed to establish that the California

24    Supreme Court's determination on this issue was contrary to or an unreasonable application of

25    United States Supreme Court law.  Consequently, his request for habeas relief on this claim must

26    be rejected.

27

28

**D.    Claim 4:  Petitioner's Challenges to the Standard California Jury
Instructions Regarding the Death Penalty Are Without Merit**

Appellant's next claim contains two subparts—a challenge to the standard California jury instruction on factors the jury could consider in determining the penalty, and a challenge to the instruction on the weighing of aggravating and mitigating circumstances in making that determination.  We address his challenges in order.

**1.    The Jury Was Not Misled Regarding How it Should Weigh
Aggravating and Mitigating Factors**

Petitioner phrases the first part of his claim as a contention that "the jury was misled regarding how it should weigh the aggravating and mitigating factors in this matter."  Pet. at 160. The claim, however, is a broader general attack on CALJIC No. 8.85, a standard California jury instruction regarding the factors in aggravation and mitigation that the jury could consider in setting petitioner's penalty.  This claim was raised in petitioner's direct appeal in the California Supreme Court.  AOB Claim XX at AG021609-AG021622; *see also* RB at AG021920-AG021928.  That court rejected the claim.  *Dykes*, 46 Cal. 4th at 814-16; AG022171-AG022173.

CALJIC No. 8.85 provides:

In determining which penalty is to be imposed on defendant, you shall consider all of the evidence which has been received during any part of the trial of this case, [except as you may be hereafter instructed].  You shall consider, take into account and be guided by the following factors if applicable:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true.

(b) The presence or absence of criminal activity by the defendant other than the crime[s] for which the defendant has been tried in the present proceedings, which involve the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction, other than the crimes for which the defendant has been tried in the present proceedings.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

96

(g) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime [and any sympathetic or other aspect of the defendant's character or record that the defendant offers] as a basis for a sentence less then death, whether or not related to the offense for which he is on trial.  You must disregard any jury instruction given to you in the guilt or innocence phase of this trial which conflicts with this principle].

CT 609-611 at AG000665-AG000667; RT 3952-3953 at AG021113-AG021114.

As described by the California Supreme Court, petitioner contends that "asserted defects in pattern jury instruction CALJIC No. 8.85 prejudicially affect the jury's understanding of its weighing function, in violation of the prohibition against cruel and unusual punishment contained in the Eighth Amendment to the United States Constitution and the Fourteenth Amendment's guarantee of equal protection of the laws, as well as parallel state constitutional provisions." *Dykes*, 46 Cal. 4th at 814; AG022171.  As the California Supreme Court stated, it had on numerous previous occasions rejected constitutional challenges to CALJIC No. 8.85 and found that petitioner had provided no basis for the court to reconsider its holdings on this issue.  *Id.* at 814-15; AG022171.  The California Supreme Court's determination of this issue was not contrary to or an unreasonable application of United States Supreme Court law.

Indeed, in analyzing this claim, we begin with a United States Supreme Court case that *rejected* several constitutional challenges to Penal Code section 190.3, the section that lists the factors a California jury should consider in the penalty-phase of a capital case.  Those factors are incorporated into CALJIC No. 8.85.  In *Tuilaepa v. California*, 512 U.S. 967, the defendant challenged three of the factors listed in CALJIC No. 8.85 as unconstitutionally vague.  The Court stated that "[b]ecause 'the proper degree of definition' of eligibility and selection factors often 'is not susceptible of mathematical precision,' [its] vagueness review is quite deferential.

97

1  [Citations.]"  *Id*. at 973.  "Relying on the basic principle that a factor is not unconstitutional if it

2  has some 'common-sense core of meaning . . . that criminal juries should be capable of

3  understanding,' [citation], [the Court has] found only a few factors vague . . . ."  *Id*. at 973-74.

4  The Court made clear that "[i]n providing for individualized sentencing, it must be recognized

5  that the States may adopt capital sentencing processes that rely upon the jury, in its sound

6  judgment, to exercise wide discretion ."  *Id*. at 974.

7      The Court described the nature of the few factors it had found vague in other states'

8  statutes.

9      In our decisions holding a death sentence unconstitutional because of a vague
10  sentencing factor, the State had presented a specific proposition that the sentence had
    to find true or false (e.g., whether the crime was especially heinous, atrocious, or
    cruel).  We have held, under certain sentencing schemes, that a vague propositional
11  factor used in the sentencing decision creates an unacceptable risk of randomness, the
    mark of the arbitrary and capricious sentencing process prohibited [by the Court].
12  Those concerns are mitigated when a factor does not require a yes or no answer to a
    specific question, but instead only points the sentence to a subject matter.
13

14  *Tuilaepa*, 512 U.S. at 974-75.  With these principles in mind, we turn to petitioner's specific

15  challenges to factors in CALJIC No. 8.85.

16      Petitioner first challenges factor (b) of CALJIC No. 8.85 which allowed the jury to consider

17  the presence or absence of criminal activity other than the crimes for which petitioner had been

18  tried in the present proceeding, which involve the use or attempted use of force or violence or the

19  express or implied threat to use force or violence.  See Pet. at 163-164.  Relying on its own

20  precedent, the California Supreme Court rejected this portion of petitioner's challenge to the

21  instruction.  *Dykes*, 46 Cal. 4th at 815; AG022172.  This determination was not contrary to

22  United States Supreme Court precedent, indeed it applied the high court's precedent.  In *Tuilaepa*,

23  the Court held:

24      Factor (b) is phrased in conventional and understandable terms and rests in large part
    on a determination whether certain events occurred, thus asking the jury to consider
25  matters of historical fact.  Under other sentencing schemes, in Texas for example,
    jurors may be asked to make a predictive judgment, such as "whether there is a
26  probability that the defendant would commit criminal acts of violence that would
    constitute a continuing threat to society."  [Citation.]  Both a backward-looking and a
27  forward-looking inquiry are a permissible part of the sentencing process, however,
    and the States have considerable latitude in determining how to guide the sentencer's
28  decision in this respect.  Here, factor (b) is not vague.

98

1  *Tuilaepa*, 512 U.S. at 976-77; *see also People v. Cain*, 10 Cal. 4th 1, 69-70 (1995) (rejecting

2  claims that the consideration of prior unadjudicated crimes denies due process, equal protection,

3  or the right to a reliable sentencing procedure).

4       Petitioner attempts to evade the holding in *Tuilaepa* by asserting that in his case, factor (b)

5  violated the Eighth Amendment because it permitted the jury to consider "unreliable evidence of

6  Petitioner's possession of a loaded firearm, an act which did not involve any violence."  Pet. at

7  163.  First, factor (b) is not limited to crimes which involve violence.  The factor is broader and

8  allows juries to consider crimes "which involve the use or attempted use of force or violence or

9  the express or implied threat to use force or violence."  Second, that petitioner asserts the

10  evidence was "unreliable" does not make it so.  It was properly admitted by the trial court and,

11  therefore, the jury was entitled to consider it.

12       Petitioner next asserts that "[t]o the extent *Tuilaepa* has any application here, Petitioner

13  respectfully submits that on these facts the holding warrants reconsideration."  Pet. at 163.

14  Petitioner's request is addressed to the wrong forum.  This Court does not have the authority to

15  "reconsider" United States Supreme Court holdings.  *See Agostini v. Felton*, 521 U.S. 203, 237-

16  38 (1997) (the Supreme Court alone has the "prerogative of overruling its own decisions").

17       Petitioner also asserts that because California law does not allow the use of adjudicated

18  offenses in non-capital sentencing, it is a violation of the Constitution to allow it in capital

19  sentencing.  Pet. at 164.  First, the premise of petitioner's assertion is not entirely correct.  In

20  certain circumstances, a sentencing court in California can consider dismissed counts in

21  sentencing a defendant.  *See People v. Hume*, 196 Cal. App. 4th 990, 996 (2011) (when the

22  defendant enters a negotiated disposition, with counts dismissed subject to a "*Harvey* waiver," the

23  court can consider the dismissed counts for purposes of sentencing and restitution); *see also*

24  *People Harvey*, 25 Cal. 4th 754 (1979) (general rule that dismissed counts cannot be considered

25  in sentencing).  More importantly, as shown, the United States Supreme Court in *Tuilaepa* found

26  no constitutional infirmity to factor (b).  Thus, petitioner's objections to California law

27  notwithstanding, the California Supreme Court's rejection of petitioner's challenge to factor (b)

28  is not contrary to or an unreasonable application of United States Supreme Court law.

Petitioner next challenges factors (d) and (h) as unconstitutional.  Factor (d) provides that the jury could consider whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.  Factor (h) provided that the jury could consider whether or not at the time of the offense petitioner's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or the effects of intoxication.  Petitioner contends that "[a]s a matter of both state and Eighth Amendment law, factors (d) and (h) may only be used by the jury to mitigate Petitioner's sentence."  Pet. at 164.

The California Supreme Court rejected petitioner's argument, stating:  "It is unnecessary to instruct the jury that section 190.3, factors (d) and (h) may be considered solely in mitigation. (*People v. Page* (2008) 44 Cal. 4th 1, 61; *People v. Lucero*, [23 Cal. 4th 692, 728 (2000].)  The pattern instruction does not suggest that the absence of a mitigating factor should be considered in aggravation. (*People v. Page*, *supra*, 44 Cal. 4th at p. 61.)"  *Dykes*, 46 Cal. 4th at 815-16; AG022172-AG022173.  The court found that petitioner had provided no basis to deviate from its presumption that jurors comprehend and accept the court's directions.  *Id.* at 816; AG022173; *see also People v. Lucero*, 23 Cal. 4th 692, 728 (2000) (rejecting challenge to factor (d)); *People v. Musselwhite*, 17 Cal. 4th 1216, 1266 (1998) (rejecting challenge to factors (d) and (h)).

In contending that factor (d) and (h) could be used only to mitigate the penalty, petitioner relies on *Parker v. Dugger*, 498 U.S. 308, 314-16 (1991) for the proposition that intoxication is a mitigating circumstance.  Pet. at 164.  That the jury in *Parker* may have found that intoxication was a mitigating circumstance is not a holding by the high court that intoxication can only be a mitigating circumstance.  Moreover, as the California Supreme Court found, nothing in CALJIC No. 8.85 would prevent a jury from considering factor (d) in mitigation.   Petitioner also cites *Zant v. Stephens*, 462 U.S. 862, 885 (1983) for the proposition that "some circumstances can only serve as mitigating."  Pet. at 164-165.  That case, however, does not so hold.  Rather, the case pertains to aggravating circumstances that are found to be invalid for failing to provide an adequate basis for distinguishing a murder case in which the death penalty may be imposed from those cases in which such a penalty many not be imposed.  Moreover, in *Tuilaepa*, the Supreme

100

1    Court rejected the argument that California's sentencing factors were flawed because they did not

2    instruct the sentence as to how they should be weighed. *Tuilaepa v. California*, 512 U.S. at 978-

3    79.

4         Petitioner next contends that factor (d) and (h) are invalid because "a claim that a defendant

5    killed due to some kind of mental illness or emotional disturbance will trigger negative responses

6    in some people and accordingly be seen as an aggravating factor for those individuals." Pet. at

7    165. Petitioner's argument fails. As *Tuilaepa* instructs, a factor is not unconstitutional if it has

8    some common-sense core of meaning that criminal juries should be capable of understanding.

9    *Tuilaepa*, 512 U.S. at 973-74. The Court made clear that "[i]n providing for individualized

10   sentencing, it must be recognized that the States may adopt capital sentencing processes that rely

11   upon the jury, in its sound judgment, to exercise wide discretion ." *Id.* at 974. Here, that

12   California allows a jury to consider the possible effect on a defendant of extreme mental or

13   emotional disturbance, or the effect on the defendant of a mental disease or defect or intoxication,

14   is within the wide discretion permitted to juries by the high court.

15        Moreover, petitioner's concern that a juror might consider mental illness or emotional

16   disturbance as an aggravating factor is at odds with his previous arguments that his counsel was

17   incompetent for not introducing more evidence on those subjects in the mitigation case.

18        That some jurors might find voluntary intoxication a mitigating factor and others might find

19   it an aggravating factor, as petitioner notes (Pet. at 165-166), provides no basis for finding factor

20   (h) unconstitutional. Again, as *Tuilaepa* held, States may provide jurors, using their common

21   sense, wide discretion in considering factors in the penalty-phase of a capital trial. No United

22   State Supreme Court precedent holds that jurors must be instructed on which factors can only be

23   mitigating and which can only be aggravating. Thus, the California Supreme Court's holding

24   cannot be contrary to or an unreasonable application of existing Supreme Court precedent.

25        Petitioner next contends that the failure to delete inapplicable factors from CALJIC No.

26   8.85 violated his constitutional rights. He lists a series of calamities that he assumes flowed from

27   this circumstance, including juror confusion, the possibility that the death penalty was imposed on

28   the basis of inapplicable factors, or the suggestion that in order to favor a life sentence, there

101

should have been more evidence of mitigation in the case.  Pet. at 167-168.  Nothing in CALJIC No. 8.85, however, suggested to the jury that all the factors were applicable.  Rather, the preface to the list of factors specifically told the jury that they were to "consider, take into account and be guided by the following factors *if applicable*."  Italics added.  Petitioner cites no authority for his assumption that inclusion in the list of factors the jurors might find inapplicable "introduced confusion, capriciousness, and unreliability into the capital decision-making process in violation of [his] rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments."  Pet. at 167; *see also* Pet. at 168 (instruction on inapplicable factors "diluted the jury's focus, distracted its attention from the difficult task at hand, and introduced confusion into the process").  As is stated in many circumstances, jurors are presumed to be intelligent and capable of understanding and applying a court's instructions.  Simply asserting a constitutional violation from the inclusion of factors which petitioner believes were not applicable—without providing any persuasive case authority—is insufficient to overcome this presumption.[30]

### 2. California's Standard Jury Instruction on the Weighing of Aggravating and Mitigating Circumstances Is Not Unconstitutional

The second part of appellant's claim is an attack on CALJIC No. 8.88 which instructs the jury regarding the weighing of aggravating and mitigating circumstances.  As read to his jury, CALJIC No. 8.88 provided:

> It is now your duty to determine which of the two penalties, death or confinement in state prison for life without possibility of parole shall be imposed on the defendant.
>
> After having heard all of the evidence and after having heard and considered the arguments of counsel you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating circumstances on which you have been instructed.

---

[30] Petitioner cites *Ford v. Wainwright*, 477 U.S. 399, 411, 414 (1986) and *Beck v. Alabama*, 447 U.S. 625, 637 (1980) in support of his arguments in this section.  He fails to explain, however, how these cases advance his claim that the inclusion of possibly inapplicable factors in a penalty-phase instruction violates the Constitution.  Neither case so holds, or suggests.  Petitioner's citation to the cases without elucidation cannot support his claim for habeas relief.

Petitioner also makes the bald assertion that the errors he identifies in CALJIC No. 8.85 "are exacerbated by the prosecutor's arguments, the jury's misconduct, and trial counsel's ineffective assistance as presented herein and as will be further developed through these proceedings."  Pet. at 169.  Clearly this threadbare declaration—without support of facts or law—does nothing to advance petitioner's argument.

An aggravating factor is any fact, condition, or event that attends the commission of a crime which increases its guilt or enormity or adds to its injurious consequence which is above and beyond the element of the crime itself.

A mitigating circumstance is any fact, condition, or event which as such does not constitute justification or excuse for the crime in question, but which may be considered as an extenuating circumstance in determining the appropriateness of the death penalty.

The weighing of aggravating and mitigating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weight to any of them.  You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider.

In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

To return a judgment of death each of you must be persuaded that the aggravating circumstances are so substantial in comparison with the mitigating circumstances that it warrants death instead of life without parole.

RT 3962-3963 at AG21123-AG021124; *see also* CT 629-630 at AG000685-AG000686.

Petitioner asserts that the instruction "violated [his] rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal [C]onstitution."  Pet. at 171.

Petitioner raised this claim, in part in his direct appeal in the California Supreme Court. AOB Claim XXI at 201-210 at AG021622-AG021631; *see also* RB 220 at AG021929.  The California Supreme Court rejected his claim.  *Dykes*, 46 Cal. 4th at 816-17; AG022173-AG022175.

Petitioner begins his argument with a multi-pronged attack on CALJIC No. 8.88, contending:

This instruction violated Petitioner's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments to the federal constitution.  The instruction was defective in a number of respects.  First, the instruction was vague and imprecise, failed to accurately describe the weighing process the jury must apply in capital cases, and deprived Petitioner of the individualized consideration the Eighth Amendment requires.  Second, the instruction contradicted the requirements of [Penal Code] § 190.3 by indicating that a death judgment could be returned if the aggravating circumstances were merely "substantial" when compared to mitigating circumstances, thus permitting the jury to impose death even if it found mitigating circumstances outweighed aggravating circumstances.  The instruction was therefore improperly weighted toward death.  Third, the instruction effectively informed the jury that a single mitigating factor was not sufficient to prevent imposition of the death penalty. The instruction's definition of mitigating circumstances was further defective in that

103

1    it failed to inform the jury of the full scope of evidence which may be considered in
2    mitigation.  *See Lockett v. Ohio*, 438 U.S. 586 (1978).  The instruction also misled the
     jury by failing to provide the jury with a definition of the legal term "life without the
3    possibility of parole."

4    Pet. at 171-172, footnote omitted.  As explained *post*, relying on its own cases that had

5    consistently rejected challenges to CALJIC No. 8.88, the California Supreme Court rejected

6    petitioner's challenges to the instruction.

7         As to petitioner's claim that the instruction was vague and imprecise and deprived him of

8    an individualized consideration, the California Supreme Court held that "the pattern instruction

9    'properly instructs the jury on it sentencing discretion and the nature of its deliberative process.'"

10   *Dykes*, 46 Cal. 4th at 816; AG022173; *see also People v. Smith*, 35 Cal. 4th 334, 370 (2005)

11   ("The phrase used in CALJIC No. 8.88, or words of similar breadth, is essential to avoid reducing

12   the penalty decision to a mere mechanical calculation").   The California Supreme Court's finding

13   on this point also disposes of petitioner's claim that the instruction was "defective because it

14   improperly suggested that a quantitative comparison of the 'totality' of mitigating factors was

15   required."  Pet. at 174.  Nothing in the language of the instruction so suggests.  Instead, as the

16   California Supreme Court held, the language of the instruction avoids reducing the penalty

17   decision to a mere mechanical calculation.  Indeed, the plain language of the instruction prohibits

18   the kind of quantitative comparison to which petitioner objects.  Thus, the instruction specifically

19   provides:  "The weighing of aggravating and mitigating circumstances does not mean a mere

20   mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of

21   weight to any of them.  You are free to assign whatever moral or sympathetic value you deem

22   appropriate to each and all of the various factors you are permitted to consider."  CALJIC No.

23   8.88.

24        Petitioner claims that the instruction indicated that a death judgment could be returned if the

25   aggravating circumstances were merely "substantial" and was improperly weighted toward death.

26   Pet. at 171.  Petitioner repeats the substance of this claim, in somewhat different language, in

27   asserting that the instruction contradicts Penal Code section 190.3 which states that a jury "shall

28   impose" a sentence of confinement in state prison for a term of life without the possibility of

104

1   parole if "the mitigating circumstances outweigh the aggravating circumstances."  Pet. at 172-

2   173.  To the extent petitioner asserts a violation of state law, he fails to state a claim on which

3   federal habeas relief can be granted.

4          Petitioner attempts to convert his claim of state law error into one of federal constitutional

5   error by citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980) (a state violates a criminal

6   defendant's due process right to fundamental fairness if it arbitrarily deprives the defendant of a

7   state law entitlement).  In *Hicks*, following the defendant's conviction, the provision of the

8   habitual offender statute under which his mandatory 40-year prison term had been imposed was

9   declared unconstitutional.  Nonetheless, the Oklahoma court refused to set aside *Hick*'s sentence.

10  The United States Supreme Court found this to be error and a deprivation of *Hick*'s due process

11  rights.  Here, no such deprivation of due process rights can be asserted.  Petitioner's sentence was

12  imposed pursuant to Penal Code section 190.3 and the jury was properly instructed with CALJIC

13  No. 8.88.  Petitioner cites no Supreme Court authority for the proposition that either the statute or

14  the instruction violate the Constitution.

15         Indeed, the California Supreme Court rejected petitioner's claim that the "so substantial"

16  language violates the Constitution.  *Dykes*, 46 Cal. 4th at 816; AG022170; *see also People v.*

17  *Arias*, 13 Cal. 4th 92, 171 (1996) ("By advising that a death verdict should be returned only if

18  aggravation is 'so substantial in comparison with' mitigation that death is 'warranted,' the

19  instruction clearly admonishes the jury to determine whether the balance of aggravation and

20  mitigation makes death the appropriate penalty"); *People v. McPeters*, 2 Cal. 4th 1148, 1194

21  (1992) ("these words 'plainly convey the importance of the jury's decision and emphasize that a

22  high degree of certainty is required for a death verdict.   Far from undermining defendant's cause

23  at the penalty phase, they assisted defense counsel in emphasizing the gravity of the jury's task,

24  which included the choice of death as a penalty'").  This finding too has not been shown to be

25  contrary to United States Supreme Court law.

26         As to petitioner's claim that the instruction informed the jury that a single mitigating factor

27  was not sufficient to prevent imposition of the death penalty, the California Supreme Court

28  disagreed.  It explained that "the instruction itself informs the jury that '[t]he weighing of

105

1   aggravating and mitigating circumstances does not mean a mere mechanical counting of factors

2   on each side of an imaginary scale, or the arbitrary assignment of weights to any of them.  You

3   are free to assign whatever moral or sympathetic value you deem appropriate . . . .'" *Dykes*, 46

4   Cal. 4th at 816; AG022173-AG022174; *see also People v. Gutierrez*, 28 Cal. 4th 1083, 1161

5   (2002) (the instruction "properly describes the weighing process as '"merely a metaphor for the

6   juror's personal determination that death is the appropriate penalty under all the

7   circumstances"'"); *People v. Page*, 44 Cal. 4th 1, 56 (2008) .  "The court was not obliged to

8   instruct the jury that a single mitigating circumstance could outweigh multiple aggravating

9   circumstances." *Dykes*, 46 Cal. 4th at 816; AG022174; *see also People v. Johnson*, 6 Cal. 4th 1,

10  52 (1993) (such an instruction would be misleading because it would wrongly imply that at least

11  one mitigating factor was needed to justify a sentence of life imprisonment without parole).

12      In asserting this part of his challenge, petitioner claims that "[t]his component alone

13  violates *Lockett v. Ohio*, 438 U.S. 586 (1978)."  Pet. at 172.  Petitioner fails to cite a specific

14  portion of the *Lockett* decision or explain how "this component" of the instruction violates

15  *Lockett*, an opinion where there was no majority decision regarding  the death penalty issue.

16  Insofar as some members of the Court found Ohio's death penalty law infirm because it limited

17  the range of mitigating circumstances which a jury could consider, no such  infirmity affects

18  California's death penalty statute.  Thus, petitioner's unexplained citation to *Lockett* is,

19  manifestly, unpersuasive.

20      Again citing *Locket*, but not a specific page of that decision, petitioner claims CALJIC No.

21  8.88's definition of mitigating circumstances was defective "in that it failed to inform the jury of

22  the full scope of evidence which may be considered in mitigation." Pet. at 172; *see also* Pet. at

23  177 (the definition of mitigation "failed to inform the jury of the full scope of evidence that may

24  be considered in determining the appropriate sentence and was reasonably likely to be understood

25  as a limitation on mitigating evidence").  Petitioner fails to explain, however, what alleged

26  evidence in mitigation the jury was prevented from considering because of the instruction.  In

27  fact, the instruction's definition of mitigating evidence is quite broad.  Thus, the instruction states:

28  "A mitigating circumstance is *any fact*, *condition*, or *event* which as such does not constitute

106

1    justification or excuse for the crime in question, but *which may be considered as an extenuating*

2    *circumstance* in determining the appropriateness of the death penalty." CALJIC No. 8.88, italics

3    added. Again, a bare cite to *Lockett*, without explanation of how that case advances his argument,

4    is insufficient to establish that the jury instruction was unconstitutional in its definition of

5    mitigation evidence.

6        Petitioner also contends that CALJIC No. 8.88 is defective because it fails to adequately

7    describe or define the penalty of life without the possibility of parole. Pet. at 175. The California

8    Supreme Court rejected this assertion. *Dykes*, 46 Cal. 4th at 817; AG022174-AG022175 . As the

9    California Supreme Court explained in *People v. Zamudio*, 43 Cal. 4th 327 (2008):

10        Defendant asserts the term "life without possibility of parole" is a "technical term"
     that juries "commonly" misunderstand, and that the trial court prejudicially erred and
11        violated his constitutional rights by failing, sua sponte, to instruct the jury that he
     "would never be considered for parole" were he to receive life without possibility of
12        parole. Defendant's assertion fails under our case law, which establishes that the
     term ""life without the possibility of parole"' is clear and unambiguous and does not
13        require a 'sua sponte definitional instruction.' [Citation.]"

14    *Id*. at 372; *see also People v. Prieto*, 30 Cal. 4th 226, 270 (2003).[31] Petitioner cites no United

15    States Supreme Court authority holding that the term "life without the possibility of parole" is a

16    technical term outside a juror's ability to comprehend without further instruction.

17        Possibly due to the lack of case law to support his position, petitioner instead relies on

18    "current academic research" that jurors allegedly do not understand the term "life without the

19    possibility of parole." Pet. at 176. First, the studies appellant calls "current" are approximately

20    20 years old. *See* Pet. at 176. Second, alleged research does not establish that the California

21    Supreme Court reached a conclusion contrary to United States Supreme Court precedent in

22    finding that the term "life without the possibility of parole" needs no further definition. The

23    California Supreme Court correctly rejected the "research" as a basis for finding CALJIC No.

24    8.88 unconstitutional. As the court stated, "we presume jurors understood the instructions

25    _____

26    [31] Petitioner's jury was also instructed that "[i]t is the law of this state that the penalty for
     a defendant found guilty of murder of the first degree shall be death or confinement in the state
27    prison for life without the possibility of parole in any case in which the special circumstance
     alleged in this case [has] been specially found to be true." CALJIC No. 8.84; CT 583 at
28    AG000639.

1    notwithstanding 'empirical assertions to the contrary based on research that is not part of the

2    record and has not been subject to cross examination' (*People v. Welch*, [20 Cal. 4th 701, 703

3    (1999)]." *Dykes*, 46 Cal. 4th at 817; AG022175.  The California Supreme Court also found

4    petitioner's reliance on *Shafer v. South Carolina*, 532 U.S. 36 (2001) (cited at Pet. at 176)

5    unavailing.  In *Shafer*, South Carolina's instructions were defective because they failed to inform

6    the jury of the defendant's parole eligibility status in a case where the defendant's future

7    dangerousness was at issue.  California instructions, however, explicitly informed the jury that

8    there would be no possibility of parole.  *Dykes*, 46 Cal. 4th at 817; AG022174-AG022175.[32]

9        In sum, as to all of the foregoing asserted deficiencies in CALJIC No. 8.88, petitioner has

10   failed to establish that the California Supreme Court's rejection of his arguments was contrary to

11   or an unreasonable application of United States Supreme Court law.

12   **E.    Claim 5:  California's Death Penalty Scheme Is Not Unconstitutional "in How and What it Allows Juries to Use as Evidence in Aggravation"[33]**

13

14       Petitioner contends that the trial court erred in refusing to instruct the jury that before

15   considering a factor in aggravation, it must unanimously find both that petitioner committed the

16   act in aggravation and that the act constituted an implied threat of force or violence.  Pet. at 179-

17   193.  He asserts that the failure to do so violated his Eighth Amendment rights.  Pet. at 179.  As

18   phrased by him, petitioner's claim has two "principal components."  Pet. at 179.  We address

19   them in turn.

20   **1.    The Absence of a Unanimity Requirement as to Aggravating Factors Does Not Render California's Death Penalty Scheme Unconstitutional**

21

22       Petitioner asserts that "the trial court's refusal to instruct the sentencing jury that, under

23   California law, it had to find unanimously that an aggravating act had been committed, and said

24   _____

[32] In support of this claim, petitioner again relies on statements jurors allegedly made to a
25   defense investigator.  *See* Pet. at 176-177.  As adequately explained *ante*, the defense
     investigator's reports are unreliable and cannot be relied upon to impeach the verdict.  In fact, the
26   California Supreme Court specifically stated that it "decline[d] to consider the unsworn affidavits
     claimed by defendant to suggest jurors believed that capital-offense defendant's serving life terms
27   without possibility of parole actually may be released." *Dykes*, 46 Cal. 4th at 817 n.24;
     AG022175.
28   [33] Pet. at 179.

                                    108

1    act had to reflect an actual or implied threat of force and violence," violated his constitutional

2    rights.  Pet. at 179.  This claim was raised in petitioner's direct appeal in the California Supreme

3    Court.  AOB Claim XII at AG021536-AG021544; *see also* RB at AG021872-AG021879.  The

4    California Supreme Court rejected the claim.  *Dykes*, 46 Cal. 4th at 799-800; AG022148-

5    AG022149.

6                          **a.    Background**

7          During the penalty-phase jury instruction conference, petitioner's counsel sought several

8    modifications to CALJIC No. 8.87 regarding his prior conduct of carrying a concealed and loaded

9    firearm.  RT 3851-3858 at AG021011-AG021018.  CALJIC No. 8.87, in relevant part, provides:

10         Evidence has been introduced for the purpose of showing that the defendant has
           committed the following criminal acts:  carrying a concealed firearm upon the person,
11         and carrying a loaded firearm on the person while in a public place, which involved
           [the implied use of force or violence].  Before a juror may consider any of such
12         criminal [act[s]] as an aggravating circumstance in this case, a juror must be satisfied
           beyond a reasonable doubt that the defendant did in fact commit such criminal
13         [act[s]].  A juror may not consider any evidence of any other criminal [act[s]] as an
           aggravating circumstance.
14
15         It is not necessary for all jurors to agree.  If any juror is convinced beyond a
           reasonable doubt that such criminal activity occurred, that juror may consider that
16         activity as a fact in aggravation.  If a juror is not convinced, that juror must not
           consider that evidence for any purpose.

17   CT 612-613 at AG000668-AG000669.  As relevant here, petitioner's counsel objected to the

18   second paragraph of the instruction, but *not* because it failed to require juror unanimity.  Rather,

19   he asked the court to "strike the second paragraph entirely . . . . [¶]  This is not a case where there

20   has been any contest as to whether or not the fact was my client had a gun, he admitted it on the

21   stand, himself.  The officer has said it.  There has been no contest, and there will not be."  RT

22   3854 at AG021014.  The court declined to make this modification.  Petitioner's counsel then

23   requested an alternative modification that seemed to acknowledge that jurors need not be

24   unanimous as to each aggravating factor:

25         Mr. Strellis [petitioner's counsel]:  Then I would want you to modify that *it is not
           necessary for all jurors to agree* to the commission of an act in aggravation because,
26         as it reads, there now, if they take that sentence, it clearly is not the law they must
           agree.  All we're saying is that, for purposes of this determination, they don't have to
27         agree.

28

                                           109

1

The Court:  Well, I don't think it is clearly the law that they must agree, not in the context of this instruction.

2

Mr. Strellis:  No, No. I say they must agree on whether or not the special circumstance is appropriate for death.  And what bothers me is that this tells them they don't have to agree.  And I don't think it's a—so all I would—if the court will not strike the paragraph in its entirety, because I consider it surplusage, under the facts of our particular case, then I would like to court to amend . . . , the first sentence in the second paragraph, so it reads, it is not necessary for all jurors to agree that an act of aggravation took place; if any juror is convinced beyond a reasonable doubt that such criminal act or criminal acts took place, if any juror is convinced beyond a reasonable doubt that such criminal activity occurred, that juror may consider that activity as a fact in aggravation.  If a juror is not so convinced, that juror must not consider that for any purpose.

3

4

5

6

7

8

So all I'm adding to it is a few words that say—that modify what it is that they don't have to agree on or that makes it somewhat more specific.

9

10   RT 3855 at AG021015, italics added.  Indeed, in his petition in this Court, petitioner concedes

11   that his counsel "did not request that to consider an incident in aggravation, the jury had to

12   unanimously agree both that it occurred and that it constituted an implead threat of force or

13   violence."  Pet. at 180.

14          The prosecutor argued that petitioner's proposed modification was confusing.  He said:

15   "You can't say other factors in aggravation, because those don't have to be proved beyond a

16   reasonable doubt.  The only factors in aggravation that . . . , have to be proved beyond a

17   reasonable doubt is other criminal activity."  RT 3856 at AG021016.  Petitioner's counsel

18   responded:  "That's what I changed.  I agree with that.  I think it is not necessary for all jurors to

19   agree as to . . . whether a criminal activity has been proved beyond a reasonable doubt, period.

20   [¶]  If any juror is convinced beyond a reasonable doubt, then it goes on, and it makes perfect

21   sense.  It just adds the criminal activity to it.  [¶]  And I agree with the District Attorney.  [¶]  I

22   misspoke myself.  It should be criminal activity because that's what we're talking about."  RT

23   3856 at AG021016.   The trial court declined to modify CALJIC No. 8.87 (RT 3856-3857 at

24   AG021016-AG021017) and gave it as written (RT 3953-3954 at AG021114-AG021115).

25          After beginning its deliberations, the jury asked the court:  "1. Did both attorneys stipulate

26   to the fact that the defendant was one, convicted of the act of carrying a concealed firearm upon

27   the person and 2) carrying a loaded firearm on the person while in a public place, which involved

28

110

1   the implied use of force or violence?"  RT 4014 at AG021175.  The court stated that it had

2   discussed the note with counsel (RT 4014 at AG021175), and provided the following response:

3           First with respect to your first question, during the course of this trial neither attorney
        formally stipulated that the defendant was convicted of the act of carrying a
4       concealed firearm upon the person or that the defendant was convicted of carrying a
        loaded firearm on a person while in public place.  The alleged conduct of the
5       defendant's carrying a loaded firearm on the person while in a public place was the
        subject of testimony received at the penalty phase of these proceedings from Officer
6       Rand Monda of the Oakland Police Department, and in addition was the subject of
        testimony by the defendant Ernest Dykes on cross examination by Mr. Carmine
7       during the guilt phase of these proceedings.

8           The weight and significance to be attached to such testimony are exclusively matters
        for your determination.  By your underlining the phrase in your note which reads, and
9       I'm quoting, which involved the implied use of force or violence, end quote, I assume
        that you wish the court to respond in some fashion to this particular phrase as it is
10      used in the instructions.  As I have just indicated there was no formal stipulation
        entered into by the attorneys on the subject although the alleged conduct itself was the
11      subject of the testimony to which I have just referred.

12          Whether the conduct involved the implied use of force or violence is also exclusively
        a matter for your determination.
13

14  RT 4015-4016 at AG021176-AG021177.   Outside the presence of the jury, the court noted that it

15  had discussed its response to the jury's question with counsel.  Petitioner's counsel stated that he

16  had wanted the court to tell the jury that they had to find the gun charge true beyond a reasonable

17  doubt, "and other than that [he] totally agree[d] with the court's recitation."  RT 4020 at

18  AG021181; *see also* RT 4021-4022 at AG021182-AG021183.

19                      **b.     The California Supreme Court's rejection of petitioner's claim**

20          Relying in large measure on its prior decisions, the California Supreme Court rejected

21  petitioner's claim of instructional error.  In doing so, it held:

22          The jury was instructed it could not consider the uncharged criminal activity in
        aggravation unless defendant's guilt was proved beyond a reasonable doubt.  The
23      court supplied extensive instruction on the elements of the firearms offenses,
        concerning which evidence was introduced at the penalty phase.  The court declined
24      to require that the jury agree unanimously that the prior crime or crimes had been
        committed.  The trial court also declined to instruct the jury that it must agree
25      unanimously and beyond a reasonable doubt that the uncharged criminal activity
        involved a threat or implied threat of violence.  The trial court acted appropriately.
26
        The "jury need not unanimously agree on the truth of aggravating factors." (*People v.*
27      *Hines* (1997) 15 Cal. 4th 997, 1066.)  More specifically, "[j]ury unanimity is not
        required with respect to unadjudicated criminal conduct." (*People v. Harris* (2008)
28      43 Cal. 4th 1269, 1316.)  Juries are not required to agree unanimously on

                                        111

"foundational" matters such as that a crime involving violence has been committed. (*See People v. Hines, supra*, 15 Cal. 4th at pp. 1066-1067; *see also People v. Brown* (2004) 33 Cal. 4th 382, 402.) We also have rejected claims that *Apprendi v. New Jersey* (2000) 530 U.S. 466, *Ring v. Arizona* (2002) 536 U.S. 584, or *Cunningham v. California* (2007) 549 U.S. 270, require juries to enter unanimous findings concerning aggravating factors. (*People v. Salcido, supra*, 44 Cal. 4th at p. 167; *see also People v. Williams* (2008) 43 Cal. 4th 584, 649.) We decline defendant's invitation to reconsider our prior decisions.

*Dykes*, 46 Cal. 4th at 799-800; AG022148-AG022149; *see also People v. Fairbank*, 16 Cal. 4th 1223, 1225-26 (1997) ("neither the federal nor the state Constitution requires the jury to agree unanimously as to aggravating factors").

### c.   The California Supreme Court's resolution of petitioner's challenge to the jury instructions is not contrary to or an unreasonable application of Supreme Court law

In contending that the state supreme court's resolution of this issue violated his constitutional rights, petitioner asserts that the instruction at issue "is deficient for the same reason addressed by the plurality opinion in *Schad v. Arizona*, 501 U.S. 624, 632-633 (1991) (plur. opn. of Souther, J.)" Pet. at 183. First, petitioner fails to explain precisely how *Schad* advances his argument; he does not specify to what he refers by the words "same reason." In any event, *Schad* supports the proposition that valid convictions may be based on differing findings as to theory, so long as they are not so vague "that people of intelligence would be relegated to differing guesses about its meaning." *Schad*, 501 U.S. at 632.

Citing the United State Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 and *Ring v. Arizona*, 536 U.S. 584, petitioner further contends that California's capital sentencing scheme violates the federal constitution because it does not require that, before rendering a verdict of death, jurors must unanimously find the presence of one or more specific aggravating factors beyond a reasonable doubt, or that those specific factors outweigh the mitigating factors beyond a reasonable doubt. Pet. at 185-186.

As stated *ante*, the California Supreme Court has upheld the constitutionality of California's capital sentencing scheme despite the fact that it does not require jurors to unanimously find the presence of one or more specific aggravating factors beyond a reasonable doubt, or that those specific factors outweigh the mitigating factors beyond a reasonable doubt.

112

1   *See People v. Demetrulias*, 39 Cal. 4th 1, 41-43 (2006); *People v. Dickey*, 35 Cal. 4th 884, 930

2   (2005); *People v. Snow*, 30 Cal. 4th 43, 126 n.32 (2003); *People v. Prieto*, 30 Cal. 4th at 275.

3        In *Apprendi* the Court held, "[o]ther than the fact of a prior conviction, any fact that

4   increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to

5   a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.  In *Ring*, the Court

6   explained that under *Apprendi*, where the jury's verdict alone does not make the defendant

7   eligible for the maximum punishment of death, additional findings necessary to make the

8   defendant eligible must be found by a jury beyond a reasonable doubt.  *Ring*, 536 U.S. at 597-

9   609.

10       As the California Supreme Court explained in *Demetrulias*, neither *Apprendi* nor *Ring* are

11  applicable to the California death penalty scheme:

12       "'[U]nder the California death penalty scheme, once the defendant has been convicted
         of first degree murder and one or more special circumstances has been found true
13       beyond a reasonable doubt, death is no more than the prescribed statutory maximum
         for the offense; the only alternative is life imprisonment without possibility of parole.
14       ([Pen. Code] § 190.2, subd. (a).)  Hence, facts which bear upon, but do not
         necessarily determine, which of these two alternative penalties is appropriate do not
15       come within the holding of *Apprendi*.'  [Citation.]  The high court's recent decision in
         *Ring v. Arizona, supra*, 536 U.S. 584 does not change this analysis.  Under the
16       Arizona capital sentencing scheme invalidated in *Ring*, a defendant convicted of first
         degree murder could be sentenced to death if, and only if, the trial court first found at
17       least one of the enumerated aggravating factors true.  (*Id.* at p. 603.)  Under
         California's scheme, in contrast, each juror must believe the circumstances in
18       aggravation substantially outweigh those in mitigation, but the jury as a whole need
         not find any one aggravating factor to exist.  The final step in California capital
19       sentencing is a free weighing of all the factors relating to the defendant's culpability,
         comparable to a sentencing court's traditionally discretionary decision to, for
20       example, impose one prison sentence rather than another.  Nothing in *Apprendi* or
         *Ring* suggests the sentencer in such a system constitutionally must find any
21       aggravating factor true beyond a reasonable doubt." (*People v. Snow*, supra, 30 Cal.
         4th at p. 126, fn. 32.)
22

23  *People v. Demetrulias*, 39 Cal. 4th at 41.

24       In rejecting the claim that the California death penalty scheme violates the federal

25  Constitution because it does not require jurors to agree unanimously on the existence of particular

26  factors in aggravation, the California Supreme Court further explained:

27       While all the jurors must agree death is the appropriate penalty, the guided discretion
         through which jurors reach their penalty decision must permit each juror individually
28       to assess such potentially aggravating factors as the circumstances of the capital crime

113

([Pen. Code] § 190.3, factor (a)), prior felony convictions (*id.*, factor (c)), and other violent criminal activity (*id.*, factor (b)), and decide for him- or herself "what weight that activity should be given in deciding the penalty." (*People v. Ghent* (1987) 43 Cal. 3d 739, 774.) The series of normative judgments involved in deciding whether a particular circumstance is indeed aggravating and, if so, what weight it should be given, cannot be fitted into a scheme of unanimous jury factfinding. Defendant's contention is premised on a "misunderstand[ing] [of] the penalty determination process." (*People v. Miranda* (1987) 44 Cal. 3d 57, 99.)

*People v. Demetrulias*, 39 Cal. 4th at 41-42.[34]

The California Supreme Court has also concluded that the high court's decisions in *Blakely v. Washington*, 542 U.S. 296 and *Cunningham v. California*, 549 U.S. 270, merely extend the *Apprendi* and *Blakely* analyses to California's determinate sentencing law and have "no apparent application to California's capital sentencing scheme." *See People v. Salcido*, 44 Cal. 4th 93, 167 (2008).

For the reasons set forth *ante*, petitioner has failed to establish that the California Supreme Court's denial of the instant claims was contrary to or an unreasonable application of United States Supreme Court law.

> **2.      Evidence that Petitioner Possessed a Loaded and Concealed Firearm Was Admissible Under California Law in the Penalty Phase, and Admission of the Evidence Did Not Violate Petitioner's Constitutional Rights**

Petitioner next challenges an evidentiary ruling made by the trial court and affirmed by the California Supreme Court. Petitioner's attempt to challenge the state-law evidentiary ruling by deeming it a violation of his federal constitutional rights fails.

During the penalty phase, the trial court permitted the prosecution to introduce evidence of a prior incident when petitioner had illegally possessed a loaded and concealed firearm. The evidence was admitted pursuant to Penal Code section 190.3, factor (b), which permits a penalty-phase jury to consider "[t]he presence or absence of criminal activity by the defendant which

---

[34] For similar reasons as to why *Apprendi* and *Ring* are not applicable, petitioner's citations to *Monge v. California*, 524 U.S. 721 (1998), *Strickland v. Washington*, 466 U.S. 668, and *Bullington v. Missouri*, 451 U.S. 430, 439 (1981), are also inapposite. Pet. at 186-187. Petitioner's arguments are still based on a fundamental misunderstanding of the nature of the penalty phase of the trial and the nature of the decision the jurors are called upon to make in that phase.

114

1   involved the use or attempted use of force or violence or the express or implied threat to use force

2   or violence."  In his direct appeal in the state supreme court, petitioner challenged this ruling as a

3   violation of state evidentiary rules and the Eighth and Fourteenth Amendments to the United

4   States Constitution.  AOB Claim VIII at AG021521–AG021525; *see also* RB at AG021851-

5   AG021855.  The California Supreme Court rejected the claim.  *Dykes*, 46 Cal. 4th at 775-78;

6   AG022114-AG022120.

7          The California Supreme Court described the background for the claim as follows:

8          The prosecution presented evidence establishing that on December 16, 1991,
       defendant was detained on grounds not specified at trial.  It was stipulated that
9       defendant's "detention and arrest . . . were based on legal cause."  Officer Monda
       testified that at approximately 9:30 p.m., he exited from his vehicle and approached
10      defendant, who was wearing dark clothing, including a cap, "a dark puffy black jacket
       with a hood over his head, [and] . . . large black ski gloves . . . ."  The officer directed
11      defendant to identify himself and noticed that defendant was "fidgeting."  In the
       absence of any request by the officer, defendant removed his cap and gloves and
12      placed them on the roof of the patrol vehicle.  Monda patted defendant down for his
       own safety and noticed that one of defendant's gloves contained a firearm.  The
13      weapon was a loaded and cocked .25-caliber semiautomatic firearm.  One round was
       in the chamber of the weapon, and three rounds were in the clip.  Monda requested
14      that defendant sit in the back of the patrol vehicle while the officer checked for
       outstanding warrants and called for backup.  Defendant was not handcuffed.  Monda
15      recalled that defendant had shouted at him from inside the vehicle when Monda
       retrieved the weapon.  The officer testified that the incident was memorable, because
16      he had not observed the weapon at the beginning of the encounter and "could have
       been shot."  He explained: "Well, he had the . . . large ski glove in his hands.  He had
17      his hand in the glove and his gun, the gun was in his hand and he could have shot me
       and I didn't even see it.  I wouldn't have even seen it coming."  Monda thereafter
18      transported defendant to jail.

19   *Dykes*, 46 Cal. 4th at 776; AG022115.  The court also described petitioner's claim of error in the

20   state court.  "Defendant claims the evidence was inadmissible because the incident did not

21   involve a threat or implied threat of violence.  He contends that an interpretation of [Penal Code]

22   section 190.3, factor (b) that would permit the admission of such evidence would heighten the

23   risk of arbitrary imposition of the death penalty, in violation of the Eighth and Fourteenth

24   Amendments to the United States Constitution."  *Id*., footnote omitted; AG022116

25          First, as a matter of state law, the California Supreme Court rejected petitioner's claim.  In

26   so doing, it relied on its decision in a prior similar case.

27          Evidence establishing that a defendant knowingly possessed a potentially dangerous
       weapon while in custody is admissible under section 190.3, factor (b), even when the
28      defendant has not used the weapon or displayed it with overt threats.  (*People v.*

                                              115

1    *Tuilaepa* (1992) 4 Cal. 4th 569, 589.)  Even in a noncustodial setting, illegal
     possession of potentially dangerous weapons may "show[] an implied intention to put
2    the weapons to unlawful use," rendering the evidence admissible pursuant to section
     190.3, factor (b).  (*People v. Michaels* (2002) 28 Cal. 4th 486, 536.)  For example, in
3    the *Michaels* case, evidence was presented that the defendant had been discovered
     with a firearm concealed in the glove compartment of his parked vehicle and had
4    been arrested for unlawful possession of knives on prior occasions.  We noted the
     criminal character of the defendant's possession of these weapons, adding that similar
5    knives had been used in charged offenses and that the concealed firearm had been
     employed in a robbery   committed one day before the discovery of the weapon in the
6    defendant's vehicle.  Citing all of these circumstances, we concluded that the trial
     court did not err in admitting the prosecution's evidence for the purpose of
7    demonstrating the defendant's commission of a prior crime involving the threat of
     violence.  The defendant, we pointed out, was free to present evidence upon which
8    the jury could base a contrary conclusion, such as "evidence . . . to show that his
     possession was for the purpose of self-protection, or the protection of someone else,
9    not for criminal violence." (*Ibid.*)

10   Similarly, in the present case the jury legitimately could infer an implied threat of
     violence from all the circumstances, including the "criminal character of defendant's
11   possession" (*People v. Michaels, supra*, 28 Cal. 4th at p. 536; *see* [Penal Code,] §§
     12025, subd. (a), 12031, subd. (a)), the concealment of the loaded and cocked weapon
12   in a manner that rendered it available for instant, surprise use, and defendant's use of
     a similar firearm in committing the present offense.

13

14   *Dykes*, 46 Cal. 4th at 776-77; AG022116-AG022117.

15        As he did in the state supreme court, petitioner implies that the permitted use of evidence of

16   his gun possession somehow violated the Second Amendment to the United States Constitution.

17   The California Supreme Court considered and rejected this argument.

18   Defendant makes a brief reference to the Second Amendment to the United States
     Constitution, commenting that "[g]enerally, a defendant may lawfully possess a
19   firearm," and surmising that it is "doubtful that the mere carrying of a firearm
     constitute[s] an implied threat of force or violence" and that the circumstance "that in
20   California, such carrying is unlawful and constitutes a  misdemeanor, does not
     transform the conduct from one of innate self-protection into a threat against others."
21
     In support of his claim, defendant refers to the solicitor general's briefing in a federal
22   case.  (*U.S. v. Haney* (10th Cir. 2001) 264 F. 3d 1161.)  More recently, however, the
     United States Supreme Court decided *District of Columbia v. Heller* (2008) 554 U.S.
23   [570] [171 L. Ed. 2d 637, 128 S. Ct. 2783] (*Heller*).  In that case, the high court
     determined that a District of Columbia law prohibiting the possession of an operable
24   handgun in the home was inconsistent with the Second Amendment of the United
     States Constitution. (*Heller, supra*, 554 U.S. at pp. [627-628, 634-635] [171 L. Ed. 2d
25   at pp. 679, 683-684].)  Defendant does not contend that the California statutes
     prohibiting possession of a concealed, loaded firearm in a public place are void under
26   the Second Amendment.  He merely suggests that, because persons have a right to
     bear arms, their possession of a firearm does not, in itself, suggest a threat of
27   violence.  We have concluded, however, that the evidence in the present case would
     permit the jury to infer an implied threat of violence.
28

116

In any event, the court in *Heller* disapproved a statute that prohibited possession of an ordinary handgun in the home.  Although the high court determined that the Second Amendment referred to an "individual right to keep and bear arms" (*Heller, supra,* 554 U.S. at pp. [594-595, 621-625] [171 L. Ed. 2d at pp. 659, 675-677]), the court warned that this right was not unlimited.  The court did not recognize a "right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," observing that historically, most courts have "held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  (*Id.* at pp. [625-626] [171 L. Ed. 2d at p. 678].)  The high court's decision in Heller does not require us to conclude that possession in a public place of a loaded, cocked, semiautomatic weapon with a chambered round, concealed in a large glove and ready to fire, cannot be defined as a crime under state law. Moreover, nothing in that decision requires us to conclude that such conduct cannot be considered as carrying an implied threat of violence.

*Dykes*, 46 Cal. 4th at 777-78; AG022118-AG022119.

To the extent petitioner argues in his federal petition for writ of habeas corpus that the state "court erred in admitting the incident of gun possession as aggravation in this case" (Pet. at 191), the claim is not cognizable.  The state supreme court's holding amounts to a determination of California law, which this Court may not revisit.  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions"); *Mendez v. Small*, 298 F. 3d 1154, 1158 (9th Cir. 2002) ("A state court has the last word on the interpretation of state law").  The United States Supreme Court has made this principle abundantly clear:  "Petitioner argues that the state appellate court erred in its determinations on the first two points of state law. . . . We are not at liberty to depart from the state appellate court's resolution of these issues of state law.  Although petitioner marshals a number of sources in support of the contention that the state appellate court misapplied state law on these two points, the California Supreme Court denied review of this case, and we are not free in this situation to overturn the state court's conclusions of state law."  *Hicks v. Feiock*, 485 U.S. 624, 629-630 (1988); *accord*, *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus"); *Jones v. Thieret*, 846 F. 2d 457, 461 (7th Cir. 1988) ("Jones and the State of Illinois litigated the meaning of [the statute], and the state won.  The state court issued a reasoned opinion. . . . It has thereby established the meaning of state law for these parties").

117

1    Petitioner attempts to convert his claim of state-law evidentiary error into one of federal

2    constitutional error by "respectfully ask[ing] this Court to assess the tension between federal law

3    and California law as stated in *Michaels* and as applied here." Pet. at 188. The attempt to alter

4    his claim of state law error into one of federal constitutional error fails. On federal habeas

5    review, the question is whether the admission of the challenged evidence was so prejudicial in the

6    context of the trial as to render the conviction unfair. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).

7    "A habeas petitioner bears a heavy burden in showing a due process violation based on an

8    evidentiary decision." *Boyde v. Brown*, 404 F. 3d 1159, 1172 (9th Cir. 2005). "Only if there are

9    *no* permissible inferences the jury may draw from the evidence can its admission violate due

10    process." *Jammal v. Van de Kamp*, 926 F. 2d 918, 920 (9th Cir. 1991). Even the admission of

11    irrelevant evidence does not violate due process, unless it "so infected the trial with unfairness as

12    to make the resulting conviction a denial of due process." *Romano v. Oklahoma*, 512 U.S. 1, 12-

13    13 (1994); *Rupe v. Wood*, 93 F. 3d 1434, 1444 (9th Cir. 1996) (erroneous admission of evidence

14    that defendant had gun collection did not violate due process, where improper testimony was

15    brief, prosecutor did not call attention to evidence, and other evidence of guilt was weighty);

16    *Hamilton v. Vasquez*, 17 F. 3d 1149, 1159 (9th Cir. 1994) (erroneous admission of letters written

17    by defendant did not render the trial unfair).

18    Here, the California Supreme Court found that the "jury legitimately could infer an implied

19    threat of violence from all the circumstances, including the 'criminal character of defendant's

20    possession' [citations], the concealment of the loaded and cocked weapon in a manner that

21    rendered it available for instant, surprise use, and defendant's use of a similar firearm in

22    committing the present offense." *Dykes*, 46 Cal. 4th at 777; AG022117. Since the inference from

23    the evidence was legitimate, there could be no violation of petitioner's federal constitutional

24    rights by the jury considering it as one factor, among numerous others, in determining the

25    appropriate penalty in this case. Introduction of the evidence did not compel the jury to find the

26    aggravator to be true or to return a sentence of death. Rather, the weight of the evidence—if

27    any—was for the jury to determine.

28

118

1   Consequently, petitioner had failed to establish that introduction of the evidence of his prior

2   gun possession was so prejudicial as to render the sentencing phase of his trial unfair.  The

3   California Supreme Court's rejection of petitioner's claim of federal constitutional error has not

4   been shown to be contrary to or an unreasonable application of Supreme Court law, hence, there

5   is no basis for issuance of the writ.

6   **F.  Claim 6:  The Trial Court Did Not Commit Federal Constitutional Error
        in Refusing to Modify a Standard Jury Instruction on the Duties of the**

7   **Jurors**

8   Petitioner asserts that the trial court committed prejudicial error in refusing to amend a

9   standard California jury instruction to tell the jury not to engage in speculation or conjecture in its

10  penalty-phase deliberations.  Pet. at 193.  Petitioner raised this claim in his direct appeal in the

11  California Supreme Court.  AOB Claim X at AG021527-AG021531; *see also* RB at AG021860-

12  AG021865.  The California Supreme Court rejected the claim concluding that the trial court did

13  not abuse its discretion in refusing to modify the standard instruction and that the instructions as a

14  whole properly informed the jury of its duty in the penalty phase.  *Dykes*, 46 Cal. 4th at 794-96;

15  AG022142-AG022144.  Petitioner fails to show that this decision was contrary to or an

16  unreasonable application of United States Supreme Court law.

17  In discussing the penalty-phase instructions, the trial court stated its intent to instruct with

18  CALJIC No. 8.84.1 on the duties of the jurors.  That instruction provided in relevant part:

19  You will now be instructed as to all of the law that applies to the penalty phase of this
    trial.  You must determine what the facts are from the evidence received during the
20  entire trial unless you are instructed otherwise.  You must accept and follow the law
    that I shall state to you.  Disregard all other instructions given to you in other phases
21  of this trial.

22  You must neither be influenced by bias nor prejudice against the defendant, nor
    swayed by public opinion or public feelings.  Both the People and the Defendant have
23  a right to expect that you will consider all of the evidence, follow the law, exercise
    your discretion conscientiously, and reach a just verdict.
24

25  CT 584 at AG000640.  Petitioner's counsel asked the court to modify the standard instruction,

26  specifically the second paragraph.  He stated his proposed modification as follows:

27  I would like to add a sentence to that, probably between public feeling and both, that
    you are to reach your verdict based upon the evidence, and should not either
28  speculate, you know, not be subject to either speculation or conjecture, 'cause clearly

119

1

> it's the law in the State of California that they can't speculate or conject [sic], but are only supposed to use the evidence as it's been presented to them. That was— conjecture, for some reason, got left out of this instruction when they went over to capital. Also I believe that to be a fair statement of the law.

2

3

4   RT 3863-3864 at AG021023-AG021024; *see also Dykes*, 46 Cal. 4th at 794-95; AG022142-

5   AG022143. "Counsel contended that the jury, rather than engage in conjecture, must make the

6   penalty decision solely upon the basis of the evidence introduced at trial." *Dykes*, 46 Cal. 4th at

7   795 at AG022142-AG022143.

8          The trial court noted that CALJIC No. 1.03 already would instruct the jurors that they

9   "must decide all question of fact in this case from the evidence received in this trial and not from

10  any other source." RT 3864 at AG021024. Petitioner's counsel, however, argued that this

11  instruction was not sufficient. RT 3864 at AG021024.

12         The trial court also expressed concern that petitioner's proposed modification would

13  conflict with CALJIC No. 8.88, which provided in relevant part:

14

> The weighing of aggravating circumstances does not mean a mere mechanical counting of factors on each side of an imaginary scale or the arbitrary assignment of weight to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various circumstances you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of the aggravating circumstances with the totality of the mitigating circumstances.

15

16

17

18  CT 629-630 at AG000685-AG000686. Ultimately, the trial court declined to amend the

19  instruction and decided, instead, to give the standard instructions. RT 3867, 3870 at AG021027,

20  AG021031; *see also* RT 3943-3944 at AG021104-AG021105 (CALJIC No. 8.84.1); RT 3945 at

21  AG0021106 (CALJIC No. 1.03); and RT 3963 at AG021124 (CALJIC No. 8.88); *Dykes*, 46 Cal.

22  4th at 795; AG022143("The trial court declined defense counsel's invitation to modify the

23  instruction, commenting that the proposed amendment to CALJIC No. 8.84.1 could have

24  confused the jury in that it stood in tension with the normative and individualized nature of the

25  jury's task at the penalty phase of the trial").

26         In addressing petitioner's claim, the California Supreme Court set out the applicable state

27  standard for claims of instructional error.

28

1
2
3
4
5
6

"To determine whether the trial court erred in instructing the jury, 'we must examine the entire record, including the instructions and arguments, to determine whether the jury was misled to the prejudice of the defendant about the scope of its sentencing discretion. [Citation.] We must ascertain whether, overall, the jury was adequately informed of the full nature of its sentencing responsibility, both as to the manner in which the various factors are to be weighed and as to the responsibility, both as to the manner in which the various factors are to be weighed and as to the scope of its sentencing discretion. [Citation.]'" (*People v. Slaughter*, [27 Cal. 4th 1187, 1215 (2002)].) Ordinarily, "'[w]e presume that jurors comprehend and accept the court's instructions.'" (*People v. Welch* (1999) 20 Cal. 4th 701, 773.)

7
8

*Dykes*, 46 Cal. 4th at 795; AG022143. Applying this standard, the state supreme court rejected petitioner's claim of instructional error. It concluded:

9
10
11
12

The trial court did not abuse its discretion. Defendant's concern that the jury not base its decision upon the existence of facts not introduced in evidence was met by other instructions. The trial court reminded the jury that they "must decide all questions of fact in this case from the evidence received in this trial and not from any other source." (CALJIC No. 1.03) The jury's factfinding function was described adequately in other instructions.

13
14

*Dykes*, 46 Cal. 4th at 796; AG022144. In a footnote, the state supreme court explained the "other instructions" to which it referred.

15
16
17
18
19

We refer to portions of CALJIC No. 8.84.1 as delivered at trial ("You must determine what the facts are from the evidence received during the entire trial unless you are instructed otherwise.") and 8.85 as delivered at trial ("In determining which penalty is to be imposed on the defendant you shall consider all the evidence which has been received during any part of the trial of the case except as you may be hereafter instructed."). The trial court also repeated guilt phase instructions defining evidence, circumstantial evidence, inferences, and the manner in which various types of evidence should be considered and weighed.

20

*Dykes*, 46 Cal. 4th at 796 n.14; AG022144.

21
22
23
24
25
26
27
28

Petitioner's claim similarly fails as one for federal habeas relief. A claim of state instructional error can be the basis of federal habeas relief only if it "so infected the entire trial that the resulting conviction violates due process." *Estelle v. McGuire*, 502 U.S. at 72. The test for constitutional error is whether there is a "reasonable likelihood" the jury misapplied the instructions. *Id.* To make this assessment, the challenged instruction must be evaluated in light of the instructions as a whole and the evidence introduced at trial, *id.*, as well as the arguments of counsel, all of which may clarify the charge to the jury. *Middleton v. McNeil*, 541 U.S. 433, 438 (2004) (per curiam). The federal habeas court must defer to a state court's reasonable application

121

1    of these principles. *Smith v. Spisak*, 558 U.S. 139 (2010); *Waddington v. Sarausad*, 555 U.S. 179,

2    191 (2009). If error occurred, the federal habeas court must separately determine whether it had a

3    substantial or injurious effect on the verdict. *Calderon v. Coleman*, 525 U.S. 141, 146 (1998)

4    (per curiam) (citing *Brecht v. Abrahamson*, 507 U.S. at 637.[35]

5         Moreover, as does California law, United States Supreme Court law presumes that jurors

6    are capable of following instructions. The notion that juries can and do follow the court's

7    instructions is the bedrock of the jury system, and has been reaffirmed many times. For example,

8    *in CSX Transp., Inc. v. Hensley*, 556 U.S. 838, (2009), the Supreme Court rejected the argument

9    that instructing the jury on the legal standard for fear-of-cancer damages would have been futile,

10   because cancer is such an emotional issue for so many people. The Supreme Court held:

11        This is a serious misunderstanding of the nature and function of the jury. The jury
         system is premised on the idea that rationality and careful regard for the court's
12        instructions will confine and exclude jurors' raw emotions. Jurors routinely serve as
         impartial factfinders in cases that involve sensitive, even life-and-death matters. In
13        those cases, as in all cases, juries are presumed to follow the court's instructions.

14   *Id*. at 841; *Richardson v. Marsh*, 481 U.S. 200, 211 (1987); *Townsend v. Knowles*, 562 F. 3d

15   1200, 1209 (9th Cir. 2009) ("The law presumes that the jury follows the instructions given").

16        The California Supreme Court's holding that the trial court did not err in refusing

17   petitioner's proposed modification to the instruction was not error, let alone error that so infected

18   the entire trial that the resulting conviction violates due process. As the California Supreme

19   Court explained, petitioner's proposed modification was unnecessary given the instructions as a

20   whole which adequately and fully apprised the jurors of their duties. Moreover, as the trial court

21   noted, the modification "could have confused the jury in that it stood in tension with the

22   normative and individualized nature of the jury's task at the penalty phase of the trial." *Dykes*, 46

23

24        [35] Citing *People v. Mickey*, 54 Cal. 3d 612 (1991), petitioner contends that the trial court's
         refusal to modify the instruction in this case "was not even consistent with prior California
25        Supreme Court decisions." Pet. at 197. First, federal habeas does not lie for errors of state law.
         *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990). In a habeas petition, a federal court is limited to a
26        review of violations of the Constitution or laws of the United States. *Estelle v. McGuire*, 502
         U.S. at 67-68. Second, it would have been up to the California Supreme Court to decide if the
27        trial court's refusal to modify the instruction was inconsistent with its prior precedent. Clearly, it
         did not find that it was. Thus, petitioner's claim fails. *See also* RB 154-155 at AG021863-
28        AG021864 (explaining why *Mickey* is distinguishable from this case).

1   Cal. 4th at 795 at AG022143; *see also Tuilaepa v. California*, 512 U.S. at 979 ("the sentencer

2   may be given 'unbridled discretion in determining whether the death penalty should be imposed

3   after it has found that the defendant is a member of the class made eligible for that penalty'").[36]

4   Petitioner has not established that the state court's rejection of his proposed modification to a

5   standard California jury instruction on the responsibilities and duties of jurors was contrary to or

6   an unreasonable application of Supreme Court precedent.[37]

7       **G.    Claim 7:  Petitioner's Challenges to California's Method of Execution Do
            Not Provide a Basis for Federal Habeas Relief**

8

9       Petitioner raises two challenges to California's method of execution.  First, he asserts that

10  "the state has failed to comply with the statutory requirement that standards for lethal injection be

11  established by the [California] Department of Corrections."  Pet. at 199-205.  Second, he

12  "submits that both of the statutory methods of execution [lethal gas and lethal injection] constitute

13  cruel and unusual punishment in violation of Petitioner's rights under the Eight Amendment."

14  Pet. at 206-208.  Neither claim provides a basis for federal habeas relief.

15      Petitioner raised the claim that California failed to abide by its own statutory requirements

16  in his direct appeal in the state supreme court.  AOB Claim XXVI at AG021646-AG021658; *see*

17  *also* RB at AG021944-AG021946.  The California Supreme Court rejected the challenge finding

18  it "not cognizable on appeal because alleged imperfections in the method of execution do not

19  affect the validity of the death judgment itself."  *Dykes*, 46 Cal. 4th at 820; AG022179.  Petitioner

20  also raised his challenge to the method of execution on direct appeal in the state supreme court.

21          [36] As he did in numerous places in his briefs in the California Supreme Court, and as he
22  has done numerous times in his petition with this Court, petitioner asserts that evidence submitted
    in support of his motion for new trial supports the view that jurors in fact speculated about
23  matters outside the record.  Pet. at 197-198.  He refers to hearsay evidence, consisting of
    postverdict remarks allegedly made by jurors to a defense investigator.  As established *ante*, this
24  hearsay evidence cannot be used to impeach the jury's verdict.
            [37] In support of his claim, petitioner cites *California v. Brown*, 479 U.S. 538, 541 (1987)
25  for the proposition that "a jury instruction directing jurors not to speculate or to make the penalty
    determination based on speculation or conjecture is a correct statement of the law."  Pet. at 196.
26  *Brown* does not support his argument.  In *Brown*, the Court found no infirmity in an instruction
    that cautioned the jury that it must not be swayed by mere sentiment, conjecture, sympathy,
27  passion, prejudice, public opinion, or public feeling.  *Brown*, however, does not stand for the
    proposition that a jury must be instructed not to speculate, otherwise the resulting sentence
28  violates the Constitution.

1    AOB Claim XXVI AG021651-AG021658 and RB Claim XXVI AG021944-AG021946.  Again

2    the California Supreme Court rejected the claim as not cognizable on appeal and premature.

3    *Dykes*, 46 Cal. 4th at 820; AG022179, citing *Baze v. Rees*, 553 U.S. 35 (2008) (Kentucky's three-

4    drug protocol for lethal injection does not violate the Eighth Amendment).  Petitioner also raised

5    his challenge to lethal injection as a method of execution in his state petition for writ of habeas

6    corpus.  State Pet. Claim XXVII at AG022783; *see also* IR at AG025120.  In denying his

7    petition, the California  Supreme Court stated that this claim was "denied as premature, without

8    prejudice to the filing of a renewed petition within 10 days after an execution date is set."

9    AG025232.

10        As to the first part of petitioner's claim, he asserts that "to his knowledge," California has

11    not complied with California statutory law and established standards for the administration of

12    lethal injections and that this failure also violates California's Administrative Procedures Act.

13    Pet. at 201.  There are several critical flaws in petitioner's argument.  First, petitioner is alleging a

14    violation of state law.  As such, his claim is not cognizable in his federal petition for writ of

15    habeas corpus.  *See Estelle v. McGuire*, 502 U.S. 62.  Petitioner's attempt to convert his state law

16    claim into a federal constitutional claim by merely citing the Fourteenth Amendment should be

17    rejected as an impermissible artifice meant to evade *Estelle*'s clear directive.

18        Second, when petitioner's counsel in his direct appeal in the California Supreme Court filed

19    Appellant's Opening Brief in August *2002*, counsel stated that "to appellant's knowledge, the

20    [California] Department of Corrections has not complied with the mandate of [Penal Code]

21    section 3604, subdivision (a), to establish standards for the administration of lethal injection or

22    with the provisions of the Administrative Procedures Act."  AOB at 227; AG021648.  The claim

23    that California had not established procedures was incorrect in 2002.  More perplexing, however,

24    is that counsel in this federal petition filed in December *2012*, over 10 years later, makes the exact

25    same assertion of being unaware of Department of Correction policies.  Pet. at 201.  This despite

26    the fact that there has been widespread attention in the legal community—particularly among

27    lawyers practicing in capital cases—and in the general media to procedures California has

28

124

1    adopted for carrying out executions, and to federal and state litigation regarding those

2    procedures.[38]

3        Pursuant to a Notice of Approval of Regulatory Action issued by the Office of

4    Administrative Law of the State of California, No. 2010-0706-02 SR (Cal. Office Admin. Law,

5    July 30, 2010), new regulations governing the execution of death sentences by lethal injection

6    became effective on August 28, 2010.  These regulations are the subject of litigation now pending

7    in the United States District Court for the Northern District of California (*Morales, et al.* v. *Cate,*

8    *et al.* (N.D. Cal. 06-219)) and California Superior Court in Marin County (*Sims, et al. v. Cal.*

9    *Dep't of Corr. & Rehab.* (Marin Co. Superior Ct. No. CIV 1004019)).

10       Thus, petitioner's assertion that California has violated in its own rules by failing to adopt

11   procedures is factually incorrect.  Consequently, his claim on this ground is without merit.

12       Finally, as the California Supreme Court stated, petitioner's claim is not cognizable on

13   appeal because alleged imperfections in the method of execution do not affect the validity of the

14   death judgment itself.  *Dykes*, 46 Cal. 4th at 820; AG022179; *see also People v. Cornwell*, 37 Cal.

15   4th 50, 106 (2004), overruled on other grounds in *People v. Doolin*, 45 Cal. 4th at 421, n.22 ("On

16   direct appeal, defendant is restricted to claims 'bear[ing] on the validity of the death sentence

17   itself.' [Citation.]  His claim regarding the existence or nonexistence of regulations that may or

18   may not be in effect when the judgment is to be carried out does not affect the validity of the

19   death sentence. In essence, defendant's claim is premature.  [Citation.]").  Petitioner does not

20   address this portion of the state supreme court's opinion in his case, much less explain why the

21   California Supreme Court's denial of his claim on this basis was an unreasonable interpretation of

22   the facts or an unreasonable application of Supreme Court law.

23       The second portion of petitioner's claim challenging the methods of execution in California

24   fares no better in this federal proceeding.  As noted, the California Supreme Court on direct

25   appeal found this claim "premature."  *Dykes*, 46 Cal. 4th at 820; AG022179 ("Defendant's attack

26

27   _____
     [38] This appears to be another instance where the federal petition simply repeats verbatim
     arguments made in the state court without attempting to tailor the claims specifically to this
     federal proceeding.

28

1  on illegalities in the execution process that may or may not exist when his death sentence is

2  carried out are premature").  As the California Supreme Court also stated in its denial of

3  petitioner's state petition for writ of habeas corpus, petitioner's claim is premature at this stage of

4  the proceedings, but he may file a "renewed petition [on this grounds] within 10 days after an

5  execution date is set."  AG025232.

6      Petitioner cannot demonstrate that the California Supreme Court's denial of his challenge to

7  California's methods of execution as premature was an objectively unreasonable application of

8  clearly established Supreme Court precedent at the time of the state court's decision.  This is

9  especially true in light of the fact that at the time of the state supreme court's resolution of

10  petitioner's direct appeal and petition for writ of habeas corpus, no controlling United States

11  Supreme Court law held that either execution by lethal gas or by lethal injection violated the

12  Eighth Amendment.  *See, e.g., Brown v. Ornoski*, 503 F. 3d 1006, 1017 (9th Cir. 2007) ("There is

13  no Supreme Court precedent holding lethal injection to be unconstitutional, and there certainly

14  was none in existence at the time of the California Supreme Court's denial of Brown's claim in

15  1999.  Because on this record Brown cannot demonstrate that the California Supreme Court's

16  denial was an objectively unreasonable application of clearly established Supreme Court

17  precedent, we affirm the district court's denial of the writ on this claim").   Additionally, any

18  challenge to the use of lethal gas fails as that would occur only if petitioner elects that method of

19  execution, and such election would operate as a waiver of any Eighth Amendment challenge.

20  *Stewart v. LaGrand*, 526 U.S. 115 (1999).

21      For the foregoing reasons, petitioner's bid for federal habeas relief on the basis of

22  challenges to California's procedures and methods for execution provide no grounds for issuance

23  of the writ.

24      **H.    Claim 8:  Petitioner's Overbroad Claim of Cumulative Error Fails**

25      Petitioner's final claim is an overly broad and imprecise assertion that "the numerous

26  penalty phase errors requires reversal of the death penalty even if no single error does so

27  independently . . . . In addition, a number of guilt-phase errors also had a considerable impact on

28  the penalty phase and the impact of these errors must also be assessed in evaluating the prejudice

126

1    resulting from the penalty phase errors." Pet. at 208. Petitioner's all-encompassing claim of

2    cumulative error fails.

3        Petitioner asserted claims of cumulative error in his direct appeal in the California Supreme

4    Court (AOB Claims VI and XXVIII at AG021500 and AG021676-AG021677; see also RB at

5    AG021828 and AG021950) and his state petition for writ of habeas corpus (State Pet. Claim

6    XXIX at AG022785-AG022786; *see also* IR at AG025123). The California Supreme Court

7    rejected the claims on direct appeal. *Dykes*, 46 Cal. 4th at 775; AG022114 (as to petitioner's

8    claim of cumulative error regarding the guilt phase: "We have not identified any error that was

9    prejudicial, whether considered separately or cumulatively. (See *People v. Salcido* (2008) 44 Cal.

10   4th 93, 156.)"); *Dykes*, 46 Cal. 4th at 820; AG022180 (as to petitioner's claim of cumulative error

11   regarding the penalty phase: "Contrary to defendant's claim, the errors we have found or

12   assumed are so insignificant in the context of the trial as a whole that there is no reasonable

13   possibility that they affected the outcome of the proceedings whether such errors are considered

14   singly or cumulatively"). The California Supreme Court also rejected petitioner's claim of

15   cumulative error in his state petition for writ of habeas corpus by denying the writ. AG025232.

16       There are several critical errors with petitioner's claim of cumulative error in his federal

17   petition for writ of habeas corpus. First, in a footnote, petitioner asserts that his claim of

18   cumulative error "relies upon and hereby incorporates the *entirety* of the claims presented during

19   both the direct appeal and the state habeas proceedings." Pet. at 208 n.93. Petitioner's attempt to

20   include in his federal petition every claim he made in the state court in his direct appeal and

21   habeas proceedings—in a footnote—is unavailing. The only claims that are properly before this

22   Court are the ones specifically articulated in the federal petition for writ of habeas corpus.

23   Manifestly, petitioner has not shown that the state court's resolution of any other claim, not

24   explicitly raised in the federal petition, is contrary to or an unreasonable application of Supreme

25   Court law. Thus, petitioner's attempt to "incorporate the entirety" of his claims presented to the

26   state court must be rejected.

27       Second, petitioner's claim of cumulative error in this Court is an almost verbatim recitation

28   of the second claim of cumulative error that he raised in his state direct appeal. *Compare* pet. at

127

1   208-211 to AOB Claim XXVIII at AG021676-AG021677.  He has made essentially no effort to

2   rephrase or revise the claim so that it is applicable to the specific claims he has raised in his

3   federal petition.  As a result, the claim is overbroad and imprecise.  For example, in his claim in

4   this Court, petitioner recites a claim of prosecutorial misconduct that he raised in the state court

5   but has not raised on federal habeas.  *See* Pet. at 209 ("prosecutor misbehaved flagrantly and

6   continuously, openly seeking to inflame the passions and prejudice of the jury.  The misconduct

7   occurred throughout both phases of the trial, but was particularly serious during closing argument

8   . . .").  He also asserts a challenge to the victim impact evidence introduced in the penalty phase

9   that was raised in the state court, but is mentioned nowhere else in his federal petition.  Pet. at 209

10   (the prosecutor's alleged misconduct "was compounded by the admission of overwhelmingly

11   prejudicial victim impact evidence").  Similarly, he asserts that the trial court "gave prejudicial

12   instructions on the question of remorse or its absence" (pet. at 209) although this claim too was

13   not raised elsewhere in the federal petition.  By simply reciting the claim of cumulative error from

14   his opening brief in his state court direct appeal, and by failing to tailor his claim of cumulative

15   error to the actual claims of error presented in his federal petition, petitioner has presented this

16   court with an overbroad and inaccurate claim for relief that must be denied.

17       Finally, even were petitioner's claim of cumulative error properly and accurately stated, it

18   would still fail.  As each of petitioner's individual claims of error presented to this court fail, his

19   claim of cumulative error also necessarily fails.  Moreover, petitioner makes no attempt to explain

20   why the California Supreme Court's denial of his claims of cumulative error on the merits were

21   either an unreasonable determination of the facts or an unreasonable application of Supreme

22   Court law.  Accordingly, petitioner has failed to make the legal or factual showing necessary to

23   satisfy 28 U.S.C, § 2254(d), and his claim of cumulative error must be denied.

24

25

26

27

28

1

**CONCLUSION**

2        Accordingly, respondent respectfully requests that the petition for writ of habeas corpus be

3    denied with prejudice.

4

Dated:  December 13, 2013                          Respectfully Submitted,

5

KAMALA D. HARRIS
6                                                        Attorney General of California
DANE R. GILLETTE
7                                                        Chief Assistant Attorney General
GERALD A. ENGLER
8                                                        Senior Assistant Attorney General
ALICE B. LUSTRE
9                                                        Deputy Attorney General

10

/s/ Eric D. Share
11

ERIC D. SHARE
12                                                       Supervising Deputy Attorney General
*Attorneys for Respondent*
13    SF2011202695
40797811.doc
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

129

Answer to Petition for Writ of Habeas Corpus – *Dykes v. Chappell* (11-CV-04454-SI)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  **Ernest Edward Dykes v. Kevin Chappell, Warden of San Quentin State Prison**

No.:  **11-CV-04454-SI**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On December 13, 2013, I served the attached

## ANSWER TO PETITION FOR WRIT OF HABEAS CORPUS

by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

California Appellate Project
Federal Court Docketing
101 Second Street, Suite 600
San Francisco, CA 94105-3647

Habeas Corpus Resource Center
303 Second Street, Suite 400 South
San Francisco, CA 94107

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 13, 2013, at San Francisco, California.

| J. Wong | /s/ J. Wong |
|---------|-------------|
| Declarant | Signature |

SF2011202695
40839925.doc