Michael Laurence (Bar No. 121854)
Cliona Plunkett (Bar No. 256648)
HABEAS CORPUS RESOURCE CENTER
303 Second Street, Suite 400 South
San Francisco, California 94107
Telephone:   (415) 348-3800
Facsimile:   (415) 348-3873
E-mail:       MLaurence@hcrc.ca.gov
              docketing@hcrc.ca.gov

Attorneys for Petitioner Ernest DeWayne Jones

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST DEWAYNE JONES,<br><br>                    Petitioner,<br><br>        v.<br><br><br>KEVIN CHAPPELL, Warden of California State Prison at San Quentin,<br><br>                    Respondent. | Case No. CV-09-2158-CJC<br><br>**DEATH PENALTY CASE**<br><br><br>**PETITIONER'S OPENING BRIEF ON CLAIM 27** |

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iii

Introduction ........................................................................................... 1

I.  The Resolution of Mr. Jones's Case Has Been, and Will Be,
    Unconscionably Delayed Because the California Death Penalty
    System Is Dysfunctional. .................................................................. 2

    A.  The California Death Penalty System Is Dysfunctional. ........... 5

        1.  Delays in the Appointment of Counsel. ............................ 5

        2.  Delays in State Court Review of Capital Judgments ......... 6

    B.  Defects in the State Process Have Produced Inordinate Delays
        in Federal Review of California Capital Cases ......................... 8

        1.  The State Fails to Provide Sufficient Resources for Habeas
            Corpus Counsel to Investigate and Present Potentially
            Meritorious Claims ......................................................... 9

        2.  The California Supreme Court's Failure to Review
            Judgments Adequately .................................................... 13

II. Mr. Jones's Execution Following Decades of Incarceration Under
    a Death Sentence Would Satisfy Neither of the Penological
    Objectives Deemed Essential to Overcome the Eighth Amendment
    Prohibition of Cruel and Unusual Punishment ............................... 16

    A.  Eighth Amendment Limitations on Punishment ...................... 16

    B.  Specific Penological Justifications for Execution ................... 18

        1.  Retribution ................................................................... 19

        2.  Deterrence .................................................................... 22

III. The Conditions of Confinement to Which Mr. Jones Is Subjected
     While Awaiting the Execution of His Sentence, as Well as the
     Uncertainties Surrounding His Execution, Constitute Torture in
     Violation of the Eighth Amendment. ............................................ 25

i

A.  The Conditions of Confinement on California's Death Row
    Are Physically and Psychologically Torturous. .........................26

    1.  Physical Conditions on East Block. ................................26

    2.  Isolation .........................................................29

    3.  Deficiencies in Medical and Psychiatric Treatment .........30

    4.  Long Periods of Confinement Under These Conditions
        Constitute Debilitating Psychological Torture .................31

B.  The Many Uncertainties Inherent in California's Death Penalty
    Scheme Render Mr. Jones's Years of Confinement Under
    Sentence of Death Psychologically Torturous. .......................35

    1.  The Uncertainty of the Duration of Mr. Jones's
        Confinement Under Sentence of Death Prior to Execution
        or to the Grant of Guilt and/or Penalty Relief Renders His
        Confinement Psychologically Torturous............................36

    2.  The Uncertainty and Years of Lack of Resolution
        Regarding the Method by Which Mr. Jones Will Be
        Executed, and the Real Possibility That the Method Will
        Result in a Painful Death, Renders Mr. Jones's
        Confinement Under Sentence of Death Psychologically
        Torturous. ......................................................37

    3.  Uncertainty Whether or Not Mr. Jones Will Be Executed by
        Any Execution Method, at Any Time, Renders Mr. Jones's
        Confinement Under Sentence of Death Intolerable for Both
        Mr. Jones and the State. ........................................41

IV.  Mr. Jones's Execution Would Violate the Equal Protection Clause
     Because California Unlawfully Penalizes Those Who Seek Review
     of a Capital Conviction With Indefinite Incarceration and
     Inordinate Delay...................................................42

Conclusion .............................................................477

# TABLE OF AUTHORITIES

**Cases ...................................................................................................... Page(s)**

*Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 345 (2002)....................................................................................................18

*Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 106 S. Ct. 2317, 90 L. Ed. 2d 899 (1986)..............................................................44

*Barnett v. Super. Ct.*, 50 Cal. 4th 890, 114 Cal. Rptr. 3d 576 (2010)....................12

*Blumberg v. Garcia*, 687 F. Supp. 2d 1074 (C.D. Cal. 2010)................................44

*Bounds v. Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977) ...........................................................................................................43

*Brown v. Plata*, __ U.S. __, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011)....................................................................................................30

*Ceja v. Stewart*, 134 F.3d 1368 (9th Cir. 1998) ..................................................25

*City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985).............................................................46

*Coker v. Georgia*, 433 U.S. 584, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977)....................................................................................................19

*Coleman v. Balkcom*, 451 U.S. 949, 101 S. Ct. 2994, 68 L. Ed. 2d 334 (1981)..............................................................................................21, 33

*Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995)...............................27, 31

*Commonwealth v. O'Neal*, 339 N.E.2d 676 (Mass. 1975) (Tauro, J., concurring)....................................................................................33

*District Attorney v. Watson*, 411 N.E.2d 1274 (Mass. 1980) ................................32

*Durdines v. Super. Ct.*, 76 Cal. App. 4th 247, 90 Cal. Rptr. 2d 217 (1999)....................................................................................................11

*Elledge v. Florida*, 525 US 944, 119 S. Ct. 366, 142 L. Ed. 2d 303 (1998)..............................................................................................25, 43

*Estelle v. Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976) ........................................................................................26

*Fierro v. Gomez*, 865 F. Supp. 1387 (N.D. Cal. 1994) ........................38

*Francois v. State*, 407 So. 2d 885 (Fla. 1981) ...................................37

*Furman v. Georgia*, 408 U.S. 238, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) ................................................................................... *passim*

*Gomez v. Fierro*, 519 U.S. 918, 117 S. Ct. 285, 136 L. Ed. 2d 204 (1996) ........................................................................................23

*Gregg v. Georgia*, 428 U.S. 153, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976) ................................................................................... *passim*

*Griffin v. Harrington*, 915 F. Supp. 2d 1091 (C.D. Cal. 2012)...........44

*Griffin v. Illinois*, 351 U.S. 12, 76 S. Ct. 585, 100 L. Ed. 891 (1956)...................42

*Hutto v. Finney*, 437 U.S. 678, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978) ........................................................................................26

*Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073 (9th Cir. 2003) .........................................................................................44

*Johnson v. Bredesen*, 558 U.S. 1067, 130 S. Ct. 541, 175 L. Ed. 2d 552 (2009)..................................................................................21

*Jones v. State*, 740 So. 2d 520 (Fla. 1999) .........................................43

*In re Kemmler*, 136 U.S. 436, 10 S. Ct. 930, 34 L. Ed. 519 (1890).......................34

*Kennedy v. Louisiana*, 554 U.S. 407, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008)..................................................................................18

*Ex parte Key*, 891 So. 2d 384 (Ala. 2004)..........................................36

*Knight v. Florida*, 528 U.S. 990, 120 S. Ct. 459, 145 L. Ed. 2d 370 (1999) ........................................................................................25

*Lackey v. Texas*, 514 U.S. 1045, 115 S. Ct. 1421, 131 L. Ed. 2d 304 (1995) ........................................................................................25

*Lisker v. Knowles*, 651 F. Supp. 2d 1097 (C.D. Cal. 2009) ..................44

iv

*In re Lucas*, 33 Cal. 4th 682, 122 Cal. Rptr. 2d 374 (2004) ...................................10

*In re Medley*, 134 U.S. 160, 10 S. Ct. 384, 33 L. Ed. 835 (1890).....................32, 34

*Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006)........................................38

*In re Morgan*, 50 Cal. 4th 932, 237 P.3d 993 (2010)........................................8, 21

*O'Neill v. Vermont*, 144 U.S. 323, 12 S. Ct. 693, 36 L. Ed. 450 (1892) ...............17

*People v. Anderson*, 6 Cal. 3d 628 (1972)..................................................................32

*People v. Chessman*, 52 Cal. 2d 467 (1979) ..............................................................32

*People v. Duvall*, 9 Cal. 4th 464, 37 Cal. Rptr. 2d 259 (1995).............................13

*People v. Romero*, 8 Cal. 4th 728, 35 Cal. Rptr. 2d 270 (1994) ...........................13

*People v. Simms,* 736 N.E.2d 1092 (Ill. 2000) ........................................................22

*Phillips v. Vasquez,* 56 F.3d 1030 (9th Cir. 1995) ................................................42

*Plata v. Brown*, Case No. C-01-1351 TEH (N.D. Cal.) .........................................27

*Rhodes v. Chapman*, 452 U.S. 337, 101 S. Ct. 2392, 69 L. Ed. 2d 59
      (1981)...........................................................................................................26

*Rinaldi v. Yeager*, 384 U.S. 305, 86 S. Ct. 1497, 16 L. Ed. 2d 577
      (1966)...........................................................................................................43

*Rivers v. State*, 298 S.E.2d 1 (Ga. 1982) ................................................................37

*Romer v. Evans*, 517 U.S. 620, 116 S. Ct. 1620, 134 L. Ed. 2d 855
      (1996)...........................................................................................................45

*Roper v. Simmons*, 543 U.S. 551, 125 S. Ct. 1183, 161 L. Ed. 2d 1
      (2005)...........................................................................................................18

*Sims v. Dep't of Corrections and Rehabilitation*, 216 Cal. App. 4th
      1059, 157 Cal. Rptr. 3d 409 (2013)...........................................................37

*Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed. 2d 340
      (1984)...........................................................................................................19

*State v. Cropper*, 225 P.3d 579 (Ariz. 2010)...........................................................36

v

*State v. Hamlet*, 321 S.E.2d 837 (N.C. 1984)..........................................................36

*In re Steele*, 32 Cal. 4th 682, 10 Cal. Rptr. 3d 536 (2004) ....................................11

*Thompson v. Enomoto*, 815 F.2d 1323 (9th Cir. 1987).............................................26

*Thompson v. McNeil*, 129 S. Ct. 1299, 129 S. Ct. 1299 (2009)......................25, 27

*Toussaint v. McCarthy*, 597 F. Supp. 1388 (N.D. Cal. 1984)................................27

*Trop v. Dulles*, 356 U.S. 86, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958) ................21, 31

*United States v. Windsor*, __ U.S. __, 133 S. Ct. 2675, 186 L. Ed. 2d
     808 (2013).............................................................................................44

*Weems v. United States*, 217 U.S. 349, 30 S. Ct. 544, 54 L. Ed. 793
     (1910).......................................................................................................16

*Williams v. New York*, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337
     (1949).......................................................................................................19

**Statutes**

Cal. Gov't Code § 68662.............................................................................................21

Cal. Gov't Code § 68666(b) .......................................................................................10

Cal. Penal Code § 1054.9 ..........................................................................................11

Cal. Penal Code § 1484 ............................................................................................11

Cal. Penal Code § 3604 ............................................................................................37

Tenn. Code Ann. § 40-23-114 (May 22, 2014)........................................................39

**Other Authorities**

Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the
     Voters?: A Roadmap to Mend or End the California Legislature's
     Multi-Billion-Dollar Debacle*, 44 Loy. L.A. L. Rev. S41  (2011)..............10, 15

Arthur L. Alarcón, *Remedies for California's Death Penalty
Deadlock*, 80 S. Cal. L. Rev. 697 (2007)
     .........................................................................................................3, 12, 22

Clinton T. Duffy, *Eighty-Eight Men and Two Women* 254 (1962).........................32

Craig Haney & Philip Zimbardo, *The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment*, 33 Am. Psychologist 709 (1998) ...................................................................31

Alex Kozinski & Sean Gallagher, *Death: The Ultimate Run-On Sentence*, 46 Case W. Res. L. Rev. 1 (1995) .........................................21

Terry A. Kupers, *Trauma and its Sequelae in Male Prisoners: Effects of Confinement, Overcrowding, and Diminished Services*, 66 Am. J. Orthopsychiatry 189 (1996) ....................................................................30

Lewis Powell, *Capital Punishment*, 102 Harv. L. Rev. 1035 (1989) ....................22

Radelet & Lacock, *Recent Developments: Do Executions Lower Homicide Rates?: The Views of Leading Criminologists*, 99 J. Crim. L. & Criminology 489 (2009) .......................................................24

Angela Sun, Note, *"Killing Time" in the Shadow of Death: Why Systematic Preexecution Delays on Death Row are Cruel and Unusual*, 113 Colum. L. Rev. 1585 (2013) ................................................36

# INTRODUCTION

On April 10, 2014, this Court ordered the parties to brief issues relating to Claim 27.  Order re: Briefing and Settlement Discussions, ECF No. 103 (Apr. 10, 2014).[1]  In the order, this Court noted that the "long delays in execution of sentence in this and other California death penalty cases" – which undermine the stated purposes for capital punishment – and the uncertainty of whether Mr. Jones will ever be executed are "intolerable."  ECF No. 103 at 1, 4.

Mr. Jones has spent nineteen years awaiting final review of his conviction and sentence of death because California's death penalty system is dysfunctional.  Moreover, because California's appellate and postconviction review process fails to correct constitutional errors in capital cases, Mr. Jones will spend several more years litigating his convictions and sentences in this Court and on appeal.  At the end of this lengthy process, this Court likely will grant Mr. Jones a new trial, as the federal courts have done in the majority of California capital habeas corpus proceedings.  Even should the state prevail in these proceedings, the state's inability to create a lawful execution procedure renders it gravely uncertain when or whether Mr. Jones's execution will ever be conducted.  California's appellate and post-conviction process thus has failed to provide Mr. Jones with a full, fair, and timely review of his conviction and sentence, his confinement is rendered unnecessarily lengthy, torturous, and inhumane, and his execution is unconstitutional.

---

[1]   The Court also ordered the parties to meet and confer to discuss "whether mediation or settlement discussions would be appropriate."  ECF No. 103 at 5.  As explained the in the Joint Statement re: Mediation and Settlement, petitioner believes that such discussions are appropriate.  ECF. No. 106 at 2.  Respondent, however, has declined to discuss possible settlement of the case.  *Id.*

# I.   THE RESOLUTION OF MR. JONES'S CASE HAS BEEN, AND WILL BE, UNCONSCIONABLY DELAYED BECAUSE THE CALIFORNIA DEATH PENALTY SYSTEM IS DYSFUNCTIONAL.

In August 1992, Mr. Jones – then twenty-eight years old – was arrested and charged with capital murder.  1 Clerk's Transcript (CT) 87-89; Exhibits to Petition of Writ of Habeas Corpus, Notice Of Lodging (NOL) at C.2, Ex. 26 at 268.  He was formally sentenced to death on April 2, 1995, and the review process of his judgment began.  2 CT 504.  Over nineteen years later, judicial review of the constitutionality of his convictions and sentences continues and will continue for the foreseeable future.  After being in custody for almost twenty-two years, Mr. Jones will turn fifty years old on June 27, 2014.  Exhibits to Petition of Writ of Habeas Corpus, NOL at C.2, Ex. 26 at 268.

The extraordinary lengthy period of judicial review that Mr. Jones has experienced is typical of California death penalty cases.  Indeed, former California Supreme Court Chief Justice Ronald M. George described the state's mechanism for appellate and habeas corpus review of death judgments as "dysfunctional," a view endorsed by the bi-partisan California Commission on the Fair Administration of Justice.  California Commission on the Fair Administration of Justice, Report and Recommendation on the Administration of the Death Penalty in California (Gerald Uelmen ed. 2008) ("Commission Report"), attached as Exhibit (Ex.) 1 at 125.[2]  The Commission drew upon the seminal study conducted

---

[2]    The California Commission on the Fair Administration of Justice, created by Senate Resolution No. 44 of the 2003-04 Session of the California State Senate, extensively studied the administration of capital punishment in California and addressed many of the issues implicated by Claim 27.  The Commission was chaired by former Attorney General John K. Van de Kamp and was composed of a judge, prosecutors, criminal defense lawyers, elected officials, law enforcement officials, academicians, representatives of victims' organizations, and other concerned individuals.  After conducting three public hearings at which seventy-

*continued...*

2

by Senior Judge Arthur Alarcón,[3] to identify multiple defects in the California death penalty process. The Commission identified numerous defects, including the failure to adequately recruit and compensate counsel who are able and willing to accept appointments in appellate and habeas corpus proceedings, the prejudicial delays in the appointment of counsel, the California Supreme Court's inability to review the automatic appeals and habeas corpus proceedings in a timely fashion, and the inability to provide death-row inmates with an effective forum for litigating potentially meritorious claims, which increases the delay during federal judicial review.[4] Ex. 1 at 127-48.

As a result, the "elapsed time between judgment and execution in California

---

two individuals testified and considering voluminous documentation, the Commission in 2008 issued detailed and extensive recommendations to repair the flaws in California's death penalty system. The critical recommendations for addressing the delays in the administration of that system – expanding the pool of attorneys willing and qualified to accept appointments in capital cases, ensuring adequate resources for the adjudication of capital cases at the trial and post-conviction stages, and reducing the likelihood of constitutional errors – were unanimously approved by the Commissioners. Ex. 1 at 126-48. (In accordance with this Court's Local Rules, citation to the Report are to the page numbers affixed to the exhibit and not the internal pagination used by the Commission.)

[3]   Arthur L. Alarcón, *Remedies for California's Death Penalty Deadlock*, 80 S. Cal. L. Rev. 697 (2007).

[4]   The current California death penalty scheme is a product of Proposition 7, better known as the "Briggs Initiative," which superseded the 1977 death penalty statute. Ex. 1 at 120. The Commission noted that the Briggs Initiative "gives broad discretion to prosecutors to decide whether a homicide should be prosecuted as a death penalty case." Ex. 1 at 131 (noting that "87% of California's first-degree murders are 'death eligible'"); *see also* ECF No. 84 at 129-45 (describing the challenge to the California statute contained in Claim 24); ECF No. 100 at 238-44 (same). This broad discretion stands in sharp contrast to other states' statutes, *see, e.g.*, ECF No. 84 at 129-45, and "has opened the floodgates beyond the capacity of our judicial system," Ex. 1 at 149.

exceeds that of every other death penalty state," averaging over two decades for the handful of executions that have occurred in California. Ex. 1 at 125, 127. As the Commission noted, the time between sentencing and execution in California is misleadingly low because so few capitally sentenced defendants have been executed. Ex. 1 at 127. Moreover, as a result of the inherent defects in the system that continue to escalate, the time frame for carrying out executions undoubtedly will reach, and exceed, three decades from the imposition of sentence. Ex. 15 ¶5 (noting that there currently are 493 capital inmates whose judgment was imposed before June 9, 1994, and 318 whose judgment was imposed before June 9, 1989); *see also* Ex. 15 ¶15 (noting that the delay between sentencing and disposition of state habeas corpus petitions resolved between 2008 and 2014 was 17.2 years).

This systemic failure is a direct consequence of inadequacies in California's death penalty system and the state's inability or unwillingness to fund the system adequately to provide representation and court resources. As the Commission on the Fair Administration of Justice concluded, using "conservative figures," $232.7 million annually must be allocated to fund the current dysfunctional process, with a several-year phase-in plan. Ex. 1 at 158. Despite the publication of the Commission's findings in 2008, the Governor and the State Legislature have failed to allocate any additional funding to remedy the defects in the system, and the unconscionable delays have been exacerbated. Ex. 15 ¶3.[5]

---

[5] Initiative efforts to remedy the dysfunctional system similarly have failed. In November 2012, Proposition 34, which would have abolished capital punishment in California, failed by a narrow margin. *See* California Secretary of State, State Ballot Measures, 2012 General Election Results (available at http://www.sos.ca.gov/elections/sov/2012-general/15-ballot-measures.pdf) (last visited June 9, 2014). In December 2013, death proponents sought to qualify an initiative on the November 2014 ballot that would have imposed severe and unworkable limitations on the presentation and review of challenges to capital judgments, but were unsuccessful in gaining sufficient signatures to qualify the

*continued...*

## A. The California Death Penalty System Is Dysfunctional.

### 1. Delays in the Appointment of Counsel.

Mr. Jones experienced substantial delays in the appointment of counsel to represent him in his automatic appeal and habeas corpus proceedings.  On April 13, 1999, more than four years after judgment was imposed, the California Supreme Court appointed counsel to represent Mr. Jones in his automatic appeal.  On October 20, 2000, over five years after Mr. Jones was sentenced to death, the California Supreme Court appointed the Habeas Corpus Resource Center to represent him in state habeas corpus proceedings.

The delay in appointment of counsel for Mr. Jones is typical of the California process.  The Commission concluded that approximately three to five years elapses after judgment is imposed before direct appeal counsel is appointed and eight to ten years elapses before the appointment of habeas corpus counsel.  Ex. 1 at 133.  Since the Commission's Report, the backlog in the appointment of counsel and the resulting delay have increased exponentially, particularly with respect to the appointment of habeas corpus counsel.  As of June 9, 2014, there were 70 condemned prisoners without counsel for the appellate proceedings in the California Supreme Court and 352 individuals without habeas corpus counsel.[6]  Ex. 15 ¶7 & Table/Figure 1.  On average, the 77 inmates whose direct appeals are concluded and who lack habeas corpus counsel have waited 15.81 years after their

---

measure for the ballot.  *See, e.g.*, California Death-Penalty Reform Initiative Pushed to 2016, KCRA.com, May 10, 2014 (available at http://www.kcra.com/news/local-news/news-sacramento/calif-deathpenalty-reform-initiative-pushed-to-2016/25914676#!WEqHc) (last visited June 9, 2014).

[6]  At the time that Mr. Jones was appointed habeas corpus counsel in 2000, there were approximately 215 inmates on California's death row without habeas corpus counsel.  Ex. 15 ¶6.

5

sentencing, still to be without the appointment of habeas corpus counsel; 160 inmates have been without habeas corpus counsel for more than ten years, and one inmate continues to lack counsel despite being sentenced in 1992, almost 24 years ago. Ex. 15 ¶8.[7]

The Commission on the Fair Administration of Justice unanimously found that backlog and delays in the appointment of counsel to handle capital cases were attributable to the failure to provide sufficient funding to expand agency counsel, or to fully compensate private attorneys in a manner that allows them to provide representation that complies with their ethical obligations to their clients. Ex. 1 at 127-28, 145-48. Because of the dearth of private counsel, the Commission found that the only means of eliminating the backlog of unrepresented inmates was to expand the HCRC with a five-fold increase in its annual state budget. Ex. 1 at 127, 146-47. In contrast to the Commission's recommendations, however, the reality is that after sustaining several years of reductions, the HCRC's annual budget has decreased to $12.7 million, and the office lacks funding to fully staff its legislatively established attorney positions.

### 2. Delays in State Court Review of Capital Judgments

The Commission found that there were substantial delays in the California

---

[7] The number of cases without habeas corpus counsel increases yearly because appointments do not keep pace with the number of new judgments of death and the need to replace private habeas corpus counsel who are unable to continue representation. Over the past five years, the State has averaged 22 death judgments per year, while over the same time period, there has been an average of 10 annual appointments to represent death-row inmates in their habeas corpus proceedings. Ex. 15 ¶9. Adding to the backlog of inmates without counsel is the need to replace counsel who withdrew from representation before the habeas corpus proceedings were completed. Since 2003, of the 192 cases in which habeas corpus petitions have been filed, 40 petitioners lost their initially appointed private counsel and required replacement counsel – a replacement rate of 21 percent. . Ex. 15 ¶10.

Supreme Court's resolution of direct appeals and habeas corpus proceedings in capital cases. Ex. 1 at 133-34. The Commission noted that there was "a backlog of 80 fully briefed automatic appeals in the death cases awaiting argument" and that the delay "averages 2.25 years." Ex. 1 at 133. The Commission similarly noted that the "California Supreme Court currently has 100 fully briefed habeas corpus petitions awaiting decision" and "there is now an average delay of 22 months between the filing of the petition and the decision of the California Supreme Court." Ex. 1 at 133-34.

In Mr. Jones's case, the delay was substantially greater than the Commission identified. Mr. Jones filed his petition in the California Supreme Court on October 21, 2002,[8] and informal briefing was completed on December 8, 2003.[9] Six-and-a-half years after the filing of the petition and sixty-three months after the briefing was completed, the California Supreme Court denied the petition on March 11, 2009, without conducting an evidentiary hearing or issuing a published decision.

---

[8]    At the time of filing the state petition, the California Supreme Court's policies provided that Mr. Jones's petition would be considered timely if it was filed two years from the date of appointment of counsel. The California Supreme Court has since determined that the minimum amount of time required to investigate and present legally sufficient challenges to a petitioner's conviction, sentence, and confinement is three years. Supreme Court Policies Regarding Cases Arising from Judgments of Death, Policy 3 Timeliness Standard 1-1.1 (as amended Nov. 30, 2005) (available at http://www.courts.ca.gov/documents/ PoliciesMar2012.pdf) (last visited June 9, 2014).

[9]    California law authorizes a court to request that the state file an "informal response" to a habeas corpus petition; if the court requests an informal response, the petitioner is entitled to file a reply. Cal. R. Ct. 4.551(b)(1) & (2) (West 2014). The time taken to complete the informal briefing in Mr. Jones's case was typical of other capital cases. For those petitions filed in 2004 – the same year that Mr. Jones filed his petition – respondent took an average of .53 years to file the informal response and petitioners took an average of .69 years to file the reply. Ex. 15 ¶12.

The California Supreme Court's delay in resolving Mr. Jones's petition was well above the 22 month average cited by the Commission and the 45 month average that the court took to resolve the other capital habeas petitions filed in 2004. The California Supreme Court's decision came over 14 years after Mr. Jones was sentenced to death.

Moreover, the California Supreme Court's delay in resolving capital habeas corpus petitions has substantially increased since the Commission's Report. The California Supreme Court currently has 176 pending capital habeas cases, with an average pending time of 4.07 years.[10] Ex. 15 ¶13. Of those cases, 107 have been fully briefed awaiting decision for an average of 4.16 years (or 50 months) since the reply to the informal response was filed. Ex. 15 ¶13 & Table/Figure 2. For the 68 capital habeas corpus petitions that the California Supreme Court *has* resolved from 2008 through the filing of this Brief, the delay is equally staggering. The average time between the completion of briefing and the California Supreme Court's decision is 3.98 years, or 47.8 months. Ex. 15 ¶14. Thus, the Supreme Court's delay in resolving capital habeas petitions has more than doubled in the six years since the Commission Report.

## B. Defects in the State Process Have Produced Inordinate Delays in Federal Review of California Capital Cases.

The delay directly attributable to the state's refusal to provide sufficient counsel and judicial resources to review capital judgments is crippling  This and the state's other defects have created substantially greater delays in federal review of these cases. As early as 1999, researchers identified the costs to the federal

---

[10]   This number excludes initial petitions that the California Supreme Court permits to be filed to toll the federal statute of limitations period while the court locates counsel willing to accept an appointment, counsel files an amended petition within the court's timeliness policies, and the court resolves the amended petition. *See, e.g.*, *In re Morgan*, 50 Cal. 4th 932, 237 P.3d 993 (2010).

judiciary resulting from the failure of the California system to fund and resolve challenges to death penalty judgments.  The Administrative Office of the United States Courts commissioned PriceWaterhouseCooper to examine the extraordinarily high federal cost of review of California capital cases. Ex. 12.  The findings demonstrate the effect that California's "perfunctory post-conviction process" has on the federal judiciary. Ex. 12 at 423; *see also* Ex. 12 at 492 (noting that "California has unique factors contributing to habeas petition and evidentiary hearing costs [in capital habeas corpus proceedings] that are not common to the other Ninth Circuit states"); Ex. 12 at 508 (noting that part of the significant cost-differential before California capital cases and federal court and non-California cases "may be due to the new discovery and investigation at the federal level overlooked at the state post-conviction level").

### 1. The State Fails to Provide Sufficient Resources for Habeas Corpus Counsel to Investigate and Present Potentially Meritorious Claims.

The Commission on the Fair Administration of Justice found that the state's death penalty system fails to adequately fund counsel in a manner that satisfies the American Bar Association guidelines and fully compensate attorneys for their work. Ex. 1 at 146.  Under California Supreme Court guidelines, private counsel may choose one of two means of compensation:  a time-and-cost basis or a fixed fee rate.  *Payment Guidelines for Appointed Counsel Representing Indigent Criminal Appellants in the California Supreme Court*; *Guidelines for Fixed Fee Appointments, on Optional Basis, to Automatic Appeals and Related Habeas Corpus Proceedings in the California Supreme Court*.[11]  Under the first system, attorneys are compensated at a rate of $145 per allowable hour, but counsel are subject to unrealistic "allowable hours benchmarks," limiting the number of hours

---

[11]   The guidelines are available on the Court's website: http://www.courts .ca.gov/documents/PoliciesMar2012.pdf (last visited June 9, 2014).

that can be spent on client communication, record review, and petition preparation. *Payment Guidelines for Appointed Counsel Representing Indigent Criminal Appellants in the California Supreme Court,* Parts II.A, II.I.3(ii).   Private appointed habeas counsel who choose to be compensated on a fixed fee and expense basis are assigned one of three categories, ranging from $85,000 to $127,000, depending on factors relating to the size of the record and nature of the case. *See Guidelines for Fixed Fee Appointments, on Optional Basis, to Automatic Appeals and Related Habeas Corpus Proceedings in the California Supreme Court*.   These fees include any assistance by second counsel and all incidental expenses (other than for habeas corpus investigation) incurred during the representation. *Guidelines for Fixed Fee Appointments*, Guideline 2.   Under both payment plans, compensation rates for services of investigators and experts are strictly limited, *id*. at Part III.C.7.a., with a maximum of $50,000. *Id*.; Cal. Gov't Code § 68666(b) ("The Supreme Court may set a guideline limitation on investigative and other expenses allowable for counsel to adequately investigate and present collateral claims of up to fifty thousand dollars ($50,000) without an order to show cause.").

These hourly benchmarks and payments fall far short of the actual costs necessary to adequately perform the work that is ethically required in habeas corpus cases.   The Commission Report noted that in a successful habeas petition in *In re Lucas*, 33 Cal. 4th 682, 122 Cal. Rptr. 2d 374 (2004), the law firm of Cooley Godward LLP provided 8,000 hours of pro bono attorney time, 7,000 hours of paralegal time, and litigation expenses of $328,000.   Ex. 1 at 146 n.71.   Other estimates of how much adequate investigation costs range from $250,000 to $300,000 – again, far above the $50,000 permitted by statute.   Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or*

*End the California Legislature's Multi-Billion-Dollar Debacle,* 44 Loy. L.A. L. Rev. S41, S621 n.624 (2011).[12]

In addition to lacking sufficient funding to conduct an adequate investigation in state habeas corpus proceedings, condemned inmates are hampered in their ability to develop the factual predicate of their claims. Absent the issuance of an order to show cause, California petitioners lack the power to issue subpoenas and compel witness testimony. Cal. Penal Code § 1484 (West 2014); *Durdines v. Super. Ct.*, 76 Cal. App. 4th 247, 252, 90 Cal. Rptr. 2d 217 (1999) (holding that the court lacked power to solicit trial counsel's declaration before the issuance of a writ or an order to show cause). Thus, the primary mechanism for postconviction discovery is California Penal Code section 1054.9. Section 1054.9 provides that, prior to filing their state habeas petitions, capital petitioners shall have reasonable access to materials they would have been entitled to receive at the time of trial, to the extent that such materials are currently in the possession of the prosecution or law enforcement authorities who were involved in the investigation or prosecution of the case. Cal. Penal Code § 1054.9 (West 2014); *In re Steele*, 32 Cal. 4th 682, 697, 10 Cal. Rptr. 3d 536 (2004). However, California courts – including the state Supreme Court – have limited the scope of available discovery by means of procedural hurdles that are frequently impossible

---

[12] The fact that these hours and expenses are necessary has been made clear under guidelines issued by the federal courts, the American Bar Association, and case law mandating a full investigation of all potentially meritorious issues. *See* American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 10.15.1 (Revised Edition, Feb. 2003) (ABA Guidelines) (requiring postconviction counsel to litigate all arguably meritorious issues, present issues in a manner to preserve them for subsequent review, and aggressively investigate "all aspects of the case"); *see also* ABA Guideline 10.7 (Investigation); ABA Guideline 10.8 (The Duty to Assert Legal Claims).

1    for petitioners to surmount.

2           Chief among these limitations is the California Supreme Court's mandate

3    that petitioners are not entitled to receive material that would have been

4    discoverable at trial, but which has never been disclosed, unless they are able to

5    demonstrate a basis to believe that the material exists (or existed at trial).  *Barnett*

6    *v. Super. Ct.*, 50 Cal. 4th 890, 901, 114 Cal. Rptr. 3d 576 (2010).  In this way,

7    postconviction discovery in California capital cases is determined by fiat of a

8    guessing game.  Petitioners can access discoverable material only to the extent that

9    habeas counsel is able to divine sufficient clues to the existence of material that

10   neither their counsel nor they have ever seen, but to which they would

11   unquestionably be entitled under the discovery rules were the material's existence

12   known to them.

13          As a result of these financial and discovery limitations, capital habeas

14   corpus petitioners in California initiate federal habeas corpus litigation without

15   having fully developed all potentially meritorious claims in state court.  Instead,

16   such claims can be developed in the first instance only after death-row inmates

17   have access to federal resources.  For its part, the California Attorney General's

18   Office routinely has insisted that habeas corpus petitioners return to the California

19   Supreme Court to exhaust state remedies.  *See, e.g.*, Ex. 12 at 422 (noting that the

20   "strategy of the California Attorney General's Office in litigating claims [by

21   raising non-exhaustion] is believed to have a major impact on the costs of cases in

22   California"); Ex. 12 at 424 (noting that attorneys report that "the California

23   Attorney General's Office will rarely waive the exhaustion defense").  Since 1978,

24   condemned inmates have filed 267 exhaustion petitions in the California Supreme

25   Court, and the average time that the inmate remains in state court following the

26   filing of an exhaustion petition is 3.19 years.  Ex. 15 ¶16; *see also* Alarcón,

27   *Remedies for California Death Row Deadlock*, 80 S. Cal. L. Rev 697 at 736

28   (2007) (finding an average of three-year delay resulting from need "to exhaust

12

claims in seventy-four percent" of the federal habeas corpus cases).

**2. The California Supreme Court's Failure to Review Judgments Adequately.**

Unlike the practice of virtually all death-penalty states, the California Supreme Court resolves in the first instance habeas corpus petitions challenging capital judgments. Following the filing of a petition, California law requires the court to assume "the petition's factual allegations are true," and determine whether "the petitioner would be entitled to relief." *People v. Duvall*, 9 Cal. 4th 464, 474-75, 37 Cal. Rptr. 2d 259 (1995). When "a habeas corpus petition is sufficient on its face (that is, the petition states a prima facie case on a claim that is not procedurally barred), the court is obligated by statute to issue a writ of habeas corpus" or an order to show cause. *People v. Romero*, 8 Cal. 4th 728, 737-38, 35 Cal. Rptr. 2d 270 (1994). In practice, however, the California Supreme Court summarily denies the overwhelming majority of capital habeas corpus petitions without any explication of its reasoning after reviewing only the petition and, usually, the requested informal briefing. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev at 741; *see also* Ex. 1 at 145. According to the Commission's Report, the Supreme Court historically has issued orders to show cause in fewer than eight percent of habeas corpus proceedings, and held evidentiary hearings in less than five percent of the cases. Ex. 1 at 145; *see also* Judge Arthur L. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev. at 741.

Judge Alarcón explained the problems that these practices have on federal review of California death penalty cases:

> The absence of a developed factual record and an articulated analysis from the California Supreme Court regarding the reasons for denying relief can contribute to lengthier delays when the prisoner seeks relief in federal court or in subsequent state habeas

proceedings. As a result of its overwhelming backlog of death penalty cases and its duty to review civil and other criminal cases on appeal, the Supreme Court has been forced to reject the requests from federal judges in the Ninth Circuit asking that orders denying a petition for a writ of state habeas corpus spell out the reasons for the denial. Chief Justice Ronald George explained in response to an inquiry from U.S. Senator Dianne Feinstein "that drafting and reviewing an order containing more information than the basic ground for denying relief consumes far more time on the part of both staff and the justices, to the detriment of the court's performance of its responsibilities in noncapital cases." After receiving Chief Justice George's response, Senator Feinstein wrote to Governor Arnold Schwarzenegger requesting his assistance in addressing the problem of the "lengthy and unnecessary delays" in processing death penalty cases in California because of inadequate funding. Senator Feinstein concluded that "[t]he absence of a thorough explanation of the [California Supreme] Court's reasons for its habeas decisions often requires federal courts to essentially start each federal habeas death penalty appeal from scratch, wasting enormous time and resources."

Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev at 742-43 (footnotes omitted); *see also* Ex. 1 at 134 (noting that "much of this delay [in federal court] is attributable to the absence of a published opinion and/or an evidentiary hearing in the state courts. Often, the federal courts cannot ascertain why state relief was denied"). Moreover, the failure to resolve factual disputes in state court has compelled federal courts to expend substantial resources to ascertain the disputed facts, determine whether an evidentiary hearing is warranted, and conduct one if necessary. Ex. 1 at 160 ("The California Supreme

14

Court's summary denial of habeas petitions without evidentiary hearings and without any explanation of the reasons does not save time, since it adds to the delay in resolution of the inevitable subsequent federal habeas corpus claim.").

Critically, the California Supreme Court has failed to correct even the most obvious prejudicial errors in capital cases. Since 1978, the court has resolved the merits of 729 of the 1003 habeas corpus petitions filed by condemned inmates. Ex. 15 ¶17. Of the 729 cases, the court has issued orders to show cause in 99 cases (13.6%), and ordered evidentiary hearings in 45 cases (6.2%). Of these cases, the California Supreme Court has granted some form of relief in capital habeas corpus proceedings only eighteen times or in 2.5% of the cases it has resolved. Ex. 15 ¶17. In contrast, the Arizona Supreme Court "reverses two out of every five sentences it reviews." Ex. 14.

As a result, many years after the imposition of sentence, federal courts have been required to conduct constitutionally mandated scrutiny of capital judgments. Not surprisingly, given the California Supreme Court's failure to find and correct constitutional error, federal courts have granted relief in habeas corpus proceedings arising from California death judgments in a substantial majority of the cases reviewed. As reported by the Commission on the Fair Administration of Justice in 2008, "federal courts have rendered final judgment in 54 habeas corpus challenges to California death penalty judgments" and "[r]elief in the form of a new guilt trial or a new penalty hearing was granted in 38 of the cases, or 70%." Ex. 1 at 126. Between the 2008 publication of the Commission's report and an article on California's death penalty system authored by Judge Alarcón and Paula M. Mitchell in 2011, "federal habeas corpus relief has been granted in five additional cases, and denied in four additional cases, all of which are final judgments, making the rate at which relief has been granted 68.25%." Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to Mend or End the California Legislature's Multi-Billion-Dollar Debacle*, 44 Loy.

L.A. L. Rev. S41, S55 n.26 (2011).

## II.   MR. JONES'S EXECUTION FOLLOWING DECADES OF INCARCERATION UNDER A DEATH SENTENCE WOULD SATISFY NEITHER OF THE PENOLOGICAL OBJECTIVES DEEMED ESSENTIAL TO OVERCOME THE EIGHTH AMENDMENT PROHIBITION OF CRUEL AND UNUSUAL PUNISHMENT.

The psychological impact of Mr. Jones's decades-long confinement, conscious as he is of the state's declared intention to escort him from his cell and execute him at some indefinite future date, renders his protracted warehousing as a condemned man a punishment materially different from either the punishment of death or the punishment of life in prison without possibility of parole.  It is more likely that a condemned prisoner will die of natural or other causes than be executed by the state.  This statistical likelihood has transmuted a California death sentence into a sentence of life imprisonment with no possibility of parole but slight possibility of execution.  California has never enacted such a Damoclean penalty, neither could it do so.  The de facto existence of this third penalty gives rise to two distinct constitutional violations: execution of a death sentence following decades-long incarceration fails to serve the penological purposes that the Supreme Court has declared indispensible to justifying application of the death penalty without offense to the Eighth Amendment; and further, prolonged incarceration under the uncertain but unremitting threat of execution is torturous and constitutes cruel and unusual punishment within the meaning of the Eighth Amendment.

### A.   Eighth Amendment Limitations on Punishment

The determination that a specific punishment does not per se violate the Constitution does not exempt the manner in which that punishment is applied from

16

continued Eighth Amendment scrutiny. *See, e.g.*, *Weems v. United States*, 217 U.S. 349, 378, 30 S. Ct. 544, 54 L. Ed. 793 (1910) (noting importance of judicial deference to legislative power, "unless that power encounters in its exercise a constitutional prohibition. In such case, not our discretion, but our legal duty, strictly defined and imperative in its direction, is invoked."). Thus, for example, although the Eighth Amendment provides that the imposition of monetary fines is a constitutional exercise of state power, it also establishes that some fines may be unconstitutional. In finding that the Eighth Amendment does not in all circumstances prohibit execution as a sanction, the Supreme Court has repeatedly articulated the qualification that, in order to avoid the ban on cruel and unusual punishment, the penalty must serve some penological end that could not be otherwise accomplished. In Mr. Jones's case, it does not.

The primary concern of the Eighth Amendment is excessive punishment. *See, e.g.*, *O'Neill v. Vermont*, 144 U.S. 323, 340, 12 S. Ct. 693, 36 L. Ed. 450 (1892) ("The whole inhibition is against that which is excessive, either in the bail required, or fine imposed, or punishment inflicted."). Moreover, "[a] penalty must accord with 'the dignity of man,' which is 'the basic concept underlying the Eighth Amendment.' (Citation omitted.) This means, at least, that the punishment not be 'excessive.'" *Gregg v. Georgia*, 428 U.S. 153, 173, 96 S. Ct. 2909, 2929-30, 49 L. Ed. 2d 859 (1976) (plurality opinion).

In the capital context, such excesses may inhere in the infliction of pain and suffering of such extremity that civilized people cannot tolerate them. *See, e.g.*, *Furman v. Georgia*, 408 U.S. 238, 332, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Marshall, J., concurring). Punishment similarly offends the Eighth Amendment when it is inflicted in excess of what is necessary to achieve legitimate penological goals. *See, e.g.*, *Gregg*, 428 U.S. at 183 ("the sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering") (citing *Wilkerson v. Utah*, 99 U.S. 130, 135-36, 25 L. Ed. 345 (1878),

17

*In re Kemmler*, 136 U.S. 436, 436, 10 S. Ct. 930, 34 L. Ed. 519 (1890)); *Furman*, 408 U.S. at 280 (Brennan, J., concurring) (punishment is excessive within meaning of Punishments Clause if it "serves no penal purpose more effectively than a less severe punishment"); *Furman*, 408 U.S. at 312 (White, J., concurring) (finding that when death penalty ceases realistically to further social ends it was enacted to serve, it violates the Eighth Amendment, results in "pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes," and is "patently excessive and cruel and unusual punishment violative of the Eight Amendment"). As set forth above, the administration of capital punishment in California has evolved to make impossible the timely resolution of capital cases, retarding execution of sentence so extremely that long-delayed or never carried out executions frustrate rather than further the social ends they are required to serve. This state of affairs renders Mr. Jones's death sentence a violation of the Eighth Amendment.

## B. Specific Penological Justifications for Execution

The Court has stated that the imposition of the death penalty, in order to be constitutional, must further the penological goals of "retribution and deterrence of capital crimes by prospective offenders." *Gregg*, 428 U.S. at 183; *see also Roper v. Simmons*, 543 U.S. 551, 571, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005) ("We have held that there are two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes by prospective offenders.") (internal quotes omitted); *Kennedy v. Louisiana*, 554 U.S. 407, 441, 128 S. Ct. 2641, 171 L. Ed. 2d 525 (2008) ("capital punishment is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes."); *Atkins v. Virginia*, 536 U.S. 304, 318-19, 122 S. Ct. 2242, 153 L. Ed. 2d 345 (2002) (unless execution of intellectually disabled defendants measurably contributes to retribution or deterrence of prospective offenders, "it 'is nothing more than the

purposeless and needless imposition of pain and suffering' and hence an unconstitutional punishment") (quoting *Enmund v. Florida*, 458 U.S. 782, 798, 102 S. Ct. 3368, 73 L. Ed. 2d 1140 (1982)).[13]   To pass constitutional muster the penalty must advance these goals significantly or measurably; failure to satisfy either ground may suffice to render it unconstitutional.  *See Roper*, 543 U.S. at 571 (finding execution violative of Eighth Amendment where "it is unclear whether the death penalty has a significant or even measurable deterrent effect on juveniles"); *Atkins*, 536 U.S. at 318 (condemning execution as unconstitutional punishment unless it "measurably contributes" to one or both of the "recognized" goals of capital punishment); *Coker v. Georgia*, 433 U.S. 584, 592, 97 S. Ct. 2861, 53 L. Ed. 2d 982 (1977) (punishment is excessive if it makes no measurable contribution to acceptable goals of punishment – retribution and deterrence – and "might fail the test on either ground").  Because of the passage of time, Mr. Jones's execution, should it ever occur, will contribute to neither goal. Consequently his sentence violates the Eighth Amendment.

### 1. Retribution

The *Gregg* Court cited earlier precedent establishing that "[r]etribution is no longer the dominant objective of the criminal law," *Williams v. New York*, 337 U.S. 241, 248, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949), but found retribution to be neither a "forbidden objective" in criminal sentencing, "nor one inconsistent with our respect for the dignity of men," *Gregg*, 428 U.S. at 183.  Regardless of its status in criminal punishment generally, the Court subsequently identified

---

[13]   Various members of the Court have occasionally discussed other possible social benefits of execution, such as the prevention of repetitive criminal acts, encouragement of guilty pleas and confessions, eugenics, and economy.  Some of these goals are manifestly unconstitutional.  *See, e.g., Furman,* 408 U.S. at 342, 355-56 (Marshall, J., concurring).  None has ever been found sufficient to justify the sanction of death.

retribution as "the primary rationale for imposing the death penalty." *Spaziano v. Florida*, 468 U.S. 447, 461, 104 S. Ct. 3154, 82 L. Ed. 2d 340 (1984).

The Supreme Court regularly describes retribution as justification for execution in terms of social morality: "In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct." *Gregg* at 183. The need to express such outrage is said to be primal: "The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law." *Furman* at 308 (Stewart, J., concurring). Extreme punishment that fails to fulfill the appropriately retributive purpose of giving voice to the moral outrage of the community, however, may devolve into primitive expressions of rage, vengeance, and retaliation forbidden by the Eighth Amendment. "The 'cruel and unusual' language limits the avenues through which vengeance can be channeled. Were this not so, the language would be empty and a return to the rack and other tortures would be possible in a given case." *Furman*, 408 U.S. at 345 (Marshall, J., concurring).

Although *Furman* and *Gregg* concerned "capital punishment," the specific element of capital punishment under consideration in these cases was execution per se, *i.e.*, the question of whether the Eight Amendment forbade execution imposed pursuant to existing state statutes under any circumstances. As set forth above, however, the rubric "capital punishment" encompasses considerably more than execution – as practiced in California, it entails lengthy incarceration under threat of execution, sometimes, though seldom, followed by execution. The Court did not address the constitutionality of the entire system of capital punishment in *Furman* or *Gregg*, and questions relating to eligibility criteria, methods of execution, and the effect of protracted incarceration on the continued constitutional legitimacy of a given execution remain matters governed by the same clearly established Eighth Amendment strictures on the imposition of cruel

and unusual punishment that governed the results in *Furman* and *Gregg*.

The "evolving standards of decency that mark the progress of a maturing society" from which the Eighth Amendment derives its meaning, *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 2 L. Ed. 2d 630 (1958), encompass society's considerable interest in ensuring that no human be executed in violation of the law. The California Supreme Court has acknowledged that the state's process of postconviction review is in place to protect California's state interest in safeguarding the rights of capital defendants by ensuring compliance with the Constitution and the correctness of procedures resulting in sentences of death as set forth in California Government Code section 68662. *See In re Morgan*, 50 Cal. 4th 932, 941 n.7, 237 P.3d 993 (2010). Limitations on resources for the judicial review essential to the integrity of our system of capital punishment so lengthen the interval between the retributive impulse underlying the jury's initial expression of moral outrage and the final execution of sentence as to deprive that execution of its retributive character. Given current delays, an execution may not be carried out by the same generation of citizens that recommended the sentence, and may be carried out on a very different person than the one once adjudged to warrant it.

The degenerative effect of time on whatever retributive character an execution may have is so widely acknowledged and uncontroversial as to be axiomatic, as reflected in the often-uttered maxim "justice delayed is justice denied." *See Coleman v. Balkcom*, 451 U.S. 949, 960, 101 S. Ct. 2994, 68 L. Ed. 2d 334 (1981) (Rehnquist, C.J., dissenting from denial of certiorari) ("There can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution."); Alex Kozinski & Sean Gallagher, *Death: The Ultimate Run-On Sentence*, 46 Case W. Res. L. Rev. 1, 4 (1995) ("Whatever purposes the death penalty is said to serve – deterrence, retribution, assuaging the pain suffered by victims' families – these purposes are not served by the system as it now operates."); *Johnson v. Bredesen*, 558 U.S. 1067, 1069, 130 S. Ct. 541, 175 L. Ed.

2d 552 (2009) (Stephens, J., and Breyer, J., respecting the denial of certiorari) ("the penological justifications for the death penalty diminish as the delay lengthens"); Lewis Powell, *Capital Punishment*, 102 Harv. L. Rev. 1035, 1041 (1989) ("The retributive value of the penalty is diminished as imposition of sentence becomes ever further removed from the time of the offense.").

Beyond failing to "significantly" or "measurably" further the recognized goals of capital punishment as the cases require, execution following protracted incarceration may affirmatively undermine them. *See, e.g.*, *People v. Simms,* 736 N.E.2d 1092, 1144 (Ill. 2000) (Harrison, J., dissenting) ("Retribution and deterrence, the two principal social purposes of capital punishment, carry less and less force" after substantial delay); Judge Arthur L. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev. 697, 709 (2007) ("Inordinate delays . . . undermine the stated purposes of having the death penalty, namely retribution and deterrence."); Carol S. Steiker & Jordan M. Steiker, *Entrenchment and/or Stabilization: Reflections on (Another) Two Decades of Constitutional Regulation of Capital Punishment*, 30 Law And Inequality 211, 230-31 (2012) ("Deterrence is attenuated when it is widely understood that an execution will not occur until many years after sentence, if at all.  Moreover, the retributive value of executions is diminished when the person executed has lived a 'second lifetime' on death row.").  Thus, Mr. Jones's execution will not fulfill the purposes the Supreme Court has declared essential for capital punishment to be constitutional – it will, rather, subvert them.

### 2.  Deterrence

The *Gregg* Court stated that, as of the time of its decision in 1976, evidence relating to the deterrent effect of execution was equivocal.  "Statistical attempts to evaluate the worth of the death penalty as a deterrent to crimes by potential offenders have occasioned a great deal of debate.  The results simply have been inconclusive." *Gregg*, 428 U.S. at 184-85.  Justice Brennan noted in his *Furman*

concurrence that proponents of the view that capital punishment deterred potential offenders, "necessarily admit that its validity depends upon the existence of a system in which the punishment of death is invariably and swiftly imposed." *Furman*, 408 U.S. at 302 (Brennan, J., concurring). Justice Marshall similarly observed that, "[f]or capital punishment to deter anybody it . . . must . . . follow swiftly upon completion of the offense." *Id.* at 354 n.124 (Marshall, J., concurring). Whatever deterrent effect an execution may have, an execution that is never carried out can have none.

In the period between Mr. Jones's arrest and the time of this filing, ninety-two men have died on California's death row. Of that number, twelve were executed at San Quentin; fifty-seven died of natural causes; fifteen are known to have died of suicide; of the remaining eight, six died of various other causes and the cause of death remains unresolved for two. Ex. 13 at 627-29. Even attributing some deterrent effect to the executions carried out at San Quentin, eighty of the ninety-two deaths since Mr. Jones's arrival there were categorically incapable of furthering any such effect because those prisoners were not executed. Statistically, there is a roughly one-in-nine chance that a California death sentence might further the goal of deterrence – a disparity that will increase as the death row population ages and the process of developing an execution protocol in compliance with the law continues. A one-in-nine chance of execution is too small a percentage to render execution a meaningful deterrent or a constitutional punishment. *See Gomez v. Fierro*, 519 U.S. 918, 117 S. Ct. 285, 136 L. Ed. 2d 204 (1996) (Stevens, J., dissenting) (noting that delay in the execution of death judgments "frustrates the public interest in deterrence and eviscerates the only rational justification for that type of punishment").

An assessment of contemporary values concerning the infliction of a challenged sanction is relevant to the application of the Eighth Amendment, and "does not call for a subjective judgment. It requires, rather, that we look at

23

objective indicia that reflect the public attitude toward a given sanction." *Gregg*, 428 U.S. at 173. Public attitudes toward capital punishment have been monitored for decades. Public endorsement of deterrence as a justification for executions was dominant in the 1950s, and remained widespread through the 1970s. Radelet & Lacock, *Recent Developments: Do Executions Lower Homicide Rates?: The Views of Leading Criminologists*, 99 J. Crim. L. & Criminology 489, 492 (2009). The proportion of Gallup Poll respondents holding the view that the death penalty acts as a deterrent to the commission of further murders has fallen steadily from 62% of respondents in 1985, to 61% in 1986, to 51% in 1991, to 35% in 2004, to 34% in 2006, to 32% in 2011, the last year for which there are available data.[14] A 1995 survey of nearly 400 police chiefs and county sheriffs found that two-thirds of them did not believe the death penalty significantly lowered the number of murders. Radelet & Lacock, *Recent Development*, 99 J. Crim. L. & Criminology at 492.

Although much of the concern underlying the *Furman* Court's invalidation of capital punishment stemmed from the arbitrary manner in which the sanction was imposed, Justice White's observations about the manner in which death sentences were dispensed is equally applicable to the manner in which they are now executed in California:

> [I]t is difficult to prove as a general proposition that capital punishment, however administered, more effectively serves the ends of the criminal law than does imprisonment. But however that may be, I cannot avoid the conclusion that as the statutes before us are now administered, the penalty is so infrequently imposed that the

---

[14] http://www.gallup.com/poll/1606/death-penalty.aspx (last visited June 8, 2014).

threat of execution is too attenuated to be of substantial service to criminal justice.

*Furman*, 408 U.S. at 313 (White, J., concurring). Mr. Jones's execution will amount to "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purpose" unless it realistically furthers the goals of retribution or deterrence. It therefore constitutes "a penalty with such negligible returns to the State" as to be "patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Id.* at 312; *see also Thompson v. McNeil*, 129 S. Ct. 1299, 129 S. Ct. 1299 (2009) (statement of Justice Stevens respecting the denial of the petition for writ of certiorari); *Knight v. Florida*, 528 U.S. 990, 120 S. Ct. 459, 145 L. Ed. 2d 370 (1999) (Breyer, J., dissenting from denial of certiorari); *Elledge v. Florida*, 525 US 944, 119 S. Ct. 366, 142 L. Ed. 2d 303 (1998) (Breyer, J., dissenting from denial of certiorari); *Lackey v. Texas*, 514 U.S. 1045, 1047, 115 S. Ct. 1421, 131 L. Ed. 2d 304 (1995) (Stevens, J., joined by Breyer, J., respecting the denial of certiorari); *Ceja v. Stewart*, 134 F.3d 1368 (9th Cir. 1998) (Fletcher, J., dissenting from order denying stay of execution).

## III. THE CONDITIONS OF CONFINEMENT TO WHICH MR. JONES IS SUBJECTED WHILE AWAITING THE EXECUTION OF HIS SENTENCE, AS WELL AS THE UNCERTAINTIES SURROUNDING HIS EXECUTION, CONSTITUTE TORTURE IN VIOLATION OF THE EIGHTH AMENDMENT.

As set forth above, Mr. Jones's confinement under sentence of death for what has already been over nineteen years, and what is certain to be at least several more years before his execution can take place, constitutes cruel and unusual punishment and violates his rights to due process and equal protection of the law under the federal and state Constitutions. Because California state

appellate and postconviction processes fail entirely to provide Mr. Jones with full, fair, and timely review of his convictions and sentence, Mr. Jones has been subjected for an unconscionable period of time to severely dehumanizing and brutal physical and psychological conditions of confinement, as well as to uncertainty regarding whether, when, and how he will be executed. The combination of the inhumane conditions of confinement and the psychological duress imposed by the state's failure to establish procedures that limit the uncertainty of the sentence to which Mr. Jones will be exposed exact torturous physical and psychological tolls upon Mr. Jones that render his continued confinement on death row, as well as his future execution, in violation of the Eighth Amendment.

## A. The Conditions of Confinement on California's Death Row Are Physically and Psychologically Torturous.

### 1. Physical Conditions on East Block.

"Conditions of confinement . . . constitute[] cruel and unusual punishment [where] they result[] in unquestioned and serious deprivation of basic human needs." *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981). Overcrowding, deprivation of nutrition, and denial of basic needs can constitute an Eighth Amendment violation. *Hutto v. Finney*, 437 U.S. 678, 98 S. Ct. 2565, 57 L. Ed. 2d 522 (1978) (holding that indeterminate confinement in isolation cells, in which between four and eleven inmates were crowded into small windowless cells containing no furniture and fed less than 1000 calories a day, constituted cruel and unusual punishment). Deliberate indifference to an inmate's medical and mental health needs also constitutes cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 103, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The physical and psychological conditions of Mr. Jones's lengthy confinement have been so dehumanizing, brutal, and severe as to constitute

26

torture.  The physical conditions under which Mr. Jones has been confined are deplorable and inhumane, and have required long-term judicial intervention and oversight.  *See, e.g.*, *Thompson v. Enomoto*, 815 F.2d 1323 (9th Cir. 1987) (alleging conditions and treatment on death row violated the Eighth and Fourteenth Amendments); *Toussaint v. McCarthy*, 597 F. Supp. 1388 (N.D. Cal. 1984), *aff'd in part, rev'd in part*, 801 F.2d 1080 (9th Cir. 1986) (holding that conditions of confinement in San Quentin, where Mr. Jones is and was housed, were unconstitutional in many respects); *Lancaster v. Tilton*, No. C 79-01630 WHA, 2008 WL 449844 (N.D. Cal. Feb. 15, 2008) (continuation of *Thompson* litigation).

For the past more than nineteen years, Mr. Jones has been housed at San Quentin State Prison with several hundred other condemned inmates in a section of the prison called East Block, "a looming warehouse-like structure constructed in 1930," that is the length of two football fields, forty yards wide, and six stories high.  *Lancaster v. Tilton*, No. C 79-01630 WHA, 2008 WL 449844 at *5 (N.D. Cal. Feb. 15, 2008).  Five of the tiers have two sides, and each side contains approximately 54 cells, making approximately 250 cells per side, and 500 cells in the block.  *Id.*  Mr. Jones's cell is windowless, six feet wide by eight feet long, and has three concrete walls.  The cell front is constructed of bars fitted with metal grating.  *See Toussaint v. McCarthy*, 597 F. Supp. 1388, 1394-95 (N.D. Cal. 1984), *aff'd in part, rev'd in part*, 801 F.2d 1080 (9th Cir. 1986).

East Block is a "crumbling, leaky maze of a place . . . echoing with the incessant chatter and shrieking cacophony of prison."  Ex. 2 at 200.  During Mr. Jones's tenure on death row, living conditions there have been found so substandard, unhealthy, and inhumane, and the medical care determined to be so deficient and below minimally acceptable constitutional standards – both on death row and in other relevant areas of San Quentin – that lawsuits and the long-term intervention and oversight of the courts have been required.  *See, e.g.*, *Plata v.*

*Brown*, Case No. C-01-1351 TEH (N.D. Cal.) (finding prison medical care, including that on death row, to be deficient); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995) (concerning deficiencies in prison mental health care); *Thompson v. Enomoto*, 815 F.2d 1323 (alleging conditions and treatment on death row violate Eighth and Fourteenth Amendments); *Toussaint*, 597 F. Supp. 1388 (describing conditions in East Block); *Lancaster*, 2008 WL 449844 (continuation of *Thompson* litigation).

East Block is "in significant disrepair in ways that make maintaining proper sanitation in the unit, and consequently in prisoners' cells, extremely difficult, if not impossible." Ex. 3 at ¶¶ 18. Disease vectors such as rodents, birds, and other vermin have posed significant hazards to the health and safety of those housed and employed in East Block. Bird droppings are caked on the tiers, gun rails, floors, gurneys used for medical purposes, laundry carts, containers holding prisoners' shaving razors, and lockers. Ex. 3 at ¶¶ 85-87; *see also* Ex. 3 at 249-50, 261-62, 270-73, 277; *Lancaster*, 2008 WL 449844, *24. Birds nest, fly, and ambulate around East Block, settling on prisoners' food trays. Disease transmission risk is extremely high as a consequence of physical contact with bird feces, inhalation of aerosolized feces, and through ingestion of feces that have contaminated food. Ex. 3 at ¶¶ 85-96; *Lancaster*, 2008 WL 449844, *24-25. Cockroaches, ants, spiders, mice, worms, and other vermin are common in East Block; drain flies in larval stages are found in the showers. Ex. 3 at ¶¶ 97-102.

Water pooling in the East Block showers and spilling out onto the tier, in addition to the unsanitary condition of the showers themselves, pose serious risks to health and safety. Ex. 3 at ¶¶ 19-24; *see also* Ex. 3 at 258-59, 264-65, 267-69. The bars on the tiers in front of the showers (which are located in the middle of each tier) are corroded and degraded from cascading shower water. Ex. 3 at ¶¶ 20, 31. "Mold and mildew populate the tier bars, floors, and ceilings in front of the showers. Congealed strands of muck and slime, composed of soap scum, hair, and

bodily detritus dangle from the tier bars and ceilings. . . . It is readily apparent that these strands, like stalactites, have formed over a long period of time as water carrying shower debris has flowed over them. These slime stalactites are perfect breeding grounds for mold and bacteria." Ex. 3 at ¶ 20. Water from the upper tiers falls "as if it were a light rain of scummy, filthy water" and dirty water from the showers flows onto each tier before cascading to the tiers below. Ex. 3 at ¶ 19. Disease is spread by the falling and standing water and by mist which forms as the cascading water aerosolizes. This falling water poses a danger of electrocution as it streams over light switches. Ex. 3 at ¶¶ 22-25.

In addition to the filth and disease generated by the birds, insects, and other vermin, and by the pooled, falling, and aerosolized water, East Block is full of debris and garbage that falls from the tiers above the second tier where Mr. Jones is housed. Ex. 3 at ¶ 26; *see also* Ex. 3 at 257, 260, 262, 270-71, 275-76. Areas in and around individual cells are grotesquely unsanitary and pose health hazards due to toilet paper shortages; bedding in disrepair; the accumulation of dust in vents; dirt and grime in areas the prisoners cannot reach to clean, or that are so degraded that they cannot be made clean; pooling water; and water leaks in the plumbing in and behind individual cells. Ex. 3 at ¶¶ 29-33; *see also* Ex. 3 at 250-56, 265-66, 275-76.

## 2. Isolation

The amount of time Mr. Jones is permitted to be outside his cell is extremely limited, and when he is transported, he is handcuffed behind his back and escorted by guards. East Block prisoners are confined to their cells and are allowed out of their cells only to shower, go to the exercise yard and medical appointments, attend visits and classification committee meetings, and for limited religious or educational programs. There is no communal space in which prisoners may interact other than the recreation yard. Ex. 4 at 308-09. Mr. Jones's "yard time is often shortened to two hours per day because of various delays, and it is frequently

not offered . . . for weeks at a time." Ex. 4 at 308. "[U]p to 80 prisoners are released at a time to share a single yard that is roughly 60 feet by 80 feet, about the size of a basketball court. Little to no exercise equipment is available, and the space is so uncomfortable and crowded that prisoners frequently decline recreation time." Ex. 4 at 309. Medical treatment and educational programs are limited by the state's resources and its willingness to supply such opportunities and treatment. Ex. 4 at 307-13.

Mr. Jones's contact with family members and friends is strictly limited. Non-legal visits are limited to three days a week, Thursdays, Saturdays, and Sundays. Condemned prisoners, unlike other prisoners, are not permitted private family or conjugal visits and instead must conduct visits in the public visiting room. Condemned prisoners are not permitted to demonstrate physical affection toward their loved ones during visits other than a "brief kiss and/or hug at the beginning and end of visit."[15] Mr. Jones, like other prisoners in his privilege group, Grade A, is allowed two 15-minute telephone calls each week, but because these calls are collect and expensive, it is difficult for Mr. Jones to utilize these calls. Ex. 4 at 310.

### 3. Deficiencies in Medical and Psychiatric Treatment

The conditions on California's death row have exacerbated Mr. Jones's mental health impairments that are set forth in the Amended Petition. Ex. 4 at 312 (noting that "death row only exacerbates [mental health] problems because of the 'lack of socialization' and the 'stress of not knowing when they'll be executed.'"); *see also* Terry A. Kupers, *Trauma and its Sequelae in Male Prisoners: Effects of Confinement, Overcrowding, and Diminished Services*, 66 Am. J. Orthopsychiatry 189, 191 (1996) (noting that "[p]risoners with a history of mental disorder or a

---

[15] http://www.cdcr.ca.gov/Visitors/docs/InmateVisitingGuidelines.pdf (last visited June 8, 2014).

tendency to become emotionally incapacitated by stress have an especially hard time"). Mental health treatment provided to Mr. Jones and others on California's death row is inadequate. *Brown v. Plata*, __ U.S. __, 131 S. Ct. 1910, 179 L. Ed. 2d 969 (2011) (finding prison medical care and mental health care, including that provided to death row inmates, so deficient as to violate the Eighth Amendment); *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995) (finding inadequate screening, understaffing, delays in access to care, deficiencies in medication management and involuntary medication, and inadequacy of medical records at California prisons, including San Quentin, where Mr. Jones is confined); *see also* Ex. 4 at 312-13 (reporting that group therapy is conducted with prisoners seated inside cramped individual "treatment cages" that are lined up in a room; that prisoners are not eligible for transfer to medical facilities for specialized mental health care; and that mental health treatment providers reveal confidential information to correctional officers).

## 4. Long Periods of Confinement Under These Conditions Constitute Debilitating Psychological Torture

Punishments that result in extreme mental or psychological distress can violate the Eighth Amendment. *Trop v. Dulles*, 356 U.S. 86, 101-02, 78 S. Ct. 5902, L. Ed. 2d 630 (1958) (holding that denationalization as punishment is barred by the Eighth Amendment and "is offensive to cardinal principles for which the Constitution stands" because, although no physical mistreatment is implicated, "[i]t subjects the individual to a fate of ever-increasing fear and distress"). Confinement in jail or prison even under sentences less than death is documented to take a serious physical and psychological toll on prisoners. *See, e.g.*, Craig Haney & Philip Zimbardo, *The Past and Future of U.S. Prison Policy: Twenty-Five Years After the Stanford Prison Experiment*, 33 Am. Psychologist 709, 719 (1998) ("The pains [of even limited periods of incarceration] [are] as much psychological – feelings of powerlessness, degradation, frustration, and emotional

distress – as physical – sleep deprivation, poor diet, and unhealthy living conditions."); Terry A. Kupers, *Trauma and its Sequelae*, at 194 (reporting "the immensity of the problem of stress response syndromes behind bars").

> The ordeals of the condemned are inherent and inevitable in any system that informs the condemned person of his sentence and provides for a gap between sentence and execution. Whatever one believes about the cruelty of the death penalty itself, this violence done the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest.

*District Attorney v. Watson*, 411 N.E.2d 1274, 1290 (Mass. 1980) (Liacos, J., concurring). Clifton Duffy, a former warden of San Quentin, in a book published in 1962 about his experiences at San Quentin, observed: "One night on death row is too long, and the length of time spent there by [many of the prisoners] constitutes cruelty that defies the imagination. It has always been a source of wonder to me that they didn't all go stark, raving mad." Clinton T. Duffy, *Eighty-Eight Men and Two Women* 254 (1962).

The United States Supreme Court, the California Supreme Court, and other federal and state courts have recognized that long periods of confinement under sentence of death can be torturous. *See, e.g.*, *In re Medley*, 134 U.S. 160, 172, 10 S. Ct. 384, 33 L. Ed. 835 (1890) (describing the period between the sentence of death and the execution – in that case a mere four weeks – as engendering "immense mental anxiety"); *People v. Anderson*, 6 Cal. 3d 628, 649 (1972), *superseded by constitutional amendment as stated in People v. Hill*, 3 Cal. 4th 959, 1015 (1992) ("The cruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to execution during which judicial and administrative procedures essential to due process of law are carried out. Penologists and medical experts agree that the process of carrying out a verdict of

death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."); *People v. Chessman*, 52 Cal. 2d 467, 499 (1979), *overruled in part on other grounds by People v. Morse*, 60 Cal. 2d 631 (1964) ("It is, of course, in fact unusual that a man should be detained for more than 11 years pending execution of a sentence of death and we have no doubt that mental suffering attends such detention."); *see also Coleman v. Balkcom*, 451 U.S. 949, 952, 101 S. Ct. 2031, 68 L. Ed. 2d 334 (1981) (Stevens, J., concurring in denial of certiorari) (recognizing that mental pain condemned prisoners suffer is "a significant form of punishment" that "may well be comparable to the consequences of the ultimate step itself"); *Furman v. Georgia*, 408 U.S. 238, 288, 92 S. Ct. 2726, 33 L. Ed. 2d 346 (1972) (Brennan, J., concurring) (commenting that "mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death"); *District Attorney v. Watson*, 411 N.E.2d at 1290 (Liacos, J., concurring) (equating mental stress suffered by death row inmate with psychological torture); *Commonwealth v. O'Neal*, 339 N.E.2d 676, 680 (Mass. 1975) (Tauro, J., concurring) (noting that "[t]he convicted felon suffers extreme anguish in anticipation of the extinction of his existence").

On California's death row, the physical and psychological effects of the torturous conditions to which Mr. Jones is exposed are not simply hypothetical; they are starkly evident from the number of condemned prisoners who have committed suicide while under sentence of death. Since November 1978, when the current death penalty statute was enacted by California voters, of the 107 prisoners sentenced to death who have died, 22, or 21%, committed suicide. Ex. 13. Two additional condemned prisoners were executed after abandoning their appeals.

Since 1979, more California death row inmates have taken their own lives

while under sentence of death than have been executed.  Fourteen of the 107 condemned inmates who have died were executed (13 in California and one in Missouri), as compared to the 22 (or 24, when including the individuals who abandoned litigation challenging their sentences) who committed suicide.  Ninety-three condemned inmates have thus died of causes other than execution.  Sixty-three of these have died of natural causes.  At least five other prisoners on California's death row have died as a result of acts of violence by other prisoners or prison officials.  Ex. 13.[16]  This brings the total number of condemned inmates who have died other than by execution or natural causes, and whose deaths can be attributed at least in part to conditions of confinement under sentence of death, to 29, or 27% of the total California condemned inmate deaths.  Ex. 13.  Over 31% of the 93 condemned inmate deaths of causes other than execution is attributable to conditions of confinement under sentence of death.

As noted above, 21% of the deaths of condemned inmates since 1978 were suicides.  Fifty-nine percent of condemned inmate deaths were the result of natural causes.  That means that over a third as many California condemned inmates have committed suicide than have died naturally.  Moreover, *the suicide rate on California's death row is more than 25 times the rate of suicide in the general population of California and in the United States general population.*  Ex. 15 ¶18 & Table 3.

Exposure to these inhumane physical and psychological conditions for decades was not a punishment contemplated or authorized by California voters when they enacted the death penalty statute by ballot in 1978, or by the jury when it sentenced Mr. Jones to death in 1995.  Mr. Jones has thus been unlawfully

---

[16]   The CDCR has identified the cause of the death of another condemned inmate as "Other" and that of two other condemned inmates as "Pending."  Ex. 13.

subjected to punishment separate from and in addition to that authorized by statute, selected by the jury, and imposed by the trial court. *See In re Medley*, 134 U.S. at 172 (holding that subjecting the defendant to solitary confinement during the period between the judgment of death and the execution was an impermissible increase in his punishment and violated the ex post facto clause because it was not authorized by the death penalty statute at the time he committed his crime); *In re Kemmler,* 136 U.S. 436, 447, 10 S. Ct. 930, 34 L. Ed. 519 (1890) ("Punishments are cruel when they involve torture or a lingering death" or "something more than the mere extinguishment of life").

**B.      The Many Uncertainties Inherent in California's Death Penalty Scheme Render Mr. Jones's Years of Confinement Under Sentence of Death Psychologically Torturous.**

"[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it . . . as to the precise time when his execution shall take place." *In re Medley*, 134 U.S. at 172. The effect on Mr. Jones and other condemned inmates caused by the medieval conditions of confinement experienced by those housed at San Quentin, is profoundly heightened by decades of uncertainty. As noted above, the systemic failures of California's death penalty scheme and state actors implementing that scheme, including the failure to appoint counsel in a timely fashion, engage in fact-finding during state court proceedings, and establish a valid and constitutional method of execution, create psychologically torturous conditions for those sentenced to death.

Under Justice Douglas's and Justice Brennan's definitions of arbitrariness, life in the shadow of death is almost certainly cruel and unusual. Life in the shadow of death is "irregularly" applied by design. The state does not tell inmates whether they will suffer the

specter of execution for five years or thirty.  Under Justice White's and Justice Stewart's respective definitions of "arbitrary" and "capricious," life in the shadow of death is cruel and unusual.  As the ultimate in-between punishment between life imprisonment and the death penalty, life in the shadow of death puts the death row inmate in purgatory.  He cannot be certain when or even whether a death sentence will "in fact [be] imposed," much like he cannot be certain when or whether lightning will strike.

Angela Sun, Note, *"Killing Time" in the Shadow of Death: Why Systematic Preexecution Delays on Death Row are Cruel and Unusual*, 113 Colum. L. Rev. 1585, 1620-21 (2013).  Furthermore, the years of unpredictability and lack of resolution associated with the methods of execution impose additional significant psychological strain and terror upon Mr. Jones and others confined under sentence of death in California.

### 1. The Uncertainty of the Duration of Mr. Jones's Confinement Under Sentence of Death Prior to Execution or to the Grant of Guilt and/or Penalty Relief Renders His Confinement Psychologically Torturous.

The stress associated with not knowing when a prisoner will be executed exacts an immeasurable toll on that prisoner's mental health.  *See, e.g.*, Ex. 4 at 314.  Many courts, in interpreting the reach of statutory aggravating circumstances permitting the imposition of a death sentence where the murder or the circumstances thereof was "cruel," have held that the time period during which the victim was held in fear for his or her life prior to death establishes the aggravating circumstance.  *See, e.g.*, *Ex parte Key*, 891 So. 2d 384, 390 (Ala. 2004) (finding the "heinous, atrocious, and cruel" aggravating circumstance was proved, and holding that "[p]sychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death.  Such torture must have been present for an appreciable lapse of time, sufficient enough to cause

prolonged or appreciable suffering.") (internal citation omitted); *State v. Cropper*, 225 P.3d 579, 583 (Ariz. 2010) (en banc) (under Arizona law, a first-degree murder is "cruel" within the meaning of a statutory circumstance where "a victim's suffering existed *for a significant period of time*," and approving a jury instruction on this point) (emphasis in original); *State v. Hamlet*, 321 S.E.2d 837, 846 (N.C. 1984) (holding that North Carolina's "especially heinous, atrocious, and cruel" aggravating circumstance is met when a killing "involve[s] infliction of psychological torture by leaving the victim in his last moments aware but helpless to prevent impending death"); *Francois v. State*, 407 So. 2d 885, 890 (Fla. 1981) (holding that "especially heinous, atrocious, or cruel" aggravating circumstance "can be sustained on the basis of mental anguish inflicted on the victims as they waited for their 'executions' to be carried out") (internal citations omitted); *Rivers v. State*, 298 S.E.2d 1, 8-9 (Ga. 1982) (finding evidence sufficient to sustain finding that murder was "outrageously and wantonly vile, horrible, and inhuman in that it involved torture to the victim" where victim was taken to a second location and thus "her end did not arrive with little or no forewarning").

    **2.   The Uncertainty and Years of Lack of Resolution Regarding the Method by Which Mr. Jones Will Be Executed, and the Real Possibility That the Method Will Result in a Painful Death, Renders Mr. Jones's Confinement Under Sentence of Death Psychologically Torturous.**

      As this Court noted in its order for additional briefing on this claim, California lacks an execution protocol that is valid under state law. *See Morales v. Cate*, Nos. 5-6-cv-219-RS-HRL & 5-6-cv-926-RS-HRL, 2012 WL 5878383, at *1-3 (N.D. Cal. Nov. 21, 2012). Although California Penal Code section 3604 provides that the punishment of death shall be inflicted by the administration of lethal gas or intravenous lethal injection, the California Department of Corrections and Rehabilitation (CDCR) has no valid regulations in place to implement the

37

Petitioner's Opening Brief on Claim 27           Case No. CV-09-2158-CJC

statute with regard to either method of execution.  *Sims v. Dep't of Corrections and Rehabilitation*, 216 Cal. App. 4th 1059, 1083-84, 157 Cal. Rptr. 3d 409 (2013) (noting that the CDCR conceded that it cannot conduct executions by lethal gas without promulgating regulations, which it has not done, and enjoining the CDCR from carrying out lethal injection executions until and unless new regulations governing lethal injection are promulgated in compliance with the state Administrative Procedure Act).

      As set forth in more detail in the First Amended Petition, California has not conducted executions since January 2006, due to the failure of the CDCR to lawfully promulgate an execution protocol that comports with constitutional requirements.  The execution methods used in California in the two decades prior to the de facto moratorium on executions in 2006 were determined by federal courts to violate the Eighth Amendment's prohibition on cruel and unusual punishment.  *Fierro v. Gomez*, 865 F. Supp. 1387 (N.D. Cal. 1994) (finding that California's lethal gas method of execution was cruel and unusual in violation of the Eighth Amendment), *vacated on other grounds in Fierro v. Terhune*, 147 F.3d 1158 (1998) (holding that current plaintiffs lacked standing); *Morales v. Tilton*, 465 F. Supp. 2d 972 (N.D. Cal. 2006) (ruling that California's three-drug lethal injection method of execution violated the cruel and unusual punishment clause of the Eighth Amendment).  Although the CDCR, under Governor Brown's direction, announced in April 2012 that it would "begin the process of considering alternative regulatory protocols, including a one-drug protocol, for carrying out the death penalty," Ex. 5 at 373, to date (more than two years later) no alternative regulatory protocols have been published.

      Mr. Jones, as well as all other prisoners confined to California's death row, thus has been confined under sentence of death for more than eight years without having any idea what method of execution will be imposed upon him in the event that he is actually executed.  During that time, and for years prior to that, Mr.

Jones has been confined under sentence of death aware that the methods most recently used to execute California prisoners failed to pass constitutional muster – that is, that the pain and suffering inflicted by the administration of lethal gas and lethal injection due to numerous factors inherent in the protocols was significant enough to compel courts to conclude that they were cruel and unusual in violation of the Eighth Amendment.  The knowledge that the methods devised to and actually implemented by the state to execute prisoners demonstrated a substantial risk of severe pain (and likely did cause severe pain to those executed by those methods) has and will continue to be a direct and proximate cause of Mr. Jones's extreme distress, anxiety, and fear regarding an impending execution. Ex. 6 at ¶ 3 (former San Quentin warden describing prisoner's questions about the execution process and psychological need for comprehensive information about the method of execution).

Furthermore, Mr. Jones and the other prisoners under sentence of death in California have now suffered for many years and will continue to suffer anxiety and fear due to the continuing uncertainty about what method of execution the state will select.  *See, e.g.*, The Capital Punishment Enforcement Act (to be codified as amended at Tenn. Code Ann. § 40-23-114 (May 22, 2014)) (Tennessee capital punishment statute recently amended to provide that if the correctional department commissioner certifies to the governor that "an essential ingredient" for lethal injection executions is unavailable, the mandatory method for carrying out the execution is by electrocution); Ex. 7 (article describing amendment to Tennessee's death penalty statute); Ex. 8 (article observing that "[f]iring squads, electric chairs and other methods of execution seen as cruel or antiquated could be getting a fresh look after Oklahoma botched a lethal injection"); Ex. 9 ("Prompted by the shortages of available drugs for lethal injections, Wyoming lawmakers are considering changing state law to permit the execution of condemned inmates by firing squad.").

Mr. Jones further is constantly exposed to continuing, realistic fear that whichever method California selects will not comport with constitutional requirements.  *See* Mot. for TRO and TRO, *Taylor v. Apothecary Shoppe, LLC.*, No. 14-CV-063-TCK-TLW, (N.D. Ok. Feb. 11 and 12, 2014), ECF Nos. 3 and 8 (describing effect that uncertainty about whether drugs to be used in an execution are defective and therefore might cause significant pain and suffering upon administration has on the psychological state of a prisoner facing execution – and issuing temporary restraining order preventing delivery of compounded pentobarbital to department of corrections for use in execution); *see also, e.g.*, Ex. 10 (describing botched lethal injection execution of Clayton Lockett in April 2014 in which Mr. Lockett convulsed, writhed on the gurney, and spoke after execution personnel had declared him unconscious and in which Mr. Lockett died of a heart attack minutes after the execution was halted); Ex. 8 ("the botched execution [of Clayton Lockett] has raised questions on whether these new protocols could be ruled as cruel and unusual punishment by the court"); Ex. 11 (describing botched execution in January 2014 of Dennis McGuire in Ohio by the novel lethal injection combination of midazolam and hydromorphone during which Mr. McGuire "appeared to gasp and convulse for roughly 10 minutes before he died").

Not least, Mr. Jones also suffers the additional anxiety created by the uncertainty engendered by the state's inability to devise within the past two years a valid method of execution despite its stated commitment to do so, and the continuing uncertainty regarding the timeframe in which the state will devise an execution protocol and submit it for public comment.  These multiple layers of uncertainty and unpredictability significantly increase the psychological torture imposed on Mr. Jones by California's death penalty scheme.

**3. Uncertainty Whether or Not Mr. Jones Will Be Executed by Any Execution Method, at Any Time, Renders Mr. Jones's Confinement Under Sentence of Death Intolerable for Both Mr. Jones and the State.**

As this Court recognized in its April 10, 2014, Order re: Briefing and Settlement Discussions, "in this case, both petitioner and the States must labor under the grave uncertainty of not knowing whether petitioner's execution will ever, in fact, be carried out." Order, April 10, 2014, ECF No. 103, at 3-4. As set forth above, only 14 of the 107 condemned inmates who have died since 1978, or 13%, have been executed. Eighty-seven percent of inmates sentenced to death between 1978 and the present thus have died from causes other than execution. The odds that Mr. Jones will be executed by any method, taking into account the various factors described above, including (1) the likelihood that he will obtain relief on the merits of his claims; (2) the ongoing litigation in federal court (and possibly state court) which, due to the inordinate delay and unpredictability of the federal and state appellate process, will result in additional years under sentence of death before relief is granted; (3) the statistical probability that he will die of some cause other than execution during those years; and (4) the significant possibility that California will be unable to adopt a constitutional method of execution by which to carry out Mr. Jones's execution, are extremely low. Mr. Jones's continued incarceration under sentence of death under these conditions, with the physically and psychologically torturous effects that a death sentence imposes, is thus arbitrarily inflicted and unusually cruel, and his death sentence must be set aside.

# IV.  MR. JONES'S EXECUTION WOULD VIOLATE THE EQUAL PROTECTION CLAUSE BECAUSE CALIFORNIA UNLAWFULLY PENALIZES THOSE WHO SEEK REVIEW OF A CAPITAL CONVICTION WITH INDEFINITE INCARCERATION AND INORDINATE DELAY.

As a result of the egregious dysfunction and delay in reviewing capital convictions in California, Mr. Jones, and all other death-sentenced persons who seek postconviction review, must endure a lengthy, tortuous, and extrajudicially imposed incarceration in exchange for the right of review.  Exacting such an extraordinary price on the exercise of this fundamental right is constitutionally intolerable — all the more so because non-capital petitioners who seek to overturn serious convictions and sentences do not face a similar fate.  A state process that discriminates so profoundly against those who seek to vindicate constitutional rights violates "the central aim of our entire judicial system — all people charged with crime must, so far as the law is concerned, 'stand on an equality before the bar of justice in every American court.'"  *Griffin v. Illinois*, 351 U.S. 12, 17, 76 S. Ct. 585, 590, 100 L. Ed. 891 (1956) (quoting *Chambers v. Florida*, 309 U.S. 227, 241, 60 S. Ct. 472, 479, 84 L. Ed. 716 (1940)).

A capital inmate who seeks postconviction review currently faces an average delay of 17.2 years from the time of capital sentencing to the California Supreme Court's ruling on state habeas corpus claims.  Ex. 15 ¶15 (noting that delay between sentencing and disposition of first state habeas corpus petitions resolved between 2008 and 2014 was 17.2 years).  During that time, he or she suffers the deprivation of adequate medical and mental health care, unhealthy and inhumane living conditions, and horrifying uncertainties about execution, among other torturous indignities.  *See* section III, *supra*.  In addition to this heavy toll, the delay — and the failure of the state to afford access to state court processes, factual development, or provide reasoned judicial opinions – fundamentally impair

a capital petitioner's ability to adequately develop and present his claims in federal court. *See* section I, *supra*. As the Ninth Circuit ruled in *Phillips v. Vasquez,* 56 F.3d 1030 (9th Cir. 1995):

> The prejudice inherent in [indeterminate and excessive state court delays in adjudicating habeas claims] is quite evident. For fifteen years, Phillips has been compelled to remain in prison under a possible sentence of death while being denied the opportunity to establish the unconstitutionality of his conviction. In addition, during so long a delay, there is a substantial likelihood that witnesses will die or disappear, memories will fade, and evidence will become unavailable. In short, the opportunity for a fair retrial diminishes as each day passes.

*Id.* at 1036.

In these ways, the state not only imposes a cruel and unusual punishment on capital petitioners, but also deprives them of access to the courts that is "adequate, effective, and meaningful" in violation of the Fourteenth Amendment and its Equal Protection guarantees. *Bounds v. Smith*, 430 U.S. 817, 822, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977) (holding that "the state and its officers may not abridge or impair petitioner's right to apply to a federal court for a writ of habeas corpus") (internal quotation omitted). In *Bounds*, the Supreme Court expressly affirmed the constitutional right of access to the courts for habeas corpus petitioners, contrasting that right to discretionary appeals by explaining:

> [W]e are concerned in large part with original actions seeking new trials, release from confinement, or vindication of fundamental civil rights. Rather than presenting claims that have been passed on by two courts, they frequently raise heretofore unlitigated issues. As this Court has constantly emphasized, habeas corpus and civil rights

actions are of fundamental importance in our constitutional scheme
because they directly protect our most valued rights.

*Id*. at 827-28 (internal quotation omitted); *see also Rinaldi v. Yeager*, 384 U.S. 305, 310, 86 S. Ct. 1497, 1500, 16 L. Ed. 2d 577 (1966) (holding that "it is now fundamental that, once established, . . . avenues [of appellate review] must be kept free of unreasoned distinctions that can only impede open and equal access to the courts").[17]

By imposing indefinite incarceration only on those death row inmates who seek judicial review — those who forgo or abandon challenges to their convictions can escape this fate — the state impermissibly discriminates against capital petitioners for exercising their fundamental rights. *See, e.g.*, *Attorney Gen. of New York v. Soto-Lopez*, 476 U.S. 898, 911, 106 S. Ct. 2317, 2325, 90 L. Ed. 2d 899 (1986) (holding state law that effectively penalized veterans for exercising fundamental right of interstate migration violated equal protection); *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1078 (9th Cir. 2003) (holding state initiative process that required some voters to accumulate 18,054 signatures and others only 61 before effectuating right to vote violated equal protection); *cf. United States v. Windsor*, __ U.S. __, 133 S. Ct. 2675, 2695-96, 186 L. Ed. 2d 808 (2013) (holding federal Defense of Marriage Act violates equal protection component of Fifth Amendment due process by imposing a disability on a class of individuals who have taken advantage of the liberty of same-sex marriage afforded

---

[17] As currently implemented in California, the death penalty system also functionally deprives Mr. Jones of his due process right of access to the courts. *See, e.g.*, *Jones v. State*, 740 So. 2d 520 (Fla. 1999) (holding twelve year delay in holding competency hearing while defendant on death row violated due process). In *Jones v. State*, the Florida Supreme Court likened the egregious delay in conducting a competency hearing to the delays in death penalty appeals criticized as excessive by Justice Breyer in *Elledge v. Florida*, 525 U.S. 944, 119 S. Ct. 366, 142 L. Ed. 2d 303 (1998).

by States).

The state also discriminates against capital petitioners by imposing heavy burdens of delay on them that non-capital petitioners do not face. Although complete information concerning the state court's resolution of challenges to non-capital judgments is not currently available, a sample of non-capital habeas cases involving convictions for murder or attempted murder reveals an average time of thirty months between the date of sentencing and resolution of state habeas claims.[18] Ex. 15 ¶19. Thus, even with the added layer of appellate review by the

---

[18] *See McCoy v. Holland*, CV 13-3804-RGK DFM, 2014 WL 2094314 (C.D. Cal. Apr. 21, 2014), *report and recommendation adopted*, CV 13-3804-RGK DFM, 2014 WL 2094322 (C.D. Cal. May 20, 2014) (denying federal petition; forty-seven months from sentencing to ruling on state habeas corpus petition; *Lugo v. Miller*, CV 03-2004-CAS CW, 2014 WL 1956659 (C.D. Cal. Feb. 25, 2014), *report and recommendation adopted as modified*, CV 03-2004-CAS CW, 2014 WL 1957019 (C.D. Cal. May 15, 2014) (granting relief on ineffective assistance of counsel claim; twenty-nine months from sentencing to ruling on state habeas corpus petition); *Garrett v. McDonald*, CV 10-4102-PA SP, 2014 WL 696353 (C.D. Cal. Feb. 18, 2014) (denying federal petition; forty months from sentencing to ruling on state habeas corpus petition); *Metzger v. Lopez*, CV 10-8518-PSG SP, 2014 WL 1155416 (C.D. Cal. Feb. 11, 2014) (denying federal petition; approximately three years from sentencing to ruling on state habeas corpus petition); *Escalante v. Grounds*, CV 02-7711 AHM FMO, 2010 WL 8731905 (C.D. Cal. 2010), *report and recommendation adopted*, CV 02-7711 AHM FMO, 2012 WL 2180602 (C.D. Cal. 2012) (granting relief on *Batson* claim; thirty-five months from sentencing to ruling on state habeas corpus petition); *Griffin v. Harrington*, 915 F. Supp. 2d 1091, 1098 (C.D. Cal. 2012) (granting relief on ineffective assistance of counsel claim; thirty-four months from sentencing to ruling on state habeas corpus petition); *Blumberg v. Garcia*, 687 F. Supp. 2d 1074, 1077 (C.D. Cal. 2010) (granting relief on *Napue* claim; seventy-five months from sentencing to ruling on state habeas corpus petition); *Lujan v. Garcia*, CV 04-1127-MMM (RCF), 2008 WL 7674923 (C.D. Cal. Sept. 15, 2008), *report and recommendation adopted as modified*, CV 04-01127 MMM (RCF), 2010 WL 1266422 (C.D. Cal. Mar. 30, 2010) (granting relief on *Miranda* violation; thirty-eight months from sentencing to ruling on state habeas corpus petition); *Lisker v. Knowles*, 651 F. Supp. 2d 1097, 1102 (C.D. Cal. 2009)

*continued...*

---

Petitioner's Opening Brief on Claim 27        Case No. CV-09-2158-CJC

California Courts of Appeal, a defendant challenging a non-capital judgment completes the state review process almost fourteen years before a capital defendant does so. A system of state review that discriminates so profoundly against capital petitioners is indefensible. As the Court ruled in *Romer v. Evans*, 517 U.S. 620, 116 S. Ct. 1620, 134 L. Ed. 2d 855 (1996), the effective "disqualification of a class of persons from the right to seek specific protection from the law is unprecedented in [Supreme Court] jurisprudence" and "discriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Id*. at 633 (internal quotation omitted).

Though these state actions warrant strict scrutiny under Equal Protection analysis, *see City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985), California's system for reviewing capital convictions does not even pass a more deferential standard, as there is no legitimate government interest supporting the state's process. Indeed, as this Court noted, the state process runs *counter* to state interests because "the State has a strong interest in expeditiously exercising its sovereign power to enforce the criminal law." Order Re: Briefing and Settlement Discussions, filed April 10,

---

(granting relief on ineffective assistance of counsel claim; nine months from sentencing to ruling on state habeas corpus petition); *Roman v. Hedgpeth*, EDCV 04-1226JFW (FMO), 2008 WL 4553137 (C.D. Cal. June 30, 2008), *report and recommendation adopted as modified*, EDCV 04-1226JFW(FMO), 2008 WL 4553091 (C.D. Cal. Oct. 8, 2008) (granting relief on juror misconduct claim; twenty-seven months from sentencing to ruling on state habeas corpus petition); *Sherrors v. Scribner*, 05CV1262IEG (LSP), 2007 WL 3276171 (S.D. Cal. Nov. 2, 2007) (granting relief on jury instruction issue; fifty-four months from sentencing to ruling on state habeas corpus petition); *Nunez v. Garcia*, C 98-1345 SI, 2001 WL 940920 (N.D. Cal. Aug. 15, 2001) (granting relief on *Miranda* violation; fifty-six months from sentencing to ruling on state habeas corpus petition).

2014, ECF No. 103 at 2.

## CONCLUSION

In January 2008, former Chief Justice Ronald George informed the Commission on the Fair Administration of Justice that "if nothing is done, the backlogs in postconviction proceedings will continue to grow 'until the system falls of its own weight.'" Ex. 1 at 126. The experience of the past six years has confirmed the accuracy of his prediction. In violation of the Eighth Amendment, Mr. Jones has suffered, and will continue to suffer the unconscionable delay in the resolution of his challenges to his convictions and sentence, be confined in horrific conditions, and tortured by the uncertainty of whether and when he will be executed. For the foregoing reasons, Mr. Jones is entitled to relief on Claim 27.

Dated: June 9, 2014        Respectfully submitted,

HABEAS CORPUS RESOURCE CENTER

By:                / s / Michael Laurence

Michael Laurence
Cliona Plunkett

Attorneys for Petitioner Ernest DeWayne Jones