1 Michael Laurence (Bar No. 121854)
2 Cliona Plunkett (Bar No. 256648)
3 HABEAS CORPUS RESOURCE CENTER
  303 Second Street, Suite 400 South
4 San Francisco, California 94107
5 Telephone:   (415) 348-3800
6 Facsimile:   (415) 348-3873
  E-mail:       MLaurence@hcrc.ca.gov
7               docketing@hcrc.ca.gov
8
  Attorneys for Petitioner Ernest DeWayne Jones
9

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST DEWAYNE JONES,<br><br>                    Petitioner,<br><br>      v.<br><br><br>KEVIN CHAPPELL, Warden of California State Prison at San Quentin,<br><br>                    Respondent. | Case No. CV-09-2158-CJC<br><br>**DEATH PENALTY CASE**<br><br>**EXHIBITS IN SUPPORT OF PETITIONER'S OPENING BRIEF ON CLAIM 27**<br><br>**VOLUME 1** |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Jones v. Chappell*

**Index of Exhibits in Support of Petitioner's Opening Brief on Claim 27**

Tab     Exhibit

1.   California Commission on the Fair Administration of Justice, Report and Recommendation on the Administration of the Death Penalty in California (Gerald Uelmen ed., 2008)

2.   Peter Fimrite, *At San Quentin, 647 Condemned Killers Wait to Die in the Most Populous Execution Antechamber in the United States*, San Francisco Chronicle, November 20, 2005

3.   Declaration of Leonard Rice, *Andrew Lancaster et al., v. James E. Tilton et al.,* Northern District of California Court Case No. C79-01630 WHA, 2008

4.   *Discrimination, Torture, and Execution A Human Rights Analysis of the Death Penalty in California and Louisiana*, Center for Constitutional Rights and International Federation for Human Rights, June 14, 2013

5.   Notice of Appeal, *Mitchell Sims v. California Department of Corrections and Rehabilitation, et al.*, Marin County Superior Court Case No. CIV1004019, April 26, 2012

6.   Declaration of Jeannie S. Woodford, August 27, 2010

7.   Ed Payne and Marino Castillo, *Tennessee to Use Electric Chair When Lethal Drugs Unavailable*, CNN.com, May 23, 2014

8.   Jon Herskovitz, *Botched Oklahoma Execution Comes As Alternatives Emerge*, Reuters, April, 30, 2014

9.   Trent Nelson, *Will Wyoming Turn To Firing Squads For Executions?*, CBSNews.com., May 22, 2014

10.  Josh Levs, Ed Payne, and Greg Botelho, *Oklahoma's Botched Lethal Injection Marks New Front In Battle Over Executions*, CNN.com, May 1, 2014

11.  Dana Ford and Ashley Fantz, *Controversial Execution In Ohio Uses New Drug Combination*, CNN.com, January 17, 2014

12. PriceWaterhouseCoopers, *Cost of Private Panel Attorney Representation in Federal Capital Habeas Corpus Cases from 1992 to 1998*, February 9, 1999

13. California Department of Corrections. *Condemned Inmates Who Have Died Since 1978*, March 4, 2014 (available at http://www.cdcr.ca.gov/ Capital_Punishment/docs/CONDEMNEDINMATESWHOHAVEDIEDSI NCE1978.pdf)

14. Howard Mintz, *State U.S. Courts at Odds on Sentences - Different Standards Lead to Reversals*, San Jose Mercury News, April 15, 2002

15. Declaration of Michael Lawrence, June 9, 2014

Exhibit 1

California Commission on the Fair
Administration of Justice, Report and
Recommendation on the Administration
of the Death Penalty in California
(Gerald Uelmen ed., 2008)

Exhibit 1
Page 1

# CALIFORNIA
## COMMISSION ON THE
# FAIR
## ADMINISTRATION OF
# JUSTICE

*Final Report*

Exhibit 1
Page 2

# California Commission
# on the Fair Administration of Justice

# Final Report

Exhibit 1
Page 3

**California**

Commission on the

**Fair**

Administration of

**Justice**

# Final
# Report

Gerald Uelmen
*Editor*

Chris Boscia
*Staff Editor*

Exhibit 1
Page 4

The contents of this report have
not been copyrighted. They may be
copied and distributed without
restriction. In reproducing or quoting
any portions of this report, the
source should be acknowledged
as "Final Report, California Com-
mission on the Fair Administration
of Justice."

Nothing contained in this volume is
to be considered as the rendering
of legal advice for specific cases,
and readers are responsible for
obtaining such advice from their
own legal counsel. This book and
any forms and agreements herein
are intended for educational
and informational purposes only.

The California Commission on the
Fair Administration of Justice
900 Lafayette Street, Suite 608
Santa Clara, CA 95050

www.ccfaj.org

Printed in the USA.

Book Design and Production:
Threestory Studio

Text of this book is composed
in Scala with display type set in
Trade Gothic.

For reprint inquiries:
Threestory Studio,
123 Sherman Avenue,
Palo Alto, CA 94306

650-323-6800
www.threestory.com

Exhibit 1
Page 5

# Letter from the Chair

*The criminal justice system in California is a human institution, and therefore cannot be perfect. However, modest reforms can improve our system, to ensure that Californians are truly safe from real perpetrators and the innocent remain free.*

The citizens of California deserve an honest assessment of our system. The debate over criminal justice has become caustic and polarized, masking substance with rhetoric. The Commission and its process stand in sharp contrast to the current state of policy discussion. Candid and forthright representatives with expertise in California's criminal justice system gathered monthly "to examine ways of providing safeguards and making improvements in the way the criminal justice system functions." Through regular public hearings, we made an effort to hear the concerns and suggestions of many Californians.

What follows are the ten reports that, with rare exceptions, represent the unanimous views of the Commissioners to ensure that the administration of justice in California is just, fair, and accurate. These recommendations are the result of hard-fought compromise and a delicate balancing of interests. Each recommendation will demand skillful implementation by the Governor, members of the Legislature, the Judiciary, the Attorney General, Public Defenders, District Attorneys, Law Enforcement, and other interested participants in the system.

I want to thank the Commissioners, all of whom worked voluntarily and diligently, without compensation. Our task could not have been accomplished without a fine Executive Director, Jerry Uelmen, and his top notch Executive Assistant, Chris Boscia.

In closing, I dedicate this report to the men and women who work tirelessly on behalf of justice in California. My hope is that the reforms we recommend in our reports are made to honor their service.

John K. Van de Kamp
*Chair, California Commission on the Fair Administration of Justice*

Exhibit 1
Page 6

# Letter from the Executive Director

*The Recommendations and Reports contained in this volume are the product of a remarkable process of collaboration by a diverse group representing the full spectrum of involvement in the criminal justice system in California.*

I will describe the deliberative process which led to these Recommendations and Reports.

From the outset, Commission Chair John Van de Kamp resolved to issue interim reports as we addressed each of the identifiable causes of wrongful convictions and California's administration of the death penalty. That way, the Commission could actively assist in the implementation of our recommendations, and expose our deliberations to greater public scrutiny. One of our first steps was to establish a website, www.ccfaj.org, making the testimony and written submissions received by the Commission publicly available, and providing immediate access to all of our reports as they were issued. The website received more than one million visits during the life of the Commission, and will remain accessible to internet users until 2018.

The excellent work done by academic researchers, the Innocence Project in New York, and similar Commissions in other States made the task of identifying the causes of wrongful conviction easier. The Commission quickly established an agenda of the topics, which we addressed in roughly the order of the frequency with which they are associated with erroneous convictions: mistaken eyewitness identifications; false confessions; perjurious informant testimony; inaccurate scientific evidence; prosecutorial and defense lawyer miscon-

Exhibit 1
Page 7

duct; and inadequate funding for defense services. We also addressed the problem of remedies for the wrongfully convicted. We saved the most difficult assignment, examining the administration of the death penalty, for last.

Our approach to each of these topics was essentially the same. First, the Commissioners were supplied with binders containing relevant background reading, including the latest research and studies. At one of our monthly meetings, the Commissioners identified the questions that called for more research, and agreed upon a set of "focus questions" to guide the testimony of witnesses at a public hearing. Contracts were negotiated with Professors at California law schools to provide any necessary additional surveys and research.

Public hearings were scheduled to address each topic. Invited witnesses included leading experts and representatives of prosecutorial agencies, public defenders and private defense lawyers, the judiciary, victims, and police and sheriff's departments. Time was reserved at each hearing for public comment.

The Commission then discussed tentative recommendations, and a tentative report was drafted. The deliberations were always vigorous, candid and insightful. The cumulative practical experience of the Commissioners greatly enriched the process, ensuring many perspectives were considered. Numerous successive drafts were prepared and examined, circulated by email. Most reports required several meetings to discuss and resolve our differences. What emerged, with rare exceptions, was unanimous agreement in our recommendations.

Together, the reports and recommendations in this volume present a hefty agenda of reform for the Legislature and the Governor, as well as many recommendations of best practices for prosecutors, defense lawyers, judges and police agencies. We hope that the implementation of these recommendations will reduce the risk of wrongful convictions in California. That risk will never be completely eliminated, as long as human error is possible. Because wrongful convictions leave guilty perpetrators free to victimize and deprive the innocent of their liberty, we should strive to do everything humanly possible to get it right.

Gerald F. Uelmen
*Executive Director, California Commission on the Fair Administration of Justice*

Exhibit 1
Page 8

# Table of Contents

**COMMISSIONERS** . . . . . . . . . . . . . . . . . . . . . . . . 1

**RECOMMENDATIONS SUMMARY**

**Eyewitness Identification** . . . . . . . . . . . . . . . . . . . 10

**False Confessions.** . . . . . . . . . . . . . . . . . . . . . . . . 12

**Informant Testimony** . . . . . . . . . . . . . . . . . . . . . 13

**Problems with Scientific Evidence** . . . . . . . . . . . . 14

**Professional Responsibility and Accountability of**

**Prosecutors and Defense Lawyers** . . . . . . . . . . . . 16

**Remedies** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**Death Penalty** . . . . . . . . . . . . . . . . . . . . . . . . . . 19

**REPORTS**

**Eyewitness Identification**

• Data & Hearings . . . . . . . . . . . . . . . . . . . . . . . . 24

• Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

• Recommendations . . . . . . . . . . . . . . . . . . . . . . 27

• Dissent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

• Response to Dissent . . . . . . . . . . . . . . . . . . . . . 31

• Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

**False Confessions**

• Data & Hearings . . . . . . . . . . . . . . . . . . . . . . . . 34

• Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

• Recommendations . . . . . . . . . . . . . . . . . . . . . . 38

• Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

**Informant Testimony**

• Data & Hearings . . . . . . . . . . . . . . . . . . . . . . . . 44

• Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

• Recommendations . . . . . . . . . . . . . . . . . . . . . . 49

• Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

**Problems with Scientific Evidence**

• Data & Hearings . . . . . . . . . . . . . . . . . . . . . . . . 52

• Report: DNA Testing Backlogs . . . . . . . . . . . . . . 54

• Recommendations: DNA Testing Backlogs . . . . . . 57

• Report: Forensic Science Evidence . . . . . . . . . . 58

• Recommendations: Forensic Science Evidence . . 65

• Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Exhibit 1

Page 9

**Professional Responsibility and Accountability of Prosecutors and Defense Lawyers**
- Data & Hearings . . . . . . . . . . . . . . . . . . . . . . . 68
- Report: Reporting Misconduct . . . . . . . . . . . . . . 70
- Recommendations: Reporting Misconduct. . . . . . 79
- Dissent: Reporting Misconduct . . . . . . . . . . . . . 81
- Report: Exculpatory Evidence . . . . . . . . . . . . . . 85
- Recommendations: Exculpatory Evidence . . . . . . 90
- Report: Funding Defense Services . . . . . . . . . . . 91
- Recommendations: Funding Defense Services. . 100
- Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

**Remedies**
- Data & Hearings . . . . . . . . . . . . . . . . . . . . . . . 102
- Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103
- Recommendations . . . . . . . . . . . . . . . . . . . . . 109
- Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

**Death Penalty**
- Data & Hearings . . . . . . . . . . . . . . . . . . . . . . . 112
- Introduction: Charge and Nature of Inquiry . . . . 113
- Summary of Recommendations. . . . . . . . . . . . . 115
- Part A: Why the System Is Broken, and What It Will Take to Fix It
  - 1. California's Death Penalty Law . . . . . . . 119
  - 2. Excessive Delay in California. . . . . . . . . 121
  - 3. Ineffective Assistance of Counsel . . . . . 125
  - 4. The Risks of Wrongful Executions, Wrongful Convictions, and Wrongful Death Sentences . . . . . . . . . . . . . . . . . . . 126
  - 5. Recommendations for the Trial of Death Penalty Cases. . . . . . . . . . . . . . . . . . . . . 127
  - 6. Recommendations for the Direct Appeal of Death Penalty Cases. . . . . . . . . . . . . . . 131
  - 7. Recommendations for State Habeas Corpus Review of Death Judgments . . . . . . 133

- 8. Recommendations for Federal Habeas Corpus Review of California Death Judgments. . . . . . . . . . . . . . . . . . . . . . . . . 136
- Part B: Available Alternatives
  - 1. The Alternative of Narrowing the List of Special Circumstances . . . . . . . . . . . . . . . 138
  - 2. The Alternative of Establishing the Maximum Penalty at Lifetime Incarceration . . . . . . . . . 142
  - 3. Estimating the Annual Additional Costs of Four Alternatives . . . . . . . . . . . . . . . . . 144
- Part C: Administrative Reforms
  - 1. Reducing the California Supreme Court Backlog . . . . . . . . . . . . . . . . . . . . . . . . . . 147
  - 2. Explaining Racial and Geographic Disparities . . . . . . . . . . . . . . . . . . . . . . . . 149
  - 3. Comprehensive Data Collection and Monitoring . . . . . . . . . . . . . . . . . . . . . . . 152
  - 4. The Need for Greater Transparency in the Exercise of Prosecutorial Discretion to Pursue the Death Penalty. . . . . . . . . . . . . . . . . . . 155
  - 5. The Governor's Clemency Power in Death Penalty Cases. . . . . . . . . . . . . . . . . . . . . 156
- Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . 157
- Appendix I: Focus Questions . . . . . . . . . . . . . . 158
- Appendix II: Federal Grants of Relief in California Capital Cases . . . . . . . . . . . . . . . . . . 159
- Separate Statement of Commissioner Brown . . . 162
- Separate Statement of Commissioner Bratton. . . 163
- Separate Statement of Commissioners Totten, Boscovich, Cottingham, Dunbar, Hill . . . . . . . . . 163
- Separate Statement of Commissioner Mayorkas . 168
- Separate Statement of Commissioners Bellas, Freehling, Hersek, Hing, Judge, Laurence, Moulds, Ring. . . . . . . . . . . . . . . . . . . . . . . . . . 168
- Separate Statement of Commissioners Streeter, Ridolfi, Hersek, Laurence . . . . . . . . . . . . . . . . 174

**ACKNOWLEDGMENTS**. . . . . . . . . . . . . . . . . . . . 184

Exhibit 1
Page 10

Exhibit 1
Page 11

# Commissioners

## John K. Van De Kamp

*Chair*

John K. Van de Kamp has a long career in public service. After graduating from Stanford Law School in 1959, he worked in the L.A. U.S. Attorney's Office from 1960 to 1967 and then served as the Director of the Executive Office of US Attorneys in Washington from 1968–69. In 1971 he became the Central District's first Federal Public Defender. In 1975, Van de Kamp was appointed Los Angeles County District Attorney, and was subsequently elected twice. Van de Kamp was elected California's Attorney General in 1982 and served two terms.



After an unsuccessful run for the Governor's Office in 1990, he left office in 1991. Van de Kamp is now Of Counsel at Dewey LeBoeuf LLP in Los Angeles.

## Jon Streeter

*Vice Chair*



Jon Streeter is a partner with Keker & Van Nest in San Francisco. He specializes in complex commercial civil litigation and has handled capital litigation at all phases of the process. Jon is past-President of the Association of Business Trial Lawyers of Northern California and past-President of the Bar Association of San Francisco. He has been named one of 100 Super Lawyers in Northern California by San Francisco Magazine, and he is listed in Chambers USA's directory of America's Leading Lawyers for Business. In addition to his commercial practice and varied bar leadership activities, Jon maintains an active pro bono practice.

Exhibit 1
Page 12

# Gerald F. Uelmen

*Executive Director*

Gerald F. Uelmen is a Professor of Law at Santa Clara University School of Law, where he served as Dean from 1986–1994. He began his career as a federal prosecutor in Los Angeles. He has appeared as defense counsel in numer-



ous high-profile cases, including the cases against Daniel Ellsberg, Christian Brando and O.J. Simpson. During the past six years, he has defended the rights of Californians to use marijuana for medicinal

purposes in five cases, including cases before the U.S. Supreme Court and the California Supreme Court. He is a past president of the California Academy of Appellate Lawyers and of California Attorneys for Criminal Justice.

# Diane Bellas

*Commissioner*



Diane Bellas was appointed the Alameda County Public Defender in 2000, after performing a range of assignments over two decades in the department. Ms. Bellas is a past President of the

California Public Defenders Association. She is a member emeritus of the American Inn of Court, Earl Warren Chapter, and was a Robert Wood Johnson Foundation, Urban Health Initiative Fellow. She served, by appointment of the Chief

Justice, on the Judicial Council of California, Collaborative Justice Courts Advisory Committee. In addition to her administrative duties, Ms. Bellas represents clients in the Alameda County Homeless Court.

# Harold "Bosco" Boscovich

*Commissioner*

Harold "Bosco" Boscovich retired from the Alameda County District Attorney's Office in March, 2004 after more than 32 years of service. He retired as a Captain of Inspectors and the Director of the Victim/Witness Assistance Division, the unit which he began in November, 1974. Prior to his employment with the District Attorney's Office he served as a police officer in the City of Oakland for over 8 years. He returned to work with the District Attorney's Office, as Site Manager, to

begin the operation of the Alameda County Family Justice Center in Oakland, "a one-stop shop" for victims of domestic violence, sexual assault, child abuse, and elder abuse. He is also the Training Coordinator



for the California Victim Service Training Institute responsible for the training of all victim advocates in California's 58 counties.

Exhibit 1
Page 13

Commissioners

**3**

# William J. Bratton

*Commissioner*



William J. Bratton was appointed by Mayor James Hahn in October 2002. The only person ever to serve as chief executive of the LAPD, the NYPD, and the Boston Police Department. Chief Bratton established an international reputation for reengineering police departments and fighting crime in the 1990s. A Vietnam veteran, Chief Bratton began his policing career in 1970, as a police officer with the Boston Police Department, rising to Superintendent of Police, the department's highest sworn rank, in just ten years. In the 1980s, Chief Bratton headed two other police agencies, the Massachusetts Bay Transportation Authority Police and the Massachusetts Metropolitan District Commission Police.

# Jerry Brown

*Commissioner*



Edmund G. Brown, Jr., known as Jerry, was elected by Californians as their 31st Attorney General in November 2006. In 1970, he was elected California Secretary of State. Brown was elected Governor in 1974 and reelected in 1978. Brown again practiced law in Los Angeles and in 1989 became chairman of the state Democratic Party. In 1998, Brown ran for mayor of Oakland, won, and was re-elected in 2002. In the field of crime fighting, Brown enacted hundreds of tough anti-crime measures, including the "Use A Gun Go To Prison" Law and mandatory sentences for rape, sale of heroin, violent crimes against the elderly, child molestation and selling PCP.

# Gerald Chaleff

*Representative of Chief Bratton*

Gerald Chaleff represents Chief William Bratton on the Commission. Chaleff was appointed to the Los Angeles Police Department by Chief Bratton on January 13, 2003. He serves



as Bureau Chief and Commanding Officer of the Consent Decree Bureau (CDB). As Bureau Chief of CDB, Mr. Chaleff oversees the operations of the Audit Division and the Civil Rights Integrity Division, which is responsible for the Department's implementation of the Consent Decree with the United States Department of Justice. In 1997, Mr. Chaleff was appointed to the Los Angeles Board of Police Commissioners, and elected as President of the Board from 1999 to 2001. He also served as President of the Los Angeles County Bar Association.

Exhibit 1
Page 14

## Ron Cottingham

*Commissioner*

Ron Cottingham joined the Commission representing the Peace Officers Research Association



of California (PORAC). Ron was elected president of PORAC in November 2003 and has been unanimously re-elected to consecutive terms. Ron has been continually employed by the San Diego Sheriffs

Department since 1973. In 1986 Ron was selected by the Sheriff's Department to establish and supervise the department's centralized investigative unit for child abuse/sexual assault. Then in 1997 Ron was selected to establish and supervise the department's centralized domestic violence investigative unit for the Sheriff's Department. Ron has graduated from the POST Supervisory School and the POST Management School.

## Glen Craig

*Commissioner*



Glen Craig is a veteran of 44 years in Law Enforcement having served with four different departments at both the state and local level. He began his career with the Visalia, CA, Police Department in 1955 upon his discharge from the United States Army. In 1956 he joined the California Highway Patrol and became the Commissioner in 1975, serving until 1983. In 1983 he was appointed Director of the Division of Law Enforcement at the State Department of Justice. He was elected Sheriff of

Sacramento County in 1986 where he served three terms and retired in 1999. He is a past-President of the California Peace Officers' Association and the American Association of Motor Vehicle Administrators.

## Chief Pete Dunbar

*Commissioner*

Chief Pete Dunbar, of Pleasant Hill, joined the Commission representing the California Police Chiefs' Association. Chief Dunbar started with the Oakland Police Department in 1982. In 1999, he was appointed as a Deputy Chief. In February of 2006, he was appointed as Chief of Police of



the Pleasant Hill Police Department. Chief Dunbar is a graduate of the POST Master Instructor Development Program and a graduate of the POST Command College. He taught Criminal Law and Search

and Seizure in the Police Academy and in-service training classes. He currently teaches Strategic Planning in the POST Management Course for the San Diego Regional Training Center.

Exhibit 1
Page 15

# James P. Fox

*Commissioner*

James P. Fox was elected
District Attorney of San
Mateo County in June
1982 and has been re-
elected every four years
since without opposition.



He joined the San Mateo County District Attorney's
office in January 1970. In January, 1974, Mr. Fox
left the District Attorney's office and served as a
member of the Private Defender Panel of the San
Mateo County Bar Association. Mr. Fox has been
active in both the California District Attorneys'
Association and the National District Attorneys'
Association. He is a past President of CDAA and
chairman of the Legislative Committee since 1990.
He is also the current President of NDAA.

# Rabbi Allen I. Freehling

*Commissioner*

Rabbi Allen I. Freehling has served as the
Executive Director of the Human Relations
Commission of the City of Los Angeles since
2002. Previously, he was the Senior Rabbi of
University Synagogue for 30 years. He is a highly
respected community activist who has held a
vast number of leadership and board positions
including President of the Board of Rabbis of Los



Angeles, founding Chair
of both the LA County
Commission on AIDS
and the International
Association of Physicians
in AIDS care, and
founding Facilitator
of the Muslim-Jewish
Dialogue. He holds an

undergraduate degree from the University of
Miami, a bachelor's, master's and honorary degree
from Hebrew Union College, from which he was
ordained in 1967.

# Janet Gaard

*Representative of Jerry Brown*

Janet Gaard represents California Attorney
General Jerry Brown
on the Commission,
replacing Scott Thorpe
and Dane Gillette. Janet
has been a member of
the Attorney General's
Office since 1984. For
14 years, she was a
Deputy Attorney General



in the Criminal Law Division. In 1999, she was
appointed Director of Legislative Affairs for the
Department of Justice and a Special Assistant
Attorney General, providing legal and policy
advice to the Attorney General and the Chief
Deputy Attorney General on criminal law and law
enforcement issues. She was recently appointed
by Governor Schwarzenegger to the Yolo County
Superior Court.

**Commissioners**

**5**

Exhibit 1
Page 16

## Micheal Hersek

*Commissioner*

Michael Hersek, a San Francisco resident, worked as a staff attorney at the California Supreme Court from 1989–1991 and 1999–2004, advising the seven Justices on non-capital criminal matters. From 1991–1999, he worked as a Deputy State Public Defender at the Office of the State Public Defender in San  Francisco. He served as an adjunct professor at Golden Gate University School of Law, from 2000 to 2004. In June 2004, Governor Schwarzenegger appointed Hersek to serve as State Public Defender.

## Sheriff Curtis Hill

*Commissioner*

 Sheriff Curtis Hill, of San Benito County, joined the Commission representing the California State Sheriffs' Association. Sheriff Hill began his career with the San Benito County Sheriff's office in 1976. In 1988 he was appointed Undersheriff, a position he held for ten years. Sheriff Hill was elected Sheriff in November of 1998. He was elected to his third term in 2006. Sheriff Hill is a 1989 graduate of the FBI National Academy. He is currently an officer with the California State Sheriff's

Association and past President of the California State Coroner's Association. He is a past member of the Corrections Standards Authority.

## Bill Ong Hing

*Commissioner*

Bill Ong Hing is a Professor of Law at the University of California, Davis. He teaches Judicial Process, Negotiations, Public Service Strategies, Asian American History, and directs the law school clinical program. He is the author of numerous academic and practice-oriented books. His books include Deporting Our Souls—Values, Morality, and Immigration Policy (Cambridge Press 2006), Defining America Through Immigration Policy (Temple Univ. Press 2004), Making and Remaking Asian America Through Immigration Policy (Stanford Press 1993), and Handling Immigration Cases (Aspen Publishers 1995). His book To Be An American, Cultural Pluralism and the Rhetoric of Assimilation (NYU Press 1997)  received the award for Outstanding Academic Book in 1997 by the librarians' journal Choice.

Exhibit 1
Page 17

Commissioners

7

# Michael P. Judge

*Commissioner*

Michael P. Judge is the Chief Public Defender for the County of Los Angeles, California. He



was appointed by the Chief Justice in 2000 to the Judicial Council of California: Collaborative Justice Courts Advisory Committee. He has co-authored several articles on indigent defense to be released shortly by the Kennedy School of Government and Harvard Law School. Mr. Judge served as the Chairperson of a ten person committee of the State Bar to establish Guidelines for Indigent Criminal Defense Providers in California, which were promulgated in 2006. He continues to serve as the Chairperson of the California Public Defenders Association Legislative Committee.

# George Kennedy

*Commissioner*

George Kennedy was elected Santa Clara County District Attorney in 1990, and reelected in 1994, 1998, and 2002. He attended the National College of District Attorneys and the F.B.I. National Law Academy.



He is past president of the California District Attorneys Association, a former director of the National District Attorneys Association, and past chairperson of the Santa Clara County Domestic Violence Council. He was a California Peace Officer Standards and Training Commissioner from 1993 to 1996. He is currently a gubernatorial appointee to the California Council on Criminal Justice. He oversaw the Santa Clara County Laboratory of Criminalistics while District Attorney.

# Michael Laurence

*Commissioner*

Michael Laurence is the Executive Director of the Habeas Corpus Resource Center, a California Judicial Branch agency created to provide representation to death-row inmates in state and federal habeas proceedings. Since 1987, Mr. Laurence has represented death-row inmates in a dozen evidentiary hearings, argued numerous cases before the California Supreme Court and



the federal courts of appeals, and in March 1998, argued before the United States Supreme Court. Mr. Laurence was a Criminal Justice Research Consultant with the Office of the California Attorney General.

Exhibit 1
Page 18

# Alejandro Mayorkas

*Commissioner*

Alejandro Mayorkas is the former U.S. Attorney for the Central District of California and is currently a partner in the Los Angeles office of O'Melveny & Myers LLP. At the age of 39 Mr. Mayorkas was the youngest U.S. Attorney in the nation. He super-



vised more than 240 Assistant U.S. Attorneys and oversaw the investigation and prosecution of cases involving complex securities and financial institution fraud, international money laundering, civil rights violations, high-tech and computer-related crime, defense procurement fraud, corrupt public officials, environmental crime, organized crime, narcotics trafficking, and racketeering. Mr. Mayorkas has extensive jury trial experience, having been before a jury in more than thirty cases.

# Judge John Moulds

*Commissioner*

Judge John F. Moulds is a Magistrate Judge for the U. S. District Court for the Eastern District of California, and has served in that position since 1986. From 1987 to 1997 he was Chief Magistrate Judge for the district. In 1992 and 1993 he was President of the Federal Magistrate Judges' Association. From 1960 to 1963 Judge Moulds worked as Administrative Assistant to State Senator Albert S. Rodda. After



graduating from University of California, Boalt Hall School of Law in 1966, he worked as an attorney with California Rural Legal Assistance for three years before entering private practice with the law firm of Blackmon, Isenberg and Moulds.

# Kathleen "Cookie" M. Ridolfi

*Commissioner*

Kathleen "Cookie" Ridolfi, Professor of Law, is co-founder and director of the Northern California Innocence Project (NCIP) at Santa Clara University. She is co-founder and past-President of the Innocence Network, an international collective of innocence projects assisting prisoners with claims of wrongful conviction and promoting law reform to address the causes of wrongful conviction.



Cookie is an experienced and highly regarded trial lawyer. She was a pioneer in the application of social science research in the jury selection process and in the development of expert testimony for use in battered women's self-defense cases.

Exhibit 1
Page 19

Commissioners

9

# Douglas R. Ring

*Commissioner*
Douglas Ring is both a private investor and an attorney. His company, The Ring Group, is a diversified real estate investment company, owning



properties in California, the Northwest, the Midwest, and Virginia. Mr. Ring served the City of Los Angeles as a Commissioner of the Los Angeles Community Redevelopment Agency. As an attorney, he specialized in both administrative and real estate law. Before entering private practice, Mr. Ring was a Deputy Los Angeles County Supervisor and a United States Congressional Field Representative. Mr. Ring was named one of "Ten Leading Los Angeles Property Lawyers" by the Los Angeles Daily Journal.

# Gregory D. Totten

*Commissioner*



Gregory D. Totten was elected district attorney of Ventura County in 2002. He is a graduate of Pepperdine University School of Law and joined the Ventura County District Attorney's Office in 1982. He served as executive director of the California District Attorneys Association from 1993 to 1996. Mr. Totten was also the founding executive director of the Institute for the Advancement of Criminal Justice. Throughout his professional career, Mr.

Totten has worked to protect and expand the rights of crime victims. Mr. Totten serves on the boards of community groups including Crime Victims United.

# Chris Boscia

*Staff*
Chris Boscia joined the Commission in March 2006 as Executive Assistant. Chris graduated from Boston College with bachelor's and master's degrees in Theology. While working for the Commission, Chris finished a Juris Doctorate from Santa Clara University School of Law and co-taught a seminar for upper division law students on Wrongful



Convictions and the Legislative Process. Chris was a pupil in the Honorable William A. Ingram American Inn of Court in San Jose and received the American Law Institute-American Bar Association Outstanding Scholar and Leader Award for the Class of 2008. Chris plans to take the California Bar Exam.

Exhibit 1
Page 20

# Recommendations Summary

## Eyewitness Identification

### THE LEGISLATURE

**1** Programs be provided and required to train police in the use of recommended procedures for photo spread, show-ups and lineups.

**2** Provision of adequate funding for any training necessitated by the recommendations of this Commission.

**3** The enactment of legislation to require the Attorney General of California to convene a task force in conjunction with POST, local law enforcement agencies, prosecutors and defense attorneys, to develop Guidelines for policies, procedures and training with respect to the collection and handling of eyewitness evidence in criminal investigations by all law enforcement agencies operating in the State of California.

(a) The Guidelines should be consistent with the recommendations of this Commission, and should be promulgated to all law enforcement agencies operating in the State of California.

(b) The Task Force should report back to the legislature within one year.

### POLICE AGENCIES

**1** A minimum of six photos should be presented in a photo spread, and a minimum of six persons should be presented in a lineup. The fillers or foils in photo spreads and lineups should resemble the description of the suspect given at the time of the initial interview of the witness unless this method would result in an unreliable or suggestive presentation.

**2** Photo spreads and lineups should be presented to only one witness at a time, or where separate presentation is not practicable, witnesses should be separated so they are not aware of the responses of other witnesses.

**3** Double-blind identification procedures should be utilized whenever practicable, so the person displaying photos in a photo spread or operating a lineup is not aware of the identity of the actual suspect. When double-blind administration is not practicable, other double-blind alternatives should be considered.

**4** When double-blind procedures are utilized, the use of sequential presentation of photos and lineup participants is preferred, so the witness is only presented with one person at a time.

Exhibit 1
Page 21

Recommendations

(a) Photos or subjects should be presented in random order, and witnesses should be instructed to say yes, no or unsure as to each photo or participant.

(b) Sequential procedures should not be used where double-blind administration is not available.

**5** All witnesses should be instructed that a suspect may or may not be in a photo spread, lineup or show-up, and they should be assured that an identification or failure to make an identification will not end the investigation.

**6** At the conclusion of a lineup, photo presentation, or show-up, a witness who has made an identification should describe his or her level of certainty, and that statement should be recorded or otherwise documented, and preserved. Witnesses should not be given feedback confirming the accuracy of their identification until a statement describing level of certainty has been documented.

**7** Live lineup procedures and photo displays should be preserved on video tape, or audio tape when video is not practicable.

(a) When video taping is not practicable, a still photo should be taken of a live lineup.

(b) Police acquisition of necessary video equipment should be supported by legislative appropriations.

**8** A single subject show-up should not be used if there is probable cause to arrest the suspect. The suggestiveness of show-ups should be minimized by documenting a description of the perpetrator prior to the show-up, transporting the witness to the location of the suspect, and where there are multiple witnesses they should be separated,

and lineups or photo spreads should be used for remaining witnesses after an identification is obtained from one witness.

**9** Training programs be provided and required to train law enforcement in the use of recommended procedures for photo spread, show-ups and lineups.

## JUDGES

**1** The standardized jury instructions utilized in eye witness identification cases to acquaint juries with factors that may contribute to unreliable identifications be evaluated in light of current scientific research regarding cross-racial identifications and the relevance of the degree of certainty expressed by witnesses in court.

**2** Training programs be provided and required to acquaint judges with the particular risks of cross-racial identifications, as well as unreliable identification procedures, and the use of expert testimony to explain these risks to juries.

## PROSECUTORS

Training programs be provided and required to acquaint them with the particular risks of cross-racial identifications, as well as unreliable identification procedures, and the use of expert testimony to explain these risks to juries.

## DEFENSE ATTORNEYS

Training programs be provided and required to acquaint them with the particular risks of cross-racial identifications, as well as unreliable identification procedures, and the use of expert testimony to explain these risks to juries.

11

Exhibit 1
Page 22

# False Confessions

## THE LEGISLATURE

**1** The enactment of the following statute to require the recording of the entirety of custodial interrogations of individuals suspected of all serious felonies:

*Section 1: Definitions.*

*(a) "Electronic Recording" or "Electronically Recorded" means an audio, video or digital audio or video recording that is an authentic, accurate, complete, unaltered record of a custodial interrogation, including a law enforcement officer's advice of the person's constitutional rights and ending when the interview has completely finished.*

*(b) "Serious Felony" means any of the offenses listed in Section 1192.7(c) of the California Penal Code.*

*(c) "Statement" means an oral, written, sign language or nonverbal communication.*

*Section 2: Electronic Recording Required.*
*All Statements made during custodial interrogation relating to a Serious Felony shall be Electronically Recorded.*

*Section 3: Cautionary Instruction Required.*
*If any Statement is admitted in evidence in any criminal proceeding which occurred during custodial interrogation which was not Electronically Recorded in its entirety in compliance with Section 2, the court shall, at the request of the defendant, provide the jury with an instruction in a form to be recommended by the California Judicial Council, which advises the jury to view such statements with caution.*

*Section 4: Handling and Preservation of Electronic Recordings of Custodial Interrogations relating to a Serious Felony.*

*(a) Every Electronic Recording of a Custodial Interrogation shall be clearly identified and catalogued by law enforcement personnel.*

*(b) If a juvenile or criminal proceeding is brought against a person who was the subject of an Electronically Recorded Custodial Interrogation, the Electronic Recording shall be preserved by law enforcement personnel until all appeals, post-conviction and habeas corpus proceedings are final and concluded, or the time within which they must be brought has expired, or the sentence has been completed.*

*(c) If no juvenile or criminal proceeding is brought against a person who has been the subject of an Electronically Recorded Custodial Interrogation, the related Electronic Recording shall be preserved by law enforcement personnel until all applicable state and federal statutes of limitations bar prosecution of the person.*

**2** The appropriation of funds, to be administered by the Attorney General, to provide grants to California Police Agencies that wish to implement programs to videotape custodial interrogations.

## POLICE AGENCIES

**1** All California law enforcement agencies to videotape the entirety of all custodial interrogations of felony suspects or, where videotaping is impractical, to audiotape the entirety of such custodial interrogations.

**2** Training programs be provided and required to train police about the causes, indicia and consequences of false confessions. Police interrogators should receive special training in how to identify and interrogate persons with developmental disabilities and juveniles.

Exhibit 1
Page 23

Recommendations

**JUDGES**

Training programs be provided and required to train them about the causes, indicia and consequences of false confessions.

**PROSECUTORS**

Training programs be provided and required to train them about the causes, indicia and consequences of false confessions.

**DEFENSE ATTORNEYS**

Training programs be provided and required to train them about the causes, indicia and consequences of false confessions.

# Informant Testimony

**THE LEGISLATURE**

**1** The enactment of a statutory requirement of corroboration of in-custody informants, similar to the current requirement of the corroboration of accomplices contained in Penal Code Section 1111.

**2** The statute should provide:

(a) A conviction can not be had upon the testimony of an in-custody informant unless it be corroborated by such other evidence as shall independently tend to connect the defendant with the commission of the offense or the special circumstance or the circumstance of aggravation to which the in-custody informant testifies.

(b) Corroboration is not sufficient if it merely shows the commission of the offense or the special circumstance or the circumstance in aggravation.

(c) Corroboration of an in-custody informant cannot be provided by the testimony of another in-custody informant.

(d) An in-custody informant is hereby defined as a person, other than a codefendant, percipient witness, accomplice or coconspirator whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution.

**3** A jury should be instructed in accordance with the language of this statute. A jury should not be instructed that corroborating evidence may be slight, as in CALCRIM No. 335.

**POLICE AGENCIES**

**1** An express agreement in writing, whenever feasible, should describe the range of recommended rewards or benefits that might be afforded in exchange for truthful testimony by an arrested or charged informant.

**2** Training programs to include a component addressing the use of arrested or charged informants as witnesses.

**PROSECUTORS**

**1** An express agreement in writing, whenever feasible, should describe the range of recommended rewards or benefits that might be afforded in exchange for truthful testimony by an arrested or charged informant.

**2** California District Attorney Offices adopt a written internal policy, wherever feasible, to govern the use of in-custody informants.

Exhibit 1
Page 24

**3** The policy should provide:

(a) The decision to use the testimony of an in-custody informant be reviewed and approved by supervisory personnel other than the deputy assigned to the trial of the case;

(b) The maintenance of a central file preserving all records relating to contacts with in-custody informants, whether they are used as witnesses or not;

(c) The recording of all interviews of in-custody informants conducted by District Attorney personnel;

(d) The corroboration of any testimony of an in-custody informant by evidence which independently tends to connect the defendant with the crime, special circumstance or circumstance in aggravation to which the informant testifies.

**4** Training programs to include a component addressing the use of arrested or charged informants as witnesses.

### JUDGES

Training programs to include a component addressing the use of arrested or charged informants as witnesses.

### DEFENSE ATTORNEYS

Training programs to include a component addressing the use of arrested or charged informants as witnesses.

# Problems with Scientific Evidence

### THE DEPARTMENT OF JUSTICE

**1** Immediately ascertain the staffing levels required for the State Laboratory to reduce the backlog in the uploading of DNA profiles to thirty days or less, both now and when the demands of Proposition 69 take effect, including the salary level necessary to fill and maintain those staffing levels.

**2** The California Attorney General to immediately commence consultation with state and local public laboratories, criminalists, law enforcement, prosecutor's offices, public defenders and private defense lawyers, victim representatives and judges to address the problems of DNA forensic technology resources in California. The following concerns should be urgently addressed:

(a) The nature and scope of current capacity problems, backlogs of unprocessed evidence and systems issues that impede the utilization of DNA forensic technology to its fullest potential.

(b) The best practices that enhance collection and timely processing of DNA evidence, including crime scene and rape kit evidence, to meet the needs of the criminal justice system.

(c) Recommendations for eliminating current backlogs and prevention of future backlogs of unprocessed evidence in state and local public laboratories.

(d) Evaluation of the efficiency and effectiveness of the current organization of resources in the State of California, to determine what systems and strategies will most effectively serve the needs of the State of California.

Exhibit 1
Page 25

Recommendations

15

(e) Recommended strategies for training and educational programs to address the shortages of trained personnel to meet the staffing needs of crime labs throughout the State of California.

(f) Assessment of the impact of "cold hits" upon local investigative, prosecution and defense resources.

(g) Reporting to the Legislature and Governor regarding the legislative or administrative steps that must be taken to insure timely processing of evidence in California's criminal justice system.

## THE LEGISLATURE AND THE GOVERNOR

**1** Emergency budget appropriations should be immediately introduced, to provide state funding to staff the State Laboratory at the levels ascertained pursuant to the Department of Justice's study of appropriate staffing levels.

**2** The Legislature and the Governor provide adequate support to quickly respond to the needs identified by the Attorney General in his consultation with state and local public laboratories, criminalists, law enforcement, prosecutor's offices, public defenders and private defense lawyers, victim representatives and judges to address the problems of DNA forensic technology resources in California.

**3** The enactment of legislation to require that any allegation of professional negligence or misconduct that would affect the integrity of the results of a forensic analysis conducted by a California laboratory, facility or entity be reported in a timely manner to the District Attorney or other appropriate prosecutorial agency, and to require the District Attorney or other prosecutorial agency to which

such allegations are reported to report the results of any independent investigations of such allegations to the State Attorney General.

**2** The creation or designation of a governmental agency or commission (which could be the office of the California Attorney General) with the power and duty to formulate and apply standards to define who is qualified to perform analysis of evidence in any particular scientific discipline on a statewide basis.

(a) The creation or designation of such an entity should be preceded by an opportunity for the Forensic Science community and all affected criminal justice agencies to be heard from, to elicit a wide spectrum of views as to how these needs can best be met.

(b) Rigorous written examinations, proficiency testing, continuing education, recertification procedures, an ethical code, and effective disciplinary procedures could be part of such a program.

(c) Such an agency could also promulgate standards for scientific testing, report writing, and the parameters of appropriate expert testimony; provide information to all participants in the criminal justice system regarding the evidentiary validity of forensic science evidence; identify and fund research needs and opportunities; and provide state-wide training programs for forensic experts.

## CRIME LAB DIRECTORS

The certification of the forensic experts they employ, and the use of certification wherever possible as a basis for promotion and salary decisions.

Exhibit 1
Page 26

### POLICE AGENCIES

Training programs for California prosecutors, defense lawyers, judges and police investigators be expanded to include greater attention to the appropriate use and validity of forensic science evidence.

### JUDGES

Training programs be expanded to include greater attention to the appropriate use and validity of forensic science evidence.

### PROSECUTORS

Training programs be expanded to include greater attention to the appropriate use and validity of forensic science evidence.

### DEFENSE ATTORNEYS

Training programs be expanded to include greater attention to the appropriate use and validity of forensic science evidence.

# Professional Responsibility and Accountability of Prosecutors and Defense Lawyers

### THE LEGISLATURE

The enactment of legislation to provide that when Counties contract for indigent defense services in criminal cases, the contract shall provide separate funding for accessing technology and criminal justice databases to the extent those are provided by law, legal research tools, travel expenses, forensic laboratory fees and costs, data processing, modern exhibit capabilities, paralegals, investigators and expert witnesses with appropriate

qualifications and experience. Full time defense counsel should be compensated at rates equivalent to comparable prosecutors.

### POLICE AGENCIES

**1** All police and other investigative agencies formulate policies and procedures to systematically collect any potential *Brady* material and, consistent with the statutory protections for personnel records, promptly deliver it to prosecutors.

**2** Training programs for peace officers include full treatment of the obligation to disclose *Brady* material to the prosecutor.

### PROSECUTORS

**1** All District Attorney Offices formulate and disseminate a written Office Policy to govern *Brady* compliance.

(a) This policy should provide for gathering *Brady* material in a systematic fashion from all appropriate sources in a manner that is consistent with *Pitchess*, tracking the delivery of the material, and disclosing material determined to be relevant.

(b) The policy should provide that material relevant to factual innocence or an affirmative defense be disclosed as soon as that determination is made, and prior to entry of a guilty plea.

**2** A list organized and maintained by each District Attorney's office should be created pursuant to procedures and standards established by that office, in consultation with law enforcement agencies, peace officer associations representing law enforcement officers, and Public Defender Offices.

Exhibit 1
Page 27

(a) The list should contain the names of police officers and other recurring witnesses as to whom there is information that may be subject to disclosure requirements under *Brady*.

(b) This list should include all facially credible information that might reasonably be deemed to undermine confidence in a conviction in which the law enforcement employee is a material witness, and is not based upon mere rumor, unverifiable hearsay, or an irresolvable conflict in testimony about an event.

**3** Training programs be conducted to assure that all deputy district attorneys understand and apply office policies and procedures with regard to *Brady* disclosure and *Pitchess* motions. If feasible, joint training programs should be organized to include prosecutors, public defenders and other criminal defense lawyers.

## JUDGES

**1** The adoption of the following California Rule of Court:

(a) When notification of the State Bar is required of a court pursuant to California Business and Professions Code Section 6086.7(a),

1. If the order of contempt, modification or reversal of judgment, imposition of judicial sanctions or imposition of a civil penalty is signed by a Superior Court judge or magistrate, that judge or magistrate shall notify the State Bar. Modification of a judgment includes the vacation of a judgment in granting an Extraordinary Writ.

2. If the order of contempt, modification or reversal of judgment, imposition of judicial sanctions or imposition of a civil penalty is by the Court of Appeal or the Supreme Court, the author of the Court's order or opinion shall notify the State Bar.

(b) The report to the State Bar shall include the State Bar member's full name, and State Bar number, if known.

(c) When notifying the attorney involved pursuant to California Business and Professions Code Section 6086.7(b), the judge, magistrate or Justice identified in this Rule shall also notify the attorney's supervisor, if known.

**2** The following changes in Canon 3D of the California Code of Judicial Ethics (Changes indicated in blue):

D. Disciplinary Responsibilities
   1. Whenever a judge has reliable information that another judge has violated any provision of the Code of Judicial Ethics, the judge shall take or initiate appropriate corrective action, which may include reporting the violation to the appropriate authority.

2. Whenever a judge has personal knowledge that a lawyer has violated any provision of the Rules of Professional Conduct, or makes a finding that such violation has occurred, the judge shall take appropriate corrective action.

Appropriate corrective action should include a prompt report to the State Bar and to the attorney's supervisor, if known, where an attorney in a criminal proceeding has engaged in egregious misconduct, including but not limited to:

(a) A willful misrepresentation of law or fact to a Court;

(b) Appearing in a judicial proceeding while intoxicated;

(c) Engaging in willful unlawful discrimination in a judicial proceeding;

Exhibit 1
Page 28

(d) Willfully and in bad faith withholding or suppressing exculpatory evidence (including impeachment evidence) which he or she is constitutionally obligated to disclose.

(e) Willful presentation of perjured testimony.

(f) Willful unlawful disclosure of victim or witness information.

(g) Failure to properly identify oneself in interviewing victims or witnesses.

Any doubt whether misconduct is egregious should be resolved in favor of reporting the misconduct.

3. A judge who is charged by prosecutorial complaint, information, or indictment or convicted of a crime in the United States, other than one that would be considered a misdemeanor not involving moral turpitude or an infraction under California law, but including all misdemeanors involving violence (including assaults), the use or possession of controlled substances, the misuse of prescriptions, or the personal use or furnishing of alcohol, shall promptly and in writing report that fact to the Commission on Judicial Performance.

4. A prompt report means as soon as practicable, and in no event more than thirty days after knowledge is acquired or a finding is made.

### THE STATE BAR

**1** Inclusion, in its annual report on the State Bar of California Discipline System, the number of Reportable Actions received from Courts pursuant to each of the four categories in Business and Professions Code Section 6068.7(a), and each of the six categories in Canon 3D(2) of the California Code of Judicial Ethics.

**2** Indication, in its annual report on the State Bar of California Discipline System, the number of Reportable Actions related to the conduct of prosecutors and defense lawyers by County.

(a) Defense lawyer data should be reported to distinguish public defenders, contract defenders, appointed lawyers, and privately retained lawyers.

(b) Prosecutorial data should be reported to distinguish district attorneys and city attorneys.

**3** Reconvening the Commission on the Delivery of Legal Services to the Indigent Accused to make recommendations regarding the adequacy of funding for defense services which meet acceptable standards of competent representation.

### LAW SCHOOLS

Courses in legal ethics and continuing education programs in legal ethics for prosecutors, defense lawyers and judges to include familiarity with the obligations to report misconduct and incompetent representation by lawyers, and the obligation of lawyers to self-report, to the California State Bar, as well as familiarity with the consequences of such reports with respect to the State Bar's investigatory and disciplinary authority.

# Remedies

## CALIFORNIA LEGISLATURE

**1** Services to assist with reintegration into society be available to all those released from custody. This would include assistance in locating housing, a cash allowance, clothing, and employment counseling.

Exhibit 1
Page 29

**2** The time limit for presentation of a claim for compensation for wrongful imprisonment of an innocent person, under California Penal Code §4901, be extended from six months after judgment of acquittal or discharge given, or after pardon granted, or after release from prison, to two years.

**3** A court granting judicial relief upon a claim of innocence be required to notify the petitioner of the availability of compensation pursuant to California Penal Code §4900, and the time limits for the filing of such claims.

**4** The requirement for a claim of victim compensation, under California Penal Code §4904, to establish that the claimant did not, by any act or omission either intentionally or negligently, contribute to the bringing about of his or her arrest or conviction, be limited to a showing that the claimant did not intentionally subvert the judicial process, so as not to exclude innocent persons who were victims of false confessions or improperly induced guilty pleas.

**5** The level of statutory compensation, under California Penal Code §4904, be substantially increased from one hundred dollars per day of incarceration, or a maximum of $36,500, to at least the level available under the federal system of compensation. There should also be an adjustment to increase the award to reflect the annual rate of inflation subsequent to enactment of this level of compensation.

**6** The enactment of legislation to provide for automatic expungement of the record of conviction whenever a final judgment of conviction is set aside or vacated and the Court makes a finding of the actual innocence of the defendant.

**7** The California Code of Civil Procedure be amended to provide that a two year Statue of Limitations for professional malpractice claims

shall commence upon the granting of post conviction relief in the form of a final judicial disposition of the underlying case.

**8** State funding for the Northern California Innocence Project and the California Innocence Project be restored.

# Death Penalty

## CALIFORNIA LEGISLATURE

**1** The Commission recommends that the California Legislature immediately address the unavailability of qualified, competent attorneys to accept appointments to handle direct appeals and habeas corpus proceedings in California death penalty cases:

(a) The Commission recommends that the backlog of cases awaiting appointment of counsel to handle direct appeals in death penalty cases be eliminated by expanding the Office of the State Public Defender to an authorized strength of 78 lawyers. This will require a 33% increase in the OSPD Budget, to be phased in over a three year period.[1]

(b) The Commission recommends that the backlog of cases awaiting appointment of counsel to handle habeas corpus proceedings in death penalty cases be eliminated by expanding the California Habeas Corpus Resource Center to an authorized strength of 150 lawyers. This will require a 500% increase in the CHCRC Budget, to be phased in over a five year period.[2]

(c) The Commission recommends that the staffing of the Offices of the Attorney General which handle death penalty appeals and habeas corpus proceedings be increased as needed to respond

---

1. Commissioner Hersek abstains from this recommendation.

2. Commissioner Laurence abstains from this recommendation.

Exhibit 1
Page 30

to the increased staff of the Office of the State Public Defender and the California Habeas Corpus Resource Center.

(d) The Commission recommends that funds be made available to the California Supreme Court to ensure that all appointments of private counsel to represent death row inmates on direct appeals and habeas corpus proceedings comply with ABA Guidelines 4.1(A), and are fully compensated at rates that are commensurate with the provision of high quality legal representation and reflect the extraordinary responsibilities in death penalty representation. Flat fee contracts should not be utilized unless an hourly alternative is available, and any potential conflicts of interest between the lawyer maximizing his or her return and spending for necessary investigation, and expert assistance and other expenses are eliminated.

**2** The Commission recommends that funds be appropriated to fully reimburse counties for payments for defense services pursuant to California Penal Code Section 987.9.

**3** The Commission recommends that the California Legislature reexamine the current limitations on reimbursement to counties for the expenses of homicide trials contained in Government Code Sections 15200–15204.

**4** The Commission recommends that upon the implementation of the Recommendations in Part A of this Report, serious consideration be given to a proposed constitutional amendment to permit the California Supreme Court to transfer fully briefed pending death penalty appeals from the Supreme Court to the Courts of Appeal. This amendment should not be adopted without the provision of adequate staff and resources for the Courts of Appeal, and provisions for ongoing monitoring by the Supreme Court.[3]

**5** The Commission recommends that upon the implementation of the Recommendations in Part A of this Report, changes to California statutes, rules and policies be seriously considered to encourage more factual hearings and findings in state habeas proceedings in death penalty cases, including a proposal to require petitions be filed in the Superior Court, with right of appeal to the Courts of Appeal and discretionary review by the California Supreme Court.

**6** The Commission recommends the establishment of a California Death Penalty Review Panel, to be composed of judges, prosecutors, defense lawyers, law enforcement representatives and victim advocates appointed by the Governor and the Legislature. It should be the duty of this Panel to issue an annual report to the Legislature, the Governor and the courts, gauging the progress of the courts in reducing delays, analyzing the costs of and monitoring the implementation of the recommendations of this Commission, and examining ways of providing safeguards and making improvements in the way the California death penalty law functions.[4]

**7** The Commission recommends that reporting requirements be imposed to systematically collect and make public cumulative data regarding all decisions by prosecutors in murder cases whether or not to charge special circumstances and/or seek the death penalty, as well as the disposition of such cases by dismissal, plea or verdict in the trial courts. The Legislature should impose a requirement upon courts, prosecutors and defense counsel to collect and report any data other than privileged material designated by the California Death Penalty Review Panel which may be necessary: (1) to determine whether demographics affect

---

3. Commissioners Bellas, Cottingham, Hill, Hing, Moulds, Ridolfi and Totten oppose this recommendation.

4. Commissioners Hill, Mayorkas and Totten oppose this recommendation.

Exhibit 1
Page 31

Recommendations

decisions to implement the death penalty, and if so, how; (2) to determine what impact decisions to seek the death penalty have upon the costs of trials and post-conviction review; and (3) to track the progress of potential and pending death penalty cases to predict the future impact upon the courts and correctional needs. The information should be reported to the California Department of Justice and the California Death Penalty Review Panel. The information reported should be fully accessible to the public and to researchers.[5]

☒ The Commission recommends that Article V, Section 8(a) of the California constitution be amended to read as follows:

> Art. V, Section 8(a). Subject to application procedures provided by statute, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each reprieve, pardon, and commutation granted or *denied.* ~~stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring.~~

☒ The Commission recommends that Penal Code Section 4813 be amended to make it discretionary rather than mandatory that requests for clemency by a twice convicted felon be referred to the Board of Prison Terms for a written recommendation.

## CALIFORNIA PROSECUTORS

The Commission recommends that each District Attorney Office in California formulate a written Office Policy describing when and how decisions to seek the death penalty are made, such as who participates in the decisions, and what criteria are applied. Such policies should also provide for input from the defense before the decision to seek the death penalty is made.

## CALIFORNIA COUNTIES

The Commission recommends that California counties provide adequate funding for the appointment and performance of trial counsel in death penalty cases in full compliance with ABA Guidelines 9.1(B)(1), 3.1(B), and 4.1(A)(2). Flat fee contracts that do not separately reimburse investigative and litigation expenses should not be permitted. Such contracts should not be utilized unless an hourly alternative exists. In all cases, attorneys must be fully compensated at rates that are commensurate with the provision of high quality legal representation and reflect the extraordinary responsibilities in death penalty representation.

21

---

5. Commissioners Boscovich, Cottingham, Dunbar, Hill, Mayorkas, Fox and Totten oppose this recommendation.

Exhibit 1
Page 32

Exhibit 1
Page 33

# Eyewitness Identification

Mistaken eye-witness identification has been identified as a factor in 80% of DNA exonerations. During the fifteen year period ending in 2003, seven innocent California defendants were convicted of serious crimes on the basis of mistaken identifications.

Exhibit 1
Page 34

## Data and Hearings

In preparation for a public hearing on the topic of Eyewitness Identifications, the Commission considered the following documents:

- Gross et al., *Exonerations In the United States 1989 Through 2003*, 95 J. Crim. L. & Criminology 523 (Winter 2005).

- Northern California Innocence Project, *California's Wrongful Convictions, Annual Report for 2006*.

- Center on Wrongful Conviction at Northwestern Law, *Causes & Remedies: Eyewitness Identification*, (May 2001).

- US Dept. of Justice, *Eyewitness Evidence: A Guide for Law Enforcement*, (October 1999).

- American Bar Association, Criminal Justice Section, *Statement of Best Practices and Report for Promoting The Accuracy of Eyewitness Identification Procedures*, (August 2004).

- Governor George H. Ryan, *Report of the Governor's Commission on Capital Punishment: Recommendations Only*, (April 2002).

- Sanger, Robert M. *Comparison of the Illinois Commission Report on Capital Punishment with the Capital Punishment System in California*, 44 Santa Clara L. Rev. 131–136 (2003).

- Farmer, John J. Jr., State of New Jersey: *Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures*, April 18, 2001.

- North Carolina Actual Innocence Commission, *Recommendations For Eyewitness Identification*, (2003).

- Innocence Commission for Virginia, *A Vision for Justice*, p. 25–42, (May 30, 2005).

- State of Wisconsin Avery Task Force, *Eyewitness Identification Procedure Recommendations and Associated Legislation*, (January 26, 2006).

- Wells, Gary L., *Eyewitness Identification Evidence: Science and Reform*, Champion, (April 2005).

- *People v. McDonald*, 37 Cal. 3d 351, (November 21, 1984).

- *People v. Sanders*, 11 Cal. 4th 475, (November 20, 1995)

- Judicial Council of California Criminal Jury Instructions, 1-300 CALCRIM 315, (2005).

- Cal Evid. Code §795 (2005).

At the public hearing in San Francisco on March 15, 2006, the Commission heard from Dr. Gary Wells from Iowa State University and Dr. Ebbe Ebbeson from UC San Diego, both experts on cognitive psychology and eyewitness identification with opposing views; David Angel, deputy District Attorney from Santa Clara County; Juliana Humphrey from the CA Public Defenders Association; and Natasha Minsker, Director of Death Penalty Policy for the ACLU of Northern California. Over 100 members of the public and press attended the hearing.

The Report and Recommendations Regarding Eyewitness Identification were released on April 13, 2006, as follows:

## Report

The Commission began by reviewing the studies and reviews of wrongful convictions conducted in other states, and identifying the causal factors that most frequently recur in cases where the wrongfully convicted have been exonerated.

Exhibit 1
Page 35

The Commission has assumed the accuracy of these studies without any independent efforts to verify them. The most frequently identified causal factors include misidentification by eyewitnesses, false confessions, perjured testimony, mishandling of forensic evidence, withholding exculpatory evidence, and the incompetence of defense lawyers.

The Commission plans detailed inquiries into each of these causes of wrongful convictions before it issues its final report.

Meanwhile, the Commission has determined that there are reforms which can improve criminal investigation techniques and thus further the cause of justice in California. Our recommendation of these reforms need not await the issuance of our final report. One such set of reforms involves procedures to improve the reliability of eyewitness identifications.

A comprehensive compilation of all exonerations in the United States from 1989 through 2003 was recently published by a group of researchers at the University of Michigan led by Professor Samuel R. Gross.[1] The researchers confined their study to cases in which there was an official act declaring a defendant not guilty of a crime for which he or she had previously been convicted, such as a pardon based upon evidence of innocence, or a dismissal after new evidence of innocence emerged, such as DNA testing. They identified 340 such cases, 27 of which occurred in the State of California. Of the 340 cases, sixty percent had been convicted of murder, and 36% had been convicted of rape or sexual assault. They note two possible explanations for the high prevalence of murder cases: false convictions are more likely to be discovered in murder and death penalty cases, because of the intensive level of post-conviction review given to these cases, or false convictions are more likely to *occur* in murder and death penalty cases. There may be other explanations. We do not know whether wrongful convictions are much more common than realized throughout the system. What we do know is that as these cases come to light we must address their causes.

One explanation for the high prevalence of rape and sexual assault cases among exonerations is recent improvements in DNA technology that can now be used not only to identify a perpetrator of rape at trial, but also to clear an individual of the crime both before and after conviction. Mistaken eyewitness identification was involved in 88% of the rape and sexual assault cases. This suggests that unexposed mistaken identification could be present in other convictions that heavily rely upon eyewitness identifications, such as robbery cases where DNA evidence is not normally present.

Among the 80 cases in which rape defendants were subsequently exonerated and the race of both parties was known, 39 of the cases involved black men who were wrongfully convicted of raping white women, and nearly all of these cases involved mistaken eyewitness identifications. Since less than 10% of all rapes in the United States involve white victims and black perpetrators, the fact that a disproportionate number of the rape exonerations involve white victims misidentifying black suspects suggests that the risk of error is greater in cross-racial identifications.

Research has consistently confirmed that cross-racial identifications are not as reliable as within-race identifications.[2]

The study by Professor Gross' researchers identified seven California exonerations involving mistaken

1. Gross, Jacoby, Matheson, Montgomery & Patil, *Exonerations in the United States 1989 Through 2003*, 95 J. of Crim. Law & Criminology 523 (2005).

2. Symposium, *The Other Race Effect and Contemporary Criminal Justice: Eyewitness Identification and Jury Decision Making*, 7 Psychol., Pub. Pol'y & Law 3-262 (2001).

Exhibit 1
Page 36

eyewitness identifications during the fifteen year period ending in 2003. In four of those cases, exoneration came via subsequent DNA testing. Additional claims of mistaken identifications leading to wrongful conviction were called to the attention of the Commission, but we undertook no independent investigation to verify these claims. The Commission is satisfied that the risk of wrongful conviction in eyewitness identification cases exists in California, as elsewhere in the country, and that reforms to reduce the risk of misidentification should be immediately implemented in California.

In 1998, U.S. Attorney General Janet Reno assembled 34 professionals from throughout the United States and Canada to form a Technical Working Group for Eyewitness Evidence. Drawing upon the research of psychologists as well as the practical perspectives of prosecutors, defense lawyers and police investigators, the Working Group produced a comprehensive guide for law enforcement to increase the accuracy and reliability of eyewitness evidence and decrease the numbers of wrongful identifications.[3] Though the guidelines were not mandated, the Department of Justice recommendations have been very influential in other states. In the State of New Jersey, for example, Attorney General John J. Farmer promulgated Guidelines for identification procedures based upon the U.S. Department of Justice recommendations, for implementation by all law enforcement agencies in the state.[4]

Many of the recommendations contained in the Department of Justice Guidelines are already being used in training by California law enforce-

ment. For example, the Peace Officers Standards and Training Basic Academy Workbook chapter on identification procedures includes instruction to officers to obtain detailed descriptions from witnesses, to remain neutral in all identification procedures, to separate multiple witnesses, and to compose lineups with at least five fillers similar in appearance to the suspect.[5] One California County has adopted a lineup protocol requiring double-blind and sequential identification procedures.[6] The Commission learned from Deputy District Attorney David Angel of the Santa Clara County District Attorneys Office that under the leadership of District Attorney George Kennedy, all law enforcement agencies in Santa Clara County agreed to the protocol without dissent, and the protocol has been successfully implemented for nearly four years without complaint.

Many of the Commissions established in other states to carry out a mission similar to our Commission, examining the causes of wrongful convictions and recommending reforms to avoid wrongful convictions in the future, have recommended the adoption of guidelines for the conduct of lineups, show-ups and photo spreads similar to the U.S. Department of Justice Guidelines. This includes the Governor's Commission on Capital Punishment established in Illinois,[7] the North Carolina Actual Innocence Commission,[8] the Innocence Commission for Virginia,[9] and the Wisconsin Innocence Task Force.[10] In addition, the American Bar Association adopted a Statement of Best Practices for Promoting the Accuracy of

3. U.S. Department of Justice, *Eyewitness Evidence: A Guide for Law Enforcement*, NCJ 178240 (October, 1999).

4. New Jersey Attorney General Guidelines for Preparing and Conducting Photo and Live Lineup Identification Procedures (April 18, 2001).

5. *Basic Course Workbook Series, Student Materials, Learning Domain 16, Search and Seizure*, Version Three, 2006, California Commission on Peace Officers Standards and Training, Ch.6.

6. Police Chiefs' Association of Santa Clara County, *Line-up Protocol for Law Enforcement*, Sept. 12, 2002.

7. Report of the Governor's Commission on Capital Punishment, State of Illinois, Recommendations 1–16 (April 2002). The Commission also considered Mecklenburg, *Report to the Legislature of the State of Illinois: The Illinois Pilot Program on Sequential Double-Blind Identification Procedures* (March 7, 2006).

8. North Carolina Actual Innocence Commission Recommendations for Eyewitness Identification.

9. Innocence Commission for Virginia, *A Vision for Justice*, pp. 25–42.

10. Avery Task Force, *Eyewitness Identification Procedure Recommendations*.

Exhibit 1
Page 37

Eyewitness Identification

27

Eyewitness Identification Procedures in August, 2004, and urged all state and local governments to adopt detailed guidelines for conducting lineups and photo spreads in a manner that maximizes their likely accuracy, and to provide periodic training to implement them.

The Commission studied the reports of all of the aforementioned bodies, and convened a public hearing in San Francisco on March 15, 2006 to hear the testimony of acknowledged experts,[11] representatives of police, prosecutor and criminal defense agencies, and concerned citizens regarding eyewitness evidence. Based upon its consideration of the available research, the testimony of experts, the experience of Santa Clara County, and the recommendations of other Commissions, Task Forces and similar bodies, the California Commission on the Fair Administration of Justice recommends the following guidelines and procedures:

## Recommendations

**1** Double-blind identification procedures should be utilized whenever practicable, so the person displaying photos in a photo spread or operating a lineup is not aware of the identity of the actual suspect. When double-blind administration is not practicable, other double-blind alternatives should be considered.

**2** When double-blind procedures are utilized, the use of sequential presentation of photos and lineup participants is preferred, so the witness is only presented with one person at a time. Photos or subjects should be presented in random order, and

witnesses should be instructed to say yes, no or unsure as to each photo or participant. Sequential procedures should not be used where doubleblind administration is not available.

**3** A single subject show-up should not be used if there is probable cause to arrest the suspect. The suggestiveness of show-ups should be minimized by documenting a description of the perpetrator prior to the show-up, transporting the witness to the location of the suspect, and where there are multiple witnesses they should be separated, and lineups or photo spreads should be used for remaining witnesses after an identification is obtained from one witness.

**4** All witnesses should be instructed that a suspect may or may not be in a photo spread, lineup or show-up, and they should be assured that an identification or failure to make an identification will not end the investigation.

**5** Live lineup procedures and photo displays should be preserved on video tape, or audio tape when video is not practicable. When video taping is not practicable, a still photo should be taken of a live lineup. Police acquisition of necessary video equipment should be supported by legislative appropriations.

**6** At the conclusion of a lineup, photo presentation, or show-up, a witness who has made an identification should describe his or her level of certainty, and that statement should be recorded or otherwise documented, and preserved. Witnesses should not be given feedback confirming the accuracy of their identification until a statement describing level of certainty has been documented.

---

11. Professor Gary Wells, Ph.D., of Iowa State University, Professor Ebbe Ebbesen, Ph.D., of the University of California at San Diego, Ralph Norman Haber, Ph.D., and Lyn Haber, Ph.D., presented testimony before the Commission at the San Francisco hearing.

Exhibit 1
Page 38

**7** A minimum of six photos should be presented in a photo spread, and a minimum of six persons should be presented in a lineup. The fillers or foils in photo spreads and lineups should resemble the description of the suspect given at the time of the initial interview of the witness unless this method would result in an unreliable or suggestive presentation.

**8** Photo spreads and lineups should be presented to only one witness at a time, or where separate presentation is not practicable, witnesses should be separated so they are not aware of the responses of other witnesses.

**9** Training programs should be provided and required to train police in the use of recommended procedures for photo spread, show-ups and lineups. The legislature should provide adequate funding for any training necessitated by the recommendations of this Commission.

**10** Training programs should be provided and required for judges, prosecutors and defense lawyers, to acquaint them with the particular risks of cross-racial identifications, as well as unreliable identification procedures, and the use of expert testimony to explain these risks to juries. The legislature should provide adequate funding for any training necessitated by the recommendations of this Commission.

**11** The standardized jury instructions utilized in eye witness identification cases to acquaint juries with factors that may contribute to unreliable identifications should be evaluated in light of current scientific research regarding cross-racial identifications and the relevance of the degree of certainty expressed by witnesses in court.

**12** The Commission recognizes that criminal justice procedures, including eyewitness identification protocols, greatly benefit from ongoing research and evaluation. Thus, the Commission recommends the continued study of the causes of mistaken eyewitness identification and the consideration of new or modified protocols.

In addition, the Commission recommends the enactment of legislation to require the Attorney General of California to convene a task force in conjunction with POST, local law enforcement agencies, prosecutors and defense attorneys, to develop Guidelines for policies, procedures and training with respect to the collection and handling of eyewitness evidence in criminal investigations by all law enforcement agencies operating in the State of California. The Guidelines should be consistent with the recommendations of this Commission, and should be promulgated to all law enforcement agencies operating in the State of California. The Task Force should report back to the legislature within one year of the effective date of the legislation, describing the policies or procedures adopted and the training implemented.

---

1. Report to the Legislature of the State of Illinois: The Illinois Pilot Program on Sequential Double-Blind Identification Procedures, March 17, 2006 (Illinois Study).

2. *Id.*, at p. 22–23; see Wells, G., Malpass, R., et.al., *Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads*, 22 Law & Human Behav. 603 (1998).

3. Illinois Study at p. 32.

4. *Id.*, at p. 5, citing Wells, G., *Does the Sequential Lineup Reduce Accurate Identification in Addition to Reducing Mistaken Identifications? Yes, But…* (Internet paper) (2004); *Eyewitness Testimony*; Stelblay, N. et. al. *Eyewitness Accuracy Rates in Sequential and Simultaneous Lineup Presentations: a Meta-Analytical Comparison*, 25 Lay & Human Behav. 459–483 (2001).

Exhibit 1
Page 39

## LETTER OF DISSENT

April 12, 2006

Commissioners
California Commission on the
Fair Administration of Justice

Dear Commissioners:

With respect to the views of the Commission, we feel compelled to dissent to two of the recommendations listed in the April 13, 2006, Interim Report.

First, we object to recommendation number two. We do not agree that sequential lineup procedures should be designated as the preferred method. The debate over the effectiveness of sequential lineups is not settled. The Commission reviewed reports on several laboratory studies which provided early indications that the sequential method might provide more reliable results. Later studies, however, including a recent yearlong in field study conducted by police departments in Illinois, have cast doubt on the reliability of sequential lineups.[1] The report on the Illinois study data was based on the analysis performed by Roy Malpass, Professor of Psychology at the University of Texas-El Paso, who co-authored the article on which the governor of Illinois relied when recommending sequential lineups.[2] Professor Malpass, along with Professors Ebbesen and Wells, both of whom testified before this Commission, reviewed and approved the protocols for the Illinois study.[3]

There appears to be agreement among the experts that the sequential method "reduces the number of accurate identifications."[4] More troubling though is the possibility that sequential lineups might actually increase the likelihood of a false identification. Witnesses in the Illinois study made more known false identifications using the sequential method than the traditional, simultaneous method.[5] Five areas have been identified where the sequential method is particularly less reliable than the simultaneous method. They are: 1) child witnesses; 2) older witnesses; 3) cross-racial identifications; 4) multiple perpetrators, and 5) suspects who have changed their appearance.[6] Some experts have recommended against using sequential lineups in these situations.[7] Others have advised that more research is needed before the sequential method is adopted as a matter of policy.[8] One important finding of the Illinois study was that false identifications occurred at a substantially lower rate than that predicted by laboratory experiments. This finding, which is consistent with findings in other jurisdictions, suggests that real-life circumstances lead to more accurate lineup results and "increased protection for innocent suspects."[9]

This is not to say that lineup procedures cannot be improved. For example, at least one study has concluded that witnesses who are admonished that the perpetrator may or may not be in the lineup were less likely to make false choices.[10] However, it is premature to hold out as "preferred" a method for presenting lineups that has not been proven in the field, and that might, in reality, increase the number of false identifications.

---

5. Illinois Study at p. 38.

6. *Id.*, at p. 7. citing , Memon, A.and Gabbart, F., *Improving the Identification Accuracy of Senior Witnesses: Do Pre-lineup Questions and Sequential Testing Help?* 88 J. of Applied Psychol. 341–347 (2003); Memon, A. and Barlett, J., *Effects of verbalization on face Recognition in Young and Older Adults*, 16 Applied Cognitive Psychology, 635–650 (2002).

7. *Ibid.*

8. Illinois Study at p. 8, citing Memon, A. and Gabbart, F., *Unraveling the Effects of Sequential Presentation in Culprit-present Lineups*, 17 Applied Cognitive Psychology 703–714 (2003).

9. Illinois Study at p. 17, 17, citing Klobuchar, A., Steblay, N. and Caligiuri, H. (2006), *Improving Eyewitness Identifications: Hennepin County's Bind Sequential Lineup Pilot Project*, Cardozo Law School Journal Public Law, Policy and Ethics (2006), manuscript p. 25; and at pp. 42–45, analyzing data from the Queens District Attorney's Office in New York.

10. Illinois Study at p. 62…

Exhibit 1
Page 40

Second, we object to recommendation number eleven. We do not believe this Commission should be interjecting itself into the development of jury instructions. This task has been delegated to the Judicial Council of California by the Chief Justice, and the criminal jury instructions that are in use now were promulgated over an eight-year period that included numerous levels of review by all interested parties. Additionally, there is more than adequate authority for a trial judge to issue a special instruction in any case when the facts and evidence warrant a deviation from the standard instruction.[11]

Moreover, instructions should be neutral, favoring neither party. Trial courts are advised to refuse an instruction that analyzes specific evidence on a disputed question of fact to the benefit of one party or another or one that informs jurors that particular evidence is in fact true – or untrue.[12] Thus, we do not believe altering the standard instruction in order to deal with a special situation represents sound public policy.

We have raised these concerns with the Commission, but recognize we are in the minority on these points. Thus, we request that our objections be noted in the Commission's report. Specifically we would like the following footnote inserted:

*We respectfully dissent from this Commission's recommendations numbers two and eleven.*

*The debate over the effectiveness of sequential lineups is not yet settled. Many experts agree that this method produces fewer accurate identifications. Even more disturbing is new research out of Illinois*

*which suggests that the sequential lineup procedures may result in more false identifications. The sequential method appears to be particularly problematic in cases involving children and the elderly, cases involving cross racial identifications, cases involving multiple perpetrators, and cases where a suspect has altered his or her appearance. Given the uncertainty involving the sequential lineup method, we feel it is premature to recommend these procedures be adopted by California's law enforcement officers.*

*We further object to this Commission's recommendation calling for changes to the standard jury instructions. The drafting of criminal jury instructions has been delegated to the Judicial Council of California by the Chief Justice which developed the current instructions with input and review by all interested parties. Instructions should be neutral, favoring neither party, and the law requires trial courts to refuse an instruction that analyzes specific evidence on a disputed question of fact to the benefit of one party or another or one that informs jurors that particular evidence is in fact true – or untrue. Thus, we do not believe altering the standard instruction in order to deal with a special situation represents sound public policy.*

*We have lodged a letter with this Commission which presents our objections in more detail.*

Finally, we encourage the Commission to delay issuing any report on the subject of lineup identification until it has had the opportunity to research and study other areas of our criminal justice system, and particularly to further research the issue of sequential lineups.

---

11. See California Rules of Court, Rule 855(e);

12. See *People v. Hines* (1997) 15 Cal.4th 997, 1067–1068; 938 P.2d 388; 64 Cal.Rptr.2d 594; *People v. Carter* (2003) 30 Cal.4th 1166, 1225, n. 22; 135 Cal.Rptr.2d 553; *People v. Moore* (1954) 43 Cal.2d 517, 527; 275 P.2d 485.

Exhibit 1
Page 41

Eyewitness Identification

31

Respectfully submitted:

James P. Fox
*District Attorney, County of San Mateo*

Bill Lockyer
*Attorney General, State of California*

Gregory D. Totten
*District Attorney, County of Ventura*

## RESPONSE TO LETTER OF DISSENT

April 17, 2006

Commissioners
California Commission on the
Fair Administration of Justice

Dear Commissioners:

The Report and Recommendations of the Commission regarding eye witness identification procedures which was released April 13, 2006 contains a dissent received shortly before its release, and the dissent refers to a more lengthy letter lodged with the Commission. The letter of dissent will be posted on the Commission website, but I did not want to do so without including this response. The Commission Report and Recommendations did not offer a lengthy justification for each of our recommendations, and I am concerned that the criticism contained in the

dissent letter might create the false impression that the recommendations were presented in haste or without full consideration of all of the research on both sides of all of the issues we considered.

It is certainly true that the debate over simultaneous vs. sequential identification procedures is not over. The Commissioners all received the Illinois study referred to, and fully considered it. Our recommendation that sequential presentation is preferred when double-blind procedures are utilized was based upon the general agreement among research studies, the recommendations adopted by the North Carolina, Virginia and Wisconsin Innocence Commissions, the favorable experience with sequential procedures in Boston, in New Jersey, and in Santa Clara County in California, and the study conducted in Hennepin County, Minnesota which concluded that the sequential, double-blind method of lineups is superior to the simultaneous method.[1] The Commission was reluctant to rely upon the single Illinois pilot program to reject the accumulated weight of prior research and experience in the absence of peer review, and the suggestion of potential flaws in the design of the pilot study.[2]

The Commission's recommendation does not foreclose more detailed guidelines to govern the appropriate choice between sequential and simultaneous procedures, as research progresses and the debate continues. Our recommendation is simply that at the present time, based upon our analysis of the available research, sequential identification procedures are preferred.

1. Klobuchar, A. and Caliguri, H., *Protecting the Innocent / Convicting the Guilty: Hennepin County's Pilot Project in Blind Sequential Eyewitness Identification*, 32 Wm.Mitchell L. Rev. 1 (2005).

2. Professor Gary Wells, who testified before the Commission, advised the Commission that the Illinois Pilot Program compared double blind sequential identifications with simultaneous identifications which were *not* double blind, thus confounding the variables. Professor Wells did not participate in the design of the Illinois study.

Exhibit 1
Page 42

With respect to the argument that this Commission should not "interject" itself into the work of the Advisory Committee on Criminal Jury Instructions, it should be noted that the Advisory Committee *invites* suggestions, and the California Judicial Council regularly seeks comment from organizations interested in improvements to courts rules and forms. Our Commission closely scrutinized the standard jury instruction recommended in California with respect to eyewitness identification.[3] The instruction includes the following two questions to be considered in evaluating identification testimony: "How certain was the witness when he or she made an identification?" and "Are the witness and the defendant of different races?" The instruction currently offers no guidance as to the potential significance, if any, of either of these factors. The Supreme Courts of five other states have questioned the adequacy of jury instructions similar to this.[4] The Commission has not endorsed or drafted any particular form of instruction, but simply recommends that the current instruction be evaluated in light of current scientific research that may not have been previously considered.

John Van de Kamp
*Chair, California Commission on the Fair Administration of Justice*

# Actions

The eyewitness identification report occasioned six articles from the press lauding the Commission's findings.

Shortly afterwards, Sen. Carole Migden (D-San Francisco) amended SB 1544 to adopt some of the Commission's recommendations. SB 1544 passed the Senate and the Assembly, only to be vetoed by Governor Schwarzenegger.

In 2007, Senator Mark Ridley-Thomas (D-Los Angeles) sponsored SB 756 to require the appointment of a task force to draft mandatory guidelines for the conduct of police line-ups and photo arrays to increase the accuracy of eyewitness identifications. The bill, based upon the Commission's report, directly addressed the concerns expressed by the Governor in his veto message with amendments recommended by the Commission. SB 756 passed the Senate and the Assembly, only to be vetoed by Governor Schwarzenegger.

In 2008, Senator Ridley-Thomas re-introduced his eyewitness identification bill as SB 1591. The bill passed the Senate Public Safety Committee but, due to the State Budget shortfall, did not pass the Senate Appropriations Committee.

---

3. Judicial Council of California, Criminal Jury Instructions, 1-300 CALCRIM 315 (2005).

4. See, e.g., *State v. Long,* 721 P.2d 483 (Utah Supreme Court, 1986) (Approving instruction that "identification by a person of a different race may be less reliable than identification by a person of the same race."); *State v. Ramirez,* 817 P.2d 774 (Utah Supreme Court, 1991) (Rejecting level of certainty as an indicator of an identification's reliability); *Brodes v. State,* 614 S.E.2d 766 (Georgia Supreme Court, 2005) (Reversible error to instruct jury to consider level of certainty as a factor in evaluating reliability of identification); *State v. Ledbetter,* 881 A.2d 290, 311 (Connecticut Supreme Court,

2005) ("uncontradicted scientific literature... suggests the [certainty] factor is particularly flawed because of a weak correlation, at most, exists between the level of certainty expressed by a witness... and the accuracy of that identification."). Cf. *Commonwealth v. Johnson,* 650 N.E.2d 1257 (Massachusetts Supreme Judicial Court, 1995); *State v. Dubose,* 699 N.W.2d 582 (Wisconsin Supreme Court, 2005).

Exhibit 1
Page 43

# False Confessions

False confessions occur in very serious cases, including rapes and homicides. Most vulnerable to coercive interrogation techniques are juveniles and those with mental disabilities.

Exhibit 1
Page 44

# Data and Hearings

In preparation for a public hearing on the topic of False Confessions, the Commission considered the following documents:

- Leo and Ofshe, *The Consequences of False Confessions: Deprivations of Liberty and Miscarriages of Justice in the Age of Psychological Interrogation*, 88 J. Crim. L. & Criminology 429 (1998).

- Cassell, Paul G., *The Guilty and The "Innocent" An Examination of Alleged Cases of Wrongful Conviction from False Confessions*, 22 Harv. J. L.& Pub. Pol'y 523 (Spring 1999).

- Leo and Ofshe, *The Truth About False Confessions and Advocacy Scholarship*, 37 Crim. L. Bull. 293, 330–70 (2001).

- Drizin and Leo, *The Problem of False Confessions in the Post-DNA World*, 82 N.C. L. Rev. 891, 923 (2004).

- Sullivan, Thomas P. *Police Experiences with Recording Custodial Interrogations*, Special Report presented by Northwestern University School of Law, Center for Wrongful Convictions (Summer 2004).

- Sanger, Robert M. *Comparison of the Illinois Commission Report on Capital Punishment with the Capital Punishment System in California*, 44 Santa Clara L. Rev. 126–130 (2003).

- New York County Lawyers' Association and American Bar Association Section of Criminal Justice, Report to the House of Delegates, *Recommendation on Taping Custodial Interrogations* (June 23, 2004).

- Taslitz, Andrew E. *Convicting the Guilty, Acquitting the Innocent: The ABA Takes a Stand*. 19-WTR Crim. Just. 18, The American Bar Association, (Winter 2005).

- *In the Interest of Jerrell C.J.*, a person Under the Age of 17: *State of Wisconsin, Petitioner-Respondent, v. Jerrell C.J., Respondent-Appellant-Petitioner*, 283 Wis.2d 145, (2005).

- Report of the Supreme Court Special Committee on *Recording of Custodial Interrogations*, State of New Jersey, April 15, 2005.

- A Vision for Justice: *Report and Recommendation Regarding Wrongful Convictions in the Commonwealth of Virginia*, Innocence Commission for Virginia, 42–58 (March 2005).

- *California Senate Bill 171*, Introduced by Senator Alquist, February 9, 2005 (as amended in the Senate April 4, 2005). Includes Bill Analysis on the Senate Floor (June 28, 2005).

At the public hearing held at the Loyola Law School in Los Angeles, on June 21, 2006, the Commission heard from Professor Richard Leo of the University of San Francisco Law School, a renowned expert in false confessions; Tom Sullivan, former co-chair of Gov. Ryan's Illinois Capital Punishment study group; Harold Hall, an exoneree from Los Angeles; Chris Ochoa, an

Exhibit 1
Page 45

exonoree from Madison, Wisconsin; and Jeaneatte Popp, mother of a victim. Over 75 members of the public and press attended the hearing.

The Report and Recommendations Regarding False Confessions were issued on July 25, 2006, as follows:

# Report

This Report will address the extraction of false confessions during police questioning of suspects.

False confessions were identified as the second most frequent cause of wrongful convictions in a national study previously reviewed by this Commission.[1]

The Commission studied the reports of commissions and task forces assembled in other states addressing this issue, as well as the research documenting 125 cases of false confessions by suspects who were indisputably proven to be innocent. (See Drizin & Leo, *The Problem of False Confessions in the Post-DNA World*, 82 No. Carolina L. Rev. 891, 2004.) The Commission convened a public hearing in Los Angeles on June 21, 2006 to hear the testimony of acknowledged experts,[2] the exonerated victims of false confessions,[3] the mother of the victim of a crime in which a false confession was elicited,[4] representatives of police, prosecutor and criminal defense agencies, and concerned citizens regarding false confessions.

Although it may seem surprising that factually innocent persons would falsely confess to the commission of serious crimes, the research provides ample evidence that this phenomenon occurs with greater frequency than widely assumed.

The research of Professors Steven Drizin and Richard A. Leo identifies 125 cases which occurred between 1972 and 2002, with 31% of them occurring in the five years previous to 2003. Eight of



Harold Hall of Los Angeles, victim of false confession.

False Confessions

35

---

1. Gross, Jacoby, Matheson, Montgomery and Patil, *Exonerations in the United States 1989 Through 2003*, 95 J.. of Crim. Law & Criminology 523, 544–545 (2005). They report that defendants confessed to crimes they had not committed in 51 of the 340 exonerations identified, or 15% of the total. Overall, 55% of all the false confessions they found were from defendants who were under 18, or mentally disabled, or both.

2. Professor Richard A. Leo of the U.S.F. School of Law, who co-authored the Drizin & Leo article, and Thomas Sullivan of Jenner & Block, Chicago, Illinois, who served as Co-Chair of Illinois Governor George H. Ryan's Commission on Capital Punishment.

3. Harold Hall of Los Angeles and Chris Ochoa of Madison, Wisconsin.

4. Jeanette Popp, the mother of Nancy DePriest, the victim of the rape-murder of which Chris Ochoa was wrongfully convicted, described her ordeal of suffering nightmares for twelve years based upon an account of her daughter's rape and murder that was factually untrue.

Exhibit 1
Page 46

these examples, or 6% of the sample, occurred in California cases.[5] The overwhelming majority of the false confession cases identified by Drizin and Leo occurred in very serious cases: 81% were homicide cases, followed by 9% rape cases.

Not all false confessions lead to conviction. Of the eight California cases identified by Drizin and Leo, none of the defendants charged were convicted of the crimes to which they falsely confessed. It should be noted, of course, that even where charges do not result in conviction, the pendency of charges based upon false confessions can impose tremendous burdens upon the accused and their families, as well as the victims and their families.

The accused is often in custody for months prior to being released. The research suggests that false confessions are often extracted from the most vulnerable suspects.

One-third (33%) of the Drizin and Leo sample were juveniles; another 22% were mentally disabled, and at least 10% were mentally ill. But even fully competent and rational persons may be victimized by coercive interrogation techniques. Excellent

examples were presented to the Commission in the testimony of Harold Hall and Chris Ochoa.

Harold Hall spent nineteen years in prison for a rape and double murder he did not commit in Los Angeles. At the age of eighteen, he was subjected to seventeen hours of interrogation, and confessed when he concluded a confession was the only way he could end the interrogation. In 2004 he was exonerated by DNA testing that established his innocence. He earned his G.E.D. in prison and is now employed by the Los Angeles County Bar Association.

Chris Ochoa was convicted of rape and murder in Texas, and served 12 years in prison before a confession by another person and DNA tests confirmed that he had not committed the crime. Ochoa confessed after he was threatened with execution under the Texas death penalty law if he did not admit his participation in the crime and implicate an innocent co-defendant. After his exoneration, he entered law school and recently graduated from the University of Wisconsin School of Law.

Both Mr. Hall and Mr. Ochoa told the Commission that they doubt they would ever have been convicted if their interrogation had been electronically recorded, and a judge or jury was able to see the coerciveness of the interrogation techniques that were used. While it is unlikely that all false

---

5. None of the California cases cited by Drizin and Leo resulted in wrongful convictions. In all eight cases, the charges were dismissed prior to actual conviction: Diane Colwell was charged with murder in the death of a 76 year old patient whom she was serving as a caregiver in 1995. During a five hour interrogation, she told police investigators that she had 300 personalities, and two of them suffocated the patient with a pillow and tried to make it look like an accident. The charges were initially dismissed when a trial judge suppressed her confession because Miranda warnings were not administered until after she had been interrogated for five hours. (Darlene Himmelspach, *Murder Charge Dismissed Against Caregiver in Death of Her 76-Year Old Patient*, San Diego Union-Tribune, May 6, 1995, at B3.) When that ruling was reversed by the Court of Appeal in 1997, the charges were reinstated. In preparing for trial, investigators learned of a Food and Drug Administration Safety Alert suggesting that a number of deaths had occurred in similar circumstances, when elderly patients became entangled in the rails of their beds and became asphyxiated. The charges were then again dismissed on motion of the Prosecution. (Moran, *Murder Charge Against Woman in 1994 Patient Death is Dropped*, San Diego Union-Tribune, May 23, 1998, at B5.

Michael Crowe, Aaron Houser and Joshua Treadway were charged with the murder of Crowe's sister in San Diego County in 1998, after she was found stabbed to death in her bedroom in the family home. Crowe was 14, Houser 15 and Treadway 16 at the time they were interrogated. The interrogations of Houser and Treadway were video-taped in their entirety, as was most of the interrogation of Crowe. The charges were dismissed in 1999 when DNA testing revealed blood spatter from the victim on the clothing of Richard Tuite, a transient who had been seen in the neighborhood the night of the killing. Tuite was subsequently convicted of voluntary manslaughter in the case. (*Crowe v. County of San Diego*, 303 F.Supp.2d 1050 (2004); *Crowe v. County of San Diego*, 359 F.Supp.2d 994 (2005); *Crowe v. County of San Diego*, 2005 U.S. Dist. Lexis 7355 (2005).) Eugene "Rufus" Dykes falsely implicated himself and others in the murder of three visitors to Yosemite National Park in 1999. He lied to the FBI in a bizarre attempt to gain leniency for other crimes he did commit. Meanwhile, Cary Stayner, the actual perpetrator of the Yosemite murders, murdered a fourth victim. Dykes, who was in prison at the time he misled the FBI, was never charged with the murders. (Christine Hanley, *Man Says He Misled FBI in Yosemite Deaths*, Columbian (Vancouver, Washington),

Exhibit 1
Page 47

False Confessions

37

confessions can ever be eliminated, the risk of harm caused by false confessions could be greatly reduced if police were required to electronically record the entirety of custodial interrogations of suspects in serious criminal cases.



Chris Ochoa of Texas, victim of false confession.
Copyright © Dan Gair, Blind Dog Photo, Inc.

There are a number of reasons why the taping of interrogations actually benefits the police departments that require it. First, taping creates an

objective, comprehensive record of the interrogation. Second, taping leads to the improved quality of interrogation, with a higher level of scrutiny that will deter police misconduct and improve the quality of interrogation practices. Third, taping provides the police protection against false claims of police misconduct. Finally, with taping, detectives, police managers, prosecutors, defense attorneys and judges are able to more easily detect false confessions and more easily prevent their admission into evidence.

Because of these benefits, over 500 police departments throughout the country require the taping of interrogations. Thomas Sullivan described for the Commission his efforts to document the police experience with recording custodial interrogations.[6] He informed the Commission that a substantial number of police departments in California already report that they currently record a majority of custodial interrogations.[7] Experienced detectives from these departments report great satisfaction with the results of recorded interrogations, including but not limited to higher conviction rates, less time litigating unwarranted suppression motions, and fewer claims of police misconduct.

The only objection to mandating the recording of police interrogation heard by the Commission was to the potential cost of video recording, as compared to audio recording.

---

Aug. 6, 1999 at A4.) Jorge Hernandez was charged with the rape of a 94 year-old victim after a ring, which belonged to his older brother, was found at the scene. Police claimed he admitted the rape during police interrogation. The case was dismissed prior to a preliminary examination when DNA testing confirmed that he did not rape the victim. (Sean Webby & Kristen Berry, *DNA Test Clear PA Man in Rape of 94-Year-Old*, San Jose Mercury News, Aug. 10, 2002 at 1A; Sean Webby, *Teen Admits Rape, or Did He? False Confession Debate Ensues*, San Jose Mercury News, Aug. 9, 2002 at 1B.) Johnny Massingale was charged with the murder of two victims whose throats were slashed in their San Diego home in 1984. He confessed to San Diego detectives who traveled to Kentucky to interrogate him. He was jailed for ten months awaiting trial. Charges were dismissed on the eve of trial, when evidence implicated another man awaiting trial for similar murders. (Scott Harris, *Suspect in 2 Slayings Leaves Jail; Attorneys Say Evidence Points Toward Man Held in 3 Other Throat-Slashings*, Los Angeles Times, Jan. 5, 1985 at 23.) Geoffrey Meyers was charged with arson after he confessed to setting a blaze that destroyed $4 million in business property in Sonoma in 2000. Police continued their investigation although they had a previously convicted arsonist

in custody, and concluded that the true culprits were two juveniles who had no connection with Meyers. The charges against Meyers were dismissed after two days. (Pamela Podger, *Convicted Arsonist Cleared in Sonoma Fire: He Recants Confession After Story Disproved, San Francisco Chronicle*, Feb. 8, 2000 at A19.)

6. See Sullivan, *Police Experiences with Recording Custodial Interrogations*, Special Report No. 1, Northwestern University School of Law Center on Wrongful Convictions (Summer, 2004); Sullivan, *Electronic Recording of Custodial Interrogations: Everybody Wins*, 95 Journal of Criminal Law and Criminology 1127 (2005); Sullivan, *Electronic Recordings of Custodial Interrogations*, XIX The Chief of Police, No. 6, p. 17 (Nov./Dec. 2005).

7. These departments include the County Sheriffs of Alameda, Butte, Contra Costa, El Dorado, Orange, Placer, Sacramento, San Bernardino, San Joaquin, Santa Clara (including all police agencies operating in Santa Clara County), Ventura and Yolo Counties, and the municipal police departments for Sacramento, San Diego, San Francisco, and San Jose.

Exhibit 1
Page 48

The tentative recommendation released by the Commission was to mandate the video recording of all custodial interrogations in homicide cases. While the Commission remains convinced that video recording is the best means of detecting false confessions, we have been persuaded that the cost of implementing this recommendation at this time would be prohibitive. Instead, we recommend that a fund be available to support the implementation of video recording by Police Departments that choose to do so. We are optimistic that improved technology will reduce these costs in the future, and that positive experience with a requirement that all custodial interrogations in serious felony cases are audio recorded will convince all concerned that eventual conversion to video recording is well worth the cost.

The cost of recording custodial interrogations must be measured against the cost of false confessions, which takes a devastating human toll upon those who are wrongfully charged, their families, the victims of crime, and their families.

Closing a case with conviction of the wrong person based upon a false confession also leaves the real perpetrator at large, to victimize others. The costs of litigating claims of police misconduct that might have been deterred by taping,[8] and the savings in avoiding false claims of police misconduct should, in the long run, more than pay the costs of implementation of a mandate that all custodial interrogation in serious criminal cases be electronically recorded.

## Recommendations

■ The Commission recommends that the state legislature enact the following statute to require the recording of the entirety of custodial interrogations of individuals suspected of all serious felonies:

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS

*Section 1: Definitions.*

*(a) "Electronic Recording" or "Electronically Recorded" means an audio, video or digital audio or video recording that is an authentic, accurate, complete, unaltered record of a custodial interrogation, including a law enforcement officer's advice of the person's constitutional rights and ending when the interview has completely finished.*

*(b) "Serious Felony" means any of the offenses listed in Section 1192.7(c) of the California Penal Code.*

*(c) "Statement" means an oral, written, sign language or nonverbal communication.*

*Section 2: Electronic Recording Required.*
*All Statements made during custodial interrogation relating to a Serious Felony shall be Electronically Recorded.*

*Section 3: Cautionary Instruction Required.*
*If any Statement is admitted in evidence in any criminal proceeding which occurred during custodial interrogation which was not Electronically Recorded in its entirety in compliance with Section 2, the court shall, at the request of the defendant, provide the jury with an instruction in a form to be recommended by the California Judicial Council, which advises the jury to view such statements with caution.*

*Section 4: Handling and Preservation of Electronic Recordings of Custodial Interrogations relating to a Serious Felony.*

*(a) Every Electronic Recording of a Custodial Interrogation shall be clearly identified and catalogued by law enforcement personnel.*

*(b) If a juvenile or criminal proceeding is brought against a person who was the subject of an Electronically Recorded Custodial Interrogation, the Electronic Recording shall be preserved by law*

---

8. Chris Ochoa and his co-defendant settled their claims of civil rights violations against the Austin, Texas Police Department for more than $16 million dollars.

Exhibit 1
Page 49

enforcement personnel until all appeals, post-conviction and habeas corpus proceedings are final and concluded, or the time within which they must be brought has expired, or the sentence has been completed.

*(c) If no juvenile or criminal proceeding is brought against a person who has been the subject of an Electronically Recorded Custodial Interrogation, the related Electronic Recording shall be preserved by law enforcement personnel until all applicable state and federal statutes of limitations bar prosecution of the person.*

**2** The Commission urges all California law enforcement agencies to videotape the entirety of all custodial interrogations of felony suspects or, where videotaping is impractical, to audiotape the entirety of such custodial interrogations.

**3** The Commission recommends that the State Legislature appropriate funds, to be administered by the Attorney General, to provide grants to California Police Agencies that wish to implement programs to videotape custodial interrogations.

**4** The Commission recommends that training programs should be provided and required to train police, prosecutors, defense lawyers and judges about the causes, indicia and consequences of false confessions. Police interrogators should receive special training in how to identify and interrogate persons with developmental disabilities and juveniles.

## ABSTAINING FROM REPORT OF COMMISSION

Sheriff Lee Baca
*Los Angeles County Sheriffs Department*

(Sheriff Baca served as a Commissioner from 2004 –2006).

## Actions

The Report occasioned six articles from the press lauding the Commission's findings.

Senator Elaine Alquist's bill, SB 171, requiring the electronic recording of interrogations, passed the Senate and the Assembly, only to be vetoed by Governor Schwarzenegger.

In 2007, Senator Alquist (D-San Jose) introduced SB 511, amending the 2006 bill based upon the Commission's recommendations. The new bill directly addressed the concerns expressed by the Governor in his veto message. SB 511 passed the Senate and Assembly, only to be vetoed by Governor Schwarzenegger.

In 2008, Senator Alquist re-introduced SB 511 as SB 1590. The bill passed the Senate Public Safety Committee, but due to the State Budget shortfall, did not pass the Senate Appropriations Committee.

### LEGISLATIVE COUNSEL'S DIGEST

SB 511, Alquist. Interrogation: recording.

Existing law provides that under specified conditions the statements of witnesses, victims, or perpetrators of specified crimes may be recorded and preserved by means of videotape.

This bill would require the electronic recordation of the entire proceedings of any custodial interrogation of an individual who is in a fixed place of detention and who, at the time of the interrogation, is suspected of committing or accused of a homicide or a violent felony, except as specified. The bill would also prohibit the interrogating entity from destroying or altering any electronic recording made of the interrogation until the final conclusion of the proceedings, as specified. The bill would become operative on July 1, 2008. By

Exhibit 1
Page 50

imposing these new requirements on local law enforcement, this bill would impose a state-mandated local program.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that, if the Commission on State Mandates determines that the bill contains costs mandated by the state, reimbursement for those costs shall be made pursuant to these statutory provisions.

## THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS

Section 1. It is the intent of the Legislature in enacting this act to require the creation of an electronic record of an entire custodial interrogation in order to eliminate disputes in court as to what actually occurred during the interrogation, thereby improving prosecution of the guilty while affording protection to the innocent.

Section 2. Section 859.5 is added to the Penal Code, to read:

859.5. ▮ (a) Any custodial interrogation of an Individual who is in a fixed place of detention and who, at the time of interrogation, is suspected of committing or accused of a homicide, as defined in Chapter 1 (commencing with Section 187) of Title 8 of Part 1, or a violent felony, as defined in subdivision (c) of Section 667.5, shall be electronically recorded in its entirety. This provision applies to both adult and juvenile proceedings.

(b) The requirement for the electronic recordation of a custodial interrogation pursuant to this section shall not apply if the person to be interrogated provides an electronically recorded statement expressing that he or she will speak to the law enforcement officer or officers only if the interrogation is not electronically recorded. Where electronic recording of that statement is refused by the person to be interrogated, then that refusal may be documented in writing.

(c) The interrogating entity shall not destroy or alter any electronic recording made of a custodial interrogation until the time that a conviction for any offense relating to the interrogation is final and all direct and habeas corpus appeals are exhausted or the prosecution for that offense is barred by law. The interrogating entity may make one or more true, accurate, and complete copies of the electronic recording in a different format.

▮ Any law enforcement officer who conducts a custodial interrogation of an individual described in subdivision (a) shall be required to make an electronic recording of the interrogation pursuant to subdivision (a), unless the law enforcement officer can demonstrate, by a preponderance of the evidence, that the electronic recording of the custodial interrogation was not feasible for a specified reason, including, but not limited to, the following:

(a) Access to equipment required to electronically record an interrogation could not be obtained during the period of time that the defendant could be lawfully detained.

(b) The failure to create an electronic recording of the entire custodial interrogation was the result of a malfunction of the recording device and obtaining a replacement device was not feasible.

(c) The questions put by law enforcement personnel, and the person's responsive statements, were part of a routine processing or booking of the person.

Exhibit 1
Page 51

(d) The law enforcement officers in good faith failed to make an electronic recording of the custodial interrogation because the officers inadvertently failed to operate the recording equipment properly, or without the officer's knowledge the recording equipment malfunctioned or stopped operating.

(e) The custodial interrogation took place in another jurisdiction and was conducted by the officers of that jurisdiction in compliance with the law of that jurisdiction.

(f) The law enforcement officers conducting or contemporaneously observing the custodial interrogation reasonably believed that the crime of which the person was suspected was not among those listed in paragraph (1) of subdivision (a).

(g) Exigent circumstances existed which prevented the making of, or rendered it not feasible to make, an electronic recording of the custodial interrogation.

(3) For the purposes of this section, the following terms have the following meanings:

(a) "Custodial interrogation" means express questioning or its functional equivalent that is conducted by a law enforcement officer from the time that the suspect is, or should be, informed of his or her rights to counsel and to remain silent, until the time that the questioning ends.

(b) "Electronic recording" means an analog or digital recording that includes the audio representations of any interrogator and individual involved in a custodial interrogation, provided however, that a motion picture, videotape, analog, or digital recording that includes both audio and visual representations of any interrogator and individual involved in a custodial interrogation is also permitted. Law enforcement officers are encouraged, if videotaping, to position the

camera to capture facial images of the suspect and the interrogators. Law enforcement officers are encouraged to videotape the custodial interrogation of individuals suspected or accused of committing a homicide.

(c) "Law enforcement officer" means any officer of the police, sheriff, highway patrol, or district attorney, and any peace officer included in Chapter 4.5 (commencing with Section 830).

(d) "Fixed place of detention" means a jail, police, or sheriff's station, holding cell, or a correctional or detention facility.

(e) A person is "suspected of" committing a homicide or violent felony, for purposes of this section, if law enforcement officers have reasonable cause, at the time of the interrogation, to believe that the person committed a homicide or violent felony.

(f) This section shall become operative on July 1, 2008.

Section 3. If the Commission on State Mandates determines that this act contains costs mandated by the state, reimbursement for those costs shall be made pursuant to Part 7 (commencing with Section 17500) of Division 4 of Title 2 of the Government Code.

Exhibit 1
Page 52

False Confessions

41

Exhibit 1
Page 53

# Informant Testimony

Of 117 death penalty appeals currently being handled by the State Public Defender, seventeen featured testimony by in-custody informants, and another six by informants who were in constructive custody. Such testimony is frequently utilized to convince a jury to impose a death sentence by showing lack of remorse.

Exhibit 1
Page 54

# Data and Hearings

In preparation for a public hearing on the topic of the Use of Jailhouse Informant Testimony, the Commission considered the following documents:

- Report of the 1989–90 Los Angeles County Grand Jury: *Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County.*

- *Jailhouse Informants*—Chapter 5, *Achieving Justice: Freeing the Innocent; Convicting the Guilty,* Report of the American Bar Association Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process, 2006.

- Warden, Robert, "The Snitch System: How Incentivised Witnesses Put 38 Innocent Americans on Death Row," presented April 25, 2002 at Arizona State University College of Law.

- The Snitch System: *How Snitch Testimony Sent Randy Steidl and Other Innocent Americans to Death Row,* Center for Wrongful Convictions, Northwestern University School of Law (Winter 2004–2005).

- Trott, The Honorable Stephen S., *Words of Warning for Prosecutors Using Criminals as Witnesses,* 47 Hastings L.J. 1381 (July/August 1996).

- Yaroshefsky, Ellen. *Introduction,* Symposium *The Cooperating Witness Conundrum: Is Justice Obtainable?,* Jacob Burns Ethics Center at Cardozo Law School, Yeshiva University, 23 Cardozo L. Rev 747, (February 2002).

- Scheck, Barry. *Closing Remarks,* Symposium *The Cooperating Witness Conundrum: Is Justice Obtainable?,* Jacob Burns Ethics Center at Cardozo Law School, Yeshiva University, 23 Cardozo L. Rev. 899, (February 2002).

- Uviller, H. Richard. *No Sauce for the Gander: Valuable Consideration For Helpful Testimony from Tainted Witnesses in Criminal Cases,* 23 Cardozo L. Rev. 771 (2002).

- Skurka, Steven. *A Canadian Perspective on the Role of Cooperators and Informants,* 23 Cardozo L. Rev. 759 (2002).

- Cal Penal Code §1127a (a)–(d), §1191.25(a), §4000.1(a)–(c)

- CALCRIM No. 336, including benchnotes and authority

At the public hearing held at the Hall of Justice in the County Board Chambers of San Mateo County, on September 20, 2006, the Commission heard from Professor Ellen Yaroshefsky of the Cardozo School of Law in New York, an expert on informant testimony; John Spillane, Chief Deputy of the Los Angeles County District Attorney's Office, responsible for their informant committee; Gigi Gordon, Director of the Post-Conviction Assistance Center, one of two original petitioners to the LA County Grand Jury in 1988 to investigate sweeping corruption in the use of jailhouse informants in Los Angeles; and Dennis Fritz, wrongfully convicted in Oklahoma for murder in the 1st degree, chronicled in the recent John Grisham book, The Innocent Man. Over 70 members of the public and press attended the hearing.

The Report and Recommendations Regarding Informant Testimony were issued November 20, 2006, as follows:

Exhibit 1
Page 55

# Report

This Report will address the use of testimony from informants who are themselves in custody or facing criminal prosecution. The motivation for such testimony is frequently the expectation of some reward in the form of reduction of charges, eligibility for bail, leniency in sentencing, or better conditions of confinement. In a report by the Northwestern University School of Law Center on Wrongful Convictions, the use of such informants was identified among the three most prevalent factors in the wrongful convictions of death row inmates. After a review of the cases of 111 persons released from the nation's death rows after they were exonerated, from 1973 through 2004, the Center found use of false testimony from informants in 45.9% of the cases. That made false informant testimony the leading cause of wrongful convictions in U.S. capital cases – followed by erroneous eyewitness identifications (25.2% of the cases), and false confessions (14.4% of the cases). (Northwestern University School of Law Center on Wrongful Convictions, *The Snitch System*, p. 3, 2005.)

While none of the 111 cases in the Center on Wrongful Convictions report took place in California, the frequent use of informant testimony in capital cases appears in California capital cases as well. Michael Laurence, the Director of the California Habeas Corpus Resource Center, explained to the Commission the reasons for the high prevalence of the use of arrested or charged informants in capital cases. In his opinion, while they are rarely needed to supply evidence of the defendant's guilt of the underlying crime, they often provide crucial testimony to prove the alleged special circumstances which make the defendant eligible for the death penalty, or to provide evidence of aggravation to persuade the jury to select death as the appropriate penalty. State Public Defender Michael Hersek reported to the Commission that of the 117 death penalty appeals currently pending in his office, seventeen featured testimony by in-custody informants, and another six included testimony by informants who were in constructive custody. Thus, confidence in the reliability of the testimony of arrested or charged informant witnesses is a matter of continuing concern to ensure that the administration of justice in California is just, fair and accurate.

The Commission conducted a public hearing in Redwood City, California on September 20, 2006. Among the witnesses who testified at the public hearing was Dennis Fritz, a former junior high school teacher from Ada, Oklahoma. Mr. Fritz told the Commission that he and a codefendant named Ron Williamson were convicted of the rape and murder of Debra Sue Carter six years after the murder took place. The principal testimony against them came from in-custody jail informants. Based on this testimony, with little corroboration, Williamson was sentenced to death, and Fritz was given a life sentence.

## Five days before his scheduled execution, Williamson won a new trial.

In preparation for the retrial, DNA testing was finally done. It resulted in a match to one of the informants, and exonerated both Williamson and Fritz. They were released after twelve years in prison. The informant was subsequently convicted of the murder, and is now serving a life sentence. Further information about this case can be found at *Williamson v. State*, 812 P.2d 384 (Okla. Ct.

Exhibit 1
Page 56

Crim. App. 1991); *Williamson v. State*, 852 P.2d 167 (Okla. Ct. Crim. App. 1993); *Williamson v. Reynolds*, 904 F.Supp. 1529 (E.D. Okla. 1995); *Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997); *Fritz v. State*, 811 P.2d 1353 (Okla. Ct. Crim. App. 1991); *Gore v. State*, 119 P.3d 1268 (Okla. Ct. Crim. App., 2005). (See Grisham, *The Innocent Man*, 2006. Compare *Letter of District Attorney William N. Peterson to Commissioner Greg Totten*. Available at www.ccfaj. org/rr-usefed.html.)

## THE LOS ANGELES COUNTY EXPERIENCE

In 1989, the exploits of Leslie Vernon White, a Los Angeles jail inmate who demonstrated on national television how easy it was for prisoners to gather information about the pending cases of other prisoners and fabricate testimony that might gain them greater lenience in their own cases, led the Los Angeles County Grand Jury to convene a comprehensive investigation of the use of in-custody informants. The grand jury heard the testimony of 120 witnesses, including six self-professed jail house informants. The report made recommendations for both the L.A. County District Attorney and the L.A. County Sheriff's Department with respect to the handling of informants in jail and their use as witnesses in criminal cases. (See Report of the 1989–90 Los Angeles County Grand Jury: Investigation of the Involvement of Jail House Informants in the Criminal Justice System in Los Angeles County, 1990.) In response to this report, the Los Angeles County District Attorney's office adopted policy guidelines to strictly control the use of jailhouse informants as witnesses. The policy requires "strong corroborative evidence," consisting of more than the fact that the informant appears to know details of the crime thought to be known only to law enforcement. A deputy wishing

to use a jailhouse informant as a prosecution witness must obtain the prior approval of a Jailhouse Informant Committee headed by the Chief Assistant District Attorney. The office maintains a Central Index of jailhouse informants who have offered to be, or who have been used as witnesses. All records of jailhouse informants are preserved, including notes, memoranda, computer printouts, records of promises made, payments made, or rewards given, as well as records of the last known location of the informant and records relating to cell assignments. (See Los Angeles County District Attorney's Office, Legal Policies Manual, Chapter 19, Jailhouse Informants, pp. 187–190, April, 2005. Available at www.ccfaj.org/rr-use-expert.html].)

John Spillane, who currently serves as Chief Assistant District Attorney in Los Angeles County, and heads the Jailhouse Informant Committee, informed the Commission that the Committee rarely approves the use of in-custody informants as witnesses. None has been approved during the past twenty months, and only twelve in the past four years.

Throughout the 1990's, the annual number of approvals averaged less than six. Mr. Spillane informed the Commission that the office also requires that interviews of in-custody informants by attorneys or investigators from the District Attorney's office must be tape recorded.

The Los Angeles District Attorney's Office also offers training sessions to its deputies to acquaint them with the risks and perils of using informants as witnesses. In recent years, the training has been conduced by Judge Stephen S. Trott of the U.S. Court of Appeals for the Ninth Circuit. (See Trott, *Words of Warning for Prosecutors Using Criminals as Witnesses*, 47 Hastings Law Journal 1381, 1996.) The Commission recommends that all prosecutors, defense lawyers, judges and police

Exhibit 1
Page 57

investigators in California receive training with respect to the perils of using arrested or charged informants as witnesses.

The Commission undertook to ascertain whether the best practices exemplified by the Los Angeles County District Attorney were being implemented by other District Attorneys throughout the State of California. A letter was sent to each of the fifty-eight County District Attorneys in the State, inquiring whether they had office policies governing the use of in-custody informants, and requesting a copy of that policy if it was in writing. The letter also inquired as to how many cases included testimony of in-custody informants during the past five years. We received nine responses. Four of the five largest counties had written policies similar to the Los Angeles County policy, requiring supervisory approval before the testimony of an in-custody informant could be utilized.[1] None of the four smallest counties had written policies, but three indicated that supervisory approval is required.[2] The Santa Clara County and Orange County District Attorneys were the only offices whose policy requires the maintenance of a central file of all informant information.

**The survey suggests that the use of the testimony of in-custody informants is rarely approved by any of the responding offices.**

The Commission recommends that the following best practices be implemented whenever feasible. The Commission recommends that each District Attorney's office in the State of California adopt a written policy which requires:

**1** The decision to use the testimony of an in-custody informant be reviewed and approved by supervisory personnel other than the deputy assigned to the trial of the case;

**2** The maintenance of a central file preserving all records relating to contacts with in-custody informants, whether they are used as witnesses or not;

**3** The recording of all interviews of in-custody informants conducted by District Attorney personnel;

**4** The corroboration of any testimony of an in-custody informant by evidence which independently tends to connect the defendant with the crime, special circumstance or circumstance in aggravation to which the informant testifies.

The 1989 Los Angeles grand jury inquiry also led the California State Legislature to enact Section 1127a of the California Penal Code, which currently requires that, upon the request of a party, the judge instruct the jury in any case in which an in-custody informant testifies that the testimony should be viewed with caution and close scrutiny, and the jury should consider the extent to which it may have been influenced by the receipt of, or expectation of, any benefits from the party calling that witness. This instruction is now contained in CALCRIM No. 336, the recommended jury instructions approved by the Judicial Council of California. Penal Code Section 1127a also requires the prosecutor to file a written statement with the court, contemporaneous with the calling of an in-custody informant as a witness in any criminal trial, setting out any and all consideration promised to, or received by the in-custody informant. Monetary payments to in-custody informants for testimony by law enforcement or correctional officials are limited to $50 by California Penal Code Section 4001.1.

---

1. Orange, San Bernardino, Santa Clara and Ventura Counties have written policies; Sacramento does not.

2. Monterey, Placer and Solano Counties all require supervisory approval. The District Attorney for Yuba County declined to disclose his policy.

Exhibit 1
Page 58

## CORROBORATION REQUIREMENTS

At present, California law does not directly require the corroboration of the testimony of an in-custody informant. The Commission was informed by Professor Ellen Yaroshefsky of the Benjamin N. Cardozo School of Law that seventeen states now require the corroboration of accomplice testimony. The only corroboration requirement currently embodied in California law is the requirement of corroboration of the testimony of accomplices, contained in Penal Code Section 1111:

*1111. A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given.*

CALCRIM No. 335 is currently used to instruct juries of the accomplice corroboration requirement. While the instruction requires supporting evidence independent of the accomplice's testimony that tends to connect the defendant to the commission of the crime, it adds:

*Supporting evidence, however, may be slight. It does not need to be enough, by itself, to prove that the defendant is guilty of the charged crime, and it does not need to support every fact... about which the accomplice testified.*

The instruction also informs the jury that accomplices may not corroborate each other:

*The evidence needed to support the testimony of one accomplice cannot be provided by the testimony of another accomplice.*

The Commission considered whether California should have a statutory requirement of corroboration for the testimony of in-custody informants, and whether that requirement should track the current requirements for accomplice testimony. The Commission concluded that the testimony of in-custody informants potentially presents even greater risks than the testimony of accomplices, who are incriminating themselves as well as the defendant. Using the language of the accomplice corroboration requirement, however, would not address the frequent use of in-custody informants in death penalty cases to prove special circumstances or provide evidence for aggravation of the penalty. In such cases, there will invariably be some supporting evidence tending to connect the defendant to the commission of the crime. The jury should be instructed that a finding of a special circumstance, or a finding of a circumstance of aggravation, may not be based solely upon the uncorroborated testimony of an arrested or charged informant, and the corroboration should independently tend to connect the defendant with the special circumstance or circumstance of aggravation. And just as with accomplices, in-custody informants should not be permitted to corroborate each other. The jury should not be instructed that corroborating evidence "may be slight." A statutory requirement embodying these suggestions is included among the Commission's recommendations.

## ARRESTED OR CHARGED INFORMANTS WHO ARE NOT IN CUSTODY

The Commission considered whether the prosecutorial policies governing the use of in-custody informants and the statutory requirement of corroboration should be extended to *all* informants, whether they are in actual custody at the time they allegedly acquire information concerning the case

Exhibit 1
Page 59

Informant Testimony

49

of another accused, or are at liberty either because they have not yet been arrested on pending charges or have been freed on bail or recognizance pending resolution of the charges against them. Here, grave concerns were expressed to insure that "informant testimony" is not defined so broadly that it encompasses citizen informants, or those responding to offers of rewards. Nor should it reach the use of informants used to supply probable cause for arrests or searches, but who never testify at trial. Not every witness who testifies to hearing a statement made by the defendant should be included, simply because they may have some expectation of benefit from their testimony. But the peculiar risks created by informants who may have some expectation of leniency or reward from their testimony are similar, regardless of whether the accused and the informant are both in custody at the time of the alleged statements. Therefore, the Commission recommends that, whenever feasible, an express agreement in writing should describe the range of recommended rewards or benefits that might be afforded in exchange for truthful testimony by an arrested or charged informant, whether the informant is in custody or not. A minority of the Commissioners would also support an expansion of the definition of the informants included in Penal Code Sections 1127a, 1191.25 and 4001.1, to include all arrested or charged informants, and an extension of the requirement of corroboration to all arrested or charged informants.[3]

## Recommendations

**1** The California Commission on the Fair Administration of Justice recommends that, whenever feasible, an express agreement in writing should describe the range of recommended rewards or benefits that might be afforded in exchange for truthful testimony by an arrested or charged informant.

**2** The California Commission on the Fair Administration of Justice recommends that, wherever feasible, California District Attorney Offices adopt a written internal policy to govern the use of in-custody informants. The policy should provide:

(a) The decision to use the testimony of an in-custody informant be reviewed and approved by supervisory personnel other than the deputy assigned to the trial of the case;

(b) The maintenance of a central file preserving all records relating to contacts with in-custody informants, whether they are used as witnesses or not;

(c) The recording of all interviews of in-custody informants conducted by District Attorney personnel;

(d) The corroboration of any testimony of an in-custody informant by evidence which independently tends to connect the defendant with the crime, special circumstance or circumstance in aggravation to which the informant testifies.

**3** The California Commission on the Fair Administration of Justice recommends the enactment of a statutory requirement of corroboration of in-custody informants, similar to the current requirement of the corroboration of accomplices contained in Penal Code Section 1111.

The statute should provide:

*A conviction can not be had upon the testimony of an in-custody informant unless it be corroborated by such other evidence as shall independently tend to connect the defendant with the commission of the offense or the special circumstance or the circumstance of aggravation to which the in-custody*

---

3. Commissioners Bellas, Hersek, Hing, Judge, Laurence, Ridolfi and Streeter.

Exhibit 1
Page 60

> *informant testifies. Corroboration is not sufficient*
> *if it merely shows the commission of the offense*
> *or the special circumstance or the circumstance*
> *in aggravation. Corroboration of an in-custody*
> *informant cannot be provided by the testimony*
> *of another in-custody informant. An in-custody*
> *informant is hereby defined as a person, other*
> *than a codefendant, percipient witness, accomplice*
> *or coconspirator whose testimony is based upon*
> *statements made by the defendant while both the*
> *defendant and the informant are held within a cor-*
> *rectional institution.*

A jury should be instructed in accordance with the language of this statute.

A jury should not be instructed that corroborating evidence may be slight, as in CALCRIM No. 335.

◼ The California Commission on the Fair Administration of Justice recommends that training programs for California prosecutors, defense lawyers, judges and police investigators include a component addressing the use of arrested or charged informants as witnesses.

## Actions

The Report occasioned six articles from the press lauding the Commission's findings.

In 2007, Sen. Gloria Romero (D-Los Angeles) introduced SB 609, providing that a Court could not convict a defendant, find a special circumstance true, or use a fact in aggravation based solely on the uncorroborated testimony of an in-custody informant. The bill passed the Senate and Assembly only to be vetoed by Governor Schwarzenegger.

In 2008, Sen. Romero re-introduced SB 609 as SB 1589. The bill passed the Senate and awaits review in the Assembly.

Exhibit 1
Page 61

# Scientific Evidence

Public confidence in investigations of negligence or misconduct in the preparation or presentation of forensic evidence requires the involvement of a government entity that is truly independent of the police and sheriff agencies that operate forensic laboratories.

Exhibit 1
Page 62

## Data and Hearings

In preparation for a public hearing on the topic of Problems with Scientific Evidence, the Commission considered the following documents:

- Mnookin, Jennifer. *The Achilles Heel of Fingerprints*, The Washington Post, May 29, 2004.

- Stahl, Lesley. *Fingerprints: Infallible Evidence?*, CBS News, June 6, 2004.

- Murphy, Shelley. *City Pays Wrongfully Jailed Man $3.2 Million*, appearing in the Los Angeles Daily Journal, August 14, 2006.

- Cherry and Imwinkelried. *A Cautionary Note About Fingerprint Analysis and Reliance on Digital Technology*, 30-AUG Champion 27, 2006.

- Profile of Josiah Sutton, retrieved from Innocence Project website on August 29, 2006.

- Mabrey, Vicki. *DNA Testing: Foolproof?* CBS News, May 28, 2003.

- Profile of Peter Rose, including:

  - Petition for Writ of Habeas Corpus, Oct. 22, 2004

  - Order Granting Petition for Writ of Habeas Corpus and Ordering Immediate Release of Petitioner from State Prison, Oct. 29, 2004.

  - Petition for Finding of Factual Innocence Pursuant to Penal Code §851.8, Feb. 10, 2005

  - Order of Exoneration, Feb. 18, 2005.

  - Orders in Support of Finding of Factual Innocence, Mar. 3, 2005.

- Barker, Jeffrey. *Inmate Free After DNA Test*, The Record, Oct. 30, 2004.

- Barker, Jeffrey. *Rape Victim Recants 10 Years Later*, The Record, Nov. 6, 2004.

- Bohm, Layla. *Police Conclude Internal Review of Rose Case, Find No Wrongdoing*, Lodi News Sentinel, Feb. 18, 2005.

- Cooper, Claire. *Ruling Goes Beyond 'Not Guilty'*, Sacramento Bee, Feb. 19, 2005.

- Profile of Jimmy Ray Bromgard, retrieved from Innocence Project website on August 29, 2006.

- Tobin and Thompson. *Evaluating and Challenging Forensic Identification Evidence*, 30-JUL Champion 12, 2006.

- Dolan, Maura. *State Pays Wrongfully Convicted Man*, Los Angeles Times, January 20, 2006.

- Blumenthal, Ralph. *Faulty Testimony Sent 2 to Death Row, Panel Finds*, The New York Times, May 3, 2006.

- *Report on the Peer Review of the Expert Testimony in the Cases of State of Texas v. Cameron Todd Willingham and State of Texas v. Ernest Ray Willis*, Arson Review Committee, Innocence Project.

- Kelley, Darryl. *Crime Lab Errs in DUI Tests*, Los Angeles Times, Feb. 4, 2004.

- Stannard, Matthew B. *Board Finds Ex-Coroner's Work Lacking; Husband Charged After 1996 Autopsy*, San Francisco Chronicle, July 30, 2002.

- Zamora, Jim Herron. *Lab Scandal Jeopardizes Integrity of San Francisco Justice; Sting Uncovered Bogus Certification*, San Francisco Examiner, Sept. 16, 1994.

- Gorman, Anna. *Murder Count Dismissed in Case Involving Chemist's Errors*, Los Angeles Times, Oct. 7, 2004.

- Gorman, Anna. *LAPD Narcotics Analyst Erred; Botched Evidence Raises Questions on Credibility;*

Exhibit 1
Page 63

*Public Defender's Office Demands an Accounting*, Los Angeles Times, Sept. 2, 2004.

- *In the Matter of An Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, in the Supreme Court of Appeals of West Virginia, September 1993 Term.

- Teichroeb, Ruth. *Crime Labs Too Beholden to Prosecutors, Critics Say*, Seattle Post Intelligencer Reporter, July 23, 2004.

- Berry, Steve. Los Angeles Biological Crime *Evidence May Be Missing Forensics: Police, Sheriffs' Department Dispute Claim that Material Has Not Been Preserved*, Los Angeles Times, April 3, 2002.

- Daunt, Tina. *LAPD Blames Faulty Training in DNA Snafu Police*, Los Angeles Times, July 31, 2002.

- *Police Accidentally Destroy DNA Samples*, The San Diego Union-Tribune, July 31, 2002.

- Daunt & Berry. *LAPD Says Evidence Destroyed Crime: Authorities No Longer Have DNA in At Least 1,100 Sexual Assault Cases*, Los Angeles Times, July 30, 2002.

- Garza, Mariel. *Lab Staffing Under the Microscope; Cooley Calls DNA-Specialist Plans Inadequate*, Los Angeles Daily News, August 14, 2002.

- Connelly, Michael. *A Few Warm Bodies Can Solve A Lot of Cold Cases*, Houston Chronicle, May 29, 2005.

- *National Forensic DNA Study Report, prepared in partnership between the Division of Governmental Studies and Services at Washington State University and Smith Alling Lane*, P.S. December 12, 2003.

- Saks and Koehler, *The Coming Paradigm Shift in Forensic Identification Science*, Science, Vol. 309, August 5, 2005.

. Forensic Evidence—Chapter 4, *Achieving Justice: Freeing the Innocent; Convicting the Guilty*, Report of the American Bar Association Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process, 2006.

- *Status and Needs of Forensic Science Service Providers: A Report to Congress*, National Institute of Justice, May 2004.

- Giannelli, Paul C. *Ake v. Oklahoma: The Right to Expert Assistance in a Post-Daubert*, Post DNA World, 89 Cornell L. Rev. 1305, September 2004.

. *Junk Science and Texas Forensic Science Commission*, retrieved from Innocence Project website on August 25, 2006.

- Neufeld, Peter J. *The (Near) Irrelevance of Daubert to Criminal Justice and Some Suggestions for Reform*, American Journal of Public Health, Supplement 1, 2005, Vol. 95, No. S1.

- Dror, Charlton, and Peron. *Contextual Information Renders Experts Vulnerable to Making Erroneous Identifications*, Forensic Science International, 156 (2006) 74–78.

- Paul Coverdell Forensic Sciences Improvement Grants, 42 U.S.C.A. §3797k

- Commission on Forensic Science and Establishment of DNA Identification Index, §995 of Chapter 18 of the Consolidated Executive Law of New York.

- Thompson, William C. *Tarnish on the 'Gold Standard': Understanding Recent Problems in Forensic DNA Testing*, Jan/Feb Champion, 2006.

- ABA Standards on Criminal Justice DNA Evidence, February 23, 2006.

Scientific Evidence

53

Exhibit 1
Page 64

At the public hearing on January 10, 2007, in Hearing Room 4203 at the State Capitol in Sacramento, the Commission heard from Peter Neufeld, Co-Director of the Innocence Project at Cardozo Law School in New York, New York; Dr. William C. Thompson, Professor and Chair of the Department of Criminology, Law, & Society at the University of California, Irvine; Dr. Frederick A. Tulleners, Director of the Forensic Science Graduate Program at the University of California, Davis; Professor Susan Rutberg, Golden Gate University School of Law; Ms. Bicka Barlow, Office of the Public Defender, San Francisco; Ms. Gail Abarbanel, Director, the Rape Treatment Center at UCLA Medical Center; Mr. Michael Chamberlain, Deputy Attorney General, DNA Legal Unit for the California Department of Justice; Mr. Rockne Harmon, Deputy District Attorney, Alameda County; Mr. Herman Atkins, Exoneree and Chair of the California Council of the Wrongfully Convicted; Mr. Thomas J. Nasser, President, the California Association of Crime Laboratory Directors; Mr. Lance Gima, Chief, Bureau of Forensic Services, at the California Department of Justice; and Mr. Barry A.J. Fisher, Director of the Crime Laboratory for the Los Angeles County Sheriff's Department. The hearing was broadcast on closed-circuit television across Sacramento and over 250 members of the public and interested parties attended this hearing.

The Commission issued an Emergency Report and Recommendations Regarding the DNA Testing Backlog in the State of California on February 20, 2007, as follows:

## Report: DNA Testing Backlogs

This Report will address the current California backlogs in the processing of DNA samples taken from suspects arrested for violent felonies and the entering of the data into the databank, as well as the delays in testing of rape kits and other DNA samples collected during criminal investigations. There are numerous other issues of justice, fairness and accuracy with regard to the availability and use of forensic evidence in the California criminal justice system, which will be addressed in future Commission reports. The problem of backlogs, however, is urgently in need of immediate attention. Recognizing this urgency, the Commission decided to address this issue first, and to issue its emergency report and recommendations as quickly as possible.

The use of DNA profiles has rapidly become one of the most useful tools available to correctly identify criminal perpetrators. Recognizing its great potential, California voters adopted the DNA Fingerprint, Unsolved Crime and Innocence Protection Act by popular initiative at the November, 2004 general election, by a 62% margin. Also known as Proposition 69, the measure mandates a vast expansion of the statewide DNA Database and Data Bank program, recognizing it as the most reasonable and certain means to solve crimes, to aid in the identification of missing and unidentified persons, and to exonerate persons wrongly suspected or accused of crime. Proposition 69 requires the taking of buccal swab samples, along with thumbprints and palmprints, from any person convicted of any felony offense, as well as any person arrested for or charged with a homicide or sexual offense. Commencing January 1, 2009, Proposition 69 provides that coverage will expand to require the submission of samples for any adult persons

1. CODIS (The Combined DNA Index System) is a national database used by qualified law enforcement officials to link DNA evidence found at a crime scene with a suspect whose DNA is already on file. It was established by the

Federal Bureau of Investigation pursuant to authority granted by the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103-322, 108 Stat. 1796 (Sept. 13, 1994). Subsequently, all fifty state legislatures enacted

Exhibit 1
Page 65

Scientific Evidence

arrested or charged with any felony offense. The buccal swab samples are deposited with the DNA Laboratory of the California Department of Justice, which is required to perform DNA analysis and enter the results in a DNA data bank and database. DNA profiles are also uploaded into the national databank [CODIS] maintained by the FBI.[1]

The Commission was informed that as of January 31, 2007, the California Department of Justice had received 895,409 buccal swab samples pursuant to Proposition 69, and had uploaded profiles for 736,863, leaving a backlog of 158,546. It is anticipated that the backlog will be reduced below 60,000 by June 30, 2007. For each of the next three years, the Department anticipates receiving 240,000 samples per year. In 2009, when samples will be taken from every adult felony arrestee, the Department estimates the number will jump another 160,000, to 400,000 per year.

DNA SAMPLES RECEIVED / UPLOADED

SOURCE: California Department of Justice



With Prop. 69 change expect to receive 390K samples each year

DNA Samples Received
DNA Samples Uploaded
Current backlog (as of May 30, 2008) 27,826

DEPARTMENT OF JUSTICE LAB SALARIES LAG BEHIND CITIES AND COUNTIES



The vast increase of samples in such a short period of time has severely burdened the capacity of the Department's DNA Laboratory in Richmond, California. The reductions in backlog achieved thus far have been accomplished by an expansion of the Richmond Laboratory facilities and staff, an increase in incentive pay for overtime, and some outsourcing of analysis to other laboratories. Opportunities for outsourcing are limited, however, since only the DOJ lab is

---

statutes, requiring convicted offenders to provide DNA samples for entry into the CODIS system. *See* H.R. Report No. 106-900(I), at 8 (Sept. 26, 2000).

Proposition 69 expanded the California statutes to include arrested suspects as well as convicted offenders.

Exhibit 1
Page 66

55

Case 2:06-cv-02158-CW45-EDocument 28-3 06/09/11/26/14-70 Page 70 of 105 ID #:4303

permitted to upload DNA profiles into the CODIS national databank. But the greatest challenge the laboratory faces is in recruiting and retaining criminalists to fill existing vacancies. There are currently twenty vacancies for criminalists in Department of Justice labs, including six vacant supervisor positions. The Department of Justice laboratories are at a serious disadvantage in recruiting criminalists because of the differential in starting pay offered by other public laboratories in the State of California. The Department reports that currently, rank and file DOJ Criminalists and supervisors/managers are at least 30% behind city and county crime laboratory salaries. Despite



10 CRIMINALISTS VACANCIES IN DOJ LABS, INCLUDING 2 SUPERVISOR POSITIONS (6/18/08).

recent stopgap measures, the serious salary differential between the state laboratory and other public laboratories remains, and is not addressed in the currently pending state budget.

Backlogs and delays in the entry of offender DNA profiles into the databank have a serious impact upon the work of all law enforcement agencies in California. If an offender's profile is not yet in the databank, a forensic sample from a crime scene entered into the databank by any crime laboratory in the state will not produce a match, leaving the offender free to commit additional crimes. The potential exoneration of a suspect by finding a match to someone else will also be foreclosed.

The DNA data bank is already producing "cold hits" at a remarkable rate, identifying perpetrators of crimes that had gone unsolved for many years in California. Delays in the processing of offender profiles can result in irretrievable loss of the opportunity to resolve unsolved cases. Frequently, when an innocent person is exonerated by means of DNA testing, the testing also produces a "cold hit" of another suspect who remained at large to victimize others. The production of "cold hits" also impacts the availability of investigative, prosecution and defense resources at the local level. Proposition 69 provided some funding to local agencies to collect buccal samples, but no resources for follow-up investigations of "cold hits." In Los Angeles alone, forty "cold hits" were produced in January, 2007.

The Commission was also informed that delays of six months or more have become the norm at local crime laboratories for analysis of rape kits and other DNA samples collected during criminal investigations. The consequences of such delays were described for the Commission by Gail Abarbanel, Director of the Rape Treatment Center at Santa Monica-UCLA Medical Center. She described the case of a rape victim whose rape kit sat on a shelf, unopened, for several months despite the investigating detective's extraordinary efforts to expedite the testing. When it was finally tested, it produced a "cold hit" identifying a rapist who had attacked at least two other victims, one a child, during the period of delay. Such delays not only endanger potential victims, they may also result in unnecessary incarceration of innocent suspects. In another case described by Ms. Abarbanel, a Rancho Cucamonga man accused of raping a 4-year-old girl was held in jail for seven months before DNA tests were finally conducted which exonerated him. Some rape kits are *never* tested. Oakland reports that it processes fewer than

Exhibit 1

Page 67

Scientific Evidence

57



30 DAYS
Blood Alcohol: 12 days
Toxicology: 10 days
Controlled Substances: 17 days
Clandestine Labs: 30 days
Criminalistics (Firearms, Biology & DNA): 180 days
Latent Prints: 290 days
0    30  50      100      150      200      250      300 DAYS
URNAROUND TIMES FOR LAB WORK IN DAYS

half of the rape kits collected in the city. One of the crime labs in Los Angeles reports a backlog of 5,000 unopened rape kits.

DNA testing is not the only laboratory forensic service that is seriously backlogged in California. The State Laboratory reports long turn-around times for other types of forensic testing (see above chart).

In order to provide a 30 day turnaround for all cases which have been pending for over 30 days, the State Laboratory would have to hire 92 new forensic scientists. At current salary levels, this is virtually impossible.

California Penal Code Section 680 already provides that law enforcement agencies have an obligation to victims to conduct timely testing of rape kit and other crime scene evidence. A state norm of a six month delay is not timely. Delays put potential victims at risk by letting offenders go free, deprive innocent accused of prompt exoneration, and inflict delays in the orderly processing of criminal cases in our courts.

# Recommendations: DNA Testing Backlogs

The California Commission on the Fair Administration of Justice recommends immediate implementation of the following measures to address the problems of DNA testing backlogs and other problems in California:

**1** The California Department of Justice should immediately ascertain the staffing levels required for the State Laboratory to reduce the backlog in the uploading of DNA profiles to thirty days or less, both now and when the future demands of Proposition 69 take effect. The salary level necessary to fill and maintain those staffing levels should also be ascertained.

**2** Emergency budget appropriations should be immediately introduced, to provide state funding to staff the State Laboratory at the levels ascertained pursuant to the Commission's first recommendation.

**3** The California Attorney General should immediately commence consultation with state and local public laboratories, criminalists, law enforcement, prosecutor's offices, public defenders and private defense lawyers, victim representatives and judges

Exhibit 1
Page 68

to address the problems of DNA forensic technology resources in California. The following concerns should be urgently addressed:

(a) Identify the nature and scope of current capacity problems, backlogs of unprocessed evidence and systems issues that impede the utilization of DNA forensic technology to its fullest potential.

(b) Identify best practices that enhance collection and timely processing of DNA evidence, including crime scene and rape kit evidence, to meet the needs of the criminal justice system.

(c) Make recommendations for eliminating current backlogs and preventing future backlogs of unprocessed evidence in state and local public laboratories.

(d) Evaluate the efficiency and effectiveness of the current organization of resources in the State of California, to determine what systems and strategies will most effectively serve the needs of the State of California.

(e) Recommend strategies for training and educational programs to address the shortages of trained personnel to meet the staffing needs of crime labs throughout the State of California.

(f) Assess the impact of "cold hits" upon local investigative, prosecution and defense resources.

(g) Report to the Legislature and Governor regarding the legislative or administrative steps that must be taken to insure timely processing of evidence in California's criminal justice system.

**4** The Legislature and the Governor should provide adequate support to quickly respond to the needs identified by the Attorney General.

After issuing the Emergency Report on the DNA testing backlog, the Commission issued its Report and Recommendations Regarding Forensic Science Evidence on May 8, 2007, as follows:

# Report: Forensic Science Evidence

This Report will address issues surrounding the preparation and use of forensic science evidence in California criminal cases, and make recommendations to minimize the risk of wrongful conviction in such cases. The Commission previously addressed the California backlog in processing DNA samples taken from suspects arrested for violent felonies, entering that data into the national databank, and the delays in testing of rape kits and other DNA samples collected during criminal investigations. There are numerous other issues of justice, fairness and accuracy with regard to the availability and use of forensic evidence in the California criminal justice system, some of which will be addressed in this Report.

The presentation of forensic science evidence is often the turning point in a criminal trial. Today, the news carries reports of erroneous forensic identifications of hair, bullets, handwriting, footprints, bite marks, and even venerated fingerprints.[1] The

---

1. A recent analysis identifies 22 reported cases of fingerprint misattributions, including the case of Brandon Mayfield, an Oregon attorney and Muslim convert wrongfully accused of participation in the Madrid terrorist train bombing, and Stephan Cowans, convicted of shooting a police officer based on fingerprint identification and eyewitness testimony, released after serving six and a half years after he was exonerated by DNA testing. The Boston Police Department acknowledged that the fingerprint identification was erroneous. Cole, *More Than Zero: Accounting for Error in Latent Fingerprint Identification*, 95 J. of Crim. Law & Criminology 985 (2005).

2. Some confusion has arisen regarding research as to which causes of wrongful conviction are most prevalent. In this Commission's first report, we cited studies that report mistaken eyewitness identifications was the leading cause of wrongful convictions. Report and Recommendations Regarding Mistaken Eyewitness Identification, April 13, 2006. In our third report, regarding the use of informant testimony, we cited a study which reports that false informant testimony was the leading cause of wrongful conviction in U.S. *capital* cases. Report and Recommendations Regarding Informant Testimony, November, 2006. The Innocence Project data includes both capital and non-capital cases in which subsequent DNA testing exonerated the defendant. It consistently concludes that eyewitness error is the leading cause of wrongful conviction,

Exhibit 1
Page 69

Scientific Evidence

59

Innocence Project at Cardozo Law School identified forensic science testing errors in 63% of 86 DNA exoneration cases analyzed, the second most common factor contributing to wrongful convictions.[2] (Saks & Koehler, *The Coming Paradigm Shift in Forensic Identification Science*, 309 Science 892, Aug. 5, 2005.)

As recently noted in the Report of the Ad Hoc Innocence Committee of the American Bar Association, three developments in the 1990's dramatically altered the judicial approach to scientific evidence. (*Achieving Justice: Freeing the Innocent, Convicting the Guilty*, ABA 2006.) First, unlike any other forensic discipline that preceded it, DNA profiling entered the courts only after it had been extensively validated through broad research and elaborate quality assurance programs which included rigorous proficiency testing, standards for declaring a match, and the appropriate content of a report. This set a "gold standard" against which other forensic sciences are now measured and often found wanting. Raising the standards of the other forensic disciplines is all the more critical since it is the non-DNA disciplines that comprise the bulk of the crime lab's output.

According to Barry Fisher, DNA testing constitutes approximately five percent of the work of crime labs.

Second, the decision of the United States Supreme Court in *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993), established a more rigorous standard of admissibility for expert testimony, requiring it to be based upon sufficient facts or data, the product of reliable principles and methods, and reliably applied to the facts of the case. The California Supreme Court rejected the application of the *Daubert* standard in California cases, *People v. Leahy*, 8 Cal.4th 587, 882 P.2d 321 (1994), retaining the more traditional "general acceptance" standard of *Frye v. United States*, 293 Fed. 1013 (D.C. Cir. 1923). The reinvigorated *Frye* standard has led to much closer scrutiny of scientific proof.[3]

The third development was the exposure of serious abuse in a number of crime labs throughout the United States. Serious misconduct of forensic experts led to the reexamination of many cases in West Virginia, Oklahoma and Montana. (See, *e.g.*, *In re Investigation of the W. Va. State Police Crime Lab, Serology Div.*, 438 S.E.2d 501, W. Va. 1993.) The Houston Police Department shut down the DNA and Serology section of its crime laboratory in early 2003 after a television exposé revealed serious deficiencies in the lab's procedures. Two men who were falsely incriminated by botched lab work were released after subsequent DNA testing proved their innocence. In Virginia, an independent lab confirmed that DNA tests conducted by the state lab were botched and misinterpreted in the case of a man who came within days of being executed. The governor ordered a broader investigation of the state lab to determine whether these problems were endemic. (See Thompson, *Tarnish on the 'Gold Standard': Understanding Recent Problems in Forensic DNA Testing*, The Champion, Jan.–Feb. 2006, p. 10.) California has occasionally endured laboratory scandals. In 1994, more than 1,000 fel-

appearing in 71% of the cases, while forensic science testing errors ranks second, appearing in 63% of the cases. More than one factor was found in many cases. See http://www.innocenceproject.org/understand/Forensic-Science-Misconduct.php The forensic testing errors identified include statistical exaggeration or misinterpretation, suppression of exculpatory evidence, lying about credentials, falsified results, contamination, and experts testifying to results of tests that were never conducted.

3. Many of the most populous states followed California's lead in rejecting the *Daubert* standard, including Florida, New Jersey, New York and Pennsylvania. Some of these courts believe *Frye* offers greater protection for criminal defendants than *Daubert. See, e.g., Ramirez v. State*, 810 So.2d 836, 843 (Fla. 2001).

Exhibit 1
Page 70

ony convictions were jeopardized by the revelation that a San Francisco police lab technician had been certifying that samples contained illicit narcotics without performing laboratory tests. (Zamora, *Lab Scandal Jeopardizes Integrity of San Francisco Justice; Sting Uncovered Bogus Certification*, San Francisco Examiner, Sept. 16, 1994, p. A–7.)

All three of these developments come into sharp focus particularly when DNA testing exonerates persons who had been convicted in reliance upon other forensic sciences that were either negligently or intentionally misapplied. The Commission learned of California cases in which wrongful convictions were at least partly attributable to erroneous non-DNA forensic evidence. Herman Atkins was convicted of rape in Riverside County in 1988, and sentenced to forty-five years in prison. After serving eleven years in prison for a crime he did not commit, he was exonerated by DNA testing conducted in 1999, which showed he was not the source of semen found on the victim's sweater. His defense at trial was based on mistaken eyewitness identification. In testifying at his trial, a criminalist from the California State Laboratory at Riverside improperly testified that Atkins was included in a population of only 4.4% of the population that could have contributed the semen. In truth, because nothing foreign to the victim was seen, no male in the world could ever be excluded as a potential semen donor. Hence, 100% of the male population could be contributors. The serology data, in fact, was not probative of guilt or innocence but the jury was nonetheless misled by the state's expert. (See *Atkins v. County of Riverside,*

No. 03-55844, 2005 U.S.App. LEXIS 19928, Feb. 9, 2005); Testimony of Peter Neufeld, California Commission on the Fair Administration of Justice Sacramento Hearing, January 10, 2007.

Jeffrey Rodriguez, 28, was freed in San Jose on Monday, February 5, 2007. He had served 5 years of a 25 years to life sentence for a robbery under California's "three strikes" law. In his case, a shaky eyewitness identification was corroborated by the testimony of a criminalist who claimed his pants contained a stain with a combination of motor oil and cooking oil. Such a combination would have connected him to the crime scene. Subsequent tests by a state crime lab concluded that the stain was not as described. Although at his first trial, jurors voted 11–1 to acquit, by the time of his retrial his family ran out of money, and his lawyer failed even to call the defense witnesses who had testified at the first trial. After his conviction was set aside on appeal because of ineffective assistance of counsel, the prosecution elected to drop the charges. (See Tulsky, "DA's Office Drops Charges Amid Signs of a Wrongful Conviction", San Jose Mercury News, Feb. 6, 2007.)

**Accreditation of Laboratories and Certification of Forensic Experts.**

In December, 1998, the California State Auditor reviewed nineteen local crime laboratories operated by police, sheriffs or district attorneys in California to assess their readiness to obtain accreditation under the standards developed by the American Society of Crime Lab Directors Laboratory Accreditation Board (ASCLD/LAB).[4] To obtain accreditation, a laboratory must demonstrate that

---

4. The Auditor noted that the 19 laboratories examined served approximately 77% of the State's population in 13 counties. The State Department of Justice operated full-service laboratories at 11 sites to provide services to the remaining counties in the State. The audit only addressed the readiness of the 19 local labs. California State Auditor, *Forensic Laboratories: Many Face Challenges Beyond Accreditation to Assure the Highest Quality Services,* p. 1 (Dec. 1998). Today, the State Department of Justice operates thirteen laboratories, all of which are fully accredited by ASCLD.

Exhibit 1
Page 71

Scientific Evidence

61

its management, operations, personnel, procedures, equipment, facility, security, and health and safety procedures meet established standards. They are also required to implement proficiency testing, continuing education, and other programs that improve the overall skills and services of laboratory personnel. The Auditor concluded that 13 of the 19 laboratories had not developed or implemented one or more of the components of a quality control system. In addition, many of the laboratories did not have proficiency testing or court monitoring programs. Through voluntary efforts, most of these shortcomings have been corrected. Seventeen of the nineteen laboratories audited in 1998 are now fully accredited by ASCLD/LAB.[5] The Commission has concluded that further action to achieve accreditation of California publicly funded crime labs is not necessary. Private laboratories also exist, two of which are ASCLD/LAB accredited.[6] The accreditation of private laboratories should also remain voluntary. California laboratories should be commended for their vigorous and sustained efforts to achieve accreditation voluntarily. The Commission does believe, however, that rigorous certification standards should be established and encouraged for individual forensic experts employed by the crime labs. While each laboratory sets its own hiring and promotion



IN CALIFORNIA, 31 OUT OF 33 PUBLIC LABS ARE ACCREDITED.

standards, there are no generally recognized standards to define who is qualified to perform analysis of evidence in any particular scientific discipline. We believe such standards should be formulated and applied on a statewide basis. Rigorous written examinations, proficiency testing, continuing education, recertification procedures, an ethical code, and effective disciplinary procedures should be part of such a program.

A program for Certification of Criminalists is currently available through the American Board of Criminalistics [ABC]. The ABC offers a certificate in criminalistics, as well as in the specialty disciplines of forensic biology, drug chemistry, fire debris analysis and trace evidence. Proficiency testing is an essential component of the ABC certification program. The Board has also adopted Rules of Ethics, and established a disciplinary procedure to deal with ethical infractions. (See www.criminalistics.com.) Whether through the ABC program or some other equivalent, California Crime Lab Directors should take the lead in encouraging certification by using it as a factor in promotion and salary decisions. Laboratories should provide the funds necessary for their criminalists and other forensic experts to achieve certification.

Where appropriate, both prosecutors and criminal defense lawyers can provide additional motivation by presenting certification in the qualification of expert witnesses in court, and cross examining uncertified experts as to why they have not pursued certification. Many lawyers are not even aware of the existence of certification standards.

5. Only the laboratories operated by the Fresno County Sheriff and the Huntington Beach Police Department have not achieved accreditation. One additional laboratory, operated by the Los Angeles County Coroner, which was not audited in 1998, has achieved accreditation.

6. Crime Scene Technologies, San Diego and Serological Research Institute, Richmond are accredited by ASCLD.

Exhibit 1
Page 72

**2 The Need for Independent Investigation of Laboratory Errors.**

While accreditation of laboratories assures compliance with accepted standards in procedures, management and equipment, the occasional errors and even rarer instances of misconduct that occur need to be closely scrutinized to identify the cause so that corrective measures can be taken. That scrutiny should come from an independent source, not connected with the management of the laboratory itself, which may be motivated to minimize or conceal an ongoing problem. For this very reason, the recipients of federal grants under the federal Paul Coverdell Forensic Science Improvement Grant Program are required to certify that:

> ...*a government entity exists and an appropriate process is in place to conduct independent external investigations into allegations of serious negligence or misconduct substantially affecting the integrity of forensic results committed by employees or contractors of any forensic laboratory system, medical examiner's office, coroner's office, law enforcement storage facility, or medical facility in the State that will receive a portion of the grant amount.*

42 U.S.C.A. § 3797k(4) (2004). California receives Coverdell grant funds each year, which are disbursed by the Governor's Office of Emergency Services, Law Enforcement and Victim Services Division (OES). In 2005, $1.1 million was received, and in 2006, $1.2 million was received. The OES requires each subgrantee to certify to the presence of an oversight process and describe that process. The Commission examined the oversight entity described by each of the California recipients, which included the State Department of Justice Bureau of Forensic Services, the Sheriff's Departments of eleven counties, and six municipal police departments and three District Attorney's offices which operate their own laboratories. In

nearly every instance, the independent auditing entity described was the Internal Affairs Division of the County Sheriff's Office or Police Department involved.[7]

The Commission believes that public confidence in the independence of investigations of negligence or misconduct in the preparation or presentation of forensic evidence in criminal cases requires the involvement of a government entity that is truly independent of the police and sheriff agencies that operate the laboratories. Not all forensic laboratories, coroner's offices or medical examiner's offices in California are recipients of Coverdell grants, and may not have any oversight entity in place.

The application of uniform standards requires consistency in the operation of the investigative function.

Moreover, some of the forensic functions that prosecutors rely upon occur outside of government laboratories. Often there are small forensic operations embedded in police departments, and sometimes the expert is an independent contractor hired directly by the prosecutor (*e.g.*, a forensic dentist opining on bite marks). The transparency of the investigative process will be hampered by a myriad of entities with varying regulations regarding disclosure of the results.

The State of Texas recently responded to a similar need with the creation of the Texas Forensic Science Commission. The Commission was charged with developing and implementing a reporting system through which accredited laboratories, facilities, or entities report professional negligence or misconduct, and:

> ...*investigate, in a timely manner, any allegation of professional negligence or misconduct that would*

---

7. The exception was the Santa Clara County Crime Lab operated by the Santa Clara County District Attorney's Office, which designates the State Attorney General for independent audits under its Coverdell Grants.

8. California Government Code Section 12550 provides: "The Attorney General has direct supervision over the district attorneys of the several counties of the State and may require of them written reports as to the condition of public business entrusted to their charge."

Exhibit 1
Page 73

Scientific Evidence

63

*substantially affect the integrity of the results of a forensic analysis conducted by an accredited laboratory, facility or entity.*

Article 38.01, Texas Code of Criminal Procedure, enacted in 2005. The Commission considered the creation of a Commission similar to the Texas model, but concluded a new level of bureaucracy is not necessary to achieve the stated goals in California. We believe the District Attorneys in each county can be relied upon to evaluate allegations of negligence or misconduct occurring in all laboratories within their county, and conduct an independent investigation where appropriate. District Attorneys can call upon the Attorney General for any additional investigative resources needed to carry out this function. County District Attorneys would have the necessary authority and independence to evaluate allegations of negligence or misconduct in the thirteen laboratories operated by the California Department of Justice as well. The results of all such independent investigations should be reported to the California Attorney General, who already has the requisite authority to maintain oversight over California District Attorneys.[8] Where a local laboratory is actually operated by the District Attorney himself or herself, as is currently the arrangement in Santa Clara, Sacramento and Kern Counties, independent examinations of allegations of negligence or misconduct should be conducted by the California Attorney General.

The Commission has not addressed the procedures and policies that should be implemented when an allegation of negligence or misconduct has been sustained. There is compelling authority, however, that such information would qualify as material evidence which should be disclosed to the defendant pursuant to the obligations imposed by *Brady v. Maryland,* even after conviction.[9]

**3 The Need for Forensic Science Standards in California.**

The Commission believes that there is a need in California for the promulgation of standards for scientific testing, report writing, and the parameters of appropriate expert testimony, as well as for greater circulation of information to all participants in the criminal justice system, and better training for those who testify as experts on any aspect of forensic science.

The Forensic Science Board created by the State of Virginia provides some of these functions. The Board is charged with the power and duty to ensure the development of long-range programs and plans for the incorporation of new technologies as they become available. It reviews, amends and approves recommendations of a Scientific Advisory Committee, which in turn is charged with the following responsibilities:

(a) The Committee may review laboratory operations of the Department and make recommendations concerning the quality and timeliness of services furnished to user agencies.

(b) The Committee shall review and make recommendations as necessary to the Director of the Department and the Forensic Science Board concerning:

1. New scientific programs, protocols, and methods of testing;

2. Plans for the implementation of new programs, sustaining existing programs and improving upon them where possible, and the elimination of programs no longer needed;

3. Protocols for testing and examination methods, and guidelines for the presentation of results in court; and

---

9. The prosecution has an independent, self-executing duty under the Constitution of the United States to disclose discovery material under *Brady v. Maryland,* 373 U.S. 83, 87 (1963). See *People v. Gonzales,* 51 Cal. 3d 1179, 1260–61 (1990) (noting the State's obligation to disclose *Brady* material continues after trial); *Thomas v. Goldsmith,* 979 F.2d 746 (9th Cir. 1992) (recognizing the State's continuing post-judgment obligation to disclose exculpatory information).

Exhibit 1
Page 74

4. Qualification standards for the various scientists of the Department, including the Director.

(c) Upon request of the Director of the Department, the Forensic Science Board, or the Governor, the Committee shall review analytical work, reports and conclusions of scientists employed by the Department. The Committee shall recommend to the Forensic Science Board a review process for the Department to use in instances where there has been an allegation of misidentification or other testing error made by the Department during its examination of evidence.

Code of Virginia, § 9.1-1113 (2005).

Continuing education and training of forensic science experts is essential to maintain their competency in scientific fields that are constantly changing and improving. A recurring problem of resource allocation in laboratories arises when personnel must devote substantial time and effort to on-site training of individuals or small groups of employees. There is currently no State entity in California which addresses the needs for statewide training and continuing education programs which would consolidate and address the training needs of laboratories and law enforcement agencies throughout the state. In addition to the promulgation of standards, such an entity could serve as a source for coordinated training and continuing education of forensic science experts. It would also provide a valuable service to the entire criminal justice system, by serving as a source of up-to-date information regarding new developments in the forensic sciences. Research needs and opportunities could be identified and funded, such as research utilizing the growing DNA database.

The Commission believes the creation or designation of an entity in California to assume these responsibilities should be preceded by an opportunity for the Forensic Science community and all affected criminal justice agencies to be heard from, to elicit a wide spectrum of views as to how these needs can best be met. The legislature should undertake an examination of the comparative merits of the alternatives that are available, including the assignment of this responsibility to the California Attorney General. Legislation has already been proposed for the creation of a "Crime Laboratory Review Task Force" to address some, but not all of these concerns. (See A. B. No. 1079, Introduced by Assembly Member Richardson on February 23, 2007.) This legislation, supported by the Attorney General, could provide an excellent vehicle to elicit the input the Commission is recommending.

**4 The Need for Forensic Science Training for Prosecutors, Defense Lawyers and Judges.** The diversity of disciplines which become the subject of expert scientific evidence and the rapid developments in new technology present serious challenges for the California judiciary. Judges need up-to-date training to assist them in their evaluation of scientific evidence and expert testimony. Recognizing this need, in February, 2005 Chief Justice Ronald M. George of the California Supreme Court established the Judicial Council Science and the Law Steering Committee, to evaluate the needs of the courts, including guidance in developing effective education strategies and pertinent educational content. The Committee, chaired by Associate Justice Ming Chin, issued its recommendations on January 10, 2007. The recommendations include a comprehensive plan to establish a statewide judicial education plan on science and technology. On February 10, 2007, the Committee issued a second set of recommen-

Exhibit 1
Page 75

Scientific Evidence

dations to improve the judicial management of issues regarding science, technology and the law. These recommendations include a number of projects and resources to facilitate the exchange of information between the courts and the science and technology communities, to assess emerging issues and potential partnerships relating to science, technology and the law. The Commission commends and encourages these efforts.

The recurring need for prosecutors and defense lawyers to have up-to-date training in issues surrounding forensic science evidence is obvious. The challenge is to provide the resources to free overworked and heavily burdened deputies to participate in training programs. Specialized programs in DNA or other categories of scientific evidence will reach only a small proportion of the deputies who confront such issues on a day to day basis. The Commission recommends greater creativity in delivering needed training, including more on-line resources for in-office training, available on a state-wide basis. Cooperative ventures should also be encouraged, to combine the training of deputy district attorneys with the training of public defenders and defense attorneys. The essential understanding of the science involved transcends the issues of tactics that may need to be addressed in a more exclusive setting.

The traditional reliance upon the adversary system to expose errors may break down when it comes to forensic science evidence.

Many of the examples of wrongful convictions attributable to misconduct or negligence by forensic experts could have been avoided if defense lawyers were fully competent to challenge the evidence. But the shortcomings of defense representation go beyond the problem of education and training. There may be serious problems with regard to the availability of experts and resources for expert assistance for defense lawyers. The Commission intends to explore such problems in addressing the issues surrounding incompetence of defense attorneys in a future report.

## Recommendations: Forensic Science Evidence

**1** The California Commission on the Fair Administration of Justice recommends that California Crime Lab Directors encourage the certification of the forensic experts they employ, and use certification wherever possible as a basis for promotion and salary decisions.

**2** The California Commission on the Fair Administration of Justice recommends that legislation be enacted to require that any allegation of professional negligence or misconduct that would affect the integrity of the results of a forensic analysis conducted by a California laboratory, facility or entity be reported in a timely manner to the District Attorney or other appropriate prosecutorial agency, and to require the District Attorney or other prosecutorial agency to which such allegations are reported to report the results of any independent investigations of such allegations to the State Attorney General.

65

Exhibit 1
Page 76

**3** The California Commission on the Fair Administration of Justice recommends that the legislature consider the creation or designation of a governmental agency or commission (which could be the office of the California Attorney General) with the power and duty to formulate and apply standards to define who is qualified to perform analysis of evidence in any particular scientific discipline on a statewide basis. The creation or designation of such an entity should be preceded by an opportunity for the Forensic Science community and all affected criminal justice agencies to be heard from, to elicit a wide spectrum of views as to how these needs can best be met. A.B. 1079, currently pending before the legislature, could provide an excellent vehicle to elicit this input. Rigorous written examinations, proficiency testing, continuing education, recertification procedures, an ethical code, and effective disciplinary procedures could be part of such a program. Such an agency could also promulgate standards for scientific testing, report writing, and the parameters of appropriate expert testimony; provide information to all participants in the criminal justice system regarding the evidentiary validity of forensic science evidence; identify and fund research needs and opportunities; and provide state-wide training programs for forensic experts.

**4** The California Commission on the Fair Administration of Justice recommends that training programs for California prosecutors, defense lawyers, judges and police investigators be expanded to include greater attention to the appropriate use and validity of forensic science evidence.

*Note: Commissoner Totten does not concur in Recommendation (3). While he supports the need for additional training and the establishment of additional professional standards, he does not support the creation of a new state agency to oversee crime labs or the assignment of this responsibility to an existing state agency. He believes that doing so will increase state bureaucracy without producing a measurable improvement in forensic services or accuracy.*

## Actions

The Reports and Recommendations on DNA testing backlog and Problems with Forensic Science Evidence occasioned twelve articles lauding the Commission for its work on this topic.

The Commission endorsed A.B.385, which was enacted by the legislature in 2007 to require a survey of the salaries of scientists employed by California public agencies. The measure was vetoed by Governor Schwarzenegger.

The Commission endorsed A.B.1079, which was enacted by the legislature in 2007 to establish a task force to review California's crime laboratory system. The measure was signed by the Governor and chaptered as Section 11062 of the California Penal Code. The task force is required to report its findings to the legislature by July 1, 2009.

Exhibit 1
Page 77

# Professional Responsibility and Accountability

Where an attorney in a criminal proceeding has engaged in egregious misconduct, appropriate corrective action should include a report to the State Bar, even if the misconduct did not affect the judgment of the court. Adequate funding is critical to meet constitutional standards for the defense of indigent accused.

Exhibit 1
Page 78

## Data and Hearings

In preparation for a public hearing on the topic of Professional Responsibility and Accountability of Prosecutors and Defense Lawyers, the Commission considered the following documents:

- Defense Counsel Practices—Chapter 6, *Achieving Justice: Freeing the Innocent; Convicting the Guilty, Report of the American Bar Association Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process,* 2006.

- *A Critical Analysis of Lessons Learned Recommendations for Improving the California Criminal Justice System in the Wake of the Rampart Scandal, Los Angeles County Bar Association Task Force on the State Criminal Justice System,* April 2003.

- Goldberg, Dick. *A Twist of Fate,* Los Angeles Daily Journal, October 13, 1995.

- Carrizosa, Phillip. *Justices to Hear Rights Claim by Ex-Defendants,* Los Angeles Daily Journal, January 23, 1997.

- Smith, Sarah Lavender. *P.D. Finds Murder Case Full of Holes,* Los Angeles Daily Journal, January 23, 1996.

- Koehler, Tamara. *Kern County Judge Frees Father After 15 Years,* Los Angeles Daily Journal, May 21, 1999.

- Koehler, Tamara. *Man Freed After 15 Years Sues DA,* Los Angeles Daily Journal, October 11, 1999.

- Perry, Tony. *Convictions Overturned in Policeman's Slaying,* Los Angeles Times, July 21, 1999.

- Weinberg, Steve. *Changing an Office's Culture,* Center for Public Integrity, June 26, 2003.

- Roemer, John. *Free From Death Row, Man Sues City, Police,* Los Angeles Daily Journal, October 29, 2002.

- Seina, Robert. *Mix of Persistence, Luck Frees Prisoner,* Los Angeles Daily Journal, September 12, 2003.

- Roemer, John. *Panel Tosses Conviction for Errors at Trial,* Los Angeles Daily Journal, July 28, 2006.

- Hansen, Amelia. *8-Year-Old's Killer Is Let Off Death Row,* Los Angeles Daily Journal, Aug. 14, 2006.

- Simmons, Leslie. *Defender Loses Malpractice Case,* San Francisco Daily Journal, May 27, 2005.

- Abrams, Gary. *Errors by Jones' Trial Attorney Were Primary Case of Reversal,* Los Angeles Daily Journal, April 11, 1997.

- Armstrong, Jason. *Counsel Ineffective at Trial, Justices Agree,* Los Angeles Daily Journal, April 28, 1998.

- Berg, Martin. *After 17 Years, Man's Plea of Injustice Yields Results,* Los Angeles Daily Journal, September 10, 1999.

- Weinstein, Henry. *Man Ordered Freed or Retried After 10 Years,* Los Angeles Times, July 23, 2002.

- Weinstein, Henry. *Man Ordered Freed or Retried After 10 Years,* Los Angeles Times, July 23, 2002.

- Love, Andrew. *Progress in Death Penalty Challenges is Too Late for Some,* Los Angeles Daily Journal, March 14, 2005.

- Zacharias, Fred C. *The Professional Discipline of Prosecutors,* Public Law and Legal Theory Working Paper #10, University of San Diego School of Law.

- *Rule 3.8: Special Responsibilities of a Prosecutor, Model Rules of Professional Conduct,* American Bar Association.

- Green, Bruce A. *Prosecutorial Ethics as Usual,* 5 University of Illinois Law Review 1573, December 2003.

Exhibit 1
Page 79

- Freedman, Monroe H. *An Ethical Manifesto for Public Defenders*, 39 Valparaiso Law Review 911, October 2005.

- Weinberg, Steve. *Shielding Misconduct: The Law Immunizes Prosecutors from Civil Suits*, Center for Public Integrity, June 26, 2003.

- *Imbler v. Pachtman*, 424 U.S. 409, March 1976.

- O'Connell, J. Bradley. *Professional Responsibility & Liability Standards for Criminal Appellate Practice*, First District Appellate Project Training Seminar, January 21, 2006.

- Zapler, Mike. *State Bar Ignores Errant Lawyers*, San Jose Mercury News, February 12, 2006.

- Drexel, Scott J. *Headlines Aside, State Bar Does Discipline Bad Lawyers*, San Jose Mercury News.

- Yaroshefsky, Ellen. *Wrongful Convictions: It Is Time to Take Prosecution Discipline Seriously*, 8 Dist. Colum. Law Rev. 1, Fall 2004.

- Davis, Angela J. *Prosecutors Who Intentionally Break the Law*, 1 Crim. L. Brief 16 (2006).

- Eliason, Randall D. *The Prosecutor's Role: A Response to Angela Davis*, 2 Crim. L. Brief 15 (2006).

- *Gideon's Broken Promise: America's Continuing Quest for Equal Justice*, A Report on the American Bar Association's Hearings on the Right to Counsel in Criminal Proceedings, 2004.

- *Guidelines on Indigent Defense Services Delivery Systems*, State Bar of California, 2006.

- *Contracting for Indigent Defense Service: A Special Report*, United States Department of Justice, Office of Justice Programs, Bureau of Justice Assistance, April 2000.

- Clark and Stone. *Bolder Management for Public Defense: Leadership in Three Dimensions*, John F. Kennedy School of Government at Harvard University, Bulletin #1, November 2001.

- Feinberg and Steige. *Cultural Revolution: Transforming the Public Defender's Office*, John F. Kennedy School of Government at Harvard University, Bulletin #3, August 2002.

- Moore, Mark H. *Alternative Strategies for Public Defenders and Assigned Counsel*, John F. Kennedy School of Government at Harvard University, April 2001.

At a public hearing on July 11, 2007 in Donovan Hall at Loyola Law School in Los Angeles, the Commission heard from Prof. Cookie Ridolfi, Santa Clara University School of Law and Executive Director of the Northern California Innocence Project; Prof. Laurie Levenson, Loyola Law School; Kate Flaherty, Deputy District Attorney, San Diego County; Dolores Carr, District Attorney, Santa Clara County; Michael Schwartz, Special Assistant District Attorney, Ventura County; Lael Rubin, Deputy District Attorney, Los Angeles County; Juliana Humphrey, Deputy Public Defender, San Diego County; Charles Patterson, Attorney at Law, Morrison & Foerster; Prof. Larry Benner, Cal Western School of Law (& Lorenda Stern); Lon Sarnoff, former Assistant Public Defender, Los Angeles County; Len Tauman, Assistant Public Defender, Sacramento County; Former Public Defender, Placer County; John Wesley Hall, First Vice-President, National Association of Criminal Defense Lawyers; Judge Steven R. Van Sicklen, Los Angeles County Superior Court, Supervising Judge, Criminal Division; Harry Sondheim, Chair, Commission for the Revision of Rules of Professional Conduct, California State Bar; Scott Drexel, Chief Trial Counsel, California State Bar.

The Commission issued three reports. The first was a Report and Recommendations on Reporting Misconduct, issued on October 18, 2007, as follows:

Exhibit 1
Page 80

# Report: Reporting Misconduct

There is every indication that, overall, District Attorneys and their staffs, Public Defenders and their staffs, and private criminal defense lawyers in California provide competent and highly professional service, meeting the highest ethical standards.

Self congratulation should not blind us, however, to the problem of accountability where prosecutors and defense lawyers do occasionally go astray. While appellate courts frequently review criminal convictions to assess claims of misconduct or incompetence on the part of prosecutors or defense lawyers, their review of these claims is often limited to determining whether the impact of misconduct or incompetence requires reversal of a judgment of conviction. Whether discipline of an attorney is warranted, and what that discipline should be, is ordinarily left to supervisory personnel in the District Attorney's or Public Defender's Office, or to the State Bar. The Commission has concluded that there are important steps which can be taken to increase the effectiveness of this system.

Internal discipline by prosecutors' or public defenders' offices necessarily lacks transparency, because of legal restrictions on disclosure to protect the privacy of employees. But the lack of public access often means that no track record is available to identify repeat offenders.

The State Bar is limited by its reliance upon the receipt of reports of misconduct or incompetence by judges or self-reporting by the offending attorneys. The Commission has discovered that much is not reported which should be, and clarification is needed of what should be reported by whom. While not recommending any statutory changes, the Commission is recommending changes in Court Rules, the California Code of Judicial Ethics, and the reporting function of the State Bar to address these shortcomings and increase the accountability and transparency of the process, without compromising the privacy of individual attorneys. While there is no public access to complaints or reports to the State Bar either, unless a disciplinary proceeding is initiated, at least the State Bar can serve as a collection and preservation point, to assure that a cumulative record is maintained and preserved.



IT IS NOT CLEAR WHO BEARS THE RESPONSIBILITY FOR REPORTING MISCONDUCT.

---

1. Use of the terms "prosecutorial misconduct" and defense lawyer "incompetence" can be misleading. These terms are so frequently used in the written opinions of courts that they have become a sort of shorthand that encompasses a wide variety of professional failings. Thus, "prosecutorial misconduct" includes conduct that may not be intentional, and defense lawyer "incompetence" includes deliberate misconduct. The use of these terms in this report does not imply any judgment that one is more or less culpable than the other. Both have been identified among the leading causes of wrongful convictions. A study of the first 74 DNA exonerations in the United States found that prosecutorial misconduct was a factor in 45% of the cases, and defense lawyer incompetence was a factor in 32% of the cases. Frequently, both factors were found in the same case. Scheck, Neufeld & Dwyer, *Actual Innocence*, p. 365 (New American Library, 2003).

2. Professor Ridolfi also searched the State Court database for cases alleging that prosecutors had withheld exculpatory evidence. She used the search term "Brady" but excluded cases that also contained the term "prosecutorial misconduct". This search yielded 154 cases. In 129, discovery had been withheld but in only 16, did the court find *Brady* error. In the remaining 113, the courts concluded that the withheld evidence did not meet the test for "materiality" under *Brady v. Maryland*, 373 U.S. 83 (1963)

Using the same search terms, she searched the federal court databases and generated 188 cases. That research remains ongoing.

There was also a search of both California State and federal databases for cases alleging discrimination in use of peremptory challenges (Batson/Wheeler violations). That search yielded 586 cases. In 20, the decision resulted in a reversal or outright reversal. In 17 or 85% of the cases the discrimination involved African Americans.

3. California Business and Professions Code Section 6086.7(a)(2) provides: "A court shall notify the State Bar of any of the following: ...(2) Whenever a

Exhibit 1
Page 81

Professional Responsibility

71

The Commission asked its researchers to analyze every reported appellate decision in California, whether published or unpublished, where the Courts addressed a claim of prosecutorial misconduct or defense lawyer incompetence for the ten year period ending in 2006.[1]

The result of this research suggests that our reliance upon the State Bar as the primary disciplinary authority is seriously hampered by underreporting.

## REPORTING OF PROSECUTORIAL MISCONDUCT

Professor Cookie Ridolfi of Santa Clara University School of Law located 2,131 California cases in which claims of prosecutorial misconduct were raised.

## Courts concluded that prosecutorial misconduct did occur in 444 of these cases, or 21%.

In 390 of these cases, however, the court concluded the misconduct was harmless error and affirmed the conviction. In 54 cases, the misconduct resulted in a reversal of the conviction. The most common forms of misconduct found were use of false evidence, improper examination of witnesses and improper argument. (Ridolfi, *Prosecutorial Misconduct: A Systemic Review*, available on the Commission's website.)[2]

Pursuant to Section 6086.7(a)(2),[3] there should have been a report made to the State Bar in each of the 54 cases in which prosecutorial misconduct resulted in a reversal in the past ten years.

In a follow-up to Professor Ridolfi's research, Chief Trial Counsel Scott Drexel of the State Bar testified that, after checking half of these 54 cases to determine whether any of them resulted in a report to the State Bar, he had yet to find a single example of a report by a court of misconduct resulting in reversal of a conviction.[4] Mr. Drexel attributes this to lack of judicial familiarity with the requirements of Section 6086.7. However, he also informed the Commission that each year the State Bar sends out a letter reminding judges of the statutory requirements. A spate of reporting follows,[5] but then it drops off.

He suggested a reminder from the Chief Justice might yield better results. It is also possible that the current lack of reporting is attributable to confusion as to who has the actual duty to report when a judgment is reversed: the trial judge who rendered the judgment? The judge who authored the reversing opinion? The Presiding Judge of the Court of Appeal that rendered the reversing judgment? All of the judges who concurred in the reversing judgment? It may be that everyone's business becomes nobody's business. Section 6086.7 should be clarified by a Court Rule clearly defining which judge of the court has the obligation to report to the State Bar.

---

modification or reversal of a judgment in a judicial proceeding is based in whole or in part on the misconduct, incompetent representation, or willful misrepresentation of an attorney."

4. This is not to suggest that prosecutors are never disciplined for misconduct by the State Bar. In February, 2006, the San Jose Mercury News reported that after reviewing 1,464 lawyer discipline cases published in the California Bar Journal between 2001 and 2005, they found just one case in which disciplinary action was taken against a prosecutor for misconduct. apler, *State Bar Ignores Errant Lawyers*, San Jose Mercury News, Feb. 12, 2006. Scott Drexel, Chief Trial Counsel for the California State Bar, responded by citing three 2005 cases in which prosecutors were disciplined, and another in which discipline was pending. Three of the cases involved failure to disclose potentially exculpatory evidence to the defense. Drexel, *Headlines Aside, State Bar Does Discipline Bad Lawyers*, San Jose Mercury News, Feb. 19, 2006. It

is not known whether these disciplinary proceedings were initiated by judicial reports, attorney self-reporting, or complaints from other sources.

5. The 2006 Report on the State Bar of California Discipline System, p. 5, indicates that in 2006, the Bar received 134 reports from judges, and 83 self-reports by attorneys. These judicial reports, however, include all "reportable actions" under Calif. Bus.&Prof. Code Sections 6086.7 and 6068(a). In addition to the reversal or modification of judgments due to misconduct of an attorney, judges are required to report all findings of contempt by lawyers, all judicial sanctions against lawyers, and all civil penalties and judgments against lawyers for fraud, breach of fiduciary duty, misrepresentation or gross negligence in a professional capacity. Self-reports by attorneys are also required in numerous other categories besides reversal or modification of a judgment due to misconduct. They must report the filing of malpractice lawsuits, judgments in specified civil actions, indictments or convictions, and the imposition of sanctions or discipline.

Exhibit 1
Page 82

Case 2:09-cr-02138-CJC Document 28-3 Filed 06/09/14 Page 86 of 105 Page ID #:4319

Limiting the mandatory reporting requirement to cases that result in a modification or reversal of a judgment appears to make little sense. Whether a judgment is reversed depends upon factors such as the strength of other evidence which may have nothing to do with the egregiousness of the misconduct or incompetence. The research conducted for the Commission by Professor Ridolfi strongly confirms this. In 444 cases in which a claim of prosecutorial misconduct was sustained, only 54 cases (12%) resulted in a reversal of the judgment. In 88% of the cases, the error was deemed harmless. She identifies eight examples in which nearly identical conduct by a prosecutor led to reversal in one reported decision, while in a different reported decision the judgment was affirmed because the identical misconduct was deemed "harmless error."[6]



Judgment Reversed 12% of cases

Error Deemed Harmless 88% of cases

OUT OF 444 PROSECUTORIAL MISCONDUCT CASES, ONLY 54 RESULTED IN REVERSAL OF JUDGMENT.

### REPORTING OF DEFENSE LAWYER INCOMPETENCE

Professor Larry Benner of Cal Western Law School located approximately 2500 California cases in which claims of ineffective counsel were raised. Courts concluded that counsel's performance fell below the constitutionally required minimum in 121 of these cases, or 4%. In 17 of these cases, the deficient performance was found to be harmless; 104 of the cases resulted in a reversal of the judgment. The most common forms of ineffective assistance were failure to investigate (44%) and lack of knowledge of the law (32%).[7]

With respect to criminal defense lawyers, the problem is more complex than with prosecutors. Defense representation may be supplied by a public defender's office, a contract lawyer who agrees to supply public defender services, a private lawyer appointed by the court, or a lawyer retained by the defendant. There does not appear to be reliable data available to indicate what proportion of criminal defendants are represented by each of these alternative means, but the State Bar Guidelines on Indigent Defense Services Delivery Systems (2006) notes the vast preponderance of persons charged with criminal offenses in California are indigent.

## Nationally, it is estimated that 60 to 90% of all criminal cases involve indigent defendants.

Based on his survey data, Professor Benner estimates that 85% of California criminal defendants are indigent. While contractors, administrators of assigned counsel systems and presiding judges may have varying practices or procedures to address complaints of misconduct or incompetence, there is simply no mechanism in place for discipline of privately retained lawyers. In his research for the Commission, Professor Benner examined all 121 California cases in which claims of ineffective assistance of counsel were sustained during the ten year period ending in 2006. In 20% of the cases, the identity of the lawyer could not be determined; 32% were privately retained, 33% were public defenders, and 15% were assigned counsel. Thus, it is clear that privately retained lawyers are vastly overrepresented in sustained claims of

---

6. Ridolfi, Preliminary Report at Appendix D.

7. Benner, *Systemic Factors Affecting the Quality of Criminal Defense Representation*, Preliminary Report and Supplemental Report, both available on the Commission's website, www.ccfaj.org.

Exhibit 1
Page 83

Professional Responsibility

73

ineffective assistance of counsel. The only mechanism available to identify them, and discipline them when appropriate, is the State Bar.

## JUDICIAL RELUCTANCE

Part of the problem of reliance on judges to report lawyer misconduct is a deep-seated reluctance on the part of trial judges to "blow the whistle" on lawyers who appear before them. Judges apparently proceed on the assumption that Canon 3D(2)[8] of the California Code of Judicial Ethics takes precedence over Business and Professions Code Section 6086.7. Canon 3D(2) provides that whenever a judge has personal knowledge that a lawyer has violated any provision of the Rules of Professional Conduct, the judge shall take "appropriate action." Even though Business and Professions Code Section 6086.7 imposes additional reporting requirements, California trial judges apparently construe their obligation to report misconduct or incompetence to the State Bar as limited to cases in which they consider such reporting "appropriate." Apparently, California trial judges rarely consider it appropriate to report misconduct or incompetence to the State Bar, and even where misconduct or incompetence *does* result in a reversal, appellate judges fail to report the attorney to the State Bar.

The Commission considered proposing an expansion of Business and Professions Code Section 6086.7 to require a judicial report of *any* finding of misconduct by a prosecutor or defense lawyer, whether it resulted in modification or reversal of the judgment or not. We were persuaded that a modification of the ethical canons in the Code of Judicial Responsibility, and a clarification by Rule of Court as to who has the duty to report under Business & Professions Code Section 6086.7, would be more effective. First, we were concerned that judges who are now reluctant to report could avoid the requirement by failing to make formal "findings" of misconduct. Second, there was no reason to expect that amending the statute would lead to increased reporting. If judges are not reporting now even when there is a modification or reversal of the judgment, it is not likely they would *increase* their reporting if the requirement of modification or reversal of the judgment were eliminated. Finally, if judges are more inclined to use Canon 3D as their guide, the problem should be addressed directly in Canon 3D by defining the circumstances where a report to the State Bar *should* be made. This change in the Canons of Judicial Ethics should be accompanied by increased training and education of judges with respect to their reporting obligations. To the extent their reluctance to report attorneys is based on a lack of confidence in the State Bar disciplinary process to sort out serious offenders from those who may be guilty of a momentary lapse, judicial ethics training should include broad exposure to how the State Bar disciplinary process works. NOT every report will lead to an investigation, and NOT every investigation will lead to discipline, but the State Bar is the most appropriate forum to exercise discretion, and the exercise of that discretion must be informed by a cumulative track record.

## INTERNAL DISCIPLINE

Some District Attorneys objected that discipline of prosecutors should be left to the internal discipline mechanism in each individual District Attorney's office. While the vast majority of California District Attorneys closely supervise their deputies and impose appropriate discipline when misconduct is called to their attention, one consequence of the independence of each of California's fifty-eight district attorney offices, and the civil service protection for many of their employees, is a complete lack of transparency of

---

8. Canon 3D(2) provides: "(2) Whenever a judge has personal knowledge that a lawyer has violated any provision of the Rules of Professional Conduct, the judge shall take appropriate corrective action."

Exhibit 1
Page 84

internal discipline procedures. The Commission's attempt, through Prof. Laurie Levenson,[9] to survey prosecutor's offices to ascertain how complaints of misconduct are handled met with substantial resistance at first. Her efforts are continuing, and there are hopeful signs the level of cooperation in the Commission's research will improve. The information collected suggests many offices lack formal procedures for tracking and investigating complaints, with no uniform policy. Professor Levenson concludes:

*One major gap in the disciplinary system is the decision by DA offices not to keep a record of complaints of misconduct. Therefore, it is very difficult to track problem DA's other than by reputation of that individual in a given office.*

Reliance upon informal internal procedures has three consequences. First, turnover in supervisory personnel will result in no continuing "track record" for subordinate employees even within the office. Second, deputies who are fired or voluntarily leave the office are free to engage in private practice while their record of prior misconduct remains invisible and inaccessible. Third, even where a report is made to the State Bar because misconduct resulted in a reversal of judgment, or discipline is contemplated for some other reason, the State Bar will have no access to any record of prior discipline to inform its exercise of discretion to undertake an investigation or initiate disciplinary proceedings.

### REPEAT OFFENDERS

The lack of a report to the State Bar in these cases means there simply is no "track record" of an offending attorney's history anywhere. Analysis of California cases in which a court made a finding of prosecutorial misconduct suggests that the phenomenon of repeat offenders is significant.

The identity of the prosecutor was ascertainable in only 347 of 443 such cases in the ten year period from January 1, 1997 to December 31, 2006. Thirty repeat offenders were identified, including two who committed misconduct in three different cases. Two-thirds of the repeat offenders committed the exact same conduct in multiple trials.

Seven of the repeat offenders had been disciplined by the State Bar but not one for misconduct in the prosecution of a criminal case.

Six were subjected to State Bar discipline for failure to pay Bar dues and one for noncompliance with MCLE requirements.[10] Another disturbing aspect of the "repeat offender" data is that several of the counties which appear to have a disproportionately high rate of cases in which claims of prosecutorial misconduct were sustained, also had multiple cases of repeat offenders. The Commission was unable to procure comparable data on the prevalence of repeat offenders among defense lawyers, but anecdotal evidence suggests repeated instances of incompetent representation even in California death penalty cases.[11]

### ENCOURAGING REPORTING BY JUDGES

From a practical standpoint, the biggest obstacle to utilizing mandatory reporting to the State Bar to compile a "track record" for claims of misconduct or incompetence is the prevailing attitude of judges. Expanding the mandatory reporting requirement, however, would present a particular problem for California trial judges. As described in the testimony of Judge Steven Van Sicklen, Supervising Judge of the Criminal Courts in Los Angeles County:

---

9. Levenson, Preliminary Report, Study of California District Attorney Offices, available on the Commission's Website.

10. Ridolfi, Prosecutorial Misconduct: A Systemic Review, available on the Commission's Website.

11. In the case of In Re Jones, 13 Cal.4th 552 (1996), the California Supreme Court reversed both the death sentence and conviction of Troy Lee Jones because he was incompetently represented by his trial attorney. In the case of *Stankewitz v. Woodford*, 365 F.3d 706 (9th Cir. 2003), the United States Court

Exhibit 1
Page 85

Professional Responsibility

75

*To require a Bench Officer to report any finding of incompetence or misconduct places a potential chilling effect on the Court, adds a potential irrelevant consequence to the fact finding process and leaves no discretion with regard to the degree of the finding. In other words does the misconduct have to be really serious or the incompetence something as innocuous as failing to ask a question a Judge might have asked if he or she were trying the case? Would every Wheeler violation have to be reported? Would the failure to call every potential witness in a case amount to reportable misconduct? Would this change generate unnecessary motions, or witness[es] in cases because an attorney is worried about what the Judge might think?*

Rather than leaving it up to each individual judge to determine which forms of misconduct or incompetence are serious enough to merit a report to the State Bar, the Commission concluded that Canon 3D should itself define what kinds of misconduct are so serious that a report to the State Bar and the attorney's supervisor would ordinarily be appropriate. While the Commission has limited its identification of examples of egregious conduct to criminal cases, these examples might be equally egregious in civil cases, and there may be additional examples applicable to civil cases. The Judicial Council may wish to address that question, but the Commission felt it was beyond its purview. Every report of such misconduct or incompetence may not result in discipline, or even in an investigation, but the complaints would be available to identify repeat offenders. A "track record" of all reports with respect to every offending attorney would be maintained.

The Commission concluded it would also be useful to maintain a county-wide track record, so particular offices that may have a high rate of prosecutorial

misconduct or defense lawyer incompetence can be identified. The need for additional training, stronger internal discipline mechanisms, or greater public accountability can thus be facilitated. Commission research suggests that some California counties may have a disproportionately high number of convictions being reversed because of judicial findings of prosecutorial misconduct, and in some cases, they appear to be the same counties that have a "repeat offender" problem of prosecutors responsible for multiple findings of misconduct. We believe that this objective can be achieved by simply reformulating the data collected by the State Bar Disciplinary System regarding reports of misconduct.

## IDENTIFYING EGREGIOUS MISCONDUCT

The task of identifying "egregious misconduct" that should be reported to the State Bar should not be difficult. There are certainly some forms of misconduct which all reasonable lawyers and judges would agree are serious, and should give rise to heightened concern and scrutiny. This is not to suggest that other forms of misconduct may not be equally serious, and that judges should only find a report to the State Bar appropriate in the defined circumstances. But the discretion of judges to determine what "corrective action" is "appropriate" should be guided by a collective judgment of the circumstances that would call for a report to the State Bar. The Commission agreed that the following forms of misconduct should be encompassed by such a recommendation:

**1 Lying to a Court.**
A deliberate misrepresentation of law or fact to a Court should be reported. Current Rule 5-200(B) provides that a member "shall not seek to mislead the judge, judicial officer, or jury by an artifice or false statement of law" in presenting a matter to

---

of Appeals reversed the denial of a writ of habeas corpus and remanded for an evidentiary hearing on the claim of Douglas Stankewitz that he was incompetently represented by the same attorney who represented Troy Lee Jones in the penalty phase of his death penalty trial. Stankewitz is the longest tenant

of California's death row, where he has been since October of 1978. Wilbur Jennings, who has been on death row for 19 years, is also asserting a claim of incompetent representation by the same attorney who represented Jones and Stankewitz in a pending habeas corpus proceeding.

Exhibit 1
Page 86

a tribunal. Recommended reporting should be limited to deliberate violations of Rule 5-200(B), but "artifice" should not be included. "Artifice" is an overly broad term that, according to the Merriam-Webster dictionary, includes "clever or artful skill." A specific requirement that requires reporting of any willful misrepresentation of law or fact to a court is appropriate. The current reporting requirement includes not only misconduct and incompetence, but any willful misrepresentation when it results in a modification or reversal of a judgment. This change would eliminate the necessity of a modification or reversal of a judgment based upon the willful misrepresentation before reporting to the State Bar.

**2** Appearing in a judicial proceeding while under the influence of illicit drugs or alcohol.
Drug or alcohol intoxication would certainly qualify as "failing to perform legal services with competence," as prohibited by Rule 3-110, but we do not want to subject every claim of incompetence to mandatory reporting. Reporting could be limited to *incompetence* caused by intoxication, but even a lawyer whose drunkenness causes a delay in a trial should be reported, whether it produces a failure to perform with competence or not. A specific rule that requires reporting of a lawyer who appears in court under the influence of illicit drugs or alcohol is appropriate. Interestingly, Judge Van Sicklen used the example of intoxication in suggesting that "appropriate action" means either discussing the matter with the attorney or reporting the matter to the State Bar. If no report is made, the same attorney could be repeatedly showing up drunk before a number of judges, none of whom are even aware of prior repeated transgressions.

Reporting an intoxicated attorney to the State Bar will often lead to intervention, and referral to the State Bar's Lawyer Assistance Program, preventing future damage to clients and facilitating treatment of the offending attorney. If no report is made, however, no track record of the attorney's repeated lapses will be available.

**3** Engaging in willful unlawful discrimination in a judicial proceeding.
Judge Van Sicklen asked whether every *Wheeler*[12] violation should be reported to the State Bar. We conclude that it should. A *Wheeler* violation occurs when a judge finds a pattern of discrimination requires an explanation, and the explanation does not dispel the appearance of deliberate racial discrimination. It ordinarily requires dismissing the jury panel and starting over. The more appropriate question may be why shouldn't every *Wheeler* violation be reported to the State Bar, whether by the prosecutor or the defense lawyer? There is currently no specific Rule of Professional Conduct that addresses improper discrimination in court.[13] But Section 231 of the California Code of Civil Procedure provides:

> *231.5. A party may not use a peremptory challenge to remove a prospective juror on the basis of an assumption that the prospective juror is biased merely because of his or her race, color, religion, sex, national origin, sexual orientation, or similar grounds.*

Commissioners Jim Fox and Greg Totten believe that not every *Wheeler* violation necessarily includes willful, unlawful discrimination. The Commission majority, however, concludes that dismissal of the jury panel and the resulting mistrial caused by the improper use of a peremptory challenge at least creates a presumption of unlawful discrimination that should be called to the attention of the State Bar.

12. *People v. Wheeler*, 22 Cal.3d 258 (1978) requires a lawyer to provide an explanation when peremptory challenges demonstrate systematic exclusion of a cognizable group. Cognizable groups include race, religion, ethnicity, gender and sexual orientation. If the explanation is not satisfactory, the jury panel must be excused. A similar requirement is imposed by the U.S. Constitution. *Batson v. Kentucky*, 476 U.S. 79 (1986). If improper discrimination is utilized

Exhibit 1
Page 87

**4** Willful *Brady* violations.

A "*Brady* violation" occurs when a prosecutor withholds or suppresses exculpatory evidence that is material to issues of guilt or punishment. It is a violation of the defendant's constitutional right to due process of law. *Brady v. Maryland*, 373 U.S. 83 (1963). Exculpatory evidence includes evidence to impeach the credibility of witnesses. *Brady* violations can occur even where the exculpatory evidence was never delivered to the prosecutor by the police, however. *Giglio v. United States*, 405 U.S. 150 (1972). Thus, requiring the reporting of every *Brady* violation would be too broad. Reporting every violation of Rule 5-220 of the California Rules of Professional Conduct might also be too broad, since it simply provides, "A member shall not suppress any evidence that the member or the member's client has a legal obligation to reveal or produce." We do not want to make every discovery violation subject to reporting, only deliberate, bad faith violations of a constitutional duty. By limiting the recommended reporting requirement to bad faith violations that are deliberate, we address a narrow category of the most egregious *Brady* violations, where the prosecutor is aware of exculpatory evidence and deliberately suppresses it.

**5** Willful presentation of material perjured testimony.

There are likely to be very few cases where a judge can conclude that a lawyer was aware that testimony he or she presented was perjurious. But such situations do occur, and reasonable lawyers and judges would agree this is among the most serious forms of misconduct imaginable, especially in criminal cases. A defense lawyer who conforms to the ethical requirements regarding the presentation of the testimony of the accused would not be willfully presenting perjured

testimony even if he knows his client is lying, because the accused has a constitutional right to testify over the objection of his attorney.

**6** Willful unlawful disclosure of victim or witness information.

The California Penal Code includes very specific limitations on the disclosure of the name or address of the victim of a sex offense (California Penal Code Section 293) and the addresses or telephone numbers of victims and witnesses revealed in the course of pre-trial discovery (California Penal Code Section 1054.2). Willful violation of Section 1054.2 by an attorney is a misdemeanor. Whether an attorney is charged with a misdemeanor or not, a willful violation of these provisions should be reported to the State Bar.

**7** Failure to Properly Identify Oneself in Interviewing a Victim or Witness.

The California Penal Code requires that prosecutors, defense lawyers and their investigators clearly identify themselves, identify the full name of the agency which employs them, and identify whether they represent the prosecution or defense before interviewing victims and witnesses. If the interview is in person a business card or official identification must be presented. California Penal Code, Section 1054.8. These provisions offer important protection to victims and witnesses. A failure to comply with these requirements should be reported to the State Bar.

## REPORTING MISCONDUCT OR INCOMPETENCE TO SUPERVISORS

The California Public Defenders Association suggests that if there is to be a duty to report misconduct, it should also be required that notice go to the head of the prosecutor or public defender office or the contractor of defender services or the

in a deliberate effort to cause discharge of the jury panel, additional sanctions may be imposed. *People v. Willis*, 27 Cal.4th 811 (2002).

13. Rule 2-400 prohibits discriminatory conduct in the management or operation of a law practice, but applies only to employment decisions and accepting or terminating representation of a client.

Exhibit 1
Page 88

Professional Responsibility

77

administrator of an assigned counsel program, or the presiding judge who controls appointment of individual attorneys. That can be easily accomplished by including such a requirement in the Rule of Court defining which judge has the mandatory duty to report.

## SELF REPORTING BY LAWYERS

If the self reporting requirements of California Business and Professions Code Section 6068(o) were fully complied with, a great deal more of the unreported misconduct and incompetence of lawyers would come to the attention of the State Bar. Section 6068(o) provides that every California lawyer has a duty:

(a) *To report to the agency charged with attorney discipline, in writing, within 30 days of the time the attorney has knowledge of any of the following:*

(b) *The filing of three or more lawsuits in a 12-month period against the attorney for malpractice or other wrongful conduct committed in a professional capacity.*

(c) *The entry of judgment against the attorney in a civil action for fraud, misrepresentation, breach of fiduciary duty, or gross negligence committed in a professional capacity.*

(d) *The imposition of judicial sanctions against the attorney, except for sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000).*

(e) *The bringing of an indictment or information charging a felony against the attorney.*

(f) *The conviction of the attorney, including any verdict of guilty, or plea of guilty or no contest, of a felony, or a misdemeanor committed in the course*

*of the practice of law, or in a manner in which a client of the attorney was the victim, or a necessary element of which, as determined by the statutory or common law definition of the misdemeanor, involves improper conduct of an attorney, including dishonesty or other moral turpitude, or an attempt or a conspiracy or solicitation of another to commit a felony or a misdemeanor of that type.*

(g) *The imposition of discipline against the attorney by a professional or occupational disciplinary agency or licensing board, whether in California or elsewhere.*

(h) *Reversal of judgment in a proceeding based in whole or in part upon misconduct, grossly incompetent representation, or willful misrepresentation by an attorney.*

(i) *As used in this subdivision, "against the attorney" includes claims and proceedings against any firm of attorneys for the practice of law in which the attorney was a partner at the time of the conduct complained of and any law corporation in which the attorney was a shareholder at the time of the conduct complained of unless the matter has to the attorney's knowledge already been reported by the law firm or corporation.*

(j) *The State Bar may develop a prescribed form for the making of reports required by this section, usage of which it may require by rule or regulation.*

(k) *This subdivision is only intended to provide that the failure to report as required herein may serve as a basis of discipline.*

Although it is limited to a reversal of judgment, as opposed to "a modification or reversal," Section 6068(o)(7) is roughly comparable to the judicial reporting requirement in Section 6086.7(a)(2). Thus, even if judges are underreporting, the attorneys themselves should be reporting cases

Exhibit 1
Page 89

in which misconduct or incompetence has led to reversal of a judgment. The lack of self reporting may be attributable to the lack of enforcement of the self-reporting requirement. Instead of operating as a "fail-safe" mechanism to require reporting by two separate, independent sources, the self reporting requirement is widely ignored, assuring that even repeat offenders completely escape any scrutiny by the bar.

While the Commission does not offer any recommendation to change the self-reporting requirement, it believes that many California attorneys are simply unaware that this requirement exists. Continuing legal education programs dealing with ethics, which are mandatory for California attorneys, should focus attention on this requirement. And the State Bar should examine compliance with self-reporting requirements in exercising its discretion whether discipline is appropriate for misconduct or incompetence, as well as basing discipline on the failure to self-report itself when appropriate.

# Recommendations: Reporting Misconduct

The Commission offers four recommendations addressed to the rule-making authority of the California Judicial Council and the State Bar of California. In addition, the Commission recommends enhanced training in ethics for California prosecutors, defense lawyers and judges, to familiarize them with the requirements for reporting and self-reporting of misconduct and incompetence, and the consequences of such reports.

**1** The Commission recommends *no* change in the statutory language of Business & Professions Code Section 6086.7:

6086.7. (a) A court shall notify the State Bar of any of the following:

(1) A final order of contempt imposed against an attorney that may involve grounds warranting discipline under this chapter. The court entering the final order shall transmit to the State Bar a copy of the relevant minutes, final order, and transcript, if one exists.

(2) Whenever a modification or reversal of a judgment in a judicial proceeding is based in whole or in part on the misconduct, incompetent representation, or willful misrepresentation of an attorney.

(3) The imposition of any judicial sanctions against an attorney, except sanctions for failure to make discovery or monetary sanctions of less than one thousand dollars ($1,000).

(4) The imposition of any civil penalty upon an attorney pursuant to Section 8620 of the Family Code. (b) In the event of a notification made under subdivision (a) the court shall also notify the attorney involved that the matter has been referred to the State Bar. (c) The State Bar shall investigate any matter reported under this section as to the appropriateness of initiating disciplinary action against the attorney.

**2** The Commission recommends the adoption of the following California Rule of Court:

*When notification of the State Bar is required of a court pursuant to California Business and Professions Code Section 6086.7(a), if the order of contempt, modification or reversal of judgment, imposition of judicial sanctions or imposition of a civil penalty is signed by a Superior Court judge or magistrate, that judge or magistrate shall notify the State Bar. Modification of a judgment includes the vacation of a judgment in granting*

Exhibit 1
Page 90

*an Extraordinary Writ. If the order of contempt, modification or reversal of judgment, imposition of judicial sanctions or imposition of a civil penalty is by the Court of Appeal or the Supreme Court, the author of the Court's order or opinion shall notify the State Bar. The report to the State Bar shall include the State Bar member's full name, and State Bar number, if known. When notifying the attorney involved pursuant to California Business and Professions Code Section 6086.7(b), the judge, magistrate or Justice identified in this Rule shall also notify the attorney's supervisor, if known.*

**3** The Commission recommends the following changes in Canon 3D of the California Code of Judicial Ethics (Changes indicated in blue):

D. Disciplinary Responsibilities

(1) Whenever a judge has reliable information that another judge has violated any provision of the Code of Judicial Ethics, the judge shall take or initiate appropriate corrective action, which may include reporting the violation to the appropriate authority.

(2) Whenever a judge has personal knowledge that a lawyer has violated any provision of the Rules of Professional Conduct, or makes a finding that such violation has occurred, the judge shall take appropriate corrective action.

Appropriate corrective action should include a prompt report to the State Bar and to the attorney's supervisor, if known, where an attorney in a criminal proceeding has engaged in egregious misconduct, including but not limited to:

(a) A willful misrepresentation of law or fact to a Court;

(b) Appearing in a judicial proceeding while intoxicated;

(c) Engaging in willful unlawful discrimination in a judicial proceeding;

(d) Willfully and in bad faith withholding or suppressing exculpatory evidence (including impeachment evidence) which he or she is constitutionally obligated to disclose.

(e) Willful presentation of perjured testimony.

(f) Willful unlawful disclosure of victim or witness information.

(g) Failure to properly identify oneself in interviewing victims or witnesses.

Any doubt whether misconduct is egregious should be resolved in favor of reporting the misconduct.

(3) A judge who is charged by prosecutorial complaint, information, or indictment or convicted of a crime in the United States, other than one that would be considered a misdemeanor not involving moral turpitude or an infraction under California law, but including all misdemeanors involving violence (including assaults), the use or possession of controlled substances, the misuse of prescriptions, or the personal use or furnishing of alcohol, shall promptly and in writing report that fact to the Commission on Judicial Performance.

(4) A prompt report means as soon as practicable, and in no event more than thirty days after knowledge is acquired or a finding is made.

Exhibit 1
Page 91

Professional Responsibility

81

**4** The Commission recommends that the State Bar include, in its annual report on the State Bar of California Discipline System, the number of Reportable Actions received from Courts pursuant to each of the four categories in Business and Professions Code Section 6068.7(a), and each of the six categories in Canon 3D(2) of the California Code of Judicial Ethics. In addition, the Report should indicate the number of Reportable Actions related to the conduct of prosecutors and defense lawyers by County. Defense lawyer data should be reported to distinguish public defenders, contract defenders, appointed lawyers, and privately retained lawyers. Prosecutorial data should be reported to distinguish district attorneys and city attorneys.

**5** The Commission recommends that law school courses in legal ethics and continuing education programs in legal ethics for prosecutors, defense lawyers and judges include familiarity with the obligations to report misconduct and incompetent representation by lawyers, and the obligation of lawyers to self-report, to the California State Bar, as well as familiarity with the consequences of such reports with respect to the State Bar's investigatory and disciplinary authority.

### LETTER OF DISSENT

October 12, 2007

Commissioners
California Commission on the
Fair Administration of Justice

Dear Commissioners:

I must respectfully dissent from the Commission's Final Report on Professional Responsibility.

It is appropriate for the Commission to urge clarification of the judicial officer responsible for reporting misconduct to the State Bar and include the attorney's supervisor as a recipient of such report. However, I strongly oppose the Commission's recommendation to create a separate rule of court that attempts to identify categories of misconduct subject to the reporting requirement contained in Business and Professions Code section 6086.7. This proposed rule places an unreasonable burden on prosecutors and the courts that will significantly increase litigation of collateral issues and further erode civility while doing little to address the issue of professional responsibility. As discussed below, there are several significant problems with the Commission's recommendations for change.

First, the report is clearly premised upon an underlying assumption that simply because courts are not fully complying with reporting requirements, attorney misconduct goes undetected and unaddressed within the criminal justice system and in district attorney offices. Most prosecutors would find this assumption both erroneous and offensive to our profession's duty of integrity and fairness.

Exhibit 1
Page 92

The public rightfully expects prosecutors to go into the competitive arena of the courtroom on a daily basis and make literally hundreds of split second decisions on law, evidence, and argument. It is also a routine occurrence and accepted strategy for defense counsel to make claims of misconduct against prosecutors during the heat of trial. As with any system administered by human beings, the court process is imperfect and errors are inevitable.

Through comprehensive training, extensive scrutiny of prosecutor applicants and prompt discipline when warranted, district attorneys strive to minimize errors and root out individuals who do not meet the very high ethical standards of our noble profession. As a result, sustained claims of prosecutor misconduct are exceedingly rare.[1]

Yet the majority effectively encourages more second-guessing of prosecutors. If the proposed rule were adopted in our highly adversarial system, demands by counsel for judicial findings of misconduct would become commonplace and the courts would inevitably find themselves mired in ruling on disputes among lawyers rather than evidence and law affecting the underlying charges. The majority thus overlooks the inherent dangers of seeking perfect process without regard to its impact on the prompt and fair resolution of criminal cases. More than three decades ago, Justice

Macklin Fleming of the California Court of Appeal warned about the pursuit of perfect procedure:

*For when we aim at perfect procedure, we impair the capacity of the legal order to achieve the basic values for which it was created, that is, to settle disputes promptly and peacefully, to restrain the strong, to protect the weak, and to conform the conduct of all to settled rules of law. If criminal procedure is unable promptly to convict the guilty and promptly acquit the innocent of the specific accusations against them, and to do it in a manner that retains public confidence in the accuracy of its results, the deterrent effect of swift and certain punishment is lost, the feeling of just retribution disappears, and belief in the efficacy of the system of justice declines.*[2]

The majority report also indirectly infers that civil service protection and the privacy of prosecutor personnel records somehow insulate prosecutor misconduct. I have been a prosecutor for 25 years and that has not been my experience. Simply stated, the basic civil service and privacy protection afforded to prosecutors has never precluded management in this office from dealing directly, swiftly and appropriately with prosecutor misconduct.

Second, the *Wheeler* and *Brady* provisions contained in the proposed rule are fraught with peril. *Brady* is a dynamic area of the law and no one can confidently predict how it will develop in the courts next year, let alone ten years from now when

---

1. The statistics upon which the Commission relies establish that incidents of prosecutor misconduct are rare in California.

The Preliminary Report of Professor Laurie Levenson lists in Section IX.A (pp. 8–9) appellate decisions citing prosecutorial misconduct and rankings of 10 California counties as a percentage of felony cases filed. She concludes, "Percentage-wise, the number of prosecutorial claims per felony cases is less than 1%, averaging from .028% to .008%." (*Id.*, fn. 7.) Converted to common fractions, this is equal to 1/3000 cases to 1/12,000 cases. And this is just the number of *claims*; the number of cases in which the court has found error is far smaller, and the number of cases in which error was reversible is smaller still. Professor Levenson's figures indicate that of 199 cases between 2000–2005 in which prosecutorial misconduct was found, only 15 (7.5%) constituted reversible error.

The Judicial Council of California reports 1,588,079 felony filings in California in the 6-year period from the 2000–2001 fiscal year through the 2005–2006 fiscal year. (Judicial Council of California, 2007 Court Statistics Report, Table

7, p. 51.) http://www.courtinfo.ca.gov/reference/documents/csr2007.pdf ). Applying the percentages from Professor Levenson's report, this would mean that prosecutorial misconduct was claimed in only 127 to 445 of these 1.6 million cases.

The Commission also considered the California Public Defenders Association Response to Focus Questions on Professional Responsibility Issues. This response states that prosecutorial misconduct is "often" cited as a factor in appellate dismissal or reversal of cases or reduction of sentences. (CPDA Response, p. 2.) In support of this contention, the response cited "Harmful Error," a Prosecutorial Misconduct Study Report written by the Center for Public Integrity. (CPDA Response, pp. 2–3, fn. 1.) According to the response, the study "studied 590 California cases from 1970 to the present [actually, 2003] in which the defendant alleged prosecutorial misconduct… .Of all the defendants who alleged misconduct, one later proved his innocence. [¶] Of the cases in which judges ruled a prosecutor's conduct prejudiced the defendant, 48 involved improper trial arguments or examination, 11 involved

Exhibit 1
Page 93

the Supreme Court is scrutinizing a prosecutor's decision in a capital case. Likewise, it makes no sense to require reporting any time a court concludes counsel violated *Wheeler* because it does not accept the prosecutor's reasons for excusing jurors. A court's decision on *Wheeler* is often subjective and can be influenced by a myriad of factors including the court's own bias or feelings about the underlying case.

*Wheeler* and *Brady* issues are the subject of intense scrutiny and litigation in the criminal justice system. Under existing law, the court already has the authority to report violations of *Brady* or *Wheeler*.[3] Creating a new court rule regarding misconduct that attempts to further define these two case doctrines will not increase the reporting of such violations. Instead, the rule would further complicate existing law, potentially narrow the circumstances under which a court already disposed to report would in fact report, and once again encourage greater litigation of collateral issues. Indeed, there is even some risk that concern about the obligation to report could influence the court's decisions on the merits of the underlying *Wheeler* or *Brady* issue.

Third, at least some of the misconduct cases cited in one of the Commission's studies appear to merit further scrutiny and review. For example, Professor Kathleen Ridolfi's study erroneously lists two cases from Ventura County, where the court allegedly found prosecutor misconduct but concluded it was "harmless error." Our review of both of these cases suggests they should not be included in the study at all.

In *People v. Hosea* (Feb. 3, 2004, B165929) 2004 WL 198360, 2004 Cal.App.Unpub.LEXIS 1109, there is no judicial finding of misconduct. In that case, the defense objected to a comment by the prosecutor during argument that to find the defendant not guilty, the jurors would have to believe the defendant's story. The court held that there was "no prejudicial misconduct" but did not state whether there was misconduct at all. The court stated in part:

> *To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner.... Prosecutorial misconduct involves use of deceptive or reprehensible methods to persuade the jury, or acts so egregious as to create an unfair trial.... There was no such egregious conduct here. The prosecutor did not employ deceptive or reprehensible methods in his argument to the jury. After the defense objection, the trial court reiterated that the prosecutor bore the burden to prove appellant's guilt beyond a reasonable doubt. This was effectively an admonition that cured any error... Appellant received a fair trial. There was no prejudicial misconduct. (Emphasis added.)*

---

withholding evidence from the defense, eight involved discrimination in jury selection, three involved improper pre-trial tactics, two involved threatening a witness and the three remaining cases involved destruction of evidence, breaching an agreement and eavesdropping." (*Ibid.*)

These figures, which cover a period of 33 years, show that only in only 75 cases was prejudicial error found, including only 11 cases of withholding evidence. This is only one *Brady* violation every three years statewide, which cannot be considered a crisis under any definition. The low incidence of prosecutorial misconduct is also supported by the statistics provided in a report prepared for the Commission's July 11 hearing by Professor Kathleen Ridolfi entitled "Prosecutorial Misconduct: A Systematic Review." She states that she reviewed California state and federal appellate court cases decided between January 1, 1997 and December 31, 2006. (Ridolfi report, Appx. A, p. 15.) Of these, 2,131 raised an issue of prosecutorial misconduct on appeal,

and the court found misconduct in 444 of these cases. (Ridolfi report, p. 4.) The court found the error to be prejudicial in only 54 of these cases. (Ridolfi report, p. 5.)

The Judicial Council reports that there were 2,585,018 felony filings from the 1996–97 fiscal year through the 2005–06 fiscal year. Using Professor Ridolfi's figures, only .08% (8 in 10,000) of the cases raised an issue of prosecutorial misconduct, in only .02% (2 in 10,000) did the court find prosecutorial misconduct, and .0002% (2 in 100,000) involved prejudicial misconduct. These figures are a small percentage of the 2.6 million felony filings during that period.

2. Justice Macklin Fleming, *The Price of Perfect Justice: The Adverse Consequences of Current Legal Doctrine on the American Courtroom*, Basic Books, Inc., New York, 1974.

3. Rule of Professional Conduct 5-220, Business and Professions Code §6086.7 and *People v. Wheeler* (1978) 22 Cal. 3d 258, 282 fn. 29...

Exhibit 1
Page 94

In the second case, *People v. Johnson* (Mar. 19, 2003, B156543) 2003 WL 1309091, one might infer that the court found misconduct but the court's opinion is not entirely clear on that issue. In that case, the prosecutor asked a deputy sheriff whether the defendant was one of the people depicted in a videotape. The defense objected that the testimony was improper. The reviewing court's analysis of the issue inconsistently referred to "the error" and the "alleged misconduct." The court stated:

> The trial court found that **the error** could be easily cured by admonishing the jury [noting that the trial court struck the question and the answer].... [¶] A trial court is vested with considerable discretion in ruling on a motion for mistrial based on prosecutorial misconduct.... Hence, in the absence of prejudice to the fairness of a trial, prosecutor misconduct will not trigger reversal.... [¶] Here there was no prejudice. The evidence was overwhelming.... [¶] The trial court was in the best position to gauge **the misconduct** and the effect on the jury. It found that an admonishment would cure **the error**.... [¶] On this record, we agree.... The **alleged misconduct** was harmless beyond a reasonable doubt. (Citations omitted and emphasis added.)

Finally, the suggestion that district attorneys do not keep records of prosecutor misconduct is misleading and use of the term "repeat offender" for attorneys is not appropriate within the professional responsibility subject matter of this report. District attorneys are required to maintain confidential personnel files on prosecutors and findings of misconduct would ordinarily be documented in such files by way of performance evaluation or disciplinary action. We do not keep separate public records

listing such findings and identifying the attorneys because doing so would violate the attorneys' rights to privacy in their own personnel records. Use of the term "repeat offender" is typically associated with individuals who commit multiple violations of criminal law and for this reason it is inappropriately inflammatory to use such a term when referring to either defense attorneys or prosecutors for committing errors in court.

In sum, I respectfully dissent from the Commission's Final Report on Professional Responsibility for all of the reasons set forth above. I continue to believe the court's failure to report attorney misconduct is most effectively addressed through additional training and education. The Commission's recommendation to create a new rule is neither necessary nor will it accomplish its intended purpose.

Very truly yours,

Gregory D. Totten, *District Attorney*

Exhibit 1
Page 95

The Commission's second report on Professional Responsibility and Accountability was a Report and Recommendations on Compliance with the Prosecutorial Duty to Disclose Exculpatory Evidence, issued on March 6, 2008, as follows:

# Report: Exculpatory Evidence

The Commission's Report and Recommendations on Professional Responsibility and Accountability of Prosecutors and Defense Lawyers, issued October 18, 2007, noted that the failure to disclose exculpatory evidence was a leading ground for reversal of California criminal convictions based on claims of prosecutorial misconduct during the ten year period ending December 31, 2006. The duty to disclose exculpatory evidence has been recognized as a constitutional imperative since 1963, when the United States Supreme Court decided the case of *Brady v. Maryland*, 373 U.S. 83 (1963). The obligation is commonly referred to as the "Brady" obligation or duty.

Prosecutorial compliance with the *Brady* duty includes the duty to disclose materials relevant to impeach prosecution witnesses, *Giglio v. United States*, 405 U.S. 150 (1972), and to materials that are in the possession or control of investigating law enforcement agencies, placing the onus upon prosecutors to insure that police or other investigative agencies have fully reported on the existence of potentially exculpatory evidence. *Kyles v. Whitley*, 514 U.S. 419 (1995). A potential source of non-compliance is that the *Brady* duty is limited to "material" exculpatory evidence. Prosecutors may not fully realize the ways in which potentially exculpatory evidence can be put to material use by criminal defense lawyers.

The prosecutor's *Brady* duty to disclose exculpatory evidence under the due process clause of the United States constitution is wholly independent of any statutory scheme.

It is self-executing and needs no statutory support to be effective. *Alford v. Superior Court*, 29 Cal.4th 1033, 1046 n.6 (2003). But the issue of access to records of misconduct complaints against police officers, which may be relevant to challenge their credibility in a criminal case, is closely related to and frequently overlaps with the *Brady* duty. Under California law, upon a showing of good cause and materiality, a court will review an officer's personnel file to determine whether it contains any information that should be disclosed to the defendant. *Pitchess v. Superior Court*, 11 Cal.3d 531 (1974); California Evidence Code §§ 1043–45; California Penal Code §§ 832.7–832.8. Such requests are commonly referred to as "*Pitchess* motions." *Pitchess* requirements limit the access of both prosecutors and defense lawyers to police personnel records, and limit the disclosure of such records.

## THE RAMPART TASK FORCE RECOMMENDATIONS

In 1999, the exposure of a pattern of false arrests, perjured testimony and the planting of evidence by L.A.P.D. officers assigned to the Crash Unit of the Department's Rampart Division led the Los Angeles District Attorney [LADA] to dismiss nearly 100 cases in which felony convictions had been obtained, many of them on pleas of guilty. In 2001, the Los Angeles County Bar Association convened a special Rampart Task Force to make recommenda-

**Professional Responsibility**

85

Exhibit 1
Page 96

tions relating to all parts of the justice system that could prevent this type of misconduct in the future.[1] Their Report, issued in April, 2003,[2] included a number of key recommendations addressing *Brady* and *Pitchess* obligations and compliance.

In anticipation of the public hearing convened by our Commission, we asked witnesses to address whether existing office policies and procedures implemented by District Attorney Offices and Public Defender Offices were adequate to ensure full compliance by all deputies with discovery obligations, and whether any legislative or administrative changes were needed to assure full compliance with the requirements for disclosure of evidence. We also asked whether four specific recommendations of the Rampart Task Force should be implemented on a statewide basis:

> *2.1 To implement prosecutors' responsibility for obtaining and producing Brady material, prosecuting agencies should establish procedures to gather Brady material in a systematic fashion from all appropriate sources. To assist prosecutors in the fulfillment of their obligations, governmental agencies should establish procedures to gather all Brady material and to provide that material to prosecuting agencies in a timely manner. Other options for obtaining Brady material should be utilized by prosecutors before resorting to Pitchess motions.*

> *2.2 Brady... material should be collected in a central database under the control of the prosecuting agency.*

> *2.3 Production of Brady material to the defense must be timely. In particular, Brady material tending to establish factual innocence or an affirmative defense should be revealed before a guilty plea is entered.*

> *2.4 In felony cases, prosecutors should be required to execute a declaration affirming that inquiries have been made of all appropriate sources and that all Brady material obtained has been reviewed and disclosed.*

We also invited written submissions to address the question whether the Rampart Task Force's detailed recommendations on the collection and dissemination of *Pitchess* material should be implemented on a statewide basis.

The Commission received thoughtful responses to these questions, both in the form of written submissions[3] and oral testimony.[4] Based upon these submissions, the Commission is in agreement that statewide legislation is not the most appropriate vehicle to assure full compliance with *Brady* and *Pitchess* obligations. The size and organization of prosecutors' offices throughout the State of California varies substantially, and assuring full compliance with these obligations is best addressed by the adoption of clear administrative policies within each office that are available for public scrutiny. Such policies should describe the standard to be used in determining whether information should be disclosed, and should require the maintenance of a "*Brady* List," identifying witnesses as to whom *Brady* material exists.

---

1. The Task Force, chaired by U.S. District Judge Audrey Collins, a former state prosecutor, included former prosecutors, public defenders, private practitioners, judges and academics.

2. Los Angeles County Bar Association Task Force on the State Criminal Justice System, *A Critical Analysis of Lessons Learned: Recommendations for Improving the California Criminal Justice System in the Wake of the Rampart Scandal*, April, 2003.

3. The responses of the California District Attorneys Association, the Los Angeles County District Attorney, and the Ventura County District Attorney are available on the Commission's website, www.ccfaj.org.

4. Santa Clara County District Attorney Dolores Carr testified on behalf of the California District Attorneys Association; Deputy District Attorney Lael Rubin testified on behalf of the Los Angeles County District Attorney's Office; and Special Assistant District Attorney Michael Schwartz testified on behalf of the Ventura County District Attorney's Office.

Exhibit 1
Page 97

## DISTRICT ATTORNEY BRADY POLICIES

The Commission has examined the publicly available office policies of the Los Angeles County District Attorney's Office, the Ventura County District Attorney's Office, and the Santa Clara County District Attorney's Office. The response of the California District Attorneys Association [CDAA] notes that "other offices... have opted not to have a specific policy, but to require their deputies to follow the statutory and case law on these subjects."[5] The Commission believes that compliance with *Brady* obligations should not be left up to each individual deputy's own interpretation of statutory and case law. A written Office Policy and training regarding this policy can help insure that all prosecutors will fully comply with their *Brady* obligations.

In accordance with the Rampart Task Force recommendations, procedures should be established to gather *Brady* material in a systematic fashion from all appropriate sources, consistent with the requirements of *Pitchess*. The material should be identified and a record should be kept of when and how it was delivered to the defense. Material determined to be relevant to factual innocence or an affirmative defense should be disclosed as soon as that determination is made, and prior to entry of a guilty plea.

When there is information about a witness that may be subject to disclosure requirements under *Brady*, the identity of that witness should be maintained on a "*Brady* List" for use in other cases. The Commission does not believe that a formal declaration of full *Brady* compliance needs to be signed

by the prosecutor, but prosecutors should be ready to offer assurances to both the defense and the court that inquiries have been made of all appropriate sources, and all *Brady* material received has been reviewed and disclosed in accordance with all legal obligations.

The CDAA finds most of these recommendations appropriate. CDAA, however, suggests that existing policies and procedures are adequate to ensure full compliance, and that "in establishing policies for *Brady* databases, one size does not fit all. Each prosecutor's office should design and implement procedures to deal with *Brady* evidence that works for that jurisdiction."

The Commission does not suggest a uniform policy and procedure for every District Attorney's Office in the State of California. We are in full agreement that each prosecutor's office should design and implement procedures that work for that jurisdiction. But the Commission strongly believes that public accountability requires such policies and procedures be in written form and available for public scrutiny. Consultation with law enforcement agencies, peace officer associations representing law enforcement officers, and Public Defender Offices will be helpful in formulating effective policies that are widely accepted and understood. In many counties, such policies are already the product of such collaboration.

The process of devising a written policy frequently exposes friction points that can be directly addressed and eliminated. A written policy also

---

5. California District Attorneys Association, *Position Statement of the California District Attorneys Association Regarding "Focus Questions for Hearing on Professional Responsibility Issues"* of the California Commission on Fair Administration of Justice, July 11, 2007, at p. 13.

Exhibit 1
Page 98

provides a basis for consistent training of personnel and evaluation of their compliance. Therefore, the Commission recommends that every District Attorney's Office in California formulate and disseminate a written Office Policy to govern *Brady* compliance, and that this policy provide for gathering *Brady* material in a systematic fashion from all appropriate sources, tracking the delivery of the material, and disclosing material determined to be relevant in a manner that is consistent with *Pitchess*. The policy should require that material relevant to factual innocence or an affirmative defense be disclosed as soon as that determination is made, and prior to entry of a guilty plea. Policies should be regularly reviewed and updated to reflect evolving changes in judicial interpretation of the *Brady* duty and *Pitchess* limitations.

## THE LIMITATIONS OF PITCHESS

With respect to the Rampart recommendations regarding *Pitchess* material, both the CDAA and the LADA point out that some of these recommendations are precluded by the subsequent ruling of the California Supreme Court in *Alford v. Superior Court*, 29 Cal.4th 1033 (2003). The Court held that protective orders issued in compliance with California Evidence Code Section 1045(e) must require that material disclosed pursuant to a defense *Pitchess* motion may only be utilized for the case in which the motion was made, and that the prosecution has no automatic right to police personnel records that are disclosed to the defense pursuant to a *Pitchess* motion. The inclusion of *Pitchess* material in a database for future disclosure does not appear to be feasible under the strictures of *Alford*. But the maintenance of an office "*Brady* List," identifying particular officers with credibility problems, is not precluded by *Alford* if information obtained from a *Pitchess* motion is not disclosed, and such a list can provide a useful tool in alerting

prosecutors to the need to further investigate the need for *Brady* disclosures, including a subsequent additional *Pitchess* motion. The recent ruling of the California Supreme Court in *Chambers v. Superior Court*, 42 Cal.4th 673 (2007) may permit defense counsel and defender offices to maintain a list of the names of officers as to whom *Pitchess* motions have been granted, so that when another *Pitchess* motion in a different case is granted as to the same officer, counsel can access derivative information in the previous case.

The system utilized by Ventura County provides a useful model. Complaints regarding the credibility of a police officer are evaluated as they are received, with an opportunity for the officer and the employing law enforcement agency to provide input. If the Office concludes that material evidence exists regarding an officer's credibility, the officer's name is placed on a "*Brady* List." Past cases in which the officer testified are researched and identified, to determine if the defense should be advised of the new information. In future cases in which the officer will be a prosecution witness, the prosecutor is required to consult with a designated supervisor as to how to proceed. Normally, the officer is not called as a witness, or the *Brady* information is disclosed. If there is doubt as to whether the information is material, an *in camera* evaluation for a judicial determination is sought.

The Commission is in agreement with Recommendation 6.2 of the Rampart Task Force, that a database organized and maintained by the prosecutor's office should be created pursuant to procedures and standards established by that office and containing the names of police officers and other recurring witnesses for whom *Brady* material exists. Case-specific *Pitchess* motions can then be filed by either the prosecution or the defense,

Exhibit 1
Page 99

or both. Again, we are aware that one size does not fit all. But we cannot accept the suggestion that such procedures are not necessarily appropriate for smaller jurisdictions where officers with credibility problems are more readily known to those in the legal community. Compliance with *Brady* requirements is too important to rely upon courthouse gossip as a substitute for systematic procedures.

## STANDARDS FOR "BRADY LIST" DETERMINATIONS

The Rampart Report recommended a standard of reasonable suspicion for information questioning a witness' credibility, before that witness is put on a "*Brady* List" to alert prosecutors to potential *Brady* problems. This appears consistent with the "substantial information" standard employed by the Ventura County and Santa Clara County District Attorneys' policies:

*"Substantial information is facially credible information that might reasonably be deemed to have undermined confidence in a later conviction in which the law enforcement employee is a material witness, and is not based on mere rumor, unverifiable hearsay, or a simple and irresolvable conflict in testimony about an event."*

The standard adopted by the Los Angeles County District Attorney requires "clear and convincing evidence":

*"The decision to include such material (concerning a peace officer or governmentally employed expert witness) will be made using a standard of clear and convincing evidence which is higher than a preponderance of evidence but less than beyond a reasonable doubt. In other words, without clear and convincing evidence that the potential impeachment evidence is reliable and credible, it will not be included in the alert system."*

While a "*Brady* List" is not a public record,[6] prosecutors must be cognizant that a decision to place an officer on the list due to a "credibility problem" can have a damaging impact upon the officer's career and reputation, and even result in termination. While established instances of dishonesty or moral turpitude must be disclosed, "preliminary, challenged, or speculative information" does not come within *Brady*, and should not result in placing an officer on a "*Brady* List". (*United States v. Agurs*, 427 U.S. 97, 109 n.16, 1976.) Where evidence challenging an officer's credibility is disputed, the existence of a dispute itself should not exempt the material from the *Brady* requirement of disclosure. The dispute, of course, must be resolved.

Whether the resolution requires "facial credibility" or "clear and convincing evidence" is not for this Commission to decide. The suggestion has been made that in actual practice, there is little difference between the standard utilized in Los Angeles County and the standard applied in Ventura and Santa Clara Counties. Others disagree. The disagreement itself underscores the importance of defining the standard in writing and making it publicly available.

*Brady* policies should include an opportunity for the affected officer and the employing law enforcement agency to provide input before a determination is made to include an officer's name on a "*Brady* List". The officer and employing agency should also be given an opportunity to seek review of the determination by senior management of the District Attorney's Office. The policies of Ventura and Santa Barbara Counties include such provisions. The dramatic effect a *Brady* determination may have upon both the officer and the employing department requires fundamental fairness in making the determination. Receiving this input will also assist the District Attorney in

6. *Coronado Police Officers Association v. Carroll*, 106 Cal. App. 4th 1001 (2003).

Exhibit 1
Page 100

understanding and evaluating the evidence. The policies must provide for expedited procedure for cases in which immediate disclosure is required, such as the discovery of information during trial.

The Commission believes all California District Attorneys should heed the warnings from the U.S. Supreme Court that "the prudent prosecutor will resolve doubtful questions in favor of disclosure," *United States v. Agurs*, 427 U.S. 97, 108 (1976) and that prosecutors should avoid "tacking too close to the wind." (*Kyles v. Whitley*, 514 U.S. 419, 439, 1995.)

### THE NEED FOR TRAINING

Written policies and procedures alone, of course, will not suffice if the policies and procedures are not part of the training of the deputies who will be expected to follow them. As the policies and procedures are interpreted and applied to specific cases, examples will be available to further the understanding of deputies through training programs. The Commission learned of an innovative approach to training regarding *Brady* issues recently undertaken in Santa Clara County. The Santa Clara County Bar Association sponsored a joint training, for both deputy public defenders and deputy district attorneys at the same time. Such joint training programs can be used to promote a collaborative and cooperative approach to troublesome discovery issues.

There is no question but that California prosecutors generally take their constitutional obligations to disclose exculpatory evidence seriously, and many District Attorney Offices have devoted considerable time and resources to the drafting, promulgation and implementation of excellent written policies. In recommending that all

California District Attorneys follow their example, the Commission is hopeful that no legislative action will be necessary to assure full compliance with *Brady/Pitchess* obligations.

## Recommendations: Exculpatory Evidence

**1** The California Commission on the Fair Administration of Justice recommends that all District Attorney Offices in California formulate and disseminate a written Office Policy to govern *Brady* compliance, and that this policy provide for gathering *Brady* material in a systematic fashion from all appropriate sources in a manner that is consistent with *Pitchess*, tracking the delivery of the material, and disclosing material determined to be relevant. The policy should provide that material relevant to factual innocence or an affirmative defense be disclosed as soon as that determination is made, and prior to entry of a guilty plea.

**2** The California Commission on the Fair Administration of Justice recommends that a list organized and maintained by each District Attorney's office should be created pursuant to procedures and standards established by that office, in consultation with law enforcement agencies, peace officer associations representing law enforcement officers, and Public Defender Offices. The list should contain the names of police officers and other recurring witnesses as to whom there is information that may be subject to disclosure requirements under *Brady*. This would include all facially credible information that might reasonably be deemed to undermine confidence in a conviction in which the law enforcement employee is

Exhibit 1
Page 101

a material witness, and is not based upon mere rumor, unverifiable hearsay, or an irresolvable conflict in testimony about an event.

**3** The California Commission on the Fair Administration of Justice recommends that training programs be conducted to assure that all deputy district attorneys understand and apply office policies and procedures with regard to *Brady* disclosure and *Pitchess* motions. If feasible, joint training programs should be organized to include prosecutors, public defenders and other criminal defense lawyers.

**4** The California Commission on the Fair Administration of Justice recommends that all police and other investigative agencies formulate policies and procedures to systematically collect any potential *Brady* material and, consistent with the statutory protections for personnel records, promptly deliver it to prosecutors.

**5** The California Commission on the Fair Administration of Justice recommends that training programs for peace officers include full treatment of the obligation to disclose *Brady* material to the prosecutor.

The Commission's third report on Professional Responsibility and Accountability was a Report and Recommendations on Funding of Defense Services in California, issued on April 14, 2008, as follows:

# Report: Funding Defense Services

The constitutions of the United States and of California guarantee a right to counsel for all accused in criminal proceedings, and indigent accused are guaranteed competent counsel regardless of their ability to pay. *Gideon v. Wainwright*, 372 U.S. 335 (1963). In 2003, after convening public hearings and hearing the testimony of 32 expert witnesses, the American Bar Association's Standing Committee on Legal Aid and Indigent Defendants concluded:

> *Forty years after Gideon v. Wainwright, indigent defense remains in a state of crisis, resulting in a system that lacks fundamental fairness and places poor persons at constant risk of wrongful conviction.*

A key recommendation of the Committee's report was that State governments should establish oversight organizations that ensure the delivery of independent, uniform, quality indigent defense representation in all criminal and juvenile delinquency proceedings. (ABA Standing Comm. on Legal Aid and Indigent Defendants, *Gideon's Broken Promise: America's Continuing Quest for Equal Justice*, 2004.)

Many of the causes of wrongful convictions that the Commission has previously recognized (mistaken eyewitness identifications, false confessions, perjured jail informant testimony, faulty forensic evidence) could have been exposed and addressed if the defendant had been represented by competent zealous counsel who had fully investigated

**Professional Responsibility**

**91**

Exhibit 1
Page 102