and prepared the case. A study of the first 74 DNA exonerations in the United States found that defense lawyer incompetence was a factor in 32% of the cases. (Scheck, Neufeld & Dwyer, *Actual Innocence*, p. 365, New American Library, 2003.)

## THE DEFENSE OF INDIGENT ACCUSED IN CALIFORNIA

The Commission has learned that the quality of representation afforded indigent accused is far from uniform in California, and sometimes falls short of the constitutional minimum. In California, the primary responsibility for providing competent counsel to indigent accused falls upon each individual county. California's fifty-eight counties meet this obligation in a variety of ways. Thirty-three counties (57%) have created one or more institutional public defender offices as county departments to serve as the primary provider of criminal defense services to indigent accused. This includes every county in California with a population in excess of 500,000, with the exception of San Mateo County.

Contract defenders are the primary provider of indigent felony and misdemeanor representation in 24 counties (41%). Eight counties have contracted with a single law firm, which provides various types of representation through branch offices. Some counties contract with solo practitioners. Several counties, for example, have four different solo contract defenders handling different portions of the caseload, and one county has seven separate contract defenders. The amount of compensation afforded by these contracts is often based upon a fixed fee per case, or a flat fee for the expected annual caseload. While this type of system is heavily concentrated in rural counties having populations of less than 100,000, it also

exists in some urban counties where public defenders are the primary providers. Many counties with a public defender office, for example, use a contract defender to handle conflicts.

In virtually every county, assigned counsel systems exist to handle multiple defendant cases where the primary provider would have a conflict of interest in representing more than one defendant. Assigned counsel is ordinarily appointed by a court to handle a single case. Only one county, San Mateo, uses an assigned counsel system administered by the local bar association as the primary provider of indigent defense services.

The Commission received evidence at our July 11, 2007 public hearing related to inadequate funding of defense services in some California counties, especially for needed investigative and expert support. Competent investigation of one's case, as well as the employment of expert witnesses who are "basic tools of an adequate defense," is just as fundamental as the right to competent counsel. (*Cf. Ake v. Oklahoma*, 470 U.S. 69, 1985.)(*Right to expert assistance in capital case raising a mental defense.*)

Professor Larry Benner of California Western School of Law conducted a statewide survey of judges and lawyers for the Commission. He also examined 2500 reported appellate decisions in which ineffective assistance of counsel claims were raised from 1997 through 2006. Courts sustained these claims, finding ineffective assistance of counsel in 121 of these cases, and in 104 of them the judgment of conviction was reversed and the case was remanded for a new trial. The most frequent performance deficiency, reported in 44% of the 121 cases, was failure to investigate.

Responses to the surveys came from 85% of the state's public defender offices, and 33% of the contract defenders. One hundred and nine certified criminal specialists responded, as well as 38

---

1. An initiative measure, Proposition 115, adopted in 1991, provides that the finding of probable cause can be based in whole or in part upon hearsay gathered by police in the course of their investigation. See California Penal Code §872(b). Since then, preliminary hearings rarely involve the live testimony of victims or witnesses; only the investigating officer testifies. Under current California law, the purpose of the preliminary hearing is not to facilitate

Exhibit 1
Page 103

Professional Responsibility

93

judges. Nearly all survey respondents indicated that lack of resources for investigation was a serious problem which they face. Further, changes in the conduct of preliminary hearings has reduced in some cases the opportunity for defense attorneys to assess the strength and weaknesses of the prosecution's case.[1] Every public defender responding reported facing excessive investigator caseloads. Over two-thirds of judges surveyed indicated that lack of investigative resources for the defense was a problem in their county. In six counties, defenders had no investigative staff. While some public defender offices have budgeted funds to retain expert witnesses, others must obtain court approval for such assistance. More than one-quarter of the offices (28%) report difficulty in obtaining such approval.

The Benner Survey also inquired into the problem of excessive attorney workloads. All public defender offices save one reported facing a problem with attorney workloads. Over 81% indicated that attorney workload was a significant, very significant, or serious problem. (Lawrence A. Benner, *Preliminary Report: Systemic Factors Affecting the Quality of Criminal Defense Representation*, 2007, available on the Commission's website.)

Despite heavy workloads, California's institutional public defenders have generally provided competent representation for their clients, and vigorous advocacy for adequate funding of defense services. The California Public Defenders Association recently surveyed public defender offices to determine the level of compliance with the State Bar Guidelines for Indigent Defense Delivery Systems, and found a high degree of compliance. Institutional Public Defenders handle 80% of the State's felony filings. We believe that California's public defender offices, and certainly the largest ones, meet reasonable standards of acceptable

workloads. That does not diminish the need, however, for California to assure that constitutional standards are being met in every case, regardless of the county in which it occurs.

## FLAT FEE CONTRACTING

While there is nothing inherently wrong with competitive bidding for contracts to supply defense services, when such contracts are awarded on a flat fee basis it may, in some cases, create a conflict of interest for the contracting lawyer. Unless it is separately reimbursed, the portion of the contract amount employed for investigative services or expert assistance comes off the top, and reduces the compensation or profit for the contracting attorney. Such contracts may also burden a defendant's right to jury trial, since the contractor's compensation will not be enhanced by the additional expense of preparing a case for trial. As described by Barry Melton, Yolo County's public defender and immediate past President of the California Public Defenders Association, to the extent a flat fee contractor does not provide services, he or she makes a profit. So if at all possible, the contractor may avoid going to trial because going to trial is expensive.[2]

In *People v. Barboza*, 29 Cal.3d 375 (1981), the California Supreme Court found that the contract between the County of Madera and the contract defender was illegal because it created a disincentive to declare a conflict of interest. Under the contract, the Madera County public defender was paid $104,000 per year, with $15,000 deducted and held in reserve to be drawn against by conflict counsel. Any deficiency in the reserve account was to be deducted from monthly payments to the public defender. Any balance left in the account at the end of the year was to be paid to the public defender. The Court concluded that this arrangement created an "inherent and irreconcilable"

discovery, but to determine probable cause. *Whitman v. Superior* Court, 54 Cal.3d 1063 (1991).

2. Miller, *California Defense Firm Borrows Wal-Mart Business Model*, The Recorder, Dec. 26, 2007.

Exhibit 1
Page 104

financial disincentive for the public defender to declare a conflict. In declaring the contract unlawful, the Court broadly condemned "contracts of this type" pursuant to "a judicially created rule of criminal procedure." By analogy, an inherent and irreconcilable financial disincentive for a contract defender to investigate the case or hire experts also creates an unacceptable conflict of interest. The Commission has concluded that flat-fee contracts in California should separately reimburse the contracting attorneys for the expenses of adequate investigation and needed experts.

In April, 2000, the U.S. Department of Justice funded a national study of Contracting for Indigent Defense Services. The Study Report began with an example of how critics' worst fears about indigent defense contract systems came true. The example came from an unidentified California county. It is a very sobering account:

> *In 1997 and 1998, a rural county in California agreed to pay a low-bid contractor slightly more than $400,000 a year to represent half of the county's indigent defendants. The contractor was a private practitioner who employed two associates and two secretaries, but no paralegal or investigator. The contract required the contractor to handle more than 5,000 cases each year. All of the contractor's expenses came out of the contract. To make a profit, the contractor had to spend as little time as possible on each case. In 1998, the contractor took fewer than 20 cases – less than 0.5 percent of the combined felony and misdemeanor caseload – to trial.*

> *One of the contractor's associates was assigned only cases involving misdemeanors. She carried a caseload of between 250 and 300 cases per month. The associate had never tried a case before a jury. She was expected to plead cases at the defendant's first appearance in court so she could move on to the next case. One afternoon, however, the associate was given a felony case scheduled for trial the following week. The case involved multiple felony and misdemeanor charges. When she looked at the case file, the associate discovered that no pretrial motions had been filed, no witness list had been compiled, no expert witnesses had been endorsed, and no one had been subpoenaed. In short, there had been no investigation of any kind into the case, and she had no one to help her with the basics of her first jury trial.*

> *The only material in the case file was five pages of police reports. In these reports, she found evidence of a warrantless search, which indicated strong grounds for suppression. She told the judge she was not ready to proceed and that a continuance was necessary to preserve the defendant's sixth amendment right to counsel. The continuance was denied. The associate refused to move forward with the case. The contractor's other associate took over the case and pled the client guilty to all charges. The associate who had asked for a continuance was fired.*

(The Spangenberg Group, *Contracting for Indigent Defense Service:* A Special Report, U.S. Department of Justice Office of Justice Programs, April, 2000.) The Commission independently verified the facts reported in this account, and learned that the unidentified California County was, in fact, Shasta

---

3. The Commission has rejected a comparison of District Attorney and Public Defender budgets as a means of measuring the adequacy of defense funding, since District Attorneys are required to fund broad categories of activity that do not affect the work of public defenders, and the nature of these activities vary significantly from one county to another. Comparisons across time within the same county, however, may suggest changes that signal growing inequity.

4. In addition to Placer County, Barker/Ciummo has been the primary public defender for Madera County since 1988 (Annual Caseload 8,000); for Amador County since 1994 (Annual caseload 1,000); for Modoc County since 1999 (Annual caseload not reported); and for Calaveras County since 2001 (Annual caseload 1,100). They also provide contract defense representation for Napa County in dependency matters, for Fresno County in conflict cases and juvenile dependency matters, and for Sonoma County in juvenile dependency matters. See website, www.ciummolaw.com. The Ciummo website, under

Exhibit 1
Page 105

County. The fired associate, Gabrielle Fitzmaurice-Kendrick, subsequently filed a federal lawsuit against the contractor who fired her, and received a substantial settlement. (*Fitzmaurice-Kendrick v. Suter*, U.S. District Court for E.D. Calif., 1999.) In a deposition for that lawsuit, the contractor boasted that he pled 70% of his clients guilty at the first court appearance, after spending 30 seconds explaining the prosecutor's "offer" to the client. *Deposition of Jack Suter*. Shasta County subsequently abandoned the use of flat-fee contracts, and established a public defender office which currently enjoys an excellent reputation. As disturbing as the scenario recounted in the federal report may be, little has been done in California to prevent the recurrence of such scenarios.

While the State Bar of California Guidelines on Indigent Defense Services Delivery Systems (2006) recommend that the cost of resources such as investigators, qualified experts, paralegals, laboratory fees and support technology "should not operate as a charge against the indigent defense provider to such an extent that the net personal compensation to the defender is diminished," (pp. 30–31), flat fee contracts are still being negotiated for defense services with no separate funding for investigators and ancillary services.

The Commission heard the testimony of Len Tauman, who described the bidding process in Placer County. Tauman was awarded the contract to provide indigent defense services in Placer

County in 1990, although he was not the lowest bidder. He had eighteen years experience as a public defender, and managed a conflicts office for ten years. His contract was renewed in 1994 despite another lower bid, when a judge convinced the Board of Supervisors that the top quality representation was worth the $1 million difference in the bids. The Board vote was 3-2. Tauman's contract was renewed in 1998 and 2002. In 2000, the defender budget in Placer County was 41% of the District Attorney budget. By 2005, they were operating at 27% of the District Attorney budget. Tauman submitted a bid for $2.8 million, to increase funding up to 38% of the D.A. budget.[3] He was undercut by a bid from John A. Barker & Associates, now operating as Richard A. Ciummo & Associates. Ciummo now contracts with eight California counties to provide defense services.[4] The Barker-Ciummo bid was $16.8 million. The County accepted the lower bid.[5] Ciummo's operation has been described as the "Wal-Mart Business Model" for providing defense services, "generating volume and cutting costs in ways his government-based counterparts can't and many private-sector competitors won't."[6] Mr. Ciummo responds that he operates on a single-digit profit margin, and substantial savings result from hiring attorneys on a contract basis that does not include expensive benefit and retirement packages.[7] While his contracts with counties provide separate reimbursement for interpreters and expert witness fees, there is no separate reimbursement for investigative services.[8] There is no comparative data

---

the headline, "What Would Your County Do With Hundreds of Thousands of Dollars?", boasts that "Every county we have contracted with has saved substantial funds over their previous method of providing these services. Additionally, our firm has an excellent record of containing cost increases."

5. Wiener, *Placer Swaps Legal Teams*, Sacramento Bee, June 28, 2006.

6. Miller, *California Defense Firm Borrows Wal-Mart Business Model*, The Recorder, Dec. 26, 2007.

7. *Id.*

8. See, e.g., Agreement with Richard A. Ciummo and Associates for Alternate Indigenet Defense Services, June 6, 2007, available at www.co.fresno.ca.us/portal/BBRs/Agreement%20with%20Richard%20A.%20Ciummo%20and%20Associates%20for%20Alter…

Exhibit 1
Page 106

available to track the impact upon per attorney caseloads or trial rates in the counties that have entered into flat-fee contracts for indigent defense. Mr. Ciummo did not respond to Professor Benner's survey for the Commission regarding any of the counties with which he contracts. In two recent unpublished rulings of the California Courts of Appeal, convictions have been reversed and/or remanded because of a conflict of interest created by Ciummo's representation.[9]

The most direct way to deal with the potential conflicts that could be presented by flat fee contracts for indigent defense services would be for the legislature to mandate certain provisions be included in such contracts. Contracting standards are already imposed by the state for county contracts for public works. See California Public Contracts Code, Sections 20120–20145. Minimal standards could be drawn from the Guidelines on Indigent Defense Services Delivery Systems approved by the State Bar of California in 2006. The State Bar Guidelines provide:

> *Indigent defense providers should enjoy parity, to the extent permitted by law, on a relative scaled basis, with prosecutors in access to technology, criminal history information, other criminal justice databases such as those housing DNA information, legal research tools, investigators and investigative tools, including a travel budget, experts, paralegals, forensic labs, facilities, data processing and exhibit creation capability. The cost of these resources*

> *should not operate as a charge against the indigent defense provider to such an extent that the net personal compensation to the defender is diminished.*

*Id.* at 30 (emphasis added). The Commission recommends that legislation be enacted to provide that when Counties contract for indigent defense services in criminal cases, the contract shall provide separate funding for accessing technology and criminal justice databases to the extent those are provided by law, legal research tools, travel expenses, forensic laboratory fees and costs, data processing, modern exhibit capabilities, paralegals, investigators and expert witnesses.

## OVERSIGHT OF DEFENDER SERVICES

Just regulating flat fee contracts, however, will not address problems of underfunding and overload that can affect all defender offices, whether contractual, assigned, or public defender types. Comparisons of defender offices to measure the availability of resources is currently impossible, because these offices are not required to collect data on the handling of cases or report it to any state agency. California lacks any statewide authority to monitor the adequacy of defender services, leaving it up to each county to determine the level of funding to be provided. That level may be determined without appropriate deference to minimum standards for delivery of defense services.

Minimum standards for indigent defense delivery systems have been drafted by a Commission of the State Bar of California. (*Guidelines on Indigent*

---

9. *People v. Cousins*, 2007 Cal. App. Unpub. LEXIS 2844 (3rd App. Dist. April 9, 2007); *In Re Manuel L.*, 2004 Cal. App. Unpub. LEXIS 8335 (5th App. Dist. Sept. 13, 2004).

Exhibit 1
Page 107

Professional Responsibility

97

*Defense Services Delivery Systems,* 2006.) The Guidelines provide clear standards with respect to standards of representation, qualifications of indigent defense providers, quality control, training, juvenile practice, resources, compensation, ethics and management/leadership. The Guidelines were drafted by a group of lawyers broadly representative of the defense bar, including public defenders, contract defenders, appointed lawyers and private practitioners. As previously noted, a survey by the California Public Defenders Association found a high level of compliance with the guidelines among institutional public defender offices. The Guidelines themselves lack any direct enforcement mechanism.[10]

As the State Bar Commission noted, workload standards vary significantly from state to state, and the 1973 national standards formulated by the National Advisory Commission on Criminal Standards and Goals[11] are of limited utility today. Because the organization of the courts and assignment of deputies varies substantially from county to county, it is not possible to devise numerical workload standards on a statewide basis. There is not even agreement, either in California or on a national basis, of how to define a "case" for purposes of caseload standards. But it might be possible to identify counties where the workloads are excessive, and broad numerical standards could help to identify those counties where excessive workload may be a problem, and calls for further investigation.

The Commission has pondered whether the functions of establishing statewide performance standards and monitoring the adequacy of defender services at the county level should be assigned to an agency with statewide jurisdiction. The composition and role of such an agency would have to be carefully defined after full input from the affected defender service providers. The Commission reviewed three alternatives which might be employed to achieve this goal in California. The alternatives are:

**1** The Administrative Office of the Courts (AOC). The AOC already administers the court appointed counsel program for indigent appeals and funds the appellate projects which provide counsel, as well as the appointment, compensation and reimbursement for attorneys handling death penalty appeals and habeas claims. Minimum standards to qualify for appointment as counsel for indigent appeals and death penalty appeals and habeas claims have been established. In 2002, the California Judicial Council also set minimum standards for appointment to represent defendants at trial in death penalty cases. Individual defender offices and contractors could be required to report to the Administrative Office of the Courts, on an annual basis, the data necessary to confirm their compliance with minimum standards for the hiring of deputies, whether the caseloads assigned to them may be excessive, the adequacy of training, compliance with ethical standards, independence, quality control, investigative resources and compensation. The AOC could then certify that particular counties are meeting minimal standards. The AOC has accumulated broad experience in

---

10. The California Rules of Professional Conduct require a lawyer to act competently, and this includes the duty to supervise the work of subordinate attorneys. Rule 3-110, California Rules of Professional Conduct, and Discussion to Rule 3-110. In addition, Rule 1-120 provides "A member shall not knowingly assist in, solicit, or induce any violation of these rules or the State Bar Act." Thus, public defenders may risk State Bar discipline if excessive caseloads are not addressed.

11. Standard 13.12 of the NAC Standards were: no more than 400 misdemeanors per attorney per year; or no more than 150 felonies per attorney per year; or no more than 200 juvenile cases per attorney per year. The associate attorney who was discharged in Shasta County was being assigned 3,600 misdemeanors per year.

Exhibit 1
Page 108

weighting caseloads in order to assess court workloads. They would be uniquely equipped to measure defense caseloads in California and identify counties that fall outside the normal range.

The disadvantage of using the Administrative Office of the Courts, however, is a potential conflict of interest and violation of the constitutional separation of powers. The identification of a county as falling outside the normal range could give rise to claims of ineffective assistance of counsel that the courts would have to litigate. The intrusion of a judicial agency into the operation of defender offices could cross the line into executive and legislative functions.

**2** The California State Bar (CSB).

The California State Bar Commission on the Delivery of Legal Services to the Indigent Accused promulgated voluntary guidelines for the delivery of indigent criminal defense services in 1990. In 2005, the Bar Board of Governors appointed a ten member working group to collect information and public comment on the 1990 Guidelines and submit a revised set of guidelines by December of 2005. *The Guidelines on Indigent Defense Services Delivery Systems* (2006) discuss standards of representation and quality of services, with suggested adaptations for each of the alternative delivery systems. While no effort was made to establish numerical caseload standards, and no means of enforcement was suggested, these tasks could be delegated to the California State Bar by the legislature. Through appropriate legislation, the State Bar could be designated as the repository of mandated reports from defender organizations and contract defenders throughout the state, empowered to establish minimum standards, and authorized to conduct investigations and certify counties that are in compliance.

One difficulty of utilizing the State Bar, of course, is that the State Bar is funded entirely by the dues paid by its member lawyers. It would be unfair to tax the bar to fund a function that is the ultimate responsibility of the State as a whole. Thus, any delegation of this task to the State Bar should be accompanied by state appropriation of funds to finance this activity.

**3** Establishment of a new Indigent Defense Commission (IDC).

In recent years, a number of states have responded to the national crisis in underfunding of indigent defense services by the creation of agencies to establish statewide standards and oversight of defense services. In 2001, Texas enacted landmark legislation, known as the Texas Fair Defense Act. It provides for statewide standards and oversight of defense services through a new Texas Task Force on Indigent Defense, and provides partial state funding of defense services for the first time ever. Just as in California, Texas counties have the primary responsibility for funding and organizing indigent defense services. Counties can opt to use a court-appointed counsel, public defender or contract counsel system to provide indigent defense services, or they can use some combination of these models. Out of the state's 254 counties, however, only seven have a public defender office. The Texas Task Force on Indigent Defense provides state formula grants to counties, whose costs increased from the reforms put in place by the Texas Fair Defense Act. In addition, the Task Force develops minimum standards of quality indigent defense services; monitors and assists counties in meeting those standards; and works to bring

Exhibit 1
Page 109

consistency, quality control and accountability to indigent defense practices in Texas. (See www.courts.state.tx.us/tfid/.)

In 2004, Virginia enacted legislation creating the new Virginia Indigent Defense Commission, which began overseeing both assigned counsel and public defender programs throughout the state in July, 2005. Among its other duties, the Virginia IDC is charged with setting caseload limits and establishing and enforcing qualification and performance standards for indigent defense representation.

Statewide systems have also operated successfully for many years in Massachusetts and Indiana. In Massachusetts, a single, independent organization, known as the Committee for Public Counsel Services, oversees both public defenders and 2,000 private attorneys statewide, and has adopted training and performance standards as well as caseload limits. Indiana has a state commission, known as the Indiana Public Defender Commission, which is authorized by statute to reimburse counties 40% of their expenditures in felony and juvenile cases, provided the counties create an independent board to oversee defense services and comply with the commission's caseload, qualification, and other standards for representation. Currently, 53 of the state's 92 counties have adopted the commission's standards and established independent boards. (See *Gideon's Broken Promise: America's Continuing Quest for Equal Justice*, American Bar Assoc. 2004.)

The difficulty with assigning this task to a new independent agency is the costs of the creation of a new bureaucracy, and its tendency to grow. The ideal system would assign *both* the function of collecting data (preferably though statutorily

mandated reporting from defense contractors and public defenders) to establish performance standards, *and* the function of identifying counties which are in compliance, to the same entity. Conceivably, however, those functions could be separated. The Administrative Office of the Courts or the State Bar, for example, could be charged with collecting the data needed to propound statewide caseload and performance standards, and formulating those standards. The subsequent identification of noncompliance with those standards could then be delegated to a newly created IDC.

The Commission was unable to agree upon either the need for oversight or the identification of the appropriate oversight entity. Strong opposition was registered by public defenders who are concerned that the designation of an oversight agency could be counterproductive. Some public defenders have expressed concern that, rather than elevating the quality of indigent defense services in California, a process of identifying providers who are in compliance with minimum standards will create a race for the bottom. Counties that currently provide adequate funding for defense services could seek to cut funding to the level that meets minimal standards for compliance. In today's budget climate, this is a realistic cause for concern.

The Commission recommends that the California State Bar reconvene its Commission on the Delivery of Legal Services to the Indigent Accused to resolve the issues of how adequate funding of defense services in California can be achieved.

Exhibit 1
Page 110

Professional Responsibility

99

## Recommendations: Funding Defense Services

**1** The Commission recommends that legislation be enacted to provide that when Counties contract for indigent defense services in criminal cases, the contract shall provide separate funding for accessing technology and criminal justice databases to the extent those are provided by law, legal research tools, travel expenses, forensic laboratory fees and costs, data processing, modern exhibit capabilities, paralegals, investigators and expert witnesses with appropriate qualifications and experience. Full time defense counsel should be compensated at rates equivalent to comparable prosecutors.

**2** The Commission recommends that the California State Bar reconvene its Commission on the Delivery of Legal Services to the Indigent Accused to make recommendations regarding the adequacy of funding for defense services which meet acceptable standards of competent representation.

## Actions

The hearing and reports occasioned six articles from the press, lauding the Commission's findings.

Exhibit 1
Page 111

# Remedies

Those who have been released back into the community after successfully challenging their convictions face the same obstacles encountered by parolees. They should receive at least the same level of counseling and assistance in locating housing or jobs.

Exhibit 1
Page 112

# Data and Hearings

In preparation for a public hearing on the topic of Remedies for Wrongful Conviction, the Commission considered the following documents:

- Systemic Remedies—Chapter 1, *Achieving Justice: Freeing the Innocent; Convicting the Guilty*, Report of the American Bar Association Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process, 2006.

- *An Act to Establish the North Carolina Innocence Inquiry Commission*, House Bill 1323, Session Law 2006-184, General Assembly of North Carolina, Session 2005.

- Fact Sheet: *Preservation of Evidence*, retrieved from Innocence Project website on July 25, 2007.

- California Penal Code §1417–1417.9

- Fact Sheet: *Access to Post-Conviction DNA Testing*, retrieved from Innocence Project website on July 25, 2007.

- California Penal Code §1404–1405

- Chamberlain, Michael. *Access to DOJ Labs and DNA Data Bank Program*, Memorandum from Department of Justice, State of California, March 8, 2007.

- Compensation for the Wrongfully Convicted—Chapter 9, *Achieving Justice: Freeing the Innocent; Convicting the Guilty*, Report of the American Bar Association Criminal Justice Section's Ad Hoc Innocence Committee to Ensure the Integrity of the Criminal Process, 2006.

- Fact Sheet: *Compensating the Wrongly Convicted*, retrieved from Innocence Project website on July 25, 2007.

- California Penal Code §4900–4906

- *Pete Rose v. Harry Hudson*, 3rd D.C.A. July 24, 2007

At a public hearing on October 17, 2007 in the Kennedy Commons at Santa Clara University in Santa Clara, the Commission heard from Prof. Myrna Raeder, Southwestern University School of Law, Los Angeles, American Bar Association Criminal Justice Section Ad Hoc Innocence Committee; Prof. Justin Brooks, California Western School of Law, San Diego, Executive Director, California Innocence Project; Linda C. Starr, Santa Clara University School of Law, Santa Clara, Legal Director, Northern California Innocence Project; Prof. Cookie Ridolfi, Santa Clara University School of Law, Executive Director, Northern California Innocence Project; Michael Chamberlain, Deputy Attorney General, Department of Justice, California; Mark Windham, Head Deputy, Los Angeles County Public Defender's Office, Representative of California Public Defenders' Association; Jon Eldan, Attorney at Law, Coblentz Hatch Duffy and Bass LLP; Richard Schoenberger, Attorney for Exoneree Rick Walker; Rick Walker, Exoneree; Mark Merin, Attorney for Exoneree Pete Rose; Herman Atkins, Exoneree; Jeff Rawitz, Partner at Jones Day and Attorney for Exoneree Dwayne McKinney. The Commission also received written submissions from Karen McGagin, Director, California Victim Compensation and Government Claims Board; and Stephen Saloom, Policy Director, Innocence Project at Benjamin N. Cardozo School of Law, Yeshiva University.

The Report and Recommendations Regarding False Confessions were issued on February 22, 2008, as follows:

Exhibit 1
Page 113

# Report

This Report will address some of the obstacles faced by persons who have established their innocence after conviction of a crime, in gaining access to post conviction relief, achieving reintegration into society, and gaining compensation for their wrongful incarceration. It will also address the access and reintegration problems encountered by those released after reversal or vacation of their convictions without a finding of innocence. Access to post conviction relief and reintegration into society should be a goal for all those whose convictions are subject to legal challenge. They often have distinct problems re-entering society, and have difficulty achieving legal redress due to a variety of substantive and technical obstacles in the law. Compensation, however, should be limited to those who have been found innocent of the crime or crimes for which they were convicted and imprisoned, not because of procedural errors in their trials. They have been deprived of their liberty based upon a failure in the criminal justice system.

It should be the policy of the State of California to redress the injury inflicted upon the innocent as quickly as possible, to restore them to full participation in the life of the community, and to provide all of the services needed for the difficult transition from wrongful imprisonment to restoration of all the rights and liberties to which they are otherwise entitled.

The Commission conducted a public hearing addressing these issues at Santa Clara University on October 17, 2007. The Commission heard testimony from innocent persons who were erroneously convicted and the lawyers who have represented them that was remarkably consistent: they face many difficult obstacles to full restoration of their rights and liberties, and the compensation they receive for their losses is frequently inadequate.

While organizations such as Life After Exoneration seek to assist, they rely upon volunteers and charitable contributions. Last year, Life After Exoneration attempted to serve over 70 exonerees throughout the nation with a budget of $100,000 and a staff of two social workers. Many of their needs are unmet. (See www.exonerated.org.) Such assistance should not be dependent upon charitable contributions. It is an obligation of the State, which bears responsibility for the wrongful deprivation of an innocent person's liberty, to provide assistance in the adequate restoration of that innocent life which was disrupted.

## COMPENSATION FOR THE INNOCENT

California has a statutory scheme for compensating claimants who can establish that the crime of which they were convicted was not committed or was not committed by them, that they did not contribute to the bringing about of their arrest or conviction, and that they sustained pecuniary injury. The statute was first enacted in 1941, with a compensation limit of $5,000. In 1969, the maximum limit was raised to $10,000. In 2000, the statute was amended to provide that if compensation is awarded, it is limited to $100 per day of wrongful incarceration, or a maximum of $36,500 per year of incarceration. The award must be subsequently approved by the legislature. The comparable federal statutory provisions for



Exhibit 1
Page 114

compensating innocent persons capped recovery at $5,000 until the 2003 enactment of the Innocence Protection Act, which increased the limit to $50,000 for each year of prison confinement, and $100,000 for each year on death row. 28 U.S.C. §2513.

Since 1984, the California Victim Compensation & Government Claims Board has approved 15 claims from persons who established their innocence of the crimes of which they were convicted.[1] During the same period, the Board denied 25 claims, and dismissed another 19 because they were untimely, incomplete, or the claimant had not been released from prison. California Penal Code Sections 4900–4906; Letter to Commission from Karen McGagin, Executive Officer, California Victim Compensation & Government Claims Board. (See www.vcgcb.ca.gov.)

California Penal Code §4901 currently requires that a claim for compensation for wrongful imprisonment of an innocent person must be

presented within a period of six months after judgment of acquittal or discharge given, or after pardon granted, or after release from prison. The Commission recommends that the time limit for presentation of such claims be extended to two years. The difficult adjustment required after release from wrongful incarceration frequently renders the current deadline unreasonable. These claims should not be precluded by a delay of less than two years.

The Commission also recommends that a court granting judicial relief upon a claim of innocence be required to notify the petitioner of the availability of compensation pursuant to California Penal Code Section 4900, and the time limits for the filing of such claims.

California Penal Code §4904 requires a claimant for victim compensation to establish that the claimant did not, by any act or omission either intentionally or negligently, contribute to the bringing about of his or her arrest or conviction. The Commission is concerned lest this requirement be utilized to exclude innocent persons who were victims of false confessions or improperly induced guilty pleas from compensation for their wrongful convictions. The exception should not include those who were victims of false confessions or improperly induced guilty pleas. It should be limited to those who intentionally subverted the judicial process.



CALIFORNA CLAIMS

| Exonerees | Claim Approved | Awarded | Years Served | | | | |
|---|---|---|---|---|---|---|---|
| David Jones | March 15, 2007 | $74,600 | 9 | | | | |
| John Stoll | May 18, 2007 | $704,400 | 19 | | | | |
| Kenneth Marsh | Jan. 19, 2006 | $756,900 | 21 | | | | |
| Pete Rose | Oct. 20, 2005 | $328,200 | 9 months | | | | |
| Kevin Baruxes | June 25, 2004 | $258,700 | 7.5 | | | | |
| Quedellis Walker | Sept. 19, 2003 | $421,000 | 12 | | | | |
| David Quindt | Feb. 28, 2003 | $17,000 | 14 months | | | | |
| Leonard McSherry | August 23, 2002 | $481,200 | 13 | | | | |
| Frederick Daye | March 22, 2002 | $389,000 | 10 | | | | |

APP O ED CLAIMS DU ING THE PAST 5 YEARS          5     10     15     20

---

1. See chart. All of these claims were subsequently approved by the legislature with the exception of David Jones. His claim was included in S.B. 242 (Torlakson)(2007) as an appropriations measure. The bill failed on the Senate floor when an Urgency clause was defeated. It may be eligible for reconsideration in its second year, however.

Exhibit 1
Page 115

Remedies

The current limitation of compensation to innocent persons who were wrongfully convicted to one hundred dollars per day of incarceration, or a maximum of $36,500 per year, should be increased. The Commission recommends that the level of statutory compensation be increased, at least to the level of comparable federal compensation ($50,000 per year maximum). There should also be an adjustment to increase the award to reflect the annual rate of inflation subsequent to enactment of this level of compensation.

### PROVIDING POST-RELEASE ASSISTANCE

It is currently the declared policy of California to provide educational, vocational, family and personal counseling necessary to assist parolees in the transition between imprisonment and discharge. California Penal Code §3074. SB 618, enacted in 2005, added Section 1203.8 to the Penal Code, to authorize Counties to develop a multiagency plan to prepare and enhance nonviolent felony offenders' successful reentry into the community. Ironically, even the limited resources made available to convicted felons who have served their sentences and are released from prison are not available to those whose convictions have been set aside. Parolees are released to the community in which they were arrested or convicted; services such as counseling and assistance in locating housing or jobs are limited to those who remain under parole supervision.

But those who are being released because their conviction is set aside, including those who have been found innocent, receive none of these services.

Those who have been released back into the community after successfully challenging their convictions, whether innocent or not, face the same obstacles encountered by parolees, and more. Many are afflicted with post-traumatic stress disorder, or other psychological damage resulting from their wrongful incarceration over a long period of time. Of the States with compensation laws, only three – Massachusetts, Louisiana and Vermont – provide for the costs of medical and psychological care.



79 EXONEREES RECEIVED NO COMPENSATION
More than 50% who did receive compensation waited 2+ years for first payment.

The *New York Times* recently gathered information on 137 of the 206 imprisoned individuals who have been found innocent by DNA testing from 1989 through 2007. The reporters also researched the compensation claims of all 206. They found that at least 79 of these persons (40%) received no compensation at all. More than half of those who did receive compensation waited two years or longer after exoneration for the first payment. Few received any government services after their release. They typically left prison with less help – prerelease counseling, job training, substance-abuse treatment, housing assistance and other services – than some states offer to paroled prisoners. Most found that authorities were slow to wipe the convictions from their records, if they

Exhibit 1
Page 116

did so at all. Even those who were well educated and fully employed at the time of their wrongful conviction had difficulty finding work after their release. (Roberts & Stanton, *A Long Road Back After Exoneration*, and *Justice is Slow to Make Amends*, New York Times, Nov. 25, 2007; Santos & Roberts, *Putting a Price on a Wrongful Conviction*, New York Times, Dec. 2, 2007.)

The Commission recommends that services to assist with reintegration into society be available to all those released from prison after their judgment of conviction has been reversed, vacated or set aside. This would include assistance in locating housing, a cash allowance, clothing, and employment counseling.

## CLAIMS BARRED BY STATUTE OF LIMITATIONS

Many of the exonerated have a valid cause of action for the wrongful acts or omissions of the lawyers who previously represented them which resulted in their erroneous conviction. If they delay filing a cause of action until they achieve exoneration, their claim will in most cases be barred by the Statute of Limitations. Yet proving their exoneration is an element they must establish to recover damages. It is a classic "Catch-22" created by California Civil Procedure Code §340.6(a), which provides:

> An action against an attorney for a wrongful act or omission, other than for actual fraud, arising in the performance of professional services shall be commenced within one year after the plaintiff discovers, or through the use of reasonable diligence should have discovered, the facts constituting the wrongful act or omission, or four years from the date of the wrongful act or omission, whichever occurs first.

California Civil Procedure Code §352.1(a) provides:

> If a person entitled to bring an action... is, at the time the cause of action accrued, imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term less than for life, the time of that disability is not a part of the time limited for the commencement of the action, not to exceed two years.

Normally, the facts constituting the wrongful act or omission (such as a failure to investigate or call available witnesses) will be known to the defendant at the time of his conviction. Even with the two year tolling, his cause of action would have to be filed within three years.

In *Coscia v. McKenna & Cuneo*, 25 Cal.4th 1194 (2001), the California Supreme Court held that a person alleging he was convicted through the wrongful acts or omissions of his lawyer must obtain post conviction relief in the form of a final judicial disposition of the underlying case, such as acquittal after retrial, reversal on appeal with directions to dismiss the charges, reversal followed by the People's refusal to continue the prosecution, or a grant of habeas corpus relief, as a prerequisite to proving actual innocence in a malpractice action against his former criminal defense counsel. This requires an erroneously convicted innocent person to file a malpractice claim within the period of the statute of limitations, even though he will not be able to pursue the claim until he achieves exoneration, perhaps many years later. It is unrealistic to expect a prisoner to file a lawsuit against his attorney before his efforts for post-conviction relief have succeeded. In many cases, post-conviction relief comes many years after conviction. If such a lawsuit were filed, it would have to be held in abeyance anyway, until post-conviction remedies have been exhausted.

The recent case of *Rose v. Hudson*, 153 Cal.App.4th 641 (2007) provides a good example. Pete Rose was convicted of the kidnap and rape of a 13 year

Exhibit 1
Page 117

Remedies

old girl in November, 1995. His conviction was vacated in October, 2004 upon his exoneration.[2] He filed a complaint against his defense attorney, alleging that the attorney's negligence contributed to his wrongful conviction. His complaint was dismissed because it was not filed within the statute of limitations, even though the Court conceded that he could not have recovered on his claim until his conviction had been vacated. Thus, the only way one who maintains his innocence can obtain relief on a claim of attorney malpractice is to file the claim prior to achieving exoneration, and ask the court to stay the suit pending resolution of his post-conviction remedies.

The Commission recommends that the California Code of Civil Procedure be amended to provide that a two year Statue of Limitations for professional malpractice claims shall commence upon the granting of post conviction relief in the form of a final judicial disposition of the underlying case.

## ACCESS TO POST-CONVICTION RELIEF

The Commission also examined some of the obstacles which innocent persons may face in obtaining access to testing and a judicial hearing that could lead to exoneration. California Penal Code Section 1405 permits a prisoner to petition for performance of DNA analysis that might exonerate him, and upon the filing of a proper motion, an attorney will be appointed to assist him. Many prisoners seek the assistance of the Innocence Projects at Santa Clara University School of Law and California Western School of Law to evaluate their claims and file the necessary petition to make an adequate showing. More than 173,000 inmates are incarcerated in California prisons. California Western Law School and Santa Clara University have been working collaboratively over the past seven years to assist indigent California inmates raising innocence claims. Santa Clara's Northern

California Innocence Project (NCIP) represents inmates convicted in Northern California courts and California Western's California Innocence Project (CIP) represents inmates convicted in Southern California courts. The Projects operate with significant assistance from law students and their sponsoring educational institutions.

Both projects are active founding members of the Innocence Network, an association of innocence projects working nationally to address problems of wrongful conviction.

In 2001, California mandated that all costs associated with representing inmates pursuant to Penal Code section 1405 to investigate and, if appropriate, file motions for DNA testing of biological evidence where such testing could prove innocence, be borne by the State. In that same year, California allocated $1.6 million dollars over two years to provide counsel to assist inmates with innocence claims. For 2002 and 2003, the NCIP and CIP received state funding. That funding was discontinued as a result of state budget cuts in 2003.

If the innocence projects are forced to shut down or seriously cut back the work they do, California will be faced with adding to the burden of state offices which would be left to handle these cases without the particularized experience representing innocence claims post-conviction, and the resource of volunteer law students.

To date, the Innocence Projects have succeeded in helping to exonerate 11 people, two based on DNA evidence and nine on other grounds. Each exoneration has saved the state the cost of housing an innocent person and has returned the exonerees to their families and communities. Moreover, as in the case of Kevin Green, whose exoneration in

2. As noted in fn. 1, *supra*, Rose established his innocence and was awarded compensation by the California Victim Compensation & Government Claims Board in 2005.

Exhibit 1
Page 118

Orange County led to the conviction of the real murderer and rapist, the work of innocence projects also advances the interest of public safety.

With hundreds of law students assisting, and the support of Santa Clara University and California Western School of Law, the Projects are screening on average 3,200 claims each year. While most innocence claims come from guilty prisoners, every claim must be reviewed and evaluated in order to identify those prisoners who do have legitimate innocence claims.

Over the past seven years, the Projects have processed and reviewed 20,431 requests for assistance. Of those, 13,990 have been rejected and 288 are being actively investigated. There is a current backlog of 700 cases, which cannot be thoroughly reviewed because of the limited resources of the Projects. The remaining cases are in various stages of administrative review. It is remarkable – a testament to the efficiency and effectiveness of the Projects – that the backlog is only 700 cases. However, that backlog is ever increasing and will only worsen at the current level of Project funding.

Other states provide state funding for the work of projects similar to the California Innocence Projects. The State of Connecticut, with a prison population that is 8.5 times *smaller* than California's, funds their Public Defender's Office with more than $500,000 per year to pay for four full-time Innocence Project positions. The new positions have no termination date and are expected to continue. The Commission recommends that State funding for the Northern California Innocence Project and the California Innocence Project be restored.

## DISCOVERY OF INFORMATION AND ACCESS TO DNA DATABASES TO ESTABLISH INNOCENCE CLAIMS

The Commission is continuing its assessment and analysis of problems encountered by the Innocence Projects and defense counsel in gaining access to information and evidence from District Attorney's Offices regarding claims of innocence which they are investigating; gaining access to DNA databases to seek matches to DNA material that may assist in establishing a claim of innocence; and gaining discovery to support pending *habeas corpus* claims on behalf of those seeking exoneration on a claim of innocence. The Commission did not have enough time to fully consider this issue.



INNOCENCE PROJECTS HAVE LIMITED RESOURCES FOR CURRENT VOLUME OF REQUESTS FOR ASSISTANCE.

Exhibit 1
Page 119

Remedies

# Recommendations

**1** The California Commission on the Fair Administration of Justice recommends that services to assist with reintegration into society be available to all those released from custody. This would include assistance in locating housing, a cash allowance, clothing, and employment counseling.

**2** California Penal Code §4901 currently requires that a claim for compensation for wrongful imprisonment of an innocent person must be presented within a period of six months after judgment of acquittal or discharge given, or after pardon granted, or after release from prison. The California Commission on the Fair Administration of Justice recommends that the time limit for presentation of such claims be extended to two years. While exonerees may wish to file these claims as quickly as possible, their claims should not be precluded by a delay of less than two years.

**3** The California Commission on the Fair Administration of Justice recommends that a court granting judicial relief upon a claim of innocence be required to notify the petitioner of the availability of compensation pursuant to California Penal Code Section 4900, and the time limits for the filing of such claims.

**4** California Penal Code §4904 requires a claimant for victim compensation to establish that the claimant did not, by any act or omission either intentionally or negligently, contribute to the bringing about of his or her arrest or conviction. This requirement should not be utilized to exclude innocent persons who were victims of false confessions or improperly induced guilty pleas from compensation for their wrongful convictions. The Commission recommends that this requirement be limited to a showing that the claimant did not intentionally subvert the judicial process.

**5** California Penal Code §4904 currently limits compensation to innocent persons who were wrongfully convicted to one hundred dollars per day of incarceration, or a maximum of $36,500 per year. The California Commission on the Fair Administration of Justice recommends that the level of statutory compensation be substantially increased, at least to the level available under the federal system of compensation. There should also be an adjustment to increase the award to reflect the annual rate of inflation subsequent to enactment of this level of compensation.

**6** Currently, innocent persons who are released from prison are required to file a separate legal action for expungement of their conviction before they are fully restored to all the rights of citizenship and relieved of the disabilities imposed by a prior conviction. The California Commission on the Fair Administration of Justice recommends the enactment of legislation to provide for automatic expungement of the record of conviction whenever a final judgment of conviction is set aside or vacated and the Court makes a finding of the actual innocence of the defendant.

**7** The California Commission on the Fair Administration of Justice recommends that the California Code of Civil Procedure be amended to provide that a two year Statue of Limitations for professional malpractice claims shall commence upon the granting of post conviction relief in the form of a final judicial disposition of the underlying case.

**8** The California Commission on the Fair Administration of Justice recommends that State funding for the Northern California Innocence Project and the California Innocence Project be restored.

109

Exhibit 1
Page 120

## Actions

The hearing and reports occasioned one article from the press, lauding the Commission's findings.

In 2008, Assemblyman Solorio (D-Anaheim) introduced AB2937, to provide post-release services for the wrongfully convicted and to extend the Statute of Limitations on bringing lawsuits against counsel. The bill has passed the Assembly and will now be considered by the Senate.

Exhibit 1
Page 121

# Death Penalty

California's death penalty is dysfunctional. The system is plagued with excessive delay in the appointments of counsel for appeals and habeas corpus petitions, and a severe backlog in the review of appeals and habeas petitions before the California Supreme Court.

Exhibit 1
Page 122

## Data and Hearings

In preparation for three public hearings on the topic of the Fair Administration of the Death Penalty in California, the Commission considered the following documents:

- *Supreme Court Proposes Amendments To Constitution in Death Penalty Appeals*, News Release #76, Judicial Council of California, November 19, 2007.

- Alarcon, Judge Arthur L. *Remedies for California's Death Row Deadlock*, 80 So. Cal. Law Rev 697 (2007).

- Liebman and Marshall. *Less is Better: Justice Stevens and the Narrowed Death Penalty*, 74 Fordham L. Rev. 1607 (2005–2006).

- Pierce and Radelet. *The Impact of Legally Inappropriate Factors on Death Sentencing For California Homicides*, 1990–99, 46 Santa Clara L. Rev 2005.

- Shatz, Steven F. *The Eighth Amendment, The Death Penalty, and Ordinary Robbery-Burglary Murderers: A California Case Study*, 59 Florida Law Rev. 4 (September 2007).

- Kreitzberg, Ellen. *The Death Penalty: A Review of Special Circumstances in California Death Penalty Cases*, Original Research for the Commission.

- Caldwell, Chase, and Goodman. *The Exercise of Discretion to Prosecute a Homicide Case as a Death Penalty Case*, Original Research for the Commission.

- Latzer and Cauthen. *Justice Delayed? Time Consumption in Capital Appeals: a Multi-State Study*, John Jay College of Criminal Justice (2004).

- Gross and O'Brien. *Frequency and Predictors of False Conviction: Why We Know So Little, and New Data on Capital Cases*, Working Paper #93, University of Michigan Law School (October 2007).

- *ABA Study: State Death Penalty Systems Deeply Flawed*, News Release from the American Bar Association, October 29, 2007.

- *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, American Bar Association, February 2003.

- Dewan and Goodman. *Capital Cases Stalling as Costs Grow Daunting*, The New York Times, November 4, 2007.

- Freedman, *The Revised ABA Guidelines and the Duties of Lawyers and Judges in Capital Post-Conviction Proceedings*, The Journal of Appellate Practice and Process, Vol. 5, No. 2 (Fall 2003).

- New Jersey Death Penalty Commission Report (January 2007).

- Feasibility Study: *Characterizing the Administration and Assessing the Administrative Costs of the Death Penalty in California* (Rand Corp. August 2007).

- California Rules of Court, Rule 4.117 Appointment of Trial Counsel in Capital Cases.

- Sullivan, Thomas. *Efforts to Improve the Illinois Capital Punishment System: Worth the Cost?*, 41 U. Richmond L. Rev. 935 (May 2007).

- Letter to the Commission from R. Clayton Seaman, Jr., Chair, Capital Case Committee, California Appellate Defense Counsel, Nov. 30, 2007.

- Letter to the Commission from Natasha Minsker, Death Penalty Policy Director, ACLU of Northern California, July 10, 2007.

Exhibit 1
Page 123

The Commission held three public hearings. At its first hearing on January 10, 2008 in Room 4203 of the State Capitol Building in Sacramento, the Commission heard from Hon. Ronald George, Chief Justice of California; Hon. Arthur L. Alarcon, Senior Circuit Judge, U.S. Court of Appeals for the Ninth Circuit; Hon. Gerald Kogan, former Chief Justice, Supreme Court of the State of Florida; former Chief Prosecutor, Homicide and Capital Crimes Division, Dade County, Florida; Co-Chair, Death Penalty Initiative, The Constitution Project; Lawrence C. Marshall, Professor of Law, Stanford Law School; Co-Founder, Center for Wrongful Convictions, Northwestern University; Steven Shatz, Professor of Law, University of San Francisco School of Law; Michael Radelet, Professor and Chair, Dept. of Sociology, University of Colorado; Ellen Kreitzberg, Professor of Law, Santa Clara University School of Law; Director, Death Penalty College.

At its second hearing on February 20, 2008 in the Los Angeles County Board of Supervisors Hearing Room 381-B in the Kenneth Hahn Hall of Administration in Los Angeles, the Commission heard from Professors Carol Chase and Chris Goodman, Pepperdine School of Law; Susan Everingham, Rand Corporation; John Phillipsborn, California Attorneys for Criminal Justice and Mexican Capital Legal Assistance Program; John Poyner, District Attorney, Colusa County; President, California District Attorneys' Association; Mike Ramos, District Attorney, San Bernardino County; Dane Gillette, Chief Assistant Attorney General, California Attorney General's Office; Greg Fisher, Deputy Public Defender, Special Circumstances Case Coordinator, Los Angeles County Public Defender's Office; Michael Laurence, Director, California Habeas Corpus

Resource Center; Michael Hersek, California State Public Defender; Michael Millman, Director, California Appellate Project, San Francisco; Barry Melton, Public Defender, Yolo County; California Public Defenders Association; Prof. Elisabeth Semel, Director of Death Penalty Clinic, Boalt Hall School of Law; Clay Seaman, California Appellate Defense Counsel; Cliff Gardner, Attorney at Law.

At its third hearing on Friday, March 28, 2008 in the California Mission Room at Santa Clara University, the Commission heard from Professors Linda E. Carter and Mary Beth Moylan, McGeorge School of Law; Craig Haney and Lois Heaney, National Jury Project; Kent Scheidegger, Criminal Justice Legal Foundation; Natasha Minsker, ACLU of Northern California; Judy Kerr, California Crime Victims for Alternatives to the Death Penalty; James S. Thomson, Attorney at Law; Bill Babbitt, Murder Victims' Families for Human Rights; Darrel Myers, Murder Victim Families for Reconciliation.

The Report and Recommendations on the Administration of the Death Penalty in California were issued on June 30, 2008, as follows:

# Introduction: Charge and Nature of Inquiry

The California Commission on the Fair Administration of Justice was established in 2004 by California State Senate Resolution No. 44 to carry out the following charges:

To study and review the administration of criminal justice in California to determine the extent to which that process has failed in the past, resulting in wrongful executions or the wrongful conviction of innocent persons;

Exhibit 1
Page 124

**2** To examine ways of providing safeguards and making improvements in the way the criminal justice system functions;

**3** To make any recommendations and proposals designed to further ensure that the application and administration of criminal justice in California is just, fair, and accurate.

In carrying out these charges, the Commission has undertaken a thorough review and analysis of the administration of the death penalty in California This is the first time since the California death penalty law was legislatively enacted in 1977 that any official body has undertaken a comprehensive review of its operation. The Commission funded a feasibility study by the Rand Corporation, and independent research by professors at California law schools, to examine particular aspects of death penalty administration in California.[1] A recent analysis of California's death row deadlock by Senior Judge Arthur Alarcon of the United States Court of Appeals for the Ninth Circuit was especially helpful to the Commission.[2] The Commissioners also considered the research and recommendations of numerous other academics and organizations who have studied the operation of California's death penalty law, as well as the laws of other states.

The Commission convened three public hearings, in Sacramento, Los Angeles and Santa Clara, and heard the views of 72 witnesses. The witnesses described a system that is close to collapse. The elapsed time between judgment and execution in California exceeds that of every other death penalty state.[3] California now has the largest death row in the nation, with 670 awaiting execution.[4]

The initial witnesses before the Commission offered thoughtful proposals to address the problems of justice, fairness and accuracy in the administration of California's death penalty law. Based upon their presentations, subsequent witnesses were asked to respond to eleven "focus questions" compiled by the Commission.[5]

Commissioners heard the testimony of judges, prosecutors, and defense lawyers actively engaged in the administration and operation of California's death penalty law, as well as academics, victims of crime, concerned citizens and representatives of advocacy organizations. A total of 66 written submissions addressing these questions were also received.

> The Commission does not view its charge in Senate Resolution No. 44 as calling for a judgment on the morality of the death penalty.

The Commissioners hold a broad spectrum of divergent views on the death penalty, some of which are reflected in individual statements attached to this report.

After careful study, the Commission finds itself in full agreement with California Chief Justice Ronald M. George in his conclusion that California's death penalty system is dysfunctional.[6]

The system is plagued with excessive delay in the appointments of counsel for direct appeals and habeas corpus petitions, and a severe backlog in

---

1. Professors Harry Caldwell, Carol Chase and Chris Chambers of Pepperdine University School of Law conducted research to identify the processes by which California District Attorneys decide to proceed with a homicide prosecution as a death penalty case; Professor Ellen Kreitzberg of Santa Clara University School of Law conducted research to identify which special circumstances were utilized in all cases resulting in a death judgment in California since 1977; and Professors Linda E. Carter and Mary Beth Moylan of the University of the Pacific, McGeorge School of Law conducted research regarding the use of commutation in California death penalty cases. The results of this research are available on the Commission's website, www.ccfaj.org, and will be summarized in this Report.

2. Arthur L. Alarcon, *Remedies for California's Death Row Deadlock*, 80 U.S.C.L. Rev. 697 (2007).

3. Latzer & Cauthern, *Justice Delayed? Time Consumption in Capital Appeals: A Multistate Study* (John Jay College of Criminal Justice, 2006).

4. The Death Penalty Information Center tracks the population of each State's death row based upon information from official prison sources. As of February, 2008, there were a total of 3,263 men and women on the nation's death rows.

5. The "focus questions" are attached to this report as Appendix I.

6. Testimony of California Chief Justice Ronald M. George, January 10, 2008.

Exhibit 1
Page 125

Death Penalty

the review of appeals and habeas petitions before the California Supreme Court. Ineffective assistance of counsel and other claims of constitutional violations are succeeding in federal courts at a very high rate. Thus far, federal courts have rendered final judgment in 54 habeas corpus challenges to California death penalty judgments. Relief in the form of a new guilt trial or a new penalty hearing was granted in 38 of the cases, or 70%.[7]

The Chief Justice told the Commission that if nothing is done, the backlogs in post conviction proceedings will continue to grow "until the system falls of its own weight." While some opponents of the death penalty might welcome such a prospect, the members of this Commission believe that doing nothing would be the worst possible course. The failures in the administration of California's death penalty law create cynicism and disrespect for the rule of law, increase the duration and costs of confining death row inmates, weaken any possible deterrent benefits of capital punishment,[8] increase the emotional trauma experienced by murder victims' families, and delay the resolution of meritorious capital appeals.

The Commission heard moving testimony from the parents and other relatives of murder victims who await the execution of the perpetrator. Some described the anger and frustration they experience over continuing delays in the administration of the death penalty. Several have waited twenty-five or thirty years for the execution of the perpetrator of a vicious murder of a son or a daughter. Many

others expressed opposition to the death penalty, arguing that they will receive no consolation from the execution of someone who murdered a family member. Both views received the respectful consideration of the Commission.

## Summary of Recommendations

This report is divided into three parts. In Part A, the Commission identifies flaws in California's death penalty system that render it dysfunctional, and remedies we unanimously recommend to repair it. Repairing the system would enable California to achieve the national average of a twelve year delay between pronouncement of sentence and the completion of all judicial review of the sentence. In Part B, the Commission offers the Legislature, the Governor, and the voters of California information regarding alternatives available to California's present death penalty law. The Commission makes no recommendation regarding these alternatives. In Part C, the Commission presents recommendations relating to miscellaneous aspects of the administration of California's death penalty law. We were not able to reach unanimous agreement upon all of these recommendations, and dissents are noted where applicable. Commissioner Jerry Brown, Attorney General of California, agrees in principle with some of the Commission's recommendations as set forth in his separate statement. Commissioner William Bratton, Chief of Police for the City of Los Angeles, abstains from the specific recommendations in this Report, and will issue a separate explanatory statement.

---

7. See Appendix II, *infra*. If a case is remanded for a new trial or a new penalty hearing, the defendant is removed from death row. The case is returned to the State courts to start over. At that point, there may be a disposition by a plea admitting to lesser criminal culpability or accepting a sentence of life without the possibility of parole (LWOP), a dismissal of charges or the death sentence, or a new guilt trial or penalty hearing before another jury. If it results in another death sentence, the process of direct appeal and habeas corpus petitions begins anew.

8. Whether the death penalty has a deterrent effect is a hotly contested issue. *Compare* Dr. Paul Rubin, Testimony Before the Subcommittee on the Constitution, Civil Rights, and Property Rights of the Committee on the Judiciary, U.S. Senate, Feb. 1, 2006, *with* Donohue & Wolfers, *Uses and Abuses of Empirical Evidence in the Death Penalty Debate*, 58 Stan. L. Rev. 791 (2005), and see Shepard, *Murders of Passion, Execution Delays, and the Deterrence of Capital Punishment*, 33 J. Legal Studies 283 (2004). If there is a deterrent value, however, it is certainly dissipated by long intervals between judgment of death and its execution.

Exhibit 1
Page 126

## PART A: WHY THE SYSTEM IS BROKEN, AND WHAT IT WILL TAKE TO FIX IT

In 1978, the people of the State of California expressed their support for the death penalty and, accordingly, the death penalty is the law of this State. However, it is the law in name only, and not in reality.

We currently have a dysfunctional system. The lapse of time from sentence of death to execution averages over two decades in California. Just to keep cases moving at this snail's pace, we spend large amounts of taxpayers' money each year. by conservative estimates, well over one hundred million dollars annually.

The families of murder victims are cruelly deluded into believing that justice will be delivered with finality during their lifetimes.

Those condemned to death in violation of law must wait years until the courts determine they are entitled to a new trial or penalty hearing. The strain placed by these cases on our justice system, in terms of the time and attention taken away from other business that the courts must conduct for our citizens, is heavy. To reduce the average lapse of time from sentence to execution by half, to the national average of 12 years, we will have to spend nearly twice what we are spending now. The time has come to address death penalty reform in a frank and honest way. To function effectively, the death penalty must be carried out with reasonable dispatch, but at the same time in a manner that assures fairness, accuracy and non-discrimination. The California Commission on the Fair

Administration of Justice unanimously recommends the following steps to achieve the goals of California's death penalty law:

**1** The Commission recommends that the California Legislature immediately address the unavailability of qualified, competent attorneys to accept appointments to handle direct appeals and habeas corpus proceedings in California death penalty cases:

(a) The Commission recommends that the backlog of cases awaiting appointment of counsel to handle direct appeals in death penalty cases be eliminated by expanding the Office of the State Public Defender to an authorized strength of 78 lawyers. This will require a 33% increase in the OSPD Budget, to be phased in over a three year period.[9]

(b) The Commission recommends that the backlog of cases awaiting appointment of counsel to handle habeas corpus proceedings in death penalty cases be eliminated by expanding the California Habeas Corpus Resource Center to an authorized strength of 150 lawyers. This will require a 500% increase in the CHCRC Budget, to be phased in over a five year period.[10]

(c) The Commission recommends that the staffing of the Offices of the Attorney General which handle death penalty appeals and habeas corpus proceedings be increased as needed to respond to the increased staff of the Office of the State Public Defender and the California Habeas Corpus Resource Center.

(d) The Commission recommends that funds be made available to the California Supreme Court to ensure that all appointments of private counsel to represent death row inmates on direct appeals and habeas corpus proceedings comply with ABA Guidelines 4.1(A), and are fully com-

---

9. Commissioner Hersek abstains from this recommendation.

10. Commissioner Laurence abstains from this recommendation.

Exhibit 1
Page 127

Death Penalty

pensated at rates that are commensurate with the provision of high quality legal representation and reflect the extraordinary responsibilities in death penalty representation. Flat fee contracts should not be utilized unless an hourly alternative is available, and any potential conflicts of interest between the lawyer maximizing his or her return and spending for necessary investigation, and expert assistance and other expenses are eliminated.

**2** The Commission recommends that funds be appropriated to fully reimburse counties for payments for defense services pursuant to California Penal Code Section 987.9.

**3** The Commission recommends that the California Legislature reexamine the current limitations on reimbursement to counties for the expenses of homicide trials contained in Government Code Sections 15200–15204.

**4** The Commission recommends that California counties provide adequate funding for the appointment and performance of trial counsel in death penalty cases in full compliance with ABA Guidelines 9.1(B)(1), 3.1(B), and 4.1(A)(2). Flat fee contracts that do not separately reimburse investigative and litigation expenses should not be permitted. Such contracts should not be utilized unless an hourly alternative exists. In all cases, attorneys must be fully compensated at rates that are commensurate with the provision of high quality legal representation and reflect the extraordinary responsibilities in death penalty representation.

## PART B: AVAILABLE ALTERNATIVES

The remedies which the Commission has proposed in Part A will require the new investment of at least $95 million dollars per year. We recognize

that we call for this investment in the face of a budget crisis of great magnitude for California. The Commission has examined two alternatives available to California to reduce the costs imposed by California's death penalty law. First, to reduce the number of death penalty cases in the system by narrowing the list of special circumstances that make one eligible for the death penalty, and second, to replace the death penalty with a maximum penalty of lifetime incarceration without the possibility of parole.

Using conservative rough projections, the Commission estimates the annual costs of the present system ($137 million per year), the present system after implementation of the reforms recommended in Part A ($232.7 million per year), a system in which significant narrowing of special circumstances has been implemented ($130 million per year), and a system which imposes a maximum penalty of lifetime incarceration instead of the death penalty ($11.5 million). There may be additional alternatives or variations which the Commission has not considered. While the Commission makes no recommendations regarding these alternatives, we believe they should be presented so the public debate over the future of the death penalty in California will be fully informed.

Whether to do nothing, to make the investments needed to fix the current system, to replace the current system with a narrower death penalty law, or to replace capital punishment with lifetime incarceration are ultimately choices that must be made by the California electorate, balancing the perceived advantages gained by each alternative against the potential costs and foreseeable consequences. We hope the balancing required can take place in a climate of civility and calm discourse. Public debate about the death penalty arouses deeply felt passions on both sides. The time has come for a rational consideration of all

117

Exhibit 1
Page 128

alternatives based upon objective information and realistic assessments. As U.S. Supreme Court Justice John Paul Stevens observed in his recent concurrence in the judgment upholding execution by lethal injection:

> *The time for a dispassionate, impartial comparison of the enormous costs that death penalty litigation imposes on society with the benefits that it produces has certainly arrived.*[11]

## PART C: ADMINISTRATIVE REFORMS

In the course of its work, the Commission examined many aspects of the administration of California's death penalty law, including the California Supreme Court backlog of undecided cases, racial and geographic disparities in employment of the death penalty, the unavailability of accurate information regarding the administration of the death penalty, the transparency of prosecutorial decision-making, and the implementation of the Governor's clemency power. We were not able to achieve unanimous agreement with respect to some of these issues, but a majority of the Commission concurs in all of the following recommendations:

**1** The Commission recommends that upon the implementation of the Recommendations in Part A of this Report, serious consideration be given to a proposed constitutional amendment to permit the California Supreme Court to transfer fully briefed pending death penalty appeals from the Supreme Court to the Courts of Appeal. This amendment should not be adopted without the provision of adequate staff and resources for the Courts of Appeal, and provisions for ongoing monitoring by the Supreme Court.[12]

**2** The Commission recommends that upon the implementation of the Recommendations in Part A of this Report, changes to California statutes, rules and policies be seriously considered to encourage more factual hearings and findings in state habeas proceedings in death penalty cases, including a proposal to require petitions be filed in the Superior Court, with right of appeal to the Courts of Appeal and discretionary review by the California Supreme Court.

**3** The Commission recommends the establishment of a California Death Penalty Review Panel, to be composed of judges, prosecutors, defense lawyers, law enforcement representatives and victim advocates appointed by the Governor and the Legislature. It should be the duty of this Panel to issue an annual report to the Legislature, the Governor and the courts, gauging the progress of the courts in reducing delays, analyzing the costs of and monitoring the implementation of the recommendations of this Commission, and examining ways of providing safeguards and making improvements in the way the California death penalty law functions.[13]

**4** The Commission recommends that reporting requirements be imposed to systematically collect and make public cumulative data regarding all decisions by prosecutors in murder cases whether or not to charge special circumstances and/or seek the death penalty, as well as the disposition of such cases by dismissal, plea or verdict in

---

11. *Baze v. Rees*, No. 07-5439, U.S. Supreme Court (Stevens, J. concurring) (April 16, 2008). Justice Stevens took particular note of California's death penalty stalemate:

Some argue that these costs are the consequence of judicial insistence on unnecessarily elaborate and lengthy appellate procedures. To the contrary, they result "in large part from the States' failure to apply constitutionally sufficient procedures at the time of initial [conviction or] sentencing." *Knight v. Florida*, 528 U.S. 990, 998 (1999) (Breyer, J., dissenting from denial of certiorari). They may also result from a general reluctance by States to put large numbers of defendants to death, even after a sentence of death is imposed.

Cf. Tempest, Death Row Often Means Long Life: California condemns many murderers, but few are ever executed, L.A. Times, Mar. 6, 2005, p. B1 (noting that California death row inmates account for about 20% of the Nation's death row population, but that the State accounts for only 1% of the Nation's executions). In any event, they most certainly are not the fault of judges who do nothing more than ensure compliance with constitutional guarantees prior to imposing the irrevocable punishment of death.

12. Commissioners Bellas, Cottingham, Hill, Hing, Moulds, Ridolfi and Totten oppose this recommendation.

13. Commissioners Hill, Mayorkas and Totten oppose this recommendation.

Exhibit 1
Page 129

Death Penalty

the trial courts. The Legislature should impose a requirement upon courts, prosecutors and defense counsel to collect and report any data other than privileged material designated by the California Death Penalty Review Panel which may be necessary: (1) to determine whether demographics affect decisions to implement the death penalty, and if so, how; (2) to determine what impact decisions to seek the death penalty have upon the costs of trials and post-conviction review; and (3) to track the progress of potential and pending death penalty cases to predict the future impact upon the courts and correctional needs. The information should be reported to the California Department of Justice and the California Death Penalty Review Panel. The information reported should be fully accessible to the public and to researchers. [14]

**5** The Commission recommends that each District Attorney Office in California formulate a written Office Policy describing when and how decisions to seek the death penalty are made, such as who participates in the decisions, and what criteria are applied. Such policies should also provide for input from the defense before the decision to seek the death penalty is made.

**6** The Commission recommends that Article V, Section 8(a) of the California constitution be amended to read as follows:

> Art. V, Section 8(a). Subject to application procedures provided by statute, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the Legislature each

reprieve, pardon, and commutation granted or ~~denied, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring.~~

**7** The Commission recommends that Penal Code Section 4813 be amended to make it discretionary rather than mandatory that requests for clemency by a twice convicted felon be referred to the Board of Prison Terms for a written recommendation.

# Part A: Why the System Is Broken, and What It Will Take to Fix It

## 1. CALIFORNIA'S DEATH PENALTY LAW

The current California death penalty law was adopted by popular initiative in 1978, after the United States Supreme Court declared that providing guidance to fact-finders to narrow the exercise of their sentencing discretion was required by the Eighth Amendment prohibition of cruel and unusual punishment, incorporated by the due process clause of the Fourteenth Amendment to the United States Constitution.[15]

California law requires three separate findings before a sentence of death may be imposed. First, the fact-finder (normally a jury, unless the right to jury trial has been waived) must determine that the defendant is guilty of first-degree murder.[16] Second, the fact-finder must determine that one or

**119**

---

14. Commissioners Boscovich, Cottingham, Dunbar, Hill, Mayorkas, Fox and Totten oppose this recommendation.

15. *Furman v. Georgia*, 408 U.S. 238 (1972); *Gregg v. Georgia*, 428 U.S. 153 (1976).

16. California Penal Code Section 189 defines first degree murder to include "all murder which is perpetrated by means of a destructive device or explosive, a weapon of mass destruction, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing," murder committed in the perpetration of any of thirteen enumerated felonies [arson, rape,

carjacking, robbery, burglary, mayhem, kidnapping, train wrecking, torture, sodomy, lewd acts against a child, unlawful oral copulation, and unlawful sexual penetration], and murder perpetrated "by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death."

Exhibit 1
Page 130

more of twenty-one separately enumerated "special circumstances" is true.[17] Both of these findings require proof beyond a reasonable doubt during the initial "guilt phase" of the trial. If the defendant is convicted of first-degree murder and a special circumstance is found true, a "penalty phase" trial follows, at which the fact-finder considers evidence of "any matter relevant to aggravation, mitigation, and sentence."[18] At the conclusion of the penalty phase, the jury is instructed as follows:

> *Determine which penalty is appropriate and justified by considering all the evidence and the totality of any aggravating and mitigating circumstances. Even without mitigating circumstances, you may decide that the aggravating circumstances, are not substantial enough to warrant death. To return a judgment of death, each of you must be persuaded that the aggravating circumstances both outweigh the mitigating circumstances and are also so substantial in comparison to the mitigating circumstances that a sentence of death is appropriate and justified.*[19]

California's definition of special circumstances gives broad discretion to prosecutors to decide whether a homicide should be prosecuted as a death penalty case. A narrower death penalty law was initially enacted by the California Legislature in 1977; the enactment of the Briggs Initiative one year later more than doubled the number of special circumstances itemized under Penal Code Section 190.2, by adding five more "victim" circumstances, four more "felony murder" circumstances, and two more "motive" circumstances. In addition, the initiative removed the requirements in the pre-Briggs

statute that the state had to prove that a murderer possessed the intent to kill before he or she could be eligible for the death penalty, and that an accomplice was personally present and physically aided the death-causing acts before he could be eligible for the death penalty. Under the death penalty statute now in effect, 87% of California's first degree murders are "death eligible," and could be prosecuted as death cases.[20]

In 1978, under the pre-Briggs statute enacted by the Legislature, only seven death sentences were handed down in California. The number tripled to 20 in 1979, then climbed to an average of 32 new death judgments per year during the twenty-one year period from 1980 to 2000. Since 2000, the number of new death judgments has declined to an average of 20 per year. The chart to the right shows the growth of California's death row from 1978 through 2007.

The death row population does not precisely correspond with the cumulative number of new death judgments rendered each year. This is because death sentences may be set aside by the courts, persons may die in prison without being executed, be re-sentenced to death, removed pending retrial, re-sentenced to a penalty less than death, or freed.

The Commission's researchers identified 822 sentences of death imposed in California from 1977 through 2007, upon 813 different defendants. (Nine defendants had sentences of death in more than one county). The difference between the 813 individuals sentenced to death and the 2007 population of California's death row (670) is attributable to deaths by natural causes (38),

---

17. California Penal Code Section 190.2 (a) defines twenty-two special circumstances. The special circumstance enumerated in Section 190.2(a)(14) (the murder was "especially heinous, atrocious or cruel") was declared unconstitutional by the California Supreme Court in *People v. Superior Court* (Engert), 31 Cal.3d 797 (1982).

18. California Penal Code Section 190.3.

19. CAL. CRIM. Jury Instruction No. 766 (2008).

20. Steven F. Shatz and Nina Rivkind, *The California Death Penalty Scheme: Requiem for Furman?*, 72 N.Y.U. L. Rev. 1283, 1331 (December, 1997).

21. Many of the reversals occurred from 1979 through 1986, when the California Supreme Court reversed 59 of 64 judgments of death it reviewed. Since the removal of three Justices in the election of 1986 and their subsequent replacement, the affirmance rate of the California Supreme Court for death judgments has exceeded 90%. *See* Uelmen, *Review of Death Penalty Judgments By the Supreme Courts of California: A Tale of Two Courts*, 23 Loyola (L.A.) L. Rev. 237 (1989). In recent years, 32 California death judgments have been set aside by federal courts in habeas corpus proceedings. Of

Exhibit 1
Page 131

Death Penalty

121

suicides (14), executions (13), and death judgments which have been reversed by the courts and not reinstated on remand (98).[21]

The number of persons on California's death row is currently driven by factors over which we have no direct control. If the current average of 20 new death judgments per year is maintained, full implementation of the Commission's recommendations could begin to reduce the size. But the backlog is now so severe that California would have to execute five prisoners per month for the next twelve years just to carry out the sentences of those currently on death row.

## 2. EXCESSIVE DELAY IN CALIFORNIA

A defendant sentenced to death in California has a right to three stages of review of the conviction and sentence: an automatic appeal directly to the California Supreme Court; a petition for a writ of habeas corpus filed in the California Supreme Court; and a federal habeas corpus petition filed in the Federal District Court.[22]

At each of these three stages, the defendant is entitled to the appointment of counsel if he or she is indigent. All of the 670 inmates on California's death row qualify as indigents, although counsel has been retained in one case (Scott Peterson). Review of the California Supreme Court's decision of the direct appeal and the state habeas corpus petition can be sought in the United States Supreme Court by petition for a writ of certiorari.

CALIFORNIA DEATH JUDGMENTS AND DEATH ROW POPULATION 1978–2007[23]

| Year | New Death Judgments | Death Row Population |
|------|---------------------|----------------------|
| 1978 | 7 | 7 |
| 1979 | 20 | 25 |
| 1980 | 23 | 42 |
| 1981 | 39 | 80 |
| 1982 | 39 | 113 |
| 1983 | 35 | 143 |
| 1984 | 27 | 161 |
| 1985 | 16 | 159 |
| 1986 | 21 | 179 |
| 1987 | 25 | 203 |
| 1988 | 34 | 223 |
| 1989 | 33 | 247 |
| 1990 | 33 | 279 |
| 1991 | 26 | 305 |
| 1992 | 40 | 345 |
| 1993 | 34 | 374 |
| 1994 | 21 | 391 |
| 1995 | 38 | 426 |
| 1996 | 40 | 461 |
| 1997 | 40 | 493 |
| 1998 | 32 | 518 |
| 1999 | 42 | 558 |
| 2000 | 33 | 589 |
| 2001 | 25 | 610 |
| 2002 | 17 | 618 |
| 2003 | 22 | 639 |
| 2004 | 12 | 642 |
| 2005 | 22 | 654 |
| 2006 | 22 | 662 |
| 2007 | 20 | 670 |

---

the federal habeas petitions of California death row inmates decided by federal courts since 1978, some relief has been granted in 70% of the cases.

22. Habeas corpus petitions provide a vital means of determining whether constitutional standards have been met and a defendant received effective assistance of counsel at the guilt and penalty phases of the trial. An independent investigation is required, and it often uncovers mitigating evidence that was available but was not presented at trial. The leading ground for reversal of death verdicts in California in both state and federal habeas proceedings is a denial of the constitutional right to effective assistance of counsel.

23. California Dept. of Justice, Criminal Justice Statistics Center, *Homicide in California*, 2005, Table 35. 2006 and 2007 statistics courtesy of California Appellate Project.

Exhibit 1
Page 132

A Federal District Court ruling on a federal habeas corpus petition can be appealed to the United States Court of Appeals for the Ninth Circuit, and review of that Court's decision can be sought in the United States Supreme Court. A defendant can also petition the Governor for clemency prior to his or her execution.

The United States Department of Justice has tracked the elapsed time from sentence to execution for all defendants who have been executed in the United States since 1978. The average lapse of time has grown steadily throughout the United States, from an average of 4.25 years during the period of 1977 to 1983, to an average of 12.25 years in 2005.[24] The average lapse of time between pronouncement of a judgment of death and execution in California is 17.2 years, but using an "average" number may be misleading since only thirteen have been executed.[25]

While it is widely assumed that delays benefit those confined on death row by prolonging their lives, it should be noted that California inmates with meritorious claims are also denied prompt disposition of those claims. In cases where the judgment of guilt and/or the sentence were vacated between 1987 and 2005, the average delay was 11 years. California death row inmates whose convictions or sentences were vacated by a federal court waited an average of 16.75 years.[26]

A recent study by Senior Judge Arthur Alarcon of the U.S. Court of Appeals for the Ninth Circuit identified the critical periods of delay that contribute to California exceeding the national average.[27]

First is the delay in appointing counsel to handle the direct appeal. There are currently 79 defendants on death row who have not yet had counsel appointed to handle their direct appeal to the California Supreme Court. There is now a wait of 3 to 5 years before appellate counsel is appointed. Delay in appointing appellate counsel also delays certification of the accuracy of the record, since the accuracy of the record cannot be certified until appellate counsel is appointed.[28]

Second is the delay in scheduling the case for a hearing before the California Supreme Court after all of the briefs have been submitted. The California Supreme Court now has a backlog of 80 fully briefed automatic appeals in death cases awaiting argument. The Court ordinarily hears 20–25 of these cases each year, so the wait for an oral argument now averages 2.25 years.

Third is the delay in appointing counsel for the state habeas corpus petition. There are now 291 inmates on California's death row who do not have counsel appointed to handle their habeas corpus petitions. Delays of 8–10 years after sentence in appointing habeas counsel mean that investigation and preparation of habeas petitions is usually delayed until after the direct appeal is decided. Prompt appointment of habeas counsel would permit the habeas petition to be prepared while the appellate briefing is being prepared, so it can be promptly filed shortly after the direct appeal is decided, if the death sentence is affirmed.

Fourth is the delay in deciding state habeas corpus petitions. The California Supreme Court currently has 100 fully briefed habeas corpus petitions

---

24. U.S. Bureau of Justice Statistics, 2006:11, table 11.

25. Two of the California executions have been of "volunteers," who withdrew their appeals and habeas petitions and requested execution.

26. Alarcon, *Remedies for California's Death Row Deadlock, supra* n 2.

27. *Id.*

28. California Penal Code Section 190.8(g) requires the trial court to certify the record for *accuracy* no later than 120 days after the record has been delivered to appellate counsel. Certification of the record for *completeness* ordinarily takes place within 90 days of the imposition of the death sentence.

Exhibit 1
Page 133

Death Penalty

awaiting decision. While these cases are rarely decided by published opinions, there is now an average delay of 22 months between the filing of the petition and the decision of the California Supreme Court.

Fifth is the delay in deciding federal habeas corpus petitions. The average delay from the filing of a habeas petition to the grant or denial by a federal district court is 6.2 years in California cases.[29] Another 2.2 years are consumed by appeals to the Ninth Circuit. Much of this delay is attributable to the absence of a published opinion and/or an

evidentiary hearing in the state courts. Often, the federal courts cannot ascertain why state relief was denied. While the Antiterrorism and Effective Death Penalty Act requires federal deference to state factual findings and legal conclusions, the typical denial of a habeas petition in a death case by the California Supreme Court contains neither. (AEDPA)[30]

The following chart summarizes the lapse of time at each of the various stages as the system currently operates in California. The total lapsed time from judgment of death to execution is 20–25 years.



UNDER **CURRENT CONDITIONS**, TOTAL LAPSED TIME 20–25 YEARS

29. Alarcon, *supra* n.2 at, 707–708.

30. In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court held that the Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a deferential standard of review that precludes a federal habeas court from granting relief based simply on its independent assessment of federal law.

Under AEDPA, federal habeas courts must defer to a state court's rejection of a petitioner's constitutional claim unless the state court's decision is either contrary to or involves an unreasonable application of established federal law.

Exhibit 1
Page 134

The Commission recommends a series of related reforms that have the potential to reduce the

California delay to the national average of 11–14 years. The following chart summarizes the potential effects of these proposed reforms:



WITH **RECOMMENDED REFORMS**, TOTAL LAPSED TIME ~11-14 YEARS

---

31. Alarcon, *supra* n. 2 at p. 748.

32. One might fairly ask, why can't California be as efficient as Florida, Texas or Virginia? The next two largest death rows after California are Florida with 397 and Texas with 393. Florida has carried out 64 executions since 1978, Texas has executed 405, and Virginia has executed 94. Virginia is the most expeditious in disposing of death penalty direct appeals, averaging less than one year compared to the national average of four years. No one has been on Virginia's death row longer than ten years. In Texas, the average delay for the direct appeal is three years. The average time on death row before execution in Texas is 10.26 years. The average in Florida is 14 years. Virginia now has a backlog of only 23 cases. It should also be noted, however, that Florida, Virginia and Texas have high rates of exonerations of innocent persons, including death row inmates. Florida has had 22 death row exonerations, more than

any other state. Since 1989, there have been 33 exonerations in Texas by DNA. Eight death row inmates have been exonerated. Virginia has recorded eight exonerations, all but one by DNA. Two of the exonerees were sentenced to death. It is also worth noting that none of these states have experienced the serious backlog that has affected the California Supreme Court. The Virginia Supreme Court receives an average of three new death judgments a year. In Texas, death penalty appeals are not heard by the State Supreme Court, but by a special Court of Criminal Appeals that does not have the responsibility of determining state law in other than criminal cases. The Florida Supreme Court reviews all death sentences for proportionality, and has the highest reversal rate in the nation for death penalty cases.

33. See Appendix II, *infra*.

Exhibit 1
Page 135

Death Penalty

125

Delays grow worse every year. As the population of California's death row has grown, the length of the delay between sentence and disposition of appellate reviews has grown as well. Thirty persons have been on California's death row for more than 25 years; 119 have been on death row for more than 20 years; and 240 have been on death row for more than 15 years.[31]

The delay between sentence and execution in California is the longest of any of the death penalty states.[32]

## 3. INEFFECTIVE ASSISTANCE OF COUNSEL

Delay in post-conviction review is not the only dysfunction in California's death penalty law. Federal courts are granting relief in 70% of the California death judgments they review, most often because of ineffective assistance of counsel at the trial level.[33] Thus, the appointment and performance of qualified trial counsel, and the resources available to counsel to adequately investigate and prepare the case, are subjects of serious concern in the administration of California's death penalty law.

For counties without a public defender, the appointment of trial counsel for death penalty cases is left to the discretion of the trial court, subject to California Rules of Court, Rule 4.117, which defines the minimum qualifications for appointed trial counsel in capital cases. In most cases, two

attorneys are appointed, one to act as lead counsel, and one to serve as associate counsel.[34] Some counties appoint a single lawyer.[35] The American Bar Association Guidelines recommend that the defense team for capital cases should consist of no fewer than two lawyers, an investigator, and a mitigation specialist from the outset of representation.[36] Typically, associate counsel directs an intensive investigation of the defendant's social history and background, to develop potential evidence of mitigation for the penalty phase.

In Los Angeles County, approximately half of the ongoing death penalty cases are handled by the Public Defender, and half are handled by the Alternate Public Defender or appointed counsel. Under Rule 4.117(g), public defender offices are supposed to assign deputies who otherwise meet the requisite qualifications for direct appointment, but no certification of those qualifications is required. Many county public defender offices assign two counsel to every death eligible case when the appointment is initially accepted. Where private counsel is appointed, however, only one lawyer is ordinarily appointed until the decision is made to file the case as a death case, which will not occur until after the preliminary hearing, as much as one year later. This may delay the mitigation investigation to the prejudice of the defendant. The results of mitigation investigations are frequently employed to persuade the district attorney not to seek the death penalty. If the investigation is delayed until second counsel is appointed, the decision to seek the death penalty has already been made.

---

34. Lead counsel must have ten years of criminal litigation experience, including at least two murder cases tried to conclusion. Associate counsel must have three years of criminal litigation experience, including three serious felony cases tried to conclusion. The court may appoint an attorney who does not meet all required qualifications if it makes a finding that "the attorney demonstrates the ability to provide competent representation to the defendant." California Rule of Court Rule 4.117(i) requires the filing of an order of appointment which certifies that appointed counsel meets the necessary qualifications. A recent survey found that 42 of California's 58 County Superior Courts had no such orders on file. Testimony of Prof. Elisabeth Semel, Director of Death Penalty Clinic, University of California Law School at Berkeley, Feb. 20, 2008.

35. Testimony of Prof. Semel, February 20, 2008, at pp. 14–15.

36. American Bar Association, *Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guidelines for the *Appointment and Performance of Defense Counsel in Death Penalty Cases*, Guideline 4.1 (A)(1) (Revised Edition, Feb. 2003):

4.1 A. The Legal Representation plan should provide for the assembly of a defense team that will provide high quality legal representation.

1. The defense team should consist of no fewer that two attorneys qualified in accordance with Guideline 5.1, an investigator, and a mitigation specialist.

2. The defense team should contain at least one member qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments.

Exhibit 1
Page 136

The payment of appointed counsel varies from one county to another. At least four counties use flat-fee contracts negotiated on a case-by-case basis.[37] The flat fee typically includes investigative and paralegal expenses, creating a conflict of interest for the lawyer when these services will reduce his or her return on the contract. The bids for flat-fee contracts must be submitted before the lawyer has fully investigated the case, which creates a risk of underbidding. The Committee learned that there is a declining pool of competent experienced criminal defense lawyers who are willing to accept employment to handle death penalty trials, because they are not supplied sufficient funding to provide competent representation.[38]

## 4. THE RISK OF WRONGFUL EXECUTIONS, WRONGFUL CONVICTIONS AND WRONGFUL DEATH SENTENCES

The Commission has learned of no credible evidence that the State of California has ever executed an innocent person. Nonetheless, the Commission cannot conclude with confidence that the administration of the death penalty in California eliminates the risk that innocent persons might be convicted and sentenced to death. All of the factors previously identified by the Commission as enhancing the risk of wrongful convictions are equally present in capital and non-capital trials. Nationally, there were 205 exonerations of defendants convicted of murder from 1989 through 2003. Seventy-four of them had been sentenced to death. Fourteen of these 205 murder cases took place in California.[39]

Since 1979, six defendants sentenced to death, whose convictions were reversed and remanded, were subsequently acquitted or had their murder charges dismissed for lack of evidence.[40] While DNA testing was not available and these defendants were not officially exonerated, the reversal of their convictions freed them. A subsequent acquittal or dismissal of charges renders them legally not guilty, although there was no determination of "factual innocence" pursuant to California Penal Code Section 851.8 in these cases.

Nationally, erroneous eye-witness identifications have been identified as a factor in 80% of exonerations, and false confessions were a factor in 15%.[41]

California State Public Defender Michael Hersek reported to the Commission that of the 117 death penalty appeals currently pending in his office, seventeen featured testimony by in-custody informants, and another six included testimony by informants who were in constructive custody.[42] The Commission's recommendations to reduce the risks of wrongful convictions resulting from erroneous eye-witness identifications, false confessions, and testimony by in-custody informants, although enacted by the Legislature, were all vetoed by Governor Arnold Schwarzenegger. These factors remain as risks in all criminal cases in California, including death penalty cases.

---

37. Testimony of Prof. Elisabeth Semel, Feb. 20, 2008, at pp. 19–23.

38. Testimony of Clifford Gardner, Feb. 20, 2008.

39. Gross, Jacoby, Matheson, Montgomery & Patil, *Exonerations in the United States, 1989 Through 2003*, 95 J. of Crim. Law & Criminology 523 (2005).

40. In 1979, the California Supreme Court reversed the 1976 conviction and death sentence of Ernest Graham for the murder of a state correctional officer because prosecutors improperly excluded prospective African-American jurors. The defendants were convicted of violating Penal Code section 4500, aggravated assault by a life prisoner. At the time the offense was committed, section 4500 prescribed the death penalty as the automatic, mandatory punishment whenever the assault was directed against a non-prisoner and

resulted in the victim's death within a year and a day. *People v. Allen*, 23 Cal.3d 286 (1979). After his fourth trial on remand, Graham was acquitted by the jury. In 1984, the California Supreme Court reversed the 1980 conviction and death sentence of Jerry Bigelow for the murder of a kidnap victim. *People v. Bigelow*, 37 Cal.3d 731 (1984). In a 1988 retrial, Bigelow was acquitted. Morain, *Inmate Walks Away From Death Row After His Acquittal*, Los Angeles Times, July 6, 1989. In 1985, the California Supreme Court reversed the 1979 conviction and death sentence of Patrick Croy for the murder of a police officer in Placer County, although the Court upheld a conspiracy conviction. In a 1990 retrial, Croy was acquitted of the murder, but placed on probation for the conspiracy charge. After Croy was returned to prison in 1997 for a probation violation, the conspiracy charge was vacated in federal court, and Croy was released in 2005. In 1996, the California Supreme Court vacated the

Exhibit 1
Page 137

Death Penalty

Identifying "wrongful" death sentences presents greater complexity, since 87% of those charged with murder in California are eligible for the death penalty, but fewer than 10% of these defendants are sentenced to death.[43] By definition, these death sentences would not be "wrongful" in the same sense that convictions would be "wrongful," if the defendant were properly convicted of the underlying murder. Yet if the defendant were inappropriately singled out for a death sentence, or if his lack of economic resources increased the probability of his death sentence, or if his lawyer failed to present mitigating evidence that might have convinced a jury to opt for a life sentence, or if the prosecutor suppressed exculpatory evidence, we would certainly conclude that his death sentence was "wrongful." An illustrative example can be found in the recent ruling of the California Supreme Court in the case of *In Re Adam Miranda*, No. SO58528 & SO60781 (May 5, 2008). The defendant was convicted of a robbery-murder in Los Angeles in 1982. His conviction was affirmed in 1987, and three prior petitions for habeas corpus were denied. Yet, after 26 years on death row, the unanimous Court vacated his death sentence and remanded for a possible new penalty trial. The only evidence in aggravation offered at Mr. Miranda's penalty trial was the testimony of Joe Saucedo that the defendant had also murdered another individual two weeks before the capital crime, after an argument over drugs. Saucedo had himself been charged with that murder, but after he testified against Miranda, the charge was reduced and he was granted probation. In 1996, it was disclosed

to Miranda for the first time that the prosecutor had a handwritten letter from a fellow prisoner of Saucedo's, recounting in detail how Saucedo described committing the murder himself. The Court concluded this was a clear violation of the prosecutor's obligations to disclose exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83 (1963).[44] Miranda is not "innocent," nor was he "wrongfully convicted," but we would certainly conclude his death sentence was "wrongful."

A national study of all death sentences imposed from 1973 to 1995 revealed that 82% (247 out of 301) of the capital judgments that were reversed and returned for a retrial or a new penalty hearing were replaced with a sentence *less* than death, or *no* sentence at all. In the latter regard, 7% (22/301) of the reversals for serious error resulted in a determination on retrial that the defendant was *not guilty* of the capital offense.[45]

## 5. RECOMMENDATIONS FOR THE TRIAL OF DEATH PENALTY CASES

The decision to seek the death penalty in a pending murder prosecution triggers a number of consequences that affect the duration, complexity and cost of the trial proceedings. Death penalty trials clearly take longer and cost more than murder trials in which the death penalty is not sought.

Unfortunately, we have only a rough estimate of how many death penalty trials are taking place each year in California. The trials that result in a

127

---

1981 conviction and death sentence of Troy Lee Jones for murder. The Fresno County District Attorney dismissed all charges against Jones in November, 1996. In 1988, the California Supreme Court vacated the 1983 death sentence of Oscar Lee Morris for murder, for prosecutorial misconduct in not revealing leniency granted to a witness in exchange for his testimony. *People v. Morris*, 46 Cal.3d 1 (1988). Ten years later, his conviction was vacated, when the witness admitted he had fabricated the entire case against Morris. Morris was released in 2000, when the Los Angeles County District Attorney declined to retry him. In 1989, the California Supreme Court overturned the 1981 death sentence of Lee Perry Farmer, Jr. for murder. *People v. Farmer*, 47 Cal.3d 888 (1989). A 1991 penalty phase retrial resulted in a life sentence. In 1997, the Ninth Circuit Court of Appeals overturned his conviction because of ineffective assistance of counsel. At a 1999 retrial, Farmer was acquitted of the murder.

41. *Supra* n. 39 at p. 544.

42. California Commission on the Fair Administration of Justice, *Report and Recommendations Regarding Informant Testimony*, p. 2 (2007).

43. Steven F. Shatz and Nina Rivkind, *The California Death Penalty Scheme: Requiem for Furman?*, 72 N.Y.U. L. Rev. 1283, 1331 (December, 1997).

44. See California Commission on the Fair Administration of Justice, Report and Recommendations on Compliance with the Prosecutorial Duty to Disclose Exculpatory Evidence. (March 6, 2008).

45. Liebman et al., *A Broken System: Error Rates in Capital Cases, 1973 –1995* (Columbia Law School, 2000).

Exhibit 1
Page 138

judgment of death and put an additional inmate on death row are a fraction of the cases that are actually tried, and an even smaller fraction of the cases that are death-eligible. During a five-year period in the early 1980's, the State Public Defender was systematically collecting data about ongoing death cases. At that time, for every 100 cases that were charged as capital cases, 40 actually went to trial on the guilt phase, 20 went to penalty phase, and 10 resulted in a judgment of death.[46] The rate of juries returning verdicts of death may have declined since then, but the Commission could not ascertain this rate because no one is keeping track.[47] If the rate is still the same, the twenty annual death judgments we currently see are the product of 200 cases per year in which special circumstances are charged, of which 80 cases proceed to trial, and 40 cases proceed to penalty phase.

When California's death penalty law was originally enacted, the legislature recognized that the trial of death penalty cases would impose serious financial burdens upon counties. Section 987.9 was added to the California Penal Code, to provide that defense counsel in capital cases "may request the court for funds for the specific payment of investigators, experts, and others for the preparation or presentation of the defense," and further provides "the Controller may reimburse extraordinary costs in unusual cases if the County provides sufficient documentation of the need for those expenditures." In fact, no funds have been appropriated for such reimbursement for more than fifteen years, leaving

counties to foot the bill. As a result, the willingness of courts to grant Section 987.9 requests varies significantly from county to county, with greater reluctance to grant requests in cash-strapped counties. Access to investigators and experts necessary for the defense of death penalty cases should not depend upon the vagaries of county budgets. The State of California should meet the obligation undertaken as part of the original death penalty law, to reimburse counties for funds awarded pursuant to California Penal Code Section 987.9. The Commission recommends that counties be fully reimbursed for payments for defense services pursuant to California Penal Code Section 987.9. The estimated annual cost of Section 987.9 payments for death penalty cases in Los Angeles County in 2007 was $4.5 million.[48] Los Angeles County accounts for approximately one-third of California's death sentences. Thus, this recommendation will require an annual shift of roughly $13.5 million of the current cost of death penalty trials in California from the counties to the State.

Another device for the State to reimburse smaller counties for the costs incurred in connection with homicide trials is provided by California Government Code Section 15200–15204. This provides that costs incurred by the district attorney, sheriff and public defender or court-appointed attorneys, except normal salaries and expenses, can be reimbursed by the State "if such costs will seriously impair the finances of the county." There are two limitations upon these provisions that should be revisited by the Legislature, however. Reimbursement is limited to costs "in excess of the amount of money derived by the county from a tax

---

46. California Appellate Project, RECAP RE:CAPITAL LITIGATION, Issue 10, June 17, 1985. Collecting all statewide special circumstance filings from August 11, 1977 through December 31, 1984, CAP reported 2,219 filings, 960 guilty trials, 394 penalty trials, and 190 death verdicts, with 372 cases still pending.

47. The Los Angeles County Public Defender's Office reports that they normally have 60 cases at a time in their office that are death-eligible, but only 10–12 of those cases will typically go to trial as death cases. Testimony of Greg Fisher, Deputy Public Defender, Special Circumstance Case Coordinator, Los Angeles County Public Defender's Office, Feb. 20, 2008.

48. Email to Commission from Robert E. Kalunian, Chief Deputy Public Defender, Los Angeles County, May 14, 2008.

Exhibit 1
Page 139

of 0.0125 of 1 percent of the full value of property assessed for purposes of taxation within the county." Section 15202(b). This formula will subject both the State and smaller Counties to unpredictable fluctuations as property assessments rise and fall in today's housing market. Such factors have no relationship to the need for reimbursement of unpredictable costs of homicide trials.

Second, Sections 15202(b) and 15202.1(a) require advance approval of the Attorney General to reimburse costs of travel in excess of 1,000 miles. Insofar as it applies to travel by defense counsel in homicide cases, this is an inappropriate limitation. The Attorney General will be opposing counsel in any appeals, creating a conflict of interest. The Commission recommends that the California Legislature reexamine the limitations on reimbursement to counties for the expenses of homicide trials contained in Government Code Sections 15200–15204.

In an effort to identify the costs of death penalty trials, the ACLU of Northern California, through a series of Public Records Act requests, obtained all documents pertaining to reimbursements to smaller counties for homicide trials for a ten year period, 1996 through 2005. The records encompass claims submitted by 20 counties in 21 identifiable homicide trials and 317 unidentified trials and hearings. The state paid $45.8 million to reimburse counties during this ten-year period. The request yielded relatively comprehensive accounting for ten trials each involving a single defendant. Eight of these trials were death penalty

cases, and two were not. The three most expensive cases were the Charles Ng trial ($10.9 million to Calaveras County),[49] the Donald Bowcutt case ($5 million to Siskiyou County),[50] and the Scott Peterson case ($3.2 million to Stanislaus County).[51] Comparing the least expensive death penalty trial to the most expensive non-death trial yielded a difference of $1.1 million more for the death case, but it is impossible to project this difference to all death penalty trials. As the author of this study concedes, "Because there is no consistent or comprehensive tracking of trial level costs across the state and so many costs are hidden, it is impossible to say for certain how much more counties are spending in pursuit of execution."[52] It can certainly be said that death penalty trials take longer and cost considerably more than non-death murder trials. The records reviewed also confirm that it is feasible to track the trial level costs in death penalty cases, if a uniform system of reporting data is imposed.

During the penalty phase, it is the obligation of defense counsel to present all available mitigating evidence which might persuade the jury to reject a penalty of death. The leading cause of reversal of death judgments in California is the failure of counsel to adequately investigate potential mitigating evidence. In subsequent habeas corpus proceedings, in which funds are made available for a complete investigation of the defendant's background, evidence is uncovered which, if presented at the penalty phase, might have persuaded a jury to reject a death sentence. In *Wiggins v. Smith*, 539 U. S. 510 (2003), the U. S. Supreme Court held that trial counsel's failure to investigate the defen-

---

49. The Ng trial costs included $1.24 million for Court expenses, $2.2 million for Prosecution expenses, and $6.42 million for Defense expenses.

50. The Bowcutt reimbursement was an advance payment of $5 million for anticipated costs. Actual costs were not documented.

51. The Peterson reimbursement included $1.4 million for prosecution expenses and $1.4 million to the City of Modesto for defense expenses. Defense expenses were not reimbursed, since Peterson had retained counsel.

52. Natasha Minsker, *The Hidden Death Tax: The Secret Costs of Seeking Execution in California*, A Report by the ACLU of Northern California, p. 32 (2008).

Exhibit 1
Page 140

dant's background and to present evidence of the defendant's unfortunate life history at the penalty phase of his trial was a violation of defendant's Sixth Amendment right to counsel, because his failure had fallen below the standard of reasonableness under prevailing professional norms. In defining prevailing professional norms, the Court relied upon the guidelines for capital defense work articulated by the American Bar Association (ABA Guidelines), "standards to which we long have referred as 'guides to determining what is reasonable.'" *Id.* at 524. The Court cited the "well-defined norm" of Section 11.4.1 (C), which provides that investigations into mitigating evidence "should comprise efforts to discover all *reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor."[53]

In a number of cases, the California Supreme Court has concluded that defense counsel's investigation of mitigating circumstances was inadequate, requiring reversal of the jury's penalty determination in a death case.[54] Most recently, in *In Re Lucas*, 33 Cal. 4th 682 (2004), the California Supreme Court followed the *Wiggins* case in finding defense counsel's representation at the penalty phase constitutionally defective, because its tactical decisions were not informed by an adequate investigation of available mitigating evidence. The Court concluded:

> *Lead counsel's failure to investigate petitioner's early social history was not consistent with established norms prevailing in California at the time of trial, norms that directed counsel in death penalty cases*

> *to conduct a reasonably thorough independent investigation of the defendant's social history – as agreed by respondent's own expert and as reflected in the American Bar Association standards relied upon by the court in the Wiggins case.*[55]

The *Wiggins* and *Lucas* rulings clearly recognize the ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases as establishing norms for competent representation in death penalty cases. The Commission has learned that in a number of important instances, the provisions for appointment of trial counsel in California death penalty cases do not meet the standards of the ABA Guidelines:

> *1. The ABA Guidelines provide that flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases. Guideline 9.1 (B)(1).*[56] *In a number of California counties, flat fee contracts have become the prevailing method of appointment of counsel in death cases.*

> *2. The ABA Guidelines recommend that the selection of lawyers for particular cases should be by a responsible agency that is "independent of the judiciary." Guideline 3.1 (B).*[57] *In many California counties, appointments of trial counsel in death penalty cases are made by the courts.*

> *3. The ABA Guidelines recommend that the defense team consist of "no fewer than two attorneys..., an investigator, and a mitigation specialist." Guideline 4.1 (A)(2).*[58] *In some California cases, a single lawyer is appointed, or the appointment of a second lawyer is delayed.*

---

53. In the February, 2003 Revised Edition of the Guidelines, portions of Guideline 11.4.1(C) were moved to Guidelines 10.5 and 10.7. Guideline 10.7 (A) now provides: "Counsel at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." The commentary to the Guideline lists all of the elements of an appropriate investigation.

54. *In Re Marquez*, 1 Cal. 4th 584 (1992); *In Re Jackson*, 3 Cal. 4th 578 (1992).

55. 33 Cal. 4th at 725 (emphasis supplied).

56. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 9.1.B:

Counsel in death penalty cases should be fully compensated at a rate that is commensurate with the provision of high quality legal representation and reflects the extraordinary responsibilities in death penalty representation.

1. Flat fees, caps on compensation, and lump-sum contracts are improper in death penalty cases.

2. Attorneys employed by defender organizations should be compensated according to a salary scale that is commensurate with the salary scale of the prosecutor's office in that jurisdiction.

3. Appointed counsel should be fully compensated for actual time and service performed at an hourly rate commensurate with the prevailing rates for similar services performed by retained counsel in the jurisdiction, with no distinction

Exhibit 1
Page 141

The Commission recommends that California counties provide adequate funding for the appointment and performance of trial counsel in death penalty cases in full compliance with ABA Guidelines 10.7 (A), 9.1(B)(1), 3.1(B), and 4.1(A)(2). Flat fee contracts that do not separately reimburse investigative and litigation expenses should not be permitted. Such contracts should not be utilized unless an hourly alternative exists. In all cases, attorneys must be fully compensated at rates that are commensurate with the provision of high quality legal representation and reflect the extraordinary responsibilities in death penalty representation.

The cost of meeting the standards of the Guidelines is very difficult to estimate, but it will be substantial. The Guidelines should be met in every potential capital case from the outset. Thus, two qualified counsel as well as an investigator and mitigation specialist should be appointed for as many as 200 cases each year, even though only 20 of them may end in a judgment of death. The breadth of our death penalty law requires a much heavier investment at the trial level than for the appeals or habeas proceedings, since in nine out of ten cases, a case in which the investment has been made will not result in a death judgment. Adequate representation by a full complement of two attorneys, an investigator and a mitigation specialist at the outset of the case may save money in the long run, however, if it results in a decision by the prosecutor not to seek the death penalty.

## 6. RECOMMENDATIONS FOR THE DIRECT APPEAL OF DEATH PENALTY CASES

The California Supreme Court has exclusive jurisdiction to consider appeals from a judgment of death in California. Since 1935, appeal has been automatic in all death cases.[59] After the filing of the trial record in the California Supreme Court,[60] indigent death row inmates must await the appointment of counsel to handle the appeal. Currently, a delay of three to five years elapses before counsel is appointed. Once counsel is appointed, he or she must read the record which averages in excess of 9,000 pages of Reporter's and Clerk's transcripts, research the law, and then file an opening brief with the Court. The average delay between appointment of counsel and the filing of the opening brief is 2.74 years. The prosecution, represented by the California Attorney General, then files a responsive brief, ordinarily within six months. The defendant is then permitted to file a reply brief, again ordinarily within six months. The case then awaits the scheduling of an oral argument before the Supreme Court. Currently, the Court has 80 fully-briefed death appeals awaiting oral argument. Since the Court ordinarily hears only 20–25 of these cases per year, the wait for oral argument will be 2–3 years. A decision is announced within 90 days after the case is argued and submitted. Thus, the average delay between judgment of death and final disposition of the automatic appeal is currently between 11.7 and 13.7 years. The duration of this delay has steadily increased. For condemned prisoners convicted

---

between rates for services performed in or out of court. Periodic billing and payment should be available.

57. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 3.1 (B) provides:

The responsible agency should be independent of the judiciary and it, not the judiciary or elected officials, should select lawyers for specific cases.

Under Guideline 3.1 (C), the Responsible Agency must be either a defender organization or an independent authority run by defense attorneys with demonstrated knowledge and expertise in capital representation.

58. See fn. 36, *supra*.

59. California Penal Code Section 1239. Section 1239 was enacted when a defendant was executed while his appeal was still pending, due to confusion whether he had filed a notice of appeal. See Alarcon, *Remedies for California's Death Row Deadlock, supra* n.2 at 714–15 .

60. Delays in the certification of the record by the trial court have been substantially reduced by the 1996 enactment of California Penal Code Section 190.8 (d), which requires the trial court to certify the record for completeness and for incorporation of all corrections no later than 90 days after imposition of a death sentence, unless good cause is shown. Certification of the *accuracy* of the record, however, must await the appointment of appellate counsel.

Exhibit 1
Page 142

between 1978 and 1989, the average delay was 6.6 years. For condemned prisoners convicted between 1990 and 1996, the average delay was 10.7 years. The Supreme Court has issued only one opinion disposing of an automatic appeal of a prisoner convicted after 1997.[61]

Delays in the appointment of counsel to handle direct appeals are attributable to the small pool of qualified California lawyers willing to accept such assignments. Many of the experienced appellate lawyers who have handled California death cases are retiring or decline to take new cases that will tie them up for ten or twelve years. The requisite qualifications for appointment to handle death penalty appeals before the California Supreme Court appear in Rule 8.605(d) of the California Rules of Court. A lawyer must have four years of active practice of law, including service as counsel of record in seven completed felony appeals, including at least one murder case, or service as counsel of record in five completed felony appeals and as supervised counsel in two death penalty appeals. Completion of training and demonstrated proficiency in appellate skills is also required. The State Public Defender can accept appointment, but must assign deputies who meet these minimum qualifications.

The State Public Defender was created in 1976 to handle indigent appellants in all criminal cases. In the early 1990's, under a gubernatorial directive, the office was asked to focus on capital cases only. In 1997, the office was expanded to 128 funded positions, which somewhat alleviated the backlog of 170 death row inmates then awaiting appointment of counsel to handle their direct appeal. That backlog has now been reduced to 79 inmates. But by 2003, budget cuts reduced the staff of the State Public Defender by 41 positions, more than half of which were attorneys. With an

annual budget of approximately $12 million, the office is currently handling 125 automatic appeals for death row inmates, and cannot accept additional appointments. The office is facing another 10% cut in next year's budget, which will result in the loss of additional attorney positions.

There is no dearth of lawyers who want to make a career of death penalty defense within the security of an agency setting. The Office of State Public Defender has a pool of 150 applicants for attorney positions. These positions provide excellent training for those who will fill the ranks of appointed lawyers in the future. The most direct and efficient way to reduce the backlog of death row inmates awaiting appointment of appellate counsel would be to again expand the Office of the State Public Defender. Instead, California is cutting its budget and reducing its staff.

Currently, private lawyers who accept an appointment to handle death row appeals are compensated at a rate of $145 per allowable hour.[62] In determining how many hours are allowable for a given task, the Court sets benchmarks, which create presumptions of what will and what will not be paid. Lawyers handing death penalty appeals in California complain that the benchmarks are set too low, and the hassle of challenging them is demeaning and time-consuming. The Commission learned that at least twenty of the lawyers handling California death penalty appeals can no longer afford to live in California, and are currently residing in other states. For the level of experience required and the rigorous demand of death appeals, the low level of income is certainly a significant factor in the decline of the pool of attorneys available to handle death penalty appeals.

61. Alarcon, *supra* n. 2 at 722-23.

62. See http://www.courtinfo.ca.gov/courts/supreme/documents/ SupremeCourtBrochure2008.pdf.

Exhibit 1
Page 143

Death Penalty

The payment of appointed lawyers to handle death penalty appeals in California does not meet the standard established by the federal courts for lawyers appointed to handle federal habeas corpus proceedings in death cases. The Ninth Circuit rate varies from $135 to $170 per hour, depending upon the level of experience. Judge Alarcon concludes:

*The California legislature must provide sufficient funds to compensate qualified lawyers who are willing to accept an appointment to represent death row inmates in their automatic appeals. There is no justification for the Legislature's failure to address the longstanding shortage of qualified counsel. Private practitioners who can bear the financial sacrifice of accepting court-appointment at the present hourly rates are scarce.*[63]

Chief Justice Ronald M. George expressed his full agreement with Judge Alarcon's call for more funding for counsel.[64] The California Supreme Court has an annual budget of $15,406,000 to compensate and reimburse expenses for appointed lawyers doing both direct appeals and habeas corpus cases for death row inmates. $5.585 million of that is allocated to the California Appellate Project (CAP), which maintains a full time staff of 40 (18 attorneys) in San Francisco to supervise and assist private lawyers who accept appointments to handle death penalty appeals. Currently, 188 private lawyers have contracted with the Court to handle direct appeals, and 141 have accepted appointment to provide representation in habeas corpus proceedings. The Commission recommends that the remaining backlog of cases awaiting appointment of counsel to handle direct appeals in death penalty cases be eliminated by expanding the Office of the State Public Defender. This will require increasing the OSPD budget to $16 million per year, a one-third increase over its current budget. The increase could be phased in over a four year period.

The existing appointments of private lawyers should, of course, be continued, and the budget of CAP should be maintained. With enhanced staffing, OSPD would be able to take on 18–20 new appointments per year to handle death penalty appeals. The current backlog of 79 unrepresented death row inmates could be reduced to a one year wait if the number of new death judgments does not begin to increase again. The Commission recommends that, to the extent appointments of private counsel are utilized, such appointments should comply with ABA Guideline 4.1(A)(2),[65] and should be fully compensated at rates that are commensurate with the provision of high quality legal representation and reflect the extraordinary responsibilities in death penalty representation. Flat fee contracts should not be utilized unless an hourly alternative is available, and any potential conflicts of interest between the lawyer maximizing his or her return and spending for necessary investigation, and expert assistance and other expenses are eliminated.

## 7. RECOMMENDATIONS FOR STATE HABEAS CORPUS REVIEW OF DEATH JUDGMENTS

In addition to the direct appeal, a defendant sentenced to death is also permitted to file a petition for a writ of habeas corpus in the California Supreme Court. A habeas corpus petition challenges the legality of a prisoner's confinement based upon factual issues that normally cannot be determined by the appellate record, such as whether the defendant received effective assistance of counsel, or the availability of new evidence of innocence that was not available at trial. Frequently, a claim of ineffective assistance of counsel requires a reinvestigation of the case, to demonstrate that additional evidence was available that could have been presented to mitigate the sentence, but was not due to the inadequacy of counsel's pretrial

---

63. Alarcon, *supra* n. 2 at 734.

64. Testimony of Chief Justice Ronald M. George, p. 7.

65. See fn. 36, *supra*.

Exhibit 1
Page 144

133

investigation. Representation of the prisoner in habeas corpus proceedings includes the duty to review the trial records; conduct an investigation of potential constitutional and statutory defects in the judgment of conviction or death sentence; prepare and file a petition for a writ of habeas corpus; represent the prisoner at the hearing to set an execution date pursuant to Penal Code section 1227; and prepare a request for executive clemency from the Governor of California.

Currently, 291 California death row inmates do not have habeas counsel. The average wait to have habeas counsel appointed is eight to ten years after the imposition of sentence. Attorneys representing death row inmates in state habeas proceedings have three years from the date of their appointment to file a state habeas petition. If counsel is appointed while the direct appeal is still pending, the investigation can be concluded and the petition filed shortly after the appeal is decided, if the death sentence is affirmed. The average delay between the filing of a state petition for a writ of habeas corpus and the filing of the California Supreme Court's decision is 22 months. In the vast majority of cases, the California Supreme Court decides the case on the basis of an informal response from the Attorney General. Out of 689 state habeas corpus proceedings filed in the Supreme Court since 1978, the Court has issued orders to show cause, requiring the Attorney General to respond to the petition, in only 57 cases, and held evidentiary hearings only 31 times.[66]

Initially, the California Supreme Court attempted to consolidate its consideration of the direct appeal and the habeas petition, appointing the same lawyer to handle both. That proved impractical for a variety of reasons.[67] California Government Code Section 68663 now provides for separate counsel to be appointed unless the prisoner and counsel request representation by the same attorney in both aspects of the capital case.

While the Court now appoints separate lawyers to handle the direct appeal and the habeas petition, the appointment of the habeas lawyer lags far behind the appointment of the appellate lawyer, creating a variety of problems. First, the factual investigation of habeas claims is delayed for many years. Inevitably, records are lost, witnesses become unavailable, and memories fade. Second, the one-year statute of limitations upon federal habeas claims begins to run when the State direct appeal proceedings have concluded. If a state habeas claim is not filed within that period, federal habeas review may be unavailable. Speeding up the disposition of death penalty appeals and addressing the delays in appointment of habeas counsel go hand in hand, since inmates must have habeas counsel while the clock is running on their federal habeas rights.

Those that have lawyers for their habeas proceedings are represented by private attorneys who accept appointment from the California Supreme Court, or lawyers employed by the California Habeas Corpus Resource Center [HCRC]. Established in 1998, HCRC is authorized to employ up to 34 attorneys to handle death penalty habeas petitions in state and federal court. With an

---

66. Alarcon, *supra* n. 2, at p. 741.

67. Representing death row inmates on direct appeal and representing them on habeas corpus call for different skill sets that are rarely found in the same lawyer. By experience, training and inclination, appellate lawyers are rarely interested in assuming responsibility for habeas representation, and vice versa.

68. The HCRC receives $13.9 million from the State's General Fund, and is authorized to receive up to $1 million from the federal government in reimbursements for work done in federal court. Given the backlog of death-row inmates needing appointment of state habeas corpus counsel, the HCRC has focused its efforts on state appointments, and accepted only nine federal appointments.

69. Rule 8.605 (e), California Rules of Court.

70. Rule 8.605 (g), California Rules of Court.

Exhibit 1
Page 145

Death Penalty

annual budget of $14.9 million,[68] it has provided representation that meets the ABA Guidelines for 70 clients in state habeas corpus proceedings. A total of 141 habeas cases are now being handled by private court appointed counsel.

Private lawyers appointed to handle habeas claims must meet qualifications similar to those required for appointment to handle direct appeals.[69] In addition, if an evidentiary hearing is ordered, the lawyer must have trial experience, or engage an attorney who has such experience.[70] Like the attorneys handling appeals, appointed habeas counsel are paid $145 per hour. In addition, a recently increased maximum of $50,000 is available to cover expenses. The expenses for a habeas investigation and the retaining of necessary experts can easily exceed this maximum. Frequently, volunteer counsel handling habeas proceedings pay out of pocket expenses far in excess of available reimbursement, on a pro bono basis.[71] Currently, the State Supreme Court allocates approximately half of its $15.4 million annual capital defense budget to habeas counsel. At this level of funding, there is little prospect that appointed private lawyers can ever meet the needs of the 284 unrepresented death row inmates for habeas counsel. California Appellate Defense Counsel, an organization of lawyers who accept appointments in capital cases, recently surveyed its membership to identify lawyers willing to accept habeas cases if expense reimbursement were increased to the current $50,000 level. They received one positive response.[72]

Representation by appointed private lawyers does not currently meet ABA Guidelines. Just as in the case of trial counsel, lump sum contracts are sometimes utilized, payment is lower than federal rates, and two counsel are not always appointed. Private lawyers are reluctant to accept appointments, knowing the client would receive better representation from HCRC. As one such lawyer told the Commission:

> *If you want private counsel to shoulder the burden, you have to fund them at the level you would fund a public agency so that we have investigators, paralegals, etc. so that when we file a petition, if you don't win in State Court, at least you don't hurt the clients by filing a petition that doesn't have all the claims and facts that need to be in that petition.[73]*

The Commission recommends that the need for additional habeas counsel be immediately met by expanding the California Habeas Corpus Resource Center to an authorized strength of 150 lawyers, phased in over a five year period. This will require a five-fold increase over the current $14.9 million annual budget of HCRC. The Commission also recommends that, to the extent they are available for conflicts, such appointments include qualified lawyers employed by the State Public Defender as well as private lawyers. Such appointments should comply with ABA Guideline 4.1(A)(2),[74] and should be fully compensated at rates that are commensurate with the provision of high quality legal representation and reflect the extraordinary responsibilities in death penalty representation. Flat fee contracts should not be utilized unless an hourly alternative is available, and any potential

---

71. For the successful habeas petition in *In Re Lucas*, 33 Cal.4th 682 (2004), the law firm of Cooley Godward LLP provided 8,000 hours of pro bono attorney time, 7,000 hours of paralegal time, and litigation expenses of $328,000. Testimony of Elisabeth Semel, February 28, 2008.

72. Testimony of Clay Seaman, February 28, 2008.

73. Testimony of Cliff Gardner, February 28, 2008.

74. See fn. 36, *supra*.

Exhibit 1
Page 146

conflicts of interest between the lawyer maximizing his or her return and spending for necessary investigation, and expert assistance and other expenses are eliminated.

## 8. RECOMMENDATIONS FOR FEDERAL HABEAS CORPUS REVIEW OF CALIFORNIA DEATH JUDGMENTS

A state prisoner, including one under sentence of death, may file an application for a writ of habeas corpus in federal court "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."[75] Federal courts can grant a request for the appointment of counsel, who can be paid and reimbursed for expenses from federal funds.[76]

A federal application for habeas corpus cannot be granted "unless it appears that the applicant has exhausted the remedies available in the courts of the State."[77] Thus, a federal application would be filed after the direct appeal and habeas petition in state court have been denied or rejected. The federal petition must be filed within one year of the conclusion of the state direct appeal, but this period is stayed while a state habeas petition is pending.

Access to federal habeas review is a crucial step for death row inmates, especially in states with a high rate of death penalty affirmance. A national study conducted by Columbia University researchers examined the review of all death judgments from 1973–1995, and found that 59% were affirmed by state supreme courts.[78] A more recent

study of fourteen death penalty states from 1992 through 2002 reported an affirmance rate of 73.7% in death appeals.[79] The California Supreme Court has affirmed death judgments at a rate in excess of 90% since 1987, and denied state habeas relief at an even higher rate. The Liebman study found that 40% of death judgments reviewed on federal habeas corpus were set aside, and this number increased where the state courts had a higher affirmance rate than the national average. In California, 70% of habeas petitioners in death cases have achieved relief in the federal courts, even though relief was denied when the same claims were asserted in state courts. There may be a number of explanations for this, including the availability of sufficient funds for investigation of the defendant's claims in federal court, the opportunity to develop a more comprehensive record at a federal evidentiary hearing, and the greater independence of federal judges with lifetime appointments.

The average delay from the filing of an application for federal habeas relief in a California death case until the grant or denial of relief by a federal district judge is 6.2 years. If the federal petition includes claims that have not been exhausted in state court, the court can stay the proceedings while the defendant returns to state court to exhaust the remedies available in the state courts.[80] This increases the delay in disposing of the federal habeas petition by two years. Because California does not provide adequate resources to lawyers handling state habeas claims, 74% of federal habeas applications filed by California

---

75. 28 U.S.C. Section 2254 (a).

76. 18 U.S.C. Section 3599 (a)(2).

77. 28 U.S.C. Section 2254 (b)(1)(A).

78. Liebman et al., *A Broken System: Error Rates in Capital Cases*, 1973–1995 (June, 2000).

79. Latzer & Cauthen, *Justice Delayed? Time Consumption in Capital Appeals: A Multistate Study*, p. 23 (2005).

80. *Rose v. Lundy*, 455 U.S. 509 (1982).

Exhibit 1
Page 147

Death Penalty

137

death row inmates are stayed for the exhaustion of state remedies.[81] Thus, the under-funding of state habeas proceedings in California increases the burden on federal courts and delays the administration of justice:

*The failure of the California legislature to provide sufficient funding to permit state habeas counsel to investigate each death row inmate's federal constitutional claims cannot be understated. It shifts to the federal government the burden of providing sufficient funds to permit federal habeas counsel to discover evidence to demonstrate additional federal constitutional violations.[82]*

The grant or denial of habeas relief by the federal district court can then be appealed to the U.S. Court of Appeals for the Ninth Circuit. The average delay for appellate review, including a petition for en banc review and a petition for certiorari to the U.S. Supreme Court is 4.2 years.[83]

Continuity of representation by the same lawyer in both state and federal habeas corpus proceedings helps to reduce many of the delays that now occur in state and federal habeas proceedings, especially where exhaustion of claims in state court is a problem. With private appointed lawyers, however, continuity cannot be assured. The appointment authority of the California Supreme Court only extends to state habeas proceedings. Representation by HCRC, on the other hand, assures continuity of representation, since the agency is available to accept federal appointments after the state proceedings are concluded, and seeks to investigate and present all federal constitutional claims in state court before a federal petition

is filed. Thus, a return to state court for exhaustion of claims may be obviated. Currently, only 7.3% of the habeas appointments of HCRC are for purposes of exhaustion, while 23.7% of the habeas appointments of private attorneys are for exhaustion purposes. The Commission recommends that continuity of representation by the same attorney for state and federal habeas claims be encouraged. The Commission's recommendation that the unmet need for habeas counsel be met by expanding HCRC, rather than expanding the number of appointments of private counsel, would address the need for continuity of counsel between state and federal habeas proceedings.

## Part B: Available Alternatives

In addition to the choices presented in Part A, to leave the present broken system in place, or to provide the recommended resources to enable California to achieve the national average in death penalty delays, the Commission examined two other available alternatives: a significant narrowing of special circumstances to reduce the number of death penalty cases coming into the system, or replacing the death penalty with a maximum sentence of lifetime incarceration. The Commission makes no recommendation regarding these alternatives, but presents information regarding them to assure a fully informed debate. An effort is made to compare the costs for all four of these alternatives, but the figures presented are only rough estimates, due to the unavailability of accurate data.

81. Alarcon, *supra* n. 2, at p. 749.

82. *Id.* at p. 748.

83. *Id.* at p. 749.

Exhibit 1
Page 148

## 1. THE ALTERNATIVE OF NARROWING THE LIST OF SPECIAL CIRCUMSTANCES

Several of the witnesses who testified before the Commission suggest the primary reason that the California Death Penalty Law is dysfunctional is because it is too broad, and simply permits too many murder cases to be prosecuted as death penalty cases. The expansion of the list of special circumstances in the Briggs Initiative and in subsequent legislation, they suggest, has opened the floodgates beyond the capacity of our judicial system to absorb. As former Florida Supreme Court Chief Justice Gerald Kogan told the Commission, having 21 special circumstances is "unfathomable. The problem is the front-end of the system. There are too many people eligible to receive the death penalty."[84] A number of research projects have concluded that the narrower the category of those eligible for the death penalty, the less the risk of error, and the lower the rate of racial or geographic variation.[85]

An initiative of the Constitution Project, based in Washington, D.C., established a blue-ribbon bipartisan commission of judges, prosecutors, defense lawyers, elected officials, FBI and police officials, professors and civic and religious leaders to examine the administration of the death penalty throughout the United States. The Constitution Project achieved broad consensus on two key recommendations to reserve capital punishment for the most aggravated offenses and most culpable offenders:

*5. Death Penalty Eligibility Should Be Limited to Five Factors:*

*The murder of a peace officer killed in the performance of his or her official duties when done to prevent or retaliate for that performance;*

*The murder of any person (including but not limited to inmates, staff, and visitors) occurring at a correctional facility;*

*The murder of two or more persons regardless of whether the deaths occurred as the result of the same act or of several related or unrelated acts, as long as either (a) the deaths were the result of an intent to kill more than one person, or (b) the defendant knew the act or acts would cause death or create a strong probability of death or great bodily harm to the murdered individuals or others;*

*The intentional murder of a person involving the infliction of torture. In this context, torture means the intentional and depraved infliction of extreme physical pain for a prolonged period of time before the victim's death; and depraved means that the defendant relished the infliction of extreme physical pain upon the victim, evidencing debasement or perversion, or that the defendant evidenced a sense of pleasure in the infliction of extreme physical pain;*

*The murder by a person who is under investigation for, or who has been charged with or has been convicted of, a crime that would be a felony, or the murder of anyone involved in the investigation, prosecution, or defense of that crime, including, but not limited to, witnesses, jurors, judges, prosecutors, and investigators.*

*6. Felony Murder Should Be Excluded as the Basis for Death Penalty Eligibility.*

*The five eligibility factors in Recommendation 5, which are intended to be an exhaustive list of the only factors that may render a murderer eligible for capital punishment, do not include felony murder as a basis for imposing the death penalty. To ensure that the death penalty is reserved for the most culpable offenders and to make the imposition of the death penalty more proportional, jurisdictions that nevertheless choose to go beyond these five eligibil-*

---

84. Testimony of Gerald Kogan, at p. 30.

85. See Liebman & Marshall, *Less Is Better: Justice Stevens and the Narrowed Death Penalty*, 74 Fordham L. Rev. 1607 (2006).

Exhibit 1
Page 149

Death Penalty

139

*ity factors should still exclude from death eligibility those cases in which eligibility is based solely upon felony murder. Any jurisdiction that chooses to retain felony murder as a death penalty eligibility criterion should not permit using felony murder as an aggravating circumstance. (2005 Update).[86]*

Similarly, the Illinois Governor's Commission on Capital Punishment, a bipartisan group of seventeen current or former prosecutors, defense lawyers, judges and civic leaders established to determine what reforms would ensure that the Illinois capital punishment system is fair, just and accurate, unanimously concluded that the Illinois death penalty law be narrowed to the functional equivalent of the Constitution Project recommendation:

*The Commission unanimously concluded that the current list of 20 factual circumstances under which a defendant is eligible for a death sentence should be eliminated in favor of a simpler and narrower group of eligibility criteria. A majority of the Commission agreed that the death penalty should be applied only in cases where the defendant has murdered two or more persons, or where the victim was either a police officer or a firefighter; or an officer or inmate of a correctional institution; or was murdered to obstruct the justice system; or was tortured in the course of murder.[87]*

Hon. Alex Kozinski, now presiding judge of the U.S. Court of Appeals for the Ninth Circuit, suggested thirteen years ago that narrowing of the death penalty laws was the most appropriate way to address the "illusory" nature of the death penalty. Noting the growing gap between the numbers of people sentenced to death and the numbers we were actually willing to execute, he suggested decreasing the number of crimes punishable by death and the circumstances under which death

may be imposed so that we only sentence to death "the number of people we truly have the means and the will to execute."[88] The goal of narrowing, then, is to limit the numbers of death row inmates to those whom we truly have the means and the will to execute.

Our Commission undertook a comprehensive review to determine which special circumstances were found in all cases in which the death penalty was imposed in California from 1978 through 2007. Despite the difficulties in gathering data because of the lack of a systematic data reporting requirement in California, the researchers, led by Professor Ellen Kreitzberg of Santa Clara University School of Law, were able to locate 822 death penalty judgments, and identify the special circumstances utilized in all but 26 of these cases. They concluded that since 1978, one of the five special circumstances identified by the Constitution Project was found in 55% of California death cases, or a total of 451 of the cases examined. This means that if the California death penalty law had limited itself to the "worst of the worst" as identified by the Constitution Project and the Illinois Commission, we would have approximately 368 on death row, rather than 670. The researchers also analyzed trends in the use of California's special circumstances over time. They found that there is a growing trend to narrow the use of special circumstances to the five which were identified in the *Mandatory Justice* report of the Constitution Project:

*Our analysis of the special circumstances found by juries in California death penalty cases shows a growing trend in the percentage of cases where at least one Mandatory Justice factor is found. Compare 1980, where only 37% of the cases that year had at least one Mandatory Justice factor, with 2007, where 79% of the cases had at least one factor. Since 1998, a Mandatory Justice factor has*

---

86. The Constitution Project, *Mandatory Justice: The Death Penalty Revisited*, p. xxiv–xxv (2001; 2005 Update).

87. State of Illinois, Report of the Governor's Commission on Capital Punishment (April 2002).

88. Hon. Alex Kozinski & Sean Gallager: *Death: The Ultimate Run-on Sentence*, 46 Case W. Res. L. Rev. 1,3 (1995).

Exhibit 1
Page 150

*been found in at least 59% of the cases each year – most years over 65% of the total cases. However, there is significant disparity from county to county with several counties falling far below the state average. California needs to determine how to eliminate these geographic disparities in the imposition of the death penalty.[89]*

Thus, a narrowing of the California special circumstances to the five factors recommended by *Mandatory Justice* and the Illinois Commission could largely eliminate the geographic variation in use of the death penalty which the Commission notes below.[90] The following chart illustrates the percentage of death penalty cases which included at least one *Mandatory Justice* factor for 1978 through 2007 from each of the fourteen counties which most frequently utilize the death penalty.

PERCENTAGE OF CALIFORNIA DEATH CASES WITH AT LEAST ONE *MANDATORY JUSTICE* FACTOR BY COUNTY[91]

| County | Total Death Sentences | Percentage with at Least One Factor |
| --- | --- | --- |
| Alameda | 55 | 51% |
| Contra Costa | 20 | 65% |
| Fresno | 18 | 50% |
| Kern | 29 | 55% |
| Los Angeles | 247 | 64% |
| Orange | 60 | 38% |
| Riverside | 65 | 48% |
| Sacramento | 43 | 37% |
| San Bernardino | 46 | 52% |
| San Diego | 43 | 63% |
| San Mateo | 18 | 78% |
| Santa Clara | 30 | 57% |
| Tulare | 17 | 41% |
| Ventura | 17 | 41% |

The Kreitzberg study was also critical of the use of felony murder as a special circumstance:

*The use of felony murder as a special circumstance should be reviewed. Over the years felony murder (robbery) was either the first or second most frequently used special circumstance. While many felony murders are among the most intentional and aggravated killings, the felony murder circumstance fails to differentiate between these aggravated murders and a minimally culpable defendant who would still qualify under this factor.[92]*

Some of the gravest concerns about the fairness of the death penalty might be alleviated or eliminated if its use were limited to the most aggravated cases. The current list of 21 factual circumstances under which a defendant is eligible for a death sentence could be eliminated in favor of a simpler and narrower group of eligibility criteria.

The use of the *Mandatory Justice* factors is not the only option available to narrow the use of California's death penalty. Other alternatives could be considered as well. Commissioner Jon Streeter suggests adding to the *Mandatory Justice* factors the further limitation that the crime in question must be found to have "legally affected all citizens of the State of California." According to this approach, any killing of a peace officer, a correctional officer, or a participant in the justice system would be presumed to have the requisite "citizen impact," since those crimes are, in effect, attacks on the State itself and on the State's ability to mete out justice on behalf of all of its citizens. For multiple murder and murder involving torture, there would be no such presumption; it would take more than a simple allegation of "murder of more than two persons" or "infliction of torture" to justify a capital charge. In those cases, "citizen impact" would have to be proved by the prosecution.[93] Unquestionably, some case-by-case line-drawing would be required,

---

89. Kreitzberg, et al., *A Review of Special Circumstances in California Death Penalty Cases*, p. 8 (2008).

90. See Section C-2 of this Report, *infra*.91. *Id.* at pp. 45–46.

92. *Id.* at p. 8.

93. By way of illustration, mass murderers (e.g. the Oklahoma City bomber, the September 11 assassins) and serial murderers whose crimes are notorious

Exhibit 1
Page 151

but the courts already do that kind of line- drawing in interpreting and applying our current death penalty special circumstances. As Commissioner Streeter puts it:

*The overall idea behind this approach would be to impose a limitation that distinguishes between purely local crimes (where the costs of prosecution will be borne largely by county taxpayers) from crimes of state-wide import (where the costs of prosecution will be borne largely by all taxpayers of the state). Not only does this approach directly address the issue of geographical disparity, but, by introducing the principle that no crime may qualify for the death penalty unless it is a matter of some state-wide consequence, it also minimizes the need to draw potentially arbitrary distinctions between different types of heinous crimes. Most importantly, because the number of capital-eligible crimes would shrink dramatically – yet leave open the option of using capital punishment in cases that are often used as examples for why we should have the death penalty – this approach accomplishes a substantial narrowing of death eligibility, yet does so in a way that acknowledges and respects the strongly-felt views of many citizens that the ultimate punishment is appropriate in some cases. In effect, we would propose to 'right size' the death penalty in the State so that the citizens end up with a workable, yet fair, system that we can afford.*

The Commission is not suggesting any particular formula or list to narrow California's death penalty law. This judgment is best left to the legislative process. Other criteria, such as the murder of children, could be included on the list. But the list must be carefully measured to actually achieve the benefits of narrowing that have been identified. However the list of special circumstances is narrowed, this narrowed list would only be applied in death penalty cases. The current list of special circumstances could still be utilized to impose sentences of life without possibility of parole.

If California's death penalty law were narrowed, it would be unwise to proceed with the execution of defendants whose death judgment was not based upon one of the identified special circumstances. With respect to the thirteen executions conducted by California since 1978, ten of them would have met the recommended special circumstance for multiple murders. Only the executions of Thomas M. Thompson, Manuel Babbitt and Stephen Wayne Anderson would not have resulted in a death sentence using the *Mandatory Justice* factors. The death sentence of any death row inmate whose conviction did not include a finding of one or more of the enumerated special circumstances could be commuted to a sentence of life without possibility of parole. Taking this step would actually have little impact for the death row inmates involved. Most of them will never be executed, but will die in prison. Changing their sentence to one of lifetime incarceration would only change the location in which they will serve their sentence. But just that change could save the State of California $27 million dollars each year over the current cost of confining these prisoners on death row.

The additional cost of confining an inmate to death row, as compared to the maximum security prisons where those sentenced to life without possibility of parole ordinarily serve their sentences, is $90,000 per year per inmate.[94]

With California's current death row population of 670, that accounts for $63.3 million annually.

for their depravity and the widespread fear they create (e.g. the ebra killings, the D.C. sniper killings) are examples of cases in which a state-wide "citizen impact" seems readily apparent and readily provable.

94. Tempest, *Death Row Often Means a Long Life*, Los Angeles Times, Mar. 6, 2005, quoting Corrections Department Spokeswoman Margot Bloch.

Reducing the death row population to those whose death judgment is based upon one or more of the five special circumstances recommended by the Constitution Project would immediately reduce the size of California's death row to 368, who could be confined on death row at an annual cost of $35 million. With respect to those no longer subject to the death penalty, millions more would be saved by eliminating the need to litigate their appeals and habeas petitions.

In terms of the future growth of California's death row, the Kreitzberg study suggests that for the past four years, 70% of the new death judgments in California have included at least one of the recommended circumstances. Thus, an average of 11 or 12 new death judgments could be anticipated, if prosecutors seek the death penalty at the same rate. The numbers, both in terms of backlog and new judgments, could be managed with substantially less resources than we currently devote to our death penalty system. The cost of implementing many of the reforms recommended by this Commission to fix the current system would be reduced by 30 to 40%.

A 45% reduction in the size of death row would also reduce the otherwise necessary expansion of the State Public Defender, the Habeas Corpus Resource Center, and the Court staffing needed.

## 2. THE ALTERNATIVE OF ESTABLISHING THE MAXIMUM PENALTY AT LIFETIME INCARCERATION

After a comprehensive review of the costs and benefits of the death penalty, the New Jersey Death Penalty Commission reached the following conclusions:[95]

> **1** *There is no compelling evidence that the death penalty rationally serves a legitimate penological purpose;*

> **2** *The costs of the death penalty are greater than the costs of life in prison without parole;*

> **3** *There is increasing evidence that the death penalty is inconsistent with evolving standards of decency;*

> **4** *The penological interest in executing a small number of persons is not sufficiently compelling to justify the risk of making an irreversible mistake;*

> **5** *The alternative of life imprisonment in a maximum security institution without the possibility of parole would sufficiently ensure public safety and address other legitimate social and penological interests, including the interests of the families of murder victims;*

> **6** *Abolition would make sufficient funds available to ensure adequate services and advocacy for the families of murder victims.*

These considerations led the State of New Jersey to abolish the death penalty this year, in favor of the alternative of life imprisonment without parole. (LWOP). We have the same alternative available in California.

California has had a sentence of life imprisonment without possibility of parole available since 1978. According to the California Department of Corrections, as of January 1, 2008, 3,622 defendants are serving LWOP sentences, including some who were initially charged in death penalty cases. Thus, throughout the past thirty years, we have increased our LWOP population at an average rate of 120 defendants per year. It is appropriate to label these as cases of lifetime incarceration. The term of imprisonment is the defendant's life. He is being sentenced to die in prison. Not only are the costs of confinement significantly reduced, compared to the cost of confinement on death row, many of the costs of trial and appellate review for death cases are eliminated.

---

95. Final Report, New Jersey Death Penalty Study Commission Report, p. 1 (January, 2007).

96. California Code of Civil Procedure, Section 197(a). In contrast, New York uses five source lists, including state income taxpayers, state unemployment, and welfare rolls. Testimony of Lois Heaney, March 28, 2008.

Exhibit 1
Page 153

Death Penalty

At the trial level, substantial savings would result from the elimination of the necessity for death-qualified juries. Among the increased costs necessitated by death penalty trials are the heavier burdens imposed upon potential jurors than non-death cases. In Los Angeles County, 800 potential jurors may be summoned for a death penalty case. California jury commissioners rely solely upon voter registration and DMV lists to summon jurors, although state law permits expansion of source lists.[96] Seventy-five percent of potential jurors will be excused for financial hardship because of the length of the trial. California courts pay jurors at a rate of $15 per day.[97] Many employers do not pay employees for jury service, and those who do frequently limit the payment to no more than two weeks. The remaining jurors must undergo individual questioning to determine whether they have opinions about the death penalty that would preclude their serving in a death case. This process of "death qualification" has resulted in larger numbers of potential jurors being excused as public opinion against the death penalty has grown.

While a jury is normally selected in one or two days in most felony cases, the selection of a death-qualified jury normally takes 8–10 days of court time. The use of limited source lists, the exclusion of a higher proportion of potential jurors for economic hardship, together with the exclusion of those who disapprove of the death penalty, results in juries that do not reflect a cross-section of the community to the extent that non-death juries do.

Upon conviction of first-degree murder and a finding of at least one special circumstance, the same jury is required to return for a second trial, the penalty phase in which the jury decides between a sentence of death or a sentence of life imprisonment without possibility of parole. This is a full trial, with opening statements, presentation of evidence by both sides, closing arguments and jury instructions. The jury is asked to weigh aggravating and mitigating circumstances, and impose a sentence of death if aggravating circumstances outweigh mitigating circumstances, or a sentence of life imprisonment without possibility of parole if mitigating circumstances outweigh aggravating circumstances. The jury must unanimously agree as to the penalty; if they are unable to achieve unanimity, another jury must be impaneled to decide the penalty.[98]

The expenses for trial and appellate counsel would also be substantially reduced if lifetime incarceration became the maximum penalty in California. Only one defense lawyer would have to be appointed for the trial. There would be no automatic appeal to the California Supreme Court, so appeals would be handled much more expeditiously by the Courts of Appeal. Between June 2005 and June 2006 the California Courts of Appeal decided 100 LWOP appeals after an average delay of 18.6 months.[99] While habeas corpus petitions are available, there is no right to appointed counsel, as there is for appeals and for habeas petitions in death cases. And since there is no discretion in the exercise of the sentencing function, there is no issue regarding the adequacy of investigation of mitigating evidence or the effective assistance of counsel at a sentencing trial. Finally, although the risks of wrongful convictions remain, there would be no wrongful executions. New trials could be ordered if necessary, and the exonerated would be released.

## If the New Jersey approach were used in California, the death penalty backlog would immediately disappear.

The issues being litigated in direct appeals and habeas petitions would no longer have to be decided by the California Supreme Court. Penalty

97. At least 31 states and the Federal Courts pay jurors more than California. In Federal Courts, jurors receive $50 per day. Testimony of Lois Heaney, March 28, 2008.

98. California Penal Code Section 190.4 (b).

99. Alarcon, *supra* n. 2 at p. 731.

Exhibit 1
Page 154

issues would not have to be decided at all. The forty death penalty trials each year would simply be added to the existing schedule of LWOP cases; instead of 120 LWOP cases per year, we would have 160. With a dysfunctional death penalty law, the reality is that most California death sentences are actually sentences of lifetime incarceration. The defendant will die in prison before he or she is ever executed. The same result can be achieved at a savings of well over one hundred million dollars by sentencing the defendant to lifetime incarceration without possibility of parole.

A significant one-time savings is also available to California under this option. According to the California State Auditor Report for 2006, the current condemned-inmate facilities at San Quentin do not meet many of the Department of Corrections standards for maximum security facilities. The Department received spending authority of $220 million to build a new condemned-inmate complex, but the audit found the analysis of alternative locations and costs was incomplete.[100] Governor Schwarzenegger has set aside $136 million to proceed with construction of a new death row at San Quentin. The Department of Corrections estimate for completion of the project is $356 million, up $19 million from the year before.[101] The California State Auditor reported in June, 2008 that this estimate is too low:

*Analyses by our consultant suggest that the cost to construct the CIC will exceed Corrections' recent estimate. Although Corrections reasonably estimated construction costs, it was precluded from*

*applying realistic escalation rates, and delays from the anticipated start date will add to project costs. Additionally, Corrections did not include the costs to activate and operate the CIC in its estimated costs. Our consultant estimates the cost to construct the CIC will exceed Corrections' estimate of $356 million by $39.3 million and that the cost to activate the new CIC will reach $7.3 million. Furthermore, our consultant estimates that the average new staffing costs to operate the new CIC will average $58.8 million per year, for a total of approximately $1.2 billion over the next 20 years.*[102]

## 3. ESTIMATING AND COMPARING THE ANNUAL COSTS OF AVAILABLE ALTERNATIVES

As we have previously noted, it is impossible to ascertain the precise costs of the administration of California's death penalty law at this time. But the choices that California faces require some comparison of projected costs; for this purpose, rough estimates will have to do.

In recent years, a number of states have attempted to compare the costs imposed by a death penalty trial to a murder trial where the death penalty is not sought, with quite consistent results. A performance audit report prepared for the State of Kansas in 2003 compared the average cost of cases in which a death sentence was imposed ($1.2 million) with the average cost of murder cases in which the death penalty was not sought ($.7 million) and concluded that seeking the death penalty adds 70% to the cost of a murder case.[103] A report by the Comptroller of the Treasury for the State of Tennessee concluded that seeking the death pen-

100. California State Auditor Report 2006-406, p. 281.

101. Halstead, *$136 Million Requested for New Death Row at San Quentin,* Marin Independent Journal, April 30, 2008.

102. California State Auditor, *California Department of Corrections and Rehabilitation: Building a Condemned Inmate Complex at San Quentin May Cost More Than Expected,* June 2008 Letter Report 2007-120.1.

103. Performance Audit Report: Costs Incurred for Death Penalty Cases, A Report to the Legislative Post Audit Committee, State of Kansas, December 2003.

104. Wilson, Doss & Phillips, Tennessee's Death Penalty: Costs and Consequences, State of Tennessee, July 2004.

105. Janeway, *The Application of Indiana's Capital Sentencing Law: Findings of the Indiana Criminal Law Study Commission* (2002).

Exhibit 1
Page 155

Death Penalty

alty in murder trials adds an average of 48% to the cost of the trial.[104] A study of Indiana death penalty trials concluded that the cost of a death penalty trial and direct appeal alone is more than five times the cost of a life without parole trial and direct appeal. Including the relative costs of incarceration, the study concluded that obtaining the death penalty increases the cost by 38%.[105] Michael Ebert of the George Mason University School of Public Policy evaluated these studies, and concluded that "the Indiana analysis may well be the new 'gold standard' in this unique area of capital vs. non-capital cost assessments. The American Bar Association (ABA) examined the Indiana study and has commented very favorably on its techniques."[106]

A recent report for the Washington State Bar Association elicited estimates from prosecutors and public defenders of the costs added to trials when the death penalty was sought. The report concluded "that the prosecutor's average estimate of $217,000 and the public defenders average estimate of $246,000 were realistic estimates of the cost difference for death penalty cases at the trial level."[107]

Not surprisingly, California estimates for trial costs have been somewhat higher. A U.C. Berkeley School of Public Policy researcher in 1993 reported that a capital murder trial cost $1.9 million, compared to $630,000 for a non-capital murder case, a difference of $1.27 million.[108] The ACLU comparison of death penalty cases and non-death penalty cases in which counties were reimbursed by the state found the difference between the least expensive death penalty trial with the most expensive non-death penalty trial was $1.1 million.[109]

For comparative purposes, the Commission adopted a very conservative estimate that seeking the death penalty adds $500,000 to the cost of a murder trial in California. The costs of a second defense lawyer, the background investigation for the penalty phase, and the added duration and expense of the trial for jury selection and penalty trial alone would easily add up to $500,000 in most cases. The current rate of 20 death sentences per year would require 40 death penalty trials per year, for a total added cost of $20 million. The Commission's recommendations for adequate funding of defense costs for death penalty trials, especially the necessary investigation of mitigation, will easily increase this cost differential by 50%. If the same pace of 40 death penalty trials were maintained, the needed reforms would then require an annual expenditure of $30 million, rather than $20 million. This expenditure would be at the county level, but $13.5 million of it would be reimbursed by the State pursuant to Penal Code Section 987.9.

If California's death penalty law were narrowed to a more selective list of special circumstances, the number of death penalty trials would be reduced to 24, requiring the expenditure of $18 million including the recommended reforms. If California opted in favor of terminal confinement [LWOP] as the maximum penalty, there would no longer be the enhanced costs of death penalty trials, but the number of LWOP trials would probably increase. In some cases, the risk of facing the death penalty provides an incentive to plead guilty and accept

---

106. Ebert, *Weighing the Costs of Capital Punishment v. Life in Prison Without Parole: An Evaluation of Three States' Studies and Methodologies*, Volume I, New Voices in Public Policy (Spring 2007).

107. Washington State Bar Association, Final Report of the Death Penalty Subcommittee on the Committee on Public Defense, December 2006, at p. 18.

108. Tempest, Death Row Often Means a Long Life, Los Angeles Times, March 6, 2005 at p. B1. Based on Erickson, Capital Punishment at What Price?, available at http://death.live.radicaldesigns.org//downloads/Erickson1993COSTSTUDY.pdf

109. Minsker, The Hidden Death Tax: The Secret Costs of Seeking Execution in California, March 2008, at p. 32.

Exhibit 1
Page 156

145

an LWOP sentence. If the incentive is removed, more LWOP cases may have to be tried. And if more LWOP cases are tried, more will be appealed. California currently processes approximately 120 LWOP cases each year, but fewer than 5% of them are disposed of by a plea of guilty.[110] Even if all cases formerly charged as death cases become LWOP cases and all of those cases go to trial, that would add approximately $5 million to the cost of LWOP trials and $3 million to the cost of LWOP appeals. Both the trials and appeals would be considerably less expensive than death cases, because there would be no penalty phase, and no right to counsel for a habeas petition.

The costs of appellate and habeas corpus review for death cases can be estimated with somewhat more precision. The current budgets of the California Supreme Court for the appointment of private lawyers ($15.4 million), of the State Public Defender for death penalty appeals ($12.1 million) and the California Habeas Corpus Resource Center for habeas representation ($14.9 million) total $42.4 million. Former Attorney General Bill Lockyer estimated that 15% of his criminal division budget is devoted to capital cases. That currently amounts to $12 million per year. Thus, at least $54.4 million is currently devoted to post-trial review of death cases in California. The recommended budget increases proposed by the Commission in Part A would increase this figure by $85 million. The added charges to the State general fund would include $6 million for the State Public Defender, $70 million for the California Habeas Corpus Resource Center, $6 million to the Attorney General, and $3 million to the State Supreme Court for appointed counsel. The reduction of the backlog by adopting the narrowing proposal would reduce these enhanced budgets by 45%, to a total of $68 million.

The costs of confinement can also be estimated with some precision, based upon the Department of Corrections estimate that confinement on death row adds $90,000 per year to the cost of confinement beyond the normal cost of $34,150. Thus, just the enhanced confinement costs for the 670 currently on California's death row totals $63.3 million. This figure increases each year as the population of California's death row grows.

The needed reforms recommended by the Commission would reduce the delays and eventually lead to reductions in the death row population. The alternative of narrowing the death penalty law could result in a 45% reduction in the size of death row, and a corresponding 45% reduction in the costs of confinement to $35 million per year. This number would also decline as the backlog was reduced. The alternative of terminal confinement would not reduce confinement costs to zero, since current death row inmates who might have been executed will be confined for their full life expectancy, although at the lower confinement rate of $34,150 per year. Assuming 100 inmates might otherwise have been executed, the cost of their continued confinement would amount to $3.5 million per year.

Thus, using conservative, rough estimates, the total cost of the available alternatives would be (1) to continue spending at least $137.7 million per year to maintain our dysfunctional system; (2) to spend $216.8 million to reduce delays in resolving cases from 20–25 years down to the national average of 12 years; (3) to spend $121 million per year for a narrowed death penalty producing 10–12 new death sentences per year; (4) or to adopt a policy of terminal confinement at an annual cost of $11.5 million.

These estimates make no effort to measure opportunity costs or savings. For example, the California Supreme Court currently devotes 20–25% of its

110. This estimate is based upon a 2008 survey of the California Appellate Projects.

Exhibit 1
Page 157

ESTIMATING THE ANNUAL COSTS OF FOUR ALTERNATIVES

| | Current System | Current System with Part A Additions | Narrowed Death Penalty Law with Part A Additions | Maximum of Lifetime Incarceration [LWOP] |
|---|---|---|---|---|
| Additional Costs of Trials | $20 million | $30 million | $18 million | $5 million |
| Additional Cost of Appeal and Habeas Proceedings | $54.4 million | $139.4 million | $77 million | $3 million |
| Additional Cost of Confinement | $63.3 million [Increasing] | $63.3 million [Declining] | $35 million [Declining] | $3.5 million |
| Total | $137.7 million [Increasing] | $232.7 million [Declining] | $130 million [Declining] | $11.5 million |

time and resources to processing death penalty appeals and habeas petitions. If California's death penalty law were significantly narrowed, the Supreme Court caseload would be correspondingly lighter. The reduction would be even more dramatic with the alternative of lifetime incarceration as the maximum penalty.

The following chart summarizes the additional annual charges to the California state budget which each of four alternatives would impose: the present system, the present system with the reforms recommended in Part A of this Report, a significantly narrowed death penalty law, and a maximum punishment of lifetime incarceration without possibility of parole.

# Part C: Administrative Reforms

## 1. REDUCING THE CALIFORNIA SUPREME COURT BACKLOG

Despite extraordinary efforts and the investment of substantial resources, the California Supreme Court has been unable to stay abreast of the rising tide of death cases arriving at its door. As already noted, the delays in appointment of counsel for both direct appeals and state habeas proceedings are attributable to lack of adequate funding rather than any failure on the part of the Court. The Court

has no control over the number of death verdicts returned each year, and the numbers have far surpassed the capacity of the court to promptly process and decide the cases. The Court has added attorneys to the staff of each Justice's chambers, and created a central staff of ten attorneys dedicated to death penalty motions, appeals and habeas proceedings. These cases arrive with lengthy records, and the opinions issued by the Court addressing the issues raised on appeal are lengthy and complex. Ordinarily, the Court will issue published opinions deciding 20 to 25 death appeals each year, and an additional 30 memorandum opinions deciding habeas petitions. There is now a delay of as much as two or three years from the time a death case is fully briefed until it is set for oral argument. The Court has 80 direct appeals fully briefed and awaiting oral argument. Another 100 fully briefed habeas petitions are before the Court.

According to Chief Justice Ronald M. George, the Court now faces a crisis, in which the death penalty backlog is threatening the Court's ability to resolve other statewide issues of law and settle conflicts at the appellate level, which is its primary duty and responsibility. The California Supreme Court has formulated a proposal to address the delay in deciding fully briefed death penalty appeals by amending the California constitution to

Exhibit 1
Page 158

give the Supreme Court discretion to transfer fully briefed cases to the intermediate Courts of Appeal for decision.[111] The Supreme Court would review the Court of Appeals judgment and could summarily affirm it, or hold oral argument and issue its own decision with reasons stated, addressing all or part of the Court of Appeal's decision.[112] On March 25, 2008, the Chief Justice announced that in view of the budget situation, the Court is not asking that the proposal be advanced at this time. The Commission recommends that this proposal be advanced only in conjunction with implementation of recommendations it is presenting in this report to adequately fund the appointment of both appellate and habeas counsel in death cases, and the provision of adequate staffing for the Courts of Appeal.

Witnesses before the Commission have addressed a number of other concerns regarding the implementation of this proposal. Concern has been expressed that transferring as many as thirty death appeals each year to the nineteen different divisions and districts of the Court of Appeal will result in inconsistent rulings, especially in resolving issues such as harmless error. The lack of formal proportionality review in California, coupled with the patterns of geographic disparity, give added weight to concerns regarding the consistency of death penalty review.

The assurance of the Supreme Court that Court of Appeal rulings would be carefully scrutinized should be accepted. An annual evaluation of the effects of this proposal could be assured by the implementation of the Commission's recom-

mendation to establish a California Death Penalty Review Panel (*infra*, pp. 102–103). The Commission majority recommends adoption of the proposed constitutional amendment if the recommendations contained in Part A of this Report are implemented.

While the California Supreme Court is also considering proposals to address the backlog of state habeas cases, Senior Judge Arthur Alarcon of the U.S. Court of Appeals for the Ninth Circuit has suggested that California law be changed to permit original habeas petitions in death cases to be filed in the Superior Courts, with right of appeal to the Courts of Appeal and discretionary review by the Supreme Court.[113] He suggests:

> The potential for reducing the delay of finally adjudicating a sentence of death by having the original habeas corpus petition filed in the superior court is tremendous. There are 1499 superior court judges in California. An average of thirty-eight state habeas corpus petitions in death penalty cases are filed each year in the California Supreme Court. Spreading these state habeas corpus petitions among the trial courts would dramatically reduce the Supreme Court's caseload while having a minimal impact on the superior courts. Trial court judges are uniquely qualified to hear original habeas corpus claims because they are already familiar with the evidence presented at trial. And in order to facilitate appellate review, the superior court judge hearing the petition should be required to issue a written order explaining the reasons for granting or denying habeas corpus relief.[114]

---

111. A constitutional amendment would be required because the California constitution gives the Supreme Court exclusive jurisdiction over appeals involving judgments of death. Cal. Const., art. VI, Section 12.

112. News Release, Supreme Court Proposes Amendments to Constitution in Death Penalty Appeals, Nov. 19, 2007.

113. Alarcon, *supra* n. 2, at 743–49.

114. *Id.* at p. 743.

Exhibit 1
Page 159

Death Penalty

The Alarcon proposal may not require amendment of the California constitution. The Supreme Court, the Courts of Appeal and Superior Courts share original jurisdiction over habeas corpus proceedings.[115] The reason habeas cases are filed directly in the Supreme Court is because only the Supreme Court is authorized to pay counsel. The California Supreme Court has adopted a policy which declares:

> *Absent prior authorization by this court, this court will not compensate counsel for the filing of any other motion, petition or pleading in any other California or federal court or court of another state. Counsel who seek compensation for representation in another court should secure appointment by, and compensation from, that court.*[116]

Adoption of the Alarcon proposal could also expedite the consideration of a subsequent habeas corpus petition in federal court. Under the existing system, federal courts do not have the benefit, in most cases, of a prior evidentiary hearing or a written order from the Supreme Court explaining the reasons for its decision. After the California Supreme Court rejected requests from the judges of the Ninth Circuit Court of Appeals that the Court spell out its reasons for denying petitions for habeas corpus, due to lack of time and resources, Senator Dianne Feinstein wrote to Governor Arnold Schwarzenegger requesting assistance in addressing this problem. She concluded that "[t]he absence of a thorough explanation of the [California Supreme] Court's reasons for its habeas corpus decisions often requires

federal courts to essentially start each federal habeas death penalty appeal from scratch, wasting enormous time and resources."[117]

The Commission majority recommends that changes to California statutes, rules and policies be seriously considered to encourage more hearings and formal findings in considering state habeas corpus petitions in death penalty cases. The California Supreme Court's summary denial of habeas petitions without evidentiary hearings and without any explanation of the reasons[118] does not save time, since it adds to the delay in resolution of the inevitable subsequent federal habeas corpus claim. Simply adopting the Alarcon proposal to shift the initial consideration of habeas petitions to the Superior Courts, however, would only add to the delays if the Superior Courts summarily deny the petitions at the same rate, competency standards for the appointment of counsel are not ensured, or additional resources are not provided for full development of the facts necessary to resolve claims for relief. Among the statutory changes to be considered should be a reexamination of the standards for requiring the Attorney General to file a return, and the standards for requiring an evidentiary hearing. Written findings should also be required.

## 2. EXPLAINING RACIAL AND GEOGRAPHIC DISPARITIES

The decision to pursue the death penalty for a death eligible defendant is the responsibility of the elected District Attorney in each California county. Although there is no current data to show

---

115. Cal. Const., art. VI, Section 10.

116. Supreme Court Policies Arising From Judgments of Death, at Policy 3, 2-1 (1989).

117. Alarcon, *supra* n. 2, at 742–43.

118. The California Supreme Court issues an order to show cause requiring the Attorney General to respond in only 8% of death penalty habeas corpus petitions, and orders an evidentiary hearing before a referee in only 4.5% of the cases.

Exhibit 1
Page 160

what proportion of California homicides are *charged* as first degree murder and/or death penalty cases, there has been research focused upon the cases that actually result in a sentence of death. Professors Glen Pierce and Michael Radelet examined the racial, ethnic and geographical variation in the imposition of the death penalty based on an analysis of homicides that occurred in California between January 1, 1990 and December 31, 1999.[119] They found that for the 33,914 homicides occurring in California during this period, 302 defendants were sentenced to death. The statewide ratio for this ten-year period was .89 death sentences for every 100 homicide victims. The authors then examined variations in this ratio based upon the race of the victim and the geographical location of the homicide. They found the ratio varied substantially among California counties. Excluding counties in which fewer than five death sentences were imposed,[120] death sentencing ratios varied from .58 for each 100 homicides to rates nearly ten times higher.

These ratios do not take into consideration variations in arrest rates across counties. Larger urban counties may have higher proportions of stranger-to-stranger homicides, which often remain unsolved and produce correspondingly lower arrest rates. Pierce and Radelet adjusted for variance in arrest rates by counting homicides in which an offender was identified (ordinarily by making an arrest), and then comparing the death sentencing rate to the urban character of the county as measured by population density, and the proportion of the county's population that were non-Hispanic whites. This comparison strongly suggested that those counties with the highest death sentencing rates tend to have the highest proportion of non-Hispanic whites in their population, and the lowest population density. The more white and more sparsely populated the county, the higher the death sentencing rate.

Pierce and Radelet also subjected their data to logistic regression analysis to ascertain whether the race and ethnicity of homicide victims is associated with imposition of the death penalty in California. Overall, controlling for all other predictor variables, they found all those who kill African Americans, regardless of the ethnicity or race of the perpetrator, are 59.3% less likely to be sentenced to death than those who kill non-Hispanic whites. This disparity increases to 67% when comparing the death sentencing rates of those who kill whites with those who kill Hispanics, again without regard to the ethnicity or race of the perpetrator.

It should be clearly understood that this data does not establish that prosecutorial discretion is affected by race and class bias, unconscious or otherwise. There are many other plausible explanations for the consistent patterns based on race of victim that appear in every death penalty state. Similar patterns have been found in other states in recent studies, including Florida, Illinois, Nebraska, Arizona, Maryland, North Carolina and Pennsylvania, as well as in studies of death sentencing in federal cases.[121] More detailed analysis of more data is necessary to identify the reasons for patterns of disparity based upon the race of the victims.[122]

---

119. Pierce & Radelet, *The Impact of Legally Inappropriate Factors on Death Sentencing for California Homicides*, 1990–1999, 46 Santa Clara L. Rev. 1 (2005).

120. In almost half the counties, 28 of the 58, no death sentences were imposed during the 1990's, although 1,160 homicides took place in these counties. The current District Attorney for San Francisco, Kamala Harris, and her predecessor, Terrence Hallinan, pledged never to seek the death penalty. Since 1979, only two defendants have been sentenced to death for murders in San Francisco. *Id.* at 26, n.128.

121. Pierce and Radelet, *supra* n. 119, at 38–39.

122. Analysis of racial data should include all cases in which the death penalty was sought and those in which it was rejected as well as those in which it was imposed. Data from San Mateo County illustrates the difficulty of drawing any conclusions from a simple comparison of the race of the defendant and the race of the victim in cases where the death penalty was imposed. Since 1983, 26 capital cases were tried to penalty phase to a jury. 13 of the defendants were white, and 13 were persons of color. There were a total of 42 victims: 27 were white and 15 were persons of color. Death verdicts were returned in 14 of the cases, 8 against white defendants, and 6 against defendants of color.

Exhibit 1
Page 161

Professors Pierce and Radelet noted broad concerns about data quality and availability in California:

> *Such issues raise crucial questions about the interest, and, more fundamentally, the ability of the State to monitor its death sentencing process. A comprehensive and effective monitoring program needs to track all homicide cases from arrest through appeal. To accurately assess the full range of factors that may or may not affect criminal justice decisions, all links and actors in the decision-making process must be monitored. This necessitates collecting information from the very start of the process, including information on the character of police investigations and prosecutorial charging decisions.*[123]

The systematic collection and monitoring of more comprehensive data about how homicide cases are selected for prosecution as death cases could yield valuable insights into the impact of the race of the victim. This data should be regularly collected and analyzed.

Prosecutors suggest that geographical variation in utilizing the death penalty is not a problem, because locally elected District Attorneys are responding to the demands of the electorate which they represent. The California Supreme Court has consistently rejected claims that the discretion conferred on the district attorney of each county to seek the death penalty results in a county-by-county disparity in capital prosecutions, causing arbitrariness forbidden by the federal Constitution.[124] Others suggest that since the death penalty is administered in the name of the State, there should be a uniform statewide standard applied to determine if the death penalty should

be employed.[125] A local decision to seek the death penalty may impose tremendous costs that will be borne by the State as a whole, including the costs of subsequent appeal and habeas proceedings and the costs of confinement on death row.

## Many states address the problem of geographical variation by imposing a requirement of comparative proportionality in death sentences.

The United States Supreme Court has ruled that the Eighth Amendment of the U.S. Constitution does not *require* comparative proportionality review in death penalty cases, concluding that disparities in death sentences cannot be labeled as cruel and unusual punishment. The Court also held that death penalty statutes without proportionality review do not violate the Fourteenth Amendment's guarantee of equal protection. Indeed, these rulings came in a case challenging California's death penalty statute for failing to provide proportionality review.[126] Nevertheless, the majority of states which provide for the death penalty do require comparative proportionality review to achieve a consistent statewide standard.[127] Gerald Kogan, former Chief Justice of the Florida Supreme Court, told the Commission that Florida has one of the highest rates of state Supreme Court reversal of death penalties in the nation, because of its employment of proportionality review.[128]

---

In those 14 cases, there were 27 victims, 16 white and 11 persons of color. In the twelve cases where the jury rejected a death verdict, 5 defendants were white and 7 were persons of color. There were 15 victims in those 12 cases: 11 were white, and 4 were persons of color.

123. *Supra*, n. 119 at p. 37.

124. *See, e.g., People v. Ayala*, 23 Cal.4th 225 (2000); *People v. Holt*, 15 Cal.4th 629, 702 (1997); *People v. Ochoa*, 19 Cal.4th 353, 479 (1998).

125. *See, e.g.*, the suggestion of Commissioner Jon Streeter, pp. 57–68 *supra*.

126. *Pulley v. Harris*, 465 U.S. 37 (1984).

127. Kaufman-Osborn, *Capital Punishment, Proportionality Review, and Claims of Fairness (With Lessons From Washington State)*, 79 Wash. L. Rev. 775, 790–92 (2004) (21 of the 39 states with death penalty laws impose a requirement of comparative proportionality review).

128. Testimony of Hon. Gerald Kogan, p. 34.

Exhibit 1
Page 162

The Commission majority has concluded that geographical and racial variation should be subjected to further study and analysis in California. Evidence of disparities in the administration of the death penalty undermines public confidence in our criminal justice system generally. California is the most diverse state in the country. It is our duty to ensure that every aspect of the criminal justice system is administered fairly and evenly, and that all residents of the state are accorded equal treatment under the law. This is especially true when the state chooses to take a life in the name of the people. The Commissioners are unwilling to recommend a requirement of comparative proportionality or approval of local death penalty decisions by a statewide body, however, without additional data and research.

## 3. COMPREHENSIVE DATA COLLECTION AND MONITORING

The Commission made a concerted effort to identify the process by which decisions are made by California District Attorneys to proceed with a homicide prosecution as a death penalty case. After completing preliminary research, Professors Harry Caldwell, Carol Chase and Chris Chambers of Pepperdine University School of Law prepared a survey form which was sent to the District Attorneys in each of California's 58 counties. The survey sought information concerning the process by which each office determines whether to file a homicide as a capital case, as well as information designed to reveal whether certain types of special

circumstances are more likely than others to be filed as capital cases, and whether certain characteristics of defendants, victims, or the crimes alleged were more likely to result in a capital charge. Despite extensive follow-up contacts, twenty counties never responded to the survey, and another fourteen responded by declining to participate in the survey. The non-cooperating counties included five of the top ten death-sentencing counties in California.[129]

With respect to the counties that completed the survey, most indicated that a panel or committee of prosecutors was utilized to make a recommendation to the District Attorney whether the death penalty should be sought. Very few counties indicated they had written policies or guidelines, and only one was willing to provide a copy of their written policy. The responding offices differed as to their use of information from the defense in making their decisions. In most counties, the decision is not made until the information is filed, after the preliminary hearing.

The survey did not yield enough statistical information to draw any conclusions with regard to the decision-making process. The Pepperdine researchers concluded:

*Of all the decisions that a government can make, the decision to seek to end the life of another human being must be the most important and sobering. These decisions should be made only after careful consideration of specified factors after a clearly defined process designed to ensure fairness and to avoid arbitrary results. As the ultimate decision for each county rests with an elected official, the District*

---

129. The non-cooperating counties included Riverside, Orange, Alameda, San Diego and Kern. The top ten death-sentencing counties in California, measured by the number of inmates on death row in January, 2004, were: 1. Los Angeles (194), 2. Riverside (54), 3. Orange (49), 4. Alameda (43), 5. Sacramento (34); 6. San Bernardino (34); 7. San Diego (32), 8. Santa Clara (27), 9. Kern (23), 10. San Mateo (16).

Exhibit 1
Page 163

Death Penalty

153

*Attorney, one would hope that the District Attorney would value transparency in his/her decision-making process, both to insure that these important decisions are being made as evenhandedly as possible and to give the electorate the opportunity to voice its approval or disapproval of the process by which the District Attorney makes those decisions. Unfortunately, our experience has revealed a wariness about disclosing information about the death penalty decision-making process on the part of many district attorneys offices. While some offices – including the office of the most populous county (Los Angeles), have been very forthcoming – a record of 15 relatively complete responses out of 58 counties[130] paints a distressing picture of the willingness of those who tinker with the machinery of the death penalty to expose their decision-making process to the electorate.[131]*

Regrettably, a similar experience of wariness was reported by the Rand Corporation, which was retained by the Commission to determine the feasibility of a major study of the administration and the administrative costs of the death penalty in California:

*At the outset of our conversations with representatives of participating agencies, the relevance of the underlying political dynamic became undeniably apparent. Namely, that many (if not most) of the participants in the death penalty process have strongly held views about the death penalty, and that those views have implications for our ability to gather the necessary data for the proposed study. The representatives on the defense side with whom*

*we spoke tended to see it as their responsibility to prevent or delay the application of capital punishment. Therefore, not surprisingly, they appear to fall largely within the group of those opposed to the use of the death penalty. And the representatives on the prosecution side, especially at the local level, showed an interest in maintaining all possible sentencing options for any given crime, which allows for the widest discretion in determining how to handle their cases, as well as providing leverage for plea-bargaining. Thus, the two groups of key stakeholders not only play adversarial roles in individual cases, but they also largely disagree when it comes to the death penalty.*

*It is perhaps not surprising then, that many of the stakeholders in the current death penalty process are wary of the kind of independent study we have proposed, for fear that it could end up swaying opinion in a direction contrary to their own convictions. This wariness was expressed to us directly by some, as well as indirectly (e.g., difficulties we encountered getting connected in a timely fashion to the right people). In our experience, such ambivalence about a study can make data collection extremely difficult – if not effectively impossible.[132]*

Providing the public with reliable information about how the death penalty is being administered in California should not depend upon the discretion of those who are charged with its administration. The Commission majority recommends that reporting requirements be imposed to systematically collect and make public data regarding all decisions by prosecutors in murder cases whether or not to charge special circumstances

---

130. In addition to Los Angeles County, relatively complete responses were received from Butte, Calaveras, Imperial, Inyo, Kings, Lake, Mendocino, Nevada, San Bernardino, San Mateo, Santa Clara, Shasta, Tehama and Tuolumne Counties.

131. Caldwell, Chase & Goodman, *Death Penalty Survey Report*, p. 7 (Nov. 7, 2007).

132. Everingham, Ridgley, Reardon & Anderson, *Feasibility Study: Characterizing the Administration and Assessing the Administrative Costs of the Death Penalty in California*, p. 11 (Rand Corp., August 2007).

Exhibit 1
Page 164

and/or seek the death penalty, as well as the disposition of such cases by dismissal, plea or verdict in the trial courts. The Legislature should impose a requirement upon courts, prosecutors and defense counsel to collect and report all data needed to determine the extent to which race of the defendant, the race of the victim, geographic location and other factors affect decisions to implement the death penalty, to accurately determine the costs, and to track the progress of potential death penalty cases. This recommendation was among the most vigorously debated by the Commission, with some Commissioners believing that data collection is useless without a carefully defined purpose for the data. The Commission majority concluded that a newly created Death Penalty Review Panel would play a vital role in defining what data is necessary to carry out its monitoring and advising functions.

The Commission received a recommendation from Professors Ellen Kreitzberg, Michael Radelet and Steven Shatz describing a comprehensive system of data collection modeled on the system implemented by the Supreme Court of New York.[133] Some counties, such as Alameda County, already routinely collect much of the data that would be reported. The Commission recommends that reporting requirements be imposed to systematically collect and make public cumulative data regarding all decisions by prosecutors in murder cases whether or not to charge special circumstances and/or seek the death penalty, as well as the disposition of such cases by dismissal, plea or verdict in the trial courts.

The Legislature should impose a requirement upon courts, prosecutors and defense counsel to collect and report any data other than privileged material designated by the California Death Penalty Review Panel which may be necessary: (1) to determine whether demographics affect decisions to implement the death penalty, and if so, how; (2) to determine what impact decisions to seek the death penalty have upon the costs of trials and postconviction review; and (3) to track the progress of potential and pending death penalty cases to predict the future impact upon the courts and correctional needs. The information should be reported to the California Department of Justice and the California Death Penalty Review Panel. The information reported should be fully accessible to the public and to researchers.

The experience of this Commission in undertaking a comprehensive review of the administration of California's death penalty law confirms the need for more comprehensive collection of data and the continual monitoring and analysis of that data, to identify and address the problems of delay, chronic under-funding, and the potential risk of wrongful convictions and executions, and to assure ourselves that racial and geographic variations do not reflect the inappropriate exercise of discretion.

The Commission majority recommends the establishment of a California Death Penalty Review Panel, to be composed of judges, prosecutors, defense lawyers, law enforcement representatives and victim advocates appointed by the Governor and the Legislature. It should be the duty of this Panel to issue an annual report to the Legislature,

---

133. Kreitzberg, Radelet & Shatz, Response to Questions on Proportionality Review and Data Collection, March 12, 2008. (Available on Commission's Website).

Exhibit 1
Page 165

the Governor and the courts, gauging the progress of the courts in reducing delays in death penalty cases, analyzing the costs of and monitoring the implementation of the recommendations of this Commission, and examining ways of providing safeguards and making improvements in the way the California death penalty law functions.

## 4. THE NEED FOR GREATER TRANSPARENCY IN THE EXERCISE OF PROSECUTORIAL DISCRETION TO PURSUE THE DEATH PENALTY

Although the Commission's attempt to survey prosecutors was largely unsuccessful, the ACLU of Northern California conducted a survey of defense attorneys to ascertain the death penalty charging procedures in their counties.[134] They received information regarding the practices in fifteen active death penalty counties,[135] in most cases from the Chief Public Defender or a deputy. The data obtained was entirely consistent with that collected by the Pepperdine researchers. It demonstrated great variation in the practices for charging special circumstances, a lack of racial diversity among the individuals who made the decision, great variation in when the decision was made, and significant variation in the involvement of the defense in the process. In all but three of the responding counties (Kern, Sacramento and Solano) review panels or Committees of prosecutors were utilized to make a recommendation to the District Attorney. Only two responses indicated the review committees were racially diverse. In three of the counties, the defense is not regularly consulted before a

decision is made.[136] Five of the counties permit written submissions by the defense.[137] Seven of the counties permit the defense to actually meet with the committee.[138]

There was also significant variation in when the decision to seek the death penalty was made. Most counties made the decision after the preliminary hearing, but there was significant variation in how long after the preliminary hearing a decision was made. In one recent case, the prosecution declared for the first time that it was seeking a sentence of death on the first day of trial.[139]

The Commission recently recommended that all District Attorney Offices in California formulate and disseminate a written Office Policy to govern compliance with the constitutional obligation to disclose exculpatory evidence. *Report and Recommendations on Compliance With the Prosecutorial Duty to Disclose Exculpatory Evidence* (March 6, 2008). We believe it is equally important that the policy governing the decision to seek the death penalty be in writing and publicly available. The Commission therefore unanimously recommends that all District Attorney Offices in California formulate and disseminate a written Office Policy describing how decisions to seek the death penalty are made, who participates in the decisions, and what criteria are applied. Such policies should also provide for input from the defense before the decision is made.

---

134. Natasha L. Minsker, *Charging Practices of CA DA's in Death Penalty Cases, Survey Responses*, Letter to the Commission dated Feb. 15, 2008 (Available on Commission's Website).

135. Responses were obtained for Alameda, Contra Costa, Fresno, Kern, Los Angeles, Orange, Riverside, Sacramento, San Bernardino, San Diego, San Mateo, Santa Clara, Solano, Tulare and Ventura Counties. Thus, all of the top ten death-sentencing counties were included. See n. 96, *supra*.

136. Kern, Riverside and San Bernardino.

137. Alameda, Contra Costa, Fresno, Los Angeles and Solano.

138. Orange, San Diego, San Mateo, Sacramento, Santa Clara, Tulare and Ventura.

139. Dan Bernstein, *A Late Penalty*, Riverside Press-Enterprise, Oct. 9, 2007.

140. Carter and Moylan, *Clemency in Capital Cases* (2008) (Available on the Commission's Website)

Exhibit 1
Page 166

## 5. THE GOVERNOR'S CLEMENCY POWER IN DEATH PENALTY CASES

The California constitution vests the power to commute or pardon a person condemned to death in the Governor.

> *Art. V, Section 8(a). Subject to application procedures provided by statute, the Governor, on conditions the Governor deems proper, may grant a reprieve, pardon, and commutation, after sentence, except in case of impeachment. The Governor shall report to the legislature each reprieve, pardon, and commutation granted, stating the pertinent facts and the reasons for granting it. The Governor may not grant a pardon or commutation to a person twice convicted of a felony except on recommendation of the Supreme Court, 4 judges concurring.*

At the request of the Commission, Professors Linda E. Carter and Mary-Beth Moylan of the University of the Pacific, McGeorge School of Law undertook a comprehensive study of the use of commutation in California death penalty cases.[140] Historically, they found substantial variation in the rates at which California Governors exercised clemency in death penalty cases. Governor Culbert Olson (1939–1942) commuted 16 death sentences while overseeing 29 executions.[141] Governor Earl Warren (1943–1953) commuted 7 death sentences while overseeing 80 executions.[142] Governor Edmund G. "Pat" Brown commuted 20 death sentences while presiding over 20 executions.[143] The last commutation of a death sentence in California was by Governor Ronald Reagan in 1967. Governor Reagan also presided

over one execution. Since the enactment of the current California death penalty law in 1978, there have been 13 executions. Clemency was denied in all 13 cases: five by Governor Pete Wilson, five by Governor Gray Davis, and three by Governor Arnold Schwarzenegger.

Professors Carter and Moylan conclude that executive clemency cannot and should not function as a device to review procedural errors or legal challenges to execution. Its purpose is to provide a safety valve, and its unregulated nature furthers that purpose. They do make two recommendations to amend Article V, Section 8(a) of the California constitution, however, and the Commission unanimously supports these recommendations:

**1** Decisions denying clemency in death cases should be preserved in the records of the Legislature as well as decisions granting clemency. All of the last thirteen denials of clemency resulted in the issuance of written decisions, but Professors Carter and Moylan encountered difficulty in locating all of those decisions. The second sentence of Section 8(a) should be amended to read: "The Governor shall report to the Legislature each reprieve, pardon, and commutation granted or *denied.*"

**2** The requirement of Supreme Court concurrence in the grant of executive clemency to a twice-convicted felon should be removed. Involving the Supreme Court in the clemency process intertwines the judicial branch in a power that is exclusively vested in the executive branch by the California constitution. No other state has a process that gives the judicial branch this type of veto power over the executive's decision. The concept of

---

140. Carter and Moylan, Clemency in Capital Cases (2008) (Available on the Commission's Website).

141. Governor Olson's Clemency Secretary was Stanley Mosk, who later served as California Attorney General and as a Justice of the California Supreme Court for 37 years.

142. Governor Warren later served as Chief Justice of the United States Supreme Court for 15 years.

143. One of Governor Brown's Clemency Secretaries was Arthur Alarcon, now a Senior Judge of the U.S. Court of Appeals for the Ninth Circuit. Governor

Brown authored a book describing his experiences in considering death penalty commutations. Edmund (Pat) Brown with Dick Adler, *Public Justice, Private Mercy: A Governor's Education on Death Row* (1989).

Exhibit 1
Page 167

Death Penalty

granting mercy is an extra-judicial function that is not within the purview or function of a court.

The Commission is also in agreement with the suggestion of Professors Carter and Moylan that Penal Code Section 4813 be amended to make it discretionary rather than mandatory that requests for clemency by a twice convicted felon be referred to the Board of Prison Terms for a written recommendation. This proposed amendment will bring the statute into conformity with the actual practice of recent Governors and alleviate a possible conflict with the California constitution and its requirement of the separation of powers.

Finally, the Commission suggests that the Governor receive information from the attorneys for the accused, and should consider in each case meeting personally with the attorneys for each side before making a decision regarding commutation in a death penalty case. As the only decision maker, the Governor should hear evidence and arguments in person as much as possible.

## Conclusion

If we are to achieve the goals of justice, fairness and accuracy in the administration of the death penalty in California, and reduce delays at least to the national average, there is urgent need to increase funding at every level: trials, direct appeals and habeas corpus review. Once increased funding has been achieved, serious consideration should be given to both a proposed constitutional amendment to permit the California Supreme Court to transfer fully briefed pending death penalty

appeals from the Supreme Court to the Courts of Appeal, and changes to California statutes, rules and policies to encourage more factual hearings and findings in state habeas proceedings in death penalty cases.

Reporting requirements should be imposed to systematically collect and make public cumulative data regarding all decisions by prosecutors in murder cases whether or not to charge special circumstances and/or seek the death penalty, as well as the disposition of such cases by dismissal, plea or verdict in the trial courts.

A Death Penalty Review Panel should be established to issue an annual report to the Legislature, the Governor and the courts, gauging the progress of the courts in reducing delays, analyzing the costs of and monitoring the implementation of the recommendations of this Commission, and examining ways of providing safeguards and making improvements in the way the California death penalty law functions.

Each District Attorney Office in California should formulate a written Office Policy describing when and how decisions to seek the death penalty are made.

The constitutional and statutory provisions governing Gubernatorial clemency should be modified to maintain consistent records and eliminate unnecessary procedural steps.

157

Exhibit 1
Page 168

This report sets forth an ambitious and expensive agenda of reform. The failure to implement it, however will be even more costly. The death penalty will remain a hollow promise to the people of California.

# Appendix I:

## DEATH PENALTY FOCUS QUESTIONS

**1** Should reporting requirements be imposed to systematically collect and make public data regarding all decisions by prosecutors in murder cases whether or not to charge special circumstances and/or seek the death penalty, as well as the disposition of such cases by dismissal, plea or verdict in the trial courts?

**2** Should the California constitution be amended to permit the transfer of jurisdiction over pending death penalty appeals from the Supreme Court to the Courts of Appeal?

**3** Should California law be changed to require state habeas corpus petitions in death penalty cases be filed in the Superior Courts?

**4** Should California law be changed to narrow the special circumstances that would make a defendant eligible for the death penalty?

(a) Should death penalty eligibility be limited to cases in which the defendant was the actual killer?

(b) Should death penalty eligibility be limited to cases in which the defendant formed the intent to kill?

(c) Should felony murder special circumstances be retained?

(d) Should special circumstances be limited to the "worst of the worst"? If so, which special circumstances define the "worst of the worst"?

**5** What measures should be taken to assure the prompt appointment of qualified lawyers to provide competent representation for the defendant in death penalty cases at the trial stage, on direct appeal, and for habeas corpus challenges?

**6** Should consistency of representation be provided for state and federal habeas corpus proceedings in death penalty cases?

**7** Are funding and support services for the defense of capital cases adequate to assure competent representation by qualified lawyers?

**8** Are there significant racial disparities associated with the race of the victim or the defendant in imposing the death penalty in California? If so, what remedies are available to minimize or eliminate the problem?

**9** Are there significant geographical disparities from county to county in utilizing the death penalty in California? Is this a problem? If so, what remedies are available to minimize or eliminate the problem?

**10** Is there a need for proportionality review of death penalty sentences in California? If so, how should such a review process be incorporated into California's death penalty law?

**11** Are clemency procedures used by California governors consistent from one administration to the next? Are they consistent with the procedures utilized by other states? Are they adequate to assure a fair opportunity to be heard by all interested parties, and to assure a principled decision on the merits?

Exhibit 1
Page 169

Death Penalty

# Appendix II:

FEDERAL GRANTS OF RELIEF IN CALIFORNIA CAPITAL CASES (JUDGMENTS ARE FINAL) (N=38)

159

|  | Inmate | Result | Relief Granted on Guilt or Penalty | Case Citation |
|---|---|---|---|---|
| 1. | Acala, Rodney | Granted | Guilt | *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) |
| 2. | Ainsworth, Steven | Granted | Penalty | *Ainsworth v. Woodford*, 268 F.3d 868 (9th Cir. 2001) |
| 3. | Bean, Anthony | Granted | Guilt | *Bean v. Calderon*, 163 F.3d 1073 (9th Cir. 1998), *cert. denied*, 528 U.S. 922 (1999) |
| 4. | Bloom, Robert | Granted | Guilt | *Bloom v. Calderon*, 132 F.3d 1267 (9th Cir. 1997), *cert. denied*, 523 U.S. 1145 (1998) |
| 5. | Caro, Fernando | Granted | Penalty | *Caro v. Woodford*, 280 F.3d 1247 (9th Cir.), *cert. denied*, 536 U.S. 951 (2002) |
| 6. | Clark, William | Granted | Guilt (Special Circumstance) | *Clark v. Brown*, 442 F.3d 708 (9th Cir.), *cert. denied*, 127 S. Ct. 555 (2006) |
| 7. | Coleman, Russell | Granted | Penalty | *Coleman v. Calderon*, 210 F.3d 1047 (9th Cir. 2000) |
| 8. | Daniels, Jackson | Granted | Guilt | *Daniels v. Woodford*, 428 F.3d 1181 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 2876 (2007) |
| 9. | Douglas, Fred | Granted | Penalty | *Douglas v. Woodford*, 316 F.3d 1079 (9th Cir.), *cert. denied*, 540 U.S. 810 (2003) |
| 10. | Dyer, Alfred | Granted | Guilt | *Dyer v. Calderon*, 151 F.3d 970 (9th Cir.), *cert. denied*, 525 U.S. 1033 (1998) |
| 11. | Frierson, Lavell | Granted | Penalty | *Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006), *cert. denied*, 127 S. Ct. 2976 (2007) |
| 12. | Ghent, David | Granted | Guilt (Special Circumstance) | *Ghent v. Woodford*, 279 F.3d 1121 (9th Cir. 2002) |
| 13. | Grant, Richard | Granted in District Court (Petitioner Appealed denial of guilt relief; Warden did not appeal grant of penalty relief) | Penalty | *Grant v. Brown*, Order, Civ. S-90-0779 (E.D. Cal. Jan. 12, 2006) |
| 14. | Hamilton, Bernard | Granted | Penalty | *Hamilton v. Vasquez*, 17 F.3d 1149 (9th Cir.), *cert. denied*, 512 U.S. 1220 (2000) |
| 15. | Hayes, Blufford | Granted | Guilt | *Hayes v. Brown*, 399 F.3d 972 (9th Cir. en banc 2002) |
| 16. | Hendricks, Edgar | Granted | Penalty | *Hendricks v. Calderon*, 70 F.3d 1032 (9th Cir. 1995), *cert. denied*, 517 U.S. 1111 (1996) |
| 17. | Hovey, Richard | Granted | Penalty | *Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006) |
| 18. | Howard, Gary | Granted in District Court (Parties stipulated to dismissal of appeal) | Penalty | *Howard v. Calderon*, Order, CV 88-7240 (C.D. Cal. Sept. 26, 1996) |

Exhibit 1
Page 170

| | Inmate | Result | Relief Granted on Guilt or Penalty | Case Citation |
|---|---|---|---|---|
| 19. | Hunter, Michael | Granted in District Court (Neither party appealed) | | *Hunter v. Vasquez*, Order, C 90-3275 (N.D. Cal. Dec. 9, 1998) |
| 20. | Jackson, Earl | Granted | Penalty | *Jackson v. Brown*, 513 F.3d 1057 (9th Cir. 2008) |
| 21. | Jackson, Michael | Granted | Penalty | *Jackson v. Calderon*, 211 F.3d 1148 (9th Cir. 2000), *cert. denied*, 531 U.S. 1072 (2001) |
| 22. | Jennings, Michael | Granted | Guilt | *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003) |
| 23. | Karis, James | Granted | Penalty | *Karis v. Calderon*, 283 F.3d 1117 (9th Cir. 2002), *cert. denied*, 539 U.S. 958 (2003) |
| 24. | Keenan, Maurice | Granted in District Court (Petitioner appealed denial of guilt relief; Warden did not appeal grant of penalty relief) | Penalty | *Keenan v. Woodford*, 2001 WL 835856 (Dec. 21, 1999) |
| 25. | Malone, Kelvin | Granted in District Court (Executed in Missouri) | Penalty | *Malone v. Vasquez*, Order, 96-4040-WJR, (C.D. Cal. Jan. 11, 1999) |
| 26. | Mayfield, Demetrie | Granted | Penalty | *Mayfield v. Woodford*, 270 F.3d 915 (9th Cir. 2001) |
| 27. | McDowell, Charles | Granted | Penalty | *McDowell v. Calderon*, 130 F.3d 833 (9th Cir. en banc 1997), *cert. denied*, 523 U.S. 1103 (1998) |
| 28. | McLain, Robert | Granted | Penalty | *McLain v. Calderon*, 134 F.3d 1383 (9th Cir.), *cert denied*, 525 U.S. 942 (1998) |
| 29. | Melton, James | Granted in District Court (Neither party appealed) | Guilt | *Melton v. Vasquez*, Order, CV 89-4182 (C.D. Cal. Jan. 19, 2007) |
| 30. | Moore, Charles | Granted | Guilt | *Moore v. Calderon*, 108 F.3d 261 (9th Cir.), *cert. denied*, 521 U.S. 1111 (1997) |
| 31. | Morris, Bruce | Granted | Penalty | *Morris v. Woodford*, 273 F.3d 826 (9th Cir.), *cert. denied*, 537 U.S. 941 (2002) |
| 32. | Murtishaw, David | Granted | Penalty | *Murtishaw v. Woodford*, 255 F.3d 926 (9th Cir. 2001), *cert. denied*, 535 U.S. 935 (2002) |
| 33. | Odle, James | Granted | Guilt | *Odle v. Woodford*, 238 F.3d 1084 (9th Cir.), *cert. denied*, 534 U.S. 888 (2001) |
| 34. | Ramirez, Richard | Granted in District Court (Warden did not appeal) | Guilt | *Ramirez v. Vasquez*, Order, 91-CV-03802 (C.D. Cal. Feb. 5, 2008) |
| 35. | Sandoval, Alfred | Granted | Penalty | *Sandoval v. Calderon*, 241 F.3d 765 (9th Cir.), *cert. denied*, 534 U.S. 847 (2001) |
| 36. | Silva, Benjamin | Granted | Guilt | *Silva v. Woodford*, 416 F.3d 980 (9th Cir. 2005) |
| 37. | Wade, Melvin | Granted | Penalty | *Wade v. Calderon*, 29 F.3d 1312 (9th Cir. 1994), *cert. denied*, 513 U.S. 1120 (1995) |
| 38. | Williams, Michael | Granted in District Court (Parties stipulated to dismissal of appeal) | Penalty | *Williams v. Vasquez*, Order, 90-1212R (S.D. Cal. Sept. 9, 1993) |

Exhibit 1
Page 171

Death Penalty

FEDERAL DENIALS OF RELIEF IN CALIFORNIA CAPITAL CASES (JUDGMENTS ARE FINAL) (N=16)[144]

|  | Inmate | Result | US Supreme Court Action | Case Citation |
|---|---|---|---|---|
| 1. | Allen, Clarence | Denied by 9th Circuit | Certiorari Denied | *Allen v. Woodford*, 395 F.3d 979 (9th Cir.), *cert. denied*, 546 U.S. 858 (2005) |
| 2. | Anderson, Stephen | Denied by 9th Circuit | Certiorari Denied | *Anderson v. Calderon*, 232 F.3d 1053 (9th Cir. 2000), *cert. denied*, 534 U.S. 1036 (2001) |
| 3. | Babbitt, Manuel | Denied by 9th Circuit | Certiorari Denied | *Babbitt v. Calderon*, 151 F.3d 1170 (9th Cir. 1998), *cert. denied*, 525 U.S. 1159 (1999) |
| 4. | Beardslee, Donald | Denied by 9th Circuit | Certiorari Denied | *Beardslee v. Woodford*, 358 F.3d 560 (9th Cir.), *cert. denied*, 543 U.S. 842 (2004) |
| 5. | Bonin, William | Denied by 9th Circuit | Certiorari Denied | *Bonin v. Calderon*, 59 F.3d 815 (9th Cir. 1995), *cert. denied*, 516 U.S. 1051 (1996) |
| 6. | Davis, Larry | Denied by 9th Circuit | Certiorari Denied | *Davis. v. Woodford*, 384 F.3d 628 (9th Cir. 2004), *cert. dismissed*, 545 U.S. 1165 (2005) |
| 7. | Fields, Stevie | Denied by 9th Circuit | Certiorari Denied | *Fields v. Woodford*, 503 F.3d 755 (9th Cir. 2007), *cert. denied*, 128 S.Ct. 1875 (2008) |
| 8. | Harris, Robert | Denied by 9th Circuit | Reversed | *Harris v. Pulley*, 692 F.2d 1189, (9th Cir.1982), *rev'd*, 465 U.S. 37 (1984) |
| 9. | Morales, Michael | Denied by 9th Circuit | Certiorari Denied | *Morales v. Calderon*, 388 F.3d 1159 (9th Cir. 2004), *cert. denied*, 546 U.S. 935 (2005) |
| 10. | Raley, David | Denied by 9th Circuit | Certiorari Denied | *Rayley v. Ylst*, 470 F.3d 792 (9th Cir. 2006), *cert. denied*, 128 S. Ct. 59 (2007) |
| 11. | Rich, Darrell | Denied by 9th Circuit | Certiorari Denied | *Rich v. Calderon*, 187 F.3d 1064 (9th Cir. 1999), *cert. denied*, 528 U.S. 1092 (2000) |
| 12. | Sims, Mitchell | Denied by 9th Circuit | Certiorari Denied | *Sims v. Brown*, 430 F.3d 1220 (9th Cir. 2005), *cert. denied*, 127 S. Ct. 62 (2006) |
| 13. | Siripongs, Jaturun | Denied by 9th Circuit | Certiorari Denied | *Siripongs v. Calderon*, 133 F.3d 732 (9th Cir.), *cert. denied*, 52 U.S. 839 (1998) |
| 14. | Thompson, Thomas | Denied by 9th Circuit | Reversed | *Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997), *rev'd*, 523 U.S. 538 (1998) |
| 15. | Williams, Keith | Denied by 9th Circuit | Certiorari Denied | *Williams v. Calderon*, 83 F.3d 281 (9th Cir.), *cert. denied*, 517 U.S. 1183 (1996) |
| 16. | Williams, Stanley | Denied by 9th Circuit | Certiorari Denied | *Williams v. Woodford*, 384 F.3d 567 (9th Cir. 2004), *cert. denied*, 546 U.S. 934 (2005) |

FEDERAL DENIALS OF RELIEF IN CALIFORNIA CAPITAL CASES (JUDGMENTS ARE NOT FINAL) (N=3)

|  | Inmate | Result | US Supreme Court Action | Case Citation |
|---|---|---|---|---|
| 1. | Brown, Albert | Denied by 9th Circuit | Certiorari Pending | *Brown v. Ornoski*, 503 F.3d 1006 (9th Cir. 2007, *cert. pending* (petition filed May 1, 2008) |
| 2. | Cooper, Kevin | Denied by 9th Circuit |  | *Cooper v. Brown*, 510 F.3d 870 (9th Cir. 2007), petition for rehearing pending |
| 3. | Pinholster, Scott | Denied by 9th Circuit |  | *Pinholster v. Ayers*, 525 F.3d 742 (9th Cir. 2008), petition for rehearing to be filed |

144. The table includes four cases of California inmates (Mr. Morales, Mr. Fields, Mr. Raley, and Mr. Sims) whose first federal petition is final, but for whom successor litigation may invalidate their convictions or sentences.

Similarly, Mr. Davis died prior to a decision regarding his petition for certiorari and thus his case was not a final decision on the merits. Nonetheless, I have included the cases out of an abundance of caution.

Exhibit 1
Page 172

## SEPARATE STATEMENT OF COMMISSIONER BROWN

June 30, 2008

John Van de Kamp, Chairman
Commissioners
California Commission on the
Fair Administration of Justice

Dear Chairman Van de Kamp and
Commission Members:

I appreciate the hard work that went into this report. There are many issues involved in the application of the death penalty in California and I know commission members strove to achieve consensus on meaningful reforms. Regretfully, this goal still eludes us.

Capital litigation constitutes a substantial portion of my office's workload. Our lawyers work every day to defend death penalty judgments consistent with fairness, due process and constitutional requirements. Currently, we are handling some 343 capital cases at various stages of direct appeal to the California Supreme Court, 103 capital cases on habeas corpus in the state courts, 121 capital cases on habeas corpus in the federal district courts, and 16 capital cases in the United States Court of Appeals for the Ninth Circuit. Four condemned inmates have exhausted all challenges to their judgments and await the setting of their execution dates once the status of California's lethal-injection protocol is resolved by the state and federal courts. I know of no defendant facing execution who is innocent of the crime for which he was convicted and sentenced.

I share the Commission's concerns about the high costs associated with capital litigation and about the difficulty in finding and appointing qualified counsel to represent defendants in these cases. I am also concerned about needless delay in reviewing capital judgments, which has a number of causes. While death penalty proceedings warrant exceptionally careful review and cannot be rushed, multiple rounds of repetitive litigation can cause unnecessary delay, increase costs, and undermine respect for the criminal justice system.

I agree with the Commission that consideration should be given to seeking a constitutional amendment to permit transferring some death-penalty appeals from the California Supreme Court to the courts of appeal. I also agree that consideration should be given to seeking authorization to allow initiating state capital habeas corpus cases in the trial court, with appellate review in the courts of appeal. I believe that we should promptly begin to work on these proposals, even though their specific features need to be worked out.

I ask that this letter be included with the Commission's report.

Sincerely,

Edmund G. Brown Jr.
*Attorney General*

Exhibit 1
Page 173

Death Penalty

163

## SEPARATE STATEMENT OF COMMISSIONER BRATTON

June 30, 2008

Commissioners
California Commission on the
Fair Administration of Justice

I believe that the imposition of the Death Penalty is an appropriate remedy. I further believe that the imposition of the penalty should be imposed within a reasonable time and not unduly delayed. There must be an assurance that those convicted of murder and sentenced to death have received adequate representation, a full review of the legal issues involved and that they are in fact guilty of the crimes charged. The improvements in technology and its increased use in the determination of these cases has given me confidence that those who will be convicted and sentenced to death will be guilty of the crimes charged. I have supported the previous recommendations of the Commission regarding eyewitness identification, use of jailhouse informants, confessions, scientific evidence, the professional responsibility and accountability of prosecutors and defense lawyers to further ensure that this occurs.

I support the position that California has a dysfunctional system. A lapse of time of over two decades between sentence and imposition of sentence is unacceptable. To require the family of the victims to have to wait over to 20 years to have the promised punishment imposed only adds to their pain and suffering and renders it an illusory punishment. The legislature and the people of the State of California should undertake a meaningful debate to determine how to correct this problem. I

realize correcting the problem will require a large expenditure of funds, at a time when we are facing a budget crisis, and may only result in the imposition of the penalty within ten years rather than 20 years. However, if we are to impose the penalty we should do it as expeditiously as possible, while ensuring that each defendant has received a fair trial and full review of all legal and factual issues.

I do not join in any proposal to limit the ultimate punishment to life without the possibility of parole or in narrowing the list of special circumstances.

William J. Bratton
*Chief of Police, Los Angeles*

## SEPARATE STATEMENT OF COMMISSIONERS TOTTEN, BOSCOVICH, COTTINGHAM, DUNBAR, HILL

June 30, 2008

Commissioners
California Commission on the
Fair Administration of Justice

We respectfully dissent from the Report and Recommendations on the Administration of the Death Penalty in California, which was issued today by the California Commission on the Fair Administration of Justice. Regrettably, we believe the majority report indirectly assaults California's death penalty by seeking to undermine public confidence in our capital punishment law and procedure. While the majority refrains from making specific recommendations to weaken this voter

Exhibit 1
Page 174

approved law, the tone and unbalanced discussion of potential reform is anything but neutral. By doing so, the majority exceeds the scope of its original charge and unfortunately, diminishes the value of other worthwhile recommendations.

The duties of the Commission were to make recommendations as to the application and administration of the criminal justice system in California, not to advocate for or against the public policy issue of whether California should have a death penalty. Although the report purports to be neutral as to capital punishment, it unmistakably reveals a personal bias against the death penalty. The report does not reflect the views of those Commissioners joining this dissent, or those of the majority of Californians.

At the outset, it is important to note two themes in the report with which we wholeheartedly agree. First, delay on appeal and in habeas corpus in state and federal court is excessive and frustrates the effective administration of the death penalty. Second, additional resources should be expended to address a major source of that delay, the availability of sufficient competent appellate counsel, coupled with an increase in the number of attorney general deputies to respond to the appeals and writs. Additional funding for appellate counsel is a realistic measure that could significantly reduce the backlog and the delays that currently plague the administration of the death penalty in California. The Commission has performed an important service in quantifying how much these changes would cost, and the expected benefits from those expenditures. While the total figure of $95 million is a significant amount of money, it is a small proportion of our state's $140 billion annual budget, or of our state judicial branch's $3.5 billion budget.

Unfortunately, the Commission did not limit itself to fact-based recommendations, but added discussion motivated by the personal philosophies of the Commissioners. For example, the majority repeatedly uses the statement that "California's Death Penalty system is dysfunctional."[1] This broad indictment of a criminal sanction that was overwhelmingly approved by voters and still enjoys the Californian's support by a 2 to 1 margin is not simply improper – it is highly misleading.[2] The report quotes California Chief Justice Ronald M. George as stating that the death penalty system in California is "dysfunctional." However, a careful reading of the Chief Justice's comments and writings makes clear that he is referring only to the overburdened capital appellate process, and not to the entire death penalty system.[3] By completely disregarding this context, the majority effectively bootstraps this comment into a broader indictment of entire death penalty system and law.

The report discusses two "available alternatives" to increased funding: narrowing the list of special circumstances that would make a murder case eligible for the death penalty, and eliminating the death penalty altogether. The Commission purports to "make[] no recommendation regarding these alternatives" and claims that it merely "presents information regarding them to assure a fully informed debate." But the lengthy discussion of these proposals consists entirely of arguments in

---

1. See majority report, pp. 3, 6 and 60.

2. The current death penalty law, Proposition 7, was an initiative approved at the General Election of November 7, 1978, by 72 percent of the voters. (*People v. Teron* (1979) 23 Cal.3d 103, 124–125.) A recent poll shows 53% of adults in favor of the death penalty, 32% opposed, and 5% with no opinion. (Field Poll, March 3, 2006.) For registered voters, the figures were 67% in favor, 29% opposed, and 4% no opinion. (*Ibid.*)

3. California Supreme Court Chief Justice Ronald M. George used the term "dysfunctional" in the narrow context of death penalty appeal delays. In a January 7, 2008 article he wrote: "The existing system for handling capital

Exhibit 1
Page 175

---

favor of these alternatives and excludes any discussion against them. A "fully informed debate" should include both sides of an issue, not just one side.

Reducing the number of special circumstances would exclude some of California's most brutal murderers from death row. The report goes so far as to suggest that these changes be retroactive to killers already on death row, even though the death penalty was lawfully imposed in those cases at the time. A few examples will illustrate how reducing the number of special circumstances would exclude from the death penalty some of California's most heinous murders:

**1** Gregory Scott Smith is on death row for the murder of an 8-year-old boy for whom he was a teacher's aide.[4] He had previously been mean to the victim, and on two occasions had tied him up with jump ropes. Angry that the victim had asked that Smith be fired, Smith gagged the victim with a cloth gag and duct tape, forcibly sodomized him, and strangled him. He poured fire accelerant on the body and set the body on fire, where it was discovered burning by firefighters. Smith was convicted of murder in the commission of a kidnapping, a lewd act upon a child, and an act of sodomy. None of these special circumstances would warrant the death penalty under the Commission's proposal.

**2** The Commission's proposal would also exclude Mitchell Sims, known as the Domino's Pizza Killer, who is on death row with all state and federal review completed.[5] After ordering pizza to be delivered to his motel room, Sims robbed the delivery driver, tied him up, strangled him with a rope, and fully submerged him in a bathtub with a gag tied into his mouth. After killing the driver, Sims went to Domino's, robbed two other employees at gunpoint, and forced them into the cooler, suspended with nooses around their necks. When one employee warned that the delivery driver was due back, Sims took off his sweater to reveal a Domino's shirt with the driver's name tag and chuckled, "No, I don't think so." Sims was found guilty of murder with special circumstances of murder while lying in wait and during the commission of a robbery, as well as attempted murder and robbery of the other employees. These special circumstances would not warrant the death penalty under the Commission's proposal.

**3** Stevie Lamar Fields is also on death row, with state and federal review completed.[6] Shortly after being released from prison for a previous manslaughter, Fields became what the California Supreme Court described as "a one-man crime wave." Sitting in a car with a victim, he fired five shots and told the driver to keep on driving. He said that the victim was not dead and he needed to be sure she was, so he hit her in the head with a blunt object and dumped her body into an alley. He was convicted of robbery-murder with the special circumstance of murder during the commission of a robbery, as well as kidnapping for robbery and forced oral copulation of several other women. Under the Commission's proposal to limit special circumstances, Fields would escape the death penalty.

appeals in California is dysfunctional and needs reform. The state has more than 650 inmates on death row, and the backlog is growing." (Ronald M. George, Reform Death Penalty Appeals, *Los Angeles Times*, January 7, 2008.)

4. *People v. Smith* (2005) 35 Cal.4th 334.

5. *People v. Sims* (1993) 5 Cal.4th 405; *Sims v. Brown* (9th Cir. 2005) 425 F.3d 560.

6. *People v. Fields* (1983) 35 Cal.3d 329; *Fields v. Brown* (9th Cir. 2007) 503 F.3d 755.

Exhibit 1
Page 176

**4** The Commission advocates eliminating the death penalty in felony-murder cases. One such case this proposal would exclude is Vicente Benavides, who was sentenced to death for the murder of a 21-month-old girl he was babysitting.[7] The victim died of an acute blunt force penetrating injury of the anus. The anus was expanded to seven or eight times its normal size, and multiple internal organs were injured. The victim's upper lip was torn, consistent with a hand being held over her mouth, and there was evidence of previous rib fractures. The special circumstances were felony-murder rape, felony-murder rape, and felony-murder sodomy, all of which the proposal would eliminate as bases for the death penalty.

These are but a few examples of special circumstances that voters, prosecutors, and juries have rightly determined to warrant death. The Commission's proposal to eliminate these and many other special circumstances is not a mere efficiency measure, but would seriously weaken California's death penalty law.

The credibility of the report is further damaged by giving serious consideration to a proposal that in order to obtain the death penalty, the prosecution be required to prove that the crime has "legally impacted all citizens of the State of California," an artificial concept that has no precedent in the law and is totally unworkable.

A significant portion of the report is devoted to promising various purported benefits of eliminating the death penalty altogether, including cost savings, shorter periods of jury service, and freeing the Supreme Court to hear more cases of other types. This section makes no attempt to even mention a single argument in favor of the death penalty

such as deterrence that will save lives, the community's sense of justice, or upholding the will of the People who enacted the death penalty.[8] One of the most important reasons for maintaining the death penalty, its deterrent effect, is quickly dismissed in a footnote earlier in the report as a "contested issue."[9]

Some of the commissioners came to the project with the unfounded assumption that the death penalty is being administered in a discriminatory manner against minorities, and that prosecutors must be considering some undisclosed improper factors to make decisions. The report engages in a circular logic that bemoans the lack of evidence to support these assumptions, and then proposes establishing another commission, the California Death Penalty Review Panel, to study whether there is any evidence to support these suspicions. In fact, during the 30-year history of California's death penalty law, there is never been even a single finding of prosecutorial abuse in this decision making process. We oppose the creation of a California Death Penalty Review Panel as an unnecessary creation of another level of bureaucracy.

The report's apprehension regarding the process utilized by district attorneys to make death penalty decisions is similarly without factual basis. The report begins with the assumption that 87% of first degree murders are eligible for the death penalty, a figure that we cannot accept as accurate. For example, in Ventura County, the District Attorney has sought death in only 4% of the murder cases filed, reserving this decision for the worst of the worst. Statewide, only 2% of "cleared" murder cases have resulted in death verdicts. The formulation of formal written policies as to how prosecutorial discretion will be exercised is not required by law and would serve primarily to create new grounds for condemned prisoners to challenge their

7. *People v. Benevides* (2005) 35 Cal.4th 69.

8. *See Baze v. Rees* (2008) 128 S.Ct. 1520, 1547, 170 L.Ed.2d 420, 450, fn. 13 (Stevens, J., conc.), and 128 S.Ct. at 1553, 170 L.Ed.2d at 456 (Scalia, J., conc.).

9. Majority report, p. 4, n. 8.

Exhibit 1
Page 177

Death Penalty

167

convictions. The factors to be considered are already laid out in the statutory enumeration of factors in aggravation and factors in mitigation.

Most puzzling is the lengthy discussion and the call for further study on the issue of "geographic disparity" between the counties, even though the law is clear that uniformity between different jurisdictions is not required. This entire discussion is inappropriate in light of the Commission's acknowledgement that the "data does not establish that prosecutorial discretion is affected by race and class bias, unconscious or otherwise." The voters of each county select a District Attorney to enforce the law, including the death penalty, according to his or her exercise of discretion. Uniformity is not mandated and should not have been the subject of the Commission's agenda.

The Commission discusses the proposal of Ninth Circuit Senior Judge Arthur Alarcon to encourage hearing habeas corpus petitions in Superior Court. The report also discusses the proposal of Chief Justice Ronald M. George to transfer capital appeals from the California Supreme Court to the Courts of Appeal. These are thoughtful proposals from distinguished jurists that merited additional discussion and study before an endorsement by the Commission should have been made. Additional ideas, such as establishing a court of criminal appeals similar to that used in Texas, also warrant discussion, and should have been addressed by the Commission.

The report's introduction correctly notes that the commissioners hold a diverse spectrum of divergent views on the death penalty. We respect the diversity of opinion on this issue in our democratic society and have never doubted the sincerity of any of the commissioners in their views. The problem is that the final report is entirely unbalanced. It gives weight only to those who seek to limit or eliminate the death penalty, and ignores views in favor.

We fear that the important accomplishments of the Commission addressing improvements in the administration in the death penalty will be overshadowed by the report's obvious bias against capital punishment. The Commission's report will rightly expose the Commission to extensive criticism where the horrific facts of hundreds of cases impacted by such a policy will be cited in detail. Such recommendations create the likelihood that the Commission will be marginalized and identified as an anti-death penalty body. Under no circumstances can we support or be a silent partner to such a fundamentally flawed effort to weaken our existing death penalty law.

Respectfully submitted,

Gregory D. Totten
*District Attorney,*
*County of Ventura*

I join in the dissent:

Harold Boscovich
*Retired, Director Victim/Witness*
*County of Alameda*

Ron Cottingham
*President,*
*Peace Officers Research Association of California*

Pete Dunbar
*Chief of Police, Pleasant Hill*
*California Police Chiefs Association Representative*

Curtis Hill
*Sheriff, County of San Benito*

Exhibit 1
Page 178

## SEPARATE STATEMENT OF COMMISSIONER MAYORKAS

June 30, 2008

Commissioners
California Commission on the
Fair Administration of Justice

The charge of our Commission has been to assess the administration of criminal justice in California and to recommend improvements. In the last phase of our work as a Commission, we have focused our attention on the administration of the death penalty in particular. I appreciate the strong feelings the death penalty engenders, and understand there are divergent views of the appropriateness of the death penalty itself. However, I do not believe it has been our Commission's charge to opine on whether or not the death penalty should be available as the ultimate sentence, or whether the crimes that qualify for its imposition should be limited in any fashion. To the extent our Commission's final report renders any such opinions, explicitly or implicitly, I respectfully dissent. The decision whether to have a death penalty in California, and to what extent, is within the province of the People of this State, and our charge as a Commission has been to make recommendations we believe will enhance the fair administration of it.

Respectfully submitted,

Alejandro N. Mayorkas
*Retired, U.S. Attorney,*
*Central District of California*

## SEPARATE STATEMENT OF COMMISSIONERS BELLAS, FREEHLING, HERSEK, HING, JUDGE, LAURENCE, MOULDS, RING

June 30, 2008

Commissioners
California Commission on the
Fair Administration of Justice

### INTRODUCTION

We support the recommendations of the Commission if Californians elect to continue the death penalty. However, we write separately because, after carefully considering all the information and evidence put before the Commission, we believe that the death penalty should be repealed. The death penalty is too costly, the possibility is high that a person who has been wrongfully convicted will be put to death, capital punishment inordinately affects communities of color, the imposition of the death penalty varies greatly from county to county, a low income defendant faces a troubling disadvantage when charged with a capital offense, the death penalty forecloses any possibility of healing and redemption, the death qualification juror requirement inherently and unjustly biases the process against the defendant, and California should follow the lead of other civilized societies who have concluded that the death penalty be abolished.

The Commission's report is the product of serious deliberations over the fairness of the death penalty in California. All members took their responsibilities seriously, with a deep commitment to justice. We are convinced that when it comes to the death penalty (and indeed punishment for any crime)

Exhibit 1
Page 179

Death Penalty

169

every member of the Commission wants to make sure that the convicted person is the actual perpetrator, in other words, that no innocent person is convicted of a crime.

We submit this separate statement with the greatest respect for our cocommissioners who have chosen not to comment more broadly. However, we present these additional views out of a sense personal duty to the public for whom we pledged responsibility when we agreed to serve. The Commission report is the result of hard, collaborative work aimed at outlining how the death penalty can be administered in a fair and just manner; in short, the recommendations address how to make the system functional. However, as we listened to testimony, read written submissions and research, and participated in Commission discussions, it became clear to us that the question of whether to continue the death penalty at all had to be considered; we felt that the public should know that there are good reasons to consider abolishing the death penalty beyond the system's dysfunctionality.

## SUMMARY OF REASONS

Here is a brief summary of the reasons that have convinced us that the people of California ought to repeal the death penalty.

Costs. The resources that go into a death penalty case are enormous. The pursuit of execution adds millions at each phase of the process, from trial, to appeal, and habeas proceedings. For example, a death penalty trial costs counties at least $1.1 million more than a conventional murder trial. The state spends at least an additional $117 million a year on capital punishment, about half of it on prison expenses that exceed the usual costs of housing inmates and the rest on arguing and

judging death penalty appeals. The costs mount because death penalty trials and appeals take far longer than others, involve more lawyers, investigators and expert witnesses, and displace other cases from courtrooms. In contrast, adopting a maximum penalty of life without possibility of parole (for which there is growing sentiment) would incur only a fraction of the death penalty costs, including prison expenses. Our personal view is that funds spent administering the death penalty would be better spent on other California priorities like health, education, and infrastructure, or for providing direct financial and social services to the relatives of crime victims.

Racial and geographic variation. The Commission considered research by Professors Glenn Pierce and Michael Radelet on variations in the death penalty related to race and geographical location. The counties with the highest death penalty sentencing rates tend to have the highest proportion of whites in their population and are more rural. Also, those who kill African Americans and Latinos are less likely to be sentenced to death than those who kill whites. The Commission was not willing to recommend comparative proportionality review in death penalty cases, as required in some states, and thought that the racial data was insufficient on which to base recommendations. In other words, the good faith of local prosecutors should be given deference. In our view, the Pierce and Radelet data and similar research are good cause to recommend termination of the death penalty. The data are troubling, and leaving these important determinations to the good faith of local prosecutors, who are subject to political winds, is fraught with potential inconsistency and danger. The Commission came across no evidence of intentional racial motivation on the part of prosecutors who seek the death penalty. Yet, persons of color have been sentenced to death at rates far exceeding their numbers in the

Exhibit 1
Page 180

population. Why? Our society has not reached the point where unconscious racism and institutional bias based on past processes and beliefs have been eliminated. We fool ourselves if we believe that we have evolved beyond institutional racism in our state and country. Consider the fact that the homicide rate for black and Latino victims is much higher than white victims. Violent crime in low-income Southeast Asian communities is on the increase as well. Poverty and socioeconomic challenges in those communities create racial impact whether we like it or not. The correlation between poor communities (that are comprised of many blacks, Latinos, and Southeast Asians) and crime and inadequate representation is just too high to accept capital punishment as a potential penalty.

Economic disadvantage. Another regrettable feature of the death penalty is that it disproportionately punishes the poor. In *Furman v. Georgia*, Supreme Court Justice William Douglas noted, "One searches our chronicles in vain for the execution of any member of the affluent strata in this society."[1] Economically deprived, marginalized Californians are particularly vulnerable in society and within the judicial system. Over 90 percent of defendants charged with capital crimes are indigent, and as a result the vast majority of death row inmates in California are poor. In our view and experience, a poor defendant initially may be at a disadvantage primarily because poverty fractures his or her past. How can a picture be painted of such an individual who rarely went to school or saw a doctor, whose own parents might be unknown to him or her, whose illiteracy compromises the ability to participate fully as a member of the defense team, whose "neighbors" were transient? A jury can be made aware of these things, but they do not "mitigate" in the common sense of that word. A person who can finance

a death penalty defense will have no trouble establishing history as a student, family member, patient, neighbor, employee or even employer. Thus, poverty creates serious disparities in the administration of justice as well. A person of means can afford to employ forensic experts with the most impressive resumes who may have access to nationally acclaimed labs. In contrast, those of modest means are often limited to experts on a court-appointed list who have agreed to work at the lowest end of the compensation scale who are likely to lose the battle of curricula vitae. Furthermore, the indigent accused may not be fortunate enough to be represented by an institutional Public Defender team with the experience, skills, and resources to provide high quality, zealous advocacy. Instead, such an indigent may be saddled with an appointed lawyer who lacks those essential qualities. Such a defendant lacks the sophistication to know whether the appointed lawyer is properly preparing the guilt and penalty defenses and no one is monitoring the preparation. A person of means can afford to hire a team and, with money as leverage, is in a better position to insist that the entire team explain all the alternatives and strategies that are available. The person who can hire a ten-person defense team is an aberration. The more likely scenario involves the middle class defendant who pools all the family resources and puts up the house to pay an attorney who, it turns out, has never tried a capital case. In those cases, the client may have been better off in a California county with a Public Defender office where death penalty cases generally are well handled (with the defendant assigned two attorneys at the outset, unlike court appointed systems where second chair is appointed after the preliminary hearing and after the district attorney has made the final decision regarding whether to seek death). Most county Public Defender offices have defense investigators and in-house expertise

---

1. 408 U.S. 238 (1972).

Exhibit 1
Page 181

Death Penalty

on a myriad of issues and topics. The problem is that depending on where the crime occurs in California, the defendant could have all of this or none of it, and that is the travesty caused by poverty. In short, the death penalty has a troubling, disparate impact on the poor.

Risk of error. While the Commission found no conclusive evidence that any wrongfully convicted person has ever been executed in California since 1977, the risk is unmistakable. Many jurists and researchers are convinced that the likelihood of wrongly convicted defendants having been executed in the United States is high. Unfortunately, in our criminal justice system, wrongful convictions arising from such factors as faulty eyewitness identification, false confessions, police mistake or misconduct, and prosecution mistake or misconduct occur with unacceptable frequency. Inept defense representation, lack of defense resources, and shoddy investigations also increase the risk of error. Many individuals on death row have been exonerated or otherwise have had their convictions set aside. That means that now or in the future, a person improperly sentenced to death will likely be sitting on California's death row. We have experienced advances in DNA science, but the problem is that in the vast majority of criminal cases, DNA evidence is not available. This all raises the grim prospect that someday a mistake will be made (if one has not already been made of which we are unaware), and an innocent person or one wrongfully sentenced will be put to death in California. There is good reason why experienced Supreme Court justices from Douglas and Blackmun to O'Conner and Ginsburg, as well as other jurists across the country, have expressed great skepticism about the accuracy and fairness of the implementation of the death penalty.

Closing off other options. Another major concern that the death penalty raises for us is that it closes the door on any possibility of redemption and healing, something that we should all care about as a civil society. We heard testimony from relatives of murder victims who had the opportunity to meet with the murderers of their loved ones. Several were convinced of the sincerity of remorse that the perpetrators expressed and believed in their redemption. Those experiences have convinced many such relatives that capital punishment must be abolished. Loved ones of murdered victims have shared with us their poignant experiences of finding a comforting balm, produced by extolling life over death by virtue of the sentence of a sentence of imprisonment until death without execution, for those convicted of such crimes. Moreover, some of those who have lost family members report they have benefited as a result of participating in what are essentially strength-based therapeutic sessions together with prisoners who demonstrated honest remorse. In addition, there are some loved ones who receive spiritual validation and fulfillment by assisting those convicted who genuinely pursue redemption in their own penitential journey toward the ultimate judgment of their savior. Are some individuals beyond redemption or rehabilitation? Probably. But being sentenced to life without the possibility of parole addresses that problem. A civil and compassionate society should embrace the opportunity to develop the humanity in these individuals through our own humanity, but the death penalty forecloses that option.

Death qualification. We are also deeply troubled by the death qualification requirement for jurors. As the Commission report points out, during jury selection, potential jurors in capital cases are questioned about their views regarding capital punishment in order to determine whether they will be able to follow the law in deciding what sentence to

Exhibit 1
Page 182

impose. In order to be "death-qualified" to serve on a capital jury, a person must be willing to consider all of the sentencing options – usually death and life imprisonment without parole. If their opinions would prevent them from considering any of the sentencing options, then they are not "death-qualified" and are barred from serving on the jury. This culling of potential jurors based on their moral views may produce a jury that looks quite different from the community at large and also, as some studies show, may bias the jury toward a verdict of guilt for the defendant. Capital juries tend to be less representative with respect to gender and race because women and African Americans are more opposed to the death penalty than white men. Researchers have found that the jury in capital trials is more biased toward the prosecution and a guilty verdict as compared to the juries in robbery trials or non-capital murder trials. There is evidence that death qualification biases the jury in two different ways. First, it tends to select jury members who are "conviction prone." Second, the very process of death qualification may further bias the jurors. A credible argument can be made that questioning the jurors intensively about punishment, before the trial even starts, suggests that there will be a sentencing phase of the capital trial – implying that the defendant is probably guilty. Death qualified juries deliberate less thoroughly and possibly less accurately than juries that better represent the whole population. This is born out by a study that reported that over 40 percent of jurors in capital cases surveyed admitted they had already decided on the penalty before the guilt phase had concluded. Thus, the requirement of a death qualified jury in itself causes unfairness.

*Evolving standards in other countries.* Capital punishment has been abandoned by a majority of the countries of the world. The list includes allies and many with whom we share a common heritage like the United Kingdom, Germany, France, Spain, Mexico, Ireland, the Philippines, and Canada. Even countries like Russia and Myanmar have a de facto ban on the death penalty. In Israel, capital punishment is illegal in almost all circumstances; the death penalty was abolished there in 1954 with the exceptions of conviction for genocide, war crimes, crimes against humanity, crimes against the Jewish people, and treason in wartime. As a death penalty jurisdiction, California is in the company of such countries as North Korea, China, Iran, Saudi Arabia, Libya, Kuwait, Pakistan, Afghanistan, Cuba, and Egypt.

The Commission report points out that New Jersey abolished the death penalty this past December. In doing so, New Jersey joined thirteen other states (Alaska, Hawaii, Iowa, Maine, Massachusetts, Michigan, Minnesota, New York, North Dakota, Rhode Island, Vermont, West Virginia, Wisconsin), plus the District of Columbia and Puerto Rico, to ban capital punishment. Illinois has had a moratorium on the death penalty for several years. New Jersey's ban came on the heels of a state Death Penalty Study Commission report that concluded that the death penalty did not fit with evolving standards of decency, was more costly to the state than life in prison, did not effectively prevent violent crime, and could lead to innocent people being executed. The commission – comprised of prosecutors, law-enforcement, victims, religious groups, and individuals – also reported that the death penalty law had not resulted in an execution since 1963 and was unfair for victims' families seeking swift justice.

Exhibit 1
Page 183

## VOICES OF RELATIVES OF VICTIMS

We can understand the desire of relatives of murder victims to see the murderers put to death by the state. Revenge, retaliation, and retribution are natural responses for many human beings. The Commission received some testimony to this effect. But in the words of former Missouri Supreme Court Justice Charles B. Blackmar, "The relatives of the victim have the right to demand swift and sure punishment, but they do not have the right to demand death when the process is so severely flawed."[2] We sincerely wish that victims' families who are looking for revenge or closure through the death penalty could find peace for their pain and agony through some other means.

In contrast, the Commission heard the words of other relatives of victims who are opposed to the death penalty. We admire all of the courageous relatives of victims who came before the Commission (both for and against the death penalty) to testify. However, we were particularly moved by those who spoke in opposition to the death penalty; we honestly do not know if we would have the ability to find forgiveness and compassion in our hearts under the same circumstances. It would be so much easier to hate and to lash out at the perpetrator. But knowing what we now know about the death penalty and why we think it should be repealed, we pray that we would have the ability and capacity to choose forgiveness over retribution if a loved one were murdered. Here are examples of those relatives of victims who demonstrated such remarkable capacity:

**1** Aba Gayle spoke of her twelve years of anger and rage, until she wrote to the murderer of her daughter. She now has visited the man in San Quentin many times, and she has forgiven him. He has expressed deep remorse and has wept while he apologizes. The man who murdered Aba's daughter no longer exists in her opinion. She feels that state-sanctioned capital punishment would tarnish the memory of her daughter.

**2** Dawn Spears' daughter was murdered, leaving three children. Dawn does not want the children growing up with hate in their hearts. She feels that if she wanted death for the murderer, the message she would be conveying to the children is that it's okay to react violently. She cannot live with that in her heart, and she does not want her grandchildren to live with that in their hearts.

**3** The murderers of Barbara Zerbe Macnab's father were executed even though her mother pleaded with the court to spare their lives. Barbara testified that capital punishment does not lessen the pain of the victim's family. Revenge is not beneficial to those who have lost a loved one.

**4** The daughter of Amanda and Nick Wilcox was murdered by a deranged gunman who went on a rampage. Mr. and Mrs. Wilcox urged the prosecutor not to seek the death penalty. They knew that their daughter would not have wanted the broken, expensive, and violent practice of capital punishment administered in her name. They believe that life without possibility of parole is appropriate for holding murderers accountable and keeping society safe.

**5** Aundre Herron's brother was murdered, Herron first had a violent reaction to seek revenge. But she then realized that doing so would have forever tied the memory of her brother to an act that was antithetical to whom she was. Herron testified that if the state really cared about relatives of victims, then money should be spent on grief counseling, funeral expenses, loss of income, and other resources that will actually help them heal.

---

2. Charles B. Blackmar, *Death Penalty Process is Full of Fatal Flaws* (Letter to the Editor), ST. PETERSBURG TIMES, Feb. 15, 2003, available at http://www.sptimes.com/2003/02/15/Opinion/Death_penalty_process.shtml

Exhibit 1
Page 184

173

**6** Lorrain Taylor's twin boys were gunned down in Oakland. She knows that her sons would not want any other mothers to feel the pain that she felt by imposing the death penalty on the perpetrators. She feels that revenge is not justice.

These individuals mirror the sentiment of Coretta Scott King, widow of Dr. Martin Luther King, Jr.: "As one whose husband and mother-in-law have died victims of murder assassination, I stand firmly and unequivocally opposed to the death penalty for those convicted of capital offenses. An evil deed is not redeemed by an evil deed of retaliation. Justice is never advanced in the taking of a human life. Morality is never upheld by a legalized murder."[3]

## CLOSING

Why consider the repeal of the death penalty? No government action taken against an individual is more serious than the imposition of the death penalty. Nothing is more severe. Nothing is more final. Our position on the death penalty says much about us as a people.

After full consideration of the information that has been brought to the attention of the Commission, we are compelled to conclude that the death penalty should be repealed in California. Its process and administration are inherently flawed. Its costs are too high.

Diane Bellas
*Alameda County Public Defender*

Rabbi Allen I. Freehling
*Executive Director,*
*City of Los Angeles Human Relations Commission*

Michael Hersek
*California State Public Defender*

Bill Ong Hing
*Professor, U.C. Davis School of Law*

Michael P. Judge
*Los Angeles County Public Defender*

Michael Laurence
*Executive Director,*
*Habeas Corpus Resource Center*

Hon. John Moulds
*Magistrate Judge,*
*U.S. District Court – Eastern District*

Douglas Ring
*Businessman, The Ring Group*

## SEPARATE STATEMENT OF COMMISSIONERS STREETER,[1] RIDOLFI, HERSEK, LAURENCE

June 30, 2008

Commissioners
California Commission on the
Fair Administration of Justice

## I. INTRODUCTION

We write separately to address alternatives to this Commission's recommendations for death penalty reform. Although the Commission's Report is complex and lengthy, it documents one simple reality. The death penalty as it is currently structured in California is vastly overbroad and cannot be sustained in its present form at a price that anyone would find even remotely reasonable. To any fair-minded reader, what follows is unavoidable: Our state's death penalty law must be either downsized or eliminated.

---

3. *See Archbishop O'Malley: Death Penalty*, THE PILOT, May 7, 2004, at http://www.rcab.org/Pilot/2004/ps040507/OMalley.html

1. Commissioner Streeter, the Vice Chairman of the Commission, is the principal author of this Statement.

Exhibit 1
Page 185

No member of the Commission disputed the death penalty's massive financial burden on taxpayers. Some, however, declined to address what should be done if the Commission's recommendations are not adopted. That is why the Report takes a neutral stance on the issue of alternatives. Commissioner Totten's dissent contends that the views of death penalty supporters were ignored in our deliberations, but our collective silence on the issue of alternatives evidences a respectful accommodation of those Commissioners who did not wish to appear to say anything that might somehow undermine the death penalty as it currently exists. Beyond that, we did not consider whether any Commissioner's views were "pro-death penalty" or "anti-death penalty." We looked solely to the fairness and function of our capital punishment system and what it will take to fix the many flaws that we found.

Given our charge, we feel duty bound to comment on what should be done if our reform recommendations are not adopted. Clearly, abolition of the death penalty is one option. The time may be right to put that issue to a statewide vote. Although current polls show continuing public support for the death penalty, whether those polls truly reflect what the voters would choose after being fully informed of the death penalty's costs is open to question. Every judge, every prosecutor, every witness who testified before the Commission gave the same answer to the question of cost; it will take tens of millions of *additional* taxpayer dollars to create a fair and functional capital punishment system. The harsh but incontrovertible reality that we must spend far more just to attain an acceptable level of fundamental fairness is bound to have a profound impact on voters. What we now know about these extraordinary costs fundamentally alters the terms

of the public debate and may alone justify returning the death penalty to the ballot by legislative referendum for a *fully informed* up-or-down vote.

The more modest alternative, and the more pragmatic approach, is a ballot referendum designed to narrow the scope of the death penalty. In describing various approaches to narrowing, the Commission's Report does not, in our view, sufficiently emphasize how much the death penalty needs to be cut back to address its mounting costs. To bring about meaningful reform, any narrowing proposal must be designed to reduce the universe of capital-eligible first-degree homicides from 87% to something less than 10%. Only by reducing the sheer volume of cases in the system can we address the root cause of the dysfunction that Chief Justice George described to us. Focusing on the front end by limiting the number of cases eligible for capital charging is crucial. We must be explicit about this goal. Anything less will amount to nothing more than rearranging the deck chairs on the Titanic.

If the recommendations of this Commission are not adopted and if the death penalty is not abolished or narrowed, another option, in theory, is to do nothing. We could just continue to muddle along with our current broken system. That is not a viable option, in our view. To continue spending massive amounts of money at current levels each year only to see the backlog of cases in the system continue to grow larger, rendering the death penalty system increasingly ineffective and increasing prone to the ultimate risk – the execution of innocent people – is impossible to justify. Given the many other critical budget priorities in this State, the fact that we spend well over a hundred million dollars a year to pay for a dysfunctional death penalty system will come as a surprise to voters; the notion of doubling that spend rate to repair it

Exhibit 1
Page 186

is likely to be taken as an outrage. *Something* must be done. Set forth are what we see as the only reasonable options.

## II. ABOLITION OF THE DEATH PENALTY

In broad terms, we embrace the conclusions reached by Commissioner Hing in his Separate Statement calling for abolition of the death penalty. Most basically, we believe that the risk of wrongful conviction and punishment – a problem that plagues our criminal justice system to a degree that is little known to most citizens – simply cannot be tolerated when life is at stake.

Commissioner Hing justifies his call for abolition on broader grounds. He is in good company. Many of the reasons he cites may be found in the published opinions of six Justices of the United States Supreme Court who have opined on different occasions since 1970 that the death penalty is unconstitutional, either facially or as applied.[2] Commissioner Hing is not the first to cite the exorbitant costs of the death penalty,[3] the statistics suggesting racial discrimination,[4] the disproportionate impact of the death penalty on the poor and the disadvantaged,[5] the biasing effect of death qualification,[6] and most importantly, the heightened risk of error in capital cases coupled with the irrevocability of the penalty.[7]

The concerns that Commission Hing so eloquently articulates call into question whether our criminal justice system – as fine as it is – is ever capable of making life-or-death decisions with the fairness, objectivity, and reliability that we expect of it. The Supreme Court Justices who have cited these same

concerns all served as the ultimate custodians of process integrity and fairness for court systems across the country; they sat atop our country's judicial apex, and for them to question whether the courts they oversaw are up to the task in death cases is *very* significant. Indeed, it is striking that several Justices changed their views with experience and after long reflection. At least three of the Justices who are now on record opposing the death penalty began as death penalty supporters on the Court, ultimately concluding, after decades of attempting to address its many flaws, that capital punishment is unworkable in practice.[8]

In California, we have reached a similar tipping point. Based on the extensive record compiled by this Commission, one can fairly conclude, as Justice Blackmun once put it explaining his own views, that the "death penalty experiment has failed."[9] We find this to be true in California.

## III. NARROWING OF THE DEATH PENALTY

Although outright abolition would be the cleanest, most definitive approach to death penalty reform if our recommendations are not adopted, we recognize that, ultimately, a political judgment must be made about whether the time is right to seek a fresh electoral choice on whether California ought to have a death penalty. The new information generated by our Report about the dysfunctional state of the death penalty, the massive costs of maintaining it, and the even more massive costs of fixing it, will pave the way to a changed public debate on that topic. Whether the time is right to seek a

---

2. *See Baze v. Rees,* ___ U.S. ___, 2008 LEXIS 3476 (2008) (Stevens, J., concurring in the judgment) (death penalty unconstitutional in all circumstances); *Callins v. Collins,* 510 U.S. 1141 (1994) (Blackmun, J. dissenting from denial of certiorari) (death penalty unconstitutional in all circumstances); *Furman v. Georgia,* 408 U.S. 238 (1972) (separate opinions of Brennan, J. and Marshall, J.) (death penalty unconstitutional in all circumstances); *id.* (separate opinions of Douglas, J., White, J. and Stewart, J.) (death penalty statutes of Georgia and Texas unconstitutional as applied). One other Justice expressed this view following retirement. *See* John C. Jeffries, Lewis Powell: A Biography, at 451 (1994) (reporting Justice Powell's view that the one vote he regretted casting was his tie-breaking vote to sustain the death penalty in

*McCleskey v. Kemp,* 481 U.S. 279 (1986)).

3. *See Baze v. Rees,* 2008 LEXIS at ***83 ("The time for a dispassionate, impartial comparison of the enormous costs that death penalty litigation imposes on society with the benefits that it produces has surely come.") (Stevens, J., concurring in the judgment).

4. *See Callins v. Collins,* 510 U.S. at 1153 ("Even under the most sophisticated death penalty statutes, race continues to play a major role in determining who shall live and who shall die.") (Blackmun, J. dissenting from the denial of certiorari); *see also McCleskey v. Kemp,* 481 U.S. 279 (1986) (Brennan, dissenting).

Exhibit 1
Page 187

Death Penalty

177

statewide vote on abolition is debatable. A more modest and pragmatic approach would be to propose a modification of the death penalty that narrows its scope.

## A. The Problem of Overbreadth

One of the most significant findings in our Report is that the death penalty encompasses 87% of all first degree murders committed in this state. Commissioner Totten's dissent takes issue with that finding, but the thrust of his criticism is that only a tiny percentage of capital-eligible crimes are charged in most counties. Whether that is the case or not, it begs the question. The gross numbers speak for themselves. There are now 670 condemned inmates on death row. On average, we had 20 new death judgments entering the appellate system annually in the last eight years. We have an accumulated backlog in the Supreme Court of 180 backlog in the Supreme Court of 180 fully briefed direct appeals and habeas cases awaiting decision, and the Court cannot process more than 30–40 of these cases a year.

The sheer volume, statewide, is overwhelming the appellate system. Against this backdrop, local prosecutors may have the perception that they are charging death cases rarely and infrequently, but on a *combined basis* the rate at which they are charging these cases is clogging the Supreme Court's docket and creating delays that were unimaginable when the death penalty was adopted. To make matters worse, there is no statewide fiscal accountability to capital charging. District Attorneys often point out that they are accountable at the ballot box, and if their capital charging policies raise

questions, they will be held accountable at election time. But the reality is that, with each capital charging decision, local prosecutors are forcing taxpayers *across the state* to subsidize their cases, often for many years into the future after the cases pass into the hands of the Attorney General at the appellate and collateral review stages. As a result, the vast majority of taxpayers who are actually footing the bill have no say in what these prosecutors are deciding when they make "local" decisions to initiate capital litigation.

## B. Carrying Out Narrowing

To address the problem of overbreadth, two basic approaches can be taken: (1) We can add more lawyers and other resources in an effort to beef up the overall litigation capacity of the death penalty system (which is the approach reflected in most of our recommendations), or (2) we can narrow the scope of the death penalty and try to reduce the number of cases that may be charged capitally.

If the Commission's recommendations are not adopted, and if policymakers decline to spend the amounts needed to repair the dysfunction in the system, there will remain only one possible way to address the problem of excessive capital case volume short of outright abolition – and that is to narrow capital case eligibility.[10] Suffice it to say that we support the idea of reducing the number of special circumstances to five in accordance with the Constitution Project's Mandatory Justice factors. We are concerned, however, that reducing the number of special circumstances in that fashion will be

---

5. *See Furman v. Georgia*, 408 U.S. at 369 ("It is…evident that the burden of capital punishment falls upon the poor, the ignorant, and the underprivileged members of society. It is the poor and the members of minority groups, who are least able to voice their complaints against capital punishment.") (separate op. of Marshall, J.).

6. *See Baze v. Rees*, 2008 LEXIS at ***88 ("Of special concern to me are rules that deprive a defendant of a trial by jurors representing a fair cross-section of the community.") (Stevens, concurring in the judgment).

7. *See Furman v. Georgia*, 408 U.S. at 288 ("The unusual severity of death is manifested most clearly in its finality and enormity.") (Douglas, J. concurring in the judgment); *see also* Brian Bakst, "O'Connor Questions Death Penalty,"

Associated Press (July 2, 2001) (quoting a speech by Justice O'Connor in which she stated "[i]f statistics are any indication, the system may well be allowing some innocent defendants to be executed").

8. *See Baze v. Rees*, 2008 LEXIS at ***63 (Stevens, J. concurring in the judgment); *Callins v. Collins*, 510 U.S. at 1153 (Blackmun, dissenting from the denial of certiorari); John C. Jeffries, Lewis Powell: A Biography, at 451 (1994).

9. *See Callins v. Collins*, 510 U.S. at 1130 (Blackmun, J. dissenting from the denial of certiorari).

10. We will not reiterate here the mechanics by which the death penalty law may be narrowed. That topic is covered thoroughly in the body of our Report.

---

Exhibit 1
Page 188

insufficient to effect a material decrease in the number of capital-eligible cases. To achieve meaningful reform, it is important to constrain *aggressively* the number of capital cases entering the system on the front end. The goal ought to be that less than 10% of first degree murders qualifies for the death penalty, rather than the current 87%. And whatever new guidelines are adopted, we should be explicit about our objective. The rules governing death penalty eligibility must be designed to reduce dramatically the number of capital cases entering the system. Tinkering around the edges will not do.

The proposal made by Commissioner Streeter to supplement the Mandatory Justice factors with a statewide "citizen impact" requirement may be one way to achieve the kind of dramatic reduction that we envision.[11] The dissent by Commissioner Totten expresses skepticism about this proposal on the grounds that it purportedly has "no precedent in law" and would be "totally unworkable." In fact, what has "no precedent in law" is our California death penalty system as it is currently administered. No other state has as many special circumstances as we do in California; no other state sentences to death as many people as we do in California; no other state and probably no other country in the world has anything close to the number of inmates we have on death row; no other state has the combined appellate and post-conviction delays that we do in California; and no other state spends the amounts of money that we do in California, to such little effect. To deal with this unusual state of affairs, unusual measures will be required.

The idea of imposing a statewide "citizen impact" requirement is, in any event, in accord with what courts do all the time in the context of change of venue motions, where the problem of media saturation is frequently litigated, without difficulty. The same or similar forensic techniques for marshalling proof in change of venue motions (e.g. use of

demographic surveys) could certainly be used. In fact, in most cases where change of venue motions are granted, the level of media saturation that is proved would probably meet the kind of statewide "citizen impact" requirement that Commissioner Streeter has proposed, since those cases often involve the kinds of crimes that are notorious for the widespread fear and anxiety that they engender.

The bottom line is that some guidelines must be put in place to create statewide accountability, and the "citizen impact" concept is as good a way as any. It is understandable that a county prosecutor would view the proposed "citizen impact" requirement as "totally unworkable." This new hurdle would constrain his power to bring capital charges for crimes of great local concern. But that is the whole point of it. We must move away from a system in which local prosecutors are free to make capital charging decisions based on considerations of purely local concern. The grisly crimes such as those described by Commissioner Totten's dissent are unimaginably horrible. But every first degree murder, by definition, involves some sort of heinous outrage. Hundreds of these cases are charged statewide every year. The combined effect of making 87% of them automatically eligible for the death penalty in all 58 counties without some mechanism to force consideration of broader statewide interests, naturally, is going to result in runaway costs. Which is exactly what has happened.

## C. Geographic Disparity and Racial Discrimination

Although significantly reducing the sheer number of capital cases coming into the criminal justice system every year is, by itself, a compelling justification for narrowing death penalty eligibility, we find one other consideration significant. The overbreadth of the death penalty law is closely related to issues of geographic disparity and racial

---

11. *See* Commission Report at 67–68.

12. *Cf. Furman v. Georgia*, 408 U.S. at 288 (death penalty imposed so "wantonishly and freakishly" is cruel and unusual for the same reason that "being hit by lightning" is cruel and unusual) (Stewart, J. concurring in the judgment).

Exhibit 1
Page 189

Death Penalty

179

discrimination. Addressing overbreadth in an effective way will help put to rest concerns in these related areas as well.

The Commission's Report covers geographic variation thoroughly. We will make only brief additional comment. The scope of the current law permits broad variation in capital charging among the individual counties. Although some degree of unpredictability and randomness may be perfectly acceptable as a general matter in a criminal justice system that consists of 58 separate counties, it is deeply troubling in death penalty administration.[12] Direct oversight from the state level may not be feasible given the decentralized structure of state and county governments, but some indirect means of enforcing uniformity is desirable. We commented above on one possible mechanism. Adopting specific measures designed to ensure financial accountability – through one of the many fiscal tools the state has at its disposal vis-à-vis county governments – might be another approach. We do not suggest shifting the costs of these cases entirely to the counties. But some means can surely be devised by which the treasuries of counties who use the death penalty most frequently will feel the budgetary effects of their capital charging decisions.

The issue of racial discrimination is an entirely different matter, and as is so often the case, it is rife with misunderstanding. It may be, as Commissioner Totten suggests in his dissent, that only a small fraction of the 87% of first degree murders meeting the criteria for capital eligibility is actually charged capitally, but what that necessarily means is that broad discretion is being used to screen out hundreds of individuals from the death penalty each year. Each of those decisions is momentous for the people involved, perhaps more momentous than any other decision that prosecutors make. In any situation where there is such vast discretion and the stakes are so high for the affected individuals, special care must be taken to ensure that every aspect of the decision-making process is not only carried out in manner that is objective and even-handed, but that it carries the *appearance* of fair and even-handed treatment.

Commissioner Totten's dissent suggests that some members of the Commission came to their task with the pre-existing belief that capital charging is infected with racial discrimination. That is an inaccurate and unfortunate charge. For our part, we do not doubt in the least the good faith and integrity shown by the prosecutors on this Commission, as well as by those who testified before it; we believe that their views are generally reflective of views that are held widely by prosecutors in this state; and we accept that, save for rare situations in which misconduct surfaces and a prosecutor violates his or her oath, prosecutors take no account of race when they decide who merits the death penalty. But nevertheless, there are troubling indications in the aggregate statistics presented by professors Pierce and Radelet that this Commission reviewed. Those statistics clearly *suggest* that race plays a part in the selection of who must face the death penalty.

There may be many innocent explanations for any particular type of differential treatment, but it is critical not to be dismissive of the concerns raised here. In communities of color, confidence in prosecuting agencies can easily erode when members of those communities come to suspect improper racial motivations by law enforcement; that, in turn, can hinder the effectiveness of these very agencies in serving all of their constituents. We do not take the Pierce and Radelet study as proof of discrimination on the part of any individual decision maker, but the empirical methods used by these two expert statisticians are reliable enough to raise questions that require serious further

Exhibit 1
Page 190

attention.[13] In fact, the study raises exactly the kind of questions, whether ultimately proved to be legitimate or not, that can destroy the trust and confidence that members of communities of color are entitled to have in prosecuting agencies. For this reason, we are disappointed that we did not see a greater receptiveness to the need for transparency in the capital charging process among the prosecution and law enforcement members of this Commission. In no way, however, does that disappointment amount to some kind of predisposition by any member of this Commission to assume improper racial motivations in capital charging.

## IV. DOING NOTHING

Chief Justice George did not elaborate on what he meant when he testified that the continued growth in the capital case backlog, if unchecked, will at some point cause the system to "collapse[] of its own weight." But if the delays in our system continue to grow, it is not hard to envision, in legal terms, what could happen: The wholesale invalidation of capital punishment in California. It happened once before, following the United States Supreme Court's decision in *Furman v. Georgia* in 1972 when the death penalty statutes of Georgia and Texas were declared unconstitutional in its application under the cruel and unusual punishment clause of the Eighth Amendment.

The key votes in *Furman* were by Justices William O. Douglas, Potter Stewart and Byron White, each of whom voted to strike down capital punishment

in Georgia and Texas as applied. In effect, these Justices hit the constitutional equivalent of a computer "re-set" button, invalidating all convictions under the challenged statutes – and under similar statutes across the country, including California – but allowing state legislators to write new death penalty legislation designed to cure the defects that they found. The practical result was that death rows in all of these states were cleared out; formerly condemned inmates received life sentences; and whatever backlogs existed on the death rows of these states prior to *Furman* suddenly disappeared.

Justice White's rationale for finding the Georgia and Texas death penalty statutes unconstitutional has particular resonance in the context of the situation we face now in California. As he explained it,

> *[T]he [death] penalty has not been considered cruel and unusual punishment in the constitutional sense because it was thought justified by the social ends it was deemed to serve. At the moment that it ceases realistically to further these purposes, however, the emerging question is whether its imposition in such circumstances would violate the Eighth Amendment. It is my view that it would, for its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes. A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.*
>
> *It is also my judgment that this point has been reached with respect to capital punishment as it is presently administered under the statutes involved*

---

13. As explained by Justice Brennan's dissent in *McCleskey v. Kemp*, 481 U.S. at 327, where a study very similar to that done by Pierce and Radelet was presented:

[The] statistics have particular force because most of them are the product of sophisticated multiple-regression analysis. Such analysis is designed precisely to identify patterns in the aggregate, even though we may not be able to reconstitute with certainty any individual decision that goes to make up that pattern…[A] multiple-regression analysis need not include every conceivable variable to establish a party's case, as long as it includes those variables that account for the major factors that are likely to influence decisions.

Exhibit 1
Page 191

Death Penalty

*in these cases. Concededly, it is difficult to prove as a general proposition that capital punishment, however administered, more effectively serves the ends of the criminal law than does imprisonment. But however that may be, I cannot avoid the conclusion that as the statutes before us are now administered, the penalty is so infrequently imposed that the threat of execution is too attenuated to be of substantial service to criminal justice.*

*Furman v. Georgia*, 408 U.S. at 312 (emphasis added) (White, J., concurring in the judgment).

Given the lengthy and growing delays documented by the Commission in its Report, the rationale applied by Justice White in his Furman opinion ought to be kept in mind. Even if we were to accept as true the theoretical arguments that capital punishment can deter crime and serve as a force for community retribution, our Report casts serious doubt on whether the death penalty in this State carries out either objective, effectively or at all. Whatever the academics say, no one can credibly suggest that the death penalty deters anything or expresses any clear sense of community outrage when the time from conviction to execution averages over two decades.

Under these circumstances, the death penalty, as it is currently administered in California, is now at or near the point where it has effectively ceased to carry out the purposes for which it was designed.[14]

A declaration that California's death penalty is unconstitutional as applied would render invalid the sentences of all of those who are currently on death row, resulting in the waste of what is now well over a billion dollars in taxpayer dollars that has so far been spent litigating these cases, and forcing either de facto abolition or adoption of a new, narrower death penalty law. In order to avoid this train-wreck scenario, something must be done to repair the death penalty system. Doing nothing is not a viable option. We do not predict a wholesale constitutional attack on California's death penalty system or comment on the correctness of any such attack, if it were ever made. We simply raise the question in order to illustrate that the consequences of leaving things as they are could conceivably lead to an unplanned result that may be as unwelcome in some quarters as it is avoidable. The flipside of this point is equally valid. For those who may view wholesale invalidation as a welcome result, the uncertainty that successful legal resort could eventually be had in the courts is reason enough to accept something less than might justifiably be demanded, purely in the interest of ensuring that something meaningful is done.

## V. CONCLUSION

We believe that the alternative of narrowing the death penalty has great merit. This approach to death penalty reform is attractive to us because it is the most practical and perhaps the most achievable alternative.

The death penalty is obviously a controversial topic, bound to stir up strong views on both sides of any policy discussion. Certainly, in the course of our deliberations we had many spirited discussions about the best approach to death penalty reform.

---

14. *See Gomez v. Fierro*, 519 U.S. 918 (1996) (delays in implementation of the death penalty can be so substantial as to eviscerate the only justification under the Eighth Amendment for that kind of punishment) (Stevens, J., dissenting from the granting of certiorari) ; *see also Lackey v. Texas*, 514 U.S. 1045 (1995) (same) (Stevens, J., respecting the denial of certiorari).

Exhibit 1
Page 192

Forceful and respectful contentions were advanced from many perspectives. The discussions involved a degree of collective problem-solving among highly skilled and experienced professionals that was truly inspiring. If the Commission's recommendations are not adopted, we would like to see the spirit of accommodation and mutual respect that characterized our deliberations continued. That is a significant reason why we propose narrowing the death penalty. Even the most basic and fundamental policy choices to be made here need not involve a zero sum game in which one point of view "wins" and one point of view "loses."

For us, narrowing is a second-best policy solution, but it is one that the evidence before the Commission fully supports. The Commissioners who took a pro-death penalty stance on the Commission have genuine and strongly-held convictions about capital punishment. The same may be said for Commissioners who question the wisdom of the death penalty. Undoubtedly, both views are broadly reflective of the opinions of millions of California voters. We believe that narrowing the death penalty represents an effort to reconcile these contending points of view, at least at some level. Not everyone on either side would be satisfied fully with a substantially narrowed death penalty. Far from it. For many on both sides, the issue is deeply infused with moral considerations and cannot be compromised. But the Commission as a whole decided early on that it would not attempt to weigh the morality of the death penalty. Rather, the Commission decided that it would seek practical solutions. In our view, the option of narrowing the death penalty is just such a solution.

Jon Streeter
*Vice Chair, California Commission on the Fair Administration of Justice*

Kathleen Cookie Ridolfi
*Santa Clara University School of Law*

Michael Hersek
*California State Public Defender*

Michael Laurence
*Executive Director,*
*Habeas Corpus Resource Center*

Exhibit 1
Page 193

Exhibit 1
Page 194

# Acknowledgments

The California Commission on the Fair Administration of Justice was created on August 27, 2004 by Senate Resolution No.44 (D-Senator Burton) to carry out the following duties:

**1** To study and review the administration of criminal justice in California to determine the extent to which that process has failed in the past, resulting in wrongful executions or the wrongful conviction of innocent persons.

**2** To examine ways of providing safeguards and making improvements in the way the criminal justice system functions.

**3** To make any recommendations and proposals designed to further ensure that the application and administration of criminal justice in California is just, fair, and accurate.

Senate Resolution No. 10, adopted June 28, 2007 resolved that the commission shall meet and make its recommendations to the Legislature and Governor no later than June 30, 2008.

No public funds were used to support any of the Commission's work. We acknowledge and thank the private foundations that generously supported the research and work of the Commission, including the Foundation of the State Bar of California, the Buckley/Horowitz Fund at the Peninsula Community Foundation, the Sheilah's Fund of Tides Foundation, the Rappaport Family Foundation, the JEHT Foundation, the Wallace Alexander Gerbode Foundation, the van Löben Sels/RembeRock Foundation, and the Gideon Project of the Open Society Institute.

We thank the generous hosts of our various public hearings and private meetings, including Loyola Law School and UCLA School of Law in Los Angeles, the San Mateo County Board of Supervisors, the staff at the State Capitol, Santa Clara University School of Law, the Los Angeles County Board of Supervisors, and the Los Angeles offices of O'Melveny & Myers LLP and Dewey & LeBoeuf LLP. Special thanks to Marlene Seaholm at Dewey & LeBoeuf.

We thank the Commission's staff. Professor Gerald F. Uelmen of Santa Clara University

Exhibit 1
Page 195

School of Law served throughout as the Commission's Executive Director, and drafted the Commission's Reports and Recommendations. Christopher Boscia served as Executive Assistant, managing the Commission office, serving as webmaster, liaison with legislative staffs, and recording secretary of the Commission's meetings and deliberations.

The law professors who undertook research assignments for the Commission made thoughtful and well documented contributions to the Commission's work. We thank Professors Ellen Kreitzberg and Cookie Ridolfi of Santa Clara University School of Law; Professor Larry Benner of California Western School of Law; Professors H. Mitchell Caldwell, Carol A. Chase and Christine Chambers Goodman of Pepperdine University School of Law; Professor Laurie Levenson of Loyola Law School in Los Angeles; Professors Linda E. Carter and Mary-Beth Moylan of University of the Pacific, McGeorge School of Law; and Professor Susan Rutberg of Golden Gate University School of Law.

Finally, we acknowledge the helpful assistance we received from many experts who were willing to provide informal advice and consultation to assist our research and deliberations, including Barry Fisher of the Los Angeles County Sheriff's Crime Lab; Lance Gima of the California Department of Justice; Professor Larry Marshall of Stanford Law School; Beth Jay, Principal Attorney to Chief Justice Ronald M. George; Natasha Minsker of the ACLU of Northern California; Nettie Sablehaus at the Senate Rules Committee; and Mary Kennedy, Chief Counsel to the California Senate Public Safety Committee.

**Acknowledgments**

**185**

Exhibit 1
Page 196

**On August 27, 2004,** The California Commission on the Fair Administration of Justice was created by California State Senate Resolution No. 44, with this charge:

(1) To study and review the administration of criminal justice in California to determine the extent to which that process has failed in the past, resulting in wrongful executions or the wrongful conviction of innocent persons.

(2) To examine ways of providing safeguards and making improvements in the way the criminal justice system functions.

(3) To make any recommendations and proposals designed to further ensure that the application and administration of criminal justice in California is just, fair, and accurate; and be it further.

After nearly four years of work, the Commission completed its task. This volume contains the findings of the Commission, along with specific recommendations from the Commission in ten reports covering seven different areas of focus.

www.ccfaj.org

Exhibit 1
Page 197

Case 3:11-cv-04454-SI Document 28-4 Filed 09/26/14 Page 96 of 99
Case 2:09-cv-02158-CJC Document 109-12 Filed 06/09/14 Page 200 of 204 Page ID
#:4434

Exhibit 2

Peter Fimrite, *At San Quentin, 647 Condemned Killers Wait to Die in the Most Populous Execution Antechamber in the United States*, San Francisco Chronicle, November 20, 2005

Exhibit 2
Page 198



America's News

## INSIDE DEATH ROW - At San Quentin, 647 condemned killers wait to die in the most populous execution antechamber in the United States

**San Francisco Chronicle (CA)** - Sunday, November 20, 2005

*Author: Peter Fimrite*

Death Row at San Quentin State Prison is an antiseptic form of hell, nearly devoid of the things, like intimacy and love, that give life value.

Living here is a numbing gray slog for the 647 condemned killers who sit, year after year, waiting to die on the nation's most populous death row.

Behind the prison's granite walls, quarried by inmates more than 150 years ago, is a stark environment of concrete floors and clanging cell doors. It is a monotonous, controlled, alternately boring and spooky place that echoes with the shouts of lost souls.

This world, with its lime green execution chamber looming in everyone's consciousness, is the destination for those deemed unsuitable to ever again step foot in the civilized world. Yet, there is a civilization inside San Quentin, where hopes still survive amid the hopelessness.

"Human beings will always make the best situation that they can for themselves in any kind of situation," said prison spokesman Vernell Crittendon, who has spent 29 years as an officer at San Quentin.

The scheduled execution of Stanley "Tookie" Williams on Dec. 13 has focused international attention on San Quentin's Death Row and the battle over its replacement. The California Department of Corrections wants to spend $233 million on a new facility with 768 cells, a project death penalty opponents and Marin County officials would like to prevent.

Williams, 51, a co-founder of the Crips gang in Los Angeles, was sentenced to death for murdering a convenience store clerk in Whittier (Los Angeles County) and two motel owners and their daughter during robberies in 1979.

After eight years on Death Row, he renounced gangs and wrote the first of nine books warning children against the gang life. He has been nominated repeatedly by supporters for Nobel Prizes.

His case has become a rallying cry for those who believe rehabilitation should count for something, preferably a commutation of his sentence.

Williams is one of three Death Row inmates whose executions are anticipated this winter. Fresno County crime lord and white supremacist Clarence Ray Allen, who is the oldest condemned prisoner, has a tentative execution date of Jan. 17, the day after his 76th birthday. Michael Morales, a convicted murderer from Lodi, is expected to be given an execution date soon.

Execution is not the usual fate of Death Row inmates. On average, those who are executed spend 16 years in prison before they get a date with "the needle." So far, there have been 11 executions since the death penalty was reinstated in 1978. Twelve condemned inmates have committed suicide and some 30 have died of natural causes during that time.

"I've found that living a life of inactivity and non-productivity makes some inmates desire the sweet taste of death," Crittendon said. "I've talked with several who have said they would not appeal their death sentences."

The Death Row population is increasing by about 30 inmates a year. The quality of their lives is dictated by a prison caste system unique to San Quentin.

There are, in actuality, three Death Rows. About 68 condemned inmates are housed in the original Death

Exhibit 2
Page 199

RME411456

Row, built in 1934. Called North-Segregation, this quiet cell block houses the privileged class, those inmates who get along with other prisoners and don't cause trouble.

Williams is a North-Seg resident. So is Richard Wade Farley, the bespectacled 57-year-old convicted killer of seven people during a 1988 rampage in Sunnyvale.

"This is my retirement plan," Farley said wryly, as he sat behind a wire mesh fence playing chess in the cell block hallway with another inmate last year.

About 415 less fortunate condemned inmates live in the East Block, a crumbling, leaky maze of a place built in 1927. It is a giant five-story cage, echoing with the incessant chatter and shrieking cacophony of prison.

David Carpenter, the infamous "Trailside Killer," is an East Block inhabitant. At 75, Carpenter, a convicted serial killer who terrorized hiking trails in Marin and Santa Cruz counties in the early 1980s, is the second-oldest prisoner on the row.

"We have people here who slit their children's throats, banged their kids' heads against the wall and killed them," Crittendon said, describing the types of people who inhabit the cells.

But even among the condemned, moral distinctions are made.

When Robert Alton Harris was being led away to his execution in 1992, Crittendon said, the inmates yelled "baby killer," and taunted him with references to his decision to eat the unfinished hamburgers left behind by his murder victims.

The prison code exists even in the Adjustment Center, where the "worst of the worst" are held under heavy guard and in isolation. These inmates get their exercise in 8-by-10-foot cages watched over by gun-wielding guards.

The Adjustment Center is where Richard Allen Davis has lived since he was convicted for the kidnap and murder of 12-year-old Polly Klaas in Petaluma in 1993. Davis has been assaulted and spat upon by other inmates at least three times. Besides killing a child, many inmates blame Davis for the three strikes law.

"He's very well aware that any inmate, if they get a chance, will attempt to kill him," said Lt. Michael Barker, who is in charge of the unit.

Richard Ramirez, the satanic killer known as the "Night Stalker," is also in the Adjustment Center, where he has continued to receive fan mail from adoring women even while exposing himself to children in the prison's visiting area, according to Barker.

Details like that quickly spread among the inmates on Death Row, where there are few secrets. Prison officials marvel at the ability of inmates to pass on even the tiniest bits of overheard conversation from guards, prisoners and guests.

"The inmate network system is incredible," Barker said. "They are ingenious in the way they get information."

Despite the bleakness, humanity is still evident on Death Row. The inmates spend most of their time reading, playing chess or basketball, going to church or taking college courses.

"I have a lot of hope," said 39-year-old double murderer Richard Moon during a rare tour of Death Row last year. "They could abolish the death penalty."

Many condemned inmates actually have Web sites from which they solicit pen pals, including Moon, who claims on his Web site to have found God and been forgiven.

San Quentin was completed in 1854 as California's first penitentiary. It was built on land purchased for $10,000 just 30 years after a Licatuit Indian chief named Quentin was defeated there by Mexican soldiers.

The rudimentary prison, complete with a dungeon and whipping post, was soon overcrowded with 300 swindlers and cutthroats drawn to San Francisco by the Gold Rush.

Exhibit 2
Page 200

RME411457

In 1891, San Quentin and Folsom prisons were officially declared the state's designated execution sites.

The first hanging at San Quentin was in 1893. A total of 215 people were hanged there until 1937, when the Legislature approved lethal gas in place of the noose as the state's official method of execution. From then on, San Quentin was the only place in California where executions could occur.

During the next six decades, 196 prisoners were gassed. That unfortunate group includes one of the inmates who helped weld the gas chamber together when it arrived in pieces from the manufacturer 68 years ago.

The inmate, who welded the chamber's roof and side walls, was released and eventually got himself arrested for murder. In 1945, he was marched into the chamber he had helped build, his expert welds plainly visible as he took his final breath, Crittendon said.

It wasn't long after that execution that a double-jointed inmate wriggled free of his restraints inside the gas chamber. Crittendon said the warden, fearing what might happen next, ordered the execution to continue. As horrified witnesses watched, the man ran around frantically inside the chamber trying to escape the lethal fog before he finally collapsed and died, curled up in a corner, Crittendon said.

Nine people have been executed by lethal injection since 1995, when the gas chamber was ruled cruel and unusual punishment. But "the big jab," as the inmates call it, is still carried out inside the gas chamber, its infamous welds visible to this day.

Many of San Quentin's original buildings are still in use, including the old dungeon, where the torturous isolation cells are now used for storing evidence.

Corrections officials insist the prison is so dilapidated and overcrowded that a new Death Row must be built if California is going to continue holding condemned inmates at San Quentin.

As it is, the inmates are so dispersed around the prison that double or triple escorts are sometimes needed to move inmates from one place to another, often around blind corners and through less-secure areas, increasing the likelihood of trouble.

A few years ago, gang members were foiled in an elaborate plan to take over the Adjustment Center. One of the leaders, Paul "Roscoe" Tuilaepa, reportedly told prison officials after he was captured that the intent was never to escape. "We just wanted to kill every guard we could get our hands on," he said.

Safety measures have been taken since then, such as the implementation of an inmate classification system and a program that places prisoners in compatible groups during exercise.

Although the prison is safer than it was in the 1970s and 1980s, according to Crittendon, death is always lurking.

"Human life is very fragile," he said, defining the one overriding fact of life on Death Row.

**Caption:** PHOTO (10)
(1) A prisoner on Death Row, photographed during a rare press tour last year, heads back to his cell from an exercise area under the careful watch of prison guards., (2) The beautiful bayside setting of San Quentin State Prison in Marin County has created opposition to building an updated facility there., (3-4) Left: The rogues gallery identifies Adjustment Center inmates, considered the "worst of the worst." Right: East Block, five crumbling tiers of cells, is in the poorest condition., (5) For security reasons, prisoners are handcuffed and accompanied by several guards when they leave their cells. A plan by gang members to take over the Adjustment Center a few years ago was foiled., (6) Adjustment Center inmates — the most isolated men on Death Row — can only exercise in individual cages under the watch of armed guards., (5-6) For security reasons, prisoners are handcuffed and accompanied by several guards when they leave their cells. A plan by gang members to take over the Adjustment Center a few years ago was foiled., (7-8) Left: Chess players must call out their moves to opponents on other tiers. Right: Adjustment Center inmates are required to enter and leave 8-by-10-foot exercise cages in handcuffs. , (9) While prisoners typically spend time alone in their cells, some are allowed to socialize during certain activities such as exercise (above), church or college courses. Some receive no such benefit., (10) An inmate hangs around a rooftop exercise area while others work out. PHOTOGRAPHS BY PENNI GLADSTONE
**Memo:** E-mail Peter Fimrite at pfimrite@sfchronicle.com.

Exhibit 2
Page 201

RME411458