1  Michael Laurence (Bar No. 121854)
2  Cliona Plunkett (Bar No. 256648)
3  HABEAS CORPUS RESOURCE CENTER
   303 Second Street, Suite 400 South
4  San Francisco, California 94107
5  Telephone:  (415) 348-3800
6  Facsimile:  (415) 348-3873
   E-mail:  MLaurence@hcrc.ca.gov
7          docketing@hcrc.ca.gov
8
   Attorneys for Petitioner Ernest DeWayne Jones
9
                **UNITED STATES DISTRICT COURT**
10
        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**
11
   ERNEST DEWAYNE JONES,          Case No. CV-09-2158-CJC
12
                  Petitioner,     **DEATH PENALTY CASE**
13
        v.
14
                                  **EXHIBITS IN SUPPORT OF**
15                                **PETITIONER'S OPENING BRIEF**
   KEVIN CHAPPELL, Warden of      **ON CLAIM 27**
16 California State Prison at San
   Quentin,                       **VOLUME 2**
17                Respondent.
18
19
20
21
22
23
24
25
26
27
28

---

# Exhibit 3

Declaration of Leonard Rice, *Andrew Lancaster et al., v. James E. Tilton et al.*, Northern District of California Court Case No. C79-01630 WHA, 2008

Exhibit 3
Page 202

1 PRISON LAW OFFICE
DONALD SPECTER # 83925
STEVEN FAMA # 99641
2 ALISON HARDY #135966
SARA NORMAN # 189536
3 RACHEL FARBIARZ # 237896
General Delivery
4 San Quentin, CA 94964
Telephone: (415) 457-9144
5 Facsimile: (415) 457-9151

6 Attorneys for Plaintiff

7

8 UNITED STATES DISTRICT COURT

9 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10 SAN FRANCISCO DIVISION

11

12 ANDREW LANCASTER, et al.,

13 Plaintiff,

14 vs.

15 JAMES E. TILTON, et al.,

16 Defendant

17

Case No.: No. C 79-01630 WHA

**DECLARATION OF LEONARD RICE**

18 I, Leonard Rice, declare:

19 **I.    Introduction, qualifications, and methodology**

20

21 **A.    Qualifications**

22 1.    I am a Registered Sanitarian, with a Bachelor of Science degree in

23 environmental health and a Master's degree in environmental science. I have worked in

24

25 the environmental health field for more than forty years. I have completed environmental

26 audits and inspections as an expert on behalf of both prison officials and prisoners. I

27

28

Rice Decl. - 1

**2667**

RME411459

Exhibit 3
Page 203

have conducted environmental audits in correctional facilities or jails in approximately a dozen different states since 1990.

2. I am a past president and remain a member of the National Environmental Health Association (NEHA). I also served for more than a decade on the executive committee of that organization, and for three years on the Technical Editorial Advisory Board of NEHA's Journal of Environmental Health. I am a member of the American Correctional Association and the American Jail Association. Since 1994, I have been an environmental consultant to the United States Department of Justice (USDOJ), Civil Rights Division, Special Litigation Section, and have conducted environmental audits for the USDOJ at numerous correctional facilities and jails. In approximately 2005, I started work for the Department of Homeland Security, Office of Civil Rights and Civil Liberties, inspecting correctional facilities. I have inspected three facilities and done document reviews for two additional facilities. I have also reviewed proposed standards for family detention centers for the Department of Homeland Security. A copy of my Curriculum Vitae is attached as Exhibit A.

3. I have personal knowledge of the facts set forth below, and if called as a witness, could and would testify to the same.

**B. Description of "Death Row" Units at San Quentin**

4. Condemned prisoners at San Quentin are housed in three housing units: North Segregation (North Seg), the Adjustment Center (AC), and East Block. There are 68 cells in North Seg, 102 in the AC, and approximately 510 in East Block.

Rice Decl. - 2

RME411460

**2668**

Exhibit 3
Page 204

5.   All prisoners in these three units are single-celled. Each cell has a coverless toilet, sink, and bunk. The cells in East Block are 48 square feet; in the AC, the cells are 56 square feet. *Toussaint v. McCarthy,*, 597 F. Supp. 1388, 1394 (N.D. Cal. 1984), *rev'd in part on other grounds,* 801 F.2d 1080 (9th Cir. 1986), *cert. denied, McCarthy v. Toussaint,* 481 U.S. 1069 (1987).   Food from a central kitchen is placed on individual trays which are then delivered to prisoners on push carts; the trays are distributed to their tiers and then the cells. Order Re Motion for Contempt and Motion to Modify Consent Decree, June 21, 2007, 10:6-9.

6.   East Block is a five-tier cell block. The block's key physical features and dimensions have been described previously by Judge Weigel and the Court-appointed monitor in this case. *Toussaint v. McCarthy,* 597 F.Supp 1388: Fourth Report of the Monitor, August 1, 1989 (Fourth Report), at 18-19. These descriptions, as well as my personal observations, form the basis for this and following two paragraphs. East Block has five rows, or tiers, of cells stacked vertically. *Toussaint,* 597 F. Supp. at 1394. "From a top view, the cells are arranged in two rows parallel to the center line of the building," separated by a service alley (also known as a pipe chase). Fourth Report at 18:15-17. The two sides are referred to as "Bay Side" (for the tiers facing San Francisco Bay to the east) and "Yard Side" (for those that face the San Quentin upper yard to the west).   In total, then, there are ten tiers of cells in East Block. Each tier is approximately 280 feet in length (*id.* at 18:14-15), and I was told each contains approximately 54 cells. I saw that, at approximately the mid-point of each tier, cells have been converted to inmate showers. The cells on each side of the showers on each tier are referred to,

collectively, as the "front bar" and "back bar," with the former designation used for those cells closer to the block's front door. At the end of each tier is a "cart room," used for storage by staff. Above the fifth tier is an area referred to as the sixth tier. I was informed that this tier has no cells and is in part used for storage, including condemned prisoners' property and legal materials.

7. Each cell in East Block has bars and a protective metal screen on its front. Outside the cells, except on the bottom floor, runs a walkway, also commonly referred to as the tier. The tier walkways are four feet, six inches in width. Fourth Report at 18:17-19. On the outer edge of the walkway, away from the cell front, the walkway is enclosed by metal railings and bars. *Toussaint*, 597 F. Supp. at 1394. On the ground floor of the block, a "broadway" roughly 15 feet wide occupies the area between the cell fronts and the outer wall of the building. Fourth Report at 18:19-22. On this broadway, several holding cells (also known as holding cages), used for the temporary placement of prisoners, are aligned against the outer wall. The first tier also contains, in place of several inmate cells, staff offices and, on the yard side of the unit, rooms used for health care.

8. Across the open space from the tiers, on the inside of the outer walls of the building and opposite the cell fronts, are walking platforms called gunwalks or gunrails. *Toussaint*, 597 F. Supp. at 1394. The gunrails are three feet, three inches wide and are patrolled by armed correctional officers. Fourth Report at 18:22 - 19:2. The outer wall of the blocks opposite the cell fronts also contains windows and the ventilation units for the block. The cells themselves have no windows. *See Toussaint*, 597 F. Supp. at 1394.

9.      Condemned prisoners who use wheelchairs are usually placed on the Yard Side on the bottom tier, near the wheelchair accessible shower.

**C.      Inspection of San Quentin State Prison and California State Prison – Solano's Laundry Facility**

10.     On January 5, 2008, I conducted an inspection at San Quentin State Prison. From approximately 8:00 a.m. to 2:20 p.m. I inspected East Block. In East Block, I walked several tiers on the "Yard" and "Bay" sides. From approximately 2:20 p.m. to 5:00 p.m., I inspected the Adjustment Center. I inspected most of the tiers in the Adjustment Center.

11.     During my time at San Quentin, I reviewed written documents, including records of daily information that are used by the prison to document certain services provided to prisoners. I took photographs and measurements, as discussed below. I also spoke with prisoners and correctional officers.   In total, I spoke to approximately 30 prisoners. Nearly all of these prisoners were selected at random; I simply approached their cells and questioned them. I also spoke with a few inmates who called out to me or where I saw something I wanted to investigate further.[1]

12.     On January 6, 2008, from approximately 9:00 a.m. to 11:25 a.m., I conducted an inspection of the Prison Industries Authority's laundry processing facility located at California State Prison– Solano (Solano). Mr. John Arnold, who was identified

---

[1] I did not tour the condemned prisoner housing in North Segregation because I did not have time to do so in the nine hours during which I was allowed access to San Quentin. I could not inspect the sixth tier on my tour of East Block because of a lead remediation project that is ongoing there. I was informed that the area is off-limits to those who are not working on this project and who are not authorized to be there.

Exhibit 3
Page 207

to me as the Superintendent of Solano's laundry processing facility, accompanied me on
my inspection.

13.     Attached as Exhibit B to this Declaration is a list and description of the
pictures I took at San Quentin on January 5 that I rely on in this declaration. Attached as
Exhibits C through EEE are true and correct copies of those pictures, as listed in Exhibit
B.

**II.    San Quentin's failure to provide the basic minimum of necessary cleaning
supplies to prisoners in East Block and the Adjustment Center poses an
unacceptable risk to these prisoners**

    **A.    Sanitation and hygiene requirements for prisoners' cells**

14.     To ensure a minimum standard of health and to protect against the outbreak
of infectious disease, every correctional institution should have clear, enforced
requirements and standards for prisoners' hygiene and sanitation within their cells and
should regularly and reliably provide adequate supplies for the prisoners to meet those
requirements and standards.

15.     At the very least, prisoners should regularly be provided a disinfectant
cleanser and some type of mop that can clean their cells' surfaces from the inevitable
build-up of bacteria, dust, and filth. Bath soap or shampoo is not an acceptable
alternative to disinfectant because it does not eliminate bacteria. Prisoners should be
provided some type of sponge or scrub pad to use for surfaces, such as the toilet, that
cannot be mopped. Prisoners should be given the means of removing dust and heavy dust
build-up in their cells, including on their cells' vents. Gloves should be provided to
protect prisoners, especially medically compromised ones, from the bacteria inevitably

encountered while cleaning. Depending upon the type of cleaner provided, a bucket or water-collection basin may be required for rinsing off disinfectant and soil. These are the most basic cleaning supplies that should be provided to all prisoners.

16. Further, measures must be in place to ensure that prisoners are regularly provided these supplies and that they are replaced when depleted, worn out, and otherwise unusable. It is not acceptable to provide these supplies only on prisoners' requests. It is also unacceptable to make them only intermittently available. These are the basic minimum requirements: every correctional facility must take affirmative steps to ensure that basic cleaning supplies are consistently available and that they are reliably provided to prisoners. The American Public Health Association's Standards for Health Services in Correctional Institutions state, for example, that written policies and procedures must be in place and enforced to assure that inmates have cleaning supplies available to them on a regular basis and not less than weekly so that inmates may clean their cells.

17. Without such measures in place, condemned prisoners living in San Quentin are at significant risk from the constantly-circulating pathogens that are necessarily present when hundreds of individuals live together. While the risk is serious for all prisoners, it is that much more significant for medically-compromised prisoners such as diabetics, asthmatics, or other immunocompromised inmates who live in the housing units.

**B. The state of sanitation and hygiene at San Quentin makes cell sanitation and hygiene extremely challenging and the enforcement of standards critical**

RME411465

Exhibit 3
Page 209

18.    The abysmal level of general sanitation in East Block makes it crucial that hygiene and sanitation standards are enforced in prisoners' cells if even the most basic standards of public health and human decency are to be maintained. I cannot emphasize enough that the need to ensure prisoners are consistently provided with adequate cleaning supplies is made all the more critical in a housing unit such as East Block, whose general sanitation falls well below any acceptable standard for human habitation. The state of general sanitation in the housing unit is critical to understanding the health and safety risks currently faced by inmates with respect to the hygiene of their own persons and cells. General sanitation conditions in San Quentin's East Block are deplorable, well below contemporary standards of decency, and dangerous to the health of prisoners housed there.

19.    Structurally, the East Block housing unit is in significant disrepair in ways that make maintaining proper sanitation in the unit, and consequently in prisoners' cells, extremely difficult, if not impossible in some instances. The most glaring and shocking structural deficiencies in East Block are the showers, which collectively cause serious sanitation problems for the entire unit. Shower stalls are located in the middle of each of the tiers. On each of the tiers above the first tier, water flows out of the shower stall onto the tier and then cascades to the tiers below. The water then collects on the first tier, immediately adjacent to where East Block prisoners are seen for their medical appointments. On the first tier, the water flows directly into, among other places, the holding cages where prisoners are placed to wait for their medical appointments. *See*

RME411466

Exh. Y.  During my tour of East Block, water from the upper tiers fell as if it were a light rain of scummy, filthy water.

20.     The bars on the tiers in front of the showers are extremely corroded and degraded from the cascading dirty shower water.  Some of these bars are so corroded that it is impossible to clean them, even if cleaning were attempted.  Mold and mildew populate the tier bars, floors, and ceilings in front of the showers.  Congealed strands of muck and slime, composed of soap scum, hair, and bodily detritus dangle from the tier bars and ceilings.  *See* Exhs. T, U, & V.  It is readily apparent that these strands, like stalactites, have formed over a long period of time as water carrying shower debris has flowed over them.  These slime stalactites are perfect breeding grounds for mold and bacteria.

21.     The water that flows over the tiers is dirty shower water, made dirtier as it picks up particles from the tier floors and bars while flowing over them.  At any given time, this water is likely to contain used soap and shampoo; body, head, pubic, and shaved hair; sloughed-off skin and detritus; blood particles from open sores and cuts, including those incurred while shaving[2]; and other bodily particles that are naturally carried away by shower water, such as saliva, mucus, and pus.  The filth of this water is evident from stains on plastic sheeting, apparently hung in an unsuccessful effort to shield passers-by from the falling water. *See* Exhs. FF & EE.

---

[2]I was informed on my tour that condemned prisoners are allowed access to a razor only while they are showering.  Shaving in the shower is therefore a regular and frequent occurrence.

RME411467

Exhibit 3
Page 211

22.     This shower water spreads prisoners' viral and bacterial pathogens throughout the unit as it falls over the tiers. The pathogens are easily picked up and spread throughout the unit by individuals who walk through the water, as well as by physical implements, such as carts and filthy mops and buckets, that are pushed through it. During my tour of East Block, it was not possible to walk the length of the first tier without walking through water that had fallen from above. Additionally, like with a waterfall, the cascading water aerosolizes into a mist as it falls. This micro-mist circulates throughout the unit, further spreading pathogens.

23.     Based on the condition of the area in front of the showers, it is clear that this glaring problem has persisted for many years, with little effort to solve it. An old gutter system is in place in some areas, but it has obviously done nothing to help, much less solve, the problem.

24.     These conditions pose serious health and safety risks not only for the prisoners who live immediately adjacent to the showers on each tier, but to all the prisoners who eat, receive medical appointments, and are expected to maintain a basic level of personal hygiene and sanitation in the unit. These glaring conditions fall well below any conceivable standard of sanitation and hygiene. I am shocked that they are allowed to persist.

25.     In addition to this shocking, central feature of East Block, there is a litany of unsanitary conditions that render adequate cell sanitation extremely challenging. For example, water also flows out of the shower on the first tier of Yard Side, which is designed for the use of prisoners with disabilities. Dirty water from this shower pools

Rice Decl. - 10

RME411468

and collects nearby, and nearby gutters have caked debris and scum that is not cleaned. *See* Exhs. II-LL. Further, during my inspection, water persistently rained down on the first tier of Bay Side, coming from either outside the unit or from very leaky pipes. I observed water falling into, and pooling in the bottom of, a wall-mounted box that is used to collect written requests for medical care. Two medical request forms were under water in this box. Water in this area was also streaming over a light switch cover, creating a serious shock hazard. My strong impression was that it was actually raining inside the unit.

26.   Debris and garbage fall and collect on East Block's first tier. I saw this debris and garbage on and about the prisoner holding cages, on objects such as laundry carts that are kept on the ground floor, and in the plexiglass shields that cover some windows. *See* Exhs. S, MM-OO, SS-TT. The first tier, Yard Side staff bathroom, located next to a prisoner medical clinic and near prisoner cells, has printed signs stating "HEALTH HAZARD DO NOT ENTER" and warning of potential lead, asbestos, and mold. *See* Exh. X. There was no lock on this door and the door was ajar. *Id.* A ventilation fan grate on the outside wall of this tier was filthy, covered with much accumulated dirt, dust, and slime. *See* Exh. CC. As discussed below, there are also accumulations of bird feces in a number of locations in the unit.

27.   In spite of this filth, I did not see many mops in East Block. Those that I did see were dirty, with dirty mop buckets. *See* Exh. DD.

**C.   The conditions of prisoners' cells at San Quentin makes sanitation and hygiene extremely challenging and the enforcement of standards critical**

RME411469

28.     In addition to the generally low levels of sanitation in East Block, there are specific conditions within and around prisoners' cells that exacerbate the challenge of maintaining a hygienic cell environment and underscore the need to ensure that proper cleaning supplies are distributed.

29.     First among these conditions is the apparent shortage of toilet paper in East Block. As I walked the tiers, I observed that homemade signs indicating a prisoner needed toilet paper were affixed to the outside of many prisoners' cells. Prisoners with whom I spoke and records that I reviewed confirmed that there are times when it is difficult for prisoners to get adequate amounts of toilet paper. If a prisoner cannot hygienically wipe himself after defecating in his cell, maintaining adequate sanitation in the cell will prove extremely difficult.

30.     Second, the vents in prisoners' cells – both those that were clean and those that were filthy – exhibited significant dust accumulation. See Exhs. F, I & O. While I did not inspect East Block's ventilation system, this dust build-up indicates that there have been extended periods of time when the ventilation system was not properly maintained. The level of dust build-up that I witnessed would seriously aggravate the condition of an asthmatic or allergic prisoner. Also, given the prevalence of old bird feces in East Block, the dust build-up could pose health risks to prisoners because it could contain aerosolized pathogens from bird feces. *See* Section IV.A, below.

31.     Third, I noted that the outside of prisoners' cells was often filthy. *See* Exhs. UU, GG, HH.. Prisoners I questioned on the tour showed me that they could not reach

Rice Decl. - 12

RME411470

Exhibit 3
Page 214

these areas to clean and, indeed, some of these surfaces were degraded to the point where they cannot be adequately cleaned. Dust particles from these filthy areas can be blown into cells, and aerosolized pathogens drawn in through air currents pose potential health hazards.

32.    Fourth, individual prisoners reported conditions in their cells that make maintaining hygiene extremely difficult, if not impossible. For example, one prisoner in the Adjustment Center called out to me with a complaint about his mattress and pillow. I observed that the plastic covering his mattress and pillow were cracked throughout, exposing the fill inside. *See* Exhs. YY & ZZ. I was informed by a correctional officer that this mattress and pillow had been used by the cell's previous occupant, before the current occupant moved in on December 21, 2007. This is completely unacceptable. Because of degradation and breakage to the plastic, this mattress and pillow are incapable of being cleaned and sanitized. No prisoner should be using such a mattress. That this mattress was used by two prisoners in succession presents a perfect scenario for the communication of viruses, fungi, and bacteria such as Methicillin-resistant *Staphylococcus aureus* or MRSA. *See* Section III.A.I, below.

33.    In another example, a prisoner on the first tier of East Block's Bay Side told me that he had a persistent leak in his cell that he believed was the result of water seeping through the wall from the adjacent "pipe chase." I observed water pooling toward the back of his cell. When I inspected the adjacent pipe chase, I observed a significant amount of standing water. *See* Exh. WW. While I cannot identify the source of this water with certainty, I believe it comes from leaking plumbing that connects through the pipe

1  chase and is therefore likely to contain fecal material from prisoners' toilets. The

2  collection of sewage water in a prisoner's cell is an unacceptable health hazard.

3      34.    Fifth, there is no regular cleaning schedule for condemned prisoners' cells.

4
5  Nor does there appear to be any effort made by San Quentin to enforce minimum

6  standards of hygiene and sanitation in prisoners' cells. From speaking to correctional

7  officers, the only "rule" regarding the sanitation of prisoners' cells that seems to be

8
9  actually enforced is that prisoners should refrain from cleaning the floors of their cells by

10  flooding them with water until after 10:00 a.m. As was explained to me, this "rule" is in

11  effect to minimize the dirty water that pours over the tiers during the hours when there is

12  frequent prisoner and correctional officer movement on the tier.

13

14      **D.    East Block prisoners cannot keep their cells acceptably clean because
        adequate cleaning supplies are not available to them**
15

16      35.    I entered several of the "cart rooms" located on each tier in East Block,

17  where records and supplies for that tier are kept. In one of these cart rooms, there was a

18  fairly new-looking bucket of cleaning supplies, which included a small broom, a dust
19
20  pan, sponge, spray bottle with a substance labeled "disinfectant," and a toilet brush.

21  These buckets were not available in all the cart rooms I entered and some of the buckets

22  did not contain all of the items listed above.

23

24      36.    It was clear to me that, despite the existence of these buckets in some of the

25  cart rooms, condemned prisoners are not receiving adequate supplies to clean their cells.

26  Even on the tiers that did have these buckets, the prisoners appeared to have absolutely
27
28  no knowledge of their existence and consistently insisted that no supplies were made

RME411472

available even after they had requested them. From my inspection of San Quentin and my questioning of staff and prisoners I have no doubt that, even when they ask for them, it is extremely rare for prisoners to receive even the most basic supplies.

37.     With very few exceptions, the consistent message I received from the approximately 30 prisoners I interviewed was that they did not receive cleaning supplies on any regular or reliable basis. I was consistently told by prisoners that if they ever received supplies to clean their cells it was because they had, out of dogged persistence, good luck, or a congenial relationship with a responsive officer, been able to get a correctional officer to track down some detergent or cleaning implement. Prisoners also consistently reported to me that it was their understanding that correctional officers whom they asked for supplies did not have any available for them to use. This was a nearly uniform message from the many prisoners with whom I spoke.

38.     This consistent message was corroborated in several ways. First, I witnessed several prisoners cleaning their cells. To scrub, they used rags cut from old towels or other clothing items, or wash-cloths that they purchased from canteen. As a cleaning agent, they used state-issued bath soap or a homemade slurry solution made from bath soap and detergent, if they could get it from the canteen.

39.     Second, correctional officers corroborated prisoners' accounts. Correctional officers stated that they try to get inmates supplies when requested but that they are often hard to come by. One officer explained the frequent scarcity of disinfectant by stating that officers often keep San Quentin-issued bottles of disinfectant locked in their personal lockers, which are not accessible to other officers who might be

Rice Decl. - 15

RME411473

**2681**

Exhibit 3
Page 217

looking for them. Another officer attempted to convince me that cleaning supplies are available by stating that when asked for supplies, he will "scrounge" around to locate them. Any system that depends on an officer "scrounging" for supplies will not be able to reliably provide those supplies that are regularly needed to maintain adequate sanitation in a housing unit.

40.   Third, I looked through dozens of filled-out forms entitled "Inmate Segregation Record CDC 114-A" that are kept for each prisoner in the tiers' cart rooms. This form states that it is a "Record of Daily Activity" and specifically states: "SUPPLIES - Cleaning and personal hygiene supplies shall be offered on a weekly basis to all inmates and provided on an as-needed basis. Record what was provided." I was informed by correctional officers that if the distribution of cleaning supplies were recorded, it would be on this CDC 114-A form. I looked at record after record and, with the exception of bath soap, I did not see any distribution of cleaning supplies logged on this form. I did not see any logging of the use of a cleaning supply bucket or kit. There were plenty of other notations on these forms, such as those indicating the provision of meals, showers, and exercise.

### E.   Adjustment Center prisoners cannot keep their cells acceptably clean because adequate cleaning supplies are not available to them

41.   In the Adjustment Center, both prisoners and correctional staff reported that the only cleaning supply that is available is a scrubbing powder that is doled out in small baggies and distributed to prisoners approximately once every two weeks. *See* Exhs.

AAA & BBB. Correctional officers specifically stated that scrub pads are not available to prisoners in the Adjustment Center.

42. A correctional officer showed me the tub from which he regularly doles out this powder. The tub is labeled "Just Clean" and reads: "DANGER: Harmful if swallowed. Contains sodium carbonate and sodium orthosilicate. Protect skin, eyes and mucous membranes from contact with this product or concentrated solution – Can produce burns." The tub's first aid indications state that for contact with skin, one should "Immediately flush skin with plenty of water." The tub's general directions state: "For normal cleansing, use 1 oz. per 1 gallon of water. Remove soil-laden solution from cleaned surfaces by flushing thoroughly with clear water using hose or thorough mopping and rinsing." At the bottom of the tub's label is written: "Gloves and goggles are recommended when using this product." See Exhs. AAA & BBB.

43. This product is dangerous and completely inappropriate for distribution to prisoners at all, much less as their sole cleaning supply. Prisoners in the Adjustment Center have no ability to use this product safely because they lack gloves, goggles, the ability to flush the product off surfaces after cleaning, and training in the proper and safe use of this chemical. Adjustment Center prisoners are likely to receive burns and/or other serious abrasions through misuse of this product.

44. There are many effective disinfectants other than "Just Clean" that San Quentin could provide to Adjustment Center prisoners. There is absolutely no reason to provide this dangerous product to them as their sole cleaning supply.

### F.  San Quentin has failed to take responsibility for the grave insufficiencies in inmate hygiene

45.    From both a public health and human decency perspective, it is unacceptable that San Quentin appears to take such minimal measures to ensure that condemned prisoners' cells are kept sanitary and hygienic. It is, of course, appropriate for San Quentin to put the onus of cleaning a prisoner's cell on the occupant. What is wholly inappropriate, however, is San Quentin's abdication of responsibility for ensuring that prisoners' cells are indeed clean and sanitary. There is simply no excuse for leaving this basic responsibility to the whim or ability of each condemned prisoner, much less for failing to ensure that cleaning supplies are provided to those who attempt to clean their cells. San Quentin appears to view basic hygiene and sanitation as an option, and not a requirement, for condemned prisoners.

46.    I was appalled to see the very real consequences of the abdication of this responsibility in East Block. In East Block, while walking the Yard Side tiers, I stopped in front of one prisoner's cell because of the foul, sour bodily odors that emanated from it. Correctional officers accommodated my request to have the prisoner removed so that I could inspect the cell. What I found was extremely distressing. Indeed, the cell was repulsive and should not be inhabited by a human being. *See* Exhs. G-Q.

47.    Food was strewn throughout the cell. The toilet was filthy, with an accumulation of a brown substance both inside and on the floor. The walls, especially around the toilet, were stained with a dark, streaked substance. There was significant dust accumulation throughout the cell, and heavy dust accumulation on the ventilation duct.

The prisoner's bedding was stained and filthy. An unidentified greyish liquid was pooled on the floor. *See id.* The odor inside the cell was pungent and very foul.

48.     I spoke briefly with this prisoner and he reported that he did not know of any brooms with which to clean his cell and that he sweeps the floor with his bare hands. Like so many other prisoners with whom I spoke, he did not know of any scrub pad or cleaning agent that was available for him to use. He reported what was patently obvious—that he had not recently cleaned his cell.

49.     I witnessed similar abdication of responsibility in the Adjustment Center. As I was concluding my tour on the North Side of the Adjustment Center's first tier, prisoners asked me to investigate the fact that their cells were very cold and that they claimed to receive no heat. One prisoner got up from his bed to speak with me about the temperature and informed me that he had been under his blanket because it was so cold.

50.     Indeed, the tier felt chilled. I twice measured the temperature in a cell on this tier, once using a thermometer supplied by a correctional officer, and once using my own. The readings from the two instruments were within one degree of each other: the temperature was about 58° F. By contrast, the American Public Health Association's Standards for Health Services in Correctional Institutions require the maintenance of a least 68°F during the coldest winter months. 58° F is simply too cold for adequate habitation in the winter.

51.     I saw that two windows were open on the outer wall at the end of this tier. A correctional officer stated that there was nothing wrong with the unit's heating system, but that officers always leave the windows open on this floor of the Adjustment Center

RME411477

because the smell would be intolerable otherwise. To compensate for surrendering

control on a sanitation issue as basic as the odor in the unit, correctional staff is freezing

the prisoners.

## III.   Laundry

### A.   San Quentin's institutional laundry process is broken.

52.   Prisoners who use the institutional laundry service in East Block place their

soiled items in mesh bags, which they tie and secure themselves, and then give to

correctional officers. In the Adjustment Center, prisoners pass their soiled items through

a slot in their doors. Correctional officers place these items in mesh bags, which they

then tie and secure. Laundry from all units is loaded into locked carts where it is

transported to the laundry processing facility at Solano.

53.   If the process is running on schedule, laundry is collected from condemned

prisoners on Monday and processed by Solano on Wednesday. After processing, it sits in

locked carts at Solano for 24 hours. It is returned to San Quentin and distributed to

prisoners on Thursday or Friday.

54.   The overwhelming majority of prisoners I spoke with reported that they

either avoided the institutional laundry completely or only periodically sent certain items,

like towels, to the laundry. They reported that they avoided the laundry for a variety of

oft-repeated reasons such as that items or entire laundry bags were not returned and

replacements were very hard to come by; laundry was returned dirty, dingy, and with

strange odors; and laundry was returned wet or damp. More than one prisoner reported

that when he does send out laundry, he habitually re-washes it upon return.

55.     San Quentin's laundry process is plainly broken in ways that both threaten

the health of condemned prisoners and compel them to rely on other, insufficient means

of trying to get their soiled laundry clean.

### 1. San Quentin perpetuates a potentially dangerous laundry system that it knows returns soiled, wet, and unsanitary laundry to prisoners

56.     From speaking with prisoners, correctional officers, and the chief of

Solano's laundry facility, John Arnold, I have little doubt that laundry indeed returns

dirty, dingy, and damp. As described in paragraph 15 of the Declaration of John Arnold

In Support of Defendants' Motion to Terminate Consent Decree, when laundry bags are

tied too snugly, causing the bag to be gathered in a tight ball of clothing and linens,

laundry can neither be properly cleaned nor dried. Indeed, Mr. Arnold's Declaration does

a fine job of describing exactly how one should *not* do laundry. I agree with Mr.

Arnold's assessment, which he stated several times on the video made by Defendants of

Solano's laundry processing facility ("Solano video"), that laundry bags that are too

tightly packed or full are unlikely to get clean or dry in the laundry processing.

57.     To do an adequate cleaning and drying job, chemicals and heating agents

must penetrate through every piece of laundry. When laundry is wadded into a tight ball,

these chemicals and heating agents may not adequately penetrate the interior of the ball.

In such cases, the interior laundry is wetted, but neither raised to the necessary

temperature, adequately penetrated by cleaning chemicals, or ultimately dried. The result

is a laundry bag whose interior retains any organisms and pathogens with which it went

RME411479

Exhibit 3
Page 223

1    into the process and is now also wet or damp. The moisture added to the mix helps these

2    pathogens and organisms to breed and multiply.

3       58.    Once these bags have been laundered, they are loaded and locked into carts,

4

5    which are, in turn, loaded onto a truck. I am informed from the Solano video that this

6    truck sits for 24 hours at Solano before returning to San Quentin. Confined in a locked

7    cart with other laundry bags for many hours, a balled, damp laundry bag can now

8

9    contaminate adjacent bags of laundry with pathogens and organisms that have survived

10    and perhaps multiplied in the laundering process.

11       59.    While this process is conducive to transmitting a host of pathogens, the

12

13    transmission of Methicillin-resistant *Staphylococcus aureus*, or MRSA, stands out as a

14    particularly serious danger. MRSA is a potentially fatal staph infection that is resistant to

15    antibiotics. Sub-optimal laundering, especially of underclothing and towels, is a key

16    factor for the continued spread of MRSA among prisoners. The laundering process

17

18    described above – in which pathogen-laden, damp bags are packed in and allowed to

19    contaminate "clean" bags – is just such an efficient means for transmitting MRSA.

20    Laundering clothing in this way is dangerous to the condemned population.

21

22       **2.**    **The problems that create this unsanitary laundry process are easily solved**

23

24       60.    Although many condemned prisoners know not to tie their laundry bags

25    into a wadded ball, I am confident that many do not know this very basic information.

26    On the Solano video, I saw such bags being processed and heard Mr. Arnold report that

27

28

Rice Decl. - 22

RME411480

**2688**

Exhibit 3
Page 224

1   many bags coming from San Quentin will not be adequately cleaned because they are tied

2   too tightly.

3       61.   As I walked up and down the tiers speaking to prisoners, I was amazed to

4
5   learn that no one at San Quentin appears to have taken on the very basic responsibility of

6   educating prisoners about how to properly bag their clothing.   Consistently, I was told

7   that while correctional officers collect prisoners' laundry bags, they have never informed

8
9   the prisoners on how to bag laundry to avoid it coming back soiled and damp.

10      62.   I spoke with one prisoner who had been at San Quentin for about 20 years

11  and regularly sends out his state-issued items for laundering.  He reported that his laundry

12  periodically is returned to him wet or soiled.  I asked him to show me how he ties his
13
14  laundry, and was not surprised to see that he tied it in a fairly tight ball.  I then explained

15  to him that his laundry would come back cleaner and drier if he tied it with more room in

16  the bag.  The prisoner informed me that in 20 years no one had ever given him this
17
18  simple piece of advice.  In the Solano video, Mr. Arnold implied that information about

19  the proper bagging of laundry was available in the housing units at San Quentin.  If this is

20  true, he seems to be the only one aware of it.

21
22      63.   What is more, under San Quentin's laundry system, not all prisoners tie and

23  secure their own laundry bags.  In the Adjustment Center, prisoners pass their dirty

24  clothing through a slot in their doors and correctional officers tie and secure the bags.  I
25
26  asked one correctional officer who worked in the Adjustment Center to demonstrate how

27  he ties prisoners' laundry bags.  He did so for me and, not surprisingly, twisted the bag

28  tightly, in a manner that would inhibit proper washing and drying.

64.     I am mystified as to why San Quentin allows this problem to continue. Clearly, Mr. Arnold well knows that his facility is not adequately cleaning and sanitizing significant numbers of laundry bags that come from San Quentin. Clearly, the officers who pass out laundry notice that they are often returning damp laundry bags.

65.     This problem has a very simple fix: San Quentin could simply make sure that prisoners' laundry bags are tied properly or instruct Solano to move up the knots on prisoners bags. Instead, San Quentin allows the problem to persist.

### 3.     There are serious problems with how the laundry is handled and managed at San Quentin

66.     Aside from those problems brought on by inappropriate tying and securing of laundry bags, there plainly are serious problems with the hygiene and effectiveness of San Quentin's laundry system that appear to stem, in large part, from how the laundry is handled and managed at San Quentin.

67.     For example, on the ground floor of East Block's yard side, I saw several carts that were identified by correctional officers as those used to hold and distribute clean laundry. I saw similar carts identified in the Solano video as the locked carts that arrive from San Quentin. Aside from the fact that these carts were coated in bird feces, I was disturbed to find that inside one cart was a dead mouse and a bird feather in plain view. In that cart I also saw a supply of blankets. I questioned an officer about the carts. He replied that he thought the carts were used for clean laundry. I later spoke to Correctional Officer Cuello, who confirmed that the laundry carts I saw did hold "clean" laundry to be distributed to inmates. *See* Exhs. MM-PP. There is no excuse for decaying

rodents and bird detritus to be in a laundry cart and their presence reflects an extremely low level of oversight and care with respect to laundry.

68.     Some of the laundry carts I saw at San Quentin did not have tops and were covered instead with sheets. These sheets had bird droppings, slices of bread, and other garbage on them. Some of the carts contained linens and two had loose whites. All were purported to contain clean laundry for distribution to inmates. *See* Exhs. MM-OO.

69.     Likewise, in the Solano video, both Mr. Arnold and another laundry supervisor stated that San Quentin's condemned laundry carts often arrive with a lot of "garbage" and "trash" inside that must be removed and weighed before laundering. There is no reason why laundry carts should be filled with garbage. Such a situation makes laundry that much more difficult to clean and sanitize.

70.     In addition to these sanitation issues, San Quentin's management of the laundry process appears deeply flawed in ways that would seem to ensure the routine loss of prisoners' laundry. When I toured the Solano processing facility, Mr. Arnold stated that even though each locked cart arrives from San Quentin with an inventory of laundry bags, his staff always re-counts the bags because San Quentin's count is generally wrong. This means either that San Quentin has a consistently faulty record-keeping system and/or that San Quentin staff consistently loses or adds bags between the time that they count and record them and when they load them into the carts. Either scenario is unacceptable since both will prevent San Quentin from properly processing and returning bags to prisoners when they are received from Solano. Indeed, my review of "In and

RME411483

Exhibit 3
Page 227

Out" laundry records from East Block confirmed that San Quentin's numbers of bags going out of each tier often do not match the numbers of bags being returned there.

71.  Additionally, from the Solano video and Mr. Arnold's Declaration, I learned that Solano regularly receives loose clothing and sometimes empty bags, in addition to full bags, from San Quentin. If condemned prisoners are on a "bag system" there is no reason that loose laundry should consistently be arriving in the condemned carts. Like with its faulty record-keeping, the fact that San Quentin regularly sends out loose clothing would seem to make it extremely difficult to properly process and return laundry to prisoners.

72.  These management failures lend credibility to the many reports I heard from prisoners that, when they use the institutional laundry, they do not always get their linens and clothing back.

**B.    Because they do not trust the institutional laundry, condemned prisoners wash soiled items in their cells' sinks, buckets, and toilets**

73.  Because of their complete lack of faith in San Quentin's laundry processing, many prisoners instead wash clothing and linens themselves in their cells. The overwhelming majority of prisoners I interviewed reported that they either avoided the institutional laundry completely or periodically sent only certain items, such as towels, to the laundry. In these prisoners' cells, I often saw laundry hung up on makeshift clotheslines. In other cells, I actually happened upon prisoners washing items in their cells.

Case 2:09-cv-02158-CJ-44-5 Document 28-5 Filed 09/26/14 Page 29 of 48 Page ID #:4466

74.     Prisoners use state-issued bath soap and/or detergent bought from the canteen to wash their clothing. Not all prisoners can afford detergent and some must therefore rely exclusively on bath-soap.

75.     Washing large items like sheets in the cell's sink is impractical due to the sink's small size. Buckets therefore must be utilized to wash larger items. Not all condemned prisoners, however, have buckets. For example, prisoners in the Adjustment Center are not permitted buckets.

76.     Some prisoners therefore use their toilets for laundering. I witnessed one prisoner washing clothes in his toilet with state-issued bath soap. *See* Exhs. CCC & DDD.

77.     Toilets are filthy places. They are even filthier on San Quentin's death row where adequate cleaning supplies are not available and where feces sits for periods of time in the bowl because prisoners are permitted only two flushes per hour. Under any standard of decency or health, people should not be washing clothing and linens in the toilet. That condemned prisoners are willing to do so says a tremendous amount about the degraded levels of sanitation and hygiene under which they live.

**1.      Given the conditions at San Quentin, prisoners' laundering of their own soiled items is an unacceptable means of maintaining basic hygiene**

78.     Given the environment of death row at San Quentin, it is completely unacceptable for prisoners to wash clothing and linens in their cells as the means of keeping these items sanitary and hygienic. This is true even if prisoners are using their sinks and buckets, and not their toilets, for washing.

79.   First, as has already been discussed, East Block is a very unsanitary place, and prisoners do not have adequate supplies with which to clean their cells. Thus, they are trying to get their laundry clean in an environment that is unsanitary to begin with.

80.   Second, a critical component of sanitary laundering is the presence of temperatures high enough to destroy pathogens in soiled laundry. Sanitary laundries achieve these levels of heat through a variety of means, including through dryers and the use of water that is at least 140º Fahrenheit. Without the use of such temperatures, the bacteria, viruses, and fungi that live in soiled laundry cannot reliably be destroyed.

81.   However, because of the serious risk of scalding and burning, prison cells should never be plumbed with water that reaches these temperatures. (With 10-15 seconds of exposure, 135°F water causes third-degree burns.) Correctional standards provide that plumbed cell water should never exceed 120º. Running 140ºF water in prisoners' sinks would be unacceptably dangerous. If San Quentin follows this very basic correctional standard of 120ºF, condemned prisoners should not have access to plumbed water that is hot enough to eliminate pathogens from their soiled laundry.

82.   To further exacerbate matters, most bath soaps, which prisoners use to clean their soiled items, do not totally dissolve in water that is less than 140ºF. Thus, when prisoners use these to wash their laundry, fats, lye, and chemicals in the soap cling to their clothing instead of breaking apart completely. When cold water is used to rinse away the soap, these fats, lye, and chemicals further solidify, lodging themselves in the clothing and linens. The result is "clean" laundry whose pathogens have not been

destroyed and which is now embedded with a residue of solidified fats, lye, and

chemicals. These residues can result in persistent eczema, skin irritations, and itching.

83.     Additionally, doing laundry in this manner is difficult on the institution and

can only serve to exacerbate the sanitation challenges in San Quentin. When partially

dissolved soap products are poured into a cell's plumbing, the solidified fats and lyes

cling to the edges of drains and pipes, creating a layer of slime and muck. These slime

collections are perfect breeding grounds for vermin like drain flies.

84.     The upshot of condemned prisoners' laundering their own soiled items in

San Quentin's abysmal conditions is that they cannot maintain very basic standards of

personal hygiene. This inability to maintain a basic level of hygiene in their clothing and

linen, and particularly with respect to prisoners' underwear and towels, further poses

public health risks to the condemned population generally. These risks are particularly

serious regarding the transmission of MRSA and should not be tolerated by the

institution.

IV.     **The infestations of birds, rodents, and vermin pose a significant risk of
        disease to condemned prisoners housed in East Block**

A.     **Birds**

85.     Based on my own observations and the information relayed to me by staff

and prisoners, it is clear that birds currently exist in East Block and have for many, many

years. Throughout the time I spent in East Block, I heard birds chirping and saw

sparrows flying, perching on objects and tier bars, and hopping along the floor of the first

tier. I also saw bird feces throughout the unit. I noted the accumulation of bird feces on

the fifth, third, and first tiers of East Block's Yard Side, among other places. While
heavier on the fifth tier, there was a significant presence of bird feces on the third tier as
well. *See* Exh. W. On the fifth and third tiers, the accumulation was concentrated on the
tier bars. *See* Exhs. C-E.

86.   On the first tier, the feces accumulation was present on the floor and, more
heavily, on objects located on the floor, such as: (1) a wheeled medical gurney; (2) the
tops of laundry carts; and (3) an open box in which prisoners' razors were stored. The
razor box also had feces surrounding it. It was placed on a sheet-covered locker that was
covered in bird feces. *See* Exhs. QQ, RR, MM, OO, Z, AA, & BB.   I was particularly
disturbed to find the accumulation of feces on these objects, which are expected to come
into direct contact with bare human skin.

87.   Bird feces is also heavily caked on the floors and railings of the gun rails
that are opposite the tiers. *See* Exhs. R & XX. Armed correctional officers patrol the gun
rails. The heavy buildup on the gun rails is evidence of a feces accumulation over a long
period of time.

88.   Birds are a sanitation concern because they spread disease, primarily
through bacteria, viruses, and fungi in their feces. Sparrows in particular are implicated
in the transmission of more than 25 diseases to humans and animals, including
histoplasmosis (respiratory illness), psittacosis (fever, headache, and pneumonia-like
symptoms), salmonellosis (gastrointestinal illness) and several forms of encephalitis
(inflammation of the brain). The most significant disease threat is from salmonellosis,

RME411488

2696

Exhibit 3
Page 232

which is easily carried and transported in bird feces that stick to the bottoms of shoes and via insects and rodents.

89.   Depending on the disease, humans may become infected through direct physical contact with feces on the skin, through the inhalation of aerosolized feces,[3] and through ingestion of bird feces that has contaminated food. Based on my observations, East Block presents an unacceptable risk of transmission of disease through all three forms of transmission.

90.   Transmission of disease is most likely through direct contact with bird feces, such as might occur when a sick prisoner lies on a feces-coated gurney or when a prisoner nicks himself on a feces-coated razor. The risk for such occurrences is extremely high in East Block, as noted above. Direct contact with the feces-coated tier bars I observed throughout the unit can also transmit disease, if the feces on the clothes and hands ends up in the mouth (through food contamination or simply by touching the face with a contaminated hand) or is aerosolized and inhaled. Given the short distance between the tier bars and prisoners' cells, I expect officers and prisoners to routinely come into contact with the bars. During my tour, I noted that the Deputy Attorneys General who accompanied the tour periodically leaned up against and rested on the tier bars.

91.   Even without physical contact, the risk of transmission exists through inhalation of feces particles that have been aerosolized by, for example, correctional

---

[3] Feces become aerosolized when they dry and become dust or powder that makes its way into a building's air flow.

officers pacing up and down East Block's feces-coated gun rails. When officers patrol the gun rails, dry, cracked feces are disturbed by their movements, resulting in microscopic particles of old feces being released into the air. This also releases disease-transmitting fungal spores that have grown and accumulated in the old feces. In some instances, such as with histoplasmosis, the older the feces, the more capable it is of transmitting disease. This is so both because fungal spores grow in older feces and because older feces are more easily aerosolized as they dry, crack, and break apart.

92.     In addition, food contamination can occur if officers touch bird feces with their hands and then hand out food trays to prisoners without washing their hands or changing their gloves. Given the amount of feces on the tier bars, without serious vigilance devoted to avoiding contact with the bars and sanitizing one's hands (including changing of disposable gloves and/or hand washing), officers can readily contaminate prisoners' food with feces during food distribution.

93.     Given the bird feces concentrations that have clearly built up over an extended period of time, there are clear and present risks of the transmission of disease from the feces to East Block prisoners.

94.     San Quentin has placed some bird netting over windows, but other solutions are clearly required, since birds still have ready access to East Block. Indeed, I saw and heard several in the few hours I spent there. In addition, windows with no screening were open in the Adjustment Center, where I saw bird feces accumulation on sills.

Case 2:09-cv-02158-cv-02454-SI Document 28-5 Filed 09/26/14 Page 35 of 48 Page 35 of 48 Page ID #:4472

95.     In addition to netting, San Quentin must seek out and cut off all access points to the interiors of these buildings by identifying birds' entry points and vigilantly controlling them. To this effect, window covers should be installed and all efforts made to ensure that doors do not stay open. If feasible, self-closing mechanisms on doors should be installed. Additionally, there must be a routine, enforced program going forward to ensure that netting, covers, and closures are operating effectively.

96.     At the most fundamental basic level, however, San Quentin simply must clean up and eliminate the bird feces accumulations that are present throughout East Block. I saw a lot of very old, dried bird feces during my inspection. These old accumulations are strong evidence that San Quentin has, for a long period of time, abdicated its responsibility for this very serious problem. A conversation I had with a correctional officer stands out as representative to me of this attitude of abdication: the officer justified the bird problem, implying that the birds' presence was the prisoners' fault because they feed the birds. I was surprised by this justification. Prisoners might feed birds, but they do not control the windows, doors, and openings. Nor do prisoners control San Quentin's obvious failure, over a long period of time, to take those necessary steps to eliminate the health risk posed by the birds. At the very least San Quentin must do that. From a public health and human decency perspective, the clean-up of bird feces in East Block is long overdue.

**B.     Rodents and Vermin**

97.     Rodents and vermin are also present in East Block, with potential health consequences to prisoners housed there. *See* Memoranda, "Birds and Rodents in East

RME411491

Exhibit 3
Page 235

Block," from J. Zaragoza to R. Fox (Sept. 1, 2007; Sept. 15, 2007; Oct. 15, 2007; Nov. 1, 2007) ("the 1st Watch staff has also reported issues with numerous rodents running around the unit").

     98.    A correctional officer in the third tier, Yard Side cart room told me that he sees cockroaches, ants, and spiders on the tier. My inspection of East Block is consistent with these reports. I saw a dead mouse in a laundry cart on the first tier of Yard Side. *See* Exh. PP. I saw old mouse droppings and urine.[4] I saw prisoners housed on the ground floor of East Block taking their own pest control measures, placing blankets and cardboard boxes against the floor in the front of their cells to keep out rodents and insects.

     99.    Given the age and decrepit condition of much of San Quentin's physical plant, I would have been very surprised if there were not rodents, insects, and other vermin in East Block. There are three reasons for this: first, rodents and vermin are generally found in facilities that are as old as East Block and as riddled with cracks and gaps in the floors, ceilings, and interior and exterior walls, which allow them to find shelter and warmth. Second, the extremely poor level of sanitation in East Block, described in Sections II. B & C above, attracts rodents and vermin and provides them with food. Third, the water leaking and pooling around the housing unit also attracts rodents and vermin. *See* Exh. XX.

---

[4] I am not surprised that I did not see more rodents and vermin in my daytime inspection, since many of these are nocturnal creatures. Prisoners, who spend virtually all of their time in the facility, are the people most likely to see rodents and vermin

Rice Decl. - 34

RME411492

100.   Rodents and insects, especially cockroaches, act as mechanical transmitters of infectious agents and spreaders of filth. In particular, they can facilitate disease transmission by spreading bird feces into prisoners' cells and even their food by picking up pathogens and infectious bacteria on their bodies as they move through East Block and carrying them wherever they go. Since they are attracted to food sources, they can easily carry infectious agents to prisoners' food in their cells. As noted above, salmonellosis is easily carried and transported in bird feces through insects and rodents.

101.   A correctional officer in an East Block third tier, Yard Side cart room reported to me that he sees small black worms in the showers approximately three times per week. I also heard reports that prisoners complain about such worms in these showers. I am familiar with such "worms," which are the larval stage of small black flies (drain flies). Drain flies are a member of the *Psychodidae* family, small flies that include fruit flies and others. The flies lay their eggs in slime, and the eggs hatch as worms in drains. They are primarily a nuisance, but they have been associated with outbreaks of asthma and contemporary standards call for simple and effective steps to eradicate them. Chemicals such as chlorine bleaches are generally ineffective; adequate control depends on either the use of enzyme-based disinfectants or mechanical cleaning and flushing of the floor and shower drain to remove the organic slime layer, so that the flies cannot lay their eggs in a place that provides food for their larvae. San Quentin does none of these things, to my knowledge. In fact, the officer who described the worms related that he puts in work orders to try to address the problem, but it there is no regular maintenance to clean out the drain.

102.   San Quentin has taken inadequate steps to address and manage the rodent and vermin problem it has, or even the rodent and vermin problem one would expect in such a decaying and inadequately cleaned physical plant. I was told that there is now one full-time pest control officer. For an institution of San Quentin's size and deteriorated state, one person is simply not enough to perform the necessary tasks. These tasks include inspections to determine the types of pests present, determinations of appropriate types of treatment (trapping, baiting, shooting birds, chemical abatement), distribution of traps and chemicals, periodically checking the effectiveness of treatment methods, and identifying entry points for pests and eliminating access. One person could perhaps handle the condemned inmates' units, but not the whole institution.

I declare under penalty of perjury under the laws of the State of California and of the United States of America that the foregoing is true and correct, and that this declaration was executed January 11, 2008, in Orangeburg, South Carolina.

_Leonard Rice_
Leonard Rice

RME411494

# EXHIBIT A

RME411495

**Curriculum Vitae**

**LEONARD F. RICE, BSEH, MES, RS**

Post Office Box 1642
Orangeburg, SC 29116

803.534.0559 (Home)
803.707.3437 (Cell)
riceconsulting@mindspring.com

## EDUCATION

Master of Environmental Science, 1970
University of Oklahoma, Norman, Oklahoma

Bachelor of Science in Environmental Health, 1968
East Tennessee State University, Johnson City, Tennessee

## PROFESSIONAL EXPERIENCE

Rice Consulting Services, LLC, Principal Consultant, 1990-Present
District Health Director, SC Dept. of Health & Environmental Control (SCDHEC), 1993-2000
District Environmental Health Director, SCDHEC, 1975-1993
Marketing Representative, General Environmental Equipment Company, 1973-1975
District Environmental Health Director, SCDHEC, 1970-1973
Environmental Sanitarian Supervisor, SCDHEC, 1966-1967
Environmental Sanitarian, SCDHEC, 1964-1966

## PROFESSIONAL AFFILIATION

Registered Sanitarian (RS), National Environmental Health Association, No. 83438
National Environmental Health Association
 Executive Committee 1981-1993
 President 1991-1992
 Technical Editorial Advisory Board, Journal of Environmental Health, 1994-1997
American Correctional Association
American Jail Association
SC Environmental Health Association
SC Public Health Association

## PROFESSIONAL AWARDS/CITATIONS

Charles E. Corley Award 1995
 South Carolina Environmental Health Association
 (Highest award given by SCEHA)
Walter F. Snyder Award 1995
 NSF *International*/National Environmental Health Association
Walter S. Mangold Award 1996
 National Environmental Health Association
 (Highest award given by NEHA)
Alabama Environmental Health Association
 Honorary Member

RME411496

## PROFESSIONAL AWARDS/CITATIONS. cont'd.

Canadian Institute of Public Health Inspectors
  Honorary Life Member
Florida Environmental Health Association
  Honorary Life Member
South Carolina Environmental Health Association
  Honorary Life Member

## PROFESSIONAL CONSULTATION

NSF *International*, Ann Arbor, MI., Council of Public Health Consultants, 1990-2002, Chairman
  1999
Centers for Disease Control (CDC), National Center for Environmental Health, Environmental
  Health Competency Project, 2001
Texas A&M University System, National Emergency Response and Rescue Training Center,
  Adjunct Instructor, 2002-Present
State of Michigan, Office of Attorney General and Department of Corrections, Consulting
  Sanitarian 1990-2000. **USA v. Michigan** and **Hadix v. Johnson.** Testified as Expert Witness in
  **USA v. MI**. Environmental Audits of Marquette State Prison, Michigan Reformatory, State
  Prison of Southern Michigan, Egeler Correctional Facility.
U. S. Department of Homeland Security, Office of Civil Rights and Civil Liberties,
  Environmental Consultant, 2006-Present
Dallas County Commissioners Court, Dallas, TX, 2007
Law Offices of Janice V. Fisher, **Cuthbert v. Aramark**, 2007
U. S. Department of Justice (USDOJ), Civil Rights Division, Special Litigation Section,
  Environmental Consultant, 1994-Present
  Environmental Audits performed for USDOJ (Partial):

Grimes Correctional Facility, AR
McPherson Correctional Facility, AR
Coffee Co. Jail, GA
Dooly Co. Jail, GA
Lee Co. Jail, GA
Mitchell Co. Jail, GA
Muscogee Co. Jail, GA
Terrell Co. Jail, GA
Cook Co. Jail, IL
Plainfield Juvenile Correctional
  Facility, IN

Marion Co. Juvenile Detention Ctr., IN
Baltimore Juvenile Justice Center, MD
Baltimore City Detention Center, MD
Detroit Police Department, MI
Oakley Training School, MS
Simpson Co. Jail, MS
Sunflower Co. Jail, MS
Cleveland Police Department, OH
C. M. Tucker, Jr. Nursing Center, SC
Dallas County Jail, TX
Patrick Co. Jail, VA

## COMMUNITY ACTIVITIES

Orangeburg County Development Commission
1994-2004
  Chairman, 1997-2004
Orangeburg County Chamber of Commerce
  Board of Directors 1995-1997
St. George Baptist Church
  Men's Ministry, Chairman, 2006
  Deacon, 2006-Present
Wolfton Volunteer Fire Department
  Chairman, Board of Directors 2006-Present

RME411497

Exhibit 3
Page 241

# EXHIBIT B

RME411498

## EXHIBIT B to Declaration of Leonard Rice: list of photographs

Exhibit C:   Photograph of tier bars on the fifth tier of East Block's yard side, reflecting an accumulation of bird feces.

Exhibit D:   Photograph of the accumulation of bird feces on the fifth tier bars on the yard side of East Block.

Exhibit E:   Photograph of the heavy accumulation of bird feces on the bars and bird feces on the floor of the fifth tier on the yard side of East Block.

Exhibit F:   Photograph of a vent in a prisoner's East Block cell (fifth tier on the yard side), reflecting a significant accumulation of dust and debris.

Exhibit G:   Photograph of a prisoner's cell on the yard side of East Block, reflecting an unsanitary bed with multiple stains on the soiled linen and with packaged food on the mattress, on the bed beside the mattress, and tucked between the mattress and the bed.

Exhibit H:   Photograph of the same prisoner's cell on the yard side of East Block, reflecting dust and debris accumulated on the bars on the outside of the door and paper trash on the outside of the cell's door and on the ground in front of the door.

Exhibit I:   Photograph of the same prisoner's cell on the yard side of East Block, reflecting trash and food strewn across the floor; a sandwich wrapped in plastic on the floor, approximately less than one foot away from the toilet; trash inside the toilet; significant stains and filth in the toilet bowl; brown stains streaking down the walls close to the toilet; and brown dust and debris in the vent under the sink and near the toilet.

Exhibit J:   Photograph of the same prisoner's cell on the yard side of East Block, reflecting multiple brown stains streaked on the wall above the toilet, yellow and brown stains almost covering the walls near the toilet, a sink with brown stains in the basin, a dark substance in and around the crevice near the faucet of the sink, and white debris on the sink.

Exhibit K:   Photograph of the same prisoner's cell on the yard side of East Block, reflecting a sandwich wrapped in plastic on the floor, inches away from the toilet. The photograph also shows a filthy toilet with multiple dark brown

1

RME411499

Exhibit 3
Page 243

and yellow stains. trash inside the bowl, and white stains on the toilet seat. The photograph also demonstrates dark stains on the floor and medication, trash, and linen on the floor, only two to four feet away from the toilet. In addition, the photograph shows an air vent almost entirely clogged with dust.

Exhibit L:  Photograph of the same prisoner's cell on the yard side of East Block, reflecting linens on the stained, dusty floor and dust balls on the floor and on the edge of a brown paper bag.

Exhibit M:  Photograph of the same prisoner's cell on the yard side of East Block, showing dust, trash, and clothing on the floor.

Exhibit N:  Photograph of the same prisoner's cell on the yard side of East Block, showing dark brown and yellow stains inside the toilet bowl; trash inside the toilet bowl; white stains all over the toilet seat; brown, dark brown, and yellow stains on the floor next to the back of the toilet; multiple streaks of brown and yellow substances on the walls next to the toilet; and a sandwich wrapped in plastic on the floor, inches away from the toilet and from the vent covered with dust and stains.

Exhibit O:  Photograph of the same prisoner's cell on the yard side of East Block, demonstrating an unidentified clumpy, congealed, dark brown substance on the floor near the back of the toilet, within inches of a sandwich wrapped in plastic; a plastic soda bottle beneath the back of the toilet where it attaches to the wall; brown and yellow streaks on the wall next to the toilet; and a significant amount of dust accumulated on the vent.

Exhibit P:  Photograph of the same prisoner's cell on the yard side of East Block, reflecting multiple stains on the prisoner's bedding and a sandwich wrapped in plastic lying on the bed.

Exhibit Q:  Photograph of the same prisoner's cell on the yard side of East Block, demonstrating an unidentified grayish liquid pooled on the floor and brown stains on the floor.

Exhibit R:  Photograph of the gun rail on the yard side of the third tier of East Block, reflecting heavy accumulations of bird feces on the railing and the floor as well as a food condiment packet on the floor.

2

RME411500

Exhibit S:    Photograph of holding cells on the first tier of East Block, reflecting paper and other trash on the tops of the holding cells and hanging from the barbed wire above the holding cells.

Exhibit T:    Photograph of the ceiling in front of a shower of the third tiers on the yard side of East Block, demonstrating extremely corroded and degraded bars and pipes, trash, and congealed strands composed of soap scum and hair and other detritus dangling from the tier bars and ceilings.

Exhibit U:    Photograph of the ceiling in front of a shower of the third tier on the yard side of East Block, reflecting extremely corroded and rusted bars, doors, and pipes.

Exhibit V:    Photograph of the bars of the third tier of the yard side of East Block, demonstrating bird feces on the bars and congealed strands of muck and slime and trash dangling from the bars.

Exhibit W:    Photograph of the bars of the third tier of the yard side of East Block, demonstrating a significant accumulation of bird feces.

Exhibit X:    Photograph of the staff restroom on the yard side of the first tier of East Block, demonstrating that the door to the bathroom was open, despite signs on the outside of the bathroom door stating, "HEALTH HAZARD. DO NOT ENTER. POTENTIAL LEAD, ASBESTOS, AND MOLD."

Exhibit Y:    Photograph of the area in front of the medical clinic on the first tier of the yard side of East Block, demonstrating streams of water from the holding cages leading to puddles on the floor.

Exhibit Z:    Photograph of a razor box on the first tier of East Block, reflecting bird feces on the sheet-covered locker on which the box was placed.

Exhibit AA:   Photograph of the sheet-covered locker on the first tier of East Block, on which the razor box was placed, reflecting a significant accumulation of bird feces on the sheet.

Exhibit BB:   Photograph of a razor box on the first tier of East Block, reflecting dust inside the razor box.

Exhibit CC:   Photograph of the ventilation fan grate on the outside wall on the first tier

3

RME411501

of East Block, reflecting a significant accumulation of matted debris inside the vent and strands of congealed matter hanging from the grate.

Exhibit DD:  Photograph of a mop bucket on the first tier of East Block, reflecting a significant accumulation of brown grime inside the bucket.

Exhibit EE:  Photograph of the prisoners' restroom and area near the medical clinic on the first tier of East Block, reflecting a stained plastic sheet hung from the ceiling and touching a corroded pipe.

Exhibit FF:  Photograph of stained plastic sheet in front of the medical clinic on the first tier of East Block, below the run-off from the shower, reflecting multiple brown, black, and orange stains on the plastic sheet.

Exhibit GG:  Photograph of the filthy floor and bars in front of a prisoner's cell in East Block, reflecting degraded floor surface and a significant level of dust on the bar of the door.

Exhibit HH:  Photograph of the filthy floor and bars in front of a prisoner's cell in East Block, reflecting degraded floor surface and a significant level of dust on the bar of the door.

Exhibit II:  Photograph of the ramp leading from the accessible shower to the ground on the yard side of the first tier of East Block, reflecting a large pool of grayish water on the floor abutting the ramp that on one side extends beyond half the width of the ramp, indicating that a wheelchair user would have to roll through the water.

Exhibit JJ:  Photograph of the ramp leading from the ground of the first tier to the same accessible shower on the yard side of the first tier of East Block, taken from the opposite direction, reflecting the large pool of grayish water on the floor, which is on the ground in front of the ramp and extends from the ground to the left of the ramp to the ground that meets a point beyond the mid-point of the ramp, indicating that a wheelchair user would have to roll through the water.

Exhibit KK:  Photograph of a gutter drain on the first tier of East Block, reflecting debris in the drain that spreads from one side of the gutter to the next and showing a wheelchair wheel just next to the gutter drain.

4

RME411502

Exhibit LL:  Photograph of a gutter drain cover next to the gutter drain on the first tier of East Block, reflecting debris on the drain cover, almost completely clogging it, which would inhibit drainage through the cover.

Exhibit MM: Photograph of the top of the laundry cart on the first tier of East Block, reflecting a slice of bread on a sheet covering the cart, which is covered with bird feces and littered with debris.

Exhibit NN:  Photograph of the top of a different laundry cart on the first tier of East Block, reflecting a sheet covering the cart that is covered with bird feces, littered with debris, and has two slices of bread and crumbs on it.

Exhibit OO:  Photograph of the top of yet a different laundry cart on the first tier of East Block, reflecting a metal cover on which there is a heavy accumulation of bird feces, dust, and debris.

Exhibit PP:  Photograph of a dead mouse in a laundry cart on the first tier of East Block. Staff reported that this laundry cart carried clean laundry (blanket and what appears to be a sheet).

Exhibit QQ:  Photograph of a medical gurney on the first tier of East Block, reflecting bird droppings on top of the gurney's railings and mattress.

Exhibit RR:  Photograph of the same medical gurney on the first tier of East Block, reflecting bird droppings on top of the gurney's railings and mattress.

Exhibit SS:  Photograph of a pile of trash and debris on a window sill in East Block.

Exhibit TT:  Photograph of laundry carts covered with food and bird feces and blocking the box containing a fire extinguisher.

Exhibit UU:  Photograph of the area around the lock to the door to a prisoner's cell on the first tier of the bay side of East Block, reflecting dust, dirt, and degraded surfaces around the lock.

Exhibit VV:  Photograph of the same area around the lock to the door to the same prisoner's cell on the first tier of the bay side of East Block, reflecting dust, dirt, and degraded surfaces around the lock.

Exhibit WW: Photograph of standing water in the pipe chase on the first tier of East

5

RME411503

Block, reflecting a significant amount of pooled water (enough see reflections of light in the water) and trash on the floor.

Exhibit XX: Photograph of a broken pipe on the gun rail opposite the third tier on the yard side of East Block, reflecting heavy accumulations of bird feces on the tiers and bars and on the floor where the officer patrols.

Exhibit YY: Photograph of a prisoner's mattress and pillow in the Adjustment Center, reflecting cracks throughout the plastic covering of the pillow and mattress large enough to expose the fill inside the mattress and pillow.

Exhibit ZZ: Photograph of the same prisoner's mattress and pillow in the Adjustment Center, reflecting cracks throughout the plastic covering of the pillow and mattress large enough to expose the fill inside the mattress and pillow.

Exhibit AAA: Photograph of cleaner that is distributed, reflecting a white plastic bucket with a label on it. Next to the bucket is a small unlabeled plastic bag of the cleaner that is an example of what is distributed to the inmates by the officers.

Exhibit BBB: Photograph of the same bucket of cleaner, reflecting that the label on the bucket states that skin, eyes, and mucus membranes must be protected from contact when using the solution; that gloves and goggles are recommended when using the solution; and that eyes and skin must be immediately flushed with water when they come into contact with the solution.

Exhibit CCC: Photograph of clothing being washed in the toilet in a prisoner's cell in the Adjustment Center.

Exhibit DDD: Photograph of clothing hanging from a clothesline and being washed in the toilet in a prisoner's cell in the Adjustment Center.

Exhibit EEE: Photograph of a prisoner's towel in the Adjustment Center, reflecting a large hole in the towel with a length that extends at least a quarter of the length of the towel and other smaller worn places on the towel.

6

RME411504