

Exhibit C



Exhibit D

RME411505



## Exhibit E



## Exhibit F

RME411506



Exhibit G



Exhibit H

RME411507



## Exhibit I



## Exhibit J

RME411508

**2716**

Exhibit 3
Page 252



## Exhibit K



## Exhibit L

RME411509



Exhibit M



Exhibit N

RME411510

**2718**

Exhibit 3
Page 254



Exhibit O



Exhibit P

RME411511



Exhibit Q



Exhibit R

RME411512

Case 2:11-cv-04454-SI  Document 28-6  Filed 09/26/14  Page 9 of 67



# Exhibit S

RME411513

**2721**

Exhibit 3
Page 257



Exhibit T



Exhibit U

RME411514



## Exhibit V



## Exhibit W

RME411515



Exhibit X



Exhibit Y

RME411516



Exhibit Z



Exhibit AA

RME411517



Exhibit BB



Exhibit CC

RME411518



Exhibit DD

RME411519



# Exhibit EE

RME411520



## Exhibit FF



## Exhibit GG

RME411521

**2729**

Exhibit 3
Page 265

Case 3:15-cv-04451-SI   Document 28-6   Filed 09/26/14   Page 18 of 67



## Exhibit HH

RME411522

**2730**

Exhibit 3
Page 266

Case 3:13-cv-04451-SI  Document 28-6  Filed 09/26/14  Page 19 of 67



# Exhibit II

RME411523



# Exhibit JJ

RME411524



Exhibit KK



Exhibit LL

RME411525



Exhibit MM



Exhibit NN

RME411526



Exhibit OO



Exhibit PP

RME411527



# Exhibit QQ

RME411528



Exhibit RR



Exhibit SS

RME411529



Exhibit TT



Exhibit UU

RME411530



Exhibit VV

RME411531



# Exhibit WW

RME411532



## Exhibit XX



## Exhibit YY

RME411533



Exhibit ZZ



Exhibit AAA

RME411534



Exhibit BBB



Exhibit CCC

RME411535



# Exhibit DDD

RME411536



Exhibit EEE

RME411537

Exhibit 4

*Discrimination, Torture, and Execution A Human Rights Analysis of the Death Penalty in California and Louisiana*, Center for Constitutional Rights and International Federation for Human Rights, June 14, 2013

Exhibit 4
Page 282





# Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana

Article 1: All human beings are born free and equal in dignity and rights. They are endowed with reason and conscience and should act towards one another in a spirit of brotherhood. Article 2: Everyone is entitled to all the rights and freedoms set forth in this Declaration, without distinction of any kind, such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status. Furthermore, no distinction shall be made on the basis of the political, jurisdictional or international status of the country or territory to which a person belongs, whether it be independent, trust, non-self-governing or under any other limitation of sovereignty. Article 3: Everyone has the right to life, liberty and security of person. Article 4: No one shall be held in slavery or servitude; slavery and the slave trade shall be prohibited in all their forms. Article 5: No one shall be subjected to torture or to cruel,



October 2013 / N°618a

RME411368



Cover photo: Treatment cages for group therapy in the Adjustment Center at San Quentin's death row. Source: Expert Decl. of Jeanne Woodford in Supp. of Pls.' Opp'n to Defs.' Mot. to Terminate, Photo Ex. C, Coleman v. Brown, No. 90-0520 (E.D. Ca. Mar. 14, 2013).

RME411369

# Table of Contents

I. Executive Summary -------------------------------------------------------------------- 4

II. Introduction-------------------------------------------------------------------------- 6

III. Overview of the Death Penalty in the United States and Internationally---------------------- 8

    A. History of the use of the death penalty in the United States ------------------------- 8

    B. Overview of the capital process---------------------------------------------------- 8

    C. General trends in the domestic use of the death penalty ----------------------------- 9

    D. General international consensus against the use of the death penalty---------- 10

IV. Legal Context --------------------------------------------------------------------- 11

    A. Discrimination---------------------------------------------------------------- 11

    B. Torture and Cruel, Inhuman or Degrading Treatment ------------------------------- 14

V. California------------------------------------------------------------------------- 19

    A. Overview of the Trial and Appeals Process--------------------------------------- 20

    B. Current State of Affairs ----------------------------------------------------- 20

    C. Discrimination and Arbitrariness in the Legal System ------------------------------- 22

    D. Delays in the Adjudication of Post-Conviction Claims for Relief ------------------- 24

    E. Conditions of Confinement ---------------------------------------------------- 25

    F. Death row phenomenon ------------------------------------------------------- 32

VI. Louisiana------------------------------------------------------------------------- 35

    A. Discrimination and Arbitrariness ------------------------------------------------ 36

    B. Conditions of Confinement on Louisiana's Death Row ------------------------------ 43

VII. Mission Findings ------------------------------------------------------------------ 50

    A. Discrimination---------------------------------------------------------------- 50

    B. Torture and Cruel, Inhuman or Degrading Treatment------------------------------- 53

VIII. Conclusion --------------------------------------------------------------------- 59

IX. Recommendations ----------------------------------------------------------------- 61

X. Appendix: Partial List of Interviewees ------------------------------------------------- 63

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 3

RME411370

**2748**
Exhibit 4
Page 285

# I. Executive Summary

***The use of the death penalty in California and Louisiana violates U.S. obligations under international human rights obligations to prevent and prohibit discrimination and torture, cruel, inhuman or degrading treatment.***

In May 2013, the Center for Constitutional Rights ("CCR") and the International Federation for Human Rights ("FIDH") undertook a fact-finding mission in California and Louisiana to evaluate the death penalty as practiced and experienced in these jurisdictions.

Applying a human rights framework, the mission examined whether the death penalty was being applied in a discriminatory manner, and if the conditions under which prisoners on death row were confined accorded with the obligation to prevent and prohibit torture and cruel, inhuman or degrading treatment.

The mission interviewed death-row prisoners, exonerees and their family members, advocates, legal counsel, and non-governmental organizations in both states. The mission analyzed the information gathered against the backdrop of international human rights law (including conventions, case-law and expert opinions), paying particular attention to the obligations undertaken by the United States as a State Party to various international treaties.

Based on the interviews conducted and documentary review, the mission concludes that the use of the death penalty in California and Louisiana fails to protect a number of basic rights, rendering the United States in breach of certain fundamental international obligations. Specifically, the mission finds California and Louisiana violate the principle of non-discrimination in the charging, conviction and sentencing of persons to death; a criminal justice system in which discrimination is evident both enables and compounds the violation. Through their detention policies and the conditions for detention, both states treat prisoners condemned to death in a manner that is, at minimum, cruel, inhuman or degrading, and in some cases, constitutes torture.

On *discrimination*: Stark racial disparities in charging, sentencing, and imposing death sentences persist; race continues to play a significant role in both states' application of the death penalty. African Americans are overrepresented on death row in both states. While they make up only 32 percent of the general population in Louisiana, they represent 65 percent of the state's death row. In California, African Americans make up 6.7 percent of the general population, but 36 percent of those on death row. Juries in death penalty cases are overwhelmingly white in both states. A small number of counties within both states are responsible for the majority of death sentences in each state, demonstrating that discretion on the part of prosecutors remains a large indication who is sentenced to death.

On *cruel, inhuman or degrading treatment* and *torture*: The conditions of confinement for persons on death row in California and Louisiana, including extreme temperatures, lack of access to adequate medical and mental health care,

RME411371

overcrowding and extended periods of isolation, do not respect and promote human dignity.  In both states, condemned prisoners can be held in solitary confinement for prolonged or indefinite periods of time, leading to severe mental pain and suffering. Such deplorable circumstances have been condemned by the U.N. Special Rapporteur on Torture as constituting cruel, inhuman, and degrading treatment, or, in certain circumstances, torture.

The use of the death penalty constitutes an inherent violation of the most fundamental of all rights, the right to life.  No legal or correctional reforms can bring legitimacy to the necessarily inhumane and premeditated taking of a life by the state through its imperfect system. As such, the mission unambiguously and fundamentally opposes any use of the death penalty in the United States, including in California and Louisiana

Although CCR and FIDH advance general recommendations to alleviate the degree to which the death penalty is carried out in a discriminatory manner and to minimize human suffering on death row, adherence to the United States' human rights obligations, including the non-derogable obligation to protect the right to life, requires complete abolition of the death penalty.

In the interim, a moratorium on executions must be imposed to protect condemned prisoners' right to life.  Simultaneously, as states progress towards abolition, they must take positive steps towards eliminating discriminatory charging and sentencing, and ensuring that those already under a sentence of death are not suffering torture or other cruel, inhuman or degrading treatment.

RME411372

**2750**
Exhibit 4
Page 287

# II. Introduction

In May 2013, the International Federation for Human Rights ("FIDH")[1] and its U.S. affiliate, the Center for Constitutional Rights ("CCR"),[2] conducted a fact-finding mission in the United States to assess whether the use of the death penalty in two States, California and Louisiana, complied with international human rights law. CCR and FIDH met with stakeholders in both States to evaluate the death penalty as practiced and experienced in the jurisdictions through a framework grounded in human rights law and practice. The mission conducted this human rights assessment through interviews with death row prisoners, exonerees, their family members, advocates, legal counsel, a federal judge, prison staff, and non-governmental organizations, as well as document review. The mission focused its analysis on discrimination and torture, cruel inhuman and degrading treatment and found numerous human rights violations, including the most basic right – the right to life – in the use of the death penalty in these two states.

The mission was conducted by two teams: Florence Bellivier, president of the World Coalition Against the Death Penalty and FIDH Representative on the Death Penalty, and Susan Hu, CCR Bertha Fellow, headed the California team; Vincent Warren, Executive Director of CCR, and Jessica Lee, CCR Bertha Fellow, headed the Louisiana team.

The mission chose to examine California based on the fact that it has the largest number of people on death row in the country and recently (November 2012) considered a state referendum to replace the death penalty with life without parole.[3] The mission focused on Louisiana because of its long, documented history of harsh treatment of death row and other prisoners, its relatively high rate of exonerations, and the presence of strong local organizing for abolition in the face of this brutality. The mission's findings, however, are not limited to these two states, but rather, reflect general trends regarding the use of the death penalty across the United States.[4]

The mission interviewed 20 stakeholders in California and 21 in Louisiana. It visited inmates on death row in California; such visits were not possible in Louisiana. The mission is very grateful to the individuals who contributed their valuable time to the mission. A partial list of interviewees is available in Appendix A, as several individuals spoke only on condition of anonymity, due to fear of reprisals from state officials.

The mission reached two overarching conclusions: (1) although there is use of a human rights framework by some advocates in both states, public officials in California and Louisiana do not, as a matter of course, apply an international human rights framework to their analysis and discussion of the death penalty; and (2) analyzing the application of the death penalty as applied in California and Louisiana through a human rights framework reveals that both states are in breach of internationally recognized standards.

Although the U.S. played a pivotal role in drafting some of the key human

RME411373

**2751**
Exhibit 4
Page 288

rights documents, including the Universal Declaration of Human Rights, and continues to hold itself out as a global leader on human rights, the U.S.'s global viewpoint belies the reality of "American Exceptionalism," whereby the U.S. chooses which internationally accepted standards or obligations it will follow and which it will not. The U.S. ambivalence to international human rights is particularly stark and disturbing in the context of the death penalty.

Internationally, there is wide recognition that the death penalty implicates not only criminal law, but also human rights law.[5]  Although the death penalty is not affirmatively recognized in international conventions as a *per se* violation of international human rights law, its use must strictly comply with all of the protections otherwise afforded by human rights law, including the right to a fair trial, with full due process protections. Moreover, the conditions under which death row inmates are held must comply with international standards, including the Standard Minimum Rules for the Treatment of Prisoners ("Standard Minimum Rules").[6]

Coincident with the United Nations Human Rights Committee's review of the United States' obligations under the International Convention on Civil and Political Rights ("ICCPR"),[7] CCR and FIDH seek not simply to criticize and condemn the U.S. system, but rather to highlight a path for application of international human right law at the state level.  Because the human rights protected by the ICCPR, which the U.S. has signed and ratified, must be guaranteed not only by the State party in general but by all divisions – federal, state and local, executive, administrative and judicial,[8] we call on these governments to take immediate action to meet their obligations under international law.

RME411374

# III. Overview of the Death Penalty in the United States and Internationally

## A. History of the use of the death penalty in the United States

The death penalty in the United States has undergone dramatic changes in its four centuries of existence. The mid-20[th] Century brought challenges to the fundamental legality of capital punishment, and in 1972 the Supreme Court struck down the death penalty in *Furman v. Georgia*,[9] declaring that its application was so arbitrary as to be unconstitutional. Although many believed that *Furman* spelled the end of capital punishment in the United States, states responded by rewriting their death penalty laws in an effort to limit the arbitrariness of the punishment. In 1976 the Supreme Court considered and upheld a number of these revised statutes in *Gregg v. Georgia*,[10] effectively ending a four-year reprieve from executions. Since *Gregg*, the Supreme Court has endeavored to delineate the scope of the "modern," constitutional death penalty, outlawing capital punishment for certain offenses, such as rape,[11] as well as for certain categories of persons, including the intellectually disabled,[12] juveniles[13] and, to a limited extent, those declared insane.[14]

The U.S. death penalty operates in a federalist context. It is imposed and managed primarily at the state level, with limited federal review. However, there is a federal death penalty, which is imposed by the United States government and encompasses a variety of crimes beyond that of first degree murder, including terrorism and large-scale drug trafficking.[15] The federal death penalty can be applied even in states that do not use the death penalty, and although executions for federal offenses remain rare, fifty-nine people are currently on the federal condemned inmates list.[16] United States military law also authorizes the death penalty for several crimes.[17]

## B. Overview of the capital process

Death penalty trials are bifurcated into two phases: the guilt/innocence phase and the penalty phase. The guilt/innocence phase operates like an ordinary criminal trial. If the defendant is found guilty, the trial proceeds to the penalty phase, during which the prosecution and the defense have the opportunity to present evidence. For the prosecution, this tends to relate to previous convictions, the nature of the offense, and, in most states, victim impact evidence. The defense, seeking to persuade the jury to spare the defendant's life, presents evidence of "mitigating circumstances,"

RME411375

including information relating to the defendant's character, mental health, and personal and family history. The jury weighs the evidence pursuant to the judge's instructions,[18] and decides whether to sentence the defendant to death.[19]

Since the "constitutionalization" of the death penalty in 1976, the Supreme Court has required three types of appellate review for defendants sentenced under state death penalty law: direct appeal, state post-conviction review, and federal habeas corpus review. Direct appeal is an automatic appeal to the highest state court,[20] and is limited to issues arising from the trial. At state post-conviction review, defendants may typically raise issues that are outside the trial record, such as ineffective assistance of trial counsel or new claims of factual innocence. At federal habeas corpus review, a civil action is brought in federal court on the grounds that the prisoner's incarceration violates the United States Constitution or federal law. Defendants can petition for discretionary Supreme Court review at the conclusion of each stage of appeals. The appellate process differs for defendants sentenced under the federal death penalty, a discussion of which is beyond the scope of this report. Executive clemency may be sought in both state and federal capital cases once all judicial options are exhausted, although it is rarely granted.[21] Clemency for state convictions is typically granted by the governor; however each state maintains its own process for review.

## C. General trends in the domestic use of the death penalty

The death penalty is currently authorized by 32 states, the federal government, and the military.[22] Death-eligible offenses vary between states, but are limited to homicide and crimes against the state.[23] As of 1 April 2013, there were 3,108 individuals on death row in the United States.[24] California has the largest death row population, with 742 prisoners as of 1 October 2013, followed by Florida (412) and Texas (298). Since capital punishment was reinstated in 1976, Texas has performed the most executions (504) – over four times that of the next state, Virginia (110).

Use of the death penalty has been declining dramatically in recent years. Six states have repealed the death penalty in the past six years: New York and New Jersey in 2007, followed by New Mexico in 2009, Illinois in 2011, Connecticut in 2012, and Maryland in 2013. In practice, executions are rare in much of the nation: 33 jurisdictions have not executed anyone in the past five years, and 26 jurisdictions had no executions in at least a decade.[25] Nine states performed executions in 2012 – the fewest number of executing states in 20 years.[26] The number of annual death sentences nationwide has dropped dramatically, from 315 in 1996 to 78 in 2012[27] – the second lowest since the death penalty was reinstated in 1976 (the lowest being in 2011).[28] A number of states where the death penalty remains an option, such as North Carolina, Virginia, South Carolina and Indiana, had no new death sentences in 2012.[29] The number of executions carried out has also been in decline: there were 43 executions a year in 2011 and 2012, compared with 85 in 2000.[30] Notably, death sentences are being overturned at a rate that outpaces admissions to death row. This trend has continued since 2001, when for the first time since 1976 the number of death sentences overturned was higher than the number handed down.[31] However, executions do continue in certain pockets of the country, with Texas executing 13 men in the first nine months of this year alone.[32]

RME411376

## D. General international consensus against the use of the death penalty

International trends show an inexorable progress towards abolition. Over two-thirds of the world's nations are now abolitionist in law or practice, with an average of three countries per year abolishing capital punishment since 1990.[33] The use of the death penalty has also been increasingly curtailed through international law. After World War II, international human rights instruments either made no mention of capital punishment or allowed it as a carefully worded exception to the right to life. International law limited the punishment, excluding certain protected categories of individuals from execution – including juveniles, pregnant women and the elderly – and confining its use to only the most serious crimes. Notably, the death penalty is not a permissible form of punishment at international criminal courts and tribunals, even for the most serious crimes including genocide, crimes against humanity and war crimes. As the consensus against the death penalty has grown, international law has become increasingly abolitionist. For example, the American Convention on Human Rights ("American Convention"),[34] adopted in 1969, prevents the reinstatement of the death penalty once abolished by a state party. Since 1980, four international human rights treaties have been adopted that proclaim the abolition of capital punishment.[35] In 2007, the UN General Assembly approved Resolution 62/149, which calls for all retentionist states to establish a moratorium on executions with a view to abolishing the death penalty; two further resolutions reaffirming the call for a global moratorium were adopted in 2008[36] and 2010,[37] and in November 2012, the UN General Assembly's Third Committee adopted a fourth resolution calling for a moratorium, which received the support of a record 110 countries; the U.S. was one of just forty states to vote against the resolution.[38]

RME411377

# IV. Legal Context

The death penalty necessarily implicates the most "supreme" of human rights, the right to life.[39]  In spite of the growing international consensus that the death penalty is a *per se* violation of that right, States that continue to use the death penalty claim that the taking of a life is not arbitrary and is permitted under law. As such, rather than focusing solely on the right to life, we examined two of the most pervasive and oft-violated rights implicated in the use of the death penalty: the right to equality and non-discrimination, and the right to be free from torture or other cruel inhuman or degrading treatment.  We analyze whether California and Louisiana meet the legal requirements for upholding these two rights, paying particular attention to those relevant international instruments which the U.S. has signed or ratified, and the jurisprudence of related treaty bodies or tribunals.  These instruments include the ICCPR, the American Declaration on the Rights and Duties of Man ("American Declaration"),[40] the American Convention,[41] International Convention on the Elimination of All Forms of Racial Discrimination ("CERD"),[42] and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").[43]  This section will define discrimination, torture, and other cruel, inhuman or degrading treatment; offer a general framework of international law; and briefly discuss significant departures from international law by the United States.

The rights to non-discrimination and to be free from torture and cruel, inhuman or degrading treatment place obligations and prohibitions not just against the federal government.  In signing international agreements, the U.S. has committed to "ensure that all public authorities and public institutions, national and local, shall act in conformity with [the treaty] obligation."[44]  To that end, the U.S. is obligated to review governmental policies and "amend, rescind or nullify any laws and regulations" [45] which create or perpetuate racial discrimination, or allow torture or cruel, inhuman or degrading treatment of prisoners on death row.

CCR and FIDH hope that the mission's analysis and findings can be of use by advocates and policymakers at the state, national and international level who are working towards full abolition in the United States.

## A. Discrimination

### 1.  Discrimination under International Law

The principle of equality and non-discrimination is a foundational norm of international law,[46] and an "essential element" of due process.[47]  The CERD defines discrimination as "distinction, exclusion, restriction or preference based on race, colour, descent, or national or ethnic origin which has the purpose or effect of nullifying or impairing the recognition, enjoyment or exercise, on an equal footing,

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 11

RME411378

**2756**
Exhibit 4
Page 293

of human rights and fundamental freedoms . . . ."[48]  Non-discrimination provisions are also included in all other core human rights treaties to which the U.S. is a party, notably the ICCPR, which binds states to respect and ensure rights of the Covenant "without distinction of any kind,"[49] and the American Declaration, which affirms the "right to equality before the law."[50]  The bodies responsible for interpreting the ICCPR and the American Declaration—the Human Rights Committee ("HRC") and Inter-American Court ("IACtHR") and Commission on Human Rights ("IACHR") respectively—have further interpreted the text of the treaties by adopting definitions of discrimination that are in accordance with the CERD definition and interpretation, including the prohibition against direct and indirect discrimination.[51]

Treaty bodies have emphasized that any unjustifiable disparate impact resulting from state conduct is contrary to human rights and violates a *jus cogens* norm.[52]  The CERD Committee has recognized the difficulty of establishing indirect discrimination in the context of the administration and functioning of the criminal justice system.  In its General Recommendation 31, it provided guidance on how "better gauge the existence and extent of racial discrimination in the administration and functioning of the criminal justice system," instructing States to "pay the greatest attention to the following possible indicators of racial discrimination: […]

> (e) The number and percentage of persons belonging to those groups who are held in prison or preventive detention, including internment centres, penal establishments, psychiatric establishments or holding areas in airports;
>
> (f) The handing down by the courts of harsher or inappropriate sentences against persons belonging to those groups; […][53]

The IACHR has addressed indirect discrimination as well.[54]  In addressing a legal regime which adversely impacted migrants, the IACHR recalled that, "[i] nternational human rights law prohibits not only deliberately discriminatory policies and practices, but also policies and practices with a discriminatory impact on certain categories of persons, even though a discriminatory intention cannot be proved."[55]  Notably, the IACHR found the U.S.'s refusal to grant a new sentencing hearing to a defendant sentenced to death under a procedure later found to be unconstitutional, when others *were* granted a new hearing, was an unjustified and discriminatory denial of his human rights.[56]

Relevant to this report, non-discrimination principles are important in examining the fairness of a trial and the validity of a particular conviction, and apply to criminal trials, convictions and sentences.[57]  Where discrimination on any basis has played a role in trying, convicting or sentencing defendants, an execution by the state is an arbitrary deprivation of life, and an affront to the most central principles and purposes of human rights.[58]  For example, the IACHR has found that "the kinds of deficiencies that have been identified . . . as rendering an execution arbitrary and contrary to Article I of the American Declaration include . . . the failure to provide strict due process guarantees, and the existence of demonstrably diverse practices that result in the inconsistent application of the penalty for the same crimes."[59]  As such, in addition to the general provisions governing equality, international instruments address the right to be free from discrimination in the context of the judicial process at length.[60]

RME411379

The HRC further observed that, "[e]xpressions of racist attitudes by a jury that are tolerated by the tribunal, or a racially biased jury selection are . . . instances which adversely affect the fairness of the procedure."[61] Thus, the HRC has found discrimination where jurors have made statements that include racial epithets or stereotypes and the court took no remedial action.[62] Similarly, the IACHR found discrimination on the part of the U.S. where a juror presented the bailiff with a drawing of a hangman accompanied by a statement "hang the [racial epithet]" and the judge took insufficient remedial action.[63] In another case, prejudicial statements referring to a defendant's status as a foreign national, offered by a prosecutor in front of a jury and permitted by the judge, were also found to violate the defendant's rights under the American Declaration to a fair trial and equal protection without discrimination.[64] Violations of the treaties' prohibitions on discrimination and requirements for a fair trial may also be found in wider contexts. In the past decade, regional courts have found substantiated statistics can play a role in establishing discriminatory effects.[65]

## 2. Discrimination in U.S. Context

The U.S. utilizes a different definition of discrimination in the context of criminal prosecutions, which brings it into conflict with its international obligations. International instruments recognize any distinction, exclusion, restriction or preference that has discriminatory *effects,* irrespective of intent, as discrimination.[66] In contrast, U.S. criminal courts only recognize claims of *intentional* discrimination.

*McCleskey v. Kemp*[67] exemplifies the significance of the U.S. reliance on a narrow, intent-only discrimination standard in the context of criminal prosecutions. In *McCleskey*, the U.S. Supreme Court rejected the discrimination claims of a man sentenced to death, despite a study using statistical evidence showing that use of the death penalty in the state of Georgia was linked to the race of the victim. Even after controlling for other factors, the study found that African Americans who killed Caucasians were over 4 times as likely to be given a death sentence. The court found that such disparities are "an inevitable part of our criminal justice system."[68] In other words, the Supreme Court acknowledged the discriminatory *effect* of the operation of the death penalty in the U.S. Despite this recognition, the Court held that any alleged victim of racial discrimination in the justice system, "must prove that the decision makers in *his* case acted with discriminatory purpose . . ."[69] According to the former Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions, the *McCleskey* ruling has "has had the effect of allowing the courts to tolerate racial bias because of the great difficulties defendants face in proving individual acts of discrimination in their cases."[70]

The CERD Committee's 2008 concluding observations on the U.S. note that the "definition of racial discrimination used in the federal and state legislation and in court practice is not always in line" with the Convention.[71] The Committee also noted that the disproportionately high ratio of minorities incarcerated "may be regarded as factual indicators of racial discrimination."[72] The Committee recommended that the U.S. review the definition it uses "to ensure . . . that it prohibits racial discrimination in all its forms, including practices and legislation that may

RME411380

not be discriminatory in purpose, but in effect."[73]  In relation to the death penalty, the Committee has expressed its concern regarding racial disparities in both of its Concluding Observations,[74] and recommended that the U.S. "adopt all necessary measures, including a moratorium, to ensure that the death penalty is not imposed as a result of racial bias on the part of prosecutors, judges, juries and lawyers."[75]  Indeed, the HRC put forward questions related to racial disparities in the use of the death penalty, among other issues of concern related to the death penalty, for the U.S. to address when it comes before the Committee in October 2013.[76]

## B. Torture and Cruel, Inhuman or Degrading Treatment

### 1. Torture and Cruel, Inhuman or Degrading Treatment under International Law

Failure to provide treatment that respects the inherent dignity of those condemned to death violates international standards prohibiting torture or other forms of cruel, inhuman or degrading treatment or punishment ("CIDT").  The prohibition of torture and CIDT is a peremptory norm.[77]  It is set forth, without reservation or exception, in the foundational human rights instrument, the Universal Declaration of Human Rights, "[78] as well as the CAT,[79] two provisions of the ICCPR,[80] and various regional human rights instruments.[81]

Article 1, paragraph 1, of the Convention Against Torture provides a definition of torture that reflects the components of torture under customary international law:

> [T]he term "torture" means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.[82]

Of particular relevance in the death penalty context is that torture is not limited to physical acts; severe mental pain or suffering can constitute torture.  The former Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Manfred Nowak, found that "[p]sychological ill-treatment is by no means less severe than physical abuse." [83]  An analysis of the treatment (physical or mental) is based on the specific circumstances including the "nature, purpose and consistency of the acts committed" and personal circumstances relating to the vulnerability of the victim.[84]  Moreover, although a variety of acts have contributed to a finding of torture, it is not necessary to assess each act individually to find that, in isolation, it constitutes an act of torture; acts can be considered in combination.[85]  The Inter-American Convention to Prevent and Punish Torture  provides that "[t]orture shall also be understood to be the use of methods upon a person intended to obliterate the personality of the victim or to diminish his physical or mental

RME411381

capacities . . . ."[86] The International Criminal Tribunal for the former Yugoslavia ("ICTY") similarly confirms the profound effects of various forms of torture on the individual and has found torture to be "a violation of personal dignity and is used for such purposes as intimidation, degradation, humiliation and discrimination, punishment, control or destruction of a person."[87]

Under CAT, torture does not include the infliction of pain or suffering that is "arising only from, inherent in or incidental to lawful sanctions."[88] However, the death penalty is not exempt from consideration as torture merely by virtue of its imposition through a legal framework, as lawful sanctions "do not include sanctions that defeat the object and purpose of the Convention Against Torture to prohibit torture."[89] According to the Special Rapporteur on Torture, "[t]he proper understanding [of the lawful sanctions provision] is that the exclusion refers to sanctions that are lawful under both national and international law."[90] As such, should a sentence of death be imposed in violation of international standards, such as standards requiring due process or non-discrimination, it would not qualify as a "lawful sanction," [91] and the pain or suffering arising from the imposition of death penalty could qualify as torture. Further, the notion of lawful sanctions can evolve and practices which might initially be considered lawful might become outlawed and viewed as the most serious violations of human rights.[92]

The U.N. General Assembly has noted that CIDT, "should be interpreted so as to extend the widest possible protection against abuses, whether physical or mental. . . ."[93] The ICTY has defined inhuman treatment as "an intentional act or omission, that is an act which, judged objectively, is deliberate and not accidental, which causes serious mental or physical suffering or injury or constitutes a serious attack on human dignity."[94] The European Commission on Human Rights has found that, at minimum, the prohibition on inhuman treatment, "covers at least such treatment as deliberately causes severe suffering, mental or physical, which, in the particular situation, is unjustifiable."[95] Degrading treatment has been defined as including treatment, "such as to arouse in the victims feelings of fear, anguish and inferiority capable of humiliating and debasing them and possibly breaking their physical or moral resistance."[96] Inhuman treatment has often arisen in the context of the treatment of prisoners of war, and, as in our case, those in detention.[97] Failing to provide for the essential needs of prisoners, and treating prisoners in a manner that constitutes a serious attack on human dignity or causes serious suffering or injury, constitutes cruel, inhuman or degrading treatment.[98]

## 2. International Standards for Treatment in the Detention Context

The prohibitions against torture and CIDT are particularly relevant in the detention context. For example, provisions of the ICCPR relate specifically to detention and apply an affirmative standard that "[a]ll persons deprived of their liberty shall be treated with humanity and with respect for the inherent dignity of the human person," and mandate that "the essential aim" of a penitentiary system shall be the "reformation and social rehabilitation" of its prisoners.[99] Although this aim is inherently discordant with the use of the death penalty, the methods of achieving such goals must be complied with despite the sentence; signatories to the ICCPR are not only prohibited from the use of torturous or other inhumane

RME411382

treatment, but are also obligated to take affirmative measures to ensure that the dignity of prisoners is maintained.

To define what standard of care would provide humane treatment, the UN General Assembly has adopted two resolutions regarding conditions of incarceration: the *Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment* and the *Basic Principles for the Treatment of Prisoners*. Both articulate the fundamental principle that "[e]xcept for those limitations that are demonstrably necessitated by the fact of incarceration, all prisoners shall retain the human rights and fundamental freedoms set out in the Universal Declaration of Human Rights" as well as any other covenant to which the State is a party.[100]

The HRC, in assessing violations by member states of these standards, relies on the Standard Minimum Rules to determine whether a State party has violated its obligations for humane treatment.[101] The Standard Minimum Rules set forth practical and specific requirements for the physical environment, policies around use of force, provision of medical care, availability of cultural and educational opportunities, and access to the outside world that the UN recognizes as *minimally* necessary for treatment in accord with the dignity of those subject to incarceration. The UN Economic and Social Council has urged member states in which the death penalty may be carried out "to effectively apply the Standard Minimum Rules for the Treatment of Prisoners, in order to keep to a minimum the suffering of prisoners under sentence of death and to avoid any exacerbation of such suffering."[102] To this end, it adopted the *Safeguards Guaranteeing Protection of the Rights of Those Facing Death Penalty* in 1984.[103] Article 7 of the *Safeguards* affirms that the Standard Minimum Rules apply to those awaiting a sentence of death.

These broad mandates have been given greater specificity through the development of jurisprudence by the Inter-American Commission and Court of Human Rights.[104] In 2008, the Commission approved the *Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas* which, in addition to the Standard Minimum Rules*, provides guidelines for ensuring that the physical conditions, availability of programming, access to family, and legal processes associated with detention respect the dignity of those subject to confinement.[105] As the Inter-American Commission found:

> [T]he conditions of imprisonment of persons sentenced to death must meet the same international norms and standards that apply in general to persons deprived of liberty. In particular, they must have access on an equal footing to the healthcare services of the jail; to education, job and training programs; to work shops and reading materials; and to cultural, sports and religious activities; and to contact with the outside world and their family members. . . .Therefore, there is no valid justification to subject this category of inmates to more restrictive or harsher conditions than those of the rest of the inmates.[106]

Although prisoners are not to be subjected to harsher conditions as a result of their sentence, condemned prisoners necessarily undergo psychological trauma as a result of the death sentence. Decisions by the Human Rights Committee make clear that conditions on death row can constitute a human rights violation and may be

16 / Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana – FIDH/CCR

RME411383

**2761**
Exhibit 4
Page 298

exacerbated by the nature of this psychological trauma.[107] A largely psychological phenomenon of severe trauma resulting from the prolonged confinement of death row prisoners has been found to constitute CIDT, and has recently been found by expert opinions to constitute torture. "Death row phenomenon" is a term used to describe the collection of harms inherent in many death row contexts as a result of the time spent awaiting execution in the challenging conditions of confinement of death row, and the mental consequences of living under a sentence of death.[108] Death row phenomenon is frequently a compounding of several harms which have been found to constitute torture, such as a believable threat of execution,[109] sensory deprivation and/or isolation, prolonged denial of rest and sleep, prolonged denial of medical care, being kept in uncertainty, subjection to excessive light or noise, and simulated executions.[110] Although analyzed on the specific facts and with a focus on the vulnerability of the victim in question, regional human rights courts have found that prolonged confinement in the difficult conditions of death row constitutes cruel inhuman or degrading treatment.[111] In fact, the Privy Council of the British House of Lords has found that "in any case in which execution is to take place more than five years after sentence there will be strong grounds for believing that the delay is such as to constitute inhuman or degrading punishment or other treatment."[112]

Recently, the Special Rapporteur on Torture evaluated the use of the death penalty and the conditions under which it is implemented. He found that regardless of the legality of the death penalty itself and the evolving norm against its use, **"most conditions under which capital punishment is actually applied renders the punishment tantamount to torture,"** and in "less severe conditions," CIDT.[113] Citing death row phenomenon, the Special Rapporteur finds that as a result of the anxiety suffered from a threat of death, which results in "great psychological pressure and trauma," a "prolonged stay on death row, along with the accompanying conditions, constitutes a violation of the prohibition of torture itself."[114] As a result, adherence to the prohibition on torture and other CIDT serve as "absolute limits on the use and enforcement of the death penalty."[115]

### 3. Torture and Cruel, Inhuman or Degrading Treatment in the US context

The U.S. government's understanding of what constitutes torture and cruel, inhuman or degrading treatment, and the means by which to address it, are not in conformity with international law and practice. Within the United States, the treatment of prisoners is governed by the Eighth Amendment to the U.S. Constitution, which prohibits the infliction of "cruel and unusual punishments."[116] The Supreme Court has held that, "[t]he Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."[117] The use of the Eighth Amendment to secure the realization of human rights has yielded some positive results, such as the abolition of the death penalty for minors,[118] and the intellectually disabled.[119] However, conditions of confinement challenges under this legal regime have resulted in haphazard, non-comprehensive standards for prisons. Necessarily, as a result of the "unusual" requirement, efforts to abolish the death penalty under this standard have thus far been limited.

Upon ratifying CAT, the U.S. issued an "understanding" clarifying its definition of torture with respect to mental harm, redefining "mental pain and suffering" as

RME411384

"prolonged" mental harm which is related to the intentional infliction or threatened infliction of certain physical acts.[120]  This limited definition of torture is also used in the federal statute prohibiting torture.[121]  Although the suffering caused by conditions prevalent on death rows and the death row phenomenon described herein likely fits within this understanding, it is important to note that this definition is contrary to the Convention.  The Committee Against Torture has urged in its Concluding Observations that the U.S. "should ensure that acts of psychological torture, prohibited by the Convention, are not limited to 'prolonged mental harm' . . . but constitute a wider category of acts . . . ."[122]

       Additionally, the U.S. fails to provide an adequate remedy to detained individuals who have suffered in detention.  The limited definition of torture serves as a barrier to inmates seeking compensation for their injuries.  The Prison Litigation Reform Act ("PRLA") was instituted to limit the ability of prisoners to bring suit based on their conditions by establishing, *inter alia,* the requirement that prisoners exhaust all administrative remedies before filing suit, the imposition of fees, and even permitting judges to revoke inmate's good time credits for filing "malicious or harassing claims."[123]  In the context of the death penalty, the PRLA bars federal civil lawsuits by prisoners "for mental or emotional injury suffered while in custody without a prior showing of physical injury" or sexual act.[124]  Although case law has established that detained individuals may sue to get a court order to cease the treatment, and some courts have allowed damages for infringement of constitutional rights, there is no mechanism for seeking compensatory damages for mental harm resulting from ill treatment.[125]  The Committee Against Torture has expressed its concern with the PRLA in its 2006 Concluding Observations[126] and again in its 2010 list of issues.[127]

RME411385

# V. California

With 741 individuals currently on death row[128] and an average of approximately 20 new judgments of death per year, California's death row is by far the most populous in the country and contains nearly twice as many condemned men and women as the nation's second largest death row in Florida.  Seven hundred and twenty two out of the 741 prisoners on death row are men, and they are held at San Quentin State Prison, the oldest prison in California. San Quentin is located along the water in Marin County, about a thirty minute drive north from San Francisco. The remaining 20 – the women of death row – are imprisoned at Central California Women's Facility in Madera County, about a two hour drive from San Francisco and San Jose and a forty minute drive from Fresno.

California adopted its current death penalty law by popular initiative in 1978, two years after the Supreme Court reaffirmed the country's acceptance of the death penalty in *Gregg v. Georgia*.[129]  Since then, the state's death row population has increased steadily. But unlike other states with large death row populations, California has carried out relatively few executions.  Thirteen individuals have been executed since 1978, and none have been executed since a court-ordered stay was entered in 2006.  More inmates on death row have died from suicides than from execution; more than four times as many have died from natural causes than from execution.

Although the lack of executions would appear to indicate that the state has little appetite for the death penalty, recent election results suggest that its citizens remain reluctant to give up the symbolism – and the fiction – of meting out the ultimate punishment to the "worst of the worst."  In the fall of 2012, abolitionist organizations around the state mounted a $7 million campaign in support of Proposition 34, a state-wide ballot measure to abolish the death penalty in California and convert the sentences of over 700 death row inmates to life without parole.[130]  The measure failed by a slim majority.  As a result, California's death row population continues to grow, even as the state struggles to meet minimum international standards for conditions of confinement for the current condemned population.

It is clear that retaining the death penalty, even without frequent executions, comes at an unacceptable price for those on death row, their families, and even the state of California itself.  In May 2013, the mission interviewed inmates on California's death row, family members of death row prisoners, attorneys who represent individuals in capital cases and post-conviction appeals, legal scholars, and advocates who have worked for decades to abolish the death penalty in California.  Interviewees emphasized fundamental problems with how the death penalty is implemented in the state and described shockingly poor conditions on death row.  These systemic problems, which will likely not be fixed in the foreseeable future given, *inter alia,* the state's long-term financial crisis, strongly suggest that continued administration of capital punishment will simply never – and can never – be compatible with the United States' obligations under international human rights law.

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 19

RME411386

**2764**
Exhibit 4
Page 301

## A. Overview of the Trial and Appeals Process

The death penalty may be imposed in California for any first degree murder that also involves a "special circumstance" enumerated by the California Penal Code.[131] The state's first-degree murder statute is broad; it includes "all murder which is perpetrated by means of a destructive device or explosive, knowing use of ammunition designed primarily to penetrate metal or armor, poison, lying in wait, torture, or by any other kind of willful, deliberate, and premeditated killing"; murder "committed in the perpetration of, or attempt to perpetrate, arson, rape, carjacking, robbery, burglary, mayhem, kidnapping, train wrecking," torture, sodomy, lewd acts against a child, unlawful oral copulation, and unlawful sexual penetration; and murder "perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict death."[132]

At trial, the factfinder (usually a jury) must make three separate findings before a sentence of death is imposed. During the "guilt phase," the factfinder must first find the defendant guilty of first-degree murder, and then find that one or more "special circumstances" was present in the case. During the "penalty" phase, the factfinder weighs the aggravating factors and the mitigating circumstances in the case to determine whether the defendant should be sentenced to death or life imprisonment. A punishment of death is imposed if the jury returns a unanimous verdict that "the aggravating circumstances both outweigh the mitigating circumstances and are also so substantial in comparison to the mitigating circumstances that a sentence of death is appropriate and justified."[133]

Although all criminal defendants are permitted to file an appeal, a state habeas petition, and a federal habeas petition, there is one crucial difference between defendants sentenced to death and all other criminal defendants. In addition to being entitled to an attorney during the trial and appeal proceedings, death row defendants are entitled to an attorney during all stages of post-conviction review if they cannot afford a lawyer. By contrast, defendants sentenced to any term of imprisonment other than death, including defendants sentenced to life without parole , are guaranteed to a court-appointed attorney only at the trial and appellate stage. Although they are still permitted to file state and federal habeas petitions raising, for example, new claims of factual innocence, in practice they are unable to do so without the assistance and resources of a lawyer. Thus, in practice, death row inmates are the only population who are able to seek relief beyond the direct appeal stage.

## B. Current State of Affairs

In the fall of 2012, California voters were given an opportunity to abolish the death penalty by popular referendum. Proposition 34, which would have ended the death penalty and converted the sentences of the 741 men and women currently on death row to life without parole, was defeated by a vote of 52.8% to 47.2%, a difference of 500,000 votes.[134] The narrow margin was a partial victory for many

20 / Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana – FIDH/CCR

RME411387

**2765**
Exhibit 4
Page 302

death penalty abolitionists, because it indicated that the state was on the cusp of change. Prop 34 was supported by a broad coalition of organizations and death penalty abolitionists around the state, which together spearheaded a $7 million campaign called SAFE California to persuade citizens to vote for the measure. One of the campaign's central arguments was the high economic cost of maintaining the death penalty in a state that in recent years had faced multi-billion dollar shortfalls and major spending cuts[135]—an influential study by the bipartisan California Commission on the Fair Administration of Justice had previously pegged the cost of the California death penalty system at a staggering $137 million, and the savings at about $125 million should the death penalty be abolished in favor of life without parole.[136]

Prop 34 had broad support among abolitionists and the death penalty defense bar, but it also raised complex questions for some about the fairness of replacing the death penalty with life without parole.[137] For many death row prisoners, the passage of Prop 34 and the conversion of their sentences to life without parole meant that they would no longer be entitled to a court-appointed attorney beyond the appeals stage, and they stood to lose an important opportunity to investigate and raise new facts that could prove their innocence.[138] For others, like Christine Thomas, wife of condemned prisoner Correll Thomas, life imprisonment was no better than a sentence of death, because "either way, you die in prison.[139] And for some prisoners who had been on death row for years or decades, the prospect of being moved out of death row into another, potentially worse facility, was nearly unbearable.[140]

Although Prop 34 did not ultimately pass and the death penalty remains on the books in California, the next execution will likely not happen anytime in the near future. Executions have been on hold since 2006, when a federal district court ordered the state to stop executing people because the three-drug protocol used by the state created an "undue and unnecessary risk that an inmate will suffer pain so extreme that it offends the Eighth Amendment['s prohibition on cruel and unusual punishment]."[141] Among other things, the court found that there were "substantial questions" as to whether six of eleven men who had previously been executed by the state had been conscious at the time of execution and had suffered an unconstitutional level of pain; and that there were "critical deficiencies" in the way the state had been implementing its execution protocol, including a lack of adequate training and supervision of the execution team.[142]

> "Back here [on death row], as long as there's hope [that you might one day be free], there's life. Life without parole takes that away from you. With LWOP [life without parole], you have no hope."
>
> – Kevin Cooper, prisoner on death row

In response, the state built a new execution chamber and revised its lethal injection protocol, but continued the use of the three-drug method, prompting a new legal challenge. In May 2013, a California appeals court upheld a ruling that the state's revised protocol failed to comply with the state's administrative procedure law, and that the state had failed to consider the single-drug protocol recommended by its own experts.[143] The state is now exploring a single-drug option. Executions could begin again once a new lethal injection protocol is approved and passes judicial review, which will likely take more than a year to complete.[144]

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 21

RME411388

**2766**
Exhibit 4
Page 303

The death row population at San Quentin continues to grow in the meantime. Approximately 20 new judgments of death are handed down each year,



adding new inmates to a facility badly in need of repair and with inadequate resources to care for an aging and increasingly diverse population.[145] For example, according to the California Appellate Project, which provides legal assistance and training to private attorneys representing condemned inmates on appeal, 61 foreign nationals are currently on death row, and many are not provided with trained, certified interpreters when medical issues arise.[146] The prison also lacks resources and services to provide adequate facilities for a transgender prisoner,[147] and for the 16 men who are now over 70 years old.[148]

US San Quentin: A police officer looks over a fence at the entrance to San Quentin Prision during a protest against the execution of death row inmate Stanley « Tookie » Williams, on December 12 2005. Protesters claimed he had been wrongly accused of the crime for which he had spent half his life in detention, © HECTOR MATA / AFP

Overcrowding is also a pressing concern. In 2011, the U.S. Supreme Court ruled that overcrowding in California's prisons created conditions that violated the Eighth Amendment's prohibition on cruel and unusual punishment, and that a reduction in the prison population was necessary to solve systemic problems, including the lack of adequate medical and mental health care.[149] California was directed to reduce its prison population to 137.5% its design capacity.[150] San Quentin, which houses general population prisoners as well as prisoners on death row, contains roughly 4,200 men and currently operates at 137% capacity.[151]

Jeanne Woodford, former Warden at San Quentin, stated in May of 2013 that there was "insufficient capacity [at San Quentin] to appropriately house the growing condemned population" and that "in approximately four months, the condemned population will exceed the cell space set aside for it."[152] A planned project to build a new $356 million prison to house condemned inmates was cancelled by Governor Jerry Brown in April 2011, and no long-term plans are currently in place to address the space shortage.[153] If California continues to sentence individuals to death row at the current rate, overcrowding will become an increasingly significant problem in the coming years, exacerbating the already-poor conditions at the prison and placing even more serious burdens on prisoners' freedom of movement.

## C. Discrimination and Arbitrariness in the Legal System

Perhaps one of the most significant problems with how sentences of death are handed down in California lies with the breadth of its death penalty statute. With 22 enumerated "special circumstances," California's sentencing statute is thought to be the broadest in the country.[154] The state is one of the few in the country that permits the imposition of the death penalty even though the defendant had no intent to kill; under § 190.2(a)(17) of the California Penal Code, the death penalty may

RME411389

be sought for any murder that occurs while a defendant is engaged in committing one of twelve listed felonies, regardless of the defendant's mental state.[155] An individual may therefore be charged with death for accidental, "unintended homicides resulting from reckless behavior, or ordinary negligence, or pure accident," as long as the homicide occurred during the course of a felony.[156] The state is also one of the few in the country that permits the death penalty to be sought for any murder committed by a defendant while "lying in wait," a definition so broad that it encompasses the vast majority of premeditated murders.[157] As a result of the breadth of special circumstances categories, 87 to 90 percent of California's first degree murders are death eligible under California's sentencing statute.[158] A more recent study of over 27,000 homicides found that the death eligibility rate of first degree murders was 95 percent using the law in place in 2008.[159]

> *"The notion that society is capable of selecting the worst of the worst to have their lives extinguished is fundamentally flawed. . . . The system is absolutely incapable of [deciding] which offender is deserving of the ultimate penalty."*
>
> – Joseph Schlesinger, Capital Habeas Unit, Office of the Federal Defender for the Eastern District of California

The district attorney's office in the county in which the crime occurs makes the initial charging decisions, including whether to charge a "special circumstance" in a first-degree murder case, making it death eligible. Two studies found that out of the total pool of death eligible defendants, only 9.6 percent are sentenced to death in California; the number drops to 5 percent when only the most common "felony-murder" special circumstance cases – burglary-murder and robbery-murder – are considered.[160] These statistics show that in deciding which defendants to select for death, prosecutors have what one attorney called "virtually unfettered discretion."[161] Such discretion allows political factors to play a larger role in the decision-making process and increases the risk of racial discrimination in both charging and sentencing decisions.[162] In the words of one Federal Attorney who represents prisoners on death row, "Who gets the death sentence is at best arbitrary and at worst discriminatory."[163]

Indeed, numerous studies have confirmed that illegitimate factors such as race play a part in whether a defendant is charged and sentenced with the death penalty, and that the death penalty is applied in an arbitrary manner. Defendants in Hispanic and African-American victim cases, for example, have been shown to be less likely to face death-eligible charges than defendants in cases where the victim was Caucasian[164] Additionally, a study of statewide homicides committed between 1990 and 1999 concluded that defendants found guilty of killing whites were 3.7 times more likely to be sentenced to death than those found guilty of killing African Americans, and 4.7 times more likely to be sentenced to death than those found guilty of killing Hispanics.[165] Even after controlling for other factors, race and ethnicity of the victims remained a "significant predictor" of the imposition of the death sentence.[166] Charging and sentencing rates also vary wildly with geography. In one study that examined death-charging in a single county in California, researchers found that the same District Attorney's office sought death 2.5 times more often for murders occurring in one area of the county – where whites were three times more likely to be homicide victims – than in another – where African-Americans were four and a half times more likely to be homicide victims.[167] Another study has

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 23

RME411390

**2768**
Exhibit 4
Page 305

shown that since 2000, 10 counties in California (out of a total of 58) with vastly different homicide rates have been responsible for 83% of all death sentences in the state,[168] while in the decade preceding, nearly half of California counties returned no death sentences for homicides.[169]  Additionally, death sentencing rates in California have been found to be highest in counties that are more sparsely populated and overwhelmingly white.[170]

This pattern of discriminatory charging and sentencing may be a contributing factor as to why African-Americans are significantly overrepresented on death row. While they make up only 6.7% of the overall population in California, African-Americans represent 36% of prisoners on death row.  While whites make up 73.7% of the overall population, they represent only 35% of prisoners on death row. [171]

## D. Delays in the Adjudication of Post-Conviction Claims for Relief

Indigent death row prisoners in California – virtually everyone on death row – are denied prompt disposition of their claims because of inordinate delays in appointment of counsel and the slowness of California's courts in deciding appeals and habeas petitions.  While death row prisoners nationwide wait an average of approximately ten years for their post-conviction claims to be adjudicated, the thirteen inmates in California who were executed waited an average of 17.5 years before their execution.[172]  New death row inmates sent to San Quentin will spend at least 20 years on death row awaiting execution.[173]  Over 240 individuals currently on death row have been there for over 15 years; over 100 have been there for over 20 years; and eight have been on death row for over 30 years.[174]  CCR and FIDH met with three inmates at San Quentin during its mission to California. All have been on death row for at least a decade or more.

The delay is due in part to a shortage of attorneys in the state qualified and willing to take on capital cases.  Attorneys for death penalty cases are not compensated adequately by the state and, according to a report published by the California Commission on the Fair Administration of Justice, inadequate compensation is a "significant factor" in the decline of available attorneys handling death penalty appeals.[175]  Death row prisoners now wait an average of 3-5 years before counsel is appointed to handle their direct appeal, and an additional 8-10 years following the conclusion of their appeal for an attorney to be assigned to their state habeas petition.[176]  Approximately 85 defendants on death row are still awaiting counsel to handle their direct appeal, and approximately 335 defendants are awaiting counsel to handle their state habeas appeal.[177]  In total, 57% of the death row population is without representation for post-conviction proceedings. The courts also add years to the delay.  The Commission on the Fair Administration of Justice found that the California Supreme Court takes an average of 2.25 years to decide a death penalty appeal and approximately 2 years to decide a state habeas petition; resolution of federal habeas petitions by the federal district and appeals courts takes an additional 8 years.[178]  By all accounts, the delay has worsened significantly since the Commission issued its report in 2008, as it now takes the California Supreme Court 3.7 years to resolve a habeas petition.[179]

24 / Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana – FIDH/CCR

RME411391

These delays create significant practical problems for defense attorneys who are assigned to investigate habeas cases long after a crime has occurred, a situation which one attorney at the California Appellate Project called a "human rights crisis."[180] One Federal Defender described how the decades-long delay made it much more difficult to challenge a conviction in a federal habeas case: "It is not uncommon for witnesses to have died, records to have been destroyed, and evidence to have been lost."[181] This is particularly problematic in a state where cases are routinely reversed – at a rate of 80 percent – only at the federal level.[182] The majority of prisoners whose sentences are later vacated will have spent over 15 years on death row.

> **"The legal system creates a lot of pain and makes people want to end their life quickly. People don't have attorneys. They tend to turn in."**
>
> – Jarvis Masters, prisoner on death row

Delays also exact a very real human cost. Sixty condemned inmates have died from natural causes while waiting for the conclusion of their post-conviction claims, three times the number of those who have been executed by the state.[183] In one case, a death row prisoner died of cancer while waiting for the California Supreme Court to decide his state habeas petition – a wait that had had gone on for 13 years.[184]

## E. Conditions of Confinement

San Quentin's death row is known for its poor living conditions. From 1980 to 2009, the prison was under judicial oversight to improve the housing and living conditions of condemned prisoners.[185] Although enough improvements were made to satisfy the court and the oversight was terminated in 2009,[186] some have argued that the termination was premature,[187] and many problems still persist.

> **"It was not until we visited the tiers that we realized how horrible, how inhumane [death row] was. They treat prisoners like animals."**
>
> – Joseph Baxter, appellate attorney

Prisoners on San Quentin's death row are housed in one of three facilities: North Segregation ("North Seg"), East Block, and the Adjustment Center, which also houses a few inmates from the general population. North Seg contains about 68 prisoners, all of whom are classified in the less restrictive "Grade A" class. East Block contains approximately 500 inmates, 450 of whom are classified as Grade A. The rest are classified as "Grade B" and are treated in a manner similar to inmates sentenced to a security housing unit, and subject to a host of restrictive measures.[188] The Adjustment Center houses about 100 prisoners, the vast majority of whom are death row inmates with a Grade B classification. All prisoners are housed in single cells, regardless of their classification.

There are significant differences in general living conditions between the three housing units. While North Block is relatively quiet, East Block, according to death row prisoner Jarvis Masters, is "very noisy . . . [there is] constant yelling

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 25

RME411392

**2770**
Exhibit 4
Page 307

and screaming down the halls [and noises from] radios and TVs; it's enough to drive you nuts."[189]  With over 250 cells along each wall stacked five stories high and separated only by tiered walkways, noise from the walkways and from each of the cells can be heard by all.  While the minority of inmates who reside in North Seg may leave their cells and access a small communal indoor space for a portion of each day, those in East Block and the Adjustment Center – or about 90 percent of the death row population – have no communal space besides the recreation yard.  The Adjustment Center is the solitary confinement unit within death row and provides the most restrictive housing conditions; prisoners in the Adjustment Center are locked in their cells for all but nine hours a week.



Walkalone yard in East Block at San Quentin's death row. Source: Expert Decl. of Jeanne Woodford in Supp. of Pls.' Opp'n to Defs.' Mot. to Terminate, Photo Ex. A, Coleman v. Brown, No. 90-0520 (E.D. Ca. Mar. 14, 2013).

### 1.  Lack of recreation time and adequate outdoor space

Although San Quentin's operating procedures for death row, known as the Condemned Manual, states that prisoners in East Block and the Adjustment Center are allowed access to outdoor yard space four hours per day, three days a week, the regulations do not reflect reality. Yard time is often shortened to two hours per day because of various delays, and it is frequently not offered to some inmates for weeks at a time.[190]  In one case documented by Woodford, recreation time appeared not to have been offered to one inmate for four months.[191]

RME411393

In addition, the amount of recreational space at San Quentin is inadequate
for the current death row population.  In East Block, up to 80 prisoners are released
at a time to share a single yard that is roughly 60 feet by 80 feet, about the size of
a basketball court.  Little to no exercise equipment is available, and the space is
so uncomfortable and crowded that prisoners frequently decline recreation time.[192]
Most of the yard space in the Adjustment Center is made up of walk-alone space,
which consists of outdoor cells known as "dog kennels" and meant for a single
prisoner. The view is obstructed by a high wall on all four sides.[193]   Prisoners
housed in the Adjustment Center are also strip searched in a holding cell before and
after going out to the yard, a policy which discourages many from going outside.[194]
Aside from time spent in the yard, there is no opportunity for inmates to socialize
in a communal space.[195]

### 2.   Restrictions on contact and communication with family members

Approximately 150 of the over 700 prisoners at San Quentin are currently
classified as Grade B and are subject to highly restrictive conditions.  The most
significant of these limitations apply to their communication with the outside world.
Grade B prisoners are not able to make or receive phone calls, including phone
calls to their attorneys; they are therefore forced to communicate with their lawyers
by mail or during the few times a year their attorney can find the time to visit.[196]
Inmates may sometimes be allowed to use the phone in exceptional circumstances
such as family emergencies, but such instances are rare and the provision of a phone
call is left to the complete discretion of prison staff.  Although Grade A prisoners are
allowed a minimum of two 15-minute time slots a week for collect phone calls,[197]
the lines are monitored by prison staff and phone calls cost $2.50 per minute – a
prohibitively expensive rate for the indigent death row prisoners and their loved
ones.[198]

In addition, visitation for Grade B prisoners is limited to one hour per visit,
and contact visits are strictly prohibited, which means that prisoners are separated
from their visitors at all times by a plexi-glass booth and must speak through a
telephone.[199]  Grade B prisoners may only receive packages once per year.[200]

These restrictions, combined with the fact that Grade B designations may
be given for indeterminate periods of time, mean that some prisoners have not had
phone calls or felt the touch of a family member for a decade or longer.

> **"Before they kill you physically, they want to kill you
> emotionally."** – Kevin Cooper, prisoner on death row
>
> *Although physical abuse by prison staff has decreased over the
> decades that San Quentin was under judicial supervision, a number of
> interviewees noted that prisoners at San Quentin are still often subject
> to harassment by correctional officers, and that certain intentional*

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 27

RME411394

*behavior by prison staff cause prisoners psychological and emotional harm.[201] According to some interviewed by the mission, prisoners are "dehumanized and antagonized,"[202] and treated by guards "like chained animals."[203] Correll Thomas, for example, described being subject to small injustices, such as having personal possessions overturned, broken, and destroyed during cell searches, on a regular basis, calling it "systematic torture."[204] Another prisoner, Jarvis Masters, recalled how a guard would taunt him by reading Masters' judgment of death out loud.[205] Kevin Cooper noted that he rarely ever saw correctional officers disciplined for mistreating and inmate and commented that "in this prison, the guards are always right, and you are always wrong."[206] These small humiliations, according to Cooper, are "all part of the process to break you."[207]*

### 3. Solitary confinement

Prolonged solitary confinement is routinely imposed at San Quentin. When inmates first arrive on death row they are placed in "administrative segregation" – solitary confinement for all practical purposes – in what San Quentin officials call the "Adjustment Center" and what death row inmates call "the Hole." This initial placement into solitary confinement may range from a few weeks to six months, and applies to all prisoners, regardless of any special status or medical needs. Solitary confinement in the Adjustment Center is also imposed on prisoners if they are sentenced to Grade B status. Woodford has described the Adjustment Center as "very restrictive," where inmates are "not allowed much freedom at all."[208] Contact with other inmates is minimal. Communal meals are not allowed, and virtually the only time inmates are able to interact is during yard time. The Condemned Manual states that prisoners in the Adjustment Center are allowed up to 12 hours a week for outdoor exercise[209] – practically the only time in which they are allowed out of their cell – but in reality, yard time is frequently not offered.[210] Because the cells have solid doors, inmates are unable to see one another when they are in their own cells, and their only means of communication is by yelling back and forth through their cell doors.

Current guidelines allow prisoners to be classified as Grade B and placed in solitary confinement for determinate periods of up to 48 months,[211] but they may also be assigned Grade B status and sent to the Adjustment Center indefinitely. The loose standards specified in the operating procedures are frequently applied with wide amounts of discretion, via a classification process that death penalty advocates have criticized as arbitrary and lacking in due process.[212] For example, correctional officers may place a prisoner in the Adjustment Center for a "serious rule violation," but offenses range widely from conduct that may be charged as a violent crime to relatively minor infractions such as possessing more than $5 without authorization, possessing – or "constructive[ly] posse[ssing]" – a cell phone; or participating in a strike.[213]

Death row prisoners may also be given *indeterminate* Grade B status based on their "gang affiliation," a term that is not defined anywhere in the regulations.[214]

RME411395

Prisoners may also be given an indeterminate Grade B term for incurring one serious rule violation and two administrative rule violations within a six-month period.[215] Indeterminate Grade B status may additionally be assigned to any inmate who prison staff determine is being "disruptive to the normal operating procedures of the institution."[216] There is no limitation to how long an individual with indeterminate Grade B status may remain in solitary confinement with all the accompanying restrictions on communication.

For individuals found to be affiliated with a gang, the prospect of release is especially bleak. Release from the Grade B "program" can only come through debriefing, which requires confessing to a gang-related crime and naming other members in the gang; or a finding by prison staff that the inmate is no longer an active gang member.[217] Neither option is satisfactory. Inactive reviews are conducted only once every *six years*,[218] and the periodic 90-day reviews provided for in the procedures[219] have little impact on a prisoner deemed to be affiliated with a gang.[220] On the other hand, debriefing comes with serious risks: it is legally unwise for many inmates who do not wish to reveal information that might damage their pending appeal; potentially dangerous for those who believe that they will be retaliated against if they reveal any names; and impossible for some who were incorrectly validated as a gang member and who have no actual information to provide.[221]

It is not surprising, then, that some death row prisoners have been in the Adjustment Center for decades.[222] The mission met with one inmate, Jarvis Masters, who spent 22 years in isolation in the Adjustment Center. Masters described the Adjustment Center as a place "where [prison guards] can torture you, taser you . . . [and] take retaliatory violence [against you]" with little repercussion. During the first six months he was in the Adjustment Center, Masters was placed in an even more restrictive environment, which he described as the "hole within the Hole," and allowed few items beyond a blanket and a mattress. During the first year, his recreation time was limited to being in the "walkalone yard," where he was not allowed to interact with any other prisoners. Because of the prohibition on contact visits and phone calls, Masters was "cut

## Hunger Strike to Protest Conditions in the Adjustment Center

*On 8 July 2013, the same day that 30,000 prisoners held in prisons across California began a hunger strike to protest the state's practice of sending inmates into solitary confinement for decades with effectively no way out,[224] nearly 100 prisoners held in the Adjustment Center initiated a peaceful hunger strike to protest the solitary confinement policies in place on death row. Among other things, the prisoners in the Adjustment Center sought changes that would lift some of the most onerous restrictions placed on Grade B inmates, such as the ban on non-contact visits, and sought to end some of the unfair practices currently in use for sending prisoners to solitary confinement.[225] The prison administration's response to the strike and to the prisoners' demands was mixed, and at times, hostile. Two weeks after the strike began, correctional officers issued rules violation reports to all striking inmates, and the hunger strikers were punished by being confined to their quarters for 10 days, which severely limited their ability to communicate with one another.[226]*

*The hunger strike ended on 14 August 2013; it lasted a total of 38 days. More than a dozen prisoners lost consciousness or experienced medical difficulties as the strike unfolded.[227] By the end, administration officials acknowledged that there was a lack of meaningful process for those assigned to indeterminate Grade B status and understood that change was necessary, but made no promises except to end the humiliating practice of strip searching Adjustment Center prisoners outside in a holding cell before allowing them access to the recreation yard.[228] The prisoners are still waiting for the administration to make concrete changes to the operating procedures. Revised operating procedures are expected to come out sometime in spring 2014.[229]*

RME411396

off from all human contact except [during] yard from 1985 to 2007" – the entire
period during which he was in solitary.[223]



Treatment cages for group therapy in the Adjustment Center at San Quentin's death row. Source: Expert Decl. of
Jeanne Woodford in Supp. of Pls.' Opp'n to Defs.' Mot. to Terminate, Photo Ex. C, Coleman v. Brown, No. 90-0520 (E.D.
Ca. Mar. 14, 2013).

### 4. Medical and mental health care

Not surprisingly, a significant portion of prisoners on death row struggle
with mental health problems. One prisoner commented that "the majority of people
here don't need prison, they need a mental hospital."[230] Another interviewee, a
Federal Defender representing death row inmates, explained that many prisoners
arrive on death row with existing mental health issues, and that death row only
exacerbates those problems because of the "lack of socialization" and the "stress of
not knowing when they'll be executed."[231] Those who arrive without any problems
develop them over time as they struggle to live under a death sentence with an
unknown execution date, and slowly deteriorate.[232]

Despite the significant mental health needs of condemned prisoners,
mental health treatment on San Quentin's death row is often inadequate. For
example, group therapy is always conducted with prisoners seated inside cramped,
individual "treatment cages" that are lined up in a "dirty and crowded" room.[233]
And current policies discourage prisoners from medical and psychiatric visits. The

RME411397

Condemned Manual requires that inmates be strip searched before and after each medical visit.[234] Woodford has similarly noted that prisoners in the Adjustment Center are strip searched after returning from mental health appointments.[235] When prisoners do go for medical visits, their ankles are handcuffed to a bed, requiring them to sit or lie in the same position – often for hours – while waiting to be seen.[236] Additionally, San Quentin's death row lacks resources and staff to treat the roughly 10-20 inmates who are severely mentally ill.[237] Unlike the general prison population, condemned prisoners are not eligible for transfer to a state hospital facility for specialized mental health care. Although the prison recently reported that a specialized program had been set up at San Quentin to treat those with acute mental illness, it has provided few details about the program. No policies and procedures have been made public, staffing for the program is uncertain, and the level of care is unknown.[238]

Two prisoners interviewed by the mission expressed feelings of mistrust between prisoners and medical staff, stating that a large part of mental health treatment at San Quentin consists of placing inmates on medication.[239] The lack of trust is due in part to knowing that mental health staff may not keep conversations confidential: one prisoner noted that doctors will sometimes reveal sensitive information told by prisoners, such as past sexual abuse, and that such information will eventually find its way to correctional officers.[240] Guards or escorts are present at all times during medical visits,[241] and one prisoner, Correll Thomas, explained that their presence deters prisoners from speaking openly to medical staff (and at times from even going to a medical visit) because prisoners know from past experience that guards will tell other officers about an inmate's medical issues, and the information will later be used to taunt and humiliate the inmate.[242] Thomas also noted that prisoners do not trust that correctional officers will respond in their best interest during a medical emergency. He described a recent incident where an inmate died in his prison cell and guards refused to go into the cell for hours because the inmate was not handcuffed.[243] He recalled another incident where, for the same reason, guards refused to enter a prison cell to help an un-handcuffed prisoner even though the prisoner had just been stabbed.[244]

Psychiatric care is given to a prisoner set to be executed, but according to Kevin Cooper, a death row prisoner who came within hours of execution before receiving a stay, the purpose of those additional psychiatric visits was to monitor his actions and ensure that he did not commit suicide before the execution date.[245] Cooper noted that in the days before he was set to be executed, guards would also come by his cell every hour to see if he was all right and to make sure "that you don't cheat them of their death."[246] Cooper stated that even though he was traumatized in the weeks following the event, he received no counseling or therapy; he was only asked whether he wanted any medication. In general, counseling or therapy is offered to inmates only following a prisoner suicide; no therapy is offered when another prisoner is executed.[247]

RME411398

## F. Death row phenomenon

> *"Everything here is about death. That's what makes [death row] different from other prisons. . . . [T]he thought of being executed, you don't ever get used to that."*
>
> – Kevin Cooper, prisoner on death row

The post-conviction appeals process is an essential safeguard against mistakes, especially when a defendant's life is at stake, and is a necessity in light of the high reversal rate for death penalty cases in California. But, as the European Court of Human Rights cautioned, "the consequence is that the condemned prisoner has to endure for many years the conditions on death row and the anguish and mounting tension of living in the ever-present shadow of death."[248] The California Supreme Court also recognized this in 1972 when it ruled the death penalty unconstitutional, noting that "the cruelty of capital punishment lies not only in the execution itself . . . but also in the dehumanizing effects of the lengthy imprisonment prior to execution during which the judicial and administrative procedures essential to due process of law are carried out."[249] That statement is even more true today, when the average length of time spent on death row is now an estimated 20 years, 12 more than the number of years that prompted the European Court of Human Rights and the California Supreme Court to make their observations.[250] The torment of a death sentence, which the California Supreme Court recognized as "psychological torture,"[251] and the punitive conditions of confinement are magnified for death row prisoners at San Quentin, who are forced to live under such conditions for decades while they wait for attorneys to be assigned and post-conviction remedies to be exhausted."

One attorney noted that the length of time prisoners stay on death row constitutes "a special kind of torture."[252] Jarvis Masters commented that it was the "people who have been on death row for a very long time" whom he saw develop mental

San Quentin Death Chamber, http://en.wikipedia.org/wiki/File:SQ_Lethal_Injection_Room.jpg



health problems and "act out in harmful ways" because they could no longer stand the wait. Cooper, who has been on death row since 1985, described watching other inmates "turn into vegetables, give up, commit suicide, and become dependent on medication" over the course of their time on death row because of the long-term psychological effect of a death sentence.[253] And one Federal Defender representing

32 / Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana – FIDH/CCR

RME411399

2777
Exhibit 4
Page 314

death row inmates noted that the stress of not knowing when they will be executed exacts an immeasurable toll on his clients' mental health, commenting, "I don't think I've had a client who isn't a potential volunteer, or who at one point was a volunteer. . . . [They say to me], I just want to be executed; I just want to get this over with. [Being on death row] is not an existence for them." [254]

Since 1978, 23 prisoners on California's death row have committed suicide (with the latest occurring four days before this report's publication), nearly twice the number executed by the state. The stress and anxiety of living under a sentence of death for a prolonged period of time is undoubtedly a factor, but conditions within San Quentin may also be contributing to feelings of loneliness, hopelessness, and isolation that impact a prisoner's will to live. The extended use of solitary confinement, which Woodford has argued is "unnecessary and avoidable,"[255] is well known for causing irreversible psychological damage.[256] The use of indefinite solitary confinement – the sentencing of prisoners to indeterminate Grade B status in the Adjustment Center – in particular exacerbates the pain and suffering of solitary because of the uncertainty of the length of punishment.[257] The "dehumanizing" treatment by correctional officers at San Quentin, which was emphasized by all three prisoners interviewed by the mission, also takes a serious toll. The constant degradation, noted the wife of one death row prisoner, is particularly hard on the prisoners who are mentally ill, who "can't bear up against [such] bullying."[258]

### *"I went through a ritual of death that was so unreal . . ."* – Kevin Cooper, prisoner on death row

On 10 February 2004, **Kevin Cooper** was set to be executed by the State of California. Before the U.S. Supreme Court issued a decision affirming a last-minute stay less than four hours before the appointed time of execution, prison officials at San Quentin prepared Cooper for his death. Cooper recalled the month-long execution "ritual" and the psychological toll it continues to have on him:

"*The first thing they did was move my property to another cage so [that] they could watch me constantly. The cage was filthy and looked like it had never been cleaned [and] I spent days scrubbing it. Prison staff came by every hour to see if [I] was all right and to make sure [I] didn't cheat them of their death. They sent psychiatrists, nurses, and administrative staff [to see me] all over a two week period. They wanted to know my clothing size . . . they took me out in the middle of the night to take photos of me. They [then] took me to the hospital to have the execution squad size me up. The doctors [talked] about my execution and where my veins were right in front of me, without acknowledging [my] being there. This went on for weeks. . . .*"

"*As [the] execution got closer and closer, everything became more intense. I was moved to [a cell] above the execution chamber, and someone [took] notes on what I was doing every hour. [I was put in] a waist chain with my hands handcuffed to my sides during visits, and guards surround[ed] and watched[] me 24/7, even during visits. All the guards watching me were white. . . . The day before [my execution,*

RME411400