*after my last visits were over], 14 guards marched me to a cage [right next to] the execution chamber. When they took my handcuffs off and strip searched me, they asked, 'When we take this cuff off, is there going to be any trouble?'"*

*"I felt like a slave on an auction block. They poked and prodded me and made me do everything: [put my] head up, lift up my testicles, bend over . . . it went on and on. It was so dehumanizing . . . I watched them carry [all the execution materials past me] to the death chamber. . . . At 8:17 [four hours before I was set to die], the phone rang. The Supreme Court had decided not to lift the stay [in my case]. . . . I felt life reenter my body. . . . I [] suffered from PTSD after the incident, but I have not received [] counseling from anyone . . . They didn't offer any help – no nurse, no doctor. . . . Every time an execution happens, I'll watch the clock and relive what they put me through. . . . I see my life now as being on the clock, especially after they tried to kill me. It's not a matter of minutes, but months."*[259]

RME411401

# VI. Louisiana

The mission's observations about the process by which defendants are sentenced to death in Louisiana and the cruelty of the conditions experienced on death row prior to execution raise serious questions about the state's adherence to international human rights law and the Constitution of the United States.

Located in the southern U.S., Louisiana is a largely rural state with a population of 4.6 million.[260]  There are currently 88 people on Louisiana's death row, including two women.  Since reinstatement of the death penalty in 1976, the state has executed 28 persons.  In keeping with national trends, Louisiana's use of the death penalty has decreased since 2000.  From 1990-1999, 68 people were sentenced to death in Louisiana, as compared with 43 people from 2000 to 2012.[261]  Only one of these executions has occurred since 2003: a man who volunteered to die without undertaking appeals.  Significantly, nine people have been exonerated while on Louisiana's death row.

Prosecutors seeking the death penalty for a homicide in Louisiana must charge a defendant with first degree murder, which includes one of 11 aggravating factors.[262]  Until 2008, "aggravated rape of a child" (La. Rev. Stat. Ann. §14:42) was also a crime which could warrant the death penalty.[263]  Louisiana has a newly implemented system of standards and operational guidelines for capital defenders,[264] which seek to reform years of poorly funded and decentralized capital defense.  Although significant improvements have been made to this system, the mission learned that a lack of funding and slow implementation of defense counsel standards continue to serve as a major source of concern for Louisiana criminal justice reformers and attorneys.

In April and May 2013, mission representatives conducted interviews in southern Louisiana with former inmates who have been exonerated, a family member of the formerly incarcerated, advocates, attorneys for those on Louisiana's death row, and trial defense counsel.  The mission was unable to gain access to visit the death row.  The Warden of Louisiana State Penitentiary also declined to meet with the mission.  Interviewees expressed their hopefulness that Louisiana will continue to decrease its use of the death penalty but also expressed a deep skepticism that the state could ever remedy both the widespread failings of its judicial process and the inhumane conditions in which it houses the incarcerated.  Those interviewed by the mission underscored how the lack of integrity of the judicial process requires that the inmate be provided more time to challenge the state's position, while the severity of the treatment of inmates demands that inmates spend less time under the brutal conditions of detention.

The evidence of entrenched racial discrimination and arbitrariness throughout the legal process and the ruthlessness with which those on death row are treated leads the mission to conclude that the application of the death penalty in Louisiana is fundamentally inconsistent with the United States' obligations under international human rights law.

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 35

RME411402

**2780**
Exhibit 4
Page 317

## A. Discrimination and Arbitrariness

Of the persons currently on death row in Louisiana, 58 are African American, 26 are Caucasian, three are Latino and one is Asian.[265] African Americans are overly represented on death row: they make up 65% of those sentenced to death, while they represent roughly 32% of the state's population.[266] From 1990 to 1999, of those sentenced to death roughly 72% were African American, and from 2000-2012, roughly 63% of those sentenced were African American.[267] Although the trend towards disproportionate convictions of African Americans has seen a slight decrease in later years, this over representation of African Americans is still profound in light of the overall population and crime data, and is particularly concerning in light of Louisiana's tumultuous racial history.

| Jurisdiction | % of persons on death row[268] (persons) | % Minority | Percent of State Population |
|---|---|---|---|
| East Baton Rouge | 20% (18) | 89% (16) | 10 % (444,526)[269] |
| Caddo | 19% (17) | 76% (13) | 6 % (257,093)[270] |
| Jefferson | 11% (10) | 80% (8) | 9% (433,676)[271] |
| **Total Top 3** | **51% (45 people)** | **82% (37 people)** | **25% (1,135,295)** |
| Total Statewide | 88 people | 70% (62 people) | 4,601,893[272] |

Interviewees identified unchecked prosecutorial discretion as one of the primary reasons for the discriminatory application of the death penalty in Louisiana. The effect of this discretion is readily apparent in both disproportionate conviction statistics and the variant rates of death penalty sentencing among the local jurisdictions in Louisiana. For example, throughout the past two decades, the Parishes (localities) of Caddo, East Baton Rouge, and Jefferson have imposed the most death sentences in the state, comprising 51% of inmates on death row.[273] It is important to note, however, that despite these past sentences, East Baton Rouge and Jefferson Parish have recently decreased their use of the death penalty.

Aside from the singular statutory requirement describing the 11 factors which can constitute first degree murder, prosecutors have total charging discretion. They are influenced by pragmatic questions of resources and likelihood of conviction, along with external political considerations. First, prosecutors must consider their capacity to try a capital case, which is resource intensive. Multiple interviewees indicated that one of the reasons suburban areas seek the death

RME411403

penalty at higher rates is that unlike small towns, they can afford the financial and human resources necessary for a death case. Prosecutors' decision-making is also factored by the size of their offices and the ability of existing staff to handle capital trials.

The political and cultural makeup of the judicial district was another factor repeatedly cited by many of the death penalty advocates and attorneys interviewed as a primary contributor to the wide variations between localities in sentencing people to death. When the culture of the area is rife with racially charged attitudes or history, serving as both an elected official and agent of justice can be challenging even for prosecutors with noble intentions. Notably, the areas which impose the most death sentences are characterized as having racial tension between communities, and a nearly even racial makeup between African Americans and Caucasians. At its worst, the Mission heard that there was a perception that prosecutors were enabling existing racial tensions within their locales as a measure of control and intimidation.

Prosecutors in Louisiana are elected, and are acutely aware of the risks related to re-election. Still, even when confronted with strong community pressure towards prosecuting certain crimes or defendants harshly, prosecutors have the opportunity to seek a lesser sentence. Abolition advocates and attorneys expressed relief that prosecutors in several districts have significantly decreased their death charges despite this pressure. Of course, the same biases present in the community may be reflected in the actions of the prosecutor, even if there is no purposeful or conscious malintent. Many prosecutors may intend and believe themselves to be fair and unbiased. Commenting on the prosecutors in a capital friendly district, one attorney stated, "I don't believe most of it is due to conscious race based discrimination. It's all under other guises."[274]

However, even when unintentional, the ramifications of racial bias on prosecutions, and ultimately sentencing, are serious. For example, disproportionate charging based on the race of the victim and defendant is the largest independent disparity in the capital process throughout the country, and readily apparent in Louisiana.[275] As a Louisiana death penalty researcher observed, "[o]ne possibility is that prosecutors' offices, jurors, judges, investigating police officers, and others involved in constructing a death penalty case are (consciously or unconsciously) not as outraged or energized, on average, when an African American is murdered as when a white is murdered."[276]

RME411404

# Louisiana Parish Map with County Seat Cities



**http://geology.com/county-map/louisiana.shtml**

RME411405

**2783**
Exhibit 4
Page 320

For example, a statistical analysis comparing all homicides with death prosecutions from 1990-2008 in East Baton Rouge Parish found that cases with Caucasian victims are prosecuted as first-degree (death eligible) at about four times the African-American victim rate.[277] The rate when an African American has allegedly killed a Caucasian (18% prosecuted) is six times higher than when an African American is alleged to have killed another African American (3%).[278] These prosecutions result in death sentences at a 2.6 times higher rate for those who were charged with killing Caucasians, and is significantly higher (2.3 times) regardless of any aggravators.[279] In another locale which has sentenced a significant number of the state's death row inmates, Caddo Parish, where 78% of potential cases were black-on-black, roughly 12% were for white-on-white crimes, and 13.4 % were black-on-white.[280] By the time cases were brought to trial, *13 times* as many black-on-white crimes were tried as death eligible as compared to black-on-black crimes.[281] Looking solely at the race of the victim, crimes against whites were prosecuted as death eligible nine times as often as murders against African Americans.[282] In Louisiana's history, only one Caucasian has ever been executed for a crime against an African-American person— in 1752.[283]

There may also be malicious intent present in the community or the prosecutor's office itself. When asked about one high level prosecutor, a veteran capital defense attorney remarked, "[redacted] is nothing but the Klan." Interviewees spoke of the "common knowledge" of bigots' involvement in Louisiana government, and indeed, a former KKK grand wizard, David Duke, was elected to the Legislature from Jefferson Parish.[284] In one disturbing incident in 2003, prosecutors in Jefferson Parish (then the parish with the most death sentences in Louisiana), wore neckties featuring a dangling noose and the Grim Reaper.[285] The prosecutors were chastised by the district attorney yet faced no other disciplinary action.[286] Although the image of the noose itself may be race-neutral in other contexts, it is important to recall that in Louisiana and throughout the American south, lynching was one of the most prominent features of the lawless era following the Civil wWar and into the turn of the century during which African Americans were grotesquely murdered.[287]

### Caddo Parish

*Caddo Parish, the home of the last capital of the Confederacy and host to a torrid history of lynch mobs and brutalism against African Americans, is now one of the top locales for death sentences in Louisiana. Encompassing both the city of Shreveport, and a number of smaller towns, Caddo is a large and racially mixed jurisdiction.[288] Despite racial parity in terms of population, reports indicate the Ku Klux Klan remains active in the area, and local African-American politicians have been terrorized.[289] Until late 2011, a Confederate flag flew in front of the Caddo courthouse.[290] This flag was erected in 1951, just twenty years after the Parish had been the lynching "capital" of the state and one of the leading lynchers in the entire South.[291] Erection of the flag outside of the courthouse during the rise of the U.S. civil rights movement is seen as white intimidation with*

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 39

RME411406

**2784**
Exhibit 4
Page 321

> lasting implications: *76% of the men who were sentenced to death row while it stood are African American.*[292]
>
> *Today, convictions in Caddo Parish are responsible for nearly 1 out of 5 of Louisiana's death row sentences.*[293] *Caddo prosecutors tried 13 times as many black-on-white crimes as death eligible as compared to black-on-black crimes.*[294]
>
> *In the jury selection for LaMondre Tucker, an 18 year old African American who was one of the last people to face a capital trial under the Confederate flag, African Americans were struck from the jury at disproportionate rates. During the trial, jurors heard characterizations of Mr. Tucker from the prosecution which "leveraged racial stereotypes," such as noting his alleged preference for white women, and portraying him as lazy. During jury selection some white jurors were heard to comment that they wanted to "hang the Defendant from the Confederate memorial outside of the courthouse"*[295] *The jury ordered Mr. Tucker's death after less than 30 minutes of deliberation.*[296]

### 1. Jury selection

The racial selection of jurors is another critical factor for assessing discrimination in the capital process in Louisiana. Although prohibited under federal and state law, interviewees reported ongoing bias in jury selection, with a considerable number of juries containing disproportionately few, if any, minorities. The absence of African Americans on juries violates their right to participate fully in their government, and affects the fairness of a jury's decision, even absent discriminatory intent. As noted in a 2006 study, "racially diverse groups may be more thorough and competent than homogeneous ones."[297] Jury "bleaching" or the removal of non-white potential jurors, has a dramatic effect in some counties. For example, 80% of criminal trials in Jefferson Parish have been found to have no effective African-American representation.[298]

Louisiana's jury selection process contributes to the disproportionate removal of African-American potential jurors. First, African-American jurors are weeded out in the creation of the jury pool itself. Indeed, the federal government has sued Louisiana for failure to meet voter registration requirements in low income communities.[299] After production of a jury pool, defense and prosecution attorneys conduct *voir dire*—questioning of the potential jurors. Following the questioning, the attorneys and judge may remove jury pool (known as the "venire") members for "cause," as defined by Louisiana statute.[300]

*"The attorney told us 'he will get an all white jury, and they will convict him to death,' like it wasn't even a question"*

– Monique Matthews Ruiz, sister exoneree Ryan Matthews

RME411407

Jury "bleaching" often occurs under the guise of "death qualifying," the jury. For example, the prosecution can "challenge for cause those prospective jurors who state that their reservations about capital punishment would prevent them from making an impartial decision as to the defendant's guilt," or who would never impose the penalty.[301]  Interviewees noted that African Americans in Louisiana are more likely to express concern with the criminal justice system or the death penalty as a result of their negative interactions with the system and Louisiana's violent racial history.  As a result, they are more frequently struck for cause.[302]  Although the U.S. Supreme Court has found that a defendant's rights were violated as a result of the prosecutor striking all jurors who expressed mere *concern* about the imposition of a death penalty, in practice, prosecutors often use such strikes in order to remove as many sympathetic jurors as possible.[303]

A study of Louisiana's Caddo Parish sheds light on the attitudes of jurors dismissed during "death qualification".  When interviewed about the impact of racial bias on their participation in the jury, potential jurors who had been removed from the jury pool during "death qualification" noted the presence of the Confederate flag outside of the courthouse.[304]  Others underlined how personal experiences shaped their view on the death penalty and how they could not extricate perceptions of injustice from questions around sentencing overall:

> Like many African-Americans I know and have spoken to, I feel that African-American people have never known justice. Slavery and segregation are a testament to this. For this reason we cannot consider the death penalty as a real option in a capital case. Our sense that the death penalty is wrong also stems from the fact that it is unbalanced in its application against other African-Americans. [305]

Another person shared how they were personally marked by injustice and its impact on their perception of the death sentence:

> Once you have been misperceived you are aware of misperception and its consequences for people's lives. In my experience, this reality lends itself to a negative view of the death penalty.[306]

Following the removal of jurors for cause, attorneys may use "peremptory challenges" to strike remaining potential jurors.  Attorneys do not need to provide any reason for their peremptory challenges, and in a capital trial, each side may strike 12 potential jurors without cause.  Examples of reasons given by Louisiana prosecutors for removing African Americans found acceptable by the trial court include: the juror was "too stupid to live much less be on a jury;"[307] a venireman "looked like a drug dealer;"[308] or the juror was a "single black male with no children."[309]  Although the U.S. Constitution forbids racially discriminatory use of peremptory challenges, in practice, prosecutors wary of the perceived impact of African American jurors can and do use preemptory challenges to strike them.  As noted in a concurrence by Thurgood Marshall, one of only two African Americans to ever serve on the U.S. Supreme Court,  in *Batson v. Kentucky*, "[a]ny prosecutor can easily assert facially neutral reasons for striking a juror, and trial courts are ill equipped to second-guess those reasons."[310]

RME411408

Case 2:05-cv-04182-SRD-JCW   Document 109-7   Filed 06/09/06   Page 9 of 67
Case 2:09-cv-02158-CJB   Document 128-7   Filed 09/26/14   Page 124 of 182   Page ID
#:4561

When jury members are stricken, a defense attorney has the option to raise a "*Batson* challenge" presenting evidence that leads to at least an inference of discriminatory purpose in the strike.[311]  In response, a prosecutor must provide a race-neutral reason for their action to strike the juror, which does not need to be "persuasive, or even plausible."[312]  In assessing those assertions, trial courts are instructed to evaluate "all relevant circumstances" to determine whether the strikes were discriminatory.[313]  Despite the high level of deference to prosecutors' assertions, as described below, in *Snyder v. Louisiana*, the Supreme Court recently found that a Louisiana prosecutor discriminated when striking an African-American college student from the jury.[314]  The prosecutor, who had struck all five of the African-American jurors who survived challenges for cause,[315] claimed that the student "looked very nervous."[316]

## 2. Oversight and Accountability

The mission also found that prosecutorial discretion was not sufficiently regulated through post-trial oversight of Louisiana death penalty cases.  Moreover, the Louisiana Supreme court rarely overturns cases due to racial disparities.  The Supreme Court's mandatory "proportionality review," implemented after *Gregg v. Georgia*,[317] seeks to determine first, whether there was an undue influence of "passion, prejudice, or any other arbitrary factors," second, whether the finding of aggravating factors was supported by evidence, and third, whether the sentence was proportionate to the sentence in other similar cases.[318]

This process is woefully inadequate. [319]  Most notable of the shortcomings is that the review is only in comparison to other *death* sentences arising in the same locale..[320].  Second, by limiting the review to cases within the same court, trends in prosecutorial discretion (or even misconduct) go unchecked, as long as they are in keeping with recent practice.  This narrow review effectively blinds the supreme court from seeing discriminatory patterns of charging, and fails to provide a means for the court to determine whether the sentences imposed are for the "worst of the worst" or simply the result of a flawed legal system.  Indeed, the Louisiana Supreme Court has only reversed one death penalty case in the last quarter century.[321]  Moreover, it was not until 2005 that the court, which oversees disciplinary actions against prosecutors, imposed its first professional sanction.  Only three prosecutors have ever been disciplined, a surprising number in a state with a high number of exonerations including nine from death row.[322]

In *Snyder v. Louisiana* in, the U.S. Supreme Court ruled on a case from Louisiana's Jefferson Parish regarding a prosecutor's use of a preemptory strike against an African-American college student.[323]  Notably, the case reached the Supreme Court twice; first the Court vacated the judgment without comment in light of its decision in *Miller-El v. Dretke*,[324] then, after the Louisiana Supreme Court upheld the conviction again, the case returned to the U.S. Supreme Court where it was overturned because the prosecutor's removal of the sole remaining African American juror was found to be racially biased.[325]  Although the defendant eventually got relief from the U.S. Supreme Court, the Louisiana Supreme Court's proportionality review of the case is nevertheless notable.  In its first review of *Snyder,* the court's analysis on "passion, prejudice, and other arbitrary factors" was

RME411409

only two sentences long.[326]  On its second attempt, the court found that statements made to the jury analogizing the case with the recently decided O.J. Simpson case were "...no more compelling than other race neutral inferences to be drawn..." and that "[n]either remark referred to Simpson's or [the defendant] Snyder's race."[327] This blindness to the racial context in which death penalty cases are tried, particularly in regard to Jefferson Parish, which had widely reported racial bias and disparity in earlier death cases, is shocking.

## B. Conditions of Confinement on Louisiana's Death Row

All those sentenced to death live in Louisiana State Penitentiary, with the exception of two women on death row housed in an all-female facility.  This former plantation turned hard-labor prison is most commonly referred to as "Angola," after the home country of the enslaved Africans that worked on the original plantation. Angola is infamous for its history of brutality and racism.  Although it is widely reported that conditions in the prison and its death row have become more tolerable under new leadership and with the building of new facilities, conditions remain bad.

"DEATH ROW TIER AT ANGOLA"



For at least twenty-three hours each day, prisoners at Angola's death row are locked in their cells alone, meeting the international standards for what is commonly considered as "solitary confinement."[328] Each cell houses a single prisoner, and is equipped with a bed, desk, toilet, and space for personal effects. Cells are clustered in tiers, with windows on one wall of the tier and cells on the other.  Prisoners have limited communication with prisoners in the adjacent cells through the metal bars at the front of the cell.  There are no windows within the cells, and the prisoners' views out of the windows in the hallway are obstructed.  Prisoners are able to watch shared televisions located outside of their cells.

Interviewees reported that prison officials tend to keep the most severely mentally ill prisoners clustered together.  Being moved to this tier is dreaded, as the prisoners

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 43

RME411410

have been known to loudly express their anguish, throw feces, or disturb fellow prisoners. At times, prisoners who are not mentally disturbed are moved to that tier as a form of punishment. Interviewees shared how it was difficult to concentrate or sleep in such conditions.

Prisoners are allowed one hour each day to exit their cells, and this time rotates, even occurring at times in the pre-dawn hours. During the out-of-cell time allotted, the prisoner may walk within the death row building, or may spend time outside. This outdoor area has been referred to as a "dog kennel," "cages," or "like Guantánamo" because it consists of small area which is completely fenced in. Once outside, the prisoner has no access to recreational activities or equipment. Some prisoners may sleep through their time for the day, or choose as a result of their mental state, not to exit. Interviewees noted some prisoners had not been outside in significant periods of time due to their mental state, and at least one had not been outside in years.

Responding to outcry against the use of solitary confinement for the "Angola 3" political prisoners in conditions similar to prisoners on Angola's death row, the Louisiana Attorney General argued that the conditions did not constitute solitary confinement, stating that the prisoners were kept in cells for 23 hours a day as a protective restriction, and noting that they have televisions, radios, reading and writing materials, can shop at the prison store twice a week, and can leave their cells for an hour a day to shower, place phone calls, and at times go outside.[329] He further noted that the prisoners are allowed to meet with spiritual advisors, medical personnel and social workers as well as visitors.[330] The mission considers that the factors the Attorney General cited are minimal provisions needed to meet international standards for detention. Access to modes of communication and in-cell recreation (such as reading) does not negate the traumatic impact of living 23 hours of every day in a cell, particularly when this continues for months, years, or even decades.[331] According to the Istanbul Statement on the Use and Effects of Solitary Confinement, solitary confinement includes being held in cells for 22-24 hours per day. In this environment, contact with other people may occur, but "[m]eaningful contact…is typically reduced to a minimum."[332] Further, in solitary confinement "[t]he reduction in stimuli is not only quantitative but also qualitative. The available stimuli and the occasional social contacts are seldom freely chosen, are generally monotonous, and are often not empathetic."[333] Conditions at Angola's death row meet this description.

## Tours of Angola Prison

*The prison conducts regular tours of the death row tiers, putting prisoners on display for visitors nearly every day. School or university groups are frequent visitors to death row. Although the number of visitors itself is not public, it is reported that at least a thousand visitors come to Angola prison each month.[334] Prisoners have described the experience of being put on display as humiliating. Although the tour guide has discretion over their narration, prisoners have often heard degrading descriptions given to the tour group, and can hear the participants' degrading comments. Tours include visits to the room*

RME411411

*where executions take place. As the sister of a death row exoneree explained, "A lot of kids looked forward to going to Angola; that was our 6th grade field trip. We were all convinced this was a good thing. Now I see that the tour terrorizes those on the row, and it teaches kids the wrong lessons."[335]*

*The mission concludes that tours of Louisiana's death row violate prisoners' rights to privacy and dignity. This "much sought after tour destination," according to the Louisiana Department of Corrections, serves to humiliate the prisoners on death row.[336] The Louisiana Department of Corrections permitting the regular entry of members of the public, including youth, exposes inmates to disparaging remarks and insults. Putting prisoners on display has been considered a human rights violation, violating ICCPR Articles 7 and 10.[337] Article 45(I) of the Standard Minimum Rules, although not contemplating the public would be allowed into a prison, notes that when prisoners are outside of the prison, "they shall be exposed to public view as little as possible, and proper safeguards shall be adopted to protect them from insult, curiosity and publicity in any form." Angola not only fails to shield the prisoners from public view, but seeks to put prisoners on display in what should be a safe environment, their home. Such action is degrading and must be ceased.*

## 1. Temperature

Housed in a brick building with limited air circulation and without air conditioning, death row prisoners suffer from the effects of sweltering Louisiana summers. As reported in recent litigation challenging these conditions under the Eighth Amendment to the U.S. Constitution and the *Americans with Disabilities Act*, the heat index[338] regularly reached over 111 degrees Fahrenheit/44 degrees Celsius, into the "Danger" and "Extreme Danger" classifications for each day in August.[339] At these temperatures, prisoners "suffer from cramps, rashes, nausea, headaches, dizziness, chest pain, profuse sweating, and sleeplessness as a result of this extreme heat."[340] Underlying health problems are exacerbated and the risk for heat stroke or other complications are high.[341]

Despite these conditions, little is done by the prison to alleviate the suffering caused by the heat. Although official policies require the provision of "fluids and ice, the allowance of additional showers and/or cold, wet towels, and increased ventilation to the area,"[342] these are not regularly supplied. Showers are scalding hot. Prisoners can only access ice during their daily out-of-cell hour, and it is often "unsanitary and infested with insects."[343]

The impact of these extreme temperatures is unhygienic and dehumanizing conditions that persist for weeks or months at a time. As one exoneree notes, "guys will throw water from the toilet onto the floor to cool off. They'll sleep on the floor to stay cool."[344] Many stay on the floor even though it exposes them to fire ant

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 45

RME411412

**2790**
Exhibit 4
Page 327

bites, which are prevalent within the cells. As a form of punishment for perceived misbehavior, prisoners can also be moved to the hotter tiers, where conditions are even more grueling.[345] Notably, the guard station is air conditioned.[346]

## 2. Recreation

Death row inmates at Angola are not allowed to participate in the recreational or rehabilitative programming offered to most prisoners such as work programs, training or educational programming. Not only does this policy deny death row prisoners the rehabilitative benefits of the programs themselves, but the denial of programming ensures the prisoners' confinement to only death row and the cages surrounding it.

Recently, in response to a prisoner's artwork being sold online, Angola instituted a policy which denies prisoners the ability to make art even within their cells. Under this new rule, prisoners are not only denied formal art supplies, but are even forbidden from informal and personal expressions. The policy has sparked paranoia and concern on death row, as, "if they so much as draw a stick figure, they'll get written up."[347] Several attorneys for death row prisoners noted that this is having a profound impact on clients' mental wellbeing with one attorney noting that his client "is deprived of the one thing that gives him hope."[348]

> **Art in Angola Prison**
>
> *Not only does the prohibition of creating art in Angola's death row demoralize inmates and deprive them of its rehabilitative effects, it also violates their right to freedom of expression. In addition to the protections under the First Amendment of the U.S. Constitution, the ICCPR protects the freedom of expression, which includes "freedom to seek, receive and impart information and ideas of all kinds, regardless of frontiers, either orally, in writing or in print, in the form of art, or through any other media of his choice."* [349]

## 3. Contact with family and attorneys

According to attorneys and prisoner advocates interviewed by the mission, family members are able to speak on the telephone with their loved ones on death row during the one hour per day that the prisoner is allowed out of their cell. However, the mission was informed that because the out-of-cell time rotates, on some days prisoners can only make calls placed in the middle of the night.[350] Moreover, interviewees indicated that calls are expensive, and many struggle to afford them.

Angola prison is located in an isolated region of Louisiana, several hours away from the areas which are home to most of the men on death row. It is challenging for many families to afford to make the trip, including taking time off

46 / Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana – FIDH/CCR

RME411413

**2791**
Exhibit 4
Page 328

of work for the travel. As such, attorneys and prisoner advocates note that visits can pose a financial burden and can be difficult for families to arrange. Furthermore, the prison's disciplinary actions, which can result in visitation being taken away, may occur with short notice. The cancellation of visits due to perceived misbehavior is a major source of stress that adds to the difficulty that families face.[351] When meetings do occur, prisoners are allowed a limited number of "contact," family visitations, meaning the inmate is in the same room with his family, with hands un-cuffed and legs shackled. The ability to meet with family and maintain family ties is cited as one of the key factors in keeping prisoners sane in an otherwise isolating environment.

> *"The first time I saw him in those conditions I screamed and hollered like a crazy woman. I just couldn't take it."*
>
> – Monique Matthews Ruiz, sister of exoneree Ryan Matthews

Prisoners are only allowed non-contact visitation with attorneys. As one attorney for prisoners on death row explained, when discussing his clients' isolated conditions: "It's worse than typical prison because of the mental anguish and torture conditions. You're waiting for someone to kill you, while you're stripped of even the most basic humanity of simply shaking someone's hand."[352] The visits are conducted through a glass pane using a phone to talk. One attorney noted that the glass, although clear enough for typical conversations, impedes the ability to observe the small mannerisms which can indicate mental distress.[353] Phone calls are recorded, including attorney calls. The mission was informed that it is possible to request non-recorded calls for attorneys once a week, however, attorneys interviewed expressed their mistrust regarding the security of these calls and noted that arranging them in advance can be onerous.

### 4. Medical Care

Prisoners at Angola's death row have regular access to doctors for basic needs, but the quality of care for more serious or chronic health needs is lacking. Reports from mid-2012 indicate that many doctors working in Louisiana's state prisons have been disciplined by the licensing board for serious infractions or even criminal convictions. A local newspaper explained that the prisons, including Angola, "appear to be dumping grounds for doctors who are unable to find employment elsewhere because of their checkered pasts, raising troubling moral questions as well as the specter of an accident waiting to happen."[354] In fact, Louisiana licensing standards include specific provisions that restrict medical practice to institutions or prisons, thereby implying a lesser standard of care for those at risk. The Assistant Medical Director of Angola has such a restriction on his license, reportedly as a result of a conviction on drug charges.[355]

The hospital at Angola is also notoriously unhygienic. The mission was informed that ventilation ducts are covered in mold and as a result air circulation is limited. Visitors to the hospital have noted that at least a portion of the facility has an ongoing problem with flies, with fly traps hanging from the ceiling directly over bedridden patients. Interviewees report that medication is not always available.[356]

Prisoners sentenced to death have been kept isolated even while seeking

RME411414

care in the hospital. Doctors cannot order a prisoner/patient removed from solitary, regardless of how it is affecting their physical or mental health. In 1992, the Louisiana Supreme Court found that Michael Perry, a mentally ill prisoner who had been institutionalized prior to his conviction in 1983, could not be forcibly medicated in order to ensure his mental competency to be executed. [357] Despite the court's finding that "his underlying insanity can never be permanently cured or quelled"[358] Perry has been deteriorating in solitary confinement for decades rather than receiving specialized care.

There is no mental health hospital for those found to be incompetent for execution, nor for those whom solitary confinement is further damaging to their mental state. Inmates speak with counselors through the bars of their cells, where there is little possibility to build intimacy and there is no privacy from guards or nearby inmates. Intensive, one-on-one treatment with a psychotherapist is not provided. For many prisoners, the only relief is through medication.

The need for intensive mental health services is desperate, considering the impact of prolonged solitary confinement on the sanity of the prisoners. The majority of current death row prisoners have spent at least a decade on death row. The longest period a current prisoner has been on death row is 28 years.[359] Among attorneys and advocates interviewed, there was a widely held belief that all those on death row have serious mental health issues. Even those who suffered from few, if any, problems at the beginning of their sentence are now struggling to maintain their sanity.

> **"[T]he sanest people go nuts in this environment."**
>
> – Veteran capital defense attorney, Louisiana

Mental anguish faced by prisoners is further exacerbated by the appeals process itself. Prisoners are often given execution dates at each stage in the post-trial process. To go from a trial to final appeal has been described as a roller coaster, with hope and despair, which for many inmates and their families includes the terrifying anguish of anticipating the inmate's execution.

> *John Thompson had been convicted of murder in 1985.[360] In the fourteen years he spent on death row, Thompson was given six dates for his execution, all procedurally stayed so that he could continue appeals. With each new writ of execution, the pressure on Mr. Thompson became "more crushing" and forced him to think about his life as "a constant countdown to lethal injection."[361] After his defense team exhausted all formal avenues of appeal, he was given his seventh date, which he knew would be his last. Mr. Thompson prepared to die. He sought to tell his youngest son about his scheduled death, which would occur the day before the boy's high school graduation, but his son's teacher unknowingly informed him first, announcing the upcoming execution to his class.[362] Just weeks before his scheduled execution, a private investigator on John's case discovered scientific evidence of his innocence which had been hidden by the prosecutor's office. His life was spared and Thompson returned home. In addition to evidencing the struggles of those on death row, Thompson's case is a prime example of the lack of redress for victims of due process violations and torture and cruel, inhuman, and degrading treatment. Upon release from prison, Thompson was given $10 and a bus ticket. Although a jury later awarded Thompson $14 million in damages, the Supreme Court reversed this award due to immunity protections the U.S. provides prosecutors.[363] Mr. Thompson is now organizing other exonerees in his community and across the nation to seek better prosecutorial oversight and options for redress. [364]*

RME411415

According to a former inmate and other interviewees, many prisoners enter death row in a stable mental state, but their mental health may deteriorate over time.

> The mental breakdown follows a pattern, with the first sign being they get paranoid, even of their allies and friends. They want to whisper, to keep quiet. They start to hear things. All friendliness is gone. They often remove their lawyers from the visitors list, even though they're the ones doing the most help to keep them alive and keep them sane.[365]

Attorneys working with inmates on death row indicated that a large portion of their work consists of supporting their client's mental stability, and that several clients have considered volunteering for early execution due to the unbearable nature of their conditions.

## 5. Current Challenge to Means of Execution

Two inmates currently on Louisiana's death row challenged Louisiana's refusal to disclose its execution protocol in federal court. The protocol, released in 2013 as a result of the lawsuit, involved a change from a controversial three drug cocktail to the sole use of pentobarbital.[366] This switch occurred as a result of international pressure cutting of sources of sodium thiopental, which was formerly used by Louisiana.[367]

An attorney representing prisoners in this federal challenge said, "we still do not know whether any medical authorities were consulted regarding the incorporation of (pentobarbital); the original source or expiration date of the new drug; how the drug is to be administered; or the training of personnel who will implement the new procedure for the first time,"[368] The imminent execution of one of the inmates, Christopher Sepulvado, had been stayed pending resolution of the case seeking the release of the protocol and in particular information on the drug's use, storage, and expiration.[369]



Cemetery at Angola Prison http://en.wikipedia.org/wiki/File:PointLookoutILSP.jpg

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 49

RME411416

**2794**
Exhibit 4
Page 331

# VII. Mission Findings

## A. Discrimination

The mission finds that California and Louisiana's practices in charging and trying defendants with capital offences, and sentencing defendants to death is discriminatory. The HRC determined that "[i]n capital punishment cases, the obligation of States parties to observe rigorously all the guarantees for a fair trial set out in article 14 of the Covenant admits of no exception."[370] The standard of review for the trial process in death penalty cases is strict and a "heightened level of scrutiny" is required in reviewing death penalty convictions, given the grave consequences of an imperfect conviction.[371] The capital trial process in California and Louisiana cannot withstand such scrutiny; discriminatory actions and effects in both states are obvious and unacceptable. Discrimination in jury selection compounds the initial harm arising from charging decisions and a failure to remedy these harms through judicial review further compounds the violation. The failure to ensure equal application of laws and policies, and provide racial and ethnic groups with proceedings that respect their right to a fair trial contravenes the international prohibition against discrimination.

Two indicators of racial discrimination are the number and proportion of minorities in prison, and the handing down of harsher sentences to those groups.[372] Both indicators are present in California and Louisiana. The justice systems in the mission states, tainted by racial bias from the charging onward, have produced death rows on which minorities are disproportionately represented; this is particularly true with regards to African Americans. In California, the ratio of African Americans on death row is nearly six times their percentage in the population at large, and in Louisiana, the percentage of African Americans is double their representation in the population. It is widely reported that the proportion of persons sentenced to death who are minorities does not correlate with the rates of all death eligible murders. As set forth above, the disparities are even more stark in cases where the victim is white. Indeed, as the CERD Committee found, "there is a disturbing correlation between race, both of the victim and the defendant, and the imposition of the death penalty."[373] The disproportionate use of the death penalty against African Americans is evidence of a legal regime which has the effect of "nullifying or impairing the…enjoyment or exercise, on an equal footing, of human rights and fundamental freedoms"[374] including the basic right to life.

Statistics are regularly found to be reliable evidence in cases addressing discrimination, and are particularly helpful in understanding widespread and systemic discrimination.[375] Treaty bodies and regional human rights courts have found discriminatory effects constitute a violation of the principle of equality and non-discrimination based on statistical evidence, including when discriminatory intent has not been established.[376] Regional human rights courts have held that once a victim establishes the state has created or perpetuated a difference in treatment

50 / Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana – FIDH/CCR

RME411417

**2795**
Exhibit 4
Page 332

tending to show discrimination, the government bears the burden of proving the difference is "the result of objective factors unrelated to any discrimination…"[377] The mission does not find any objective explanation for the disproportionate number of minorities charged and tried with capital offenses and sentence to death in California and Louisiana.

### 1. Charging Patterns and Practices

Reports indicate that the discretion granted to elected prosecutors in California and Louisiana and California contributes to inconsistent and biased use of the death penalty. Some of the clearest indicators of racial disparity – and discrimination – in the death penalty context arise in the prosecutor's choice to charge those who kill whites, and minorities who kill whites in particular, with crimes punishable by death at significantly higher rates. In the mission states, this trend in racially biased charging exposes Hispanics and African Americans charged with killing white victims to the risk of death at rates up to 13 times greater than the rate of those with African-American and Hispanic victims. This charging process strongly suggests prosecutors are biased, consciously or unconsciously, against minorities.

*Capital eligible offenses: California and Louisiana have regularly increased the number of death eligible factors in their death penalty statutes. Continually adding more death eligible offenses further broadens the ability of a prosecutor to seek death for homicide suspects and violates international standards against the practice. The American Convention on Human Rights, Article 4(2) notes that the death penalty "shall not be extended to crimes to which it does not presently apply." Upon its last review of the U.S., the Human Rights Committee expressed its concern with the continued expansion of the death penalty to additional offenses.*

### 2. Jury Selection

Denial of the ability to participate in juries strips African Americans of the right provided for in the ICCPR to "take part in the conduct of public affairs" and "to have access, on general terms of equality, to public service in his country."[378] The statistics clearly demonstrate that the process of jury selection in the mission states produces a discriminatory effect. It ensures that the voices of African Americans are absent, or minimized, in one of the most important functions of government, in such a way as to impact verdicts.

A comparative example from the European Court of Human Rights is instructive. The court considered the issue of discriminatory jury selection in the context of the Maltese judicial system, in which statistical evidence established a disproportionately low number of women on juries. As in the mission states, there were no explicitly discriminatory laws related to jury selection. However discrimination was a part of "a well-established practice, characterized by a number of factors, such as the manner in which the lists of jurors were compiled and the criteria for exemption from jury service."[379] The court considered these claims, recalling that discrimination is not only evidenced by laws themselves, but can also arise from a "de facto situation."[380] The Court rejected the government's justification, which included claims that dismissals from jury service were often based on work and family obligations, and that "for cultural reasons" there was a

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 51

RME411418

**2796**
Exhibit 4
Page 333

tendency for the defense to challenge female jurors.[381]  Similarly, in the mission states, there is no reliable explanation that could justify the consistent overuse of strikes against African-American potential jurors.

Finally, the removal of African Americans from the jury furthers the belief by a significant part of the public that the courts are not impartial.  Such an undermining of public confidence in the judiciary can "adversely affect the fairness of the procedure."[382]  The Inter-American Commission has found that the standard on this issue of impartiality is an objective one based on "reasonableness, and the appearance of impartiality"[383] and that a court must consider whether there "is a real danger of bias affecting the mind" of the jurors.[384]  Aside from any conscious bias, diverse groups have been found to exhibit better decision making; deliberating longer, discussing a wider range of facts and perspectives, and making fewer errors and more corrections.[385]  The mission heard repeatedly that removal of African Americans does create the appearance of a partial tribunal – a view also shared by academics and advocates alike.[386]  This is particularly true in Louisiana where there is the perception that prosecutors seek an all-white jury for the specific purpose of sentencing a defendant to death.  Although the presence of an all-white jury has not been considered proof in itself of discrimination, courts reviewing the issue in the capital context have considered the racial makeup of juries in their findings.[387]

### 3.  Checks on the process

*Both trial level judges and prosecutors are elected in California and Louisiana, leading to further concerns over impartiality.  The HRC has repeatedly concluded that political influence on judges is an unacceptable affront to the independence of the tribunal. The Human Rights Committee's General Comment No. 32 provides that "States should take specific measures guaranteeing the independence of the judiciary, protecting judges from any form of political influence in their decision-making through the constitution or adoption of laws establishing clear procedures and objective criteria for the appointment, remuneration, tenure, promotion, suspension and dismissal of the members of the judiciary and disciplinary sanctions taken against them."[389]*

Article 14, paragraph 5 of the ICCPR establishes the right to have one's conviction and sentence reviewed by a higher court.  Review of lower court rulings must be undertaken in as timely a manner as practicable; and the delays experienced in California and Louisiana are unacceptable.  Critically, such a review must be substantive and must address both fact and law.[388]  The high number of exonerations and commutations from death row at the federal level in both California and Louisiana suggest that serious systemic problems at the trial level are contributing to unjust convictions which may not be remedied for decades.  These include lack of adequately trained and qualified defense attorneys, lack of resources for thorough investigations, and racial bias..  Local courts, for example, fail to remedy the non-invidious evidence of discrimination, such as the intimidation presented by flying a Confederate flag at the courthouse or the numerous instances of racially biased public statements by prosecutors.

RME411419

## B. Torture and Cruel, Inhuman or Degrading Treatment

"A prolonged stay on death row, along with the accompanying conditions, constitutes a violation of the prohibition of torture itself,"[390] according to the Special Rapporteur on Torture. Prolonged isolation with the limited social and intellectual stimulation described herein, combined with the constant confrontation with "the lengthy and anxiety-ridden wait for uncertain outcomes," result in "mental trauma and physical deterioration" frequently referred to as "death row phenomenon."[391] Over two decades ago, the European Court of Human Rights identified "death row phenomenon."[392] It found that the conditions on death row a young prisoner would face if extradited to the U.S. state of Virginia would violate the European Charter's prohibition against cruel, inhuman or degrading treatment, and therefore refused the extradition request.[393] Shortly after, the Privy Council of the British House of Lords found that a delay of more than five years on death row in itself would provide strong ground for a claim of inhuman or degrading punishment.[394] Just less than a decade later, the Inter-American Commission found that a prisoner's suffering from death row phenomenon was cruel, inhuman or degrading treatment.[395] Thus, there is consensus at the international level that death row phenomenon constitutes, at minimum, cruel, inhumane, or degrading treatment, and could also constitute torture.[396]

Death row phenomenon for prisoners in California and Louisiana results as a combination of indefinite solitary confinement and isolation, inhumane prison conditions, and a lengthy and uncertain wait for execution. In California, the anxiety and horror of waiting for an execution date is exacerbated by the length of time prisoners spend on death row – in some cases for 20 or 30 years – in a constant state of uncertainty. Louisiana death row prisoners have expressed the terror at seeing their fellow inmates leave for execution, especially when uncertain of whether their own death may be a year or a decade away. In both states, lengthy waits in isolated and difficult conditions, while receiving multiple execution dates, contribute to severe suffering characteristic of the death row phenomenon.

The use of solitary confinement and the violations of international prison conditions standards described herein, particularly when assessed in light of the vulnerability of death row prisoners and the decades spent in these conditions, readily give rise to a finding of cruel, inhumane and degrading treatment. The mission finds that, particularly in cases involving prolonged or indefinite periods of solitary confinement, the conditions for many prisoners on death row further gives rise to credible claims of torture.

The mission further finds that the conditions of confinement for death row prisoners are widely considered a part of the inmate's punishment, imposed on prisoners as a result of

First-hand account of John Thompson, exoneree who spent over a decade on Louisiana's death row:

"*One summer they executed eight men. They executed one on August 29, while I was in jail, because I hadn't been transferred even a year after conviction...I saw it on the news. Then, on September 1st I was called up. I was being moved to death row, but no lawyer had ever explained what the process was. I had no idea, thought I was being called up to die. All I could think is "I'm dying today." Instead, I was brought to Angola. I walked on the grounds the first time and it looked and felt like a concentration camp*."

RME411420

**2798**
Exhibit 4
Page 335

their status as condemned.  In fact, the attorney defending Louisiana's extreme heat conditions has stated, "[t]hey've been subject to their treatment because of their statuses as death row inmates…it's the price offenders pay for their crimes against humanity."[397]  Particularly when viewed in combination, the totality of the death row prisoner's mental and physical pain and suffering described below is undoubtedly severe.

## 1. Solitary Confinement

Solitary confinement constitutes the most striking threat to human dignity of death row prisoners in the mission states and contributes significantly to the degradation of their mental and physical well-being.[398]  As concluded by the Special Rapporteur on Torture,

> Considering the severe mental pain or suffering solitary confinement may cause when used as a punishment, during pretrial detention, indefinitely or for a prolonged period, for juveniles or persons with mental disabilities, it can amount to torture or cruel, inhuman or degrading treatment or punishment.[399]

The Special Rapporteur has concluded that "solitary confinement used on death row is by definition prolonged and indefinite and thus constitutes cruel, inhuman or degrading treatment or punishment or even torture."[400]  The vulnerability and lack of oversight inherent in the use of solitary in the mission states' death rows runs contrary to international standards calling for the regulation and oversight in the use of solitary.  As the Principles and Best Practices provide most succinctly, solitary confinement should be allowed only:

> as a disposition of last resort and for a strictly limited time, when it is evident that it is necessary to ensure legitimate interests relating to the institution's internal security, and to protect fundamental rights, such as the right to life and integrity of persons deprived of liberty or the personnel.  In all cases, the disposition of solitary confinement shall be authorized by the competent authority a shall be subject to judicial control, since its prolonged, inappropriate or unnecessary use would amount to acts of torture, or cruel, inhuman, or degrading treatment or punishment.[401]

The solitary confinement regime practiced in the mission states relegates inmate's sanity to the control of prison administrators, until they grant release —or the inmate is executed.  This is contrary to the Inter-American Commission's requirement that "[u]nder no circumstances may the solitary confinement of an individual be left exclusively in the hands of the authorities in charge of the centers of deprivation of liberty without proper judicial oversight."[402]  This classification-based solitary and its lack of oversight are particularly detrimental to those facing serious mental health challenges.  The Special Rapporteur has stated that "[w]here the damaging effects of solitary confinement on a particular individual are known, the regime cannot continue."[403]  In keeping with this principle, regional bodies have required or suggested prisons conduct regular assessments of those committed to solitary for their ability to withstand such treatment.[404]  However, the mission

RME411421

states continue to confine a large number of prisoners whose mental deterioration is closely linked to their isolated status, and, in one case in Louisiana, continues to isolate at least one prisoner who has been found so mentally incompetent that he cannot be executed.

The use of solitary confinement in California and Louisiana, like solitary in prisons across the United States, is also damaging as a result of its *prolonged* nature. As the Special Rapporteur on Torture observed, "the longer the duration of solitary confinement or the greater the uncertainty regarding the length of time, the greater the risk of serious and irreparable harm to the inmate that may constitute cruel, inhuman or degrading treatment or punishment or even torture."[405] The Special Rapporteur has called for "an absolute prohibition" on confinement lasting over 15 days; any longer is considered prolonged and may be "torture or cruel, inhuman or degrading treatment or punishment, depending on the circumstances."[406] The European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment recommends that states use solitary confinement as a punishment for no more than 14 days, and "preferably lower."[407] Prior to the Special Rapporteur's recommendation, the European Court determined that a detention in solitary confinement for three years was a violation of the prohibition against torture and cruel, inhuman or degrading treatment.[408] The decades spent in solitary confinement in the mission states well exceeds these time periods.

In addition to the physical isolation of inmates in their cells, the mission states implement further practices which serve to isolate prisoners from social contact, contrary to the requirements of international law.[409] Louisiana's ad hoc control of visitation rights by prison officials, and its practice of allowing phone calls only during one pre-assigned hour a day, and California's policy of denying all communication by phone and all contact visits for Grade B inmates place unacceptable burdens on the ability for inmates to communicate with their loved ones. These practices may be contrary to the HRC's finding that under provision of Article 10(1) of the ICCPR "prisoners should be allowed under necessary supervision to communicate with their family and reputable friends at regular intervals, by correspondence as well as by receiving visits."[410] Additionally, the failure of Louisiana to provide for ample and unmonitored communication with attorneys is a detriment to their legal representation.[411]

The Inter-American Court has found the prohibition against cruel, inhuman or degrading treatment violated where prisoners were held in unacceptable conditions and prisoners were characterized as "suffering lack of communication or restrictions to visits"[412] and recommended the transfer of prisoners to penitentiary centers close to their families.[413] In addition to the suffering separation caused the prisoners, the Inter-American Court found that the inmates' *families* endured "great pain and suffering and have been constantly worried as a consequence of the degrading and inhuman detention conditions suffered by the alleged victim, the isolation to which he was subject, the distance and inaccessibility of the different penitentiaries to which he was transferred. All of the above constituted a violation of the mental and moral integrity of the alleged victim's next of kin."[414] The testimony provided to the mission from prisoners' family members, who described their continuous and prolonged anguish regarding the conditions of confinement and sentence of their love ones, describes facts similar to those the court found impermissible.

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 55

RME411422

**2800**
Exhibit 4
Page 337

The mission finds that indefinite and prolonged solitary confinement and social isolation in the mission states results in severe mental suffering. Prisoners, former prisoners, and their attorneys have attested to the gradual decline in mental health that the prison regimes create. Although difficult and unnecessary to distinguish the harms caused by each aspect of prison conditions, solitary confinement has repeatedly been referred to as a major source of the inmates' suffering.

## 2. General conditions of confinement

For death row prisoners in the mission states, who are imprisoned in their cells for extended periods of time, the unsatisfactory conditions of confinement significantly add to the suffering. Conditions of confinement in Louisiana and California do not meet international standards. The mission is concerned with the widespread perspective that inmates on death row are owed a lesser standard of treatment as a result of their sentence.

General cell conditions in Louisiana fail to meet international standards. For example, the death row at Angola prison has insufficient windows; there are no windows within the cells, and the windows in the building are shuttered, providing only minimal ventilation and light. This contravenes the Standard Minimum Rules requiring windows "large enough to enable the prisoners to read or work by natural light, and shall be so constructed that they can allow the entrance of fresh air whether or not there is artificial ventilation."[415] Further, the presence of biting fire ants violates the Standard Minimum Rules on proper maintenance.[416] Finally, the general cell conditions are often unsanitary.

Access and facilities for recreation, particularly critical for those inmates in solitary confinement, is noticeably lacking in both mission states. Not only do the Standard Minimum Rules require access to the outdoors *daily*, but also provides that "[y]oung prisoners, and others of suitable age and physique, shall receive physical and recreational training during the period of exercise. To this end space, installations, and equipment should be provided."[417] In contrast, prisoners in mission states are not given equipment necessary to ensure their recreational time is useful for the maintenance of their physical wellbeing; prisoners in California do not receive daily outdoor recreation time and may sometimes be denied recreation time for weeks; and prisoners in Louisiana are not allowed to participate in group recreation.

Finally, the mission observes that the amount of discretion given to guards for imposing disciplinary measures leads to abuse and punishment that is overly harsh and arbitrary. For example, prison staff at San Quentin are allowed to send prisoners to solitary confinement inside the Adjustment Center for months at a time for infractions as minor as possessing more than $5, and may impose solitary indefinitely on any prisoner found to be "disruptive to the normal operating procedures of the institution."[418] Additionally, the mission expresses concern about the use of informal disciplinary measures in Louisiana, such as forcing inmates to move cells for perceived misbehavior and recalls that due process applies to all disciplinary action.[419] Such a practice can be disturbing or even destabilizing for prisoners already under extreme mental stress.

RME411423

> ## Heat in Angola prison
>
> *One of the most disturbing prison conditions reported to the mission was the use of extreme heat in Angola prison. This heat, which regularly exceeds a heat index of 110 degrees F (44 C), creates unsafe and painful conditions for those on death row, who are locked in their sweltering cells for at least 23 hours each day with no respite. The Principles and Best Practices on the Protection of Persons Deprive of Liberty in the Americas specify, in addition to the general norm of humane treatment, that prisons shall have "appropriate ventilation and heating, according to the climatic conditions..."[420] Both the Principles and Best Practices and the Standard Minimum Rules specifically note the requirement that bathing needs be met in a fashion appropriate for the climate.[421] The European Court has found treatment was inhuman where inmates are exposed to extreme temperatures,[422] and other courts have noted conditions of extreme temperature in their findings of torture or other cruel, inhuman or degrading treatment.[423]*

### 3. Provision of medical care

The provision of medical care, including mental health care, constitutes part of the State's obligation to provide humane treatment,[424] and should be of the best available quality regardless of the inmates' status as prisoners.[425] Although the mission is not in a position to address the specific health needs of individual prisoners, reports raised concerns that the quality of medical and mental health care for chronic and complex problems is insufficient. In California, the policy of not transferring prisoners who are severely mentally ill to appropriate care facilities do not conform with international standards, which require the transfer of prisoners who require specialist treatment "to specialized institutions or civil hospitals."[426] The mission is particularly disturbed by reports from Louisiana that indicate medical licensing boards knowingly relegate certain practitioners to Angola prison as a result of their violation of the professional code, or even criminal law. Although this is not *per se* a violation of the prisoners' human rights, it tends to evidence a lesser standard of care for those in detention. Notably, this practice is contrary to Principle XX of the Principles and Best Practices which states "the personnel shall be carefully selected, taking into account their ethical and moral integrity…."[427]

Further, the availability of mental health care for disturbed prisoners is of particular concern. International provisions call for the insane to be detained in separate accommodations.[428] The European Court for Human Rights has found that subjecting a mentally ill person to isolation "is not compatible with the standard of treatment required in respect of a mentally ill person."[429] Special provisions must be made to accommodate those suffering from severe mental distress. Regardless of where these prisoners are housed, mental health treatment should be provided by well qualified practitioners, and undertaken confidentially.

The mission further finds that California may be unacceptably contributing to suicide risk within its death row. Suicide is an "ever-present reality" resulting

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 57

RME411424

**2802**
Exhibit 4
Page 339

from the simple act of "confining someone in a closed environment from which they are unable to leave at their own will" and states must take appropriate actions to alleviate the risk of prisoners harming themselves.[430] The Inter-American Commission has specifically noted several stressors influencing the decision to commit suicide which are particularly present in California, including physical or sexual assault, "reiterated and unjustified procedural delays," and "particularly trying or degrading conditions of detention, such as intolerable overcrowding or solitary confinement with significantly long periods of confinement."[431] The

<div style="float:left; width:45%;">

**Medical and Mental Health Visits at San Quentin**

*On California's death row, correctional officers remain in the room during medical visits and frequently do not keep communications between patients and doctors confidential. In addition, San Quentin's practice of requiring strip-searches before a medical or mental health visit for prisoners held in the Adjustment Center may deter prisoners from accessing medical services due to the humiliation involved. The Inter-American Commission has urged that "[p]risoners must be able to consult medical professionals confidentially…"[434]*

</div>

Inter-American Commission has found that the maintenance of inhuman conditions, coupled with inadequate medical care and not reacting properly to suicide threats constituted a "series of omissions that caused [the victim's] health to deteriorate and ultimately caused his death."[432] Although the mission has not evaluated the 22 specific incidences of suicide in California's death row, the testimony it received leads it to conclude that the poor conditions, lack of health care, and lack of monitoring are similar to those which have been found to contribute to an inmate's suicide risk. Although, the Inter-American Commission has found that in addition to the multitude of stressors already inherent in detention "the incarceration of an individual in isolation conditions that do not meet the applicable international standards constitutes a risk factor for suicide."[433]



US Washington – June 29 2009, Abolitionist Action Committee protests in front of the US Supreme Court, @ CHIP SOMODEVILLA / GETTY IMAGES NORTH AMERICA / AFP

RME411425

# VIII. Conclusion

The death penalty, as implemented in California and Louisiana, violates not only the right to life but also other fundamental human rights, including those of non-discrimination, due process, and freedom from torture or cruel, inhuman, or degrading treatment. The violations of these core human rights obligations overlap and intersect, and are present at every stage in the capital process, from the charging of a death eligible crime, to the actual commission of the execution.

In assessing potential remedies to the problematic use of the death penalty in these states, the mission is faced with a paradox. To ensure capital trials are impartial and absent discrimination, not only must radical changes be implemented at the outset of the trial process, but the post-conviction appeals process must be, impartial, undertaken by fully-funded and well qualified counsel, and thorough. To reach these goals, states would need to substantially increase the time and resources available to the already lengthy, costly post-trial process — while continuing to imprison the condemned on death row for significant periods of time. Therefore, in order to address the problem of racial discrimination, states would have to maintain the inherently cruel system of a lengthy and uncertain wait for death. [435]

The mission considers that it is impossible to honor both the right to a fair trial and the right to be free from torture or cruel, inhuman or degrading treatment; abandoning either, however, would be contrary to human rights obligations. The duty to ensure due process in a death case is absolute, while the duty of states to not torture is one of the core tenets of a modern society. Both obligations are protected by law. The mission can conceive of no permissible balance that can be struck between these foundational tenets of human rights, which the United States has promised both its citizens and the international community to uphold.

This paradox underscores once again that the only ethically and legally tenable response to the death penalty is its complete abolition.

The use of the death penalty constitutes an inherent violation of the most fundamental of

all rights, the right to life. No legal or correctional reforms could bring legitimacy to the necessarily inhumane and premeditated taking of a life by the state through its imperfect system. As such, the mission unambiguously and fundamentally opposes any use of the death penalty in the United States, including in California and Louisiana. To continue to use the death penalty, particularly in light of the fair trial and treatment violations, shocks the conscience and violates international law. The mission calls for its immediate abolition.

Nevertheless, we recognize that complete abolition of the death penalty will not occur immediately, despite the multitude of efforts throughout the United States, and internationally, to end it. In the interim, a moratorium on executions must be imposed to protect condemned

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 59

RME411426

prisoners' right to life.  In addition, states must alter trial procedures to ensure that more defendants are not sentenced to death in trials rife with discrimination. Further, reforms to prison conditions must be implemented to ensure that those already under a sentence of death are not suffering torture or other cruel, inhuman, or degrading treatment.

RME411427

# IX. Recommendations

Until the complete abolition of the death penalty in the United States is realized, we recommend the following interim steps must be taken to bring California and Louisiana into compliance with the U.S.'s international treaty obligations, including:

1. **Impose an immediate moratorium on executions and new death sentences**

2. **Expand the domestic prohibition to include discriminatory impact without a particularized showing of intent—in line with international norms**

3. **End the use of solitary confinement and isolation for death row**. Prisoners must have meaningful access to phone calls and regular contact visitation with their families and attorneys. Visitation, phone calls and mail must not be denied arbitrarily

4. **Ensure meaningful, expeditious judicial review of death penalty convictions**

5. **Regulate prosecutorial discretion that makes minorities vulnerable.** Prosecutorial discretion should not be unsupervised and unguided. Steps should be taken to reduce the total discretion exercised by prosecutor by:

   - Reducing rather than expanding the list of death-eligible aggravating factors and narrowing the definition of existing factors

   - Establishing advisory boards to assist prosecutors in capital charging decisions

   - Implementing or strengthening sanctions against prosecutors with high reversal rates, repeated due process violations, or racist statements;

6. **Provide properly funded and well trained counsel.** States must properly fund trial and post-conviction counsel in timely fashion, and ensure full funding for experts and investigators. States must also follow ABA guidelines on the qualification of capital defense counsel

7. **Ensure there are impartial juries that represent the full range of public opinion**

   - Allow for those with even strong doubt about the use of the death penalty to serve on juries

   - Implement reforms to more carefully monitor the use of peremptory challenges against jurors

RME411428

8. **Ensure humane conditions on death row**

- Ensure death row meets international conditions standards outlined by the Standard Minimum Rules

- Reform the PRLA to provide access to justice and restitution for those who have undergone torture orCIDT at the hands of the state

- Require procedural safeguards and due process for any punishment of a prisoner

- Ensure the confidentiality of attorney/client communications

- Maintain a comfortable temperature, ensure access to clean cold water and ice, provide air ventilation

- Ensure prisoners have privacy and dignity by ending tours of death row in Louisiana

9. **Ensure high quality medical and mental health care**

- Ensure medical care is given by properly qualified staff

- Ensure that medical and mental health communications remain confidential between inmates and doctors

- Provide sanitary hospital conditions

- Permit ready access to necessary mediations

- Establish special medical regimes, housing and protections for those condemned prisoners who suffer from mental illness and severe mental illness, including access to therapy in a one-on-one setting

- End practices, such as strip searches and the use of handcuffs during medical exams, that deter or prevent prisoners from utilizing medical and mental health services

10. **Allow access to social and educational outlets**

- Allow death row inmates to participate in rehabilitation, educational and work programming available to the general population

- Allow death row inmates to create art

- Provide access to communal spaces

- Provide daily access to outdoor recreational space with appropriate recreational equipment

- End practices, such as strip searches, that deter or prevent prisoners from utilizing recreational space

RME411429

# X. Appendix: Partial List of Interviewees

## 1. California

- Pat Aties, member, Campaign to End the Death Penalty
- Joseph Baxter, Attorney for Jarvis Masters, Law Offices of Joseph Baxter
- Sarah Chester, Staff Attorney, California Appellate Project
- Kevin Cooper, death row prisoner since 1985
- Steve Fama, Attorney, Prison Law Office
- The Honorable William Fletcher, Judge, 9th Circuit Court of Appeals
- Norm Hile, attorney for Kevin Cooper, Senior Counsel, Orrick, Herrington, & Sutcliffe LLP
- Terry Kupers, M.D., Psychiatrist
- Michael Laurence, Executive Director, Habeas Corpus Resource Center
- Jarvis Masters, Death row prisoner since 1990
- Michael Millman, Executive Director, California Appellate Project
- Natasha Minsker, Associate Director, ACLU of Northern California
- Fred Renfroe, Staff Attorney, Habeas Corpus Resource Center
- Joseph Schlesinger, Chief Attorney, Capital Habeas Unit, Office of the Federal Defender, Eastern District of California
- Elizabeth Semel, Clinical Professor of Law, University of California Berkeley School of Law
- Kathrin Smith, Wife of death row prisoner Jarvis Masters
- Don Spector, Attorney, Prison Law Office
- Christine Thomas, wife of Correll Thomas and paralegal, Office of the Federal Defender for the Eastern District of California
- Correll Thomas, Death row prisoner since 1999
- Jeanne Woodford, Former Warden of San Quentin State Prison
- Elizabeth Zitrin, Attorney, Vice President of Coalition Against the Death Penalty

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 63

RME411430

## 2. Louisiana

- Richard Bourke, Director, Louisiana Capital Assistance Center
- Gary Clements, Director, Capital Post Conviction Project of Louisiana
- Ben Cohen, Of-Counsel, The Capital Appeals Project
- Elizabeth Compa, Staff Attorney, The Capital Appeals Project
- Rosana Cruz, Associate Director of Voice of the Ex-Offender
- Sophie Cull, Louisiana Coalition for Alternatives to the Death Penalty
- Calvin Duncan, 2013 Soros Justice Fellow and Paralegal, Louisana Capital Assistance Center
- Norris Henderson, Founder and Executive Director of Voice of the Ex-Offender
- Denny LeBoeuf, ACLU Capital Punishment Project
- Mercedes Montagnes, Deputy Director, The Capital Appeals Project
- Monique Matthews Ruiz, Advocate and sister of exonerees Ryan Matthews
- William Sothern, Law Office of William M. Sothern
- John Thompson, Co-founder and Director, Resurrection After Exoneration
- Nick Trenticosta, Director, Center for Equal Justice
- Cecelia Trenticosta, Staff Attorney, The Capital Appeals Project

RME411431

# Endnotes

1. The International Federation for Human Rights ("FIDH") is a federation comprised of 178 human rights organizations in more than 100 countries. Founded in 1922, FIDH aims at obtaining effective improvements in the prevention of human rights violations, the protection of victims, and the sanction of their perpetrators. With activities ranging from judicial enquiry, trial observation, research, advocacy and litigation, FIDH has developed strict and impartial procedures which are often relied upon by independent human rights experts. FIDH is a member of the Steering Committee of the World Coalition against the Death Penalty ("WCADP"). For more information, visit www.fidh.org.

2. The Center for Constitutional Rights ("CCR") is dedicated to advancing and protecting the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights. Founded in 1966 by attorneys who represented civil rights movements in the South, CCR is a non-profit legal and educational organization committed to the creative use of law as a positive force for social change. CCR is a member of the WCADP. For more information, visit www.ccrjustice.org.

3. That is also the reason why the International Commission against the Death Penalty ("ICDP") conducted a mission to California in April 2012, before the referendum. *See Country Mission to California*, ICDP, HTTP://WWW.ICOMDP.ORG/2012/05/COUNTRY-MISSION-TO-CALIFORNIA-23-27-APRIL-2012. The Commission observed that, "Repeal of the death penalty in California will provide important leadership not only to other U.S. states but also internationally to countries moving towards abolition."

4. The mission chose not to select target states based on number of executions; if so, it might have selected Texas, where FIDH conducted a mission ten years ago. *See* FIDH INVESTIGATIVE MISSION REPORT: UNITED STATES OF AMERICA, THE DEATH PENALTY IN THE UNITED STATES (2002), http://www.fidh.org/IMG/pdf/us316a-2.pdf.

5. This is evident from the myriad decisions on the death penalty that have been the focus of the Inter-American Court on Human Rights and the European Court of Human Rights, as well as by the fact that the Third Committee of the U.N. General Assembly has considered, and adopted, a resolution entitled "Moratorium on the use of the death penalty," which garnered 110 votes in support in November 2012. Currently, 150 countries have either abolished or do not practice the death penalty. *See* Press Release, U.N. Secretary-General, Secretary-General Welcomes Third Committee's Death Penalty Moratorium Resolution, U.N. Press Release SG/SM/14661 (21 Nov. 2012).

6. *Standard Minimum Rules for the Treatment of Prisoners*, adopted by the First U.N. Congress on the Prevention of Crime and the Treatment of Offenders (1955), approved by the U.N. Econ. & Soc. Council, E.S.C. Res. 663(C) (XXIV) (31 July 1957) and E.S.C. Res. 2076 (LXII) (13 May 1977).

7. International Covenant on Civil and Political Rights, 16 Dec. 1966, 999 U.N.T.S. 17. *See also* THE ADVOCATES FOR HUMAN RIGHTS AND REPRIEVE: SHADOW REPORT ON THE DEATH PENALTY IN THE UNITED STATES FOR CONSIDERATION DURING THE 109TH SESSION OF THE U.N. HUMAN RIGHTS COMMITTEE (2013), http://www.theadvocatesforhumanrights.org/united_states_-_human_rights_committee_-_death_penalty_-_october_2013.html.

8. *See* U.N. Hum. Rts. Com., CCPR Gen. Comm. No. 31, *The nature of the general legal obligation imposed on States Parties to the Covenant*, 26 May 2004, U.N. Doc. CCPR/C/21/Rev.1/Add.13.

9. 408 U.S. 238 (1972).

10. 428 U.S. 153 (1976).

11. *Coker v. Georgia*, 433 U.S. 584 (1977); *Kennedy v. Louisiana*, 554 U.S. 407 (2008). There remain certain non-homicide crimes against the state, such as treason and espionage, for which capital punishment has not been ruled unconstitutional. The Supreme Court has yet to address the proportionality of capital punishment for these crimes because no death sentence has been imposed for them in the post-*Furman* era.

12. *Atkins v. Virginia*, 536 U.S. 304 (2002).

13. *Roper v. Simmons*, 543 U.S. 551 (2005).

14. *Ford v. Wainwright*, 477 U.S. 399 (1986); *Panetti v. Quarterman*, 551 U.S. 930 (2007).

15. U.S. DEP'T OF JUSTICE, BUREAU OF JUSTICE STAT'S [*hereinafter* U.S. DEP'T OF JUSTICE, B.J.S.], *Table 3, Federal Capital Offenses, By Statute, 2009*, http://www.bjs.gov/content/pub/pdf/cp11st.pdf. Note that each state has its own criminal code, and there also is a federal criminal code.

16. Three individuals have been executed for federal offenses since the reinstatement of the federal death penalty in 1988. *See Federal Death Row Prisoners List*, Death Penalty Information Center [*hereinafter* DPIC] http://www.deathpenaltyinfo.org/federal-death-row-prisoners#list.

RME411432

17. *The U.S. Military Death Penalty*, DPIC, http://www.deathpenaltyinfo.org/us-military-death-penalty.

18. The formula for weighing aggravating and mitigating circumstances varies by state.

19. Every death penalty state utilizes jury sentencing except Alabama, Florida and Delaware.  In those states, the jury requests a sentence but the judge makes the ultimate decision.  This system means that judges can override jury verdicts of life to impose the death penalty.

20. In two states, Alabama and Tennessee, the direct appeal beings in the intermediate court of criminal appeals.

21. Barry Latzer & David McCord, Death Penalty Cases: Leading U.S. Supreme Court Cases on Capital Punishment 33 (3d ed. 2011).

22. *States With and Without the Death Penalty*, DPIC, http://www.deathpenaltyinfo.org/states-and-without-death-penalty.

23.  U.S. Dep't of Justice, B.J.S., *Table 1, Capital Offenses, By State, 2010*, http://www.bjs.gov/content/pub/pdf/cp10st.pdf.

24. *Death Row Inmates by State and Size of Death Row by Year*, DPIC, http://www.deathpenaltyinfo.org/death-row-inmates-state-and-size-of-death-row-year#state.

25. This includes both death penalty and non-death penalty states; *see Jurisdictions With No Recent Executions*, DPIC, http://www.deathpenaltyinfo.org/jurisdictions-no-recent-executions.

26. *2012 Year End Report*, DPIC, 2, http://deathpenaltyinfo.org/documents/2012YearEnd.pdf.

27. *Facts About the Death Penalty (May 2013)*, DPIC, 3, http://www.deathpenaltyinfo.org/FactSheet.pdf.

28. *2012 Year End Report*, DPIC, *supra* note 26, at 1.

29. *Id.*

30. *Executions By Year*, DPIC, http://www.deathpenaltyinfo.org/executions-year.

31. *Capital Punishment, 2011 – Statistical Tables*, U.S. Dep't of Justice, B.J.S., http://www.bjs.gov/content/pub/pdf/cp11st.pdf.

32. *Number of Executions by State and Region Since 1976*, DPIC, http://www.deathpenaltyinfo.org/number-executions-state-and-region-1976.

33.  *Abolitionist and Retentionist Countries*, Amnesty Int'l, http://www.amnesty.org/en/death-penalty/abolitionist-and-retentionist-countries.

34. American Convention on Human Rights, 21 Nov. 1969, 1144 U.N.T.S. 143.

35. Protocol No. 6 to the European Convention for the Protection of Human Rights and Fundamental Freedoms concerning the Abolition of the Death Penalty, 28 Apr. 1983, E.T.S. 114; Second Optional Protocol to the ICCPR, Aiming at the Abolition of the Death Penalty, G.A. Res. 44/128, U.N. Doc. A/RES/44/128 (15 Dec. 1989); Protocol to the American Convention on Human Rights to Abolish the Death Penalty, 8 June 1990, O.A.S.T.S. 73, 29 I.L.M. 1447; Protocol 13 to the European Convention for the Protection of Human Rights and Fundamental Freedoms on the Abolition of the Death Penalty in All Circumstances, 3 May 2002, E.T.S. 187.

36. G.A. Res. 63/168, U.N. Doc. A/RES/63/168 (8 Dec. 2008); 106 countries voted in favor of the resolution.

37. G.A. Res. 65/206, U.N. Doc. A/RES/65/206 (21 Dec. 2010); 109 countries voted in favor of the resolution.

38. G.A. Third Com. Res., U.N. Doc. A/C.3/67/L.44/Rev.1 (15 Nov. 2012); 110 countries voted in favor of the resolution.

39. U.N. Hum. Rts. Com. CCPR Gen. Comm. No. 6: *The right to life (art. 6)*, 30 Apr. 1982, U.N. Doc. HRI/GEN/1/Rev.1.  *See also Interim report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment*, U.N. Doc. A/67/279 (9 Aug. 2012) (by Juan Méndez) [*hereinafter* Méndez 2012 Interim Report], ¶ 26 ("Capital punishment is the ultimate exception to the inherent right to life.").

RME411433

40. American Declaration of the Rights and Duties of Man, OEA/Ser.L./V.II.23, doc. 21, rev. 6 (2 May 1948).

41. American Convention, *supra* note 34..

42. International Convention on the Elimination of All Forms of Racial Discrimination, 21 Dec. 1965, 660 U.N.T.S. 195.

43. Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, 10 Dec. 1984, 1465 U.N.T.S. 85.

44. CERD, *supra* note 42, at art. 2(a).

45. *Id.* at art. 2(c)(c).

46. "[T]he principle of equality before the law, equal protection before the law and non-discrimination belongs to jus cogens, because the whole legal structure of national and international public order rests on it and it is a fundamental principle that permeates all laws. Nowadays, no legal act that is in conflict with this fundamental principle is acceptable." *Juridical Condition and Rights of the Undocumented Migrants*, Advisory Opinion OC-18/03, Inter-Am. Ct. H. R. (ser. A) No. 18, ¶ 101 (2003).

47. *Id.* at ¶ 47.

48. CERD, *supra* note 42, at art. 1, para. 1.

49. ICCPR, *supra* note 43, at art. 2, para 1; *see also id.* at art. 26 ("All persons are equal before the law and are entitled without any discrimination to the equal protection of the law.").

50. American Declaration, *supra* note 40, at art. 2. The American Convention, which the U.S. has signed but not ratified, includes the duty to ensure the free exercise of rights and equal protection under the law without discrimination; American Convention, *supra* note 34, at arts. 1, 24.

51. *See, inter alia*, U.N. Hum. Rts. Com., CCPR Gen. Comm. No. 18, *Non-discrimination* (10 Nov., 1989), U.N. Doc. HRI/GEN/1/Rev.1, ¶ 7; *Juridical Condition and Rights of the Undocumented Migrants*, *supra* note 46, at ¶ 101.

52. *See* U.N. Hum. Rts. Com., CCPR Gen. Comm. No. 18, *supra* note 51; *Simunek et al. v. Czech Republic*, U.N. Hum. Rts. Com . Communic'n No. 516/1992 (19 July, 1995), U.N. Doc. CCPR/C/54/D/516/1992, ¶ 11.7 ("[A] n act which is not politically motivated may still contravene article 26 if its effects are discriminatory"); *Cecilia Derksen v. Netherlands*, U.N. Hum. Rts. Com. Communic'n No. 976/2001 (1 Apr., 2004), U.N. Doc. CCPR/ C/80/D/976/2001, ¶ 9.3 (finding that "article 26 prohibits both direct and indirect discrimination" in the case of a law that was neutral on its face, yet failed to provide equal legal standing for children born out of wedlock). The CERD Committee has found indirect discrimination to be a violation of the Convention where a proposed housing measure was approved, but later cancelled due to racially charged public opposition. Finding that even the denial of a *proposed* benefit was a discriminatory action, the Committee noted that, "[i]n assessing such indirect discrimination, the Committee must take full account of the particular context and circumstances of the petition, as by definition indirect discrimination can only be demonstrated circumstantially." *L.R. et al. v. Slovakia*, U.N. CERD Com., Communic'n No. 31/2003 (7 Mar. 2005), U.N. Doc. CERD/C/66/D/31/2003, ¶ 12. While international law permits race-based differentiations in certain very limited circumstances, treaty bodies have emphasized that any unjustifiable disparate impact resulting from state conduct is contrary to human rights and violates a *jus cogens* norm. *See* U.N. CERD Com., Gen. Rec. No. 14, *Definition of discrimination (Art. 1, par.1)* (22 Mar. 1993), U.N. Doc. A/48/18, ¶ 2 ("a differentiation of treatment will not constitute discrimination if the criteria for such differentiation, judged against the objectives and purposes of the Convention, are legitimate"). In analyzing a race-based differentiation, the Committee focuses on the effect, and will determine if the action "has an effect contrary to the Convention" through evaluating any "unjustifiable disparate impact." *See also Proposed Amendments to the Naturalization Provision of the Constitution of Costa Rica*, Advisory Opinion OC-4/84, Inter-Am. Ct. H.R. (ser. A) No. 4 ¶ 57 (19 Jan. 1984) (finding there is no discrimination if "the classifications selected are based on substantial factual differences and there exists a reasonable relationship of proportionality between these differences and the aims of the legal rule under review. These aims may not … be arbitrary, capricious, despotic or in conflict with the essential oneness and dignity of humankind").

53. U.N. CERD Com., Gen. Rec. No. 31, *On the prevention of racial discrimination in the administration and functioning of the criminal justice system*, (3 Oct. 2005), U.N. Doc. A/60/18, *in* Rep. of the CERD Com., 66th Sess., 21 Feb.–11 Mar. 2005, U.N. Doc. A/60/18, GAOR, 60th Sess., Supp. No. 18, at 99, 98-108, ¶ 1. *See also, id., Preamble*, ". . . .Convinced that, even though the system of justice may be regarded as impartial and not

RME411434

affected by racism, racial discrimination or xenophobia, when racial or ethnic discrimination does exist in the administration and functioning of the system of justice, it constitutes a particularly serious violation of the rule of law, the principle of equality before the law, the principle of fair trial and the right to an independent and impartial tribunal, through its direct effect on persons belonging to groups which it is the very role of justice to protect . . . ."

54. *See Juridical Condition and Rights of the Undocumented Migrants*, *supra* note 46, at ¶¶ 83-96; *The Yean and Bosico Children v. Dominican Republic*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 130 (8 Sept. 2005); *The Situation of People of African Descent in the Americas*, Inter-Am. Comm'n H.R., OEA/Ser.L/V/II., Doc. 62, 5 Dec., 2011; *Mossville Environmental Action Now v. United States*, Case 12.755, Inter-Am. Comm'n H.R., Report No. 43/10, OEA/Ser.L./V/II.138, doc. 47, ¶ 42 (17 Mar. 2010) ("[T]he right to equal protection under international human rights law has been interpreted as prohibiting not only intentional discrimination, but also any distinction, exclusion, restriction or preference which has a discriminatory effect . . .").

55. *Juridical Condition and Rights of the Undocumented Migrants*, *supra* note46, at ¶ 47.

56. *Jeffrey Timothy Landrigan v. United States*, Case 12.776, Inter-Am. Comm'n H.R., Report No. 81/11, ¶¶ 46-54 (21 Jul. 2011).

57. *See, inter alia,* U.N. Hum. Rts. Com., CCPR Gen. Comm. No. 32, *Article 14: Right to equality before courts and tribunals and to a fair trial* (23 Aug. 2007), U.N. Doc. CCPR/C/GC/32.

58. *See id.*, ¶ 59 ("The imposition of a sentence of death upon conclusion of a trial, in which the provisions of article 14 of the Covenant [requiring equality before courts and tribunals] have not been respected, constitutes a violation of the right to life…"); ICCPR, *supra* note 7, at art. 6(2) ("This penalty can only be carried out pursuant to a final judgment rendered by a *competent* court" (emphasis added)); *The Death Penalty in the Inter-American Human Rights System: From Restrictions to Abolition*, Inter-Am. Comm'n H.R., OEA/Ser.L/V/II. Doc. 68, ¶ 11 (31 Dec. 2011) [*hereinafter The Death Penalty in the Inter-American Human Rights System*] ("[T]he kinds of deficiencies that have been identified by the Commission as rendering an execution arbitrary and contrary to Article I of the American Declaration include … the failure to provide strict due process guarantees, and the existence of demonstrably diverse practices that result in the inconsistent application of the penalty for the same crimes.").

59. *The Death Penalty in the Inter-American Human Rights System, supra* note 58, at ¶ 11.

60. *See*, ICCPR, *supra* note 7, at art. 6(2) (the death penalty can only be carried out pursuant to a final judgment rendered by a competent court), art. 26 (right to equality before the law); *see also* American Declaration, *supra* note 40, art. 2 (right to equality before the law), art. 18 (right to a fair trial), art. 26 (right to due process of law).

61. U.N. Hum. Rts. Com., Gen. Com. No. 32, *supra* note 57, at ¶ 25.

62. *Narrainen v. Norway*, U.N. CERD Com., Communic'n No 3/191 (15 Mar. 1994), U.N. Doc. CERD/C/44/D/3/1991, ¶ 2.4-2.5.

63. *William Andrews* v. *United States*, Case 11.139, Inter-Am. Comm'n H.R., Report No. 57/96, OEA/Ser.L/V/II.95, doc. 7 (1996) (finding violations of arts. 1, 2 and 26 where, in a jurisdiction whose citizenry held prejudicial beliefs, a juror presented the bailiff with a drawing of a hangman accompanied by the statement, "Hang the [racial epithet]," and the judge took no remedial action).

64. *Roberto Moreno Ramos v. United States*, Case P4446/02, Inter-Am. Comm'n H.R., Report No. 61/03, OEA/Ser.L/V/II.118, doc. 70 ( 2003).

65. *Case of Zarb Adami v. Malta*, 2006 Eur. Ct. H.R. 637, ¶¶ 75, 77-78 (finding discrimination based on statistics); *Orlando Cordia Hall v. United States*, Case 12.719, Inter-Am. Comm'n H.R., Report No. 77/09, OEA (2009). *But see Hugh Jordan v. the United Kingdom*, 2001 Eur. Ct. H.R. 327, ¶ 154 (finding statistics alone insufficient proof of discrimination); *Celestine v. United States,* Case 10.031, Inter-Am. Comm'n H.R., Res. No. 23/89, OEA/Ser.L/V/II.77, doc. 7 (1989) (finding statistics from another jurisdiction alone were insufficient evidence of discriminatory purpose).

66. *See* U.N. CERD Com., Gen. Rec. No. 14, *supra* note 52.

67. 481 U.S. 279 (1987).

68 / Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana – FIDH/CCR

RME411435

68. *Id.* at 312.

69. *Id.* at 292.

70. Special Rapporteur on extrajudicial, summary or arbitrary executions, *Question of the Violation of Human Rights and Fundamental Freedoms in Any Part of the World, with Particular Reference to Colonial and Other Dependent Countries and Territories, Addendum, Mission to the United States*, U.N. Doc. E/CN.4/1998/68/Add.3, ¶ 65 (22 Jan. 1998) (by Bacre Waly Ndiaye).

71. U.N. CERD Com., *Consideration of Reports Submitted by States Parties under Article 9 of the Convention, Concluding Observations of the CERD Committee: United States of America*, U.N. Doc. CERD/C/USA/CO/6 ¶ 10 (8 May 2008) [*hereinafter CERD U.S. Concluding Observations 2008*].

72. *Id.* at ¶ 20.

73. *Id.* at ¶ 10.

74. U.N. CERD Com., *Concluding Observations of the Committee on the Elimination of Racial Discrimination: United States of America*, U.N. Doc. CERD/C/59/Misc.17/Rev.3, ¶ 17(13 Aug. 2001) [*hereinafter* CERD U.S. Concluding Observations 2001], ("[T]here is a disturbing correlation between race, both of the victim and the defendant, and the imposition of the death penalty, particularly in states like Alabama, Florida, Georgia, Louisiana, Mississippi and Texas."); *see also CERD U.S. Concluding Observations 2008*, *supra* note 71, at ¶ 23.

75. *CERD U.S. Concluding Observations 2008*, *supra* note72, at ¶ 23.

76. U.N. Hum. Rts. Com., *List of issues in relation to the fourth periodic report of the United States of America (CCPR/C/USA/4 and Corr. 1), adopted by the Committee at its 107th Session (11-28 March 2013)*, U.N. Doc. CCPR/C/USA/Q/4, ¶¶ 8(a), 8(e) (29 Apr. 2013).

77. For example, the International Criminal Tribunal for the former Yugoslavia ("ICTY") has observed that the "essence of the whole corpus of international humanitarian law as well as human rights law lies in the protection of the human dignity of every person, whatever his or her gender. The general principle of respect for human dignity is […] the very *raison d'etre* of international humanitarian law and human rights law; indeed in modern times it has become of such paramount importance as to permeate the whole body of international law." *The Prosecutor v. Furundžija*, Case No. IT-95-17/1-T, Judgment, ¶ 183 (10 Dec. 1998).

78. Universal Declaration of Human Rights, G.A. Res. 217 (III) A, UN Doc A/RES/217 (III), art. 5 (10 Dec., 1948) [*hereinafter* UDHR].

79. CAT, *supra* note 43, at arts. 2, 16.

80. ICCPR, *supra* note 7, at arts. 7, 10.

81. European Convention for the Protection of Human Rights and Fundamental Freedoms, as amended by Protocols 11 and 14, 4 Nov. 1950, E.T.S. 5, art. 3 [*hereinafter* European Convention on Human Rights]; American Declaration, *supra* note 40, art. 25, 26; American Convention, *supra* note 34, art. 5; African Charter on Human and Peoples' Rights, 27 June 1981, 21 I.L.M. 58, art. 5.

82. CAT, *supra* note 43, at art.1. Notably, the Inter-American Convention to Prevent and Punish Torture applies a broader definition, which includes "physical or mental pain or suffering inflicted…for any other purpose." Inter-American Convention to Prevent and Punish Torture, 9 Dec. 1985, O.A.S.T.S. 67, art. 2. The United States is not a party to this convention.

83. *Interim Report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment*, U.N. Doc. A/HRC/13/39, ¶ 46 (30 Dec. 2009) (by Manfred Nowak) ("Definitions of torture that leave out its psychological dimension encourage the use of mental ill-treatment and provide a loophole resulting in impunity.").

84. U.N. Hum. Rts. Com., Gen. Comm. No. 20: *Replaces general comment concerning prohibition of torture and cruel treatment or punishment (Art. 7)*, ¶ 4 (10 Mar. 1992) ("[T]he distinctions depend on the nature, purpose and severity of the treatment applied."); *Prosecutor v. Brdjanin*, Case No. IT-99-36-T, Judgment, ¶¶

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 69

RME411436

484-85 (1 Sept. 2004). *See also Soering v. United Kingdom*, 161 Eur. Ct. H.R. ¶ 104 (ser. A) (1989); *Case of Iorgov v. Bulgaria* 2004 Eur. Ct. H.R. 113, ¶ 119 ("[W]hen assessing conditions of detention, account has to be taken of the cumulative effects of those conditions, as well as the specific allegations made by the applicant." (citing *Dougoz v. Greece*, 2001 Eur. Ct. H.R. 213, ¶ 46, and *Kalashnikov v. Russia*, 2002 Eur. Ct. H.R. 416, ¶ 95).

85. *See, e.g.,* .R. 186 (Eur. Comm'n on H.R.) ("*the Greek Case*").

86. Inter-American Convention to Prevent and Punish Torture, *supra* note 83, at art. 2. *See also* U.N. Hum. Rts. Com., CCPR Gen. Comm. No 32, *supra* note 57 .

87. *Prosecutor v. Brdjanin*, Case No. IT-99-36-T, ¶ 485.

88. CAT, *supra* note 43, at art. 1; *see also* Inter-American Convention to Prevent and Punish Torture*, supra* note 83, art. 2 ("[I]nherent in or solely the consequence of lawful measures, provided that they do not include the performance of the acts or use of the methods referred to in this article."). The ICCPR does not contain a similar provision.

89. Implementation of the Convention Against Torture, 8 C.F.R. § 208.18(a)(3).

90. Méndez 2012 Interim Report, *supra* n. 39, at ¶ 28. Taking corporal punishment as an example of interpretations of "lawful sanctions" that change over time, the former Special Rapporteur on torture traced the arc of corporal punishment from an act that was "widely accepted in European societies" to one that  was widely recognized as a form of cruel, inhuman or degrading treatment. *See Report of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/HRC/10/44, ¶ 35 (14 Jan. 2009) (by Manfred Nowak). The current Rapportuel, in further developing this analysis, explains that because corporal punishment has been found to at least constitute CIDT, "it is not immune from being categorized as torture. Likewise, if the death penalty can be characterized as unlawful in some manner, including as a form of CIDT, it is not immune from also being found to be a form of torture.". Méndez 2012 Interim Report, *supra* note 39, at ¶ 28.

91. *Reid v. Jamaica*, U.N. Hum. Rts. Com. Communic'n No. 250/1987 (20 July 1990), U.N. Doc. CCPR/C/39/D/250/1987, ¶ 11.5 ("the provision that a sentence of death may be imposed only in accordance with the law and not contrary to the provisions of the Covenant implies that "the procedural guarantees therein prescribed must be observed, including the right to a fair hearing by an independent tribunal, the presumption of innocence, the minimum guarantees for the defence, and the right to review by a higher tribunal"" Absent these guarantees it is an arbitrary deprivation of life.)

92. Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment, *Question of the Human Rights of all Persons Subjected to Any Form of Detention or Imprisonment*, U.N. Doc. E/CN.4/1988/17, ¶¶ 42, 44 (22 Jan. 1988) (by Pieter Kooijmans).

93. *Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment*, G.A. Res. 43/173, U.N. Doc. A/RES/43/173 (9 Dec. 1988), Note to Principle 6.

94. *Prosecutor v. Delalić (Zejnil)*, Case No. IT-96-21-T, Judgment, ¶ 543 (16 Nov. 1998); for an extensive review of the development of the understanding of inhuman treatment, *see also* ¶ 551, explaining that cruel treatment is equivalent to inhumane treatment.

95. *Denmark, Norway, Sweden and The Netherlands v. Greece*, App. No. 3321-3/67, 1969 12 Y.B. Eur. Conv. on H.R. 186 (Eur. Comm'n on H.R.) ("*the Greek Case*").

96. *Ireland v. United Kingdom*, 35 Eur. Ct. H.R. (ser. A) ¶ 167 (1976).

97. *Prosecutor v. Delalić (Zejnil)*, Case No IT-96-21-T, ¶¶ 516-543.

98. *See, inter alia*, *Case of Neira Alegria et al. v. Peru*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 20, ¶ 60 (19 Jan. 1995) ("[E]very person deprived of her or his liberty has the right to live in detention conditions compatible with her or his personal dignity . . . Consequently, since the State is the institution responsible for detention establishments, it is the guarantor of these rights of the prisoners."); *Case of The "Street Children" (Villagrán-Morales et al.) v. Guatemala*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 63, ¶ 165 (19 Nov. 1999); *Prosecutor v. Delalić (Zejnil)*, Case No. IT-96-21-T, ¶ 543; *Case of Labita v. Italy*, 2000 Eur. Ct. H.R. 161, ¶ 120.).

99. ICCPR, *supra* note7, at art. 10, paras 1, 3. *See also* American Declaration, *supra* note 40, art. 25 ("Every

RME411437

individual who has been deprived of his liberty . . . has the right to humane treatment during the time he is in custody") and at art. 26 ("Every person accused of an offense has the right . . . not to receive cruel, infamous or unusual punishment"); American Convention on Human Rights, *supra* note 34, at art. 5 ("No one shall be subjected to torture or to cruel, inhuman, or degrading punishment or treatment.").

100. *Basic Principles for the Treatment of Prisoners*, G.A. Res. 45/111, U.N. Doc. A/RES/45/111, ¶ 5 (14 Dec. 1990); *see also Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment*, *supra* note 93.

101. *Standard Minimum Rules for the Treatment of Prisoners*, *supra* note 6. *See, e.g., Womah Mukong v. Cameroon*, U.N. Hum. Rts. Com. Communic'n No. 458/1991 (10 Aug. 1994), U.N. Doc. CCPR/C/51/ D/458/1991, ¶ 9.3. The Special Rapporteur on Torture has recently issued a detailed report examining the Standard Minimum Rules from the perspective of torture and CIDT, and recommends areas where the Rules should be updated in light of developments in international law, while urging States to "renew their commitment to adequately addressing the needs of persons deprived of liberty, with full respect for their inherent dignity and their fundamental rights and guarantees, *Interim report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment*, U.N. Doc. A/68/295, *Summary* (9 Aug. 2013) (by Juan Méndez).

102. U.N. Econ. & Soc. Council, E.S.C. Res. 1996/15, ¶ 7 (23 Jul. 1996).

103. Safeguards Guaranteeing Protection of the Rights of Those Facing the Death Penalty, U.N. Econ. & Soc. Council, E.S.C. Res. 1984/50, U.N. Doc. E/RES/1984/84 (25 May 1984).

104. The Inter-Am. Comm'n H.R. and Inter-Am. Ct. H.R. have applied the Standard Minimum Rules for the Treatment of Prisoners to determine whether the treatment of prisoners complies with international standards and obligations; *see, inter alia, Case of Raxcacó-Reyes v. Guatemala*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 133, ¶ 99 (15 Sept. 2005); *Dexter Lendore v. Trinidad and Tobago*, Case 12.269, Merits, Inter-Am. Comm'n H.R., Report No. 28/09, OEA/Ser.L/V/II.124, doc. 7, ¶¶ 30-31 (2009); *Chad Roger Goodman v. Bahamas*, Case 12.265, Merits, Inter-Am. Comm'n H.R., Report No. 78/07, OEA/Ser.L/V/II.130, doc. 22 rev. 1, ¶¶ 86-87 (2007).

105. Principles and Best Practices on the Protection of Persons Deprived of Liberty in the Americas, Inter-Am. Comm'n H.R., Res. 01/08, 131st Sess., 3-14 Mar. 2008 (13 Mar. 2008).

106. *Report on the Human Rights of Persons Deprived of Liberty in the Americas*, Inter-Am. Comm'n H.R., OEA/Ser.L/V/II Doc. 64 (31 Dec. 2011) [*hereinafter Report on the Human Rights of Persons Deprived of Liberty in the Americas*], ¶¶ 513-515.

107. *See, e.g. Rolando v. The Philippines*, U.N. Hum. Rts. Com. Communic'n No. 1110/2002 (3 Nov. 2004), U.N. Doc. CCPR/C/82/D/1110/2002, ¶ 5.4 ("[R]eiterat[ing] [our] prior jurisprudence that the issue of a warrant for execution necessarily causes intense anguish to the individual concerned and is of the view that the State party should attempt to minimize this anguish as far as possible"); *Wilson v. The Philippines*, U.N. Hum. Rts. Com. Communic'n No. 868/1999 (30 Oct. 2003), U.N. Doc. CCPR/C/79/D/868/1999, ¶ 7.4 ("In view of these aggravating factors constituting further compelling circumstances beyond the mere length of time spent by the author in imprisonment under a sentence of death, (13) the Committee concludes that the author's suffering under a sentence of death amounted to an additional violation of article 7"); *Francis v. Jamaica*, U.N. Hum. Rts. Com. Communic'n No. 606/1994 (3 Aug. 1995), U.N. Doc. CCPR/C/54/ D/606/1994, ¶ 9.2 ("Whereas the psychological tension created by prolonged detention on death row may affect persons in different degrees, the evidence before the Committee in this case, including the author's confused and incoherent correspondence with the Committee, indicates that his mental health seriously deteriorated during incarceration on death row").

108. For more information, *see* CCR, THE UNITED STATES TORTURES BEFORE IT KILLS: AN EXAMINATION OF THE DEATH ROW EXPERIENCE FROM A HUMAN RIGHTS PERSPECTIVE (2011), http://ccrjustice.org/files/deathrow_torture_ postition_paper.pdf.

109. *See Prosecutor v. Natelić and Martinović*, Judgment, Case No. IT-98-34-T, ¶ 367-68 (31 Mar. 2003).

110. U.N. Special Rapporteur on Torture, Report pursuant to Hum. Rts. Comm'n Res. 1985/33, U.N. Doc. E/ CN.4/1986/15, ¶ 119 (19 Feb. 1986) (by Pieter Kooijmans)(articulating a non-exhaustive list of actions found

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 71

RME411438

**2816**
Exhibit 4
Page 353

to constitute torture). *See also* Report of the Comm. Against Torture, 25th & 26th Sess., 13-24 Nov. 2000, 30-18 May 2001, U.N. Doc. A/56/44, GAOR, 56th Sess., Supp. No. 44, ¶ 186 (2001) (concerning the inquiry on Peru, finding severe isolation to cause "persistent and unjustified suffering which amounts to torture").

111. *See, e.g. Soering v. United Kingdom*, 161 Eur. Ct. H.R. (ser. A) (1989) (finding cruel, inhuman or degrading treatment where a young prisoner would experience the death row phenomenon in a Virginia prison); *Hilaire, Constantine, Benjamin et al. v. Trinidad and Tobago*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 94, ¶¶ 168-169 (21 June 2002) (finding cruel, inhuman or degrading treatment or punishment where the victims were subjected to inhuman treatment for "extensive periods of time," including a suffering caused by delays in the appeals process and the agony of anticipating execution); *Denton Aitken v. Jamaica*, Case 12.275, Inter-Am. Comm'n H.R., Report No. 58/02, OEA/Ser./L/V/II.111, doc. 20 rev. ¶ 133 (2002) (finding a violation of the American Convention on Human Rights, art. 5, "when considered in light of the lengthy period of nearly four years for which he has been detained on death row"); *Paul Lallion v. Grenada*, Case 11.765, Inter-Am. Comm'n H.R., Report No. 55/02, OEA/Ser.L/V/II.117, doc. 5 rev. 1 ¶¶ 86-90 (2002) (finding a violation of the American Convention on Human Rights, art. 5, where the conditions to which the victim was "subjected fail to respect his physical, mental and moral integrity").

112. *Pratt & Morgan v. Jamaica*, 1993] 4 All E.R. 769 (P.C.). *See also Pratt & Morgan v. Jamaica*, U.N. Hum. Rts. Com. Communic'n No. 210/1986 and 225/1987 (6 Apr. 1988), U.N. Doc. Supp. No. 40 A/44/40 at 222 ¶¶ 13.6-13.7 (rejecting Article 7 claim for prolonged judicial proceedings, but finding an Article 7 violation as a result of the State not informing prisoners of a stay of execution).

113. Méndez 2012 Interim Report, *supra* note 39, ¶ 75.

114. *Id.* at 75.

115. *Id*. at 76.

116. U.S. Const. amend. VIII. The Federal Constitution also applies to the states under U.S. Const. amend. XIV.

117. *Trop v. Dulles*, 356 U.S. 86, 100-101 (1958).

118. *Roper v. Simmons*, 543 U.S. 551(2005).

119. *Atkins v. Virginia*, 536 U.S. 304 (2002).

120. The understanding provides: "mental pain or suffering refers to prolonged mental harm caused by or resulting from: (1) the intentional infliction or threatened infliction of severe physical pain or suffering; (2) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality; (3) the threat of imminent death; or (4) the threat that another person will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality." U.S. reservations, declarations, and understandings, CAT, Cong. Rec. S17486-01 (daily ed., 27 Oct. 1990).

121. 18 U.S.C. § 2340.

122. U.N. CAT Comm., *Consideration of Reports Submitted by States Parties Under Article 19 of the Convention, Conclusions and Recommendations of the Committee against Torture: United States of America*, U.N. Doc. CAT/C/USA/CO/2, ¶ 13 (25 Jul. 2006) [*hereinafter* U.N. CAT Com., *U.S. Concluding Observations 2006*].

123. *See* Jennifer Winslow, *The Prison Litigation Reform Act's Physical Injury Requirement Bars Meritorious Lawsuits: Was It Meant to?* 49 UCLA L. Rev. 1655, 1660 (2002), citing 42 U.S.C. § 1997e(a); 28 U.S.C. § 1915(b)(1); Prison Litigation Reform Act of 1995 - Section Summary, 141 Cong. Rec. S14,417 (1995).

124. PLRA 42 U.S.C. § 1997e(e).

125. U.S. State Dep't, *Periodic Report of the United States of America to the Committee Against Torture*, ¶ 151, (12 Aug. 2013), http://www.state.gov/documents/organization/213267.pdf.

126. U.N. CAT Com., *U.S. Concluding Observations 2006*, *supra* note 122, at ¶ 29.

127. U.N. CAT Com., *List of issues prior to the submission of the fifth periodic report of United States of*

RME411439

*America*, U.N. Doc. CAT/C/USA/Q/5, ¶ 28 (10 Jan. 2010).

128. DIV. OF ADULT OPS., CAL. DEP'T OF CORR. AND REHAB., *Condemned Inmate Summary List*, (1 Oct. 2013), http://www.cdcr.ca.gov/Capital_Punishment/docs/CondemnedInmateSummary.pdf.

129. *Gregg v. Georgia*, 428 U.S. 153 (1976).

130. California's state constitution allows California voters to pass state laws by popular initiative. When a petition for the proposed measure receives a sufficient number of signatures, the proposed law is placed on the ballot and submitted for a direct vote by the people. Initiatives pass by simple majority.

131. CAL. PENAL CODE § 187-90.2.

132. CAL. PENAL CODE § 189.

133. JUDICIAL COUNCIL OF CAL., CRIM. JURY INSTRUCTIONS, No. 766 (2013).

134. David Love, *Prop 34 Fails But Signals the Imminent Demise of California's Death Penalty*, THE GUARDIAN, 9 Nov., 2010, http://www.theguardian.com/commentisfree/2012/nov/09/proposition34-fails-california-death-penalty.

135. Interview with Natasha Minsker, Associate Director, ACLU of Northern California, in San Francisco, Cal. (8 May 2013) (notes on file with author).

136. CALIFORNIA COMMISSION ON THE FAIR ADMINISTRATION OF JUSTICE, FINAL REPORT 10 (Chris Boscia & Gerald Uelman 2008), http://www.ccfaj.org/documents/CCFAJFinalReport.pdf [*hereinafter* CCFAJ REPORT].

137. *See*, *e.g.*, Interview with Pat Aties, member, Campaign to End the Death Penalty, in San Francisco, Cal. (5 May 2013).

138. Interview with Kevin Cooper, death row prisoner, in San Quentin, Cal. (6 May 2013) (notes on file with author); Interview with Christine Thomas, wife of death row prisoner, in San Quentin, Cal. (5 May 2013) (notes on file with author); Interview with Correll Thomas, death row prisoner, in San Quentin, Cal. (5 May 2013) (notes on file with author). *See also* Bob Egelko, *Death Row Inmates Oppose Prop. 34*, SAN FRANCISCO CHRONICLE, 24 Sept. 2013, http://www.sfgate.com/news/article/Death-Row-inmates-oppose-Prop-34-3891122.php.

139. Interview with Christine Thomas (5 May 2013).

140. Interview with Kevin Cooper (6 May 2013) (commenting that "a lot of prisoners believed that passing the bill would send them to Pelican Bay," the prison facility known for notoriously harsh solitary confinement conditions).

141. *Morales v. Tilton*, 465 F. Supp. 2d 972, 974 (N.D. Cal. 2006).

142. *Id.* at 979-980.

143. Order Affirm. J., *Sims v. Dep't of Corrections*, 216 Cal. App. 4th 1059 (30 May 2013); Maura Dolan, *Ruling, Red Tape are a Setback for California Executions*, L.A; TIMES, 31 May , 2013 http://articles.latimes.com/2013/may/31/local/la-me-lethal-injection-20130601.

144. Howard Mintz, *California Abandons Defense of Three-Drug Executions,* SAN JOSE MERCURY NEWS, 11 July, 2013, http://www.mercurynews.com/ci_23635792/california-death-penalty-state-abandons-defense-three-drug.

145. CCFAJ,Report, *supra* note 136, at 18.

146. Interview with Sarah Chester Staff Attorney, California Appellate Project, in San Francisco, Cal. (9 May 2013). According to Chester, correctional officers rather than certified interpreters are usually asked to translate for the prisoners. When interpreters must be used because guards are not available, they frequently interpret for the prisoner over the phone and rarely come to the prison to translate in person. Interpreters are rarely ever used when the prisoner goes before a committee hearing.

147. *Id.*

148. Div. of Adult Ops., Cal. Dep't of Corr. and Rehab., Condemned Inmate Summary List, (1 Oct. 2013),

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 73

RME411440

**2818**
Exhibit 4
Page 355

http://www.cdcr.ca.gov/Capital_Punishment/docs/CondemnedInmateSummary.pdf. *See also* Interview with
Sarah Chester (9 May 2013); Interview with Jeanne Woodford, former Warden of San Quentin State Prison, in
San Francisco, Cal. (9 May 2013) (notes on file with author).

149. *Brown v. Plata*, 131 S. Ct. 1910, 1947 (2011).

150. *See, e.g.*, Three-Judge Ct. Order Requiring List of Proposed Population Reduction Measures, *Coleman v.
Brown*, No. 90-00520, dkt no. 5452 (E.D. Ca. 11 April 2013).

151. Cal. Dep't of Corr. and Rehab., 18 Sept. 2013 Population Report, http://www.cdcr.ca.gov/Reports_
Research/Offender_Information_Services_Branch/WeeklyWed/TPOP1A/TPOP1Ad130918.pdf.

152. Expert Decl. of Jeanne Woodford in Supp. Of Pl.'s Opp. To Def'ts' Mot. to Terminate, ¶ 37, *Coleman v.
Brown*, No. Civ S 90-0520, dkt no. 4380 (E.D. Ca. 14 Mar. 2013) [*hereinafter* Woodford Declaration].

153. Wyatt Buchanan, "Gov. Brown Cancels Plans to Build New Death Row," SAN FRANCISCO CHRONICLE, 20
April 2011.

154. Steven F. Shatz & Nina Rivkind, *The California Death Penalty Scheme: Requiem for Furman?*, 72 N.Y.U.
L. REV. 1283, 1287 (1997); *see also* Steven F. Shatz, Summary of Expert Testimony Before the Cal.Comm'n on
the Fair Admin. of Justice, http://www.ccfaj.org/documents/reports/dp/expert/Shatz%20Testimony.pdf.

155. The twelve felonies are: robbery; kidnapping; rape; sodomy; the performance of a lewd or lascivious act
on a child under the age of 14; oral copulation; first or second degree burglary; arson; train wrecking; mayhem;
rape by instrument; and carjacking. Cal. Pen. Code § 190.2(a)(17).

156. Shatz & Rivkind, *supra* note 154, at 1321. The authors gave the following example of what qualifies as
a death-eligible crime: "In one case, the defendant yanked the victim's purse off her arm in a store parking lot
and fled. When the victim gave chase, she suffered a heart attack and died shortly thereafter. The defendant
was charged with murder. Because the defendant had used force on the victim by yanking the purse, the purse-
snatch was a robbery. Because the death occurred during flight from the robbery, the defendant was guilty of
felony murder and was death-eligible." *Id.* at 1321-22.

157. CAL. PENAL CODE § 190.2(a)(15); Shatz & Rivkind, *supra* note 154, at 1322-23; *see also* Garth A. Osterman
& Colleen Wilcox Heidenreich, *Lying in Wait: A General Circumstance*, 30 U.S.F.L. REV. 1249, 1279 (1996).

158. Shatz & Rivkind, *supra* note __, at 1331; Shatz Testimony Before the Cal Admin. of
Justice, *supra* note 154, at 1; *see also* CCFAJ REPORT, *supra* note 136, at 16-18. ACLU OF NORTH. CAL., DEATH
BY GEOGRAPHY: A COUNTY TO COUNTY ANALYSIS OF THE ROAD TO EXECUTION IN CAL. 3-5 (2008).

159. *See* Amended Decl. of David C. Baldus, *Ashmus v. Wong*, No. 93-594, dkt no. 473 (N.D. Cal. 19 Sept. 2010).

160. Shatz & Rivkind, *supra* note 154, at 1322; Steven F. Shatz, *The Eighth Amendment, the Death Penalty, and
Ordinary Robbery-Burglary Murderers: A California Study*, 59 U. FL. L. REV. 719, 745 (2007).

161. Interview with Michael Laurence, Executive Director, Habeas Corpus Resource Center, in San Francisco,
Cal. (10 May 2013) (notes on file with author); *see also* Phone interview with Joseph Schlesinger, Chief Attorney,
Capital Habeas Unit, Office of the Federal Defender for the Eastern District of California (17 Apr. 2013) (notes
on file with author); Phone Interview with Elisabeth Semel, Clinical Professor of Law, University of California
Berkeley School of Law (19 Apr. 2013) (notes on file with author); Steven Shatz & Terry Dalton, *Challenging
the Death Penalty with Statistics: Furman, McCleskey, and a Single County Case Study*, 34 CARDOZO L. REV.
1227, 1258 (2013); Shatz & Rivkind, *supra* note 154, at 1332 ("[f]ewer than one out of eight death-eligible
convicted first degree murderers is selected for death at the complete discretion of prosecutors and juries.").

162. Shatz, *supra* note 160, at 769.

163. Interview with Joseph Schlesinger in San Francisco, Cal. (10 May 2013) (notes on file with author).

164. *See*, *e.g.*, Catherine Lee, *Hispanics and the Death Penalty: Discriminatory Charging Practices in San
Joaquin County, California*, 35 J. OF CRIM. JUST. 17, 21 (2007).

165. Glenn L. Pierce & Michael L. Radelet, *The Impact of Legally Inappropriate Factors on Death Sentencing
for California Homicides*, 1990-1999, 46 SANTA CLARA L. REV. 1, 18 (2005).

RME411441

166. *Id.* at 36.

167. Shatz & Dalton, *supra* note 161, at 1262, 1266.

168. ACLU of Northern California, Death by Geography: A County to County Analysis of the Road to Execution in California 3-5 (2008). The ten counties are Los Angeles, Riverside, San Bernardino, Alameda, Orange, Contra Costa, San Diego, Sacramento, Tulare, and Ventura.

169. Pierce & Radelet, *supra* note 165, at 25.

170. *Id.* at 32.

171. *Compare* United States Census Bureau, State and County QuickFacts: California, http://quickfacts.census.gov/qfd/states/06000.html *with* Cal. Dep't of Corr. & Rehab., Condemned Inmate Summary List (4 Sept. 2013), *available at* http://www.cdcr.ca.gov/Capital_Punishment/docs/CondemnedInmateSummary.pdf.

172 Cal. Dep't of Corr. & Rehab., Inmates Executed, 1978-Present , *http://www.cdcr.ca.gov/Capital_Punishment/Inmates_Executed.html*.

173. Judge Arthur Alarcon, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev. 697, 726 (2007).

174. CCFAJ Report, *supra* note 136, at 26-27.

175. *Id.* at 47.

176. *Id.* at 23-24.

177. Interview with Sarah Chester (9 May 2013).

178. *Id.* at 24; *see also* Alarcon, *supra* note 173, at 722-23.

179. Statistics provided by Michael Laurence indicate that for first petitions filed after July 17, 2002, the California Supreme Court's disposition has taken an average of 3.7 years, and with many of those petitions still pending.

180. Interview with Sarah Chester (9 May 2013).

181. Phone Interview with Joseph Schlesinger(17 April 2013).

182. James S. Liebman & Jeffrey Fagan, A Broken System: Error Rates in Capital Cases, App. A-25, 1973-1995 (2000), *available at* http://www2.law.columbia.edu/instructionalservices/liebman/.

183. Sara Colon, *Capital Crime: How California's Administration of the Death Penalty Violates the Eighth Amendment*, 97 Cal. L. Rev. 1377, 1401 (2009).

184. Interview with Joseph Schlesinger (10 May 2013). Schlesinger also stated that he knew of at least two innocence cases where the client died before his case could be heard. *Id.*

185. *See generally Thompson v. Enomoto*, 815 F.2d 1323 (9th Cir. 1987)

186. *See Lancaster v. Cate*, 2009 WL 837643 (N.D. Cal. 26 Mar. 2009).

187. Testimony by Jeanne Woodford for the House Jud. Subcomm. on Crime, Terrorism, and Homeland Security, Hearing on H.R. 4109, the "Prison Abuse Remedies Act of 2007," April 22, 2008.

188. San Quentin's operating procedures for death row, also known as the "Condemned Manual," defines Grade A as prisoners "without a high violence or escape potential who have demonstrated a good disciplinary-free adjustment and are able to get along safely and peacefully with other inmates and staff." Grade B prisoners are defined as inmates "with a high escape or violence potential or who are serious disciplinary or management cases." San Quentin Operational Procedure, Condemned Manual, No. 608 ("OP 608"), § 301 (revised March 2013).

189. Interview with Jarvis Masters, death row prisoner, in San Quentin, Cal. (8 May 2013) (notes on file with author).

190. Interview with Correll Thomas(5 May 2013); Woodford Declaration, *supra* note 152, ¶ 29.

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 75

RME411442

**2820**
Exhibit 4
Page 357

191. Woodford Declaration, *supra* note ___, ¶ 30.

192. Interview with Sarah Chester (May 9, 2013); Interview with Jeanne Woodford (May 9, 2013); Woodford Declaration, *supra* note 152, ¶¶ 31, 41.

193. *See* Woodford Declaration, *supra* note 152, ¶ 32.

194. Interview with Sarah Chester (9 May 2013); *see also* OP 608, § 471(g).

195. Interview with Correll Thomas (5 May 2013).

196. Interview with Jarvis Masters (8 May 2013). The Condemned Manual does not specify telephone privileges for "Grade B" prisoners at all, and states explicitly that "Grade B inmates are not routinely afforded access to the telephone." OP 608, § 475-78.

197. *Id.* § 477.

198. Interview with Correll Thomas (5 May 2013).

199. OP 608, § 480(b).

200. *Id.* § 446.

201. *See* Interview with Joseph Baxter, Attorney, in San Quentin, Cal. (8 May 2013) (notes on file with author); Interview with Steve Fama and Don Specter, Attorneys, Prison Law Office, in Berkeley, Cal. (7 May 2013) (notes on file with author).

202. Interview with Correll Thomas (5 May 2013).

203. *Id.*; Interview with Kevin Cooper (6 May 2013).

204. Interview with Correll Thomas (5 May 2013).

205. Interview with Jarvis Masters (8 May 2013).

206. Interview with Kevin Cooper (6 May 2013).

207. *Id.*

208. Interview with Jeanne Woodford (9 May 2013).

209. OP 608, § 467(e).

210. Interview with Jarvis Masters (8 May 2013); *see also* Woodford Declaration, *supra* note 152, ¶ 41.

211. OP 608, § 829. The guidelines specify, for example, that a term of up to 18 months may be assessed for "leading a . . . strike" or conspiring to lead a strike; up to 12 months for fighting; and up to 9 months for refusing to accept a housing assignment.

212. Interview with Steve Fama and Don Spector (7 May 2013).

213. OP 608, § 805(D); 15 Calif. Code Reg. § 3315(a)(3); *see also* Interview with Correll Thomas (5 May 2013).

214. OP 608, § 301. Under the Condemned Manual, a gang may be any formal or informal association of three or more people whose members have an identifying symbol and who have engaged or threatened or planned to engage in an "act of misconduct" on behalf of the group. *Id.* § 802. Although "gang association" is defined in regulations governing all California prisons, *see* 15 Calif. Code Reg. § 3375.3, "gang affiliation" is not.

215. OP 608, § 826(B).

216. Inmates may receive a Grade B classification as long as prison officials find that the inmate "endangers the lives of staff, other inmates and/or [is] disruptive to the normal operating procedures of the institution." OP 608, § 826(B)(3).

217. *Id.* § 828(2); 15 Calif. Code Reg. § 3378.1.

RME411443

218. 15 Calif. Code Reg. § 3378(e).

219. OP 608, § 826(A).

220. *See* Phone Interview with Joseph Schlesinger (17 April 2013); Phone Interview with Kathrin Smith, wife of death row prisoner (18 April 2013) (notes on file with author); Interview with Sarah Chester (9 May 2013).

221. In an active federal lawsuit, CCR is currently challenging the procedures by which prisoners in California's Pelican Bay State Prison are placed into solitary confinement as a result of their validation as gang affiliates, as well as conditions of confinement in these isolation units. *See* Second Am. Compl., *Ashker et al. v. Governor of Cal., et. al.*, No. 09-5796, dkt no. 136 (N.D. Cal. 10 Sept. 2012).

222. Interview with Sarah Chester (9 May 2013).

223. Interview with Joe Baxter (8 May 2013).

224. *See* Paige St. John, *Inmates End California Prison Hunger Strike*, L.A. TIMES, 5 Sept. 2013.

225. *See* Prisoner Hunger Strike Solidarity, San Quentin Demands, http://prisonerhungerstrikesolidarity. wordpress.com/san-quentin-demands/.

226. Email from Sarah Chester, 3 Oct. 2013 (notes on file with author).

227. *Id.*

228. *Id.*

229. Phone Interview with Christine Thomas (3 Oct. 2013).

230. Interview with Kevin Cooper (6 May 2013).

231. Interview with Joseph Schlesinger (10 May 2013).

232. Interview with Jarvis Masters (8 May 2013) ("People who have been on death row for a very long time are those with problems; they start to act out in a harmful way."); Interview with Kevin Cooper (6 May 2013).

233. Interview with Christine Thomas (5 May 2013); Woodford Declaration, *supra* note 152, ¶ 53.

234. OP 608, § 420(d).

235. Woodford Declaration, *supra* note 152, ¶ 56.

236. Phone interview with Christine Thomas (3 Oct. 2013) (notes on file with author).

237. Interview with Steve Fama and Don Specter (7 May 2013); Interview with Sarah Chester (9 May 2013).

238. Interview with Steve Fama and Don Specter (7 May 2013); Woodford Declaration, *supra* note 152, ¶ 45.

239. Interview with Jarvis Masters (8 May 2013); Interview with Correll Thomas (5 May 2013).

240. Interview with Terry Kupers, M.D. (6 May 2013) (notes on file with author).

241. Interview with Correll Thomas (5 May 2013).

242. *Id.*

243. *Id.*

244. *Id.*

245. Interview with Kevin Cooper (6 May 2013).

246. *Id.*

247. *Id.*; Interview with Correll Thomas (5 May 2013).

RME411444

248. *Soering v. United Kingdom*, 161 Eur. Ct. H.R. (ser. A) (1989), ¶ 106.

249. *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972).

250. *Id.* at 894 n. 7; *Soering*, 161 Eur. Ct. H.R. (ser. A), ¶ 106.

251. *People v. Anderson*, 493 P.2d at 894.

252. Interview with Steve Fama and Don Specter (7 May 2013).

253. Interview with Kevin Cooper (6 May 2013) ("This place is unnatural; it makes people do things and become things they would not become. A lot of people here give up on life. They don't live, they exist.").

254. Interview with Joseph Schlesinger (10 May 2013).

255. ACLU, A Death Before Dying: Solitary Confinement on Death Row 6 (July 2013).

256. *See generally* Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J. L. & Pol'y 325 (2006).

257. *Interim report of the Special Rapporteur on torture and other cruel, inhuman or degrading treatment or punishment*, U.N. Doc. A/66/268 (5 Aug. 2011) (by Juan Méndez) [*hereinafter* Méndez 2011 Interim Report], ¶¶ 58-59.

258. Phone Interview with Christine Thomas (5 Oct. 2013) (notes on file with author).

259. Interview with Kevin Cooper (6 May 2013).

260. U.S. Census Bureau , U.S. Dep't of Commerce, , *State & County QuickFacts, Louisiana,* http://quickfacts.census.gov/qfd/states/22000.html (last revised 27 June 2013) [hereinafter *QuickFacts Louisiana*].

261. This information is updated through January 23, 2012, as this is the most recent date to which comprehensive sentencing data is available. Data Tables, Interview with Nick Trenticosta, Director, Center for Equal Justice, in New Orleans, L.A. (10 Apr. 2013)(data on file with the author)[*hereinafter*, Trenticosta Data Tables].

262. First degree murder is defined as the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm, "(1)and is engaged in the perpetration or attempted perpetration of aggravated kidnapping, second degree kidnapping, aggravated escape, aggravated arson, aggravated rape, forcible rape, aggravated burglary, armed robbery, assault by drive-by shooting, first degree robbery, second degree robbery, simple robbery, terrorism, cruelty to juveniles, or second degree cruelty to juveniles; (2) …upon a fireman, peace officer, or civilian employee of the Louisiana State Police Crime Laboratory or any other forensic laboratory engaged in the performance of his lawful duties, or when the specific intent to kill or to inflict great bodily harm is directly related to the victim's status as a fireman, peace officer, or civilian employee; (3)… upon more than one person; (4) … and has offered, has been offered, has given, or has received anything of value for the killing; (5) …upon a victim who is under the age of twelve or sixty-five years of age or older; (6) …while engaged in the distribution, exchange, sale, or purchase, or any attempt thereof, of a controlled dangerous substance listed in Schedules I, II, III, IV, or V of the Uniform Controlled Dangerous Substances Law; (7) …and is engaged in the activities prohibited by R.S. 14:107.1(C)(1); (8) … and there has been issued by a judge or magistrate any lawful order prohibiting contact between the offender and the victim in response to threats of physical violence or harm which was served on the offender and is in effect at the time of the homicide; (9) …upon a victim who was a witness to a crime or was a member of the immediate family of a witness to a crime committed on a prior occasion and: (a) The killing was committed for the purpose of preventing or influencing the victim's testimony in any criminal action or proceeding whether or not such action or proceeding had been commenced; or (b) The killing was committed for the purpose of exacting retribution for the victim's prior testimony; (10) … upon a taxicab driver who is in the course and scope of his employment…; (11) … and the offender has previously acted with a specific intent to kill or inflict great bodily harm that resulted in the killing of one or more persons." ." La. Rev. Stat. Ann. § 14:30 (A).

263. The U.S. Supreme Court rejected the Supreme Court of Louisiana's position that rape of a child could warrant the death penalty. *Kennedy* v. *Louisiana*, 554 U.S. 407 (2008).

264. *See* Capital Defense Guidelines, La. Admin. Code tit. 22, pt.XV

265. Deborah Fins, Criminal Justice Project, NAACP Legal Def. & Educ. Fund, Death Row U.S.A. Spring 2013 http://www.deathpenaltyinfo.org/documents/DRUSASpring2013.pdf.

RME411445

266. *QuickFacts, Louisiana, supra* note 260.

267. Trenticosta Data Tables, *supra* note 261.

268. *Death Row Inmates by County*, DPIC, http://www.deathpenaltyinfo.org/documents/DeathRowCounties.
xlsx  [hereinafter *Death Row Inmates by County*].

269. U.S. Census Bureau, U.S. Dep't of Commerce, *State and County Quick Facts: East Baton Rouge Parish,
Louisiana*, http://quickfacts.census.gov/qfd/states/22/22033.html (last revised 27 June 2013).

270. U.S. Census Bureau, U.S. Dep't of Commerce, *State and County Quick Facts: Caddo Parish Louisiana*
http://quickfacts.census.gov/qfd/states/22/22017.html (last revised 27 June 2013) [hereinafter QuickFacts
Caddo Parish Louisiana].

271. U.S. Census Bureau, U.S. Dep't of Commerce, *State and County Quick Facts: Jefferson Parish Louisiana*
http://quickfacts.census.gov/qfd/states/22/22051.html (last revised 27 June 2013).

272. *Quick Facts: Louisiana, supra* note 260.

273. *Death Row Inmates by County*, *supra* note 268.

274. Interview "H," New Orleans, Louisiana (19 Apr. 2013)

275. *See, e.g.,* Tushar Kansal, The Sentencing Project,  Racial Disparity in Sentencing: A Review of the
Literature, (Marc Mauer ed., 2005) http://www.sentencingproject.org/doc/publications/rd_sentencing_review.
pdf

276. Glenn L. Pierce & Michael L. Radelet, *Death Sentencing in East Baton Rouge Parish, 1990–2008*, 71 La.
L. Rev. 647, 671 (2011).

277. Tim Lyman, East Baton Rouge (LA) Parish Study on Race, Homicides, and Death-Eligible Prosecutions,
1990-2008, (5 Aug. 2013) at 4, (unpublished report), http://ssrn.com/abstract=2096254 [hereinafter *Caddo
(LA) Parish Study*]; *See also* Pierce & Radelet, *supra* note 276

278. Pierce & Radelet, *supra* note 276.

279. *Id.* at 660.

280. *Caddo (LA) Parish Study, supra* note 277 at 2.

281. *Id.* at 5.

282. *Id.*

283. Pierce & Radelet, *supra* note 276, at 649, note 16, citing, Michael L. Radelet, *Executions of Whites for
Crimes Against Blacks: Exceptions to the Rule?*, 30 Soc. Q. 529, 537 (1989).

284. *See* Henry Weinstein, *Jury to Come Under Justices' Scrutiny*. L.A. Times, (3 Dec. 2007)**,** http://articles.
latimes.com/2007/dec/03/nation/na-jury3.

285. Jeffrey Gettleman, *Prosecutors' Morbid Neckties Stir Criticism*, N.Y. Times, (5 Jan. 2003), http://www.
nytimes.com/2003/01/05/us/prosecutors-morbid-neckties-stir-criticism.html.

286. *Id.*

287. For more context on this period or the noose, *see* Jeannine Bell, *The Hangman's Noose and the Lynch
Mob: Hate Speech and the Jena Six* 44 Harv. C.R. –C.L. L. Rev. 329 (2009); James W. Clarke, *Without Fear
or Shame: Lynching, Capital Punishment and the Subculture of Violence in the American South*, 28 B.J. Pol.
S. 269 (Apr. 1998).

288. As of 2012 the Caddo population was 257, 093, 49% white and 47.7% black.  *See: QuickFacts Caddo
Parish Louisiana, supra* note 270.

289. *See* Cecelia Trenticosta and William C. Collins, *Death and Dixie: How the Courthouse Confederate Flag
Influences Capital Cases in Louisiana*, 27 Harv. J. Racial & Ethnic Just. 125 (2011).

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 79

RME411446

290. Carolyn Roy and Jeff Ferrell, *Confederate flag comes down Friday*, KSLA, (17 Nov. 2011) http://www.ksla.com/Global/story.asp?S=15955226&autostart=true.

291. Trenticosta and Collins, *supra* note 289, at 131, citing: MICHAEL JAMES PFEIFER, ROUGH JUSTICE: LYNCHING AND AMERICAN SOCIETY, 1874-1947, 142 (2004) and STEWART EMORY TOLNAY & E.M. BECK, A FESTIVAL OF VIOLENCE: AN ANALYSIS OF SOUTHERN LYNCHINGS, 1882-1930, 138 (1995).

292. *Death Row Inmates by County*, *supra* note 268.

293. *Id*.

294. *Caddo (LA) Parish Study*, *supra* note 277, at 4.

295. *Id.* at 91.

296. *Id*. at 94.

297. Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberations*, 90 J. PER. SOC. PSYCHOL. 597 (2006).

298. "Effective representation" is used because for non-death penalty felony trials, verdicts need not be unanimous, and the presence of one or even two African Americans can be negated by all whites voting to convict. RICHARD BOURKE, JOE HINGSTON & JOEL DEVINE, LOUISIANA CRISIS ASSISTANCE CENTER, BLACK STRIKES: A STUDY OF THE RACIALLY DISPARATE USE OF PEREMPTORY CHALLENGES BY THE JEFFERSON PARISH DISTRICT ATTORNEY'S OFFICE, (1 Sept. 2003) http://www.blackstrikes.com/resources/report/black_strikes_report_september_2003.pdf.

299. *Justice Department Files Lawsuit Against Louisiana Alleging Violations of the National Voter Registration Act*, Department of Justice, Office of Public Affairs, (12 July 2011) http://www.justice.gov/opa/pr/2011/July/11-crt-908.html

300. *See* LA. CODE. CRIM. PROC. ANN. § 797. *See also* LA. CODE. CRIM. PROC. ANN. § 798 (1990) for additional information on cause.

301. *Witherspoon v. Illinois*, 391 U.S. 510, 513 (1968).

302. Note: this may also mean that African Americans are more likely to be dismissed from the jury pool under a peremptory challenge. Attorneys selecting the venire know that they could justify their striking of a particular juror in an appeal by expressing concern about the potential juror's sentiments on the judicial system.

303. *Witherspoon*, 391 U.S. 510.

304. Mtn. for a New Trial, *State of Louisiana v. Lamondre Tucker*, Case 273-436 (La. App. 2 Cir. Section 4), at Ex. 16.

305. *Id.* at Ex. 14.

306. *Id.* at Ex. 15.

307. *State v. Crawford*, 873 So. 2d 768, 784 (La.App. 5 Cir. 27 Apr. 2004) (upholding the trial court's finding that the strike was not discriminatory).

308. *Id*. at 783.

309. *State v. Harris*, 820 So. 2d 471, 477 (La. 21 Jun. 2002) (finding a *Batson* violation for the strike).

310. 476 U.S. 79, 106 (1986).

311. *Johnson v. California*, 545 U.S. 162 (2005)(clarifying *Batson* standard); *Batson*, 476 U.S. at 93-94 (stating that the defendant makes a *prima facie* case of purposeful discrimination against a strike "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose.").

312. *Purkett v. Elem* 514 U.S. 765, 768 (1995).

313. *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

RME411447

314. 552 U.S. 472 (2008).

315. *Id.* at 475-76.

316. *Id*. at 478.

317. 428 U.S. 153 (1976).

318. LA. S. CT. R. 28 § 1.

319. For a thoughtful and comprehensive examination of the proportionality review, *see* Bidish J. Sharma, Smith Robert J. Smith & Ben G. Cohen, *Struck by Lightning: Walker v. Georgia and Louisiana's Proportionality Review of Death Sentences* 37 S.U. L. Rev. 65 (2009).

320. "If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises." *State v. Legrand,* 864 So. 2d 89, 104 (La. 2003).

321. Sharma, Smith & Cohen, *supra* note 319 at 2.

322. Radley Balko, *The Untouchables: America's Misbehaving Prosecutors, And the System That Protects Them,* THE HUFF. POST (1 Aug. 2013) http://www.huffingtonpost.com/2013/08/01/prosecutorial-misconduct-new-orleans-louisiana_n_3529891.html.

323. 552 U.S. 472.

324. *Snyder v. Louisiana*, 545 U.S. 1137 (2005).

325. *Snyder,* 552 U.S. 472.

326. *State v. Snyder*, 750 So. 2d 832, 861 (La. 1999).

327. *State v. Snyder,* 942 So. 2d 484, 499 (La. 2006).

328. Louisiana code *prohibits* the use of solitary confinement. *See* La. Rev.Stat. Ann. § 15:865 (2004).

329. *See* James Ridgeway and Jean Casella, *Louisiana Attorney General Says Angola 3 "Have Never Been Held in Solitary Confinement,"* SOLITARY WATCH, 21 Mar. 2013, http://solitarywatch.com/2013/03/21/louisiana-attorney-general-says-angola-3-have-never-been-held-in-solitary-confinement/.

330. *Id*.

331. Notably, one of the Angola 3, Herman Wallace, was released on 1 October 2013, after having spent 41 years in conditions commonly understood to constitute solitary confinement. He died 3 days later. *See* Associated Press, Herman Wallace: 'Angola Three' inmate dies days after release from solitary, THE GUARDIAN, (4 Oct. 2013), http://www.theguardian.com/world/2013/oct/04/herman-wallace-angola-three-dies-solitary-confinement.

332. *The Istanbul Statement on the Use and Effects of Solitary Confinement*, adopted 9 Dec. 2007, Int'l. Psych. Trauma Symp. http://solitaryconfinement.org/uploads/Istanbul_expert_statement_on_sc.pdf.

333. *Id.*

334. James Ridgeway, *God's Own Warden,* MOTHER JONES, (Jul./Aug. 2011) http://www.motherjones.com/politics/2011/07/burl-cain-angola-prison.

335. Telephone interview with Monique Matthews Ruiz, 18 May 2013.

336. LA. DEP'T OF PUBLIC SAFETY & CORR., *Louisiana State Penitentiary*, ("Tours at LSP"), http://www.doc.la.gov/pages/correctional-facilities/louisiana-state-penitentiary/.

337. *Polay Campos v. Peru*, U.N. Hum. Rts. Com. Communic'n No. 577/1994 (6 Nov. 1997), U.N. Doc. CCPR/C/61/D/577/1994, ¶ 8.5; *Valasinas v. Lithuania*, 2001 Eur. Ct. H.R. 483, ¶ 117 (the Eur. Ct. H.R. found degrading treatment where the treatment in question, a strip search in the presence of a woman, "must have left [the applicant] with feelings of anguish and inferiority capable of humiliating and debasing him.").

RME411448

338. A calculation taking into account both heat and humidity, as calculated by *The Meteorological Conversions and Calculations: Heat Index Calculator,* Nat'l Oceanic and Atmosph. Admin., U.S. Dept. of Commerce http://www.hpc.ncep.noaa.gov/html/heatindex.shtml (last modified 3 June 2013).

339. Mem. in Support of the Motion for a Preliminary Injunction, *Ball, et. al. v. LeBlanc, et. al.*, Civil Action No. 13-368, US District Court, West Feliciana (18 Jun. 2013) [*hereinafter Ball* Preliminary Injunction Mem.] at 1.

340. *Id.* at 2.

341. *Id.*

342. *Id.* at 17.

343. *Id.* at 5.

344. Interview "E" New Orleans Louisiana (21 May 2013).

345. *Id.*

346. *Ball* Preliminary Injunction Mem., *supra* note 339, at 5.

347. Interview "C," New Orleans Louisiana (21 May 2013).

348. Interview "H," New Orleans, Louisiana (9 Apr. 2013).

349. ICCPR, *supra* note 7, at art. 19(2).

350. Interview "B" New Orleans, Louisiana (8 Apr, 2013).

351. Interview "B" New Orleans, Louisiana (6 May 2013); Telephone interview with Monique Matthews Ruiz, sister of exoneree (18 May 2013).

352. Interview "H" New Orleans, Louisiana (19 Apr. 2013).

353. Interview "I" New Orleans, Louisiana (8 Apr, 2013).

354. Cindy Chang, *Many doctors treating state's prisoners have disciplinary records themselves,* THE TIMES-PICAYUNE, (29 Jul. 2012) http://www.nola.com/crime/index.ssf/2012/07/many_doctors_treating_states_p.html.

355. *Id.*

356. For example, the sister of Ryan Matthews who was exonerated from death row, noted "*We had to fight to get him his anti-seizure medicine. I wrote letters, I even offered to pay for the medicine myself…People started to realize he was innocent and started treating him with more dignity and respect. Still, it took about a year for him to start getting medicine regularly, and we worry that his time without the medicine did serious damage.*" Telephone interview with Monique Matthews Ruiz, sister of exoneree (18 May 2013).

357. *State v. Perry*, 610 So. 2d 746 (La. 1992).

358. *Id*. at 748.

359. Trenticosta Data Tables, *supra* note 261.

360. Interview with John Thompson, death row exoneree, New Orleans, Louisiana (22 May 2013).

361. JOHN HOLLOWAY AND RONALD M. GAUTHIER, KILLING TIME: AN 18-YEAR ODYSSEY FROM DEATH ROW TO FREEDOM, (2010).

362. John Thompson, *The Prosecution Rests, but I Can't,* N.Y. TIMES, (9 Apr. 2011), www.nytimes.com/2011/04/10/opinion/10thompson.html.

363. *Connick v. Thompson*, 131 U.S. 1350 (2011).

364. Interview with John Thompson, former death row inmate and Founder and Director of Resurrection After Exoneration, New Orleans, Louisiana (22 May 2013).

RME411449

365. Interview "E" New Orleans Louisiana (21 May 2013).

366. Information about Execution Protocol and the use of Pentobarbital is available online. *See* State of Louisiana, Department of Public Safety and Corrections, Corrections Services, Department Regulation No. C-03-001, (1 Aug. 2012), *available at* http://www.scribd.com/doc/150605809/Louisiana-Execution-Protocol.

367. Lauren McGaughy, *Louisiana releases execution protocol; inmate's lawyer calls it 'inadequate'*, THE TIMES PICAYUNE, (28 June 2013) http://www.nola.com/crime/index.ssf/2013/06/death_row_execution_protocol_l.html. *See also*, Erik Eckholm and Katie Zezima, *States Face Shortage of Key Lethal Injection Drug,* N.Y. TIMES, ( 21 Jan. 2011) http://www.nytimes.com/2011/01/22/us/22lethal.html?_r=0.

368. McGaughy, *Louisiana releases execution protocol; inmate's lawyer calls it 'inadequate, supra* note 367.'

369. *Id.*

370. *Lenford Hamilton v. Jamaica,* U.N. Hum. Rts. Com. Communic'n No. 333/1988 (7 Nov. 1988), U.N. Doc. CCPR/C/50/D/333/1988 ¶ 10.

371. *Medellín, RamírezCardenas and LealGarcía v. United States,* Case 12.644, Inter-Am. Comm'n H.R., Report No. 90/09, OEA/Ser.L/V/II.135, doc. 37, ¶¶122-23 (2009); *Rudolph Baptiste v. Grenada,* Case 11.743, Inter-Am Comm'n H.R., Report No. 38/00, OEA/Ser.L/V/II.106, doc. 3, ¶¶ 64-66 (2000); *Desmond McKenzie et al., v Jamaica,* Cases. 12.023, 12.044, 12.107, 12.126 & 12.146, Inter-Am. Comm'n H.R., Report No. 41/100, OEA/Ser.L/V/II.106, doc. 3 ¶¶ 169-71 (2000).

372. *See* U.N. CERD Com., Gen. Rec. No. 31 *supra* note 53, at ¶¶ 1 (e) and (f).

373. CERD U.S. Concluding Observations 2001, *supra* note 74, at ¶ 17; *see also* CERD U.S. Concluding Observations 2008, *supra* note 71, at ¶ 23 (noting the "persistent and significant racial disparities" evidenced by studies, and recommending remedial action including a moratorium); U.N. CAT Com., *U.S. Concluding Observations 2006, supra* note 122, at ¶ 29 ("the Committee remains concerned by studies according to which the death penalty may be imposed disproportionately on ethnic minorities.").

374. CERD, *supra* note 42, at art. 1, ¶ 1.

375. *See D.H. and Others v the Czech Republic,* 2007 Eur. Ct. H.R. 922 ¶ 180 ("the Court has in the past stated that statistics could not in themselves disclose a practice which could be classified as discriminatory. However, in more recent cases on the question of discrimination in which the applicants alleged a difference in the effect of a general measure or *de facto* situation, the Court relied extensively on statistics produced by the parties to establish a difference in treatment between two groups (men and women) in similar situations." (internal citations omitted)); *see, also* Hoogendijk v. The Netherlands, 2005 Eur. Ct. H.R. 930; *Opuz v. Turkey,* 2009 Eur. Ct. H.R. 870 ¶183.

376. *See, e.g. Horvath and Kiss v Hungary,* 2012 Eur. Ct. H.R. 1206 ¶¶ 110, 129; *D.H. and Others,* 2007 Eur. Ct. H.R. ¶¶ 190-193 (finding discrimination for a practice of sending Roma children to special schools).

377. *Hoogendijk,*2005 Eur. Ct. H.R. *See, e.g. Mudric v. the Republic of Moldova,* 2013 Eur. Ct. H.R. 685, ¶¶ 60, 62-64. One petitioner to the European Court of Human Rights argued that the domestic violence she suffered was in part due to state discrimination and failure to protect women from violence, as required by international law. The court found, based in part on statistics noting the disproportionate effect of domestic violence on women, that the state violated the prohibition on non-discrimination and equal protection in the European Convention by failing to implement an adequate legal framework to protect against acts of violence, in effect condoning the acts.

378. ICCPR, *see supra* note 7, at art. 25 (a)(c).

379. *Zarb Adami v. Malta,* 2006 Eur. Ct. H.R. 637, ¶ 75.

380. *Id.* at ¶ 76.

381. *Id.* at ¶¶ 56, 81-82.

382. *See, e.g.* U.N. Hum. Rts. Com., CCPR Gen. Comm. No. 32, *supra* note 57, at ¶ 25, citing *Gridin v. Russian Federation,* U.N. Hum. Rts. Com. Communic'n No. 770/1997 (18 July 2000), U.N. Doc. CCPR/C/69/D/770/1997¶ 8.2. S*ee also, Gregory v. The United Kingdom,* 1997 Eur. Ct. H.R 9, ¶ 43 (finding that "it is of fundamental importance in a democratic society that the courts inspire confidence in the public and above all, as far as criminal proceedings are concerned, in the accused").

RME411450

383. *William Andrews*, Case 11.139, Inter-Am. Comm'n H.R ¶ 159.

384. *Id*. at ¶ 130.

385. Sommers, *supra* note 297, at 608.

386. *See, inter alia*, EQUAL JUSTICE INITIATIVE, ILLEGAL RACIAL DISCRIMINATION IN JURY SELECTION: A CONTINUING LEGACY (Aug. 2010) http://www.eji.org/files/EJI%20Race%20and%20Jury%20Report.pdf ; SPEEDY RICE, NATIONAL ASSOCIATION OF CRIMINAL DEFENSE LAWYERS, THE DEATH PENALTY IN THE UNITED STATES, RESPONSE TO THE PERIODIC REPORT OF THE UNITED STATES TO THE UNITED NATIONS COMMITTEE ON THE ELIMINATION OF RACIAL DISCRIMINATION, 6 (Feb. 2008) http://www2.ohchr.org/english/bodies/cerd/docs/ngos/usa/USHRN21.doc (citing racially based jury selection as a "source of the racial disparity.")

387. In addressing the issue of a United States capital prosecution, where the primary consideration was the trial court's failure to appropriately address a juror's presentation of a note stating, "hang the [epithet]" alongside a drawing of a hanging stick figure, the Inter-American Commission also looked to the makeup of the jury. Mr. Andrews was an African-American male, and was tried by an all-white jury some of whom were members of the Mormon Church and adhered to its teachings that African-American people were inferior beings. .The Commission noted that "[t]he record … reflects ample evidence of "racial basis." *William Andrews*, Case 11.139, Inter-Am. Comm'n H.R ¶ 165.

388. *Bandajevsky v. Belarus,* U.N. Hum. Rts. Com. Communic'n No. 1100/2002, (19 Apr. 2002) U.N. Doc. CCPR/C/86/D/1100/2002.

389. U.N. Hum. Rts. Com., CCPR General Comment No. 32, *supra* note57, at ¶ 19 citing U.N. Hum. Rts. Com., *Consideration of Reports Submitted by States Parties Under Article 40 of the Covenant, Concluding Observations of the Human Rights Committee: Slovakia,* U.N. Doc. CCPR/C/79/Add.79. ¶ 18. ),¶ 18.

390. Méndez 2012 Interim Report, *supra* note 39, at ¶78.

391. *Id.* at ¶ 42.

392. *See Soering v. United Kingdom*, 161 Eur. Ct. H.R. (ser. A) (1989).

393. *Id.*

394. *Pratt & Morgan v. Jamaica*, [1993] 4 All E.R. 769 (P.C.).

395. *Hilaire, Constantine, Benjamin et al. v. Trinidad and Tobago*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 94, ¶¶ 167-169 (21 June 2002).

396. Méndez 2012 Interim Report, *supra* note 39, at ¶ 72.

397. Lauren McGaughy, *Angola prison warden apologizes for violating court order during death row heat lawsuit,* , THE TIMES PIC., 6 Aug. 2013, http://www.nola.com/crime/baton-rouge/index.ssf/2013/08/angola_warden_apologizes_for_v.html.

398. For a definition of solitary confinement, *see The Istanbul Statement on the Use and Effects of Solitary Confinement*, adopted 9 Dec. 2007, Int'l. Psych. Trauma Symp. Istanbul, http://solitaryconfinement.org/uploads/Istanbul_expert_statement_on_sc.pdf ("Solitary confinement is the physical isolation of individuals who are confined to their cells for twenty-two to twenty-four hours a day. In many jurisdictions prisoners are allowed out of their cells for one hour of solitary exercise. Meaningful contact with other people is typically reduced to a minimum. The reduction in stimuli is not only quantitative but also qualitative. The available stimuli and the occasional social contacts are seldom freely chosen, are generally monotonous, and are often not empathetic.").

399. Méndez 2012 Interim Report, *supra* note 39, at ¶ 81.

400. *Id.* at ¶ 48.

401. Principles and Best Practices on the Protection of Persons Deprived of Their Liberty in the Americas, Inter-Am. Comm'n H.R., *supra* note 105, Principle XXII.

402. *Report on the Human Rights of Persons Deprived of Liberty in the Americas supra* note 106, at ¶ 412."

403. Méndez 2011 Interim Report, *supra* note 257, at ¶ 56 citing *G.B. v. Bulgaria,* 2004 Eur. Ct. H. R. 112, ¶ 85.

RME411451

404. *Montero-Aranguren et al (Detention Center of Catia) v. Venezuela,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 150. ¶ 94 (5 July 2006).

405. Méndez 2011 Interim Report, *supra* note 257, at ¶ 58.

406. *Id.* at ¶ 76.

407. Eur. Comm. for the Prevention of Torture and I.D.T.P., *21st General Report of the CPT*, Doc. No. CPT/Inf (2011) 28(2011), http://www.cpt.coe.int/en/annual/rep-21.pdf.

408. *A.B. v. Russia,* 2010 Eur. Ct. H. R. 1511, ¶¶ 99-113.

409. *See, e.g. Standard Minimum Rules for the Treatment of Prisoners, supra* note 6, at arts. 37, 44(2); Principles and Best Practices on the Protection of Persons Deprive of Liberty in the Americas, *supra* note 105, at Principle XVIII.

410. *Estrella v. Uruguay,* U.N. Hum. Rts. Com. Communic'n No. 84/1981, (29 Mar. 1983) U.N. Doc. CCPR/C/OP/2, ¶ 9.2.

411. *Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, supra* note 93, at Principle 18. 3 ("The right of a detained or imprisoned person to be visited by and to consult and communicate, without delay or censorship and in full confidentiality, with his legal counsel may not be suspended or restricted save in exceptional circumstances, to be specified by law or lawful regulations, when it is considered indispensable by a judicial or other authority in order to maintain security and good order.").

412. *Garcia-Asto v. Peru,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 137 ¶¶ 221, 229, 233 (25 Nov. 2005).

413. *Id.* at ¶ 225.

414. *Id.* at ¶ 230 (internal citations omitted); *see also id.* at ¶¶ 234-35.

415. *Standard Minimum Rules for the Treatment of Prisoners*, *supra* note 6, art. 11(a).

416. *Id*. at arts. 10, 14.

417. *Id.* at art. 21 (2).

418. *See supra* note 213.

419. *See Body of Principles for the Protection of All Persons under Any Form of Detention or Imprisonment, supra* note 93, at Principle 30(2) ("A detained or imprisoned person shall have the right to be heard before disciplinary action is taken. He shall have the right to bring such action to higher authorities for review.").

420. Principles and Best Practices on the Protection of Persons Deprived of Their Liberty in the Americas, Inter-Am. Comm'n H.R., *supra* note 105, at Principle XII(1).

421. *Id.*; *Standard Minimum Rules for the Treatment of Prisoners, supra* note 6, at art. 13 ("[E]very prisoner may be enabled and required to have a bath or shower, at a temperature suitable to the climate, as frequently as necessary for general hygiene according to season and geographical region . . .").

422. *Zakharkin v. Russia,* 2010 Eur. Ct. H.R. 885, ¶ 125; *Mathew v. The Netherlands,* 2005 Eur. Ct. H.R. 652, ¶ 214 ("The court finds it unacceptable that anyone should be detained in conditions involving a lack of adequate protection against precipitation and extreme temperatures.").

423. *See, e.g., Slyusar v. Ukraine*, U.N. CAT Com., Communic'n No. 353/2008 (16 Jan. 2011), U.N. Doc. CAT/C/47/D/353/2008 (plaintiff held in temporary detention where the cell was near freezing, was beaten, threatened with harm to family, and deprived of food and sleep found to constitute torture); *Gultyayeva v. Russia*, 2010 Eur. Ct. H.R. 437 (finding that windowless and smoke-filled cells, infested with insects and subject to extreme temperatures constituted inhuman and degrading treatment); *Juvenile Reeducation Institute v. Paraguay*, Judgment, Inter-Am. Ct. H.R. (ser. C) No. 112, ¶ 69(e) (2 Sep. 2004) (noting prisoners suffered in summer temperatures of not less than 40 degrees and the cells had only one ceiling fan); *Garcia-Asto v. Peru,* Judgment, Inter-Am. Ct. H.R. (ser. C) No. 137 (25 Nov. 2005) (noting the lack of covers in a freezing cell, alongside *inter alia* solitary confinement, limited contact with family, beating and poor medical care).

424. *See, e.g.*, *Garcia-Asto v. Peru,* Preliminary Objection, Merits, Reparations and Costs, Inter-Am. Ct. H.R.

FIDH/CCR – Discrimination, Torture, and Execution: A Human Rights Analysis of the Death Penalty in California and Louisiana / 85

RME411452

(ser. C) No. 137, ¶ 226 (25 Nov. 2005) ("[L]ack of adequate medical assistance does not meet the minimum material requirements for humane treatment . . . .").

425. *See, inter alia, Application of the Inter-Am. Comm'n H.R. to the Inter-Am. Ct. H.R. in the case of Pedro Miguel Vera Vera (Case 11.535) v. Ecuador*, ¶  42 (2010) ("[T]he obligation of states to respect their physical integrity, not to use cruel or inhuman treatment, and to respect the inherent dignity of the human person,includes guaranteeing access to proper medical care."); *Principles for the Protection of Persons with Mental Illness and for the Improvement of Mental Health Care*, G.A. Res. 46/119, U.N. Doc. A/RES/46/119, Principle 1.1 (17 Dec. 1991) ("All persons have the right to the best available medical health care, which shall be part of the health and social care system."); *Standard Minimum Rules for the Treatment of Prisoners*, *supra* note 6, at arts. 22-26; *Cabal and Pasini v. Australia*, U.N. Hum. Rts. Com. Communic'n No. 1020/2001 (7 Aug. 2003), U.N. Doc. CCPR/C/78/D/1020/2002, ¶ 7.7 (right to health governed by ICCPR arts. 6, 10); Principles and Best Practices on the Protection of Persons Deprived of Their Liberty in the Americas, Inter-Am. Comm'n H.R., *supra* note 105, Principle X ("Persons deprived of liberty shall have the right to health, understood to mean the enjoyment of the highest possible level of physical, mental, and social well-being, including amongst other aspects, adequate medical, psychiatric, and dental care; permanent availability of suitable and impartial medical personnel; access to free and appropriate treatment and medication; implementation of programs for health education and promotion, immunization, prevention and treatment of infectious, endemic, and other diseases; and special measures to meet the particular health needs of persons deprived of liberty belonging to vulnerable or high risk groups . . . .").

426. *Standard Minimum Rules for the Treatment of Prisoners*, *supra* note 6, at art. 22(2).

427. Principles and Best Practices on the Protection of Persons Deprived of Their Liberty in the Americas, Inter-Am. Comm'n H.R., *supra* note 105.

428. *Standard Minimum Rules for the Treatment of Prisoners, supra* note 6, at art. 82.

429. *Keenan v. The United Kingdom* 2001 Eur. Ct. H.R. 242.

430. *Report on the Human Rights of Persons Deprived of Liberty in the Americas, supra* note 106, at ¶¶ 313, 319; *César Alberto Mendoza et al. v. Argentina*, Case 12.651, Inter-Am. Comm'n H.R., Report No. 172/10, OEA/Ser.L/V/II.130, doc. 22 rev. 1 ¶ 276 (2010).  *See also*, WORLD HEALTH ORGANIZATION, PREVENTING SUICIDE IN JAILS AND PRISONS 9-21 (2007) (providing guidelines on the prevention of suicide in detention).

431. *Report on the Human Rights of Persons Deprived of Liberty in the Americas, supra* note 106, at ¶ 314.

432. *César Alberto Mendoza et al.,* Case 12.651, Inter-Am. Comm'n H.R., ¶ 271; *see also, Barbato et al. v. Uruguay,* U.N. Hum. Rts. Com. Communic'n No. 84/1981, (21 Oct. 1982) U.N. Doc. CCPR/C/OP/2 ¶ 9.2 ("While the Committee cannot arrive at a definite conclusion as to whether [the victim] committed suicide, was driven to suicide or was killed by others while in custody; yet, the inescapable conclusion is that in all the circumstances the Uruguayan authorities either by act or by omission were responsible for not taking adequate measures to protect his life").

433. *Report on the Human Rights of Persons Deprived of Liberty in the Americas, supra* note 106, at ¶ 319.

434. *Id*. at ¶ 575(9).

435. The HRC has refused to consider the time spent of death row as a determining factor in a CIDT analysis, specifically because of this paradox.  *See LaVende v. Trinidad and Tobago*, U.N. Hum. Rts. Com. Communic'n No. 554/1993, (17 Nov. 1997) U.N. Doc. CCPR/C/61/D/554/1993, ¶ 5.5 ("The second implication of making the time factor per se the determining one, i.e. the factor that turns detention on death row into a violation of the Covenant, is that it conveys a message to States parties retaining the death penalty that they should carry out a capital sentence as expeditiously as possible after it was imposed.... It should be stressed that by adopting the approach that prolonged detention on death row cannot, per se, be regarded as cruel and inhuman treatment or punishment under the Covenant, the Committee does not wish to convey the impression that keeping condemned prisoners on death row for many years is an acceptable way of treating them. It is not. However, the cruelty of the death row phenomenon is first and foremost a function of the permissibility of capital punishment under the Covenant. This situation has unfortunate consequences.").

RME411453



## Keep your eyes open

## Establishing the facts
### Investigative and trial observation missions
Through activities ranging from sending trial observers to organising international investigative missions, FIDH has developed, rigorous and impartial procedures to establish facts and responsibility. Experts sent to the field give their time to FIDH on a voluntary basis.
FIDH has conducted more than 1 500 missions in over 100 countries in the past 25 years. These activities reinforce FIDH's alert and advocacy campaigns.

## Supporting civil society
### Training and exchange
FIDH organises numerous activities in partnership with its member organisations, in the countries in which they are based. The core aim is to strengthen the influence and capacity of human rights activists to boost changes at the local level.

## Mobilising the international community
### Permanent lobbying before intergovernmental bodies
FIDH supports its member organisations and local partners in their efforts before intergovernmental organisations. FIDH alerts international bodies to violations of human rights and refers individual cases to them. FIDH also takes part in the development of international legal instruments.

## Informing and reporting
### Mobilising public opinion
FIDH informs and mobilises public opinion. Press releases, press conferences, open letters to authorities, mission reports, urgent appeals, petitions, campaigns, website… FIDH makes full use of all means of communication to raise awareness of human rights violations.



## Center for Constitutional Rights (CCR)
The Center for Constitutional Rights is dedicated to advancing and protecting the rights guaranteed by the United States Constitution and the Universal Declaration of Human Rights. Founded in 1966 by attorneys who represented civil rights movements in the South, CCR is a non-profit legal and educational organization committed to the creative use of law as a positive force for social change.

CCR uses litigation proactively to advance the law in a positive direction, to empower poor communities and communities of color, to guarantee the rights of those with the fewest protections and least access to legal resources, to train the next generation of constitutional and human rights attorneys, and to strengthen the broader movement for constitutional and human rights. Our work began on behalf of civil rights activists, and over the last four decades CCR has lent its expertise and support to virtually every popular movement for social justice.

Since our founding, CCR has provided legal skills in a unique and effective manner and always with a progressive perspective. We use daring and innovative legal strategies which have produced many important precedents. CCR is often "ahead of the curve" in both identifying a problem and in suggesting novel or radical legal responses which, over time, become accepted and respected precedents and theories.

For more information about CCR:
www.ccrjustice.org
Facebook: CenterforConstitutionalRights
Twitter: theccr

FIDH - International Federation for Human Rights
17, passage de la Main-d'Or - 75011 Paris - France
CCP Paris : 76 76 Z
Tel: (33-1) 43 55 25 18 / Fax: (33-1) 43 55 18 80
www.fidh.org

Director of the publication: Karim LAHIDJI
Editor: Antoine Bernard
Authors: Susan Hu and Jessica Lee, with the assistance of: Alexs Agathocleous, Karine Bonneau, Florence Bellivier, Katherine Gallagher, Rachel Meeropol, Jimena Reyes, Vincent Warren and Nahal Zamani. CCR and FIDH acknowledge the assistance of Robert Meeropol, Bill Quigley, Kate Morris, Tamara Morgenthau, Megan Wachspress, Matthew Daloisio, Leana Taing and Nikkita Oliver
Design: CBT

Imprimerie de la FIDH - Dépôt légal octobre 2013 - FIDH (English ed.) ISSN 2225-1804 - Fichier informatique conforme à la loi du 6 janvier 1978 (Déclaration N°330 675)

RME411454



FIDH
represents 178
human rights organisations
on 5 continents

inhuman or degrading treatment or punishment. Article 6: Everyone has the right to recognition everywhere as a person before the law. Article 7: All are equal before the law and are entitled without any discrimination to equal protection of the law. All are entitled to equal protection against any discrimination in violation of this Declaration and against any incitement to such discrimination. Article 8: Everyone has the right to an effective remedy by the competent national tribunals for acts violating the fundamental rights granted him by the constitution or by law. Article 9: No one shall be subjected to arbitrary arrest, detention or exile. Article 10: Everyone is entitled in full equality to a fair and public hearing by an independent and impartial tribunal, in the determination of his rights and obligations and of any criminal charge against him. Article 11: (1) Everyone charged with a penal offence has the right to be presumed innocent until proved guilty

## ABOUT FIDH

FIDH takes action for the protection of victims of human rights violations, for the prevention of violations and to bring perpetrators to justice.

A broad mandate
FIDH works for the respect of all the rights set out in the Universal Declaration of Human Rights: civil and political rights, as well as economic, social and cultural rights.

A universal movement
FIDH was established in 1922, and today unites 178 member organisations in more than 100 countries around the world. FIDH coordinates and supports their activities and provides them with a voice at the international level.

An independent organisation
Like its member organisations, FIDH is not linked to any party or religion and is independent of all governments.



Find information concerning FIDH's 178 member organisations on www.fidh.org

RME411455

**2833**
Exhibit 4
Page 370

Exhibit 5

Notice of Appeal, *Mitchell Sims v. California Department of Corrections and Rehabilitation, et al.*, Marin County Superior Court Case No. CIV1004019, April 26, 2012

Exhibit 5
Page 371

1   KAMALA D. HARRIS
    Attorney General of California
2   THOMAS S. PATTERSON
    Supervising Deputy Attorney General
3   State Bar No. 202890
      455 Golden Gate Avenue, Suite 11000
4     San Francisco, CA  94102-7004
      Telephone:  (415) 703-5727
5     Fax:  (415) 703-5843
      E-mail:  Thomas.Patterson@doj.ca.gov
6   *Attorneys for Defendants*
    *California Department of Corrections and*
7   *Rehabilitation and Matthew Cate*

8                                                    (Exempt from filing fees—
                                                     Gov. Code, § 6103.)
9

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11                     COUNTY OF MARIN

12

13   **MITCHELL SIMS,**                    Case No. CIV1004019

14                         Plaintiff,      **NOTICE OF APPEAL**

15           v.

16

17   **CALIFORNIA DEPARTMENT OF**
     **CORRECTIONS AND**
18   **REHABILITATION, et al.,**

19                         Defendants.

20

21       TO THE CLERK OF THE ABOVE-ENTITLED COURT:

22       NOTICE IS HEREBY GIVEN that defendants the California Department of Corrections

23   and Rehabilitation and its Secretary, Matthew Cate, appeal to the Court of Appeal for the First

24   District from the judgment filed on February 21, 2012, in favor of plaintiff Mitchell Sims.

25       The state has expended significant time and resources developing a three-drug lethal-

26   injection protocol for carrying out the death penalty, and this protocol conforms with a procedure

27   that has been upheld by the United States Supreme Court.  This notice of appeal is filed because

28   the state's three-drug protocol is the law of California and should not be abandoned without

                                         1

Exhibit 5
Page 372                    Notice of Appeal  (CIV1004019)

1  appellate review, and because the superior court made fundamental errors in issuing its decision.

2  At the same time, appellants recognize that the availability of the three drugs comprising the

3  current protocol is uncertain.  If it becomes certain in the future that the drugs needed to

4  implement the protocol have, in fact, become unavailable, appellants will reevaluate whether this

5  appeal, or any portions of it, should continue to be prosecuted.  In the meantime, under the

6  Governor's direction, the California Department of Corrections and Rehabilitation will also begin

7  the process of considering alternative regulatory protocols, including a one-drug protocol, for

8  carrying out the death penalty.

9

10  Dated:  April 26, 2012                                  Respectfully Submitted,

11                                                          KAMALA D. HARRIS
                                                            Attorney General of California
12

13

14                                                          /s/ Thomas S. Patterson

15                                                          THOMAS S. PATTERSON
                                                            Supervising Deputy Attorney General
16                                                          *Attorneys for Defendants*
                                                            *California Department of Corrections and*
17                                                          *Rehabilitation and Matthew Cate*

18  SF2010201806
    20596991.doc
19

20

21

22

23

24

25

26

27

28

                                                 2

Exhibit 5
Page 373

Notice of Appeal  (CIV1004019)

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name: **M. Sims v. CDCR, et al.**
No.: **CIV1004019**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On <u>April 26, 2012</u>, I served the attached

## NOTICE OF APPEAL

by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Sara J. Eisenberg, Esq.**
**Howard Rice Nemerovski Canady**
**Falk & Rabkin**
**Three Embarcadero Center, 7th Floor**
**San Francisco, CA 94111-4024**
*Attorney for Plaintiff*
*Mitchell Sims*

**Norman C. Hile**
**Orrick, Herrington & Sutcliffe LLP**
**400 Capitol Mall, Suite 3000**
**Sacramento, CA 94814-4497**

**Jan B. Norman**
**Attorney at Law**
**1000 Wilshire Boulevard, Suite 600**
**Los Angeles, CA 90017**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on April 26, 2012, at San Francisco, California.

_____
T. Oakes
Declarant

_____
Signature

SF2010201806
20597697.doc

Exhibit 5
Page 374

Case 3:11-cv-04454-SI   Document 28-7   Filed 09/26/14   Page 60 of 67
Case 2:09-cv-02158-CJC   Document 109-2   Filed 06/09/14   Page 176 of 182   Page ID
#:4612

# Exhibit 6

# Declaration of Jeannie S. Woodford, August 27, 2010

Exhibit 6
Page 375

# DECLARATION OF JEANNE S. WOODFORD

I, Jeanne S. Woodford, declare as follows:

1.     I was employed as the Warden at California State Prison, San Quentin, for five years, from March 1999 to February 2004. I joined the staff at San Quentin in 1978, and between 1978 and 1999, I served as a correctional officer, a correctional counselor, and a program administrator. Before I became Warden of San Quentin, I also served as an associate warden and as the chief deputy warden. In February 2004, I was appointed Director of the California Department of Corrections by Governor Arnold Schwarzenegger. I served in the administration of the California Department of Corrections, currently the Department of Corrections and Rehabilitation, until my retirement in July 2006. My career in the California prison system spanned almost thirty years.

2.     I presided over four executions during the five years I served as Warden of San Quentin. One of my duties as Warden was to ensure that each of the inmates for whom an execution date had been set was served personally with the execution warrant and informed that he was allowed to choose to have the punishment of death imposed by lethal gas or lethal injection. I also ensured that each of these inmates was informed that if he did not make a selection between lethal gas and lethal injection within ten days of being served with the execution warrant, he would be executed by the default method, lethal injection. Whether or not I served the execution warrant myself, I met with the inmates on one or more occasions to discuss, among other things, the method of execution.

3.     Of the four inmates over whose executions I presided, I spent the most time discussing methods of execution with Robert Lee Massie. After Mr. Massie was served with the execution warrant, I met with him several times to discuss the execution process. Mr. Massie asked me numerous questions about the lethal injection process, the most pressing of which were whether he would feel any pain and how long it would take for him to die. During one of our meetings, Mr. Massie said to me, "Please promise me this won't hurt." It was clear to me that Mr. Massie wanted as much information as he could possibly obtain about what he would experience during his execution so that he could be prepared. I took his questions very seriously and answered them as best I could, as I knew the information would assist Mr. Massie in his preparations to die with dignity.

The foregoing is true and correct and executed under penalty of perjury under the laws of the

Declaration of Jeanne S. Woodford                    1

Exhibit 6
Page 376

1 | United States and the State of California on August 27, 2010.

2

3

4 | JEANNE S. WOODFORD

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration of Jeanne S. Woodford

2

Exhibit 6
Page 377

Case 3:11-cv-04454-SI   Document 28-7   Filed 09/26/14   Page 63 of 67
Case 2:09-cv-02158-CJC   Document 109-2   Filed 06/09/14   Page 178 of 182   Page ID
#:4615

# Exhibit 7

# Ed Payne and Marino Castillo, *Tennessee to Use Electric Chair When Lethal Drugs Unavailable*, CNN.com, May 23, 2014

Exhibit 7
Page 378

## Tennessee to use electric chair when lethal drugs unavailable

*By Ed Payne and Mariano Castillo , CNN*
*updated 11:14 AM EDT, Fri May 23, 2014*

CNN.com

**(CNN)** -- As controversies over lethal injection drugs surge, Tennessee has found a way around the issue:
It is bringing back the electric chair.

Eight states authorize electrocution as a method of execution but only at the inmate's discretion.

Now Tennessee is the first state to make use of the electric chair mandatory when lethal injection drugs
are unavailable.

Tennessee Gov. Bill Haslam signed the measure into law Thursday.

"This is unusual and might be both cruel and unusual punishment," said Richard Dieter, president of the
Death Penalty Information Center.

"No state says what Tennessee says. This is forcing the inmate to use electrocution," according to Dieter,
who believes "the inmate would have an automatic Eighth Amendment challenge."

The amendment protects against cruel and unusual punishment.

"The electric chair is clearly a brutal alternative," Dieter said.

Controversy over lethal injections has been brewing in recent years after European manufacturers,
including the Denmark-based manufacturer of pentobarbital, banned U.S. prisons from using their drugs in
executions.

In April, a botched lethal injection in Oklahoma catapulted the issue back into the international spotlight. It
was the state's first time using a new, three-drug cocktail for an execution. Execution witnesses said
convicted murderer and rapist Clayton Lockett convulsed and writhed on the execution gurney and
struggled to speak, before officials blocked the witnesses' view. Lockett died 43 minutes after being
administered the first drug, CNN affiliate KFOR-TV in Oklahoma City reported.

Earlier this year, a convicted murderer and rapist in Ohio, Dennis McGuire, appeared to gasp and
convulse for at least 10 minutes before dying from the drug cocktail used in his execution.

In 2009, the U.S.-based manufacturer of sodium thiopental, a drug also commonly used in executions,
stopped making the painkiller.

Many states have scrambled to find products from overseas or have used American-based compounding
pharmacies to create substitutes.

This month, a group of criminal justice experts recommended that federal and state governments move to
a single lethal drug for executions instead of complex cocktails that can be botched.

The controversy over legal injection drugs raises the question of when a case will arise to test the new

Exhibit 7
Page 379

law.

The last death penalty by electrocution in Tennessee was that of Daryl Holton in 2007.

Holton -- a convicted murderer who killed his three young sons and his ex-wife's daughter -- elected to be killed by the electric chair.

Before Holton's execution, Tennessee had not used the electric chair in 47 years.

CNN's Dave Alsup contributed to this report.

© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

Exhibit 7
Page 380

Case 2:09-cv-02158-CJC-Document 109-2 Filed 06/09/14 Page 13 of 132 Page ID
Case 3:12-cv-04454-SI Document 28-7 Filed 09/26/14 Page 66 of 67
#:4618

# Exhibit 8

# Jon Herskovitz, *Botched Oklahoma Execution Comes As Alternatives Emerge*, Reuters, April, 30, 2014

Exhibit 8
Page 381

» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

## Botched Oklahoma execution comes as alternatives emerge from shadows

Wed, Apr 30 2014

By Jon Herskovitz

AUSTIN, Texas (Reuters) - Firing squads, electric chairs and other methods of execution seen as cruel or antiquated could be getting a fresh look after Oklahoma botched a lethal injection, leaving the condemned inmate withering in apparent pain on its death chamber gurney.

Lawmakers in several states this year have put forward legislation to revise alternative methods of capital punishment in the face of a shortage of drugs once used for executions as well as legal challenges to new lethal "cocktails."

Oklahoma was among those states, and it had faced lawsuits to stop the execution of convicted rapist and murderer Clayton Lockett, who died on Tuesday night of an apparent heart attack minutes after a medical official on the scene called a halt to the botched process, saying something had gone wrong with the lethal injection.

"As long as there are problems with lethal injection, and there have been and there will be, there will always be legislators determined to kill people with some other method," said Rick Halperin, director of the Embrey Human Rights Program at Southern Methodist University in Dallas.

So far this year, lawmakers in Tennessee have passed a measure to allow the state to electrocute death row inmates if it could not obtain drugs for lethal injections.

A Missouri lawmaker introduced a bill to set up firing squads and a gas chamber should there be problems with lethal injections. In Wyoming, lawmakers were also considering firing squads.

The Virginia House in January passed a measure to make electrocution the default death penalty method if lethal injection drugs cannot be procured, but the bill was halted in the state Senate.

The electric chair was used for years after the U.S. Supreme Court reinstated capital punishment in 1976, but it has also produced some horrific results.

There were reports in both Virginia and Alabama of an inmate being set on fire in the early 1980s, with the smell of charred flesh wafting through the death chambers.

In response, several states led by Texas began using lethal injections in the early 1980s, with the method of execution seen as more humane.

It is now the primary method of execution in all of the 32 U.S. states that use the death penalty as well as for federal death row convicts.

Since 1976, just over 1,200 inmates have been executed by lethal injection while 158 were electrocuted, 11 put to death in a gas chamber, three hanged and three killed by firing squad, according to the Death Penalty Information Center, a capital punishment monitoring agency.

CRUEL AND UNUSUAL

Eight states still have electrocution on their books as an alternative method of execution, but with caveats. For example, Oklahoma can use the electric chair if its lethal injection protocol is found to be unconstitutional.

Virginia allows some inmates to die in the electric chair if they chose to do so. Its last electrocution using the chair was in 2013 when it put inmate Robert Gleason to death.

About five minutes after all the drugs of a three-drug cocktail were administered, a physician would be called in to pronounce death.

However, there were a few rare times when inmates blurted "I can feel it," or "I can taste it," after the injection, Fitzgerald said.

Larry Fitzgerald, a former spokesman for the Texas Department of Criminal Justice who has witnessed scores of executions, said the results of the state's lethal injections were always the same - with the inmate being rendered unconscious and then dying from drugs designed to stop breathing and stop the heart.

The U.S. Supreme Court has ruled that executions do not need to be painless. In a pair of cases out of Kentucky, the court in 2008 dismissed the idea that the potential for pain made the three-drug cocktail method of execution unlawful.

"Simply because an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual," Chief Justice John Roberts wrote then.

The Eighth Amendment to the U.S. Constitution bans cruel and unusual punishment.

Megan McCracken a lawyer at the University of California, Berkeley School of Law's Death Penalty Clinic said that although lethal injections appear serene, the inmate can be suffering greatly.

"The prisoner could be conscious and in extraordinary agony, but once that paralytic is administered, we would never see it," McCracken said.

The lethal injection process in the United States underwent a fundamental change in 2011, when drug company Hospira stopped making sodium thiopental, due to concerns about its widespread use in executions. It was the lone U.S. manufacturer of the drug.

The drug was an anesthetic that would render a person unconscious before the other drugs that would cause death were administered.

Texas changed to a single drug while other states scrambled to develop new lethal injection protocols.

The botched execution in Oklahoma has raised questions on whether these new protocols could be ruled as cruel and unusual punishment by the courts.

"This is really going to make the courts demand a whole lot more and they are not going to be as quick to allow executions to go forward unless the state can prove it knows what it is doing," said Richard Dieter, executive director of the Death Penalty Information Center.

(Additional reporting Bredan O'Brien in Milwaukee, Wisconsin and David Ingram in New York; editing by G Crosse)

© Thomson Reuters 2014. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

Exhibit 8

Page 382