1   Michael Laurence (Bar No. 121854)
2   Cliona Plunkett (Bar No. 256648)
3   HABEAS CORPUS RESOURCE CENTER
    303 Second Street, Suite 400 South
4   San Francisco, California 94107
5   Telephone:   (415) 348-3800
6   Facsimile:   (415) 348-3873
    E-mail:       MLaurence@hcrc.ca.gov
7                docketing@hcrc.ca.gov
8
    Attorneys for Petitioner Ernest DeWayne Jones
9
                UNITED STATES DISTRICT COURT
10
        FOR THE CENTRAL DISTRICT OF CALIFORNIA
11
12  ERNEST DEWAYNE JONES,          Case No. CV-09-2158-CJC
                   Petitioner,
13                                 DEATH PENALTY CASE
          v.
14
15                                 EXHIBITS IN SUPPORT OF
    KEVIN CHAPPELL, Warden of      PETITIONER'S OPENING BRIEF
16  California State Prison at San  ON CLAIM 27
    Quentin,
17                 Respondent.     VOLUME 3
18
19
20
21
22
23
24
25
26
27
28

---

Petitioner's Opening Brief on Claim 27                Case No. CV-09-2158-CJC

# Exhibit 9

# Trent Nelson, *Will Wyoming Turn To Firing Squads For Executions?*, CBSNews.com., May 22, 2014

Exhibit 9
Page 383



CBSNews.com | CBS Evening News | CBS This Morning | 48 Hours | 60 Minutes | Sunday Morning | Face The Nation          Log In   Search

Video | US | World | Politics | Entertainment | Health | MoneyWatch | SciTech | Crime | Sports | Photos | More



AP / May 22, 2014, 8:30 AM

# Will Wyoming turn to firing squads for executions?



The execution chamber at the Utah State Prison after an execution by firing squad June 18, 2010; the bullet holes are visible in the wood panel behind the chair. / TRENT NELSON, AP

17 Comments / 34 Shares / Tweets / Stumble / Email          More +

**CHEYENNE, Wyo.** -- Prompted by the shortages of available drugs for lethal injections, Wyoming lawmakers are considering changing state law to permit the execution of condemned inmates by firing squad.

A Wyoming legislative committee has directed its staff to draft a firing-squad bill for consideration ahead of next year's legislative session starting in January.

Lawmakers in Utah also may consider a return to firing squads for civilian executions. A Republican state lawmaker there recently announced that he intends to introduce firing-squad legislation in his state's next legislative session in January as well.

Utah outlawed execution by firing squad in 2004 but kept it as an option for inmates convicted before that time. It last executed an inmate by firing squad in 2010.



Play VIDEO
**British woman's efforts stopped supply of execution drug to U.S.**

Bob Lampert, director of the Wyoming Department of Corrections, told members of the Wyoming Legislature's Joint Interim Judiciary Committee last week in Rawlins that drugs for lethal injection have become increasingly difficult to obtain.

"In the event that we had an execution scheduled and we couldn't carry it out as a result of lack of substances, I suggested to the Joint Judiciary that we may want to consider having an alternate means of execution, such as the firing squad," Lampert said Wednesday.

Current state law specifies Wyoming would execute condemned inmates in a gas chamber, which the state doesn't currently have, as a backup to lethal injection only if lethal injection were found to be unconstitutional. Existing state law doesn't address how the state should proceed in response to a drug shortage.

Lethal injection is becoming increasingly difficult for states to perform as pharmaceutical companies withhold drug compounds that states traditionally have used. Some inmates have raised constitutional challenges as states have

## Most Popular

**01** What's behind the national ammo shortage?
50651 views

**02** Kidnap victim found alive 10 years later; arrest made
46132 views

**03** Pat Sajak sparks Twitter backlash with "unpatriotic racists" comment on climate change
34556 views

**04** Cops: Jace confessed to killing wife on 911 call
32235 views

**05** Retiree dies in police custody after traffic stop
27257 views



play VIDEO
**Teen nails Michael Jackson routine at HS talent show**

Flirty Plus-Size Outfits
zulily.com
Shop Flirty Plus-Size Outfits on Sale up to 70% Off. Shop Now!

Weddings on the Water

## Most Shared

 Pat Sajak sparks Twitter

Exhibit 9
Page 384

turned to untried compounds.

Wyoming has no execution drugs on hand, Lampert said.



*Play* **VIDEO**

**Okla. executions on hold after lethal injection goes wrong**

Last month, Oklahoma inmate Clayton Lockett died of a heart attack more than 40 minutes after corrections officials there started trying to administer drugs at his execution. President Obama called the Lockett incident deeply troubling and said he had asked his attorney general to review the application of the death penalty.

Sen. Bruce Burns, R-Sheridan, had proposed a bill in the state's legislative session earlier this year to change state law to allow the use of firing squads. He's a member of the judiciary committee.

Burns said Wednesday the committee intends to consider the firing-squad approach at its next meeting in July. He floated a bill in the legislative session early this year calling for allowing use of the firing squad, but it failed an introductory vote.

Burns said his fellow lawmakers increasingly seem to recognize that the state needs to act.

Burns said he believes using the firing squad would be a preferable means of execution to lethal injection, in which inmates feel the needle and then have to wait for drugs to take effect.

Wyoming has only one inmate on death row: Dale Wayne Eaton, 69, is pressing a federal appeal of the state court death penalty he received in 2004 for the murder of Lisa Marie Kimmell, 18, of Billings, Montana.

Cheyenne lawyer Terry Harris represents Eaton in his federal appeal. An attempt to reach Harris for comment Wednesday wasn't immediately successful.

Rep. Stephen Watt, R-Rock Springs, serves on the Joint Interim Judiciary Committee. He said he intends to sponsor a bill in the state's coming legislative session to do away with the death penalty entirely but doesn't expect it will get much support.

Watt is a former Wyoming Highway Patrol trooper who was severely injured in a gunfight on the job years ago.

"The biggest and probably the most important one is probably my Christian beliefs that it's wrong for man to kill man," Watt said Wednesday of his opposition to the death penalty. "The second one is because of technology. All the time, we're coming up with more and more technology, and we're finding innocent people that have been wrongly convicted and sentenced to die. It would be a tragedy for one innocent person to die."

Watt said he doesn't consider the firing squad to be a more humane alternative to lethal injection.

"I've been shot," he said. "And I don't care how quickly death comes from firing squad. It still hurts and it's still terrifying. And I think it's cruel and unusual."

© 2014 The Associated Press. All Rights Reserved. This material may not be published, broadcast, rewritten, or redistributed.

**17** Comments  /  **34** Shares  /  Tweets  /  Stumble  /  Email          More +

### Around the web
Recommended by


**Kid Goes After His Bully During Fight and Gets…**
*Mamas Latinas*


**Meet the Beautiful Girlfriends of Soccer…**
*People en Espanol*


**10 Greatest Goalies In NHL History**
*SportsBreak*

**Michelle Obama's DNA Test Show Slave Owner as…**
*Ancestry.com*

### Featured in Politics



### Popular on CBS News


Cabinet shuffle: Obama

---


backlash with "unpatriotic racists" comment on climate change


Is cheap food to blame for the obesity epidemic?


What's behind the national ammo shortage?


China calls for new security pact with Russia, Iran

New meteor shower visible this weekend: How to watch



38 **PHOTOS**
**amfAR gala at the Cannes Film Festival**

### Most Discussed


Who do Americans blame for the VA scandal?
**471 COMMENTS**


What will it take to fix the VA?
**199 COMMENTS**


Retiree dies in police custody after traffic stop
**243 COMMENTS**


House snubs Pentagon on defense spending bill
**53 COMMENTS**


Pat Sajak sparks Twitter backlash with "unpatriotic racists" comment on climate change
**161 COMMENTS**



Exhibit 9
Page 385



## Americans' view of Congress: Throw 'em out

A new CBS News poll reveals the lowest-ever percentage of Americans who think members of Congress deserve re-election



## What will it take to fix VA health care?

With the VA roiled by scandal and expecting an influx of new vets from wars winding down, it needs solutions

 nominates Julian Castro as HUD secretary

 John Kerry to testify on Benghazi
**95 COMMENTS**

 Chuck Hagel: New officers must help eliminate sexual assault

 Judge allows Rep. John Conyers to be on ballot
**12 COMMENTS**

 GOP sues feds for right to raise unlimited campaign cash
**15 COMMENTS**

 Back home briefly, Obama breakfasts with Illinois governor

 VA Secretary Eric Shinseki begins to draw friendly fire

 After controversy, IRS to revise rule changes for tax-exempt political groups
**15 COMMENTS**

# 17 Comments

*17 Comments*  /  *26 people listening*                    SIGN IN

| + FOLLOW | | Share | POST COMMENT AS... |

**NEWEST | OLDEST | TOP COMMENTS**          COMMENTING FAQS / GUIDELINES

**SFTOMMY_012**  *May 22, 2014 2:2PM*

Give the convicted a choice from the police drug confiscation lockers; OD on the one of their choice.

Strap 'em down and let it go....

No costs involved.

LIKE /    REPLY

**ROADKING041**  *May 22, 2014 2:2PM*

That's what I'm talking about!  Lead is cheaper than drugs, and when you see a condemned prisoner.  And for all you anti-death penalty whiners, if it was your child that had her head partially blown off with a shotgun, then buried alive as with the Oklahoma murderer that was recently put to death, you would be calling for his head on a platter.  As far as i'm concerned heinous murderers on death row SHOULD suffer as much physical and mental pain that can be administered while they take their last worthless breath on this earth.  THAT is justice!

LIKE /    REPLY

**ASKAGAIN**  *May 22, 2014 1:1PM*

A wiser move would be to have several execution choices which either the state or the person on death row can choose from. That might avoid some of the frivolous appeals.

LIKE /    REPLY

**GTR5**  *May 22, 2014 0:12PM*

Exhibit 9
Page 386

Just use a rope.

LIKE /    REPLY

---

**BETTERUSA**  *May 22, 2014 0:12PM*
For the people that spout too many innocent ones being executed; execute the the killers that are caught committing the crime. E.g. Holmes, Loughner, the Ft. Hood shooter, are examples of killers that should be executed immediately. I am certain there are many on death row that were 100% guilty like these three examples. Unfortunately, these guilty types are lawyered up and are spending millions of taxpayer dollars fighting the system. Only the lawyers win! Those that are convicted and given death or life without parole should be put in a 5 foot by 5 foot cubicle that is completely without light and fed through a slot in the door. I believe most would beg to be executed instead of living in a coffin.

LIKE /    REPLY

---

**DJSEAVY**  *May 22, 2014 11:11AM*
The death penalty should be abolished, since they seem to manage to put innocent people on death row.  I also believe being put in solitude until your dying breath would be better punishment.  I realize a lot of people believe death is appropriate in many cases, and I can't say that I disagree.  However, the cost of incarceration pales in comparison to the cost of appeals and everything else that goes along with a dp case.  And if they execute an innocent person, which is very likely that they have already, then what?  It's a sentence that - once carried out - is impossible to reverse.

LIKE /    REPLY

---

**ALWAYS SURPRISED**  *May 22, 2014 11:11AM*
I wouldn't want to be in the firing squad, pretty crappy job. They say it's cheaper to keep him in prison  for life. If that's true, probably better, but who can prove that it's cheaper?

LIKE /    REPLY

---

**DANNYSTEELE**  *May 22, 2014 11:11AM*
Personally, I'd do away with the death penalty.  I've been in a prison cell (I was there as part of construction project).  Keeping someone locked up until natural death seems to be a harsher sentence than the death penalty.

LIKE /    REPLY

---

**VERITAS830**  *May 22, 2014 11:11AM*
Obviously,when the constitution was written & hanging was the most popular form of execution it wasn't considered cruel or unusual.The biggest concen I have is do you have the right guy.

LIKE /    REPLY

---

> **EMPIRICAL RATIONALIST**  *May 22, 2014 11:11AM*
> **@Veritas830**  Oh I agree, we need a mechanism in the law that to convict someone of capital murder, there is sound physical scientific evidence.  Too many people get convicted simply because they're ugly or unpopular.
>
> LIKE /    REPLY

---

> **CBCHASE**  *May 22, 2014 11:11AM*
> @Veritas830 Good point.  Hangings and firing squads weren't considered unconstitutional while the men who wrote said document were still around, but now it's a major outrage if a guy has a panic attack or feels discomfort from an IV while lying on a bed with a pillow under his head.  What?
>
> LIKE /    REPLY

---

**EMPIRICAL RATIONALIST**  *May 22, 2014 10:10AM*
Simple, cheap, quick, effective, and if we are talking headshots, would be quite painless.  Throw the body in a bag, and hose down the mess into the drain.  It is a great way to execute.  Though I think hanging from a rope would probably be a little cleaner, and you can reuse the rope.

1 LIKE /    REPLY

---

**PHILS1950**  *May 22, 2014 10:10AM*
"And I don't care how quickly death comes from firing squad. It still hurts and it's still

Exhibit 9
Page 387

terrifying. And I think it's cruel and unusual."

And feeling that needle slip under you skin, and the warm flow of the drug isn't terrifying? Good to see how the victims felt huh......

Jeez, being put to death isn't mean to be pleasant, just think of the deaths of the victims of these people, personally I don't care, how they top them off, What I do care about is getting it done in a timely manner, as I really resent supporting these POS in prisons for a couple of decades.

3 LIKE /   REPLY

---

**LIVINGSWORD**   *May 22, 2014 9:9AM*

The gun is the weapon of choice to execute, just ask the NRA and most politicians who support shooting Bambi with assault rifles. Or ask any of the many stone cold murderers who have killed innocent men, women, and children at the many fine colleges, universities, and even grade schools where mass murder by these killing weapons have happened. They will tell you how humane and effective it is to gun down all these people. Ask any muslim terrorist group or any NRA peoson just how wonderful these bullets do their job. Im sure without a doubt that a 'Firing Squad' of maybe just two or three executioners would definately put all these bad people out of their misery once and for all. Like in a New York minute man, or like an instant cup of coffee. Yeah now that is not 'cruel and unusual punishment', at all dude.

1 LIKE /   REPLY

---

    **NOMORENICEGUY**   *May 22, 2014 10:10AM*

    @LivingSword Or ask the victims...oops..you can't because they're DEAD.

    1 LIKE /   REPLY

---

**BOBW1212**   *May 22, 2014 7:7AM*

...you dip a guy in brown gravy and lock him in a small room with a wolverine who's high on angel dust.

-George Carlin on capital punishment

2 LIKE /   REPLY

---

**MERLIN BIKE**   *May 22, 2014 5:5AM*

Wait, what?

Where are they going to get the ammo?

3 LIKE /   REPLY

---

### CBSNews.com

Site Map
Help
Contact Us
CBS Bios
Careers
Internships
Development Programs

### CBS Interactive

Privacy Policy
Terms of Use
Mobile User Agreement
About CBS
Advertise
Closed Captioning

### Follow Us

Facebook
Twitter
RSS
YouTube
Email Newsletters
CBS Radio News
CBS Local

Copyright © 2014 CBS Interactive Inc.
All rights reserved.

Search... 🔍

Exhibit 9
Page 388

Exhibit 10

Josh Levs, Ed Payne, and Greg Botelho, *Oklahoma's Botched Lethal Injection Marks New Front In Battle Over Executions*, CNN.com,

May 1, 2014

Exhibit 10
Page 389

# Oklahoma's botched lethal injection marks new front in battle over executions

*By Josh Levs, Ed Payne, and Greg Botelho , CNN*
*updated 3:32 PM EDT, Thu May 1, 2014*

CNN.com

**(CNN)** -- A botched lethal injection in Oklahoma has catapulted the issue of U.S. capital punishment back into the international spotlight, raising new questions about the drugs being used and the constitutional protection against cruel and unusual punishment.

"We have a fundamental standard in this country that even when the death penalty is justified, it must be carried out humanely -- and I think everyone would recognize that this case fell short of that standard," White House spokesman Jay Carney said Wednesday.

What went wrong Tuesday in Oklahoma "will not only cause officials in that state to review carefully their execution procedures and methods," said Richard W. Garnett, a former Supreme Court law clerk who now teaches criminal and constitutional law at the University of Notre Dame, "it will also almost prompt many Americans across the country to rethink the wisdom, and the morality, of capital punishment."

"The Constitution allows capital punishment in some cases, and so the decision whether to use it or abandon it, and the moral responsibility for its use and misuse, are in our hands," he said.

Precisely what happened during the execution of convicted murderer and rapist Clayton Lockett remains unclear. Witnesses described the man convulsing and writhing on the gurney, as well as struggling to speak, before officials blocked the witnesses' view.

It was the state's first time using a new, three-drug cocktail for an execution.

Oklahoma halted the execution of another convicted murderer and rapist, Charles Warner, which was scheduled for later in the day.

Thirty-two U.S. states have the death penalty, as does the U.S. government and the U.S. military. Since 2009, three states -- New Mexico, Connecticut, and Maryland -- have voted to abolish it.

States that have capital punishment have been forced to find new drugs to use since European-based manufacturers banned U.S. prisons from using theirs for executions. One of those manufacturers is the Danish company Lundbeck, maker of pentobarbital.

Carney, speaking to reporters at a daily briefing, said he had not discussed the Oklahoma case with President Barack Obama.

"He has long said that while the evidence suggests that the death penalty does little to deter crime, he believes there are some crimes that are so heinous that the death penalty is merited." The crimes committed by the two men in Oklahoma "are indisputably horrific and heinous," Carney said.

**'There was chaos'**

Lockett lived for 43 minutes after being administered the first drug, CNN affiliate KFOR reported. He got out the words "Man," "I'm not," and "something's wrong," reporter Courtney Francisco of KFOR said. Then the blinds were closed.

Other reporters, including Cary Aspinwall of the Tulsa World newspaper, also said Lockett was still alive and lifted his head while prison officials lowered the blinds so onlookers couldn't see what was going on.

Dean Sanderford, Lockett's attorney, said his client's body "started to twitch," and then "the convulsing got worse. It looked like his whole upper body was trying to lift off the gurney. For a minute, there was chaos."

Sanderford said guards ordered him out of the witness area, and he was never told what had happened to Lockett, who was convicted in 2000 of first-degree murder, rape, kidnapping and robbery.

After administering the first drug, "We began pushing the second and third drugs in the protocol," said Oklahoma Department of Corrections Director Robert Patton. "There was some concern at that time that the drugs were not having the effect. So the doctor observed the line and determined that the line had blown." He said that Lockett's vein had "exploded."

The execution process was halted, but Lockett died of a heart attack, Patton said.

"I notified the attorney general's office, the governor's office of my intent to stop the execution and requested a stay for 14 days," said Patton.

Gov. Mary Fallin issued a statement saying that "execution officials said Lockett remained unconscious after the lethal injection drugs were administered."

**Another state, another botched execution**

Earlier this year, a convicted murderer and rapist in Ohio, Dennis McGuire, appeared to gasp and convulse for at least 10 minutes before dying from the drug cocktail used in his execution.

Ohio used the sedative midazolam and the painkiller hydromorphone in McGuire's January execution, the state said.

Louisiana announced later that month that it would use the same two-drug cocktail.

Oklahoma had announced the drugs it planned to use: midazolam; vecuronium bromide to stop respiration; and potassium chloride to stop the heart. "Two intravenous lines are inserted, one in each arm. The drugs are injected by hand-held syringes simultaneously into the two intravenous lines. The sequence is in the order that the drugs are listed above. Three executioners are utilized, with each one injecting one of the drugs."

The execution was the first time Oklahoma had used midazolam as the first element in its three-drug cocktail. The drug is generally used for children "before medical procedures or before anesthesia for surgery to cause drowsiness, relieve anxiety, and prevent any memory of the event," the U.S. National Library of Medicine says. "It works by slowing activity in the brain to allow relaxation and sleep."

The drug "may cause serious or life-threatening breathing problems," so a child should only receive it "in a

Exhibit 10
Page 391
Page 2 of 5                                                                    May 23, 2014 04:33:35PM MDT

http://www.cnn.com/2014/04/30/us/oklahoma-botched-execution/index.html

Case 2:09-cv-04454-SLum-Dogument 28-8 Filed 09/26/14 Page 11 of 136
Case 2:11-cv-04454-SLum-Document 28-8 Filed 09/26/14 Page 11 of 136 D #:4630

hospital or doctor's office that has the equipment that is needed to monitor his or her heart and lungs and to provide life-saving medical treatment quickly if his or her breathing slows or stops."

### Cruel and unusual?

The question for courts is whether using such drugs in executions constitutes "cruel and unusual" punishment, in violation of the Eighth Amendment to the U.S. Constitution.

After his execution, McGuire's family filed a lawsuit seeking an injunction of the execution protocol the state used.

"The lawsuit alleges that when Mr. McGuire's Ohio execution was carried out on January 16th, he did endure frequent episodes of air hunger and suffocation, as predicted," the office of the family's attorney Richard Schulte said in a statement. "Following administration of the execution protocol, the decedent experienced 'repeated cycles of snorting, gurgling and arching his back, appearing to writhe in pain,' and 'looked and sounded as though he was suffocating.' This continued for 19 minutes."

In Oklahoma, attorneys for both Lockett and Warner have been engaged in a court fight over the drugs used in the state's executions.

They'd initially challenged the state Department of Corrections' unwillingness to divulge which drugs would be used. The department finally disclosed the substances.

Lockett and Warner also took issue with the state's so-called secrecy provision forbidding it from disclosing the identities of anyone involved in the execution process or suppliers of any drugs or medical equipment. The Oklahoma Supreme Court rejected that complaint, saying such secrecy does not prevent the prisoners from challenging their executions as unconstitutional.

After Lockett's execution, Adam Leathers, co-chairman of the Oklahoma Coalition to Abolish the Death Penalty, accused the state of having "tortured a human being in an unconstitutional experimental act of evil."

"Medical and legal experts from around the country had repeatedly warned Oklahoma's governor, courts and Department of Corrections about the likelihood that the protocol intended for use ... would be highly problematic," said Deborah Denno, death penalty expert at Fordham Law School.

"This botch was foreseeable and the state (was) ill prepared to deal with the circumstances despite knowing that the entire world was watching. Lethal injection botches have existed for decades but never have they been riskier or more irresponsible than they are in 2014. This outcome is a disgrace," Denno said.

Amnesty International USA called the botched execution "one of the starkest examples yet of why the death penalty must be abolished."w

"Last night the state of Oklahoma proved that justice can never be carried out from a death chamber," Executive Director Steven W. Hawkins said in a statement.

### Investigation

The Oklahoma attorney general's office is "gathering information on what happened in order to evaluate," said spokeswoman Dianne Clay.

Fallin ordered an independent review of the state's execution procedures and issued an executive order granting a two-week delay in executions.

"I believe the legal process worked. I believe the death penalty is an appropriate response and punishment to those who commit heinous crimes against their fellow men and women. However, I also believe the state needs to be certain of its protocols and its procedures for executions and that they work," she told reporters Wednesday.

Fallin gave no deadline for the review, which will be led by Department of Public Safety Commissioner Michael Thompson. If it is not done within the 14-day period, the governor said she would issue an additional stay for Warner.

Lockett's attorney slammed the announcement and called for a "truly" independent investigation.

"The DPS is a state agency, and its Commissioner reports to the Governor. As such, the review proposed by Governor Fallin would not be conducted by a neutral, independent entity.

"In order to understand exactly what went wrong in last night's horrific execution, and restore any confidence in the execution process, the death of Clayton Lockett must be investigated by a truly independent organization, not a state employee or agency," Dean Sanderford said in a statement.

Lockett was convicted in 2000 of a bevy of crimes that left Stephanie Nieman dead and two people injured.

Nieman's parents released a statement Tuesday prior to Lockett's scheduled execution.

"God blessed us with our precious daughter, Stephanie for 19 years," it read. "She was the joy of our life. We are thankful this day has finally arrived and justice will finally be served."

Warner, who now awaits execution, was convicted in 2003 for the first-degree rape and murder six years earlier of his then-girlfriend's 11-month-old daughter, Adrianna Waller.

His attorney, Madeline Cohen, said further legal action can be expected given that "something went horribly awry" in Lockett's execution Tuesday.

"Oklahoma cannot carry out further executions until there's transparency in this process," Cohen said. "... Oklahoma needs to take a step back."

In a CNN/ORC poll earlier this year, 50% of Americans said the penalty for murder in general should be death, while 45% said it should be a life sentence. The survey's sampling error made that a statistical tie. Fifty-six percent of men supported the death penalty for murder in general, while 45% of women did.

A Gallup poll last year found 62% of Americans believe the death penalty is morally acceptable, while half as many, 31%, consider it morally wrong.

Exhibit 10
Page 393

Page 4 of 5                                                                                     May 23, 2014 04:33:35PM MDT

http://www.cnn.com/2014/04/30/us/oklahoma-botched-execution/index.html

CNN's Dana Ford, Elliott C. McLaughlin and Ross Levitt contributed to this report.

© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

Exhibit 10
Page 394

Exhibit 11

Dana Ford and Ashley Fantz,
*Controversial Execution In Ohio Uses New Drug Combination*, CNN.com,
January 17, 2014

Exhibit 11
Page 395

http://www.cnn.com/2014/01/16/justice/ohio-dennis-mcguire-execution/

Case 2:09-cr-02158-CJC Document 109-3 Filed 09/26/14 Page 15 of 136
Case 2:09-sp-02158-CJC Document 109-3 Filed 06/09/14 Page 15 of 263 Page ID #:4634

## Controversial execution in Ohio uses new drug combination

*By Dana Ford and Ashley Fantz , CNN*
*updated 1:01 PM EST, Fri January 17, 2014*

CNN.com

**(CNN)** -- Ohio inmate Dennis McGuire appeared to gasp and convulse for roughly 10 minutes before he died Thursday by lethal injection using a new combination of drugs, reporters who witnessed it said.

McGuire was convicted in 1994 of the rape and murder of 22-year-old Joy Stewart, who was seven months pregnant. Her relatives were at Southern Ohio Correctional Facility in Lucasville to witness his death, according to tweets from television reporter Sheila Gray.

McGuire's "children and daughter-in-law were crying and visibly upset," Gray tweeted.

She said McGuire, before the drugs took effect, thanked Stewart's family for a letter he apparently received.

"To my children, I'm sorry. I love you. I'm going to heaven and I'll see you there when you come," McGuire reportedly said, according to CNN affiliate WDTN.

Columbus Dispatch reporter Alan Johnson said that the whole execution process took 24 minutes, and that McGuire appeared to be gasping for air for 10 to 13 minutes.

"He gasped deeply. It was kind of a rattling, guttural sound. There was kind of a snorting through his nose. A couple of times, he definitely appeared to be choking," WDTN quoted Johnson as saying.

The convicted murderer was pronounced dead at 10:53 a.m. ET.

The execution generated controversy because, like many states, Ohio has been forced to find new drug protocols after European-based manufacturers banned U.S. prisons from using their drugs in executions -- among them, Danish-based Lundbeck, which manufactures pentobarbital.

According to Ohio's corrections department, the state used a combination of the drugs midazolam, a sedative; and the painkiller hydromorphone.

Both the length of time it took for McGuire to die and his gasping are not typical for an execution, said Howard Nearman, an anesthesiologist at University Hospitals Case Medical Center in Cleveland.

"Why it took 24 minutes, I really can't tell you," he said. "It just makes you wonder -- what was given? What was the timing, and what were the doses?"

In an opinion piece written for CNN this week, a law professor noted that McGuire's attorneys argued he would "suffocate to death in agony and terror."

"The state disagrees. But the truth is that no one knows exactly how McGuire will die, how long it will take or what he will experience in the process," wrote Elisabeth A. Semel, clinic professor of law and director of the Death Penalty Clinic at U.C. Berkeley School of Law.

Speaking on behalf of McGuire's legal team, attorney Allen Bohnert called on the governor to impose a moratorium on future executions because of what took place Thursday.

"At this point, it is entirely premature to consider this execution protocol to be anything other than a failed, agonizing experiment," he said in a statement.

"The people of the State of Ohio should be appalled at what was done here today in all of our names. Ohio, like its citizens, must follow the law. The state has failed."

CNN's Sonny Hostin said that McGuire's execution will likely spark debate over whether how inmates react to the use of the drugs constitutes cruel and unusual punishment prohibited by the U.S. Constitution.

"Whenever there's a change in the lethal injection process clearly it's subject to legal proceedings and perhaps we will see those," Hostin said.

Ohio ran out of pentobarbital, which is a narcotic and sedative barbiturate, in September, according to JoEllen Smith, spokeswoman for the Ohio Department of Rehabilitation and Correction.

In response to that shortage, the department amended its execution policy to allow for the use of midazolam and hydromorphone.

Stewart's body was discovered by hikers near a creek in southwestern Ohio in February of 1989. Her throat was cut and she had been sodomized.

Death penalty states scramble for lethal injection drugs

There are currently 138 men and one woman on death row in Ohio.

The state was set to execute death row inmate Ron Phillips using the new drug combination last year, but Gov. John Kasich granted the convicted killer a stay of execution pending a review of a possible organ donation to his family members.

CNN's Joe Sutton, Ross Levitt and Deborah Feyerick contributed to this report.

© 2014 Cable News Network. Turner Broadcasting System, Inc. All Rights Reserved.

Exhibit 11
Page 397
Page 2 of 2

# Exhibit 12

# PriceWaterhouseCoopers, *Cost of Private Panel Attorney Representation in Federal Capital Habeas Corpus Cases from 1992 to 1998*, February 9, 1999

Exhibit 12
Page 398

# *Cost of Private Panel Attorney Representation in Federal*
# *Capital Habeas Corpus Cases from 1992 to 1998*

**February 9, 1999**



Exhibit 12
Page 399

TABLE OF CONTENTS

Section I: Executive Summary.............................................................................. i

    I.1   Introduction.......................................................................................... i

    I.2   The Nine Steps of Capital Litigation ............................................... iii

    I.3   Costs of Federal Capital Habeas Corpus Cases ...................................v

    I.4   Regional Differences in the Costs of Federal Capital Habeas Corpus

    Cases ..................................................................................................x

    I.5   Factors Driving Costs of Federal Capital Habeas Corpus Cases.... xvi

    I.6   Factors Explaining the Cost Differential Between California and

    Non-California Cases........................................................................ xviii

Section II: Background to Study....................................................................II-1

    II.1  The Defender Services Program .....................................................II-1

    II.2  The Cost of Federal Capital Habeas Corpus Review......................II-2

    II.3  Reason for This Study....................................................................II-4

Section III: Federal Capital Habeas Corpus Case Life Cycle..................... III-7

    III.1 Definition of Federal Capital Habeas Corpus ............................... III-7

    III.2 Background on Federal Capital Habeas Corpus ........................... III-7

    III.3 The 9 Stages of Capital Litigation ............................................. III-10

Section IV: Methodology..........................................................................IV-28

    IV.1 Overall Methodology ..................................................................IV-28

    IV.2 Data Analysis Methodology ........................................................IV-29

    IV.3 Survey Methodology....................................................................IV-33

    IV.4 Methodology for the Case Studies...............................................IV-35

Section V: CJA Panel Attorney Payment System Database Analysis....... V-38

    V.1  National Costs.............................................................................. V-38

    V.2  Breakdown of Costs by Stage of Proceeding................................ V-39

    V.3  Breakdown of Costs by Component ............................................. V-44

    V.4  Breakdown of Costs by Circuit..................................................... V-46

*PRICEWATERHOUSECOOPERS* 🅐

Exhibit 12
Page 400

V.5  Study of Ninth Circuit Cases by State ......................................... V-59

V.6  Accounting for the Cost Differential Between the Average California
and Non-California Case.......................................................... V-67

Section VI:  Factor Analysis .................................................... VI-81

VI.1 Attorney Opinions........................................................ VI-82

VI.2 Regression Analysis...................................................... VI-86

Section VII:  Comparative Study of Selected States ................................ VII-96

VII.1 Habeas Petition Stage.................................................. VII-96

VII.2 Evidentiary Hearing Stage...................................... VII-101

VII.3 Appeal Stage........................................................ VII-105

VII.4 All Stages ......................................................... VII-106

Section VIII:  Conclusions.................................................... VIII-111

VIII.1 The Costs of Capital Federal Habeas Corpus Cases ........... VIII-112

VIII.2 Factor Analysis ................................................. VIII-115

VIII.3 Case Study Analysis and Analysis of States in the Ninth Circuit
................................................................... VIII-117

### TABLE OF FIGURES

ES Figure 1:  Total Cost of Federal Capital Habeas Corpus Cases ......................... vi

ES Figure 2:  Average Federal Capital Habeas Corpus Costs by Component.........ix

ES Figure 3: Median Federal Capital Habeas Corpus Costs by Component...........ix

ES Figure 4:  Cost of Federal Capital Habeas Corpus Cases by Circuit .................. x

ES Figure 5:  Cost of All Cases By Circuit.............................................. xi

ES Figure 6:  Average and Median Cost of Federal Capital Habeas Corpus
Cases by State............................................................... xii

ES Figure 7:  Average and Median Cost Per Case By District.............................. xiii

ES Figure 8:  The Cost Difference Between the Average Case Cost in Non-
California Cases and the Average Case Cost in California........................... xiv

*PRICEWATERHOUSE(COOPERS* ⬛

Exhibit 12
Page 401

ES Figure 9: Additional 1,600 Attorney Out-of-Court Hours Spent in California Cases Compared to Non-California Cases Broken Down by Activity .................................................................................................... xv

ES Figure 10: Difference Between Average Cost of Stage of Proceedings for California and Non-California Cases ............................................................ xvi

Figure III-1: The Stages of Capital Litigation ................................................. III-11

Figure III-2: Life Cycle of a Federal Capital Habeas Corpus Case ................. III-17

Figure V-1: Distribution of Costs and Number of Cases ................................... V-38

Figure V-2: Distribution of Costs and Number of Open Cases ......................... V-40

Figure V-3: Distribution of Costs and Number of Closed Cases ....................... V-42

Figure V-4: Total Cost of Open Cases by Stage of Proceeding ......................... V-43

Figure V-5: Total Cost of Closed Cases by Stage of Proceeding ...................... V-44

Figure V-6: Average Cost Per Case—Attorney, Expert Costs and Expenses .... V-45

Figure V-7: Median Cost Per Case—Attorney, Expert Costs, and Expenses ..... V-45

Figure V-8: Average and Median Cost Per Case By Circuit ............................. V-46

Figure V-9: Average Cost of All, Open and Closed Cases by Circuit ................ V-47

Figure V-10: Percentage of Open Cases by Circuit .......................................... V-48

Figure V-11: Average and Median Cost By State ............................................. V-49

Figure V-12: Average and Median Cost Per Case By District .......................... V-50

Figure V-13: Plot of All Cases for All Circuits and California .......................... V-51

Figure V-14: Comparison of Costs of California and Non-California Cases .... V-52

Figure V-15: Out-of-Court Hours Spent by Attorney per Case per Circuit........ V-53

Figure V-16: Average Out-of-Court Attorney Rate per Circuit ......................... V-54

Figure V-17: Average Attorney Hours in the Habeas Petition Stage by Circuit
.................................................................................................................... V-55

Figure V-18: Average Attorney Hours in the Evidentiary Hearing Stage by Circuit ........................................................................................................ V-56

Figure V-19: Average Attorney Hours Spent in the Appeal Stage By Circuit ... V-57

Figure V-20: Average Expert Cost Per Case by Circuit ..................................... V-58

Figure V-21: Average Costs Per Case for Habeas Petition and Evidentiary Hearing Stages ........................................................................................... V-61

*PRICEWATERHOUSECOOPERS*

Exhibit 12
Page 402

Figure V-22: Average Out-of-Court Rate Per Case in the Ninth Circuit, By
State .................................................................................................... V-63

Figure V-23: Average Number of Out-of-Court Hours per Case in the Ninth
Circuit .................................................................................................. V-64

Figure V-24: Average Number of Attorneys Per Case in the Ninth Circuit, By
State .................................................................................................... V-65

Figure V-25: Average Time Spent Per Case Per Activity ................................. V-66

Figure V-26: The Cost Differential Between the Average Case Cost in Non-
California Cases and the Average Case Cost in California ........................ V-68

Figure V-27: Percentage of the Cost Differential Between California and Non-
California Cases Attributable to Certain Factors ...................................... V-68

Figure V-28: Percentage of Out-of-Court Cost Attributed to Each Attorney
Activity ................................................................................................ V-69

Figure V-29: Average Cost Per Case For Experts in All Stages ........................ V-74

Figure V-30: Average Cost per Case by Expert Type, California Cases vs.
Non-California Cases ............................................................................. V-76

Figure V-31: Average and Median Cost by Stage of Proceeding for California
and Non-California Cases ....................................................................... V-78

Figure VII-1:  Average Cost of the Habeas Petition Stage of a Case for
Selected States ..................................................................................... VII-97

Figure VII-2: Average Cost of Investigators Per Case for Selected States ..... VII-99

Figure VII-3: Average Cost Per Case for Selected States of Reviewing Court
Records ................................................................................................ VII-100

Figure VII-4: Average Cost Per Case of the Evidentiary Hearing Stage for
Selected States ..................................................................................... VII-101

Figure VII-5: Average Cost of Experts Per Case for Selected States ............ VII-103

Figure VII-6: Average Cost Per Case of Mental Health Experts for Selected
States .................................................................................................. VII-104

Figure VII-7: Average Cost Per Case of Consulting With Experts for Selected
States .................................................................................................. VII-105

PRICEWATERHOUSECOOPERS 🅑

Exhibit 12
Page 403

Figure VII-8: Average Cost Per Case of the Appeal Stage for Selected States ........................................................................................................ VII-106

**TABLE OF TABLES**

ES Table 1: Average and Median Costs of Open and Closed Federal Capital Habeas Corpus Cases ........................................................................ vi

ES Table 2:  Average and Median Costs per Stage of Proceeding ....................... viii

Table V-1: Average Cost Per Case in Ninth Circuit States ............................... V-60

Table V-2: Number of Cases by Stage of Proceeding ....................................... V-62

Table V-3: Percentage of Cases Using Experts ................................................ V-73

Table V-4: Average Cost Per Expert by Stage of Proceeding ........................... V-75

Table VI-1: List of Factors ............................................................................. VI-83

Table VI-2: Survey Results on the Percentage of Habeas Claims Per Case ..... VI-84

Table VI-3: Attitudes that Affect Costs ......................................................... VI-85

Table VI-4-: Regression Model of All Cases ................................................... VI-94

Table VI-5-:  Regression Model of Non-California Cases ............................... VI-95

**APPENDICES**

Appendix A: Regression Analysis Methodology ......................................... A-1

Appendix B: Federal Capital Habeas Corpus Survey for Panel Attorneys .... B-1

Appendix C:  Case Study Profiles ............................................................... C-1

*PriceWaterhouseCoopers* 🅡

Exhibit 12
Page 404

# Section I: Executive Summary

## I.1 Introduction

In September 1998 the Administrative Office of the United States Courts (AOUSC) requested that PricewaterhouseCoopers (PwC) analyze the costs of private panel attorney[1] representation of federal capital habeas corpus cases from 1992 to 1998. In particular, PwC was asked to identify regional differences in costs and potential reasons for those differences. The following report is the result of that analysis.

Federal capital habeas corpus involves federal court review of a state capital murder conviction and a death sentence that has already been upheld by a state court. The petitioner—the person sentenced to death—makes a claim that his constitutional rights were violated at some point during the state proceedings.[2] Thus, the writ of habeas corpus serves as a check on state courts and their application of federal constitutional protections, but does not determine the prisoner's guilt or innocence. The procedural and substantive legal rules governing federal capital habeas corpus review are evolving and very complicated (see I.2. The Nine Steps of Capital Litigation below).[3]

---

[1] Private panel attorneys are private attorneys who are compensated with public dollars to provide representation to those financially unable to secure adequate representation in criminal and related proceedings. As such, they are part of the Defender Services Program operated by the Administrative Office of the U.S. Courts. These attorneys are often referred to as CJA panel attorneys in reference to the Criminal Justice Act of 1964, which provides authorization for compensating them.

[2] Claims are typically made under the 4th, 5th, 6th, 8th, and 14th Amendments.

[3] See Section 3 for a detailed discussion of the life cycle of a federal capital habeas case.

i

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 405

Concern about regional differences in the costs of federal capital habeas corpus representations by CJA panel attorneys arose, in part, from a 1998 Coopers & Lybrand report on the costs of the Defender Services Program. In that report, Coopers & Lybrand noted that the Ninth Circuit, driven by the California districts, accounted for 60 to 76 percent of capital habeas representation costs, in contrast with 48 to 63 percent of the representations between 1992 and 1997.[4]

Following a House Appropriations Subcommittee hearing during which this finding was discussed, Judge John G. Heyburn II, Chair of the Judicial Conference Budget Committee, and Leonidas Ralph Mecham, AOUSC Director, wrote to Representative Harold Rogers, Chairman of the House Subcommittee, outlining the judiciary's efforts to control the cost of capital habeas cases in the Ninth Circuit and California. These measures include mandatory case budgeting as well as Circuit Judicial Council review and approval of case budgets for all pending and new capital habeas proceedings. In addition, the AOUSC awarded PwC a contract to study the issue.

In this study, PwC used three sources of data and information to identify the costs and regional disparities in the costs of federal capital habeas corpus cases, as well as the possible reasons behind these costs and regional disparities:

1.  Analysis of vouchers from the CJA Panel Attorney Payment System database, which contains information on costs incurred and hours spent on CJA panel attorney cases;

---

[4] Report on Costs and Recommendations for the Control of Costs of the Defender Services Program, Coopers & Lybrand L.L.P., page 25.

ii

*PRICEWATERHOUSE*COOPERS ▣

Exhibit 12
Page 406

2.     Analysis of responses to a survey distributed to a sample of CJA panel attorneys; and

3.     Case studies of seven separate cases from six states, including two cases from California.

None of the analyses included in this report should be taken as representing PwC's recommendations as to what are, or should be, *appropriate* costs of federal capital habeas corpus cases. In particular, comparison of the average costs of cases by circuit, district, and state does not, by itself, indicate whether costs are too high or too low in any particular region.

## I.2   The Nine Steps of Capital Litigation

Beginning with the state trial, a capital case may pass through nine steps of litigation before the case is finally closed. These nine steps are:

Step 1:  State trial and sentencing;

Step 2:  Direct appeal at the state level;

Step 3:  Petition for certiorari review of state conviction in the U.S. Supreme Court;

Step 4:  State collateral review (post-conviction proceedings);

Step 5:  Appeal of state collateral review decision at the state level;

Step 6:  Petition for certiorari review of state collateral review in the U.S. Supreme Court;

Step 7:  Petition for writ of habeas corpus in federal district court;

Step 8:  Appeal of federal district court decision in the federal court of appeals; and

iii

PRICEWATERHOUSECOOPERS 🅿

Exhibit 12
Page 407

Step 9:  Petition for certiorari review in U. S. Supreme Court.

The federal capital habeas corpus stage begins at Step 7 and ends at Step 9, but the time taken for a case to pass through these steps depends heavily on what occurs at the state level in the prior six steps. Therefore, petitioner's counsel must familiarize himself or herself with all that went on in the case before it reaches Step 7.  The volume and complexity of the work involved in providing representation in a federal capital habeas corpus case can therefore be substantial.

Moreover, there are various sub-steps in the federal habeas corpus stage.  They include:
- Appointment of counsel;
- Request for stay of execution, and appeals (if relevant) of denials of stay;
- The hearing of dispositive motions; and
- The holding of an evidentiary hearing (if needed) and oral arguments before the judge.

These steps do not always proceed uninterrupted.  At any point in the process this sequence of sub-steps may be suspended: a case may be sent back to the state court; an appeal may be made to the circuit court; or procedural litigation, such as whether the time limits imposed by the Anti-terrorism and Effective Death Penalty Act apply, may be instigated.  Each delay adds to the cost of a case as attorneys take time to review the case again, learn new statutory and case law, renew contact with witnesses, and so on.  The life cycle is discussed more fully in section III.

iv

*PRICEWATERHOUSECOOPERS* 🔲

Exhibit 12
Page 408

## I.3 Costs of Federal Capital Habeas Corpus Cases[5]

***Total Costs of Federal Capital Habeas Corpus Cases:*** The total cost
of CJA panel attorney representation in 1,009 federal capital habeas
corpus cases between 1992 and 1998 was $112.1 million. PwC
removed certain vouchers and cases (totaling $9.8 million) deemed
inappropriate for the analysis,[6] leaving $102 million in total costs for
783 cases. The analyses and figures in the rest of this report relate to
these 783 cases.

Almost 90 percent of these costs (about $90 million) were incurred in
631 open cases, while approximately 10 percent of the total costs
analyzed were incurred in the 152 closed cases.[7] Of the open cases,
most of the costs ($85 million) were incurred in active cases , while
only a small proportion of the total costs ($5 million) were incurred in
open cases that are dormant.[8]

---

[5] The costs analyzed in this report do not include the costs of services provided by Post-Conviction Defender Organizations (PCDOs) staff in Federal Defender Organizations, assistance provided by law school interns, or the value of pro bono work performed by other attorneys. Many of the cases in the database received assistance from one or more of these sources, especially from the PCDOs, that were operational from 1989 to 1996.

[6] A case was unsuitable for analysis if the stage of proceeding was not noted on any of the vouchers for that case, if the case's vouchers only included experts' costs, if the case had started within the past 6 months, or if the case was under seal.

[7] Cases are considered closed if the petitioner died in prison, was executed, was granted habeas relief and released (or received a reduced sentence as a result), or if the death sentence was commuted and the state court reduced the sentence. Otherwise, cases are considered open.

[8] Open cases are considered active if the attorney submitted a voucher within the last 2 years. Otherwise open cases are considered dormant.

v

*PRICEWATERHOUSECOPERS* 🗖

Exhibit 12
Page 409

## CJA Panel Attorney Payment System Data

*Open and Closed Cases by Case Disposition*



**All Cases**
Number of Cases: 783
Sum Cost : $102,293,031.13
Avg. Cost: $130,642.44
Median Cost:$63,256.82

**Open Cases**
Number of Cases: 631
Sum Cost: $89,856,704.23
Avg. Cost: $142,403.65
Median Cost: $68,154.90

**Closed Cases**
Number of Cases: 152
Sum Cost: $12,436,326.90
Avg. Cost: $81,817.94
Median Cost: $54,779.85

**Active**
Number of Cases: 563
Sum Cost: $85,218,988.17
Avg. Cost: $151,365.90
Median: $72,910.73

**Dormant**
Number of Cases: 68
Sum Cost: $4,637,716.06
Avg. Cost: $68,201.71
Median: $33,517.75

**Executed**
Number of Cases: 131
Sum Cost: $10,866,740.36
Avg. Cost: $82,952.22
Median: $55,616.75

**Commuted/Released/Died**
Number of Cases: 21
Sum Cost: $1,569,586.54
Avg. Cost: $74,742.22
Median: $53,428.87

**ES Figure 1: Total Cost of Federal Capital Habeas Corpus Cases**

*Average and Median Costs of Federal Capital Habeas Corpus Cases:*
Open cases are, on average, more costly than closed cases, and active open cases are are more costly than dormant cases. For closed cases there is little difference in cost by the final disposition of the case, as shown in ES Table 1 below.

**ES Table 1: Average and Median Costs of Open and Closed Federal Capital Habeas Corpus Cases**

| Status of Case | | Average Cost | Median Cost |
|---|---|---|---|
| All Cases | | $130,642 | $63, 257 |
| Open Cases | | $142,404 | $68,155 |
| Closed Cases | | $81,818 | $54,780 |
| *Disposition of Case* | | | |
| Open Cases: | Active | $151,366 | $72,911 |
| | Dormant | $68,202 | $33,518 |
| Closed Cases: | Executed | $82,952 | $55,617 |
| | Commuted/Released/Died | $74,742 | $53,429 |

vi

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 410

The median costs (that is, the cost of the "middle" case[9]) for all categories of case are lower than the average costs, implying that the distribution of costs is skewed to the low end (that is, there are more cases with below-average costs than above-average costs). As discussed below, this is due in large part to the number of high-cost California cases. Otherwise, the median costs show a similar pattern to the average costs: open active cases are still the most costly, and there is little difference in the median cost of closed cases by case disposition.

The relatively low average cost of closed cases compared to open cases is due largely to the impact of the large number of open and high-cost California cases. When the costs of only non-California cases are compared, there is little difference between the average cost of a closed case ($81,806) compared to an open case ($66,931).

***Cost of Federal Capital Habeas Corpus Cases by Stage of Proceeding:*** Preparation of the habeas petition is the most costly part of a case, most likely because not only does the bulk of investigation and research take place at this time but arguments are developed. This is true for both open and closed cases. For open cases, the evidentiary hearing stage is the next most costly stage. However, for closed cases the next most expensive stage is the appeal stage. This is shown in ES Table 2 below.

---

[9] By definition, 50 percent of the cases are more costly than the cost of the median case, and 50 percent of the cases are less costly.

PRICEWATERHOUSE COOPERS 🔲

Exhibit 12
Page 411

ES Table 2:  Average and Median Costs per Stage of Proceeding[10]

| Stage of Proceeding | Open Cases | | Closed Cases | |
|---|---|---|---|---|
| | Average | Median | Average | Median |
| Habeas Petition Stage | $129,363 | $46,614 | $42,366 | $27,715 |
| Evidentiary Hearing | $54,594 | $17,200 | $20,060 | $8,937 |
| Dispositive Motions | $24,570 | $12,398 | $22,976 | $8,921 |
| Appeal Stage | $29,428 | $20,713 | $30,041 | $21,140 |
| Petition for Cert | $9,333 | $8,025 | $11,762 | $8,351 |
| Other Stages | $11,216 | $4,836 | $11,015 | $4,608 |

The cost discrepancies between open and closed cases is, again, primarily due to the impact of California cases.

***Costs of Federal Capital Habeas Corpus Cases by Cost Components:***
The majority of costs (over 80 percent) for both open and closed cases can be attributed to attorney fees for time spent out of court.  The next most costly component is compensation for experts, followed by attorney expenses.  Attorney fees for in-court hours are, by comparison, minimal.  ES Figure 2 and ES Figure 3, respectively, show the average and median costs for each of these components.

---

[10] The average cost of each stage of proceeding is calculated by dividing the total costs in the database for that stage of proceeding by the number of cases that had that stage of proceeding. Each case does not go through every stage (for example, not every case has an evidentiary hearing).  Therefore, the sums of the average cost by stage ($258,504 and $138,220 for open and closed cases respectively) exceed the averages for open and closed cases given above ($142,404 and $81,818 respectively).

PRICEWATERHOUSECOOPERS 🅘

Exhibit 12
Page 412



**ES Figure 2: Average Federal Capital Habeas Corpus Costs by Component**



**ES Figure 3: Median Federal Capital Habeas Corpus Costs by Component**

ix

PRICEWATERHOUSE COOPERS

Exhibit 12
Page 413

## I.4 Regional Differences in the Costs of Federal Capital Habeas Corpus Cases

***Average Cost of Cases By Circuit:*** The average cost of a case in the Ninth Circuit is more than three times the average case cost in any other circuit, as shown in ES Figure 4.



**ES Figure 4: Cost of Federal Capital Habeas Corpus Cases by Circuit**

The high average cost of a Ninth Circuit case is not simply the result of a small number of very expensive cases. ES Figure 5 shows a curve for all cases in each circuit that links the cost of those cases, starting with the most costly case and ending with the least costly case.[11] Curves for California and non-California Ninth Circuit cases have also been included in the chart. Several facts are immediately apparent:

---

[11] Although cases in the Ninth Circuit were the most costly, all circuits had at least one case whose costs exceeded the national average and median.

x

*PRICEWATERHOUSE COOPERS* 🅶

Exhibit 12
Page 414

- District courts in the Ninth Circuit have a larger caseload than district courts in other circuits, with approximately 300 cases out of a total of 783;

- The median cost of a case in the Ninth Circuit is very high relative to that of other circuits; in fact 95% of the cases in these other circuits cost less than the median cost of a case in the Ninth Circuit; and

- California cases drive Ninth Circuit costs.



**ES Figure 5: Cost of All Cases By Circuit**

***Average and Median Cost of Cases by State:*** Further evidence that the high average and median cost of Ninth Circuit cases is driven by the costs of California cases is shown in ES Figure 6 below, a comparison of costs by state. Note that for most states, the median cost is lower than the average cost, again indicating that in most states low-cost cases outnumber high-cost cases. The high average costs and

xi

*PRICEWATERHOUSECOOPERS*

Exhibit 12
Page 415

the large number of California cases mean that California cases account for $58 million, or 57 percent, of the total national cost of $102 million.



**ES Figure 6: Average and Median Cost of Federal Capital Habeas Corpus Cases by State**

***Average Cost of Cases by District:*** PwC also analyzed average case costs by district for districts with more than 10 cases in the CJA Panel Attorney Payment System database (see ES Figure 7 below). All California districts had a very high average case cost (and median case cost), ranging from California Eastern's $300,000 to $436,000 in California Northern (California Southern is not shown because it only had one case). No other district outside of California approached the average California case cost, although many of the non-California Ninth Circuit districts had relatively high average costs compared to non-Ninth Circuit cases. This suggests that part, but only a small part,

xii

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 416

of California's high costs can be attributed to factors relating to the
Ninth Circuit as a whole.



**ES Figure 7: Average and Median Cost Per Case By District (Districts
With More Than 10 Cases)**

***Average California and Non-California Costs:*** The average cost of a
case originating in California was $372,029, and the average cost of a
non-California case was $70,360. Most of the difference between
these two averages ($301,669) is due to the additional out-of-court
hours that California attorneys work, as shown by the following
breakdown of the difference in averages:

- $170,349 is due to the additional out-of-court hours worked by
  California attorneys (an average of 2,180 hours for California cases
  compared to an average of 578 hours for non-California cases);

xiii

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 417

- $60,253 is due to the higher attorney hourly rates in California ($133.90 average per hour for California cases, compared to $106.30 average per hour for non-California cases);[12]

- $35,888 is due to higher expert costs in California cases (an average of $39,462 in expert costs in California cases, compared to an average of $3,574 in non-California cases);

- $31,360 is due to higher attorney expenses in California cases (an average of $35,566 in California cases, compared to an average of $4,205 in non-California cases); and

- $3,831 is due to additional in-court attorney fees in California (an average of 134 in-court hours in California cases, compared to an average of 106 in-court hours in non-California cases).

This breakdown is shown graphically in ES Figure 8.



**ES Figure 8: The Cost Difference Between the Average Case Cost in Non-California Cases and the Average Case Cost in California**

---

[12] The hourly rate is now capped at $125 by statute.

xiv

PRICEWATERHOUSECOOPERS 🅑

Exhibit 12
Page 418

Of the $170,349 resulting from the difference in out-of-court hours, almost half (45 percent) was due to additional time spent performing legal research and writing, as shown below in ES Figure 9. California attorneys spent, on average, 135 more hours reviewing the (typically much longer) trial record than their non-California counterparts (188 hours for California cases compared to 53 hours for non-California cases) for an additional cost of $14,377, and 89 more hours consulting with experts (107 hours for California cases compared to 18 hours for non-California cases) for an additional cost of $9,507.



**ES Figure 9: Additional 1,600 Attorney Out-of-Court Hours Spent in California Cases Compared to Non-California Cases Broken Down by Activity**

*Average California and Non-California Costs By Stage of Proceeding:* The greatest difference between the average cost of a California case compared with a non-California case can be attributed to the difference in costs incurred during the habeas petition stage

PRICEWATERHOUSECOOPERS 🅐

Exhibit 12
Page 419

(approximately $330,000 for California cases, compared to $50,000 for non-California cases).

An evidentiary hearing in California is also more costly (approximately $113,000 for California cases compared to $20,000 for non-California cases).



**ES Figure 10: Difference Between Average Cost of Stage of Proceedings for California and Non-California Cases**

## I.5 *Factors Driving Costs of Federal Capital Habeas Corpus Cases*

Many factors drive the costs of federal capital habeas corpus cases.[13] A statistical analysis of the impact of nine factors on the costs of 84 non-

---

[13] The factors driving the costs of all cases may differ from the factors that explain why the costs of California cases are greater than the costs of non-California cases.

xvi

*PRICEWATERHOUSECOOPERS* ⓘ

Exhibit 12
Page 420

California cases only accounted for only 14 percent of the total costs.[14] This supports the notion that the costs of cases are typically based on case-specific factors, such as the complexity of the petitioner's personal background, the particulars of the circumstances surrounding the crime, and the idiosyncrasies of the state trial. These factors are difficult to quantify and include in a statistical model.

PwC therefore sent out a survey to CJA panel attorneys as part of this study. The survey results showed that the attorneys believe the following factors are the most important in driving the costs of cases. The factors are listed in descending order of importance:

- *The level of competency of state trial counsel:* More than 80 percent of the attorneys who were surveyed raised "Ineffective assistance of counsel" (at the state trial) as a habeas claim. A poor defense by counsel at the initial trial often leads to underdevelopment of the facts of the case.

- *The lack of development of facts during the state trial:* At the federal habeas corpus stage, an underdeveloped case may, in turn, lead to more investigation, research, and development of an argument of ineffective assistance of trial counsel. Such investigation and research typically occurs years after the initial trial, and can be time-consuming and costly.

- *The degree of legal research required, especially for new or original claims:* New claims (that is, claims for which a precedent

---

[14] These factors were: attorney experience; size of trial record; number of habeas corpus claims raised; whether investigation at trial involved travel to other states; continuity of counsel from state to federal post-conviction proceedings; number of state post-conviction proceedings; denial of attorney requests (for experts, attorney fees, and for evidentiary hearings) at the federal post-conviction proceedings; denial of a request for an evidentiary hearing at the state post-conviction proceeding; and whether funding was provided for the state post-conviction proceeding.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 421

has not been set) typically require more hours spent in research and writing than claims which follow precedents.

- *The complexity of the petitioner's personal background:* The complexity of the petitioner's personal background and the idiosyncrasies of the state trial (which may give rise to habeas claims) also play a part in affecting costs. The degree of complexity of these issues can differ significantly from case to case. But these issues provide the basis for habeas petition claims and can therefore dictate the number of hours spent in investigating, researching and writing, and developing the case.

- *The "aggressiveness" of the state attorney general:* The attitude and tactics of the state attorney general's office can increase costs in a number of ways. For example, decisions by the attorney general's office to raise, rather than waive, the exhaustion defense[15] can increase the amount of time spent in litigation and prolong the entire judicial process. The strategy of the California Attorney General's Office in litigating claims is believed to have a major impact on the costs of cases in California, as discussed below.

## I.6 Factors Explaining the Cost Differential Between California and Non-California Cases

PwC identified several possible reasons for the regional difference in average costs. However, in linking these reasons directly to costs,

---

[15] The exhaustion defense is an argument that petitioner's counsel did not raise all the claims contained in the federal habeas corpus petition in the state courts, either on direct appeal or in state post-conviction proceedings. If petitioner's counsel did not exhaust all claims during the state proceedings before filing in federal court, the federal court can require the petitioner to present the claims to the state court before continuing the federal proceedings.

*PRICEWATERHOUSE COOPERS* 🅡

Exhibit 12
Page 422

PwC encountered two problems. First, while the CJA Panel Attorney Payment System Database shows the amount of time spent on specific tasks, there is no way of knowing from the database the *causes* for time being devoted to those tasks. Secondly, many of the factors identified are related and mutually reinforcing, creating a set of interlocking factors that create a high-cost environment. For example, a perfunctory state post-conviction process that results in an undeveloped case may lead to high investigation costs at the federal level as the petitioner's counsel investigates the facts. Similarly, if the federal court requires rigorous review of the facts of the case, investigation costs may also be high. When these two factors are combined—that is, when the state has a perfunctory post-conviction process and the federal court requires rigorous review of the facts of the case—investigation of the case at the federal level may become very costly. In this case it is almost impossible to separate the relative importance of the two factors. It is the combination of the two factors that drives costs.

The two factors described above are typical of California state and federal court processes. A state that exhibits one, but not both of these characteristics, may have relatively low costs. For example, compared to other states and similar to California, Texas has a relatively cursory post-conviction review process at the state level. But when cases reach the federal courts, Texas cases do not receive the attention afforded California cases. This is one reason why Texas, unlike California, is a low-cost state.

xix

PRICEWATERHOUSECOOPERS 🅸

Exhibit 12
Page 423

Despite these problems, there is anecdotal, circumstantial, and quantifiable evidence that supports the following reasons as being key factors that affect costs. However, the relative significance of these reasons cannot be accurately determined.

***The Litigation Strategy Employed by the California Attorney General's Office:*** One factor that emerged during the case studies was the litigation tactics used by the California Attorney General's Office.[16] For example, attorneys interviewed by PwC stated that the California Attorney General's Office will rarely waive the exhaustion defense (see footnote 15). Eighty-three percent of the California attorneys surveyed by PwC, but only 38 percent of non-California attorneys surveyed, stated that their cases were, at one point, pending in the federal court while simultaneously in the state court for exhaustion proceedings. This delays the federal proceedings while the case is in state court, potentially increasing costs. Attorneys need time to review the case and new statutory and case law following the state proceedings. Attorneys also need to renew contact with witnesses and experts.

In addition, since the Anti-terrorism and Effective Death Penalty Act (AEDPA) was passed in 1996, the California Attorney General's Office has litigated the application of the AEDPA in every case—a practice unique to California. An alternative strategy used in other states is to litigate the issue once in a test case in federal court and use the result as precedent, thereby limiting the number of these AEDPA-

---

[16] A new California Attorney General was elected in the 1998 elections.

*PRICEWATERHOUSECOOPERS* 🅾

Exhibit 12
Page 424

related hearings. The attorneys interviewed for the case profiles provided many examples of the California Attorney General Office's litigation practices in this regard.

This type of litigation strategy is familiar to attorneys who practice in California, but it is difficult to quantify the financial impact of such strategies. More litigation results in more time spent out-of-court preparing motions and undertaking legal research and writing. A hypothetical example demonstrates how an intensive litigation strategy could potentially increase out-of-court attorney fees and hence costs. For example, if two attorneys each spend an additional 80 out-of-court hours (or 2 weeks each), at a rate of $125 per hour responding to issues raised by the California Attorney General's Office, the additional cost to that case would be $20,000. If the response took 400 hours (or 10 weeks) each, the additional cost would be $100,000.

***Judicial Practices and Jurisprudence of the California State and Federal Courts:*** These factors can have a very direct impact on the cost of cases. For example, the combination of relatively limited state post-conviction proceedings and thorough federal post-conviction proceedings adds to costs in a variety of ways. Differences in the jurisprudence between the Ninth Circuit Court of Appeals and the California federal district courts can also lead to more time being spent by attorneys as the case goes from federal district to federal circuit court and possibly back to the district court again. Some of the most important jurisprudential factors that affect costs are as follows:

- *Provision of funding for investigation and experts by the federal courts.* Federal capital habeas corpus attorneys in California cases

xxi

PRICEWATERHOUSECOOPERS 🅑

Exhibit 12
Page 425

spend $15,000 per case on investigators compared to $1,600 in non-California states at the federal post-conviction level. This is in part to make up for factual underdevelopment of the case at the state post-conviction level. For example, according to attorneys surveyed, requests for discovery at the state level are more often denied in California than in other states: in California, 88 percent of requests for discovery were denied, as opposed to 59 percent of requests for discovery in other states.

- *The granting of evidentiary hearings at the federal level because the state courts deny evidentiary hearings at the state post-conviction stage.* The average cost, including costs for expert services, of an evidentiary hearing in the federal courts in California is $112,800 compared to $20,200 in other states. Moreover, evidentiary hearings are more common in California federal courts than in the federal courts in other states. Of cases that have progressed to the appeal stage, 42 percent of the California cases had an evidentiary hearing, compared to only 11 percent of the non-California cases. This is probably related to the fact that requests for evidentiary hearings are routinely denied during the state post-conviction proceedings in California. In their responses to the PwC survey, California attorneys indicated that requests for evidentiary hearings at the state level were denied or sharply reduced. By contrast, non-California attorneys responded that such requests were minimally reduced. The federal courts may hold an evidentiary hearing to promote the complete development of facts that in other states are revealed during the state post-conviction evidentiary hearing.

PRICEWATERHOUSECOOPERS 🏢

Exhibit 12
Page 426

- *California cases are more likely to have an interlocutory appeal[17] than cases from other states.* Of 129 cases covered in the survey, 65 percent of the California cases had an interlocutory appeal to the circuit court, whereas only 22 percent of non-California cases had an interlocutory appeal. Interlocutory appeals increase the amount of time spent on a case because attorneys need to prepare and respond to filings related to the appeal.

Note that the costs of all cases—both California and non-California cases—are reviewed and approved by the judicial officer presiding over the case. Judges in the Ninth Circuit are little different from judges in other circuits with respect to the percentage of claimed attorney fees and expenses they approve. According to the CJA Panel Attorney Payment System database, Ninth Circuit judges approve 97 percent of claimed costs whereas judges in all other circuits combined approve 95 percent of claimed costs. While these approval ratios are similar, there is a large difference in the dollars approved, because claimed costs are significantly higher in the Ninth Circuit (and particularly in California) than in other circuits. Even though Ninth Circuit judges have expressed concern about the high costs of this type of case (and have taken steps to reduce costs), the high approval ratio implies they believe that most claims for fees and expenses have reasonable grounds in the context of current laws and judicial procedures.

---

[17] An interlocutory appeal occurs when a federal circuit court will hear and rule on an issue before the federal district court proceedings are complete.

*PriceWaterhouseCoopers* 🄫

Exhibit 12
Page 427

***Adoption of a Rigorous Evaluation of the Petitioner's Mental
Health:*** In California, an examination of the petitioner's mental health
is common during the federal habeas proceeding, and the petitioner's
attorneys generally use the services of mental health experts. Direct
costs resulting from the more frequent use of experts amount to an
additional $8,000 spent on psychologists and psychiatrists in an
average California case, compared to an average non-California case.
In addition, California attorneys spend more time—and therefore more
money—consulting with such experts and performing their own
investigation in this area.

***Use of Panel Attorneys from Large Corporate Law Firms:*** Beginning
in the late 1980s, a shortage of panel attorneys in California led the
federal courts to ask large corporate law firms to represent federal
capital habeas corpus petitioners. This practice has since largely
stopped, but some cases in the study include costs of representation by
panel attorneys from these firms. In a limited review of the 36 most
expensive California cases, PwC asked an attorney familiar with these
cases to identify the counsel for petitioners who worked for large,
corporate law firms. This led to a list of 33 civil attorneys who
provided representation in these cases. The total payments to these 33
attorneys contributed $88,441 to the average cost of *all* California
cases. In other words, removing the vouchers submitted by these civil
attorneys would lead to a drop in the average cost of a California case
from $372,029 to $283,588, a decrease of 24 percent.

Of course, this does not mean that all these costs could have been
avoided if criminal attorneys had been appointed instead of civil

xxiv

PRICEWATERHOUSECOOPERS 🅟

Exhibit 12
Page 428

attorneys. The work performed by the civil attorneys would have been performed by someone else. Nevertheless, it is reasonable to suppose that some of the time billed by these attorneys, who most likely were inexperienced in representing habeas corpus and capital cases, was for hours spent learning the notoriously complex federal capital habeas corpus case law. Corporate law firms are accustomed to billing for however many attorney hours it takes to research complex legal issues, a practice different from smaller, criminal law firms.

Moreover, on average these 33 civil attorneys spent three times as much on non-travel expenses as criminal attorneys ($64,139 compared to $22,534 per case). This, also, this may reflect the different billing practices of large corporate law firms compared to smaller, criminal law firms.

***The Relatively High Cost of Living in California:*** As noted above, the difference in the higher attorney rates in California, compared to rates in other states accounts for approximately one-fifth, or $60,000 of the $300,000 differential in average costs of California cases relative to non-California cases.

***Other Factors:*** In addition to the factors presented above, there may be other factors, more difficult to pinpoint, that contribute to the high average cost of a case in California. During this study, several people commented that the legal "culture" of California contributes to the high costs. Where possible, PwC has tried to identify the particular elements of the culture that may add to costs, such as the strategy used by the California Attorney General's Office, or the adoption of a

xxv

PRICEWATERHOUSECOOPERS 🅰

Exhibit 12
Page 429

rigorous evaluation of the mental health of the petitioner. However, other factors related to California's legal culture may be too nebulous to measure easily.

Further, many of the factors presented in this report are related and mutually reinforce each other, sustaining a relatively high-cost environment. The rest of the report considers the costs of federal capital habeas corpus cases, and the reasons for these costs, in more detail.

xxvi

*PriceWaterhouseCoopers* 

Exhibit 12
Page 430

## Section II:    Background to Study

### *II.1   The Defender Services Program*

The Sixth Amendment of the United States Constitution guarantees an accused person the right to counsel in criminal prosecutions.  When the Congress passed the Criminal Justice Act (CJA) of 1964, it ensured this right to representation in federal courts by establishing, within the judicial branch, a program to provide compensation and reimbursement of expenses for attorneys appointed to represent petitioners otherwise unable to afford representation in federal criminal and related proceedings (18 U.S.C. 3006A).  The Administrative Office of the U.S. Courts (AOUSC) operates the Defender Services Program to compensate and reimburse attorneys appointed to represent such petitioners.

The mission of the Defender Services Program is to ensure that the right to counsel guaranteed by the Sixth Amendment, the CJA, and other congressional mandates is enforced on behalf of those who cannot afford to retain counsel and necessary defense services.  The goals of the program are to:

1.  Provide assigned counsel services to all eligible persons in timely fashion;
2.  Provide appointed counsel services that are consistent with the best practices of the legal profession; and
3.  Provide cost-effective services, limiting increases in costs to those due to inflation and those necessary to respond to changes in the

II-1

*PRICEWATERHOUSECOOPERS* 🄫

Exhibit 12
Page 431

law or changes in prosecutorial, judicial, or law enforcement
practices.

In FY 1999, to carry out its mission and goals, the Defender Services
Program was appropriated $360 million.

In general a Federal Public Defender Organization, Community
Defender Organization, or private attorneys who serve on a panel
designated or approved by the court provide representation. These
panel attorneys submit vouchers to the court for time and expenses.
Funding for these expenditures is provided in the Defender Services
appropriation. For death penalty cases (including federal capital
habeas corpus cases), panel attorneys, who provide the majority of
representations, are compensated at a rate and in an amount determined
by the presiding judge to be reasonably necessary to obtain qualified
counsel, with a statutory limit of $125 per hour for cases beginning on
or after April 24, 1996. The presiding judge also approves the amount
of funding provided for experts and other associated expenses for each
case. In cases beginning after April 24, 1996, expenditures for
investigative and expert services are limited to a total of $7,500 unless
the district court finds that a higher sum is warranted for "unusual"
services and that finding is approved by the Chief Judge of the circuit.

## II.2 The Cost of Federal Capital Habeas Corpus Review

In the past few years, the House and Senate Appropriations
Subcommittees on the Departments of Commerce, Justice, and State,
the Judiciary, and related agencies have grown increasingly concerned

II-2

PRICEWATERHOUSECOOPERS ⬛

Exhibit 12
Page 432

over growth in costs of the Defender Services Program. In particular, the subcommittees were concerned about the cost per representation and what is believed to be different rates of cost growth for specific judicial districts and types of cases. In attempts to explain costs to Congress, the AOUSC has produced several reports explaining why total costs for death penalty cases were growing at a significantly faster rate than the increase in the number of annual representations. In 1997, the Administrative Office, following discussions with Congressional Appropriations Subcommittee staff, engaged the services of the consulting firm Coopers & Lybrand L.L.P. (C&L) to help develop a report entitled "The Report on Costs and Recommendations for the Control of Costs of the Defender Services Program." C&L made the following summary finding:

> *Defender Services Program costs are in line with what one would expect from the increase in the number of representations, the increasing proportion of capital and capital habeas representations, and the costs incurred in a handful of extraordinarily costly representations each year.*[18]

C&L's analysis of six years of federal capital habeas corpus data also showed that the Ninth Circuit, driven by the California districts, accounted for 60 percent to 76 percent of federal capital habeas corpus representation costs, but 48 percent to 63 percent of the representations

---

[9] Report on Costs and Recommendations for the Control of Costs of the Defender Services Program, Executive Summary, January 28, 1998, Coopers & Lybrand, L.L.P., p. 3.

II-3

PRICEWATERHOUSE COOPERS 🄳

Exhibit 12
Page 433

from FY 1992 to FY 1997[19].  Because of this high proportion of costs, California cases drive the national average cost of federal capital habeas corpus cases.

## II.3  Reason for This Study

The House and Senate Appropriations Subcommittees held their hearings on the Judiciary's FY 1999 appropriations requests on March 4 and March 12, 1998, respectively.  During the House hearing, Chairman Rogers and Judge Heyburn, Chair of the Judicial Conference Budget Committee, discussed the finding in the recent C&L report that "the Ninth Circuit drives the nation's capital habeas average annual cost-per-representation as well as overall capital habeas costs."[20] Chairman Rogers expressed concern and indicated that if the judiciary did not address this issue, the Congress would.  As a result, on March 31, 1998, Judge Heyburn and AOUSC Director Leonidas Mecham wrote to Chairman Rogers outlining the following:

- On February 27, 1998, the Judicial Council of the Ninth Circuit unanimously adopted a new Ninth Circuit policy that requires the attorneys for each capital habeas petitioner to submit a case budget at the beginning of each proceeding.  This budget is then reviewed by a judge from another district to achieve a more consistent and proportionate use of resources.  In addition, the Ninth Circuit has

---

[19] Report on Costs and Recommendations for the Control of Costs of the Defender Services Program, IV Findings– 25 C&L, L.L.P, p. 25.

[14] Report on Costs and Recommendations for the Control of Costs of the Defender Services Program, Executive Summary, January 28, 1998, Coopers & Lybrand, L.L.P., p. 12.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 434

"established presumptive maximum rates for second attorneys and associates, paralegals and law clerks, as well as a minimum rate of 60 pages per hour for review of case records," in addition to the statutory cap on hourly fees paid to attorneys. Finally, the Ninth Circuit has adopted a special process to review all state death penalty habeas corpus cases to ensure costs are reasonable and are reduced wherever possible.

- Furthermore, within the Northern District of California, the Court has adopted guidelines that require case management conferences for complex cases, set presumptive rates for experts and expenses, and establish requirements for seeking payments which exceed statutory maximums. In the Central and Eastern Districts, capital habeas representation units have been established within the federal defender organizations to allow specially trained attorneys to represent federal capital habeas petitioners previously represented by large corporate law firms. It is hoped that this measure will improve the quality and efficiency of federal capital habeas corpus representation. These steps illustrate the commitment of the Ninth Circuit Judicial Council to contain costs in the Ninth Circuit, particularly in the high-cost state of California.

Subsequently, staff from the Administrative Office's Office of Finance and Budget (OFB) met with James Kulikowski, Staff Director for the House Appropriations Subcommittee, to discuss the letter from Judge Heyburn and Director Mecham to Chairman Rogers. Mr. Kulikowski informed OFB staff that he had a plan to track costs of federal capital habeas corpus cases by circuit to: (1) ensure that Ninth Circuit (California) costs decrease; and (2) identify lower cost circuits to

PRICEWATERHOUSECOOPERS 🖉

Exhibit 12
Page 435

determine why the costs are lower and whether procedures in place in those circuits could be applied to the higher cost circuits. Although the AOUSC can identify costs by circuit and district, only anecdotal information is available to explain the disparity in costs.

This study was undertaken to enable the AOUSC to better understand costs associated with private attorney representation of federal capital habeas corpus cases and to further explain regional disparities by linking costs to region-specific procedures, and culture. This report provides explanations for the Ninth Circuit's, and more specifically California's, higher average costs per case.[21]

---

[21] This report does not provide an opinion on what average or median case costs for representing a federal capital habeas corpus case should be. Rather, the report explains what the costs are, when they are incurred during a federal capital habeas corpus case, and the regional cost disparities that exist.

II-6

PRICEWATERHOUSECOOPERS 🏠

Exhibit 12
Page 436

## Section III: Federal Capital Habeas Corpus Case Life Cycle

### III.1  Definition of Federal Capital Habeas Corpus

Federal capital habeas corpus involves federal court review of a state capital murder conviction and a death sentence upheld by a state court. The petitioner–the person sentenced to death–makes a claim that his constitutional rights were violated at some point during the state proceedings.[22] The primary function of the writ of habeas corpus is to release the petitioner from unlawful imprisonment or an unconstitutional death sentence.  The office of the writ is not to determine the prisoner's guilt or innocence.  The only issue presented is whether the prisoner is unlawfully restrained of his liberty.[23]

### III.2  Background on Federal Capital Habeas Corpus

The writ of habeas corpus can be traced back to thirteenth-century common law as a way to "challenge unlawful detention of citizens by the executive under the English crown."[24]  Eventually, the writ evolved to correct injustices that occurred during criminal trials.  Petitioners pleaded for relief through both a summons and a court-issued order that gave the court the authority to question the cause for

---

[22] Claims are typically made under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments.

[23] Henry Campbell Black, *Black's Law Dictionary*, West Publishing Co., 1991, p. 491.

[24] *Criminal Justice Policy Review*, "The Federal Habeas Corpus Process: Unraveling the Issues." 116.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 437

imprisonment. This summons and order became known as the writ of habeas corpus. As with any legal procedure with such longevity, the writ has adapted to hundreds of years of progress and change.

Habeas corpus emerged in the United States with the writings of Alexander Hamilton in the Federalist Papers. The concept was incorporated into the Constitution, Article I, Section 9, as a protection for the newly defined citizen against arbitrary imprisonment by governmental authorities. The value of the writ was challenged during the Civil War when President Lincoln imprisoned southern sympathizers who had settled in the North and suspended the writ as a means of preventing their release. The importance of the writ in the judicial process was affirmed when Lincoln's actions were overturned by the Supreme Court in the landmark case *Ex Parte Milligan*. During Reconstruction, fearing that southern states might "vengefully incarcerate postwar northern Reconstructionists," Congress enacted further legislation allowing state prisoners the right to review by the federal courts, thus "federalizing protection of the writ."[25] In this century, the Supreme Court has interpreted the 1867 statute as "providing the federal courts with broad review of federal habeas petitions."[26]

As the courts continued to extend to state prisoners the right to seek federal habeas corpus relief, and as the prison population continued to

---

[25] *Criminal Justice Policy Review*, "The Federal Habeas Corpus Process: Unraveling the Issues." 117.

[26] *Criminal Justice Policy Review*, "The Federal Habeas Corpus Process: Unraveling the Issues." 118

III-8

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 438

expand, the number of prisoners seeking habeas corpus relief increased from less than 1,000 between 1941 and 1961 to more than 12,000 between 1962 and 1992.[27] The implications of this dramatic increase have been widely debated in the legal community. According to Professor Robert Pursley of Buffalo State University, in recent years, the habeas corpus debate has included four major parts:

1.  The ability of habeas corpus to postpone the imposition of a sentence;

2.  Jurisprudential, constitutional, and workload issues caused by the length of habeas corpus cases;

3.  The federal courts' ability to intervene over state court decisions; and

4.  Recent attempts by the Supreme Court to curtail the rights of state prisoners who wish to seek federal review.[28]

During the 1990s, there has been a renewed interest in habeas corpus reform and, more specifically, its application in capital cases. Current Supreme Court Chief Justice William Rehnquist noted that "statutory habeas corpus procedures, particularly those dealing with capital cases, are an area where careful reform can preserve the benefits of the Great Writ while rationalizing its application and eliminating the repetitive and time-intensive demands on the federal courts."[29]

---

[27] *Criminal Justice Policy Review*, "The Federal Habeas Corpus Process: Unraveling the Issues." 118.

[28] *Criminal Justice Policy Review*, "The Federal Habeas Corpus Process: Unraveling the Issues." 120.

[29] "Federal Habeas Corpus Reform: The State's Perspective" by Christopher E. Smith, *The Justice System Journal*, Volume 18, Number 1, p. 3.

III-9

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 439

The discussions over this issue culminated with the passage of the 1996 Anti-terrorism and Effective Death Penalty Act (AEDPA). The AEDPA includes a requirement that a petitioner file a federal capital habeas corpus petition within a year after the state court denies the direct appeal. In addition, the new law:

- Greatly restricts review of same-claim successive petitions;
- Requires prisoners to obtain permission from a three-judge appellate panel before filing new-claim successive petitions;
- Limits the issues available for federal capital habeas corpus review in states that establish a system for appointing and compensating competent counsel for state post-conviction proceedings in capital cases; and
- Enacts timetables for federal courts to act on petitions brought by death row inmates (only if the state established a system for appointing and compensating counsel in state post-conviction proceedings in capital cases).

The AEDPA follows a national strategy of implementing more stringent sentencing laws, increasing law enforcement, and ultimately limiting opportunities for federal capital habeas corpus review. Because this law was only recently enacted, its effects on the cost of federal capital habeas corpus cases have yet to be seen.

## III.3 The 9 Stages of Capital Litigation

This section describes how a capital case typically moves through the state and federal court system. Each step is numbered to allow for

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 440

easy identification of the stages. It should be noted that the federal capital habeas corpus stage begins at Stage 7. However, what occurs during previous stages determines how a capital case proceeds through federal capital habeas corpus review. For this reason, all nine stages, as illustrated in Figure III-1, are discussed here.



*This portrayal was provided by Mark Olive, capital habeas litigator and trainer for the habeas Assistance and Training Project.

**Figure III-1: The Stages of Capital Litigation**

## (1) State Trial and Sentencing

A state capital trial is conducted in two independent stages. First, in the "guilt phase," the jury or judge decides whether the prosecution has proved beyond a reasonable doubt that the defendant is indeed guilty of a capital crime. Second is the "sentencing phase," in which the prosecution may present evidence and argue the existence of

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 441

"aggravating factors," circumstances such as the defendant's prior criminal record, which may weigh in favor of a death sentence. In the same proceeding, the defense may present evidence and argue the existence of "mitigating factors," circumstances such as the defendant's lack of a prior criminal record, which may weigh against the imposition of a death sentence. The judge or jury then must consider the aggravating and mitigating factors and decide whether or not to impose the death penalty.[30] As a result of this two-step process, a capital case is more complicated than a non-capital case, because attorneys must not only investigate the crime and prepare for the guilt phase, but also must prepare for the sentencing phase. To complicate matters further, these cases often involve complex crimes and defendants with complex histories or psychological backgrounds.

Most states have the two-step, or bifurcated system described above. However, California has a three-step, or trifurcated system. In the first step, the court decides whether the defendant is guilty of the crime. In the second step, separate hearings are held to determine whether or not the offense is a capital offense. Finally, in the third step, the court weighs the aggravating and mitigating factors in deciding whether the defendant should receive the death penalty. Thus, the three steps are:

1. Decision as to whether or not an act of first-degree homicide was committed;

2. Decision on whether or not the homicide was a capital offense; and

---

[30] For most capital cases, juries must choose between the death sentence and life without the possibility of parole.

PRICEWATERHOUSECOOPERS 🅑

Exhibit 12
Page 442

3. Comparison of the aggravating and mitigating factors and decision
   as to whether or not to impose the death penalty.[31]

The added step (step 2) increases the complexity and cost of
California's state capital cases.  In addition, this system partly explains
why California typically has longer trial court transcripts than other
states.

If the petitioner is found guilty and sentenced to death, he or she may
initiate a direct appeal (stage 2).  Depending on state law, the trial
court may set an execution date immediately after sentencing, or no
date may be set until after the direct appeal has been completed.

## (2) Direct Appeal

In some states, the defendant must appeal a conviction and a death
sentence directly to the state supreme court.  In other states, the
petitioner must go through an intermediate circuit court of appeals
before reaching the state supreme court.   In a direct appeal, the
petitioner's counsel can raise only those issues which appear on the
trial record.[32]

This is the last stage in which representation by counsel is guaranteed
by the Constitution.   As a cost-cutting and timesaving measure, state
courts often assign the same attorney who represented the petitioner

---

[31] Telephone conversation with Professor James Liebman of Columbia University Law School
on October 9, 1998.

[32] For example, an improper jury instruction would appear on the court record and, therefore,
could be raised in a direct appeal.   However, jury misconduct that occurred out of court could
not be raised until step 4, the State Collateral Review.

III-13

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 443

during the original trial to the direct appeal.  If a new attorney is appointed to the case, then he or she must quickly learn the case, mainly by reading the trial record.  In the appellate briefing, the attorney must raise all issues that indicate that the petitioner was incorrectly convicted or sentenced.   If the direct appeal is denied by the state's highest court, the appellant's next option is to petition for certiorari review in the U.S. Supreme Court.

### (3) Petition for Certiorari Review in U.S. Supreme Court

The petitioner may or may not choose to petition the U.S. Supreme Court for review by writ of certiorari.   The right to Supreme Court review is not constitutionally guaranteed; the Supreme Court does not have to hear every criminal case that petitions for review, but may, if it so chooses, hear individual cases.   In addition, at this point, legal representation is not guaranteed.  Some states compensate counsel for preparation of a certiorari petition; in others, representation may be provided pro bono or by a local legal aid or defender organization.   If certiorari review is granted, a briefing is prepared and an oral argument held before the Court.  The petitioner may raise only those issues previously presented to the state courts on direct appeal.  If certiorari is denied, the appellant has the choice of pursuing state collateral review or filing a federal capital habeas corpus petition in federal district court.

### (4) State Collateral Review (Post-Conviction Proceedings)

In addition to direct appeals, all states have post-conviction proceedings in which issues that occurred *outside* of the court record

III-14

PRICEWATERHOUSECOOPERS 🅑

Exhibit 12
Page 444

may finally be introduced into state court. State post-conviction proceedings generally do not begin until direct appeal proceedings are completed and certiorari is denied by the U.S. Supreme Court. In some states, however, state post-conviction proceedings may begin while direct appeal proceedings are ongoing. To prepare the state post-conviction petition, all prior proceedings must be reviewed, and all possible claims suggested by the record and prior investigation in the case must be investigated. This investigation includes looking into the facts of the underlying offense, the petitioner's background, and other issues such as ineffective assistance of counsel, the state's suppression of exculpatory evidence, or jury exposure to extraneous information. There is no constitutional right to counsel in state post-conviction proceedings. While some states provide for the appointment and compensation of competent counsel, many do not. Without a thorough investigation by counsel, many material facts are not discovered and many potential claims for relief remain undeveloped.

### (5) Appeal of State Collateral Review Decision

In many states, post-conviction review begins with the filing of a post-conviction petition in trial court, often before the same judge who presided over the original state trial and sentencing. The trial judge considers the claims presented and may or may not hold an evidentiary hearing to develop the facts prior to the court's decision. In these states, if the petitioner is unsuccessful at the trial court level, he or she may appeal. While this appeal ultimately goes to the state supreme court, it often initially goes through an intermediate court. In other states, state post-conviction review begins with filing the post-

III-15

PRICEWATERHOUSECOOPERS ⬛

Exhibit 12
Page 445

conviction petition in the state supreme court. If the court decides an evidentiary hearing is warranted, it may remand the case for a hearing before the trial court. After the hearing the case returns to the Supreme Court for briefing, argument, and a final ruling on the merits. Either way, if the petitioner wishes to exhaust his claims for federal capital habeas corpus review, he must present all claims to the state's highest court with appellate jurisdiction. Accordingly, most capital petitioners do so. Quite often, once state post-conviction proceedings are complete, the state will set an execution date.

### (6) Petition for Certiorari Review in U.S. Supreme Court

On completion of state post-conviction proceedings, the petitioner may again petition for certiorari review in the U.S. Supreme Court. This stage is similar to stage 3 in that the certiorari petition will be constructed and delivered in the same way, but the petition may raise only those issues arising from the state post-conviction proceedings. This stage is not necessary to exhaust claims for presentation to the federal courts in habeas corpus proceedings. As counsel is generally neither provided nor compensated for filing a certiorari petition following denial of state post-conviction relief, and because of time pressures resulting from either an execution date or the AEDPA's statute of limitations, many capital petitioners bypass this stage.

### (7) Petition for Writ of Habeas Corpus in U.S. District Court

Once stage 6 has been completed or bypassed, the case moves from the state to the federal court system. Stages 7 through 9 describe the stages of a typical federal capital habeas corpus case.

III-16

PRICEWATERHOUSECOOPERS ⬛

Exhibit 12
Page 446

Figure III-2 tracks the possible steps of litigation of a capital habeas case once it has reached the federal level. In federal habeas corpus cases, the petitioner brings his or her suit against the warden of the state penal institution in which he or she is incarcerated. The State Attorney General's office represents the warden in court. At various times throughout this process, the case may move up to circuit court on an interlocutory appeal, or may be sent down to state court to satisfy exhaustion requirements.

**Lifecycle of a Federal Capital Habeas Corpus Case**



**Figure III-2: Life Cycle of a Federal Capital Habeas Corpus Case**

### Appointment of Counsel

A federal capital habeas corpus case usually begins when a motion is filed for the appointment of counsel to represent a petitioner who is

III-17

PRICEWATERHOUSECOOPERS 🄮

Exhibit 12
Page 447

seeking habeas corpus relief, along with a request for a stay of execution. The motion for counsel is filed under Section 848 of Title 21 of the United States Code. Section 848 requires the appointment of at least one attorney (and allows for the appointment of two attorneys) for anyone accused or convicted of a capital offense.

Section 848 also provides a statutory right to expert and investigative assistance in federal capital habeas corpus cases. On a case's arrival in the federal court, many potential claims have not yet been fully investigated in any of the prior proceedings. In *McFarland v. Scott*, 512 U.S. 849 (1944), the Supreme Court decided that under Section 848 an indigent capital petitioner may invoke these statutory rights to counsel and investigative assistance *before* the habeas petition is filed. Hence, counsel will seek funds to investigate colorable[33] claims for relief to determine if they should be included in the petition.

Once a request for counsel and experts is made, the federal court must enter a stay of execution to allow for preparation of the petition. In order to be compensated, attorneys must file a motion in district court to allow a petitioner to proceed *in forma pauperis* (as a pauper). Protocol for filing this request varies by district and circuit.

### Stay of Execution

If the state trial judge has set an execution date, the petitioner may file a motion for a stay of execution simultaneously with the request for appointment of counsel. The petitioner asks the court to vacate the

---

[33] A claim that appears worthy of further investigation and court review

III-18

PRICEWATERHOUSECOOPERS 🅸

Exhibit 12
Page 448

execution date to allow time for petition preparation. If the district court grants a stay of execution, then the execution date is postponed, and the petitioner's counsel may take more time to prepare. Specific petition preparation time frames are discussed below. However, the district court may deny this motion.

### Request for Stay from Circuit Court of Appeals

If the motion for a stay of execution is denied, the petitioner's counsel may file a request for a stay in the court of appeals requesting that the court grant a stay of execution. If the court of appeals denies the stay, the petitioner may request one from the U.S. Supreme Court.

### Request for Stay from U.S. Supreme Court

If the district and appellate courts have denied a stay, the petitioner seeks a stay from the U.S. Supreme Court. If the Supreme Court denies the stay, then the petitioner's counsel must complete the habeas petition and receive a ruling before the execution date.

### Petition Preparation

On appointment by the federal court, the petitioner's counsel will begin to prepare the federal capital habeas corpus petition. Preparing the petition can be an extraordinarily time-consuming task. Petitioner's counsel must review the record from the state trial, appellate, and post-conviction proceedings, conduct further investigations and legal research to support arguments. Trial records can range from 100 to 70,000 pages of text, all of which the counsel

III-19

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 449

must review fully to write a thorough petition. Investigation and legal research may also require significant amounts of time.

According to PwC's surveys, on average, between 11 and 40 habeas claims were presented in a typical federal capital habeas corpus petition. These claims often vary in their complexity. For example, a claim for relief that pleads counsel's ineffectiveness for failing to investigate a viable alibi is likely to be more time-consuming and costly to investigate and document than a simple case of jury misconduct. The petition for the writ of habeas corpus will likely raise those constitutional issues that were presented to the state courts during direct appeal and state post-conviction proceedings. Under the Supreme Court's decision in *McCleskey v. Zant*, federal capital habeas counsel is required to include all colorable claims for relief in the first federal capital habeas corpus petition.

For example, when investigating colorable claims for relief, counsel must thoroughly research the facts of the case and petitioner's background to uncover evidence that should have been presented to the jury at trial as a basis for an acquittal of the capital crime or a sentence less than death. This often requires the use of investigators, as well as mental health professionals and other experts. Investigation of the client's background is difficult, because a typical federal capital habeas corpus petitioner often has a previous criminal record or has moved several times throughout his life, thus limiting access to various witnesses and state records owing to the possibility of incurring prohibitive travel costs. Once complete, the petition often includes a lengthy appendix that references expert reports and historical records.

III-20

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 450

Because of the amount of resources necessary to complete a petition, this is generally the most costly stage in a federal capital habeas corpus case.

Before 1996, the length of the petition preparation stage varied from one month to several years and was generally determined by the setting of an execution date. However, not all states set execution dates. Further, some states, for example, Florida, Georgia, and Texas, set execution dates arbitrarily—one convicted felon might not receive one until all state appellate and post-conviction proceedings were complete. The petitioner with the set execution date, therefore, has less time to prepare his petition than the petitioner with no set date. Often, the setting of execution dates and the granting or denial of stays determined the date by which a federal capital habeas corpus petition had to be filed.

In 1996, a 1-year statute of limitations for filing a federal capital habeas corpus petition was enacted in the Antiterrorism and Effective Death Penalty Act (AEDPA). The interpretation of this statute of limitations provision is still being litigated, and individual federal courts are interpreting this time frame in slightly different ways. In most cases where the AEDPA applies, it appears that the time for petitioner's counsel to prepare the federal capital habeas corpus petition will be significantly shorter than before the statute of limitations provision was enacted. After the petition is filed, all other time limits are contingent on the court's orders.

III-21

PRICEWATERHOUSECOOPERS 🅟

Exhibit 12
Page 451

### Petition and Discovery

Once the petition is prepared, the petitioner's counsel files the petition and an accompanying appendix (if necessary) in court. The petition must show that for each claim, the petitioner's constitutional rights were violated and that either the conviction or the death sentence should be vacated. For example, for a claim pleading the prosecutor unconstitutionally suppressed exculpatory evidence, the petitioner must present facts demonstrating that evidence was suppressed, that the evidence was exculpatory, and that if the evidence had been presented, the result of the case would have been different. A discovery request and a motion for an evidentiary hearing may be filed with the petition. Once the petition is filed, petitioner's counsel must wait for the state Attorney General's reply, but in the meantime, he or she may continue to investigate the case.

### The Answer And Motions For Summary Judgment

The State Attorney General (AG), representing the warden of the state, will typically respond to the petition with an answer as well as opposition to any requests for discovery. In addition to, or instead of, an answer, the AG may file a motion for summary judgment, asserting that there are no disputes of material fact warranting an evidentiary hearing and that the state is entitled to a judgment as a matter of law on some or all of the claims presented in the petition.

III-22

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 452

## Opposition to Summary Judgment

In an Opposition to Summary Judgment, petitioner's counsel responds to all of the points raised by the AG. If a dispute of material facts exists, the petitioner's counsel may choose to file a motion for an evidentiary hearing.

At this point, the judge may hear an oral argument and rule on some or all of the claims presented in the petition. For instance, in a case with 10 claims, the judge may rule on four claims and grant an evidentiary hearing to develop the underlying facts prior to a decision on the other six claims.

## Evidentiary Hearing

If an evidentiary hearing is granted, the parties may introduce new evidence and argue why it should be allowed. The judge then decides on whether or not the evidence is credible, and on whether or not it demonstrates that the petitioner is entitled to habeas corpus relief.

The time dedicated to preparing to present evidence and question witnesses in a federal capital habeas corpus evidentiary hearing can be enormous. Many experienced federal capital habeas counsel described the preparation required for an evidentiary hearing as similar to that required for an entire capital trial. In particular, the coordination in serving subpoenas and working out the logistics of getting experts in court to testify is time-consuming and costly. Petitioner's counsel must pay experts for interview time, preparation time, time spent waiting outside of the courtroom to testify, travel

III-23

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 453

expenses, and so forth.  The evidentiary hearing is followed by a post-hearing briefing during which petitioner's counsel must convince the judge of the significance of the facts presented at the hearing and demonstrate that relief is warranted.

### Oral Argument

At any time during the federal capital habeas corpus process, the judge may request an oral argument to clarify points or to receive additional information.  To prepare for the hearing, petitioner's counsel must thoroughly review the relevant documents, the supporting case law, and practice delivery of his or her argument.   On listening to the arguments delivered during the hearing, the judge may rule on various issues or take new information under advisement.

### Motions to Alter or Amend Judgment/ Notice of Appeal

The petitioner's counsel has 10 days after entry of the judgment in which to file a motion in district court to alter or amend the district court's decision under Rule 59 of the Federal Rules of Civil Procedure. A Rule 59 motion asks the district court to reconsider its decision. Rule 59 motions are usually denied in federal capital habeas corpus cases.[34]  However, the judge may grant the Rule 59 Motion and alter the judgment in some material manner.  For example, if the district court initially decides to deny habeas corpus relief, it may reconsider and decide to grant relief.  If the motion is denied, then petitioner's

---

[34] Discussion with Mark Olive, October 8, 1998.

III-24

PRICEWATERHOUSECOOPERS 🅾

Exhibit 12
Page 454

counsel must decide whether to appeal to the circuit court of appeals. This is another point in time when the state may set an execution date.

To appeal, petitioner's counsel must file a notice of appeal in the district court and request a Certificate of Appealability (which used to be called a Certificate of Probable Cause) from the district court. If the district judge believes that there are no substantial questions warranting further review, it can deny the petitioner's request for a Certificate of Appealability. Petitioner may then seek a Certificate of Appealability from the circuit court of appeals. If the Certificate of Appealability is granted, the district court will transcribe any necessary hearings from the proceedings. Generally, the petitioner's counsel must designate those portions of the record which counsel would like to be made part of the appeal within 30 days of filing for the appeal.

### (8) Appeal of District Court Decision in the Circuit Court of Appeals

On certification by the district court that the transcripts have been prepared, the circuit court of appeals will set a briefing schedule. The petitioner's brief may raise various claims arising from the district court proceedings. Then, the state must file an answering brief, and petitioner's counsel can file a reply brief. At any time, the court may ask questions or request supplemental briefs to further explain particular issues.

Once the opening brief, answering brief, and reply brief are filed, the case goes before a three-judge panel. The judges select an oral argument date that is usually held 2 to 4 months after the last reply

PRICEWATERHOUSE COPERS 🄬

Exhibit 12
Page 455

brief has been submitted. Each side is provided with 30 minutes to state their arguments. After the hearing, the judges may or may not request supplemental briefing. Once the case has been fully briefed and argued, the judges will rule on the case. The circuit court of appeals may rule on the merits of petitioner's claims, or may remand the case back to district court for additional consideration. For example, if the district court failed to hold an evidentiary hearing on one or more of petitioner's claims, the circuit court of appeals may order the district court to hold a hearing.

If the circuit court grants habeas corpus relief, the state will likely petition for writ of certiorari to the U.S. Supreme Court. If the circuit court panel affirms the district court's denial of habeas corpus relief, the petitioner can seek a rehearing from the court of appeals, suggest that all the judges on the court of appeals rehear the case en banc, or seek certiorari review in the U.S. Supreme Court.

## (9) Petition for Certiorari Review in U.S. Supreme Court

A petition for writ of certiorari must be filed in the Supreme Court within 90 days after the circuit court's final decision. Often, a petition will be filed sooner, if an execution date is quickly approaching. There is no right to appeal to the Supreme Court, and the Supreme Court grants review in only a few federal capital habeas corpus cases each year. If certiorari review is granted, the case is briefed and argued before the Court. If certiorari review is denied, the proceedings on petitioner's first federal capital habeas corpus petition are complete.

PRICEWATERHOUSE COOPERS

Exhibit 12
Page 456

Ultimately, if habeas corpus relief is granted as to the petitioner's conviction, the case returns to the state trial court for possible retrial. If relief is granted only as to the death sentence, the case may be returned to the state trial court for a new sentencing trial. If habeas corpus relief is denied, the petitioner may seek authorization from the circuit court of appeals to file a second habeas petition in the district court. Authorization by the U.S. Supreme Court to hear the case will likely be denied, and the petitioner will be executed.

One of the final options available for the petitioner is an application to the governor's office for a clemency proceeding. If the governor grants a clemency proceeding, the petitioner may argue his case to the governor and, after reviewing the evidence presented, the governor will decide whether to vacate the petitioner's death sentence. If the governor denies a clemency proceeding or grants a clemency proceeding but denies clemency, then the death sentence remains. If the governor vacates the petitioner's sentence, a trial court must re-sentence the petitioner.

III-27

PRICEWATERHOUSECOOPERS ⑧

Exhibit 12
Page 457

# Section IV:    Methodology

## IV.1  Overall Methodology

PwC, in cooperation with the AOUSC, developed a methodology to examine the costs, and the factors driving the costs, of federal capital habeas corpus cases.  The methodology involved combining findings from three data sources:

1.  The CJA Panel Attorney Payment System database, which contains information on the costs of and hours spent on CJA panel attorney cases[35];

2.  A total of 129 responses to a survey sent out to approximately 400 panel attorneys; and

3.  A case study of seven separate cases, which included interviews with the panel attorneys who provided representation in those cases.

Using data and information from these sources, PwC conducted three different types of analyses:

1.  Data analysis: analysis of the cost components of federal capital habeas corpus cases using data from the CJA Panel Attorney Payment System database;

2.  Statistical analysis:  data, correlation, and regression analyses using CJA Panel Attorney Payment System and survey data; and

---

[35] The CJA Panel Attorney Payment System database contains vouchers submitted by panel attorneys to the AOUSC to be reimbursed for attorney fees, expert costs, travel costs, and other expenses.  The vouchers include in-court, out-of-court, rate, and attorney activity information.

PRICEWATERHOUSECOOPERS ⬛

Exhibit 12
Page 458

3. Case study analysis: a comparison of the factors that drove the costs in the seven case studies.

Together, these three sources of data and analytical methods permitted more comprehensive analysis than would have been possible with only a single data source.

## IV.2 Data Analysis Methodology

The data analysis portion of the Defender Services study used information in the CJA Panel Attorney Payment System database. The data analysis followed a structured methodology to ensure the most in-depth analysis possible using this data. The methodology consisted of the following:

1. Quality control;
2. Identification of additional information; and
3. Analysis of the data.

### Quality Control

The cost data used in this report were extracted from the AOUSC's CJA Panel Attorney Payment System database. PwC's previous work with the database gave the team an understanding of the content and of the type of quality control needed. The data was converted to an MS Access database and stored on a secure hard drive accessible only to PwC team members. PwC checked to ensure that the database was transferred correctly to the new format. Next, PwC studied the contents of the database and identified possible data problems. The team then cleaned the database.

IV-29

PRICEWATERHOUSECOOPERS 🄴

Exhibit 12
Page 459

PwC identified cases with duplicate vouchers, missing data, input errors, and vouchers not related to federal capital habeas corpus cases. The list of cases was presented to the AOUSC, which then provided corrections or recommended removing cases from the analysis. The original database contained 1,021 cases with 13,168 vouchers (or 12.9 vouchers per case). During the database cleaning, PwC removed the following:

- 179 cases that did not list the stage of proceeding[36] for any voucher;
- 22 cases that had no vouchers submitted for attorneys;
- 12 cases that were not federal capital habeas corpus cases; and
- Four sealed cases.

PwC also removed 24 cases that had started within the past 6 months. For this analysis, recent cases with low costs incurred would have skewed the results.

At the end of the cleaning, the number of cases in the database dropped to 783 from 1,021, and the number of vouchers fell from 13,168 to 12,217 vouchers.

## Identification of Additional Data

### Open and Closed Status

After the database was cleaned, PwC identified the gaps between the information available in the database and the information required for

---

[36] Each voucher submitted by panel attorneys indicates to the stage to which costs should be attributed. The stages include habeas petition, evidentiary hearing, dispositive motion, petition to Supreme Court for writ of certiorari, stay of execution, appeal or denial of stay, petition to Supreme Court regarding denial of stay, or other.

IV-30

PRICEWATERHOUSECOOPERS ⏍

Exhibit 12
Page 460

thorough analysis. A key piece of missing data was case status—whether cases were open or closed. This information was important in analyzing costs, since it would be misleading to compare the costs of completed cases with those that are still incurring costs. To collect this information on case status, PwC first performed independent research to find publicly available case status information. By contacting non-profit organizations that collect information on death penalty appeals, the team determined open or closed status for approximately half the cases. For closed cases, PwC also obtained information on case disposition. The Death Penalty Information Center, for example, provided information on recent executions. In addition, PwC classified two sets of cases as open:

- Cases in which at least one voucher was submitted in the last 6 months; and
- Cases whose vouchers were only for the habeas petition stage.

PwC provided the AOUSC with a list of the remaining cases (approximately 400 cases). The AOUSC contacted the lead attorneys for those cases and obtained information on:

1. Open/closed status;
2. Final disposition of a closed case;
3. Denial/granting of habeas petition; and
4. Status of appeal, if any.

### Active and Dormant Status for Open Cases

For open cases, PwC wanted to differentiate between those currently incurring costs and those not incurring costs. PwC defined open cases

IV-31

PRICEWATERHOUSECOOPERS ⓘ

Exhibit 12
Page 461

as either active or dormant. A case was defined as active if vouchers have been submitted in the past 2 years, or if attorneys contacted by the AOUSC indicated that the case is still open. Otherwise, the case was classified as dormant.

### Stage of Proceeding Information

The AOUSC had requested an analysis of costs by stage of proceeding. However, there were many vouchers for which the stage of proceeding was not identified. PwC identified stage of proceeding information for many of these by comparing the dates of vouchers for the same petitioner that did contain stage of proceeding information. For example, if a voucher submitted January 1995 did not indicate the stage of proceeding, but a voucher for the same case submitted three months later indicated that case was in the habeas petition stage, the January 1995 voucher was also classified as a habeas petition stage voucher. At the end of this process, approximately 90 percent of the vouchers contained information on the stage of proceeding.

## Data Analysis

PwC first analyzed all cases to show national trends and cost drivers. This analysis was performed for all cases, open cases, and closed cases. As only 152 of the 783 cases under study were closed, PwC analyzed cases by individual stage of proceeding, circumventing the problem noted above of comparing costs of open cases with costs of closed cases. In this way, PwC was able to integrate both open and closed cases into the study.

IV-32

PRICEWATERHOUSECOOPERS 🅑

Exhibit 12
Page 462

PwC conducted similar analyses by circuit and state, focusing on high-cost stages. PwC also selected two groups of states to analyze further to identify the cost disparities between California cases and cases from other states:

1. Ninth Circuit states; and

2. The six states from which the case studies were taken.

Ninth Circuit costs were analyzed to compare the costs of states within the high-cost circuit. The case study states were selected to examine regional disparities in costs, particularly between California and lower cost states. These states all had multiple cases as well as a mix of high-, medium-, and low-cost cases. The states chosen for each comparative analysis were:

| Ninth Circuit States | Case Study States |
|---|---|
| California | California |
| Arizona | Texas |
| Washington | Pennsylvania |
| Nevada | Alabama |
| Idaho | Missouri |
| | Illinois |

## IV.3 Survey Methodology

### Survey Design

The CJA Panel Attorney Payment System database does not contain data on case-specific or geographical factors that cause disparities in

IV-33

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 463

time or costs in different cases. For example, factors such as the complexity of case and judicial attitudes are not documented in the CJA Panel Attorney Payment System database or elsewhere. Therefore, PwC designed a survey aimed at collecting information to supplement data from the CJA Panel Attorney Payment System database. The survey was designed through a collaborative effort between PwC, federal capital habeas corpus litigators, and representatives of the Defenders Services Division of the AOUSC. A copy of the survey is provided in Appendix B.

**Case Selection**

Because of the time and costs involved in collecting information on all cases in the database, PwC sent surveys to a sample of attorneys representing 392 of the total 783 cases. The sample was selected based upon the following criteria:

- 295 cases that had reached the appellate level;
- 47 cases with comparatively low costs; and
- 50 cases with comparatively high costs.

Of the 392 surveys sent, 129 (32 percent) were returned. On receiving the data, PwC consolidated the data into a database. PwC then used the survey data as the source data for a regression analysis. Regression analysis is a method of testing the statistical importance of various factors influencing a variable (in this instance the costs of federal capital habeas corpus cases). A more detailed explanation of regression analysis is provided in Appendix A.

IV-34

PRICEWATERHOUSECOOPERS 🅸

Exhibit 12
Page 464

## IV.4 Methodology for the Case Studies

The case study portion of the analysis was a study of the actual experiences of seven federal capital habeas corpus attorneys. PwC gathered and analyzed information on seven cases from six states (the six case study states to better understand the factors affecting the time and money spent in different regions of the United States. The case studies also provided the opportunity to discuss PwC's preliminary findings with attorneys who have represented and submitted vouchers for these types of cases. The seven case studies are described in Appendix C.

**Case Selection**

With the assistance of the AOUSC, PwC chose 7 cases based on the following criteria:

1. Geographically, the cases were from a diversity of states;
2. The appointed counsel completed their survey;
3. The case had progressed at least to the circuit court of appeals stage; and
4. The case had at least one district and one circuit voucher.

The final list of seven cases included:

- One case from Pennsylvania (Third Circuit);
- One case from Texas (Fifth Circuit);
- One case from Illinois (Seventh Circuit);
- One case from Missouri (Eighth Circuit);
- Two cases from California (Ninth Circuit); and
- One case from Alabama (Eleventh Circuit).

IV-35

*PRICEWATERHOUSECOOPERS* ⑧

Exhibit 12
Page 465

All of the cases had progressed through the appellate stage. In addition, almost all of the original crimes were double homicides with an accompanying felony.

## The Attorney Interviews and Group Discussion

All of the attorneys who represented these cases were interviewed as part of the study; four attorneys were interviewed in San Francisco, California, and three in Washington, D.C. The interviews, which lasted approximately 2 hours each, covered the history of the case and the various factors impacting the cost of the case. In California, PwC also conducted a focus group to discuss preliminary findings and generate discussion of regional differences in practice and culture.

## Corporate Law Firm Analysis

During the case study interviews, the California attorneys hypothesized that the costliest cases were all represented by large corporate law firms. By contrast, although corporate law firms represent many capital habeas corpus petitioners pro bono in a number of states, panel attorneys from Texas, Pennsylvania, Illinois, Missouri, and Alabama were unaware of such firms billing the federal courts for their work in federal capital habeas corpus cases in the states where they practiced.

To examine the hypothesis, PwC gathered information on 36 of the 37 most costly cases in the CJA Panel Attorney Payment System database, all of which were from California. Because the CJA Panel Attorney Payment System database does not indicate the type of law a panel attorney practiced when he or she represented the case, PwC

IV-36

*PRICEWATERHOUSE(COPERS* 

Exhibit 12
Page 466

asked a federal capital habeas corpus expert whether or not a large corporate law firm employed the attorney providing representation in these 36 cases.

The expert classified attorneys as "civil" attorneys, if a large corporate law firm employed them; otherwise they were categorized as criminal attorneys. In addition, the Martindale-Hubble Directory of attorneys provided information on several attorneys the expert was unable to classify. This was not a foolproof method of accurately identifying the cases represented by large corporate law firms, and conclusions drawn from this analysis are subject to methodological error. However, given the limitations in time and information, this was the best possible method for identifying attorneys who worked for large corporate law firms while providing federal capital habeas corpus representation.

IV-37

PRICEWATERHOUSECOOPERS 🅲

Exhibit 12
Page 467

# Section V: CJA Panel Attorney Payment System Database Analysis

## V.1 National Costs

PwC analyzed the cost of federal capital habeas corpus cases from the CJA Panel Attorney Payment System database for the years FY 1992 to FY 1998, subject to removal of some cases as described in the methodology. As depicted in Figure V-1 below, the sum costs of the 783 cases analyzed was $102,293,031.[37] The average cost per case was approximately $130,000, and the median was approximately $63,000 per case.

**CJA Panel Attorney Payment System Data**

*Open and Closed Cases by Case Disposition*



**Figure V-1: Distribution of Costs and Number of Cases**

---

[37] The figures above reflect only those amounts paid to private panel attorneys to cover attorney fees, expenses, and expert costs. However, the attorneys that PwC interviewed also cited the use of other resources, including the defunded Resource Centers, law school students, interns, and pro bono attorneys. The attorneys suggested that this use of additional resources is common practice nationwide. The costs noted here understate the true value of resources provided in the representation.

V-38

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 468

Overall, open cases incurred 88 percent of all costs ($89.9 million), whereas closed cases incurred only 12 percent of costs ($12.4 million).[38] Moreover, open cases that are active were the most costly:

- $82,952 average (and $55,617 median) cost of closed cases in which the petitioner was executed;

- $74,742 average (and $53,429 median) cost of closed cases in which the petitioner died in prison, was released or in which his or her sentence was commuted;

- $151,366 average (and $72,911 median) cost of open cases that are active; and

- $68,202 average (and $33,518 median) cost of open cases that are dormant (that is, nonactive).

California cases largely drive the high average cost of open cases. If the California cases were removed, the average cost of open cases would drop to $66,931— a decrease of almost 50 percent. In contrast, the average cost of non-California closed cases is $81,805, *higher* than the average cost of non-California open cases. Therefore, if California cases are removed, closed cases are more costly than open cases.

## V.2 Breakdown of Costs by Stage of Proceeding

Most of the costs of open cases were incurred during the habeas petition stage (shown in Figure V-2 below). This result is not

---

[38] The estimate for closed costs, however, may be low since many of those cases may have incurred costs before 1992, and are not reflected in the totals in the CJA Panel Attorney Payment System database. In 119 open cases and 51 closed cases, attorneys were appointed prior to FY 1992.

V-39

PRICEWATERHOUSE COOPERS 🄫

Exhibit 12
Page 469

surprising considering that most work in a federal capital habeas corpus case involves preparation of the petition. For all cases, the petition stage accounted for, on average, 789.5 of the average 913.8 hours billed per case, equivalent to 86 percent of the average hours billed per case.

## CJA Panel Attorney Payment System Data

*Open Cases by Stage of Proceeding*



**Figure V-2: Distribution of Costs and Number of Open Cases**

The habeas petition stage is the most costly stage and drives the total cost of a case. The average and median costs of the habeas petition stage for *open* cases ($129,363 and $46,614 respectively) are close to the average and median costs of all cases all stages for all cases combined ($130,642 and $63,257, respectively). As noted above,

V-40

PRICEWATERHOUSECOOPERS ⓘ

Exhibit 12
Page 470

discrepancies in costs between open and closed cases are due to the preponderance of California cases among the open population. Open cases also incur high costs in the evidentiary hearing and appeal stages. These stages incur average and median costs of over $15,000. However, because not all cases have reached these stages (and some may never reach these stages), the total costs represented by these stages is approximately $11 million, compared to a total of $71 million for the petition stage.[39]

Similarly, for closed cases, most costs were incurred in the habeas petition stage. However, the appeals stage also accounts for a large proportion of the total costs of closed cases (see Figure V-3 below). This is partly due to two reasons. First, more closed than open cases have reached the appellate stage. Eighty-three percent of closed cases have reached the appellate level as opposed to 26 percent of open cases. Secondly, while the appellate stage has the same cost on average (nearly $30,000), regardless of whether the case is open or closed, closed cases are less costly in total, partly due to the impact of California cases noted earlier, and partly due to the relatively age of closed cases compared to open cases. Closed cases were, on average, 17.3 months old on October 1, 1991—the date of the first voucher in the database—and hence had incurred more costs than open cases. Open cases were 11.3 months old on October 1, 1991 on average.

---

[39] The unknown stage also had high costs. A voucher was assigned to the unknown stage if the stage of proceeding was not noted on the voucher. Based on a review of voucher submission dates, PwC believes that many vouchers assigned to the 'unknown' stage really belong in the habeas petition stage.

PRICEWATERHOUSECOOPERS 🅰

Exhibit 12
Page 471

## CJA Panel Attorney Payment System Data

*Closed Cases by Stage of Proceeding*



**Figure V-3: Distribution of Costs and Number of Closed Cases**

In contrast, the average cost of an evidentiary hearing is almost twice as much for an open case as for a closed case. This is largely due to the impact of California cases. If the California cases are removed, the average cost per case for open cases is only $20,004.

Prior to 1995, attorney vouchers did not specify stage of proceeding, and therefore, many vouchers submitted prior to 1995 were attributed to the "unknown" stage of proceeding. For closed cases, "unknown" vouchers account for almost 30 percent of total dollars, as opposed to approximately 7 percent of total costs for open cases. Since the habeas petition and evidentiary hearing stages occur early in the life cycle of a

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 472

case, it is likely that most of the $3 million in the "unknown" stage is attributable to the habeas petition or evidentiary hearing stages. This would increase the average cost for each of these stages.

Figure V-4 and Figure V-5 below present some of the same information in the form of pie charts. The figures show the percentage of total costs incurred between FY 1992 and FY 1998 for open and closed cases, broken down by stage of proceeding. Figure V-4 shows that 80 percent of the total costs of open cases were incurred during the habeas petition stage. Figure V-5 shows that for closed cases, the appeal stage incurred the same percentage of total costs as the habeas petition stage. As noted above, this may simply reflect the age of the closed cases; older cases would have incurred costs in the petition stage prior to the period covered in this analysis.



**Figure V-4: Total Cost of Open Cases by Stage of Proceeding**

V-43

PRICEWATERHOUSE COOPERS 🄯

Exhibit 12
Page 473



**Figure V-5: Total Cost of Closed Cases by Stage of Proceeding**

Because the habeas petition, evidentiary hearing, and appeal stages account for the vast majority of costs, PwC's analysis of stages focused on the costs of these stages of proceeding.

## V.3 Breakdown of Costs by Component

A breakdown of costs by component shows that the largest component is, by far, out-of-court attorney fees. This is followed by expert costs, attorneys' expenses, and finally, in-court fees. This is shown in Figure V-6 below.

_PriceWaterhouseCoopers_ ⬛

Exhibit 12
Page 474



**Figure V-6: Average Cost Per Case—Attorney, Expert Costs and Expenses**



**Figure V-7: Median Cost Per Case--Attorney, Expert Costs, and Expenses**

V-45

*PRICEWATERHOUSECOOPERS* 🅖

Exhibit 12
Page 475

The large proportion of out-of-court costs occur because federal capital habeas corpus cases require extensive amounts of out-of-court time for petition preparation, client interviews, background research, and investigation. Attorneys only spend a small amount of in-court time for courtroom presentations such as an evidentiary hearings or dispositive motions.

## V.4   Breakdown of Costs by Circuit

PwC compared the average cost of cases by circuit (see Figure V-8).



**Figure V-8: Average and Median Cost Per Case By Circuit**

Overall, Ninth Circuit cases had a significantly higher average cost than cases in other circuits. The average cost in the Ninth Circuit was $289,054, compared to an average of $62,483 for all other circuits. Moreover, the Ninth Circuit accounts for the 37 most costly cases in the CJA Panel Attorney Payment System database. If those cases are

V-46

*PRICEWATERHOUSECOOPERS* 🄫

Exhibit 12
Page 476

removed, the national average cost drops by approximately 25 percent to $97,556 from $130,642. The average cost per case in the Ninth Circuit would drop by $89,000 or 30 percent, to $199,912. This emphasizes the impact that Ninth Circuit cases have on average costs nationwide.

The cost per open case in the Ninth Circuit is $299,318, slightly more than the overall average cost per case in the Ninth Circuit of $289,053. However, the average cost of closed cases in the Ninth Circuit is on par with average costs of closed cases in other circuits. This indicates that there are not many closed cases that push down the average cost for all cases in the Ninth Circuit.



**Figure V-9: Average Cost of All, Open and Closed Cases by Circuit**

In fact, closed cases account for only 5 percent of all cases in the Ninth Circuit; the remaining 95 percent are open. This implies that it is not

PRICEWATERHOUSECOOPERS ⓡ

Exhibit 12
Page 477

just the proportion of cases that leads to higher average costs, but that specific Ninth Circuit factors associated with open cases drive costs.



**Figure V-10: Percentage of Open Cases by Circuit**

When costs are compared by state, California cases have the highest average and median costs nationwide (see Figure V-11 below).

Given the large number of California cases (20 percent of all federal capital habeas corpus cases), it is clear that the cost of California cases is driving the cost of all cases. California cases make up 57 percent of the $102 million in total costs. Since 95 percent of California cases are open, it is also clear why the average cost of open cases is much higher than the average cost of closed cases—the 149 open California cases drive up the average cost of all open cases.

V-48

*PRICEWATERHOUSE COOPERS* 🅸

Exhibit 12
Page 478



**Figure V-11: Average and Median Cost By State**

PwC analyzed the costs of cases by district for all districts with more than 10 cases in the database. Not surprisingly, PwC found that cases in the California districts were much more costly than cases in any other district in the country. California Southern only had one case, so it was not included in the analysis, but case costs in the three other California districts averaged at least $299,000. Several other Ninth Circuit districts had high average costs. Idaho, Nevada, and Arizona districts all had an average cost of approximately $100,000 per case. This suggests that some of the high average cost in California can be attributed to factors that relate to the Ninth Circuit as a whole. However, California districts were the only districts with higher average costs than the national average, indicating that much of the additional cost is concentrated in practices that are specific to California.

V-49

PRICEWATERHOUSECOOPERS 🄯

Exhibit 12
Page 479



**Figure V-12: Average and Median Cost Per Case By District**
**(Districts with more than 10 cases)**

The difference between the cost of cases in California, in the Ninth Circuit, and in other circuits can be seen in Figure V-13. In the chart below, the median cost of each case is connected by a line for each circuit, and the vertical axis (y-axis) shows the cost of each case. The costs of the cases have been ranked within each circuit to create a smooth curve that connects the few high-cost cases with the more numerous lower cost cases for each circuit. The Ninth Circuit has also been divided into California and non-California cases to show the impact that California cases have on Ninth Circuit costs.

V-50

PRICEWATERHOUSECOOPERS 🅑

Exhibit 12
Page 480



**Figure V-13: Plot of All Cases for All Circuits and California**

Immediately evident is that California's high costs are driving Ninth Circuit costs and are considerably higher than the costs of cases in other circuits. In the Ninth Circuit as a whole, average costs are just below $290,000, whereas in California average costs are close to $372,000. Overall, California cases account for $58.0 million of the $67.9 million in the Ninth Circuit and the $102.3 million in the whole of the United States. In other words, California cases alone account for 57 percent of the total costs of the CJA Panel Attorney Payment System database and 85 percent of all Ninth Circuit costs. In addition, of the 37 most costly cases nationally, 36 are in California.

The average cost of California cases is over $370,000, compared to approximately $70,000 for non-California cases. The median for

PRICEWATERHOUSECOOPERS ⊞

Exhibit 12
Page 481

California cases is $307,666, and the median for non-California cases is $48,401. This is shown in Figure V-14.[40]



Figure V-14: Comparison of Costs of California and Non-California Cases

The difference in costs between circuits can be partly accounted for by the fact that attorneys in the Ninth Circuit bill more out-of-court hours than attorneys in other circuits, as shown in Figure V-15 below.

[40] The number of California plus non-California cases in the figure above equals 785, not 783, because two petitioners had cases in two different states. In PwC's analysis these are treated as the same case; this does not materially affect the results of the analysis.

PRICEWATERHOUSECOOPERS 🅐

Exhibit 12
Page 482



**Figure V-15: Out-of-Court Hours Spent by Attorney per Case per Circuit**

On average, an attorney in the Ninth Circuit spends 861.7 out-of-court hours per case—almost three times the average for all other circuits (306.3 out-of-court hours per attorney per case). In contrast, the Ninth Circuit hourly out-of-court rate ($128.45 per hour) was only slightly higher than the average rate for other circuits ($111.46), as shown in Figure V-16 below. This implies that it is primarily the amount of time spent by attorneys working on California cases that drives the high costs, not the average hourly rate.

Given that out-of-court time is the largest cost category in federal capital habeas corpus cases, the amount of time spent per attorney per case in the Ninth Circuit for open cases is the largest cost driver of CJA panel attorney costs.

V-53

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 483



**Figure V-16: Average Out-of-Court Attorney Rate per Circuit**

To discover how attorneys spend their time, PwC looked at 10 categories of attorney time in the stages of proceeding that incur the most costs: the habeas petition stage, the evidentiary hearing stage, and the appeal stage (Figure V-17, Figure V-18, Figure V-19). In all of these stages, most attorney time was spent conducting legal research and writing. Discussions with attorneys and representatives from the AOUSC revealed that this broad category is often used as the default category by attorneys that fill out the CJA vouchers from which the data is drawn.

Figure V-17 shows the average amount of time spent per attorney in the preparation of the habeas petition, by circuit. Time spent in legal research and writing dominates other activities, costing attorneys in the Ninth Circuit $53,053 per case on average.

V-54

PRICEWATERHOUSECOOPERS ⓡ

Exhibit 12
Page 484



**Figure V-17: Average Attorney Hours in the Habeas Petition Stage by Circuit**

It is noticeable that attorneys in the Ninth Circuit spend approximately twice as much time reviewing documents and the trial record as attorneys in other circuits. This costs $10,789 more for reviewing documents, and $6,513 more for reading the trial record. This is most likely due to the large size of trial records and counsel files in California relative to other states, as well as to the litigious nature of defending a case in California. California attorneys who were interviewed for the Case Study Section of this report supported this hypothesis. Attorneys in California also spend more time interviewing clients and witnesses, traveling, and spending time on "other

PRICEWATERHOUSECOOPERS ⬛

Exhibit 12
Page 485

activities."[41]  Section V-6 will discuss the costs associated with the extra time California attorneys spend in these activities.

In the evidentiary hearing stage, attorneys in the Ninth Circuit spend more time interviewing clients, consulting with the Resource Centers (defunded in 1995), consulting with experts, and reviewing documents.



**Figure V-18: Average Attorney Hours in the Evidentiary Hearing Stage by Circuit**

In the appeal stage, attorneys in the Ninth Circuit spend more time conducting legal research and writing, and to a lesser extent, reviewing

---

[41] The practice of spending more time reviewing the record, interviewing clients, traveling and doing "other activities" may reflect a more general practice in California by attorneys working on any type of case (capital, capital habeas corpus, and noncapital), not just federal capital habeas corpus.

V-56

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 486

documents. However, the differences as to how time is spent are not as significant as for the other stages of proceeding.



**Figure V-19: Average Attorney Hours Spent in the Appeal Stage By Circuit**

Attorneys in the Ninth Circuit spend much more time consulting with experts than their counterparts in other circuits. This is consistent with the high average expert costs per case in the Ninth Circuit. As shown in Figure V-20 below, average expert costs in the Ninth Circuit are more than twice the average cost for experts in the other circuits.[42] Comparison of the average number of experts per case in California and non-California cases explains this difference. In California, an

---

[42] This average is computed for only those cases with expert vouchers, not for all cases.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 487

average case has 4.3 experts, whereas a non-California case has 0.8 experts.



**Figure V-20: Average Expert Cost Per Case by Circuit**

This preliminary analysis leads to several findings regarding the costs of federal capital habeas corpus cases in California and the Ninth Circuit:

- The average and median cost of cases in the Ninth Circuit are significantly higher than those of other circuits;
- The cost of cases in the Ninth Circuit are driven by the cost of California cases;
- Attorneys in the Ninth Circuit spend almost three times as much time working out-of-court as their counterparts in other circuits;
- Expert costs are, on average, over three times as high in the Ninth Circuit as they are in other circuits.

V-58

PRICEWATERHOUSECOOPERS 🅱

Exhibit 12
Page 488

## V.5 Study of Ninth Circuit Cases by State

The comparison of states within the Ninth Circuit focused on the following factors:

1.    Average cost per case for each stage of proceeding;

2.    Average hourly rate per attorney per case;

3.    Average number of out-of-court hours per case;

4.    Average number of attorneys per case; and

5.    Average time spent per activity per case.

The conclusions drawn from these analyses have to be qualified due to the low number of cases in some states. For example, Washington has only five cases, so there is no such thing as a "representative" case in Washington. Montana, which has only one case in the database, was not included in this portion of the analysis. When the population size is small, PwC indicates how many cases constitute the population in each state.

Overall, the non-California Ninth Circuit average cost per case is $125,204—twice the $62,483 average cost per case outside of the Ninth Circuit. Even without California, the Ninth Circuit would still show high costs. This extra $63,000 of costs is most likely attributable to Ninth Circuit factors and is not a function of the special circumstances in California. This section will highlight differences between the states of the Ninth Circuit, and also between the Ninth Circuit and the country. Later sections will explore differences between California and non-California states.

PRICEWATERHOUSECOOPERS 🔲

Exhibit 12
Page 489

Examination of Ninth Circuit cases began by analyzing the average cost per case by state. California was clearly the most costly state. The findings are presented in Table V-1.

**Table V-1: Average Cost Per Case in Ninth Circuit States**

| State | Average Cost Per Case |
|-------|----------------------|
| Arizona | $95,231 |
| Nevada | $101,058 |
| Idaho | $126,407 |
| Washington | $184,396 |
| California | $324,176 |

PwC next studied the costs of the major stages of proceeding (habeas petition and evidentiary hearing) for costs incurred prior to the case reaching the appellate level. For this analysis, appellate- level costs were excluded.

For the habeas petition stage, the average cost of non-California Ninth Circuit cases is $117,155, while the median cost is $46,614. In California, the average cost of $294,400 is more than twice the national average. Washington state also had a high average but only a small number of cases. Figure V-21 displays these results below:

PRICEWATERHOUSECOOPERS 🅶

Exhibit 12
Page 490



Average and Median Cost Per Stage For Ninth Circuit States

**Figure V-21: Average Costs Per Case for Habeas Petition and Evidentiary Hearing Stages**

In the evidentiary hearing stage, comparison between the states was not meaningful due to the small population sizes of all states except for California (see Table V-2). For example, Arizona and Washington had average costs for this stage of $25,197 and $36,836 respectively. However, since they each only had two cases in this stage of proceeding, it was difficult to draw any conclusions about average or typical costs. Thirty-two of the 36 Ninth Circuit cases with evidentiary hearings were in California. For the habeas and evidentiary hearing stages, it is not surprising that California, with an average cost of $100,357, drives the Ninth Circuit's average cost of $92,653. This is about twice the national average of $49,614.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 491

**Table V-2: Number of Cases by Stage of Proceeding**

| State | Total Case Pop. | Habeas Petition Pop. | Evidentiary Hearing Pop. | Percentage of Total Reaching the Ev. Hearing Stage |
|---|---|---|---|---|
| Arizona | 44 | 29 | 2 | 5% |
| Nevada | 14 | 13 | 0 | 0% |
| Idaho | 13 | 13 | 0 | 0% |
| Washington | 5 | 1 | 2 | 40% |
| California | 156 | 149 | 32 | 21% |

This analysis shows California's costs in key stages of proceeding are higher than those of other Ninth Circuit states. California has unique factors contributing to habeas petition and evidentiary hearing costs that are not common to the other Ninth Circuit states.

The next step was a comparison of attorney rates per case in each state. The rates were calculated by dividing the total out-of-court attorney fees by the total number of out-of-court hours for all cases. Out-of-court costs and hours were used rather than in-court costs and hours, because out-of-court time is the primary driver of case costs.

California's out-of-court rates were somewhat higher than both the national average and other states in the Ninth Circuit, but not high enough to account for the large disparities in average costs per case. Figure V-22 shows that California's average out-of-court rate was $136.05, not significantly higher than that of other states in the Ninth Circuit.

PRICEWATERHOUSECOOPERS 🏢

Exhibit 12
Page 492



**Figure V-22: Average Out-of-Court Rate Per Case in the Ninth Circuit, By State**

The rate is approximately 6 percent higher than the Ninth Circuit average of $128.45, and 10 percent higher than the national average of $123.25.

Further analysis shows that the number of out-of-court hours in California is much higher than in any other state in the Ninth Circuit. The average amount of out-of-court time spent on non-California Ninth Circuit cases was 900 hours. In comparison, California averages 2,115. Figure V-23 below compares California to other Ninth Circuit states.

PRICEWATERHOUSECOOPERS 🅿

Exhibit 12
Page 493



**Figure V-23: Average Number of Out-of-Court Hours per Case in the Ninth Circuit**

Combining the data on rates and hours shows that the hours spent on a case are the major determinant of California's higher costs. In addition, these results show that significantly more time is being spent on Ninth Circuit cases compared to non-Ninth Circuit cases.

One possible factor contributing to the number of hours spent in a case is the average number of attorneys working on a case in each state. In California, an average of 2.14 attorneys worked on a case over its lifetime (Figure V-24). This was not, however, the highest in the Ninth Circuit—California's average was only the median value of the five states. Figure V-24 shows that in both Idaho and Washington more attorneys were assigned to cases, on average, than in California.

V-64

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 494



**Figure V-24: Average Number of Attorneys Per Case in the Ninth Circuit, By State**

The higher number of attorneys per case does not necessarily correlate with higher average costs. However, two qualifiers should be mentioned. First, the CJA Panel Attorney Payment System database did not allow PwC to determine accurately if two attorneys were working at the same time, if attorneys worked successively, or both (an attorney may have started as co-counsel and replaced the lead counsel later). Secondly, the data used to calculate these numbers only showed the number of attorneys who billed their time. In some cases, one attorney may have represented a law firm, where a number of attorneys were working on the case, but submitted a consolidated bill. These issues are further explored in Section VII.

Since out-of-court time was the primary driver of costs, the final step in our comparison of cases was a further breakdown of how attorneys

PRICEWATERHOUSECOOPERS 🄫

Exhibit 12
Page 495

spend their time in each Ninth Circuit state. This analysis was performed in the same way as the breakdown of attorney time in the stage of proceeding and circuit analyses. PwC eliminated those cases with no information submitted for attorney time activities. For the remaining cases, PwC then found the average amount of time spent on each activity per case for each state.

As shown in Figure V-25 below, California attorneys spent more time in every category except for courtroom hearings. As in other analyses, legal research and writing was the main cost-driver. On average, attorneys in California spent 562.3 hours, or approximately $70,000 on legal research and writing.[43]



**Figure V-25: Average Time Spent Per Case Per Activity**

---

[43] The time spent on each activity are underestimated. On average, California cases consumed over 2,000 attorney out-of-court hours. Of these, 914.5 hours are not allocated to any particular activity in the CJA Panel Attorney Payment System database. The remaining 1,200 hours are divided among different activities as shown in Figure V-25.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 496

In conclusion, several factors differentiate cases in California from other Ninth Circuit cases with respect to costs, but primarily it is the amount of time that attorneys spend on a case that drives the high costs of federal capital habeas corpus cases in California.

## V.6  Accounting for the Cost Differential Between the Average California and Non-California Case

To determine the source of the difference in costs of California and non-California cases, PwC compared an average non-California case with an average California case by cost component, including:

1.  Out-of-court hours;
2.  Out-of-court rate;
3.  Attorney expenses;
4.  Expert costs; and
5.  In-Court fees;

In addition, the costs of California and non-California cases were compared by identifying cost differences by stage of proceeding.

The average case originating in California cost $372,029, and the average non-California case cost $70,360. The medians were $307,666 for California and $48,401 for non-California states—both slightly less than the averages. The $301,669 difference in the average costs can be divided into the five components listed above. The results are displayed in Figure V-26 below.

PRICEWATERHOUSECOOPERS 🅐

Exhibit 12
Page 497



**Figure V-26: The Cost Differential Between the Average Case Cost in Non-California Cases and the Average Case Cost in California**

The percentage of the $301,669 difference in costs attributable to each factor is shown in the pie chart below:



**Figure V-27: Percentage of the Cost Differential Between California and Non-California Cases Attributable to Certain Factors**

*PRICEWATERHOUSECOOPERS* 🅡

Exhibit 12
Page 498

### V.6.1.1   Out-of-Court Hours

As expected, the vast majority of the difference in average costs can be attributed to out-of-court hours. In fact, over half the difference in the costs between California and non-California cases can be explained by this single factor.

To further understand the difference in costs attributable to out-of-court hours, PwC analyzed differences in the amount of time attorneys spent on certain activities. The CJA Panel Attorney Payment System database contains information on nine out-of-court activities. PwC broke down the percentage of time attorneys spent on each activity, and compared the averages for California and non-California. Figure V-28 below shows the results:



**Figure V-28: Percentage of Out-of-Court Cost Attributed to Each Attorney Activity**

V-69

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 499

Almost half the difference is attributable to legal research and writing. However, as noted earlier in the report this is a broad category that captures many tasks and activities, making it difficult to draw any conclusions about what causes this difference in hours.

Part of the difference in total out-of-court hours can be explained by the longer state trial records that California federal capital habeas corpus attorneys must review. When attorneys broke down their time by activities, California attorneys indicated that they spent on average 187.8 hours reviewing the trial records, compared with 52.5 hours for attorneys from non-California cases. This excludes time they spent reviewing other court documents. The difference of 135.2 hours translates into $14,377 at the non-California attorney rate of $106.30 per hour. This figure is the direct cost of reading the longer California trial records.

California attorneys also spend more time consulting with experts. On average, attorneys in a California case spent 107.3 hours in this activity, while outside of California attorneys spent 17.9 hours consulting with experts. Multiplying the difference, 89.4 hours, by the average non-California rate ($106.30 per hour), results in $9,507. This is on top of the additional money that California attorneys spent directly on experts, as discussed below.

Some of the additional time was spent traveling. Attorneys representing a California case spent an average of 90.8 hours per case traveling, compared with 30.3 hours per case for attorneys in other

V-70

PRICEWATERHOUSECOOPERS ⬚

Exhibit 12
Page 500

states. This translates into approximately $9,655 in additional costs. The amount of money that attorneys billed to travel is discussed below.

### V.6.1.2 Out-of-Court Rate

The difference in attorney hours does not entirely explain the higher costs in California. The second greatest factor was the difference between average California and non-California rates that accounted for $60,253 of the difference in costs. In part, this is because the difference in rates was multiplied by the average number of hours spent on a case in California (not the number of hours spent on a non-California case), so much of this $60,253 arises from the greater number of hours billed by California attorneys. The rest is simply the result of California attorneys billing at a rate of $133.90, 9 percent higher than the $106.30 average for the rest of the country.

### V.6.1.3 Attorney Expenses

Although attorney expenses accounts for only about 10 percent of the difference between average California and non-California costs, California attorneys charged an average of $35,564 in expenses, more than eight times the average non-California attorney's expenses of $4,204. In comparison, the total cost of a California case is, on average, approximately five times the cost of a non-California case. These figures show that attorney expenses compose a higher percentage of total case costs in California than in non-California cases. Attorney expenses are the sum of travel and "other" dollars in the CJA Panel Attorney Payment System database. When average expenses in California are broken down by these categories, an average

V-71

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 501

of $3,116 was incurred for travel and the remaining $32,449 for
"other" (non-travel) expenditures. This compares with $706 worth of
expenditures for travel and $3,499 spent on "other" in the average non-
California case. The CJA Panel Attorney Payment System database
does not differentiate between types of non-travel expenses.

The difference in travel accounts for only $2,410 of the additional cost
of a California case, compared to a non-California case. Combined
with the $9,655 extra cost of time spent traveling discussed above,
only $12,065 of the $301,669 cost differential can be explained by
travel. The difference in "other" expenses remains unexplained.
However, one possible source of the difference between California and
non-California costs is the use and billing practices of attorneys from
large corporate law firms. While this use could not be fully analyzed
within the limits of the study, the issue is briefly discussed below in
Section VII.

### V.6.1.4  Expert Costs

The difference between the average expert cost in California and the
average expert cost outside of California explained approximately 12
percent of the total difference in costs. However, experts in California
cost an average of $39,461 per case—eleven times the non-California
average cost of $3,574. Again, this is disproportional to the overall
cost difference—California cases are on average, five times more
costly than non-California cases. To explain the higher expert costs,
PwC examined the data and found, not surprisingly, that experts are
being used more often in California. Although the same types of

PRICEWATERHOUSECOOPERS 🅰

Exhibit 12
Page 502

experts are used in all states, California attorneys simply use more of them more often. It might also be true that experts bill at higher rates in California, but that could not be ascertained from the information in the CJA Panel Attorney Payment System database.

In California, on average 4.3 experts work on a case, compared with 0.80 experts per case for all non-California states. In addition, when comparing the use of experts for California and non-California cases, experts were used in a much greater proportion of California cases than non-California cases.

**Table V-3: Percentage of Cases Using Experts**

| Percentage of Cases Using Experts | | | |
|---|---|---|---|
| | All | California | Non-California |
| Total Cases | 783 | 156 | 627 |
| Investigator | 30% | 86% | 13% |
| Interpreter | 1% | 6% | 0% |
| Psychologist | 20% | 64% | 9% |
| Psychiatrist | 16% | 58% | 7% |
| Polygraph | 0% | 0% | 0% |
| Documents | 1% | 3% | 0% |
| Fingerprint | 0% | 2% | 0% |
| Accountant | 0% | 1% | 0% |
| CALR | 0% | 1% | 0% |
| Chemist | 1% | 3% | 0% |
| Ballistics | 1% | 3% | 1% |
| Other | 30% | 78% | 15% |

The table above shows that attorneys most often employ psychiatrists, psychologists and investigators as experts. For both California and non-California cases, these expert costs occur most often in the habeas

PRICEWATERHOUSECOOPERS ⬚

Exhibit 12
Page 503

petition stage, followed by the evidentiary hearing and dispositive motions stages, as shown below in Figure V-29.



Figure V-29: Average Cost Per Case For Experts in All Stages

As shown in Table V-4, California experts have higher average costs than non-California experts for the habeas petition and evidentiary hearing stages. This indicates that, in California, experts are used much more in discovery and investigation. Attorneys interviewed in the case studies suggested that the greater use of mental health experts in California could be a possible cause of higher costs. This corresponds to the data in Table V-3 above, which shows that psychiatrists and psychologists are used in over half the cases in California.

V-74

PRICEWATERHOUSECOOPERS 🅰

Exhibit 12
Page 504

Interestingly, average expert costs were lower in California than in non-California states for the dispositive motion stage. More curious is that non-California cases used experts more in the dispositve motion stage than in an evidentiary hearing or habeas petition stage.

### Table V-4: Average Cost Per Expert by Stage of Proceeding

| Stage of Proceeding | Non CA | CA | All |
|---|---|---|---|
| Habeas Petition | $10,235 | $41,429 | $25,200 |
| Evidentiary Hearing | $5,939 | $20,787 | $10,972 |
| Dispositive Motion | $18,398 | $2,357 | $12,382 |
| Appeal | $957 | $318 | $923 |
| Petition for Cert | $683 | | $683 |
| Appeal of Denial of Stay | $1,991 | | $1,991 |
| Other | $1,920 | $4,731 | $2,388 |
| Unknown | $8,126 | $15,269 | $9,938 |

To further explore expert costs, PwC compared the amount of money spent on mental health experts (psychologists and psychiatrists), investigators, and all other experts in California and non-California.

As depicted in Figure V-30 below , attorneys representing California cases spend more, on average than attorneys representing non-California cases, for all three types of experts. In fact, California attorneys spend an average of 10 times more on each type of expert than non-California attorneys.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 505



**Figure V-30: Average Cost per Case by Expert Type, California Cases vs. Non-California Cases**

California cases use an average of 1.54 mental health experts per case, while the average for a non-California case is 0.26. In California, $9,092 per case is spent on mental health experts on average, compared to $863 in non-California cases. The use of these mental health experts supports the theory mentioned above, that the mental health of the petitioner is more rigorously evaluated in California than elsewhere.

Outside of California, 0.22 investigators used per case on average, costing $1,688. In California, attorneys use an average of 1.30 investigators costing $15,473. Thus, the average case in California spends almost 10 times as much on investigators as the rest of the country. This suggests that more time is spent in California cases researching both the facts and the history of the case than in non-California cases.

V-76

PRICEWATERHOUSECOOPERS ⓘ

Exhibit 12
Page 506

There is little difference in the mix of experts used in California and non-California cases. The average California case has, on average, more than five times the number of experts overall, six times the number of mental health experts, and six times the number of investigators compared to the average non-California case. The experts in California are more costly partially because of a greater use of experts, and possibly due to higher rates or to more time worked.

### V.6.1.5  In-Court Attorney Fees

Finally, in-court attorney fees represented only 1 percent of the difference in the average costs of California and non-California cases. California attorneys charged an average of $5,006—three times the average of $1,175 billed by non-California attorneys. In-court attorney compensation is only a small factor in explaining California's higher average cost per case.

### V.6.1.6  Stage of Proceeding

PwC compared the costs of California and non-California cases by stage of proceeding. The results are depicted in Figure V-31 below.

V-77

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 507



**Figure V-31: Average and Median Cost by Stage of Proceeding for California and Non-California Cases**

The differences between California and non-California costs were most pronounced in the habeas petition stage. In California, the habeas petition stage costs an average of $331,295, compared with $51,517 in other states, a difference of almost $280,000. The bulk of the differential between California and non-California cases therefore lies in this stage. Part of this cost difference may be due to new discovery and investigation at the federal level to explore issues overlooked at the state post-conviction stage. The California attorneys interviewed as part of the case study analysis stated that federal capital habeas corpus cases often were not fully developed during the state post-conviction proceedings, thus requiring more research and investigation at the federal level to fully address all issues. Eighty-eight percent of attorneys from California who were surveyed stated that their requests for discovery at the state post-conviction proceedings were "denied or

V-78

PRICEWATERHOUSECOOPERS ⬛

Exhibit 12
Page 508

sharply reduced." This compares with 59 percent of non-California attorneys. The fact that California attorneys spent an additional $13,785 on investigators compared to their non-California counterparts supports the hypothesis that more investigation and research was needed in California cases than in non-California cases (or California attorneys perceive this to be so).

The evidentiary hearing stage also showed a substantial cost disparity of $92,000 between California and non-California cases. In California, the average evidentiary hearing cost $112,799 compared with $20,245 for non-California states. Part of this substantial difference is due to additional expert costs, since $14,800 of the extra expert cost per case in California occurs in the evidentiary hearing stage. However, most is attributable to attorney out-of-court hours. In addition to the higher cost of an evidentiary hearing in California, evidentiary hearings are held more often there. The CJA Panel Attorney Payment System database showed that, of the cases that went to the appeal stage, 42 percent of California cases had evidentiary hearings, compared to 11 percent of non-California cases. The surveys told a similar story. Both California and non-California attorneys usually request evidentiary hearings at the federal level (95 percent of California and 97 percent of non-California attorneys surveyed requested an evidentiary hearing), but California attorneys are granted evidentiary hearings more frequently. Eighty-three percent of California attorneys were granted hearings, compared to 40 percent of non-California attorneys.

PRICEWATERHOUSECOOPERS 🔲

Exhibit 12
Page 509

The other stages of proceeding show minor differences between the costs of California and non-California cases. In California, dispositive motions cost $11,000 more than non-California cases, and appeals cost $13,000 more. The remaining stages had minimal differences or showed non-California cases to be slightly more costly. These stages also had a low volume of cases, making a comparison of costs of little value.

V-80

PRICEWATERHOUSECOOPERS 🅮

Exhibit 12
Page 510

# Section VI:   Factor Analysis

The previous analysis shows that the costs of all cases are largely driven by the number of hours spent out of court preparing the habeas petition.  In addition, comparison of California cases with non-California cases reveals that the higher costs in California are due to:

- More time spent by attorneys out of court in preparing the petition (57 percent of the cost difference);
- Higher attorney compensation rates in California compared to other states (20 percent of the cost difference);
- Higher expert costs in California (12 percent of the cost difference); and
- Higher attorney expenses (10 percent of the cost difference).

This leads to two questions:

1.  What, typically, are the factors that drive the costs of federal capital habeas corpus cases (and hence drive the amount of time spent preparing the petition) of all cases; and

2.  What factors make California so different from the rest of the country?

To address these questions PwC sent out a questionnaire to 392 panel attorneys who provided representation in at least one federal capital habeas corpus case.  The questionnaire asked about the factual details of the case and post-conviction proceedings, as well as the attorney's opinion of the factors driving the costs of the cases in which they were

VI-81

*PRICEWATERHOUSECOOPERS*

Exhibit 12
Page 511

involved. A copy of the questionnaire is provided in Appendix B. The responses were used in a variety of ways. First, PwC examined the reasons attorneys gave for high case costs. Secondly, PwC used regression analysis to identify factors that were strongly related to the costs of cases.[44] The factors that PwC used in the analysis were based on the reasons the attorney gave for high-cost cases and on suggestions from representatives of the Defender Services Division of the AOUSC. Responses to particular questions that differentiated California from non-California cases were also analyzed, to see whether those responses supported or conflicted with cost factors suggested by the case study analysis.

## VI.1  *Attorney Opinions*

The surveys listed possible factors that might contribute to the costs of federal capital habeas corpus cases. Attorneys were asked to give each factor a score of 1 to 4. Attorneys gave a score of 1 to those factors they believe made a high contribution to costs, and a score of 4 to factors they believed did not contribute to costs.

PwC calculated the average response for each factor and then ranked them in order of importance, as shown in Table VI-1 below. A score of 2.5 is the average response, so all responses that received below 2.5 reported an above-average contribution to costs.

---

[44] A discussion of regression analysis is included in Appendix A.

VI-82

PRICEWATERHOUSECOOPERS 🅿

Exhibit 12
Page 512

**Table VI-1: List of Factors**

| Possible Factors Contributing to the Costs of Federal Capital Habeas Corpus Cases | Contribution to Costs (1=High Contribution, 4=No Contribution) | | |
|---|---|---|---|
| | All | CA | Non-CA |
| Competency of state trial counsel | 1.55 | 1.25 | 1.63 |
| Other | 1.57 | 1.75 | 1.53 |
| Incomplete factual development in state court | 1.61 | 1.25 | 1.70 |
| Significant legal research to support motions | 1.62 | 1.58 | 1.63 |
| Complex defendant personal background | 1.83 | 1.61 | 2.13 |
| Aggressiveness of the Attorney General | 1.85 | 1.88 | 1.84 |
| Large number of habeas claims | 1.94 | 1.52 | 2.04 |
| Large number of expert witnesses required | 2.19 | 1.63 | 2.35 |
| Competency of state post-conviction counsel | 2.20 | 2.05 | 2.21 |
| Number of motions | 2.30 | 2.08 | 2.36 |
| Court evidentiary hearings | 2.32 | 2.07 | 2.37 |
| Number of pages of trial record | 2.36 | 2.29 | 2.37 |
| Expedited briefing required because of execution date or other limitations | 2.37 | 3.14 | 2.30 |
| Geographically dispersed evidence and witnesses | 2.40 | 2.46 | 2.39 |
| Large number of capital charges or aggravating circumstances | 2.42 | 2.47 | 2.41 |
| Difficulty in locating state records | 2.52 | 2.22 | 2.60 |
| Number of pages of trial counsel files | 2.54 | 2.50 | 2.54 |
| Number of pages of appellate counsel files | 2.67 | 2.78 | 2.88 |
| Need for translators/interpreters | 3.76 | 3.85 | 3.71 |

This table shows that the views of attorneys in California and non-California states do not greatly differ with respect to the contribution of various factors to total case costs. In all three categories, attorneys believe that the most significant factor contributing to the costs of the federal capital habeas corpus case is the competency of state trial counsel. Incomplete factual development in the state trial proceedings is also ranked as a high contributor to costs. These factors are related. Ineffective counsel in the state trial will result in incomplete factual development at the trial. "Ineffective assistance of counsel" is commonly raised as a federal capital habeas corpus claim. Eighty-one percent of attorneys surveyed made an "ineffective assistance of counsel" claim for the guilt phase of the trial, and 83 percent made this claim for the sentencing phase. A likely reason for the common use of the ineffective assistance of counsel claim is that it can encompass

VI-83

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 513

many other claims about the weakness of a trial. Claims based on the Fourth, Eighth, and Fourteenth Amendments are more restricted.

Several differences arose in the comparison of California attorney responses with non-California attorney responses. First, California attorneys gave the category "large number of habeas claims" a score of 1.52, as opposed to 2.04 for non-California attorneys. The survey responses showed that, California attorneys raise more claims than their non-California counterparts, as shown in Table VI-2.

**Table VI-2: Survey Results on the Percentage of Habeas Claims Per Case**

| Number of Habeas Claims Sought | All | CA | Non-CA |
|---|---|---|---|
| 1 | 7% | 8% | 7% |
| 2 to 5 | 36% | 24% | 40% |
| 6 to 10 | 34% | 44% | 33% |
| 11 to 20 | 16% | 20% | 16% |
| 21 to 30 | 5% | 4% | 5% |
| 31 to 40 | 0% | 0% | 0% |
| More than 40 | 0% | 0% | 0% |
| Unknown Cases | 3 | 1 | 2 |
| Total Number of Cases | 126 | 25 | 101 |

Secondly, California attorneys consider the number of expert witnesses required as a more substantial contributor to costs than non-California attorneys (see Table VI-1). This supports the prior findings on the impact of expert witnesses on the costs of California cases. Third, California attorneys, more than non-California attorneys, believed that the complexity of the petitioner's personal background had a larger impact on costs.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 514

The survey also asked attorneys whether a number of possible environmental factors, including the attitudes of the local community, the judge, and the attorney general, toward both the crime and the death penalty itself, increased the costs of the case. The factors and responses are shown in Table VI-3 below. The table shows the percentage of attorneys who believed that each factor increased the costs they represent.

**Table VI-3: Attitudes that Affect Costs**

| Factor | Increased Costs |
|---|---|
| Local community attitudes toward the original crime | 29% |
| Local community attitudes toward the death penalty | 31% |
| Attitude of the judge toward the original crime | 34% |
| Attitude of the judge toward the death penalty | 34% |
| Attitude of the Office of the Attorney General toward the original crime | 63% |
| Attitude of the Office of the Attorney General toward the death penalty | 70% |

Most attorneys surveyed believe that the attitude of the Office of the Attorney General increased the costs of their case. Only one-third of the attorneys surveyed believed the judge's attitude either towards the original crime or toward the death penalty, increased the costs. This is consistent with the high ranking of the aggressiveness of the Office of the Attorney General as a cost driver in Table VI-1.

PRICEWATERHOUSECOOPERS 🗷

Exhibit 12
Page 515

## VI.2 Regression Analysis

While the views of attorneys provided useful insights into the causes of costs of federal capital habeas corpus cases, they are subjective measures, dependent on attorney expectations, experiences, and beliefs, and may be limited to specific knowledge of local state and federal court practices.

PwC used regression analysis, a type of statistical test as a means of using objective data to test which factors affect the costs of federal capital habeas corpus cases. This involved developing two models of factors likely to affect costs and testing the significance of these factors through statistical calculations. The two models were designed to analyze:

1. The impact of various factors on the costs of 105 cases (all cases with a fully completed survey); and

2. The impact of various factors on costs of 84 non-California cases all non-California cases with a fully completed survey).

The reason for including the second (non-California) model was to determine if the factors that apparently influence the costs of all cases—based on the results of the first regression analysis—also appear to affect the costs of non-California cases. This helped differentiate between the factors that drive the costs of all cases and the factors that drive the costs of non-California cases.

The factors tested in both models included:

VI-86

*PRICEWATERHOUSECOOPERS* 🅾

Exhibit 12
Page 516

- Whether travel was required for investigation to other states (at trial);
- Whether the case originated in California;
- Whether there was continuity of counsel from state to federal post-conviction proceedings;
- The number of prior capital representations by counsel;
- The number of pages of trial record;
- The number of state post-conviction proceedings;
- Whether the federal judge denied attorney requests (for experts, attorney fees, and for evidentiary hearings) at the federal post-conviction proceedings;
- Whether the state judge denied a request for an evidentiary hearing at the state post-conviction proceeding;
- Whether the state provides funding for the state post-conviction proceeding; and
- The number of claims made in the federal capital habeas corpus petition.

The second model excluded the variable as to whether the case originated in California (as by design, they were all non-California cases).

## Summary

The combined results of the two models were inconclusive. The results suggested that:

VI-87

PRICEWATERHOUSECOOPERS 🔲

Exhibit 12
Page 517