- Many factors drive the costs of non-California federal capital habeas corpus cases. The factors noted above explained only 14 percent of the costs of the 84 non-California cases;
- One or more factors driving the costs of cases in California are not captured in either model; and
- None of the factors included were robust predictors of case costs. That is, the statistically significant factors in one model were not statistically significant in the other model.

The results appeared to depend on the sample of cases—a different sample of cases in the analysis would likely have yielded different results as to which factors are significant. In addition, many factors not included in the regression model influenced costs.

For these reasons, the regression analysis supports the notion that case costs are based on a variety of unpredictable factors. As suggested by attorneys, such factors might include, the complexity of the petitioner's personal background, particulars of the crime and the circumstances surrounding the crime, and the idiosyncrasies of the state trial.

## Methodology

PwC initially reviewed the factors suggested by attorneys for high costs of federal capital habeas corpus cases. These factors included:

➤ Attorney experience (number of previous capital cases and years of experience);

➤ Number of murder victims;

VI-88

*PRICEWATERHOUSECOOPERS* 🅰

Exhibit 12
Page 518

- ➤ Number of co-defendants;
- ➤ Judicial denial of resources at the state or federal post-conviction stages;
- ➤ Size of trial record;
- ➤ Number of habeas corpus claims raised;
- ➤ Defendant history of mental illness;
- ➤ Length of state trial;
- ➤ Whether investigation at trial involved travel to other states;
- ➤ Continuity of counsel from state to federal post-conviction proceedings;
- ➤ Number of state post-conviction proceedings;
- ➤ Denial of attorney requests (for experts, attorney fees, and for evidentiary hearings) at the federal post-conviction proceedings;
- ➤ Denial of a request for an evidentiary hearing at the state post-conviction proceedings; and
- ➤ Whether funding was provided for the state post-conviction proceedings.

From these factors, PwC removed those during initial testing did not show an impact on case costs. PwC then developed two final regression models to test.

The results of the two regression analyses are shown in Table VI-4 and Table VI-5 below. The factors that showed the most significant impact on costs are in bold and are at the top of the table. The table shows:

- *The value of the coefficient*—this shows how much the costs of the case increase if the relevant factor increases. For example, if the

VI-89

PRICEWATERHOUSECOOPERS 🅴

Exhibit 12
Page 519

number of years of attorney experience is a factor ($X_1$), and the coefficient of that factor is -$1,000, then for each year of attorney experience, on average the costs of a federal capital habeas corpus case decrease by $1,000. If the sign of the coefficient is negative, the factor decreases costs rather than increases costs.

- *The level of confidence in statistical significance*—the factor (and value of the coefficient) can only be considered to affect case costs if the factor is statistically significant, which depends on the results of statistical tests. The regression analysis only provides evidence that the factors with a "yes" in these columns affect the costs of cases. For columns with a "no," the value of the coefficient is not statistically reliable.

- *The value of "$r^2$"*—the percentage of the difference in costs explained by the factors in the model; the "$r^2$" value of 0.65 means that 65 percent of the costs of the cases are explained by the factors in the model, and the remaining 35 percent of the costs are unexplained (or due to other factors).

The level of confidence in the statistical significance of the variables is shown for both a 95 percent confidence level (the generally accepted level of confidence by statisticians) and at the 90 percent confident level (a lower level of confidence). When a factor is statistically significant, it is unlikely that the regression results are due simply to sampling error (that is, picking a sample that is unrepresentative of all cases). A factor that is statistically significant most likely affects costs, either increasing costs or decreasing costs, depending on the sign of the coefficient.

PRICEWATERHOUSECOOPERS 🏛

Exhibit 12
Page 520

## Results

The first table shows the results of the model that analyzed the costs of both California and non-California cases, and the second table shows the results of the second model that analyzed the costs of non-California cases only.

For the model that included all cases, three factors appear to be statistically significant:

1. Whether travel to other states for investigation was required at the trial—an indication of the need for travel at the federal post-conviction stage;

2. Whether there was continuity of counsel between the state and federal post-conviction stages—as expected, continuity of counsel decreases the costs at the federal level (that is, the coefficient is negative); and

3. Whether the case originated in California—not surprisingly, this confirmed previous findings, that cases in California are significantly more costly than non-California cases.

Neither of the first two factors was statistically significant in the second model of non-California cases. This implies that the need for travel and continuity of counsel had a different impact on the costs of non-California cases compared to the impact on California cases. In fact, no factor was statistically significant at the generally accepted 95 percent level of confidence in the non-California model. This implies that there are other factors, not included in the list above, that affect the cost of cases.

VI-91

*PRICEWATERHOUSECOOPERS*

Exhibit 12
Page 521

During the case study interviews, attorneys identified several reasons why costs in California may differ significantly from the costs of non-California cases—such as the impact of the California's Office of the Attorney General on increasing the hours spent in litigation. Some of the reasons—for example, the tendency of the attorney general's office to litigate exhaustion requirements—cannot be easily converted into objective quantifiable data that can be analyzed using regression analysis.

A curious result of the non-California model is that the number of pages of the trial record is statistically significant at a 90 percent level of confidence, but the coefficient was negative. This suggests that after taking all the other factors in the analysis into account, the longer the trial record, the lower—not higher—the costs. This is counterintuitive, and at odds with the finding in the data analysis that shows that more time is spent in California cases reviewing the trial record and documents than in non-California cases. This is one indication that the results of the analysis may be subject to sampling error, or that the models fail to capture some of the most important cost drivers.

Less surprisingly, attorney experience is a statistically significant factor at the 90 percent confidence level (the more experienced the attorney the lower the costs), as is the number of state post-conviction proceedings. (The more times the case enters the state courts, the lower the costs at the federal post-conviction stage, presumably, because the issues are dealt with effectively at the state level and require less investigation and research at the federal level. This is inconsistent

VI-92

PRICEWATERHOUSECOOPERS 🏢

Exhibit 12
Page 522

with an alternative hypothesis that costs increase if the case "bounces" between state and local courts as issues as attorneys take time to refresh their memory, familiarize themselves with new laws and case law, renew contact with witnesses, and so on). However, to conclude that these factors are statistically significant, PwC has to decrease the acceptable level of confidence from the generally accepted standard of 95 percent to 90 percent. Thus, while there was evidence that suggests these two factors are statistically significant, the evidence is not strong.

Finally, the value of $r^2$ in the first model was 0.65. This means that 65 percent of the costs of these cases is explained by the factors shown in the table. This is a substantial percentage of costs. In contrast, the value of $r^2$ in the non-California model—which excluded California cases—was only 0.14 , or 14 percent. The reason for the difference is the impact of the California variable in the first model. The analysis shows—confirming the data analysis—that California cases have higher costs. In the second model, California costs were excluded to rule out the impact of California cases on the model results and to see whether the analysis can determine the factors driving the costs of non-California cases. Removing the California cases and the California variable from the model clearly changes the results, as shown below in Table VI-4. This is the basis for concluding that the same factors affect the costs of California and non-California in different ways.

VI-93

PRICEWATERHOUSECOOPERS 🅰

Exhibit 12
Page 523

**Table VI-4-: Regression Model of All Cases**

| Factors | Coefficients | Statistically Significant at 95% Confidence Level? | Statistically Significant at 90% Confidence Level? |
|---|---|---|---|
| **Travel for Investigation (at trial)*** | **63,167.27** | **YES—Increases Costs** | **YES—Increases Costs** |
| **California Case*** | **400,739.50** | **YES—Increases Costs** | **YES—Increases Costs** |
| **Continuity of Counsel from State to Federal PCP*** | **-46,527.00** | **YES—Decreases Costs** | **YES—Decreases Costs** |
| No. of Prior Capital Representations by Counsel | -857.22 | NO | YES—Decreases Costs |
| Pages of Trial Record (by category) | -19,339.66 | NO | YES—Decreases Costs |
| No. of State PCPs | -17,245.36 | NO | YES—Decreases Costs |
| Judge Denied Resources at Federal PCP* | 4,219.47 | NO | NO |
| Judge Denied Evidentiary Hearing at State PCP * | 9,721.91 | NO | NO |
| Provision of Funding for State PCP* | -12,840.08 | NO | NO |
| Number of Claims (Federal PCP) | 436.29 | NO | NO |
| Number of Cases | 105 | | |
| Value of $r^2$ (r-squared) | 0.65 | | |

VI-94

PRICEWATERHOUSECOOPERS ⓡ

Exhibit 12
Page 524

**Table VI-5-: Regression Model of Non-California Cases**

| Factors | Coefficients | Statistically Significant at 95% Confidence Level? | Statistically Significant at 90% Confidence Level? |
|---|---|---|---|
| Number of Claims (Federal PCP) | 959.71 | NO | YES—Increases Costs |
| Pages of Trial Record (by category) | -11,248.78 | NO | YES— Decreases Costs |
| Travel for Investigation (at trial)* | -8,560.28 | NO | NO |
| Continuity of Counsel from State to Federal PCP* | -19,478.77 | NO | NO |
| No. of Prior Capital Representations by Counsel | 16.07 | NO | NO |
| No. of State PCPs | -3,154.21 | NO | NO |
| Judge Denied Resources at Federal PCP* | 7,787.59 | NO | NO |
| Judge Denied Evidentiary Hearing at State PCP * | -19,349.73 | NO | NO |
| Provision of Funding for State PCP* | 15,204.80 | NO | NO |
| Number of Cases | 84 | | |
| Value of $r^2$ (r-squared) | 0.14 | | |

To further investigate the factors driving costs, and why the factors examined in the regression analysis did not show significant results, PwC analyzed the costs of cases in particular states.

VI-95

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 525

## Section VII: Comparative Study of Selected States

This section analyzes the average case costs of six states, as well as procedural and cultural factors of those states, in an attempt to further explain cost disparities between California and non-California federal capital habeas corpus cases. The states examined are the same as those for which case studies were collected. In order to concentrate on the costliest parts of a case, this analysis concentrates on the three stages of proceeding in which most costs are incurred:

- The habeas petition stage;
- The evidentiary hearing stage; and
- The appeals stage.

Because some factors influence case costs in more than one stage, a final category entitled "All Stages" discusses those factors that may contribute to costs over the lifetime of a case.

This section combines findings from the CJA Panel Attorney Payment System database, the survey results, and the case studies. The case study profiles are furnished in Appendix C. The three sets of data support each other in providing reasons for California's significantly higher average costs per case.

### VII.1 Habeas Petition Stage

As shown earlier, California has a more costly habeas petition stage than any other state—almost $250,000 more costly on average than the second most costly state studied. Because the habeas petition stage accounts for so much of costs, there is a correlation between the

PRICEWATERHOUSECOOPERS 🏛

Exhibit 12
Page 526

average cost of an entire case and the average cost of the habeas petition stage of proceeding. For example, Texas was the least expensive state studied and also had the lowest average cost per case for the habeas petition stage.



**Figure VII-1: Average Cost of the Habeas Petition Stage of a Case for Selected States**

The case studies offer some explanation for the differences shown in Figure VII-1 above. For the two California cases, many of the facts in the cases were underdeveloped at the state level and required many hours of investigation at the federal level. Attorneys hypothesized that lack of funding at the state post-conviction level resulted in underdeveloped cases reaching federal court. The California attorneys stated that as a result, they spent more time performing investigations at the federal habeas corpus petition stage than attorneys in other states. In support of this assertion, the payments to investigators are

VII-97

*PRICEWATERHOUSECOOPERS* 🅸

Exhibit 12
Page 527

much higher in California than in the other states studied. By contrast, most of the investigation in the case study from Alabama took place at the state level; hence investigation costs were low.

The survey data also indicates that California attorneys are denied resources at the state post-conviction proceedings more frequently than non-California attorneys. Eighty-three percent of California attorneys surveyed stated that their requests for discovery in state court were denied or sharply reduced, compared with 59 percent of non-California attorneys.

Among the four states in Figure VII-2 below (Alabama and Pennsylvania did not have any cases which billed for investigators), California attorneys were four times more likely to use investigators than attorneys in the other states. On average, investigators in an average California case cost more than $15,000 compared with $1,000 in Missouri, $1,100 in Texas, and $700 in Illinois. These figures do not include attorney time spent on investigation, and indicate that investigations may be much more thorough in California federal courts. A high level of investigation may also explain the relatively high average cost in Missouri, where the attorney interviewed emphasized the necessity of conducting new investigations at the federal district level.[45]

---

[45] See Case study #3 in Appendix C.

_PRICEWATERHOUSECOOPERS_ 🅡

Exhibit 12
Page 528



**Figure VII-2: Average Cost of Investigators Per Case for Selected States**

In addition, the trial records in California are longer than trial records in other states, requiring attorneys to spend substantial time reading and understanding the case's history. As federal capital habeas attorneys read the record, they must not only look for general themes of the case, but they must also decide which specific portions of the record are relevant when writing the federal habeas corpus petition.

The data in the CJA Panel Attorney Payment System database supports the anecdotal evidence provided in the case studies on the amount of time that attorneys spend reviewing the trial records. California attorneys spend an average of 188 hours per case, compared with 136 hours in Missouri. The product of the average number of hours and the average out-of-court rate provides the average cost per case. In California, attorneys spent $25,300 for reviewing the record, which is

PRICEWATERHOUSECOOPERS 🄯

Exhibit 12
Page 529

$10,000 more than Missouri, and $20,000 more than a typical state like Pennsylvania.



**Figure VII-3: Average Cost Per Case for Selected States of Reviewing Court Records**

The case studies illustrated one factor possibly limiting costs in Texas and Alabama. This factor is that the attorneys did not bill for all their work because of historically low payments. Judges can also decide how much of a voucher is worthy of reimbursement and can cut what they want. Sometimes an attorney could choose not to bill because of an expectation that a judge will cut his or her voucher. In California, attorneys stated that they are generally paid the full amount of a submitted voucher. One of the California attorneys stated that when the judge tried to cut his vouchers, he argued with the judge and in the end, received the money. Different billing practices in each state, therefore, may partly explain the variations in costs.

VII-100

PRICEWATERHOUSECOOPERS 🄯

Exhibit 12
Page 530

## VII.2 Evidentiary Hearing Stage

In California, the average cost of the evidentiary hearing stage was almost twice the average cost of the average evidentiary stage in the next most costly case study state. In fact, the average cost of an evidentiary hearing in California, over $100,000, was greater than the average cost of an entire federal capital habeas corpus case of the other case study states examined. The graph below provides a more detailed comparison.



**Figure VII-4: Average Cost Per Case of the Evidentiary Hearing Stage for Selected States**

Again, the case studies suggested reasons for these differences in costs. A California attorney stated that in California, the State Supreme Court rarely holds evidentiary hearings during state post-conviction proceedings. Holding an evidentiary hearing at the state level may

VII-101

PRICEWATERHOUSECOOPERS 🅰

Exhibit 12
Page 531

decrease the need for an evidentiary hearing at the federal level.
However, if an evidentiary hearing is not held at the state level, the
district court may want the evidence to be presented at the federal
level. Special circumstances, such as the discovery of new evidence
and so on may create the need for a hearing in both state and federal
court. Part of the reason why hearings in the federal level might be
more expensive than at the state level is because so much time has
elapsed since the state trial. Changes in the law and delays in
interviewing witnesses create additional challenges for the federal
capital habeas attorney. According to data in the CJA Panel Attorney
Payment System database, 42 percent of all California federal capital
habeas cases proceeding to the appeals stage had evidentiary
hearings.[46] In all of the other states, only 11 percent of cases had an
evidentiary hearing by the appeal stage.

The higher cost of evidentiary hearings can also be attributed to the
frequent use of experts in California cases, especially mental health
experts (psychiatrists and psychologists). On average, a California
case uses 4.3 experts per case, more than three times the number of
experts used in Missouri and eight times the number used in Texas or
Pennsylvania (no Alabama case billed for expert costs). This translates
into an average expenditure of $39,500 per case in California, while
other states averaged less than $4,000. Thus, the average cost per case
of experts in California is at least 10 times higher than in other states.

---

[46] The California attorneys interviewed believed that almost all California federal capital habeas
corpus cases have an evidentiary hearing at some point–possibly on remand by the Ninth
Circuit.

PRICEWATERHOUSECOOPERS 🅱

Exhibit 12
Page 532



**Figure VII-5: Average Cost of Experts Per Case for Selected States**

Equally important is the difference between cases in California and other states in the likelihood of using mental health experts. The attorney who provided representation in one California case study considered the cost of the psychologist and psychiatrist very costly. The CJA Panel Attorney Payment System database and the survey data show that this was typical of California cases. California federal capital habeas corpus cases average 1.54 mental health experts per case, seven times the 0.20 average of other states. The average cost of mental health experts per case in California was $9,000, 10 times the average cost in Pennsylvania, the median state.

VII-103

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 533



**Figure VII-6: Average Cost Per Case of Mental Health Experts for Selected States**

In addition to the higher expert costs, California attorneys on average spent more time consulting experts. The average amount of time spent per case in California was 107 hours, which, when multiplied by the average out-of-court attorney rate, translates into $14,500 per case, $12,000 more than Missouri. Non-California attorneys in the case studies stated that if they were granted more money for experts, they could greatly improve the strength of their cases.

VII-104

*PRICEWATERHOUSECOOPERS* 🅾

Exhibit 12
Page 534



**Figure VII-7: Average Cost Per Case of Consulting With Experts for Selected States**

## VII.3 Appeal Stage

An item of further study was a comparison of the cost of the appeal stage. California had the highest average cost at the appellate stage, but there was no direct correlation between the cost of the appeal stage and the average case cost, since the cost of the appeal stage is typically a smaller component of total case costs than other stages.

VII-105

*PRICEWATERHOUSECOOPERS* ⓡ

Exhibit 12
Page 535



**Figure VII-8: Average Cost Per Case of the Appeal Stage for Selected States**

In the appeal stage, California cases do not cost much more on average than cases from other states. The average cost of the appeal stage in California was 39 percent higher than in Missouri, the state with the next highest costs. This indicates that most of the higher costs are in other stages and are concentrated in the district courts.

## VII.4 All Stages

There are several factors that can drive the costs of a typical federal capital habeas corpus case in more than one stage. Some of these factors are discussed below.

PRICEWATERHOUSECOOPERS ⓘ

Exhibit 12
Page 536

**Litigation Strategy of the Attorney General**

California attorneys emphasized that the California Attorney General's Office never waives exhaustion requirements and litigates all matters. The California Attorney General's litigation of exhaustion requirements often sends cases back to state court while the federal habeas corpus proceedings are ongoing. Survey responses showed that California cases were more likely to be simultaneously in federal and state court. Eighty-three percent of California cases were in both courts at some point in time, compared with 30 percent of non-California cases. The case studies revealed that in the states of Alabama, Texas, and Pennsylvania (with the exception of Philadelphia), the representation for the state typically waives exhaustion claims and enforces procedural defenses to expedite the entire habeas corpus process. In these places, the state provides compensation for representation in proceedings that return to state court. The attorneys interviewed suggested that the actions of the California Attorney General's Office drive a portion of California federal capital habeas corpus attorney activity, which increases case costs. However, the litigation strategy of each state's attorney general's office cannot be quantified in terms of costs.

**Movement of Cases Among the State, District, and Circuit Courts**

As well as "bouncing" down from the federal district to the state court, cases can also "bounce" up from the federal district to the federal appellate court. Cases may be remanded to the state court to resolve exhaustion requirements that the Attorney General pursued, or because the district court finds that some issues are underdeveloped. The

*PRICEWATERHOUSECOOPERS* 🅑

Exhibit 12
Page 537

Attorney General also often files interlocutory appeals, challenging the California district courts' rulings on procedural matters. The survey data showed that 65 percent of California cases had an interlocutory appeal taken to the Ninth Circuit Court of Appeals, compared with 22 percent of non-California cases. The case studies suggested that this tendency to move back and forth might contribute significantly to the number of hours spent both preparing and filing documents and researching the appropriate court proceedings.

### Use of Attorneys from Large Corporate Law Firms[47]

In response to an apparent shortage in the number of available panel attorneys, during the 1990s, judges assigned a number of federal capital habeas corpus cases to attorneys from large, corporate law firms. It is possible that the use of attorneys from such firms increased the total, average, and median costs of California cases during the late 1980s and early 1990s. One possible cause is that the attorneys may have been inexperienced in this type of law, and may have used different billing practices from smaller criminal law firms who typically represent these cases. This factor may not be relevant to costs in recent or future federal capital habeas corpus cases, because large corporate law firms are generally no longer appointed in federal capital habeas corpus cases.

---

[47] Note that this section is not a judgment on the competency or efficiency of one set of attorneys as opposed to another. Rather, the point is more intuitive: costs are likely to be lower if the attorney does not need to spend significant amounts of time learning about federal capital and habeas corpus law.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 538

To investigate the possible cost impact of using attorneys from large corporate law firms to provide representation, PwC analyzed the costs of the 36 most expensive cases in California. The average cost of these cases is approximately $758,000, with costs ranging between $500,000 and $2,000,000. These case represent only 24 percent of all California cases but 44 percent of the total costs in California. As a result, these 36 cases add $139,771 to the average cost of all the 156 California cases. When the costs of these 36 cases are broken down by type of attorney[48], compensation is discovered to be $13,796,719 for the 33 civil attorneys and $11,531,164 for 47 criminal attorneys. This data indicates that civil attorneys were billing more per case than criminal attorneys. On average, the 33 civil attorneys contributed $88,441 to the average case cost of $372,029 for California's 156 cases. Thus, without the vouchers submitted by 33 civil attorneys, the average cost of California cases would have been $283,588, rather than $372,029.

This section does not indicate that if the civil attorneys had not provided representation, the average cost would have fallen by $88,000. Someone still would have been needed to perform the work. The question is whether by criminal attorneys would have performed the same work at lower costs.

There are reasons to believe why this may be the case. Attorneys from civil law firms may have been more costly, because they frequently used several associates on one case, all of whom bill for the hours that

---

[48] PwC asked an attorney familiar with California cases to identify which of the 80 attorneys providing representation in these cases were employees of large corporate law firms ("civil" lawyers, or of firms that specialize in criminal cases ("criminal" lawyers).

PRICEWATERHOUSECOOPERS 🏛

Exhibit 12
Page 539

they expended. These attorneys may have also needed to familiarize themselves with federal capital habeas corpus law, thus incurring costs that would not be charged by experienced capital habeas corpus attorneys.

Billing practices of civil law firms may also differ from those of criminal firms in the area of non-travel expenses, which may include the cost of paralegals, research assistants, and administrative expenses. On average, civil attorneys in the top 36 most expensive cases spent three times more money on non-travel expenses than criminal attorneys. In the 36 most expensive cases, civil attorneys spent an average of $64,139 on non-travel expenses, while criminal attorneys spent an average of $22,534. In fact, civil attorneys charged an average of $24.83 per hour in non-travel expenses, compared to criminal attorneys, who charged an average of $14.28 per hour in other expenses, which is 43 percent less.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 540

# Section VIII:   Conclusions

The three kinds of analyses described above are consistent in their portrayal of the costs of federal capital habeas corpus cases and the factors that drive those costs.  These analyses also suggest why costs of cases originating in California are much higher than cases that originate in other states.  Nevertheless, the issue of why costs are higher in California than in other parts of the country is complex, one that involves the interaction of many social, judicial, behavioral, political and economic factors that create a high-cost environment in that state.

The factors driving the costs of federal capital habeas corpus cases are difficult to determine due to the uniqueness of each case:

- The costs of the federal post-conviction proceedings are determined partly by what happens at the state trial and during the state post-conviction proceedings; analyzing the costs of federal capital habeas corpus cases is relatively similar to examining what drives the cost of inspecting products rolling off the end of a faulty production line.[49]
- The hours spent on an individual case are often determined by several factors specific to the case that make generalizations difficult; specific factors include:
  - The complexity of the petitioner's personal background;

---

[49]   The analogy is only partly true: the cost to the federal courts also includes tearing the faulty product (that is, case) apart and rebuilding it or debating whether the product and product line is faulty at all.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 541

- Actions undertaken by the trial counsel and the state post-conviction counsel;
- Unusual incidents that happen during the course of the original state trials; and
- The "novelty" of the constitutional claims being raised.

In spite of these difficulties, PwC was able to reach several conclusions on non-case-specific factors as a result of this study. These conclusions flow from the data analysis, the factor analysis, and the case studies.

## VIII.1   The Costs of Capital Federal Habeas Corpus Cases

### National Findings

- **Of the 783 federal capital habeas corpus cases examined, 631 were open and 152 were closed. However, 90 percent of the total $102 million costs of the 783 cases were incurred by open cases and only 10 percent by closed cases.** The proportionately low percentage of costs incurred by closed cases is due to the large number of open and costly cases from California. If California cases are not included in the analysis, the difference between the average cost of open and closed cases disappears.
- **Eighty-six percent of out-of-court hours are spent preparing and writing the habeas petition.** As discussed below, this is most probably due to the amount of investigation and legal research required during this stage.
- **Other costly stages include the evidentiary hearing stage and the appeal stage.** On average, an evidentiary hearing costs $55,000 for

PRICEWATERHOUSECOOPERS 🄫

Exhibit 12
Page 542

open cases and $20,000 for closed cases. An average appeals stage costs $29,000 for open cases and $30,000 for closed cases.

- ***In total, the costs of federal capital habeas corpus cases are largely a function of the number of hours spent out of court.*** Approximately 80 percent of the costs of cases are composed of attorney fees for time spent out of court.

### Regional Findings

- ***The cost of cases in the Ninth Circuit is approximately four times greater than the cost of cases in all other circuits.*** For both open and closed cases, the average cost per case in the Ninth Circuit is $289,054, compared to $62,483 for all other circuits combined.

- ***The high cost of cases in the Ninth Circuit is primarily due to the high costs of California cases.*** The average cost of California cases is more than $370,000, compared to approximately $70,000 for non-California cases. The median cost of California cases is $307,666, and the median cost of non-California cases is $48,401.

- ***The combined impact of the sheer number (156 cases out of 783) and high average cost of California cases is that cases originating in California have generated more than 57 percent of the total CJA panel attorney payments between FY 1992 and FY 1998.***[50] The total amount of CJA payments (including expert expenses) was $102 million between 1992 and 1998. Cases originating in California account for $58 million of this total. In

---

[50] This includes only the payments analyzed in this study. Some vouchers and cases were not included in the analysis for various reasons presented in the methodology section.

PRICEWATERHOUSECOOPERS 🏛

Exhibit 12
Page 543

other words, 20 percent of the cases have generated 57 percent of the costs.

- ***Attorneys in the Ninth Circuit spent almost three times as much time working out of court as their counterparts in other circuits. In addition, expert costs are, on average, more than three times as much in the Ninth Circuit as in other circuits.*** These differences account for a large part of the cost differences between cases in the Ninth Circuit, compared to cases in other circuits.

- ***California cases cost five times as much as non-California cases (from all circuits).*** There is a gap of approximately $300,000 between the average cost of a case in California ($372,029) and the average cost of a non-California case ($70,360). This difference is made up of:

  - $170,000 resulting from the additional out-of-court hours worked by attorneys in California;
  - $60,000 resulting from the higher attorney hourly rates in California;
  - $35,000 resulting from higher expert costs in California cases;
  - $31,000 resulting from higher attorney expenses in California cases; and
  - $4,000 resulting from additional in-court attorney fees in California.

  While most of the additional costs in California are due to the additional out-of-court hours, expert costs and attorney expenses in California are many times the equivalent costs of non-California cases (eight times for attorney expenses and 11 times for experts).

- ***Forty-five percent of California attorney out-of-court time is spent conducting legal research and writing.*** Fourteen percent is

PRICEWATERHOUSECOOPERS 🄫

Exhibit 12
Page 544

spent reviewing documents, 8 percent in reviewing the record, and
6 percent in consulting with experts.

## VIII.2  Factor Analysis

Many factors influence the costs of federal capital habeas corpus cases.
PwC attempted to identify some of these factors through the use of
regression analysis, a type of statistical analysis. Due to the number
and complexity of factors that influence case costs and the variation in
costs of cases that, on paper, appear similar in terms of case, petitioner,
and attorney characteristics, the regression analysis was inconclusive.
One reason for this is that many factors that influence case costs were
not included in the analysis, either because the factors were too
difficult to quantify, or because data describing the factors was not
available.

- *Regression analysis found that two factors—whether*
  *investigation for the trial involved travel to other states and*
  *continuity of counsel between state and federal post-conviction*
  *proceedings—were significant cost drivers.* However, these two
  factors were not statistically significant when California cases were
  excluded from the analysis, most likely because there are one or
  more other factors affecting costs in California that were not
  captured in the analysis.

- *The regression analysis of non-California cases found no factor*
  *that was statistically significant (at the 95 percent level of*
  *confidence) in driving costs of cases.* This means that many
  factors influencing the costs of federal capital habeas corpus cases
  not easily quantifiable. The regression analysis was unable to

VIII-115

*PRICEWATERHOUSECOOPERS* ⬛

Exhibit 12
Page 545

identify any single variable that consistently showed a statistically significant relationship to case costs in different tests. Moreover, the factors in the model for non-California cases only accounted for 14 percent of the costs of cases. The remaining costs were accounted for by factors outside of the model. This suggests that costs are driven by many factors, some of which may be difficult or impossible to quantify.

Although many factors are influencing case costs, attorney survey responses indicated the factors that attorneys believe to be the most important:

- *The single most important factor driving the costs of federal capital habeas corpus cases is the competency of the state trial counsel.* Not only is this the view of the attorneys surveyed by PwC, but "ineffective assistance of counsel" (at the state trial) is the most common claim raised in federal capital post-conviction proceedings. Over 80 percent of the attorneys surveyed raised this issue in their petition to the federal courts. The problem stems from the fact that federal habeas corpus review is, in essence, a quality control procedure. Consequently, the costs of this procedure depend heavily on whether mistakes were made earlier on in the process. This, however, does not explain why costs are higher in California compared to elsewhere.

- *Most attorneys surveyed (70 percent) believe that the attitude of the office of the attorney general for the state increased costs in the federal capital habeas corpus case they represented.* This finding supports assertions to this effect made by the case study attorneys, notably those from California. Many attorneys noted that the behavior of the state attorneys plays a significant role in

PRICEWATERHOUSECOOPERS 

Exhibit 12
Page 546

determining the length and hours spent on a case. For example, decisions by the attorney general's office (or the attorney representing the state) to raise, rather than waive, exhaustion, and other defenses will add to the time spent in litigation and will prolong the whole process. As described below, the litigation practices of California's Office of the Attorney General appear to have a major impact on the costs of cases.

## VIII.3 Case Study Analysis and Analysis of States in the Ninth Circuit

The case studies were a useful tool in understanding the factors that drive costs of individual federal capital habeas corpus cases. In addition, attorneys reviewed statistical findings to ensure that PwC was drawing appropriate conclusions from the data. Generally, these attorneys were not surprised by the findings and did not challenge them. The attorneys also suggested other factors and explained why they may be difficult to quantify and capture in responses to a questionnaire or in statistical analysis.

These answers, in combination with the data analysis, the regression analysis, attorney opinions, and survey responses, allowed PwC to develop, and to some extent test, various hypotheses as to why costs in California are higher than cases from other parts of the country.

- *Much time spent by attorneys in California is in response to challenges and decisions made by the state attorneys.* A strong and common theme from attorneys who practice, or who have practiced, in California is that the attorneys representing the state

VIII-117

PRICEWATERHOUSECOOPERS 🔲

Exhibit 12
Page 547

are persistent in making legal challenges to the actions of the petitioner's attorneys at every step in the process. Such behavior was not common in other states. For example, the attorneys representing the state of California will consistently maintain that not all of the habeas claims made by the petitioner have been exhausted during the state post-conviction proceedings. Therefore, the case is remanded from federal to state court. According to the seven case study attorneys, state attorneys in other states, such as Texas, often waive this challenge. The Office of the Attorney General seems to play an important role in determining the speed with which a case moves through the federal courts in California and in generating a workload that is unparalleled in other states.

- ***Among the top 36 most costly California cases, civil law firms account for a disproportionate amount of costs.*** The use of attorneys from large corporate law firms as counsel for some of the petitioners possibly increased the total and average costs of cases in California. While the top 36 cases represent only about 24 percent of California cases, they incurred 44 percent of the total costs in California. In fact, the 36 most costly cases added about $139,771 to the average cost of the 156 California cases. In these 36 cases, 33 "civil attorneys" (attorneys who were employed in a large corporate law firms) provided representation for total fees of just under $13.8 million. It is likely that many of these civil attorneys were inexperienced in representing habeas corpus and capital cases, and spent many hours learning the notoriously complex case law. Corporate law firms are accustomed to billing for however many attorney hours it takes to research complex legal issues, a different practice from smaller, criminal law firms who have fewer

VIII-118

*PRICEWATERHOUSECOOPERS* 🅘

Exhibit 12
Page 548

attorneys' hours to allocate. These 33 civil attorneys also averaged $64,139 in non-travel expenses, while attorneys who practiced in a criminal practice averaged $22,534. This also may reflect different billing practices between large, corporate law firms and smaller, criminal law firms.

- ***The federal courts in California will generally allow an evidentiary hearing to be held at some point in the process.*** This is not always true of judges in other federal districts or circuits. Based on attorney survey results, 83 percent of requests for evidentiary hearings in California are granted as opposed to 40 percent of requests for evidentiary hearings in non-California cases. The high cost of evidentiary hearings in California (average $92,000 per case) contributes to the high total cost of California cases. This begs the question of why evidentiary hearings are typically allowed in California cases. Part of the explanation may be that the state post-conviction procedures in California rarely, if ever, allow for an evidentiary hearing at that stage. This puts pressure on federal judges to grant an evidentiary hearing to account for the lack of one during the state post-conviction proceedings. By contrast, the state post-conviction proceedings in Missouri will often include an evidentiary hearing, lessening the need for one at the federal level. However, according to the case study attorney from Texas, evidentiary hearings are rare in Texas at both the state and the federal level.

- ***Federal judges in California approve vouchers for higher amounts than judges in other states.*** PwC heard several examples where judges in other districts and circuits were surprised at the cost of cases on their docket, while the cost of these cases were

*PRICEWATERHOUSECOOPERS* 🅱

Exhibit 12
Page 549

lower than the cost of the average case in California. There is the possibility that approval of vouchers for high-cost cases sets expectations that may guide the attorney in his or her next case. As judges consistently approve vouchers for high-cost cases, attorneys for the petitioner—in their duty to provide adequate representation—request the resources required.

- *The significant difference between the average costs of experts in California and non-California cases suggests that judges in California approve the use of expert witnesses more often than those in non-California states.* As stated above, California cases employ more experts and incur more expenses for experts than non-California cases. The difference in the costs of experts may be due to a number of factors: the high cost of living in California, the process for evaluating mental health, and difficulty in finding local experts willing to provide services at the low rates provided by the courts.

- *The absence of a rigorous state post-conviction process, combined with procedurally conscientious judges in the California district courts and the Ninth Circuit Court of Appeals, create a situation whereby the federal courts pick up costs that state courts would incur otherwise.* The suggestion from some attorneys is that the combination of a perfunctory state post-conviction process in California with a rigorous federal post-conviction process means that the federal courts are performing tasks, such as holding evidentiary hearings, that would normally be undertaken during state post-conviction proceedings. However, the costs of California cases are so much higher than they are in non-California cases (average difference of approximately $300,000)

VIII-120

PRICEWATERHOUSECOOPERS ⑬

Exhibit 12
Page 550

that it does not appear to be the result of a simple cost-shifting (deliberate or not) process.

Further understanding of the explanatory power of each of the above factors would require a more in-depth examination of how California attorneys spend their time and for what reason. This requires going beyond the data provided in the CJA Panel Attorney Payment database, but interviewing or surveying more attorneys with experience of practicing in California and other states to understand more how they spend their time. Given the affect of case-specific factors on costs, even this analysis would not necessarily provide an explanation of the costs of specific cases.

PRICEWATERHOUSE COPERS ⬛

Exhibit 12
Page 551

Case 3:12-cv-04454-SI   Document 28-8   Filed 09/26/14   Page 85 of 127
Case 2:09-cv-02158-CBC-S   Document 109-8   Filed 06/09/16   Page 191 of 263   Page ID
#:4790

# APPENDICES
# A, B, & C

Exhibit 12
Page 552

Case 2:09-cv-02158-CBC Document 109-38 Filed 06/09/16 Page 172 of 263 Page ID
Case 3:12-cv-04154-SI Document 28-9 Filed 09/26/14 Page 86 of 127
#:4791

# APPENDIX A:
# REGRESSION ANALYSIS
# METHODOLOGY

Exhibit 12
Page 553

# APPENDIX A: Regression Analysis Methodology

**Overview of regression analysis[1]**

Regression analysis is a form of statistical analysis that shows how one variable—called the *dependent variable*—is related to one or more other variables—called *independent variables.* For example, regression analysis might be used to show that the number of votes cast for an incumbent president (the dependent variable) is the result of a number of other factors, such as indicators of the strength of the economy and dollars spent on the campaign (independent variables). Investment banks use regression analysis to try to predict how exchange rates are a function of other economic variables.

To identify such relationships, regression analysis compares a large number of *observations,* or sets of dependent and independent variables, and then computes an equation that links them. Each observation must include one value for each independent variable and one value for the dependent variable. The number of votes cast for President Carter in 1979 and the inflation rate at the time of the election together constitute an example of a single observation for a regression analysis that relates the number of votes for an incumbent president with inflation rates. Generally, the more observations included in the comparison, the greater the confidence in the results.

---

[1]  For a fuller discussion of regression analysis see Mansfield, Edwin, *Statistics for Business and Economics.* 1991. W.W. Norton and Company: New York, pp. 457 to 467.

PRICEWATERHOUSE COPERS 🄫

Exhibit 12
Page 554

Regression analysis creates an equation that relates the variables being considered. For a regression analysis that only considers one independent variable, the equation is generally in the form of:

$$Y = a + bX$$

where "Y" represents the dependent variable, "X" represents the independent variable, and "a" and "b" represent constants that relate the independent variable to the dependent variable. For example, a hypothetical study using regression analysis to investigate the relationship between the number of years a person spends in higher education to a person's salary at the age of 40 might result in an equation:

$$Y = \$20{,}000 + \$5{,}000 \times X$$

where "Y" represents the person's salary at the age of 40, "a" = $20,000, "b" = $5,000 and "X" represents the number of years that person spends in higher education. This equation would show that a person with four years of college would, on average, be earning $40,000 at the age of 40 ($20,000 + $5,000 x 4).

**Goodness of Fit**

Of course, there are many factors besides the number of years spent in higher education that affect a person's salary. For this reason, the regression equation shows only a *statistical* relationship (the likely

A-2

PRICEWATERHOUSECOPERS

Exhibit 12
Page 555

impact of education on salary), not a *deterministic*[2] relationship (a guaranteed impact of education on salary). In the example above, the equation only represents what happens when all of these other factors that influence a person's salary are held constant (that is, if they gain another year of higher education but there are no other changes that would affect their salary).

In reality these other factors are never constant. Gaining an additional year of higher education may lead to a person's salary increasing more or less than $5,000, depending on these other factors. Regression analysis includes the calculation of a number, known as "$r^2$" (r-squared), that tells the researcher how well the independent variable or variables—and only the independent variables—explain or predict the value of the dependent variable, ignoring the effect of these other variables. The value of the "$r^2$" is the percentage of variation in the dependent variable explained by the independent variables and is also known as the "goodness of fit."

In the example above, the value of "$r^2$" shows how much of the differences in peoples' salaries are explained by the number of years spent in higher education alone. Suppose the value of "$r^2$" is 10 percent. This means that 10 percent of a person's salary is explained by the number of years that person spent in higher education. This also means that 90 percent of a person's salary is explained by other factors. In this case, the 10 percent figure is low (the figure is probably higher in real life). If more independent variables are added (such as

---

[2] Mansfield, Edwin. 1991. *Statistics for Business and Economics.* W.W. Norton and Company: New York, p. 460.

PRICEWATERHOUSECOOPERS 🅿

Exhibit 12
Page 556

IQ scores or scores on tests that measure a person's diligence), then the
value of "$r^2$" will increase. However, because the world is a very
complicated place, with many factors influencing salaries, the value of
"$r^2$" would never reach 100 percent for this regression analysis.

At the same time, there is no set "acceptable" level of "$r^2$" for
regression analysis. The acceptable level depends on the specifics and
complexity of the analysis being undertaken.

Regression analysis is commonly used in many academic disciplines
and in business to try to identify some of the *causes* of a dependent
variable (for example, what causes the number of votes cast for an
incumbent president, or what causes the unemployment rate).
However, strictly speaking, regression analysis can only show
statistical relationships between variables, not *causal* relationships.
For this reason, it is important that a regression analysis be built on a
theory as to *why* the variables being analyzed should be related. A
theory as to how variables are related should be developed before the
regression analysis begins. If the regression analysis shows a
statistical relationship consistent with the theory, then causal
relationships between the variables being analyzed are inferred,
although not proven.

The use of a theory is one way to avoid faulty conclusions. For
example, regression analysis potentially could show that the rainfall in
the state capital on a given day is statistically related to the
unemployment rate in the state. However, without a theory that
explains why these should be related—such as why years of higher

A-4

*PRICEWATERHOUSE COOPERS* 🄰

Exhibit 12
Page 557

education should be related to a person's salary—the analysis is not very meaningful.

## Statistical Significance

Even if a theory is supported by the regression analysis, the possibility exists that the statistical relationship shown by the regression analysis happens just by chance. This might be so if the regression analysis is based on only a *sample* of all the total possible observations, which is often the case. For example, no statistician would be able to collect all possible observations of the number of years of higher education and that person's salary at the age of 40, for this would require collecting information on everyone in the U.S. population aged 40 and over. Researchers typically use a sample instead, and then draw conclusions about the population (that is, all possible observations) based on the results of the sample. The question becomes how does the researcher know that the regression results are not simply the result of a sample that is not representative of the population?

There is one measure calculated by regression analysis typically used to measure the probability that the relationship shown by the regression analysis simply results from choosing a skewed sample. This is called the standard error. The standard error can be used to determine the likelihood that the value of "b" (from the equation above) is greater (or less, if the sign of "b" is negative) than zero, due to choosing a skewed or unrepresentative sample.

A-5

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 558

Statisticians will adopt an acceptable level of probability, prior to the regression, that the value of "b" is greater (or less) than zero due to an unrepresentative sample. For example, a statistician may create a rule that says any value of "b" where the chance of that value being greater than zero *simply by the selection of an unrepresentative sample* is greater than 95 percent shall be called a statistically significant value. This means that the statistician will accept a value as being statistically significant if the standard error shows that the chances of that value being greater than zero is 95 percent. The statistician can be confident that the probability of the value of "b" being greater than zero is 95 percent (called the level of confidence). As with the acceptable level of "r²" there is no universally accepted level of probability. However, the convention is that the 95 percent level of confidence is used unless there is a reason to adopt a higher (or lower) level of confidence.

**Model Building**

Once a level of confidence has been adopted, model building for the regression can begin. This involves selecting the most appropriate variables or factors to put into the equation, using an underlying theory (see the preceding discussion). Model building may entail trying out several different variables to see which group of variables provides the best fit, and shows an acceptable level of confidence. However, care must be taken to avoid simply selecting the variables that provide the best fit without developing any underlying theory to explain why those variables are appropriate.

A-6

*PriceWaterhouseCoopers* ⬛

Exhibit 12
Page 559

Once the model is built with appropriate variables, various tests can be performed—such as the statistical significance test—to ensure that the methodology and the results are valid. Discussions of these tests can be found in standard statistical textbooks.

A-7

*PRICEWATERHOUSECOOPERS* 🅡

Exhibit 12
Page 560

Case 3:12-cv-04454-SI Document 28-8 Filed 09/26/14 Page 44 of 127

# APPENDIX B:
# FEDERAL CAPITAL
# HABEAS CORPUS SURVEY
# FOR PANEL ATTORNEYS

Exhibit 12
Page 561

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

If you are not a panel attorney or have not represented a federal capital habeas corpus petitioner, please contact the Administrative Office of the US Courts representative, Elizabeth A. Brown, at (202) 273-1670 or the PricewaterhouseCoopers representative, Mindy Murch, at (703) 633-4619. Please return the completed survey in the postage paid envelop or fax it to (703) 633-4300 by *Friday, November 13, 1998.*

---

## A. Attorney Background Information

1. Total number of years practicing criminal law:
   - ○ Less than 1 year
   - ○ 1 to 3 years
   - ○ 4 to 7 years
   - ○ 8 to 10 years
   - ○ 11 to 15 years
   - ○ More than 15 years (*specify*) _____

2. Total number of years practicing in federal court:
   - ○ Less than 1 year
   - ○ 1 to 3 years
   - ○ 4 to 7 years
   - ○ 8 to 10 years
   - ○ More than 10 years (*specify*) _____

3. Total number of years representing this petitioner in federal capital habeas corpus proceedings:
   - ○ Less than 1 year
   - ○ 1 to 3 years
   - ○ 4 to 7 years
   - ○ 8 to 10 years
   - ○ More than 10 years (*specify*) _____

4. Have you previously provided representation in: (*Please enter number of cases.*)

| | | | |
|---|---|---|---|
| Federal capital habeas corpus | _____ | Capital trial | _____ |
| Direct appeal of a death sentence | _____ | Trial of a non-capital homicide | _____ |
| State capital post-conviction | _____ | Trial of a felony | _____ |
| Direct appeal of non-capital homicide | _____ | Non-capital federal habeas corpus | _____ |
| Direct appeal of a felony | _____ | Other trial | _____ |

5. Approximate number of hours spent in training programs on federal capital habeas corpus litigation (prior to this case)?
   - ○ 0 to 10 hours
   - ○ 11 to 20 hours
   - ○ 21 to 30 hours
   - ○ 31 to 40 hours
   - ○ More than 40 hours

6. Did the court provide you with access to computer-assisted legal research?   ○ Yes      ○ No

7. Was co-counsel appointed to this case?   ○ Yes      ○ No

---

## B. Profile of Petitioner

1. Age of Petitioner at the Time of the Crime:
   - ○ Under 20 years of age
   - ○ Between 20 and 29 years of age
   - ○ Between 30 and 39 years of age
   - ○ Between 40 and 49 years of age
   - ○ 50 years of age or older

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

2. Gender of Petitioner:  ○ Male    ○ Female

3. Race of Petitioner:
   - ○ American Indian or Alaska Native    ○ Black or African American
   - ○ Native Hawaiian or Other Pacific Islander    ○ Asian
   - ○ White

4. Citizenship of Petitioner:  ○ U.S.    ○ Other

5. Does petitioner suffer from mental illness, mental retardation, or other infirmity?
   ○ Yes        ○ No

   If yes, did the mental illness, mental retardation, or other infirmity make the representation more costly?    ○ Yes        ○ No

6. Did you require the use of a translator to communicate with the petitioner?
   ○ Yes        ○ No

7. Did the petitioner have previous criminal convictions when he was arrested for the crime tried at the state level?
   ○ Yes        ○ No

8. Were these convictions in another state?
   ○ Yes        ○ No

## C. Information on State Court Proceedings

1. Was this a felony-murder case?    ○ Yes    ○ No

   If yes, what was the underlying felony? (*Please mark all that apply.*)
   - ○ Robbery    ○ Arson
   - ○ Burglary    ○ Torture
   - ○ Rape    ○ Other (*specify*) _____
   - ○ Kidnapping

2. Aggravating factors presented by the Prosecution: (*Please mark all that apply.*)

| Aggravating Factors | Please mark here |
|---|---|
| a.  Prior criminal conviction(s)<br>If marked, please circle number of crimes<br>1  2  3  4  5  6  7  8  9  10 or more | ○ |
| b.  Unadjudicated prior bad acts<br>If marked, please circle number of acts<br>1  2  3  4  5  6  7  8  9  10 or more | ○ |
| c.  Multiple murder | ○ |
| d.  Murder committed during the course of a felony | ○ |

# Federal Capital Habeas Corpus Survey for Panel Attorneys
## CONFIDENTIAL INFORMATION

| Aggravating Factors | Please mark here |
|---|---|
| e. Murder was "heinous," "depraved," "cruel," etc. | O |
| f. Murder committed by lying-in-wait | O |
| g. Murder committed for financial gain | O |
| h. Murder for hire | O |
| i. Murder committed to avoid arrest | O |
| j. Torture of victim | O |
| k. Vulnerable victim | O |
| l. Public official victim | O |
| m. Future dangerousness | O |
| n. Defendant's lack of remorse | O |
| o. Defendant's age | O |

3. Mitigating factors presented by the Defense: (*Please mark all that apply.*)

| Mitigating Factors | Please mark here |
|---|---|
| a. Absence of criminal history | O |
| b. Remorse | O |
| c. Abuse suffered as a child | O |
| d. Youth | O |
| e. Mental retardation | O |
| f. Medical problems | O |
| g. Mental illness or defect | O |
| h. Emotional disturbance | O |
| i. Post-traumatic stress syndrome | O |
| j. Fetal alcohol syndrome | O |
| k. Addiction/substance abuse or intoxication | O |
| l. Adjustment to prison | O |
| m. Cooperation with police/prosecution | O |
| n. Cultural background | O |
| o. Potential for rehabilitation | O |
| p. Disparate sentencing of co-defendants | O |
| q. Lingering doubt of defendant's guilt | O |
| r. Dysfunctional family | O |
| s. Institutional failure | O |
| t. Poverty | O |
| u. Military service | O |
| v. Positive relationship with family and friends | O |
| w. Tolerance of life sentence by family of victim | O |
| x. Other positive acts/attributes of defendant | O |

# Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

4. How many charges were there in addition to the murder charge?
   - ○ 0
   - ○ 2
   - ○ 4
   - ○ 6 or more
   - ○ 1
   - ○ 3
   - ○ 5

5. Number of Co-Defendants:
   - ○ 1
   - ○ 2
   - ○ 3
   - ○ 4
   - ○ 5
   - ○ 6 or more

6. Number of Murdered Victims:
   - ○ 1
   - ○ 4
   - ○ 7
   - ○ 10 or more
   - ○ 2
   - ○ 5
   - ○ 8
   - ○ 3
   - ○ 6
   - ○ 9

7. Number of Other Victims:
   - ○ 0
   - ○ 3
   - ○ 6
   - ○ 9
   - ○ 1
   - ○ 4
   - ○ 7
   - ○ 10 or more
   - ○ 2
   - ○ 5
   - ○ 8

8. How many months did the trial last? (From appointment of counsel to handing down of sentence.)
   Months _____

9. Did the investigation require travel to other states?     ○ Yes     ○ No

   If yes, how many states? _____

10. Did the investigation require travel to another country?     ○ Yes     ○ No

    If yes, how many countries? _____

11. Was a translator used to communicate with the petitioner during the trial?
    - ○ Yes
    - ○ No

12. What was the level of media exposure or interest in the case?
    - ○ Low
    - ○ Medium
    - ○ High

13. Did the following factors affect the costs associated with the case? If yes, did they increase or decrease costs?

| Factors | Yes | No | Increase | Decrease |
|---|---|---|---|---|
| a.  Local community attitudes toward the original crime. | ○ | ○ | ○ | ○ |
| b.  Local community attitudes toward the death penalty. | ○ | ○ | ○ | ○ |
| c.  Attitude of the state judge toward the original crime. | ○ | ○ | ○ | ○ |
| d.  Attitude of the state judge toward the death penalty. | ○ | ○ | ○ | ○ |
| e.  Attitude of the prosecutor's office toward the original crime. | ○ | ○ | ○ | ○ |
| f.  Attitude of the prosecutor's office toward the death penalty. | ○ | ○ | ○ | ○ |
| g.  Experience of the prosecutors assigned to the case. | ○ | ○ | ○ | ○ |

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### *CONFIDENTIAL INFORMATION*

14. Overall, to what extent did the judge deny or reduce defense requests for the following during the state trial?

| Requests | Denied | Sharply Reduced | Minimally Reduced | Did Not Reduce | N/A |
|---|---|---|---|---|---|
| a. Requests for experts | O | O | O | O | O |
| b. Requests for discovery | O | O | O | O | O |
| c. Requests for investigation | O | O | O | O | O |
| d. Requests for travel | O | O | O | O | O |

## D. State Trial Attorneys

1. In your state, are defense attorneys for state capital trials chosen by a set of criteria?
   O Yes    O No
   If yes, please list the criteria:

   a. _____
   b. _____
   c. _____
   d. _____
   e. _____
   f. _____
   g. _____
   h. _____
   i. _____

2. Had the lead counsel at trial previously represented a client in: (*Please enter number of cases.*)

   | | | | |
   |---|---|---|---|
   | Direct appeal of a death sentence | _____ | State trial of a non-capital homicide | _____ |
   | State capital post-conviction | _____ | State trial of a felony | _____ |
   | Direct appeal of non-capital homicide | _____ | Non-capital federal habeas corpus | _____ |
   | Direct appeal of a felony | _____ | Other trial | _____ |
   | State capital trial | _____ | Unknown | _____ |

3. What was the hourly rate of compensation for lead counsel at trial?
   - O Pro Bono
   - O Less than $20
   - O Between $20 and $39
   - O Between $40 and $59
   - O Between $60 and $79
   - O Between $80 and $99
   - O $100 or more

4. Did the state trial judge deny or reduce defense requests for attorney fees?
   O Denied    O Sharply Reduced    O Minimally Reduced    O Did Not Reduce

5. Did or do you represent the federal capital habeas corpus petitioner in the state trial?

   O Yes    O No

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

6. Was co-counsel appointed to this case at the state trial level?    ○ Yes        ○ No

---

## E.  Information on State Post-Conviction Proceedings

1.  How many state post-conviction proceedings have there been in this case?
    ○ 1            ○ 2            ○ 3            ○ 4            ○ 5 or more

2.  Where were the state post-conviction proceedings originally filed?
    ○ Trial Court        ○ Appellate Court

3.  How many months did the state post-conviction proceedings last? (*If more than one proceeding, please provide total months.*)        Months _____

4.  Was additional investigation undertaken for the state post-conviction proceedings?
    ○ Yes        ○ No

5.  If yes, did the investigation require travel to other states?    ○ Yes        ○ No
    How many states? _____

    To other countries?                                                 ○ Yes        ○ No
    How many countries? _____

6.  What was the level of media exposure or interest in the state post-conviction proceedings?
    ○ Low        ○ Medium        ○ High

7.  Did the state provide funding for state post-conviction representation?    ○ Yes        ○ No

8.  To what extent did the judge deny or reduce defense requests for the following during the state post-conviction?

| Requests | Denied | Sharply Reduced | Minimally Reduced | Did Not Reduce |
|---|---|---|---|---|
| a.  Requests for experts | ○ | ○ | ○ | ○ |
| b.  Requests for discovery | ○ | ○ | ○ | ○ |
| c.  Requests for evidentiary hearings | ○ | ○ | ○ | ○ |
| d.  Requests for investigations | ○ | ○ | ○ | ○ |
| e.  Requests for travel | ○ | ○ | ○ | ○ |

---

## F.  State Post-Conviction Attorneys

1.  Was there continuity of counsel from the state trial to the state post-conviction process?
    ○ Yes        ○ No

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

2. In your state, are defense attorneys for state post-conviction proceedings chosen by a set of criteria?
   ○ Yes    ○ No
   If yes, please list the criteria:

   a. _____
   b. _____
   c. _____
   d. _____
   e. _____
   f. _____
   g. _____
   h. _____
   i. _____

3. Had the lead counsel in the state post-conviction proceeding previously represented a client in:
   (*Please enter number of cases.*)

   | | | | |
   |---|---|---|---|
   | Federal capital habeas corpus | _____ | State capital trial | _____ |
   | Non-capital federal habeas corpus | _____ | State trial of a non-capital homicide | _____ |
   | Direct appeal of a death sentence | _____ | State trial of a felony | _____ |
   | State capital post-conviction | _____ | Other trial | _____ |
   | Direct appeal of non-capital homicide | _____ | Unknown | _____ |
   | Direct appeal of a felony | _____ | | |

4. What was the hourly rate of compensation for lead counsel for the state post-conviction proceeding?
   ○ Pro Bono              ○ Between $60 and $79
   ○ Less than $20         ○ Between $80 and $99
   ○ Between $20 and $39   ○ $100 or more
   ○ Between $40 and $59

5. Did the state post-conviction judge deny or reduce defense requests for attorney fees?
   ○ Denied    ○ Sharply Reduced    ○ Minimally Reduced    ○ Did Not Reduce

6. Did or do you represent the federal capital habeas corpus petitioner in the state post-conviction proceedings?    ○ Yes    ○ No

---

## G. Information on Federal Capital Habeas Corpus Case

1. How many months were there between the entry of the death sentence in state court and the commencement of federal proceedings?    Months _____

2. How many months from the conclusion of the first state post-conviction proceeding to the commencement of federal proceedings?    Months _____

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

3. Was the case ever pending at the federal level while it was simultaneously in state court for exhaustion proceedings?
   ○ Yes      ○ No

   If yes, for how long?      Months _____

4. Number of Habeas claims:
   ○ 1            ○ 6 to 10        ○ 21 to 30        ○ More than 40 (specify) _____
   ○ 2 to 5       ○ 11 to 20       ○ 31 to 40

5. Claim(s) on which Habeas was sought (Please mark all that apply.):

   Actual innocence                                   ○ Ineffective appellate counsel      ○
   Ineffective assistance of counsel in guilt phase   ○ Jury misconduct                     ○
   Ineffective assistance of counsel at sentencing    ○ Jury selection                      ○
   Prosecutorial misconduct                           ○ Other _____          ○
   Newly discovered evidence                          ○

6. What is the current case status ?      ○ Open         ○ Closed

7. If open, current stage:
   ○ Pre-Petition                              ○ Pending Hearing or Dispositive Motion
   ○ On Appeal of Grant or Denial of Relief    ○ On Certiorari

8. If closed, method of disposition:
   ○ Habeas Granted      ○ Habeas Denied      ○ Government Dismissed

9. Did the state set an execution date? ○ Yes   ○ No

   If yes, did the execution date affect the cost of the federal capital habeas corpus process?
   ○ Yes      ○ No

10. How many months did it take to complete the stages listed below? (Please enter number where applicable.)

| Stage | Months | Stage | Months |
|---|---|---|---|
| Habeas petition | _____ | Petition for Supreme Court Writ of Certiorari | _____ |
| Evidentiary hearing | _____ | Stay of execution | _____ |
| Dispositive motions | _____ | Appeal of denial of stay | _____ |
| Appeal | _____ | Petition for Writ of Certiorari to Supreme Court regarding denial of stay | _____ |
| Other | _____ | | |

11. How long was the trial record?
    ○ 0 to 500 pages              ○ 30,001 to 50,000 pages
    ○ 501 to 1,000 pages          ○ 50,001 to 75,000 pages
    ○ 1,001 to 10,000 pages       ○ More than 75,000 pages
    ○ 10,001 to 30,000 pages

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

12. How many pages were the trial counsel files?
- ○ 0 to 500 pages
- ○ 501 to 1,000 pages
- ○ 1,001 to 10,000 pages
- ○ 10,001 to 30,000 pages
- ○ 30,001 to 50,000 pages
- ○ 50,001 to 75,000 pages
- ○ More than 75,000 pages

13. How many pages were the appellate counsel files?
- ○ 0 to 500 pages
- ○ 501 to 1,000 pages
- ○ 1,001 to 10,000 pages
- ○ 10,001 to 30,000 pages
- ○ 30,001 to 50,000 pages
- ○ 50,001 to 75,000 pages
- ○ More than 75,000 pages

14. Did you request an evidentiary hearing?     ○ Yes      ○ No

15. Were you granted an evidentiary hearing?     ○ Yes      ○ No

16. Was the case decided by the grant or denial of a dispositive motion?  ○ Yes      ○ No

17. Was an interlocutory appeal taken to the Circuit Court of Appeals?  ○ Yes      ○ No

18. Was the case reversed on appeal?      ○ Yes      ○ No

     If yes, was the case remanded to the District Court?      ○ Yes      ○ No

19. What was the level of media exposure or interest in the case?
   ○ Low          ○ Medium     ○ High

20. What were major contributors to costs?  Please rate the following with respect to their effect on total case costs.

| | High Contribution | Moderate Contribution | Little Contribution | No Contribution | Not Applicable |
|---|---|---|---|---|---|
| a. Complex defendant personal background | ○ | ○ | ○ | ○ | ○ |
| b. Large number of capital charges or aggravating circumstances | ○ | ○ | ○ | ○ | ○ |
| c. Competency of state trial counsel | ○ | ○ | ○ | ○ | ○ |
| d. Competency of state post-conviction counsel | ○ | ○ | ○ | ○ | ○ |
| e. Incomplete factual development in state court | ○ | ○ | ○ | ○ | ○ |
| f. Large number of habeas claims | ○ | ○ | ○ | ○ | ○ |
| g. Number of pages of trial record | ○ | ○ | ○ | ○ | ○ |
| h. Number of pages of trial counsel files | ○ | ○ | ○ | ○ | ○ |
| i. Number of pages of appellate counsel files | ○ | ○ | ○ | ○ | ○ |
| j. Difficulty in locating state records | ○ | ○ | ○ | ○ | ○ |

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### CONFIDENTIAL INFORMATION

| | High Contribution | Moderate Contribution | Little Contribution | No Contribution | Not Applicable |
|---|---|---|---|---|---|
| k. Large number of expert witnesses required | O | O | O | O | O |
| l. Geographically dispersed evidence and witnesses | O | O | O | O | O |
| m. Number of motions | O | O | O | O | O |
| n. Significant legal research to support motions | O | O | O | O | O |
| o. Court evidentiary hearings | O | O | O | O | O |
| p. Expedited briefing required because of execution date or other limitations | O | O | O | O | O |
| q. Need for translators | O | O | O | O | O |
| r. Aggressiveness of the Attorney General | | | | | |
| s. Other _____ | O | O | O | O | O |

21. Were or are there any state specific statutes or laws which have increased or decreased costs in this case?     O Yes     O No
    If yes, please list them below:

    Increased   _____
                _____
                _____
                _____
    Decreased   _____
                _____
                _____
                _____

22. Were there any state specific clemency laws which have increased or decreased costs in this case?
    O Yes          O No
    If yes, please list them below:

    Increased   _____
                _____
                _____
                _____
    Decreased   _____
                _____
                _____
                _____

## Federal Capital Habeas Corpus Survey for Panel Attorneys
### *CONFIDENTIAL INFORMATION*

23. Did any of the following factors affect the cost of the federal capital habeas corpus case? If yes, did they increase or decrease costs?

| Factors | Yes | No | Increase | Decrease |
|---|---|---|---|---|
| a.   Local community attitudes toward the original crime. | O | O | O | O |
| b.   Local community attitudes toward the death penalty. | O | O | O | O |
| c.   Attitude of the judge toward the original crime. | O | O | O | O |
| d.   Attitude of the judge toward the death penalty. | O | O | O | O |
| e.   Attitude of the Office of the Attorney General toward the original crime. | O | O | O | O |
| f.   Attitude of the Office of the Attorney General toward the death penalty. | O | O | O | O |

24. Overall, to what extent did the federal judge deny or reduce defense requests for the following during the federal capital habeas corpus process?

| Requests | Denied | Sharply Reduced | Minimally Reduced | Did Not Reduce | N/A |
|---|---|---|---|---|---|
| a. Requests for experts | O | O | O | O | O |
| b. Requests for evidentiary hearings | O | O | O | O | O |
| c. Requests for attorney fees | O | O | O | O | O |

25. Did you employ any of the following techniques as a means of lowering case costs?

| | | |
|---|---|---|
| Conduct independent or unilateral case budgeting | O Yes | O No |
| Conduct case budgeting with judicial oversight | O Yes | O No |
| Employ paralegals | O Yes | O No |
| Consult with expert counsel | O Yes | O No |
| Other _____ | O Yes | O No |

   If you did consult with expert counsel, was counsel associated with:
   - O   The Federal Habeas Assistance and Training Counsel Project
   - O   A Federal Defender Organization
   - O   A State or Local Defender Organization
   - O   Other _____

26. Overall, did you lose money as a result of representing this petitioner?
       O Yes       O No

*Thank you for completing the survey. Please return the completed survey in the postage paid envelop or fax it to (703) 633-4300 by **Friday, November 13, 1998**.*

Exhibit 21
Page 572

Case 2:09-cv-02158-CBC-S Document 109-8 Filed 06/09/16 Page 192 of 203 Page ID
Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 56 of 127 Page ID
#:4811

# APPENDIX C:
# CASE STUDY
# PROFILES

Exhibit 12
Page 573

# Appendix C: Case Study Profiles

The case study section describes in detail the proceedings of 7 cases from 6 different states: California, Texas, Alabama, Illinois, Pennsylvania, and Missouri. The table below, which summarizes state- and case-specific information, provides two sets of data. The first half of the table details state-specific cost and procedural information. The second half of the table describes case-specific information for each case study conducted.

C-1

Exhibit 12
Page 574

## Table C-1: Breakdown of Costs and Cost Factors by Selected State

A Regional Comparison of Cost Factors

in the States of the Case Profiles[1]

| State | California | Missouri | Texas | Pennsylvania | Alabama | Illinois |
|---|---|---|---|---|---|---|
| Circuit | Ninth Circuit | Eighth Circuit | Fifth Circuit | Third Circuit | Eleventh Circuit | Seventh Circuit |
| Average/Median Cost | High | Medium-High | Low | Medium | Medium-Low | Medium |
| Average Total Case Cost by State | $324,176 | $74,975 | $35,092 | $66,418 | $57,480 | $67,163 |
| Median Case Cost by State | $266,105 | $65,959 | $24,289 | $42,464 | $30,401 | $64,459 |
| Average In-Court Attorney Costs | $ 5,006 | $ 725 | $ 350 | $ 1,339 | $ 257 | $ 1,681 |
| Average Out-of-Court Attorney Costs | $ 292,815 | $ 90,832 | $ 40,880 | $ 57,096 | $ 53,900 | $ 61,348 |
| Average Expert Costs | $49,462 | $3,714 | $1,907 | $2,756 | -- | $843 |
| Standards of Qualification to Represent Indigent Defendants in a Capital Case | Yes | No | No | No | Yes | No |
| Number of Capital Offenses Prosecutable by State | First Degree Murder with special circumstances[2] | 1 | 8 | 18 | 18 | 15 |

---

[1] The above data and information were extracted from the following sources: the CJA Payment System, The Bureau of Justice Statistics, Federal Capital Habeas Corpus Attorney Case Profiles, and an article by Stephen Bright of Emory University Law School and the Southern Center for Human Rights.

[2] According to the California Attorneys in the Case Profile, there are over 300 offenses that can make a defendant eligible for the death penalty.

C-2

Exhibit 12
Page 575

## Table C-2: Breakdown of Costs and Cost Factors by Profiled Case

| | Specific Case Profile Comparison[3] | | | | | |
|---|---|---|---|---|---|---|
| Petitioner Name | Petitioners # 1 & # 2 | Petitioner # 3 | Petitioner # 4 | Petitioner # 5 | Petitioner # 6 | Petitioner # 7 |
| Total Case Costs | # 1: $670,782 #2: $386,306 | $112,822 | $48,777 | $53,180 | $59,267 | $65,654 |
| Total In-Court Attorney Costs | #1: $30,710 #2: $10,218 | $250 | $88 | $925 | $450 | $790 |
| Total Out-of-Court Attorney Costs | #1:$526,343 #2: $307,459 | $107,291 | $46,813 | $50,550 | $57,825 | $64,761 |
| Total Expert Costs | #1: $3,468 #2: $52,168 | $1,690 | $0 | $0 | $0 | $0 |
| Attorney General Litigated Exhaustion Requirement and Waives Procedural Default | # 1: Yes #2: No | No | No | Yes[4] | No | Yes |
| District Evidentiary Hearing | Granted (in Both Cases) | Denied | Denied | Denied | Denied | Denied |
| State Post-Conviction Evidentiary Hearing | No (in Both Cases) | Under Time Limits Only | Sometimes Granted | Usually Granted | Sometimes Granted | Usually Granted |
| Attorney Utilized Resources Outside of CJA Compensation | Yes (in Both Cases) | Yes | Yes | Yes | Yes | Yes |
| Court Cut This Attorney's Expenses/ Vouchers | No | Yes | No | No | No | No |

Following is a summary of each case and the factors contributing to costs.

---

[3] See Appendix C for the Case Profile Analysis.

[4] Federal Habeas Attorney # 4 stated that only in Philadelphia are exhaustion requirements waived. Also, Pennsylvania has a unique state criminal prosecution system, guided by local District Attorneys, rather than by a centralized Attorney General's Office.

C-3

Exhibit 12
Page 576

*Case Profile # 1*

### Table C-3: Profile for Petitioner # 1

| Petitioner Name | Petitioner #1 |
|---|---|
| *Case Background* | |
| Circuit, State, and District | Ninth Circuit, California, Northern |
| Number of Original Charges | 3 |
| Number of Murdered Victims | 2 |
| Crime Description | Double Homicide/Robbery |
| Case Disposition | Open: Active |
| Number of Habeas Claims in Petition | 11-20 |
| Most Recent Stage of Proceeding | Application to United States Supreme Court for Writ of Certiorari |

| *Amount of Time and Money Spent* | |
|---|---|
| **Breakdown of Attorney Hours** | **Number of Hours** |
| Attorney In-Court Hours | 230 |
| Attorney Out-of-Court Hours | 4,209 |
| Total Attorney Hours | 4,439 |
| **Breakdown of Attorney Fees** | **Amount of Money Spent** |
| Attorney In-Court | $30,710 |
| Attorney Out-of-Court | $526,343 |
| Total Attorney Costs | $557,053 |
| **Breakdown of All Fees by Stage** | **Amount of Money Spent** |
| Habeas Petition | $281,352 |
| Evidentiary Hearing (District and Circuit) | $200,694 |
| Dispositive Motion | $30,622 |
| Appeal | $149,594 |
| Application to Supreme Court for Certiorari | $8,520 |
| **Total Case Costs** | **Amount of Money Spent** |
| Attorney, Expert and Expenses in District | $492,130 |
| Attorney, Expert and Expense in Circuit | $178,652 |
| Total Case Costs | $670,782 |

## Background to the Crime

In the early 1980s, Petitioner # 1, a foreign national, moved to California only 18 months before his arrest. Petitioner # 1 was convicted and sentenced to death for a robbery in which two people were killed.

C-4

*PRICEWATERHOUSECOOPERS*

Exhibit 12
Page 577

**The State Trial**

During the state trial, two public defenders represented Petitioner # 1. The public defenders office had two part-time investigators and four experts working on the case. Petitioner # 1 was the only person arrested for the crime, but the circumstances of the offense raised the possibility that someone else may have been involved. However, trial counsel did not pursue an accomplice defense. Rather, even though there was significant forensic proof that Petitioner # 1 was at the scene of the crime, his trial counsel argued that he was not there. The jury rejected Petitioner # 1's alibi defense, and he was convicted of first-degree robbery murder.

During the penalty phase, the prosecution used the fact that Petitioner # 1 had been convicted for a crime in his native land as an aggravating factor. During the penalty phase presentation, the defense neither challenged the validity of the foreign conviction, nor investigated for mitigating evidence in Petitioner # 1's homeland. Even though Petitioner # 1 had only been in the United States for 18 months, defense counsel provided little mitigating evidence beyond witnesses who testified that Petitioner # 1 was a good person and a well-behaved prisoner.

**The Direct Appeal**

In California, there is an automatic direct appeal to the State Supreme Court in death penalty cases. This case was one of the earliest death penalty appeals heard before the California Supreme Court. In

C-5

PRICEWATERHOUSE COOPERS

Exhibit 12
Page 578

Petitioner # 1's case, the trial record was approximately 5,500 pages, the average size of a case tried in California at this time. The appeal raised issues regarding tapes of a conversation between Petitioner # 1 and a friend. The California State Supreme Court denied the petitioner's appeal.

### State Post-Conviction Proceedings

During state post-conviction proceedings, a large corporate law firm was appointed to represent the petitioner. Counsel was provided $3,000 in seed money for investigation, but no additional funds were granted. Without holding an evidentiary hearing, the Court issued a summary decision in which it denied some of the habeas claims and simply did not rule on the others. The Court did not detail the reasons for its decision. The case profile attorneys from California stated that in California, the State Supreme Court does not typically provide a written opinion to clarify its position on the issues within a case. Therefore, when the case progresses to federal court, the district judge must first try to discern for himself or herself why the claims were denied at the state level and then must rule on the claims. This creates a longer review process. In contrast, attorneys from other states have stated that the highest court in their state often writes opinions that can easily be reviewed by the district courts.

### Proceedings in the Federal District Court

Petitioner # 1's case moved to federal district court in 1988. State post-conviction counsel continued as representation on the case. In his

C-6

PRICEWATERHOUSE(COOPERS 🍀

Exhibit 12
Page 579

petition, Petitioner # 1 claimed that had trial counsel investigated in his
native country, he not only would have uncovered extensive mitigating
evidence, but also that Petitioner # 1's prior criminal conviction was
inappropriately used as an aggravating factor. The California Resource
Center (CAP) performed most of the investigation for the petition.
The district court judge denied Petitioner # 1's entire habeas petition
without holding an evidentiary hearing.

In his appeal to the Ninth Circuit Court of Appeals, one issue that
demanded a large amount of time and money was the debate over
whether the district court should have permitted an evidentiary hearing.
In its decision, the Ninth Circuit Court of Appeals determined an
evidentiary hearing was required and remanded the case to the district
court for a hearing.

· The day the case returned to the district court, the judge ordered the
evidentiary hearing to be held two weeks later. In preparation for the
hearing, Federal Habeas Attorney # 1 traveled to the petitioner's native
country (charging his firm, because he was not granted travel expenses
by the federal district court judge). There, he interviewed the
petitioner's family and reviewed the records relating to Petitioner # 1's
prior conviction.

The evidentiary hearing consisted of many exhibits, even though
counsel's motion for discovery was granted very late. Because this
was one of the first federal capital habeas corpus cases to have an
evidentiary hearing in California, a lot of novel issues were raised.
About a dozen witnesses were called to the stand, including trial

C-7

PRICEWATERHOUSECOOPERS 🍷

Exhibit 12
Page 580

counsel and some family members. The court approved travel expenses for members of Petitioner # 1's family who were witnesses, leading to costly travel expenses. The examination of trial counsel lasted about 4 days instead of the usual one. In all, the evidentiary hearing lasted 2 weeks. After the evidentiary hearing was complete, Federal Habeas Attorney # 1 filed extensive post-trial briefings and requested further hearings on the ineffective assistance of counsel claim.

Following the passage of the Antiterrorism and Effective Death Penalty Act (AEDPA) in April 1996, there was another round of briefings needed regarding the application of AEDPA to Petitioner # 1's case. In the spring of 1996, Federal Habeas Attorney # 1 discussed the possibility of a settlement with the Attorney General. The Attorney General rejected the proposed settlement. Several months later, the district court entered a decision against the petitioner over the course of a 3-hour telephone conversation with the attorneys.

## Proceedings in the Ninth Circuit Court of Appeals

Before the hearing was held, Petitioner # 1's case returned to the Ninth Circuit Court of Appeals twice. According to a California attorney, the Ninth Circuit Court of Appeals differs from other circuits, because it grants the writ of Mandamus in about 80 percent of cases.[5] The writ of Mandamus effectively overturns the summary judgment and orders the

---

[5] PwC was not able to verify or disprove this claim.

C-8

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 581

district court to rule on specific matters. In this case, the writ stated that:

1. Federal Habeas Attorney # 1 was entitled to expert witnesses; and
2. When the district court judge cross-examined Petitioner # 1 on the witness stand, the petitioner was entitled to a Fifth Amendment defense.

After the district hearing, Federal Habeas Attorney # 6 submitted a 35-volume record of the district court proceedings. At the beginning of 1998, the appeal was denied. Later, the U.S. Supreme Court denied certiorari.

### Factors Affecting the Amount of Time and Resources Expended

Petitioner # 1 had three sets of attorneys——one at the trial, one at the direct appeal, and one at the federal habeas stage. When attorneys had to "reinvent the wheel" at each stage, costs inevitably increased. Regardless of costs, the appointment of new counsel is considered appropriate in many cases, especially when ineffective assistance of counsel at the trial or appellate level is one of the habeas corpus claims.

The Attorney General's strategy may have also driven case costs. Attorneys suggested that in most other states, the Attorney General's Office wants the courts to decide claims expeditiously so that the death sentence can be implemented. According to the case profile attorneys from California, the California Attorney General's Office often takes action that prolongs the cases. This includes a refusal to waive

C-9

PRICEWATERHOUSECOOPERS 🄯

Exhibit 12
Page 582

exhaustion requirements, leading to extensive procedural litigation. The zealous litigation strategy adopted by the Office of the Attorney General may cause the case to travel between district and state courts, creating what has been coined a "bouncing effect." There is no anecdotal evidence that this occurs in other states.

According to the case profile attorneys from California, one possible reason for the "bouncing effect" may be that a petitioner in federal court has a good chance of victory when the California district court rules on the merits of a case. This may have two consequences:

1. Attorneys representing federal capital habeas corpus petitioners request funds or implement zealous litigation strategies, which does not occur in other states; and

2. The California Attorney General's Office litigates most procedural issues and thus sidesteps the merits of the case. For example, the Office apparently litigates the applicability of the AEDPA in all 150 federal capital habeas corpus cases, rather than allowing there to be a test case and creating a precedent for all others.

In California, as in several other states, the death penalty can be used as a way to gain political office. The case profile attorneys from California stated that many district attorneys are able to pursue the death penalty in almost every murder case, because the special circumstances of capital murder under California statute are extremely broad. Similarly, the case study attorney from Pennsylvania said that in Philadelphia the district attorney prosecutes the death penalty in almost every murder case in order to gain political recognition.

C-10

PRICEWATERHOUSE COOPERS 🅱

Exhibit 12
Page 583

A further issue in California is the lack of development of cases at the state appellate level.  Now, there are 500 people on California's death row (increasing at a rate of about 40 a year).  Sometimes, the most basic , such as whether the convicted crime merits the punishment is never confronted in state appellate court, possibly because of the State Supreme Court's attempt to shift costs to the federal level.  The case profile attorneys from California claimed that if the state post-conviction process were more rigorous, many cases would be eliminated at the state, rather than at the federal level.

The other integral part omitted from Petitioner # 1's state post-conviction proceedings was an evidentiary hearing.  According to the California case profile attorneys, only two California cases have included an evidentiary hearing since the Court's composition changed in early 1989.  One possible reason why there may be so few evidentiary hearings is that the California Supreme Court is simply not financially equipped for such a large number of state post-conviction appeals. While California state post-conviction appeals are filed in the State Supreme Court, in many other states they are filed in an intermediate court, which has more time to decide on the procedural and material issues of a case.  In these states, some cases may be filtered out during state post-conviction proceedings, thus leading to a relatively lighter workload for both the state supreme court and the federal courts.

In addition to the aforementioned factors, the amount of investigation and the size of the record greatly increased the time spent exploring possible claims as well as conducting legal research.  The novelty of

PRICEWATERHOUSECOOPERS 🅚

Exhibit 12
Page 584

the issues in this case also increased the amount of time spent litigating
unique matters not typical in an average case.  According to Frank
Zimring, professor at the University of California's Boalt Law School,
the number of issues litigated per case in California is greater than in
other states due to the lack of uniformity in the interpretation of
various laws by the district, and even circuit courts.

C-12

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 585

*Case Profile #2*

## Table C-4 : Profile for Petitioner #2

| Petitioner Name | Petitioner #2 |
|---|---|
| *Case Background* | |
| Circuit, State, and District | Ninth Circuit, California, Northern |
| Number of Original Charges | 3 |
| Number of Murdered Victims | 2 |
| Crime Description | Double Homicide/Robbery |
| Case Disposition | Closed: Granted Habeas Petition (as to penalty) |
| Number of Habeas Claims in Petition | 11-20 |
| Most Recent Stage of Proceeding | Application to United States Supreme Court for Writ of Certiorari |

| *Amount of Time and Money Spent* | |
|---|---|
| **Breakdown of Attorney Hours** | **Number of Hours** |
| Attorney In-Court Hours | 58 |
| Attorney Out-of-Court Hours | 2,170 |
| Total Attorney Hours | 2,228 |
| **Breakdown of Attorney Fees** | **Amount of Money Spent** |
| Attorney In-Court Cost | $10,218 |
| Attorney Out-of-Court Cost | $307,459 |
| Total Attorney Costs | $317,677 |
| **Breakdown of All Fees by Stage** | **Amount of Money Spent** |
| Unknown Stage | $335,770 |
| Habeas Petition Stage | -- |
| Evidentiary Hearing Stage (District and Circuit) | -- |
| Dispositive Motion | -- |
| Appeal | $21,821 |
| Application to Supreme Court for Certiorari | $28,715 |
| **Total Case Costs** | **Amount of Money Spent** |
| Attorney, Expert and Expense Costs in District | $255,331 |
| Attorney, Expert and Expense Costs in Circuit | $130,974 |
| Total Case Costs | $386,306 |

## The State Trials

Petitioner # 2 was tried in two cases simultaneously, both of which involved double homicides. In the first case, the petitioner was eventually sentenced to Life Without The Possibility Of Parole

C-13

PRICEWATERHOUSECOOPERS 🄯

Exhibit 12
Page 586

(LWOP). In the second case, he was sentenced to death. Although he had no prior criminal convictions, he had led a difficult life. His issues included:

1. Drug and alcohol abuse;
2. Problems holding a steady job;
3. Constant transience; and
4. Psychological problems.

In back-to-back trials, Petitioner # 2 was tried and found guilty of both sets of murders.

## The Direct Appeal

In the early 1980s, the California Supreme Court appointed Federal Habeas Attorney # 2 to file the automatic appeal in both of Petitioner # 2's cases. Counsel did not have to file a state habeas petition along with a direct appeal; the documents could be filed sequentially. This changed in 1989, when a California law was enacted that required state habeas corpus proceedings to occur simultaneously with a direct appeal.

In the midst of Petitioner # 2's direct appeal, the makeup of the California Supreme Court changed drastically. A few months later, the newly composed court affirmed one case; the other was reversed and remanded to the trial court. In that case, the trial court resentenced Petitioner # 2 to LWOP.

C-14

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 587

## State Post-Conviction Proceedings

During state post-conviction proceedings of the affirmed case, Federal Habeas Attorney # 2 received no funding for investigation, and Petitioner # 2's appeal was denied without either a hearing or a written opinion. Consequently, Federal Habeas Attorney # 2 applied for certiorari to the U.S. Supreme Court, but as is typical, certiorari was denied.

## Federal District Court Proceedings

In the late 1980s, Federal Habeas Attorney # 2 filed a federal capital habeas corpus petition expanding on all the issues laid out in the state petition. The new petition consisted of the same core issues, but was more focused and refined. The case was assigned to a district judge who had not previously presided over a death penalty case. A week after the petition was filed and before the state responded, the judge denied relief in a two-page decision. Federal Habeas Attorney # 2 appealed to the Ninth Circuit Court of Appeals.

The Ninth Circuit found the district court's summary decision deficient and reversed the district court's decision. The Circuit Court of Appeals returned the case to district court and ordered the district court to require a written response from the Attorney General. Subsequently, the Attorney General filed a response, and Federal Habeas Attorney # 2 filed a written reply, as well as a motion for an evidentiary hearing.

C-15

PRICEWATERHOUSECOOPERS 🅱

Exhibit 12
Page 588

In support of the request for an evidentiary hearing, Federal Habeas Attorney # 2 amassed key information to support a claim of ineffective assistance of counsel, including signed affidavits by trial counsel admitting a failure to accumulate information on the petitioner's childhood, family background, and mental history. Federal Habeas Attorney # 2 billed the court for very little of the investigative costs, as CAP performed most of the work to support the ineffective assistance of counsel claim. The district court eliminated many claims because of an insufficient amount of merit-based evidence and denied the federal habeas petition.

**Proceedings in the Ninth Circuit Court of Appeals**

The Ninth Circuit Court of Appeals reversed the district court's decision, holding that a hearing was required on the ineffective assistance of counsel claim. In its decision, the Court criticized the Attorney General for not conceding that an evidentiary hearing was required.

The presiding district judge passed away. A newly assigned judge required 6 months before the commencement of briefings to read the court record. After reviewing the record of a 6-day-long evidentiary hearing, the successor judge determined that trial counsel had been ineffective at the penalty phase, but not at the guilt phase. Both Petitioner # 2 and the state appealed. The Circuit denied both appeals, and the case was sent back to the trial court for re-sentencing. The Attorney General appealed to the U.S. Supreme Court, but certiorari

C-16

PRICEWATERHOUSECOOPERS 🔲

Exhibit 12
Page 589

was denied.  The trial court eventually re-sentenced Petitioner # 2 to LWOP.

### Factors Affecting the Amount of Time and Resources Expended

When attorney fees reached $60,000 at the district level, the presiding judge tried to stop the attorney from billing more hours.  The attorney argued, and the judge eventually conceded, allowing him to continue charging time.  In other states, attorneys stated that judges often cut their vouchers without debate.

Federal Habeas Attorney # 2 cut his own time on the vouchers by about 15 percent, but except for a disagreement with one judge, did not have any problems being reimbursed.  The attorney stated that vouchers are now scrutinized much more closely.  Apparently, legislators exert pressure on judges to reduce costs, and as a result, judges press federal capital habeas attorneys to reduce costs.  In this particular case, Federal Habeas # 2 believed that actions taken by the Attorney General did not increase costs except for the postponement of the evidentiary hearings.

The two primary factors driving costs in this case included:
1.  Three appeals to the Circuit Court of Appeals; and
2.  High expert costs: there was one psychologist and one psychiatrist, both from the East Coast.

The experts were brought in from the East Coast, because apparently, the pool of California experts who work in these types of cases is small.  One expert was used for the guilt phase claim and the other for

C-17

*PriceWaterhouseCoopers* 🅛

Exhibit 12
Page 590

the sentencing phase claim. Before the hearing, Federal Habeas
Attorney # 2 devoted substantial time to reviewing and refining both
the two experts' and the two trial lawyers' testimony.

Federal Habeas Attorney # 2 commented that certain factors typical of
California affected this case's costs:

1. There was no state evidentiary hearing; as in most California cases,
   most work was not completed at the state, but at the federal level.
   Federal hearings are more costly, mainly because they happen at a
   much later date and are more costly to investigate, because of
   changes that occur in:
   - The law;
   - The participants; and
   - The case itself;

2. The size of records in all California cases, but especially in this
   case, was extraordinarily low due to the number of hearings and
   trials. The evidentiary hearing itself lasted 6 days, requiring about
   12 hours of work each day and about 200 hours of preparation;

3. Cost of living expenses are higher in California than in other states,
   making costs difficult to compare;

4. The State Supreme Court denies state habeas petitions without
   explaining the reasons for its decisions. This does not happen in
   any other state. This means that not only are more cases in federal
   court, but also, the judges in the district courts must spend more
   time trying to interpret rulings at the state level; and

5. Ineffective state trial counsel was one of the claims.

Federal Habeas Attorney # 2 stated that, in contrast to popular
perception, many California judges who grant habeas claims are not

C-18

PRICEWATERHOUSECOOPERS ⓡ

Exhibit 12
Page 591

liberal, especially in the Northern and Central districts.  Independent of
political persuasion, many judges become frustrated when cases reach
their chambers that do not appear to warrant a death sentence.

One factor that might have decreased costs in this case is that one
attorney continued as counsel from the state post-conviction
proceedings to the federal level.  Continuity of counsel most likely
decreases costs, because the initial research does not need to be
repeated, as the attorney probably knows the strengths and weaknesses
of the issues as the case progresses.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 592

*Case Profile #3*

**Table C-5: Profile for Petitioner # 3**

| Petitioner Name | Petitioner #3 |
|---|---|
| *Case Background* ||
| Circuit, State, and District | Eighth Circuit, Missouri, West |
| Number of Original Charges | 4 |
| Number of Murdered Victims | 2 |
| Crime Description | Double homicide, robbery |
| Case Disposition | Closed: death sentence re-sentenced to LWOP at trial court |
| Number of Habeas Claims in Petition | More than 60 |
| Most Recent Stage of Proceeding | Granted Relief by Eighth Circuit Court of Appeal |

| *Amount of Time and Money Spent* ||
|---|---|
| **Attorney Hours** | **Number of Hours** |
| Attorney In-Court Hours | 2 |
| Attorney Out-of-Court Hours | 603 |
| Total Attorney Hours | 605 |
| **Breakdown of Attorney Fees** | **Amount of Money Spent** |
| Attorney In-Court Cost | $250 |
| Attorney Out-of-Court Cost | $107,291 |
| Total Attorney Costs | $107,541 |
| **Breakdown of All Fees by Stage** | **Amount of Money Spent** |
| Unknown Stage | $80,228 |
| Habeas Petition Stage | -- |
| Evidentiary Hearing Stage (District and Circuit) | -- |
| Dispositive Motion | -- |
| Appeal | $30,166 |
| Application to Supreme Court for Certiorari | $2,438 |
| **Total Case Costs** | **Amount of Money Spent** |
| Attorney, Expert and Expense Costs in District | $80,228 |
| Attorney, Expert and Expense Costs in Circuit | $32,604 |
| Total Case Costs | $112,822 |

## Background to the Crime

In the mid-1980s, Petitioner # 3 was incarcerated for a drug-related
crime involving two first-degree homicides. The state trial began
almost 2 years after Petitioner # 3's arrest but lasted only 4 days.
Petitioner # 3's habeas appeal was granted 12 years later, and the

C-20

*PRICEWATERHOUSECOOPERS* 🄫

Exhibit 12
Page 593

Eighth Circuit Court of Appeals reduced his sentence from death to Life Without Parole.

## The State Trial

Even though Petitioner # 3 was charged with a capital crime, the public defender representing him did not prepare the trial as a death penalty case, because the case involved one "bad guy" killing "two other bad guys," which usually does not warrant a sentence of death. In fact, Petitioner # 3 was provided with an opportunity to plea-bargain his sentence down to a term of 20 years, but instead, decided to let the jury decide his verdict and sentence. As a result, Petitioner # 3 was found guilty of both murders, in addition to a robbery committed that same day.

In preparation for trial, Petitioner # 3 underwent a 30-minute mental health evaluation that included no testing, only interviews by a psychologist. Despite sufficient behavior to suggest that Petitioner # 3 might suffer from bipolar manic depression, trial counsel failed to request additional testing to prepare for the sentencing phase. There was very little mitigation evidence presented, and the jury sentenced Petitioner # 3 to Life Without Parole for one of the murders and to death for the other.

## The Direct Appeal and *Batson* Review

In the late 1980s, while Petitioner # 3's case was on direct appeal to the Missouri Supreme Court, the U.S. Supreme Court decided the case *Batson v. Kentucky*. The decision in *Batson* stated that neither

C-21

PRICEWATERHOUSECOOPERS ⦿

Exhibit 12
Page 594

attorneys nor judges can use an individual's race as a factor to
disqualify potential jurors from a trial.   Another case further held that
*Batson* applied retroactively to all cases occurring before it was
decided.  In light of this development, the Missouri Supreme Court
sent Petitioner # 3's case back to the state trial court for a hearing on
whether there was cause to believe that the trial prosecutor violated the
rules laid out in the *Batson* decision.   However, the judge who
presided over the original trial found no *Batson* violations, and the
Missouri Supreme Court affirmed Petitioner # 3's conviction and death
sentence.  The following year, the U.S. Supreme Court denied
Petitioner # 3's application for the writ of certiorari.

### State Post-Conviction Proceedings

Over a year later, new counsel was appointed for the state post-
conviction stage of Petitioner # 3's trial.  However, Missouri law
provided post-conviction review.  Once counsel was provided, the
petition had to be filed within 30 days, with only one additional
extension allowed for up to 30 days thereafter.  Petitioner # 3 had
already filed a *pro se* petition, meaning that when counsel was
appointed, he was not provided with the full 30 days.  Nevertheless,
the attorney thought that the court would adhere to its behavior under
the old rules (with no time limits on filing amended petitions) and filed
six amended petitions with additional claims after the deadline had
already passed.  The court held an evidentiary hearing on the first
claim (the others were defaulted) that lasted 8 days, and post-
conviction relief was denied.  On appeal, the Missouri Supreme Court
affirmed the denial of relief, and the U.S. Supreme Court denied

C-22

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 595

certiorari review.  Seven months later, Petitioner # 3 filed his habeas
petition in the federal district court.

## Proceedings in the Federal District Court

In federal court, Federal Habeas Attorney # 3 was appointed as
counsel.    The petition for the writ of habeas corpus included the
*Batson* claim as well as claims of prosecutorial misconduct, ineffective
assistance of counsel in the guilt and sentencing stages, and other
claims of improper jury selection.

The filed petition was approximately 150 pages long, and 6 months
later the Attorney General filed a 170-page response.  Three months
later, Federal Habeas Attorney # 3 submitted a 140-page reply.
Almost a year later, the district court issued a short order denying both
an evidentiary hearing and relief, but did not directly address the
habeas issues.  Federal Habeas Attorney # 3 responded with a motion
to alter, amend, or reconsider the previous decision, but this motion
was denied as well.

## Proceedings in the Eighth Circuit Court of Appeals

The case continued to the Eighth Circuit Court of Appeals where
Petitioner # 3 and Federal Habeas Attorney # 3 found a more
sympathetic panel.   The Court of Appeals affirmed the convictions but
vacated the death sentence on fact-specific grounds of prosecutorial
misconduct and ineffective assistance of counsel.   The case returned to
state court for re-sentencing where eventually, 14 years after his trial,

C-23

*PRICEWATERHOUSE COOPERS*

Exhibit 12
Page 596

Petitioner # 3 was sentenced to LWOP. While Federal Habeas Attorney # 3 successfully presented the case, a district court judge significantly reduced the amount of fees he would reimburse.

## Factors Affecting the Amount of Time and Resources Expended

Federal Habeas Attorney # 3 was not assigned to this case until about 7 years after the trial verdict. During that time, only mental health status investigation had been undertaken. Because certain facts were underdeveloped or undeveloped during the trial, many new issues had to be investigated thoroughly for the first time during the habeas stage. In order to know what issues to investigate, Federal Habeas Attorney # 3 devoted substantial time to reading the state trial and post-conviction proceeding records, which described everything that had occurred in the case up to that point.

His investigation work was challenging and costly, because it occurred 8 years after the state trial. It was difficult to find the client's family and friends, as well as employment and other records. Research about the client's bipolar manic depression absorbed much of Federal Habeas Attorney # 3's time, because he had to become well versed in a medical diagnosis with which he was unfamiliar, and also, because it was an issue that had been inadequately pursued at trial.

Federal Habeas Attorney # 3 relied on the Resource Center to assist him, because the case involved a type of law to which he had not been previously exposed. In addition, several cutting-edge issues such as *Batson* and the AEDPA surfaced during state and federal proceedings.

C-24

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 597

Before this case, a capital habeas corpus appeal would linger for 2 or more years in Missouri Western District Court. This case moved very quickly once it reached the circuit level, partly because of the sympathetic panel. Neither the district court nor the attorney general enforced exhaustion requirements, so Federal Habeas Attorney # 3 was able to submit his claims at the federal level without the state post-conviction court ruling on them.

Federal Habeas Attorney # 3 won the case, but his firm went into significant debt, partly due to the high cost of this case. Federal Habeas Attorney # 3 concluded that he would never take a case with the same presiding district court judge because of the judge's refusal to sign Federal Habeas Attorney # 3's vouchers. According to Federal Habeas Attorney # 3, the subtlest factors affecting costs is attorney expectations on how much money judges will approve and at the same time how much money judges expect federal capital habeas corpus attorneys to request. According to Federal Habeas Attorney # 3, the most obvious factor is the presence of underqualified state trial attorneys who make mistakes that require significant resources to correct later in the process. Both of these factors are difficult to quantify.

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 598

*Case Profile #4*

**Table C-6 : Profile for Petitioner # 4**

| Petitioner Name | Petitioner #4 |
|---|---|
| *Case Background* | |
| Circuit, State, and District | Fifth Circuit, Texas, Southern |
| Number of Original Charges | 3 |
| Number of Murdered Victims | 2 |
| Crime Description | 2 murders, burglary, and rape |
| Case Disposition | Open: Active |
| Number of Habeas Claims in Petition | 11-20 |
| Most Recent Stage of Proceeding | Petition for Writ of Cert |

| *Amount of Time and Money Spent* | |
|---|---|
| **Attorney Hours** | **Number of Hours** |
| Attorney In-Court Hours | 1 |
| Attorney Out-of-Court Hours | 375 |
| Total Attorney Hours | 376 |
| **Breakdown of Attorney Fees** | **Amount of Money Spent** |
| Attorney In-Court Cost | $88 |
| Attorney Out-of-Court Cost | $46,813 |
| Total Attorney Costs | $46,901 |
| **Breakdown of All Fees by Stage** | |
| Unknown Stage | $13,413 |
| Habeas Petition | $11,154 |
| Evidentiary Hearing (District and Circuit) | -- |
| Dispositive Motion | $5,232 |
| Appeal | $18,978 |
| Application to Supreme Court for Certiorari | -- |
| **Total Case Costs** | |
| Attorney, Expert and Expense Costs in District | $29,799 |
| Attorney, Expert and Expense Costs in Circuit | $18,978 |
| Total Case Costs | $48,777 |

**Background to the Crime**

In the mid-1980s, Petitioner # 4 was convicted of the burglary,
aggravated assault, and murder of two women in a Texas suburb.
Petitioner # 4 received a sentence of death for one of the murders and
pled guilty to the other, which resulted in a sentence of life.

C-26

*PriceWaterhouseCoopers*

Exhibit 12
Page 599

## The State Trial

The defense counsel who represented Petitioner # 4 during the state trial were two former District Attorneys defending their first capital case. A key issue at trial was whether a law enforcement official coerced Petitioner # 4's confession. The trial court allowed the jury to hear the confession, and as a result, the guilt phase of the trial lasted 1 week.

At the sentencing phase, which lasted 1 day, the prosecution introduced several aggravating factors, arising from Petitioner # 4's criminal record and acts of violence in other states. Mitigating evidence included testimony that Petitioner # 4 was a good worker, exhibited a change in behavior when intoxicated, was abused as a child, and had been born into a dysfunctional family. The jury sentenced Petitioner # 4 to death for one murder. He pled guilty to the second murder and received a life sentence.

## The Direct Appeal

Petitioner # 4's trial counsel also represented him on direct appeal. The Texas Court of Criminal Appeals (CCA), the state's highest criminal court, affirmed Petitioner # 4's conviction and sentence. The CCA denied counsel's motion for a rehearing. The following winter, the U.S. Supreme Court denied counsel's petition for the writ of certiorari. The CCA set the execution date for 2 months later.

C-27

*PRICEWATERHOUSECOOPERS* 🅚

Exhibit 12
Page 600

## State Post-Conviction Proceedings

Three attorneys, including Federal Habeas Attorney # 4, were all members of the Texas Resource Center. They filed Petitioner # 4's state post-conviction petition in the trial court. Four days before his scheduled execution, Petitioner # 4 was granted a temporary stay of execution. Several months later, the trial court denied the petitioner's habeas claims. The court signed the state's proposed findings of fact and conclusions of law, which recommended a denial of relief without change or revision. According to Federal Habeas Attorney # 4, this case was typical of Texas state post-conviction cases in that the court quickly set an execution date, granted a temporary extension of the execution date, and summarily rejected the petitioner's claims. The CCA adopted the trial court's findings and conclusions and denied relief. A new execution date was set for 6 months later.

A couple of weeks before his scheduled execution, Petitioner # 4 filed a second state post-conviction petition to exhaust all remaining claims. Ten days later and 2 days before his execution, Petitioner # 4's state post-conviction petition was denied. On the day of his scheduled execution, Petitioner # 4 filed a federal habeas petition, and his execution was stayed within 5 hours of the execution.

## Federal District Court

In district court, Federal Habeas Attorney # 4 continued as counsel. The district court denied funds to investigate, which, according to Federal Habeas Attorney # 4, is not unusual in Texas. Combined with

C-28

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 601

the setting of the execution date, this meant that the Texas Resource Center's prior work in state court represented most of the evidence available to petitioner's counsel. Because of time and resource limitations, Federal Habeas Attorney # 4 was unable to perform an exhaustive background investigation in various parts of the country where both the petitioner and his family had previously lived. Purportedly, the denial of investigative funds is not unusual in Texas capital cases. The presiding district judge had granted Federal Habeas Attorney # 4 with up to $7,500 in investigative funds in other cases, but only under special circumstances.

Despite the time constraints, Federal Habeas Attorney # 4 devoted substantial time to reading the 3,000-page trial record. After filing a 100-page federal capital habeas corpus petition on Petitioner # 4's behalf, Federal Habeas Attorney # 4 filed motions for both discovery and an evidentiary hearing.

Although a Texas district judge granted an oral argument on the discovery motion, Federal Habeas Attorney # 4 considered this unusual. The district court ordered a supplemental briefing on the discovery issue, and the hearing demanded a substantial amount of preparation time. At this point, the Attorney General filed a motion for summary judgment. In response, Federal Habeas Attorney # 4 filed a motion to postpone the decision on summary judgment until after the discovery motion was resolved. However, the district court issued an order denying discovery and granting summary judgement. This was done without an opportunity for Federal Habeas Attorney # 4 to respond to the motion for summary judgment. Although the hearing

C-29

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 602

on the discovery motion was not typical, according to counsel, the final result was highly typical in that the motion for discovery was denied regardless. After the federal habeas corpus petition was denied, Federal Habeas Attorney # 4 filed lengthy motions requesting the court to reconsider its ruling. These motions took about 160 hours to prepare and write, and were subsequently denied.

## Proceedings in the Fifth Circuit Court of Appeals

In the briefing to the Fifth Circuit Court of Appeals, there were two relatively standard suppression of evidence claims asserting that:

- The prosecution did not share evidence regarding a claim of self-defense in an alleged prison assault involving Petitioner # 4; and
- The district court incorrectly denied discovery with regard to the law enforcement official's record of civilian complaints.

The Court of Appeals affirmed the district court's decision, and a petition to the U.S. Supreme Court for the writ of Certiorari was filed earlier this year.

## Factors Contributing to Costs

Federal Habeas Attorney # 4 stated that he billed for only 20 percent of what he and his colleagues devoted to this case. All told, his firm was compensated $70,000. The district judge did not cut his vouchers. In another federal capital habeas corpus case, when Federal Habeas Attorney # 4 presented a $120,000 voucher to another Texas district judge, the judge responded that he had never received a voucher for

C-30

*PRICEWATERHOUSECOOPERS* 

Exhibit 12
Page 603

such a large amount of money and proceeded to cut the voucher by about 25 percent.

The Texas Attorney General's Office is known for being experienced and administratively united. The Office apparently reduces costs by frequently using boilerplate language in its briefings and by importing it from one case to another. However, this can mean that arguments are made that are inapplicable or out of context. This can also increase costs for petitioner's counsel, who must respond to all of the Attorney General's arguments.

Federal Habeas Attorney # 4 stated that an underlying factor increasing his case costs was the minimal amount of investigation work conducted by trial counsel. A Texas statute at the time of Petitioner # 4's state trial provided only $500 for investigations in capital cases. Not only was state trial counsel unable to undertake any meaningful investigation, but counsel also failed to present an aggressive cross-examination of witnesses. As a result of these factors, Federal Habeas Attorney # 4 had to develop or expand on information to which the jury could have been exposed during the original trial. By the time that Federal Habeas Attorney # 4 was appointed to this case, a key witness was in failing health, making it difficult for Federal Habeas Attorney # 4 to question him.

According to Federal Habeas Attorney # 4, other factors that drove down the costs of this case include:

1. The setting of execution dates as a form of docket control. For example, Texas courts often set dates that prevent a sentenced

C-31

PRICEWATERHOUSECOOPERS 🔲

Exhibit 12
Page 604

individual to utilize his or her full year for filing a federal habeas petition (established by the AEDPA);

2. The Attorney General did not litigate most motions, but rather, aimed to proceed in the most expeditious manner possible; and

3. Federal Habeas Attorney # 4's heavy caseload which, when combined with the state's aggressive setting of execution dates, compressed the time he could spend on the case. Federal Habeas Attorney # 4 claimed he often worked long hours for a short period of time to meet execution deadlines.

Federal Habeas Attorney # 4 believes that the lack of continuity of counsel from state to federal post-conviction increases the costs of Texas cases. He also mentioned that at present state post-conviction representation in Texas is limited to $15,000. Because judges cut his vouchers in previous state post-conviction proceedings, Federal Habeas Attorney # 4 no longer accepts appointment to state post-conviction cases.

A court's denial of a request for investigation will usually decrease costs in the federal capital habeas corpus stage, because it limits potential claims. However, the federal court's denial of investigators may have a reverse effect on costs, because attorneys are more costly to compensate than investigators. On the other hand, if the attorney does perform the investigation, he will either have to work more hours to fulfill other commitments (for example, interviewing witnesses, researching, and so forth), or will have less time to spend on other activities. This is an example of how one factor may have an ambiguous impact on costs.

C-32

PRICEWATERHOUSE(COOPERS [?]

Exhibit 12
Page 605

*Case Profile # 5*

### Table C-7: Profile for Petitioner # 5

| Petitioner Name | Petitioner #5 |
|---|---|
| *Case Background* ||
| Circuit, State, and District | Third Circuit, Pennsylvania, Eastern |
| Number of Original Charges | 1 |
| Number of Murdered Victims | 1 |
| Crime Description | 1 murder for hire |
| Case Disposition | Open: Active |
| Number of Habeas Claims in Petition | 11-20 |
| Most Recent Stage of Proceeding | Application to United States Supreme Court for Certiorari |

| *Amount of Time and Money Spent* ||
|---|---|
| **Breakdown of Attorney Hours** | **Number of Hours** |
| Attorney In-Court Hours | 8 |
| Attorney Out-of-Court Hours | 538 |
| Total Attorney Hours | 546 |
| **Breakdown of Attorney Fees** | **Amount of Money Spent** |
| Attorney In-Court Cost | $925 |
| Attorney Out-of-Court Cost | $50,550 |
| Total Attorney Costs | $51,475 |
| **Breakdown of All Fees by Stage** | **Amount of Money Spent** |
| Habeas Petition | $20,417 |
| Evidentiary Hearing (District and Circuit) | -- |
| Dispositive Motion | $13,538 |
| Appeal | $14,088 |
| Application to Supreme Court for Certiorari | $5,137 |
| **Total Case Costs** | |
| Attorney, Expert and Expense Costs in District | $13,538 |
| Attorney, Expert and Expense Costs in Circuit | $39,642 |
| Total Case Costs | $53,180 |

## Case Background

In the late 1970s, Petitioner # 5 arranged a contract killing. Two co-defendants were charged with capital murder but were tried separately. The petitioner initially concocted a false story, but later confessed to

C-33

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 606

the police.  He then recanted his confession during the trial.  Only
Petitioner # 5 was sentenced to death.

## The State Trial

Petitioner # 5 had privately retained trial counsel.  His defense was that
his co-defendants blackmailed him, but the men ruthlessly killed the
victim even though he paid them the money.  The jury did not believe
this story and convicted the petitioner of first-degree murder.  During
the penalty phase, the petitioner's family testified to his good
character, but little other evidence was offered in mitigation. Petitioner
# 5 was sentenced to death.

## The Direct Appeal

On direct appeal, Petitioner # 5 was appointed new counsel, as he
could no longer afford private counsel. The state provided minimal
compensation for Petitioner # 5's representation and his appeal was
denied in 1984, 4 years after the state trial was completed.  Apparently,
the Pennsylvania Supreme Court often takes a long time to process
capital cases.

## State Post-Conviction Proceedings

During the first of two state post-conviction proceedings, Petitioner #
5's direct appeal attorney represented him and received expert
assistance.  After the post-conviction petition was denied, new
evidence indicated that Petitioner # 5 was coerced to pay a co-
defendant.  Thus, the state court ordered a second hearing to consider
this new evidence and whether trial counsel performed ineffectively.

C-34

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 607

The Pennsylvania State Supreme Court rejected these claims, and the
case proceeded to the federal district court.

### Proceedings in Federal District Court

The district court granted habeas relief, finding ineffective assistance
of trial counsel.  The District Attorney appealed.  The Third Circuit
Court of Appeals reversed the district court's decision after it
determined that Petitioner # 5 was not prejudiced by counsel's
ineffectiveness.  The court also decided that the petitioner was not
denied due process.  However, the court remanded the case to the
district court for consideration of the remaining issues.

On remand, the district court denied the remaining claims, and
Petitioner # 5 appealed.  The Circuit Court of Appeals reversed the
district court's decision, holding that the penalty phase jury
instructions were unconstitutionally misleading.  The District
Attorney's application to the U.S. Supreme Court for a writ of
certiorari was denied.

### Factors Affecting the Amount of Time and Resources Expended

The number of briefings increased costs in this case.  However, many
of the strongest claims, both the penalty phase jury instruction issue
and the ineffective assistance of counsel claim, were presented in state
post-conviction proceedings.  Thus, the investigation was well
developed when the case reached the federal level and did not demand
substantial federal compensation for investigation.  The research into

C-35

*PriceWaterhouseCoopers*

Exhibit 12
Page 608

the jury instruction claim demanded a lot of time, because it involved a cutting-edge issue.

According to Federal Habeas Attorney # 5, the District Attorney's litigation strategy did not increase costs in this case. Enforcement of the exhaustion requirements is not uniform in Pennsylvania. According to Federal Capital Habeas Attorney #5, the state prosecutor's office is not as centralized as California's Attorney General Office. In Pennsylvania, the county district attorney not only represents the state at trial, but also at the direct appeal and at post-conviction proceedings. Pennsylvania's decentralized district attorney system prevents development of a uniform strategy. Therefore, some cases may have more litigation than others. For example, Federal Habeas Attorney # 5 mentioned that in the state of Pennsylvania, only the District Attorney in Philadelphia routinely refuses to waive exhaustion requirements. As a result, there is not the same backlog of cases that originated in Philadelphia as there is in those cases in the rest of the state. Apparently, Philadelphia also has a resourceful public defenders service, so ineffective assistance of counsel claims do not arise as often in cases from this area.

In addition, Federal Habeas Attorney # 5 said that many cases are currently percolating in the Pennsylvania state post-conviction stage, partly because in Pennsylvania, the governor, not the court, signs death warrants. Prior to 1994, the presiding governor rarely signed death warrants. He would carefully read each case before making a decision and often did not feel that the death penalty was warranted. In addition, the Pennsylvania courts rarely enforced the statute of

C-36

PRICEWATERHOUSECOOPERS 🌐

Exhibit 12
Page 609

limitations for state prisoners.  As a result of these two factors, Federal Habeas Attorney # 5 stated that during this time, there was no need to submit an appeal and no time pressure if an appeal was made.

Because the current governor, elected in 1994, has signed many death warrants, the number of cases entering or about to enter the federal system has increased.  Currently, there are few cases that have reached the circuit court.  As a result, total average costs in Pennsylvania (district and circuit) are relatively low.  However, the expectation is that costs might increase as cases begin to reach the later stages of capital litigation.

C-37

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 610

*Case Profile # 6*

## Table C-8: Profile for Petitioner # 6

| Petitioner Name | Petitioner # 6 |
|---|---|
| *Case Background* | |
| Circuit, State, and District | Eleventh Circuit, Alabama, Northern |
| Number of Original Charges | 3 |
| Number of Murdered Victims | 2 |
| Crime Description | Homicide, arson, and burglary |
| Case Disposition | Closed: Executed |
| Number of Habeas Claims in Petition | 5 |
| Most Recent Stage of Proceeding | Application to United States Supreme Court for Writ of Certiorari |

| *Amount of Time and Money Spent* | |
|---|---|
| **Breakdown of Attorney Hours** | **Number of Hours** |
| Attorney In-Court Hours | 8 (Co-Counsel) |
| Attorney Out-of-Court Hours | 676 |
| Total Attorney Hours | 684 |
| **Breakdown of Attorney Fees** | **Amount of Money Spent** |
| Attorney In-Court Cost | $450 |
| Attorney Out-of-Court Cost | $57,825 |
| Total Attorney Costs | $58,275 |
| **Breakdown of All Fees by Stage** | **Amount of Money Spent** |
| Habeas Petition | $37,290 |
| Evidentiary Hearing (District and Circuit) | ---- |
| Dispositive Motion | ---- |
| Appeal | $11,057 |
| Application to Supreme Court for Cert. | $10,920 |
| **Total Case Costs** | |
| Attorney, Expert and Expense Costs in District | $28,200 |
| Attorney, Expert and Expense Costs in Circuit | $31,067 |
| Total Case Costs | $59,267 |

## Background to the Crime

Petitioner # 6 accompanied two men in an armed burglary that resulted in the death of the homeowner. The crime generated much anxiety and sorrow within the local community, particularly because the victim was well respected. The petitioner was arrested and held in jail for

C-38

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 611

about 3 months before the trial began. During this time, Petitioner # 6 confessed in great detail to the murder. Later, he claimed that he confessed only because he was promised a polygraph test that he believed would exonerate him.

## The State Trial

The two attorneys assigned to this case were compensated a total of $1,000. One of the attorneys had recently graduated from law school, and the other had never provided representation in a capital case. The only alibi evidence presented during the guilt phase was testimony by Petitioner # 6's girlfriend that Petitioner # 6 was with her when the crime allegedly occurred. Although the police had little direct evidence linking Petitioner # 6 to the crime, his confession was the only evidence necessary for Petitioner # 6's conviction.

At the penalty phase, the prosecution presented evidence of Petitioner # 6's long criminal record, including a crime committed in prison while he was on trial in this case. The defense attorneys did not present any evidence in mitigation. In defense of their tactics, they argued that Petitioner # 6 did not want to be saved. According to Federal Habeas Attorney # 6, because they had conducted little investigation about the petitioner's background, they were unaware that the petitioner had earlier undergone a serious brain operation.

According to Alabama statute, the jury merely recommends the appropriate sentence, and the judge decides whether or not to accept it.

C-39

PRICEWATERHOUSECOOPERS 🅰

Exhibit 12
Page 612

In this case, the jury and the judge were in agreement that a death sentence was appropriate.

## The Direct Appeal

During the direct appeal, Petitioner # 6's counsel submitted a 4-page brief, citing only the *Miranda v. Arizona* case as precedent to justify his appeal. The attorneys also raised the issue of prosecutorial misconduct but did not base their argument on case law. The Court denied Petitioner # 6's direct appeal.

## State Post-Conviction Proceedings

For the state post-conviction proceedings, Petitioner # 6 was appointed new counsel from the Southern Poverty Law Center. The new counsel further investigated the innocence claim. He also established a relationship with the petitioner's family and uncovered evidence of childhood psychological and sexual abuse. A psychiatrist for both the defense and prosecution examined the petitioner. A brain surgeon was also deposed regarding the petitioner's injury. The state judge denied post-conviction relief. During the state post-conviction proceedings, the petitioner went on a hunger strike and underwent a religious conversion. From that point onward, the petitioner attended weekly religious meetings and no longer acted violently towards others.

## Proceedings in Federal District Court

Petitioner # 6 was assigned new counsel in federal court, a federal public defender who had never before represented a federal capital

PRICEWATERHOUSECOOPERS 🅘

Exhibit 12
Page 613

habeas corpus petitioner.  Because of the scarcity of attorneys with federal capital habeas corpus experience in several states along the Gulf of Mexico, attorneys from other states are frequently appointed to cases in this area as happened in this case.  According to Federal Habeas Attorney # 6, the investigation conducted by the Resource Center was virtually complete by the time he received the records. Another local attorney was appointed as co-counsel, but his duties only involved appearing in court.  However, there were no district court hearings, so co-counsel's bills were minimal.

Federal Habeas Attorney # 6 visited Petitioner # 6 in Alabama prison and met with the petitioner's family members.  As a result of his religious conversion, Petitioner # 6 became a helpful source of information.  In addition, Federal Habeas Attorney # 6 met with the trial lawyers who provided him with the trial record.  According to Federal Habeas Attorney # 6, the record of the state post-conviction proceedings was much longer than the trial transcripts, because an investigation and several hearings were conducted during the post-conviction phase.

The district judge denied relief without ordering an evidentiary hearing, relying instead on the state court's findings plus various affidavits submitted by both parties.  The court denied two of the claims on the merits and the others were deemed procedurally defaulted.  The court may deny a petitioner's habeas corpus claim, either on the grounds that it was unjustified (on the merits), or on the grounds that it did not follow federal guidelines (procedural default).

C-41

PRICEWATERHOUSECOOPERS 🄴

Exhibit 12
Page 614

## Proceedings in the Eleventh Circuit Court of Appeals

Federal Habeas Attorney # 6 wrote the brief filed in the Eleventh Circuit Court of Appeals but then withdrew from the case. New counsel continued to investigate the innocence claim and sought clemency from the Governor. The governor seriously considered granting clemency to Petitioner # 6, but clemency was denied. After the Eleventh Circuit denied the appeal, the Supreme Court twice denied certiorari. Petitioner was ultimately executed.

## Factors Affecting the Amount of Time and Resources Expended

At the time that Federal Habeas Attorney # 6 was working on the case, the Attorney General had a friendly working relationship with the Resource Center. Before 1995, federal capital habeas attorneys representing Alabama petitioners, including Habeas Attorney # 6, were apparently allowed unrestricted time to research and write a petition. The Attorney General never requested a death warrant in this case. On several occasions, Federal Habeas Attorney # 6 requested extensions of time on procedural deadlines, and they were readily granted. For a similar case in Pittsburgh, where this attorney has also practiced, there was more time pressure. The attorney claimed that strict deadlines can cause an attorney to rush and to waste time on a less important issue. The Alabama district court judge ultimately denied relief but never cut vouchers, nor denied funding.

Originally, Federal Habeas Attorney # 6 planned on representing Petitioner # 6 pro bono. When he was granted local co-counsel,

PRICEWATERHOUSECOPERS 🅑

Exhibit 12
Page 615

Federal Habeas Attorney # 6 changed his mind, but still did not bill aggressively, because he was working under salary in the Federal Defenders Office. Consequently, he had no overhead costs to consider and thus, decided to cut some hours out of his vouchers.

According to Federal Habeas Attorney # 6, the following factors reduced costs:

1. The Alabama Attorney General waived exhaustion requirements to expedite the case. As a result, Federal Habeas Attorney # 6's case never reentered state court (no bouncing effect);

2. The Alabama Attorney General requested, and the court granted, procedural default. Depending on the case, procedural default generally can either speed up or slow down the federal habeas corpus process. In some cases, procedural default is argued on every issue and usually denied, thus adding many unnecessary hearings. In other cases, like this one, procedural default is immediately granted on the petitioner's claims and the case is shortened;

3. Federal Habeas Attorney # 6 did not perform any substantial investigation, because the state post-conviction proceedings already had held exhaustive hearings, and the Resource Center completed the other necessary investigation work; and

4. Federal Habeas Attorney # 6 worked in a publicly funded office, where he received a salary and paid no overhead.

Federal Habeas Attorney # 6 also mentioned that there was a lack of issues to raise in this particular case. The innocence claim was difficult to prove, because several key witnesses would not cooperate, and

C-43

PRICEWATERHOUSECOOPERS 🅱

Exhibit 12
Page 616

because direct appeal counsel raised so few issues. The district court decided only two claims on the merits. The rest were procedurally defaulted.

Finally, personal characteristics of the petitioner played a role in reducing costs, as Petitioner # 6 was generally easy to work with at the federal level. Federal Habeas Attorney # 6 received additional pro bono legal assistance from law professors at the Columbia University and New York University Law Schools. This use of an outside resource is an instance whereby the AOUSC did not incur all costs.

C-44

*PriceWaterhouseCoopers*

Exhibit 12
Page 617

*Case Profile # 7*

### Table C-9: Profile for Petitioner # 7

| Petitioner Name | Petitioner # 7 |
|---|---|
| *Case Background* | |
| Circuit, State, and District | Seventh, Illinois, Northern |
| Number of Original Charges | 8 |
| Number of Murdered Victims | 2 |
| Crime Description | Double Homicide, Armed Burglary |
| Case Disposition | Closed: Executed |
| Number of Habeas Claims in Petition | 10 |
| Most Recent Stage of Proceeding | Application to the United States Supreme Court for Writ of Certiorari |

| *Amount of Time and Money Spent* | |
|---|---|
| **Attorney Hours** | **Number of Hours** |
| Attorney In-Court Hours | 10 |
| Attorney Out-of-Court Hours | 703 |
| Total Attorney Hours | 713 |
| **Attorney Fees In-Court/Out-Court** | **Amount of Money Spent** |
| Attorney In-Court Cost | $790 |
| Attorney Out-of-Court Cost | $64,761 |
| Total Attorney Costs | $65,551 |
| **Breakdown of Attorney Fees by Stage** | **Amount of Money Spent** |
| Habeas Petition | $25,138 |
| Evidentiary Hearing (District and Circuit) | ---- |
| Dispositive Motion | $3,345 |
| Appeal | $37,171 |
| Application to Supreme Court for Certiorari | ---- |
| **Total Case Costs** | |
| Attorney, Expert and Expense Costs in District | $28,483 |
| Attorney, Expert and Expense Costs in Circuit | $37,171 |
| Total Case Costs | $65,654 |

## Background to the Crime

In the early 1980s, Petitioner # 7 was involved in two armed robberies in the Chicago area. During the second robbery, three people were shot; two were killed. Petitioner # 7 was immediately apprehended.

PRICEWATERHOUSECOOPERS 🔲

Exhibit 12
Page 618

While in police custody, a court reporter transcribed the petitioner's 45-page oral confession.

**The State Trial**

Petitioner # 7 was represented at trial by two county public defenders who worked in the murder task force division. Because this was an early case, trial counsel was hindered by the lack of an organized manual to assist Illinois defense counsel in determining how to best prepare for both the guilt and penalty phases of a death penalty case. Now, however, there are various texts available to defense attorneys who provide representation in Illinois death penalty cases.

The defense had difficulty mustering a powerful argument with respect to Petitioner # 7's guilt in light of his confession and entered a blind guilty plea on the day the case was set for trial. In other words, the defendant changed his plea from not guilty to guilty without any promise of leniency from the prosecution or from the court. Possibly because this was the presiding judge's first death penalty case, he failed to issue admonishments to the defense when they changed their plea. An admonishment is a judge's warning to the defendant to ensure that he understands that he is voluntarily surrendering the procession of the guilt phase, and that all promises made by the court or by the state are on the record. There is no record of such promises.

At the penalty phase, the state presented the petitioner's criminal record, but he had no felonies as an adult and had never served a day in the Illinois Department of Corrections. The state also presented the

C-46

PRICEWATERHOUSECOOPERS 🏢

Exhibit 12
Page 619

gruesome details of the crime with little cross-examination by the defense. Four witnesses testified on the petitioner's behalf. Two were family members and two were former employers. The testimony of the employees was eventually used against in the petitioner as aggravating evidence. There was some evidence of a history of drug abuse, which defense counsel never presented. The defense made a motion to perform a psychological study of the petitioner, but the court denied the motion. The defense also argued that the Illinois capital crime statute was unconstitutional. The public defenders' closing argument was about 10 pages long and counsel simply made a plea for compassion from the judge. The trial record was only 500 pages, most of which included the state's presentation of aggravating factors. Federal Habeas Attorney # 7 noted that the record's length was comparable to that of a simple automobile theft case.

The court sentenced Petitioner # 7 to death. After the death sentence was handed down, defense counsel made a motion to withdraw the guilty plea, but the motion was denied.

**The Direct Appeal**

In Illinois, capital appeals proceed directly to the Illinois State Supreme Court. The state funded Appellate Defenders Office represented the petitioner on direct appeal. The primary issue was the voluntariness of the guilty plea, because the plea was entered haphazardly. The Supreme Court denied the petitioner's appeal by a single vote of 4 to 3.

C-47

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 620

## State Post-Conviction Proceedings

During the state post-conviction proceedings, the Appellate Defenders Office continued representation and repeated the argument that the guilty plea was entered involuntarily. Neither the State court nor the Attorney General was in any hurry for this case to proceed. As a result, there was an extended period of time to file briefs. A new execution date was set during this delay. Even though the U.S. Supreme Court decided that ineffective assistance of counsel during the state trial is a legitimate state and federal habeas corpus claim, ineffective assistance of trial counsel was never raised, and post-conviction relief was denied without a hearing.

## Proceedings in Federal District Court

The Appellate Defenders Service withdrew from the case, because they could not claim their own ineffective assistance of counsel for failing to raise on appeal trial counsel's failure to investigate and present any mitigating evidence. As a result, Federal Habeas Attorney # 7 was appointed to represent Petitioner # 7 in federal court. In addition to the ineffective assistance of state trial and post-conviction counsel claims, Federal Habeas Attorney # 7 also raised issues with respect to the constitutionality of the Illinois death penalty statute.

Much of the early litigation in the district court involved the need for an evidentiary hearing. The district judge eventually postponed the execution date until after the completion of federal proceedings. In the early 1990s, the judge finally issued an opinion stating that the trial

PRICEWATERHOUSECOOPERS 🏠

Exhibit 12
Page 621

court judge should not have accepted Petitioner # 7's guilty plea without first admonishing him properly. The state could have foregone the appeal and accepted a sentence of LWOP, but instead decided to appeal to the Seventh Circuit Court of Appeals.

**Proceedings in the Seventh Circuit Court of Appeals**

The Seventh Circuit Court of Appeals reversed the district court's decision. In a motion to reconsider the court's decision, Federal Habeas Attorney # 7 mentioned that the district court overlooked several claims. The motion for reconsideration and a subsequent petition to the U.S. Supreme Court for the writ of certiorari were both denied, but the Circuit Court remanded the case and ordered the district court to decide on all remaining claims.

Thereafter, the district court denied relief on the remaining claims, including the ineffective assistance of counsel claim. Federal Habeas Attorney # 7 appealed to the Seventh Circuit Court of Appeals. The Court denied the second appeal expeditiously, and the U.S. Supreme Court subsequently denied the second petition for the writ of certiorari. At the request of the Attorney General, the district court set an execution date for the end of 1997. Federal Habeas Attorney # 7 filed a state post-conviction petition in the state court. The motion was denied.

Federal Habeas Attorney # 7 returned to the federal district court by filing a new petition arguing that the AEDPA's 1-year statute of limitations did not apply to this case. The district court denied relief,

PRICEWATERHOUSE COOPERS 🅿

Exhibit 12
Page 622

but did grant a Certificate of Appealability (see Life Cycle section). The Seventh Circuit Court of Appeals denied the Certificate of Appealability after 3 days of review, and Federal Habeas Attorney # 7 filed an emergency petition in the U.S. Supreme Court. The Supreme Court denied the petition, and on the same day, the governor of Illinois denied a petition for clemency. Petitioner # 7 was executed at 12:01 a.m. the next day.

**Factors Affecting the Amount of Time and Resources Expended**

The district court never reduced Federal Habeas Attorney # 7's vouchers, but counsel was initially compensated at a rate of only $75 an hour. The judge's rationale behind this relatively low rate was that this case was relatively straightforward. After the first reversal, the Court of Appeals granted Federal Habeas Attorney # 7 the maximum rate of $125 an hour.

As with many other cases in this study, Federal Habeas Attorney # 7 had several resources available to him, most notably law school students who provided free legal assistance. The Resource Center conducted the investigation for Federal Habeas Attorney # 7, and he therefore did not bill for any investigation work.

If the presentation of aggravating evidence at the penalty phase had not been included in the trial record, it would have totaled only about 50 pages. As a result, Federal Habeas Attorney # 7 did not need to devote much time to learning the case. The brevity of the record raised other challenges, though, such as the need to investigate and pursue other

C-50

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 623

possible habeas claims. When this case was delayed, there were
changes in the law that required new research. Moreover, every time
an issue arose or a court date approached, the attorney had to become
reacquainted with the case. In addition, this was Federal Habeas
Attorney # 7's first federal capital habeas corpus case, so it took some
time before he fully understood this type of law. Overall, the bulk of
attorney costs was spent drafting the habeas petition. Part of the costs
could be attributed to the ineffective assistance of counsel at the state
level, because so many facts were left undeveloped in the state
proceedings.

The court appointed one expert, a psychologist and a neurologist who
examined Petitioner # 7 at the early stages of the federal proceedings.
Because there were no evidentiary hearings or research expenses, the
bills were relatively low, considering that Habeas Attorney # 7 was in
district court twice and circuit court three times. Still, Federal Habeas
Attorney # 7 subsidized this case through earnings from his own
privately retained clients.

The Attorney General's office did not substantially drive costs up in
this case. The Attorney General raised exhaustion questions and filed
a response to everything, whether it was merited or not. Federal
Habeas Attorney # 7 attributed this frustrating strategy at least partly to
the Attorney General's inexperience with federal capital habeas corpus
cases. Federal Habeas Attorney # 7 believes that the Attorney
General's strategy has become less frustrating, as they have become
more experienced in these cases. On the other hand, according to
Federal Capital Habeas Attorney # 7, the Attorney General has adopted

C-51

<span style="float:right">PRICEWATERHOUSECOOPERS 🅟</span>

Exhibit 12
Page 624

a more aggressive strategy to decrease the current backlog of death penalty cases on appeal in Illinois. Unlike Pennsylvania, both Illinois governors have signed death warrants expeditiously, and partly as a result, more cases have reached the federal stage.

In the past, the state did not track cases, but according to Federal Habeas Attorney # 7, the Illinois Attorney General's Office has become much more centralized. According to Federal Capital Habeas Attorney # 7, the primary issue currently litigated by the Illinois Attorney General's Office is the AEDPA and the application of procedures initially intended to expedite cases. Purportedly, the litigation of procedural issues has delayed or prevented many cases from being argued on their merits, and Federal Habeas Attorney # 7 is not sure whether this piece of legislation will, in the end, reduce costs.

C-52

PRICEWATERHOUSECOOPERS

Exhibit 12
Page 625

Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 109 of 127
Case 2:09-cv-02158-GSC Document 109-3 Filed 06/09/16 Page 246 of 269 Page ID
#:4864

Exhibit 13

California Department of Corrections. *Condemned Inmates Who Have Died Since 1978*, March 4, 2014 (available at http://www.cdcr.ca.gov/ Capital_Punishment/docs/CONDEMNE DINMATESWHOHAVEDIEDSINCE19 78.pdf)

Exhibit 13
Page 626

Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 110 of 127
Case 2:09-cv-02158-CJC Document 109-3 Filed 06/09/14 Page 246 of 263 Page ID
#:4865

# CONDEMNED INMATES WHO HAVE DIED SINCE 1978

| NAME: | DATE DIED: | CAUSE: |
|---|---|---|
| 1. David Moore | November 29, 1980 | Suicide |
| 2. Richard Chase | December 26, 1980 | Suicide |
| 3. Ronald Hawkins | January 17, 1983 | Suicide |
| 4. George Carpenter | January 30, 1984 | Suicide |
| 5. Mose Willis | June 26, 1988 | Natural Causes |
| 6. Joselito Cinco | December 26, 1988 | Suicide |
| 7. Ronald Fuller | March 24, 1989 | Suicide |
| 8. Lewis Crain | November 3, 1989 | Natural Causes |
| 9. Joseph    Poggi | March 22, 1990 | Natural Causes |
| 10. Martin Gonzalez | March 30, 1990 | Natural Causes |
| 11. Gary Guzman | February 7, 1991 | Natural Causes |
| 12. Donrell Thomas | March 31, 1992 | Suicide |
| 13. Robert Alton Harris | April 21, 1992 | *Executed* |
| 14. Jay Kaurish | November 6, 1992 | Natural Causes |
| 15. David Mason | August 24, 1993 | *Executed* |
| 16. Corvin Emdy | September 18, 1993 | Suicide |
| 17. Robert McDonald | December 31, 1993 | Natural Causes |
| 18. Christopher Day | January 29, 1994 | Suicide |
| 19. Roland Comtois | May 6, 1994 | Natural Causes |
| 20. Timothy Pride | September 30, 1994 | Shot on Exercise Yard |
| 21. Robert Danielson | September 7, 1995 | Suicide |
| 22. William Bonin | February 23, 1996 | *Executed* |
| 23. Keith Williams | May 3, 1996 | *Executed* |
| 24. Jeffrey Kolmetz | August 16, 1996 | Natural Causes |
| 25. Jeffrey Wash | September 12, 1996 | Suicide |
| 26. Michael Wader | May 11, 1997 | Natural Causes |
| 27. Sammy Marshall | June 15, 1997 | Heart attack after pepper spray exposure |
| 28. Jimmy Palma | October 13, 1997 | Stabbed on exercise yard |
| 29. Thomas Walker | November 18, 1997 | Suicide |
| 30. Jessie Ray Moffat | May 2, 1998 | Natural Causes |
| 31. Thomas Thompson | July 14, 1998 | *Executed* |
| 32. Andrew Robertson | August 22, 1998 | Natural Causes |
| 33. William Poynor | October 19, 1998 | Natural Causes |
| 34. Jerry Bailey | December 25, 1998 | Natural Causes |

*California Department of Corrections and Rehabilitation*
*Office of Public and Employee Communications*
*March 4, 2014*

Exhibit 13
Page 627

Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 111 of 127
Case 2:09-cv-02158-GSC-S Document 00923-9 Filed 06/09/14 Page 240 of 269 Page ID
#:4866

| | | |
|---|---|---|
| 35. Kelvin Malone | January 13, 1999 | *Executed in MO* |
| 36. Jaturun Siripongs | February 9, 1999 | *Executed* |
| 37. Manuel Babbit | May 4, 1999 | *Executed* |
| 38. Bronte Wright | February 5, 2000 | Natural Causes |
| 39. Darrell Rich | March 15, 2000 | *Executed* |
| 40. Robert Lee Massie | March 27, 2001 | *Executed* |
| 41. Frank Dean Carter | August 21, 2001 | Natural Causes |
| 42. James Warren Bland | August 30, 2001 | Natural Causes |
| 43. Theodore F. Frank | September 5, 2001 | Natural Causes |
| 44. George Marshall | October 14, 2001 | Natural Causes |
| 45. Stephen Anderson | January 29, 2002 | *Executed* |
| 46. Stephen DeSantis | March 2, 2002 | Natural Causes |
| 47. Gerald Gallego | July 18, 2002 | Natural Causes (Died in Nevada) |
| 48. Robert Nicolaus | April 12, 2003 | Natural Causes |
| 49. Robert E. Stansbury | December 12, 2003 | Natural Causes |
| 50. Raymond Johns | March 28, 2004 | Natural Causes |
| 51. Paul Brown | April 10, 2004 | Natural Causes |
| 52. Charles Whitt | November 7, 2004 | Natural Causes |
| 53. Robert F. Garceau | December 29, 2004 | Natural Causes |
| 54. Donald J. Beardslee | January 19, 2005 | *Executed* |
| 55. Nicholas Rodriguez | July 10, 2005 | Drug Overdose |
| 56. Larry Davis Jr. | September 2, 2005 | Acute drug toxicity |
| 57. Caroline Young | September 16, 2005 | Natural Causes |
| 58. Drax Quartermain | September 22, 2005 | Natural Causes |
| 59. Michael Ihde | October 9, 2005 | Natural Causes |
| 60. Donald Miller | October 14, 2005 | Natural Causes |
| 61. Stanley Williams | December 13, 2005 | *Executed* |
| 62. Stuart Alexander | December 27, 2005 | Natural Causes |
| 63. Clarence Ray Allen | January 17, 2006 | *Executed* |
| 64. Earl Preston Jones | February 3, 2006 | Natural Causes |
| 65. Robert Thompson | October 1, 2006 | Natural Causes |
| 66. James Tulk | November 30, 2006 | Suicide |
| 67. Alejandro G. Ruiz | January 4, 2007 | Natural Causes |
| 68. Marcelino Ramos | January 22, 2007 | Natural Causes |
| 69. Raymond Gurule | February 3, 2007 | Natural Causes |
| 70. Herb Koontz | May 5, 2007 | Natural Causes |
| 71. Tony Lee Reynolds | June 10, 2007 | Suicide |
| 72. Billy Ray Hamilton | October 22, 2007 | Natural Causes |
| 73. Bill Bradford | March 10, 2008 | Natural Causes |

*California Department of Corrections and Rehabilitation*
*Office of Public and Employee Communications*
*March 4, 2014*

Exhibit 13
Page 628

Case 3:12-cv-04454-SC Document 28-9 Filed 09/26/14 Page 112 of 127
Case 2:09-cv-02158-GSC Document 109-3 Filed 06/09/14 Page 248 of 263 Page ID
#:4867

| | | |
|---|---|---|
| 74. Alfredo Padilla | July 25, 2008 | Natural Causes |
| 75. Edward Bridges | October 9, 2008 | Suicide |
| 76. Terrance C. Page | December 5, 2008 | Suicide |
| 77. Isaac Gutierrez, Jr. | December 7, 2008 | Natural Causes |
| 78. Thomas Edwards | February 14, 2009 | Natural Causes |
| 79. Larry Graham | June 16, 2009 | Suicide |
| 80. Lawrence Bergman | June 26, 2009 | Natural Causes |
| 81. Michael Mattison | July 17, 2009 | Natural Causes |
| 82. Fred Freeman | July 25, 2009 | Natural Causes |
| 83. Miguel Martinez | July 26, 2009 | Natural Causes |
| 84. Albert Howard | August 13, 2009 | Natural Causes |
| 85. David Arisman | September 5, 2009 | Natural Causes |
| 86. Cedric Harrison | November 19, 2009 | Natural Causes |
| 87. Joseph Musselwhite | February 2, 2010 | Natural Causes |
| 88. Robert Rubane Diaz | August 11, 2010 | Natural Causes |
| 89. George Hatton Smithey | August 28, 2010 | Suicide |
| 90. John Levae Post | December 20, 2010 | Other |
| 91. Richard Parson | February 28, 2011 | Natural Causes |
| 92. James Glenn VanPelt | March 6, 2011 | Natural Causes |
| 93. Brandon Wilson | November 17, 2011 | Suicide |
| 94. David Murtishaw | November 22, 2011 | Natural Causes |
| 95. Dennis H. Lawley | March 11, 2012 | Natural Causes |
| 96. Frank Abilez | April 3, 2012 | Natural Causes |
| 97. James Lee Crummel | May 27, 2012 | Suicide |
| 98. Kenneth Friedman | August 26, 2012 | Suicide |
| 99. James Karis | January 31, 2013 | Natural Causes |
| 100. Justin Helzer | April 14, 2013 | Suicide |
| 101. Mario Gray | May 4, 2013 | Natural Causes |
| 102. Timothy Rodriguez | June 2, 2013 | Natural Causes |
| 103. Richard Ramirez | June 7, 2013 | Natural Causes |
| 104. Timothy Russell | October 5, 2013 | Pending |
| 105. Albert Ruiz | December 29, 2013 | Natural Causes |
| 106. Wilbur Lee Jennings | February 11, 2014 | Natural Causes |
| 107. Ralph Michael Yeoman | March 4, 2014 | Pending |

*California Department of Corrections and Rehabilitation*
*Office of Public and Employee Communications*
*March 4, 2014*

Exhibit 13
Page 629

## *SUMMARY OF CONDEMNED INMATES WHO HAVE DIED SINCE 1978*

---

**Executed in California: 13**
**Executed in Missouri: 1**
**Total Executions: 14**

**Natural Causes: 63**
**Suicide: 22**
**Other: 6**
**Pending: 2**

**Total Non-Execution Deaths: 93**

**Total Deaths: 107**

*California Department of Corrections and Rehabilitation*
*Office of Public and Employee Communications*
*March 4, 2014*

Exhibit 13
Page 630

Case 3:12-cv-04454-SI   Document 28-9   Filed 09/26/14   Page 114 of 127
Case 2:09-cv-02158-GJC   Document 109-3   Filed 06/09/14   Page 280 of 269   Page ID
#:4869

Exhibit 14

Howard Mintz, *State U.S. Courts at Odds on Sentences - Different Standards Lead to Reversals*, San Jose Mercury News, April 15, 2002

Exhibit 14
Page 631

Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 115 of 127
Case 3:09-cv-02158-CJC Document 109-3 Filed 08/09/16 Page 251 of 269 Page ID
#:4870



America's News

English

# STATE, U.S. COURTS AT ODDS ON SENTENCES - DIFFERENT STANDARDS LEAD TO REVERSALS

**San Jose Mercury News (CA)** - Monday, April 15, 2002

*Author:* HOWARD MINTZ, Mercury News

When it comes to death sentences, the California Supreme Court and federal courts seldom agree. The state's highest court upholds them. Federal judges overturn them.

The conflict between these two powerful institutions can be seen in cases like that of James Richard Odle, who was convicted in 1983 of murdering a Contra Costa County woman and then killing a police officer in a shootout.

Odle's guilt has never been in doubt. But last year, a federal appeals court reversed the death sentence based on evidence that had been disregarded by the state courts throughout Odle's 18-year legal odyssey.

Long before the slayings, doctors treating Odle for injuries suffered in a car accident had removed part of his brain. The state Supreme Court, in rejecting his appeals on four occasions, never considered the brain injury relevant to whether Odle was mentally competent to stand trial.

The federal judges not only considered the injury important but also found that the state's failure to evaluate its impact on Odle may entitle him to a new trial.

As Odle's case illustrates, federal judges and the state Supreme Court have developed very different legal standards for evaluating death sentences -- such different standards that nowhere in the country is there a more pronounced divide in the way a state high court and the federal courts administer death-penalty justice.

A comprehensive Mercury News review of death-penalty appeals found 36 cases in which the California Supreme Court noted problems in a trial and decided they were not important enough to reverse a death sentence -- and a federal court later overturned the sentence because of those same problems.

The review found that federal courts, by reversing six out of 10 California death sentences, are overturning a higher percentage of capital cases than those from any other state. But it is the California Supreme Court that has moved further from the national norm in ruling on these life-and-death cases, affirming nine of every 10 it reviews.

Studies show that the California Supreme Court is less likely to overturn a death sentence than just about any of the 38 state high courts that review capital appeals.

"Maybe the reality is that state courts aren't looking at things they should be," said Judge Alex Kozinski of the 9th U.S. Circuit Court of Appeals, a President Reagan appointee who has voted to affirm and reverse death sentences, and who wrote the ruling overturning Odle's sentence.

"I've been amazed and sometimes appalled at some of the things I've seen come out of the state system," he said.

For California, the consequences of this conflict are enormous, with more than 600 inmates on death row waiting for their appeals to make their way through the system.

Legacy of 1986
Death penalty seen
as political must

The review indicates that the federal courts have become a formidable counterweight to the conservative California Supreme Court that grew out of the 1986 election in which voters removed Chief Justice Rose Bird and two liberal colleagues who consistently voted to reverse death sentences.

Exhibit 14
Page 632

Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 116 of 127
Case 2:09-cv-02158-GSC Document 109-3 Filed 06/09/14 Page 292 of 269 Page ID
#:4871

That is particularly true of the San Francisco-based 9th Circuit, the nation's largest appeals court. The court, which covers California and eight other states, has voted eight times since November to reverse a California death sentence.

California's seven-member high court includes six justices appointed by the tough-on-crime Republican Govs. George Deukmejian and Pete Wilson. And the death penalty remains such a political must in California that Gov. Gray Davis, a Democrat, demands support for it from his judicial nominees, including his recent choice for the Supreme Court, Carlos Moreno.

Even some federal judges who review the California Supreme Court's work wonder whether the ghosts of the 1986 election still haunt the state's justices. Federal judges are appointed for life.

"It may well be they are saying, 'What the hell, the 9th Circuit or the district courts will take care of it if there is a problem,' " said one 9th Circuit judge, insisting on anonymity. "We're free from political pressure."

California Supreme Court Chief Justice Ronald George strongly denied that political considerations have anything to do with the court's record indeath-penalty cases. His court takes a hard look at every death sentence, he said.

But George also acknowledged the conflict with his federal counterparts: "It may just be we have different standards on prejudicial error than the federal courts," he said.

"The bulk of the cases in which they granted relief, we recognize some error," he said. "But in the context of evaluating all the evidence and the law, we found" the errors not prejudicial.

Critics speak out
Prosecutors decry
federal reversals

Death-penalty supporters say the problem is with the federal courts, which have been accused of blocking California's death penalty since at least 1992. That year, California executed its first inmate since the reinstatement of capital punishment, Robert Alton Harris, only after the U.S. Supreme Court issued an unprecedented order forbidding any more federal delays.

Supporters say the federal courts are interfering with a death-penalty law that the state's voters strongly support, and that the state Supreme Court affirms most death sentences because California's capital trials are fundamentally fair. Prosecutors such as Gary Yancey, the former Contra Costa County district attorney who tried James Odle, call the federal court reversals "nonsense."

Prosecutors are particularly frustrated because Congress enacted a law in 1996 intended to make it tougher for federal judges to second-guess the state courts in death-penalty cases. The U.S. Supreme Court has adopted a strict reading of the law, but even that hasn't mattered in California cases.

"The U.S. District Courts and the 9th Circuit are vehemently opposed to the death penalty," said Alameda County prosecutor James Anderson, who has sent more murderers to death row than anyone else in California. "We're at their mercy."

To prevail in federal court, the last stop in the appellate process, death row inmates must show that their constitutional rights were violated at trial. And federal judges in California do appear to reverse a higher percentage of death sentences than their counterparts elsewhere.

The Mercury News found that federal judges have overturned 36 of 58 cases in the state -- 62 percent -- since California restored capital punishment in 1978. Nationally, a Columbia University study found that all federal courts reversed about 40 percent of cases from 1973 to 1995. Because of California's long delays, few of its cases had reached the federal level by 1995.

Only the Atlanta-based 11th Circuit, which covers Florida and other states, came close to the 9th Circuit, reversing 50 percent of its death sentences. At the other extreme, the conservative 4th Circuit reversed about 15 percent of death sentences in Virginia, Maryland and the Carolinas.

A league of its own
California reverses
fewest capital cases

Exhibit 14
Page 633

Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 117 of 127
Case 3:09-cv-02158-CJC-SP Document 109-3 Filed 08/09/14 Page 202 of 269 Page ID
#:4872

The state Supreme Court, however, stands alone at the opposite end: the Mercury News found that since 1997 it has reversed seven of the 67 death sentences for which it has produced full rulings, or 10 percent. By comparison, the Columbia study found that other state high courts reversed about 40 percent.

Even in Texas, which leads the country in executions, state courts reversed 31 percent, triple California's rate.

"The fact there are federal court reversals in California doesn't mean jack because there are no state court reversals," said Maria Stratton, the chief federal public defender in Los Angeles who has supervised dozens of death-penalty appeals.

In fact, there is evidence that the 9th Circuit is more willing to uphold death sentences when state courts are more aggressive in weeding out flaws. Consider the case of Arizona, where the high court reverses two out of every five sentences it reviews, four times California's rate.

When Arizona affirms a death sentence, the 9th Circuit tends to agree, reversing 42 percent of them, in line with the national average. One result is that Arizona has executed 22 people since 1992, compared with 10 in California, even though its death row is one-fifth the size.

A second fact that stands at odds with the critics' portrayal of liberal bias in the 9th Circuit is this: The court has many conservatives among its current and former judges, and the Mercury News review shows that those conservatives have voted dozens of times to overturn death sentences.

While Democratic appointees do vote more often to reverse sentences, Republican appointees voted to reverse in about a third of the cases.

"It's not a secret to anybody that the 9th Circuit views the death penalty different than some other places," said Idaho-based 9th Circuit Judge Stephen Trott, a Reagan appointee who usually votes to affirm death sentences. "But we just call them the way we see them. I think the 9th Circuit as a court attacks these things very objectively."

Faulty defense
Court downplays poor lawyering

The central difference between the California court and the federal courts in capital cases is how they regard trial mistakes. And the review of reversed death sentences shows that the main example of this conflict is how judges view the issue of inadequate legal representation.

Incompetent lawyering -- which can often be the difference between a defendant being sentenced to death and being sentenced to life in prison -- is the biggest reason for reversals in the federal courts.

Federal judges have overturned 19 death sentences because of constitutionally defective representation -- half of all the cases they have reversed.

In the state Supreme Court, by comparison, incompetent representation is the third-most-common reason for reversals. Of the hundreds of cases the state court has heard (most have not yet reached the federal level), it has reversed seven for bad lawyering.

The result can be seen in cases like that of Steven Ainsworth, who was convicted in 1980 of murdering a woman near Sacramento in the Sacramento area. The jury sentenced him to death after his lawyer put on four witnesses in the penalty phase of the trial during a one-hour defense.

The California Supreme Court, without comment, rejected Ainsworth's claims that the verdict was unfair because his lawyer had failed to prepare for the penalty phase.

But federal judges took a different view. In 1999, U.S. District Judge Lawrence Karlton reversed the death sentence, saying Ainsworth's legal defense "amounted to no representation at all." Last fall the 9th Circuit agreed, affirming Karlton's decision.

Twenty-one years after trial, the appeals court concluded that Ainsworth's lawyer "failed to investigate, develop or present the wealth of evidence available."

**Caption:** Photo, Charts (2)
PHOTO: CALIFORNIA DEPARTMENT OF CORRECTIONS
Although California leads the nation in death row inmates, only 10 people have been executed

Exhibit 14
Page 634

Case 2:09-cv-02158-GSC Document 109-23 Filed 06/09/14 Page 294 of 269 Page ID
Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 118 of 127
#:4873

since 1978. Most death sentences upheld by the state's high court are ultimately overturned in federal court.

**Memo:** RELATED STORIES: page 12A

---

*Edition:* Morning Final
*Section:* Front
*Page:* 1A
*Series:* LIFE-AND-DEATH DECISIONS THE DEATH PENALTY IN CALIFORNIA Second in an occisional series
*Record Number:* 0204160173
*Copyright (c) 2002 San Jose Mercury News*

To bookmark this article, right-click on the link below, and copy the link location:
STATE, U.S. COURTS AT ODDS ON SENTENCES - DIFFERENT STANDARDS LEAD TO REVERSALS

Exhibit 14
Page 635

Case 3:12-cv-04454-SI Document 28-9 Filed 09/26/14 Page 119 of 127
Case 2:09-cv-02158-CJC Document 109-3 Filed 06/09/16 Page 290 of 269 Page ID
#:4874

Exhibit 15

Declaration of Michael Laurence,

June 9, 2014

Exhibit 15
Page 636

Case 3:12-cv-04454-SI Document 108-9 Filed 06/09/14 Page 120 of 127
Case 2:09-cv-02158-GEB Document 103-9 Filed 09/26/14 Page 266 of 269 Page ID
#:4875

# DECLARATION OF MICHAEL LAURENCE

I, Michael Laurence, declare as follows:

    1.    I am an attorney at law admitted to practice by the State of California and before this Court. I am the Executive Director of the Habeas Corpus Resource Center (HCRC).

    2.    On October 20, 2000, the California Supreme Court appointed the HCRC to represent Ernest Jones in habeas corpus proceedings stemming from his convictions and judgment of death. Mr. Jones filed a petition for writ of habeas corpus in the California Supreme Court on October 21, 2002. On April 14, 2009, this Court appointed the HCRC to represent Mr. Jones in his federal habeas corpus proceedings. I was designated lead counsel in both proceedings.

    3.    In 2008, the Commission on the Fair Administration of Justice recommended a five-fold increase in the HCRC's budget, phased in over a five-year period, to address the severe shortage of counsel willing and able to accept habeas corpus appointments. Since the publication of the Commission's Report, the HCRC has submitted Budget Change Proposals to expand the HCRC's ability to accept appointment in every budget cycle. To date, none of these proposals have been funded.

    4.    Pursuant to its legislative mandate as a resource center for California capital postconviction attorneys (Cal. Gov't Code § 68661), the HCRC collects and analyzes information concerning the California death penalty process and California Supreme Court's disposition of state habeas petitions. The information contained in this Declaration and the

Exhibit 15
Page 637

{Initials}

Case 3:12-cv-58455-SC   Document 20-9   Filed 08/09/16   Page 121 of 127
Case 2:09-cv-02158-JAM   Document 1029-3   Filed 09/26/14   Page 291 of 269   Page ID
#:4876
Declaration of Michael Laurence
Page 2 of 5

accompanying Tables/Figures was collected as part of the HCRC's information-gathering function.

5.      There are 493 capital inmates in California whose judgment was imposed before June 9, 1994, and 318 whose judgment was imposed before June 9, 1989.

6.      At the time that Mr. Jones was appointed habeas corpus counsel in 2000, there were approximately 215 inmates on California's death row without habeas corpus counsel.

7.      There currently are 70 condemned prisoners without counsel for the automatic appeal in the California Supreme Court and 352 condemned prisoners who are awaiting appointment of postconviction counsel.  Table/Figure 1 attached to this Declaration contains the number of California death row inmates without habeas corpus counsel as of June 30 (the end of the state fiscal year) for the years between 1999 and 2013 and as of June 6, 2014.

8.      On average, the 77 inmates whose direct appeals are concluded and who lack habeas corpus counsel have waited 15.81 years after their sentencing; 160 inmates have been without a habeas corpus attorney for more than ten years, and one lacks counsel despite being sentenced in 1992.

9.      Between January 1, 2009 and December 31, 2013, the state has averaged 22 death judgments per year, while over the same time period, there has been an average of 10 annual appointments to represent death-row inmates in their habeas corpus proceedings.

Exhibit 15
Page 638

10.     Since 2003, of the 192 cases in which habeas corpus petitions have been filed, 40 capital habeas corpus petitioners lost their initially appointed private counsel and required replacement counsel – a replacement rate of 21 percent.

11.     Since 2006, the HCRC has accepted approximately forty percent of the capital habeas appointments made by the California Supreme Court, and in the past five years has filed approximately forty percent of the first habeas corpus petitions.

12.     For first state habeas corpus petitions filed in 2004 in capital cases, the respondent took an average of .53 years to file the informal response and petitioners took an average of .69 years to file the reply. Following the submission of the informal briefing in these cases, the California Supreme Court took an average of 3.78 years to issue an order denying the petition.  In one case, *In re Kenneth Gay*, Case No. S130263, the California Supreme Court issued an order to show cause, and the case is still pending.

13.     The California Supreme Court currently has 176 pending capital habeas cases.  Thus number excludes initial petitions that the California Supreme Court permits to be filed to toll the federal statute of limitation period while the court locates counsel willing to accept an appointment, counsel files an amended petition within the court's timeliness policies, and the court resolves the amended petition in accordance with *In re Morgan*, 50 Cal. 4th 932, 237 P.3d 993 (2010).  The average pending time of these 176 cases is 4.07 years.  Of the 176 cases, 107 have been fully briefed awaiting decision for an average of 4.16 years (or 50 months) since the reply to the informal response was filed.

Exhibit 15
Page 639

Case 3:12-cv-58455-SC Document 93-9 Filed 09/26/14 Page 123 of 127
Case 3:09-cv-02158-CBC Document 1003-9 Filed 06/09/14 Page 230 of 269 Page ID
#:4878

Table/Figure 2 attached to this Declaration depicts the length of time that the fully briefed case have been pending.

14.     For the 68 first capital habeas corpus petitions that the California Supreme Court has resolved from 2008 through the filing of this Brief, the average time between the completion of briefing and the California Supreme Court's decision is 3.98 years, or 47.8 months.

15.     For those capital habeas corpus proceedings in which the California Supreme Court has issued a final decision between 2008 and the filing of this Declaration, the average time between sentencing and the final decision was 17.2 years.

16.     Since 1978, condemned inmates have filed 267 exhaustion petitions in the California Supreme Court, and the average time that the inmate remains in state court following the filing of the exhaustion is 3.19 years.

17.     Since 1978, the court has resolved the merits of 729 of the 1003 habeas corpus petitions filed by condemned inmates.  Of the 729 cases, the court has issued orders to show cause in 99 cases (13.6%), and ordered evidentiary hearings in 45 cases (6.2%).  Of these cases, the California Supreme Court has granted some form of relief in capital habeas corpus proceedings only eighteen times or in 2.5% of the cases it has resolved.

18.     Using figures publicly available from the California Department of Justice and the California Department of Corrections and Rehabilitation, I calculated the average suicide rate on California's death row between 1980 and 2010 to be 299.5 per 100,000.  In comparison, the

Exhibit 15
Page 640

average suicide rate in the general population of California and in the United States in the same time period were 11.6 per 100,000, and 11.7 per 100,000, respectively. Table/Figure 3 attached to this Declaration compares the average suicide rates for California death row inmates to other relevant populations.

19.    To conduct an initial assessment of the length of time it takes the state court to resolve non-capital habeas corpus petitions, my staff searched for federal recommendations, orders, and opinions resolving federal habeas corpus petitions filed under 28 U.S.C. section 2254 that included the date a state petitioner was sentenced and the date the state court completed review of his or her state habeas corpus claims. The time from sentencing to completion of state habeas corpus review in number of months and averaged the time across the cases that comprise the sample. The search was to homicide and attempted homicide cases and primarily searched for cases that subsequently obtained relief in federal court, though three cases in which the federal habeas corpus petition was denied were included. There was not a significant difference in the length of the state court process for non-capital petitions based on whether or not they received relief in federal court.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on June 9, 2014.

/s/ Michael Laurence
Michael Laurence

Exhibit 15
Page 641

TABLE/FIGURE 1

| Fiscal year end | Number of inmates needing habeas counsel |
|---|---|
| 6/30/1999 | 160 |
| 6/30/2000 | 215 |
| 6/30/2001 | 220 |
| 6/30/2002 | 260 |
| 6/30/2003 | 248 |
| 6/30/2004 | 263 |
| 6/30/2005 | 266 |
| 6/30/2006 | 271 |
| 6/30/2007 | 279 |
| 6/30/2008 | 284 |
| 6/30/2009 | 303 |
| 6/30/2010 | 315 |
| 6/30/2011 | 324 |
| 6/30/2012 | 332 |
| 6/30/2013 | 341 |
| 6/06/2014 | 352 |
| Source: California Supreme Court Automatic Appeals Monitor and Habeas Corpus Resource Center | |

Exhibit 15
Page 642

Case 3:12-cv-04454-SI   Document 28-9   Filed 09/26/14   Page 126 of 127
Case 2:09-cv-02158-CJC   Document 109-3   Filed 06/09/14   Page 262 of 263   Page ID
#:4881

TABLE/FIGURE 2



**Number of Fully Briefed Habeas Corpus Cases
Currently Awaiting Decision**
as of 6/6/14

Source: Habeas Corpus Resouce Center

Exhibit 15
Page 643

TABLE/FIGURE 3



## Average Suicide Rates 1980-2010
### (per 100,000)

**Souce: California Department of Corrections and Rehabilitation, California Department of Justice, and Habeas Corpus Resource Center**

Exhibit 15
Page 644