1   **PHILLIP A. TREVIÑO** [SBN 121119]
2   137 N. Larchmont Blvd., #801
    Los Angeles, California 90004
    Telephone: (213) 949-8000
3

4   Attorney for Petitioner
    **ERNEST DYKES**

5

6

7              **UNITED STATES DISTRICT COURT**

8       **FOR THE NORTHERN DISTRICT OF CALIFORNIA**

9

| | |
|---|---|
| **ERNEST DYKES,** | )  **Case No. 11-CV-04454-SI** |
|       Petitioner, | ) |
| | )  (PROPOSED) AMENDMENT / SUPPLEMENT |
|       v. | )  TO PETITION FOR WRIT OF HABEAS |
| | )  CORPUS UNDER 28 U.S.C. 2254 |
| **MICHAEL MARTEL, Acting Warden,** | ) |
|       Respondent. | ) |
| _____ | )  **DEATH PENALTY CASE** |

16     By contemporaneously filed motion, Petitioner respectfully seeks
17   leave to supplement / amend his pending petition for a writ of habeas
18   corpus with the following additional claims and allegations, to be
19   inserted at the end of Claim 1.[1]

20

21   201.A.    In support of these individual and aggregate claims,
22   Petitioner alleges the following facts, among others to be
23   presented after full discovery, investigation, adequate funding,
24   access to this Court's subpoena power, and an evidentiary hearing.

25

26

_____

27      [1]    Upon grant of leave of this Honorable Court to make the
28 requested amendment / supplement to this petition, Petitioner will file
a unified petition incorporating these changes.

201.B.    Petitioner has already spent close to twenty (20) years awaiting review of his conviction and sentence of death because California's death penalty system is dysfunctional.  Moreover, because California's review process fails to correct constitutional errors in capital cases, Petitioner likely will spend several more years litigating his convictions and sentences. At the end of this lengthy process, it is statistically probable that Petitioner will be granted a new sentencing trial, as the federal courts have done in the majority of California capital habeas corpus proceedings.

201.C.    Even should the state prevail in these proceedings, the state's inability to create a lawful execution procedure renders it gravely uncertain when or whether Petitioner's execution will ever be conducted.

201.D.    California's appellate and post-conviction processes have failed, and are failing, to provide Petitioner with a full, fair, and timely review of his conviction, and sentence, his confinement is thereby rendered unnecessarily lengthy, tortuous, and inhumane, and his proposed execution rendered unconstitutional.  Petitioner's sentence of death and continued confinement are unlawful and violate his rights to due process; equal protection; meaningful appellate review; and freedom from the infliction of torture and cruel and unusual punishment, ex post facto punishment,and double jeopardy as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, international law as set forth in treaties, customary law, international human rights

law, including but not limited to the European Convention on Human Rights and international decisional law, and under the doctrine of jus cogens.

201.E.    The protracted delay Petitioner has been forced to undergo by the California Supreme Court following the imposition of Petitioner's judgment of death has negated the purposes of the death penalty that are deemed constitutionally acceptable.

201.F.    Petitioner was born in 1972, and arrested and charged with capital murder in July, 1993, at which time he was twenty-one (21) years old.  He was formally sentenced to death on December 22, 1995, at age twenty-three (23).  Twenty (20) years having since passed, he is now forty-one (41) years old.

201.G.    Petitioner has been on Death Row continuously under a sentence of death at San Quentin State Prison for almost all of those twenty (20) years. The length of time between the imposition of sentence and the final review of the legality of his convictions and death sentence is attributable to no fault of Petitioner. The delay is a direct consequence of pervasive inadequacies in California's death penalty system and the state's inability to implement capital punishment in a manner that does not violate the federal Constitution. "The elapsed time between judgment and execution in California exceeds that of every other death penalty state", averaging over two decades for the handful of executions that have occurred in California. California Commission on the Fair

Administration of Justice, Report and Recommendation on the
Administration of the Death Penalty in California at 114 (Gerald
Uelmen ed., 2008)("Commission Report") at 116; Exhibit 01, at 116.

201.H.    Petitioner was, and at all times has been, indigent and
therefore forced to rely on the courts for the appointment of
counsel in state and federal proceedings.

201.I.    The California Supreme Court has had great difficulty
recruiting experienced counsel to represent death-sentenced
prisoners in automatic appeals because of various contributing
factors, starting with the unique combination of skills necessary
for such representation.  Appeal from a judgment of death is
automatic, mandatory, and cannot be waived by individuals sentenced
to death. <u>People v. Deere</u>, 41 Cal.3d 353 (1985)[2]  As discussed in
<u>Deere</u>, the mandatory nature of this process stems from the state's
interest in insuring reliability in legal proceedings that result
in a sentence of death.  Moreover, counsel in a capital appeal have
a duty to raise all meritorious issues, and the California Supreme
Court has a duty to examine the complete record to determine
whether the trial that resulted in a death sentence was fair.

201.J.    The delay Petitioner experienced during the appeal

---

[2]    "Defense counsel explained at length to the court why he
permitted his client to waive a jury trial at the guilt phase, to
plead guilty, and to waive a penalty jury. The court sentenced
defendant to death, and denied his motion to modify the penalty.
(Section 190.4(e)). The appeal is automatic. (Section 1239(b))" <u>Deere</u>,
at 357.

process was typical.  More than four (4) years passed before the California Supreme Court appointed counsel to represent Petitioner in his automatic appeal on April 6, 2000. Petitioner's automatic appeal was not fully briefed until January 7, 2004. The California Supreme Court did not hear oral argument in the matter until over five (5) years later, on April 6, 2009.   On June 16, 2009, the California Supreme Court affirmed Petitioner's conviction, and the judgment became final on January 11, 2010, over fourteen (14) years after he was sentenced to death.   This exceeds the eight (8) year delay that Judge Carney found excessive in <u>Jones v. Chappell</u>, and is on the outside range of the typical 12 to 14 year appellate delay most condemned inmates experience. (<u>Jones</u> Order, at 14; Exhibit 2, at 14.)

201.K.    On December 8, 2000, habeas corpus counsel was appointed to represent Petitioner in the state court system.   Petitioner's state habeas petition was denied by the California Supreme Court on August 31, 2011, almost eleven (11) years after state habeas counsel was appointed, and sixteen (16) years after the death sentence was first imposed.

201.L.    This is within the realm, albeit on the outside, of what is currently typical in California capital matters.    The California Supreme Court grapples frequently with delays in the review of condemned inmates' judgments during the state post-conviction proceedings.    These delays are the result of a lack of funding and other state-created disincentives; as a result the

recruitment of experienced counsel to represent death-sentenced

prisoners has been virtually impossible. Commission Report at 133-

36; Exhibit 01 at 133-36.


201.M.    At the time that Petitioner was appointed state habeas

corpus counsel, there were approximately 215 inmates on

California's death row without habeas corpus counsel. The number is

growing, through no fault of the condemned appellant-petitioners.

Currently, there are approximately 353 men and women under sentence

of death in California without habeas corpus counsel.


201.N.    Almost five (5) years after Petitioner was sentenced to

death, on December 8, 2000, the California Supreme Court appointed

counsel Steven S. Lubliner represent him in state habeas corpus

proceedings. Petitioner filed his state petition for habeas corpus

on July 6, 2004, containing detailed allegations of the

constitutional claims asserted and supplied numerous supporting

records and declarations.


201.O.    The size of the California Supreme Court's caseload, and

limitations on judicial resources, resulted in the passage of over

seven (7) years before the court denied Petitioner's state habeas

petition on August 31, 2011, and yet it did so without even

conducting a hearing or resolving factual disputes, invariably

leaving such issues for the federal courts to grapple with later.


201.P.    As with the automatic appeal process, California's state

habeas process is in place to protect California's interest in safeguarding the rights of its citizens by ensuring compliance with the Constitution and the correctness of procedures resulting in sentences of death, as set forth in California Government Code Section 68662. <u>In re Morgan</u>, 50 Cal. 4th 932, 941 n.7, 237 P.3d 993 (2010). The delay, therefore, is integral to California's desire to vindicate its own interests, and so any resulting delay cannot properly be attributed to a capital defendant-petitioner.

201.Q.    As a consequence of California's inadequate review process, and as confirmed by extensive federal case law coming out of California, federal litigation of Petitioner's challenges to his convictions and death sentence will be protracted and have a statistically significant likelihood of resulting in the granting of habeas corpus relief.

201.R.    The California Supreme Court has granted some form of relief in capital habeas corpus proceedings only eighteen (18) times since the current capital sentencing law was enacted in 1978. The California Supreme Court summarily denies the overwhelming majority of capital habeas corpus petitions without any explication of its reasoning after reviewing only the petition and, in certain cases, having received "informal" briefing from opposing counsel. Arthur L. Alarcón, Remedies for California's Death Row Deadlock, 80 S. Cal. L. Rev. 697, 741 (2007); <u>see also</u> Commission Report at 134; Exhibit 01 at 134. Indeed, the California Supreme Court historically has issued orders to show cause in fewer than eight

1    (8) percent of habeas corpus proceedings, and held evidentiary

2    hearings in less than five (5) percent of the cases. Commission

3    Report at 134; see also Arthur L. Alarcón, Remedies for

4    California's Death Row Deadlock, 80 S. Cal. L. Rev. at 741.

5

6    201.S.    On December 21, 2012, Petitioner timely filed a Petition

7    for Writ of Habeas Corpus by a Prisoner in State Custody (28 U.S.C.

8    § 2254) (Petition) in this Court. Docket Control Number ("DCN") 13.

9    Respondent filed an Answer to Petition for Writ of Habeas Corpus

10   (Answer) on December 13, 2013, in which he generally denied the

11   allegations presented by Petitioner. DCN 18.    This matter was

12   pending the filing of Petitioner's traverse when Judge Carney's

13   order issued.[3]

14

15   201.T.    Respectfully, it is a sad reality that litigation in this

16   Court and the appellate courts likely will be protracted, further

17   delaying the ultimate resolution of whether Petitioner's judgment

18   is constitutionally infirm. Moreover, much of the delay in federal

19   court proceedings is properly 'attributable to the absence of a

20   published opinion and/or evidentiary hearing in the state courts.'

21   Commission Report at 123. Exhibit 01 at 123.

22

23   201.U.    In contrast with the California Supreme Court's rate of

24   affirmance and denial in death penalty cases, federal courts have

25

26   [3]    The deadline for Petitioner's traverse had been extended by

27   this Honorable Court because counsel underwent major surgery and was
     physically not able to proceed.    Having recovered, counsel again
     thanks the Court for its understanding.

28

granted relief in habeas corpus proceedings arising from California death judgments more often than not in the cases they have reviewed. As reported by the Commission on the Fair Administration of Justice in 2008, "federal courts have rendered final judgment in 54 habeas corpus challenges to California death penalty judgments' and '[r]elief in the form of a new guilt trial or a new penalty hearing was granted in 38 of the cases, or 70%." Commission Report at 115; Exhibit 01 at 115.  Between the 2008 publication of the Commission's report and an article on California's death penalty system authored by Judge Alarcón and Paula M. Mitchell in 2011, "federal habeas corpus relief has been granted in five additional cases, and denied in four additional cases, all of which are final judgments, making the rate at which relief has been granted 68.25%." Arthur L. Alarcón & Paula M. Mitchell, Executing the Will of the Voters: A Roadmap to Mend or End the California Legislature's Multi-Billion-Dollar Debacle, 44 Loy. L.A. L. Rev. S41, S55 n.26 (2011).

201.V.    The death penalty as currently implemented in California has functionally deprived Petitioner of his due process right of access to the courts. See e.g., Jones v.State, 740 So. 2d 520 (Fla. 1999) (finding twelve (12) year delay in holding competency hearing while defendant on death row violated due process). In that case, the Florida Supreme Court likened the egregious delay to hold a competency hearing to the delays in death penalty appeals criticized as excessive by Justice Breyer in Elledge v. Florida,525 U.S. 944, 119 S. Ct. 366, 142 L. Ed. 2d 303 (1998).

201.W.    Prolonged confinement under sentence of death is physically and psychologically torturous in violation of the Eighth Amendment to the Constitution of the United States.

201.X.    At San Quentin, Petitioner has been housed with several hundred other condemned inmates in East Block. East Block is "a looming warehouse-like structure constructed in 1930," and is described as being the length of two football fields, forty yards wide, and six stories high. "It is like a giant empty warehouse into which a smaller five-story concrete structure has been concentrically placed." The five stories, or tiers, have two sides. Each side of these five tiers contains approximately 54 cells, making approximately 250 cells per side, and 500 cells in the block. "Each cell is fully encased by concrete, with a grated metal door that adjoins the narrow walkway running the length of the tier." Armed officers patrol narrow gun rails built into the outer wall. There are two such gun rails that run the circumference of the four interior walls. Guards look into the cells across the space separating the gun rails from the tiers. Lancaster v. Tilton, No. C 79-01630 WHA, 2008 WL 449844 at *5 (N.D. Cal.Feb. 15, 2008). Petitioner lives in a windowless, six by eight foot cell with three concrete walls and bars on the cell front, fitted with metal grating. See Toussaint v. McCarthy, 597 F. Supp. 1388, 1394-95 (N.D. Cal. 1984), aff'd in part, rev'd in part,801 F.2d 1080 (9th Cir. 1986).

201.Y.    During Petitioner's confinement on California's Death

Row, living conditions have been found so substandard, unhealthy, and inhumane, and the medical and mental health care determined to be so deficient and below minimally acceptable constitutional standards - both on Death Row and in other relevant areas of San Quentin - that lawsuits and the long-term intervention and oversight of the courts have resulted. See e.g., Plata v. Brown, Case No. C-01-1351 TEH (N.D. Cal.) (finding prison medical care, including that on Death Row, to be deficient); Coleman v. Wilson, 912 F. Supp. 1282 (E.D. Cal. 1995) (concerning deficiencies in prison mental health care); Thompson v. Enomoto, 815 F.2d 1323 (9th Cir. 1987) (alleging conditions and treatment on Death Row violate Eighth and Fourteenth Amendments); Toussaint, 597F. Supp. 1388 (describing conditions in East Block); Lancaster, 2008 WL 449844 (continuation of Thompson litigation).

201.Z.    During Petitioner's confinement at San Quentin starting in 1995, twelve (12) men have been executed (one in Missouri), thirteen (13) have committed suicide, and at least sixty (60) have died of natural causes or other means.  During this time, several of the executions have been botched, and unprecedented publicity has focused on the torturous nature of the method of execution in California and nationwide.

201.AA.    California does not currently have a method of execution that comports with either state or federal law.    California Penal Code Section 3604(a) provides that "[t]he punishment of death shall be inflicted by the administration of a lethal gas or by an

intravenous injection of a substance or substances in a lethal quantity sufficient to cause death, by standards established under the direction of the Department of Corrections."

201.BB.   California's use of lethal gas executions has been found to violate the Eighth Amendment. <u>Fierro v. Gomez</u>, 865 F. Supp. 1387 (N.D. Cal. 1994) (finding that California's method of execution by lethal gas was cruel and unusual under the Eighth Amendment, due to the pain inflicted and the evidence of the rejection of the method by society), <u>vacated on other grounds</u>, <u>Fierro v. Terhune</u>, 147 F.3d 1158 (9th Cir. 1998)(holding that current plaintiffs lacked standing).   The California Department of Corrections and Rehabilitation (CDCR) currently has no lawful regulations to conduct executions.

201.CC.   Because of litigation challenging California's lethal injection protocol, there have been no executions since January, 2006.   In December, 2006, the United States District Court for the Northern District of California declared the manner in which the CDCR implemented its lethal injection protocol violated the Eighth Amendment's prohibition on cruel and unusual punishment. <u>Morales v. Tilton</u>, 465 F.Supp. 2d 972 (N.D. Cal. 2006).

201.DD.   In May, 2007, the CDCR revised its lethal injection protocol. The CDCR, however, failed to follow the required regulatory process when doing so, and the Marin County Superior Court subsequently enjoined the CDCR from executing condemned

inmates by lethal injection until the regulations were properly enacted and in compliance with the California Administrative Procedures Act (APA). The CDCR appealed and, in 2008, the California Court of Appeal affirmed the trial court's decision. Morales v. California Dept. of Corrections & Rehabilitation, 168 Cal. App. 4th 729, 85 Cal. Rptr.3d 724 (2008). In response, the CDCR began to promulgate new regulations in May, 2009, the validity of which were once again challenged in state court. In May, 2013, the California Court of Appeal held that the revised protocol was again invalid for failure to comply with the provisions of the APA, and permanently enjoined the execution of any inmate by lethal injection unless and until new regulations governing lethal injection are lawfully promulgated. Sims v. Dep't of Corr. & Rehab., 216 Cal. App. 4th 1059, 1064, 157 Cal. Rptr. 3d 409, 413 (2013).

201.EE.   At this time, California does not have a lethal injection protocol in place. Morales v. Cate, 5-6-CV-219-RS-HRL, 2012 WL 5878383 (N.D. Cal. Nov. 21, 2012). Moreover, California will not have a valid lethal injection protocol for the foreseeable future because the state must first comply with the APA requirements for publishing the regulations and responding to comments and because any such regulations likely will be subjected to protracted litigation in state and federal court.

201.FF.   A death sentence that does not serve legitimate and substantial penological goals, and that could be accomplished by an

alternative sentence, violates the Eighth Amendment. The legitimate penological goals of a death sentence are deterrence and retribution. <u>See</u> <u>e.g.</u>, <u>Kennedy v. Louisiana</u>, 554 U.S. 407, 420 (2008); <u>Gregg v. Georgia</u>, 429 U.S. 153, 183, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976). <u>Cf.</u> <u>Furman v. Georgia</u>, 408 U.S. 238, 343, 92 S. Ct. 2726, 33 L. Ed. 2d 346(1972) (Marshall, J., concurring) ('Retaliation, vengeance, and retribution have been roundly condemned as intolerable aspirations for a government . . . Punishment as retribution has been condemned by scholars for centuries, and the Eighth Amendment itself was adopted to prevent punishment from becoming synonymous with vengeance.') (citations omitted). A punishment is deemed excessive and unconstitutional if it serves no penological purpose more effectively than would a less severe punishment. <u>See e.g</u>., <u>Furman</u>, 408 U.S. at 280 (Brennan, J., concurring), 312-13 (White, J., concurring); <u>Ceja v. Stewart</u>, 134 F.3d 1368, 1373-78 (9th Cir. 1998).

201.GG.    Execution of Petitioner following such a lengthy and torturous incarceration constitutes cruel and unusual punishment both because of the physical and psychological suffering inflicted on Petitioner, and because of the failure of such an extraordinary sentence to serve any legitimate state interest. <u>See e.g.</u>, <u>Thompson v.McNeil</u>, 129 S. Ct. 1299, 129 S. Ct. 1299 (2009) (statement of Justice Stevens respecting the denial of the petition for writ of certiorari); <u>Knight v. Florida</u>, 528 U.S.990, 120 S. Ct. 459, 145 L. Ed. 2d 370 (Breyer, J., dissenting from denial of certiorari); <u>Elledge v. Florida</u>, 525 U.S. 944 (1998) (Breyer, J., dissenting

from denial of certiorari); <u>Lackey v. Texas</u>, 514 U.S. 1045, 1047,

115 S. Ct. 1421, 131 L. Ed. 2d 304(1995) (Stevens, J., joined by

Breyer, J., respecting the denial of certiorari); <u>Ceja v.Stewart</u>,

134 F.3d 1368 (9th Cir. 1998) (Fletcher, J., dissenting from order

denying stay of execution). Delay in the execution of death

judgments "frustrates the public interest in deterrence and

eviscerates the only rational justification for that type of

punishment." <u>Gomez v. Fierro</u>, 519 U.S. 918, 117 S. Ct. 285, 136 L.

Ed. 2d 204(1996) (Stevens, J., dissenting).

201.HH.    Carrying out Petitioner's sentence after the

extraordinary delay the California Supreme Court and other state

actors have caused would violate the Eighth Amendment.  To confine

an individual, such as Petitioner, on Death Row for such a

protracted period of time constitutes cruel and unusual punishment.

<u>See e.g.</u>, <u>Knight v. Florida</u>, 528 U.S. at 990; <u>Lackey v. Texas</u>, 514

U.S. at 1047. Over a century ago, the United States Supreme Court

recognized that "when a prisoner sentenced by a court to death is

confined in the penitentiary awaiting the execution of the

sentence, one of the most horrible feelings to which he can be

subjected during that time is the uncertainty during the whole of

it." <u>In re Medley</u>, 134 U.S. 160, 172, 10 S. Ct. 384, 33 L. Ed. 835

(1890); <u>see also</u> <u>Solesbee v. Balkcom</u>, 339 U.S. 9, 14, 70 S. Ct.

457, 94 L. Ed. 604 (1950) (Frankfurter, J., dissenting) ("In the

history of murder, the onset of insanity while awaiting execution

of a death sentence is not a rare phenomenon.").

1    201.II.    Execution following lengthy and torturous incarcerations

2    constitutes cruel and unusual punishment because the State's

3    ability to exact retribution and deter other serious offenses by

4    actually carrying out such a sentence is drastically diminished.

5    See e.g., Ceja v. Stewart, 134 F.3d 1368 (9th Cir. 1998).

6

7    201.JJ.    To survive Eighth Amendment scrutiny, a death sentence

8    must serve legitimate and substantial penological goals.  When the

9    death penalty "ceases realistically to further these purposes . . .

10   its imposition would then be the pointless and needless extinction

11   of life with only marginal contributions to any discernible social

12   or public purposes.  A penalty with such negligible returns to the

13   State would be patently excessive and cruel and unusual punishment

14   violative of the Eighth Amendment." Furman, 408 U.S. at 312; see

15   also Gregg v. Georgia, 428 U.S. at 183 ("[T]he sanction imposed

16   cannot be so totally without penological justification that it

17   results in the gratuitous infliction of suffering.").

18

19   201.KK.    In order to satisfy the Eighth Amendment, "the imposition

20   of the death penalty must serve some legitimate penological end

21   that could not be otherwise accomplished. If 'the punishment serves

22   no penal purpose more effectively than a less severe punishment,'

23   then it is unnecessarily excessive within the meaning of the

24   Punishments Clause." Ceja v. Stewart, 134 F.3d at 1373 (quoting

25   Furman, 408 U.S. at 280 (1972) (Brennan, J., concurring)).

26

27   201.LL.    Petitioner has already had the uncertainty of awaiting

28

execution of his sentence for nineteen (19) years. The acceptable

state interest in retribution is and has been satisfied by the

psychological and physical harshness and severity of that very

reality.  In Medley, the period of uncertainty in question was just

four weeks. 134 U.S. at 172.  That description should apply with

even greater force in Petitioner's case where the delay has already

lasted nineteen (19) years and will likely continue for at least

several more years. Lackey, 514 U.S. at 1045-47 (Stevens, J.,

dissenting from denial of certiorari).


201.MM.   The state's interest also has been satisfied by the

additional deterrent effect of many years in prison and a continued

life of incarceration. The additional deterrent effect of an actual

execution in this case is minimal at best.   Petitioner had a

minimal criminal history (a single misdemeanor conviction), and the

jury expressly found he did not have the requisite intent for a

first degree attempted murder finding.


201.NN.   The application of the Eighth Amendment in this context

must be interpreted in light of evolving public opinion. "The

Amendment must draw its meaning from the evolving standards of

decency that mark the progress of a maturing society." Trop v.

Dulles, 356 U.S. 86, 100-01, 78 S. Ct. 590, 2 L. Ed. 2d 630

(1958)(footnote omitted).  Moreover, "the Clause forbidding 'cruel

and unusual' punishments" is not fastened to the obsolete but may

acquire meaning as public opinion becomes enlightened by a humane

justice. Gregg, 428 U.S. at 171 (quoting Weems v. United States,

217 U.S. 349, 378, 30 S. Ct. 544, 54 L. Ed 793 (1910)). Since 1995, the year Petitioner was sentenced to death, forty-one (41) countries have abolished the death penalty for all crimes, see Amnesty International (available at http://www.amnesty.org/en/death-penalty/countries-abolitionist-for-all-crimes). Since Petitioner's arrival on Death Row, six (6) states have abolished capital punishment - New York and New Jersey in 2007; New Mexico in 2009; Illinois in 2011; Connecticut in 2012; and Maryland in 2013. See Death Penalty Information Center (available at http://www.deathpenaltyinfo.org/ states-and-without-death-penalty).  As discussed in the petition, a closely divided electorate very nearly abolished capital punishment in California in the general election of 2012. Society is clearly evolving away from capital punishment.  As this consensus grows, the more obvious it becomes that execution of an inmate following a long and torturous incarceration under sentence of death violates the standards of decency that give the Eighth Amendment its meaning.

201.OO.   Petitioner's prolonged confinement under sentence of death violates international human rights law.  The European Court of Human Rights has held that protracted post-conviction, pre-execution confinement is a human rights violation of sufficient magnitude to prohibit the United Kingdom from sending an accused to face such a fate. Soering v. United Kingdom, App. No. 14038/88, 11 Eur. H. R. Rep. 439 (1989)(six to eight year delay before execution in Virginia prohibited United Kingdom from extraditing potential

1  capital defendant to that state).

2

3  201.PP.   The Canadian Supreme Court cited such delays as a

4  relevant consideration in deciding that extradition of a murder

5  suspect to the United States without first obtaining assurances

6  that the death penalty would not be imposed violated principles of

7  fundamental justice. United States v. Burns, 1 S.C.R. 283, 353

8  (2001).

9

10 201.QQ.   Courts in other countries, even those espousing the

11 lawfulness of capital punishment, have held that "lengthy delay in

12 administering a lawful death penalty renders ultimate execution

13 inhuman, degrading, or unusually cruel." Knight v. Florida, 120 S.

14 Ct. at 462 (Breyer, J., dissenting from denial of certiorari). A

15 delay of fourteen years (less than the amount of time Petitioner

16 has been condemned) is deemed "shocking," and delays of more than

17 five years are described as "inhuman or degrading punishment." Id.

18 at 463 (internal citations omitted).

19

20 201.RR.   Moreover, California has no legitimate penological

21 interest (deterrent or retributive) in executing Petitioner and his

22 execution would involve the needless infliction of avoidable mental

23 anguish and psychological pain and suffering were it to occur given

24 the unique facts of this case.    As alleged in the Petition at ¶¶

25 169 through 173, this is simply not one of the "worst of the worst"

26 cases such as might otherwise justify a capital sentence.

27

28

201.SS.    The cruelty that has attended the delay to date of the execution of Petitioner's death sentence renders the sentence excessive under currently prevailing and evolving standards of decency under the state and federal constitutions, as well as under international law.    Accordingly, and for each and all of these reasons, Petitioner's death sentence is unconstitutional and relief should be granted.