# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNEST DEWAYNE JONES, | ) |
| Petitioner, | ) Case No.: CV 09-02158-CJC |
| | ) |
| vs. | ) |
| | ) |
| | ) ORDER DECLARING |
| KEVIN CHAPPELL, Warden of | ) CALIFORNIA'S DEATH PENALTY |
| California State Prison at San Quentin, | ) SYSTEM UNCONSTITUTIONAL |
| | ) AND VACATING PETITIONER'S |
| Respondent. | ) DEATH SENTENCE |
| | ) |
| | ) |

On April 7, 1995, Petitioner Ernest Dewayne Jones was condemned to death by the State of California. Nearly two decades later, Mr. Jones remains on California's Death Row, awaiting his execution, but with complete uncertainty as to when, or even whether, it will ever come. Mr. Jones is not alone. Since 1978, when the current death penalty system was adopted by California voters, over 900 people have been sentenced to death for their crimes. Of them, only 13 have been executed. For the rest, the dysfunctional administration of California's death penalty system has resulted, and will continue to result, in an inordinate and unpredictable period of delay preceding their actual execution. Indeed, for most, systemic delay has made their execution so unlikely that the death

sentence carefully and deliberately imposed by the jury has been quietly transformed into one no rational jury or legislature could ever impose: *life in prison, with the remote possibility of death*.  As for the random few for whom execution does become a reality, they will have languished for so long on Death Row that their execution will serve no retributive or deterrent purpose and will be arbitrary.

That is the reality of the death penalty in California today and the system that has been created to administer it to Mr. Jones and the hundreds of other individuals currently on Death Row.  Allowing this system to continue to threaten Mr. Jones with the slight possibility of death, almost a generation after he was first sentenced, violates the Eighth Amendment's prohibition against cruel and unusual punishment.

## BACKGROUND

### A.  Delay in California's Death Penalty System

California juries have imposed the death sentence on more than 900 individuals since 1978.[1]  Yet only 13 of those 900 have been executed by the State.  Of the remainder, 94 have died of causes other than execution by the State, 39 were granted relief from their death sentence by the federal courts and have not been resentenced to

---

[1]  In 1977, five years after the California Supreme Court first invalidated the State's death penalty statute, *see People v. Anderson*, 6 Cal. 3d 628 (1972), the California Legislature acted to reinstate the punishment.  One year later, the current death penalty system took form, when voters passed Proposition 7, known as the Briggs Initiative, amending the death penalty statute and significantly expanding the circumstances under which prosecutors could seek the death penalty.  *See* California Commission on the Fair Administration of Justice, Final Report 120 (Gerald Uelmen ed., 2008) ["Commission Report"], *available at* http://www.ccfaj.org/documents/CCFAJFinalReport.pdf ("Under the death penalty statute now in effect, 87% of California's first degree murders are 'death eligible' . . . .").

death, and 748 are currently on Death Row, having their death sentence evaluated by the courts or awaiting their execution.[2]

      The simplest explanation for the size of California's Death Row is that in each year since 1978, more individuals have been sentenced to death than have been removed from Death Row.  *See* Commission Report at 121 (showing historical growth in the size of California's Death Row).  As the size of California's Death Row grows larger and larger, so too do the delays associated with it.  Of the 748 inmates currently on California's Death Row, more than 40 percent, including Mr. Jones, have been there longer than 19 years.[3]  Nearly all of them are still litigating the merits of their death sentence, either before the California Supreme Court or the federal courts.[4]  *See* Appendix A.[5]

---

[2] *See* Cal. Dep't of Corr. & Rehab., Condemned Inmate List (July 2014), *available at* http://www.cdcr.ca.gov/capital_punishment/docs/condemnedinmatelistsecure.pdf.  Despite having been granted relief by the federal courts, 10 of the 39 individuals are listed by the CDCR as being among the 748 inmates currently on Death Row.  *See id.*  In at least some of these cases, this may be explained by the State's intention to again seek the death penalty against these inmates in a new trial.

[3] *See* Cal. Dep't of Corr. & Rehab., Condemned Inmate Summary List at 2 (June 2014) ["CDCR Summary"], *available at* http://www.cdcr.ca.gov/Capital_Punishment/docs/CondemnedInmateSummary.pdf.

[4] Those sentenced to death in California proceed through a post-conviction review process that begins with a mandatory automatic appeal to the California Supreme Court.  If that appeal is denied, an inmate may seek collateral review of the death sentence, again from the California Supreme Court.  If state habeas relief is denied, an inmate may then pursue collateral review of the death sentence from the federal courts.  If relief is denied at each of these levels, then the inmate may be executed.

[5] Between 1978 and 1997, 591 new death judgments were issued in California.  *See* Cal. Dep't of Justice, Criminal Justice Statistics Center, Homicide in California, 2011 at tbl. 35, *available at* http://oag.ca.gov/sites/all/files/agweb/pdfs/cjsc/publications/homicide/hm11/hm11.pdf.  Appendix A describes the current case status of 511 individuals sentenced in that time period.  It does not include individuals whose death sentences were overturned by the California Supreme Court, unless subsequently reinstated.  Because most of the death sentences overturned by the California Supreme Court were overturned in the period between 1979 and 1986, inclusion of those sentences in Appendix A would not accurately reflect the current state of affairs in the California death penalty system.  *See* Commission Report at 120 n.21 (noting that between 1979 and 1986, the California Supreme Court reversed 59 of 64 death judgments it reviewed, but that

For those whose challenge to the State's death sentence is ultimately denied at each level of review, the process will likely take 25 years or more. *See* Gerald Uelmen, *Death Penalty Appeals and Habeas Proceedings: The California Experience*, 93 Marq. L. Rev. 495, 496 (2009) ("Typically, the lapse of time between sentence and execution is twenty-five years, twice the national average, and is growing wider each year."). The majority of that time will likely be spent litigating before the California Supreme Court. *See* Dkt. No. 109-3, Exh. 15 ["Laurence Decl."] ¶ 15 (noting that for inmates who had their state habeas petitions decided between 2008 and 2014, the average delay between sentencing and disposition of the petition was 17.2 years). There is no evidence to suggest that the trend is reversing.

Of course, the vast majority of those sentenced to death in California will not actually be executed by the State. Indeed, the most common way out of California's Death Row is not death by State execution, but death by other means. Of the 511 individuals sentenced to death between 1978 and 1997, 79 died of natural causes, suicide, or causes other than execution by the State of California. *See* Appendix A. Another 15 sentenced after 1997—or two more than the total number of inmates that have been executed by California since the current death penalty system took form—have died of non-execution causes.[6] As California's Death Row population gets older, that number is sure to rise. *See* CDCR Summary at 1 (showing that nearly 20 percent of California's current Death Row population is over 60 years old).

---

since that time, it has reversed death judgments less than 10 percent of the time). Appendix A also does not include individuals whose post-conviction proceedings have been stayed based on their lack of mental competency to face the death penalty. Finally, Appendix A does not include individuals sentenced to death after 1997 because state proceedings are ongoing for all but a small handful, and none have completed the federal habeas process.

[6] *See* Cal. Dep't of Corr. & Rehab., Condemned Inmates Who Have Died Since 1978 (2014) (showing that since 1978, 63 inmates have died of natural causes, 22 have committed suicide, 8 have died of other causes, including drug overdose or violence on the exercise yard, and 1 has been executed by another state), *available at* http://www.cdcr.ca.gov/Capital_Punishment/docs/CONDEMNEDINMATESWHOHAVEDIEDSINCE1978.pdf.

For those that survive the extraordinary wait for their challenge to be both heard and decided by the federal courts, there is a substantial chance that their death sentence will be vacated.  As of June 2014, only 81 of the 511 individuals sentenced to death between 1978 and 1997 had completed the post-conviction review process.  Of them, 32 were denied relief by both the state and federal courts—13 were executed, 17 are currently awaiting execution, and two died of natural causes before the State acted to execute them.[7]  *See* Appendix A.  The other 49—or 60 percent of all inmates whose habeas claims have been finally evaluated by the federal courts—were each granted relief from the death sentence by the federal courts.[8]  *See id.*

//

//

---

[7]  These 17 inmates are awaiting execution because since 2006, federal and state courts have enjoined executions by California.  In 2006, the federal district court for the Northern District of California enjoined the State from executing Death Row inmate Michael Morales on grounds that, as administered, the State's lethal injection protocol "create[d] an undue and unnecessary risk that an inmate will suffer pain so extreme" that it violated the Eighth Amendment's prohibition against cruel and unusual punishment.  *See Morales v. Tilton*, 465 F. Supp. 2d 972, 974, 976–77 (N.D. Cal. 2006).  The State subsequently amended the protocol, but because those amendments were not promulgated in compliance with the State's Administrative Procedures Act (APA), the Marin County Superior Court enjoined executions under them.  *See Morales v. Cal. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 729, 732 (2008).  In response to the ruling, the State undertook to promulgate a lethal injection protocol through the APA's rulemaking process.  After the regulations went into effect in August 2010, Death Row inmate Mitchell Sims sued to enjoin executions under the amended protocol, again for failure to comply with the APA.  The state court agreed, invalidating the regulations for substantial failure to comply with the requirements of the APA, and permanently enjoining executions in California until the State is able to adopt an execution protocol that complies with its own procedural law.  *See Sims v. Dep't of Corr. & Rehab.*, 216 Cal. App. 4th 1059 (2013).  California is therefore without any execution protocol by which to execute the 17 Death Row inmates who have been finally denied relief by both the state and federal courts, or to execute any other inmates who may similarly be denied relief in the near future.

[8]  The State resentenced 10 of these individuals to death, thus starting anew the post-sentencing appeal process on the renewed sentences, though two have since died while on post-conviction review for the second time.  *See* Appendix A.

## B.  The Nature of Delay in California's System

The nature of the delay in California's administration of its death penalty system has been comprehensively studied, including by the State itself.  In 2004, the California State Legislature established the California Commission on the Fair Administration of Justice (the "Commission"), and tasked it with conducting a comprehensive review of the State's justice system, including its administration of the death penalty.  *See* Commission Report at 113–14.  The Commission, a bipartisan panel which was composed of prosecutors, criminal defense attorneys, law enforcement officials, academics, representatives of victim's rights organizations, elected officials, and a judge, issued its Final Report in June 2008.  Its conclusion was a stern indictment of the State's death penalty system:

> California's death penalty system is dysfunctional.  The system is plagued with excessive delay in the appointments of counsel for direct appeals and habeas corpus petitions, and a severe backlog in the review of appeals and habeas petitions before the California Supreme Court.

*Id.* at 114–15.[9]  The Commission is not alone in reaching this determination.  In 2008, then-Chief Justice of the California Supreme Court Ronald M. George offered the same assessment.  *See* Ronald M. George, *Reform Death Penalty Appeals*, L.A. Times, Jan. 7, 2008 ("The existing system for handling capital appeals in California is dysfunctional and needs reform.  The state has more than 650 inmates on death row, and the backlog is growing.") (cited in Commission Report at 164–65 n.3).  Ninth Circuit Court of Appeals Senior Judge Arthur L. Alarcón has suggested the same in his study of the issue.  *See* Arthur L. Alarcón & Paula M. Mitchell, *Executing the Will of the Voters?: A Roadmap to*

---

[9]  Even the commissioners who dissented from the Commission Report agreed "wholeheartedly" that "delay on appeal and in habeas corpus in state and federal court is excessive and frustrates the effective administration of the death penalty."  Commission Report at 164 (separate statement of Commissioners Totten, Boscovich, Cottingham, Dunbar, and Hill).

*Mend or End the California Legislature's Multi-Billion-Dollar Death Penalty Debacle*, 44 Loy. L.A. L. Rev. S41, S61 (2011) (describing California's "broken" death penalty system).

   In reaching these conclusions, the Commission and others have documented the source and nature of the delay in California's death penalty system.  Their studies confirm that delay is evident at each stage of the post-conviction review process, including from the time the death sentence is issued.

## 1.  Delay on Direct Appeal

   In California's death penalty system, delay sets in at the first step of post-conviction review—direct appeal.  California law mandates that after a death sentence is imposed, it must be automatically appealed to the California Supreme Court for review. *See* Cal. Penal Code § 1239.  To pursue that appeal, indigent Death Row inmates are entitled to the assistance of court-appointed counsel.[10]  *See* Cal. Penal Code § 1240.  But inmates must wait years—on average, between three and five years—until counsel is appointed to represent them.  *See* Commission Report at 122.  Indeed, as of June 2014, there were 71 Death Row inmates awaiting appointment of counsel for their direct appeal.  Dkt. No. 116 ["Laurence Supplemental Decl."] ¶ 3.  Unsurprisingly, until such counsel is appointed, there is effectively no activity on the inmate's case.

   This delay is likely due to the severe shortage of qualified attorneys available to accept appointment as counsel on direct appeal.   To be appointed, attorneys must have at least four years of active law practice, experience in felony appeals, completion of

---

[10]  That a Death Row inmate is indigent is essentially a foregone conclusion.  Of the 670 inmates on California's Death Row in 2008, each was indigent and therefore entitled to the assistance of court-appointed counsel in the post-conviction review process.  *See* Commission Report at 121.

training, and demonstrated proficiency in appellate skills.  Commission Report at 132 (citing Cal. Rule of Court Rule 8.605(d)).  Notably, however, the Commission did not find a general dearth of lawyers able to meet these qualifications or willing to take on the representation of Death Row inmates.  Rather, the Commission found the State's underfunding of its death penalty system to be a key source of the problem.  *Id.*  For example, the Commission noted that despite the high volume of applicants willing to represent Death Row inmates from the security of an agency setting, the Office of the State Public Defender's budget has been cut and its staff reduced.  *Id.* (recommending that "[t]he most direct and efficient way to reduce the backlog of death row inmates awaiting appointment of appellate counsel would be to again expand the Office of the State Public Defender").  Similarly, as to appointments of private counsel, the Commission found that the low rate at which private appointed counsel are paid by the State is "certainly a significant factor in the decline of the pool of attorneys available to handle death penalty appeals."  *Id*; *see also* Arthur L. Alarcón, *Remedies for California's Death Row Deadlock*, 80 S. Cal. L. Rev. 697, 734 (2007) ["Alarcón Study"] ("Private practitioners who can bear the financial sacrifice of accepting court-appointment at the present hourly rates are scarce.").

Once counsel is eventually appointed, that counsel must learn the trial record, which often totals more than 9,000 pages, must research the law, and must file an opening brief with the California Supreme Court.  *See* Commission Report at 131.  Including the time spent by the State to file a responsive brief, and by counsel for the inmate to file a reply brief, the briefing process will typically consume under four years.  *Id.*  The parties must then wait for the case to be scheduled for argument before the California Supreme Court.  On average, the California Supreme Court generally hears between 20 and 25 death penalty appeals per year, and so another two to three years will likely pass before arguments are scheduled and the case is subsequently decided.  *Id.*  Taken together then, from the sentence of death to the California Supreme Court's

disposition of the automatic appeal, between 11.7 and 13.7 years will have elapsed, *see id.*, with inmates spending much of that time waiting for counsel to be appointed and for oral argument to be scheduled.

### 2. Delay on State Collateral Review

Whereas on direct review the inmate challenges issues raised at the trial and sentencing, on collateral review the inmate may attack the legality of his confinement based on issues that normally cannot be determined in the direct appeal process, including claims of ineffective assistance of counsel at trial.  As on direct appeal, indigent Death Row inmates are entitled to the assistance of state-appointed counsel to pursue their habeas petitions.  *See* Cal. Gov't Code § 68662.  Unless the inmate requests that the same counsel provide representation both on direct appeal and during collateral review, California law directs that different counsel be appointed at each stage.  Cal. Gov't Code § 68663.  The majority of counsel appointed in capital habeas cases are private attorneys, though a number of inmates receive the assistance of the Habeas Corpus Resource Center ("HCRC"), the entity created by the Legislature to provide habeas representation to Death Row inmates.[11]  *See* Laurence Decl. ¶ 11 (in fiscal years 2005 to 2012, the HCRC was appointed, on average, in 43 percent of state habeas cases).

//

---

[11]  Whether an inmate receives the assistance of the HCRC or a private attorney may significantly affect the extent of delays in the inmate's post-conviction review proceedings.  Whereas the HCRC may be able to provide continuous representation in both the inmate's state and federal habeas claims, the same is not true of private attorneys appointed to represent Death Row inmates in their state habeas proceedings, who generally do not continue to provide representation in federal proceedings as well.  *See* Commission Report at 137.  As the Commission found, "[c]ontinuity of representation by the same lawyer in both state and federal habeas corpus proceedings helps to reduce many of the delays that now occur in state and federal habeas proceedings."  *Id.*

The California Supreme Court has noted that "[i]deally, the appointment of habeas corpus counsel should occur shortly after an indigent defendant's judgment of death" so as to "enable habeas corpus counsel to investigate potential claims for relief and to prepare a habeas corpus petition at roughly the same time that appellate counsel is preparing an opening brief on appeal." *In re Morgan*, 50 Cal. 4th 932, 937 (2010). An expeditious appointment "would ensure the filing of a habeas corpus petition soon after completion of the briefing on the appeal." *Id.* Yet as of June 2014, 352 inmates—nearly half of Death Row—were without habeas corpus counsel. *See* Laurence Decl. ¶ 7. And that number is up from 291 inmates awaiting appointment of habeas counsel in 2008. *See* Commission Report at 134; *see also* Laurence Decl. tbl. 1 (showing that in all but one year since 1999, the total number of Death Row inmates awaiting the appointment of habeas counsel has increased). The growing backlog of appointments can again be traced to underfunding issues similar to those on direct appeal. *See* Commission Report at 135 (describing the below-market rates at which appointed habeas counsel are paid, and the low cap on funds made available to conduct habeas investigations and retain necessary experts); Alarcón Study at 738 (same). And unless the State is able to reverse the current trend, the backlog of Death Row inmates awaiting habeas counsel will only continue to grow. *See* Laurence Supplemental Decl. ¶ 5 (noting that over the past five years, the State has issued an average of 22.8 death judgments per year compared with only 9.4 annual appointments of habeas counsel over the same period).

The Commission found in 2008 that, far from meeting the California Supreme Court's ideal, habeas counsel is generally not appointed until between eight and ten years after the imposition of the death sentence. *See* Commission Report at 134. And the length of delay is growing. Currently, of the 352 inmates without habeas counsel, 159 have been awaiting appointment of such counsel for more than ten years. *See* Laurence Supplemental Decl. ¶ 4; Laurence Decl. ¶ 8. Further, there are 76 inmates whose direct appeals have been fully denied by the California Supreme Court but still lack habeas

counsel.  *See* Laurence Supplemental Decl. ¶ 4.  They have already waited an average of 15.8 years after the imposition of their death sentence for habeas counsel to be appointed, and are still waiting.  *Id.*

Once habeas counsel is appointed, that counsel must learn the trial record, investigate any potential constitutional or statutory claims, and file the habeas petition with the California Supreme Court.[12]  To be presumed timely, the petition must be filed either within 180 days after the final due date for filing the appellant's reply brief on direct appeal or within 36 months after the appointment of habeas counsel, whichever is later.[13]  Then, in most cases, the State will only file an informal reply to the petition before it is decided by the California Supreme Court.  *See* Laurence Decl. ¶ 17 (noting that of the 729 habeas petitions resolved on the merits by the California Supreme Court since 1978, the court has issued orders to show cause, requiring the Attorney General to formally respond to the petition, in only 99 cases, and held evidentiary hearings only 45 times).

In 2008, the Commission estimated that after a habeas petition was filed, it would take the California Supreme Court 22 months on average to decide it.  *See* Commission

---

[12]  Given that habeas petitions at both the state and federal level often include claims of ineffective assistance of counsel, the appointed habeas counsel is often required to reinvestigate the inmate's case to discover whether any additional mitigating evidence might have been presented to the jury, but was not for lack of adequate representation during the guilt and penalty phases of the inmate's trial.  *See* Commission Report at 133–34.  As noted above, however, such investigation may be hampered by underfunding, which may in turn further delay the federal habeas process.  *See id.* at 135; Alarcón Study at 738.

[13]  *See* Supreme Court Policies Regarding Cases Arising from Judgments of Death, Policy 3, Timeliness Standard 1-1.1 (as amended Nov. 30, 2005), *available at* http://www.courts.ca.gov/documents/PoliciesMar2012.pdf.  At the time Mr. Jones filed his state habeas petition in 2002, the Policy required the petition to be filed within 90 days after the final due date for the filing of the appellant's reply brief on direct appeal or within 24 months after the appointment of habeas counsel, whichever is later.

Report at 134.  But that delay has more than doubled since the Commission's report was issued.  Of the 176 capital habeas petitions currently pending before the California Supreme Court, the average amount of time that has elapsed since each petition was filed is 49 months.  Laurence Supplemental Decl. ¶ 6.  Similarly, of the 68 capital habeas petitions the court has decided since 2008, it has taken an average of 47.8 months for the California Supreme Court to issue a decision once each petition was fully briefed.  Laurence Decl. ¶ 14.  In all, by the time the inmate's state habeas petition is decided, he will likely have spent a combined 17 years or more litigating his direct appeal and petition for state habeas review before the California Supreme Court.[14]  *See id.* ¶ 15.

### 3.   Delay on Federal Collateral Review

When an inmate's state habeas petition is denied, the inmate may seek relief in federal court by alleging that the State has violated his federal constitutional rights. Federal habeas proceedings are significantly affected by the habeas proceedings before the state court.  Federal courts are generally limited in their review by the legal and factual determinations of the state court.  28 U.S.C. § 2254(d).  Moreover, if an inmate discovers new facts in the federal proceeding that were not before the California Supreme Court when it decided the state habeas petition, that inmate must generally halt the federal proceeding and return to the California Supreme Court by way of an exhaustion

---

[14]   When the California Supreme Court does rule on a capital habeas petition, it usually does so by way of a summary unpublished opinion.  For example, the California Supreme Court denied Mr. Jones's habeas petition in a mere 202 words, excluding citations.  *See* Jones (Ernest Dewayne) on H.C., No. S110791 (Cal. Mar. 11, 2009, amended Mar. 16, 2009), *available at* http://appellatecases.courtinfo.ca.gov/search/case/dockets.cfm?dist=0&doc_id=1842470&doc_no=S110791.  The Commission noted that much of the delay in federal habeas proceedings "is attributable to the absence of a published opinion and/or an evidentiary hearing in the state courts" because "[o]ften, the federal courts cannot ascertain why state relief was denied." Commission Report at 123.

petition to present to it the new facts and exhaust the state remedy. *See* 28 U.S.C. § 2254(b).

As of 2008, the complete federal habeas review process, including initial review by the district court, appeal to the Ninth Circuit, and possible petitions for en banc and Supreme Court review, took an average of 10.4 years. *See* Commission Report at 123, 137. While certainly lengthy, "[m]uch of the delay in federal habeas corpus proceedings . . . is attributable to the need to exhaust state remedies and to conduct investigations." Alarcón Study at 750. For example, since 1978, Death Row inmates have filed 268 exhaustion petitions in the California Supreme Court after initiating federal habeas proceedings. Laurence Supplemental Decl. ¶ 7; *see also* Alarcón Study at 749 (noting that approximately 74 percent of federal habeas proceedings are stayed at some point during the proceeding for exhaustion of state remedies). The average time that elapses before that exhaustion petition is decided by the California Supreme Court is 3.2 years. Laurence Supplemental Decl. ¶ 7; *see also* Alarcón Study at 749 (finding that, as of 2007, "[t]he average delay for the exhaustion of state remedies before the California Supreme Court [was] 2.8 years").

Ultimately, since 1978 only 81 inmates—of the more than 900 individuals sentenced to death in California—have received a final determination on the merits of their federal habeas petitions.[15] Less than half of those 81 have been denied relief at all levels, and only 13 have actually been executed. *See* Appendix A. Of the 17 that are currently awaiting their execution, each has been on Death Row for more than 25 years, and eight have been there for more than 30 years. *Id.* More inmates will ultimately be

---

[15] This number includes two inmates who technically never had their petitions decided by the federal courts because they voluntarily withdrew their petitions, choosing to be executed immediately by the State rather than have their habeas petitions finally decided by the federal courts.

denied relief at each stage of review, but when or whether they will be executed is unclear. Indeed, not one inmate has been executed in California since 2006. *See id*.

## C.  Mr. Jones's Claim

After Mr. Jones was sentenced to death in April 1995, he waited approximately four years before the State appointed counsel to represent him in his direct appeal. Then, another four years later, on March 17, 2003, the California Supreme Court affirmed Mr. Jones's conviction. *People v. Jones*, 29 Cal. 4th 1229 (2003). After certiorari was denied by the United States Supreme Court, the judgment became final on October 21, 2003. *Jones v. California*, 540 U.S. 952 (2003). In total, Mr. Jones spent about eight years litigating his direct appeal before the California Supreme Court—considerably less time than the 12 to 14 years spent by most individuals on California's Death Row.

Mr. Jones's state habeas counsel was appointed on October 20, 2000, five years after he was sentenced to death and while he was still litigating his direct appeal. By October 21, 2002, Mr. Jones's counsel—the Habeas Corpus Resource Center, which continues to represent him in this federal habeas proceeding—filed his state habeas petition. Six and a half years later, and over five years after the petition was fully briefed, on March 11, 2009 the California Supreme Court denied Mr. Jones's petition in an unpublished order. No hearing was conducted, and no briefing was provided by the State beyond an informal reply.

Finally, on March 10, 2010, Mr. Jones filed his petition for federal habeas relief. *See* Dkt. No. 26. Briefing on the petition was completed in January 2014, and the Court is reviewing his claims. On April 28, 2014, Mr. Jones amended Claim 27 of his petition to broaden the nature of his claim of unconstitutional delay in California's administration of its death penalty system. *See* Dkt. No. 105 ["First Am. Pet."]. Mr. Jones's new claim

asserts that as a result of systemic and inordinate delay in California's post-conviction review process, only a random few of the hundreds of individuals sentenced to death will be executed, and for those that are, execution will serve no penological purpose. *Id.*

## ANALYSIS

The Eighth Amendment prohibits the imposition of cruel and unusual punishment by the state. Although reasonable people may debate whether the death penalty offends that proscription, no rational person can question that the execution of an individual carries with it the solemn obligation of the government to ensure that the punishment is not arbitrarily imposed and that it furthers the interests of society. As the American tradition of law has long recognized, death is a punishment different in kind from any other. *See, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 995 (1991) (noting the "qualitative difference between death and all other penalties"); *Coleman v. McCormick*, 874 F.2d 1280, 1288 (9th Cir. 1989) ("The finality and severity of a death sentence makes it qualitatively different from all other forms of punishment."). Indeed, in its finality, the punishment of death "differs more from life imprisonment than a 100-year prison term differs from one of only a year or two. Because of that qualitative difference, there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976).

Recognizing that solemn obligation, in 1972 the United States Supreme Court invalidated the death sentences of the three petitioners appearing before it, and signaled that as it was then being imposed across much of the country, the death penalty violated the Eighth Amendment. *See Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). In *Furman*, the Court encountered state sentencing schemes by which judges and juries were afforded virtually untrammeled discretion to decide whether to impose the ultimate

sanction.  The result was that the death penalty was being imposed in an at best random manner against some individuals, with "no meaningful basis for distinguishing the few cases in which it [was] imposed from the many cases in which it [was] not."  *See id.* at 313 (White, J., concurring).  While no majority opinion controlled in *Furman*, the Supreme Court agreed that such an outcome was abhorrent to the Constitution, holding that the death penalty "could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner."  *See Gregg v. Georgia*, 428 U.S. 153, 188 (1976) (plurality opinion) (describing *Furman*'s holding).  Put another way, the Constitution quite simply "cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed."  *Furman*, 408 U.S. at 310 (Stewart, J., concurring).  In the 40 years since *Furman*, the Supreme Court has never retreated from that fundamental principle.

The *Furman* decision was rooted in part in the Court's recognition that arbitrary imposition of the death penalty could not justly further the penological goals of society—deterrence and retribution.  *See id.* at 312 (White, J., concurring) ("At the moment that [the death penalty] ceases realistically to further these purposes, . . . its imposition would then be the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes.  A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment.").  Indeed, in *Gregg v. Georgia*, when the Supreme Court lifted what had become *Furman*'s de facto moratorium on the death penalty, it did so with the understanding that such punishment should serve these "two principal social purposes."  428 U.S. at 183.  Since that time, the Supreme Court has harkened back to these twin purposes to guide its evaluation of challenges to the death penalty under the Eighth Amendment.  *See, e.g.*, *Kennedy v. Louisiana*, 554 U.S. 407, 441 (2008) ("[C]apital punishment is excessive when it is grossly out of proportion to the crime or it does not

fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes."). They are bedrock principles of the Constitution's promise to not permit the infliction of cruel and unusual punishment by the State.

**A. Arbitrariness in California's Death Penalty System**

California's death penalty system is so plagued by inordinate and unpredictable delay that the death sentence is actually carried out against only a trivial few of those sentenced to death. Of the more than 900 individuals that have been sentenced to death since 1978, only 13 have been executed. For every one inmate executed by California, seven have died on Death Row, most from natural causes. The review process takes an average of 25 years, and the delay is only getting longer. Indeed, no inmate has been executed since 2006, and there is no evidence to suggest that executions will resume in the reasonably near future. Even when executions do resume, the current population of Death Row is so enormous that, realistically, California will still be unable to execute the substantial majority of Death Row inmates. In fact, just to carry out the sentences of the 748 inmates currently on Death Row, the State would have to conduct more than one execution a week for the next 14 years. Such an outcome is obviously impossible for many reasons, not the least of which is that as a result of extraordinary delay in California's system, only 17 inmates currently on Death Row have even completed the post-conviction review process and are awaiting their execution. *See* Appendix A. For all practical purposes then, a sentence of death in California is a sentence of life imprisonment with the remote possibility of death—a sentence no rational legislature or jury could ever impose.

Of course, for an arbitrarily selected few of the 748 inmates currently on Death Row, that remote possibility may well be realized. Yet their selection for execution will not depend on whether their crime was one of passion or of premeditation, on whether

they killed one person or ten, or on any other proxy for the relative penological value that will be achieved by executing that inmate over any other. Nor will it even depend on the perhaps neutral criterion of executing inmates in the order in which they arrived on Death Row. Rather, it will depend upon a factor largely outside an inmate's control, and wholly divorced from the penological purposes the State sought to achieve by sentencing him to death in the first instance: how quickly the inmate proceeds through the State's dysfunctional post-conviction review process.

Mr. Jones's case is illustrative. Mr. Jones is now in his fifth year of federal review, and given that the final briefing on the merits of his claims was completed in January, a decision from this Court could be rendered by the end of the year. On average, review at the Ninth Circuit will take another 2.2 years. *See* Commission Report at 123. Accounting then for the time spent seeking en banc review from the Circuit and certiorari from the United States Supreme Court, and assuming relief is denied at every level, the federal stay on Mr. Jones's execution could be lifted and he could be ready for execution within three or four years—about 23 years after he was first sentenced to death.

By comparison, of the 380 inmates included in Appendix A who are currently on Death Row, 285 have been there longer than Mr. Jones. *See* Appendix A; *see also* CDCR Summary at 2 (showing that about 40 percent of all inmates have been on Death Row longer than Mr. Jones). Over a third of them are engaged in state court proceedings. *See* Appendix A (showing that 109 of the 285 inmates who have been on Death Row longer than Mr. Jones have state proceedings ongoing). In all likelihood, given the delays in the post-conviction review process, most of them will never face execution as a realistic possibility, unlike Mr. Jones. Similarly, of the 38 Death Row inmates who like Mr. Jones were sentenced to death in 1995, only 7, including Mr. Jones, have completed the state habeas review process. *See id.* Were his petition denied today, Mr. Jones would be one of three inmates sentenced in 1995 to have his federal habeas petition under

review by the Ninth Circuit, effectively the last available stage before execution. Again, because of the inordinate delays inherent in California's system, many of the rest will never be executed. They will instead live out their lives on Death Row. *See* Gerald Uelmen, *Death Penalty Appeals and Habeas Proceedings: The California Experience*, 93 Marq. L. Rev. 495, 496 (2009) ("For all practical purposes, a sentence of death in California is a sentence of life imprisonment without the possibility of parole.").

For Mr. Jones to be executed in such a system, where so many are sentenced to death but only a random few are actually executed, would offend the most fundamental of constitutional protections—that the government shall not be permitted to arbitrarily inflict the ultimate punishment of death. *See Furman*, 408 U.S. at 293 (Brennan, J., concurring) ("When the punishment of death is inflicted in a trivial number of the cases in which it is legally available, the conclusion is virtually inescapable that it is being inflicted arbitrarily. Indeed, it smacks of little more than a lottery system."). To be sure, *Furman* specifically addressed arbitrariness in the selection of who gets sentenced to death. But the principles on which it relied apply here with equal force. The Eighth Amendment simply cannot be read to proscribe a state from randomly selecting which few members of its criminal population it will sentence to death, but to allow that same state to randomly select which trivial few of those condemned it will actually execute. Arbitrariness in execution is still arbitrary, regardless of when in the process the arbitrariness arises.

**B. The Penological Purpose of California's Death Penalty System**

The systemic delay and dysfunction that result in the arbitrary execution of California's Death Row inmates give rise to a further constitutional problem with the State's administration of its death penalty system. In California, the execution of a death sentence is so infrequent, and the delays preceding it so extraordinary, that the death

penalty is deprived of any deterrent or retributive effect it might once have had.  Such an outcome is antithetical to any civilized notion of just punishment.

### 1.  Deterrence

Whether the death penalty has any deterrent effect when administered in a functional system is a widely contested issue upon which no clear empirical consensus has been reached.  But even when administered in a functional system, few could dispute that long delays preceding execution frustrate whatever deterrent effect the death penalty may have.  Indeed, the law, and common sense itself, have long recognized that the deterrent effect of *any* punishment is contingent upon the certainty and timeliness of its imposition.  *See, e.g.*, *Harmelin*, 501 U.S. at 989 ("[D]eterrent effect depends not only upon the amount of the penalty but upon its certainty . . . ."); *United States v. Panico*, 308 F.2d 125, 128 (2d Cir. 1962) ("There can be little doubt that the effectiveness of punishment as a deterrent is related not only to the quality of the possible punishment but to the certainty and promptness as well."), *vacated on other grounds*, 375 U.S. 29 (1963); *see also* Commission Report at 115 n.8 (agreeing that "[i]f there is a deterrent value [to the death penalty], . . . it is certainly dissipated by long intervals between judgment of death and its execution").  In the death penalty context, where finality of punishment is not achieved until the actual execution of the inmate, the case is no different.

In California, the system in which the death penalty is administered can only be described as completely dysfunctional.  The delay inherent in California's system is so extraordinary that it alone seriously undermines the continued deterrent effect of the State's death penalty.  *See Chief Justice Ronald George Reflects on Death Penalty, Prop. 8*, The California Report, Dec. 6–8, 2013 ("[O]ne of the rationales for the death penalty is a deterrent effect that it . . . has on a certain number of cases, . . . and when there's so much delay as there is now—25 years' worth is the average stay on death row—I think it

loses its justification.").[16]  But delay is not the only problem.  Executions by the State are so few and far between that since 1978, of the 900 individuals sentenced to death in California, only 13 have been executed.  The reasonable expectation of an individual contemplating a capital crime in California then is that if he is caught, it does not matter whether he is sentenced to death—he realistically faces only life imprisonment.   Under such a system, the death penalty is about as effective a deterrent to capital crime as the possibility of a lightning strike is to going outside in the rain.[17]

## 2.  Retribution

Just as inordinate delay and unpredictability of executions eliminate any deterrent effect California's death penalty might have, so too do such delay and unpredictability defeat the death penalty's retributive objective.  It is true that the Supreme Court has consistently affirmed the view that retribution, as "an expression of society's moral outrage at particularly offensive conduct," is a constitutionally permissible aim of capital sentencing schemes.  *See Gregg*, 428 U.S. at 183.   But no reasonable jurist could dispute that inordinate delay frustrates that aim.  *See Coleman*, 451 U.S. at  960 (Rehnquist, J., dissenting from the denial of certiorari) ("There can be little doubt that delay in the enforcement of capital punishment frustrates the purpose of retribution."); *Ceja v. Stewart*, 134 F.3d 1368, 1374 (9th Cir. 1998) (Fletcher, J., dissenting) ("[T]he ability of

---

[16]  *Available at* http://www.californiareport.org/archive/R201312061630/c.

[17]  In 1995, the same year Mr. Jones was sentenced to death, now-Chief Judge of the Ninth Circuit Court of Appeals Alex Kozinski commented that as it then existed in the United States, the "death penalty . . . has no deterrent value because it is imposed so infrequently and so freakishly."  *See* Alex Kozinski & Sean Gallagher, *Death: The Ultimate Run-On Sentence*, Lecture, 46 Case W. Res. L. Rev. 1, 25 (Fall 1995).  In the nearly 20 years since, the evidence is clear that the problem has only gotten worse.  California has made true then-Justice Rehnquist's remark—perhaps hyperbolic at the time—that "the existence of the death penalty in this country is virtually an illusion."  *See Coleman v. Balkcom*, 451 U.S. 949, 957–58 (1981) (Rehnquist, J., dissenting from the denial of certiorari).

an execution to provide moral and emotional closure to a shocked community diminishe[s] as the connection between crime and punishment [becomes] more attenuated and more arbitrary."); Lewis Powell, *Capital Punishment*, Commentary, 102 Harv. L. Rev. 1035, 1041 (1989) ("The retributive value of the death penalty is diminished as imposition of sentence becomes ever farther removed from the time of the offense.").

In California, a Death Row inmate will likely wait at least 25 years before his execution becomes even a realistic possibility. Were such lengthy delay an isolated, or even necessary, circumstance of a system that otherwise acts purposefully to give meaning to society's moral outrage, the retributive purpose of the death penalty might continue to be served. Here, however, the delay is systemic, and the State itself is to blame. The State has allowed such dysfunction to creep into its death penalty system that the few executions it does carry out are arbitrary. Whereas few have been or will eventually be executed by California, the vast majority of individuals sentenced to death—each of whom, in the State's view, committed crimes sufficiently reprehensible to warrant death—will effectively serve out terms of life imprisonment. *See* Appendix A. This reality of delay and dysfunction created by the State simply cannot be reconciled with the asserted purpose of retribution. *See Furman*, 408 U.S. at 304–05 (Brennan, J., concurring) ("The asserted public belief that murderers . . . deserve to die is flatly inconsistent with the execution of a random few."); *id.* at 311 (White, J., concurring) ("[W]hen imposition of the [death] penalty reaches a certain degree of infrequency, it would be very doubtful that any existing general need for retribution would be measurably satisfied.").

## C.  Petitioners' Fault in Creating Delay

As the State correctly notes, courts have thus far generally not accepted the theory that extraordinary delay between sentencing and execution violates the Eighth

Amendment. *See, e.g.*, *People v. Anderson*, 25 Cal. 4th 543, 606 (2001) ("[A]ppellate delay in a capital case is not cruel and unusual punishment."). When courts have rejected the theory, however, they have often not addressed whether any penological purpose of the death penalty continues to be served more than two decades after the death sentence was imposed. Rather, courts often rely on two justifications for rejecting the theory: first, that the delay is reasonably related to the state's effort to safeguard the inmate's constitutional rights by ensuring the accuracy of its death conviction and sentence, and second, that the delay is caused by the petitioner himself, and therefore cannot be constitutionally problematic.[18] The facts here, however, show that at least as to California's administration of its death penalty system, such assumptions are simply incorrect.

The Court pauses first to note the arguments that the State is not making in opposition to Mr. Jones's claim. The State is not arguing that the delay in Mr. Jones's execution is an isolated incident in a system that otherwise operates as expeditiously as possible to execute those sentenced to death.[19] Nor does the State argue that it is rational or necessary for it to take more than two decades to provide Death Row inmates with the

---

[18]  For example, in *Anderson*, the California Supreme Court found that "the automatic appeal process following judgments of death is a constitutional safeguard, not a constitutional defect." 25 Cal. 4th at 606. Similarly, Justice Clarence Thomas, concurring in the Supreme Court's denial of certiorari in *Thompson v. McNeil*, argued that "[i]t makes 'a mockery of our system of justice . . . for a convicted murderer, who, through his own interminable efforts of delay . . . has secured the almost-indefinite postponement of his sentence, to then claim that the almost-indefinite postponement renders his sentence unconstitutional.' " 556 U.S. 1114, 129 S. Ct. 1299, 1301 (2009) (Thomas, J., concurring in the denial of certiorari) (quoting *Turner v. Jabe*, 58 F.3d 924, 933 (4th Cir. 1995) (Luttig, J., concurring in judgment)).

[19]  Unlike Mr. Jones's claim here, in previous instances where federal courts have been presented claims of unconstitutional delay preceding execution, they have generally appeared in the context of claims brought by inmates in whose *individual* cases the delay was extraordinary. *See, e.g.*, *Lackey v. Texas*, 514 U.S. 1045 (17 years of delay); *Smith v. Mahoney*, 611 F.3d 978 (9th Cir. 2010) (25 years of delay). In those cases, however, the petitioner did not argue, as does Mr. Jones here, that his execution would be arbitrary and serve no penological purpose because of system-wide dysfunction in the post-conviction review process.

process required to ensure that their death sentence comports with constitutional requirements. Indeed, the State cannot reasonably make these arguments.

On the record before it, the Court finds that much of the delay in California's post-conviction review process is created by the State itself, not by inmates' own interminable efforts to delay.[20] Most Death Row inmates wait between three and five years for counsel to be appointed for their direct appeal. After the issues are briefed on direct appeal, another two to three years are spent waiting for oral argument to be scheduled before the California Supreme Court. On state habeas review, far from meeting the ideal goal of appointing state habeas counsel shortly after the death verdict, at least eight to ten years elapse between the death verdict and appointment of habeas counsel. When that counsel is appointed by the State, investigation of potential claims is hampered by underfunding, which in turn slows down the federal habeas review process. Then, after state habeas briefs are submitted, another four years elapse before the California Supreme Court issues a generally conclusory denial of the inmate's claims. This lack of a reasoned opinion further slows adjudication of inmates' federal habeas claims. Finally, even after filing a petition for federal habeas review, many inmates, often because of deficiencies rooted in the State's process, must stay their federal cases to exhaust claims in state court.

These delays—exceeding 25 years on average—are inherent to California's dysfunctional death penalty system, not the result of individual inmates' delay tactics, except perhaps in isolated cases. *See generally* Appendix A (showing that very few of California's Death Row inmates have completed the state and federal post-conviction

---

[20]  Indeed, in Mr. Jones's case, there is no evidence of frivolous filings or unreasonable delay caused by Mr. Jones. Rather, the unnecessary delay in his case—as in the cases of most other Death Row inmates—is attributable to structural problems inherent in California's death penalty system.

review process, even 20 years after being sentenced to death).  That such delays are not reasonably necessary to the fair administration of justice is evident.  In 2008, the Commission recommended a series of related reforms that, in its view, would help alleviate delay inherent in California's death penalty system.  The Commission's recommendations included more adequately funding the system and removing the requirement that death penalty appeals must be automatically heard by the California Supreme Court rather than the state's intermediate courts of appeal.  *See* Commission Report at 124.  Through its proposed reforms, the Commission estimated that the delay between sentencing and execution of a Death Row inmate could be reduced to between 11 and 14 years.[21]  *See id*.  So reducing California's time to execution would bring California closer to, or even below, the national average, which between 2000 and 2012 was approximately 12.5 years, and in 2012 was 15.8 years.[22]

The Commission's proposal, and the experience of other states across the country—which, on average, take substantially less than 20 years, let alone 25 or 30 years, to adjudicate their post-conviction review process—demonstrate that the inordinate delay in California's death penalty system is not reasonably necessary to protect an inmate's rights.  Moreover, there is no basis to conclude that inmates on California's Death Row are simply more dilatory, or have stronger incentives to needlessly delay the capital appeals process, than are those Death Row inmates in other states.  Most of the delay in California's post-conviction process then is attributable to California's own system, not the inmates themselves.

---

[21]  Whether the State adopts the Commission's proposed reforms, or any others, is a policy question beyond the scope of this proceeding.  But the proposals are relevant to supporting Mr. Jones's claim that the delay in California is of a structural and systemic nature, and are cited here for that purpose.

[22]  United States Dep't of Justice, Bureau of Justice Statistics, NCJ 245789, Capital Punishment, 2012—Statistical Tables (May 2014) at 14, *available at* http://www.bjs.gov/content/pub/pdf/cp12st.pdf.

Of course, the Court's conclusion should not be understood to suggest that the post-conviction review process should be curtailed in favor of speed over accuracy. Indeed, it bears noting that in more than half of all cases in which the federal courts have reviewed a California inmate's death sentence on habeas review, the inmate has been granted relief from the death sentence. *See* Appendix A. The post-conviction review process is, therefore, vitally important. It serves both the inmate's interest in not being improperly executed, as well as the State's interest in ensuring that it does not improperly execute any individual. Nevertheless, the Court holds that where the State permits the post-conviction review process to become so inordinately and unnecessarily delayed that only an arbitrarily selected few of those sentenced to death are executed, the State's process violates the Eight Amendment. Fundamental principles of due process and just punishment demand that any punishment, let alone the ultimate one of execution, be timely and rationally carried out.

## D.  Procedural Bars to Federal Collateral Review

The State argues that Mr. Jones's claim is procedurally barred. Specifically, the State contends that Mr. Jones has not exhausted available state remedies as required under the Anti-Terrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C. § 2254(b). Federal courts generally may not grant habeas relief to an individual in state custody unless that individual has first exhausted the remedies available in state court. *See* 28 U.S.C. § 2254(b)(1)(A). However, where "circumstances exist that render [the state] process ineffective to protect the rights of the applicant," exhaustion is not required. 28 U.S.C. § 2254(b)(1)(B)(ii). The Court has determined that systemic delay caused by the dysfunctional state review process has resulted in the arbitrary selection of a small handful of individuals for execution, and has therefore rendered Mr. Jones's death sentence unconstitutional. Requiring Mr. Jones to return to the California Supreme Court to exhaust his claim would only compound the delay that has already plagued his post-

conviction review process.  *See* Laurence Decl. ¶ 16 (noting that, on average, 3.19 years elapse before an exhaustion petition in a capital habeas case is decided by the California Supreme Court).  More importantly, it would require Mr. Jones to have his claim resolved by the very system he has established is dysfunctional and incapable of protecting his constitutional rights.  Special circumstances clearly exist such that Mr. Jones need not return to the California Supreme Court to exhaust his claim.  *Cf. Phillips v. Vasquez*, 56 F.3d 1030, 1035 (9th Cir. 1995) ("[E]xtraordinary delay in the state courts can render state corrective processes 'ineffective' within the meaning of section 2254(b) [such] that exhaustion is not required . . . .") (citation omitted); *Jones v. Tubman*, 360 F. Supp. 1298, 1300 (S.D.N.Y. 1973) ("[E]xhaustion is not mandated where the state consideration would be either futile or where state procedures do not provide swift review of petitioner's claims.").

While not specifically addressed by the State, the Court considers a second procedural defense commonly raised to avoid federal habeas review: that the petitioner's claim seeks the announcement of a new rule on collateral review and is therefore barred under *Teague v. Lane*, 489 U.S. 288, 306 (1989).[23]  The rule Mr. Jones seeks to have applied here—that a state may not arbitrarily inflict the death penalty—is not new.  Rather, it is inherent in the most basic notions of due process and fair punishment embedded in the core of the Eighth Amendment.  *See Furman*, 408 U.S. at 274–77 (Brennan, J., concurring) (describing the principle that "the State must not arbitrarily inflict a severe punishment" as "inherent in the [Cruel and Unusual Punishment] Clause" and tracing its application in Anglo–American jurisprudence); *see also id.* at 242 (Douglas, J., concurring) ("There is evidence that the provision of the English Bill of Rights of 1689, from which the language of the Eighth Amendment was taken, was

---

[23]  Because there is no underlying state court ruling on the merits of Mr. Jones's claim of arbitrariness in California's death penalty system, the Court does not consider the claim under AEDPA's deferential standard of review.  *See* 28 U.S.C. § 2254(d).

concerned primarily with selective or irregular application of harsh penalties and that its aim was to forbid arbitrary and discriminatory penalties of a severe nature."). This rule is certainly one "so deeply embedded in the fabric of due process that everyone takes it for granted." *Dyer v. Calderon*, 151 F.3d 970, 984 (9th Cir. 1998) (en banc). It is therefore not a new rule for *Teague* purposes. *See id.* ("[A] rule needs to be announced for purposes of *Teague* only if it's new.").

                              *    *    *

When an individual is condemned to death in California, the sentence carries with it an implicit promise from the State that it will actually be carried out. That promise is made to the citizens of the State, who are investing significant resources in furtherance of a punishment that they believe is necessary to achieving justice. It is made to jurors who, in exercise of their civic responsibility, are asked to hear about and see evidence of undeniably horrific crimes, and then participate in the agonizing deliberations over whether the perpetrators of those horrific crimes should be put to death. It is made to victims and their loved ones, for whom just punishment might provide some semblance of moral and emotional closure from an otherwise unimaginable loss. And it is made to the hundreds of individuals on Death Row, as a statement their crimes are so heinous they have forfeited their right to life.

But for too long now, the promise has been an empty one. Inordinate and unpredictable delay has resulted in a death penalty system in which very few of the hundreds of individuals sentenced to death have been, or even will be, executed by the State. It has resulted in a system in which arbitrary factors, rather than legitimate ones like the nature of the crime or the date of the death sentence, determine whether an individual will actually be executed. And it has resulted in a system that serves no

penological purpose.  Such a system is unconstitutional.  Accordingly, the Court hereby VACATES Mr. Jones's death sentence.


DATED:     July 16, 2014

_____
CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE