1   MICHAEL LAURENCE (State Bar No. 121854)
    JEAN R. STERNBERG (State Bar No. 79353)
2   STERNBERG, SOWARDS & LAURENCE
    604 Mission Street, Ninth Floor
3   San Francisco, CA 94105
    Telephone: (415) 896-2254
4   Facsimile:  (415) 896-1591

5   Attorneys for Petitioner TROY ADAM ASHMUS

6

7

8                 IN THE UNITED STATES DISTRICT COURT

9       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO HEADQUARTERS

10

11  TROY A. ASHMUS,                    )   Case No.  C-93-0594-TEH
                                       )
12              Petitioner,            )   **DEATH PENALTY CASE**
                                       )
13         v.                          )
                                       )   FINALIZED PETITION FOR WRIT OF
14  ARTHUR CALDERON, Warden of         )   HABEAS CORPUS BY A PERSON IN
    California State Prison at San Quentin, )  STATE CUSTODY  (28 U.S.C. § 2254)
15                                     )
                Respondent.            )
16  _____)

17

18

19

20

21

22

23

24

25

26

27

28

ORIGINAL
FILED

MAY 15 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

TABLE OF CONTENTS

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     PROCEDURAL HISTORY AND BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . 2

III.    STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.    PROCEDURAL HISTORY AND TRIAL PROCEEDINGS . . . . . . . . . . . . . . 10

        B.    FACTS OF OFFENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        C.    FACTS IN AGGRAVATION AND MITIGATION . . . . . . . . . . . . . . . . . . . . 15

IV.     CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    CLAIM 1: PETITIONER'S FELONY CONVICTION FOR ASSAULT
              WITH INTENT TO COMMIT RAPE WAS UNCONSTITUTIONALLY
              OBTAINED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        B.    CLAIM 2: PETITIONER'S CONVICTION AND DEATH SENTENCE
              MUST BE SET ASIDE BECAUSE OF THE FAILURE TO RECUSE THE
              PROSECUTOR'S OFFICE FROM PETITIONER'S CASE . . . . . . . . . . . . . . 33

        C.    CLAIM 3: PETITIONER IS ENTITLED TO RELIEF BECAUSE THE
              PROSECUTION FAILED TO DISCLOSE MATERIAL EVIDENCE IN
              MITIGATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

        D.    CLAIM 4: PETITIONER WAS DENIED HIS CONSTITUTIONAL
              RIGHTS WITH REGARD TO THE SELECTION AND IMPANELING
              OF THE JURY BY WHICH HE WAS TRIED . . . . . . . . . . . . . . . . . . . . . . 39

        E.    CLAIM 5:    PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE
              EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR AND
              RELIABLE DETERMINATION OF GUILT AND PENALTY BY TRIAL
              COUNSEL'S PREJUDICIALLY DEFICIENT PERFORMANCE . . . . . . . . . 44

        F.    CLAIM 6: THE TRIAL COURT AND TRIAL COUNSEL DENIED
              PETITIONER HIS DUE PROCESS RIGHT TO BE PRESENT AT HIS
              TRIAL AND NOT TO BE TRIED WHEN HE WAS UNABLE TO
              COMPREHEND CRITICAL PORTIONS OF THE PROCEEDINGS OR
              TO COMMUNICATE AND COOPERATE WITH COUNSEL . . . . . . . . . . . 75

        G.    CLAIM 7: THE STATE'S DEATH PENALTY STATUTE FAILS TO
              NARROW THE CLASS OF OFFENDERS ELIGIBLE FOR THE DEATH
              PENALTY AND RESULTS IN IMPOSITION OF DEATH IN A
              CAPRICIOUS AND ARBITRARY MANNER . . . . . . . . . . . . . . . . . . . . . 80

        H.    CLAIM 8:    PETITIONER'S JUDGMENT IS UNCONSTITUTIONAL
              BECAUSE IT WAS OBTAINED BY IMPROPER CHARGING,
              PROSECUTING AND SENTENCING CONSIDERATIONS . . . . . . . . . . . . 102

I.  CLAIM 9:  PETITIONER WAS DEPRIVED OF HIS FEDERAL
    CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF
    COUNSEL ON APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

J.  CLAIM 10: THE STATE HAS INTERFERED WITH PETITIONER'S
    RIGHTS TO PETITION THE COURTS FOR REDRESS AND TO
    INVESTIGATE AND PREPARE THIS HABEAS PETITION . . . . . . . . . . . 104

K.  CLAIM 11: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
    AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S
    FAILURE TO EXCLUDE JURORS FOR CAUSE WHOSE VIEWS ON THE
    DEATH PENALTY PREVENTED OR SUBSTANTIALLY IMPAIRED
    THEIR ABILITY TO PERFORM THEIR DUTIES . . . . . . . . . . . . . . . . . . . . 105

L.  CLAIM 12: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
    AMENDMENT RIGHTS WERE VIOLATED BY THE EXCLUSION OF
    JURORS WHO WERE RELUCTANT TO IMPOSE A DEATH SENTENCE
    UPON PETITIONER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

M.  CLAIM 13: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
    AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S
    RESTRICTION ON VOIR DIRE DESIGNED TO DETERMINE WHETHER
    THE JURORS COULD FAIRLY CONSIDER A PUNISHMENT OF LIFE
    WITHOUT PAROLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

N.  CLAIM 14:  PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
    AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S
    ERRONEOUS INSTRUCTIONS ON THE SPECIAL CIRCUMSTANCES
    ELEMENT OF INTENT TO KILL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 116

O.  CLAIM 15: PETITIONER'S FIFTH, EIGHTH, AND FOURTEENTH
    AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF A
    NUMBER OF IRRELEVANT AND INFLAMMATORY PHOTOGRAPHS  118

P.  CLAIM 16: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
    AMENDMENT RIGHTS WERE VIOLATED BY AN INSTRUCTION
    WHICH CREATED AN UNJUSTIFIABLE PERMISSIVE PRESUMPTION OF
    INTENT AND GUILT SHOULD THE JURY FIND PETITIONER MADE
    MISLEADING STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

Q.  CLAIM 17: PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT
    RIGHTS TO DUE PROCESS, A FAIR TRIAL AND THE PRESUMPTION
    OF INNOCENCE WERE VIOLATED BY PROSECUTORIAL
    MISCONDUCT DURING ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

R.  CLAIM 18: PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT
    RIGHTS WERE VIOLATED BY THE INTRODUCTION OF
    PETITIONER'S INVOCATION OF HIS RIGHT TO REMAIN SILENT
    AND PORTIONS OF HIS STATEMENT WHICH FOLLOWED THAT
    INVOCATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

S.  CLAIM 19: PETITIONER'S FIFTH, EIGHTH, AND FOURTEENTH
    AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF
    ELECTROPHORETIC ANALYSES OF DRIED SEMEN STAINS . . . . . . . . 125

T.   CLAIM 20: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
     AMENDMENT RIGHTS WERE VIOLATED BY THE PROSECUTOR'S
     USE OF UNPROVEN SEXUAL ALLEGATIONS AS EVIDENCE IN
     AGGRAVATION OF PETITIONER'S SENTENCE IN CROSS-EXAMINING
     DR. YARVIS AND IN CLOSING ARGUMENT TO THE JURY ........ 128

U.   CLAIM 21: PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT
     RIGHTS WERE VIOLATED BY THE PROSECUTOR'S ARGUMENTS
     ABOUT MARCELLA DAVIS AND THE CRIME SCENE ............. 131

V.   CLAIM 22: PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT
     RIGHTS WERE VIOLATED BY THE INTRODUCTION OF A SUBSEQUENT
     AND NON-FINAL FELONY CONVICTION AS A FACTOR IN
     AGGRAVATION DURING THE PENALTY PHASE ................. 133

W.   CLAIM 23: PETITIONER'S FIFTH, EIGHTH, AND FOURTEENTH
     AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF
     THE CIRCUMSTANCES UNDERLYING A FELONY CONVICTION
     SUFFERED BY PETITIONER ................................... 134

X.   CLAIM 24: PETITIONER'S FIFTH, SIXTH, EIGHTH, AND
     FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE
     COURT'S SUMMARY EXCUSAL AND REPLACEMENT OF A JUROR
     DURING THE PENALTY PHASE ............................... 135

Y.   CLAIM 25: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
     AMENDMENT RIGHTS WERE VIOLATED BY THE COURT'S FAILURE
     TO INSTRUCT THE JURORS TO START DELIBERATIONS ANEW
     AFTER THE REPLACEMENT OF A JUROR ...................... 136

Z.   CLAIM 26: PETITIONER'S RIGHT TO DUE PROCESS WAS VIOLATED
     BY THE PROSECUTOR'S ARGUMENT THAT PETITIONER LACKED
     REMORSE FOR THE CRIME AND THAT THE JURY COULD CONSIDER
     THIS FACTOR IN AGGRAVATION ............................. 137

AA.  CLAIM 27: PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT
     RIGHTS WERE VIOLATED BY PENALTY PHASE INSTRUCTIONS WHICH
     WERE IMPERMISSIBLY VAGUE, PRECLUDED THE JURY FROM GIVING
     FULL EFFECT TO PETITIONER'S MITIGATING EVIDENCE, DEPRIVED
     PETITIONER OF AN INDIVIDUALIZED SENTENCING DETERMINATION
     AND RESULTED IN AN UNRELIABLE SENTENCE, BASED ON PASSION
     AND PREJUDICE ............................................ 137

BB.  CLAIM 28: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
     AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S
     FAILURE TO EXPLAIN TO THE JURY THAT A SENTENCE OF LIFE
     WITHOUT PAROLE MEANT PETITIONER WOULD NOT BE RELEASED
     FROM PRISON .............................................. 142

CC.  CLAIM 29: PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT
     RIGHTS WERE VIOLATED BY THE COURT'S INSTRUCTIONS, WHICH
     ALLOWED THE JURORS TO IMPERMISSIBLY INFLATE THE
     CIRCUMSTANCES IN AGGRAVATION THEY COULD PERMISSIBLY
     CONSIDER IN SENTENCING PETITIONER ...................... 143

DD.  CLAIM 30: PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY A SERIES OF ERRORS COMMITTED BY THE TRIAL COURT IN IMPOSING JUDGMENT ON PETITIONER ..... 144

EE.  CLAIM 31: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS WERE VIOLATED BY THE STATE'S REFUSAL TO DISCLOSE, AND THE TRIAL COURT'S FAILURE TO ORDER DISCLOSURE OF RELEVANT INFORMATION WHICH WOULD HAVE SHOWN THAT THE CAPITAL CHARGING DECISION WAS ARBITRARY, CAPRICIOUS, DISCRIMINATORY AND STANDARDLESS ................................................... 147

FF.  CLAIM 32: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE SUGGESTIVE IDENTIFICATION PROCEDURES WHICH RESULTED IN THE INTRODUCTION OF A TAINTED CONVICTION AND TESTIMONY ... 149

GG.  CLAIM 33: PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY A NUMBER OF FLAWS IN THE STATE'S CAPITAL SENTENCING SCHEME AND PROCEDURES ............. 151

PRAYER FOR RELIEF                                                      152

VERIFICATION ........................................................ 154

1   MICHAEL LAURENCE (State Bar No. 121854)
    JEANNIE R. STERNBERG (State Bar No. 79353)
2   STERNBERG, SOWARDS & LAURENCE
    604 Mission Street, Ninth Floor
3   San Francisco, CA 94105
    Telephone:  (415) 896-2254
4   Facsimile:  (415) 896-1591

5   Attorneys for Petitioner TROY A. ASHMUS

6

7

8                  IN THE UNITED STATES DISTRICT COURT

9      NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO HEADQUARTERS

10

11   TROY A. ASHMUS,                        )   Case No. C-93-0594-TEH
                                            )
12              Petitioner,                 )   **DEATH PENALTY CASE**
                                            )
13        v.                                )
                                            )   FINALIZED PETITION FOR WRIT OF
14   ARTHUR CALDERON, Warden of             )   HABEAS CORPUS BY A PERSON IN
     California State Prison at San Quentin,)   STATE CUSTODY  (28 U.S.C. § 2254)
15                                          )
                Respondent.                 )
16   _____)

17        Petitioner Troy A. Ashmus, by and through his counsel, respectfully petitions this Court

18   for a writ of habeas corpus pursuant to 28 U.S.C. sections 2241 and 2254 et seq., and by this

19   verified amended petition alleges the following facts and causes for issuance of the writ:

20                                       **I.**

21                                **INTRODUCTION**

22        Pursuant to this Court's orders filed March 3, 1998, and March 25, 1998, and in

23   accordance with the Local Rules and case authority governing the filing of petitions brought under

24   28 U.S.C. section 2254, the following claims for relief represent constitutional challenges to

25   petitioner's conviction and sentence of death that have been fairly presented to and exhausted in

26   the state courts.

27   ///

28   ///

## II.

## PROCEDURAL HISTORY AND BACKGROUND

A.     Petitioner is unlawfully imprisoned under a judgment of conviction and sentence of death at the California State Prison at San Quentin, San Quentin, California by Arthur Calderon, Warden, and C.A. Terhune, Director of the California Department of Corrections.  Such judgment was imposed by the San Mateo Superior Court on July 25, 1986, in Case Number C-15661.  CT 822-24.[1]

B.     By information filed August 17, 1984, in Sacramento County Superior Court, and refiled on January 17, 1986, in San Mateo Superior Court, petitioner was charged with capital murder during the commission of rape, sodomy and a lewd act on Marcella Davis, a person under the age of fourteen, as well as the underlying offenses of rape, sodomy, and a lewd act.  CT 139-41.  The crime occurred on May 19, 1984, in Sacramento.  Due to massive publicity and the considerable likelihood that petitioner could not get a fair trial in Sacramento, however, the Superior Court, on September 11, 1985, granted petitioner's change of venue motion.  CT 250.  In January 1986, petitioner's case was transferred to San Mateo County.  CT 257.

C.     Petitioner pleaded not guilty and was tried by a jury.

    1.     Petitioner's trial commenced on February 24, 1986.  CT 382, 444.

    2.     Prior to voir dire, the trial court considered and ruled upon several pre-trial motions.  CT 444-45, 447-50, 478, 530.

    3.     Jury selection began on April 1, 1986, and was completed with the jury being sworn on May 5, 1986.  CT 531, 581-85.

    4.     On May 5, 1986, the guilt and special circumstance phase of petitioner's trial began.  CT 585.

    5.     The jury found petitioner guilty on all of the charges and found true all of the special circumstance allegations in the information.  CT 657-63, 672-75; RT 6194-97.

---

[1]     Throughout this petition, citations to the Reporter's and Clerk's Transcripts on direct appeal will appear as RT (Reporter's Transcript of Trial); Pretrial RT (Volume of Miscellaneous Pretrial Hearings which occurred in Sacramento County) and CT (Clerk's Transcript for both Sacramento and San Mateo County)

6.    The penalty phase commenced on June 2, 1986.  CT 695-96.

7.    The jury returned a death verdict on June 13, 1986.  CT 776-77; RT 7430-31.

D.    Petitioner testified in the guilt phase of the trial, but did not testify in the penalty phase.

E.    The Superior Court denied petitioner's motion to modify the jury's death verdict and imposed a judgment of death on July 25, 1986, after hearing statements from Marcella Davis's mother and from petitioner.  CT 823-24, 833; RT 7436-65.

F.    Petitioner's convictions and sentences were automatically appealed to the California Supreme Court.

1.    On March 4, 1987, the California Supreme Court appointed Linda F. Robertson to represent Mr. Ashmus on his automatic appeal.  On July 27, 1992, the California Supreme Court appointed Charles Bush as associate counsel.

2.    The California Supreme Court affirmed petitioner's conviction and sentence on December 5, 1991.  *People v. Ashmus*, 54 Cal.3d 932 (1991).

3.    Petitioner unsuccessfully sought a rehearing in the California Supreme Court, which denied petitioner's timely petition by minute order dated January 29, 1992.

4.    The issues raised in the automatic appeal were:

a.    Petitioner's rights under the Sixth, Eighth, and Fourteenth Amendments were violated by the failure to exclude for cause jurors whose views on the death penalty prevented or substantially impaired their ability to perform their duties.

b.    Exhaustion of peremptory challenges is not required under the Sixth, Eighth, or Fourteenth Amendments to obtain relief for constitutional error in the jury selection process where a modified struck system was used to select jurors.

c.    Petitioner's Sixth, Eighth, and Fourteenth Amendment rights were violated by the removal of several jurors for cause based on their views on the death penalty.

d.    Petitioner's Sixth and Fourteenth Amendment rights to due process and to a fair and impartial jury were violated by limitations placed on defense counsel's voir dire by the trial court on the question of the meaning of a sentence of life without parole.

e.    Petitioner's Sixth, Eighth, and Fourteenth Amendment rights were violated

by the exclusion through peremptory challenges of death-scrupled jurors who stated they could impose a death sentence in an appropriate case.

        f.      Petitioner's Fourteenth Amendment rights to due process were violated by the delivery of confusing and misleading jury instructions that did not inform the jury of the requisite mens rea element of capital murder.

        g.      Petitioner's Fifth, Eighth, and Fourteenth Amendment rights were violated by the admission of a number of irrelevant and inflammatory photographs.

        h.      Petitioner's Eighth and Fourteenth Amendment rights to due process and a reliable verdict were violated by an instruction that created an unjustifiably permissive presumption of intent and guilt should the jury find petitioner made deliberately false and misleading statements.

        i.      Petitioner's rights to a fair trial, the presumption of innocence, and due process were violated by prosecutorial misconduct during argument.

        j.      Petitioner's Fifth, Eighth, and Fourteenth Amendment rights were violated by the admission of electrophoretic analysis of dried semen stains.

        k.      Petitioner's Fifth and Fourteenth Amendment rights were violated by the introduction of petitioner's invocation of his right to remain silent and portions of petitioner's statement made after that invocation.

        l.      Petitioner's Sixth, Eighth, and Fourteenth Amendment rights were violated by the prosecutor's use of unproven sexual allegations as evidence against petitioner during the penalty phase of his trial.

        m.      Petitioner's rights to due process and to a reliable and accurate verdict based on record evidence, not prejudice or passion were violated by the prosecutor's argument about the victim and the crime scene and by faulty instructions on the role of sympathy and pity.

        n.      Petitioner's rights to due process of law and to a reliable penalty verdict were violated by the introduction during the penalty phase of a non-final felony conviction that petitioner sustained following the crime for which he was charged.

o.     Petitioner's protection against double jeopardy and his right to a reliable judgment were violated by the admission of the circumstances underlying a felony conviction suffered by petitioner.

p.     Petitioner's rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments were violated by the court's summary excusal and replacement of a juror during the penalty phase presentation.

q.     Petitioner's Sixth, Eighth, and Fourteenth Amendment rights were violated by the court's failure to instruct the jurors to start deliberations anew after the replacement of a seated juror with an alternate juror.

r.     Petitioner's right to due process was violated by the prosecutor's argument that petitioner lacked remorse for the crime for which he was convicted.

s.     Petitioner's Eighth and Fourteenth Amendment rights were violated by the trial court's limitation on the jurors' consideration of mitigating evidence of petitioner's mental or emotional disturbances that were determined to be less than extreme.

t.     Petitioner's Eighth and Fourteenth Amendment rights were violated by the trial court's failure to inform the jury that future conduct in prison was a mitigating factor which could justify a sentence less than death.

u.     Petitioner's Sixth, Eighth, and Fourteenth Amendment rights were violated by the trial court's failure to inform the jury that a sentence of life without parole meant petitioner would not be released from prison.

v.     Petitioner's Eighth and Fourteenth Amendment rights were violated by the failure to inform the jury that it should consider petitioner's background in mitigation in selecting the appropriate punishment and that the absence of evidence of a mitigating factor did not render the factor aggravating.

w.     Petitioner's Eighth and Fourteenth Amendment rights were violated by the jury's consideration of two special circumstances based on the same conduct.

x.     Petitioner's Eighth and Fourteenth Amendment rights were violated by the delivery of instructions that invited the jury to consider crimes adjudicated during the guilt

phase under two and three separate aggravating factors.

y.    Petitioner's constitutional rights were violated by the court's failure to inform the jury that before it could consider violent criminal activity in aggravation of petitioner's sentence, it had to find beyond a reasonable doubt that the activity occurred.

z.    Petitioner's Eighth and Fourteenth Amendment rights were violated by multiple flaws in the statute and process employed in death penalty cases, including the failure of the statute and instructions to designate factors as aggravating or mitigating; the failure to require the jury to find beyond a reasonable doubt that factors in aggravation outweighed those in mitigation and that death was the appropriate punishment; the triple counting of a felony to obtain a conviction, to establish death eligibility, and as a factor in aggravation; the lack of a requirement of written findings; and the lack of adequate appellate review.

aa.    Petitioner's Eighth and Fourteenth Amendment rights were violated by allowing the victim's mother to address the court at sentencing, by the court's consideration of a probation report that contained unreliable hearsay not previously placed before the fact finder, and by the trial court's rejection of mitigating evidence in pronouncing judgment.

bb.    Petitioner's Eighth and Fourteenth Amendment rights were violated by the denial of discovery of standards for seeking the death penalty employed in the county in which petitioner was charged.

cc.    Petitioner's Eighth and Fourteenth Amendment rights were violated by the identification procedures by which petitioner was identified as the perpetrator of an assault with intent to commit rape the day before the capital crime occurred.

dd.    Petitioner's Sixth and Fourteenth Amendment rights were violated by trial counsel's prejudicial omissions during the guilt and penalty phases.

G.    On May 26, 1992, petitioner filed a petition for writ of certiorari in the United States Supreme Court.

1.    The petition requested certiorari on four legal issues involving challenges to the

jury selection procedures, admission of testimony of the victim's family during sentencing before the judge, and the state court's methodology in determining the effect of ambiguous instructions on the jury.

    2.    The Supreme Court denied the petition on October 5, 1992. *Ashmus v. Calderon*, No. 91-8387.

    3.    Petitioner's timely petition for rehearing was denied on November 30, 1992.

H.    On February 17, 1993, petitioner filed a pro se request for the appointment of counsel and requested a stay of execution in this Court to permit that court to locate and appoint appropriate counsel.

I.    On December 1, 1993, this Court appointed Bernard Zimmerman, Esq., and Grace Suarez, Esq., to represent petitioner in his federal habeas corpus proceeding.

J.    On August 9, 1995, this Court granted Mr. Zimmerman's and Ms. Suarez's motion to withdraw as counsel and appointed Michael Laurence, Esq., and Jeannie R. Sternberg, Esq., to represent petitioner in his pending action.

K.    On April 17, 1997, petitioner filed a federal habeas corpus petition in this Court.

L.    On April 24, 1997, this Court ordered respondent to identify the claims contained in the April 17, 1997 federal petition that respondent intended to challenge as unexhausted. On May 1, 1997, respondent filed a pleading challenging the exhaustion status of each of the claims contained in the federal petition. On March 3, 1998, this Court concluded that all but three issues in the federal petition had previously been presented to the California Supreme Court and therefore were exhausted. This Court further ordered petitioner to present any unexhausted claims to the California Supreme Court by April 16, 1998.

M.    On April 16, 1998, petitioner complied with this Court's order and filed a petition for writ of habeas corpus in the California Supreme Court. The state petition presented the state court with all known exhausted and unexhausted claims for the express purposes of (i) enabling the state court properly to evaluate the cumulative error of all of the serious constitutional violations that affected petitioner's convictions and death sentence, and (ii) facilitating a speedy and just determination of petitioner's claims by eliminating any possibility that the doctrine of exhaustion

1    will be again raised in the future as to any claim presented to this Court in the federal petition for

2    writ of habeas corpus.

3    N.    The factual allegations of the state petition demonstrated that, pursuant to state and federal

4    law, all of the claims for relief were timely raised and that petitioner is factually innocent of

5    capital murder, and ineligible for imposition of the death penalty.  With the exception of the

6    claims previously presented to the state court on direct appeal, the claims in the state petition were

7    presented almost immediately after their discovery by counsel for petitioner.  Petitioner was

8    unable to present any such claims prior to the District Court's ruling on the exhausted status of

9    the federal petition because to have done so risked piecemeal litigation.  Any perceived failures

10   to comply with state procedural rules were excusable under state procedures, and otherwise do

11   not constitute adequate bars to the consideration of any claims contained in this Petition on the

12   merits:

13        1.    Petitioner is indigent, suffers from a myriad of mental dysfunctions, and has been

14        incarcerated since his conviction.  Consequently, he has had no ability to investigate the

15        factual bases for these claims.  The California Supreme Court appointed counsel to

16        represent petitioner "on his automatic appeal" on March 4, 1987.  On June 6, 1989, a

17        week before petitioner's counsel filed Appellant's Opening Brief, the Court issued a set

18        of Policies Regarding Cases Arising from Judgments of Death, establishing a duty on

19        appointed counsel, apparently regardless of the date of their appointment, "to investigate

20        factual and legal grounds for the filing of a petition for a writ of habeas corpus."  As

21        applicable to petitioner's case, the Policies provided for the filing of an application for

22        investigative and ancillary assistance within 120 days of June 6.  Petitioner's counsel filed

23        such an application for funds on October 3, 1989.  The Court granted and then vacated

24        and ultimately denied the requested funds in December 1989.  Thereafter, petitioner's

25        counsel made every effort to comply with the newly-created duties, but were ultimately

26        unable to do so because of a lack of funding.  Counsel's efforts included the filing of a

27        renewed application of funds in January 1992, which the California Supreme Court denied

28        several months later.  Without funds for investigation or expert assistance, and in light of

the Court's policy that it would not issue a stay of execution unless a state habeas corpus petition were filed, petitioner had no choice but to begin federal habeas corpus proceedings and obtain a stay of execution under Rule 296-8(b) of the Local Rules of Practice for the United States District Court for the Northern District of California. Petitioner's proceedings in federal court were interrupted when his appointed counsel was appointed to the federal bench. Current counsel were appointed in August 1995 by the federal court and diligently pursued substantive legal claims and litigated a host of additional legal issues until ordered by that court on March 3, 1998, and March 25, 1998, to present all known claims to the California Supreme Court by April 16, 1998.

2.     The resources necessary to discover the factual predicate for the claims contained herein were obtained only when the federal district court granted petitioner's funds request. Since receiving the resources necessary to conduct an investigation, counsel for petitioner have investigated and presented the claims in a timely and expedient fashion.

3.     Petitioner was entitled to the constitutional right to counsel on direct appeal and for all ancillary proceedings associated with the direct appeal. *See, e.g., Evitts v. Lucey,* 469 U.S. 387 (1985). Any dereliction of responsibility by appellate counsel would constitute sufficient justification to review the claims on the merits or under the rubric of ineffective assistance of appellate counsel. *See, e.g., Coleman v. Thompson,* 501 U.S. 722 (1991).

4.     No impartial juror who considered the evidence that underlies petitioner's claims, and which petitioner can more fully present to this Court in an evidentiary hearing, would have convicted petitioner or sentenced him to death. Thus, despite any failure to comply with procedural rules, the claims contained in this petition should be heard on the merits because a miscarriage of justice will result otherwise.

O.     Without requesting informal briefing, the California Supreme Court filed on May 13, 1998, an order denying the state petition for writ of habeas corpus.

P.     Counsel for petitioner received notice of the California Supreme Court's order on May 14, 1998, and immediately commenced work to file this Petition.

Q.     All grounds presented herein to this Court have been presented fairly to the highest state

1    court.

2    R.    There are no other petitions currently pending in any court attacking the judgment at issue

3    herein and none has previously been filed except for those set forth above.

4    S.    At the preliminary hearing, arraignment, plea, trial, and sentencing, petitioner was

5    represented by the Office of the Sacramento County Public Defender, Assistant Public Defender

6    Michael Arkelian, and Richard Fathy, Esq.  On automatic appeal in state court petitioner was

7    represented by Linda Robertson, Esq. and Charles Bush, Esq.  In the federal proceedings,

8    petitioner was initially represented by Bernard Zimmerman, Esq., and Pillsbury, Madison &

9    Sutro, and Grace Suarez, Esq. Since August 1995, petitioner has been represented by Michael

10   Laurence, Esq., and Jeannie R. Sternberg, Esq.

### III.

### STATEMENT OF THE CASE

13   A.    PROCEDURAL HISTORY AND TRIAL PROCEEDINGS.

14        Petitioner was arrested shortly before midnight on May 19, 1984, for the killing of

15   Marcella Davis, which had occurred earlier that day in Santa Anita Park.  On August 17, 1984,

16   following a preliminary hearing in Municipal Court, an information was filed in Sacramento

17   Superior Court, charging petitioner with first degree murder, rape, sodomy, and lewd conduct

18   with a minor.  Three special circumstance allegations accompanying the murder count -- that the

19   homicide occurred during the commission of a rape, sodomy, and lewd conduct -- made petitioner

20   eligible for the death penalty. CT 139-41.

21        On September 14, 1985, the superior court granted petitioner's motion for a change of

22   venue. CT 250. Prior to transfer of the case, however, petitioner moved to discover information

23   about the Sacramento County prosecutor's charging practices and procedures, alleging that the

24   prosecutor's lack of uniform procedures or standards for determining whether to seek the death

25   penalty violated petitioner's rights to due process and equal protection of the law.  The court

26   denied this motion.

27        In January 1986, the case was transferred to San Mateo County for further proceedings

28   and trial.  CT 257.  Prior to the start of jury selection, the San Mateo Superior Court denied

1  petitioner's motion to prohibit the exclusion of *Witherspoon*-excludable jurors from the guilt phase

2  of trial, CT 530, and petitioner's motion to exclude evidence of the electrophoretic serum typing

3  of semen samples taken from the crime scene, CT 448.  The court further denied in part and

4  granted in part petitioner's motion to exclude post-arrest statements by petitioner on the ground

5  that his constitutional rights to counsel and to remain silent were violated by his interrogators.

6  CT 478.  On March 20, 1986, the court ruled that a sanitized version of the statement was

7  admissible.  CT 478.

8        Jury selection began on April 1, and concluded on May 5, 1986.  On April 8, the

9  prosecutor successfully objected to questions by petitioner's counsel designed to ascertain each

10 prospective juror's actual understanding of the sentence of life in prison without the  possibility

11 of parole.

12       The evidentiary portion of the guilt phase began on May 5, 1986, and concluded on May

13 28, 1986, with the start of jury deliberations.  Before the start of the prosecutor's case-in-chief,

14 petitioner's counsel told the jury that petitioner would not deny the commission of sexual

15 intercourse or that petitioner's actions caused the death of Marcella Davis, but would vigorously

16 contest the prosecutor's contention that petitioner intended to kill and deliberately killed Marcella

17 Davis.  Petitioner unsuccessfully objected to the admission of enlargements of photographs of

18 Marcella Davis before her death and of petitioner shortly after his arrest on the ground that neither

19 the identity of the perpetrator nor the fact that a homicide and sexual acts occurred was in dispute.

20 The prosecutor was permitted to provide the jury with a transcript of petitioner's taped

21 interrogation, which included material not permitted as part of the court's pretrial order.  A

22 criminalist testified for the prosecution that genetic factors in semen stains found on Marcella's

23 body were consistent with those of petitioner.  Pathologist Gwen Hall testified that Marcella Davis

24 died by asphyxiation.  Dr. Hall's external examination of Marcella Davis provided no clue as to

25 the cause of death.  After examining neck organs and muscle under the larynx, however, Dr. Hall

26 discovered two plastic bags obstructing Marcella Davis's windpipe.  The plastic bags appeared

27 to have been placed in Marcella Davis's mouth at the same time, not seriatim.  Dr. Hall

28 acknowledged that it was equally plausible that the location of the bags was the result of Marcella

1   Davis struggling for air rather than as a result of them being forcibly pushed down her throat,

2   although Dr. Hall believed they were intentionally inserted and Marcella Davis's death was

3   intentionally, not accidentally, caused.

4   Petitioner testified at the guilt phase of the trial. He admitted to having sexual intercourse

5   with Marcella Davis and causing her death, but denied intending to kill her. Dr. Eckert, a forensic

6   pathologist, testified for the defense that the postmortem examination performed on Marcella

7   Davis was not informative as to whether or not the killing was intentional. He disagreed with Dr.

8   Hall's belief that the bags were forced into place and that petitioner intentionally caused Marcella

9   Davis's death. Dr. Eckert believed that the bags were placed in Marcella Davis's mouth to stifle

10  cries for help and that her death was accidentally caused. Marcella Davis's physical injuries

11  (aside from the injuries attributed to the sexual conduct) were consistent with friction and

12  movement, not assaultive conduct. There was no basis for determining whether the bags were

13  inserted or sucked into Marcella Davis's throat. Dr. Eckert previously consulted on a case in

14  which death was accidentally caused after a woman occluded her air passage by sucking a

15  handkerchief into her throat.

16  Jury deliberations began on the afternoon of May 28, 1986. On the morning of May 29,

17  the jurors returned to court to obtain clarification of the instructions on willful, deliberate, and

18  premeditated murder, and felony-murder.

19  On the afternoon of May 29, 1986, the jury returned verdicts finding petitioner guilty on

20  all of the charges in the information and finding true all the special circumstances alleged in the

21  information.

22  The penalty phase began on June 2, 1986. In that portion of the trial, the prosecutor

23  introduced evidence of petitioner's prior felony convictions for second-degree burglary and assault

24  with intent to commit rape. The latter offense occurred earlier on the same date as the homicide

25  of Marcella Davis. Petitioner was tried and convicted on that charge while his capital case was

26  awaiting trial. Over objection, the court permitted the prosecution both to call the victim in that

27  incident as a witness and to introduce a certified copy of the judgment of conviction on that

28  charge.

1    Petitioner presented testimony from his parents, paternal and maternal grandmothers,

2    teachers, probation officers, one neighbor, a deputy sheriff, a neuropsychologist and a

3    psychiatrist.

4    On the morning of June 10, 1986, before the start of proceedings, a juror telephoned the

5    clerk of the court and asked to be excused. The court excused the juror and told the attorneys of

6    its action when they appeared for that day's proceedings. The court overruled defense counsel's

7    objection to the excusal and chose an alternate to replace the juror who had been excused.

8    Jury deliberations began on June 12, 1986, and ended the following day with the jury

9    returning a death verdict.

10    The court denied petitioner's motion to modify the jury's death verdict and imposed a

11    judgment of death on July 25, 1986, after hearing statements from Marcella Davis's mother and

12    from petitioner. Petitioner's appeal to the California Supreme Court was automatic.

13    **B.    FACTS OF OFFENSE**

14    In May 1984, petitioner traveled from Pomona to Sacramento to see his mother for

15    Mother's Day. He did not provide advance notice to his family of his plans. His mother was

16    away when he arrived. Despite the fact that both of petitioner's grandmothers were alive and

17    living in Sacramento, petitioner had no place to stay. From May 15 to May 19, he stayed in Santa

18    Anita Park. He worked in the yard at his paternal grandmother's house, but did not go over to

19    her house on the day of the crime because she told him to not to. Instead, on the morning of May

20    19, after waking up in the park, petitioner decided to look for a job and to try to remain in

21    Sacramento. He smoked some strong marijuana during the day.

22    In the afternoon, Marcella Davis, her brother Arby Davis, and his friend P.J. Guerra were

23    in Howe Park. Marcella Davis rode to the park on her bicycle. Guerra's father drove P.J. and

24    Arby to the park, where they fished at the pond. The boys saw Marcella between the pond and

25    playground at Howe Park and told her they would be fishing. Petitioner gave the boys some

26    advice about fishing and stayed by the pond for a while.

27    Many adults, including two people who knew petitioner, and two teenagers who had seen

28    petitioner the previous night at a party, saw petitioner in Howe Park or Santa Anita Park, which

was adjacent to Howe, during the late afternoon and early evening. Several witnesses saw petitioner walking with Marcella Davis toward or in Santa Anita Park. They provided a variety of recollections of his demeanor. Steve Rohner, Gerald Bridges, and Matthew Murphy recalled their interactions or observations of petitioner as negative, inappropriate or odd. Dianne Shaw, whose friend shared an apartment with petitioner in the early 1980s, and Richard Bent, who saw petitioner in the park, perceived petitioner's demeanor to be unnatural: Dianne Shaw described him as "oblivious" and looking "very puzzled and lost," while Bent said he had a "weird" or "spaced out" look. Bent described petitioner's appearance as one that was not dependant upon being under the influence of drugs. Jim Clarke, who knew petitioner when Clarke was a counselor in a job training program and petitioner was a trainee, described petitioner as unfocused and preoccupied, but cordial.

A number of people, such as Kathyrin Butrin, Kimberly Conner, and Gordon Stevens, saw petitioner walking with Marcella Davis through the park and took note of them because of the disparity between their demeanors and incongruity of seeing Marcella with petitioner. All of the people who saw petitioner in the park agreed that he either called attention to himself by talking to them or playing with other children in the park, and made no effort to hide his identity or that of Marcella Davis.

In his testimony, petitioner acknowledged talking to Marcella Davis while he was near the pond in Howe Park. He had seen a nest of duck eggs, which he believed were about to hatch, near a place called the "pit" in Santa Anita Park, where he had been sleeping while in Sacramento. He offered to give one of the newborn baby ducks to Marcella Davis. After talking to her brother Arby, Marcella Davis and petitioner walked toward Santa Anita Park, stopping to talk to Jim Clarke. When they arrived at Santa Anita, petitioner saw two teenagers, Max Bauman and Shane Miller, who had been at the same party petitioner attended the previous night. He talked to them for a while before arriving at the pit where he had been staying and storing his belongings. He was surprised and upset that the eggs had not hatched.

Petitioner and Marcella Davis talked at the pit and then she said she had to leave. Petitioner grabbed Marcella Davis and sat her back down. After she complied with his request

to take her clothes off, he began to fondle her. Although she started to resist after a couple of minutes, petitioner did not stop. Petitioner had sexual intercourse with Marcella Davis, but did not recall acts of oral copulation or sodomy. He heard an "echo of a cry for help" in the back of his head and thought he heard someone ask if anyone hollered for help. Marcella Davis may have cried out for help. In an effort to keep her quiet, petitioner put a hand over her mouth and reached for plastic wrapping, which he stuffed in her mouth. Before he left, petitioner covered Marcella Davis with a piece of carpet. Petitioner testified that he believed that he saw her chest moving as he was leaving.

Petitioner went to his maternal grandmother's house, washed, ate and sat with his grandmother for awhile. He left her house to buy cigarettes at a 7-11 convenience store. A deputy sheriff stopped, detained, and then arrested petitioner at about 11:20 or 11:30 p.m. as petitioner was on his way to the store. Deputy sheriffs took petitioner to the sheriff's department where he was interrogated and booked for murder.

## C.     FACTS IN AGGRAVATION AND MITIGATION

The evidence in aggravation at the penalty trial consisted of the facts of the crime, as well as the following incident: Lisa Cronin, a student at Sacramento State College, left a fraternity party she had been attending sometime after midnight on May 19, 1984. She went home, but when she could not get into the apartment, she went to a convenience store and bought cookies. As she headed back to her apartment she was grabbed from behind and pushed into the bushes. Her assailant grabbed her breasts and was undoing his belt and pants buttons when two men, who had seen Cronin go into the convenience store, came to her rescue. She reported the incident the next day. After she saw petitioner on television following his arrest on capital charges, Ms. Cronin identified petitioner as her assailant.

The thrust of the evidence presented in mitigation at trial was as follows: Petitioner suffered physical abuse and neglect from his earliest years at the hands of his father and mother. His parents' marriage was troubled, unhappy, and ended in divorce when petitioner was a teenager. Petitioner was an emotionally and behaviorally disturbed child, youth, and adult. He was hurtful to animals and peers, experimented with drugs and was friendless, angry, and

1  refractory.  He may have had organic brain impairment.  He may have been under the influence

2  of some mental or emotional disturbance at the time of the crimes.  The prior burglary conviction

3  was the product of petty, nonviolent criminal conduct.  Petitioner also presented evidence that he

4  had been a good prisoner while in jail awaiting trial.

### IV.

### CLAIMS FOR RELIEF

7  Because a reasonable opportunity for full factual development through discovery, adequate

8  funding, access to this Court's subpoena power, and an evidentiary hearing has not been provided

9  to petitioner, the full evidence in support of the claims that follow is not presently obtainable.

10  Nonetheless, the evidence that is obtainable and set out below adequately supports each claim and

11  justifies issuance of the order to show cause and relief.

**A.    CLAIM 1:  PETITIONER'S FELONY CONVICTION FOR ASSAULT WITH INTENT TO COMMIT RAPE WAS UNCONSTITUTIONALLY OBTAINED.**

13  Petitioner's death sentence and confinement are illegal and were obtained in violation of

14  his Sixth, Eighth, and Fourteenth Amendment rights to the effective assistance of counsel and

15  representation by conflict free counsel, to a fair and impartial jury as guaranteed by mandatory

16  state law and the federal constitution, and to a penalty determination based on accurate, reliable

17  and lawfully obtained information by a sentencer who had not been provided with misinformation

18  because the jury at petitioner's capital sentencing trial was permitted to use, as a factor in

19  aggravation, an unconstitutionally obtained prior conviction which  was void because petitioner

20  was incompetent to stand trial at the time of the prior trial and which was obtained in further

21  violation of his federal constitutional rights to conviction upon proof beyond a reasonable doubt,

22  a fair and impartial jury, the effective assistance of counsel, a fair trial, and an impartial tribunal.

23  The facts, among others to be presented after adequate funding, full investigation,

24  discovery, access to this court's subpoena power, and an evidentiary hearing which support this

25  claim are:

26  1.    Petitioner was charged by information with capital murder on August 17, 1984, in

27  Sacramento County Superior Court Number 69579.  On January 31, 1985, petitioner was charged

by separate information, in a separate proceeding, Sacramento County Superior Court Case No. 70984, with one count of assault with intent to commit rape, a violation of California Penal Code section 220.

        a.      After several continuances, jury selection began on July 2, 1985 and concluded the following day.  The evidentiary portion of the case lasted from July 3 through July 11, 1985.

        b.      During the people's case-in-chief, in the early morning hours of July 9, petitioner, who was confined in the Sacramento County Jail, tried to commit suicide.

        c.      The properly admitted evidence against petitioner came from Lisa Cronin, who was the victim of an assault in the early morning hours of May 19 in Sacramento. She reported the assault about twelve to fourteen hours after it occurred.  Four days later, on May 23, 1985, she saw petitioner on television following his first court appearance in the capital case and identified him from that viewing.  No further identifications took place until September 24, 1984, at which time she viewed a photospread, which was tainted by the television viewing and by events described later in this claim.  Less than six weeks later she attended a live line-up and again identified petitioner.  The prosecutor's investigator impermissibly bolstered her testimony with inadmissible testimony about the lighting conditions, his opinion on them, and his opinion on the credibility of her identification.  An expert on the factors which adversely affected the accuracy of Ms. Cronin's identification testified on petitioner's behalf.  Mr. Davis, father of homicide victim Marcella Davis, was present throughout petitioner's trial.

        d.      The jury began deliberations on July 12, returning guilty verdicts later that same day after asking to rehear a portion of the victim's direct testimony concerning her assailant's clothing, the testimony of Officer Johnson-Stapp, who arrested petitioner on the capital crime, and a portion of the testimony of Christine North.

2.      Petitioner was mentally incompetent to stand trial during all relevant pre-trial, trial and sentencing proceedings in his prosecution for a violation of California Penal Code section 220.

a.      The environment created and maintained in the jail by state officials violated the proscription against cruel and unusual punishment and/or created a climate of terror for petitioner, thereby precluding him from rationally assisting counsel during pre-trial and trial proceedings.

(1)      In October 1984, petitioner was severely beaten by a fellow jail inmate under circumstances indicating that the jail guards and/or jail administration were responsible for the beating and acted with knowledge of the danger to petitioner or in reckless disregard for petitioner's safety.   This incident left petitioner with a cracked bone below his left eye, a 1/2" cut over the left eye, and a 3/8" cut under his left eye.  Jail personnel transferred the assailant to petitioner's floor after learning from the assailant in August, 1984, that he was a cousin of the victim in petitioner's case and would attempt to kill petitioner should he be placed near him.

(2)      Guards, as well as inmates, targeted petitioner for harassment because of the charged crime.  Guards called him the "baby raper Ashmus," "baby killer Ashmus," or "child molester" whenever petitioner came out of his cell or whenever they interacted with him on the jail tier.  They publicized his crime, by prominently and gratuitously annotating the posted list of inmates housed on petitioner's tier with the words "Baby Raper" next to petitioner's name.

(3)      Jail staff repeatedly fostered physical violence against petitioner, as well as verbal and emotional harassment of and threats to petitioner by other inmates, including threats of rape.  In late February 1985, petitioner received threats of such a serious nature that documentation was required.

(4)      Jail staff threatened especially disfavored inmates with a particularly terrifying and terrorizing form of punishment known as "the old elevator ride," during which guards trapped an inmate in the elevator, put a helmet on the inmate and then punched, kicked, beat, and battered the inmate.  Not surprisingly, when several guards attempted to take petitioner, cuffed, into the elevator on one

occasion, he dropped to his knees and began banging his head against the wall near the elevator.

b.      Petitioner unsuccessfully tried to kill himself during the early morning hours of July 9, 1985.

(1)      A fellow inmate-trustee in the Sacramento County Jail heard noise coming from petitioner's cell and alerted a deputy sheriff to the possibility that petitioner might be having a seizure because he heard a choking sound coming from petitioner's cell.

(2)      As the inmate reached petitioner's cell he saw petitioner kneeling on the floor with a piece of rope around his neck.  Petitioner was leaning forward to put pressure on his neck.

(3)      The trustee yelled to the deputy sheriff again and tried to untie petitioner, breaking the rope in the process.

(4)      Upon arrival at petitioner's cell, the deputy sheriff could not feel a pulse, but observed that petitioner was breathing.

(5)      As petitioner was removed from the tier, he twitched and twisted his neck and body and had to be restrained by deputies after he started biting his arms. He tried to remove head restraints, which had been placed on him by medical staff attempting to keep his head and neck immobilized.  He grabbed at his cell bars as he was removed from the tier.

c.      Petitioner's pre-existing mental illness symptoms, mental vulnerabilities and deficits, combined with the jail conditions rendered him unable to assist and to consult with counsel rationally or have a rational understanding of the import of the proceedings.

(1)      Those facts set forth in IV.E. and IV.F are hereby incorporated by this reference as if fully set forth herein.

(2)      These mental vulnerabilities, symptoms and behaviors, alone or in combination with the conditions in the jail rendered him incompetent in fact at the time of the Penal Code section 220 trial.

3.    The trial court violated petitioner's constitutional rights enumerated at the outset of this claim in failing to sua sponte declare a doubt about petitioner's competence to stand trial.

a.    The facts set forth above in subsection IV.A.2 with respect to petitioner's attempted suicide are incorporated into this subsection by this reference.

b.    Upon learning of petitioner's attempted suicide, the court determined it appropriate to cancel the jury proceedings set for July 9. On the record, the court announced that it had dismissed the jury "because of the circumstances that occurred last night at the jail to your client, Mr. Arkelian."

c.    Petitioner's counsel responded that he wished proceedings to adjourn so that he could further investigate the matter of petitioner's attempted suicide because his investigation may have a definite effect on the trial proceedings and may make any work performed on the case unnecessary. In other words, counsel wanted to investigate petitioner's then-present competence to proceed and wished to place certain matters on the record in camera. The court rejected petitioner's counsel's request. The court's response to a renewed motion to "deal with the medical situation in camera" was to ask "What medical situation?"

d.    Instead of instituting California Penal Code section 1368 proceedings or allowing petitioner's trial counsel to provide information concerning his client's mental health and conditions in the county jail which counsel believed rendered him incompetent to assist counsel rationally, the court labeled petitioner's attempted suicide as "just another facet of his obstreperousness that has been displayed throughout the proceedings since I first laid eyes on him."

e.    An attempted suicide is an extremely serious action. It raises substantial questions about competence when it occurs at a critical juncture, such as during a criminal trial.

f.    Instead of attempting to elicit information from petitioner or defense counsel and instead of granting counsel's request for an adjournment so that counsel could adequately inform himself and then the court about petitioner's mental state, the court

attributed the suicide attempt to petitioner's purported obstreperousness, a characterization of petitioner's behavior which is nowhere supported by the record and speaks more to the trial court's bias against petitioner than petitioner's demeanor. A serious suicide attempt, which surely would have been successful but for unforeseeable intervention of an alert jail trustee, is not indicative of a displeasing personality.

g.    Given the attempted suicide, the trial court wrongfully relied upon its view of petitioner's past demeanor. The event and its timing provided the trial court with sufficient knowledge and a basis on which to require the declaration of a doubt. The trial court's failure to declare a doubt and hold a hearing rendered petitioner's conviction void and obtained in violation of due process of law.

h.    Had the court not cut off trial counsel and had the court conducted even a preliminary inquiry, it would have learned of petitioner's lengthy suicidal and self-destructive history and emotional lability, as well as the conditions to which he had been subjected in the jail.

i.    Had the court properly declared a doubt, the jury would not have seen petitioner in court with unusual clothes designed to hide the suicide attempt and would not have been provided with the opinion of court personnel that petitioner attempted suicide. because he felt badly for what he had done, i.e., was guilty. Petitioner would not have been convicted.

4.    Petitioner's counsel negligently, unreasonably and prejudicially violated petitioner's constitutional rights as enumerated at the outset of this claim by failing to seek a determination of petitioner's competence to stand trial by formally invoking a formal competence inquiry pursuant to California Penal Code section 1368 et seq. and the federal constitution.

a.    Petitioner hereby incorporates those facts set forth in IV.E. and IV.F. and subsections IV.A.2. and IV.A.3. of this claim.

b.    Trial counsel negligently, prejudicially, and unreasonably failed to make a complete record of his concerns, and failed to investigate petitioner's mental state fully and adequately in light of his knowledge of petitioner's emotional and psychological

1    history and conditions in the county jail.

2          c.    Had he done so, the trial court would have declared a doubt, appointed

3    appropriate experts who would have presented the facts set forth in IV.E and IV.F. and

4    in earlier subsections of this claim and would have concluded that petitioner was not

5    competent to continue with the trial. The ensuing jury verdict was rendered unreliable not

6    only because petitioner was unable to assist counsel, but also because the jury knew

7    petitioner had attempted suicide, which was explained as indicative of a consciousness of

8    guilt. Petitioner would not have been convicted.

9          5.    Petitioner's constitutional rights enumerated at the outset of this claim were violated

10   in that he was not able to get a fair trial in Sacramento County, and trial counsel's representation

11   fell below a level of performance to be expected of reasonably competent counsel performing as

12   a diligent advocate by his failure to press for a ruling or to present evidence in support of a motion

13   to change the venue of trial.

14         a.    Trial counsel was aware of the massive, inflammatory and negative

15   publicity which attended petitioner and his capital crime. Accordingly, he moved for a

16   change of venue, hired a number of experts to provide factual support for his motion, and

17   set the matter for hearing.

18         b.    Because of the unavailability of experts, counsel successfully moved to

19   continue an evidentiary hearing on his change of venue motion until after petitioner's

20   California PenalCode section 220 trial, which was consequently held in Sacramento

21   County Superior Court.

22         c.    At the time of petitioner's trial on the California PenalCode section 220

23   charge, trial counsel knew that a public opinion survey of 457 randomly-selected jury-

24   eligible Sacramento County adults, conducted between March 2 and April 5, 1985 (ten

25   months after the crime and three months before the California PenalCode section 220

26   prosecution), showed 81 percent of those polled recognized petitioner's name and the facts

27   of the capital crime and approximately 60 percent of those who recognized the case had

28   prejudged petitioner's guilt, believing he was either definitely or probably guilty.

Nineteen percent of the jury-eligible individuals surveyed either did not know about or did not remember the crime and case or simply refused to answer the questions posed to them.

d.     The Sacramento Union designated the homicide of Marcella Davis as the number three story in its list of top local stories of 1984. Pretrial RT 537. This article had a photograph of Marcella Davis and reported that the "molestation and murder of 7 year old Marcella Davis," which was accomplished by a stranger, became "the shocking catalyst for a wave of concern about child safety. Parents, schools, and the news media opened discussion on a variety of problems facing children in a society of adults: questions of safety, child abuse, molestation, kidnap and punishment for adults who commit crimes against children."

e.     In the four days following the crime, stories about the crime, the investigation, and petitioner appeared in forty-four separate television news broadcasts. As of mid-June 1984, well over fifty stories relating to petitioner's case appeared as part of television news broadcasts. During the hearing on petitioner's motion for a change of venue, news clips from seventy-seven television broadcasts were presented. Pretrial RT 258-59.

f.     On the anniversary of the crime, i.e., on May 19, 1985 (after the completion of the public opinion poll described above and less than six weeks before the California PenalCode section 220 trial), Channel 10 aired a news broadcast about petitioner's case on several occasions during the day. The broadcast featured an interview with Marcella Davis's father in which he provided information known only to the prosecutor (that petitioner offered to plead guilty to capital murder in exchange for a life term). That story was an extensive retrospective and also provided details of the Davis family's tribulations, which included separation, loss of employment, and grief. Pretrial RT 337. The judge who granted the venue change motion described the anniversary broadcast as "a walking time bomb" which would be difficult, if not impossible, to erase from the mind of any potential juror who viewed it. Pretrial RT 859.

g.     The disclosure by Mr. Davis of the guilty plea offer was particularly

devastating because it was extra-record information which would be inadmissible in court and because it represented a tacit confession. Pretrial RT 261, 576-77. It was the fact which ultimately tipped the scales for the judge in favor of granting the venue change motion.

h.    Nearly every resident polled in Sacramento at the time read exclusively local newspapers, watched exclusively local television, and listened exclusively to local radio programs, making the county isolated and saturated from a media perspective. Experts estimated the media saturation to be 90 percent. Pretrial RT 472-78; 554-56.

i.    There were many case-specific aspects to the publicity which provided a dramatic likelihood that a subliminal message of petitioner's guilt was communicated to and unconsciously internalized by the citizens of Sacramento. Prosecution witnesses were filmed in the courtroom during the preliminary hearing and interviewed outside of court, the media repeatedly portrayed petitioner as an itinerant former carnival worker who was to be feared and distrusted; repeated pictures and photographs of petitioner appeared along with articles recounting the nature of the crimes (murder, rape, sodomy) and summarizing the information from law enforcement about them; and stories about petitioner were often linked to or appeared before and after other stories about sexual assaults.

j.    The strong media identification of the case with a duck provided a method of ready identification of petitioner and the crime for the public. It was a "device through which many people have fixed it [the crime] in their minds," and prejudicially so, because it was portrayed as a cynical device to lure an innocent child to her death. Pretrial RT 281.

k.    Law enforcement, through the visual, audio, and printed media, repeatedly assured the community that petitioner committed the crime; petitioner was guilty; and they had arrested the right person. Pretrial RT 261-62, 275, 276, 282, 313-15, 526-57, 535. The media played an activist role in presenting the public with witness accounts, other evidence, and law enforcement beliefs of petitioner's guilt. Pretrial RT 565.

l.    The victim's parents achieved local recognition and developed a relationship

with the media. Pretrial RT 861. They met with members of the governor's staff and Paul Gann, who were then spear-heading a strong attack on the courts and criminal justice system. The Davises publicly extended their gratitude to the community and law enforcement for their efforts on the case, provided interviews to the visual and written media to publicize the need to protect children, and affirmed by their words and actions (presence in court) that they were representing "their little girl" in court. Pretrial RT 262, 304, 318, 325, 332, 337-38, 525-27, 533-34.

    m.    Mr. Davis had a difficult time controlling himself emotionally in court. Pretrial RT 141-46, 526-27, 865-66. Both petitioner's expert and the court, in ruling on the motion for change of venue, recognized that Mr. Davis's presence at a trial, whether or not he displayed appropriate decorum "presents a problem for a fair trial," *id*. at 865-66, and tends to have "an untoward effect on the administration of justice," *id*. at 526-27, with respect to both witnesses and jurors because of his image in the media.

    n.    Trial counsel recognized that the California Penal Code section 220 trial and its outcome were important because an adverse result provided the state with a penalty phase aggravating circumstance in petitioner's pending capital trial.

    o.    In light of the foregoing, reasonably competent counsel, acting as a diligent and zealous advocate, would have moved for a change of venue for petitioner's California Penal Code section 220 trial. Counsel's failure to do so fell below an objective standard of reasonableness under prevailing professional norms when viewed in light of the relevant circumstances.

    p.    Counsel's omission prejudiced petitioner. The motion for a change of venue, as evidenced by the facts set forth above and by the favorable ruling on the change of venue motion obtained two months after petitioner's California Penal Code section 220 trial, was meritorious and would have been granted. Petitioner's jury, as evidenced by the facts set forth in subsection 6, of this claim, was biased and partial. Although the question of petitioner's guilt was a close one, the jury convicted petitioner based on extra-record information about his notoriety. Because of the pre-trial publicity they were aware of the

1    existence and details of the capital trial.  Had petitioner's change of venue motion been

2    made and granted this would not have occurred and petitioner would have been acquitted,

3    thereby eliminating a penalty phase aggravating factor, and producing a reliable and fair

4    verdict of life without possibility of parole.

5          6.     Petitioner did not receive a fair trial because of repeated multiple instances of juror

6    taint and improper receipt of inflammatory, prejudicial non-record information.

7          a.     Dr. Martin Blinder testified as a defense expert about the facts affecting the

8    reliability of an eyewitness identification and the problematic nature of such identifications

9    involving strangers.  A deputy sheriff told the jurors prior to their deliberations that the

10   defense witness was a "high priced" expert who testified as a defense expert for Dan

11   White.  The deputy called the expert the "Twinkie Man."  Thereafter, the jurors used the

12   same belittling pejorative in discussing Dr. Blinder.

13         b.     One of the sheriff's deputies told the jurors about petitioner's suicide

14   attempt, informing them that petitioner tried to hang himself because he felt very guilty

15   and did not want to live through a trial with his guilt.  Petitioner appeared in court on July

16   10, 1985, i.e., the day after his attempt wearing a turtleneck shirt.

17         c.     The jurors knew that petitioner was facing capital charges for killing a

18   young girl in Santa Anita park.  They frequently referred to him as the "baby killer."

19   They joked about eating duck for lunch, a clear reference to that aspect of the capital crime

20   which was adopted and publicized by the media as a signature-like or defining feature.

21         d.     The jurors knew the capital homicide case involved the rape of a young girl,

22   thereby permitting them to fill in evidentiary gaps in the California Penal Code section 220

23   case with forbidden propensity evidence.  They were aware petitioner was awaiting trial

24   for that crime and heard he was guilty.

25         e.     None of this information was a matter of record or even admissible at trial.

26   Petitioner's counsel strove to prevent the jury from learning about the pending capital

27   charges.  All of the information was the type of inflammatory, irrelevant information

28   which would and did cause the jury to convict petitioner, despite the weakness of the

1    prosecutor's case against petitioner.  It produced an unreliable jury verdict.

2        f.      Trial counsel was on notice of the high likelihood of juror misconduct, not

3    only because of the rampant publicity about his client and the capital case, but because he

4    was conscious of spectator misconduct (and the attendant potential for jury taint).  He also

5    knew that the jury expressed displeasure with the pace of the trial and that at least on one

6    occasion on the record, the court had to inquire of and admonish a juror and bailiff about

7    improper communications.  Pretrial RT 141-46.

8        g.      The specific instances of juror misconduct and taint set forth above, the

9    massive pretrial publicity described earlier in this subsection and the spectator misconduct

10   by Mr. Davis, described later in this subsection all, singly or together deprived petitioner

11   of his right to a fair and impartial jury, the effective assistance of counsel, confrontation

12   and cross-examination, and compulsory process.

13       h.      Had petitioner's trial counsel or counsel on appeal from the California Penal

14   Code  section 220 conviction interviewed the jurors, they would have discovered

15   meritorious grounds for a new trial motion or for a meritorious writ petition, either of

16   which would have succeeded.

17   7.      Judicially acknowledged legal errors made during petitioner's California Penal

18   Code section 220 trial rendered the conviction too unreliable to be used as an aggravating factor,

19   even though they were not deemed sufficiently prejudicial on appeal from the non-capital

20   conviction.  As a result, heightened standards of reliability in the factors relied upon by the jury

21   in a capital case in selecting the appropriate sentence mandated exclusion of the conviction.

22       a.      At the outset of the trial, petitioner's counsel sought unsuccessfully to have

23   petitioner's California Penal Code section 220 conviction set aside because the conviction

24   was non-final, not a prior conviction, and likely to be set aside due to errors at trial.  RT

25   6202-23, 6412-12.

26       b.      The prosecutor's case against petitioner consisted primarily of the testimony

27   of Lisa Cronin, the woman who was assaulted on May 19, 1984.  To bolster her

28   identification, the prosecutor, over objection, presented an investigator's opinion about the

lighting conditions in the vicinity where Lisa Cronin was assaulted.  On appeal, the Court of Appeal held the trial court should not have admitted this evidence.

        c.      The Court of Appeal also found error in the trial court's failure to admonish the jury, pursuant to CALJIC No. 2.71.7, that evidence of oral pre-offense statements by a defendant should be viewed with caution.

        d.      These errors, though not causing a reversal on appeal of the non-capital conviction, were sufficient to render the conviction too unreliable to separately and additionally serve as an aggravating factor during the capital penalty phase.

    8.      The identification testimony of Lisa Cronin was irremediably tainted, and should have been excluded from both the California Penal Code section 220 and capital trials because it was unreliable and obtained in violation of petitioner's constitutional rights to a fair, reliable and accurate verdict.

        a.      On May 19, 1984, at about 2 a.m., Lisa Cronin was assaulted as she was returning to her apartment from a 7-11 convenience.  She reported the crime the following afternoon, at which time a member of the sheriff's department interviewed her.

        b.      Four days later, on May 23, 1984, Cronin's roommate had her watch a newscast which featured petitioner being led, handcuffed and surrounded by law enforcement deputies, down a corridor.

        c.      Petitioner's preliminary hearing, which was open to the public and press, but from which the court excluded cameras, occurred in early August.  The preliminary hearing generated publicity and interviews with testifying witnesses and Marcella Davis' parents.

        d.      On August 20, 1984, petitioner was arraigned in Sacramento Superior Court on capital murder charges.  This event was again accompanied by significant media attention.

        e.      Approximately one month later, on September 24, 1984, Lisa Cronin viewed a photospread for the first time and selected petitioner's photograph. Approximately six weeks after that Cronin attended a live lineup and again selected

petitioner's photograph.

f.    Prior to these identifications, the investigating officer determined that Cronin's identification of petitioner from the May 23, 1984 television viewing was so inherently prejudicial that any subsequent identification would be tainted.

g.    Cronin was aware of petitioner's status as a suspect in the Davis case every time she identified petitioner as her assailant.

h.    Under these circumstances, Cronin's identifications after May 23, 1984 were unconstitutionally tainted and should have been excluded as the product of unduly suggestive procedures. In addition, her testimony and identification of petitioner were rendered additionally unreliable because Mr. Davis's presence in court corrupted the factfinding process adversely to petitioner.

i.    To the extent that these matters should have been raised by trial counsel prior to petitioner's California Penal Code section 220 trial or prior to the penalty phase of the capital case, trial counsel's representation fell below a level of performance to be expected of reasonably competent counsel performing as a diligent advocate and these failings prejudiced petitioner.

9.    Petitioner was deprived of his constitutional rights, as enumerated at the outset of this claim because he was denied a fair trial in a fair tribunal before a judge with no actual bias against him.

a.    On numerous occasions, the trial court displayed its bias against petitioner by unusually intemperate remarks about petitioner and toward counsel.

b.    The court berated counsel for worrying too much that the jury would learn of petitioner's pending murder trial, berated counsel during the hearing on petitioner's attempted suicide, characterized petitioner's suicide attempt as "obstreperousness," refused to admonish one or more spectators who were laughing during Dr. Blinder's testimony, and made no reasonable or serious attempt to investigate an instance of juror misconduct called to his attention.

c.    The court's conduct was influenced by the nature of petitioner's pending

capital case and the presence in court of the homicide victim's family.

      d.    In addition, at the time of petitioner's California Penal Code section 220 trial, the judge was on criminal probation, having been sentenced to three years probation following a "no contest" plea to a misdemeanor charge of soliciting a prostitute, which grew out of his activities with a local prostitute in an alley near the courthouse after work hours. Following this incident, the embattled judge vowed not to resign and to fight to keep his seat on the bench. The matter was handled by the Sacramento County District Attorney's Office, the same office prosecuting petitioner. It was also referred to the Commission on Judicial Performance for evaluation of appropriate disciplinary actions. The judge's misdemeanant probationary status (as well as his status with the Commission on Judicial Performance), like a witness's probationary status, provided him with a strong motive to curry favor with the prosecutor's office and to be influenced and biased against petitioner.

      e.    The court's bias adversely affected the manner in which it presided over petitioner's trial to petitioner's prejudice. Had the court acted as an impartial tribunal, it would have conducted a reasonable inquiry into petitioner's competence, would have allowed counsel a brief continuance to obtain equipment for taping Lisa Cronin's testimony, would have insured the jury did not speculate about petitioner's pending case, and would have ferreted out the bailiff, juror, and spectator misconduct which tainted the jury's impartiality. Petitioner would not have been convicted and the conviction would not have been prejudicially used against him in his capital case.

    10.    Spectator misconduct prejudicially deprived petitioner of his constitutional rights as enumerated at the outset of this claim as well as his rights to a trial by an impartial jury and a fair tribunal with no bias against him.

      a.    During petitioner's trial on the California Penal Code section 220 charges, people in the audience laughed during the testimony of defense expert Dr. Martin Blinder.

      b.    Petitioner's trial counsel was aware that one of the spectators was Mr. Davis, the father of Marcella Davis and that he was "somewhat disruptive of the court

proceedings, at one point audibly laughing at a witness, at one point making audible sound when a verdict was returned." Pretrial RT 141.

c.    The court, however, refused to admonish the audience and trial counsel requested no specific admonishment or warning to Mr. Davis.

d.    The spectator misconduct was prejudicial. As pointed out subsequently by one of defense counsel's experts, demonstrations of emotion and other comments by Mr. Davis, who was well-identified and sympathetically portrayed by the media, "do[] tend to have an untoward effect on the administration of justice. It certainly, on jurors, if they were to see that, I think couldn't help but be affected by that sort of behavior." Petitioner's expert further testified that "even to someone who is a witness, it is at the very least disconcerting and I think does put some pressure on the neutral administration of justice." Pretrial RT 550-53. These observations were echoed by the judge assigned to adjudicate the change of venue motion. He noted the occurrence of demonstrations by Mr. Davis, despite the fact that the judge admonished him at the outset of the hearing. The judge found Davis' difficulty controlling himself to be wholly understandable but one which nevertheless presented "a problem for a fair trial." Pretrial RT 865-66. The reliability of both the juror's verdicts and the testimony of the prosecution witnesses, particularly that of Lisa Cronin, was prejudicially undercut by the spectator misconduct.

11.    Trial counsel's roles as petitioner's lawyer in the earlier California Penal Code section 220 prosecution and as counsel in the capital case created a legal conflict which had an adverse impact on representation of petitioner in the capital prosecution during the penalty phase.

a.    Trial counsel's dual representation prevented him from effectively moving to strike the California Penal Code section 220 conviction and from effectively challenging the admission of testimony about the underlying circumstances based on his own constitutionally inadequate representation. It created an actual irreconcilable conflict which worked to petitioner's detriment.

b.    Counsel could not adequately or properly attack the admission of the California Penal Code section 220 conviction and the testimony of Lisa Cronin on grounds

that he failed to take reasonable steps during that trial to protect petitioner's constitutional rights to a fair trial and reliable jury determination.

c.    Such grounds for attack existed, including counsel's failure to move for an inquiry into petitioner's competence to stand trial; failure to seek a change of venue out of Sacramento; failure to make timely arrangements for Dr. Blinder to be able to view Lisa Cronin's testimony; failure to safeguard petitioner's right to an impartial jury and impartial tribunal; and failure to vigorously litigate the admissibility and reliability of Lisa Cronin's testimony and identification.

d.    Counsel sought exclusion of the prior conviction on the ground that it was not a prior conviction within the meaning of the statute and was not final.  He sought exclusion of Lisa Cronin's testimony on the ground that testimony about the underlying circumstances were inadmissible as a matter of statutory construction if the conviction itself was to be admitted.

e.    The exceedingly narrow scope of these challenges and their substantially weaker nature, when contrasted with the facts and challenges set forth in IV.A.2 through IV.A.10., demonstrate that the conflict had some effect on a crucial aspect of counsel's handling of petitioner's capital trial.  Moreover, even had counsel moved to strike the conviction based on his own ineffectiveness, his credibility in so moving would have been so suspect that the trial court would have discounted the bona fides of counsel's arguments, believing that counsel raised the matter and was willing "to fall on his sword" simply because he did not want his client to die, and not because the matters were meritorious.

12.    Petitioner was prejudicially deprived of his constitutional right to the effective assistance of counsel at trial and on appeal from the California Penal Code section 220 conviction.

a.    To the extent that any of the foregoing attacks on the constitutionality of the California Penal Code section 220 conviction or on the reliability of the identification of petitioner as Lisa Cronin's assailant comes too late, in that they should have been raised at trial (including in any motion for a new trial), petitioner has been deprived prejudicially

1  of his right to the effective assistance of counsel at those critical stages of the California

2  Penal Code section 220 litigation.

3         b.    Had trial counsel litigated these issues as expected of reasonably competent

4  counsel in the context of the California Penal Code section 220 trial, neither the conviction

5  nor Lisa Cronin's testimony would have been admitted in the capital case and the jury

6  would have returned a verdict of life in prison without the possibility of parole because the

7  issues would have been resolved favorably to petitioner during the section 220 trial or on

8  appeal therefrom.

9         c.    To the extent that any of the foregoing attacks on the constitutionality of the

10  California Penal Code section 220 conviction, the reliability of the identification of

11  petitioner as Lisa Cronin's assailant or the quality of trial counsel's representation comes

12  too late, in that they should have been raised  on appeal from that conviction, petitioner

13  has been deprived of his right to the effective assistance of counsel at those critical stages

14  of the litigation.  Trial counsel solicited appellate counsel to represent petitioner on appeal.

15  The scope of the appeal was unduly, unconstitutionally and prejudicially narrow.

16  Appellate counsel raised three issues and ignored those issues which are set forth above.

17  Had appellate counsel been functioning as a reasonably competent appellate lawyer he

18  would have raised those issues set forth in IV.A.2 through IV.A.10.  Had he done so,

19  petitioner's conviction would have been reversed and the underlying testimony found

20  unreliable.

21  **B.**    **CLAIM 2:  PETITIONER'S CONVICTION AND DEATH SENTENCE MUST BE SET ASIDE BECAUSE OF THE FAILURE TO RECUSE THE PROSECUTOR'S**

22      **OFFICE FROM PETITIONER'S CASE.**

23      Petitioner's death sentence and confinement are illegal and were obtained in violation of

24  his Sixth, Eighth and Fourteenth Amendment rights to a fair trial, due process, counsel and the

25  effective assistance thereof, the privilege against compelled self-incrimination, fair and reliable

26  adjudicatory procedures, and to be free of cruel and unusual punishment by the court's failure to

27  recuse the prosecutor's office sua sponte or by trial counsel's failure to press for recusal of the

28  Sacramento District Attorney from his case.

The facts, among others to be presented after adequate funding, investigation, discovery and an evidentiary hearing, which support this claim are:

1.     The prosecutor improperly sought and obtained confidential work product generated by defense counsel and their investigator.

a.     In May 1984, shortly after petitioner's arrest, the public defender undertook to represent petitioner.  Counsel and an investigator began their preliminary factual investigation shortly thereafter.

b.     On September 21, 1984, petitioner telephoned Ivan Geren, one of petitioner's former juvenile probation officers, seeking to locate his brother.  Pretrial RT 25.

c.     After this first telephone call, Geren telephoned the prosecutor responsible for petitioner's case, who advised Geren to refrain from interrogating petitioner, but to keep notes of his conversations with petitioner.  *Id.* at 28.

d.     Petitioner telephoned Geren on several additional occasions and wrote one letter to him.  Inmates may make only collect telephone calls.  On each occasion, Geren accepted petitioner's calls.  During these calls, petitioner said that he did not wish to talk over the telephone with Geren as he was certain the telephones were "bugged."  *Id.* at 25-40.

e.     On October 9, 1984, following a conversation with the prosecutor, Geren met with petitioner at the county jail.  The prosecutor told Geren that he did not have to admonish petitioner or provide him with *Miranda* warnings.

f.     During this visit, petitioner gave Geren a folder of reports generated by petitioner's investigator.  Geren recognized them as defense investigative reports.  Upon leaving the jail, he went directly to the prosecutor's office, reported the substance of his conversation with petitioner about the crime, and gave the prosecutor the investigation reports.  The prosecutor copied the reports, put the copies in a manila envelope and had them put in his office's evidence locker.  Pretrial RT 45-51.

g.     The prosecutor waited approximately two months after the first contact

between petitioner and Geren and over five weeks after receiving the documents before notifying petitioner's counsel about Geren's visits and the documents obtained by Geren. The prosecutor delayed notifying petitioner's counsel because he wanted to give Geren an opportunity to obtain further information from petitioner. Geren did not inform petitioner's counsel of the visits until petitioner's counsel contacted him after receiving the prosecutor's notice.

h. Petitioner's counsel immediately, by memorandum dated November 20, 1984, demanded return of the reports. The prosecutor responded that he believed he was entitled to have them and that he would not return them voluntarily.

i. By motion filed on November 28, 1984, petitioner's counsel asked the court to order the prosecutor to return the defense-generated reports. Following an evidentiary hearing, the court, on February 20, 1985, granted petitioner's motion. Petitioner's counsel labeled the state's subterfuge "unconscionable." Pretrial RT 78-79.

j. The court should have recused the prosecutor and his office from petitioner's case. After petitioner's telephone call, Geren nurtured his relationship with petitioner and played on his lack of understanding about Geren's position and role in the criminal justice system. Geren continued to see petitioner only to obtain information to forward to the prosecutor. Geren studiously avoided informing petitioner correctly about his role. The prosecutor told Geren not to Mirandize petitioner. The prosecutor (and Geren) knew the reports were defense counsel's work product but accepted them nonetheless. Because of this highly intrusive violation of petitioner's right to counsel and the inability to ascertain accurately what information the prosecutor gained therefrom, the trial court should have recused the prosecutor's office sua sponte. If there was no duty upon the trial court, as the ultimate arbiter of the fairness of the proceedings to order recusal, then trial counsel's failure to seek this remedy was an omission which is not expected of reasonably competent counsel.

2. A former assistant public defender, who participated in discussions about petitioner's case during the first nine months of the public defender's representation of petitioner,

became a deputy district attorney while petitioner's case was being prosecuted by that office.

a.    On May 23, 1984, shortly after petitioner's arrest, the municipal court appointed the Sacramento County Public Defender to represent petitioner.

b.    At the time of this appointment, Vincent Adeszko was an experienced assistant public defender in the office and a senior trial attorney. He was privy to many confidential discussions about petitioner's case with other assistant public defenders and within the special unit to which serious felony cases were assigned.

c.    Adeszko remained a colleague of petitioner's trial counsel until February 1985. In February 1985, Adeszko resigned from the Public Defender's Office to accept employment as a deputy district attorney in the office prosecuting petitioner.

d.    Mr. Adeszko was not screened from petitioner's case, as evidenced by his active participation (including the filing of a declaration) in drafting a Motion to Quash various subpoenas issued by petitioner's counsel. That motion was filed in December 1985.

e.    Counsel successfully moved to recuse Adeszko from participating in petitioner's case based on the foregoing facts. The court should have recused the entire Sacramento County District Attorney's Office sua sponte. The intrusion into the defense camp was significant. The Sacramento County Public Defender's Office employed less than two dozen assistant public defenders at the time petitioner was a client in the office. Only a small number of deputies were in the Major Crimes Section of the Public Defender's Office. Thus, even if the trial court had no sua sponte duty to preserve the fairness and appearance of fairness in the process, trial counsel's failure to seek recusal of the entire office was an omission which is not expected or reasonably competent counsel acting as a diligent advocate.

3.    Petitioner was prejudiced by these omissions and the multiple invasions of petitioner's right to communicate privately and confidentially with counsel. Had the Sacramento County District Attorney's Office been recused immediately, strategy decisions traceable to the invasions of the attorney-client privilege, including, *inter alia*, the selection of witnesses to be

1  interviewed, would not have been made.

2  **C.    CLAIM 3: PETITIONER IS ENTITLED TO RELIEF BECAUSE THE PROSECUTION FAILED TO DISCLOSE MATERIAL EVIDENCE IN MITIGATION.**

4  Petitioner's Fifth, Sixth, Eighth, and Fourteenth Amendment rights to due process, a fair

5  trial, the effective assistance of counsel, present a defense, confrontation, compulsory process,

6  a reliable and accurate guilt and penalty assessment based on accurate rather than false testimony

7  and evidence, a fair, reliable, non-arbitrary sentencing determination, and be free of the

8  imposition of a cruel and unusual punishment were violated by the prosecutor's failure to disclose

9  material exculpatory evidence.

10  The facts, among others to be presented after full discovery, investigation, funding, access

11  to this Court's subpoena power, and an evidentiary hearing, which support this claim are:

12  1.    In the days and weeks after the crime, dozens of citizens who were in Santa Anita

13  and Howe Parks on May 19, 1984, as well as individuals who had contact with petitioner during

14  various portions of his life, telephoned the Office of the District Attorney with information about

15  petitioner or the crime.

16  2.    One of these individuals was Jan Yungling, the Ashmus' next door neighbor when

17  petitioner's family lived for about two years on Smithhart Street.  Petitioner was then a toddler

18  and very young child.

19  3.    When she heard that petitioner had been arrested, she obtained the telephone

20  number for the Sacramento County District Attorney's Office, called that office, asked to speak

21  with someone who was working on petitioner's case, and was transferred to a man.  She told him

22  that petitioner had been badly abused by his parents and that she believed this had an influence

23  on his development.  She was informed that many people in jail had been abused, and that he was

24  not interested in her information.  She was never contacted by anyone after this telephone call.

25  4.    The prosecutor did not disclose this telephone call and its substance to petitioner's

26  counsel despite its patent exculpatory nature.

27  5.    The information possessed by Jan Yungling was exculpatory and the prosecutor's

28  failure to disclose it was prejudicial because of the materiality of the information.  Had the

prosecutor disclosed the telephone conversation to petitioner's counsel, the jury would have heard the following information:

      a.     Although Yungling supported the death penalty, she believed that if the jurors had witnessed and knew about a fraction of the abuse, neglect, and maltreatment of petitioner which she witnessed, they would have spared petitioner's life.

      b.     The Ashmus home was filthy, dark, and barren, and it reeked of urine and dirty dishes and was not at all decorated.

      c.     Petitioner was a sweet, curious toddler. He came to the Yungling's house for food and attention. He appeared almost daily at about eight o'clock in the morning for breakfast, often in dirty, smelly clothes, which were not appropriate for the weather.

      d.     Frequently he was dressed in hats and long sleeved shirts to hide the remnants of the severe beatings meted out to him at home. He became panicky when Yungling forced him to remove his hat or shirt, thereby exposing red welts and bruises. On one occasion, Yungling had to force her way into the Ashmus home to check on petitioner. Petitioner was in bed, looking very pale. He appeared to be in a lot of pain and was holding his genital and groin area. Yungling demanded that he show her his pelvic area. She found it to be badly bruised and noticed his scrotum was severely swollen. When confronted, petitioner's mother said that petitioner's father had kicked him until "they" started to swell.

      e.     Petitioner's mother treated him roughly and called him "stupid," "idiot," and a "bad seed." Although petitioner's mother was lively and friendly with neighbors, she treated petitioner with severe contempt and loathing. Petitioner's mother acted as if she had no idea how to raise children, frequently failing to feed them appropriately.

      f.     Yungling observed petitioner to be jumpy, jittery, and clingy. He was very hyperactive, and had a very difficult time focussing. He wrung his hands a lot, and he constantly darted around, as if he did not want to be in anyone's way. He was unusually disturbed when there were many things going on around him, and when there were a lot of loud noises. He often retreated into his own world. He responded well to direct one-

1    on-one contact during those times.

2        g.    Eventually, after discussing the matter with a neighbor, Yungling contacted

3    law enforcement because she feared for petitioner's safety.  The day following her

4    telephone call, two male officers came, spoke with her and went over to the house.  She

5    never heard from the police again.  Subsequently, petitioner's mother told her that police

6    officers came and checked on them every once in a while but that everything was fine.

7        6.    The unlawful failure to disclose this evidence requires the granting of relief.  A jury

8    hearing this information would not have sentenced petitioner to death.

9    **D.    CLAIM 4: PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS WITH
         REGARD TO THE SELECTION AND IMPANELING OF THE JURY BY WHICH
10       HE WAS TRIED.**

11       Petitioner's conviction, sentence, and confinement are unlawful and his Fifth, Sixth, Eighth

12   and Fourteenth Amendment rights to due process, a fair trial by a jury drawn from a fair cross-

13   section of the community, effective assistance of counsel, confrontation, presentation of evidence,

14   equal protection, self-incrimination, and a fair, reliable, and non-arbitrary sentencing were

15   violated due to the systematic underrepresentation of Hispanics in the venire and at all stages of

16   jury selection as well as the prosecutor's discriminatory use of peremptory challenges.

17       The following facts, among others to be presented after full investigation, access to

18   discovery and the court's processes, funding, and an evidentiary hearing, support this claim:

19       1.    Petitioner was denied his right to a jury drawn from a fair cross section of the

20   community, as guaranteed by the federal constitution.

21       a.    Hispanics are a distinctive group for purposes of constitutional analysis.

22       b.    Hispanics were underrepresented in the jury pools in San Mateo County at

23   the time of petitioner's trial, and by at least 1984, trial counsel in other cases were

24   litigating this underrepresentation.

25       (1)    According to the United States Census, Hispanics residing in San

26   Mateo County in 1990, who were at least eighteen years old, comprised

27   approximately 15.48 percent of the population.  The percentage is actually higher

28   since the Census undercounts Hispanics by approximately 5 percent.

(2)    At petitioner's trial, the jury commissioner originally called three hundred and nineteen (319) prospective jurors to serve on the panel. Of those, approximately nineteen (19) at most were Spanish-surnamed. Only two hundred and fifty (250) of the 319 prospective jurors summoned actually appeared in court on April 1, April 2, and April 3, 1986. CT 531-53, 534-35, 538. Of these no more than approximately sixteen (16) were Spanish surnamed. These numbers are approximations for a number of reasons, one of which relates to the fact that a significant percentage of Spanish surnamed persons in San Mateo County are actually Filipino. The Filipino population in San Mateo County in 1990 was 6.89 percent and at least two prospective jurors who did appear -- Joseph Acuna and Karen Villeneuva -- were Filipino although their surnames appear on the official Spanish surname list. In addition, the surnames of non-Hispanic individuals (i.e., Caucasian potential jurors) appeared on the Spanish surname list. On the other hand, there may be one or two individuals in the panel, who are Hispanic but whose surnames do not appear on the official list.

(3)    Even with these allowances, and giving the state the benefit of the doubt, the number of Hispanic jurors called to sit on petitioner's trial was no more than 5.96 percent (using the 319 prospective jurors actually notified to appear) or 6.40 percent (using the 250 prospective jurors who actually appeared in court) of the venire, and potentially smaller.

(4)    Since Hispanics eighteen years or older were roughly 15.48 percent of the county population, the absolute disparity is no smaller than 9.52 percent (using the 319 juror pool) or 9.08 percent (using the 250 juror pool). The comparative disparities are approximately 61.50 percent and 58.66 percent respectively.

(5)    This underrepresentation is not fair and reasonable in relation to the number of Hispanics in the community.

(6)    Petitioner cannot perfect his showing of underrepresentation because

1    a full presentation will have to await access to discovery, subpoena power, and a

2    hearing inasmuch as the information necessary to refine this data, compute relevant

3    disparities, and provide the court with data based on a larger number of venires,

4    pools or the master list as is appropriate under the Sixth Amendment is within the

5    exclusive possession of the County of San Mateo and unavailable to counsel either

6    because the personnel in the Jury Commissioner's Office are unwilling or unable

7    to provide the needed data.

8        c.    This disparity is inherent in and results from the particular system of

9    selection used in San Mateo County during the relevant time period.  Based on information

10   currently available, this systemic underrepresentation of Hispanics in San Mateo County

11   appears to be the combined product of several mechanisms, each of which

12   disproportionally operates to remove Hispanics from the jury selection process.

13       (1)    As in the case of proof of underrepresentation, a full presentation

14   of the selection process must await discovery, subpoena power, and a hearing.

15   Attempts to secure the jury selection procedures and written court policies in San

16   Mateo County have been unavailing because the county officials claim they cannot

17   locate them.

18       (2)    Between May 1984 and January 1985, a challenge to the jury

19   selection system in San Mateo County in *People v. James Floyd Martin*, San Mateo

20   County Court Case No. C12531, revealed that the county was using a jury

21   selection system that was inherently biased against Hispanics.  A number of the

22   mechanisms for jury selection, described in *Martin*, account for the  disparity,

23   including:

24       (i)    The use of transportation hardships as determined by the jury

25   commissioner's office.  Hispanics were disproportionately eliminated from

26   the pool by use of these hardships.

27       (ii)    The use of a "quota" system that draws from each city

28   within the county, a percentage of prospective jurors roughly equivalent to

the percentage of the county-wide population residing in that city.

(iii)     The failure to follow-up on affidavits which were not returned unless the jury commissioner determines that the rate of non-return was such that the mailing list as a whole required it.

(iv)     The over-representation of non-returns in cities with higher Hispanic populations.

(3)     Where the quota was met in a community which had a high percentage of African-American and Hispanic residents, the likelihood of gross underrepresentation was high because the commissioner did not follow up on non-returns once the quota was met.

(4)     Additionally, when the quota was not met in those high-percentage minority communities, the nature of the follow-up procedures used to secure the quota were such that minorities, including Hispanics and African-Americans, were disproportionately excluded.

(5)     Making telephone calls to draw jurors once they are selected to serve disproportionately reduces Hispanic and African-American representation since those with lower incomes are less likely to have phone service or be home during the day.

d.     As the testimony in *Martin* illustrates, and as the court there found, there was a prima facie showing of underrepresentation of Hispanics in San Mateo County. The county failed to rectify this problem, which continued at least until the time of petitioner's trial.

e.     The system of sending second notices and the decision-making process with respect to sending these notices, as well as the process of using the telephone to obtain prospective jurors once the need for jurors is established, resulted in the systematic exclusion of Hispanic jurors and prospective jurors at the time of petitioner's trial.

f.     Petitioner's counsel was constitutionally and prejudicially ineffective for not investigating the jury composition, for failing to raise the issue, and for failing to request

1   a hearing wherein he would have presented evidence of these violations of petitioner's

2   rights.  Consequently, petitioner was denied his Sixth Amendment right to a jury drawn

3   from a fair cross-section of the community and his right to an impartial jury as guaranteed

4   by the Sixth Amendment.  The arbitrary exclusion of groups of citizens from jury service,

5   moreover, violates equal protection guarantees under the state and federal constitutions.

6   The reliability of the jurors fact-finding process was compromised.  Finally, the process

7   used to select petitioner's jury violated California's mandatory statutory and decisional

8   laws concerning jury selection and petitioner's right to a jury drawn from a fair cross-

9   section of the community, Code Civ. Proc. section 197, and thereby deprived petitioner

10  of a state-created liberty interest and due process of law under the Fourteenth Amendment.

11      2.     The prosecutor used his peremptory challenges in a racially discriminatory manner

12  so as to violate petitioner's federal constitutional right to equal protection of the law and his

13  mandatory state law rights to a jury drawn from a representative cross-section of the community.

14          a.     During petitioner's trial, the prosecutor used his peremptory challenges to

15  exclude all members of cognizable ethnic or racial groups.

16          b.     The prosecutor exercised twenty-two peremptory challenges during regular

17  jury selection and four additional challenges during the selection of alternate jurors.

18          c.     He used these challenges to remove three Asian-American prospective

19  jurors, two Hispanic and/or Filipino prospective jurors, and at least two African-American

20  prospective jurors.  During selection of alternate jurors, he challenged at least one

21  additional African-American prospective juror.

22          d.     The prosecutor's challenges reflect racial animus and succeeded in

23  producing a jury stripped of the classes identified above.

24          e.     Trial counsel was on notice that the prosecutor engaged in racially

25  discriminatory jury selection practices and unreasonably failed to object and move for a

26  mistrial based thereon.  Petitioner was prejudiced by trial counsel's omission because had

27  counsel objected, the prosecutor would not have been able to rebut counsel's prima facie

28  case, the court would have granted a mistrial motion, and a constitutionally selected jury

would have imposed a different verdict.

**E.    CLAIM 5: PETITIONER WAS DEPRIVED OF HIS RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL AND TO A FAIR AND RELIABLE DETERMINATION OF GUILT AND PENALTY BY TRIAL COUNSEL'S PREJUDICIALLY DEFICIENT PERFORMANCE.**

The convictions and sentence of death were rendered in violation of petitioner's rights to a fair and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and penalty, to the effective assistance of counsel, to present a defense, and to due process of law as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because petitioner's trial counsel rendered constitutionally deficient representation at critical stages of the criminal proceedings.

Petitioner's counsel rendered ineffective assistance at trial when they unreasonably and prejudicially failed to protect petitioner's constitutional rights at trial by failing to object to the introduction of inadmissible and prejudicial testimony and prosecutory misconduct; investigate, develop, and present evidence of petitioner's mental functioning before, during and after the crime; investigate adequately and present evidence of petitioner's background and character; present a coherent trial strategy; and make informed and rational decisions regarding potentially meritorious defenses and tactics.

Petitioner's counsel's errors and omissions were such that a reasonably competent attorney acting as a diligent and conscientious advocate would not have performed in such a fashion. At the time of petitioner's trial, capital defense attorneys routinely obtained and developed information relevant to petitioner's upbringing and medical history, educational history, employment and training history, family and social history, and correctional history.

Counsel's failures to investigate adequately and present defenses and protect petitioner's statutory and constitutional rights prejudiced the defense. But for counsel's unprofessional errors, the result of the proceedings would have been different.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1. Trial counsel prejudicially and unreasonably failed to object to the admission of inadmissible evidence, object to prejudicial prosecutorial misconduct, or otherwise protect petitioner's constitutional rights.

 a. Prior to trial, trial counsel objected to the admission of testimony concerning electrophoretic analysis of dried semen stains discovered at the crime scene. RT 501-93. The trial court denied petitioner's objections. On appeal to the California Supreme Court, petitioner asserted, *inter alia*, that the trial court's ruling violated petitioner's rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution. *See* Appellant's Opening Brief at 135-142, Appellant's Reply Brief at 61-64. The California Supreme Court noted that trial counsel failed to raise these federal objections in the trial court. *People v. Ashmus*, 54 Cal.3d 932, 972 n.10 (1991). Trial counsel's failure to raise these federal grounds in the trial court constitutes constitutionally deficient and prejudicial representation. Absent trial counsel's failure to litigate the federal objections to the admissibility of the electrophoretic analysis, petitioner would not have been convicted of capital murder or sentenced to death and would have been entitled to a reversal by this Court on appeal.

 b. At trial, trial counsel objected to the admission of several photographs of the victim. The trial court denied petitioner's objections and permitted the prosecution to introduce several inflammatory photographs. CT 385-89; RT 5231-39; 5398-5400; 5488-5518. On appeal to the California Supreme Court, petitioner asserted, *inter alia*, that the trial court's ruling violated petitioner's rights guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. *See* Appellant's Opening Brief at 190-220, Appellant's Reply Brief at 51-53. The California Supreme Court noted that trial counsel failed to raise these federal objections in the trial court. *People v. Ashmus,* 54 Cal.3d at 974 n.11. Trial counsel's failure to raise these federal grounds in the trial court constitutes constitutionally deficient and prejudicial representation. Absent trial counsel's failure to litigate the federal objections to the admissibility of the photographs, petitioner would not have been convicted of capital murder or sentenced to death and

1    would have been entitled to a reversal by the California Supreme Court on appeal.

2         c.    During closing argument, the prosecutor argued that petitioner "changed

3    his defense and that his testimony that he did not intend to kill the victim and thus lacked

4    the mental state necessary to find the special circumstance was "the last refuge of the

5    hopelessly guilty." RT 6083-84. The trial court overruled petitioner's objection to the

6    prosecutor's argument. *Id.* On appeal to the California Supreme Court, petitioner

7    asserted, *inter alia*, that the trial court's ruling violated petitioner's rights guaranteed by

8    the Due Process Clause of the Fourteenth Amendments to the United States Constitution

9    and California statute. The California Supreme Court noted that trial counsel failed to

10   object to the "last refuge" portion of the argument in the trial court. *People v. Ashmus*,

11   54 Cal.3d at 976. Trial counsel's failure to object to the entire argument and to protect

12   petitioner's right to the presumption of innocence in the trial court by requesting the jury

13   be admonished to disregard the argument constitutes constitutionally deficient and

14   prejudicial representation. Absent trial counsel's failure to properly object and request an

15   admonishment, petitioner would not have been convicted of capital murder or sentenced

16   to death and would have been entitled to a reversal by the California Supreme Court on

17   appeal.

18        d.    During the penalty trial, the prosecution sought to introduce evidence that

19   petitioner had committed and been convicted of the felony of assault with intent to commit

20   rape. Petitioner had sustained the conviction following his arrest for capital murder. In

21   addition, at the time of the penalty trial, petitioner's appeal of the conviction was pending.

22   Over petitioner's objection, the trial court permitted the prosecutor to prove the underlying

23   facts of the felony and the fact that petitioner sustained a conviction for the crime. RT

24   6336, 6450-55. On appeal to the California Supreme Court, petitioner asserted, *inter alia*,

25   that the prior conviction was inadmissible because it was entered after the commission of

26   the capital crime and that the admission of the conviction violated petitioner's rights

27   guaranteed by the Eighth and Fourteen Amendments to the United States Constitution.

28   Petitioner also argued that the admission of the facts underlying the conviction violated his

federal rights guaranteed by the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and by state law. Petitioner further argued on appeal that the eyewitness identification procedure was unduly suggestive and violated his right to Due Process guaranteed by the Fourteenth Amendment to the United States Constitution. *See* Appellant's Opening Brief at 178-79, 180-190; Appellant's Reply Brief at 90-91, 92-96. The California Supreme Court noted that trial counsel failed to raise these objections in the trial court. *People v. Ashmus,*54 Cal.3d at 983, 984 n.14 & 985 n.15. Trial counsel's failure to raise this objection in the trial court constitutes constitutionally deficient and prejudicial representation. Absent trial counsel's failure to properly object to the evidence of the conviction on readily available state and federal grounds, petitioner would not have been sentenced to death and would have been entitled to a reversal by the California Supreme Court on appeal.

e.    During the penalty phase, juror Fred Godfrey telephoned the court and requested discharge from the jury because his mother had died. RT 7067. Over petitioner's objection, the trial court discharged Godfrey. RT 7067-71. On appeal, petitioner argued, *inter alia*, that the procedure used and the discharge of Godfrey violated his federal constitutional rights to be present, to the assistance of counsel at all critical stages of a criminal proceeding, to the right to have all proceedings held in the presence of a judge, and to be free from cruel and unusual punishment. *See* Appellant's Opening Brief at 191-95; Appellant's Reply Brief at 97-102. The California Supreme Court noted that trial counsel failed to raise these federal objections in the trial court. *People v. Ashmus,*54 Cal.3d at 987 n.16. Trial counsel's failure to raise these objections in the trial court constitutes constitutionally deficient and prejudicial representation. Absent trial counsel's failure to properly object to the evidence of the conviction on readily available federal grounds, petitioner would have been entitled to a mistrial in the Superior Court and a reversal by the California Supreme Court on appeal.

f.    During closing argument in the penalty phase, the prosecutor referred to his cross-examination of defense expert Richard Yarvis, M.D. and "evidence" of petitioner's

"past history" of sexual misconduct.   RT 7344.  In fact, no evidence had been introduced at trial concerning the incidents of sexual misconduct to which the prosecutor referred during his cross-examination of Dr. Yarvis and in his closing argument.  Trial counsel objected to the prosecutor's argument and requested a mistrial, or in the alternative an admonition to the jury.  RT 7363-64.  The trial court concluded that there was no error and denied the mistrial and request for admonishment.  RT 7368.  On appeal to the California Supreme Court, petitioner asserted, *inter alia*, that the trial court's failure to admonish or instruct the jury violated petitioner's rights guaranteed by the United States Constitution and state law.  *See* Appellant's Opening Brief at 149-63; Appellant's Reply Brief at 70-83.  The California Supreme Court noted that trial counsel failed to object to the prosecutor's argument or request an instruction in the trial court.  *People v. Ashmus*, 54 Cal.3d at 989 & 990 n.18.  Trial counsel's failure to object to the entire argument and to protect petitioner's rights to confront witnesses against him, to be free from cruel and unusual punishments, and to due process guaranteed by the Sixth, Eight, and Fourteenth Amendments to the United States Constitution and state law by requesting the jury be admonished that there was no evidence of sexual misconduct, that the prosecutor's questions and Dr. Yarvis's answers did not constitute such evidence, and to disregard the argument constitutes constitutionally deficient and prejudicial representation.  Absent trial counsel's failure to properly object and request an admonishment, petitioner would not have been sentenced to death and would have been entitled to a mistrial in the Superior Court and a reversal by the California Supreme Court on appeal.

g.    During closing argument in the penalty phase, the prosecutor argued that the jury should impose a death sentence based on sympathy and pity for the victim and the victim's family.  RT 7338-41.  The trial court overruled petitioner's objections to the prosecutor's argument and denied the request for a mistrial or admonishment to the jury.  RT 7340, 7362-68.  On appeal to the California Supreme Court, petitioner asserted, *inter alia*, that the trial court's ruling violated petitioner's rights guaranteed by California Penal Code section 190.3, the Eighth Amendment and the Due Process Clause of the United

States Constitution. *See* Appellant's Opening Brief at 164-77; Appellant's Reply Brief at 84-89. The California Supreme Court noted that trial counsel failed to object to the argument based on the limitations of California Penal Code section 190.3. *People v. Ashmus*, 54 Cal.3d at 990-91. Trial counsel's failure to object based on Penal Code section 190.3 and the federal right to a state-created liberty interest protected by the Due Process Clause to the prosecutor's appeal to sympathy and pity for the victim and the victim's family and to protect petitioner's rights by requesting the jury be admonished to disregard the argument constitutes constitutionally deficient and prejudicial representation. Absent trial counsel's failure to properly object and request an admonishment, petitioner would not have been sentenced to death and would have been entitled to a mistrial in the Superior Court and a reversal by the California Supreme Court on appeal.

h.     On appeal to the California Supreme Court, petitioner asserted, *inter alia*, that reversal was necessary because the trial court failed to instruct the jury not to consider the conduct of the crime under both factor (a) and factor (b) of California Penal Code section 190.3 because such consideration would constitute impermissible double counting. *See* Appellant's Opening Brief at 236-40; Appellant's Reply Brief at 121-25. The California Supreme Court noted that the trial court was not under a sua sponte duty to so instruct the jury. *People v. Ashmus*, 54 Cal.3d at 997. Trial counsel's failure to request an instruction based upon California Penal Code section 190.3, the California Constitution, and the right to a trial by jury guaranteed by the Sixth Amendment, to be free from cruel and unusual punishment guaranteed by the Eighth Amendment, and to due process guaranteed by the Fourteenth Amendments to the United States Constitution constitutes constitutionally deficient and prejudicial representation. Absent trial counsel's failure to request such an instruction, petitioner would not have been sentenced to death and would have been entitled to a reversal by the California Supreme Court on appeal.

i.     On appeal to the California Supreme Court, petitioner asserted, *inter alia*, that reversal was necessary because the trial court failed to instruct the jury that the prosecution had the burden to prove beyond a reasonable doubt that petitioner committed

1   the felony of assault with intent to commit rape before it consider the crime as a

2   circumstance in aggravation. *See* Appellant's Opening Brief at 241-42; Appellant's Reply

3   Brief at 126-28. The California Supreme Court noted that the trial court was not under

4   a sua sponte duty to so instruct the jury. *People v. Ashmus,* 54 Cal.3d at 1000-01. Trial

5   counsel's failure to request an instruction based upon California Penal Code section 190.3,

6   the California Constitution, and the right to a trial by jury guaranteed by the Sixth

7   Amendment, to be free from cruel and unusual punishment guaranteed by the Eighth

8   Amendment, and to due process guaranteed by the Fourteenth Amendment to the United

9   States Constitution constitutes constitutionally deficient and prejudicial representation.

10  Absent trial counsel's failure to request such an instruction, petitioner would not have been

11  sentenced to death and would have been entitled to a reversal by the California Supreme

12  Court on appeal.

13         j.     On appeal to the California Supreme Court, petitioner asserted, *inter alia,*

14  that reversal was necessary because the trial court failed to deliver Defendant's Proposed

15  Instruction No. 10: "If a factor is not found to be by you a mitigating factor, that in and

16  of itself does not make that factor an aggravating factor." The California Supreme Court

17  noted that the proposed instruction was confusing and thus the trial court was not under

18  a duty to so instruct the jury. *People v. Ashmus,* 54 Cal.3d at 1004. Trial counsel's

19  failure to request a proper  instruction based upon California Penal Code section 190.3,

20  the California Constitution, and the right to a trial by jury guaranteed by the Sixth

21  Amendment, to be free from cruel and unusual punishment guaranteed by the Eighth

22  Amendment, and to due process guaranteed by the Fourteenth Amendments to the United

23  States Constitution constitutes constitutionally deficient and prejudicial representation.

24  Trial counsel should have requested that the jury be instructed that the absence of any

25  factor may not be used as aggravation. Absent trial counsel's failure to properly draft and

26  request such an instruction, petitioner would not have been sentenced to death and would

27  have been entitled to a reversal by the California Supreme Court on appeal.

28         2.     Trial counsel prejudicially and unreasonably failed to develop and present evidence

of petitioner's mental state at the time of the crime, which violated petitioner's Sixth, Eighth and Fourteenth Amendment rights to receive a fair trial, due process, the effective assistance of counsel, compulsory process, access to competent psychiatric assistance, present a defense, a fair and reliable determination of guilt and penalty, and his mandatory right, under state law, to the jury's consideration of lingering doubts as to guilt.

a.    Those facts set forth throughout IV.E., are hereby incorporated into this subsection by this reference, as if fully set forth herein.

b.    Petitioner's trial counsel proffered a defense on petitioner's behalf which acknowledged the commission of a rape and the acts which culminated in Marcella Davis's death, but denied the mens rea -- intent to kill -- necessary to sustain the special circumstances or a murder conviction which was not predicated on the felony-murder rule.

(1)    Dr. William Eckert, a forensic pathologist testified in support of a defense of accident, i.e., that the plastic bags were put in Marcella Davis's mouth because she was making noise and there was no basis for determining whether the bags were inserted into Davis's throat and windpipe or became sucked into the same by Davis's breathing. RT 6016-76.

(2)    Petitioner testified on his own behalf that he did not intend to kill Davis. RT 5822. He testified to having a poor memory generally and specifically acknowledged that he frequently lost track of his actions, thoughts, and locations. He described occasions of memory gaps and further testified specifically that there were periods during the day of the crime and the crime itself for which he had no or little memory.  RT 5818, 5828, 5860, 5874, 5896, 5901, 5922-23, 5952.

c.    Trial counsel unreasonably failed, in light of their chosen defense, and in light of their knowledge of petitioner and his psychiatric symptomatology, to investigate adequately and present a mens rea defense, rooted in petitioner's history of dissociation, delusions and hypomanic traits, to complement the proffered defense of accident (i.e., lack of mens rea) and to explain petitioner's inability to recall all of the events prior to, during, and after the crime.

(1)    Trial counsel were in possession of school and institutional records which contained substantial evidence of a demeanor displayed by petitioner which was consistent with psychic numbing, "checking out," or separating himself mentally from his physical surroundings.  Despite normal hearing, petitioner frequently appeared not to be listening or appeared not to hear teachers throughout grammar school.

(2)    Trial counsel were in possession of school and institutional records which contained overwhelming evidence of extreme emotional lability, hyperactivity, hypomanic behavior alternating with social withdrawal, all of which merited further investigation because they are consistent with major mental illness.

(3)    Trial counsel were in possession of institutional records and anecdotal information from neighbors detailing petitioner's extraordinary and extreme self-mutilation and other physically self-destructive, hurtful behaviors, and his lack of any sensation of pain associated therewith.  Such cutting and lack of pain are suggestive of the existence of an involuntary conditioned response to dissociate and switch rapidly into an altered state of consciousness.

(4)    Trial counsel were in possession of an evaluation by Dr. Edwards, whom they retained to test and evaluate petitioner.  Although he testified concerning his neuropsychological findings, counsel failed to elicit evidence of the behavioral consequences of his findings, failed to utilize his finding that petitioner had a very poor verbal memory, and failed to follow-up on the doctor's comment that further record review and history-taking was required to document the presence of other Axis 1 diagnoses. Moreover, Dr. Edwards' found that projective testing suggested that petitioner was delusional ("psychotic delusions") and had "strong often paranoid" beliefs.

(5)    Trial counsel had other reliable indicia that petitioner was severely delusional.  For example, petitioner believed he and his brother Tracy could communicate telepathically and that his headaches were a function of his trying to

get in touch with Tracy or vice versa.  In addition, he told counsel's investigator that his "twin brother," was accidentally flushed down the toilet at birth in the hospital and his birth therefore went unrecorded.

(6)    Petitioner's testimony provided clear evidence of memory gaps, delusions and dissociation in his description of the non-existent voice of an alleged passerby at the time of the crime; in his descriptions of getting from one place to another without knowing how he got there; and in his failure to recall certain aspects of his day.  During his testimony, petitioner appeared to dissociate as well. *See, e.g.*, RT 5962.

(7)    Counsel, armed with this knowledge, had a duty to investigate petitioner's family history of major mental illnesses and explore the possibility of a mens rea defense with competent mental health professionals.

d.    Trial counsel's failure to investigate adequately, consult with competent mental health professionals, provide them with requested materials, adequately guide and channel their inquiry (including informing them of the applicable legal standards) and prepare them to testify was prejudicial.

(1)    Had counsel done so, they would have been able to present a mens rea defense which would have accommodated his theory that petitioner did not intend to kill Marcella Davis.

(2)    Had counsel performed an adequate investigation they would have obtained the information set forth throughout this claim.

(3)    Had counsel provided competent experts with this material and provided these experts with appropriate referral questions, they would have opined that petitioner became delusional and dissociated during the crime and did not intend to kill Marcella Davis.  Evidence of this altered state existed in petitioner's testimony but went unrecognized by and unexplained to the jury.

(4)    Had counsel presented this defense, the jurors would not have found the special circumstance true because they would have understood that petitioner

did not recall putting the bags in Marcella Davis's mouth and that petitioner was in a dissociated state after he put the plastic bags in her mouth. This altered state of consciousness would have provided the explanation that alternate juror Yount was seeking when she sent a note to the court asking:

> "This last witness stated that an asphyxiated victim would stop breathing in approx 5 min. And Troy A. testimony stated that the reason he did not remove bags was that he forgot about them being in Marcie's mouth. My question is: Wouldn't a person notice if the victim stopped struggling/breath? And then remember the bags?"

Alternate juror Yount was probably not alone in her curiosity. A mens rea defense would have filled in this gap favorably to petitioner.

4.    Trial counsel prejudicially and unreasonably failed to develop and present the testimony of readily available experts who would have provided compelling mitigating evidence concerning, *inter alia*, petitioner's multiple mental dysfunctions, the debilitating physical and psychological effects of his traumatic and violent childhood and his deteriorating psycho-social functioning. Prior to the start of the trial, counsel retained several mental health experts to explore petitioner's mental functioning. These experts informed trial counsel that they believed petitioner exhibited signs of major mental illness and recommended further investigation into petitioner's background and functioning. Trial counsel unreasonably failed to pursue adequately these experts' suggestions, obtain and provide the experts with records and investigation results relevant to the experts' inquiries, inform the experts' evaluations with relevant legal referral questions, and develop a coherent mental state defense for presentation at the penalty phase. Trial counsel's deficient performance prejudiced petitioner because, had trial counsel performed competently, the jury would have received a coherent, compelling, and mitigating description of petitioner's mental functioning and impairments and the effects that those impairments had on his behavior. It is reasonably probable that the jury would have not sentenced petitioner to death.

a.    Those facts set forth throughout this claim are hereby incorporated into this subsection by this reference, as if fully set forth herein.

b    Trial counsel recognized the need to consult with and retain mental health

experts for the presentation of a defense at trial.  Prior to trial, trial counsel retained several experts and requested their assistance in the case.  Two of these experts, Daniel Edwards, Ph.D., and Richard Yarvis, M.D., testified during the penalty phase.

(1).  Dr. Edwards testified that, based on the disparity between petitioner's verbal and performance IQ, petitioner likely suffers from brain damage in the left hemisphere.  RT 7008-10.

(2)  Dr. Yarvis testified that although he had been retained for the "usual reasons" -- determining mental incompetency, diminished capacity, and criminal insanity -- his role in the case changed after the first few months of the case.  RT 7036-38.  Dr. Yarvis remained in the case to establish rapport with petitioner and to utilize a "good cop/bad cop" approach to make petitioner "spill his guts."  RT 7038-39.  After petitioner provided the information Dr. Yarvis sought, Dr. Yarvis continued to meet with petitioner in a therapeutic role.  RT 7045.  Dr. Yarvis proceeded to testify at the penalty trial about his conversations with petitioner and observations of the witnesses at the penalty trial.  Dr. Yarvis did not purport to diagnose petitioner at any stage of his life or provide a psychiatric explanation for his behavior.

b.  Trial counsel unreasonably failed to develop and present expert testimony concerning petitioner's mental impairments and their effect on his behavior and functioning.

(1)  Trial counsel unreasonably failed to present expert testimony concerning the effect that the brain damage identified by Dr. Edwards had on petitioner's behavior and functioning.  The jury was left with the testimony that petitioner had brain damage.  But no expert informed the jury about the consequences of such damage or how brain damage affects a person's functioning and behavior.

(2)  Trial counsel did not guide or instruct Dr. Yarvis or any other expert consulted with an appropriate referral question to inform their evaluation of

petitioner.

(3)    Trial counsel unreasonably did not explain or explore the statutory and constitutional mitigating factors or death sentencing framework with any of the experts consulted.

(4)    Trial counsel unreasonably failed to ensure that Dr. Yarvis understood the purpose of his involvement in the case. Trial counsel further unreasonably failed to ensure that Dr. Yarvis was sufficiently prepared to fulfill that role at trial. During both direct and cross-examination, Dr. Yarvis exhibited his uncertainty as to his purpose in testifying and the basis for his testimony, his unfamiliarity with critical psychiatric and psychological conditions in petitioner's life, and his inability to assimilate written and oral accounts of petitioner's behavior and functioning into his testimony.

c.    Trial counsel unreasonably failed to conduct an adequate investigation into petitioner's mental functioning and behavior, family history of mental illness, and aberrant behavior and pursue investigative leads suggested by the retained experts and others.

(1)    During his evaluation of petitioner, Dr. Edwards found that projective testing suggested that petitioner was delusional ("psychotic delusions") and had "strong often paranoid" beliefs. Dr. Edwards recommended that further record review and history-taking be conducted to document the presence of other Axis 1 diagnoses. Trial counsel unreasonably failed to obtain or provide their retained experts with any additional records or history of petitioner's mental functioning.

(2)    Trial counsel also were informed that a psychiatric examination in October 1985, revealed that petitioner displayed symptoms of battered child syndrome and other mental impairments, including a seizure disorder and schizophrenia. The examination further revealed that the cause of his impairments may be biological. Trial counsel noted that the examination revealed that "Troy is the kind of person, who because of his inborn impairments, does not have the

1    ability to constrain his behavior."    Despite this favorable evaluation and the

2    suggestion that future investigation focus on petitioner's family history, trial

3    counsel unreasonably failed either to present psychiatric testimony of petitioner's

4    mental illness or pursue the investigative leads suggested.

5        d.    Reasonably competent counsel also would have investigated petitioner's

6    medical and psychological conditions and functioning and would have consulted with

7    appropriate experts to develop and present compelling mitigation about his medical and

8    psychological functioning.    Reasonably competent counsel would have provided this

9    information to experts for their evaluation and to corroborate their findings.    Absent trial

10    counsel's constitutionally deficient performance, the jury would have heard such

11    compelling testimony, including the following:

12        (1)    Petitioner's history reveals multiple injuries to his brain and central

13    nervous system during critical developmental years.    Petitioner's parents delivered

14    harsh blows to his head and face during beatings.    Small for his age, petitioner was

15    often attacked by larger children.    Additionally, he sustained several serious head

16    injuries from accidents.

17        (2)    Qualified mental health experts would have testified that the nature,

18    severity and duration of the petitioner's childhood victimization were of the type

19    likely to cause a variety of long-term psychiatric and emotional consequences.

20    Petitioner's social, developmental and medical histories include readily evident

21    symptoms of such consequences, including but not limited to learning disabilities,

22    diffuse brain dysfunction, chronic depression, suicidal ideation, extreme

23    suggestibility, poor memory and confabulation, and chronic drug dependency.

24        (3)    Readily available records of petitioner's academic and institutional

25    histories documented these symptoms and petitioner's developmental and functional

26    impairments.

27        (4)    A minimally adequate investigation of the background and

28    functioning of petitioner's siblings also would have documented the familial impact

of probable genetic predisposition toward mental illness and the parental abuse suffered by the children in petitioner's household.  Petitioner's brother is under prolonged, prescribed anti-psychotic medication, supported by governmental stipends for mental disabilities, and has a history of psychiatric hospitalization.

5.    Trial counsel prejudicially and unreasonably failed to investigate, develop, and present compelling mitigation at the penalty phase in violation of petitioner's constitutional rights to effective assistance of counsel and a reliable death sentencing determination as guaranteed by the Sixth, Eighth and Fourteenth Amendments.

a.    During the penalty phase, trial counsel presented some evidence about petitioner's background, childhood, and mental functioning. *See, e.g.*, RT 6661.  Trial counsel's penalty phase defense consisted of presenting petitioner's family members, teachers, persons employed by law enforcement, and others with varying degrees of information about petitioner.

b.    Rather than a compelling and corroborated case in mitigation, however, the jury heard a misleading and incomplete view of petitioner's life and character.  The jury was confronted with inconsistent versions of events by petitioner's mother and father, each assigning responsibility to the other for petitioner's behavior.  Without any attempt to corroborate the competing versions or to explore fully the abusive and destructive home environment, the jury likely dismissed their testimony as either self-serving and unbelievable or the false product of interspousal strife and hatred.  Moreover, petitioner's familial history of mental illness, the physical, sexual, emotional, and psychological abuse suffered by petitioner from infancy through adolescence, the financial insecurity experienced in the Ashmus household, and petitioner's mental deficits were entirely omitted, significantly minimized, or inaccurate.  The jury did not learn of the readily available law enforcement records and friends' and neighbors' accounts of the chronic physical and sexual abuse and neglect in the Ashmus household. The jury did not hear testimony from those people who witnessed the debilitating effects of the abuse and strife on petitioner as an infant, toddler, and child.  Numerous witnesses could have testified that

petitioner suffered severe, protracted and sadistic physical, psychological, and sexual abuse. In addition, the jury never learned that petitioner's paternal and maternal family histories were fraught with alcoholism, mental illness, mental disturbance, and domestic violence.

    c.    Trial counsel's investigation of petitioner's life and potential mitigation was constitutionally inadequate.

    (1)    During the course of their representation of petitioner, trial counsel obtained some records concerning petitioner's life and background. Virtually all of these records were obtained from the prosecution through discovery. The Sacramento District Attorney provided trial counsel with petitioner's school records, medical and psychological records, employment records, and law enforcement records. In addition, the prosecution obtained and provided to defense counsel copies of law enforcement records relating to suspected child abuse perpetrated by petitioner's parents. These records contain a wealth of mitigation and investigative leads, which reasonably competent attorneys would have pursued.

    (2)    Trial counsel unreasonably did not identify, obtain, and use a myriad of readily available records and documents relating to petitioner's character and background. With the limited exceptions of petitioner's military records, records from the Sacramento County jail, and his medical records from the University of California, Davis Medical Center, trial counsel did not independently locate and obtain any other readily available records concerning petitioner, which contained mitigation or investigative leads.

    (3)    Trial counsel unreasonably did not identify, obtain, and use a myriad of readily available records and documents relating to petitioner's immediate and extended family. The sole exception is that trial counsel obtained the Sacramento County Superior Court file of Lena and Robert Ashmus's 1979 divorce case. Trial counsel unreasonably did not obtain the critical deposition given by petitioner's mother during that divorce, or the family services files, which

detailed the couple's abusive relationship. Moreover, trial counsel did not subpoena or otherwise obtain educational, medical, mental health, law enforcement, military, or other readily available and relevant records concerning petitioner's immediate and extended family.

(4)    Trial counsel unreasonably failed to consider or pursue lines of investigation reasonably suggested by the records or attempt to introduce them as independent and unbiased sources of compelling mitigation.

(5)    Trial counsel unreasonably failed to conduct adequate interviews with petitioner's family, neighbors, friends, and other persons whose identity was known or reasonable should have been known. These potential witnesses include relatives, neighbors, friends, medical personnel, teachers, juvenile hall counselors, and others with compelling information about petitioner's life and family history. The investigation that trial counsel did conduct was unreasonably and deficiently limited in scope and focus.

(6)    As a result of the constitutionally deficient investigation, trial counsel was unable to assess potential guilt and penalty phase strategies, develop and present coherent and compelling guilt and penalty phase defenses, and present compelling testimony from unbiased and reliable witnesses

d.    Trial counsel failed to support the mitigation witnesses' testimony with any readily available and reliable documentary evidence that was created before the commission of the crime and which would have provided support for and mitigating explanations for the witnesses' observations. Trial counsel unreasonably failed to utilize school, medical, and law enforcement records which, *inter alia*, demonstrated that petitioner suffered mental, emotional or psychological problems, that petitioner's maternal and paternal families are fraught with incidents of mental illness, alcoholism, and physical, psychological, and sexual abuse, that petitioner was tormented by his abusive and mentally impaired mother and father, that petitioner's family was plagued by financial difficulties throughout his childhood, that petitioner's hyperactivity, ostracization, and bizarre

behavior stemmed from his multiple mental dysfunctions and environmental conditions and not from volitional acts, that petitioner functioned well in structured settings, and that supported virtually all of the mitigating factors presented at trial. Although trial counsel obtained portions of some of these records, trial counsel unreasonably failed to utilize them in examining witnesses or introduce them into evidence as independent and unbiased sources of compelling mitigation. Moreover, trial counsel unreasonably failed to utilize records and witness accounts that they possessed or should have possessed to impeach penalty phase witnesses. Thus, the jury heard a disjointed, grossly incomplete, and distorted picture of petitioner's life.

e.    As a result of trial counsel's lack of preparation and inadequate and unfocused presentation of the penalty phase testimony, the prosecution was able unfairly to disparage and argue the irrelevance of the compelling mitigation. Moreover, trial counsel were unable to construct and present compelling arguments for a sentence of life without the possibility of parole.

f.    The timely investigation of petitioner's background, development, and functioning would have produced evidence in mitigation that competent counsel would have investigated and presented during the penalty phase of the trial proceedings. The jury would heard compelling and corroborated mitigation about petitioner's life, including the following:

(1)    Petitioner's multigenerational social history is replete with numerous individuals suffering from addictive disorders, including alcohol addiction, and individuals with mental illness, including depression, schizophrenia, delusional thought disorders, and suicidal tendencies. The history also documents the particularly chaotic and unstable environment that contributed to or caused petitioner's own mental impairments and drug use from an early age. Children on both the paternal and maternal sides of petitioner's family endured threats to their physical and mental integrity, abandonment, and neglect at the hands of their caretakers, including sexual exploitation and abuse.

(2)     Petitioner's parents' marriage was dysfunctional and abusive from its inception.  Although both parents immediately recognized the mistake in their marriage, they remained together for almost two decades because of the birth of petitioner and his brother.  Both parents, however, unleashed their frustrations with the marital discord on their children.

(3)     Both parents displayed symptoms of severe, long-standing mental disorders, which affected their ability to perceive situations accurately, control their behavior, and care and nurture their children.

(4)     Throughout his childhood, petitioner endured abandonment, neglect, and severe physical, sexual, and mental abuse.  Petitioner's parents subjected him to cruelty and physical assaults on a daily basis.  Numerous witnesses were available and willing to testify concerning the abuse.  For example,

(i)     Lillian Foley, petitioner's great aunt, describes petitioner's mother's horrific treatment of him when he was just a toddler: " The first memory I have of Troy is when he was just a baby, before his younger brother Tracy was born.  Although Troy was young enough to be crawling, Lena did not breast or bottle feed Troy.  Instead, Lena took the jug of milk out of the refrigerator and placed it on the floor for Troy to figure out how to open it.  That first time that I saw Lena feed Troy this way, Troy became upset because he could not get to the milk.  When he started crying, Lena picked him up and threw him across the room, so his little body slammed against the kitchen wall and then fell to the floor.  I told Lena that if she gave him warm milk, and actually fed it to him, Troy would not cry.  Lena immediately lashed out at me in a manner similar to the way she dealt with Troy.  I was astounded by her reaction and fearful that she might strike me. "

(ii)     Petitioner's cousin, who describes one such episode when petitioner was three years old: "One of the first times I ever saw Lena with

Troy was at a holiday family gathering held at Aunt Fran and Uncle Andy's house. While the women were sitting around the table chatting, Troy came up to his mother, calling, 'Mom.' He could not have been any more than three years old. As he came up to Lena, Lena backhanded him across his face so hard that he went flying across the dining room floor."

(iii)    Another cousin Eugene Foley witnessed petitioner's mother throw petitioner through a window during a holiday party: "Troy was a toddler, and was still crawling around the floor. Lena was in the kitchen and Troy crawled up to her, and grabbed onto her dress, as if to pull himself up onto his feet. Lena became enraged, picked him up, and threw him out of the open kitchen window onto the porch. As relatives ran to check on Troy, Lena stayed in the kitchen, acting as if nothing had happened."

(iv)    Jan Yungling, a neighbor, frequently witnessed the effects of the abuse on petitioner. On one occasion, she found petitioner, then only a young boy, in bed, looking very pale and appeared to be in a lot of pain and holding his genital and groin area. When she insisted on examining petitioner, she found that "his pelvic area was badly bruised and his scrotum was swelled to the size of oranges." Petitioner's mother told Mrs. Yungling that petitioner's father "had kicked him until 'they' started to swell." The beatings were so frequent and so severe that Mrs. Yungling notified the police department.

(5)    Petitioner was exposed to and corrupted by his parents' sexual practices and perversion from an early age. Throughout his life, petitioner's father has engaged in sadistic and perverse sexual activities. After he married petitioner's mother, petitioner's father forced her to participate in sadistic sexual acts. Petitioner was exposed to his father's sexual paraphernalia, magazines, and sexual activities at an early age. As petitioner grew older, he too became the target of

sexual abuse at the hands of the very persons charged with his care.

(6)    Petitioner's parents also forced the children to engage in ritualized killing and bizarre treatment of the family pets. On one occasion, petitioner and his brother came home to find that their mother's dog had died.  Instead of disposing of the remains, however, petitioner's mother placed the deceased dog in the freezer, where it remained for several months.   When petitioner was about ten years old, his father brought home several rabbits, which the boys adopted as pets. After the rabbits matured, petitioner's parents informed the boys that the rabbits were to be killed.  Petitioner's father forced petitioner to break the rabbits necks and skin them.  The boys were later forced to eat the meat from their pet rabbits.

(7)    Contrary to the impression presented to the jury, *see, e.g.*, RT 6612, 6617, petitioner grew up in poverty and experienced inadequate nutrition, filth, and deprivation.  Although the jury learned in passing that the family declared bankruptcy, the jury never viewed the bankruptcy records or learned the true extent of the poverty that plagued petitioner's family.  Even when the family had a sufficient income, petitioner went without food and other necessities.  To prevent petitioner from obtaining food, his parents locked the kitchen cupboards.

(8)    From infancy throughout adulthood, petitioner displayed symptoms of major mental illness and psychological disorders.  Throughout his childhood, his behavior fluctuated markedly between mania and depression.  Petitioner often dissociated or "checked out," particularly in response to stressful situations.

(9)    From an early age, petitioner engaged in self-destructive and suicidal behavior caused by his mental dysfunctions and home environment. Petitioner's records were replete with references to and evidence of his physically self-destructive behaviors and self-mutilation, including slamming his fists into walls until his hands became bloody, slamming his hands into glass fixtures, and cutting on his chest and limbs with knives and other sharp implements.

(10)    Petitioner's longstanding history of suicidal ideation, suicide

attempts, and self-injurious behavior including self-mutilation are consistent with his documented history of both exposure to multiple traumas, physical, sexual, and psychological, and symptoms of a major mental illness.  Witnesses and records document a history of self-mutilation dating from the time petitioner was just six years old.  Self-mutilation took the form of cutting into himself using staples, knives, needles and glass, and was documented by neighbors, teachers, juvenile hall and group home counselors, and treating physicians.  Self-injurious behavior included repeatedly banging his head and slamming his fists against concrete school and juvenile hall walls with such force and repetition that medical attention and observation often were required.  Witnesses to this self-injurious behavior included juvenile hall and group home counselors as well as county jail personnel.

(11)    Petitioner was first observed trying to commit suicide by his mother when he was just eight years old.  On that occasion, his mother intervened while he was strangling himself with a leather belt.  Petitioner's mother also recalls him trying to kill himself on a second occasion before he was ten years old, during which he climbed up into a backyard tree, and was preparing to dive when his mother came out and talked him down from the tree.   Then at age eleven, petitioner's mother wrestled a kitchen cutting knife from his hand as he was slitting his wrists.  A fourth attempt was made when petitioner was twenty-one years old and injected substantial quantities of mercury into each forearm.  At that time, a lethal dose did not penetrate into his circulatory system.  The mercury remains in his arms to this day.  Petitioner again almost succeeded in killing himself one year later while incarcerated at Sacramento County Jail.  While incarcerated, petitioner succeeded in hanging himself by one of his sheets.

(12)    Throughout his childhood, petitioner was isolated from his peers and instructed to maintain the secrecy of the events in the house.  Petitioner's parents avoided having visitors to the house, and insisted that the children conceal the true nature of the family environment, including the abuse they endured.

(13)    Petitioner's parents neglected to care for his basic needs, and his mental disorders rendered him incapable of performing basic hygiene or caring for himself. His parents humiliated and tortured him by forcing him to wear urine and feces soiled clothing, and by forcing him to sleep in a urine-soaked bed.  His disheveled appearance, repulsive odor,  and awkward mannerisms led to ridicule and taunting, causing petitioner to be further isolated from his peers.

(14)    Records and teachers consistently described petitioner as having severe emotional and behavioral problems.  These records and interviews with teachers reveal that these problems stem from petitioner's psychiatric and psychological disorders and chaotic and abusive home environment.

(15)    Although the jury learned of petitioner's difficulties with other children, RT 6714, 6765, 6793, they were not presented with substantial and corroborative evidence that petitioner was rarely the aggressor in any altercation.

(16)    Contrary to the impression left with the jury, petitioner's troubles with juvenile authorities did not result from his running away from home after committing criminal acts. RT 6467.  Instead, petitioner's encounters with juvenile authorities began when petitioner ran away from home because he could no longer endure the chaos and abuse and continued after his parents threw him out of the house.  As a young teenager, petitioner was forced to live on the streets, facing constant dangers.  Lacking the capacity to care for himself, petitioner was easily preyed upon and influenced by others.

(17)    Petitioner did not possess the sophistication or past delinquent behavior of the other wards during his confinement in juvenile hall.  He was extraordinarily immature and displayed behavioral and emotional levels appropriate to a child who was ten to twelve years old, rather than an adolescent of seventeen years.  He was extremely intimidated by the other wards.

(18)    Although petitioner's mental problems were identified at an early age, he did not receive effective medication or therapy necessary to allow him to

mediate his behavior.    Instead, petitioner's mental and emotional problems worsened and his ostracization from his peers increased, as his increasingly bizarre behavior subjected him to taunts and ridicule.  Eventually, petitioner began to self-medicate with street drugs as a means to minimize his uncontrollable mood fluctuations and aberrant behavior.

g.    Trial counsel unreasonably and prejudicially failed to retain and present an expert to review, synopsize, and explain petitioner's social history and to provide a context within which the jury could evaluate the mitigation presented.  Employing a social historian with qualifications in family dynamics and child abuse, would have resulted in a complete investigation into petitioner's family history, mental illness, and psychological disorders.  Moreover, the presentation of such an expert would have permitted the jury to understand the mitigating social dynamics and influences that shaped petitioner's life and behavior and would have provided a context for understanding and assimilating the penalty phase witnesses' testimony.

h.    Trial counsel unreasonably and prejudicially failed to develop and present a coherent penalty phase presentation so as to avoid the introduction of otherwise irrelevant and prejudicial information through direct- and cross-examination.  Moreover, trial counsel failed to place the seemingly prejudicial information about petitioner's conduct and behavior into context and explain the mitigating causes of the behavior. Absent the introduction of the prejudicial information or had trial counsel placed petitioner's conduct into context, the jury would not have sentenced petitioner to death.

i.    The failure of defense counsel to produce convincing evidence of petitioner's family history, his childhood, and adult life, deprived petitioner of a fair penalty phase trial and denied to trial counsel the insight required to protect petitioner's constitutional rights in both the guilt and penalty phases of the trial.

j.    Absent trial counsel's deficient representation, the jury would not have sentenced petitioner to death.

6.    Trial counsel unreasonably failed to make a motion to exclude witnesses from the

court or otherwise ensure that witnesses' testimony was not influenced by the presence of other witnesses. During the penalty phase, Tracy Ashmus, petitioner's brother, testified about the family dynamics and events. Tracy Ashmus, however, was unable to testify fully and truthfully because his mother, father, and other relatives were in the courtroom and in the hallway.

7.    Trial counsel unreasonably failed to develop and present lay and expert evidence concerning petitioner's future adjustment in custody. Trial counsel's unreasonable failure to develop and present lay and expert evidence of petitioner's probable future non-dangerousness if sentenced to life in prison constitutes prejudicially deficient performance.

a.    An inference of future non-dangerousness, i.e., that petitioner would not pose a danger if spared his life but incarcerated in prison, based on consideration and evaluation of past conduct, is a valid, desirable, and critically significant mitigating factor. Petitioner's trial counsel recognized as much in presenting the brief and isolated testimony of jailer Kenneth Franklin. RT 6955-66. Trial counsel, however, neglected to present a wealth of relevant evidence dating from grammar school, or expert testimony on institutional adjustment. They failed to develop this theme in mitigation and further failed to marshal testimony provided by penalty phase witnesses for purposes in support of this theme.

b.    Data about petitioner in his school records and testimony from teachers would have supported a powerful mitigating theme that petitioner posed no danger to others if sentenced to life without possibility of parole. Had the jurors heard this evidence, they would have learned that:

(1)    Although records and teachers consistently described petitioner as having severe emotional and behavioral problems as well as multiple symptoms of psychiatric or psychological disorders, they also described him as someone who "seldom retaliate[d]," despite harassment from other students.

(2).    Petitioner was described as someone who "is not aggressive or destructive" and who simply wanted to please teachers and peers and be liked by them but had no idea how to achieve these goals.

(3)    Petitioner worked well in one-on-one situations and responded to individualized attention. He needed and responded well in highly structured surroundings.

(4)    Even in junior high and high school, while he agitated peers verbally and because of his odd behavior, petitioner did not seek out physical confrontations but shrank from them. As a fellow student noted at the time of petitioner's arrest, petitioner was a timid person who "never was looking for a fight. He was always the one being beat up." This was confirmed by one of petitioner's high school English teachers, who recalled that he stood out because he was "such a withdrawn guy." According to her, petitioner became angry in class perhaps once during the semester and seemed to have neither any friends nor any enemies in her class.

(5)    Testifying witnesses had similar recollections of petitioner as someone who worked well in one-on-one situations and who responded well to limits and clear expectations. *See, e.g.,* RT 6730, 6764, 6783-84. Trial counsel failed to develop or utilize any of this information as an aspect of petitioner's character or record which called for a sentence less than death because he would function well in a structured prison setting.

c.    Information in petitioner's juvenile hall records and testimony from counselors and other juvenile hall personnel would have supported a powerful mitigating circumstance, i.e., that petitioner posed no danger to others if sentenced to life without possibility of parole. Had this information been provided to the jurors, they would have learned that:

(1)    Petitioner did not possess the sophistication or past delinquent behavior of the other wards during his confinement in juvenile hall. He was extraordinarily immature -- displaying behavioral and emotional levels appropriate to a child who was ten to twelve years old, rather than an adolescent of seventeen years. He was extremely intimidated by the other wards.

(2)    Petitioner would benefit from intensive supervision, support and psychotherapy in a highly structured setting.  He was observed to be disoriented at times and highly anxious.  His constellation of psychological symptoms required confinement accompanied by mental health intervention.  At the time petitioner was in juvenile hall, no mental health team was available to work with petitioner.  That job was left to unit supervisors.

(3)    Juvenile Hall staff kept petitioner on "S-3" status for the majority of his confinement.  This designation was afforded to minors who were suicide risks.  In addition, petitioner was frequently housed with an older, trusted ward whose job it was to keep an eye on petitioner so that he did not seriously hurt or kill himself.

(4)    Petitioner's immaturity, verbal agitation, and behavioral oddities made him a target for abuse by his peers.  Staff frequently isolated petitioner for his own protection and the protection of property, rather than for the protection of other individuals.

(5)    Petitioner's records were replete with references to and evidence of his physically self-destructive behaviors, including self-mutilation, slamming his fists into walls until his hands became bloody, slamming his hands into glass fixtures, and cutting on his chest and limbs with knives or other sharp implements.

(6)    Petitioner craved positive attention, but did not know how to obtain it.  He was not malicious but his impulsive and odd behavior put him on the defensive with other wards.

(7)    Despite moods and behaviors which alternated between manic and withdrawn, petitioner was not physically aggressive toward other wards and did not pick fights.

d.    Records of petitioner's participation in a job training program in 1983, which were created and maintained at the time of his participation would have demonstrated that in a structured job setting he was a productive, prompt, desirable, and

steady worker.  In the words of one supervisor, petitioner was "one of the best student aides we have had."

e.    Petitioner's jail custodial records would have supported a powerful mitigating circumstance, i.e., that petitioner posed no danger to others if sentenced to life without possibility of parole.  The jury would have learned the following facts:

(1)    Petitioner was confined in the Sacramento and San Mateo County Jails for over two years -- from late May 1984 until late July 1986.

(2)    Although he was the victim and target of constant verbal abuse, intimidation, harassment and threats of physical violence, and was occasionally the victim of physical violence, he did not fight back and did not initiate any form of physical aggression.  He neither participated in physical misconduct nor had any write-ups for such conduct while in jail in either location, despite the fact that he was not well liked by either staff or fellow inmates because of the nature of his crime.

(3)    Conforming conduct and acceptable behavior in a jail setting are often more difficult to achieve than in prison because jails are not set up for long term confinement and therefore provide less opportunities for inmates to involve themselves in constructive, structured work, exercise, or activities.

f.    Expert testimony about petitioner's future institutional adjustment in light of his probable placement within the California Department of Corrections if sentenced to life without possibility of parole would have provided powerful mitigating evidence.  Readily available competent expert testimony of a social psychologist familiar with the California Department of Corrections would have established the following facts for the jury:

(1)    If sentenced to life without possibility of parole, petitioner would have been placed by California Department of Corrections personnel in a Level IV institution, which represented the most secure prison setting in the department.  Placement is a function of a "classification score."  Although a classification score

is calculated by reviewing a variety of factors, the single most important one is the length of the prisoner's sentence.  Because of this,  prisoners sentenced to life without possibility of parole were (and are)  housed only in a Level IV institution, unless granted an extraordinary override.

(2)     Prisoners in Level IV institutions had to be escorted during all movement outside of  their living units.  The units in the older Level IV institutions were essentially "lock-up" facilities, consisting of large cell blocks, with three to five tiers of cells, each of which was located along a catwalk.  Gun walks (areas where guards carry mini-14 rifles and walk up and down the block) faced the cells and protective fencing ran down the side of the tiers.  Exercise was available only in the inmate's cell or on an exercise yard. Exercise yards were under separate gun cover.  Inmates in Level IV institutions were under gun cover (as well as escort) whenever they were out of the cell blocks.  Each Level IV institution placed primary emphasis on security and employed a variety of security measures, including wire, checkpoints, automated gates and grills, and metal detectors.  The Department of Corrections maintained a psychiatric staff at Level IV institutions.

(3)     The newer Level IV institutions, some of which had been planned and were in construction at the time of petitioner's trial, all featured even more rigorous security measures, including TV cameras, smaller housing units with glassed control units, and tightly controlled inmate movement.

(4)     Level IV institutions were well-suited to petitioner's need for and ability to flourish in a highly structured, rigidly controlled environment.  The clarity of expectations, stability, and structure of a Level IV institutional environment would have been therapeutic to someone like petitioner who demanded and needed limits.  An individual such as petitioner, who functioned well with individualized attention, in one-on-one situations or very small group environments where rules and regulations were very clear, would have been well-

suited to the environment in a Level IV institution which provided inmates with less choices and ambiguity with respect to rules than the outside world. The comments of petitioner's teachers and counselors, in records, testimony and witness statements, support an expert's opinion that petitioner would thrive in rather than balk at or rebel against the structure offered by a Level IV institution.

(5)     Moreover, in light of petitioner's commitment offenses — convictions for a crime of violence and sex offenses involving a young girl -- it was highly likely that he would choose to be placed in protective custody which offered additional structure. Sex offenders, especially in cases involving young children, choose the greater security and safety of such custody. Petitioner's history of victimization, and his repeated lack of physical aggression or retaliation in situations where to do nothing is a sign of weakness support this prediction.

(6)     Petitioner's generally conforming conduct and lack of violence in the jail were predictive of his functioning if confined in a Level IV institution. Petitioner's talent with respect to computer programming, about which the jury heard testimony at trial, his adequate intellectual functioning, and his performance in a supervised job training program demonstrate that petitioner would have had the ability to contribute and channel himself creatively in a structured setting.

(7)     Petitioner's behavior record improved in custodial settings as he grew older and as the structure increased, thereby suggesting this trend would continue in prison. Moreover, prison, unlike juvenile hall, offered not only structure, but the chance for ongoing therapy and psychiatric assistance if needed.

(8)     If asked, a social psychologist familiar with the California Department of Corrections institutions, human adjustment to prison environments, and the psychological effect of prison conditions on individuals, would have testified to the foregoing and further opined that petitioner had the temperament and ability to adjust well and become a highly conforming prisoner if sentenced to life without possibility of parole, and that factors in his background, character and

1    history were predictive of future conforming behavior in prison.

2    g.    Although trial counsel called Kenneth Franklin, a Sacramento County

3    correctional officer, to testify on behalf of petitioner, counsel did not inform the jury that

4    good institutional adjustment by itself or as an indicator of future non-violence in prison

5    was a mitigating factor. In fact, counsel's only reference to Franklin's testimony was a

6    fleeting, disjointed and obscure one during closing argument, RT 7399, demonstrating that

7    they did not appreciate or recognize that good institutional adjustment (alone or as a

8    predictor of future behavior) was an independent mitigating factor entitled to substantial

9    weight. Moreover, counsel failed to mention or otherwise utilize any of the testimony

10    from witnesses about petitioner's responsiveness to structure, RT 6730, 6764, 6783-84,

11    his industriousness as a worker, RT 6940-43, and relative intellectual talent, RT 6774,

12    6825, as part of a theme that petitioner would contribute to and pose no threat of harm to

13    anyone if sentenced to life without the possibility of parole.

14    h.    Trial counsel's failure to develop this theme in mitigation; investigate and

15    marshal lay evidence in support thereof; utilize testimony presented by the witnesses to

16    support this theme; and retain an expert who could testify about the prison environment

17    and adaptive functioning therein constituted a level of performance not expected of

18    reasonably competent counsel performing as a diligent advocate. Trial counsel's failure

19    was prejudicial. The mitigating factor that trial counsel omitted was central to the jury's

20    question of whether petitioner could be safely housed in prison as an alternative to the

21    death penalty. Petitioner's ability to conform his conduct while in prison was a matter on

22    which the jury had to satisfy itself before deciding whether other factors in petitioner's

23    background, character, and history justified a sentence less than death. In a case where

24    overwhelming evidence potentially existed on this fundamental notion of safety and where

25    not even petitioner's family stood behind him, the jury would not have sentenced petitioner

26    to death had they believed petitioner posed no undue danger to  fellow inmates and

27    custodial staff.

28    8.    Absent any or all of counsel's failings, the jury would have reached more favorable

1    verdicts on the questions of guilt and penalty.

2 **F.    CLAIM 6: THE TRIAL COURT AND TRIAL COUNSEL DENIED PETITIONER**
3 **HIS DUE PROCESS RIGHT TO BE PRESENT AT HIS TRIAL AND NOT TO BE**
    **TRIED WHEN HE WAS UNABLE TO COMPREHEND CRITICAL PORTIONS OF**
    **THE PROCEEDINGS OR TO COMMUNICATE AND COOPERATE WITH**
4     **COUNSEL.**

5         The convictions and sentence of death were rendered in violation of petitioner's rights to

6 be present and to comprehend the nature and content of all pre-trial and trial proceedings, to a fair

7 and impartial jury, to a reliable, fair, non-arbitrary, and non-capricious determination of guilt and

8 penalty, to the effective assistance of counsel, to present a defense, and to due process of law as

9 guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States

10 Constitution because petitioner was unable to comprehend the nature of the proceedings or to

11 communicate and cooperate with his counsel; both the nature and extent of petitioner's mental

12 impairments were readily evident to the state trial court, the defense counsel, prosecutor and all

13 other state officials who had custody and control of petitioner as a pre-trial detainee and

14 unsentenced prisoner; and said individuals and officials unreasonably and intentionally failed to

15 inquire into the need for or to employ readily available remedies to enable petitioner to

16 comprehend and participate in the proceedings.

17         Petitioner was deprived of his constitutional rights to participate in the development and

18 presentation of his defense because he was incompetent to stand trial. There is a wealth of

19 background information relating to petitioner's life history, his functioning before, during, and

20 after trial, including medical reports, and numerous other documents directly relevant to

21 petitioner's mental functioning. This information, of which representatives of the state, trial

22 counsel, and other responsible persons were aware or reasonably should have been aware,

23 documents that petitioner has exhibited lifelong symptoms of delusional thought patterns, affective

24 disorders, psychotic disorders, including schizophrenia, and the sequelae of severe trauma

25 typically found in those suffering from post traumatic stress disorder.

26         Petitioner's multiple mental impairments were exacerbated by the torment he endured at

27 the hands of other inmates and guards in both facilities. These conditions, coupled with

28 petitioner's developmental and mental impairments, thwarted petitioner's participation at several

1    critical junctures of the criminal proceedings.  Thus, petitioner was incompetent to understand the

2    nature of the proceedings against him, to aid and assist in a rational manner his counsel, and

3    effectuate knowing, intelligent, and voluntary waivers of his constitutional rights.

4         The trial court's failure to declare *sua sponte* a doubt as to petitioner's competency to

5    proceed, as well as trial counsel's failure to bring the matter to the trial court's attention, deprived

6    petitioner of his procedural due process rights and his right to effective assistance of counsel

7    guaranteed by the federal constitution.

8         In support of this claim, petitioner alleges the following facts, among others to be

9    presented after full discovery, investigation, adequate funding, access to the California Supreme

10    Court's subpoena power, and an evidentiary hearing:

11         1.    Those facts set forth in IV.A., IV.C., and IV.E. in this Petition, which are

12    incorporated by this reference as if fully set forth herein.

13         2.    Petitioner's familial and personal history includes instances of severe mental

14    disorders, including schizophrenia.  Petitioner has a history of suicide attempts and suicidal

15    ideation from an early age, including suicide attempts while in custody awaiting trial for the

16    offenses in this case.

17         3.    At all times relevant to this claim, petitioner suffered from a myriad of mental

18    impairments. Petitioner has exhibited lifelong symptoms of delusional thought patterns, affective

19    disorders, psychotic disorders, including schizophrenia, sleep disorders, and the sequelae of

20    severe trauma typically found in those suffering from post traumatic stress disorder. Petitioner's

21    familial history includes instances of serious mental disorders, including schizophrenia.

22         4.    Petitioner's mental impairments prevented him from comprehending or participating

23    in any and all pre-trial and trial proceedings including, but not limited to the preliminary hearing

24    conducted in the municipal court, hearings on pretrial motions, jury selection, the guilt and

25    penalty phases of the trial, the hearing and decision on petitioner's motion for new trial and

26    motion for modification of the death verdict, and the trial court's imposition of the death

27    judgment.

28         5.    Witness accounts from guards, staff, and inmates at the facilities detail the

systematic harassment that petitioner endured and petitioner's deteriorating mental condition while institutionalized.

6.     Information disclosed to, in the possession of and/or otherwise acknowledged and discussed by the state court judges, appointed counsel, and state officials made them aware or reasonably should have made them aware of the existence, nature and severity of petitioner's mental impairments and of the need to stay the capital trial proceedings in order to examine petitioner and to take appropriate measures to ameliorate petitioner's inability to follow and understand the proceedings, to cooperate with counsel and participate in his own defense.  Despite their awareness of said information, the state authorities and trial counsel intentionally failed and refused to take reasonable steps to evaluate petitioner's mental impairments, and conducted critical pre-trial and trial proceedings that they were aware petitioner could not comprehend.   Said information included, but was not limited to the following:

a.     Petitioner has a history of suicide attempts and suicidal ideation from an early age, including a suicide attempt and multiple incidences of suicidal thoughts while in custody awaiting trial for the offenses in this case.

(1)     Upon his admission into each jail, petitioner was interviewed by a staff nurse.  The Receiving-Screening form indicates that petitioner informed the nurse that he previously had thoughts of ending his life and had injected mercury in both arms.  Each nurse recommended that petitioner be housed in a single cell.

(2)     Although petitioner denied suicidal thoughts, two days after his entry into the jail, his jailers noted that he was a suicide risk and advised that he not be isolated at the end of the tier.

(3)     The Prisoner Location Card for the Sacramento County Jail contains an entry dated August 9, 1985 that describes petitioner's "risk for going off by suicidal gesture" and advises that psychiatric services should be notified if petitioner "becomes unusually agitated."

(4)     On April 4, 1986, San Mateo County Deputy Carr noted that petitioner displays suicidal tendencies and should be closely monitored.

(5)    On July 25, 1986, Troy was placed on suicide watch by San Mateo County Jail medical staff.

b.    Petitioner's behavior prior to and during trial included numerous bizarre incidents.

(1)    On November 14, 1985, petitioner became agitated during a routine search of his person at the Sacramento County Jail. Following the search and while being escorted to a different section of the jail, petitioner, while handcuffed, fell to his knees and "began hitting his head on the elevator wall." Fearing that petitioner might "nut up," deputies escorted him for a jail psychiatric staff evaluation.

(2)    On December 26, 1985, petitioner inexplicably struck the top of a steel table with such force as to injure his right hand.

c.    Petitioner's erratic behavior was exacerbated by physical threats and psychological abuse inflicted by other inmates.

(1)    On October 16, 1984, inmate Michael Gehman punched petitioner in the left eye, knocking him from his chair and causing him to strike the back of his head on the door. The blow cracked a bone below petitioner's left eye.

(2)    On October 20, 1984, jail officials noted on the Prisoner Location Card that petitioner was to be kept separated from Michael Davis, the uncle of the victim.

(3)    On numerous occasions, Sacramento jail officials noted that petitioner should be isolated from other inmates because of concerns for his safety. On August 20, 1984, an entry was made to petitioner's Location Card that he was to be kept separate from inmate Gehman, the victim's cousin. On October 20, 1984, Michael Davis was added to the list of inmates who threatened petitioner. On August 12, 1985, Sacramento County jailors noted that the Court ordered that petitioner be isolated from other inmates.

(4)    On August 12, 1985, the Security Division of the Sacramento

County Sheriff's Department noted that petitioner was to be isolated from other prisoners.

(5)    On January 14, 1986, petitioner was threatened by Mr. Long, another inmate in the Sacramento Jail.

(6)    While incarcerated at the Sacramento County Jail, inmate Ronny Mozingo planned to kill petitioner.

d.    Petitioner's behavior in the courtroom, including evidence that he dissociated at critical times, raised serious doubts about his ability to understand the proceedings and assist his counsel. *See, e.g.,* RT 5962.

7.    Petitioner's mental impairments remained an ongoing condition throughout the pre-trial, trial and sentencing proceedings.  Trial counsel were personally aware that petitioner could not communicate effectively with them or assist them in the preparation and presentation of a defense.  Trial counsel unreasonably failed to move for a stay of the proceedings and/or to conduct a competent and reliable evaluation of petitioner's ability to comprehend and attend the proceedings.

8.    The trial court and counsel unreasonably and prejudicially failed to make appropriate inquiry and determinations as to whether the nature and severity of petitioner's mental dysfunctions impaired his ability to comprehend the proceedings, and to take reasonable steps to ensure that petitioner's ability to comprehend the proceedings met minimal constitutional standards.

9.    The trial court and counsel were aware that the officers and staff of the Sacramento County Sheriff's Department and the San Mateo County Sheriff's Department, in whose custody petitioner was confined while awaiting trial and sentencing, failed to care for petitioner's mental health.

10.    The trial judge was aware that during the pre-trial proceedings and the trial itself, petitioner exhibited signs of bizarre behavior, which should have raised a doubt about whether petitioner was competent to follow and comprehend the proceedings and to participate, assist, and communicate with counsel during the course of the proceedings.

11.    The trial court's and trial counsel's failings unreasonably and impermissibly prevented petitioner from attending, comprehending, and participating in the proceedings and consulting and assisting counsel in the presentation of his defense.

12.    The resulting deprivation of petitioner's fundamental federal constitutional rights was prejudicial *per se*, had a substantial and injurious effect or influence on the jury's determination of the verdicts at the guilt and penalty phases, and requires the granting of habeas corpus relief from the judgment of convictions and the sentence of death.

**G.    CLAIM 7:  THE STATE'S DEATH PENALTY STATUTE FAILS TO NARROW THE CLASS OF OFFENDERS ELIGIBLE FOR THE DEATH PENALTY AND RESULTS IN IMPOSITION OF DEATH IN A CAPRICIOUS AND ARBITRARY MANNER.**

Petitioner's conviction, judgment of death, and confinement are unlawful and unconstitutional under the Fifth, Sixth, Eighth, and Fourteenth Amendments, because the California death penalty statute fails to narrow the class of offenders eligible for the death penalty and permits the imposition of death in an arbitrary and capricious manner.  In particular, petitioner's conviction of capital murder violated the Eighth and Fourteenth Amendments' requirements that the provisions of a state's death penalty statute must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence compared to others found guilty of murder, and thereby resulted in the imposition of a freakish, wanton, arbitrary and capricious judgment of death.  The failure to narrow the class of persons eligible for capital punishment deprived petitioner of his due process rights under the Fourteenth Amendment; permitted arbitrary selection for prosecution without consistent guidelines to ensure reliability; and violated the Eighth Amendment prohibition against cruel and unusual punishment.  In addition, counsel's failure to object deprived petitioner of his right to assistance of counsel.

The facts, among others to be presented after full investigation, discovery, access to this Court's subpoena power, and an evidentiary hearing, which support this claim are:

1.    Petitioner was convicted of first degree murder and sentenced to death under California Penal Code sections 187, 190.2(a)(17)(iii), (iv), and (v).  The special circumstance

rendering petitioner eligible for imposition of a sentence of death was the felony-murder special circumstance, as alleged and found true under Penal Code sections 190.2(a)(17)(iii), (iv), and (v).

2. Under the Eighth and Fourteenth Amendments, a death penalty statute must, by rational and objective criteria, genuinely narrow the group of murderers who may be subject to the death penalty.

3. California's death penalty statute as written fails to perform this narrowing, and the California Supreme Court's interpretations of the statute have actually *expanded* the statute's reach.

4. As written and applied, the California death penalty statute potentially sweeps the great majority of murders into its grasp, and permits any conceivable circumstance of a crime -- even diametrically opposite ones (e.g., the fact that a decedent was young as well as the fact that a decedent was old, the fact that a decedent was killed at home as well as the fact that a decedent was killed outside the home) -- to be used to justify the imposition of the death penalty.

5. Interpretations of California's death penalty statute by the California Supreme Court and the United States Supreme Court have placed the burden of narrowing the class of murderers to those most deserving of death on California Penal Code section 190.2, the "special circumstances" section of the statute.

6. That statute contained twenty-six different crimes punishable by death at the time of petitioner's crime and, according to the voter's pamphlet, was specifically enacted for the purpose of making every murderer eligible for the death penalty.[2]

7. Empirical evidence shows that this goal has largely been achieved. A survey of published and unpublished decisions, from 1988 through 1992, on appeals from first degree murder convictions establishes that 84 percent of first degree murder cases are factually special circumstance cases under the present version of section 190.2, thus rendering such murderers

---

[2]    Section 190.2's all-embracing special circumstances were created with an intent to make the death penalty apply to nearly every murderer.  Such intent directly violates the constitutional requirement that capital sentencing legislation define *and circumscribe* the class of persons eligible for the death penalty.  In fact, section 190.2 neither defines nor circumscribes, thereby catching within its net almost every person who has committed a first degree murder.

death-eligible.  Schatz & Rivkind, *The California Death Penalty Scheme: Requiem for Furman* 72 N.Y.U.L. Rev. 1283, 1332-35 (1997).

8.     California's death penalty scheme defines death-eligibility so broadly that it creates a greater risk of arbitrary death sentences than the pre-Furman death penalty schemes. California's statutorily defined death-eligible class is so large and imposition of the death penalty on members of the class so infrequent as to violate *Furman* and its progeny.

9.     California Penal Code section 190.2's failure to genuinely narrow the class of death eligible murderers is neither corrected nor ameliorated by Penal Code section 190.3, the statute which sets forth the circumstances in aggravation and mitigation which the jury is to consider in determining whether to impose a sentence of death upon a defendant convicted of special circumstance murder.  In practice and as a result of interpretation by the California Supreme Court, the section 190.3 factors have been used in ways so arbitrary and contradictory as to violate due process of law.  Furthermore, the California Supreme Court's interpretations of the Section 190.3 factors have created a process biased in favor of death that does not genuinely narrow the pool of murderers to those most deserving of death.

10.     California's statutory scheme is particularly death biased in felony-murder cases, such as petitioner's case, because the California felony-murder rule itself is exceedingly broad, all first degree felony-murder cases are special circumstance cases, and after rendering a first degree murder conviction and special circumstance finding based on felony-murder, the penalty jury is instructed to weigh the same felony-murder "crime circumstances" and the same felony-murder special circumstance(s) as factors in aggravation.  *See* Cal. Penal Code § 190.3(a).

11.     Safeguards employed by most other states to ensure a fair jury verdict are not a part of California law, and the review of death judgments by the California Supreme Court yields an affirmance rate higher than any other court in the country – much higher than the affirmance rate in states such as Florida, Georgia, or Texas.

12.     Individual prosecutors in California are afforded complete unguided discretion to determine whether to charge special circumstances and to seek penalties of death, thereby creating a substantial risk of county-by-county arbitrariness.  *See People v. Adcox,* 47 Cal.3d 207, 275-76

1    (1988) (Broussard, J. concurring).

2        13.    The present death penalty law in California is truly a "wanton and freakish" system

3    that randomly chooses among the thousands of murderers in California a few victims of the

4    ultimate sanction.

5        14.    The number and breath of the special circumstances, i.e., the death-eligibility

6    finding under California's death penalty statute, has steadily increased since 1977.

7        a.    In 1977, the California Legislature enacted a new death penalty law.  Under

8    the law, one of twelve special circumstances had to be proved beyond a reasonable doubt

9    to make a murderer death-eligible.  Stats. 1977, ch. 316, at 1255-66.  Under the statute,

10   death eligibility was to be the exception rather than the rule.  As stated by the California

11   Supreme Court, first degree murder was "'punishable by life imprisonment for

12   extraordinary cases in which special circumstances are present.'" *People v. Green,* 27

13   Cal.3d 1, 48 (1980) (quoting *Owen v. Superior Court,* 88 Cal.App.3d 757, 760 (1979).

14   Also, according to the California Supreme Court, the special circumstances were intended

15   to define death eligibility in California and thus perform the narrowing function required

16   by *Furman.  Id.* at 61.

17       b.    The 1977 law was superseded in 1978 by the enactment of Proposition 7,

18   known as the "Briggs Initiative."  Petitioner was tried and convicted under this 1978 death

19   penalty law.  The Briggs Initiative was to give Californians the "toughest" death-penalty

20   law in the country.  California Journal Ballot Proposition Analysis, 9 Calif. J. (Special

21   Section, November 1978) p. 5.)  The intent of the voters, as expressed in the ballot

22   proposition arguments, was to make the death penalty applicable to all murders:

23       And, if you were to be killed on your way home tonight simply
         because the murderer was high on dope and wanted the thrill, the
24       criminal would not receive the death penalty.  Why?  Because the
         Legislature's weak death penalty law does not apply to every
25       murderer.  Proposition 7 would.

26   1978 Voter's Pamphlet, p. 34.[3]

27

28       [3]    This goal of the voters was unconstitutional, and directly pertinent to the constitutionality

c.      The Briggs Initiative sought to achieve this result by expanding the scope of California Penal Code section 190.2 in a number of respects.

(1)      The Briggs Initiative more than doubled the number of special circumstances, adding five more "victim" circumstances, California Penal Code section 190.2(a)(8) (federal law enforcement officer), (9) (fireman), (11) (prosecutor), (12) (judge), (13) (elected or appointed official); four more felony-murder circumstances, California Penal Code section 190.2(a)(17)(iv) (sodomy), (vi) (oral copulation), (viii) (arson), (ix) (train wrecking); two more "means" circumstances, California Penal Code section 190.2(a)(15) (lying in wait), (19) (poison); two more "motive" circumstances, California Penal Code section 190.2(a)(5) (to avoid arrest or escape), (16) ("hate" motive); and one new catchall circumstance:   that the murder was "especially heinous, atrocious, or cruel, manifesting exceptional depravity," California Penal Code § 190.2(a)(14).

(2)      The Briggs Initiative substantially broadened the definitions of prior special circumstances, most significantly by eliminating the across-the-board homicide mens rea requirement of the 1977 law.  Under the Briggs Initiative, the majority of the special circumstances, including the felony-murder circumstances, for the actual killer, have no homicide mens rea requirement.  *See* Cal. Penal Code §190.2(a)(17); *see also People v. Anderson,* 43 Cal.3d 1104 (1987).

(3)      The Briggs Initiative expanded death-eligibility for accomplices by eliminating the "personal presence" and "physical aid" requirements generally applicable under the 1977 law.

d.      Since the adoption of the Briggs initiative in 1978, the Legislature and the California Supreme Court have continued to expand the scope of both first degree murder and the special circumstances.

---

of the statute:  the California Supreme Court has repeatedly held that election ballot arguments are entitled to great weight in interpreting statutes. *Lungren v. Deukmejian,* 45 Cal.3d 727, 740 n. 14 (1988); *Long Beach City Employees Assn. v. City of Long Beach,* 41 Cal.3d 937, 943 n.5 (1986).

(1)    In 1982, the Legislature added a new "means" murder: knowing use of armor-piercing bullets. 1982 Cal. Stat. 950, § 1 (codified as amended at Cal. Penal Code § 189).

(2)    In 1981, the Legislature, as part of a general rejection of the diminished capacity defense, eliminated two mental state defenses previously available in first degree murder cases. 1981 Cal. Stat 404, §§ 2, 7 (codified as amended at Cal. Penal Code §§ 22, 189). The California Supreme Court had previously held that proof of intoxication (and, inferentially, any mental defect) could negate malice, even in the case of a premeditated killing, *People v. Conley,* 64 Cal.2d 310 (1966), but the defense was eliminated by amendments to the definition of the "malice." Cal. Penal Code § 188; *see also People v. Saille,* 54 Cal.3d 1103 (1991) (explaining that changes in section 188 repudiated *Conley*). Similarly, the California Supreme Court had earlier held that, even in the case of a planned killing, a defendant could negate "premeditation and deliberation" by raising a doubt as to whether the defendant had the capacity to "maturely and meaningfully reflect upon . . . his contemplated act." *People v. Wolff,* 61 Cal.2d 795 (1964). That defense was eliminated by amendments to the definition of "willful, deliberate, and premeditated killing." Cal. Penal Code § 189; *see also People v. Stress,* 205 Cal.App.3d 1259 (1988) .

(3)    The list of special circumstances underwent a similar statutory expansion. In 1990, Proposition 115 added two more felony-murders to the special circumstances list: mayhem and rape by instrument. It also expanded the liability of felony-murder accomplices, eliminating the intent to kill requirement and requiring only that the accomplice meet the constitutional threshold required by the Eighth Amendment and controlling Supreme Court decisions. In 1996, Proposition 196 was enacted, adding three more special circumstances: felony-murder car jacking, murder of a juror, and murder by discharging a firearm from a motor vehicle. *See* 1995 Cal. Stat. 478, enacted by Proposition 196, § 2 (approved

March 26, 1996).

e.    Despite the far broader sweep of the special circumstances under the Briggs Initiative, the special circumstances are still allegedly expected to perform the same constitutionally required 'narrowing' function as the 'aggravating circumstances' or 'aggravating factors' that some of the other states use in their capital sentencing statutes." *People v. Bacigalupo*, 6 Cal.4th 457 (1993).

15.    The death-eligible class, created by the California death penalty scheme is too broad to comply with *Furman*.

a.    As a result of the number of special circumstances, the legislative definition of first degree murder, and judicial rulings on the scope of first degree murder, the special circumstances and common felonies statutes, a substantial majority of murders in California have been first degree murder and, in virtually all of them, at least one special circumstance could be proved.

b.    First degree murder in California is defined by Penal Code section 189. As it read at the time of petitioner's conviction, section 189 created three categories of first degree murders:  murders committed by listed means, killings committed during the perpetration of listed felonies, and willful murders committed with premeditation and deliberation.

c.    At the time of Petitioner's crime and conviction, California Penal Code section 190.2 contained 26 special circumstances, or 26 different crimes punishable by death.

d.    The real breadth of the special circumstance categories is not in the number of categories alone or in the number that produce death sentences, but in two factors which, in combination, makes California's scheme exceptional.

(1)    First, California, along with only seven other states (Florida, Georgia, Maryland, Mississippi, Montana, Nevada, and North Carolina) makes felony-murder simpliciter a narrowing circumstance. *See People v. Anderson*, 43 Cal.3d 1104 (1987).  Although the felony-murder language of California Penal

Code section 189 is not identical to the special circumstance language in application, there is no difference. *See People v. Hayes,* 52 Cal.3d 577 (1990).

(2) Second, California, along with only three other states (Colorado, Indiana and Montana), makes "lying-in-wait" a "narrowing" circumstance. Cal. Penal Code § 190.2(a)(15). As interpreted by the California Supreme Court, this circumstance encompasses a substantial portion of premeditated murders. Only California and Montana have death penalty schemes with both felony-murder simpliciter and lying-in-wait death-eligibility circumstances and, unlike California's numerous and broad felony-murder special circumstances, Montana's felony-murder narrowing circumstances encompass only two felonies: aggravated kidnaping and sexual assault on a minor. *See* Mont. Code Ann. § 46-18-303(7), (9) (1995).

e. At the time of Petitioner's trial, there was substantial overlap between the intentional murders committed by listed means in section 189 and the special circumstances set forth in section 190.2. Four of the five "means" listed in section 189 (murders by destructive device or explosive, poison, torture and lying in wait) were also special circumstances in intentional killings. *See* Cal. Penal Code § 190.2(a)(4), (a)(6), (a)(15), (a)(18), and (a)(19).

f. There also was substantial overlap between the felony murders listed in section 189 and the special circumstances listed in California Penal Code section 190.2(a)(17). Five of the six felonies listed in section 189 (arson, rape, robbery, burglary and violations of Cal. Penal Code § 288(a)) also were special circumstances. *See* Cal. Penal Code § 190.2, subds. (a)(17)(i), (a)(17)(iii), (a)(17)(v), (a)(17)(vii), and (a)(17)(viii).) Only mayhem could have been the basis for a first degree felony-murder conviction without at the same time making the murderer death-eligible.

g. The only intentional first degree murders not expressly qualifying for the death penalty were those where the first degree murder was established by proof of premeditation and deliberation. Some of these murders would have been capital murders

because the defendant committed another murder, Cal. Penal Code § 190.2 (a)(2), (a)(3), the defendant acted with a particular motive, Cal. Penal Code § 190.2 (a)(1), (a)(5), (a)(16), or the defendant killed a particular victim, Cal. Penal Code § 190.2, (a)(7) - (a)(13)).

h.    Virtually all the remaining premeditated murders also would have been capital murders because, by definition, most premeditated murders are done while the defendant was lying in wait. Cal. Penal Code § 190.2 (a)(15); *see People v. Morales,* 48 Cal.3d 527, 557, 575 (1989); *see also People v. Ceja,* 4 Cal.4th 1134, 1147 (1993) (Kennard, J., concurring).

i.    The situation is similar with regard to unintentional first degree murders. Unintentional murders are first degree murders by virtue of the felony-murder rule. Cal. Penal Code § 189. An unintentional killing during one of the listed felonies (except mayhem) makes the actual killer death eligible.

j.    At the time of petitioner's trial and in the years following, the broad reach of the felony-murder rule has resulted from three factors.

(1)    The felony-murder rule applies to the most common felonies resulting in death, particularly robbery and burglary, crimes which themselves are defined very broadly by statute and court decision.

(2)    The felony-murder rule applies to killings occurring even after completion of the felony, if the killing occurs during an escape, i.e., before the defendant reaches a place of "temporary safety," or as a "natural and probable consequence" of the felony. *See People v. Cooper,* 53 Cal.3d 1158 (1991); *People v. Birden,* 179 Cal.App.3d 1020 (1986).

(3)    The felony-murder rule is not limited in its application by normal rules of causation and applies to altogether accidental and unforeseeable deaths. *See e.g.,People v. Dillon,* 34 Cal.3d 441, 447 (1983).

k.    The breadth of California Penal Code section 190.2 is more than just theoretical. Empirical evidence confirms what is evident from the face of the statute: a

survey of 596 published and unpublished decisions on appeals from first and second degree murder convictions in California, from 1988 through 1992, as well as 78 unappealed murder conviction cases filed during the same period in three counties, Alameda, Kern, and San Francisco, demonstrates that California Penal Code section 190.2 fails to perform the narrowing function required under the Eighth and Fourteenth Amendments. *California Death Penalty Scheme: Requiem for Furman*, *supra*, at 1327-35.

l.     According to this survey, the California Supreme Court reversed a capital case, in whole or in part, only once because of insufficient evidence to support the finding of special circumstances. See *People v. Morris*, 46 Cal.3d 1 (1988).

m.     The results of this study of published appeals from first degree murder convictions make clear the following points:

(1)    First, the overwhelming majority (92 percent) of non-death judgment first degree cases are also factually special circumstance cases.

(2)    Second, the felony-murder special circumstances play the predominant role in defining death-eligibility in the California scheme. One or more of the felony-murder special circumstances was proved in almost three-quarters (74 percent) of the death judgment cases and in 60 percent of the other actual or potential special circumstance cases. *California Death Penalty Scheme: Requiem for Furman*, *supra*, at 1328-30.

n.     The results of this study of unpublished appeals from first degree murder convictions generally confirm the data for the published cases. Again, the overwhelming majority (85 percent) of first degree murder cases are factually special circumstance cases, with the majority of the special circumstance cases being felony-murder cases. The distribution of special circumstances closely tracks the distribution in the published non-death judgment first degree murder cases.

o.     The published case sample indicates that 92 percent of non-death judgment first degree murder cases are factually special circumstance cases, while the unpublished case sample puts the number at 85 percent. When the percentages for the three categories

of first degree murder cases (death judgment cases, published non-death judgment cases, and unpublished cases) are combined according to their respective proportions of total first degree murder cases, the result is that approximately 87 percent of first degree murder cases are factually special circumstance cases. Thus, approximately seven out of eight first degree murder cases are factually special circumstances cases, the majority of first degree murders are felony murders, and felony murders are virtually all special circumstance murders. Accordingly, California's felony-murder special circumstances, pursuant to which petitioner became death-eligible, alone defeat any possibility of genuine narrowing.

p.    The class of first degree murderers is narrowed to a death-eligible class not only by the special circumstances of section 190.2, but also by California Penal Code section 190.5, which forbids application of the death penalty to anyone under the age of eighteen at the time of the commission of the crime. When juvenile first degree murderers are excluded from the calculation, the result is that more than 84 percent of first degree murderers are statutorily death-eligible under California Penal Code section 190.2.

q.    Professor Shatz's study demonstrates that California Penal Code section 190.2 fails to genuinely narrow the group of murderers who may be subject to the death penalty and does not address the risk of arbitrariness prohibited by the Eighth and Fourteenth Amendments. According to this study, only 9.6 percent of those statutorily death-eligible under California's death penalty scheme are actually sentenced to death. If 84 percent of first degree murderers are statutorily death-eligible, and only 9.6 percent are sentenced to death, California has a death sentence ratio of 11.4 percent . This ratio is significantly below the assumed percentage of death judgments at the time of *Furman* (15-20 percent,), a percentage impliedly found by the majority of the United States Supreme Court to create enough risk of arbitrariness to violate the Eighth Amendment.

r.    Because almost all first degree murders in California fall within the special circumstances enumerated in California Penal Code section 190.2, the death penalty statute fails to genuinely narrow the class of death eligible murderers in violation of the Eighth

and Fourteenth Amendments.  As a consequence, the death-eligible class is so large that fewer than one out of eight statutorily death-eligible convicted first degree murderers is actually sentenced to death.   Under California's death penalty scheme, there is no meaningful basis to distinguish the cases in which the death penalty is imposed. California's scheme defines death-eligibility so broadly that it creates a greater risk of arbitrary death sentences than the pre-*Furman* death penalty schemes.

16.    California Penal Code section 190.2's failure to narrow the death-eligible class is neither corrected nor ameliorated by controls at other points in the process. California Penal Code section 190.2's failure to narrow is not ameliorated by California Penal Code section 190.3's aggravating and mitigating circumstances.

a.    California Penal Code section 190.2's failure to genuinely narrow the class of death eligible murderers is neither corrected nor ameliorated by California Penal Code section 190.3, the statute which sets forth the circumstances in aggravation and mitigation which the jury is to consider in determining whether to impose a sentence of death upon a defendant convicted of special circumstance murder.   The purpose of this statute, according to its language and interpretations by both the California and United States Supreme Courts, is to inform the jury of what factors it should consider in assessing the appropriate penalty.   In actual practice, it has been used in ways so arbitrary and contradictory as to violate due process of law.

b.    Factor (a), listed in section 190.3, directs the jury to consider in aggravation the "circumstances of the crime."  Having found that the broad term "circumstances of the crime" meets constitutional scrutiny, the California Supreme Court has never applied any limiting construction to this factor.  Instead, the California Supreme Court has allowed extraordinary expansions of this factor, approving reliance on the "circumstance of the crime" aggravating factor because the defendant had a "hatred of religion,"[4] or because

---

[4]    *People v. Nicolaus,* 54 Cal.3d 551, 581-82 (1991).

three weeks after the crime defendant sought to conceal evidence,[5] or threatened witnesses after his arrest,[6] or disposed of the decedent's body in a manner that precluded its recovery.[7]

c.     Prosecutors throughout California have argued that the jury could weigh in aggravation almost every conceivable circumstance of the crime, even those that, from case to case, reflect starkly opposite circumstances.   Thus, prosecutors have been permitted to argue that "circumstances of the crime" is an aggravating factor to be weighed on death's side of the scale:

(1)     Because the defendant struck many blows and inflicted multiple wounds,[8] or because the defendant killed with a single execution-style wound.[9]

(2)     Because the defendant killed the victim for some purportedly aggravating motive (money, revenge, witness-elimination, avoiding arrest, sexual gratification)[10] or because the defendant killed the victim without any motive at all.[11]

---

[5]     *People v. Walker,* 47 Cal.3d 605, 639 n.10 (1988).

[6]     *People v. Hardy,* 2 Cal.4th 86, 204 (1992)

[7]     *People v. Bit taker,* 48 Cal.3d 1046, 1110 n.35 (1989).

[8]     *See, e.g., People v. Morales,* Cal. Sup. Ct. No. S004552, RT 3094-95 (defendant inflicted many blows); *People v. Zapien,* No. S004762, RT 36-38 (same); *People v. Lucas,* No. S004788, RT 2997-98 (same);  *People v. Carrera,* No. S004569, RT 160-61 (same).

[9]     *See, e.g., People v. Freeman,* No. S004787, RT 3674, 3709 (defendant killed with single wound); *People v. Frierson,* No. S004761, RT 3026-27 (same).

[10]     *See, e.g., People v. Howard,* No. S004452, RT 6772 (money);  *People v. Allison,* No. S004649, RT 968-69 (same); *People v. Belmontes,* No. S004467, RT 2466 (eliminate a witness); *People v. Coddington,* No. S008840, RT 6759-60 (sexual gratification); *People v. Ghent,* No. S004309, RT 2553-55 (same); *People v. Brown,* No. S004451, RT 3543-44 (avoid arrest); *People v. McLain,* No. S004379, RT 31 (revenge).

[11]     *See e.g., People v. Edwards,* No. S004755, RT 10544 (defendant killed for no reason); *People v. Osband,* No. S005233, RT 3650 (same);  *People v. Hawkins,* No. S014199, RT 6801 (same).

(3)     Because the defendant killed the victim in cold blood[12] or because the defendant killed the victim during a savage frenzy.[13]

(4)     Because the defendant engaged in a cover-up to conceal his crime,[14] or because the defendant did not engage in a cover-up and so must have been proud of it.[15]

(5)     Because the defendant made the victim endure the terror of anticipating a violent death[16] or because the defendant killed instantly without any warning.[17]

(6)     Because the victim had children,[18] or because the victim had not yet had a chance to have children.[19]

(7)     Because the victim struggled prior to death,[20] or because the victim did not struggle.[21]

---

[12]     See, e.g., People v. Visciotti, No. S004597, RT 3296-97 (defendant killed in cold blood).

[13]     See, e.g., People v. Jennings, No. S004754, RT 6755 (defendant killed victim in savage frenzy [trial court finding]).

[14]     See, e.g., People v. Stewart, No. S020803, RT 1741-42 (defendant attempted to influence witnesses); People v. Benson, No. S004763, RT 1141 (defendant lied to police); People v. Miranda, No. S004464, RT 4192 (defendant did not seek aid for victim).

[15]     See, e.g., People v. Adcox, No. S004558, RT 4607 (defendant freely informs others about crime); People v. Williams, No. S004365, RT 3030-31 (same); People v. Morales, No. S004552, RT 3093 (defendant failed to engage in a cover-up).

[16]     See, e.g., People v. Webb, No. S006938, RT 5302; People v. Davis, No. S014636, RT 11125; People v. Hamilton, No. S004363, RT 4623.

[17]     See, e.g., People v. Freeman, No. S004787, RT 3674 (defendant killed victim instantly); People v. Livaditis, No. S004767, RT 2959 (same).

[18]     See, e.g., People v. Zapien, No. S004762, RT 37 (Jan 23, 1987) (victim had children).

[19]     See, e.g., People v. Carpenter, No. S004654, RT 16752 (victim had not yet had children).

[20]     See, e.g., People v. Dunkle, No. S014200, RT 3812 (victim struggled); People v. Webb, No. S006938, RT 5302 (same); People v. Lucas, No. S004788, RT 2998 (same).

[21]     See, e.g., People v. Fauber, No. S005868, RT 5546-47 (no evidence of struggle); People v. Carrera, No. S004569, RT 160 (same).

(8)     Because the defendant had a prior relationship with the victim,[22] or because the victim was a complete stranger to the defendant.[23]

d.     Of equal importance to the arbitrary and capricious use of contradictory circumstances of the crime to support a penalty of death is the use of the "circumstances of the crime" aggravating factor to embrace facts which cover the entire spectrum of factors inevitably present in every homicide:

(1)     The age of the victim.  Prosecutors have argued, and juries were free to find, that factor (a) was an aggravating circumstance because the victim was a child, an adolescent, a young adult, in the prime of life, or elderly.[24]

(2)     The method of killing.  Prosecutors have argued, and juries were free to find, that factor (a) was an aggravating circumstance because the victim was strangled, bludgeoned, shot, stabbed or consumed by fire.[25]

(3)     The motive of the killing.  Prosecutors have argued, and juries were free to find, that factor (a) was an aggravating circumstance because the defendant killed for money, to eliminate a witness, for sexual gratification, to avoid arrest,

---

[22]     *See, e.g., People v. Padilla*, No. S014496, RT 4604 (prior relationship); *People v. Waidla*, No. S020161, RT 3066-67 (same); *People v. Kaurish*, 52 Cal.3d at 648, at 717 (1990).

[23]     *See, e.g., People v. Anderson*, No. S004385, RT 3168-69 (no prior relationship); *People v. McPeters*, No. S004712, RT 4264 (same).

[24]     *See, e.g., People v. Deere*, No. S004722, RT 155-56 (victims were young, ages 2 and 6); *People v. Bonin*, No. S004565, RT 10075 (victims were adolescents, ages 14, 15, and 17); *People v. Carpenter*, No. S004654, RT 16752 (victim was 20); *People v. Phillips*, 41 Cal.3d 29, 63, 711 P.2d 423, 444 (1985) (26-year-old victim was "in the prime of life"); *People v. Samayoa*, No. S006284, XL RT 49 (victim was an adult "in her prime"); *People v. Kimble*, No. S004364, RT 3345 (61-year-old victim was "finally in a position to enjoy the fruits of his life's efforts"); *People v. Melton*, No. S004518, RT 4376 (victim was 77); *People v. Bean*, No. S004387, RT 4715-16 (victim was elderly").

[25]     *See, e.g., People v. Clair*, No. S004789, RT 2474-45 (strangulation); *People v. Kipp*, No. S004784, RT 2246 (same); *People v. Fauber*, No. S005868, RT 5546 (use of an ax); *People v. Benson*, No. S004763, RT 1149 (use of a hammer); *People v. Cain*, No. S006544, RT 6786-87 (use of a club); *People v. Jackson*, No. S01723, RT 8075-76 (use of a gun); *People v. Reilly*, No. S004607, RT 14040 (stabbing); *People v. Scott*, No. S010334, RT 847 (fire).

1    for revenge, or for no motive at all.[26]

2            (4)     The time of the killing.  Prosecutors have argued, and juries were

3    free to find, that factor (a) was an aggravating circumstance because the victim was

4    killed in the middle of the night, late at night, early in the morning or in the middle

5    of the day.[27]

6            (5)     The location of the killing.  Prosecutors have argued, and juries

7    were free to find, that factor (a) was an aggravating circumstance because the

8    victim was killed in her own home, in a public bar, in a city park or in a remote

9    location.[28]

10       e.    The foregoing examples of how the factor (a) aggravating circumstance is

11   applied in practice make clear that every prosecutor  relies upon it as an aggravating factor

12   in every case without limitation.

13       f.    Juries consider, and prosecutors have been permitted to turn entirely

14   opposite facts, or facts that are inevitable variations of every homicide, into aggravating

15   factors which the jury is urged to weigh on death's side of the scale.

16   17.    California's statutory scheme is particularly death-biased in felony-murder cases,

17   such as petitioner's case.

18       a.    As noted above, California's scheme is particularly death-biased in felony-

19   murder cases, such as petitioner's case, because the California felony-murder rule itself

20

---

21       [26]    *See, e.g.*, *People v. Howard*, No. S004452, RT 6772 (money);  *People v. Allison*, No.
     S004649, RT 969-70 (same); *People v. Belmontes*, No. S004467, RT 2466 (eliminate a witness); *People
22   v. Coddington*, No. S008840, RT 6759-61 (sexual gratification); *People v. Ghent*, No. S004309, RT 2553-
     55 (same); *People v. Brown*, No. S004451, RT 3544 (avoid arrest); *People v. McLain*, No S004370, RT
23   31 (revenge); *People v. Edwards*, No. S004755, RT 10544 (no motive at all).

24       [27]    *See, e.g.*, *People v. Fauber*, No. S005868, RT 5777 (early morning); *People v. Bean*, No.
25   S004387, RT 4715 (middle of the night);  *People v. Avena*, No. S004422, RT 2603-04 (late at night);
     *People v. Lucero*, No. S012568, RT 4125-26 (middle of the day).

26
         [28]    *See, e.g.*, *People v. Anderson*, No. S004385, RT 3167-68 (victim's home); *People v. Cain*,
27   No. S006544, RT 6787 (same); *People v. Freeman*, No. S004787, RT 3674, 3710-11 (public bar); *People
     v. Ashmus*, No. S004723, RT 7340-41 (city park); *People v. Carpenter*, No. S004654, RT 16749-50
28   (forested area); *People v. Comtois*, No S017116, RT 29760 (remote, isolated location).

is exceedingly broad.

b.      Additionally, pursuant to California Penal Code section 190.3(a), a California penalty phase jury is instructed to weigh in aggravation of sentence any special circumstance which it found true at the guilt phase. Cal. Penal Code § 190.3(a); CALJIC No. 8.84.1. And, after a first degree murder conviction and special circumstance finding based on felony-murder, the penalty phase jury is instructed to weigh the same felony-murder "crime circumstances," Cal. Penal Code § 190.3(a) and the same felony-murder special circumstance(s) as factors in aggravation. Thus, a defendant convicted of first degree murder under a felony-murder theory is therefore automatically eligible for a duplicating special circumstance, Cal. Penal Code § 190.2(a)(17), *et seq.*, and a duplicating penalty phase aggravating factor, Cal. Penal Code § 190.3(a), by the nature of the charge.

c.      By contrast (and capriciously), a defendant accused of a premeditated killing does not automatically have a built-in special circumstance. Something more must be found to make that defendant eligible for death, and to support a sentencer's decision to impose death. This disparity between premeditated and felony-murder is incongruous, and violates the due process guarantees of the Eighth and Fourteenth Amendments, as well as the Fourteenth Amendment's equal protection clause.

d.      California's effort to comply with the Eighth Amendment's narrowing requirement by special circumstances findings fails because the special circumstance of a felony-murder, Cal. Penal Code § 190.2(a)(17), *et seq.*, duplicates exactly the elements of the underlying crime. The effect of this flaw is augmented by having the jury consider the special circumstance finding as a penalty phase aggravating factor. Cal. Penal Code § 190.3(a). This triple use of facts in a capital felony-murder case violates the Eighth Amendment's prohibition against cruel and unusual punishment, the Fourteenth Amendment's due process clause, and the enhanced capital case due process protection of both. This is a process biased in favor of death that does not genuinely narrow the pool of murderers to those most deserving of death.

18.    Individual prosecutors in California are afforded complete discretion to determine whether to charge special circumstances and whether to seek death, thereby creating substantial risk of county-by-county arbitrariness.

a.    The California murder and death penalty statutory scheme, contained in California Penal Code sections 187-190.5, affords the individual prosecutor complete discretion to determine whether special circumstances will be charged and whether a penalty hearing will be held, in violation of the Eighth and Fourteenth Amendments, thereby creating a substantial risk of county-by-county arbitrariness. There are no statewide standards to guide the prosecutor's discretion.

b.    Some offenders, under the California statutory scheme, are chosen as candidates for the death penalty by one prosecutor, while others with similar factors in different counties are not. This arbitrary determination can be made at the charging stage, prior to trial, after the guilt phase, and during or even after the penalty phase. This range of opportunity, coupled with the absence of any standards to guide the prosecutor's discretion, permits reliance on constitutionally irrelevant and impermissible considerations, including race, ethnicity, sexual orientation, and/or economic status. Additionally, the prosecutor is free to seek death in virtually every first degree murder case on either a lying-in-wait theory or a felony-murder theory, and to argue that death should be imposed based on nothing more than the same facts that substantiated a conviction for first degree murder.

c.    Petitioner would not have been charged with the death penalty had he been charged with the same crimes in many other counties in California. The California statutory scheme, by design and in effect, improperly produced arbitrary and capricious prosecutorial discretion throughout the capital case process, in charging, prosecuting, submitting the case to the jury and opposing the automatic motion to modify the sentence.

19.    The California death penalty scheme contains none of the safeguards common to other death penalty schemes to protect against the arbitrary imposition of death.

a.    In addition to its failure to genuinely narrow the class of death-eligible

1  defendants and its provision of unfettered charging discretion to individual prosecutors,

2  the California murder/death penalty statutory scheme, as written and applied, contains

3  none of the safeguards against the arbitrary imposition of death common to other death

4  penalty sentencing schemes.  Juries do not have to make written findings or achieve

5  unanimity as to aggravating circumstances.  They do not have to believe beyond a

6  reasonable doubt that aggravating circumstances outweigh the mitigating circumstances and

7  that death is the appropriate penalty.  Not only is inter-case proportionality review not

8  required, it is not permitted.

9         b.     Other jurisdictions with a death penalty have at least one of these

10  safeguards, in order to avoid the imposition of random or vindictive death sentences.

11  None is a part of California's death penalty law.

12         c.     Twenty-five states require that factors relied on to impose death in a penalty

13  phase be proven beyond a reasonable doubt by the prosecution, and three additional states

14  have related provisions.[29]  Only California and four other states (Florida, Missouri,

15  Montana, and New Hampshire) fail to address the matter by statute.

16         d.     California does not require that a reasonable doubt standard be used to

17

18  [29]    *See* Ala. Code § 13A-5-45(e) (1975); Ark. Code Ann. § 5-4-603 (Michie 1987); Colo. *Rev.*

19  *Stat.* Ann. § 16-11-103(d) (West 1992); Del. Code Ann. tit. 11, § 4209(d) (1) (a) (1992); Ga. Code Ann.
§ 17-10-3-(c) (Harrison 1990); Idaho Code § 19-2515(g) (1993); Ill. Ann. Stat., ch. 38, para. 9-1(f)

20  (Smith-Hurd 1992); Ind. Code Ann. § 35-50-2-9(a), (e) (West 1992); Ky. Rev. Stat. Ann. § 532.025(3)
(Michie 1992); La. Code Crim. Proc. Ann., art. 905.3 (West 1984); Md. Ann. Code, art. 27, § 413(d),

21  (f), (g) (1957); Miss. Code Ann. § 99-19-103 (1993); *State v. Stewart*, 250 N.W.2d 849, 863 (Neb. 1977);
*State v. Simants*, 250 N.W.2d 881, 888-890 (Neb. 1977); Nev. Rev. Stat. Ann. § 175.554(3) (Michie

22  1992); N.M. Stat. Ann. § 31-20A-3 (Michie 1993); Ohio Rev. Code § 2929.04 (Page's 1993); Okla. Stat.
Ann., tit. 21, § 701.11 (West 1993); 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iii) (1982); S.C. Code Ann. §

23  16-3-20(A), (C) (Law Co-op 1992); S.D. Codified Laws Ann. § 23A-27A-5 (1988); Tenn. Code Ann. §

24  39-13-204(f) (1991); Tex. Crim. Proc. Code Ann. § 37.071(c) (West 1993); *State v. Pierre*, 572 P.2d
1338, 1348 (Utah 1977); Va. Code Ann. § 19.2-264.4(C) (Michie 1990); Wyo. Stat. § 6-2-102(d)(i)(A),

25  (e)(i) (1992).

26      Washington has a related requirement that, before making a death judgment, the jury must make
a finding beyond a reasonable doubt that no mitigating circumstances exist sufficient to warrant leniency.

27  Wash. Rev. Code Ann. 10.95.060(4) (West 1990).  And Arizona and Connecticut require that the
prosecution prove the existence of penalty phase aggravating factors, but specify no burden. Ariz. Rev.

28  Stat. Ann. § 13-703(c) (West 1989); Conn. Gen. Stat. Ann. § 53a-46a(c) (West 1985).

determine whether a death sentence should be imposed. However, this heightened standard is employed for matters of much less importance to an individual than life or death, i.e., commitment to a mental hospital, or appointment of a conservator. In fact, California's failure to provide any standard of proof for aggravating or mitigating circumstances, or the weighing process, and failure to assign such a burden to either party, is an additional unconstitutional failure of the statute.

e.    Three states require that the jury base any death sentence on a finding beyond a reasonable doubt that death is the appropriate punishment.[30] A fourth state, Utah, has reversed a death judgment, because that judgment was based on the same standard of proof as applied in California, i.e., less than proof beyond a reasonable doubt.

f.    Of the thirty-four post-*Furman* state capital sentencing systems, twenty-five require some form of written findings, specifying the aggravating factors upon which the jury has relied in reaching a death judgment. Nineteen of these states require written findings regarding all penalty phase aggravating factors found true, while the remaining six require a written finding as to at least one aggravating factor relied on to impose death.[31]

g.    Of the twenty-two states which, like California, vest the responsibility for death penalty sentencing on the jury, fourteen require that the jury unanimously agree on the aggravating factors proven, and unanimously agree that death is the appropriate

---

[30]    *See* Ark. Code. Ann. § 5-4-603(a)(3) (Michie 1991); Wash. Rev. Code Ann. § 10.95.060 (West 1990); *State v. Goodman*, 257 S.E.2d 569, 577 (1979).

[31]    *See* Ala. Code § 12A-5-46(f), 47(d) (1982); Ariz. Rev. Stat. Ann. § 13-703 (D) (1989); Ark. Code Ann. § 5-4-603 (a) (Michie 1987); Conn. Gen. Stat. Ann. § 53a-46a(e) (West 1985); *State v. White*, 395 A.2d 1082, 1090 (Del. 1978); Fla. Stat. Ann. § 921.141(3) (West 1985); Ga. Code Ann. § 17-10-30(c) (Harrison 1990); Idaho Code § 19-2515(e) (Michie 1987); Ky. Rev. Stat. Ann. § 532.025(3) (Michie 1988); La. Code Crim. Proc. Ann., art. 905.7 (West 1993); Md. Ann. Code, art. 27, § 413(i) (1992); Miss. Code Ann. § 99-19-103 (1993); Mont. Code Ann. § 46-18-306 (1993); Neb. Rev. Stat. § 29-2522 (1989); Nev. Rev. Stat. Ann. § 175-554(3) (Michie 1992); N.H. Rev. Stat. Ann. § 630:5 (IV) (1992); N.M. Stat. Ann. § 31-20A-3 (Michie 1990); Okla. Stat. Ann., tit. 21, § 701.11 (West 1993); 42 Pa. Cons. Stat. Ann. § 9711 (1982); S.C. Code § 16-3-20(C) (Law. Co-op. 1992); S.D. Codified Laws Ann. § 23A-27A-5 (1988); Tenn. Code Ann. § 39-13-204(g) (1993); Tex. Crim. Proc. Code Ann. § 37.071(c) (West 1993); Va. Code Ann. § 19.2-264.4(D) (Michie 1990); Wyo. Stat. § 6-2-102(e) (1988).

sentence.[32]  California does not have such a requirement.

h.    Petitioner's jurors were never told that they were required to agree on which factors in aggravation had been proven.  They could have made their decision to impose death using any of the improper considerations described *ante*, or still other similar, improper matters.   Absent a requirement of unanimous jury agreement as to the existence of any aggravating factors, and written findings thereon, the propriety of the judgment herein cannot be reviewed in a constitutional manner.  Moreover, each juror could have relied on a factor which could potentially constitute proper aggravation, but was different from such factors relied on by the other jurors; i.e., there was no actual agreement on why petitioner should be condemned.

i.    Thirty-one of the thirty-four states that sanction capital punishment require comparative, or "inter-case," appellate sentence review.  By statute, Georgia requires that the state Supreme Court determine whether ". . . the sentence is disproportionate compared to those sentences imposed in similar cases." Ga. Stat. Ann. § 27-2537(c). This provision was approved by the United States Supreme Court, holding that it guards "further against a situation comparable to that presented in *Furman v. Georgia,* 408 U.S. 238 (1972)." *Gregg v. Georgia,*  428 U.S. 153, 198 (1976).  Towards the same end, Florida has judicially "adopted the type of proportionality review mandated by the Georgia statute." *Proffitt v. Florida,* 428 U.S. 242, 259 (1976)  Twenty states have statutes similar to that of Georgia, and seven have judicially instituted similar review.[33]

---

[32]    *See* Ark. Code Ann. § 5-4-603(a) (Michie 1993); Colo. Rev. Stat. Ann. § 16-11-103(2) (West 1992); Ill. Ann. Stat., ch. 38, para. 9-1(g) (Smith-Hurd 1992); La. Code Crim. Proc. Ann., art. 905.6 (West 1993); Md. Ann. Code, art. 27, § 413(i) (1993); Miss. Code Ann. § 99-19-103 (1992); N.H. Rev. Stat. Ann. § 630:5(IV) (1992); N.M. Stat. Ann. § 31-20A-3 (Michie 1990); Okla. Stat. Ann., tit. 21, § 701.11 (West 1993); 42 Pa. Cons. Stat. Ann. § 9711(c)(1)(iv) (1982); S.C. Code Ann. § 16-3-20(C) (Law. Co-op. 1992); Tenn. Code Ann. § 39-13-204(g) (1993); Tex. Crim. Proc. Code Ann. § 37.071 (West 1993).

[33]    *See* Ala. Code § 13A-5-53(b)(3) (1982); Conn. Gen. Stat. Ann. § 53a-46(b)(3) (West 1993); Del. Code Ann., tit. 11, § 4209(g)(2) (1992); Ga. Code Ann. § 17-10-35(c)(3) (Harrison 1990); Idaho Code § 19-2827(c)(3) (1987); Ky. Rev. Stat. Ann. § 532.075(3) (Michie 1985); La. Code Crim. Proc. Ann., art. 905.9.1(1)(c) (West 1984); Miss. Code Ann. § 99-19-105(30(c) (1993); Mont. Code Ann. § 46-18-310(3) (1993); Neb. Rev. Stat. § 29-2521.01, 03, 29-2522(3) (1989); Nev. Rev. Stat. Ann. §

j.    California Penal Code section 190 does not require that either the trial court or the California Supreme Court undertake a comparison between this and other factually similar cases to examine the proportionality of the sentence imposed, i.e., inter-case proportionality review.  The statute also does not forbid such review.  The California Supreme Court has made it clear, however, that neither trial courts nor reviewing courts are permitted in California to perform inter-case proportionality review.  This blanket prohibition on the consideration of any evidence showing that death sentences are not being charged by California prosecutors or imposed by California juries on similarly situated defendants, regardless of the circumstances of a particular case, violates the United States Constitution.

20.    Because almost all first degree murders in California fall within the special circumstances enumerated in California Penal Code section 190.2, the individual prosecutors in California are afforded complete discretion to determine whether to charge special circumstances and seek penalties of death, and the California statutory scheme contains none of the safeguards common to other death penalty sentencing schemes to guard against the arbitrary imposition of death, California's death penalty statute fails to genuinely narrow the class of death eligible murderers in violation of the Eighth and Fourteenth Amendments and permits the imposition of death sentences in an arbitrary and capricious manner.

21.    Because petitioner was prosecuted under this overly-inclusive and unconstitutional statute, his death sentence is invalid and a writ of habeas corpus should issue reversing his penalty.

///

177.055(d) (Michie 1992); N.H. Rev. Stat. Ann. § 630:5(XI)(c) (1992); N.M. Stat. Ann. § 31-20A-4(c)(4) (Michie 1990); N.C. Gen. Stat. § 15A-2000(d)(2) (1983); Ohio Rev. Code Ann. § 2929.05(A) (Baldwin 1992); 42 Pa. Cons. Stat. Ann. § 9711(h)(3)(iii) (1993); S.C. Code Ann. § 16-3-25(C)(3) (1988); Tenn. Code Ann. § 13-206(c)(1)(D) (1993); Va. Code Ann.  § 17.110.1C(2) (Michie 1988); Wash. Rev. Code Ann. § 10.95.130(2)(b) (West 1990); Wyo. Stat. § 6-2-103(d)(iii) (1988); *see also State v. Dixon,* 283 So. 2d 1, 10 (Fla. 1973); *Alford v. State,* 307 So. 2d 433, 444 (Fla. 1975); *People v. Brownell,* 404 N.E. 2d 181, 197 (Ill. 1980); *Brewer v. State,* 417 N.E.2d 889, 899 (Ind. 1981); *State v. Pierre,* 572 P.2d 1338, 1345 (Utah 1977); *State v. Simants,* 250 N.W.2d 881, 890 (Neb. 1977) ; *State v. Richmond,* 560 P.2d 41, 51 (Ariz. 1976); *Collins v. State,* 548 S.W.2d 106, 121 (Ark. 1977).

## H.    CLAIM 8:    PETITIONER'S JUDGMENT IS UNCONSTITUTIONAL BECAUSE IT WAS OBTAINED BY IMPROPER CHARGING, PROSECUTING AND SENTENCING CONSIDERATIONS.

Petitioner was deprived of his constitutional rights because he was selected for capital prosecution, convicted, and sentenced based on a series of arbitrary, constitutionally irrelevant, impermissible, and discriminatory factors.  Prior to trial, petitioner sought the discovery of information concerning the District Attorney's charging procedures, application of those procedures in petitioner's case and other cases, and other information to challenge the prosecutor's decision to charge petitioner with special circumstance murder. CT 259 (Notice of Motion and Motion for Discovery).  The trial court denied petitioner's access to this information.  CT 368.

Had petitioner been able to discover this information, he would have been able to demonstrate that prior to, during, and after the filing of capital charges against petitioner, the Sacramento County District Attorney made charging decisions in murder cases without any written criteria, objective standards, or even uniform procedures.  The result is that the Sacramento District Attorney's charging decisions were, at all times relevant to the prosecution of petitioner, arbitrary and based upon unconstitutional factors.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.    The Sacramento County District Attorney's Office, as an agency and entity, made a special circumstance charging decision, including the decision to charge petitioner with a capital offense, prosecute the case, and obtain a death sentence.

2.    Petitioner is a white male.  The victim was a white female.

3.    A significant number of homicides occurring during the commission of a felony involving non-white victims have occurred in Sacramento County, many of which were as aggravated as, or more aggravated than, petitioner's case and were not capitally charged or prosecuted or did not result in death verdicts.

4.    The Sacramento County District Attorney's office did not prosecute other cases, with facts similar to the prosecution's version of the facts against petitioner, as capital cases or

1    with the same intensity as petitioner's case because of the ethnicity, gender, and race of the

2    defendants, the ethnicity, gender, race of the victims, political considerations, and other

3    impermissible considerations.

4        5.    The improper motivations for the capital charging decision and prosecution in

5    petitioner's case renders the convictions, special circumstance finding, and sentences

6    unconstitutional.

7    I.    **CLAIM 9:   PETITIONER   WAS   DEPRIVED   OF   HIS   FEDERAL
        CONSTITUTIONAL RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL**
8    **ON APPEAL.**

9        Petitioner's confinement is unlawful and obtained in violation of his Sixth, Eighth, and

10    Fourteenth Amendment rights to due process, the right to counsel and the effective assistance

11    thereof, full and fair appellate proceedings, and a reliable determination of his guilt and

12    punishment by appellate counsel's representation which prejudicially fell below minimally

13    acceptable standards of competence by counsel acting as a zealous advocate in a capital case. The

14    U.S. Supreme Court long ago recognized that the Sixth Amendment compels the appointment of

15    competent counsel on direct appeal. *See Evitts v. Lucey,* 469 U.S. 387 (1985); *Douglas v.*

16    *California,* 372 U.S. 353 (1963). To the extent that the California Supreme Court concluded that

17    any state procedural defaults applied and barred review of otherwise meritorious constitutional

18    claims, appellate counsel's failure to raise issues in conformity with state procedures deprived

19    petitioner of his Sixth Amendment right to counsel.

20        In support of this claim, petitioner alleges the following facts, among others to be

21    presented after full discovery, investigation, adequate funding, access to this Court's subpoena

22    power, and an evidentiary hearing:

23        1.    Those facts set forth in each of the claims in this petition, which are incorporated

24    by this reference as if fully set forth herein.

25        2.    Appellate counsel prejudicially and unreasonably failed to advance all meritorious

26    legal bases for issues presented on petitioner's behalf on direct appeal and in any available

27    collateral proceeding.

28        3.    To the extent that petitioner should have raised any of the issues or federal

constitutional bases presented herein on appeal, he received prejudicially inadequate assistance of counsel on appeal.

**J.    CLAIM 10: THE STATE HAS INTERFERED WITH PETITIONER'S RIGHTS TO PETITION THE COURTS FOR REDRESS AND TO INVESTIGATE AND PREPARE THIS HABEAS PETITION.**

Petitioner's conviction, death sentence, and confinement are unlawfully and unconstitutionally imposed in violation of the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution because the State has interfered with petitioner's ability to pursue post-conviction relief in state court.

The facts in support of this claim, among others to be developed after adequate discovery, funding, investigation, and access to this Court's subpoena power and other court processes and an evidentiary hearing are:

1.    The California Supreme Court denied petitioner's prior court-appointed appellate counsel adequate and necessary funds to develop and present legal and factual claims on petitioner's behalf. Petitioner's prior counsel twice applied to the California Supreme Court for funding for expert and investigative assistance. The Court denied both applications, notwithstanding the fact that it had imposed a duty on appointed counsel to investigate factual and legal grounds for relief. The California Supreme Court deprived petitioner and appellate counsel of the means to seek post-conviction relief contemporaneously with petitioner's automatic appeal. Those facts and allegations set forth in subsection II, above, are hereby incorporated by this reference as if fully set forth herein.

2.    San Mateo County officials have interfered with petitioner's ability to perfect his showing that the master list and pool from which his jury panel was unconstitutionally compiled because the underrepresentation of Hispanics was due to their systematic exclusion in the composition process. The San Mateo Jury Commissioner's Office has resisted attempts to obtain master (or source) lists from which individual jury venires are drawn, claiming variously that the lists do not exist or cannot be obtained without a court order. The Commissioner's Office has declined or been unable to produce written procedures and policies for the creation of a master list or that the exact location of such written guidelines are unknown. If petitioner's prima facie

1   showing here be deemed inadequate, he cannot, consistent with due process, be penalized since

2   the state has interfered with his ability to perfect his showing at this juncture of the litigation.

3   Petitioner hereby incorporated the facts set forth in IV.D., as if fully set forth herein.

4          3.      The Sacramento County Deputy District Attorney who prosecuted petitioner refused

5   petitioner's request to review the files generated by him and his agents during petitioner's capital

6   and California Penal Code section 220 prosecutions.

7                  a.      Counsel for petitioner telephoned the prosecutor in mid-March 1998 and

8          requested an opportunity to review the files in his office.  The prosecutor responded in

9          writing, refusing the request and offering to provide specified documents as long as

10         counsel for petitioner provided a reasonable basis for believing the documents would be

11         relevant to an issue cognizable in post- conviction.

12                 b.      That proposal is not an adequate substitute for counsel's review.  The

13         prosecutor has refused to reconsider his position.

14                 c.      Petitioner has no right to pre-petition discovery in this state and possibly

15         no right to discovery until a reference hearing is ordered by the California Supreme Court.

16                 d.      Until such time as this Court orders discovery or the prosecutor reconsiders

17         his position, petitioner's rights to counsel and the effective assistance thereof, to due

18         process, and to prosecute this action are being unconstitutionally denied.

19  **K.     CLAIM   11:    PETITIONER'S   SIXTH,   EIGHTH,   AND   FOURTEENTH**
    **AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S FAILURE**
20  **TO EXCLUDE JURORS FOR CAUSE WHOSE VIEWS ON THE DEATH**
    **PENALTY PREVENTED OR SUBSTANTIALLY IMPAIRED THEIR ABILITY TO**
21  **PERFORM THEIR DUTIES.**

22         Petitioner's conviction, sentence, and confinement are unlawful and were obtained in

23  violation of his federal constitutional rights to a fair and impartial jury, a reliable, non-arbitrary,

24  and non-capricious judgment of death and to due process of law under the Sixth, Eighth, and

25  Fourteenth Amendments as a result of the trial court's failure to remove for cause four jurors

26  whose views on the death penalty would have prevented or substantially impaired the performance

27  of their duties in accordance with the instructions and their oaths.

28         In support of this claim petitioner alleges the following facts, in addition to those to be

FINALIZED PETITION FOR WRIT OF
HABEAS CORPUS -- C 93-0594 TEH                    105

1   presented after full investigation, discovery and access to this Court's subpoena power and an

2   evidentiary hearing:

3       1.    Potential jurors Sylvio Trapani, Betty Chadwick, Russell Wong, and William

4   Wisecarver were challenged for cause by petitioner's trial counsel as substantially unable to

5   perform their duties as jurors due to their strong pro-death penalty views, and additional views

6   on relevant matters, which rendered them unable to follow the court's instructions, consider

7   mitigation, or determine the appropriate penalty in a fair and impartial manner.

8       a.    Prospective Juror Sylvio Trapani stated under oath that he would not

9   consider life imprisonment and that he would automatically vote for death. RT 1675. He

10   believed life imprisonment to be an unnecessary burden on the public fisc. RT 1675-76.

11   When told that evidence in mitigation of the punishment might include psychiatric

12   testimony, he stated that he did not believe in its mitigating role at either phase of trial.

13   RT 1680, 1693. Despite Trapani's views, the trial court denied petitioner's challenge for

14   cause. RT 1697.

15       b.    Prospective Juror Betty Chadwick worked as a nurse for the Veteran's

16   Administration in a drug and alcohol abuse program. RT 2825-26. She stated that if she

17   were the defendant in a case like petitioner's she would not want to have someone like

18   herself as a juror. RT 2843. She stated that she did not believe she could consider

19   petitioner's background in determining penalty, RT 2839, and she referred to those who

20   might consider petitioner's sympathetic background factors as "sob sisters," RT 2838,

21   2843-44. She further testified that she had never heard a valid use of psychiatric testimony

22   in court and that she believed that psychiatric opinions did not belong in court

23   proceedings. RT 2849. The trial court denied petitioner's challenge for cause. RT 2851-

24   52.

25       c.    Prospective Juror Russell Wong described himself as strongly in favor of

26   the death penalty and would be strongly inclined to vote for the death penalty in the case

27   of a first-degree murder. RT 3814-16. He would be "easily convinced" to vote for the

28   death penalty in a given case. RT 3827. He viewed life prison sentences as unnecessary

burdens on society and an insufficient deterrent to murder. RT 3816. Although he described himself as fair-minded, RT 3817, he could think of no arguments for a life sentence other than the elimination of a lengthy appellate process. RT 3830. Wong further stated that he believed that the typical mitigating factors were inappropriate: "those types of extenuating circumstances have no place in out society. And actions of that sort must be -- must be dealt with with the death penalty." RT 3819. The trial court denied petitioner's case challenge. RT 3845.

d.    Prospective Juror William Wisecarver testified that he strongly favors the death penalty and believed courts were too lenient vis-a-vis the death penalty. RT 4476-79, 4491, 4495-96. He recognized that he was not totally objective, but objective only "to a point." RT 4503. He characterized mental health testimony as "poppycock" and believed that psychiatric testimony has no legitimate part in the criminal justice process. RT 4490. The trial court denied petitioner's challenge for cause. RT 4505.

2.    All four jurors unequivocally expressed their prejudgment on the crime, their biases in favor of imposing a death sentence and their inability to consider, as mitigating factors, relevant evidence of petitioner's character and record, including psychiatric testimony. Each of the four jurors' views on the efficacy or propriety of a punishment of life in prison similarly rendered them unqualified jurors. Their views were stated with such clarity and forcefulness that any reasonable decision-maker would conclude that each juror's views would substantially impair their ability to remain impartial and determine the appropriate penalty fairly and in accordance with the law.

3.    The trial court expressly applied a legally incorrect standard in failing to excuse prospective jurors Trapani and Chadwick. *See* RT 1697 (Trapani); 2852 (Chadwick). The court did not articulate any standard or applied the standard incorrectly in failing to excuse jurors Wisecarver and Wong.

4.    Petitioner was required to remove Trapani and Wong (as well as two other jurors against whom challenges for cause were denied) by using peremptory challenges. Jurors Chadwick and Wisecarver were not seated in the jury box but were positioned so that they theoretically could have been called into the jury box had both parties exercised their allotted

1    peremptory challenges.

2        5.    The use of the modified "struck system" of jury selection rendered the errors

3    prejudicial in petitioner's case and requires that the death sentence be set aside. CT 582; RT 5070.

4            a.    Under the struck system, prospective jurors were individually voir dired and

5    challenges for cause were exercised as each juror was questioned.  All voir dire was

6    completed before the jurors were seated and challenged.

7            b.    The panel from which petitioner's jury was drawn consisted of eighty-five

8    members.  CT 582.  Each member was given a number, and listed in the order drawn.

9            c.    The first twelve on the list were seated in the jury box.  As each prospective

10    seated juror was challenged, the next in order on the list replaced the challenged juror.

11    CT 581-83; RT 5076-88.

12            d.    At all times, counsel knew the names of the remaining jurors on the list, the

13    order in which they were to be called as the seated jurors were challenged, and the content

14    of their voir dire responses.  Each side then began to exercise its twenty-six allotted

15    challenges.

16            e.    After the fifty-third prospective juror was seated, each side passed the jury.

17     CT 583; RT 7088.  Petitioner had used eighteen challenges; the prosecution had used

18    twenty-two.  CT 583.  During the selection of five alternate jurors, seven additional

19    challenges were used -- three by petitioner and four by the prosecutor.  Jury selection

20    ended after the sixtieth member of the jury panel was selected.

21            f.    Two panelists whom petitioner challenged for cause -- prospective jurors

22    Wisecarver and Chadwick were sixty-eighth and seventy-first on the list, respectfully.  CT

23    583.  Each was mathematically reachable as an alternate had petitioner risked exercising

24    additional peremptory challenges during jury selection.

25            g.    Exhaustion of peremptory challenges is not necessary to show prejudice

26    in such a situation in order to preserve the issue of erroneous denials of challenges for

27    cause because the error affects the composition of the jury by placing prospective jurors

28    who should have been disqualified in position to be chosen as a juror; it infringes on the

mandatory state-created right of peremptory challenges because the petitioner cannot control the prosecutor's use of peremptory challenges and can eliminate the likelihood that an unqualified juror will be seated only by foregoing his own peremptory challenges.

6.    The trial court's application of an incorrect legal standard and its failure to remove the challenged jurors for cause violated petitioner's federal constitutional rights to a fair and impartial jury, a reliable, non-arbitrary, and non-capricious judgment of death and to due process of law under the Sixth, Eighth, and Fourteenth Amendments. Moreover, absent the trial court's erroneous rulings, petitioner would have been free to exercise his full allotment of peremptory challenges without fear that a partial juror would be seated. The infringement on the right to full use of peremptory challenges ruling, guaranteed by California law, and the attendant risk that exercising those challenges may result in the seating of a biased juror, deprived petitioner of due process of law.

7.    The Court may not defer to the trial court's rulings because the trial court failed to understand or apply the appropriate standard for resolving cause challenges.  *See, e.g.*, RT 4274 (instructing potential jurors that voir dire was to ascertain whether they "would automatically" impose one sentence). Those facts set forth in IV.L. are hereby incorporated by this reference as if fully set forth herein. Moreover, deference is particularly improper because the trial court unlawfully restricted petitioner's ability to voir dire potential jurors on their biases or views on the death penalty and mitigation. Those facts set forth in IV.M. are hereby incorporated by this reference as if fully set forth herein.

8.    The trial court's improper denial of petitioner's cause challenges requires the granting of habeas relief. The resulting deprivation of petitioner's fundamental federal constitutional rights was prejudicial, had a substantial and injurious effect or influence on the jury's determination of the verdicts at the guilt and penalty phases, and requires the granting of habeas corpus relief from the judgment of convictions and the sentence of death.

///

///

///

L.   CLAIM 12:   PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE EXCLUSION OF JURORS WHO WERE RELUCTANT TO IMPOSE A DEATH SENTENCE UPON PETITIONER.

Petitioner's death sentence is unlawful because his rights to a fair and impartial jury drawn from a fair cross section of the community and to a reliable penalty determination under the Sixth, Eighth, and Fourteenth Amendments were violated by the exclusion of jurors who were reluctant to impose a death sentence upon petitioner, but who could and would nonetheless consider its imposition.

In support of this claim petitioner alleges the following facts, in addition to those to be presented after full investigation, discovery and access to this Court's subpoena power and an evidentiary hearing:

1.   The trial court's voir dire did not accurately assess whether potential jurors' views on the death penalty, potential mitigation, and the facts of the crime disqualified them from serving on the jury.

a.   During voir dire, the trial court informed the potential jurors about the guilt and penalty phases and that the individual voir dire was necessary to determine whether the jurors' conscientious opinions about the death penalty or life imprisonment may rendered them ineligible for service. *See, e.g.*, RT 4268-75. The court did not explain the process by which the jurors were to make the penalty determination or describe with any specificity the aggravating and mitigating factors used in making that determination.

b.   Moreover the court did not ascertain whether potential jurors would be able to set aside their personal belief if instructed by the court and required by their oaths as jurors.

c.   As a result, the trial court's explanation of the jurors' role and the sentencing process failed accurately to inform the prospective jurors of their role assigned by the law governing petitioner's trial, and failed to provide a basis for concluding that any juror was unwilling or unable to discharge his or her legitimate duties as imposed by law.

d.    The trial court's failure to make adequate inquiry into the jurors' willingness and ability to follow the law applicable to petitioner's case rendered the court incapable of any informed basis for determining the fairness, impartiality or other qualifications of the excluded jurors. Instead, the court's voir dire procedures produced a jury uncommonly willing to impose death.

2.    Moreover, the trial court resolved cause challenges utilizing an incorrect interpretation of the standard. Those facts set forth in IV.K. are hereby incorporated by this reference as if fully set forth herein.

3.    The trial court excluded prospective juror Michael Sullivan, who although reluctant to impose the death penalty, was not excludable because of those views.

a.    Sullivan stated that although he favored a sentence less than death, he would consider the death sentence in this case. RT 2986, 2991. Sullivan further stated that his reluctance to impose a death sentence stems from the irrevocability of the sentence and his concern that an innocent person might be executed. RT 3007-09, 3015, 3022. He agreed that proof beyond a reasonable doubt is a sufficient standard by which to determine a person's guilt. RT 3007, 3009, 3021.

b.    The trial court excluded Sullivan because he expressed doubt that he could vote during the penalty phase for the death penalty unless he felt absolutely sure of petitioner's guilt. RT 3023-24.

c.    The trial court's ruling violated state and federal law and was made without a sufficient basis. Sullivan was not supplied with a definition of reasonable doubt ("an abiding conviction, to a moral certainty, of the truth of the charge") and his voir dire responses concerning his discomfort with the reasonable doubt standard were tied to his reluctance to find someone guilty of first degree murder based on that standard where the punishment is death. Under California law, a juror is permitted to "demand a greater degree of certainty of guilt for the imposition of the death penalty." *People v. Terry,* 61 Cal.2d 137, 145-56 (1964).

4.    The trial court excluded prospective juror Johnnie Van Giesen, who although

1  reluctant to impose the death penalty, was not excludable because of those views.

2          a.      Prospective juror Johnnie Van Giesen was reluctant to impose the death

3  penalty. RT 4301. She was unable to state that she would be unable to impose a death

4  sentence or how she would vote given the facts of this case. *See, e.g.*, RT 4303-06. She

5  remained equivocal. Her views were not so fixed that they would have prevented her from

6  listening to and following the court's instructions.

7          b.      The trial court's ruling violated state and federal law and was made without

8  a sufficient basis. The trial court excluded her based upon a single answer to a question

9  and without regard to the entirety of her voir dire. RT 4322, 4327. The trial court's

10  ruling violated state and federal law because the trial court failed to properly instruct the

11  jurors, adequately explain the death sentencing process, or conduct a meaningful and

12  accurate assessment of Van Giesen's views. Moreover, consistency in application of the

13  test to jurors who strongly favored and those who strongly opposed the death penalty

14  should have resulted in denial of the state's challenge for cause.

15      4.      The Court may not defer to the trial court's rulings because the trial court failed

16  to understand or apply the appropriate standard for resolving cause challenges. Moreover,

17  deference is particularly improper because the trial court unlawfully restricted petitioner's ability

18  to voir dire potential jurors on their biases or views on the death penalty and mitigation. Those

19  facts set forth in Claim 13 are hereby incorporated by this reference as if fully set forth herein.

20      5.      The trial court's errors were prejudicial *per se*, and further, in fact, had a

21  substantial and injurious effect or influence on the jury's determination of the verdict at the

22  penalty phase of petitioner's trial.

23  **M.    CLAIM 13:    PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
        AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S
24      RESTRICTION ON VOIR DIRE DESIGNED TO DETERMINE WHETHER THE
        JURORS COULD FAIRLY CONSIDER A PUNISHMENT OF LIFE WITHOUT
25      PAROLE.**

26  Petitioner's death sentence was unlawfully obtained in that petitioner's Sixth, Eighth, and

27  Fourteenth Amendment rights to a fair hearing, a fair and impartial jury, a reliable penalty

28  determination, and due process of law were violated by the trial court's restriction of the voir dire

of petitioner's counsel designed to determine whether the jurors could fairly and reliably deliberate on the appropriate penalty to be imposed and whether the jurors understood the law and the meaning of a sentence of life in prison without the possibility of parole.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.    Jury voir dire with respect to hardships began on April 1, 1986.  CT 531-33. Individual sequestered voir dire began on April 7, 1986, at which time the court and counsel questioned eleven prospective jurors.  Of these eleven jurors, six were questioned in detail about their understanding of the meaning of a sentence of life without possibility of parole.  Three of these six demonstrated a misapprehension about the nature of the sentence:

> a.    Prospective juror Nowlin said that she had heard of a sentence labeled life without the possibility of parole, but that she had also heard that "they get parole eventually."

> b.    Prospective juror Williams said she did not realize that a sentence of life without parole means "it would be continuous. . .zip, not parole. . . ."

> c.    Prospective juror Pierce said he "thought they could commute or change the sentence or change anything any time they wanted."

2.    On April 8, after five jurors were questioned on voir dire, the prosecutor objected to defense counsel's questions designed to ascertain whether the jurors understood and believed that a sentence of life without possibility of parole meant that petitioner would not be eligible for release on parole.  The court ruled that it did not "want any questions asked about the juror's understanding of life in prison without parole.  If they ask what it means of anybody, then you are entitled to tell them what it means."  The court stated that it might take care of the subject during its voir dire, but the lawyers were to refrain from doing so.  After petitioner objected, the court repeated that it would "allow the question, 'Do you understand that life without possibility of parole really means that in California; no eligibility for parole?'"  If the juror said yes that was to be the end of the inquiry.  RT 1836-40.

3.    On April 9, during the morning court session, the court and counsel questioned four jurors.

a.    Prospective Juror Beauchamp reported that he "heard that there are people that have murdered people and have been out of jail in three years. Been found guilty. And been out in three years."

b.    During the questioning of the third juror, Kenneth Judnick, on the morning of April 9, 1986, petitioner wished to pursue the juror's understanding of the meaning of a sentence of life without parole but was precluded from doing so. After Mr. Judnick left the courtroom, petitioner's counsel again objected to the restriction placed on their voir dire by the court.

4.    During the afternoon session, petitioner's attempts to question prospective juror Hooper about his understanding of a sentence of life without parole were squelched by the trial court. Counsel noted that he felt restricted in his ability to uncover biases, but agreed to abide by the court's ruling.

5.    Thereafter, numerous jurors revealed their disbelief that life without parole meant that the prisoner would not be released and others were unaware of the existence of such a sentence. Other jurors initially responded affirmatively to the judge's single query whether they understood life without parole meant petitioner would not be paroled, but later, revealed their misunderstanding during questioning on other related topics:

a.    Prospective Juror Chadwick asked the judge whether this case was different from those in which "you hear a decision that someone is getting life in prison and then you hear they're getting out."

b.    Prospective Juror Mahoney initially responded to the judge's inquiry by stating that he understood that a sentence of life without possibility of parole meant exactly that. Later, during voir dire by counsel, he said that in conversations about life without parole, "you hear people say that 'Well, in seven years they got paroled anyway."

c.    Prospective Juror Martindale responded to the judge's inquiry by stating that he was clear "now" that the indicated sentence meant no chance of parole. Later he

stated that he was initially "under the impression that there was no such penalty, that he was given life imprisonment but came up for parole at different intervals."

d. Prospective juror Butler stated she understood that life without parole meant no parole dates, but later, during questioning by counsel stated that "the different trials or anything I have read about or heard about, and they go through --it seems as though it's not solid. It doesn't stick.. . . .if they are found guilty and they go to jail, it seems as though a very serious crime, they are let go. . . .I know a girl that is married to a guy that was sent to prison -- he murdered his wife. He spent three years in prison and he is out."

e. Juror Pippin responded to the court's explanation of life without parole by signaling her approval that the sentence meant no parole eligibility. Later, during examination by defense counsel, Pippin said she did not know that such a sentence existed because she "thought there were people out there getting murdered and the people doing it would get life penalty or life in prison, and then get out in 25 years."

f. Prospective juror Lyon said that he understood the judge's explanation of life without parole but was "not sure I believe it." Upon questioning by petitioner, Lyon explained, "because I heard of a lot of other cases where people were sentenced to life in prison without parole and for one reason or another -- I don't know what those reasons might have been -- the person was later released."

g. Prospective juror Pattillo told the judge she understood that life without parole meant exactly that. During later exchanges she said that "to me there is no justice there where they -- you have a lot of people looking and seeing someone kill someone or something like it. For instance, this guy he will probably get out eventually and I think something like that bothers me."

h. Prospective jurors Yount and Brown said they heard of prisoners sentenced to life getting out after serving de minimis amounts of time (seven years, according to Brown and three or four years according to Yount).

i. Prospective juror Shearer explained that she voted for the death penalty because she did not want someone who killed to "come out and do the same."

j.    Prospective juror Ayers said that she did not believe the death penalty had been carried out because "they usually get paroled." She believed the same was true with respect to a life without parole punishment.

k.    Juror Diana Stephens said that "at least under current law as it is practiced by the Supreme Court, these people get out of jail and they do terrible things all over again, and I really resent that."

l.    Prospective juror Marino remarked that he had heard "too many instances where you get life imprisonment and the guy is out in seven years. . . .I mean I don't trust the judicial system that we are going to keep this guy in jail."

m.    Prospective juror Luetje said that "there are so many cases that a man is convicted and he's sent to prison for a length of time and he's out on parole in seven or eight years, which I don't think is right for a man who killed somebody."

n.    Prospective juror Schneider opined that "everybody has heard that there have been cases, somebody sentenced to life without parole and then later they had been paroled."

6.    The trial court's improper restrictions on voir dire require the granting of habeas relief from the state court judgment.

**N.    CLAIM 14: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S ERRONEOUS INSTRUCTIONS ON THE SPECIAL CIRCUMSTANCES ELEMENT OF INTENT TO KILL.**

Petitioner's special circumstance findings and death sentence are unlawful and his Sixth, Eighth, and Fourteenth Amendment rights to a fair trial by juror on every element of the offense, conviction upon proof beyond a reasonable doubt, a reliable guilt and death eligibility determination, and the enforcement of mandatory state-created right to a jury trial were violated by the confusing and contradictory instructions on the critical special circumstance element of intent to kill, which were compounded by the prosecutor's erroneous definition of intent to kill and equation of intent with knowledge.

In support of this claim, petitioner alleges the following facts, among others to be

presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.      The key disputed element of the special circumstance murder charges was petitioner's intent at the time of the crime.

2.      At the end of trial, the court delivered several standard and modified jury instructions dealing with this issue to the jury.  Although the court correctly instructed the jury that the crime of murder and the special circumstances required the specific intent to kill a human being and the mental state of malice, the jurors were provided with an array of additional instructions that defined the elements of murder and special circumstances liability in a contradictory and erroneous fashion.

3.      From these instructions taken as a whole, a reasonable jury could have based a finding of intent to kill by implying that intent from petitioner's intent to commit the underlying sexual offenses.

4.      The closing arguments of petitioner's counsel and the prosecutor emphasized the element of "intent to kill," but did not correctly define it.  The prosecutor's argument labeled the specific intent to kill as a primitive type of mental state that animals and people possessed and then argued that petitioner's failure to engage in a logical, reasonable review of his options, "doesn't mean that he didn't know what he was doing; that he didn't know by placing all those objects in Marcie's mouth that it was likely to result in her death."  Contrary to the prosecutor's argument, knowledge that a death might occur does not constitute specific intent to kill under state law.

5.      The confusing and misleading nature of the instructions had a substantial and injurious effect on the jury's special circumstance verdicts and on the penalty determination.  The issue of intent is one of the most complex in criminal cases generally.  It was the key guilt phase issue in petitioner's case.  The jury heard conflicting testimony on that issue.  The jury asked to review instructions and testimony on that issue.  The prosecutor's argument exacerbated the confusion by erroneously equating knowledge with intent.

a.      The only contested element during the guilt phase was that of the petitioner's mental state at the time of his acts.  Petitioner testified that he did not intend

to kill Marcella Davis.  The physical evidence was subject to conflicting inferences and petitioner's testimony was supported by expert opinion testimony that the asphyxiation was accidental. The prosecution expert -- the pathologist who conducted the autopsy -- testified that the position of the plastic bags was more consistent with an intentional homicide and that it was possible that the bags were inhaled by the victim rather than stuffed into her mouth by petitioner to kill her.  The prosecutor's expert witness also testified that the position of the bags was consistent with petitioner's testimony that he stuffed them into the victim's mouth together to silence her.

b.    During deliberations, the jury made three requests directly related to the element of intent to kill, which demonstrated that they struggled during deliberations with that element:  the jurors asked for clarification between deliberate and premeditated murder and felony murder; they requested transcripts of the testimony of petitioner and of the prosecutor's pathologist about the plastic bags found in Marcella Davis's throat, and they asked for written instructions on the three special circumstances.

c.    Empirical jury research shows that the concepts of mens rea and intent are among the most confusing for jurors in criminal cases and that jurors frequently misapply and misunderstand these concepts.

6.    The failure to properly instruct the jury on this critical element requires the granting of habeas relief from the state court judgment.

**O.    CLAIM 15:    PETITIONER'S FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF A NUMBER OF IRRELEVANT AND INFLAMMATORY PHOTOGRAPHS.**

Petitioner's convictions, sentences, and confinement were unlawfully obtained in violation of his Fifth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, and reliable guilt and penalty verdicts by the introduction of irrelevant and highly inflammatory photographs of petitioner taken the morning after his arrest, two enlarged color photographs of the victim while alive, one photograph of the victim at the crime scene and thirteen pictures taken during the autopsy (four color photographs and nine color slides).

In support of this claim, petitioner alleges the following facts, among others to be

presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.      The photographs of petitioner were not relevant to any material issue. Prior to their admission, petitioner's counsel delivered an opening statement to the jury in which he stated that petitioner was the person seen walking in the park with Marcella Davis shortly before her death and that he was the person who killed her. Petitioner never placed his identity in issue.

2.      The photographs of Marcella Davis while alive were not relevant to any material issue. Her identity was not in issue at trial and was never disputed at any time prior to or during trial.

3.      Neither the crime scene nor autopsy photos shed any light on any disputed issues in the case. They shed no light on any intermediate factual issues relevant to the disputed issue of intent. The photos and slides did not reveal or provide circumstantial evidence on the cause of death. As the pathologist testified, the manner of death was revealed by the internal, not external examination. All of the photos and slides were of the external examination.

4.      The photographs were inflammatory and crippling to petitioner's mens rea defense and had a substantial and injurious effect on the jury's guilt and penalty verdicts. Specifically, the admission of the photographs distorted petitioner's defense that he lacked intent to kill, which was a necessary element of the charged felony-murder special circumstances.

        a.      The first set of photographs contains an enlarged photo of petitioner nude from the waist up, his arms jutting out to show off tattoos. The photo was taken by the police the morning after the crime, RT 5234-35, after the police deliberately caused petitioner to dress and pose in this provocative manner. The nudity suggests aggressive sexuality; the tattoos suggest association with the lower elements of society.

        b.      The photographs of the victims alive show an attractive little girl with an engaging smile. The photographs show a child filled with the joy of living, even to the extent of a festive watercolor painted on her cheek in one of the photographs. Plaintiff's Exhibit No. 3.

        c.      The photographs of the victim dead have the grimness of the most realistic

police television docu-drama.  In the crime scene photograph, the lifeless and naked body of seven year old Marcella Davis is in the dirt under the nighttime lighting, surrounded by debris.  In the autopsy slides and photographs, isolated parts of the dead child's body, pale and limp.

5.      The jury had the task of resolving a difficult, subtle issue, ultimately technical in nature, relating to Mr. Ashmus's state of mind.  Whether Mr. Ashmus intended to kill the victim did *not* depend on whether defendant looked sinister and threatening, whether the victim was attractive and vivacious, or whether death is ugly and grim.  From a legal standpoint, even sinister-looking men can lack intent to kill; even ugly deaths can be unintended.  But from an emotional standpoint, the admission of the three categories of photographs stacked the deck against petitioner.  The photographs admitted were so compelling, their juxtaposition so artfully contrived, as to preclude rational consideration of the intent-to-kill issue by the jury.

6.      The introduction of these prejudicial photographs requires the granting of habeas relief from the state court judgment.

**P.    CLAIM 16:    PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY AN INSTRUCTION WHICH CREATED AN UNJUSTIFIABLE PERMISSIVE PRESUMPTION OF INTENT AND GUILT SHOULD THE JURY FIND PETITIONER MADE MISLEADING STATEMENTS.**

Petitioner's conviction, sentence, and confinement are unlawful in that his Sixth, Eighth, and Fourteenth Amendment rights to conviction upon proof beyond a reasonable doubt on every element of the offense, to a reliable guilt, death-eligibility and penalty determination, and to due process of law were violated by the court's instruction to the jurors that they could consider any statements by petitioner that they found to be willfully false or deliberately misleading as tending to prove guilt.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.      The court delivered the standard California Criminal Jury Instruction (CALJIC) No. 2.03 over petitioner's objection.  This instruction allowed  the jurors to consider wilfully false

1    and deliberately misleading statements about the charges by petitioner as a circumstance tending

2    to prove a consciousness of guilt.

3         2.    The instruction created a permissive presumption because it linked a proved fact

4    and a presumed fact.  To be constitutional the presumed fact must be more likely than not to flow

5    from the proved fact on which it depends.  Its validity depends on its application in the specific

6    case and facts before the court, not on its face in the abstract.

7         3.    The proved fact which was the predicate for the instruction was that petitioner made

8    wilfully false and deliberately misleading statements to the interrogating police officers upon his

9    arrest, denying any connection to the victim and the crimes.

10        4.    The presumed fact in this case -- the only disputed guilt issue at the time the

11   instruction was delivered to the jury -- was whether petitioner acted with the specific intent to kill

12   the victim.

13        5.    The presumed fact of petitioner's mental state at the time of the crime was not more

14   likely that not to flow from the proved fact of petitioner's statements upon his arrest.  Petitioner's

15   statements were not false and misleading on the only disputed issue of whether he intended to kill.

16   Assuming the jury found the statements to be intentionally false and deliberately misleading, those

17   statements did not create inferences of intent.

18        6.    The erroneous delivery of the unconstitutional instruction was prejudicial and had

19   a substantial and injurious effect on the jury's verdict because it went to the heart of petitioner's

20   defense and encouraged the jury to incorrectly infer that his alleged lies to the arresting officer

21   were direct evidence of guilt.  The prosecutor used the instruction in precisely this fashion, i.e.,

22   to argue that in evaluating whether petitioner harbored the requisite mens rea, the jurors should

23   consider petitioner's attempts to fabricate evidence by his statements to the police officers.

24   **Q.    CLAIM 17: PETITIONER'S SIXTH AND FOURTEENTH AMENDMENT RIGHTS**
     **TO DUE PROCESS, A FAIR TRIAL AND THE PRESUMPTION OF INNOCENCE**
25   **WERE VIOLATED BY PROSECUTORIAL MISCONDUCT DURING ARGUMENT.**

26        Petitioner's conviction, sentence, and confinement were unlawfully obtained in violation

27   of his Sixth and Fourteenth Amendment rights to a fair trial, the presumption of innocence and

28   conviction upon proof beyond a reasonable doubt in that the prosecutor argued to the jury that

1    petitioner changed his defense to adopt a mens rea defense which was the last refuge of hopelessly

2    guilty criminal defendants.

3        In support of this claim, petitioner alleges the following facts, among others to be

4    presented after full discovery, investigation, adequate funding, access to this Court's subpoena

5    power, and an evidentiary hearing:

6        1.    During closing argument, the prosecutor argued to the jury that petitioner "changed

7    his defense" from denial to lack of the requisite mens rea because of the strength of the state's

8    identification evidence.  He further argued that the defense raised by petitioner -- that of denying

9    the mental state was -- "the last refuge of the hopelessly guilty."

10       2.    The prosecutor effectively told the jury that a mental state defense is raised only

11   by those who are guilty.

12       3.    The misconduct was prejudicial and had a substantial and injurious effect on the

13   jury's verdict and on petitioner's right to have the jury accurately assess the truth of the special

14   circumstances allegations and the appropriate punishment.  The prosecutor's comment turned

15   petitioner's mens rea defense against him by suggesting that the defense was one used only by

16   guilty people as a false defense, designed to deceive the jury.

17   **R.    CLAIM 18: PETITIONER'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS
           WERE VIOLATED BY THE INTRODUCTION OF PETITIONER'S INVOCATION
18         OF HIS RIGHT TO REMAIN SILENT AND PORTIONS OF HIS STATEMENT
           WHICH FOLLOWED THAT INVOCATION.**

19

20       Petitioner's Fifth and Fourteenth Amendment rights against self-incrimination, a fair trial,

21   and due process of law were violated by the introduction during the guilt phase of trial of

     petitioner's invocation of his right to remain silent and the portion of petitioner's taped post-arrest
22
     statement which followed the invocation, because they were obtained in violation of his right to
23
     remain silent and to invoke his constitutional rights without having that invocation be placed
24
     before the jury as evidence of guilt.
25
         In support of this claim, petitioner alleges the following facts, among others to be
26
     presented after full discovery, investigation, adequate funding, access to this Court's subpoena
27
     power, and an evidentiary hearing:
28

1.    Prior to trial, petitioner objected to admission of his taped post-arrest statement on the ground that neither the statements nor the waivers was voluntarily given.  Additionally, petitioner objected to the admission of his invocation of his right to remain silent and the portion of the statement which followed that invocation.

2.    Following a pre-trial hearing on the admissibility of petitioner's post-arrest statements, the trial court ruled (and the prosecutor agreed) that the first portion of petitioner's statement, up to but not including his invocation of his right to remain silent, was admissible.

3.    The prosecutor expressly informed the court that "the jury would not hear" petitioner's invocation that he did not wish to make any further statement.  CT 476 (petitioner states "now I ain't saying no more").  The prosecutor stated he recognized petitioner's point and promised that the legal issue did not have to be resolved because the prosecutor was not going to offer that portion of the tape before the jury.

4.    The trial court ruled that the prosecutor's "cut-off point is probably appropriate."

5.    At trial, immediately prior to the admission of the taped statement and transcript thereof, petitioner noticed that both the tape and transcript included the objectionable material relevant to the invocation of petitioner's right to remain silent.

6.    The prosecutor responded that at the pre-trial conference "this [after the invocation] is exactly what we had agreed upon."  The trial court did not have before it the reporter's transcript of the pretrial hearing, which was still in transcription and preparation.  The trial court nonetheless acquiesced in the prosecutor's recollection, which proved faulty.

7.    Consequently, over petitioner's objection, the following excepts of petitioner's statement, which were illegally obtained in violation of petitioner's right to remain silent, were introduced into evidence for the jury's use in assessing guilt at trial:

HASH:        · Um, well see when he said he saw you and he was talkin' to you at the, there was a little girl standin' next to you.  And he's walkin . . .

ASHMUS:    (Interrupting) you're gonna try to con-, *now I ain't saying no more.*

HASH:        Pardon?

ASHMUS:    You ain't gonna, no.  I'm not gonna get accused of somethin'.  I love

| | | |
|---|---|---|
| 1 | | people too much. |
| 2 | HASH: | Um hum. |
| 3 | ASHMUS: | I wouldn't even kill a fly, I'm sorry. |
| 4 | HASH: | Who said anything about killing anybody? |
| 5 | ASHMUS: | I wouldn't even hurt a fly or kill a fly, I'm sorry, *don't say no more* |
| 6 | | (inaudible) |
| 7 | HASH: | (Interrupting) Troy, who said any-, who said anything about killing |
| 8 | | anybody? |
| 9 | ASHMUS: | The way you guys are talkin' to me, I'm sorry it's what it sounds like. |
| 10 | HASH: | Nobody said anything about that.  How come you're bringing that up. |
| 11 | ASHMUS: | He told me there's a serious offense. |
| 12 | HASH: | Who told you what's a serious offense? |
| 13 | ASHMUS: | The cop that told, brought me in. |
| 14 | HASH: | The uniformed officer? |
| 15 | ASHMUS: | Yeah. |
| 16 | HASH: | What did he tell you? |
| 17 | ASHMUS: | He told, I asked him what is my charge?  He says there's been a serious |
| 18 | | offense occurred and you were a suspect, a sus-, suspect. |
| 19 | HASH: | Um hum.  People's Exhibit No. 34; People's Exhibit No. 34A, p. 18; CT |
| 20 | | 476 (emphases added). |

8.     The admission of this evidence violated petitioner's protection against self-incrimination.  The admission of this evidence also unconstitutionally imposed a penalty upon petitioner for the assertion of the constitutional right to remain silent by informing the jury of that invocation.

9.     The admission had a substantial and injurious effect on the jury's special circumstances verdict and penalty determination.  The sole defense was whether petitioner intended to kill Marcella Davis.  It depended in large measure upon the jury's assessment of petitioner's credibility on this point.  Admission of the material quoted above grossly undercut

1  petitioner's credibility inasmuch as it consisted of petitioner's refusal to answer questions and his

2  palpably untrue statement that he would not even hurt or kill a fly only hours after the crime.

3  During the penalty phase, the prosecutor argued that petitioner deserved a death sentence because,

4  inter alia, petitioner had continually lied in the past and during his testimony at trial. The material

5  quoted above was plainly evidence of a past lie.

6  **S.      CLAIM 19:    PETITIONER'S FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF**

7  **ELECTROPHORETIC ANALYSES OF DRIED SEMEN STAINS.**

8          Petitioner's Fifth, Eighth, and Fourteenth Amendment rights against self-incrimination,

9  and to the presumption of innocence, due process, and a capital conviction upon reliable, accurate

10  information were violated by the introduction of expert testimony and evidence of the

11  electrophoretic testing and analysis performed on dried semen samples obtained from the victim's

12  body in that the evidence so admitted was unreliable.

13          In support of this claim, petitioner alleges the following facts to be presented after full

14  discovery, adequate funding, investigation, and an evidentiary hearing:

15          1.      Prior to trial, petitioner objected to the proposed admission of testimony by Robert

16  Garbutt, a criminalist with the Sacramento County District Attorney's Laboratory of Forensic

17  Services, that he performed electrophoretic tests of petitioner's and the victim's blood and saliva

18  and on dried semen stains found on the victim, and that the semen could have come from

19  approximately 1.5 percent of the male Caucasian population, including petitioner.

20          2.      As a result, the Court held an in limine hearing to determine the general acceptance

21  of electrophoretic analysis of dried semen stains in the relevant scientific community and the

22  reliability of the tests and evidence thereon in petitioner's case.

23          3.      Dr. Robert Garbutt testified at that hearing as follows:

24                  a.      He participated in the collection of evidence on the night of the crime at the

25  scene but performed no tests on the blood or semen stains at that time.

26                  b.      He participated with the pathologist, Dr. Gwen Hall, in a preliminary

27  examination of the body between 2 and 3 a.m. the next morning and performed a

28  presumptive test for the presence of seminal fluid which was positive. He obtained a

1    blood sample from the victim during the autopsy and subsequently from petitioner.

2            c.        During the following week and the week after that, he analyzed the semen

3    stains in the ABO system of typing, by using the absorption inhibition method.  On the

4    vaginal swab he detected weak B antigen activity.  He detected no ABO inhibition activity

5    on the rectal swabs.  On the semen swabs taken from Davis's thighs and abdomen he

6    detected B and O antigen (weak).  Davis's blood was type A.  Petitioner's was type B.

7            d.        Garbutt then subjected the seminal stains to electrophoretic testing in order

8    to identify certain additional genetic markers.  Garbutt determined petitioner's PGM type

9    to be 1 plus 1 minus.  Marcella Davis's PGM type was 1 plus 2 plus.  The Peptidase A

10   type of both Marcella Davis and petitioner was 1.  Garbutt's test of the semen stains from

11   Marcella Davis's abdomen and thighs showed that the donor was B, secreted positive in

12   the ABO system, with a PGM of 1 plus 1 minus, and a Peptidase A type 1.

13           e.        Garbutt concluded that petitioner's typing was consistent with that of the

14   possible donor.  Approximately 1.5 percent of the Caucasian population had the same

15   characteristics as petitioner.

16   4.       The prosecutor called Brian Wraxall as a witness in order to meet the foundational

17   requirement that the evidence be reliable, i.e., that electrophoretic testing of dried semen was

18   generally accepted in the relevant scientific community as producing accurate results.  Wraxall

19   testified as follows:

20           a.        Wraxall was a forensic serologist, who worked at the Serological Research

21   Institute as a paid consultant in criminal and civil cases and sponsored training programs

22   in blood stain and body fluid analysis.  He devoted much of his professional career to

23   establishing and promoting the use and acceptance of electrophoresis as a forensic

24   technique.  He was part of a Law Enforcement Assistance Administration (LEAA) project

25   involved in developing more efficient methods of analyzing dried stains, which was

26   directed by Dr. Benjamin Grunbaum.  Dr. Grunbaum resigned because of concerns about

27   the reliability of tests conducted on dried stains.

28           b.        Wraxall had written numerous articles concerning electrophoretic testing

1    and was a member of several forensic societies, including an international electrophoresis

2    society.  He believed that electrophoretic testing on bodily fluids and blood, including

3    dried stains, was reliable and accepted.  He endorsed the testing performed by his friend

4    Robert Garbutt as reliable.

5           c.     He acknowledged that at least two scientists in the field believed the testing

6    and evidence therefrom to be problematic, especially when concerned with dried blood or

7    semen stains.  Wraxall also testified that a third scientist, Dr. George Sensabaugh, had

8    done a study which suggested that semen mixed with saliva could produce false positive

9    results in electrophoretic testing.

10           d.     Wraxall discussed the conclusions by the California Supreme Court in

11    *People v. Brown*, 40 Cal.3d 513, 528-535 (1986), which excluded the results of tests run

12    on dried stain samples because the record in that case did not demonstrate the evidence

13    was sufficiently reliable.

14         5.     Petitioner's counsel presented no affirmative evidence and offered no argument.

15         6.     The court found that the foundational requirements of reliability for the admission

16    of scientific evidence had been met.

17         7.     The admission of the evidence was improper because Wraxall's testimony was

18    insufficient to establish its acceptance in the relevant scientific community because his livelihood

19    was bound up with the reliability of the technique and his stature in the profession was based on

20    his contributions to the development of the technique.  The disagreement in the relevant scientific

21    community over the reliability of tests performed on dried semen was sufficient to warrant

22    exclusion of the evidence.

23         8.     The admission of the evidence was prejudicial and had a substantial and injurious

24    effect on the outcome of the guilt and penalty phases.  The trial court's ruling, made well in

25    advance of trial, necessarily affected all of counsel's decisions made thereafter concerning the

26    defense of petitioner.

27    ///

28    ///

**T.    CLAIM 20:    PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE PROSECUTOR'S USE OF UNPROVEN SEXUAL ALLEGATIONS AS EVIDENCE IN AGGRAVATION OF PETITIONER'S SENTENCE IN CROSS-EXAMINING DR. YARVIS AND IN CLOSING ARGUMENT TO THE JURY.**

Petitioner's death sentence must be set aside as obtained in violation of his Sixth, Eighth, and Fourteenth Amendment rights to confrontation and a reliable penalty determination based on accurate record evidence, not misinformation, as to petitioner's prior history and conduct in that the prosecutor incorrectly informed the jury of the existence of evidence of prior sexual misconduct, argued that the alleged "evidence" as evidence in aggravation and was not corrected by the trial court, despite the existence of a standard jury instruction on point.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.    Dr. Richard Yarvis, a psychiatrist, testified during petitioner's case in mitigation during the penalty phase.

2.    In cross-examination of Dr. Yarvis, the prosecutor asked Dr. Yarvis the following questions and elicited the following answers:

a.    Q: Also, in the area of sexual behavior, do you see evidence of sado-masochistic personality?

A: I think what you're looking for there is the diagnosis of sexual sadism which is one of the psychiatric diagnoses one can make. And the only evidence I have for that lies with the offense itself. One would want, I think, a more, a longer history of that kind of behavior before making that diagnosis.

b.    Q: Well, did you review Wendy Barrett's report that when she was about 15 that he handcuffed her and spanked her, forcing her to cry? This was entirely against her will.

A: I don't think that would be sufficient to make the diagnosis of sexual sadism. It's an unusual diagnosis and not one we make lightly. The kinds of cases I have made that diagnosis in have been repetitive histories of very violent sexual

behavior.  Like the offense, but strings of them.

c.     Q:  How about Kim Sidener, the mother of his child, testified that the defendant would whip her and ask her to whip him?

[Defense counsel]:  I assume that the district attorney misspoke.  I don't recall Kim saying that in this courtroom.

[Prosecutor]:  Sorry

Q:  Would be the report to that effect?

A:  I don't recall.  That would also, you know, that would be a piece of information that one would certainly, you know, direct, would be in that direction.  I don't know that in and of itself it's enough for that particular diagnosis.

d.     Q:  Did you see reports from, concerning interviews of the people who knew the defendant when he lived in the North Highlands on E Street, the defendant had a lot of sexual paraphernalia, dildos and that sort of thing, and magazines of a sado-masochistic nature which he used to keep with him in his room, lock the door to keep other people out?

A:  Again, I don't recall that specifically, but assuming it, for the moment, that alone would not, could not, you know, that wouldn't be enough for diagnosis of sexual sadism which has to be, as I read the diagnostic manual, violent sexual behavior.  Not simply reading sado-masochistic magazines.

e.     Q:  Would Kim Sidener's report that the defendant requested that she insert a table leg into his rectum be more evidence of a bizarre, sadistic sexual nature?

A:  No, not sadistic, masochistic.

f.     Q:  In reference to what happened to Marcie Davis in the sodomy that was done to her, did you consider it significant that the defendant apparently manipulated the anus of the 18-month-old in the E Street complex and apparently admitted doing so?

A:  Well, of course it's significant, but I am not sure what connection you

1         are looking for.

2         3.    No evidence was ever introduced to support any of the "facts" implied by the

3    prosecutor's questions.  There was no evidence that petitioner spanked and handcuffed Barrett,

4    whipped Kim Sidener, asked Kim Sidener to whip him, kept sexual paraphernalia    and

5    pornography, asked Kim Sidener to insert a table let in his rectum, or manipulated the anus of a

6    baby.  Nor could evidence of most of these instances have been introduced without running afoul

7    of mandatory state law principles or the federal constitution.

8         4.    In closing argument, however, the prosecutor argued that these incidents occurred

9    and that evidence of petitioner's sadistic sexual practices existed and suggested that petitioner

10   derived additional sado-masochistic pleasure from the sexual offenses committed in the present

11   case.

12        5.    There was nothing to suggest these allegations of sexual conduct were accurate and

13   petitioner was never provided an opportunity to confront this "evidence" against him.

14        6.    Petitioner objected to the prosecutor's closing argument and his use of the unproven

15   allegations of sexual conduct as "evidence" and requested an admonition.

16        7.    The trial court did nothing to correct the misinformation perniciously presented to

17   the jury by the prosecutor or to ameliorate the misconduct despite the existence of an instruction

18   which would have made clear that questions and answers regarding reports of conduct are not to

19   be treated or used as evidence.  California Jury Instruction - Criminal (CALJIC) No. 2.42 states

20   (and stated) that

21             Where on cross-examination, a witness is asked if he has heard of reports

22             of certain conduct of a defendant inconsistent with the traits of good character as

23             to which the witness has testified, such questions and the witness' answers thereto

24             may be considered only for the purpose of determining the weight to be given to

25             the opinion of the witness or to his testimony as to the good reputation of the

26             defendant.

27             Such questions and answers are not evidence that the reports are true and

28             you must not assume from them that the defendant did in fact conduct himself

FINALIZED PETITION FOR WRIT OF
HABEAS CORPUS -- C 93-0594 TEH              130

1   consistently with such traits of character.

2       8.    The prosecutor's questioning and argument, and the trial court's failure to correctly

3   instruct the jury on the principles of law that were to guide their consideration of the evidence had

4   a substantial and injurious effect on the jury's verdict.

5       a.    The prosecutor used incidents and character evidence that was

6   constitutionally inadmissible against petitioner and could not have been introduced against

7   petitioner without violating due process.

8       b.    The suggestion by the prosecutor during his closing argument to the jurors

9   that the jury consider this evidence as a circumstance of the crime was grossly improper.

10  The manner in which the prosecutor urged the jurors to use this evidence was lurid and

11  inflammatory.

12      c.    The constitutional errors effectively extinguished a mitigating factor under

13  state law, *see* California Jury Instructions - Criminal (CALJIC) No. 8.84.1, subd. (k),

14  exponentially increased the aggravating effect of another factor, *id*. subd. (a), and

15  provided evidence of yet a third factor, *id*. subd. (b). In a state in which the jury is

16  required to determine the existence or nonexistence of a set of aggravating and mitigating

17  factors and then weigh the former against the latter in arriving at the appropriate

18  punishment, an error of the present magnitude cannot be harmless.

19  **U.    CLAIM 21:  PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT**
    **RIGHTS WERE VIOLATED BY THE PROSECUTOR'S ARGUMENTS ABOUT**
20  **MARCELLA DAVIS AND THE CRIME SCENE.**

21      Petitioner's death sentence is unlawful in that his Eighth and Fourteenth Amendment rights

22  to be sentenced on the basis of accurate, reliable information that was a matter of record and to

23  the enforcement of mandatory state court sentencing procedures were violated by the prosecutor's

24  argument concerning the victim's character and good deeds and argument that sympathy rightfully

25  belonged to the victim, not the defendant.

26      In support of this claim, petitioner alleges the following facts, among others to be

27  presented after full discovery, investigation, adequate funding, access to this Court's subpoena

28  power, and an evidentiary hearing:

FINALIZED PETITION FOR WRIT OF
HABEAS CORPUS -- C 93-0594 TEH      131

1.    As part of the prosecutor's penalty phase closing argument, he told the jury that the victim's brother, who was supposed to be watching his sister, will live with the guilt for the rest of his life that he should not have let her out of his sight.

2.    The prosecutor also told the jury that Marcella Davis's friends and the community all fear a little more for "our children" as a result of petitioner's crime.

3.    The prosecutor argued that petitioner's crime caused the community to lose trust and was the reason that Santa Anita Park was "denuded."

4.    After reading an excerpt from a book written about an unrelated homicide case, the prosecutor accused petitioner of usurping the compassion that belongs to the victim and of stealing the victim's moral constituency.

5.    At the time of petitioner's trial, state law required that the bases used to impose death be limited to a finite list of aggravating factors or considerations. None of the foregoing -- not the impact upon Marcella Davis's brother, friends or the community at large -- was included in that list.

6.    The use of these factors to bolster the aggravation side of the equation had a substantial and injurious effect on the jury's verdict. There was no record evidence to support the statements set forth in paragraphs 1, 2, and 3. The prosecutor's argument addressed inflammatory topics designed to arouse any reasonable person's sympathy in favor of Marcella Davis's friends and family and antipathy against petitioner.

7.    The effect of the argument was compounded by the court's refusal to admonish the jury to ignore the prosecutor's argument, despite two requests by petitioner's counsel, and by the court's delivery of an instruction which erroneously invited the jury to "consider pity, sympathy, or mercy" in determining the appropriate punishment. The instruction sanctioned the prosecutor's argument.

8.    The prosecutor's improper argument requires the granting of habeas relief from the state court judgment.

///

///

## V.    CLAIM 22:    PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE INTRODUCTION OF A SUBSEQUENT AND NON-FINAL FELONY CONVICTION AS A FACTOR IN AGGRAVATION DURING THE PENALTY PHASE.

Petitioner's death sentence was unlawfully obtained in violation of his Eighth and Fourteenth Amendment rights to the due process enforcement of the mandatory requirements of the state's sentencing statute and a reliable penalty determination as a result of the introduction of a felony conviction, entered after the commission of the present offense, which was not final at the time it was introduced into evidence, and by the California Supreme Court's failure to follow mandatory statutory rules by disposing of this issue on a ground not raised by the parties and not reflected by the record.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.    The crime with which petitioner was charged occurred on May 19, 1984.

2.    During the penalty phase of petitioner's capital trial in 1986, over objection, the trial court allowed the prosecutor to produce evidence of a felony conviction for assault with intent to commit rape suffered by petitioner on September 13, 1985.

3.    The conviction was not final at the time it was admitted into evidence in 1986 and therefore was not sufficiently reliable to be admitted as an aggravating factor.

4.    Under the mandatory terms of the state's sentencing scheme, a felony conviction entered after the date of the capital crime does not qualify as a prior felony conviction within the meaning of California Penal Code section 190.3, subdivision (c).

5.    The admission of this felony conviction had a substantial and injurious effect on the jury's verdict. The other felony conviction admitted against petitioner was of second-degree burglary for breaking into a high school student store to steal some pencils, erasers, and candy bars. Viewed pragmatically, the admission of the conviction for assault with intent to commit rape turned subdivision (c) into a substantial aggravating factor as opposed to a factor which was inconsequential to either party.



6.    The California Supreme Court denied petitioner appellate due process and due process by violating mandatory statutory rules by disposing of this claim on a ground not raised by either party and then failing to afford petitioner a rehearing.

7.    In addition, combined with other errors which extinguished or reduced mitigating factors and exponentially increased the aggravating factors, the error here was cumulatively prejudicial.

**W.    CLAIM 23:    PETITIONER'S FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE ADMISSION OF THE CIRCUMSTANCES UNDERLYING A FELONY CONVICTION SUFFERED BY PETITIONER.**

Petitioner's sentence and confinement are unlawful in that his Fifth, Eighth, and Fourteenth Amendment protection against double jeopardy and right to a reliable penalty determination were violated by the admission of the circumstances underlying the California Penal Code section 220 conviction in addition to the fact of the conviction.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.    The prosecutor admitted documentary proof of petitioner's prior felony conviction. The documentary proof revealed both the fact of the conviction and the nature of it as an assaultive crime.

2.    Nonetheless, over objection during the penalty phase, the prosecutor called Lisa Cronin, the victim of the assault with intent to commit rape, as a witness. Ms. Cronin testified that she was born and raised in San Bruno (in the county where petitioner's trial occurred). She was a twenty-three year old student at Sacramento State College on May 19, 1984, at the time of the assault. Ms. Cronin testified in minute detail about the assault and its results (she reported suffering a bruised and sprained arm) and identified petitioner as her assailant.

3.    Cronin's testimony was improperly admitted and had a substantial and injurious effect on the jury's verdict. Her testimony made up a major part of the prosecutor's case-in-chief for the death penalty. She was a member of the jurors' community who suffered physical harm

1   and identified petitioner as the cause of that harm. The nature of the crime was already put in

2   evidence as a result of the conviction and Ms. Cronin's presence was inflammatory, and not

3   probative.

4   **X.    CLAIM 24:  PETITIONER'S FIFTH, SIXTH, EIGHTH, AND FOURTEENTH
        AMENDMENT RIGHTS WERE VIOLATED BY THE COURT'S SUMMARY
5       EXCUSAL AND REPLACEMENT OF A JUROR DURING THE PENALTY PHASE.**

6       Petitioner's sentence and confinement are unlawful and his Fifth, Sixth, Eighth, and

7   Fourteenth Amendment rights to be present, to the effective assistance of counsel, to a fair trial

8   by jury, as mandated by state law, and to a reliable and fair penalty assessment were violated by

9   the excusal of a juror during the penalty phase based on a telephone call from the juror to the

10  court clerk and as reported by the court clerk.

11      In support of this claim, petitioner alleges the following facts, among others to be

12  presented after full discovery, investigation, adequate funding, access to this Court's subpoena

13  power, and an evidentiary hearing:

14      1.    Before the start of the day's penalty phase proceedings on June 10, juror Fred

15  Godfrey telephoned the court and spoke to the court clerk. On the day prior to this incident Dr.

16  Yarvis had testified on direct examination.

17      2.    Juror Godfrey told the court clerk that his mother had died the night before and

18  requested that he be removed from the jury.

19      3.    Approximately an hour later, the trial court notified the prosecutor and petitioner's

20  counsel and informed them that juror Godfrey had been excused. The trial court did not invite

21  discussion of the dismissal. Counsel for petitioner objected to the dismissal and the procedures

22  involved therein.

23      4.    The procedures were flawed because petitioner was not present, petitioner's counsel

24  was not present, neither petitioner nor his counsel was notified of the problem, no record exists

25  of the dialogue leading to the dismissal, and the critical portion of this proceeding occurred

26  outside the presence of the judge inasmuch as the dismissal was based solely on a conversation

27  between the court clerk and the juror which was then relayed to the judge.

28      5.    The improper dismissal of a qualified juror such as Juror Godfrey in this fashion

and the violation of petitioner's right to counsel here, was a structural error which is reversible error per se or at minimum was prejudicial and had a substantial and injurious effect on the verdict.

**Y.    CLAIM 25:    PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE COURT'S FAILURE TO INSTRUCT THE JURORS TO START DELIBERATIONS ANEW AFTER THE REPLACEMENT OF A JUROR.**

Petitioner's sentence and confinement were unlawful and his Sixth, Eighth, and Fourteenth Amendment rights to due process, a fair trial, and a fair, reliable, and individualized penalty assessment based on the jury's full consideration of all permissible evidence, and to a fair and impartial jury verdict were violated by the trial court's failure to instruct the jury either to renew its deliberations on the issue of guilt or to consider lingering doubt in mitigation of sentence after the substitution of juror Godfrey with juror Severance in the middle of the penalty phase.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.    The court replaced juror Godfrey with juror Severance in the middle of the penalty phase.

2.    The trial court did not instruct the jury that it should review the guilt phase evidence anew or re-deliberate on the issues of the truth of the murder charge or special circumstance allegation; that the prosecutor and petitioner had a right to a verdict reached only after participation of all twelve jurors; and that in order to secure this right to petitioner the jurors had to permit renewed deliberations on petitioner's guilt. The trial court did not instruct the jury to consider any lingering doubts they may have as to petitioner's guilt of the murder charge or the special circumstance allegation as a factor in mitigation of sentence.

3.    In California, a factor in aggravation is the circumstances of the crime and the existence of the special circumstances. Thus, the jury is required to consider anew the guilt phase evidence. In addition, jurors during the penalty phase are entitled to rest a life verdict on lingering doubts about petitioner's guilt of special circumstances murder.

4.     The court's failure to so instruct the jurors precluded juror Severance from considering the guilt phase evidence independently and from expressing or considering any lingering doubt he may have had that petitioner was actually guilty of special circumstances.

5.     The error was prejudicial and had a substantial and injurious impact on petitioner's fundamental rights and deprived him of a fair and reliable determination of penalty.

**Z.     CLAIM 26:  PETITIONER'S RIGHT TO DUE PROCESS WAS VIOLATED BY THE PROSECUTOR'S ARGUMENT THAT PETITIONER LACKED REMORSE FOR THE CRIME AND THAT THE JURY COULD CONSIDER THIS FACTOR IN AGGRAVATION.**

Petitioner's sentence and confinement are unlawful because his rights to due process, a fair penalty determination, and enforcement of mandatory state sentencing procedures, were violated by the state's use of petitioner's alleged lack of remorse as an aggravating factor.

In support of this claim, petitioner alleges  the following facts, among others to be presented after full discovery, investigation, adequate funding,  access to this Court's subpoena power,  and an evidentiary hearing:

1.     The prosecutor structured the first portion of his penalty phase argument around the instructions the jury would receive, including the sentencing factors for the jury's consideration.  He then explained which factors he believed to be aggravating.

2.     He concluded his argument on the aggravated nature of the circumstances of the offense by introducing the theme that petitioner lacked remorse after the crime, as determined by his post-offense conduct, his conduct while in jail, and his interviews with Dr. Yarvis.  The prosecutor's argument urged the jury to consider petitioner's purported lack of remorse as a factor in aggravation.  At the conclusion of his argument focussing on lack of remorse, the prosecutor informed the jury that he would turn briefly to "other aggravating factors in this case," which included the assault on Lisa Cronin.

3.     Petitioner objected to the prosecutor's argument on lack of remorse.  Later petitioner unsuccessfully sought an instruction that the absence of  a mitigating factor did not constitute an aggravating factor.

4.     Under the sentencing scheme established by California, the jury may consider only

1    a specified list of aggravating factors: Remorse is not among them and may not be argued as such

2    to the jury. Once a state establishes a sentencing scheme, the defendant has a due process right,

3    which was violated here, to its enforcement.

4        5.    The prosecutor's argument was prejudicial and had a substantial and injurious effect

5    on the jury's verdict. The argument framed around the theme of remorse accounted for slightly

6    more than one-fourth of the prosecutor's closing argument. It improperly added an impermissible

7    factor to the aggravating side to be weighed against the mitigating evidence by the jury in making

8    their penalty assessment. During deliberations, which lasted the approximate equivalent of one

9    full day, the jury asked to rehear the testimony of Dr. Yarvis and deputy sheriff Franklin, both

10   of whom testified for petitioner during the penalty phase, and both of whom provided positive

11   character evidence.

12   **AA.  CLAIM 27:  PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT
     RIGHTS WERE VIOLATED BY PENALTY PHASE INSTRUCTIONS WHICH
13   WERE IMPERMISSIBLY VAGUE, PRECLUDED THE JURY FROM GIVING
     FULL EFFECT TO PETITIONER'S MITIGATING EVIDENCE, DEPRIVED
14   PETITIONER OF AN INDIVIDUALIZED SENTENCING DETERMINATION AND
     RESULTED IN AN UNRELIABLE SENTENCE, BASED ON PASSION AND
15   PREJUDICE.**

16   Petitioner's confinement and death sentence are unlawful and were obtained in violation

17   of the Eighth and Fourteenth Amendments in that the court's instructions to the jurors provided

18   them with impermissibly vague directions for selecting the appropriate punishment; permitted

19   them to utilize in aggravation, factors which, consistent with the constitution may only be

20   mitigating; precluded them from giving full effect to petitioner's evidence in mitigation; deprived

21   petitioner of his right to an individualized determination of the appropriate sentence based on his

22   background; and resulted in a sentence that was arbitrary, unreliable, capricious, and based on

23   passion and prejudice.

24   In support of this claim, petitioner alleges the following facts, among others to be

25   presented after full discovery, investigation, adequate funding, access to this Court's subpoena

26   power, and an evidentiary hearing:

27       1.    The court instructed the jurors that they could consider petitioner's mental or

28   emotional disturbance only if they found it to be "extreme."

a.    During the penalty phase, petitioner produced evidence of mental and emotional disturbance during the testimony of teachers, a probation officer, and Dr. Richard Yarvis. The heart of petitioner's penalty phase presentation in mitigation was this evidence of his life long mental and emotional disorders.

b.    The trial court instructed the jurors that they were to consider, if applicable, "whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance."

c.    Under the court's instructions, the sentencer -- the jury -- was not allowed to consider petitioner's mental or emotional disturbance unless it found the same to be extreme. The adjective created a barrier to the jury's full consideration and assignment of mitigating weight to petitioner's penalty phase presentations because the jury could not consider the evidence unless it reached a threshold of "extreme." In addition, it rendered the sentencing factor impermissibly vague because the jury lacked guidance on the scope of its discretion and the quantum of evidence which qualified as "extreme."

d.    The instruction was prejudicial and had a substantial and injurious effect on the jury's verdict. Given the nature of the emotional and mental disturbances, and the evidence that petitioner was not so chronically disturbed as to appear floridly psychotic or developmentally disabled, one or more jurors could have believed erroneously that, under these instructions, the evidence proffered by petitioner had no legal significance or effect since it might not meet the jurors' definition of extreme.

2.    The trial court refused to deliver petitioner's requested instruction informing the jury that petitioner's conforming conduct should he be sentenced to life without possibility of parole may be considered in mitigation.

a.    During the penalty phase Sacramento County deputy sheriff Kenneth Franklin, a guard in the Sacramento County jail who knew petitioner while the latter was confined, testified that petitioner was a compliant, easily managed prisoner, who caused no problems. He was immature, but not a behavior problem in jail. Franklin was fond of petitioner.

b.    At the end of the penalty phase, petitioner requested and the trial court refused the following instruction:  "You may consider as a mitigating circumstance evidence that defendant would serve the rest of his life in state prison as a cooperative and compliant prisoner."

c.    The court should have delivered the instruction.  The jury must be permitted to consider evidence of conforming conduct in jail custody as a factor in mitigation.  The standard instructions, even as supplemented in this case, provide no indication that conforming conduct is a relevant penalty factor.  Absent an explicit direction, the charge to petitioner's jury precluded them from giving full mitigating weight to petitioner's penalty phase evidence.  Given the magnitude of the crime and the evidence of petitioner's non-conforming conduct from childhood to arrest, the evidence of petitioner's cooperation as a jail confinee  was critical to his obtaining a sentence of life without possibility of parole.  The error was prejudicial and had a substantial and injurious effect on the jury's penalty verdict.

3.    The trial court failed to deliver petitioner's requested instruction that the absence of a mitigating factor does not render the factor one in aggravation.

a.    Petitioner requested that the jury be instructed that "If a factor is not found to be by you a mitigating factor, that in and of itself does not make that factor an aggravating factor."

b.    The Court declined to deliver the instruction.

c.    The failure to deliver the instruction was prejudicial and had a substantial and injurious effect on the jury's verdict.  No instruction so informed the jury.  In California, it is common for prosecutors and judges to make the very mistake petitioner tried to eliminate in the present case.  If professionals in the field make this mistake, there is no reason to assume jurors, unguided in their deliberations, do not similarly treat the absence of mitigation as aggravation.

4.    The court failed to inform the jury that petitioner's background could be considered by the jury as a basis of a sentence less than death.

a.    The trial court directed the jury to consider and be guided by any other circumstance which diminishes the gravity of the crime, even though it is not a legal excuse for the crime and any sympathetic or other aspect of petitioner's character or record that defendant offers as a basis for a sentence less than death.

b.    The court neglected to inform the jurors that they were to consider any evidence or aspect of petitioner's background which he proffered as a basis for a sentence less than death.

c.    A capital sentencing jury is required to consider mitigating aspects of petitioner's character, record *and* background.

d.    The omission from the instructions of petitioner's background was prejudicial and had a substantial and injurious effect on the jury's verdict, as it was the most likely source, as opposed to the evidence of record and character, of mitigation that would produce a sentence less than death. The jury was precluded from giving full mitigating consideration and effect to petitioner's proffered evidence.

5.    The trial court misinformed the jury on the role of sympathy, pity and mercy.

a.    The trial court instructed the jury to consider sympathy, pity or mercy in determining petitioner's punishment.

b.    The instruction did not limit this consideration to feelings of sympathy, pity or mercy that might be engendered based on the evidence in petitioner's favor.

c.    Coming on the heels of the prosecutor's argument, in which he urged the jurors not to allow petitioner to usurp the compassion that belongs to the victim and implored the jurors to think about Davis's brother who would live with the guilt for the rest of his life that he should not have let her out of his sight, a reasonable juror would interpret the instruction to apply against petitioner as well.

d.    The instruction, as delivered invited the jury to base its decision on passion and prejudice, not reason. In a case involving a seven year old girl, in which the prosecutor reminded the jury that we should all fear a little more for our children and invited the jurors to feel sorry for Davis's brother and the family, the instruction had a

substantial and injurious effect on the verdict.

6. The trial court's failure to properly instruct the jury requires the granting of habeas relief from the state court judgment.

**BB. CLAIM 28: PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE TRIAL COURT'S FAILURE TO EXPLAIN TO THE JURY THAT A SENTENCE OF LIFE WITHOUT PAROLE MEANT PETITIONER WOULD NOT BE RELEASED FROM PRISON.**

Petitioner's sentence was unlawfully obtained in violation of his Sixth, Eighth, and Fourteenth Amendments rights to a fair trial, the effective assistance of counsel, an individualized sentencing determination, which is not arbitrary or capricious, which is based on relevant record considerations, not misinformation, and which is the product of suitably guided discretion, by the trial court's failure to inform the jury that a sentence of life without possibility of parole meant that petitioner would not be paroled and would live his life in prison.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1. During voir dire, as detailed in Claim Three and incorporated by this reference, 22 of the 126 jurors who were questioned on substantive (non-hardship) matters expressed varying degrees of confusion, misunderstanding and skepticism about the nature and duration of a sentence of life in prison without parole.

2. Of these twenty-two jurors, two (foreperson Diana Stephens and juror Wendy Pippin) deliberated on petitioner's sentence. A third -- Fred Godfrey -- was excused during the penalty phase.

3. Given this common and widespread misunderstanding, petitioner requested that the court instruct the jury at the conclusion of the penalty phase that "a sentence of life without the possibility of parole means that the defendant will remain in state prison for the rest of his life and will not be paroled at any time."

4. The court refused the requested instruction.

5. This refusal was prejudicial and had a substantial and injurious effect on the jury's

1   verdict.  The overwhelming majority of jurors disbelieve the literal language of life without

2   parole, believing instead that one sentenced to life without possibility of parole will be released.

3   A juror's faith in the efficacy of the alternative punishment to a death sentence has a powerful,

4   if not determinative effect on his or her choice of punishment.

5   **CC.    CLAIM 29:    PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT**
    **RIGHTS WERE VIOLATED BY THE COURT'S INSTRUCTIONS, WHICH**
6   **ALLOWED    THE    JURORS    TO    IMPERMISSIBLY    INFLATE    THE**
    **CIRCUMSTANCES    IN    AGGRAVATION    THEY    COULD    PERMISSIBLY**
7   **CONSIDER IN SENTENCING PETITIONER.**

8        Petitioner's confinement and death sentence were illegally obtained in violation of the

9   Eighth and Fourteenth Amendment rights to a reliable, accurate, and individualized determination

10  of punishment based on sentencing factors that are not vague, and by a sentencer that has been

11  fully informed of the factors it must use in determining the appropriate punishment, by the

12  multiple errors in instructing the jury with respect to the circumstances of the present offense and

13  the prior offenses.  Petitioner was further deprived of appellate due process in violation of the

14  Fourteenth Amendment by the California Supreme Court's affirmance of the instructional error

15  by developing and applying a new factual theory concerning the alleged commission of oral

16  copulation.

17       In support of this claim, petitioner alleges the following facts, among others to be

18  presented after full discovery, investigation, adequate funding, access to this Court's subpoena

19  power, and an evidentiary hearing:

20       1.    The trial court's instructions unconstitutionally allowed the jurors to separately

21  consider the special circumstance that petitioner engaged in lewd conduct with a child under

22  fourteen years old, despite the fact that this special circumstance was based on the same conduct

23  as the special circumstances alleging that petitioner committed a rape and sodomy.  Permitting the

24  jury to consider these overlapping special circumstances separately at the penalty phase artificially

25  inflated the circumstances in aggravation.

26       2.    The trial court's instructions unconstitutionally allowed the jury to consider the

27  crimes of which petitioner was convicted during the guilt phase under three separate aggravating

28  factors.

a.      At the conclusion of the penalty phase the jury was directed to consider the following factors (among others):  (1) the circumstances of the crime of which petitioner was convicted in the present case and the existence of any special circumstances found to be true, (2) the presence or absence of criminal activity by petitioner which involved the use or attempted use of force or violence of the express or implied threat to use force or violence, and (3) the presence or absence of any felony convictions.

b.      Under this instruction the jury was directed to use the convictions just rendered in the guilt phase and the facts of the capital crime three times as aggravating factors, under subparagraph (1), (2) and (3) above, rather than as a single aggravating factor under subsection (1).

c.      The court's instructions violated the federal constitution and violated the state's mandatory sentencing procedures, thereby violating petitioner's due process interest in the enforcement of these procedures.

d.      This triple counting artificially inflated the factors in aggravation against petitioner.  In a state where the jury is to weigh aggravating factors against mitigating factors, this artificial inflation necessarily had a substantial and injurious effect on the jury's verdict.

3.      The California Supreme Court affirmed the propriety of the instructions by developing a new factual theory on appeal concerning the alleged commission of oral copulation in ruling that the special circumstance allegations were not overlapping.

4.      These errors require the granting of habeas relief from the state court judgment.

**DD.   CLAIM 30:   PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY A SERIES OF ERRORS COMMITTED BY THE TRIAL COURT IN IMPOSING JUDGMENT ON PETITIONER.**

Petitioner's sentence and confinement were obtained in violation of the Eighth and Fourteenth Amendment rights to notice and an opportunity to defend against the information relied upon by the sentencer, to an accurate, individualized and reliable penalty assessment which is not contaminated with misinformation and which is free of passion and prejudice, to full consideration of evidence proffered as a basis for a sentence less than death, and to the enforcement of the

1    state's sentencing procedures by the court's multiple errors at the time of sentencing.

2        In support of this claim, petitioner alleges the following facts, among others to be
3    presented after full discovery, investigation, adequate funding, access to this Court's subpoena
4    power, and an evidentiary hearing:

5        1.    The trial court's consideration of a probation report rife with unreliable and
6    inaccurate hearsay that was not presented to the jury violated petitioner's rights to notice and an
7    opportunity to be heard, to a sentence based on accurate and reliable information, and to his
8    substantial and legitimate expectation in the enforcement of the sentencing scheme established by
9    the state.

10            a.    In passing sentence on petitioner, the trial court read and considered a
11    probation report prepared by the San Mateo County Probation Department.

12            b.    The information in the probation report was culled from information
13    received from the Offices of the Sacramento County District Attorney, Sheriff and
14    Probation Department, the Kern County Probation Department, the California Department
15    of Motor Vehicles and from interviews with the victim's mother and the state's primary
16    investigating officer.

17            c.    The report included double and triple hearsay, the primary source of which
18    was often unknown or unidentified, which was not admitted at trial, including that
19    petitioner had a fascination for knives; played Dungeons and Dragons; sought bizarre and
20    physically harmful sexual behavior; showed an unusual interest in sexual behavior
21    involving children or younger females; physically assaulted peers and animals; frequently
22    butchered rabbits; killed mice by squeezing them to death; repeatedly ran over a cat with
23    a car; did not participate in normal youth activities such as scouting or little league because
24    of his inability to get along with his peers; handcuffed and spanked his girlfriend when
25    they were young teens; was accused of and admitted molesting an eighteen month old boy;
26    asked a girlfriend to insert a chair leg into his rectum; claimed he was the devil; insisted
27    on engaging in sodomy and mutual whipping with a girlfriend; was previously arrested for
28    burglarizing a bowling alley, statutory rape, grand theft, and burglarizing a golf course

1    snack shop; and smiled and snickered at the victim's parents during the preliminary

2    hearing in the present case.

3        d.    The probation report also included a summary of a lengthy interview with

4    the victim's mother, including the fact that her daughter may have gone with petitioner to

5    find ducks because she was to be "a little duck in a school play" during the upcoming

6    week, that the crime and trial resulted in the break-up of her marriage; that her husband

7    became an alcoholic as a result of the event; and the fact that her son endured great trauma

8    and guilt.  She included her fervent hope that the death penalty would be carried out and

9    explained the great hardship she endured in traveling from Sacramento to trial because of

10   the change of venue.  The report mentioned Mrs. Davis's high praise for law enforcement

11   officers, the prosecutor, the judge, and the jury in this present case.

12       e.    Finally, the probation officer offered his own opinions that "all persons

13   involved in the case deserve a 'thank you' from society," and that "members of the jury

14   merit appreciation from society for their substantial inconvenience and ability to reach

15   appropriate decisions in a case that was probably the most difficult thing they will face in

16   their lifetime."

17       f.    There was not a shred of evidence to support any of these opinions or

18   statements.  Moreover, nearly all of the foregoing allegations, and opinions, even if true,

19   would have been inadmissible under California law at petitioner's penalty trial because

20   they fall within none of the specified statutory aggravating factors.  Under the California

21   capital sentencing scheme in effect at petitioner's trial the sentencer may only consider

22   evidence which falls into one of the statutory aggravating categories

23       g.    Under California law, petitioner is deemed to have made a motion for

24   modification of the judgment from death to life without parole.  In considering petitioner's

25   automatic motion for modification pursuant to California Penal Code section 190.4(e), the

26   court is allowed to consider only the aggravating and mitigating evidence relied upon by

27   the jury.  None of the information specified in paragraphs (c),(d),and (e) was before the

28   jury as evidence.

1       h.     The improperly considered uncorroborated and unreliable hearsay was

2   extraordinarily inflammatory and shocking. The probation officer's bias against petitioner

3   is evident. It is impossible to read the report without being adversely affected by the

4   information contained therein. The court's constitutionally impermissible consideration

5   of it in sentencing petitioner had a substantial and injurious effect on the statutorily

6   required sentencing procedure.

7       2.     The trial court impermissibly allowed the victim's mother to address the court prior

8   to imposing a death sentence on petitioner. She spoke of the great suffering endured by the family

9   since Marcella Davis's death and of the great joy she brought to others during her life, and begged

10   to court to show that society will not accept this terrible tragedy. The information contained

11   therein was not heard by the jury and would not have been admissible before it under the

12   California statutory scheme as it existed at the time of petitioner's trial.

13       3.     The trial court impermissibly failed to give independent mitigating weight to

14   petitioner's background evidence in mitigation which did not serve to justify or extenuate the

15   gravity of the crime. The court noted three times that none of the evidence presented by petitioner

16   explained the crime, justified or diminished the gravity of the crime or provided any moral or

17   legal justification for petitioner's conduct. The court's unduly restrictive view of the function and

18   role of mitigating factors violated the Eighth Amendment and prejudicially deprived petitioner of

19   the exercise of discretion contemplated by the California capital sentencing scheme and required

20   by the Eighth Amendment.

21       4.     The trial court's errors in sentencing require the granting of habeas relief from the

22   state court judgment.

23   **EE.   CLAIM 31:   PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH
AMENDMENTS WERE VIOLATED BY THE STATE'S REFUSAL TO DISCLOSE,
AND THE TRIAL COURT'S FAILURE TO ORDER DISCLOSURE OF
RELEVANT INFORMATION WHICH WOULD HAVE SHOWN THAT THE
CAPITAL CHARGING DECISION WAS ARBITRARY, CAPRICIOUS,
DISCRIMINATORY AND STANDARDLESS.**

26       Petitioner's conviction, sentence and confinement were unlawfully obtained in violation

27   of his Sixth, Eighth, and Fourteenth Amendment rights to present a defense, to a fair and reliable

28

trial and to a capital proceeding or prosecution, including charging, not infected by arbitrary and capricious actions by state agents, as a result of the State's refusal to disclose information relevant to showing that the Sacramento County District Attorney charged and disposed of capital-eligible murder cases in an arbitrary, capricious, discriminatory, and standardless manner.

In support of this claim, petitioner alleges the following facts, among others to be presented after full discovery, investigation, adequate funding, access to this Court's subpoena power, and an evidentiary hearing:

1.    Prior to trial, in November, 1985, petitioner sought by formal motion to compel the Sacramento County District Attorney to disclose information relevant to that office's charging practices and procedures in capital cases for the preceding seven years. Petitioner alleged the prosecutor had no rational procedures by which it determined in which of the capitally-eligible cases, the death penalty would be sought. Petitioner stated this information would be used in support of a motion to dismiss the special circumstances or to prohibit the prosecutor from seeking the death penalty should the data support petitioner's position.

2.    In support of the motion, petitioner's counsel provided a declaration alleging that the death penalty charging decision was two-fold:  one deputy prosecutor decided how each homicide case should be charged and a second deputy determined whether the office would make a plea offer. Counsel further alleged that no deputy prosecutor was guided in any portion of this process by articulable or written standards governing the decisions to seek a punishment of death, life without possibility of parole, or life with possibility of parole. Counsel alleged that the result was irrational, arbitrary, and capricious decision-making.

3.    In further support of the motion, petitioner's counsel provided a sample of ten cases comparable to petitioner's in which plea offers less than death were made or no special circumstances were filed, or no first degree murder conviction was sought.

4.    Petitioner sought specific information:  the case name and number of all murder complaints filed in Sacramento Municipal Court, and all murder informations filed in Sacramento Superior Court within the last seven years; descriptions of the prosecutor's decision making process leading to the manner in which each charging document is pled;  a description of the plea-

1   bargaining process; written materials which discuss or describe the manner in which the deputies

2   should plead or resolve murder cases; and the nature of the murders charged in the informations

3   and complaints for the preceding seven years.

4       5.      On November 27, 1985, the trial court limited the hearing on petitioner's motion

5   to  the question of whether petitioner had the right to an evidentiary hearing on his discovery

6   motion.  The court denied the motion, but permitted petitioner to file supplemental declarations

7   and points and authorities to perfect his showing.  Petitioner then sought to interview the District

8   Attorney concerning his charging practices and subpoenaed several deputy district attorneys to a

9   further hearing on the discovery motion.

10      6.      Eventually, on December 19, 1985, the court denied petitioner's discovery request

11  in reliance on *Keenan v. Superior Court*, 126 Cal. App.3d 576 (1981).

12      7.      The error is a structural error as to which no showing of prejudice is required and

13  is one which was prejudicial and had a substantial and injurious effect on petitioner's sentence

14  because had petitioner obtained the requested discovery he would have been able to establish a

15  prima facie case for relief.

16  **FF.   CLAIM 32:    PETITIONER'S SIXTH, EIGHTH, AND FOURTEENTH**
    **AMENDMENT RIGHTS WERE VIOLATED BY THE SUGGESTIVE**
17  **IDENTIFICATION PROCEDURES WHICH RESULTED IN THE INTRODUCTION**
    **OF A TAINTED CONVICTION AND TESTIMONY.**

18      Petitioner's sentence and confinement were unlawfully obtained in violation of the Sixth,

19  Eighth, and Fourteenth Amendment rights by the admission of the tainted testimony of Lisa

20  Cronin and the unconstitutionally obtained conviction for assault with intent to commit rape.

21      In support of this claim, petitioner alleges the following facts, among others to be

22  presented after full discovery, investigation, funding, and an evidentiary hearing:

23      1.      The procedures by which Lisa Cronin identified petitioner as her assailant were

24  unconstitutionally suggestive and likely to produce an unreliable identification.

25      2.      Shortly after 2 a.m. on May 19,1984, a male grabbed Lisa Cronin as she was on

26  her way back to her apartment from making a purchase at a 7-11 Store, pulled her into bushes,

27  pushed her onto the ground and told her that she "wanted it" and was "going to get it."

28

3.    The next afternoon, Ms. Cronin decided to report the attack. She described her attacker to a report writer for the Sacramento Sheriff's Department, as white, male, 25 years old, 5'11" and 165 lbs., with short straight light brown hair, blue eyes, and a mustache.

4.    Several days later, Ms. Cronin's roommate called her to look at a news report, featuring footage of petitioner getting out of a police car, handcuffed, and walking down a hallway to a courtroom. Before Ms. Cronin saw the footage, her roommate told her the person in police custody matched the description she gave to the sheriff's department employee the day after the attack.

5.    In September, 1984, Ms. Cronin saw a photographic lineup containing petitioner's photograph. She identified him.

6.    On November 5, 1984, over objection, petitioner participated in a corporeal line-up viewed by Ms. Cronin. She identified petitioner as her assailant. On November 14, 1984, a complaint issued charging petitioner with assault with intent to commit rape.

7.    These procedures, from the highly suggestive television viewing of petitioner by Ms. Cronin, after she was told that the man she would see on television looked like her attacker, to the photo spread several months later, created an unacceptable risk that Ms. Cronin would identify petitioner at the live lineup because she had seen him before on television and not because she remembered him as her assailant.

8.    Psychological research suggests that under such circumstances the person may be unaware that he or she is distorting or faultily reconstructing his or her memory. The phenomenon of "unconscious transference" is often the product of identification procedures such as those used here.

9.    The identification procedures violated due process. Cronin's testimony against petitioner -- the only testimony to identify him as the perpetrator -- was the product of this impermissibly suggestive and hence unconstitutional procedure. Petitioner's felony conviction for a violation of California Penal Code section 220 was a direct consequence of Cronin's identification.

10.    The admission of Cronin's testimony and of the California Penal Code Section 220

1    conviction during the penalty phase was prejudicial and had a substantial and injurious effect on

2    the jury's verdict. This was the only evidence which properly could have been used by the jury

3    to render California Penal Code section 190.3(b) an aggravating, not mitigating factor. Its

4    admission not only created an aggravating factor against petitioner, but extinguished a mitigating

5    one as well.

6    **GG.    CLAIM 33:    PETITIONER'S EIGHTH AND FOURTEENTH AMENDMENT**

7    **RIGHTS WERE VIOLATED BY A NUMBER OF FLAWS IN THE STATE'S CAPITAL SENTENCING SCHEME AND PROCEDURES.**

8    Petitioner's confinement and sentence are unlawful and were obtained in violation of his

9    Eighth and Fourteenth Amendment rights to due process, to be free of cruel and unusual

10   punishment, to reliability in the procedures leading to the imposition of a death sentence, to a

11   sentencer whose discretion has been suitably channeled and guided, and provided with notice of

12   the scope of factors to consider, and to be free of arbitrary and capricious application of the law.

13   In support of this claim, petitioner alleges the following facts, among others to be

14   presented after full discovery, funding, investigation, and an evidentiary hearing:

15       1.    In accordance with the statute, the jury was presented with an undifferentiated list

16   of factors for the jury's consideration, none of which were labeled as aggravating or mitigating.

17   Each juror was thus free to determine for him or herself whether the factor was aggravating or

18   mitigating because no notice or guidance was given to them. A juror was free to utilize a factor

19   such as age or mental vulnerability as aggravating although such factors may constitutionally be

20   considered only in mitigation.

21       2.    The statute does not require the jury or the trial court to find that death is the

22   appropriate punishment beyond a reasonable doubt, or that aggravating factors outweigh

23   mitigating ones beyond a reasonable doubt, thereby failing to impose a reliable standard of proof

24   for the sentencing decision. Given the interest at stake, the risk of an erroneous judgment, and

25   the state's equal interest in a reliable decision, the statute's flaw is at odds with the constitutional

26   requirement of heightened scrutiny and reliability.

27       3.    The statute does not require written findings as to the aggravating factors selected

28   by the jurors, or juror unanimity on those factors, thereby insulating the decision from meaningful



appellate review and violating due process in light of the nature of the interest, the risk of an erroneous deprivation, and the ease with which the risk could be minimized by requiring written findings. There is therefore no mechanism by which the appellate court can meaningfully review the sentencers' decision.

4.    The statute does not require proof beyond a reasonable doubt of any of the aggravating factors.

5.    The use of a felony to obtain a conviction of first degree murder under a felony-murder theory, to render petitioner death eligible under California Penal Code section 190.2, and to aggravate the sentence during the penalty phase violates the right to a reliable, individualized sentencing determination and is misleading.

6.    The unconstitutional statutory scheme requires the granting of habeas relief from the state court judgment.

## PRAYER FOR RELIEF

WHEREFORE, petitioner respectfully requests that this Court:

A.    Order respondent to show cause why the requested relief should not be granted;

B.    Grant petitioner leave to conduct discovery, including the right to take depositions, request admissions, propound interrogatories, issue subpoenas for documents and other evidence, and afford petitioner the means to preserve the testimony of witnesses;

C.    Grant petitioner sufficient funds to secure investigative and expert assistance as necessary to prove the facts alleged in this petition;

D.    Order an evidentiary hearing at which petitioner will offer this and further proof in support of the allegations herein;

E.    Permit petitioner a reasonable opportunity to supplement the petition to include claims which become known as a result of discovery and further investigation and as the result of obtaining information previously unavailable to petitioner;

F.    After full consideration of the issues raised in this petition, issue a writ of habeas corpus relieving petitioner from the judgment of conviction and sentence of death imposed in San Mateo County Superior Court Number C- 15661.

1    G.    Grant such further relief as the Court may deem appropriate in the interests of justice.

2

3    DATED: May 15, 1998                    Respectfully submitted,

4                                          MICHAEL LAURENCE
      JEANNIE R. STERNBERG
5                                          STERNBERG, SOWARDS & LAURENCE

6

7

8    JEANNIE R. STERNBERG

9

10

11

12    MICHAEL LAURENCE

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

I, Michael Laurence, declare as follows:

1.     I am an attorney licensed to practice law in the State of California and before the United States District Court for the Northern District of California. I and co-counsel Jeannie R. Sternberg have been appointed to represent petitioner Troy A. Ashmus in this action. I make this verification because the factual matters presented in this petition are more within my knowledge than within Mr. Ashmus's knowledge; I am authorized by petitioner to represent him in this action and to file this petition on his behalf; 28 U.S.C. Section 2242 authorizes this verification; and because of the time constraints for filing this Petition.

2.     Co-counsel and I have prepared the foregoing petition for writ of habeas corpus and I know that the contents of the petition to be true and correct.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct and executed on this fifteenth day of May, 1998, in San Francisco, California.


_Michael Laurence_

MICHAEL LAURENCE



1    <u>PROOF OF SERVICE</u>

2    RE: *Ashmus v. Calderon* C-93-0594 TEH

3         I, Michael Laurence, declare that I am a citizen of the United States, employed in the City

4    and County of San Francisco; I am over the age of 18 years and not a party to this action or

5    cause; my current business address is 604 Mission Street, Ninth Floor, San Francisco, California

6    94105.

7         On May 15, 1998, I served a true copy of the following document:

8    FINALIZED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE
     CUSTODY  (28 U.S.C. § 2254)
9
     on each of the following in said cause by placing a true copy thereof in a sealed envelope, with
10
     first class postage thereon fully prepaid, in the United States mail at San Francisco, California,
11
     addressed as follows:
12
     DANIEL E. LUNGREN, Attorney General
13   RONALD S. MATTHIAS, Supervising Deputy Attorney General
     Office of the Attorney General
14   50 Fremont Street, Suite 300
     San Francisco, CA 94105
15

16        I declare under penalty of perjury that the foregoing is true and correct.  Executed on

17   May 15, 1998, at San Francisco, California.

18

19

20                                              _Michael Laure___

21                                              MICHAEL LAURENCE

22

23

24

25

26

27

28

RECEIVED

1998 MAY 15 P 6: 14

RICHARD W. WIEKING. CLERK
U.S. DISTRICT COURT
, NO. DIST. OF CA.