1  XAVIER BECERRA
   Attorney General of California
2  RONALD S. MATTHIAS
   SENIOR ASSISTANT Attorney General
3  GLENN R. PRUDEN
   Supervising Deputy Attorney General
4  ERIC D. SHARE
   Supervising Deputy Attorney General
5  State Bar No. 151230
     455 Golden Gate Avenue, Suite 11000
6    San Francisco, CA  94102-7004
     Telephone:  (415) 510-3858
7    Fax:  (415) 703-1234
     E-mail:  Eric.Share@doj.ca.gov
8  *Attorneys for Respondent*

9

10            IN THE UNITED STATES DISTRICT COURT

11         FOR THE NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14

| | |
|---|---|
| **ERNEST EDWARD DYKES,** | **CAPITAL CASE** |
| Petitioner, | 11-CV-04454-SI |
| **v.** | **OPPOSITION TO PETITIONER'S FIRST MOTION FOR DISCOVERY** |
| **RONALD DAVIS, Warden of San Quentin State Prison,** | |
| Respondent. | |

21

22                    **INTRODUCTION**

23        Petitioner in this capital habeas corpus case has filed a "First Motion for Discovery" asking

24  this Court to order discovery from the California Attorney General's Office, the Alameda County

25  District Attorney's Office, and the district attorney's offices for all the other 57 counties in

26  California.  He describes his discovery request as "limited and conservative" and "narrowly

27

28

                              1

1  tailored." Mot. at 3, 14.  His request is anything but limited, conservative, or narrowly tailored.[1]

2  His motion should be denied because it is based on an incorrect factual understanding of his own

3  case and is precluded by controlling legal authority.  When the correct factual underpinnings of

4  the case are clarified, and the legal authority governing discovery in capital habeas cases

5  explained, it is clear that petitioner's discovery motion should be denied.

6                              **THE DISCOVERY PETITIONER SEEKS**

7         As stated, petitioner seeks discovery from: (1) respondent's counsel, the California

8  Attorney General; (2) the Alameda County District Attorney, the office that prosecuted petitioner

9  in the trial court; and (3) "the District Attorney (or equivalent prosecuting office) for each and all

10  of the other fifty-seven (57) California Counties."  Mot. at 1.  The time period covered by the

11  request "is for any offenses occurring post the U.S. Supreme Court decision in Furman v.

12  Georgia, 403 U.S. 952 (1971)" (Mot. at 1-2)—i.e., nearly 50 years.

13         The premise of petitioner's discovery motion—which will be shown below to be factually

14  imprecise—is that his sentence of death is unconstitutional because he lacked premeditation to

15  kill.  Thus, he seeks to ask each of the entities specified above to:  "Identify by name, and docket

16  number, each criminal defendant prosecuted for first degree murder (Cal. Penal Code § 187) and

17  where the prosecution proceeded, either solely or inter alia on a theory of felony-murder, and

18  where the prosecution subsequently or ab initio conceded, or where it was found by the trier-of-

19  fact (with either the court sitting without a jury or by a jury), that the defendant had no

20  premeditation to commit murder."  Mot. at 2.  For each person identified above, he asks for the

21  name of those for which a sentence of death was sought and each for which a sentence of death

22  was returned.  Mot. at 2.  Separately he asks for "all working guidelines used, currently or

23  previously, by the pertinent prosecuting agency to determine whether to seek a death sentence in

24  any prosecution for first-degree murder."  Mot. at 2.  Finally, in a particularly broad request that

25  has no bearing on his own case, he seeks "[s]uch reports concerning the investigation, detection,

26  prosecution, and punishment *of all crimes*, specifically including homicide prosecutions, both

27         [1] Petitioner notes that once he receives discovery from the entities listed in this first
discovery motion, he will seek leave of this Court to propound discovery "on a national level."
28  Mot. at 3.

2

capital and non-capital, in their respective jurisdictions that each of the District Attorneys Offices has prepared and provided to the California Attorney General consistent with that Office's authority to collect such information under section 13 of article V of the California Constitution and related authorities." Mot. at 3.[2]

## THE FACTUAL PREMISE UNDERLYING PETITIONER'S DISCOVERY MOTION IS INCORRECT

Petitioner asserts that the requested discovery will "support, if not fully establish, the gravamen of Claim One of the petition, namely that his offense conduct and personal profile are such that this case falls outside the constitutionally permissible realm—as defined by the U.S. Constitution—of capital prosecutions within the immediate jurisdiction of Alameda County, and indeed California at large." Mot. at 3. His attempt to do this is by seeking to gather information on cases in which the death penalty was sought or returned on a felony-murder theory where the defendant did not "premeditate" the killing. Underlying this claim is his continued discounting of the seriousness of his conduct on the day he, while robbing his landlady Bernice Clark, fired a gunshot that almost killed 70-year-old Bernice and did kill her nine-year-old grandson Lance Clark. As he has done throughout his pleadings in this habeas corpus case, appellant has characterized his conduct in firing the fatal shot as unintentional and a tragic accident. Although in this federal habeas proceeding he does not challenge his guilt of the crimes for which he was convicted in state court (see Mot. at 5), inexplicably he seems not to understand the crimes of which he was convicted. Thus, in this discovery motion, he states: "The jury expressly found Petitioner not guilty of the attempted murder of Bernice Clark." Mot. at 6. This is wrong. In fact, as will be shown below, the jury found petitioner guilty of attempted murder and this conviction is highly significant because it includes the jury's finding that petitioner *intended to kill* Bernice Clark when he fired his gun. Hence, even though petitioner's murder conviction was

[2] Whatever merit there could be to petitioner's discovery motion in general, and we will show there is none, there cannot be any merit to this particular request. Petitioner makes no effort to show how reports concerning the investigation, detection, prosecution, and punishment of all crimes would lead to information relevant to his particular capital case. Instead, this request is clearly meant to be burdensome and lead to endless delay of the proceedings. It alone shows that, contrary to his description, petitioner's motion is anything but "limited and conservative" and "narrowly tailored."

1  based on a felony-murder theory, that does not excuse, lessen, or mitigate his conduct.  He

2  intended to kill a 70-year-old woman and, by happenstance, killed a nine-year-old boy instead.

3  Thus, all of petitioner's attempts to minimize his culpability fall by the wayside and the factual

4  underpinnings of his motion for discovery crumble.

5                    **PETITIONER'S CONVICTIONS IN STATE COURT**

6           To summarize, petitioner seeks habeas relief from his sentence of death following his

7  conviction of the first degree murder of Lance Clark, Cal. Pen. Code, § 187, subd. (a)),[3] the

8  attempted murder Bernice Clark, §§ 664, 189, and the robbery of Bernice Clark, § 211.  In

9  connection with each count, the jury found that petitioner personally used a firearm. § 12022.5.

10  With respect to the charge of attempted murder, the jury found not true an allegation that the

11  attempted murder had been willful, deliberate, and premeditated, §§ 189, 664 (a).  In connection

12  with the attempted murder and robbery counts, the jury found true the allegations that the victim

13  suffered great bodily injury and that she was a victim age 70 years or older, § 12022.7 (c).  The

14  jury found true a robbery-murder special-circumstance allegation § 190.2 (a)(17)(A).  *See People*

15  *v. Dykes*, 46 Cal.4th 731, 742 (2009).

16         **THE FACTS OF THE MURDER, ATTEMPTED MURDER, AND ROBBERY**

17          Bernice Clark, age 70, owned an apartment building in Oakland.  Dykes, age 20, lived with

18  his mother in one of the apartments.  Tenants, including Dykes, knew that Bernice carried cash

19  with her on her visits to the building.  She would cash checks for tenants and lend them money.

20  Another tenant, LaCondra Douglas testified that Dykes had expressed an intent to rob Bernice

21  prior to the commission of the charged crimes.  On multiple occasions, tenants had observed

22  Lance Clark, age nine, Bernice's young grandson, accompanying Bernice on her visits to the

23  apartments.  *See Dykes*, 46 Cal.4th at 742.

24          On July 26, 1993, Bernice and Lance drove to the rear parking lot of the apartment

25  building.  Bernice was approached by one of her tenants, Edward Tyson, who asked to borrow

26  $20.  A man approached wearing a stocking mask.  He placed a dark object against her head.  She

27  recognized him as Dykes and told him that he looked like one of her tenants.  She heard a shot,

28  _____
         [3] Further statutory references are to the California Penal Code.

                                                    4

1    then Dykes said something about money or a holdup, and she recalled a struggle over her wallet.

2    She heard only one shot, but her recollection of the crime was confused, and she was unable to

3    hear well after the gun discharged. *See Dykes*, 46 Cal.4th at 743.

4        Tyson similarly testified that Bernice had agreed to lend him $20. As Bernice sat in the

5    driver's seat with the door open, Tyson saw Lance next to her. A man approached wearing a

6    stocking over his head. The man pointed his weapon at Bernice and demanded money. Bernice

7    told the man that he resembled one of her tenants named Ernest. Tyson fled and heard a firearm

8    "dry fire." He subsequently heard two shots in quick succession, the first followed by a sound of

9    breaking glass. After an interval, he heard a third shot. He heard the robber continue to demand

10    money after the first shot. *See Dykes*, 46 Cal.4th at 743.

11        Alphonso Odom testified that he was acquainted with Dykes and Bernice. Odom saw

12    Dykes in front of the apartment building a few minutes prior to the shooting. Odom saw Bernice

13    drive with her grandson to the rear of the apartment building. Shortly thereafter, Odom heard two

14    shots and witnessed the second shot being fired as he stood on his apartment balcony. He saw

15    Dykes standing by Bernice's vehicle holding a firearm. He heard the sound of breaking glass

16    after the second shot and observed Dykes flee over the back fence. *See Dykes*, 46 Cal.4th at 743.

17        Dykes changed his clothes and returned to the scene. He spoke with a police officer, stating

18    that he had observed Tyson speaking with Bernice as she sat in her vehicle and that as he crossed

19    the parking lot he heard shots. In an apparent effort to deceive the police, he falsely claimed to

20    have seen an unidentified, armed Black male run past him and flee over the back fence. The

21    officer testified that Dykes appeared composed and was not intoxicated. *See Dykes*, 46 Cal.4th at

22    743-44.

23        Lance was killed by a single gunshot that passed through his body from his left chest,

24    exiting on the lower right side of his back. There was a large entry wound, indicating the same

25    bullet had passed through Bernice's neck before it struck Lance. Bernice received an injury to

26    her neck but survived. *See Dykes*, 46 Cal.4th at 744.

27        On August 7, 1993, Dykes called the Oakland Police Department, stating he "want[ed] to

28    know if I shot somebody." He mentioned Bernice, but denied responsibility for the crime. He

5

1    was arrested and transported to the police department for interrogation. During questioning, he

2    first denied responsibility for the crime. He said that he had heard the shots because he had been

3    walking through the parking lot, and he repeated his story of having witnessed an unidentified

4    Black male flee from the scene. Ultimately the officers confronted him with evidence, including

5    statements of eyewitnesses. He then admitted involvement in the shooting. The unrecorded

6    statement reflected the circumstance that he was aware prior to the shooting that Lance was in the

7    vehicle. *See Dykes*, 46 Cal.4th at 744.

8        Dykes subsequently made two tape-recorded statements. In the first he explained that he

9    needed money to attend community college. He saw Bernice and decided to rob her. He

10   approached the vehicle and demanded money. She did not respond quickly, so he unsuccessfully

11   attempted to fire a warning shot, and on the second attempt fired a shot to the rear of the vehicle,

12   intending to destroy the rear window. Bernice said "don't be silly, child" and told him to take the

13   money from her wallet but leave the cards. He had one hand on the wallet and the other hand,

14   which was holding his firearm, on the headrest of the driver's seat. During the struggle over the

15   wallet, the weapon fired accidentally. He claimed he had not observed Lance in the vehicle. He

16   left from the scene, changed his clothes, and returned to the scene. Later, he threw the murder

17   weapon into the Oakland Estuary. Dykes cried during the recorded statements and said, "I didn't

18   mean for it to go down like that. I'm no killer." *See Dykes*, 46 Cal.4th at 745-46.

19        **PETITIONER'S UNSUCCESSFUL ATTEMPTS TO MINIMIZE HIS**
          **CULPABILITY FOR HIS CRIMES**
20

21        Based on the jury's finding that the attempted murder was not "willful, deliberate, *and*

22   premeditated," petitioner has continuously sought to minimize his personal accountability for the

23   crimes. He does it in this discovery motion by seeking discovery about cases where it was found

24   that the "defendant had no premeditation to commit murder." Mot. at 2. But as the California

25   Supreme Court explained in its opinion on direct appeal, the jury's special finding on the

26   attempted murder count in no way lessened petitioner's culpability because the jury still found

27   that petitioner attempted to kill Bernice Clark, a conviction that included a finding that he

28

1    *intended to kill* Bernice.  Because this understanding of petitioner's crimes is essential to

2    explaining why the underpinnings of petitioner's discovery motion is fundamentally flawed, we

3    summarize it here (as we did in our answer to the petition for habeas corpus).

4         During penalty-phase deliberations, the jury posed the following question to the trial court:

5    "Even though we agreed that the death of Lance Clark was murder of the first degree because it

6    happened during the commission of a robbery [felony murder law], are we now permitted to look

7    at the willful, premeditated and deliberate nature of this killing under Factor A?"  CT 557 at

8    AG000615, brackets in original; *see also* RT 4015 at AG021176.[4]  The reference to "Factor A" in

9    the jury's question was to California Penal Code section 190.3, factor (a), which states in relevant

10   part:  "In determining the penalty, the trier of fact shall take into account any of the following

11   factors if relevant:  (a) The circumstances of the crime of which the defendant was convicted in

12   the present proceeding and the existence of any special circumstances found to be true pursuant to

13   Section 190.1."

14        The trial court, after stating that it had discussed the question with counsel, RT 4014 at

15   AG021175 provided the jury with the following response:  "You may consider such factors under

16   Factor A of jury [CALJIC] instruction 8.85 in your consideration of the circumstances of the

17   crime of which the defendant was convicted in the present proceeding and the existence of any

18   special circumstance found to be true."  RT 4016 at AG021177; *see also* CT 636 at AG000692.

19   "Defense counsel did not object to the court's response to the jury's question or request that the

20   jury be reminded of its 'not true' finding in connection with the allegation that the attempted

21   murder of Bernice was willful, deliberate, and premeditated.  Indeed, the court stated on the

22   record that the court and counsel discussed the jury's question and agreed upon the wording of

23   the court's response."  *Dykes*, 46 Cal. 4th at 800; AG022150.

24        On direct appeal in the California Supreme Court, petitioner claimed that the trial court's

25   response "failed to take into account the danger that the jury would reconsider its prior verdict."

26   *Dykes*, 46 Cal. 4th at 800; AG022151.  In rejecting the claim, the California Supreme Court first

27

28        ───────────────────────
          [4] Citations refer to the record originally lodged with this court in conjunction with
          respondent's answer to petitioner's petition for writ of habeas corpus.

                                                    7

1    explained the contours of the argument in language that is relevant to the factual underpinnings of

2    Dykes's discovery motion in this court.

3
"He claims the jury's verdict on the charge of attempted murder of Bernice Clark—a
4    verdict convicting defendant of the attempted murder but acquitting him of having
committed a willful, deliberate, and premeditated attempted murder—established that
5    the jury acquitted defendant of having committed a willful, deliberate, premeditated
murder of Lance Clark, and that the jury should have been so informed to avoid
6    violating double jeopardy principles that defendant invokes for the first time on
appeal.  Defendant claims that the unusual facts of the case established an implied
7    acquittal, thereby requiring deviation from the general rule that, if the trial is based
upon an accusatory pleading charging two or more crimes, '[a]n acquittal of one or
8    more counts shall not be deemed an acquittal of any other count' ([Cal. Penal Code,]
§ 954), and also from the general rule that '"'[t]he murder of two persons, even by the
9    same act, constitutes two offenses, for each of which a separate prosecution will lie,
and . . . a conviction or acquittal in one case does not bar a prosecution in the other.'"
10    [Citation.]'  (People v. Carpenter (1999) 21 Cal. 4th 1016, 1039, fn. 4 [90 Cal. Rptr.
2d 607, 988 P. 2d 531].)  He points to the circumstance that a single shot
11    accomplished both the attempted murder and the murder, claiming that the jury's
verdict on the attempted murder charge therefore essentially constituted a special
12    verdict or finding with respect to the mental state involved in the murder.  He claims
this asserted special verdict should have barred 'reconsideration' of willfulness,
13    deliberation, and premeditation as circumstances of the crime under section 190.3,
factor (a).  He asserts the court's response constituted an error under section 190.3,
14    factor (a), which refers only to consideration of circumstances of the crimes of which
the defendant was convicted, and that the error violated the federal double jeopardy
15    clause.  He also urges that the asserted error constituted a violation of the Eighth
Amendment to the United States Constitution, because it undermined the reliability of
16    the proceedings."

17    Dykes, 46 Cal. 4th at 800-01, footnote omitted; AG022151-AG022152.

18         The California Supreme Court held that even if it were to accept the "debatable general

19    premise of [petitioner's] collateral estoppel argument, his claim contains analytical flaws."

20    Dykes, 46 Cal.4th at 802 at AG022152.

21
"For example, the 'not true' finding constituted a finding that the prosecutor had
22    failed to prove that the attempted murder of Bernice Clark was willful, deliberate, and
premeditated, but the verdict did not establish that the jury agreed none of those
mental states had been established.  The verdicts certainly did not reflect a finding
23    that the attempted murder of Bernice was not willful.  A killing is willful if intent to
kill is proved (People v. Moon (2005) 37 Cal. 4th 1, 29 [32 Cal. Rptr. 3d 894, 117 P.
24    3d 591]), and the attempted-murder verdict established the jury found intent to kill
(People v. Smith (2005) 37 Cal. 4th 733, 739 [37 Cal. Rptr. 3d 163, 124 P. 3d 730]).
25    The element of willfulness was the focus of the parties' closing arguments and was
impervious to any possible attack based upon collateral estoppel principles."
26

27    Dykes, 46 Cal. 4th at 801-02 at AG022152, italics added.  As the California Supreme Court

28    further explained:

8

"Guilt phase instructions permitted the jury to convict defendant of the first degree murder of Lance Clark on a felony-murder theory, which does not require proof of malice (*People v. Dillon* (1983) 34 Cal. 3d 441, 474-475; see also *People v. Patterson* (1989) 49 Cal. 3d 615, 626), or alternatively on the theory that the murder was committed with malice aforethought (§§ 188, 189). The jury evidently was concerned because it had based the first degree murder verdict on a felony-murder theory, but was uncertain whether at the penalty phase it was permissible to consider such mental elements as to which it had been instructed with respect to the other theory of first degree murder. The court's answer to the jury's question was correct in that a jury that has convicted a defendant of first degree murder on the basis of a felony-murder theory may consider, as part of its evaluation of the defendant's culpability and its moral and normative decision concerning the appropriate penalty, the defendant's state of mind with respect to the murder—that is, whether the defendant also intended to kill or acted with malice aforethought. It was this information that the court's response conveyed, and we conclude the jury would have understood the court's response in this manner. If defendant wished to limit or clarify the information conveyed by the court, defense counsel should have requested limitation or clarification."

*Id.* at 802-03 at AG022153-AG022154, footnote omitted. In a footnote, the California Supreme court further explained that a defendant's culpable mental state may be considered a circumstance of the crime under section 190.3, factor (a). *Id.* at 803 n.18 at AG022154. "Even when the verdict is based upon a felony-murder theory, *it is appropriate to consider any apparent premeditation on the part of the defendant as an aggravating circumstance of the crime.*" *Id.*, italics added.

Furthermore, after two deliberating penalty-phase jurors were excused and alternate jurors were seated, the trial court and counsel discussed the principle that the newly constituted penalty-phase jury should begin penalty-phase deliberations anew. *Dykes*, 46 Cal. 4th at 803; AG022154-AG022155. The court, however, was concerned that the jury not be misled into thinking that it had to begin the guilt-phase deliberations anew. The court, therefore, proposed that the jury be instructed to commence the penalty-phase deliberations anew. *Id.*; AG022155. Defense counsel commented: "And for the record, . . . I am specifically requesting this because at the time of the guilt phase they found a nonpremeditated murder and I don't . . . want to revisit that. They have made a finding and I believe we have a right to have that finding be an appropriate finding.'" *Id.* As the California Supreme Court concluded, "This comment clearly suggests that defense counsel did not believe the court's response to the jury's earlier question suggested to the jury that it should reconsider its prior verdict." *Id.*

9

1    The prosecutor responded that it could not be determined that the jury acquitted petitioner

2 of the premeditated murder of Lance Clark and, in any event,

3      "'they're free under the law to consider the circumstances of the offense as they see
       fit, . . . based on all the evidence . . . . But the fact that they had a reasonable doubt as
4      to whether or not the murder was willful, deliberate and premeditated would not
       prevent them from considering either the theory of willful, deliberate and
5      premeditated or certain parts of it and you never know if they had a reasonable *doubt
       as to one part* . . . . [¶]  In any event, the burden of proof of the circumstances of the
6      events is not beyond a reasonable doubt and therefore a jury could have conceivably
       been convinced to some extent that it was actually deliberate and premeditated or
7      some part thereof and yet not be convinced beyond a reasonable doubt of that, but
       would be free to revisit those views as it bears on the circumstances of the offense
8      because there is a different burden of proof, and by their finding that the attempted
       murder was not the finding, not the true premeditation clause, does not prevent them
9      from considering any part of the state of mind that that instruction defines.'"  (Italics
       added.)
10

11 *Dykes*, 46 Cal. 4th at 804; AG022155-AG022156.  The California Supreme Court found the

12 prosecutor's response significant "because *defense counsel stated he agreed with it*."  *Dykes*, 46

13 Cal. 4th at 803, italics added; AG022155.

14    The trial court agreed that the newly constituted jury was not to begin guilt-phase

15 deliberations anew, but added:  "'[t]he law is clear they should consider the circumstances of the

16 crime as one of the factors under [§ 190.3, factor (a)] as one of the things they may consider in

17 determining appropriate penalty.  [¶]  So certainly they are free and I have told them previously in

18 response to earlier notes that is precisely what they may do . . . .'"  *Dykes*, 46 Cal. 4th at 804;

19 AG022156.  Defense counsel responded:  "'I'm not arguing with his [the prosecutor's] statement

20 as to what they can consider, I believe the instruction [concerning recommencing deliberation] as

21 amended more accurately tells them what they're supposed to be doing and with this jury I may

22 not live long enough from them to go back and relitigate both parts of the case.'"  *Id*.

23 Accordingly, the trial court instructed the jury to begin its deliberations "'from the beginning,'"

24 but explained:  "'You must therefore set aside and disregard all past deliberations at the penalty

25 phase of the trial and begin deliberating anew.  This means that each remaining original juror

26 must set aside and disregard the earlier deliberations at the penalty phase of the trial as if they

27 [had] not taken place.'"  *Id*.

28

1    The prosecutor's closing argument in the penalty phase was consistent with the court's and

2   the parties' understanding described by the California Supreme Court above.

3    "Thus, in his closing argument at the penalty phase of the trial, the prosecutor did not
     ask the jury to reconsider its prior finding that the allegation that the attempted
4    murder of Bernice Clark occurred with premeditation, deliberation, and willfulness
     was not true.  Rather, he informed the jury that he anticipated the defense would
5    renew its claim that the shooting was accidental or at least did not involve intent to
     kill.  He reminded the jury it had found intent to kill when it convicted defendant of
6    the attempted murder of Bernice.  The prosecutor argued that the robbery was
     planned and that when defendant prepared for the robbery, he contemplated the
7    possibility he might employ deadly force against a weak and elderly victim.  The
     prosecutor stressed that intent to kill could be inferred from this preparation and from
8    the circumstance that defendant realized Bernice had recognized him."

9    "For its part, the *defense's closing argument reminded the jury of its apparent
     conclusion that the attempted murder of Bernice Clark involved intent to kill* but was
10   not premeditated, and it focused on asking the jury to recognize some lingering doubt
     concerning the question whether the shooting involved an intent to kill or was entirely
11   accidental.  Defense counsel urged that even if defendant formed the intent to kill, the
     death penalty was not warranted.  The prosecutor did not offer argument in rebuttal to
12   this point."

13   *Dykes*, 46 Cal. 4th at 805, italics added; AG022157.

14    Thus, obtaining almost 50 years of discovery from the California Attorney General, all 58

15   counties in California and, ultimately, every prosecuting office across the nation about cases in

16   which a defendant was prosecuted and a sentence of death sought "solely or inter alia on a theory

17   of felony-murder, and where the prosecution subsequently or ab initio conceded, or where it was

18   found by the trier-of-fact . . that the defendant had no premeditation to commit murder" (Mot. at

19   2) has no bearing on petitioner's particular case or sentence.  That, clearly, is not petitioner's

20   case.  As the California Supreme Court's opinion makes clear, the jury's special finding on the

21   attempted murder conviction did not necessarily mean that the jury still did not consider the

22   mental states of willfulness, premeditation, and deliberation in determining petitioner's moral

23   culpability for Lance Clark's death.  At the very least, it is certain that the jury found petitioner

24   intended to kill Bernice Clark.  Although the jury as a whole might not have been convinced

25   beyond a reasonable doubt in the guilt-phase case that petitioner harbored the mental states of

26   willfulness, premeditation, *and* deliberation with regard to the attempted murder, individual jurors

27   in making their normative decision as to penalty, might have believed that petitioner harbored one

28   or more of those mental states when he attempted to kill Bernice (and did kill Lance).  Thus,

11

1  mountains of discovery on cases pertaining to premeditation alone would be irrelevant to

2  petitioner's individual case and culpability.  It would do nothing to establish petitioner's stated

3  goal, i.e., proving that his sentence of death is unconstitutional under the Eighth Amendment of

4  the Constitution.  Thus, on a factual basis alone, petitioner's motion for discovery should be

5  denied.

6        **AS A MATTER OF LAW, PETITIONER IS NOT ENTITLED TO DISCOVERY**

7        In addition to petitioner having failed to establish a factual basis entitling him to discovery,

8  he also has failed to establish a legal basis supporting his motion.  Although federal habeas corpus

9  is considered a civil action, the Federal Rules of Civil Procedure apply only to the extent they are

10  not inconsistent with the Habeas Rules.  *See* Rules Governing Section 2254 Cases in the United

11  States District Courts, Rule 12.  Consequently, habeas petitioners are not entitled to the same

12  broad-ranging discovery as other civil litigants.  *Bracey v. Gramley*, 520 U.S. 899, 904 (1997).

13  Rule 6 of the Rules Governing Section 2254 cases specifically requires a habeas petitioner to

14  demonstrate good cause before discovery will be permitted.  *Rich v. Calderon*, 187 F.3d 1064,

15  1068 (9th Cir. 1999).  The petitioner must also include in his request any proposed interrogatories

16  and requests for admission, and specify any requested documents.  Habeas Rule 6(b).

17        What constitutes good cause is highly dependent upon the facts of a particular case.  *Gilday*

18  *v. Callahan*, 99 F.R.D. 308, 309 (D.Mass. 1983.)  "The burden of demonstrating the materiality

19  of the information requested is on the moving party."  *Williams v. Bagley*, 380 F.3d 932, 974 (6th

20  Cir. 2004) (quoting *Stanford v. Parker*, 266 F.3d 442, 460 (6th Cir. 2001)).  Good cause is not

21  shown when petitioner makes only generalized statements about the possible existence of

22  generalized information.  *Munoz v. Keane*, 777 F.Supp. 282, 287 (S.D.N.Y. 1991).  Rule 6 of the

23  Rules Governing Section 2254 cases "*does not sanction 'fishing expeditions'*; *discovery will not*

24  *be allowed so that petitioner can 'explore* [*his*] *case' looking for new constitutional claims.  Rich*

25  *v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999)."  *William v. Hall*, 648 F.Supp.2d 1222, 1225

26  (D.Or. 2009) (italics added).  Habeas "was never meant to be a fishing expedition for habeas

27  petitioners to 'explore their case in search of its existence.'  *Calderon v. U.S.D.C.* (*Nicolaus*), 98

28  F.3d 1102, 1106 (9th Cir. 1996) (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970)."

1  *Rich v. Calderon*, 187 F.3d at p. 1067.  "A 'good cause' analysis requires the reviewing court to

2  identify the 'essential elements' of the underlying substantive claim, and determine whether

3  petitioner's allegations, if proven, would satisfy those elements and show the violation of a

4  constitutional right.  *Bracy*, 520 U.S. at 904."  *William v. Hall*, 648 F.Supp.2d at 1225.

5          The granting of discovery generally rests within the sound discretion of the district court

6  and will not be disturbed absent an abuse of discretion.  *Rich v. Calderon*, 187 F.3d at 1068;

7  *Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir. 1996).  A district court's denial of discovery is an

8  abuse of discretion only if that discovery is "indispensable to a fair, rounded development of

9  material facts."  *Toney v. Gammon*, 79 F.3d at 700.  Implicit in this concept of materiality is the

10  requirement that the claim(s) for which the facts to be developed must be properly before the

11  court.  *Id*. at 697.)

12          In addition to the stringent requirements set out above, since this petition is governed by the

13  AEDPA, it is important to consider the limits that statue puts on petitioner's ability to obtain

14  discovery.  As the United States Supreme Court has made clear, under the AEDPA, "review

15  under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the

16  claim on the merits.  Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that

17  'resulted in' a decision that was contrary to, or 'involved' an unreasonable application of,

18  established law.  This backward-looking language requires an examination of the state-court

19  decision at the time it was made.  It follows that the record under review is limited to the record in

20  existence at that same time i.e., the record before the state court."  *Cullen v. Pinholster*, 563 U.S.

21  170, 181-82 (2011).  "'The federal habeas scheme leaves primary responsibility with the state

22  courts . . .' [Citation.]  Section 2254(b) requires that prisoners must ordinarily exhaust state

23  remedies before filing for federal habeas relief.  It would be contrary to that purpose to allow a

24  petitioner to overcome an adverse state-court decision with new evidence introduced in a federal

25  habeas court and reviewed by that court in the first instance effectively *de novo*."  *Id*. at 182.  As

26  the United State Supreme Court held:

27          "Limiting § 2254(d)(1) review to the state-court record is consistent with our
          precedents interpreting that statutory provision.  Our cases emphasize that review
28          under § 2254(d)(1) focuses on what a state court knew and did.  State-court decisions

1

2

3

4

5

6

7

> are measured against this Court's precedents as of 'the time the state court renders its decision.' *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003). To determine whether a particular decision is 'contrary to' then-established law, a federal court must consider whether the decision 'applies a rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court. *Williams v. Taylor*, 529 U.S. 362, 405, 406, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (*Terry Williams*). If the state-court decision 'identifies the correct governing legal principle' in existence at the time, a federal court must assess whether the decision 'unreasonably applies that principle to the facts of the prisoner's case.' *Id.*, at 413, 120 S.Ct. 1495. It would be strange to ask federal courts to analyze whether a state court's adjudication resulted in a decision that unreasonably applied federal law to facts not before the state court."

8

9

10

11

12

*Id.* at 182. "Although state prisoners may sometimes submit new evidence in federal court, AEDPA's statutory scheme is designed to strongly discourage them from doing so. Provisions like §§ 2254(d)(1) and (e)(2) ensure that '[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state proceedings." *Id.* at 186.

13

14

15

16

17

18

In addition AEDPA puts limits on a habeas petitioner's ability to obtain an evidentiary hearing in federal court. Section 2254 (e)(1) bars most evidentiary hearings if the applicant "failed" to develop the factual basis for the claim in state court. *Kemp v. Ryan*, 638 F.3d 1245, 1258 (9th Cir. 2011). "In this context, 'failed' 'connotes some omission, fault or negligence on the part of the person who has failed to do something.' *Williams* [*v. Taylor*], 529 U.S. [420] at 431-32 [(2000)]." *Id.*

19

20

21

22

23

24

> "If the court determines that the applicant did fail to develop the factual basis for a claim in state court, the district court can hold an evidentiary hearing only if the petitioner meets two demanding requirements: First, the claim must rely on a rule of constitutional law newly announced by the Supreme Court and available to habeas petitioners, 28 U.S.C. § 2254(e)(2)(A)(I), or must be based on facts that 'could not have been previously discovered through the exercise of due diligence,' § 2254(e)(2)(A)(ii). Second, even if a petitioner raises a new claim or one based on a new factual predicate, a hearing is required only if 'the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable fact-finder would have found applicant guilty of the underlying offense.' § 2254(e)(2)(B)."

25

26

*Id.* at 1258-59. If a habeas petitioner is not entitled to an evidentiary hearing on a claim, ordering discovery on the claim would be "futile." *See Kemp v. Ryan*, 638 F.3d at p. 1260.

27

28

Here, the discovery petitioner asks this Court to agree to allow him to propound to the California Attorney General, the Alameda County District Attorney, the 57 other District

14

1    Attorney's offices in the State of California, and, eventually, nationwide, is nothing more than a

2    fishing expedition that the controlling case authority specifically prohibits.  Petitioner made no

3    attempt to obtain discovery in the California state courts even though the information he

4    purportedly seeks is not new information that could not have been sought in his state court

5    proceedings, (allegedly) would have been in the possession of the state entities, and would have

6    been in their possession long before the date of this discovery request in federal court.  Indeed,

7    petitioner seeks information covering the last almost 50 years.

8        Petitioner makes several allegations in his discovery motion to try to overcome the bars to

9    discovery in the controlling statutes and case law.  Given the definitive dictates of the statutes and

10   cases, and the self-evident weaknesses of many of petitioner's arguments, we do not address each

11   case he cites individually.  We address, instead, his main arguments.  First, he asserts that he has

12   made the requisite showing for discovery through his allegations in Claim One of his petition that

13   his sentence of death is in violation of the Eighth Amendment and disproportionate to his crime,

14   and that the death penalty as administered by the state of California is in violation of the Eighth

15   Amendment.  Mot. at 9.  These claims, however, are standard claims made in most, if not all,

16   capital federal habeas petitions.  Were they sufficient to overcome the discovery limitations

17   discussed above, there would be no limits on discovery in federal court at all.  This cannot be

18   what was intended and, thus, petitioner's allegations are clearly insufficient to justify the broad

19   discovery request he urges this Court to sanction, especially when no discovery was sought in the

20   state courts.

21       Next, petitioner asserts that AEDPA does not apply to his discovery request because "28

22   U.S.C. 2254 permits a habeas petitioner to proceed where the lower state court's decision was

23   'contrary to, or involved an unreasonable application of, clearly established federal law as

24   determined by the Supreme Court of the United States.'  Id.  This exception applies here."  Mot.

25   at 10.  Petitioner has put the proverbial cart before the horse.  No such finding has yet been made

26   by this Court in this habeas proceeding.  Indeed, that will be the ultimate question for this Court

27   when it resolves petitioner's habeas petition.  Contrary to petitioner's assertion, it cannot be

28   presumed when ruling on the discovery motion.  Indeed, the rest of petitioner's argument in this

15

1   section belies his claim.  He states that capital punishment should be reserved for "the worst of

2   the worst," and the state court violated the principle.  "Petitioner should be allowed to

3   demonstrate through the requested discovery the truth, and strength, of this premise."  Mot. at 10.

4   In other words, he has not done so yet and will need discovery to try to do so.  Thus, his assertion

5   that AEDPA does not apply is incorrect.

6       Petitioner also asserts that *Pinholster* does not apply to his case.  Mot. at 10-11.  He states

7   that he does not seek to develop or introduce facts unique to him or his case, "something that

8   Pinholster might prohibit.  Rather he seeks to develop a legal question, anchored in the facts

9   already and always known to the California courts below when the lower courts assessed the

10  lawfulness of the capital judgment rendered in this matter."  Mot. at 10-11.  The meaning of

11  petitioner's attempt to evade the United States Supreme Court's decision in *Pinholster* is far from

12  clear.  If he does not seek to develop facts unique to him or his case, he fails to show how

13  discovery will allow him to show that his own sentence of death violates the Constitution.  Also,

14  if the facts were already and always known to the California courts, it begs the question of why he

15  did not seek discovery there, but instead waited years to try to obtain it through this Court's

16  process.  In short, petitioner's explanation for why *Pinholster* does not apply fails to convince.

17      In a possible attempt to place this Court and respondent in a Catch-22 position, petitioner

18  asserts that because he asks this Court for permission to propound discovery "from third parties

19  who are not represented by Respondent," "Respondent has no standing to raise any such

20  objections on behalf of any third parties."  Mot. at 13.  Presumably, petitioner is referring to the

21  Alameda County District Attorney's Office, the District Attorney's Offices for the other 57

22  California Counties, and, eventually, all the other nationwide prosecuting offices on whom he

23  intends to serve discovery.  This attempt to prevent Respondent from opposing his discovery

24  motion rings hollow.  As established above, the discovery petitioner seeks in his motion is

25  impermissible under AEDPA and the controlling cases.  Respondent is the proper party to oppose

26  the discovery motion.  First, the other entities from whom Petitioner purportedly seeks discovery

27  are not parties to this action, respondent is.  Respondent is the proper party to respond to the

28  motion and show, as it has above, that there is neither a factual or legal basis for the discovery

1    petitioner seeks.  Second, there are no rules that compel this Court to permit Petitioner to

2    propound the discovery requests first, and then later field objections from 59—or more—separate

3    entities to Petitioner's impermissible discovery requests.  The suggestion to the contrary is

4    impractical, illogical, and a waste of this Court's resources.

5                                                        **CONCLUSION**

6            Accordingly, because there is neither a factual nor legal basis for allowing discovery at this

7    stage of Petitioner's habeas corpus case, respondent respectfully asks that the discovery motion

8    be denied and that this Court proceed to resolve Petitioner's habeas corpus petition.

9

10   Dated:  June 26, 2019                        Respectfully submitted,

11                                                XAVIER BECERRA
                                                  Attorney General of California
12                                                RONALD S. MATTHIAS
                                                  Senior Assistant Attorney General
13                                                GLENN R. PRUDEN
                                                  Supervising Deputy Attorney General
14

15                                                /s/ Eric D. Share

16                                                ERIC D. SHARE
                                                  Supervising Deputy Attorney General
17                                                *Attorneys for Respondent*

18   SF2011202695
     21509415.docx

19

20

21

22

23

24

25

26

27

28

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:     **Ernest Edward Dykes v. Ron Davis, Warden of San Quentin State Prison**

No.:     **11-CV-04454-SI**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On <u>June 26, 2019,</u> I served the attached

## OPPOSITION TO PETITIONER'S FIRST MOTION FOR DISCOVERY

by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

California Appellate Project
101 Second Street, Suite 600
San Francisco, CA  94105-3647

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on June 26, 2019, at San Francisco, California.

| J. Wong | J Wong |
| --- | --- |
| Declarant | Signature |

SF2011202695
21513328.docx