**PHILLIP A. TREVIÑO** [SBN 121119]
137 N. Larchmont Blvd., #801
Los Angeles, California 90004
Telephone: (213) 949-8000

Attorney for Petitioner
ERNEST DYKES

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ERNEST DYKES**, | Case No. 11-CV-04454-SI |
| Petitioner, | REPLY IN SUPPORT OF FIRST MOTION FOR DISCOVERY; MEMORANDUM OF POINTS AND AUTHORITIES; EXHIBIT |
| v. | |
| **KEVIN CHAPPELL, Warden,** | |
| Respondent. | **DEATH PENALTY CASE** |

**REPLY IN SUPPORT OF PETITIONER'S FIRST MOTION FOR DISCOVERY**

Petitioner continues to stand on the points and authorities advanced in his opening motion, and expressly rejects all of Respondent's contrary allegations. However, Petitioner limits himself herein to correcting the more egregious assertions advanced by Respondent that might lead this Court astray and that simply do not square with this record.

The most salient points follow.

**First**: Petitioner has not denied or minimized his culpability. He confessed at the time of his arrest.[1] He has been lawfully convicted of a felony-murder. In his federal petition for habeas corpus, he has raised <u>no</u> claims relative to his guilt phase

---

[1] In his opposition to Petitioner's motion, Respondent even admits that Petitioner confessed to the offenses pretrial.

1 trial.  The only relief he can obtain in this proceeding is to have
2 his death sentence vacated.   It is a foregone conclusion he will
3 spend the rest of his life in prison.
4     Respondent's assertions that Petitioner is somehow minimizing
5 or misunderstanding his legal culpability are simply wrong.
6 Petitioner does not deny his legal guilt. But he rejects
7 Respondent's implicit and repeated suggestion that the jury's
8 finding Petitioner did not have first-degree intent to kill Bernice
9 Clark is irrelevant here.   It is highly relevant.   There is only
10 one bullet at issue here.
11     As the California Supreme Court notes expressly in its
12 decision:
13     "Lance was killed by a single gunshot wound. . . the same
        bullet had passed through Bernice's neck before it struck
14     Lance."
15 People v. Dykes, 46 Cal.4th at 744. If Petitioner had no first-
16 degree intent when the gun was fired, then the bullet could not
17 have acquired any such intent while in mid-air and ricocheting in
18 the car prior to striking Lance.   Respondent's arguments simply
19 defy common sense and the facts stated in the California Supreme
20 Court's decision.
21     Petitioner challenges the premise that he, with no prior
22 felony convictions, having confessed to this crime, and with an
23 express jury finding that he did not attempt to commit first degree
24 murder, is one of the "worst of the worst" that the U.S. Supreme
25 Court describes as warranting capital punishment.   He is not.
26     Respondent makes extensive arguments Petitioner has not
27
28

advanced, and that merit no more of this Court's time.[2]

**Second**: Respondent's protestations about the magnitude of Petitioner's discovery requests conveniently overlook the fact Respondent wants to kill Petitioner. This is what gives this matter magnitude, not the fact Petitioner seeks lawful recourse.

Petitioner alleges, with good cause and in good faith, that the empirical data will show, on a local, state-wide, and national level, that Respondent's view this is properly a capital case is simply and flatly wrong. Given leave to conduct the pertinent discovery, Petitioner will show he is correct and that Respondent is mistaken.[3]

---

[2] Respondent also advances another legally erroneous premise. He faults Petitioner for not having sought this discovery while before the California Supreme Court. Respondent's counsel is the Office of the California Attorney General and may be presumed to know California law. And California law expressly limits a capital habeas petitioner's ability to seek discovery. People v. Gonzalez, 51 Cal.3d 1179 (1990). "The related petitions for habeas corpus in this court also provide an inappropriate discovery vehicle. Whatever role court-ordered discovery might properly play in a habeas corpus proceeding, the bare filing of a claim for postconviction relief cannot trigger a right to unlimited discovery. A habeas corpus petition must be verified, and must state a "prima facie case" for relief. That is, it must set forth specific facts which, if true, would require issuance of the writ. Any petition that does not meet these standards must be summarily denied, and it creates no cause or proceeding which would confer discovery jurisdiction. (§§ 1474, subds. 2, 3, 1475; see In re Hochberg, supra, 2 Cal.3d 870, 875, fn. 4; In re Swain (1949) 34 Cal.2d 300, 304; cf. People v. Pacini (1981) 120 Cal.App.3d 877, 882-887.)" Gonzales, 51 Cal.3d at 1258-59. Petitioner simply was not allowed to do what Respondent now claims he should have done.

[3] Petitioner expressly made this point in his opening motion. Yet nowhere in his opposition does Respondent identify any other capital case that remotely approaches this case. The reader will recall that Respondent's counsel handles all capital cases, on direct review as well as in habeas, in the California and federal courts. Even so, despite presumably readily available resources that would have enable Respondent to do so had he wished to do so, he does not identify even one other capital defendant with no prior felony
(continued...)

1  It is true the discovery sought will be substantial in
2 magnitude. This does not mean the requests are not limited or
3 narrow.  They are.  Indeed, Respondent did not offer a single
4 specific amendment or clarification in his opposition.  He
5 contented himself with simply objecting to the entire process.
6  Capital punishment is not a minor matter, nor should it be.
7 If California intends to kill people, it should shoulder the
8 attendant challenges it will face in trying to do so rather than
9 complain about the work.  Certainly the federal courts do not fail
10 to appreciate the gravity of these matters.
11  Further, as Petitioner duly notes in his motion, in the
12 context of the constitutional question presented by Respondent's
13 prosecutorial decisions, the first discovery requests are indeed
14 tailored and limited.  The question at hand, however, is
15 substantial.  That is not Petitioner's fault
16  Any burden that may result from a grant of discovery is almost
17 certain to fall heaviest on Petitioner who, in the context of this
18 civil action, will presumably bear the burden of collecting,
19 collating, and presenting in a meaningful fashion the data he knows

---

[3](...continued)
conviction who has been sentenced to death.  Respondent does not identify even one other capital defendant who has been sentenced to death on strictly a felony-murder basis for the murder.  And Respondent does not identify even one other capital defendant who faces execution where a jury made an express finding of not guilty as to premeditated murder.  It follows logically that since Respondent did not identify even a single capital case that shares even <u>one</u> of these exceptional circumstances, Respondent has certainly not identified any case that shares two, let alone all three, of these exceptional circumstances. One can readily deduce why Respondent has failed to make any such showing; there can be none.  And yet Respondent fails to understand why Petitioner proceeds?

exist, and which, if granted leave by this Court, he can present in support of his claim.[4]

Equally important is the fact this evidence was directly known, or should have been directly known, to the California Supreme Court when it adjudicated Petitioner's direct appeal. After all, at the time it reviewed Petitioner's case that court handled all capital cases on direct review and in habeas.

The Alameda Superior Court, under California law had a duty sua sponte to consider whether to modify the sentence of death returned by the jury before imposing the sentence, California Penal Code section 190.4(e).  The case profiles presented in the attached Exhibit were surely known to that Superior Court since it is where the judgments were entered.

Regardless of whatever burden may result from the undertaking of discovery in this matter, it is of Respondent's making, not Petitioner's.[5]  Petitioner has made abundantly clear his interest in resolving this matter.  Respondent persists in his desire to kill Petitioner.

---

[4] In his opening motion, Petitioner noted there appear to be no other capital cases affirmed by the California Supreme Court and originating in Alameda County where the sole theory is felony murder. (Motion at 7 fn.3.)  If Respondent had been able to identify even one surely he would have brought it to this Court's and Petitioner's attention. He did not.  The exhibit offered today in further support of this pleading details this. To date no other case out of Alameda County even remotely equates with the instant matter.

[5] From his submission, it seems Respondent intends to violate Rule 45 of the Federal Rules of Civil Procedure. Petitioner objects to this, and notes that Respondent may lodge whatever objections he considers warranted and appropriate at the time any discovery is offered to this Court, but as Rule 45 clearly states, it is not for Respondent to act on behalf of the individuals from whom the discovery is sought.

**Third**: The constitutional issue squarely presented here is anchored in bedrock U.S. Supreme Court case law. Furman v. Georgia, 408 U.S. 238 (1972) and progeny.[6] Post Furman, the Supreme Court has consistently required limiting capital punishment to only the "worst of the worst." Respondent has disregarded this, and now complains he is being challenged for this laxity.

This case - particularly the death of Lance Clark - is tragic, but the ricochet was hardly something Petitioner could have calculated. The jury certainly understood this, and said as much with its not guilty finding. Respondent has a seemingly clouded perspective and argues zealously, confusing the felony-murder special circumstance with the felony-murder doctrine, all while trying to discount the importance of the jury's not guilty finding on the attempted murder of Bernice Clark.[7] Logic and common sense betray his efforts. Petitioner stands firm on his prior averments concerning the relative simplicity of this tragic situation.

While Respondent denies the singularity of Petitioner's

---

[6] E.g., Spaziano v. Florida, 468 U.S. 447 (1984); Penry v. Lynaugh, 492 U.S. 302 (1989); Sochor v. Florida, 504 U.S. 527 (192); Stringer v. Black, 503 U.S. 222 (1992); Atkins v. Virginia, 536 U.S. 304 (2002); Roper v. Simmons, 543 U.S. 551 (2005).

[7] The California Supreme Court goes straight to this point in its published decision. "[T]he jury convicted defendant of the first degree murder of Lance Clark and found true a felony-murder special-circumstance allegation. The jury also convicted defendant of the attempted murder of Bernice Clark but found not true an allegation that the attempted murder was willful, deliberate and premeditated." People v. Dykes, 46 Cal.4th at 801. There was only one bullet fired, and the forensic evidence showed the same bullet that passed through Bernice Clark's throat was the bullet that killed Lance Clark. No matter how much Respondent wrangles and challenges the point, it is clear the jury found Lance Clark's death was the result of an accidental discharge of the gun.

predicament, Petitioner submits herewith as an Exhibit a compilation of all Alameda County capital cases he has been able to identify which the California Supreme Court has decided since Furman. There is not a single other case among them in which the death sentence was imposed based upon a felony-murder conviction.[8]

This is not a pro forma or mundane Eight Amendment claim.[9] Respondent asks this Court simply to ignore decades of core capital jurisprudence, and in doing so deny Petitioner the protections our federal courts are duty-bound to uphold since Furman.  This is unwarranted and should not even need to be discussed.

**Prevailing "norms" in capital punishment in California**

The gravamen of Petitioner's claim becomes even more clear with an overview of the individuals the State of California has executed since reinstating capital punishment post Furman. Thirteen (13) executions have occurred in California since 1976.

All of the men executed were found guilty of first degree murder (mostly multiple murders), and with concomitant express jury findings of premeditation.  Each man executed had prior felony convictions, many had prior murder convictions.

---

[8] If granted the requested discovery, Petitioner anticipates that similar results will surface for the rest of California.

[9] It is notable that Respondent alleges in his reply to this motion that such claims are routine, almost suggesting they are boilerplate. Opposition at 15. Does Respondent genuinely not see how callous a comment that is?  In any event, in this case this is anything but a rote allegation, it is the gravamen of Petitioner's cause before this Court.

| | Name | Deaths | Synopsis |
|---|---|---|---|
| 01 | Harris, R. | 2 | Convicted of two murders, kidnaping, burglary and robbery. |
| 02 | Mason, D. | 5 | Killed four (4) elderly people, his cellmate, and suspected of killing his male lover. |
| 03 | Bonin, W. | 14 | Convicted of raping, torturing, and killing at least twenty-one (21) boys and young men. Suspected of committing a further fifteen (15) murders. |
| 04 | Williams, K. | 3 | Kidnaped, raped, and then murdered one (1) victim, and murdered two (2) other victims. |
| 05 | Thompson, T. | 1 | Raped and murdered victim, stabbing her multiple times in the head |
| 06 | Siripongs, J. | 2 | Robbed and burglarized his victims. One victim was strangled to death, the second stabbed in the head and neck before death. |
| 07 | Babbitt, M. | 1 | Committed a string of burglaries, and during one murdered a 78 year-old woman. Committed a sexual assault after the murder. |
| 08 | Rich, D. | 4 | Convicted of rape, sodomy, kidnaping. One victim beaten with a rock, as was a second victim after being raped. Another victim was raped, shown the dead body of a prior victim, and then shot. Fourth victim was raped and sodomized. She was then thrown from a bridge to die on rocks 105 feet below. |
| 09 | Massie, R. | 1 | -Originally sentenced to death pre-1974 for three (3) murders, each committed following the robbery of the victims.<br>-That capital sentence was vacated by Furman.<br>-While on parole for murder, he committed another robbery and murdered his victim. Volunteered for execution. |

| 10 | Anderson, S. | 1 | -Known to have killed or admitted to having killed at least eight (8) additional people. Seven (7) of the murders were for pay. |
|----|--------------|---|---|
| 11 | Beardslee, D. | 2 | Convicted of murder in 1969. Released. Convicted anew of two (2) murders during a drug transaction, shooting both victims and slashing the throat of one. |
| 12 | Williams, S. | 4 | Founder of the notorious "Crips" street gang in Los Angeles. Four (4) murders committed during two of three separate criminal episodes involving robbery. |
| 13 | Allen, C. | 3 | Serving a sentence for murder when he organized the killing of three (3) more people, murders for which he was ultimately executed. |

Petitioner's lack of prior felony convictions, as well as his conviction under the felony-murder doctrine, and the jury's express not guilty finding of attempted first-degree murder as to Bernice Clark, puts him in an altogether different category. He is simply not the worst of the worst. No matter how many different ways Respondent tries to phrase it, his contrary ipse dixits will not change this.

Petitioner also corrects Respondent's faulty premise that Petitioner has no need for any information or discovery concerning cases that were not charged as capital. The U.S. Supreme Court holding in United States v. Armstrong, 517 U.S. 456 (1996), proves the importance of this, and shows why Petitioner requires this discovery to perfect his claim.

In the late 1980s through the 1990s, federal judges in the Central District of California - doubtless as in many other districts - saw an ever increasing number of abuses of

prosecutorial discretion in how the harsh crack cocaine sentencing guidelines were being applied.[10]  It was abundantly clear to court observers that federal prosecutors were proceeding under the enhanced crack sentencing Guidelines[11] almost exclusively against Black defendants.  Anglo violators were also prosecuted by law enforcement for crack offenses, but their cases were routinely referred out by federal authorities for state prosecution where the federal sentencing Guidelines had no application.

The convictions most Anglo defendants received in state court resulted almost always in nominal punishments, while under the federal sentencing guidelines Black defendants were receiving ten (10) year, twenty (20) year, and even life sentences. Eventually the Central District criminal defense bar mounted a large scale challenge to this prosecutorial practice.  In an effort to weaken the defense challenge, the Department of Justice subsequently - and quickly - authorized local prosecutors to settle and even dismiss some cases, predominantly those handled by the more aggressive and experienced federal defense lawyers.  In other cases the prosecution pressed forward nonetheless.

U.S. District Judge Consuelo B. Marshall presided over one of the cases where the prosecution persisted.  United States v.

---

[10]  Due to subsequent amendments, this is no longer true, but at the time crack cocaine offenses were sentenced in the federal courts more harshly than powder cocaine offenses by a 100-to-1 ratio.

[11]  In the years following Armstrong, the U.S. Sentencing Commission has implemented numerous changes to this.  Coupled with other steps Congress has taken, the dramatic injustice worked by the original sentencing Guidelines has been mitigated. See inter alia, the Fair Sentencing Act of 2010.

Armstrong, CR 92-336-CBM.  A former prosecutor, and a former California state court judge, Judge Marshall clearly had an acute appreciation for the sensitivity and the breadth of the issue before her.

The federal defendants challenged the prosecutorial process that caused Anglo defendants to land in state court while Black defendants landed in federal court.  In support of this challenge, the defense asked for discovery into the prosecutorial decision making process in order to demonstrate the role that race was playing in it.  The prosecution contended the discovery was beyond the defense reach, intrusive into the discretionary prosecutorial process, irrelevant, and unduly burdensome.

After extensive briefing and deliberation, Judge Marshall issued a decision authorizing the defense request for discovery of the normally sensitive data and factors that went into the discretionary process.

The Government appealed her decision to the Ninth Circuit.  Like the federal trial court judges in California, many of the Circuit judges also were aware of what they had been seeing unfold before them during the previous years.   Sitting en banc, the Ninth Circuit ultimately upheld Judge Marshall's decision granting the defendants discovery.  United States v. Armstrong, 48 F.3d 1508 (9th Cir. 1995)(en banc).

The prosecution persisted in its objections.

The matter reached the Supreme Court, where the lower court decisions were overturned.   The Supreme Court noted that there were no empirical data in the record to demonstrate the alleged

1  contrast in the racial profiles of those defendants who landed in
2  state court contrasted against those who landed in federal court.

> "[R]espondents' "study" did not constitute "some evidence
> tending to show the existence of the essential elements
> of" a selective-prosecution claim. . . The study failed
> to identify individuals who were not black and could have
> been prosecuted for the offenses for which respondents
> were charged, but were not so prosecuted."

517 U.S. at 470 (citation ommitted).[12]

Sadly, this result was not altogether unpredictable.  Trial judges know what they, and their colleagues, see reflected in their dockets over the years.  Circuit judges have a similar proximity and vantage point from which to assess the matters before them. In its vaulted position, the Supreme Court stands alone, however, and is justified in expecting, *voire* requiring, a fully developed and proper record to be presented to it when it is asked to review a matter.[13]

Surely fully aware of what she had seen come through her courtroom, Judge Marshall did not flinch.  She - along with an en banc court from the Circuit - acted fairly and rationally in responding to the challenge.

Regrettably, the record on its four corners was incomplete. This was not Judge Marshall's fault.  The litigants before her

---

[12] It should be noted that Armstrong's claim asserted a violation of equal protection, while Petitioner advances an Eighth Amendment violation.  But the analysis in focus in both is the justification, and need, for the requested discovery.

[13] Ultimately after a groundswell of public outcry, the offending federal sentencing guidelines were amended.  This is a salutary improvement, but the intervening costs that were paid are staggering. How many lives, families, public resources, and other costs were destroyed during the intervening years.

should have done the requisite work and supplied the court with the empirical data to create the record needed to sustain what experience, common sense, and first-hand observation told Judge Marshall. If that record had been complete, her decision could have withstood scrutiny when challenged in the higher court. She was failed by the litigants who did not prepare a proper record to ensure her order would stand.[14]

An analogous situation is now before this Court. Petitioner wants to ensure not only that a just decision follows, but that an equally just decision is the final result at any and all higher courts that may review this matter.

Trying to derail the matter, Respondent argues that Petitioner has no legitimate need for discovery of the "other" matters. <u>Armstrong</u> clearly and plainly shows that Petitioner does need the comparative data in order to establish the accuracy of his contentions. Respondent is mistaken in urging this Court to deny discovery of this further evidence as irrelevant to Petitioner's case. Respondent is inviting this Court down what <u>Armstrong</u> teaches is an ill-advised path.

To date no successful Eighth Amendment claim has resulted from the myriad of challenges that have flowed through the federal courts. This is not a minor undertaking, and Petitioner is

---

[14] As the Supreme Court noted in its adverse decision, in support of the defense motion the record solely disclosed that in every one of the 24 cases (involving crack cocaine offenses) closed by the Office of the Federal Public Defender in 1991, each and all of the defendants were Black. 517 U.S. at 459. The absence of comparative evidence was found to be an overwhelming deficiency in the defense preparation.

prepared to proceed with it.  He should be enabled to do so, this Court certainly has the discretionary power to allow this.[15]

This case warrants habeas relief.  The requested discovery is a necessary and integral first step, and Petitioner asks this Court to exercise its discretion and enable him to obtain it.  Petitioner asks not for any special treatment, he asks simply to be allowed to do the necessary work to compile and put before this Court a full and proper record.[16]

This Court should grant Petitioner the discovery he needs and has requested.  Once so enabled, Petitioner will conclusively prove that his death sentence is a violation of the Eighth Amendment.

---

[15]  Respondent makes no contention to the contrary, nor could he.

[16]  As this Court's records reflect, Petitioner refrained for a substantial time in proceeding with this portion of the proceedings. His willingness to refrain was out of deference to court staff communications, including a request from previous CJA staff that he forego preliminary data compilation while drafting the petition. Petitioner understood and honored the request, in the hope that the issue might never ripen.  For this reason, Petitioner limited himself to his own counsel's declaration regarding now vastly different Alameda County prosecutorial practices.  Albeit scant, the declaration is fully comports with federal habeas notice pleading requirements.  Respondent's subsequent positions before the Court, coupled with further considerations, have finally compelled Petitioner, respectfully, to proceed now in this manner.  The burden Petitioner now faces, as illustrated by Armstrong and similar authorities, now requires Petitioner to adduce the proof that clearly exists.  Even a cursory analysis of the thirteen (13) individuals executed in California shows this.

**Conclusion**

Petitioner is simply not "the worst of the worst." While tragic, this crime is not "the worst of the worst."

While he argues strenuously against Petitioner's motion for discovery, even Respondent cannot bring himself to aver that this case is one of the "worst of the worst."

This is not properly a capital case. The motion for discovery is designed to aid Petitioner in making this showing and thereby justify his petition for relief from this Court.

Petitioner asks the Court to grant the motion.

Respectfully submitted,

Dated: November 18, 2019        s/Phillip A. Treviño
                                Counsel to Petitioner Dykes