ROB BONTA
Attorney General of California
LANCE E. WINTERS
Chief Assistant Attorney General
JAMES WILLIAM BILDERBACK II
Senior Assistant Attorney General
SARAH J. FARHAT
Deputy Attorney General
ERIC D. SHARE
Supervising Deputy Attorney General
State Bar No. 151230
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 510-3858
  Fax:  (415) 703-1234
  E-mail:  Eric.Share@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **ERNEST EDWARD DYKES,**<br><br>Petitioner,<br><br>v.<br><br>**RON BROOMFIELD, Acting Warden of San Quentin State Prison,**<br><br>Respondent. | 11-CV-04454-SI<br><br>**<u>DEATH PENALTY CASE</u>**<br><br>**RESPONDENT'S RESPONSE TO PETITIONER'S SUMMATION BRIEFING—CLAIM 3**<br><br>Judge:      The Honorable Susan Illston<br>              United States District Judge |

1

## TABLE OF CONTENTS

2

**Page**

3   Introduction .................................................................................................................... 1

4   Argument ........................................................................................................................ 1

5         Petitioner's Summation Briefing Does Not Advance His Claim of "Jury
      Misconduct" ............................................................................................ 1

6         A.    The State Trial Court Did Not Violate Petitioner's Constitutional Rights
            Against Double Jeopardy in Responding to a Jury Question ................................... 1

7         B.    Petitioner's Attempt to Change His Claim of Juror Misconduct Is
            Unavailing ............................................................................................. 10

8   Conclusion .................................................................................................................... 17

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Ashe v. Swenson*
    397 U.S. 436 (1970) ................................................................................ 6

*Bravo-Fernandez* v. *United States*
    137 S. Ct. 352 (2016) .............................................................................. 6

*Bullington v. Missouri*
    451 U.S. 430 (1980) ........................................................................ *passim*

*Coeur D'Alene Tribe of Idaho v. Hammond*
    384 F.3d 674 (9th Cir. 2004) .................................................................. 7

*Coleman v. Thompson*
    501 U.S. 722 (1991) ................................................................................ 3

*Cortez v. Callahan*
    2021 WL 3773617 (N.D. Cal. 2021) ...................................................... 3

*Cullen v. Pinholster*
    563 U.S. 170 (2011) .............................................................................. 16

*Dowling v. United States*
    493 U.S. 342 (1990) ................................................................................ 6

*Fairbank v. Ayers*
    650 F.3d 1243 (9th Cir. 2011) ................................................................ 3

*McCoy v. Mass. Ins. of Tech.*
    950 F.2d 13 (1st Cir. 1991) .................................................................... 7

*Mitchell v. United States*
    958 F.3d 775 (9th Cir. 2000) ........................................................... 13, 14

*Monge v. California*
    (1998) 524 U.S. 721 ............................................................................ 6, 7

*Paulino v. Castro*
    371 F.3d 1083 (9th Cir. 2004) ................................................................ 3

*Peña-Rodriguez v. Colorado*
    137 S. Ct. 855 (2017) ...................................................................... *passim*

# TABLE OF AUTHORITIES
### (continued)

**Page**

*People v. Anderson*
    25 Cal. 4th 543 (2001) ............................................................................................ 10

*People v. Carpenter*
    15 Cal. 4th 312 (1997) ............................................................................................ 10

*People v. Dykes*
    46 Cal. 4th 731 (2009) ..................................................................................... *passim*

*People v. Leon*
    8 Cal. 5th 831 (2020) .............................................................................................. 10

*People v. Linton*
    56 Cal. 4th 1146 (2013) .......................................................................................... 10

*Rich v. Calderon*
    187 F.3d 1064 (9th Cir. 1999) ................................................................................ 12

*Schiro v. Farley*
    510 U.S. 222 (1994) ..................................................................................... 4, 5, 6, 8

*Soto v. Cisneros*
    2021 WL 3913046 (N.D. Cal. 2021) ........................................................................ 3

*United States v. Montero–Camargo*
    208 F.3d 1122 (9th Cir. 2000) .................................................................................. 7

*Wainwright v. Sykes*
    433 U.S. 72 (1977) ................................................................................................. 12

*Walker v. Martin*
    562 U.S. 307 (2011) ................................................................................................. 3

*Wynne v. Town of Great Falls*
    376 F.3d 292 (4th Cir. 2004) .................................................................................... 7

*Ylst v. Nunnemaker*
    501 U.S. 797 (1991) ............................................................................................ 3, 12

**STATUTES**

28 U.S.C.
    § 2254 ........................................................................................................................ 1
    § 2254(d)(1) ............................................................................................................ 16

1

## TABLE OF AUTHORITIES
### (continued)

2

**Page**

3  California Evidence Code

4    § 1150................................................................................................................. 13

5  California Penal Code
     § 190.1................................................................................................................. 2
6    § 190.3.............................................................................................................. 2, 9

7  **CONSTITUTIONAL PROVISIONS**

8  United States Constitution
     Sixth Amendment ............................................................................................... 13
9

10  **COURT RULES**

11  Federal Rules of Evidence
      rule 606(b)........................................................................................................... 13

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**INTRODUCTION**

Petitioner represented to this Court that supplemental briefing on the merits of the claims in his Petition for writ of habeas corpus was necessary because of the passage of time since the filing of the original Petition.  (Doc. 105 at 2 ("The petition was filed on December 21, 2012. During the intervening years there have been numerous changes in the case law.  This is a weighty factor which amply justifies this Court's now directing the parties to provide updated briefing on the numerous and detailed joined issues before it").)  On July 1, 2021, "defer[ring] to [petitioner's] representation that intervening case law justifies updated briefing of his claims" (Doc. 107 at 2), this Court issued a Case Management Order permitting supplemental briefing on the claims, as requested by Petitioner.  (Doc. 107; *see* Doc. 105.)  On August 16, 2021, Petitioner filed summation briefing on Claim Three—which he labels as instances of "jury misconduct." (Doc. 119 at 2.)  His brief adds nothing new to the merits of his claim.  Respondent's Answer (Doc 18) addressed in detail the allegations, which in essence were really a claim that the trial court erred in instructing the jury and in denying Petitioner's motion for a new trial.  In his summation briefing, Petitioner, as he has before, misdescribes the relevant facts and law related to these claims.  He also ignores the reasons the California Supreme Court rejected his claims, most significantly that they were forfeited in the State court.  Moreover, in his summation briefing, Petitioner cites no new United States Supreme Court precedent, or persuasive Ninth Circuit authority, that would affect this Court's analysis or resolution of this claim under 28 U.S.C. § 2254.  Indeed, Petitioner cites no opinion that, even if not published when he filed his original Petition, could not have been cited at the time he filed his Traverse.  For the reasons discussed in Respondent's Answer and below, Claim Three of his Petition should be denied.

**ARGUMENT**

**PETITIONER'S SUMMATION BRIEFING DOES NOT ADVANCE HIS CLAIM OF "JURY MISCONDUCT"**

**A.    The State Trial Court Did Not Violate Petitioner's Constitutional Rights Against Double Jeopardy in Responding to a Jury Question**

Petitioner maintains that the trial court violated his constitutional rights against being put twice in jeopardy for the same crime and principles of collateral estoppel by permitting the jury to

1

1    consider in the penalty phase whether his crimes were premeditated and deliberate.  (Doc. 13 at

2    138-51.)  As fully explained in Respondent's Answer (Doc. 18 at 93-102), Petitioner's argument

3    is based on a misunderstanding of the precise language of the jury's question and the trial court's

4    answer.  In his summation briefing on this claim, Petitioner cites no United States Supreme Court

5    (or Ninth Circuit) case that has been decided after he filed his Traverse.  Consequently, there was

6    no need for summation briefing on this claim, and Petitioner's rearguing of points made in his

7    original Petition and Traverses adds nothing to advance his claim.

8          The background on the jury's question and the trial court's response is detailed in full in

9    Respondent's Answer and need not be repeated here.  (Doc. 18 at 94-95.)  Briefly, the jury asked

10   during penalty-phase deliberations if it could "look at the willful, premeditated and deliberate

11   nature of this killing under" California Penal Code section 190.3, factor (a).[1]  (AG000615 (CT

12   557).)[2]  The court responded:  "You may consider such factors under Factor A of jury [CALJIC]

13   instruction 8.85 in your consideration of the circumstances of the crime of which the defendant

14   was convicted in the present proceeding and the existence of any special circumstance found to be

15   true."  (AG021177 (RT 4016); *see also* AG000692 (CT 636).)  Petitioner's counsel did not object

16   to the court's answer to the jury's question.  *People v. Dykes*, 46 Cal. 4th 731, 800 (2009)

17   (AG022150).  Nonetheless, Petitioner has maintained in the California Supreme Court and in this

18   Court that the trial court's answer allowed the jury to reconsider its conclusion in the guilt phase

19   that the murder of Bernice Clark was based on a theory of felony murder and, in his view,

20   therefore, he "did not have the requisite intent to commit murder in the first-degree when he shot

21   Bernice Clark."  (Doc. 119 at 2.)

22         Preliminarily, and critically, as fully explained in our Answer, the California Supreme

23   Court determined that Petitioner's claim was forfeited because he did not object to the trial

24   court's response to the jury's question or request clarification.  *Dykes*, 46 Cal. 4th at 802

25   _____
        [1] California Penal Code section 190.3 states in relevant part:  "In determining the penalty,

26   the trier of fact shall take into account any of the following factors if relevant:  (a) The
     circumstances of the crime of which the defendant was convicted in the present proceeding and
     the existence of any special circumstances found to be true pursuant to Section 190.1."

27         [2] "CT" refers to the Clerk's Transcript on Appeal, and "RT" refers to the Reporter's
     Transcript on Appeal, which were lodged with this Court with the rest of the State court record

28   and sequentially paginated as indicated.

2

1    (AG022152); *see also* Doc. 18 at 96-99.  As also explained in our Answer, because trial counsel

2    did not preserve the claim of error in the state court, it cannot form the basis for federal habeas

3    relief.  *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (if petitioner has defaulted his

4    federal claim in state court pursuant to an independent and adequate state procedural rule, federal

5    habeas review of the claim is barred); *Walker v. Martin*, 562 U.S. 307, 315-16 (2011); *Ylst v.*

6    *Nunnemaker*, 501 U.S. 797, 799, 806 (1991); *Fairbank v. Ayers*, 650 F.3d 1243, 1256 (9th Cir.

7    2011) ("California consistently applies its contemporaneous objection rule when a party fails to

8    object to the admission of evidence"); *Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004)

9    (failure to object to jury instruction).

10        In his summation briefing, Petitioner has cited no new United States Supreme Court case—

11    nor could he—overruling the holding of *Coleman* and the many cases that have followed it

12    finding that a procedurally defaulted claim in state court cannot form the basis for federal habeas

13    corpus relief.  Indeed, the rule has been reaffirmed many times, including by this District, since

14    the principal briefs in this case were filed by the parties.  *See Soto v. Cisneros*, 2021 WL

15    3913046, at *33-*34 (N.D. Cal. 2021) ("The rule cited here by the [California] court of appeal,

16    specifically, that a defendant must make a contemporaneous objection at trial in order to preserve

17    an issue on appeal, has been found to be a sufficiently independent and adequate procedural rule

18    to support the denial of a federal petition on grounds of procedural default"); *Cortez v. Callahan*,

19    2021 WL 3773617, at *15 (N.D. Cal. 2021) ("The United States Supreme Court and the Ninth

20    Circuit have recognized that California's contemporaneous objection rule is an adequate and

21    independent state ground sufficient to bar the review of claims by a federal court").  As a result,

22    no matter Petitioner's other arguments in his original Petition or here, his claim is defaulted and

23    must, on that ground alone, be dismissed.

24        The California Supreme Court further determined that even were Petitioner's claim not

25    forfeited, it would fail on its merits.  *Dykes*, 46 Cal. 4th at 804-05(AG022156-AG022157).  The

26    California Supreme Court explained, "it is not reasonably likely the jury would understand the

27    court's response as an invitation to reconsider its verdict [citations], especially in light of the

28    apparent purpose of the jury's question—to determine generally whether it could consider

3

1    defendant's mental state with reference to the murder of Lance Clark despite the circumstances

2    that the murder verdict rested upon the felony-murder rule." *Id*; *see also id*. at 805(AG022157-

3    AG022158) ("the jury did not pose a question specifically directed at reconsideration of prior

4    guilt phase verdicts or findings, nor was the court's response directed to that possibility").  The

5    full reasoning of the California Supreme Court is explained in our Answer.  (Doc. 18 at 100-02.)

6        Also in our Answer we explain that even had the jury considered the findings it made in the

7    guilt phase in assessing punishment, there would have been no violation of principles of Double

8    Jeopardy or collateral estoppel.  (Doc. 18 at 101-02.)  Having found no subsequent United States

9    Supreme Court precedent since he filed his original Petition or Traverse to contradict

10   Respondent's argument, Petitioner chose to use his summation briefing to attack a collateral point

11   made in Respondent's Answer (something he could have done in his Traverse).

12       In explaining in our Answer why principles of Double Jeopardy and collateral estoppel

13   would not apply to this case, Respondent cited *Schiro v. Farley*, 510 U.S. 222, 230 (1994).  In

14   *Schiro*, a jury convicted the defendant of felony murder (count II) but did not return a verdict on

15   intentional murder (count I).  *Id*. at 225–26.  "Thereafter, in a separate sentencing hearing, the

16   same jury unanimously concluded that Schiro did not deserve the death penalty, presumably

17   because he had not intended to kill."  *Id*. at 239 (Stevens, J., dissenting, footnote omitted).  And

18   that presumption appeared well grounded because "[t]he principal issue at trial was Schiro's

19   mental condition."  *Id*. at 240.  Moreover, both the jury instructions and Indiana state law

20   permitted the jurors to return a guilty verdict on every count on which they had unanimity—

21   which could imply the jury intended to acquit the defendant on each count they failed to return

22   (like count I, intentional murder).  *See id*. at 233–34 (majority opinion); *id*. at 246–47 (Stevens, J.,

23   dissenting) (arguing jury's failure to return a verdict on intentional murder implicitly acquitted on

24   that count).  The trial judge, nonetheless, rejected the jury's recommendation and sentenced

25   Schiro to death, finding that he had committed murder by intentionally killing the victim while

26   committing or attempting to commit rape.  *Id*. at 227.

27       In the United States Supreme Court, Schiro first argued that he could not be sentenced to

28   death based on an intentional-murder aggravating circumstance because the sentencing

1   proceeding amounted to a successive prosecution for intentional murder in violation of the

2   Double Jeopardy Clause. *Schiro*, 510 U.S. at 229. Schiro, in effect, urged the Supreme Court "to

3   treat the sentencing phase of a single prosecution as a successive prosecution for purposes of the

4   Double Jeopardy Clause." *Id*. The Court "decline[d] to do so." *Id*. at 230. It was for this

5   proposition, i.e, that the sentencing phase of a single prosecution is not a successive prosecution,

6   that Respondent cited *Schiro* in its Answer. (Doc. 18 at 101-02.)

7       In finding that the sentencing phase of a single prosecution was not a successive

8   prosecution for purposes of the Double Jeopardy Clause, *Schiro* found that its prior decision in

9   *Bullington v. Missouri*, 451 U.S. 430 (1980) "is not to the contrary." *Schiro*, 510 U.S. at 231.

10  Bullington was convicted of capital murder. At the first death penalty sentencing proceeding, the

11  jury rejected the death penalty and sentenced him to a term of years. *Id*. His conviction was

12  overturned and, on resentencing, the state again sought to impose the death penalty. *Id*. The

13  Supreme Court recognized:

14      the general rule that "the Double Jeopardy Clause imposes no absolute prohibition
        against the imposition of a harsher sentence at retrial." [Citation.] Nonetheless, we
15      recognized a *narrow exception* to this general principle because the capital sentencing
        scheme at issue "differ[ed] significantly from those employed in any of the Court's
16      cases where the Double Jeopardy Clause has been held inapplicable to sentencing.
        [Citation.] Because the capital sentencing proceeding "was itself a trial on the issue
17      of punishment," [citation], requiring a defendant to submit to a second, identical
        proceeding was tantamount to permitting a second prosecution of an acquitted
18      defendant [citation].

19  *Id*. at 231 (italics added). The *Schiro* Court found the situation in *Schiro* "manifestly different"

20  than the situation in *Bullington*. *Id*.

21          Neither the prohibition against a successive trial on the issue of guilt nor the
        *Bullington* prohibition against a second capital sentencing proceeding is implicated
22      here—the State did not reprosecute Schiro for intentional murder, nor did it force him
        to submit to a second death penalty hearing. It simply conducted a *single sentencing*
23      *hearing in the course of a single prosecution*. The State is entitled to "one fair
        opportunity" to prosecute a defendant, *Bullington*, *supra*, at 446 (internal quotation
24      marks omitted), and that opportunity extends not only to prosecution at the guilt
        phase, but also to present evidence at an ensuing sentencing proceeding.
25

26  *Id*. at 231-32 (italics added).

27      Schiro also contended that principles of collateral estoppel required vacation of his death

28  sentence. *Schiro*, 510 U.S. at 232. He reasoned that the jury had acquitted him of "intentionally"

5

1  murdering the victim and, as a result, the trial court was precluded from finding the existence of

2  the aggravating circumstance that he committed the murder by intentionally killing the victim

3  while committing or attempting to commit rape. *Id.* The Supreme Court declined to address

4  whether collateral estoppel could bar the use of the "intentional" murder aggravating

5  circumstance, "because Schiro has not met his burden of establishing the factual predicate for the

6  application of the doctrine, if it were applicable, namely, that an 'issue of ultimate fact has once

7  been determined' in his favor. [*Ashe v. Swenson*, 397 U.S. 436, 443 (1970).]" *Id.*; *see also*

8  *Bravo-Fernandez* v. *United States*, 137 S. Ct. 352, 359 (2016) ("We have also made clear that

9  '[t]he burden is on the defendant to demonstrate that the issue whose relitigation he seeks to

10  foreclose was actually decided' by a prior jury's verdict of acquittal. *Schiro v. Farley*, 510 U.S.

11  222, 233 (1994) (internal quotation marks omitted); accord, [*Dowling v. United States*], 493 U.S.

12  342, 350 (1990)").

13  As explained by the California Supreme Court and in our Answer, here, as in *Schiro*,

14  Petitioner has not met his burden of establishing the factual predicate for application of either the

15  Double Jeopardy Clause or principles of collateral estoppel, i.e., that an issue of ultimate fact had

16  once been determined in his favor. *See Dykes*, 46 Cal. 4th at 801-02 (AG022152). For this

17  reason too, his claim for federal habeas relief must be denied.

18  Nonetheless, Petitioner goes to great effort in his summation briefing to try to convince this

19  Court that *Schiro*'s "invocation and ostensible repudiation of *Bullington* is nothing more than

20  dicta" (Doc. 119 at 11), and that "*Bullington* should remain persuasive, even decisive" (Doc. 119

21  at 11). In urging this Court to consider *Bullington* "decisive" despite *Schiro*, Petitioner opines

22  that the United States Supreme Court "dismissed the *Bullington* decision, but it did so summarily,

23  and without reason or even an attempt at justifying its disregard for precedent." (Doc. 119 at 16).

24  It is peculiar that Petitioner would devote so much effort in his summation briefing to trying

25  to convince this Court to disavow a Supreme Court case. This is especially so in light of the fact

26  that the Supreme Court continued to recognize after *Schiro* that *Schiro* is the general rule, and

27  *Bullington* is a "narrow exception" because of the distinctive characteristics of the sentencing

28  phase in Bullington's first trial. *See Monge v. California* (1998) 524 U.S. 721, 730.

6

1

2

3

4

5

6

7

8

9

10

> Our opinion in *Bullington* established a "narrow exception" to the general rule that double jeopardy principles have no application in the sentencing context. *See Schiro v. Farley*, 510 U.S. 222, 231 (1994). In *Bullington*, a capital defendant had received a sentence of life imprisonment from the original sentencing jury. The defendant subsequently obtained a new trial on the ground that the court had permitted prospective women jurors to claim automatic exemption from jury service in violation of the Sixth and Fourteenth Amendments. 451 U.S., at 436. When the State announced its intention to seek the death penalty again, the defendant alleged a double jeopardy violation. We determined that the first jury's deliberations bore the "hallmarks of the trial on guilt or innocence," *id*., at 439, because the jury was presented with a choice between two alternatives together with standards to guide their decision, the prosecution undertook the burden of establishing facts beyond a reasonable doubt, and the evidence was introduced in a separate proceeding that formally resembled a trial, id., at 438. In light of the jury's binary determination and the heightened procedural protections, we found the proceeding distinct from traditional sentencing, in which "it is impossible to conclude that a sentence less than the statutory maximum 'constitute[s] a decision to the effect that the government has failed to prove its case.'" *Id*., at 443 (quoting *Burks* [*v. United States*, 437 U.S. 1, 15]).

11

12

13

14

*Id*. at 730-31. In sum, as *Monge* shows, the United States Supreme Court has not considered its treatment of the *Bullington* decision as summary, or "without reason or even an attempt at justifying its disregard for precedent." (Doc. 119 at 16.) Rather, the Court continued to describe *Bullington* as a narrow exception to *Schiro*'s general rule.

15

16

17

18

19

20

21

22

23

24

25

26

27

Even were Petitioner correct that *Schiro*'s discussion of *Bullington* was merely "dicta," that does not mean it could be ignored or dismissed as "without reason." (Doc. 119 at 16.) As the Ninth Circuit Court of Appeals has explained, even "non-binding Supreme Court dicta is accorded 'appropriate deference.'" *United States v. Montero–Camargo*, 208 F.3d 1122, 1132 n.17 (9th Cir. 2000) (en banc) ("Supreme Court dicta have a weight that is greater than ordinary judicial dicta as prophecy of what that Court might hold; accordingly, we do not blandly shrug them off because they were not a holding," internal quotation marks and citations omitted); *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 683 (9th Cir. 2004) ("our precedent requires that we give great weight to dicta of the Supreme Court"); *see also Wynne v. Town of Great Falls*, 376 F.3d 292, 298 n.3 (4th Cir. 2004) ("[W]ith inferior courts, like ourselves . . . carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative"); *McCoy v. Mass. Ins. of Tech*., 950 F.2d 13, 19 (1st Cir. 1991) ("We think that federal appellate courts are bound by the Supreme Court's considered dicta almost as firmly as by

28

7

1  the Court's outright holdings, particularly when . . . a dictum is of recent vintage and *not*

2  *enfeebled by any subsequent statement*," italics added).)

3      Thus, even were Petitioner correct that the *Schiro* Court's discussion of *Bullington* was

4  merely dicta, he is wrong in suggesting that "the decision in *Bullington* should remain the true

5  considered decision on point and should control this Court's determination in this matter."

6  (Doc. 119 at 16.)  As explained, the dicta of the United States Supreme Court is highly

7  authoritative, especially when it has not been enfeebled by any subsequent statement.  Since

8  *Schiro* was decided, the United States Supreme Court has not retracted or contradicted its

9  statement that the sentencing phase of a single prosecution is not a successive prosecution for

10  purposes of the Double Jeopardy Clause.

11      Moreover, Petitioner's reliance on *Bullington* would be unavailing even were that case to

12  have the continued authority he believes it to have.  The situation here bears no resemblance

13  either factually or legally to that the Supreme Court addressed in *Bullington*.  In *Bullington*, the

14  Supreme Court described the sentencing proceeding in the capital trial in Missouri it was

15  reviewing as like a trial of guilt or innocence where the state had the burden of proving before a

16  jury certain elements beyond a reasonable doubt before the death penalty could be imposed.  The

17  jury was required to designate in writing the aggravating circumstance or circumstances that it

18  found beyond a reasonable doubt.  It also had to find beyond a reasonable doubt that any

19  aggravating circumstance or circumstances were sufficient to warrant the death penalty.

20  *Bullington*, 451 U.S. at 432-34.  Under these unique circumstances, the Court held that after the

21  original jury fixed Bullington's punishment at imprisonment for life, and Bullington's murder

22  conviction was reversed on appeal, he could not be put twice in jeopardy for the death penalty.

23  *Id*. at 444-45.  "By enacting a capital sentencing procedure that resembles a trial on the issue of

24  guilt or innocence . . . Missouri *explicitly requires* the jury to determine whether the prosecution

25  has 'proved its case.'"  *Id*. at 444.  "A verdict of acquittal on the issue of guilt or innocence is, or

26  course, absolutely final.  The values that underlie this principle . . . are equally applicable when a

27  jury has rejected the State's claim that the defendant deserves to die . . . ."  *Id*. at 445.

28

8

1    What occurred in Petitioner's case bears no resemblance to the situation in *Bullington*.

2    First, of course, *Bullington* does nothing to resolve the procedural bar that prevents Petitioner

3    from obtaining federal habeas relief on this claim, i.e., his claim was forfeited in the State court.

4    Second, as explained by the California Supreme Court and in our Answer, Petitioner was not

5    "acquitted" of any charge for which he was twice put in jeopardy.  Contrary to Petitioner's

6    assertion, he was not acquitted of a crime in the guilt phase, nor did the jury make a binding

7    finding that prevented it in the penalty phase from considering Petitioner's mental state when he

8    committed his crimes.

9       [T]he [jury's] "not true" finding [that the attempted murder of Bernice Clark
10      was willful, deliberate, *and* premeditated] constituted a finding that the prosecutor
        had failed to prove that the attempted murder of Bernice Clark was willful, deliberate,
11      *and* premeditated, but the verdict did not establish that the jury agreed *none* of those
        mental states had been established.  The verdicts certainly *did not reflect a finding*
12      *that the attempted murder of Bernice was not willful.*  A killing is willful if intent to
        kill is proved [citation], and the *attempted-murder verdict established the jury found*
13      *intent to kill* [citation].

14    *Dykes*, 46 Cal. 4th at 801-02(italics added) (AG022152).  Under these circumstances, the

15    California Supreme Court explained, there was no error in allowing the jury to consider

16    Petitioner's culpable mental state during the penalty phase as a circumstance of the crime under

17    California Penal Code section 190.3, factor (a).  *Dykes*, 46 Cal. 4th at 803, n.18 (AG022154).

18    Moreover, "the jury did not pose a question specifically directed at reconsideration of prior guilt

19    phase verdicts or findings, nor was the court's response directed to that possibility."  *Id*. at 805

20    (AG022157-AG022158).

21    Finally, the nature of the penalty phase proceeding in Petitioner's trial was not similar to

22    that of Missouri's in *Bullington*, further making that case inapposite to the extent it retains any

23    persuasive authority.  The penalty phase in a California capital case, unlike the penalty-phase

24    proceeding in *Bullington*, is not akin to a trial on guilt or innocence with a specified burden of

25    proof.  As the California Supreme Court has explained, "'the sentencing function is inherently

26    moral and normative, not factual; the sentencer's power and discretion under [California's death-

27    penalty law] is to decide the appropriate penalty for the particular offense and offender under all

28    the relevant circumstances.'  [Citation.]  Because of this, instructions associated with the usual

9

1   fact-finding process—such as burden of proof—are not necessary.  [Citations.]"  *People v.*

2   *Carpenter*, 15 Cal. 4th 312, 417–18 (1997); *see also People v. Leon*, 8 Cal. 5th 831, 853 (2020)

3   (the prosecution is not constitutionally obligated to bear a burden of proof or persuasion in a

4   capital sentencing proceeding, which is an inherently moral and normative function, and not a

5   factual one amenable to burden of proof calculations); *People v. Linton*, 56 Cal. 4th 1146, 1215

6   (2013) (unlike the guilt determination, the sentencing function of a capital trial is inherently moral

7   and normative, not factual and, hence, not susceptible to a burden-of-proof quantification);

8   *People v. Anderson*, 25 Cal. 4th 543, 589 (2001) (the prosecution has no burden of proof that

9   death is the appropriate penalty, or that one or more aggravating factors or crimes exist, in order

10  to obtain a judgment of death).  Thus, *Bullington*, even were it to be considered by this Court,

11  does not advance Petitioner's claim.

12      **B.    Petitioner's Attempt to Change His Claim of Juror Misconduct Is
              Unavailing**

13

14      Based on posttrial defense investigator's reports allegedly recounting statements by jurors,

15  Petitioner contended in the State court that the jurors engaged in misconduct in the penalty phase

16  of his trial by discussing improper and impermissible topics during deliberations.  The trial court

17  found no basis to hold an evidentiary hearing on Petitioner's claim, and the California Supreme

18  Court affirmed.  In his federal Petition, Petitioner claims that "the trial court's refusal to hold an

19  evidentiary hearing on jury misconduct was error under both state and federal law, as was the

20  subsequent trial court's ruling denying the motion for new trial."  (Doc 13. at 152.)

21      Now, rather than support his claim with more recent, controlling Supreme Court authority,

22  Petitioner attempts to alter the facts of his claim to fit a United States Supreme Court case that

23  was decided *before* he filed his partial and complete Traverse.  The attempt is unavailing.

24      To fully understand why Petitioner's attempt to change his claim in this summation briefing

25  fails, it is essential to understand how the claim has been presented up to this point.  In a motion

26  for new trial in the trial court Petitioner alleged three instances of juror misconduct:

27  (1) "'First . . .  did the jury discuss the opinion that death did not mean death, despite the court[']s

28  instructions.  Second did the jury discuss the defendant[']s lack of remorse as a factor in

10

aggravation.  Third, did the jury discuss that "life does not mean life."'" *Dykes*, 46 Cal. 4th at 806 (AG022159).  "Attached to the [motion] were unsworn reports, prepared for defense counsel by the defense investigator, concerning interviews with several jurors.  The motion was based exclusively on the three enumerated claims and concluded with a request for an evidentiary hearing." *Id*.  The trial court found that the defense investigator's reports were inadmissible to impeach the verdict and, even if they were considered, the allegations lacked merit.  *Id*. at 807 (AG022160).

In the California Supreme Court, and in Petitioner's original Petition in this Court, Petitioner purported to rely on other comments by jurors as the basis for additional claims of juror misconduct that were *not* part of the motion for new trial in the trial court.  In his original Petition, Petitioner described the claims as follows:

> [Juror] RA stated that she had heard that the district attorney's automobile tires had been slashed during the trial.  (CT 662.)  The jury speculated whether this incident was connected to the case.  [Fn. omitted.]  *Id*.  RA also expressed fear to other jurors and actively urged the jurors to remain anonymous when returning their verdict.  *Id*.  RA was afraid of several young men in the courtroom who, she stated, the jury assumed were friends, relatives, or acquaintances of Petitioner.  *Id*.  She stated that "some" jurors saw the young men create a disturbance as they were leaving the courtroom and outside the courthouse by pulling up their shirts, lowering their pants, running through traffic, and shouting profanity.  (CT 662.)  Juror FC also mentioned this misconduct, and described the courthouse spectators in question as "little gangsters."  (CT 669.)  She relayed that the judge observed the misbehavior and instructed jurors not to leave the courthouse unless accompanied by the bailiff.  (CT 669-700

(Doc. 13 at 170-71.)

> Finally, the jurors committed misconduct when they considered the activities of some unidentified trial spectators who they unjustifiably associated with Petitioner, as well as when they somehow received and then discussed information that the district attorney's automobile tires had been slashed during the trial.  Notably, there is no evidence in the record regarding these unidentified spectators or that the slashed tire event occurred, let alone that any of this was in any way associated with Petitioner if it did occur.

(Doc. 13 at 175-76.)  Petitioner also alleged that jurors speculated that he had committed other crimes and had a juvenile criminal record.  (Doc. 13 at 171.)

11

1    We focus here on the claims of juror misconduct that were *not* part of the motion for new

2    trial in the trial court as does Petitioner in his summation briefing.[3]  The California Supreme

3    Court found those claims forfeited.

4         In his appellate briefs, defendant refers to a number of other alleged instances
         of juror misconduct that he claims were disclosed by the investigator's reports and

5         should have been the basis for a hearing or a new trial.  The People respond that
         defendant did not raise these concerns in the trial court in connection with his motion

6         for new trial or his request for an evidentiary hearing, and therefore the additional
         claims of misconduct should be forfeited on appeal.  We agree that failure to raise the

7         issue of juror misconduct and seek relief from the court on that basis results in a
         forfeiture of the issue on appeal.  (See *People v. Stanley*, [39 Cal.4th 913, 950 (2006)

8         [failure to object to juror misconduct and request mistrial]; *People v. Holloway*
         (2004) 33 Cal.4th 96, 124.)  The circumstance that defendant raised some juror

9         misconduct claims in his motion for new trial does not serve to preserve other bases
         for his claim on appeal.  (*People v. Masotti* (2008) 163 Cal.App.4th 504, 508.)

10

11   *Dykes*, 46 Cal. 4th at 808, n.22 (AG022162-AG022163).  Consequently, they cannot form the

12   basis for a claim of federal habeas relief.  *See Ylst v. Nunnemaker*, 501 U.S. at 806; *Wainwright v.*

13   *Sykes*, 433 U.S. 72, 87 (1977); *Rich v. Calderon*, 187 F.3d 1064, 1070 (9th Cir. 1999); Doc. 18 at

14   105-06 [Answer].

15   Now, in his summation briefing, Petitioner cites a United States Supreme Court case, *Peña-*

16   *Rodriguez v. Colorado*, 137 S. Ct. 855 (2017), claiming that it has expanded the circumstances

17   under which evidence of juror misconduct may be considered by a reviewing court.  (Doc. 119

18   at 18.)  Thus, he concludes, the state trial court violated his constitutional rights by not holding a

19   hearing on his claims of juror misconduct based on his defense investigator's reports.  We first

20   note that *Pena-Rodriguez* was decided by the Supreme Court almost three months before

21   Petitioner filed his partial Traverse in this case and over two years before Petitioner filed his

22   complete Traverse.[4]  Yet, he did not cite the case in either of those briefs.

23   Moreover, the Supreme Court's holding in *Peña-Rodriguez* was that where a juror makes a

24   clear statement that indicates he or she relied on racial stereotypes to convict a criminal

25   _____

26   [3] Our full response to Petitioner's claim of juror misconduct, including the claims that
were in the motion for new trial, is in our Answer and need not be repeated here.  (Doc. 18 at
102-12.)

27   [4] *Peña-Rodriguez* was decided on March 16, 2017.  Petitioner filed his partial Traverse,
which addressed this claim, on May 31, 2017 (Doc. 55), and his complete Traverse, which also

28   included a response to Claim One, on April 1, 2019 (Doc. 76).

12

1  defendant, the Sixth Amendment requires that the no-impeachment rule regarding a jury verdict

2  give way in order to permit the trial court to consider evidence of the juror's statement.  *Peña-*

3  *Rodriguez*, 137 S. Ct. at 869.  Petitioner's late attempt to fit the facts of his case into the rubric of

4  *Peña Rodrigeuz* is unavailing.

5       In *Peña-Rodriguez*, the United States Supreme Court considered a Colorado rule of

6  evidence, similar to Federal Rules of Evidence, rule 606(b), that generally provided that a juror

7  could not testify about statements and incidents that occurred during the jury's deliberations.[5]

8  "Prior to *Peña-Rodriguez*, the Supreme Court had declined to recognize any exceptions (other

9  than those in Rule 606(b)) to the no-impeachment rule."  *Mitchell v. United States*, 958 F.3d 775,

10  788 (9th Cir. 2000).  "*Peña-Rodriguez* subsequently recognized an exception to Rule 606(b) to

11  allow jurors to testify about statements showing racial bias."  *Id*.  In *Peña-Rodriguez*, the

12  defendant was convicted of unlawful sexual contact and harassment for sexually assaulting two

13  teenage sisters.  *Peña-Rodriguez*, 137 S. Ct. at 861.  After the jury was discharged, two jurors

14  gave affidavits telling the defendant's counsel that another juror had expressed anti-Hispanic bias

15  against the defendant and the defendant's alibi witness during deliberations.  *Id*.  The trial court

16  denied the defendant's motion for a new trial, finding the affidavits would be inadmissible under

17  Rule 606(b).  *See Mitchell*, 958 F.3d at 788–89.

18       The United States Supreme Court acknowledged the safeguards that protect the right to an

19  impartial jury and urged trial courts to use such "standard and existing processes designed to

20  prevent racial bias in jury deliberations."  *Peña-Rodriguez*, 137 S. Ct. at 871.  The Court noted,

21  however, that "their operation may be compromised, or they may prove insufficient" in

22  addressing juror prejudice.  *Id*. at 868.  The Ninth Circuit Court of Appeals in *Mitchell* described

23  how the high court resolved this tension.

24       In light of these concerns, the Court held that "where a juror makes a clear
   statement that indicates he or she relied on racial stereotypes or animus to convict a
25   criminal defendant," then "the Sixth Amendment requires that the no-impeachment
   rule give way in order to permit the trial court to consider the evidence of the juror's
26

27       [5] California Evidence Code section 1150, relied on by the trial court here, is similar to rule
   606(b), and states:  "No evidence is admissible to show the effect of such statement, conduct,
28   condition, or event upon a juror either in influencing him to assent to or dissent from the verdict
   or concerning the mental processes by which it was determined."

statement and any resulting denial of the jury trial guarantee." [*Peña-Rodriguez*, 137 S. Ct. at 869]. The Court did not set down a rule for determining "[w]hether that threshold showing has been satisfied" but rather held that such a decision "is a matter committed to the substantial discretion of the trial court in light of all the circumstances, including the content and timing of the alleged statements and the reliability of the proffered evidence." *Id*. The Court noted that "[n]ot every offhand comment indicating racial bias or hostility will justify setting aside the no-impeachment bar to allow further judicial inquiry." Instead, "there must be a showing that one or more jurors made statements exhibiting overt racial bias that cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict" and "the statement must tend to show that racial animus was a significant motivating factor in the juror's vote to convict." *Id*.

Despite establishing this exception to Rule 606(b), *Peña-Rodriguez* acknowledged and confirmed the longstanding rules giving trial courts discretion over lawyer efforts to investigate and interview jurors. The Court stated that "[t]he practical mechanics of acquiring and presenting such evidence will no doubt be shaped and guided by state rules of professional ethics and local court rules, both of which often limit counsel's post-trial contact with jurors." *Id*. Limits on contact with jurors "seek to provide jurors some protection when they return to their daily affairs after the verdict has been entered" and can be found even in jurisdictions "that recognize a racial-bias exception" to the no-impeachment rule. *Id*. at 869–70. The Court explained that jurors "may come forward of their own accord" to report racial bias notwithstanding rules prohibiting lawyers from initiating such contact, a practice that "is common in cases involving juror allegations of racial bias." *Id*. (collecting cases).

*Mitchell*, 958 F.3d at 789–90.

Attempting to rely on the narrow exception to the no-impeachment rule outlined in *Peña-Rodriguez,* Petitioner in his summation briefing, for the first time, asserts that "there are numerous aspects of the misconduct revealed by the post-trial defense investigation which suggest racial bias was work." (Doc. 119 at 18.) He describes those aspects as follows: "The jurors' unfounded speculations that Petitioner must have had a more significant criminal record than the jury was told; the perception that the young Black men in the courtroom were necessarily Petitioner's friends; and the further speculation the same young Black men were gangsters because of their untoward behavior outside of the courtroom." (Doc. 119 at 19.)

Neither in the California Supreme Court nor in Petitioner's original Petition in this Court was it asserted that the jurors' alleged speculation about Petitioner's criminal record was based on race. The supposed race of the men in the courtroom also was never specified. *See* AG021560

14

(Appellant's Opening Brief on the Merits in the California Supreme Court)[6]; Doc. 13 at 170-71, 175-76 (Respondent's Answer in this Court).

More critically, the defense investigator's reports to trial counsel describing his alleged conversations with jurors, upon which this entire claim has been based in the State courts and this Court, do not mention race as a factor in the jury's observations or deliberations. Thus, in the defense investigator's letter to trial counsel regarding his conversation with Juror R.A., he states:

> She stated that one of the reasons for this was that early on in the trial there had been several young men who had come into the courtroom and were assumed to be friends or acquaintances of Mr. Dykes'. That same afternoon, some of the jurors saw these same young men as they were leaving the courtroom, and as they did so they were running through traffic creating a disturbance by pulling up their shirts, lowering their pants and shouting profanity at traffic in their way. She said that this made some of the jurors nervous that these people might be a problem to the jurors if they were acting in such a disruptive behavior outside and if in fact they were friends or acquaintances of Mr. Dykes'.

(AG000718.) The defense investigator described his conversation with Juror F.C. as follows:

> She stated that approximately two days into the penalty phase trial, there were a lot of people in the courtroom which were "a bunch of kids about his (the defendant's) age." She referred to these kids as "little gangsters." She stated that when she went outside on one of those days, these youths were sauntering across the street and harassing motorists as they held up traffic. She stated that Judge Homer also saw the misbehavior of these people and on that particular afternoon, told the jurors that they would not leave the courthouse without being accompanied by a bailiff.

(AG000725.)

---

[6] The claim as framed in Petitioner's brief in the California Supreme Court read:

> [Juror R.A.] stated that she had heard that the district attorney's automobile tires had been slashed during the trial. (C.T. 662.) The jury speculated whether this incident was connected to the case. *Id.* [R.A.] also expressed fear to other jurors and actively urged the jurors to remain anonymous when returning their verdict. [R.A.] was afraid of several young men in the courtroom who, she stated, the jury assumed were friends, relatives, or acquaintances of Ernest Dykes. *Id.* She stated that "some" jurors saw the young men create a disturbance as they were leaving the courtroom and outside the courthouse by pulling up their shirts, lowering their pants, running through traffic, and shouting profanity. (C.T. 662.) Juror [F.C.] also mentioned this misconduct, and described the courthouse spectators in question as "little gangsters." (C.T. 669.) She relayed that the judge observed the misbehavior and instructed jurors not to leave the courthouse unless accompanied by the bailiff. (C.T. 669-700.)

(AG021560.)

1    Hence, even were a court to consider the hearsay statements that were allegedly made to the

2    defense investigator by jurors in Petitioner's trial, they in no way would constitute "clear

3    statement[s]" that indicate the jurors "relied on racial stereotype or animus to convict" Petitioner.

4    *Peña-Rodriguez*, 137 S. Ct. at 869. As the United States Supreme Court stated in *Peña-*

5    *Rodriguez*, not even every "offhand comment indicating racial bias or hostility will justify setting

6    aside the no-impeachment bar to all further judicial inquiry." *Id.* "For the inquiry to proceed,

7    there must be a showing that one or more jurors made statements exhibiting overt racial bias that

8    cast serious doubt on the fairness and impartiality of the jury's deliberations and resulting verdict.

9    To qualify, the statement must tend to show that racial animus was a significant motivating factor

10    in the juror's vote to convict." *Id.* Petitioner's assertions now that the defense investigator's

11    reports "suggest racial bias was at work" (Doc. 119 at 18), and his presumption about the race of

12    the men the jurors discussed (Doc. 119 at 18), is manifestly insufficient even under *Peña-*

13    *Rodriguez* to find that the California state courts acted unconstitutionally in refusing to set aside

14    the state's no-impeachment rule in this case.[7]

15    Even were Petitioner able to show that *Peña-Rodriguez* had some application, the Supreme

16    Court still cautioned in that case that "[w]hether the threshold showing has been satisfied [to set

17    aside the no-impeachment rule] is a matter committed to the substantial discretion of the trial

18    court in light of all the circumstances, including the content and timing of the alleged statements

19    and the *reliability of the proffered evidence*." *Peña-Rodriguez*, 137 S. Ct. at 869 (italics added).

20    In *Peña-Rodriguez* itself, the defendant's counsel, "with the trial court's supervision, obtained

21    affidavits from the two jurors describing a number of biased statements" by another juror. *Id.*

22    at 861.

23

24    _____

        [7] Petitioner also cannot seek a discovery order from this Court under *Peña-Rodriguez* to
        breach the general no-impeachment rule. To do so would turn the rule on its head. *See also*

25    *Cullen v. Pinholster*, 563 U.S. 170, 181-82 (2011) (under the AEDPA, "review under
        § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on

26    the merits. Section 2254(d)(1) refers, in the past tense, to a state-court adjudication that 'resulted
        in' a decision that was contrary to, or 'involved' an unreasonable application of, established law.

27    This backward-looking language requires an examination of the state-court decision at the time it
        was made. It follows that the record under review is limited to the record in existence at that

28    same time i.e., the record before the state court").

1    Here, by stark contrast, the information Petitioner submitted to the trial court in support of

2    his new trial motion was not reliable.  First, as will be recalled, the claims at issue here were not

3    even part of Petitioner's motion for new trial in the superior court.  Thus, the California Supreme

4    Court found they were forfeited.  *Dykes*, 46 Cal. 4th at 808, n.22 (AG022162-AG022163).

5    Second, the claims were based not on affidavits, but unsworn reports of Petitioner's own

6    investigator of posttrial conversations he allegedly had with jurors; there were no statements—

7    sworn or unsworn—from any juror.  The California Supreme Court stated that a "trial court

8    would have discretion to view an unsworn report by a defense investigator as lacking in sufficient

9    credibility." *Dykes*, 46 Cal. 4th at 810, n.23 (AG022163-AG022165).  The hearsay evidence,

10   similarly, would not meet *Peña-Rodriguez*'s requirement of reliable evidence to breach the no-

11   impeachment rule.

12   Thus, petitioner's attempt in his summation briefing to change the nature and facts of his

13   jury misconduct claim is unavailing.  Moreover, *Peña-Rodriguez* is neither applicable to

14   Petitioner's claim nor, even were it applicable, would it advance his claim.

15                                    **CONCLUSION**

16   Accordingly, for the reasons detailed in the Answer and in this brief, Claim Three should be

17   denied.

18   Dated:  December 13, 2021                    Respectfully submitted,

19                                                ROB BONTA
                                                  Attorney General of California
20                                                LANCE E. WINTERS
                                                  Chief Assistant Attorney General
21                                                JAMES WILLIAM BILDERBACK II
                                                  Senior Assistant Attorney General
22                                                SARAH J. FARHAT
                                                  Deputy Attorney Genera
23
                                                  */s/ Eric D. Share*
24
                                                  ERIC D. SHARE
25                                                Supervising Deputy Attorney General
                                                  *Attorneys for Respondent*
26
     SF2011202695
27   42991020.docx

28
                                             17

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Ernest Edward Dykes v. Ron Broomfield, Acting Warden of San Quentin State Prison**

No.:    **11-CV-04454-SI**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

On December 13, 2021, I served the attached **RESPONDENT'S RESPONSE TO PETITIONER'S SUMMATION BRIEFING—CLAIM 3** by placing a true copy thereof enclosed in a sealed envelope in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004, addressed as follows:

California Appellate Project
345 California Street
Suite 1400
San Francisco, CA  94104

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on December 13, 2021, at San Francisco, California.

|  |  |
| --- | --- |
| J. Wong | /s/ J. Wong |
| Declarant | Signature |

SF2011202695
42997688.docx