**PHILLIP A. TREVIÑO** [SBN 121119]
137 N. Larchmont Blvd., #801
Los Angeles, California 90004
Telephone: (951) 703-3000

Attorney for Petitioner
ERNEST DYKES

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ERNEST DYKES**, | Case No. 11-CV-04454-SI |
| Petitioner, | **APPLICATION TO STAY PROCEEDINGS WHILE PETITIONER EXHAUSTS NEW CLAIM PURSUANT TO U.S. SUPREME COURT DECISION IN NEW YORK STATE V. BRUEN, 597 U.S. ___ (JUNE 23, 2022)** |
| v. | |
| **KEVIN CHAPPELL, Warden,** | |
| Respondent. | **DEATH PENALTY CASE** |

Petitioner hereby respectfully moves this Honorable Court to stay these proceedings so that Petitioner may return to the California Supreme Court to exhaust a new claim based upon the U.S. Supreme Court's dramatic decision issued this past week in New York State Rifle & Pistol Association, Inc., et al. v. Bruen, 597 U.S. ___, decided June 23, 2022.

Petitioner respectfully asks that, pending his exhaustion of said new claim, this Honorable Court hold all proceedings in this matter in abeyance. This new claim will have a direct and powerful impact on Petitioner's sentence of death, as it will directly undermine the constitutionality of key evidence received by the jury in the penalty phase of Petitioner's capital trial.

Respectfully submitted,

Dated: June 27, 2022        s/Phillip A. Treviño
                            Attorney at Law
                            Counsel for Petitioner

**MEMORANDUM OF POINTS AND AUTHORITIES**
**I.**
**STATEMENT OF FACTS**

Petitioner is a Black man.

Petitioner filed his petition for a writ of habeas corpus in this Court on December 21, 2012.  Therein he included a claim as follows:

- the death penalty here is disproportionate to Petitioner's culpability and therefore violates the Eighth Amendment.

(Petition at 84-86).

At his capital sentencing trial there was a single uncharged circumstance advanced by the prosecution in aggravation. It centered on Petitioner's possession of a concealed loaded firearm. The gun was found by a police officer who had just patted down Petitioner, having first had him remove his gloves and place them atop the officer's squad car. It was after Petitioner had already been placed in the squad car, without incident or any threat of violence, that the officer determined that Petitioner had left a firearm inside the gloves Petitioner had left behind and on top of the squad car. Petition for a Writ of Habeas Corpus, at paragraph 107, p. 53.

Notably, at no time did Petitioner brandish or otherwise display the firearm.  Yet the fact he was carrying a firearm was used as evidence in aggravation against him in his capital sentencing trial.  Based upon the <u>Bruen</u> decision, Petitioner should be allowed now to amend Claim One of his petition to allege this as a further constitutional defect in his sentence of death.

## II.
## THE LAW

This past week, in a stunning decision that has captivated the attention of legal scholars world-wide, the U.S. Supreme Court has just invalidated a regulatory scheme in use in New York State for over a century. New York State Rifle & Pistol Association, Inc., et al. v. Bruen, 597 U.S. ___, decided June 23, 2022 (hereinafter "Bruen"). The momentous decision spans an aggregate of 135 pages, majority and dissenting opinions combined. Doing so, the Court wholly embraces an analysis of history going back to the Middle Ages in order to conclude the Framers' intent when enacting the Second and Fourteenth Amendments. In its lengthy exegesis, the Bruen Court observes how common daggers were in centuries past, how critical it was for freedmen to be able to carry firearms (Petitioner is Black), and touches on numerous other factors that it seems fair to note no one evaluated or articulated earlier in this ligation.

Even so, the Bruen Court has not found a new constitutional right; it has simply redefined how this country, and the myriad of courts in this land, should have been viewing the Second Amendment all along, and how courts must do so now going forward.

Put concisely, the U.S. Supreme Court has now held that the Fourteenth Amendment invalidates a regulatory scheme that impairs law-abiding citizens with ordinary self-defense needs from exercising their Second Amendment right to keep and bear arms in public for self-defense. "We . . . now hold . . . that the Second and Fourteenth Amendments protect an individual's right to carry a

1  hand-gun for self-defense outside the home." Id. at 1.
2      The Supreme Court canvassed doctrine, practice, and law
3  spanning centuries, indeed going back to the Middle Ages, and
4  ultimately focused its holding on the interests and practices not
5  as evolving in today's society, but rather as accepted and
6  respected by the American people at the time the Amendments were
7  enacted.
8      The Second Amendment 'is the very product of an interest
9      balancing by the people' and it 'surely elevates above
10     all other interests the right of law-abiding, responsible
11     citizens to use arms' for self-defense. Heller, 554 U.S.
12     at 635.
13 Bruen, at 17.
14     Doing so, the Court rejected concerns that many people and
15 Government entities see as crucial in modern-day life.  The Court
16 based its holding instead upon historic considerations, finding
17 citizens have always been, and should have always been, guaranteed
18 the right to carry handguns publicly for self-defense.  The Court
19 clarified: carrying "refers to the right to 'wear, bear, or carry .
20 . . upon the person or in the clothing or in a pocket, for the
21 purpose . . . of being armed and ready for offensive or defensive
22 action in a case of conflict with another person.' Id. at 584
23 (quoting Muscarello v. United States, 524 U.S. 125, 143
24 (1998)(Ginsburg, J., dissenting).   Bruen, at 23.
25     The Bruen Court notes that this was such an important command
26 that even disadvantaged segments of the population were guaranteed
27 this privilege.
28

>     "Even Catholics, who fell beyond the protection of
>     the right to have arms, and who were stripped of all
>     "Arms, Weapons, Gunpowder, [and] Ammunition," were at
>     least allowed to keep 'such necessary Weapons as shall be
>     allowed . . . by Order of the Justices of the Peace . . .
>     for the Defence of his House or Person.'   1 Wm. & Mary
>     c. 15, section 4, in 3 Eng. Stat. at Large 399 (1688).

Bruen, at 36 n. 12.

The Bruen Court went on to observe that in the same way recently freed slaves were particularly in danger in public, and had frequently been noted to need and use muskets and revolvers to defend themselves following the abolition of slavery.

>     "On July 6, 1868, Congress extended the 1866
>     Freedmen's Bureau Act, see 15 Stat. 83, and reaffirmed
>     that freedmen were entitled to the 'full and equal
>     benefit of all laws and proceedings concerning personal
>     liberty [and] personal security . . . *including the
>     constitutional right to keep and bear arms*.' . . . 'No
>     Union man or negro who attempts to take any active part
>     in politics, or the improvement of his race, is safe a
>     single day; and nearly all sleep upon their arms at
>     night, and carry concealed weapons during the day.'
>     H.R. Exec.Doc. No. 329, 40th Cong., 2d Sess., at 40.

Bruen, at 54 (emphasis in original).

Continuing its analysis of just how widespread the right to bear arms has been historically, the Bruen Court went on:

>     'Around the same time, the editors of The Loyal

1        Georgian, a prominent black-owned newspaper, were asked
2        by 'A Colored Citizen' whether 'colored persons [have] a
3        right to own and carry fire arms.'   The editors
4        responded the blacks had 'the *same* right to own and carry
5        fire arms that *other* citizens have.' The Loyal Georgian,
6        Feb. 3, 1866, p. 3, col. 4.
7   Bruen, 55.
8        Concluding, the Bruen majority held:
9             The constitutional right to bear arms in public for
10       self-defense is not 'a second-class right, subject to an
11       entirely different body of rules than the other Bill of
12       Rights guarantees.   McDonald, 561 U.S. at 780 (plurality
13       opinion).   We know of no other constitutional right than
14       an individual may exercise only after demonstrating to
15       government officials some special need. That is not how
16       the First Amendment works when it comes to unpopular
17       speech or the free exercise of religion. It is not how
18       the Sixth Amendment works when it comes to a defendant's
19       right to confront the witnesses again him.   And it is
20       not how the Second Amendment works when it comes to
21       public carry for self-defense.
22  Bruen, 63.
23       Against this newly, and sternly, articulated backdrop it is
24  clear the prosecution should not have been allowed to introduce
25  evidence in aggravation of the simple – and historically always
26  constitutionally lawful – fact that Petitioner was simply carrying
27  a firearm on that fateful day.   After all, as a Black man he
28

1 clearly should have enjoyed the right to carry a firearm just as
2 all others did.

3 　　　Petitioner moves now for leave to amend his federal petition
4 to incorporate this further, important, allegation.  Use of this
5 simple fact as evidence in aggravation of sentence was a
6 constitutional violation and it further invalidates Petitioner's
7 sentence of death.

8 　　　Under Rose v. Lundy, 455 U.S. 509 (1982), Petitioner may not
9 add an unexhausted claim to his petition, or he will face dismissal
10 for proceeding with a "mixed" petition.[1]

11 　　　Normally in order to amend a pending federal petition to add
12 an unexhausted claim, a petitioner is compelled to return to state
13 court to exhaust that claim. Rhines v. Weber, 544 U.S. 269 (2005).
14 He should ensure the ongoing vitality of the federal petition, or
15 if it is dismissed he risks violating the statutory requirements
16 set forth in AEDPA. See Duncan v. Walker, 533 U.S. 167, 181-82
17 (2001); 28 U.S.C. 2254(b)(1)(A), 2244(d).

18 　　　A petitioner who has not exhausted a claim must normally show
19 good cause for failing to do so earlier.  Here the Supreme Court's
20 decision in Bruen could not have been anticipated earlier in this
21 proceedings. Petitioner is acting as promptly as possible now that
22 this new doctrine has been announced by the Supreme Court.

23 　　　However, exhaustion is not always necessary, nor is it
24 jurisdictional.  If Respondent elects to concede futility of any
25 further state proceedings, this matter may properly remain active

---

[1] There is no debate as to Petitioner's other pending claims; they are all exhausted.

in the federal arena and this claim may properly be added to the already pending petition. Ex Parte Hawk, 321 U.S. 114, 117 (1944); Granberry v. Greer, 481 U.S. 129, 135-36 (1987).

Absent an indication by Respondent of such a willingness, Petitioner will and hereby does move this Honorable Court for an order staying further proceedings in this matter pending exhaustion of this further and important new claim based upon the U.S. Supreme Court's decision in Bruen.

### III.
### CONCLUSION

Based upon the points and authorities discussed herein, Petitioner respectfully asks that this Honorable Court stay this proceeding pending exhaustion before the California Courts of his new federal constitutional claim based upon Bruen.

Since this goes straight to validity of Claim One of the pending petition, and that is the only claim which is still pending briefing, abeyance of this matter is fully and properly warranted at this time.

Respectfully submitted,

Dated: June 27, 2022          s/Phillip A. Treviño