ROB BONTA
Attorney General of California
LANCE E. WINTERS
Chief Assistant Attorney General
JAMES WILLIAM BILDERBACK II
Senior Assistant Attorney General
ALICE B. LUSTRE
Supervising Deputy Attorney General
ERIC D. SHARE
Supervising Deputy Attorney General
State Bar No. 151230
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3858
 Fax:  (415) 703-1234
 E-mail:  Eric.Share@doj.ca.gov
*Attorneys for Respondent*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| **ERNEST EDWARD DYKES,**<br><br>Petitioner,<br><br>v.<br><br>**RON BROOMFIELD, Acting Warden of San Quentin State Prison,**<br><br>Respondent. | 11-CV-04454-SI<br><br>**DEATH PENALTY CASE**<br><br>**Opposition to Petitioner's Application to Stay Proceedings While He Exhausts New Claim in State Court**<br><br>Judge:   The Honorable Susan Illston<br>           United States District Court |

# TABLE OF CONTENTS

Page

Argument ........................................................................................................................................ 1

    Petitioner's Application for a Stay Should Be Denied Because His Proposed New Claim Is Plainly Meritless ................................................................................................... 1

    A.    Petitioner's Proposed New Claim ................................................................... 1

    B.    Under *Rhines*, Stay and Abeyance Can Be Denied When a New Claim is Plainly Meritless ............................................................................................... 2

    C.    The Evidence in Aggravation Was Not Simply that Petitioner Possessed a Firearm, it Was that His Possession of the Firearm Involved a Threat or Implied Threat of Violence to a Peace Officer ............................................... 4

    D.    The United States Supreme Court Did Not Hold that Citizens Have Had an Unfettered Constitutional Right to Carry Concealed Weapons Outside the Home ................................................................................................................ 8

    E.    Should this Court Determine that Petitioner Can State a New Claim for Relief, He Must First Exhaust the Claim in the California State Courts ............. 13

Conclusion .................................................................................................................................... 14

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Baldwin v. Reese*
  541 U.S. 27 (2004) .................................................................................................................. 14

*Cassett v. Stewart*
  406 F.3d 614 (9th Cir. 2005) ................................................................................................. 3, 4

*Clinton v. Jones*
  520 U.S. 681, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997) ........................................................... 2

*District of Columbia v. Heller*
  554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008) ................................................ 9, 10, 11

*Dixon v. Baker*
  847 F.3d 714 (9th Cir. 2017) ..................................................................................................... 3

*Duncan v. Henry*
  513 U.S. 364, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) ....................................................... 13, 14

*Konigsberg v. State Bar of Cal.*
  366 U.S. 36, 81 S.Ct. 997 (1961) .............................................................................................. 9

*Landis v. North American Co.*
  299 U.S. 248, 57 S.Ct. 163, 81 L.Ed. 153 (1936) ..................................................................... 2

*McDonald v. Chicago*
  561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010) ......................................................... 11

*New York State Rifle & Pistol Association, Inc., et al., v. Bruen*
  579 U.S. __ (June 23, 2022) .............................................................................................. *passim*

*O'Sullivan v. Boerckel*
  526 U.S. 838, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999) ............................................................. 14

*People v. Dykes*
  46 Cal.4th 731 (2009) ........................................................................................................ *passim*

*People v. Michaels*
  28 Cal.4th 486 (2002) ............................................................................................................... 6

*People v. Tuilaepa*
  4 Cal.4th 569 (1992) ................................................................................................................. 5

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Picard v. Connor*
    404 U.S. 270 (1971) .......................................................................................... 13

*Rhines v. Weber*
    544 U.S. 269, 92 S.Ct. 509, 30 L.Ed.2d 438 (2005) ......................................... *passim*

*Rose v. Palmateer*
    395 F.3d 1108 (9th Cir. 2005) ............................................................................ 14

*Tilcock v. Budge*
    538 F.3d 1138 (9th Cir. 2008) .............................................................................. 3

*United States v. Miller*
    307 U.S. 174, 59 S.Ct. 816, 83 L.Ed.2d 1206 (1939) ......................................... 9

**STATUTES**

28 U.S.C.
    § 2254(b)(1) ....................................................................................................... 13
    § 2254(b)(1)(A) ................................................................................................... 2
    § 2254(d)(1) ........................................................................................................ 2

Antiterrorism and Effective Death Penalty Act of 1996 ............................................. 2, 3

California Penal Code
    § 190.3 .................................................................................................................. 5
    § 12025 ................................................................................................................. 6
    § 12025, subd. (a) ................................................................................................ 6
    § 12031, subd. (a) ................................................................................................ 6
    § 12031, subd. (a)(1) ........................................................................................... 6

**CONSTITUTIONAL PROVISIONS**

United States Constitution
    Second Amendment ................................................................................... *passim*
    Eighth Amendment ............................................................................................. 5
    Fourteenth Amendment .................................................................................... 5, 8

**OTHER AUTHORITIES**

D. Kopel & J. Greenlee, The 'Sensitive Places' Doctrine, 13 Charleston L. Rev.
    205, 229–236, 244–247 (2018) ......................................................................... 11

Petitioner has filed an application to stay proceedings in this Court on his petition for a writ of habeas corpus challenging his state court sentence of death while he exhausts a new claim in the California state courts based on the United States Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc., et al., v. Bruen*, 579 U.S. __ (June 23, 2022), 2022 WL 2251305. (Dkt. No. 134.) Petitioner asserts that in the penalty phase of his capital trial, an uncharged circumstance advanced by the prosecution in aggravation centered on his possession of a concealed and loaded firearm. He contends that under *Bruen*, he now should be allowed to amend Claim One of his petition to allege that admission of this evidence was improper and, as a result, this was a further constitutional defect in his sentence of death. (Dkt. 134 at 2.) In order to raise the claim in his federal petition, he recognizes that he would first need to exhaust the claim in the California state courts. Petitioner's purported new claim, however, is based on a misreading of both the evidence that was admitted against him at the penalty phase of his state court trial and of the United States Supreme Court's decision in *Bruen*. Therefore, respondent opposes petitioner's request to amend his petition and his application for a stay.

## ARGUMENT

**PETITIONER'S APPLICATION FOR A STAY SHOULD BE DENIED BECAUSE HIS PROPOSED NEW CLAIM IS PLAINLY MERITLESS**

**A.    Petitioner's Proposed New Claim**

As framed by petitioner in his application for a stay, at the penalty phase of his capital trial evidence was introduced that on a prior occasion, before the murder and attempted murder for which he was sentenced to death, he had possessed a gun. Under the Supreme Court's decision in *Bruen*, 2022 WL 2251305, he asserts, admission of the evidence violated his constitutional rights because the Second Amendment to the United States Supreme Court guaranteed a broad right for citizens to carry concealed firearms outside of their homes. More specifically, he contends:

> At his capital sentencing trial there was a single uncharged circumstance advanced by the prosecution in aggravation. It centered on Petitioner's possession of a concealed loaded firearm. The gun was found by a police officer who had just patted down Petitioner, having first had him remove his gloves and place them atop the officer's squad car. It was after Petitioner had already been placed in the squad

1

> car, without incident or any threat of violence, that the officer determined that Petitioner had left a firearm inside the gloves Petitioner had left behind and on top of the squad car.  Petition for a Writ of Habeas Corpus, at paragraph 107, p. 53.
>
> Notably, at no time did Petitioner brandish or otherwise display the firearm. Yet the fact he was carrying a firearm was used as evidence in aggravation against him in his capital sentencing trial.  Based upon the *Bruen* decision, Petitioner should be allowed now to amend Claim One of his petition to allege this as a further constitutional defect in his sentence of death.

(Dkt. 134 at 2.)

As to the Supreme Court's *Bruen* decision, petitioner concludes: "Against this newly, and sternly, articulated backdrop it is clear the prosecution should not have been allowed to introduce evidence in aggravation of the simple—and historically always constitutionally lawful—fact that Petitioner was simply carrying a firearm on that fateful day.  After all, as a Black man he clearly should have enjoyed the right to carry a firearm just as all others did." (Dkt. 134 at 6-7.)

**B.     Under *Rhines*, Stay and Abeyance Can Be Denied When a New Claim is Plainly Meritless**

A District Court cannot grant relief on a claim in a federal habeas petition unless the claim has been exhausted in state court.  28 U.S.C. § 2254(b)(1)(A).  The court may, however, deny relief on an unexhausted claim.  28 U.S.C. § (b)(2).  The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provided that a one-year period of limitation shall apply to an application for federal writ of habeas corpus.  28 U.S.C. § 2254(d)(1).  In limited circumstances, a District Court can stay a petition while a petitioner exhausts a claim in the state courts.  Thus, the United States Supreme Court has held: "District courts ordinarily have authority to issue stays, see *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936), where such a stay would be a proper exercise of discretion, see *Clinton v. Jones*, 520 U.S. 681, 706, 117 S.Ct. 1636, 137 L.Ed.2d 945 (1997)." *Rhines v. Weber*, 544 U.S. 269, 276 (2005).  The AEDPA "does not deprive district courts of that authority, cf. 28 U.S.C. § 2254(b)(1)(A) ('An application for a writ of habeas corpus . . . shall not be *granted* unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" (emphasis added)), but it does circumscribe their discretion.  Any solution to this problem must therefore be compatible with AEDPA's purposes." *Rhines*, 544 U.S. at 276.

2

In *Rhines*, the United States Supreme Court sanctioned the use of "stay and abeyance" procedures "*only in limited circumstances*." *Rhines*, 544 U.S. at 277 (emphasis added). Recognizing that the "twin purposes" of the AEDPA of streamlining and encouraging finality of federal habeas proceedings would be undermined by frequent employment of a "stay and abeyance" procedure, the Supreme Court prescribed certain conditions that a petitioner must meet in order to justify imposition of a stay. *Ibid*. First, "stay and abeyance is only appropriate when the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court." *Ibid*. Second, even where good cause is found, stay and abeyance is warranted only if the claims are not "*plainly meritless*." *Ibid*., emphasis added. Third, a stay is inappropriate "if a petitioner engages in abusive litigation tactics or intentional delay." *Id*. at 278.

In *Dixon v. Baker*, 847 F.3d 714 (9th Cir. 2017) the Ninth Circuit Court of Appeals held, consistent with *Rhines*, that "[a] federal habeas petitioner must establish that at least one of his unexhausted claims is not 'plainly meritless' in order to obtain a stay under *Rhines*. 544 U.S. at 277, 125 S.Ct. 1528." *Id*. at p. 722. The standard for judging whether a claim is "plainly meritless" for *Rhines* purposes is lenient. "In determining whether a claim is 'plainly meritless,' principles of comity and federalism demand that the federal court refrain from ruling on the merits of the claim unless 'it is perfectly clear that the petitioner has no hope of prevailing.'" *Dixon*, 847 F.3d at 722, quoting *Cassett v. Stewart*, 406 F.3d 614, 624 (9th Cir. 2005). In other words, a federal court may forego a *Rhines* stay and proceed to deny an unexhausted claim on the merits "only when it is perfectly clear that the applicant does not raise even a colorable federal claim." *Cassett*, 406 F.3d at 623-24. A claim is "colorable" when the petitioner has "alleged specific facts that, if true, would entitle him to relief." *Tilcock v. Budge*, 538 F.3d 1138, 1145-46 (9th Cir. 2008).

The decision whether to grant a petitioner's request to stay proceedings is subject to the district court's discretion. *Rhines*, 544 U.S. at 276-79. For example, an abuse of discretion will be found where a stay is granted even though the petitioner's claims are "plainly meritless." *Ibid*. at 277. On the other hand, denial of a stay where the petitioner has good cause for a failure to

exhaust, the claims are "potentially meritorious," and there is "no indication that the petitioner engaged in intentionally dilatory litigation tactics," will constitute an abuse of discretion. *Ibid.*

As respondent will show below, petitioner's proposed new claim is premised on a mischaracterization of both the evidence that was introduced against him in aggravation at the penalty phase of his trial and of the holding of the United States Supreme Court's decision in *Bruen*. As a result, it is "perfectly clear" that he does not raise even a colorable federal claim. *Cassett*, 406 F.3d at 623-24. Thus, under *Rhines*, this court can and should deny his application for stay and abeyance.

### C. The Evidence in Aggravation Was Not Simply that Petitioner Possessed a Firearm, it Was that His Possession of the Firearm Involved a Threat or Implied Threat of Violence to a Peace Officer

Petitioner represents that the evidence introduced in aggravation at the penalty phase of his trial was simply that on an occasion prior to the murder and attempted murder at issue, he possessed a concealed and loaded firearm. Thus, as he frames it in his application for a stay, "the fact he was carrying a firearm was used as evidence in aggravation against him in his capital sentencing trial." (Dkt. 134 at 2.) This mischaracterizes and minimizes the evidence that was introduced against him. The evidence, instead, focused not on his mere possession of the firearm, but on the fact that his possession of the concealed and loaded firearm involved a threat or implied threat of violence to a peace officer.

As described by the California Supreme Court in its opinion in petitioner's direct appeal, the prosecution presented evidence that on December 16, 1991, prior to the murder and attempted murder at issue in the capital case, petitioner was detained on grounds not specified at trial. It was stipulated, however, that petitioner's "detention and arrest . . .[was] based on legal cause." *People v. Dykes*, 46 Cal.4th 731, 776 (2009). Oakland Police Officer Rand Monda testified that he exited from his vehicle and approached petitioner, who was wearing dark clothing, including a cap, "a dark puffy black jacket with a hood over his head, [and] . . . large black ski gloves. . . ." *Ibid*. The officer directed petitioner to identify himself, and he noticed that petitioner was "fidgeting." *Ibid*. In the absence of any request by the officer, petitioner removed his cap and gloves and placed them on the roof of the patrol vehicle. Officer Monda patted petitioner down

4

for the officer's safety and noticed that one of petitioner's gloves contained a firearm. The weapon was a loaded and cocked .25–caliber semiautomatic firearm. One round was in the chamber of the weapon, and three rounds were in the clip. *Ibid.* Officer Monda requested that petitioner sit in the back of the patrol vehicle while the officer checked for outstanding warrants and called for backup. Petitioner was not handcuffed. *Ibid.* Officer Monda recalled that petitioner had shouted at him from inside the vehicle when Officer Monda retrieved the weapon. The officer testified that the incident was memorable, because he had not observed the weapon at the beginning of the encounter and "could have been shot." *Ibid.* He explained: "Well, he had the . . . large ski glove in his hands. He had his hand in the glove and his gun, the gun was in his hand and he could have shot me and I didn't even see it. I wouldn't have even seen it coming." *Ibid.* Officer Monda thereafter transported petitioner to jail. *Ibid.*

In the California Supreme Court, petitioner claimed that the evidence was inadmissible in the penalty phase of his trial because the incident did not involve a threat or implied threat of violence under California Penal Code section 190.3, factor (b). *Dykes*, 46 Cal.4th at 776. That section permits the introduction of evidence in aggravation consisting of "[t]he presence . . . of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Petitioner contended that an interpretation of California Penal Code section 190.3, factor (b), that would permit the admission of the evidence that was used against heightened the risk of the arbitrary imposition of the death penalty in violation of the Eighth and Fourteenth Amendments to the United States Constitution. *Dykes*, 46 Cal.4th at 776.

The California Supreme Court rejected petitioner's argument. That Court held that evidence establishing that a defendant knowingly possessed a potentially dangerous weapon while in custody was admissible under California Penal Code section 190.3, factor (b), even when the defendant had not used the weapon or displayed it with overt threats. *Dykes*, 46 Cal.4th at 776-77; see also *People. Tuilaepa*, 4 Cal.4th 569, 589 (1992). As the Court explained:

> Even in a noncustodial setting, illegal possession of potentially dangerous weapons may "show[ ] an implied intention to put the weapons to unlawful use," rendering the evidence admissible pursuant to section 190.3, factor (b). (*People v.*

5

*Michaels* (2002) 28 Cal.4th 486, 536.) For example, in the *Michaels* case, evidence was presented that the defendant had been discovered with a firearm concealed in the glove compartment of his parked vehicle and had been arrested for unlawful possession of knives on prior occasions. We noted the criminal character of the defendant's possession of these weapons, adding that similar knives had been used in charged offenses and that the concealed firearm had been employed in a robbery committed one day before the discovery of the weapon in the defendant's vehicle. Citing all of these circumstances, we concluded that the trial court did not err in admitting the prosecution's evidence for the purpose of demonstrating the defendant's commission of a prior crime involving the threat of violence. The defendant, we pointed out, was free to present evidence upon which the jury could base a contrary conclusion, such as "evidence .to show that his possession was for the purpose of self-protection, or the protection of someone else, not for criminal violence." (*Ibid.*)

*Dykes*, 46 Cal.4th at 777.

The California Supreme Court explained that "[s]imilarly, in the present case, the jury legitimately could infer an implied threat of violence from all the circumstances, including the 'criminal character of [petitioner's] possession' (*People v. Michaels*, *supra*, 28 Cal.4th at p. 536; see [Cal. Pen. Code,] §§ 12025, subd. (a), 12031, subd. (a)), *the concealment of the loaded and cocked weapon in a manner that rendered it available for instant, surprise use*, and [*petitioner's*] *use of a similar firearm in committing the present offense*." *Dykes*, 46 Cal.4th at 777, emphasis added.[1]

In the California Supreme Court, petitioner contended that his possession of a firearm ordinarily was not illegal, that his possession would have been legal had he obtained a special permit to carry a concealed weapon, and that in some states permits are not required for the possession of concealed and loaded firearms. The Court rejected those contentions stating that they did "not detract from the conclusion that a jury could determine that defendant's possession

---

[1] Former California Penal Code section 12025 provided in relevant part:

"(a) A person is guilty of carrying a concealed firearm when he or she does any of the following:

[¶] . . . [¶]

(2) Carries concealed upon his or her person any pistol, revolver, or other firearm capable of being concealed upon the person.

Former California Penal Code section 12031, subdivision (a)(1), provided: "A person is guilty of carrying a loaded firearm when he or she carries a loaded firearm on his or her person or in a vehicle while in any public place or on any public street in an incorporated city or in any public place or on any public street in a prohibited area of unincorporated territory."

of a loaded and concealed firearm, without the permit required in California, constituted a crime, and that an inference of an *implied threat of violence* properly could be drawn from the circumstances of the incident." *Dykes*, 46 Cal.4th at 777, emphasis added.

The California Supreme Court noted that petitioner made a brief reference to the Second Amendment to the United States Constitution, "commenting that '[g]enerally, a defendant may lawfully possess a firearm,' and surmising that it is 'doubtful that the mere carrying of a firearm constitute[s] an implied that of force or violence' and that the circumstance 'that in California, such carrying is unlawful and constitutes a misdemeanor, does not transform the conduct from one of innate self-protection into a threat against others.'" *Dykes*, 46 Cal.4th at 777-78. The Court did note that at that time petitioner did not contend that the California statutes prohibiting possession of a concealed, loaded firearm in a public place are void under the Second Amendment. "He merely suggests that, because persons have a right to bear arms, their possession of a firearm does not, in itself, suggest a threat of violence." *Id*. at 778. The Court found that an argument based on the Second Amendment would be unpersuasive, however, because it had concluded "that the evidence in the present case would permit the jury to infer an implied threat of violence." *Ibid*.

Thus, it is evident that this was not a case in which evidence had been introduced merely that petitioner was found to be in possession in a public place with a concealed firearm on his person and that evidence was used against him in aggravation. Rather, it was uncontested that petitioner had been properly detained and was in police custody. The firearm was not simply in a holster or on his person in a typical place where one might be expected to carry a firearm; it was in petitioner's glove, and petitioner had just had his hand in the glove when he was in the officer's immediate presence. Also, the firearm presented a particular danger to the police officer in that it was a loaded and cocked .25–caliber semiautomatic firearm with one round in the chamber and three rounds in the clip. Moreover, there was no evidence that petitioner made the officer aware of the presence of the firearm during the detention; the officer discovered it on his own.

In sum, petitioner's mischaracterization and minimization of the evidence that was admitted against him in aggravation must be rejected. As will be shown below, this incorrect

7

1  representation of the evidence compels the conclusion that the *Bruen* decision has no impact on
2  petitioner's case.

> **D. The United States Supreme Court Did Not Hold that Citizens Have Had an Unfettered Constitutional Right to Carry Concealed Weapons Outside the Home**

Petitioner's request for a stay also is based on a misreading and misunderstanding of the scope of the United States Supreme Court's holding in *Bruen*. The Court did not hold that under the Second Amendment citizens always have had an unfettered Constitutional right to carry concealed weapons outside the home. Rather, the Court addressed the permissible requirements states constitutionally may impose on citizens applying for licenses to carry concealed weapons outside the home. It held that the requirements in six states were unduly and unconstitutionally stringent. As a result of petitioner's misinterpretation of *Bruen*, petitioner's contention that *Bruen* entitles him to a stay and abeyance to exhaust a new claim in the state courts also is legally meritless.

In *Bruen*, the Supreme Court held that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense outside the home. *Bruen*, 2022 WL 2251305 at *5. The Court stated that the dispute in the case was whether New York's *licensing regime* respects the constitutional right to carry handguns publicly for self-defense. *Ibid*. As the Court explained, "In 43 States, the government issues licenses to carry based on objective criteria. But in six States, including New York, the government further conditions issuance of a license to carry on a citizen's showing of some additional special need." *Ibid*. The Court held: "Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution." *Ibid*.

In defining what was at issue in the case, the court explained that the "vast majority of States—43 by our count—are 'shall issue' jurisdictions, where authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability. Meanwhile, only six States and the District of Columbia have 'may issue; licensing laws, under

1  which authorities have discretion to deny concealed-carry licenses even when the applicant
2  satisfies the statutory criteria, usually because the applicant has not demonstrated cause or
3  suitability for the relevant license." *Bruen*, 2022 WL 2251305 at *6, fn. omitted.  California is
4  one of the six states.  *Ibid*.

5      The Supreme Court engaged in an extensive discussion of the Second Amendment and,
6  although concluding that an individual's right to bear arms is broad, it notably also held that
7  "'"[l]ike most rights, the right secured by the Second Amendment is not unlimited.' [*District of
8  Columbia v. Heller*, 554 U.S. 570] at 626, 128 S.Ct. 2783 (2008). 'From Blackstone through the
9  19th-century cases, commentators and courts routinely explained that the right was not a right to
10  keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'
11  *Ibid*. For example, we found it 'fairly supported by the historical tradition of prohibiting the
12  carrying of "dangerous and unusual weapons"' that the Second Amendment protects the
13  possession and use of weapons that are ' "in common use at the time."' *Id*., at 627, 128 S.Ct.
14  2783 (first citing 4 W. Blackstone, Commentaries on the Laws of England 148–149 (1769); then
15  quoting *United States v. Miller*, 307 U.S. 174, 179, 59 S.Ct. 816, 83 L.Ed. 1206 (1939))." *Bruen*,
16  2022 WL 2251305 at *9.

17      The Supreme Court set out the standard for applying the Second Amendment to state's
18  regulations. "We reiterate that the standard for applying the Second Amendment is as follows:
19  When the Second Amendment's plain text covers an individual's conduct, the Constitution
20  presumptively protects that conduct. The government must then justify its regulation by
21  demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.
22  Only then may a court conclude that the individual's conduct falls outside the Second
23  Amendment's 'unqualified command.' *Konigsberg* [*v. State Bar of Cal.*], 366 U.S. [36] at 50,
24  n. 10, 81 S.Ct. 997 [(1961)]." *Bruen*, 2022 WL 2251305 at *11. The Court found that the
25  Second Amendment's plain text presumptively guaranteed the petitioners in the case a right to
26  "bear" arms in public for self-defense. *Id*. at *15.

27      The Supreme Court also explained that it's holding was *not* that all state licensing laws
28  would be unconstitutional as an infringement on a citizen's right to bear arms in public for self-

9

defense. Rather, it was only that laws such as New York's that imposed a "proper-cause requirement" did not pass constitutional muster.

> Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late-19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense. We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper-cause requirement. Under *Heller*'s text-and-history standard, the proper-cause requirement is therefore unconstitutional.

*Bruen*, 2022 WL 2251305 at *18, footnote omitted. In a footnote, the Court reiterated that it was not invalidating all state laws that would require a citizen to obtain a license before carrying a concealed weapon in pubic for self-defense, even were those laws to place burdens on applicants such as requiring them to undergo background check or pass a firearms safety course.

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which "a general desire for self-defense is sufficient to obtain a [permit]." *Drake v. Filko*, 724 F.3d 426, 442 (CA3 2013) (Hardiman, J., dissenting). Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent "law-abiding, responsible citizens" from exercising their Second Amendment right to public carry. *District of Columbia v. Heller*, 554 U.S. 570, 635, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). Rather, it appears that these shall-issue regimes, which often require applicants to undergo a background check or pass a firearms safety course, are designed to ensure only that those bearing arms in the jurisdiction are, in fact, "law-abiding, responsible citizens." *Ibid*. And they likewise appear to contain only "narrow, objective, and definite standards" guiding licensing officials, *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), rather than requiring the "appraisal of facts, the exercise of judgment, and the formation of an opinion," *Cantwell v. Connecticut*, 310 U.S. 296, 305, 60 S.Ct. 900, 84 L.Ed. 1213 (1940)—features that typify proper-cause standards like New York's. That said, because any permitting scheme can be put toward abusive ends, we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry.

*Bruen*, 2022 WL 2251305 at *18, n. 9.

The Supreme Court further noted that states still even had the authority to ban the carrying of concealed weapons in certain "sensitive places." *Bruen*, 2022 WL 2251305 at *14. It referenced *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." *Heller*, 554 U.S. at 626. It stated:

10

"Although the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. See D. Kopel & J. Greenlee, The 'Sensitive Places' Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018); see also Brief for Independent Institute as Amicus Curiae 11–17. We therefore can assume it settled that these locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of 'sensitive places' to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible." *Bruen*, 2022 WL 2251305 at *14.

Concurring opinions in *Bruen* further emphasized that the Court's majority opinion did not establish an unfettered, unrestricted, and unconstrained right to carry a concealed firearm in public for self-defense without a license. In his concurring opinion, Justice Alito stated: "Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald v. Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), about restrictions that may be imposed on the possession or carrying of guns." *Bruen*, 2022 WL 2251305 at *34 (Alito, J., concurring); see also *id*. at *37 ("All that we decide in this case is that the Second Amendment protects the right of law-abiding people to carry a gun outside the home for self-defense and that the Sullivan Law, which makes that virtually impossible for most New Yorkers, is unconstitutional").

In his concurring opinion, Justice Kavanaugh, joined by the Chief Justice, also reiterated the limits on the Court's opinion. He stated:

> I join the Court's opinion, and I write separately to underscore two important points about the limits of the Court's decision.
>
> First, *the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense*. In particular, the Court's decision does not affect the existing licensing regimes—known as "shall-issue" regimes—that are employed in 43 States.

> The Court's decision addresses only the unusual discretionary licensing regimes, known as "may-issue" regimes, that are employed by 6 States including New York. As the Court explains, New York's outlier may-issue regime is constitutionally problematic because it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense. Those features of New York's regime—the unchanneled discretion for licensing officials and the special-need requirement—in effect deny the right to carry handguns for self-defense to many "ordinary, law-abiding citizens." *Ante*, at ——; see also *Heller*, 554 U.S. at 635, 128 S.Ct. 2783. The Court has held that "individual self-defense is 'the central component' of the Second Amendment right." *McDonald*, 561 U.S. at 767, 130 S.Ct. 3020 (quoting *Heller*, 554 U.S. at 599, 128 S.Ct. 2783). New York's law is inconsistent with the Second Amendment right to possess and carry handguns for self-defense.
>
> By contrast, 43 States employ objective shall-issue licensing regimes. Those shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. Brief for Arizona et al. as Amici Curiae 7. Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. As petitioners acknowledge, shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice. Tr. of Oral Arg. 50−51.
>
> Going forward, therefore, the 43 States that employ objective shall-issue licensing regimes for carrying handguns for self-defense may continue to do so. Likewise, the 6 States including New York potentially affected by today's decision may continue to require licenses for carrying handguns for self-defense so long as those States employ objective licensing requirements like those used by the 43 shall-issue States.

*Bruen*, 2022 WL at 2251305 at *38-*39 (Kavanaugh, J. concurring), emphasis added.

Thus, although undoubtedly a highly significant case, *Bruen* simply does not stand for the legal proposition petitioner thinks it does. All the Justices who joined the majority opinion and wrote concurrences made clear that *Bruen* is a case about the licensing requirements states may impose on citizens before permitting them to carry concealed weapons in public. It does not create a new constitutional right, nor recognize a constitutional right that has always existed, for citizens to carte blanche carry a concealed weapon in public. Consequently, petitioner errs when he asserts that now, under *Bruen*, he can bring a new claim that the "prosecution should not have been allowed to introduce evidence in aggravation of the simple—and historically always constitutionally lawful—fact that Petitioner was simply carrying a firearm on that fateful day. After all, as a Black man he clearly should have enjoyed the right to carry a firearm just as all others did." (Dkt. 134 at 6-7.)

Since *Bruen* is a case about licensing requirements, it is important to reiterate what the California Supreme Court opinion in petitioner's direct appeal stated: "In the California Supreme Court, petitioner contended that his possession of a firearm ordinarily is not illegal, that his possession would have been legal *had* he obtained a special permit to carry a concealed weapon . . . ." *Dykes*, 46 Cal.4th at 777, emphasis added. The Court also noted that petitioner did not contend that the California statutes prohibiting possession of a concealed, loaded firearm in a public place were void under the Second Amendment. "He merely suggests that, because persons have a right to bear arms, their possession of a firearm does not, in itself, suggest a threat of violence." *Id*. at 778. This was an explicit concession in the California Supreme Court that petitioner did not have a license to carry a concealed weapon on the date of the incident in question. Notably, in his application for a stay in this Court, petitioner does not contend that his claim, should he return to the California Supreme Court, would be that under the United States Supreme Court's analysis in *Bruen,* he had applied for, and unconstitutionally been denied by California, a license to carry a concealed firearm prior to the incident in question. For this reason too, his proposed new claim would not implicate *Bruen*.

In sum, because petitioner's proposed new claim is factually and legally without basis, this court under *Rhines* can deny his application for a stay and abeyance for him to exhaust the claim in the state court as it is "plainly meritless." *Rhines*, 544 U.S. at 278.

E.   **Should this Court Determine that Petitioner Can State a New Claim for Relief, He Must First Exhaust the Claim in the California State Courts**

Should this Court conclude that under *Bruen* appellant factually and legally can state a new constitutional claim for federal habeas relief, respondent agrees that he must first exhaust the claim in the California state courts. "Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the ""'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights.""" *Duncan v. Henry*, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971). To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each

13

appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. *Duncan*, *supra*, at 365–366, 115 S.Ct. 887; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S.Ct. 1728, 144 L.Ed.2d 1 (1999)." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); see also *Rose v. Palmateer*, 395 F.3d 1108, 1110 (9th Cir. 2005).

Due to the nature of petitioner's claim, and the new United States Supreme Court authority upon which it is based, it has not been presented to the California state courts, and those courts have not had an opportunity to consider it. Thus, for it to be considered by this Court, it would first have to be presented to the state courts, and the present proceedings in this Court would have to be stayed and abated under *Rhines*.[2]

**CONCLUSION**

Accordingly, this Court should deny petitioner's application for a stay and abeyance to exhaust a new claim in the California state courts.

Dated: July 8, 2022                                           Respectfully submitted,

                                                              ROB BONTA
                                                              Attorney General of California
                                                              LANCE E. WINTERS
                                                              Chief Assistant Attorney General
                                                              JAMES WILLIAM BILDERBACK II
                                                              Senior Assistant Attorney General
                                                              ALICE B. LUSTRE
                                                              Supervising Deputy Attorney General

                                                              */s/ Eric D. Share*

                                                              ERIC D. SHARE
                                                              Supervising Deputy Attorney General
                                                              *Attorneys for Respondent*

---

[2] Should this Court deny petitioner's application for a stay, petitioner's supplemental brief on Claim One is now due. On June 19, 2022, the day before the supplemental brief was due, petitioner filed an ex parte application to extend the due date by one week to June 27, 2022. This Court granted the application. Dkt. 132 & 135. Petitioner's application was based on heat waves in France, disruptions in electric service, and several days of his business travel. Dkt. 132 at 2. Since those issues would presumably have been resolved by now, and counsel would have had additional time while this Court is considering his application for a stay, counsel should be able to file the supplemental brief upon any order denying the application for a stay.

# CERTIFICATE OF SERVICE

Case Name:  **Dykes v. Broomfield**   No.  **11-CV-04454-SI**

I hereby certify that on <u>July 8, 2022</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**OPPOSITION TO PETITIONER'S APPLICATION TO STAY PROCEEDINGS WHILE HE EXHAUSTS NEW CLAIM IN STATE COURT**

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 8, 2022</u>, at San Francisco, California.

| J. Wong | /s/ J. Wong |
|---|---|
| Declarant for eFiling | Signature |

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter.  I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service.  In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service with postage thereon fully prepaid that same day in the ordinary course of business.

I further certify that some of the participants in the case are not registered CM/ECF users.  On <u>July 8, 2022</u>, the foregoing document(s) have been mailed in the Office of the Attorney General's internal mail system, by First-Class Mail, postage prepaid to the following non-CM/ECF participants:

California Appellate Project
345 California Street
Suite 1400
San Francisco, CA  94104

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>July 8, 2022</u>, at San Francisco, California.

| S. Kowalski | /s/ S. Kowalski |
|---|---|
| Declarant for Service by U.S. Mail | Signature |